**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| RANDOLPH W. KEUCH, | : | CASE NO. 2:19-CV-05488 |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | (JUDGE JOHN M. GALLAGHER) |
| TEVA PHARMACEUTICALS USA, INC., | : | |
| And TEVA PHARMACEUTICAL | : | (Electronically Filed) |
| INDUSTRIES, Ltd., | : | |
| | : | |
| | : | |
| Defendants. | : | |

**Index of Items in Joint Appendix**

**A. Written Discovery Requests and Responses**

| Document Name | Discovery Bates Range | Joint Appx Bates Range |
|---|---|---|
| Defendants First Set of Document Requests to Plaintiff Regarding Plaintiff Randolph Keuch | | 0001-14 |
| Defendant First Set of Interrogatories to Plaintiff Regarding Plaintiff Randolph Keuch | | 0015-31 |
| Plaintiff's Answers to Defendants' First set of Interrogatories | | 0032-42 |
| January 11, 2022 Letter to Alan B. Epstein regarding Discovery Deficiencies | | 0043-47 |
| March 8, 2022 Response Email from Alan B. Epstein regarding Discovery Deficiencies | | 0048-50 |

**B. TEVA Bates Labeled Documents**

| Document Name | Discovery Bates Range | Joint Appx Bates Range |
|---|---|---|
| Keuch Employment Application | TEVA000035 -42 | 0051-58 |
| Keuch Offer Letter | TEVA000047-49 | 0059-61 |
| TUSA Employee Proprietary Information and Inventions Agreement | TEVA000069-73 | 0062-66 |
| Mark Sabag Update Email | TEVA000113-115 | 0067-69 |
| Keuch Dec. 20, 2017 Email and Attachments | TEVA000116-143 | 0070-97 |
| Keuch Dec. 14, 2017 Email and Attachments | TEVA000144-171 | 0098-125 |

| Keuch Unsigned Separation Agreement | TEVA000172-188 | 0126-142 |
| Teva Announcement Dec. 14, 2017 | TEVA000242-245 | 0143-146 |
| Teva PPT Dec. 14, 2017 Announcement | TEVA000246-258 | 0147-159 |
| Teva Code of Conduct | TEVA000518-561 | 0160-0203 |
| Dec. 21, 2017 Email Chain | TEVA000608-609 | 0204-205 |
| Topics for Ron | TEVA000748 | 0206 |
| Vitman Email | TEVA000768 | 0207 |
| Asaaf Email | TEVA000781-782 | 0208-209 |
| Eduardo Nasi Pay Increase | TEVA000853 | 0210 |

## C. KEUCH Bates Labeled Documents

| Document Name | Discovery Bates Range | Joint Appx Bates Range |
|---|---|---|
| Zorman Update | KEUCH000009-10 | 0211-0212 |
| Org Chart | KEUCH000017 | 0213 |
| Keuch Salary Increase | KEUCH000024 | 0214 |
| KEUCH Retention Bonus | KEUCH000028-29 | 0215-216 |
| Keuch Dec 14, 2017 Email and Attachments | KEUCH000050-78 | 0217-245 |
| Keuch Dec. 20, 217 Email Chain | KEUCH000079 | 0246 |
| Keuch Unsigned Separation Agreement with all Attachments | KEUCH000135-163 | 0247-267 |
| Keuch Separation Notification and Benefits Summary | KEUCH000183-184 | 0268-269 |
| Departing Employee Checklist | KEUCH000251-252 | 0270-271 |
| Keuch Email with L. Billow | KEUCH000388-389 | 0272-273 |
| Weinstein Pay Summary | KEUCH000514 | 0274 |

## D. Deposition Transcript Excerpts

| Document Name | Discovery Bates Range | Joint Appx Bates Range |
|---|---|---|
| Tal Zorman Deposition Transcript Excerpts | | 0275-299 |
| Mark Sabag Deposition Transcript Excerpts | | 0300-308 |
| Daniel Lawlor Deposition Transcript Excerpts | | 0309-313 |
| Randolph Keuch Deposition Transcript Excerpts | | 0314-346 |
| Eduardo Nasi Deposition Transcript Excerpts | | 0347-359 |

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| RANDOLPH W. KEUCH, | : | |
| | : | CASE NO. 2:19-CV-05488 |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| TEVA PHARMACEUTICALS USA, INC., | : | |
| And TEVA PHARMACEUTICAL | : | |
| INDUSTRIES, Ltd., | : | |
| | : | |
| | : | |
| Defendants. | : | |

## <u>DEFENDANTS' FIRST SET OF DOCUMENT REQUESTS ADDRESSED TO PLAINTIFF REGRADING PLAINTIFF RANDOLPH KEUCH</u>

Pursuant to Rule 34 of the Federal Rules of Civil Procedure, Defendants, Teva Pharmaceuticals USA, Inc. ("TUSA") and Teva Pharmaceutical Industries, Inc. ("TPI" and together with TUSA, the "Defendants"), request Plaintiff to produce the following documents within thirty (30) days from the date of service.

### Definitions

The following definitions are applicable to and incorporated by reference into each production request:

The following definitions are applicable to and incorporated by reference into each production request:

1.      The term "person," as used herein, means any natural person, partnership, corporation, or other business entity and all present and former officers, directors, agents, employees, attorneys and others acting or purporting to act on behalf of such natural person, partnership, corporation or other business entity.

2.      The term "Complaint," as used herein, means the Amended Complaint filed in the above-captioned action.

3.      The terms "Plaintiff," "you" and "your," as used herein, mean the named Plaintiff and each person acting or authorized to act on behalf of the named Plaintiff, including but not limited to Plaintiff's counsel.

4.      The term "Defendants," means, TUSA and TPI.

5.      The term "policy," as used herein, means each rule, procedure, or directive, formal or informal, and each common understanding of a course of conduct which was recognized as such by you or other persons acting on your behalf, that was in effect at any time during the period covered by these production requests.

6.      The terms "and" and "or," as used herein, shall be construed conjunctively or disjunctively as required to include within the scope of each discovery request any information that might be excluded by the opposite construction.

7.      The term "identify" or "identity" when used in reference to:

a.  An individual or natural person, means to give the person's full name; all known aliases; the present or the last known business and home addresses; present position or business affiliation, and position or business affiliation at all times during the time period covered by the Complaint;

b.  Any other "person" as defined herein, means to give the person's official, legal and formal name or the name under which the person acts or conducts business; the address of the person's place of business, profession, commerce or home; and the identity of the person's principal or chief executive officer or person who occupies the position most closely analogous to a chief executive;

2

c.  A document, means to describe specifically the "document," its date, its author (and, if different, the signer or signers), type of document (e.g., "letter"), each addressee and known recipient, its present or last known location and custodian, the manner and date of its disposition if any such "document" was, but is no longer, in your possession or subject to your control, and all other means of identifying it with  sufficient particularity to satisfy the requirements for its inclusion in a demand for its production pursuant to a subpoena duces tecum; and

d.  A communication, means to identify the pertinent "document" or "documents" if the communication is written, or to identify the participants and set forth the date, manner, place and substance of the communication if it is non-written.

8.      The term "document," as used herein, means the original and all copies of any written, printed, typed or other graphic matter of any kind or nature and any other tangible thing in your possession, custody or control, wherever located.  Any copy containing thereon or having attached thereto any alterations, notes, comments, or other material not included in the originals or copies referred to in the preceding sentence shall be deemed a separate document within the foregoing definition.  The term "documents" includes, but is not limited to:

a.  All contracts, agreements, letter agreements, representations, warranties, certificates and opinions;

b.  All letters or other forms of correspondence or communication, including envelopes and notes, telegrams, cables, telex messages, electronic communications and other messages, including reports, notes, notations and memoranda of or relating to telephone conversations or conferences;

3

      c.  All memoranda, reports, test results, financial statements or reports, notes, scripts, transcripts, tabulations, studies, analyses, evaluations, projections, work papers, corporate records or copies thereof, expressions or statements of policy, lists, comparisons, questionnaires, surveys, charts, graphs, summaries, extracts, statistical statements or records, compilations and opinions or reports of consultants;

      d.  All desk calendars, appointment books, logs and diaries;

      e.  All minutes, records or transcripts of meetings and conferences, and lists of persons attending meetings or conferences;

      f.  All reports and summaries of interviews and negotiations;

      g.  All books, articles, press releases, magazines, newspapers, booklets, brochures, pamphlets, circulars, bulletins, notices, instructions and manuals;

      h.  All motion pictures and photographs (whether developed or undeveloped), tape recordings, microfilms, phonographs, tapes or other records, punch cards, magnetic tapes, discs, data cells, drums, print-outs and other data compilations from which information can be obtained; and

      i.  Drafts of any document, revisions of drafts of any document and original or preliminary notes.

    9.    The term "communications," as used herein, means all statements, admissions, denials, inquiries, discussions, conversations, negotiations, agreements, contracts, understandings, meetings, telephone conversations, letters, correspondence, notes, telegrams, telexes, advertisements, or any other form of written or verbal intercourse.

10.     The term "relate(s) to," as used herein, means constitute(s), refer(s) to, reflect(s), concern(s), pertain(s) to or in any way logically or factually connect(s) with the matter described in the production request.

**Rules of Construction**

In construing these production requests:

1.     The singular shall include the plural and the plural shall include the singular.

2.     A masculine, feminine or neuter pronoun shall not exclude the others.

**Instructions**

1. To the extent any information for which these production requests call is unknown to you, so state, and set forth such remaining information as is known.  If any estimate can reasonably be made in place of unknown information, also set forth your best estimate, clearly designated as such, in place of unknown information, and describe the basis upon which the estimate is made.

2. To the extent you object to any production request, set forth all reasons for your objection.  If you claim privilege as a ground for not answering any production request in whole or in part, describe the factual basis for your claim of privilege in sufficient detail to permit the court to adjudicate the validity of the claim.  If you object in part to any production request, answer the remainder completely.

3. These production requests shall be deemed continuing and require additional responses if further information is obtained between the time the responses are served and the time of trial.  Such additional responses shall be served from time to time, but not later than 20 days prior to the first date fixed for trial, or immediately upon obtaining such information if it is first discovered thereafter.

4. If you no longer possess a requested document, explain the reason you no longer have it.

5.  If a requested document has been destroyed, indicate:

    a.  the reason for the destruction;

    b.  the date of destruction; and

    c.  the identity of the person who destroyed the document.

## REQUESTS FOR PRODUCTION OF DOCUMENTS

1.  Each and every document, item, material and thing identified in your Responses to Defendants' First Set of Interrogatories Addressed to Plaintiff Regarding Plaintiff Randolph Keuch

2.  All documents that you created and/or maintained as business or personal records, notes and/or diaries, including documentation, e-mails, text messages, notes, records, writings, and video or audio tape recordings, of communications, conversations, and/or discussions with any former or current supervisors, managers, agents, representatives or employees of Defendants, evidencing, supporting, refuting, referring or relating in any way to your claims in this case and/or your alleged employment at Defendants and/or separation from employment.

3.  All emails and other documents to or from Kåre Schultz that you have retained.

4.  All emails and other documents to or from Tal Zorman that you have retained.

5.  All emails and other documents to or from Eduardo Nasi that you have retained.

6.  All emails and other documents to or from Daniel Lawlor that you have retained.

7.  All emails and other documents to or from individuals who worked in Total Rewards that you have retained.

8.  All documents that support, evidence, refute, refer or relate in any way to the allegations in the Complaint.

9.  All documents that support, evidence, refute, refer or relate in any way to the damages and other relief you are seeking in this action, including but not limited to compensatory damages, back pay, front pay, insurance benefits, other benefits, actual damages, damages for pain, emotional distress, suffering and humiliation, punitive damages, attorney's fees, costs and expenses, injunctive relief and all other legal and equitable relief you are seeking.

10. All documents that you submitted to, filed with, sent to, referred to, provided to, or which you received from any administrative agency relating or referring in any way to the allegations in your Complaint against Defendants, including, but not limited to, intake forms, answers to questionnaires, charges, correspondence, notices, notes, memos, records, and statements by you, any witness or other former or current employees of Defendants.

11. All documents, including all medical, psychological, psychiatric, and counseling records and charts, identifying, showing, referring, or relating to all doctors, psychiatrists, psychologists, medical providers, hospitals, clinics, treatment centers, counselors, health care facilities and/or personnel, and all other persons, providers, or entities who saw, examined, treated and/or counseled you for any mental condition, mental injury, mental problem, mental distress, mental or emotional issues, mental anguish, anxiety, emotional distress, depression, mental pain and suffering, and/or any other mental state or condition you claim you suffered as a result of Defendants' conduct as alleged in your Complaint.

12. All documents, including all medical, psychological, psychiatric, and counseling records and charts, identifying, showing, referring, or relating to all doctors, psychiatrists, psychologists, medical providers, hospitals, clinics, treatment centers, counselors, health

care facilities and/or personnel, and all other persons, providers, or entities who saw, examined, treated and/or counseled you for any mental condition, mental injury, mental problem, mental distress, mental or emotional issues, mental anguish, anxiety, emotional distress, depression, mental pain and suffering, and/or any other mental state or condition at any point in your life.

13. All documents, including, but not limited to, federal, state and local income tax forms and returns, W-2 forms, and payroll check stubs, that show, evidence, relate or refer to all of your employers and/or self-employment, and the amount and all sources of income received by you, or accruing to you, from March 18, 2018 to the present.

14. All documents that evidence, support, relate or refer to your attempts to find new employment from March 18, 2018 to the present, including a list of the names and addresses of all such employers with whom you sought employment, copies of applications you submitted, documents showing where and when you applied and/or were interviewed for employment, and copies of advertisements for positions to which you responded or applied.

15. All documents identifying your employers, and any wages and salary, earnings, hours worked, insurance and other benefits, and terms and conditions of employment for any employment, or self-employment, that you now have, or previously had, from March 18, 2018 to the present time.

16. A copy of the financial statements evidencing the profits and losses, total revenue and amount of compensation or equity (if any) that you derive from any and all businesses, partnerships, companies, or organizations in which you, own, are a member of or have any ownership/management interest in.

17. All documents showing, relating, or referring to your claim(s) for and receipt of unemployment compensation benefits, if any, after March 18, 2018.

18. All documents that you contend support your belief that you were subjected to discrimination because of your age by Defendants during your alleged employment at Defendants and/or in connection with your separation from employment.

19. All documents showing, relating, or referring to your communications with Defendants as relates to the allegations in your Complaint.

20. All documents identified in your Initial Disclosures pursuant to Fed. R. Civ. P. 26(a).

21. All documents from or by you on electronic social media, including but not limited to Facebook, Twitter and Instagram, regarding Defendants or your alleged employment with or termination of employment by Defendants.  "Documents" as used in this request, specifically includes, but is not limited to, copies of all statements, posts, status updates, messages, comments, "tweets" and photographs.

22. All documents from or by you on electronic social media, including but not limited to Facebook, Twitter and Instagram regarding Kåre Schultz, Ron Yaniv, Daniel Lawlor, Tal Zorman or Eduardo Nasi.  "Documents" as used in this request, specifically includes, but is not limited to, copies of all statements, posts, status updates, messages, comments, "tweets" and photographs.

23. All documents that relate or pertain to all communications (except for communications solely between you and your lawyers) that you have had with any person regarding this action, and/or your allegations that you were treated wrongly or unlawfully by Defendants or one or more of their employees.

24. All documents showing, supporting, relating or referring to your claim that as a result of the allegations in the Complaint you are entitled to damages for "emotional distress and humiliation."

25. Regarding all experts retained and/or engaged on your behalf in connection with this action, provide all of the following documents (a) copies of each expert's resume and curriculum vitae, (b) all reports, correspondence, and other documents they prepared, relied on, produced, utilized, referred to, transmitted, or communicated in connection with this matter, including all drafts of reports, correspondence and other documents, including all mark ups of each, (c) all texts, treatises, or articles relied upon by your experts or which they intend to rely upon at trial, (d) all bills from each such expert witness, (e) all payments, and documents referring to payments, made to each expert witness and (f) each article and/or other writing published by each such expert in the last five years.

26. All agreements for the retention and/or engagement of each and every expert witness whose services you intend to utilize in connection with this action.

27. A list of all of the witnesses, including their addresses and phone numbers, whom you believe would support your claims in this matter and/or whom you would call to testify on your behalf at the trial in this case and/or depose or communicate with about this case.

28. All documents relating to your allegations in Paragraph 41 of your Complaint that Defendants implemented compensation policies that disfavored older employees.

29. All documents relating to your allegations in Paragraph 42 of your Complaint that Defendants raised the age of retirement in the 2010 and 2015 equity plans to adversely effect older employees.

30. All documents relating to your allegations in Paragraph 43 of your Complaint that Defendants instituted a punitive severance plan in 2017 that adversely affected older workers.

31. All documents relating to your allegations in Paragraph 43 of your Complaint that support your allegation that "US Teva leadership espoused a belief that those over age 62 would no longer be employable and could not properly apply for unemployment compensation benefits."

32. All documents relating to your allegations in Paragraph 44 of your Complaint that support your allegation that you witnessed age bias in Defendants hiring of employees.

33. All documents relating to your allegations in Paragraph 44 of your Complaint that support your allegation that Daniel Lawlor stated that a candidate working as a contractor did not have "long term potential" because of her advanced age.

34. All documents relating to any "alternate proposals" you allege you made as discussed in Paragraph 46 of your Complaint.

35. All documents supporting your allegation in Paragraph 46 of your Complaint that you volunteered to be relocated to Israel.

36. All documents supporting your allegation in Paragraph 47 of your Complaint that you would have accepted a demotion in lieu of termination.

37. All documents supporting your allegation in Paragraph 48 that Eduardo Nasi replaced you.

38. All documents supporting your allegation in Paragraph 51 of your Complaint that Mr. Nasi's employment "in your position" did not affect any monetary savings for Defendants.

39. Please complete and submit one fully executed original of the attached Authorization for Release of Medical Record Information of Randolph Keuch.

40. To the extent not previously produced in response to the other Requests contained herein, produce all documents that refer or relate to the allegations contained in the Complaint, Defendants' defenses thereto, the subject matter of the Complaint, and/or the relief sought by Plaintiff

**STEVENS & LEE, P.C.**

Dated: August 27, 2021                    By: *Brandon S. Shemtob*
                                               Larry J. Rappoport, Esquire
                                               Brandon S. Shemtob, Esquire
                                               STEVENS & LEE
                                               A PA Professional Corporation
                                               1500 Market Street, East Tower, Suite 1800
                                               Philadelphia, PA 19102
                                               Phone: (215) 751-1949
                                               Fax: (610) 371-7906

                                               *Attorneys for Defendants*

**STEVENS & LEE**
**AUTHORIZATION FOR RELEASE OF MEDICAL RECORD INFORMATION**[1]

I hereby authorize the release of my health information as listed below.

**Patient name:** Randolph W. Keuch   **Social Security No.** _____        **Date of Birth:**

**Address** _____

_____

**Telephone:** _____

**Provider or facility authorized to release information:**  Any health care provider or entity that has provided any medical, psychological, chiropractic or psychiatric services to Randolph Keuch.

**Person or entity authorized to receive information:**
Stevens & Lee P.C., 1500 Market Street, East Tower, Suite 1800, Philadelphia, PA 19102

**Dates of Service:**    ☒  All    ☐  Specific Dates of Service:

**Description of information:**

☒  Entire Record   ☒  Other:  All medical records, medical documents, medical charts, psychological records, psychiatric records, charts, prescriptions, reports, notes, diagnoses, prognoses, X-rays, test results, medical bills, statements of account, and all other documents and records in your possession pertaining to the care and treatment of Randolph Keuch.

**Special Records:**  Include the following medical records if such information is included in your records. Checking the boxes is not a representation that such information exists.

☒ Include drug and alcohol records    ☒ Include Mental Health Records    ☐ Include all confidential HIV-related Records

☐ Include sexual abuse/assault counseling records.

**Purpose of Release of Information:**
Legal Proceedings – Randolph W. Keuch  v. Teva Pharmaceuticals USA, Inc. et al,
United States District Court, Eastern District of Pennsylvania, Civil Action No. 22:19-CV-05488

1.     This authorization will expire ☐ Date:_____ ☐ Event:_____ ☒ One year

         Unless otherwise specified, this authorization will expire 1 year after the date of this request.

2.     I understand that I may revoke this authorization at any time by notifying Stevens & Lee, P.C., 1500 Market Street, East Tower, Suite 1800, Philadelphia, PA 19102 or by notifying the provider or entity that is authorized to release these records. I understand that revocation will not have any effect on actions taken prior to any revocation.

3.     This authorization is voluntary.

4.     I understand that if the organization authorized to receive the information is not a health plan or a health care provider, the information may no longer be protected by federal privacy regulations.

_____        _____
**Signature of patient or patient's representative**        **Date**

**Printed name of patient's representative:**_____

**Relationship to the patient:**_____

_____

[1] This authorization complies with the HIPAA privacy regulations, specifically 45 C.F.R. § 164.508

**<u>CERTIFICATE OF SERVICE</u>**

I, Brandon Shemtob, certify that on this 27th day of August 2021, I served

Defendants First Set of Document Requests Regarding Plaintiff Randolph Keuch upon

counsel for Plaintiff, via email, addressed as follows:

Alan Epstein, Esquire
Jennifer Myers Chalal, Esquire
1635 Market Street, 7th Floor
Philadelphia, PA 19103
aepstein@sgrvlaw.com
jmyers@sgrvlaw.com

*/s/ Brandon Shemtob*
Brandon Shemtob

14

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| RANDOLPH W. KEUCH, | : | |
| | : | CASE NO. 2:19-CV-05488 |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| TEVA PHARMACEUTICALS USA, INC., | : | |
| And TEVA PHARMACEUTICAL | : | |
| INDUSTRIES, Ltd., | : | |
| | : | |
| | : | |
| Defendants. | : | |

## DEFENDANTS' FIRST SET OF INTERROGATORIES ADDRESSED TO PLAINTIFF REGRADING PLAINTIFF RANDOLPH KEUCH

Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure, Defendants, Teva Pharmaceuticals USA, Inc. ("TUSA") and Teva Pharmaceutical Industries, Inc. ("TPI" and together with TUSA, the "Defendants"), serve the following interrogatories upon the Plaintiff, Randolph Keuch, to be answered separately and fully in writing under oath, within thirty (30) days from the date of service hereof.

## Definitions

The following definitions are applicable to and incorporated by reference into each interrogatory:

A.  The term "person," as used herein, means any natural person, partnership, corporation, or other business entity and all present and former officers, directors, agents, employees, attorneys and others acting or purporting to act on behalf of such natural person, partnership, corporation or other business entity.

B.  The term "Complaint," as used herein, means the Amended Complaint filed in the above-captioned action.

1

C.  The terms "Plaintiff," "you" and "your," as used herein, mean the named

Plaintiff and each other person acting or authorized to act on behalf of the named Plaintiff,

including Plaintiff's counsel.

D.  The term "Defendants," means, TUSA and TPI.

E.  The term "policy," as used herein, means each rule, procedure, or directive,

formal or informal, and each common understanding of a course of conduct which was

recognized as such by you or other persons acting on your behalf, which was in effect at any

time during the period covered by these interrogatories.

F.  The terms "and" and "or," as used herein, shall be construed conjunctively or

disjunctively as required to include within the scope of each interrogatory any information which

might be excluded by the opposite construction.

G.  The term "identify" or "identity" when used in reference to:  (1) an individual

or natural person, means to give the person's full name; all known aliases; the present or the last

known business and home addresses; present position or business affiliation, and position or

business affiliation at all times during the time period covered by the Complaint; (2) any other

"person" as defined herein, means to give the person's official, legal and formal name or the

name under which the person acts or conducts business; the address of the person's place of

business, profession, commerce or home; and the identity of the person's principal or chief

executive officer or person who occupies the position most closely analogous to a chief

executive; (3) a document, means to describe specifically the "document," its date, its author

(and, if different, the signer or signers), type of document (e.g., "letter") each addressee and

known recipient, its present or last known location and custodian, the manner and date of its

disposition if any such "document" was, but is no longer, in your possession or subject to your

2

control, and all other means of identifying it with sufficient particularity to satisfy the requirements for its inclusion in a demand for its production pursuant to a subpoena duces tecum; and (4) a communication, means to identify the pertinent "document" or "documents" if the communication is written, or to identify the participants and set forth the date, manner, place and substance of the communication if it is non-written.

H.   The term "document," as used herein, means the original and all copies of any written, printed, typed or other graphic matter of any kind or nature and any other tangible thing in your possession, custody or control, wherever located.  Any copy containing thereon or having attached thereto any alterations, notes, comments, or other material not included in the originals or copies referred to in the preceding sentence shall be deemed a separate document within the foregoing definition.  The term "document" or "documents" include, but are not limited to:

1.   All contracts, agreements, letter agreements, representations, warranties, certificates and opinions;

2.   All letters or other forms of correspondence or communication, including envelopes and notes, telegrams, cables, telex messages, electronic communications and other messages, including reports, notes, notations and memoranda of or relating to telephone conversations or conferences;

3.   All memoranda, reports, test results, financial statements or reports, notes, scripts, transcripts, tabulations, studies, analyses, evaluations, projections, work papers, corporate records or copies thereof, expressions or statements of policy, lists, comparisons, questionnaires, surveys, charts, graphs, summaries, extracts, statistical statements or records, compilations and opinions or reports of consultants;

4.   All desk calendars, appointment books, logs and diaries;

5.  All minutes, records or transcripts of meetings and conferences, and lists of persons attending meetings or conferences;

6.  All reports and summaries of interviews and negotiations;

7.  All books, articles, press releases, magazines, newspapers, booklets, brochures, pamphlets, circulars, bulletins, notices, instructions and manuals;

8.  All motion pictures and photographs (whether developed or undeveloped), tape recordings, microfilms, phonographs, tapes or other records, punch cards, magnetic tapes, discs, data cells, drums, print-outs and other data compilations from which information can be obtained; and

9.  Drafts of any document, revisions of drafts of any document and original or preliminary notes.

I.  The term "communications," as used herein, means all statements, admissions, denials, inquiries, discussions, conversations, negotiations, agreements, contracts, understandings, meetings, telephone conversations, letters, correspondence, notes, telegrams, telexes, advertisements, or any other form of written or verbal intercourse.

J.  The term "relate(s) to," as used herein, means constitute(s), refer(s) to, reflect(s), concern(s), pertain(s) to or in any way logically or factually connect(s) with the matter described in the interrogatory.

**Rules of Construction**

In construing these interrogatories:

A.  The singular shall include the plural and the plural shall include the singular.

B.  A masculine, feminine or neuter pronoun shall not exclude the others.

**Instructions**

A.  To the extent any information called for by these interrogatories is unknown to you, so state, and set forth such remaining information as is known.  If any estimate can

4

reasonably be made in place of unknown information, also set forth your best estimate, clearly designated as such, in place of unknown information, and describe the basis upon which the estimate is made.

      B.  To the extent you object to any interrogatory, set forth all reasons for your objection.  If you claim privilege as a ground for not answering any interrogatory in whole or in part, describe the factual basis for your claim of privilege in sufficient detail to permit the court to adjudicate the validity of the claim.  If you object in part to any interrogatory, answer the remainder completely.

      C.  These interrogatories shall be deemed continuing and require additional responses if further information is obtained between the time the responses are served and the time of trial.  Such additional responses shall be served from time to time, but not later than 20 days prior to the first date fixed for trial, or immediately upon obtaining such information if it is first discovered thereafter.

**INTERROGATORIES**

1.  With regard to your allegations in Paragraph 41 of your Complaint, (a) identify and explain which compensation policies Defendants' implemented that disfavored older workers; (b) how these policies harmed older works; (c) what specific changes were made to the these policies; (d) how and when you learned of these policies; (e) what involvement, if any, you had in the formulation of these policies; and (f) who you contend made the decision to implement these policies.

**ANSWER:**

2.  With regard to Paragraph 42 of your Complaint, (a) identify when you allege the retirement age was increased; (b) how and when you learned of these changes; (c) what involvement, if any, you had in the formulation of these changes; (d) who you contend made the decision to change these policies; (e) how you allege that these changes adversely affected older workers; and (f) how these policy-changes negatively impacted the equity compensation of older employees.

**ANSWER:**

3.  With regard to your allegations in Paragraph 43 of your Complaint, (a) identify when you allege the "putative severance plan" was instituted; (b) how and when you learned of this plan; (c) what involvement, if any, you had in the formulation of plan; (d) who you contend made the decision to implement this plan; (e) how you allege that this plan

6

01/05/2021 SL1 1670921v2 113731.00002

adversely affected older workers given your admission that those over the age of 62 were exempt from the deduction.

**ANSWER:**


4.   With regard to your allegation in Paragraph 43 of your Complaint that "US Teva leadership espoused the belief that those over age 62 would no longer be employable and could not properly apply for unemployment compensation benefits," (a) identify who you heard espouse this belief; (b) when you heard these statements made; (c) state what, if any, responses were made to this statement; (d) identify any witnesses that heard these statements; (e) state whether these statements were made orally or in writing; and (f) if in writing, provide a copy of all such documents.

**ANSWER:**

01/05/2021 SL1 1670921v2 113731.00002

5.  With regard to your allegation in Paragraph 44 of your Complaint, identify every instance in which you witnessed age bias in the hiring of employees. For each instance identified:

        (a)  Provide the name of the person or persons who allegedly were involved in the incident;

        (b)  Provide the name or names of the persons who allegedly were discriminated against;

        (c)  Provide the date of the incident;

        (d)  Describe, in detail, how the person or persons were discriminated against;

        (e)  Provide the names of all witnesses to the incident;

        (f)  Identify all documents that support your allegation that age bias was a factor in the hiring decision.

**ANSWER:**

6.  With regard to your allegation in Paragraph 44 of your Complaint that Dan Lawlor stated that a candidate working as a contractor did not have "long term potential" because of her advanced age, identify (a) when this occurred; (b) who he was speaking about; (c) if there were any witnesses to this statement; (d) whether this statement was oral or written; (e) what if anything was said in response to Mr. Lawlor's alleged statement; and (f) all documents that support your allegation that Mr. Lawlor made this statement.

8

**ANSWER:**

7.  With regard to your allegations in Paragraph 46 of your Complaint, (a) identify who asked you to outline alternate proposals that would meet the needs of the Defendants and not break the laws of the countries and states where Total Rewards employees were employed; (b) describe what, if any, proposals you made; (c) identify to whom you made these proposals; (d) state what, if any, response your received to these proposals.

**ANSWER:**

8.  With regard to your allegations in Paragraph 46 of your Complaint, (a) identify to whom you stated that you were volunteering to be relocated to Israel to help plan cost saving measures; (b) when you made this offer; (c) what title you would have if you were relocated to Israel; (d) whose position you would be filing if you relocated to Israel; and (e) whether your compensation would change if you relocated to Israel.

**ANSWER:**

9.  With regard to your allegations in Paragraph 47 of your Complaint, (a) state whether you volunteered to accept a demotion in lieu of termination; (b) if so, identify, who you volunteered this offer to; (c) state when you volunteered this offer; (d) identify any employee

9

that you contend was offered a demotion in lieu of termination as it relates to the 2017-2018 reduction in force.

        **ANSWER:**

10.  With regards to the allegations in Paragraph 48 of your Complaint, explain your contention that Eduardo Nasi replaced you.

        **ANSWER:**

11.  With regards to the allegations in Paragraph 51 of your Complaint, explain your contention that the employment of Mr. Nasi did not affect any monetary savings for Defendants.

        **ANSWER:**

12.  Describe, in detail, all incidents related to the allegations in your Complaint that you suffered age based discrimination. For each incident:

10

(a)  Provide the name of the person or persons who allegedly discriminated against you on the basis of your age;

(b)  Provide the date of the incident;

(c)  Describe, in detail, how the person or persons discriminated against you;

(d)  Provide the names of all witnesses to the incident;

(e)  If you allege you complained to anyone regarding the alleged discrimination, state whom you complained to and when you complained to him/her;

(f)  Identify all documents that support your allegation that age bias was a factor in the hiring decision.

**ANSWER:**

13.  Identify and explain how Kåre Schultz was involved in your selection for termination as you allege in Paragraph 25 of your Complaint.

**ANSWER:**

14.  Identify:  (a) each person who either was a witness to the facts alleged in your Complaint and/or has knowledge of or relating to the facts alleged in your Complaint or the claims set forth therein including, but not limited to, your allegations that you were subjected to age-based discrimination, and, (b) for each such person identified, describe in detail the facts, allegations or claims in the Complaint regarding which the person has knowledge or witnessed.

**ANSWER:**

11

15. Identify, including stating their names, addresses and phone numbers, all doctors, psychiatrists, counselors, psychologists, chiropractors, medical personnel, hospitals, medical facilities, clinics, health care facilities and institutions, and all other medical/health care personnel or providers who saw, examined, or treated you, or where you were seen, examined, or treated, for your alleged "compensatory damages," and/or for mental anguish, emotional distress, humiliation, damages to reputation or other nonpecuniary losses, for any time in your life.

**ANSWER:**

16. If you have obtained treatment or care or been examined for any type of emotional or psychological problem, illness, sickness, distress, anguish or condition (including, but not limited to, any general therapy or counseling and/or counseling or treatment for substance abuse) related to the allegations in the Complaint, provide the following information:

(a) Identify each person providing the treatment or care or examination; Specify the dates on which you received any such treatment or care or examination;

(b) Describe each problem, illness, sickness, distress, anguish or condition for which you received treatment or care or have been examined;

(c) Identify all documents relating to or concerning the treatment or care or examination for any such problem, illness, sickness, distress, anguish or condition.

**ANSWER:**

12

17.  Prior to March 18, 2018, had you ever obtained treatment or care or been examined for any medical, mental, psychological, emotional, or intellectual problem, illness, sickness, distress, anguish or condition (including any treatment and/or care for alcohol and/or drug abuse)?  If your answer is "yes," provide the following information:

(a)  Identify each institution and/or person providing the treatment or care or examination;

(b)  Specify the dates on which you received any such treatment or care or examination;

(c)  Describe each problem, illness, sickness, distress, anguish or condition for which you received treatment or care or have been examined;

(d)  Identify all documents relating to or concerning the treatment or care or examination for any such problem, illness, sickness, distress, anguish or condition.

**ANSWER:**

18.  With respect to your claims for damages and other relief other in this action:

(a)  set forth the specific relief and damages sought, including the amount of each item of damages and other relief, and the factual basis upon which you seek such damages and other relief; and

(b)  identify all individuals whom you know or have reason to believe have information regarding these claims.

**ANSWER:**

13

19.  With respect to any employment or self-employment you hold or have held since March 18, 2018, set forth the following:

(a)  each position held, including the name and address of the employer;

(b)  the date of commencement of each such position; and,

(c)  the wages, salary and fringe benefits of each such position.

**ANSWER:**

20.  Identify every potential employer you have contacted since March 18, 2018, in order to secure employment and the result of such contacts.  With respect to any search for employment you commenced on or following March 18, 2018 identify the following:

(a)  each employer or employment agency you contacted;

(b)  any responses you received from such employers or employment agency;

(c)  the identity of the individual who made the decision;

(d)  the reasons given for the decision; and,

(e)  any offers of employment you received and the terms of such offers.

**ANSWER:**

21.  Identify any business, partnership, company, or organization in which you, own, are a member of or have any ownership/management interest in. For each such entity:

14

(a) identify what goods or services it provides;

(b) identify all clients that it services and all potential clients that it solicits,

(a) provide a copy of the entity's financial statements evidencing its profits and losses, its total revenue and the amount of compensation or equity (if any) that you derive from it.

**ANSWER:**

22.  Identify the name and address of each person whom you have retained, or intend to retain, as an expert in this matter, and separately for each such expert provide the following information:

(a)  state the subject matter on which each such expert is expected to testify;

(b)  describe in detail the substance of the facts and opinions to which each such expert is expected to testify and the grounds for each such opinion;

(c)  set forth the qualifications of each such expert, listing the schools attended, years of attendance, degrees received and experience in any particular field of specialization or expertise; and

(d)  describe in detail all prior retentions, relationships, dealings, and transactions between each such expert and you, if any.

**ANSWER:**

15

**STEVENS & LEE, P.C.**

Dated: August 27, 2021            By: _Brandon S. Shemtob_____
                                      Larry J. Rappoport, Esquire
                                      Brandon S. Shemtob, Esquire
                                      STEVENS & LEE
                                      A PA Professional Corporation
                                      1500 Market Street, East Tower, Suite 1800
                                      Philadelphia, PA 19102
                                      Phone: (215) 751-1949
                                      Fax: (610) 371-7906

                                      *Attorneys for Defendants*

16

## **<u>CERTIFICATE OF SERVICE</u>**

I, Brandon Shemtob, certify that on this 27th day of August 2021, I served

Defendants First Set of Interrogatories Regarding Plaintiff Randolph Keuch upon counsel for

Plaintiff, via email, addressed as follows:

Alan Epstein, Esquire
Jennifer Myers Chalal, Esquire
1635 Market Street, 7th Floor
Philadelphia, PA 19103
aepstein@sgrvlaw.com
jmyers@sgrvlaw.com

*/s/ Brandon Shemtob*
Brandon Shemtob

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| RANDOLPH W. KEUCH, | : | CASE NO. 2:19-CV-05488 |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| TEVA PHARMACEUTICALS USA, INC., | : | |
| And TEVA PHARMACEUTICAL | : | |
| INDUSTRIES, Ltd., | : | |

**PLAINTIFF'S ANSWERS TO DEFENDANTS' FIRST SET OF INTERROGATORIES**

1.      With regard to your allegations in Paragraph 41 of your Complaint, (a) identify and explain which compensation policies Defendants' implemented that disfavored older workers; (b) how these policies harmed older works; (c) what specific changes were made to the these policies; (d) how and when you learned of these policies; (e) what involvement, if any, you had in the formulation of these policies; and (f) who you contend made the decision to implement these policies.

2.      With regard to Paragraph 42 of your Complaint, (a) identify when you allege the retirement age was increased; (b) how and when you learned of these changes; (c) what involvement, if any, you had in the formulation of these changes; (d) who you contend made the decision to change these policies; (e) how you allege that these changes adversely affected older workers; and (f) how these policy-changes negatively impacted the equity compensation of older employees.

3.      With regard to your allegations in Paragraph 43 of your Complaint, (a) identify when you allege the "putative severance plan" was instituted; (b) how and when you learned of this plan; (c) what involvement, if any, you had in the formulation of plan; (d) who you contend made the decision to implement this plan; (e) how you allege that this plan adversely affected older workers given your admission that those over the age of 62 were exempt from the deduction.

4.      With regard to your allegation in Paragraph 43 of your Complaint that "US Teva leadership espoused the belief that those over age 62 would no longer be employable and could not properly apply for unemployment compensation benefits," (a) identify who you heard espouse this belief; (b) when you heard these statements made; (c) state what, if any, responses were made to this statement; (d) identify any witnesses that heard these statements; (e) state

1

whether these statements were made orally or in writing; and (f) if in writing, provide a copy of all such documents.

**COLLECTIVE ANSWER TO INTERROGATORIES 1-4:**

<u>**Equity treatment and Qualifying Retirement**</u>

Prior to 2015, the definition of qualifying retirement under the Teva long-term incentive plans was Age plus years of service equal to or greater than 70 plus country Human Resources approval In 2015, the definition was changed to age greater than 65 and at least 5 years of service.

On March 21, 2017 Roni Percik sent a memo to US HR leaders informing them that the HRCC approved an adjustment to the Qualifying Retirement Policy for equity awards. Specifically, the definition of "Qualifying Retirement" under the equity plans was changed from age greater than 65 years and at least 5 years of service to age greater than 65 years and at least 10 years of service.

As a result, the following three qualifying retirement rules were changed to reflect these changes:

1. Any termination other than death, disability or cause that meets the following rule:  Participant's age is at least 65, and at least 10 years of service will receive full continued vesting of all grants and continued exercisability for full term.

2. Company initiated retirement (or by mutual agreement) meeting the following rule: Participant's age is at least 65, and at least 15 years of service will receive full continued vesting of all grants and continued exercisability for full term.

3. Company initiated retirement (or by mutual agreement) meeting the following rule: Participant's age plus years of service is at least 70, and age is greater than 55 will receive full continued vesting of tranches vesting in the next 12 months and continued exercisability for full term.

Plaintiff was hired in January 2014 at age 60.  under the original retirement plan under which he was hired, he could retire (assuming that he was 55 or older) at any time the combination of his age and service equaled a numerical total of 70. In Plaintiff's case he could retire at any time he reached the age of 65 years.  However, under the plan change announced in 2017, he could not choose to retire until he reached age 70.

The revised plan effective in 2017 had additional impacts on TEVA employees.  It disallowed US Teva employees who became employed by the Company after the age of 56 and who were eligible to receive equity grants or had actually received those grants from retiring at age 65 and retaining their equity.  The policy clearly effectively had a discriminatory impact on older employees.

2

Additionally, under the TEVA bonus plans, when an employee meets the definition of retirement under the equity plans and holds RSUs, these RSUs immediately vest and taxes are assessed. When the retirement rules changed, any taxes paid upon meeting the old retirement rules were not refunded and if the employee were terminated before actual retirement under the new rule, equity upon which taxes were paid would be forfeited.

Finally, Canadian employees, who had been permitted to retire when they reached age 55 and had at least two years of service, would under the new plan be greatly age disadvantaged.

When Plaintiff was consulted on the change, he stated that the new plan discriminates against older employees, and without any success, railed against not fully advising employees regarding the potential impact on their ability to retire and the tax ramifications of the new plan. adversely affected older workers given your admission that those over the age of 62 were exempt from the deduction.

## US Separation Policy Changes

On January 2, 2018 Daniel Lawlor, SVP HR North America sent out an email on the US Separation Policy Updates to US Top Management and US HR Leadership Team. That policy which required a severed employee to apply for state unemployment benefits and reduced any severance paid by TEVA by the amount received by the separated employee from the state unemployment agency exempted severed employees over the age of 62 based upon Mr. Lawlor's view that persons over the age of 62 are unemployable:

> "I do not want to have those employees over age 62 to have to suffer the humiliation and embarrassment of filing for unemployment. They should simply retire as they probably will not find another job."

Teva also excluded target bonuses in the calculation of severance pay. As older workers tend to be in more senior positions which include target bonus eligibility, the older workers are greatly impacted.

5.   With regard to your allegation in Paragraph 44 of your Complaint, identify every instance in which you witnessed age bias in the hiring of employees. For each instance identified:

  (a)   Provide the name of the person or persons who allegedly were involved in the incident;

  (b)   Provide the name or names of the persons who allegedly were discriminated against;

  (c)   Provide the date of the incident;

  (d)   Describe, in detail, how the person or persons were discriminated against;

3

(e)     Provide the names of all witnesses to the incident;

(f)     Identify all documents that support your allegation that age bias was a factor in the hiring decision.

6.      With regard to your allegation in Paragraph 44 of your Complaint that Dan Lawlor stated that a candidate working as a contractor did not have "long term potential" because of her advanced age, identify (a) when this occurred; (b) who he was speaking about; (c) if there were any witnesses to this statement; (d) whether this statement was oral or written; (e) what if anything was said in response to Mr. Lawlor's alleged statement; and (f) all documents that support your allegation that Mr. Lawlor made this statement.

**COLLECTIVE ANSWER TO INTERROGATORIES 5 and 6:**

**When a Compensation Manager position became available in the Total Awards group, after candidate interviews were completed, Plaintiff and Miriam Weinstein received the "green light" to hire Rose Riciolli, age 55, Daniel Lawler expressed deep concern that she was too old ("Does Rose have enough long-term potential for us") and vetoed her being hired.**

7.      With regard to your allegations in Paragraph 46 of your Complaint, (a) identify who asked you to outline alternate proposals that would meet the needs of the Defendants and not break the laws of the countries and states where Total Rewards employees were employed; (b) describe what, if any, proposals you made; (c) identify to whom you made these proposals; (d) state what, if any, response your received to these proposals.

**ANSWER:**

**In November of 2017, Teva Corporate was engaged in determining how to reduce headcount in the US and other countries.  As part of that process, Plaintiff was requested to develop a PowerPoint presentation describing several approaches to reducing headcount by 50% That presentation was sent on December 15th, 2017 to Plaintiff's newly appointed Manager Tal Zorman who was employed by the parent Company in Israel. Rejecting the suggestion that selection for severance should be based on ability and competence, Plaintiff was directed that the reduction would not be so guided and each manager was to make the final decision, allowing personal or corporate bias be injected into the process.**

8.      With regard to your allegations in Paragraph 46 of your Complaint, (a) identify to whom you stated that you were volunteering to be relocated to Israel to help plan cost saving measures; (b) when you made this offer; (c) what title you would have if you were relocated to Israel; (d) whose position you would be filing if you relocated to Israel; and (e) whether your compensation would change if you relocated to Israel.

9.      With regard to your allegations in Paragraph 47 of your Complaint, (a) state whether you volunteered to accept a demotion in lieu of termination; (b) if so, identify, who you volunteered this offer to; (c) state when you volunteered this offer; (d) identify any employee that you contend was offered a demotion in lieu of termination as it relates to the 2017-2018 reduction in force.

4

10.    With regards to the allegations in Paragraph 48 of your Complaint, explain your contention that Eduardo Nasi replaced you.

11.    With regards to the allegations in Paragraph 51 of your Complaint, explain your contention that the employment of Mr. Nasi did not affect any monetary savings for Defendants.

12.    Describe, in detail, all incidents related to the allegations in your Complaint that you suffered age based discrimination. For each incident:

**COLLECTIVE ANSWER TO INTERROGATORIES 8 - 12:**

On December 20th, 2017 Plaintiff sent an email to Tal Zorman, attaching his resume and volunteering to go to Israel on temporary assignment to assist with urgent matters relating to the global benefits function during the planned layoffs internationally. There was no suggestion that job title or compensation would change. Unbeknownst to Plaintiff, Ms. Zorman, Daniel Lawlor and Ron Yanov had already made the decision to replace Plaintiff as the head of Total Rewards for the Americas with Edu Nasi, an employee who Plaintiff supervised and reject the offer of Plaintiff to serve the parent global company in Israel. On January 2, 2018, Plaintiff was first advised that his offer was rejected. In a conversation with Mr. Nasi, Plaintiff learned the details of the deception and that he would be replaced by Edu Nasi. Plaintiff would have accepted a demotion to a Grade level 16 (the Grade level to which Mr. Nasi was subsequently elevated since in accordance with Teva practice and policy such action would not have reduced his then current compensation). Plaintiff was far more qualified to maintain the position at the helm of Total Rewards than Mr. Nasi and had prior to his termination achieved outstanding results in saving Teva money while elevating the benefits paid to employees.

13.    Identify and explain how Kåre Schultz was involved in your selection for termination as you allege in Paragraph 25 of your Complaint.

**ANSWER:**

Kare Schultz became the President and CEO of Teva Global in 2017 and thereafter directed the discriminatory actions that led directly to the termination of Plaintiff's employment and the policies that allowed the discriminatory practices that resulted in the termination of over 1000 Teva Americas employees.

14.    Identify: (a) each person who either was a witness to the facts alleged in your Complaint and/or has knowledge of or relating to the facts alleged in your Complaint or the claims set forth therein including, but not limited to, your allegations that you were subjected to age-based discrimination, and, (b) for each such person identified, describe in detail the facts, allegations or claims in the Complaint regarding which the person has knowledge or witnessed.

**ANSWER:**

Prior to the layoffs, a senior HR leader (Pam Daknis) held a meeting with other HR leaders and other HR function leaders to discuss how they would analyze the termination

5

data to address discrimination, a typical practice at Teva which performed at all
Reductions in Force initiatives prior to Plaintiff's employment termination.  At that
meeting, Daniel Lawlor, Head of HR for North America, entered the meeting and told the
group not to perform that analysis

Daniella Shea, a native Brazilian, was a grade 17 Sr. Director and the Head of
Shared Services for Teva Americas who was nearly 50 years old.  While she had  excellent
performance ratings, throughout her employment with Teva, she was terminated and
replaced by Laura Brenner, a far less experienced manager in her 20's who she supervised.
Elaine McGee was a grade 14 Associate Director who reported to Daniella Shea.  Her title
was Associate Director, HROS North America.  She is also in her late 40's and should have
been considered for the job vacated by Daniella Shea when Daniella was terminated. Laura
Brenner, 20 years younger with far less experience received the open position involuntarily
vacated by Ms. Shea.

The following are additional witnesses to the facts set forth in Plaintiff's complaint
that are or were employed at Teva and Teva has their full contact information:

| | |
|---|---|
| Miriam Weinstein | Head of Compensation for North America was present at the meeting where Mr. Lawlor ordered the HR community to not track or analyze discrimination throughout the Reduction in Force.  She was also involved in Mr. Lawlor's age discrimination of Rose Riciolli. |
| Pamela Daknis | HR Director was also present at this meeting where Mr. Lawlor ordered the HR community to not track or analyze discrimination throughout the Reduction in Force, as were other HR employees.  She also may have been one of the HR members who interviewed Rose Riciolli and approved her being hired. |
| Edu Nasi | Current Head of Total Rewards for North America was involved in the circumstances involved in Plaintiff's termination.in Plaintiff's termination |
| Samantha Blattler | Conduent Lead for the Unemployment Supplemental Plan at Teva |
| Samantha Rivello | Former Benefits Manager for Teva |
| Sandra Malito | Benefits Analyst for Teva |
| Kent Schurr | Former Compensation Manager for Teva |
| Lesley Billow | CHRO for Hayward Holdings and previously Head of HR for the Americas |
| Noel Mulvihill | Head of Total Rewards for Pandora and previously Head of Total Rewards for Teva  Europe |
| Randy Miller | Former Teva HR Director |

6

**Rose Riciolli**          **Contract employee for the Teva Total Rewards team.**

**Financial Planners from Beacon Trust, Adam Goldberg and Christopher Perrine who may be called upon to provide damages information regarding the potential of Plaintiff's lifetime wealth accumulation**

15.     Identify, including stating their names, addresses and phone numbers, all doctors, psychiatrists, counselors, psychologists, chiropractors, medical personnel, hospitals, medical facilities, clinics, health care facilities and institutions, and all other medical/health care personnel or providers who saw, examined, or treated you, or where you were seen, examined, or treated, for your alleged "compensatory damages," and/or for mental anguish, emotional distress, humiliation, damages to reputation or other nonpecuniary losses, for any time in your life.

**ANSWER:**

**As set forth in Plaintiff's responses to Defendants Request for documents, Plaintiff's distress in being fired and unable to secure another position is of the "garden variety" emotional distress usually attendant to such circumstances and information regarding past medical conditions will not be supplied.**

16.     If you have obtained treatment or care or been examined for any type of emotional or psychological problem, illness, sickness, distress, anguish or condition (including, but not limited to, any general therapy or counseling and/or counseling or treatment for substance abuse) related to the allegations in the Complaint, provide the following information:

      (a)    Identify each person providing the treatment or care or examination; Specify the dates on which you received any such treatment or care or examination;

      (b)    Describe each problem, illness, sickness, distress, anguish or condition for which you received treatment or care or have been examined;

      (c)    Identify all documents relating to or concerning the treatment or care or examination for any such problem, illness, sickness, distress, anguish or condition.

**ANSWER:**

**Plaintiff has not received any medical treatment for emotional distress or other medical conditions related to his discharge from employment or his inability to secure a corporate position thereafter.**

17.     Prior to March 18, 2018, had you ever obtained treatment or care or been examined for any medical, mental, psychological, emotional, or intellectual problem, illness, sickness, distress, anguish or condition (including any treatment and/or care for alcohol and/or drug abuse)? If your answer is "yes," provide the following information:

7

(a)     Identify each institution and/or person providing the treatment or care or examination;

(b)     Specify the dates on which you received any such treatment or care or examination;

(c)     Describe each problem, illness, sickness, distress, anguish or condition for which you received treatment or care or have been examined;

(d)     Identify all documents relating to or concerning the treatment or

(e)     care or examination for any such problem, illness, sickness, distress, anguish or condition.

**ANSWER:**

**As set forth in Plaintiff's responses to Defendants Request for documents, Plaintiff's distress in being fired and unable to secure another position is of the "garden variety" emotional distress usually attendant to such circumstances and information regarding past medical conditions will note be supplied.**

18.     With respect to your claims for damages and other relief other in this action:

(a)     set forth the specific relief and damages sought, including the amount of each item of damages and other relief, and the factual basis upon which you seek such damages and other relief; and

(b)     identify all individuals whom you know or have reason to believe have information regarding these claims.

**ANSWER:**

*See* **documents previously supplied that detail Plaintiffs employment, job searchs, networks, earnings and lost earnings calculations, Bates Nos. 380-508**

19.     With respect to any employment or self-employment you hold or have held since March 18, 2018, set forth the following:

(a)     each position held, including the name and address of the employer;

(b)     the date of commencement of each such position; and,

(c)     the wages, salary and fringe benefits of each such position.

**ANSWER:**

**President**
**The Total Rewards Consulting Group**
**7 Summer Dunes Lane**
**Isle of Palms, SC29451**

8

***See also*** **documents previously supplied that detail Plaintiffs employment, job searchs, networks, earnings and lost earnings calculations, Bates Nos. 380-508**

20.     Identify every potential employer you have contacted since March 18, 2018, in order to secure employment and the result of such contacts. With respect to any search for employment you commenced on or following March 18, 2018 identify the following:

>      (a)     each employer or employment agency you contacted;
>
>      (b)     any responses you received from such employers or employment agency;
>
>      (c)     the identity of the individual who made the decision;
>
>      (d)     the reasons given for the decision; and,
>
>      (e)     any offers of employment you received and the terms of such offers

**ANSWER:**

***See*** **documents previously supplied that detail Plaintiffs job searchs AND networking, Bates Nos. 380-498**

21.     Identify any business, partnership, company, or organization in which you, own, are a member of or have any ownership/management interest in. For each such entity:

>      (a)     identify what goods or services it provides;
>
>      (b)     identify all clients that it services and all potential clients that it solicits,
>
>      (c)     provide a copy of the entity's financial statements evidencing its profits and losses, its total revenue and the amount of compensation or equity (if any) that you derive from it.

**ANSWER:**

>      **President**
>      **The Total Rewards Consulting Group**
>      **7 Summer Dunes Lane**
>      **Isle of Palms, SC29451**

22.     Identify the name and address of each person whom you have retained, or intend to retain, as an expert in this matter, and separately for each such expert provide the following information:

>      (a)     state the subject matter on which each such expert is expected to testify;

9

    (b)    describe in detail the substance of the facts and opinions to which each such expert is expected to testify and the grounds for each such opinion;

    (c)    set forth the qualifications of each such expert, listing the schools attended, years of attendance, degrees received and experience in any particular field of specialization or expertise; and

    (d)    describe in detail all prior retentions, relationships, dealings, and transactions between each such expert and you, if any.

**ANSWER:**

    **None**

SPECTOR GADON ROSEN VINCI P.C.

/s/ *Alan B. Epstein*

Alan B. Epstein, Esquire
Jennifer M. Chalal, Esquire
Pa. Atty. I.D. No. 77481
SPECTOR GADON & ROSEN, P.C.
1635 Market Street, Seventh Floor
Philadelphia, PA  19103
(215) 241-/8817
Attorney for Plaintiff, Jeanne Pace

Dated:  December 30, 2021

10

## VERIFICATION

I, Randolph W. Keuch, hereby verify that I am the Plaintiff in this action and that the facts set forth in the foregoing Answers to Defendants' First Set of Interrogatories are true and correct to the best of my knowledge, information and belief.  I understand that the statements herein are made subject to the penalties of 18 Pa.C.S.A. § 4904 relating to unsworn falsification to authorities.

_____
Randolph W. Keuch

Dated: December 30, 2021

11

# STEVENS & LEE
## LAWYERS & CONSULTANTS

1500 Market Street, East Tower, Suite 1800
Philadelphia, PA  19102
(215) 575-0100 Fax (215) 851-0214
www.stevenslee.com

| | |
|---|---|
| Direct Dial: | (215) 496-3835 |
| Email: | bss@stevenslee.com |
| Direct Fax: | (610) 371-7977 |

January 11, 2022

**<u>Via Electronic Mail Only</u>**
Alan B. Epstein, Esquire
Spector, Fagon Rosen Vinci, P.C.
Seven Penn Center
1635 Market Street, Seventh Floor
Philadelphia, PA 19103
aepstein@sgrvlaw.com

**Re:  Keuch, Randolph V. vs. Teva Pharmaceuticals USA, Inc.,** *et al*

Dear Alan,

We are writing to address issues with your client's objections and responses to Teva Pharmaceuticals USA, Inc. ("TUSA") and Teva Pharmaceutical Industries, Ltd ("TPI" and together with TUSA the "Defendants") First Set of Interrogatories and First Set of Document Requests in the above-referenced action. Below, please find a discussion regarding the specific deficiencies we have observed with the responses that we have received to date.

Relatedly and as I am sure you are aware, the parties current deadline to complete discovery is January 14, 2022. Given the delays encountered thus far in obtaining discovery responses and the outstanding deficiencies that remain, it is unlikely that we will be able to complete discovery in this timeframe. Therefore, we propose filing a joint motion to the Court with the following revised deadlines:

1. The deadline for the completion of all fact discovery be extended through February 28, 2022.

2. During this extension period the parties agree that no new written discovery requests may be submitted, however, deficiency letters and requests to fully respond to outstanding discovery requests may be exchanged.

3. Any depositions of fact witnesses shall be completed by February 28, 2022.

4. Motions for Summary Judgment shall be filed by: April 8, 2022.

Philadelphia   •   Reading   •   Valley Forge   •   Lehigh Valley   •   Harrisburg   •   Lancaster   •   Scranton
Williamsport   •   Wilkes-Barre   •   Princeton   •   Cherry Hill   •   New York   •   Wilmington

A PROFESSIONAL CORPORATION

# STEVENS & LEE
## A PA Professional Corporation

Alan B. Epstein, Esquire
January 11, 2022

5.   Responses in Opposition to Motions for Summary Judgement shall be filed by: April 22, 2022.

6.   Replies in further support of Summary Judgment shall be filed by: April 29, 2022.

Given this revised proposed schedule, we would be unable to complete discovery prior to Magistrate Judge Rice's announced retirement. Therefore, we would suggest informing Magistrate Judge Rice that the matter be reassigned to a different magistrate judge per his e-mail from December 20, 2021.

**Discovery Deficiencies:**

1.   Document Request 12, Interrogatory Requests 15 and 17, and the Authorization for Release of Medical Record Information all relate to Defendants' request for information relating to Plaintiff's emotional and medical state at any point during Plaintiff's life. In response to these requests, Plaintiff has consistently responded, "Plaintiff's distress in being fired and unable to secure another position is of the "garden variety" emotion distress usually attendant to such circumstances and information regarding past medical conditions will not be supplied."

Your objection misses the point of the request. Plaintiff has asserted a claim for emotional distress. Because of this, Defendants are entitled to take discovery regarding his mental state, the extent of any alleged emotional distress, and other potential sources of that alleged distress. Discovery of all of Plaintiff's physicians and/or medical care providers is therefore appropriate. The below discussion by Judge Tucker of the Eastern District of Pennsylvania in a case addressing this exact topic is instructive.[1] She explained:

> Plaintiff's counsel relies heavily on the assertion that Plaintiff has only filed a "garden variety" claim for emotional distress against Defendants. (Pl.'s Mem. of Law at 1). Plaintiff's reliance on this garden variety language, however, is misplaced. Indeed, courts have consistently made a distinction between the "in controversy" requirement in the context of *Rule 35(a)* and *Rule 26(b)*. *See, e.g., Turner v. Imperial Stores,* 161 F.R.D. 89, 95 (S.D.Cal.1995) (noting that under *Rule 35(a)* "a court will order plaintiffs to undergo mental examinations when, in addition to a claim of emotional distress, one or more of the following elements are present: (1) a cause of action for intentional or negligent infliction of emotional distress; (2) an allegation of specific mental or psychiatric injury or disorder; (3) a claim of unusually severe emotional distress; (4) plaintiff's offer of expert testimony to support a claim of emotional distress; and/or (5) plaintiff's concession that his or her mental condition is 'in controversy' within the meaning

---

[1] *McKinney v. Delaware Cty. Mem'l Hosp.*, No. CIV A 08-1054, 2009 WL 750181, at *5 (E.D. Pa. Mar. 20, 2009)

# STEVENS & LEE
## A PA Professional Corporation

Alan B. Epstein, Esquire
January 11, 2022

of *Rule 35(a)."* ). Notably, Defendants have moved to compel pursuant to *Rule 26(b)* because at issue here is Plaintiff's psychological and medical records—governed by *Rule 26(b)*—not compelling Plaintiff to undergo a psychiatric evaluation—governed by *Rule 35(a). See, e.g., Bowen v. Parking Auth. of City of Camden,* 214 F.R.D. 188, 195 (D.N.J.2003). Thus, while demonstrating the presence of an additional element, other than the mere filing of a claim for emotional distress damages, may be necessary to satisfy the "in controversy" prong when a Defendant moves pursuant to *Rule 35(a),* such is not necessarily the case when a Defendant moves, as here, pursuant to *Rule 26(b).*

Similarly, while Plaintiff's assertion that she can and will establish emotional stress damages without resort to expert testimony is technically sound, it misses the point. Obviously, Plaintiff may establish her emotional stress damages with her own or other lay testimony. The issue, however, is not how Plaintiff intends to prove her emotional distress damages, but, rather Defendants' right to defend themselves fully against Plaintiff's claims. *See Sanchez v. U.S. Airways, Inc.,* 202 F.R.D. 131, 136 n. 7 (E.D.Pa.2001) ("How the Plaintiffs decide to prosecute their claims is a tactical decision for them alone. But, the determination of relevant evidence is outside their purview ... none of the cases stated ... stand for the idea that just because Plaintiffs do not intend to use expert testimony, the records related to their use of a mental health professional is inviolable."); *Lowe v. Philadelphia Newspapers Inc.,* 101 F.R.D. 296, 298 (E.D.Pa.1983) (reasoning that defendants should have a right to inquire into a plaintiff's past for the purpose of showing that their emotional distress was caused, at least in part, by events and circumstances that were not job related). Thus, the Plaintiff's affirmative use, or not, of medical expert testimony is not dispositive. *See Thorne v. Universal Properties, Inc.,* 1987 WL 7683, at *2 (E.D.Pa. Mar.10, 1987) ("If a plaintiff seeks damages for alleged emotional or psychological injuries, the defendant's case ought not be limited by the plaintiff's decision not to introduce available medical or psychological testimony that bears directly on the truth of the claim.")

In light of this explanation of the current case law we hope that you would concede that simply because Plaintiff is alleging a "garden variety" claim for emotional distress damages, Plaintiff is not now shielded from producing relevant documents related to his medical history. Therefore, please provide a supplemental response that accurately and fully responds to this request as well as a signed Authorization for Release of Medical Record Information. Alternatively, if Plaintiff no longer wishes to pursue a claim for emotional distress, please let us know and we will draft an appropriate stipulation for the Court.

# STEVENS & LEE

### A PA Professional Corporation

Alan B. Epstein, Esquire
January 11, 2022

     2.     Document Request 13 asked Plaintiff to provide "All documents, including, but not limited to, federal, state and local income tax forms and returns, W-2 forms, and payroll check stubs, that show, evidence, relate or refer to all of your employers and/or self-employment, and the amount and all sources of income received by you, or accruing to you, from March 18, 2018 to the present." Similarly, Document Request 15 asked Plaintiff to provide documents relating to compensation he has received since March 2018. In response, Plaintiff has provided a handful of 1099 statements from various years. However, Plaintiff has not provided any tax returns or any other information relating to his earnings since March 2018. Defendants are entitled to this information as it goes directly to Plaintiff's efforts to mitigate his damages as well as what damages Plaintiff would be entitled to. Therefore, please provide a supplemental response that accurately and fully responds to this request.

     3.     Document Request 16 asked Plaintiff to provide a "copy of the financial statements evidencing the profits and losses, total revenue and amount of compensation or equity (if any) that you derive from any and all businesses, partnerships, companies, or organizations in which you, own, are a member of or have any ownership/management interest in." In response, Plaintiff has stated that he has held the position of "President" for the "Total Rewards Consultiung Group." Despite this representation, Plaintiff has not provided a copy of any financial statements evidencing the profits and losses, total revenue and amount of compensation or equity (if any) that he derives from this entity. Therefore, please provide a supplemental response that accurately and fully responds to this request.

     4.     Document Request 17 asked Plaintiff to provide all documents "showing, relating, or referring to your claim(s) for and receipt of unemployment compensation benefits, if any, after March 18, 2018." In response, Plaintiff produced some documents related to his claim for unemployment but it does not appear to be complete. For example, there is no application for unemployment compensation included in the production nor is there a determination letter included. Please provide a supplemental response that accurately and fully responds to this request.

     5.     In Plaintiff's collective response to Defendants' Interrogatories 1-4, Plaintiff states "When Plaintiff was consulted on the change, he stated that the new plan discriminates against older employees, and without any success, railed against not fully advising employees regarding the potential impact on their ability to retire and the tax ramifications of the new plan." Plaintiff, however, fails to specify to whom he made this statement, when he made this statement, whether there were any witnesses to this statement and if the statement was made verbally or written. Therefore, please provide a supplemental response that accurately and fully responds to this request.

# STEVENS & LEE

A PA Professional Corporation

Alan B. Epstein, Esquire
January 11, 2022

6.      In Plaintiff's collective response to Defendants' Interrogatories 1-4, Plaintiff
attributes the following quote to Daniel Lawlor: "I do not want to have those employees over age
62 to have to suffer the humiliation and embarrassment of filing for unemployment. They should
simply retire as they probably will not find another job." Plaintiff, however, fails to specify
whether there were any witnesses to this statement and if the statement was made verbally or
written. If the statement was allegedly written, please direct Defendants to the bates-label
associated with the written documentation. If oral, please provide a supplemental response that
accurately and fully responds to this request.

7.      In Plaintiff's collective response to Defendants' Interrogatories 5-6, Plaintiff
states "When a Compensation Manager position became available in the Total Awards group,
after candidate interviews were completed, Plaintiff and Miriam Weinstein received the "green
light" to hire Rose Riciolli, age 55, Daniel Lawlor expressed deep concern that she was too old
("Does not have enough long-term potential for us") and vetoed her being hired. Plaintiff,
however, fails to specify to whom Mr. Lawlor allegedly made this statement, when he made this
statement, whether there were any witnesses to this statement and if the statement was made
verbally or written. Furthermore, Plaintiff fails to identify who allegedly provided the "green
light" for Ms. Riciolli's hiring or when this interaction allegedly took place. Lastly, Plaintiff fails
to explain how he knew Ms. Riciolli's age. Therefore, please provide a supplemental response
that accurately and fully responds to this request.

We thank you in advance for your cooperation in addressing these deficiencies.
Additionally, please provide us with a response to the proposed schedule outlined in this letter at
your earliest convenience.

Sincerely,

STEVENS & LEE

*/s/ Brandon S. Shemtob*

Brandon Shemtob

Perry, Earl J.

| | |
|---|---|
| **From:** | Alan Epstein <aepstein@sgrvlaw.com> |
| **Sent:** | Tuesday, March 8, 2022 13:55 |
| **To:** | Shemtob, Brandon |
| **Cc:** | Rappoport, Larry J.; Jennifer Myers Chalal |
| **Subject:** | Keuch v. TEVA |

Brandon,

I am finally relieved of matters relating to the trial in the EDPa and the following are the responses to your previous deficiency letter:

<u>Document Request No. 12, Interrogatory Requests No. 15 and 17</u>

Plaintiff Randolph W. Keuch has never received any treatment or examination from any physician regarding emotional distress, psychiatric disorders, mental health or any physical manifestations of the same.  Accordingly, there are no documents to be supplied and Plaintiff will not sign the requested authorization for release of medical information.

<u>Document Request No. 13</u>

Plaintiff has provided all relevant documents related to income received from employment.  The requested tax returns contain no income information other than investment income for Plaintiff and his wife and are not relevant or responsive to the request.

<u>Document Request No. 16</u>

Plaintiff has submitted all total income earned during the relevant period.  The Total Rewards Consulting Group, LLC is an Limited Liability Company formed and wholly owned Plaintiff in January 2021 and there are no financial documents prepared by that entity evidencing any profits and losses, total revenue or compensation or equity.

<u>Document Request No. 17</u>

Plaintiff does not possess any application for unemployment compensation benefits or determination letter regarding his receipt of any benefits.  All documentation received related to his receipt of unemployment benefits has been produced.

<u>Interrogatories Nos. 1-4</u>

In answer to the specific inquiry made in the letter, Plaintiff's statement regarding the age-related impact on older employees was made to Ron Yanis and may also have been communicated orally in the presence of Leslie Billow, Daniel Lawler, Tom McDonough, Esquire and other members of the HR leadership team.  Additional information regarding Plaintiff's regarding the subject plan may also have been the subject of email transmissions with Roni Percik.  The stated quote of Daniel Lawler in Paragraph 6 of your letter was transmitted orally and was not the subject of a any writing known to Plaintiff.  The statement was made by Mr. Lawler in either late December 2017 or January 2018.

**Interrogatories Nos. 5-6**

The HR individuals who interviewed Rose Riciolli (age 55 at the time) for the Compensation Manager position in the Total Awards group and gave the "green light" to Miriam Weinstein for her elevation to that position may have been Linda Misialek, Shannon Phillips and Kriten Krebs. Ms. Riciolli made Plaintiff aware of her age.

In light of the nature of these supplemental responses please advise whether you require a supplemental Verification.

Additionally, I would like to schedule the following persons for deposition during the set discovery period that presently ends on April 15:

1. Mark Sabag
2. Tal Zorman
3. Kare Schultz
4. Daniel Lawler
5. Eduardo Nasi
6. Daniella Shea
7. Ron Percik
8. Pamela Dakis
9. Miraim Weinstein
10. Rose Riciolli
11. Leslie Billow
12. Eleane McGee

I assume you will want to pursue other depositions including Plaintiff's during the applicable discovery period as well. I am relatively flexible (with minor exceptions) for scheduling these depositions virtually during the following weeks:

1. March 22-25
2. March 28-31
3. April 4-8
4. April 11-15

If your schedules do not allow completion of these matters within the current time constraint, would you consider requesting additional discovery time from Judge Gallagher who appears to be the judicial selection for final disposition in light of your declining to have the matter presided over by Judge Wells.

I am available to have a conference call any time this week to further discuss these matters. Just let me know what works best for you.

Alan



**Alan Epstein, Esquire**

## Spector Gadon Rosen Vinci P.C.

**T** +1 215-241-8832
**F** +1 215-531-9103
**E** aepstein@sgrvlaw.com

**www.sgrvlaw.com**   1635 Market Street, 7th Floor, Philadelphia, PA 19103

---

This communication including attachments, may contain information that is confidential and protected by the attorney/client or other privilege. If you are not the intended recipient of this communication, or if you believe that you have received this communication in error, please notify the sender immediately and kindly delete this email, including attachments, without reading or saving them in any manner.

IRS Circular 230 Disclosure: To ensure compliance with U.S. Treasury Regulations governing tax practice, we inform you that, unless expressly indicated otherwise, any federal tax advice contained in this communication (including attachments) was not written to be used for and cannot be used for (i) purposes of avoiding any tax-related penalties that may be imposed under Federal tax laws, or (ii) the promotion, marketing, or recommending to another party of any tax-related transaction or matter addressed herein.



# EMPLOYMENT APPLICATION

*It is the policy of Teva Pharmaceuticals Industries Ltd and its subsidiaries ("Teva") to promote and assure equal opportunity employment for all current and prospective employees without regard to race, creed, color, religion, sex, age, disability, pregnancy, marital status, sexual orientation, national or ethnic origin, citizenship status, status as a disabled veteran or veteran of the Vietnam era, or any legally recognized status entitled to protection under applicable federal, state, or local anti-discrimination laws.  This policy governs all matters related to recruitment, advertising and initial selection of employment.  It shall also apply to all other aspects of employment, including, but not limited to, aspects of compensation, promotion, demotion, transfer, lay-offs, terminations, leave of absence and training opportunities.*

Date completed 7/30/2014

| Last Name (please print): | First Name: | Full Middle Name: |
|---|---|---|
| KEUCH | RANDOLPH | William |

Day Time Number: 412.225.8000                                        Cell Phone Number: 412.225.8000

E-Mail Address: randy.keuch@gmail.com
Present Address:  Street, City, State, Zip Code, County
409 Wynstone Drive
Wexford PA 15090
Allegheny
How long at this address:
8.5 years

I understand that any material misrepresentation or omission on any employment application materials or within any information fields will be grounds for immediate disqualification of candidacy.   ☑ YES  ☐ NO

| Position Applied For or Desired: | Salary Range: |
|---|---|
| Head of Total Rewards - Americas | |

Are you able to perform the essential duties of the job with or without reasonable accommodation?                                    Are you under the age of 18?
☑ YES  ☐ NO      Comments:                          ☐ YES  ☑ NO

Have you previously been employed by Teva or a predecessor company of Teva?     ☐ YES  ☑ NO

**If yes:**
Company:                                    Location:
Job title:                                   Dates employed:  From_____ To_____

List any relatives who are currently employed by Teva:
| Name: | Relationship | Dept. |
| Name: | Relationship | Dept. |
| Name: | Relationship | Dept. |

Have you ever filed an application with Teva?  Please Specify:
☐ YES  ☑ NO      If Yes, When:                    Position:

Type of work desired:  ☑ Full Time   ☐ Part Time
                        ☐ Temporary   ☐ Summer          Shift Availability:  ☑ 1st   ☐ 2nd   ☐ 3rd

When are you available for employment?              Are you available to work overtime, if scheduled?
1/6/2014                                            ☑ YES  ☐ NO

Are you currently employed?                          Are you willing to relocate?
☐ YES  ☑ NO                                         ☑ YES  ☐ NO

**HIGH SCHOOL / GED**

| School Attended | City/State | Did you receive a diploma from High School or a GED? | Last Name Used During High School (if different) |
|---|---|---|---|
| James Caldwell High School | West Caldwell NJ | ☑ High School Diploma<br><br>☐ GED | |

**CONTINUED EDUCATION**

| School Attended | City/State | Number of Years Attended | Degree | Degree (i.e.: BA, BS, MD) | Course/Major | Last Name Used During College (if different) |
|---|---|---|---|---|---|---|
| COLLEGE<br>Stevens Institute of Technology | Hoboken NJ | 4 | ☑ YES<br>☐ NO | BS | Industrial & Organizational Psychology | |
| COLLEGE<br>Stevens Institute of Technology | Hoboken NJ | 4 | ☑ YES<br>☐ NO | MS | Applied Psychology | |
| COLLEGE | | | ☐ YES<br>☐ NO | | | |
| COLLEGE | | | ☐ YES<br>☐ NO | | | |

| | |
|---|---|
| Are you able to furnish grade transcripts on request?    ☑ YES   ☐ NO<br>If NO, explain why: | |

Please identify:

Software regularly used: Microsoft Office

| Foreign languages: | Write | Speak | Both |
|---|---|---|---|
| | ☐ | ☐ | ☐ |
| | ☐ | ☐ | ☐ |

**PROFESSIONAL LICENSES**

Has any professional license held by you ever been revoked or suspended?    ☐ YES   ☑ NO

If yes, please explain, including type of license, jurisdiction, and date revoked or suspended.

TEVA 000036

**EMPLOYMENT HISTORY**

Please list your complete job history for a minimum of the past 10 years starting with your present or most recent employment and noting any periods during which you were not employed in the section below.   Please use an additional sheet of paper, if necessary.

| | |
|---|---|
| Company Name:<br>HJ Heinz Company | Employment<br>Dates:               **To**<br>        4/2005      9/2013<br>        Month/Year   Month/Year |
| Address:<br>1 PPG Place, Suite 3100<br>Pittsburgh PA 15222-2530 | Last Base<br>Salary:      USD $340,000.00/Yr.<br><br>Bonus (if<br>applicable):   170000 |
| Type of Business:<br>Consumer Products | Reasons for leaving:<br>Company was acquired and taken private. |
| Job Title:<br>VP, Total Rewards | May we contact: ☑ YES  ☐ NO<br>Supervisor's Name and Title:<br>Steve Clark |
| Job Duties:<br>All facets of compensation, he alt and wellness, retirement<br>plans and mobility as well as aviation function, travel<br>function, fleet, and credit card relationship. | Email: stephensanfordclark@gmail.com<br><br>Telephone #: (412) 370-1978 |

| | |
|---|---|
| Company Name:<br>The Hartford | Employment<br>Dates:               **To**<br>        2/2004      4/2005<br>        Month/Year   Month/Year |
| Address:<br><br>Hartford CT | Last Base<br>Salary:<br><br>Bonus (if<br>applicable): |
| Type of Business:<br>Insurance | Reasons for leaving: |
| Job Title:<br>AVP, Compensation - P&C Division | May we contact: ☑ YES  ☐ NO<br>Supervisor's Name and Title:<br>Karen Macke |
| Job Duties:<br>Responsible for compensation programs for the P&C<br>division | Email: MACKEK1@nationwide.com<br><br>Telephone #: (860) 810-8645 |

TEVA 000037

| Company Name: Pfizer | Employment Dates: | To | |
|---|---|---|---|
| | 3/1998 Month/Year | 2/2004 Month/Year | |
| Address: 345 East 42nd Street New York City NY | Last Base Salary: Bonus (if applicable): | | |
| Type of Business: Pharmaceuticals | Reasons for leaving: Time for a change following 2 very large acquisitions. | | |
| Job Title: Corp Director, Strategic Rewards | May we contact: ☑ YES ☐ NO Supervisor's Name and Title: Barry Westlake | | |
| Job Duties: Design of global reward and recognition programs | Email: Unknown as he retired Telephone #: Unknown as he retired | | |

| Company Name: | Employment Dates: | To | |
|---|---|---|---|
| | Month/Year | Month/Year | |
| Address: | Last Base Salary: Bonus (if applicable): | | |
| Type of Business: | Reasons for leaving: | | |
| Job Title: | May we contact: ☐ YES ☐ NO Supervisor's Name and Title: | | |
| Job Duties: | Email: Telephone #: | | |

| Please identify periods in which you were not employed: |
|---|
| |

TEVA 000068

**PROFESSIONAL REFERENCES**

Please identify three <u>professional</u> references who have observed your work or relevant school performance (if you are a recent graduate) for a period of at least six months. At least one of your references should be a current or former supervisor.

Name  Steve Clark
Title    Chief People Officer
Company/school  HJ Heinz
Phone (412) 370-1978
Length of time known  8 years

Address _____

How do you know this person? Prior Manager

Name  Don Lindner
Title    Senior Manager
Company/school  WorldAtWork
Phone (480) 748-7427
Length of time known  20 years

Address  14040 N. Northsight Blvd
              Scottsdale AZ 85260

How do you know this person? Worked together over the years at WorldAtWork

Name  Helen Darling
Title    President & CEO of the National Business Group on Health
Company/school  National Business Group on Health
Phone (202) 585-1805
Length of time known  4 years

Address  50 F Street, NW
              Washington DC 20001

How do you know this person? I sit on the NBGH Board of Directors

---

*(This question is voluntary. Refusal to answer will have no adverse affect on the employment decision.)*

Is there another name under which you have worked and/or attended school that we should use when making such inquires on your behalf?

☐ YES   ☑ NO      If yes, please provide name:

---

Were you in the Military?  ☐ YES  ☑ NO          Can you furnish copies of your DD214?  ☐ YES  ☐ NO

Length of Military Service: Years _____     Months _____

| Rank at Discharge* | Branch of Service | Type of Duty | Special Training | Service Number |
|---|---|---|---|---|
|  |  |  |  |  |
| *Dishonorable/general discharge is not an automatic bar to employment.* | | | | |

---

Are you legally authorized to work in the US?
☑ YES  ☐ NO

---

Do you have a valid driver's license?
☑ YES  ☐ NO

---

Do you have any allergies or sensitivity to medical substances (example: penicillin, latex, bleach, etc.) which preclude you from working in the production facility?
☑ YES   ☐ NO

If YES, describe:
Penicillin

TEVA 000039

*Answering "yes" will not necessarily disqualify you from consideration.)*
*(California applicants should exclude marijuana related convictions that are more than two years old.)*

Have you ever been convicted of or pled guilty or no contest to any crime other than a minor traffic violation?   ☐ YES   ☑ NO
If yes, give details:

Have you ever had your employment involuntarily terminated?   ☑ YES   ☐ NO
If yes, please explain:
4 months following the acquisition of Heinz and after the Company was taken private, my job was eliminated and I was provided a severance package.

Have you ever been asked to resign from any job?   ☐ YES   ☑ NO
If yes, please explain:

Have you ever resigned from any job when confronted with allegations of misconduct, a violation of company policies, or unsatisfactory work performance?

☐ YES   ☑ NO

If yes, please explain:

Do not report any conviction that has been sealed, expunged, statutorily eradicated, annulled, impounded, erased, dismissed under the First Offender's law, pardoned by the Governor or in which state law allows you to lawfully deny as set forth below.   You are also not required to disclose violations, infractions, petty misdemeanors or summary offenses.

* **California applicant/residents:** You need not disclose any referral to, and participation in, any pre-trial or post-trial diversion program, or any misdemeanor convictions for which probation has been successfully completed and discharged.  Do not list any marijuana-related misdemeanor convictions over two years old, or felony marijuana convictions under California Health and Safety Code Section 11360 (c) which occurred prior to 1976.

* **Connecticut applicant/residents:** You need not disclose any conviction record that has been erased pursuant to sections 46b-146, 54-76o or 54-142a of the Connecticut General Statutes. Records subject to erasure under these sections are records pertaining to a finding of delinquency or that a child was a member of a family with service needs, adjudication as a youthful offender, a criminal charge that was dismissed or nolled, or a criminal charge for which the person was found not guilty or received an absolute pardoned conviction.  Any person whose records were erased within the meaning of these three sections may consider such events to have never occurred and may so swear under oath.

*Hawaii applicants/residents: Do not respond to this question until you have been given a conditional offer of employment.

*Kentucky applicants/residents: You do not respond "Yes" as a result of any misdemeanor conviction where the date of conviction was more than five years ago.

*Massachusetts applicants/residents: An applicant for employment with a sealed record on file with the commissioner of probation may answer "no" to the above with respect to an inquiry herein relative to prior arrests, criminal court appearances or convictions.  In addition, any applicant for employment may answer "no" to the above with respect to any inquiry relative to prior arrests, court appearances and adjudications in all cases of delinquency or as a child in need of services which did not result in a complaint transferred to the superior court for criminal prosecution.

You may exclude information regarding first convictions for the following misdemeanors: drunkenness, simple assault, speeding, minor traffic violations, affray, or disturbance of the peace, or a conviction for any misdemeanor where the conviction occurred or any prison sentence ended five or more years ago whichever date is later, unless you have been convicted of another offense within the last 5 years.

*Washington applicants/residents: You may exclude convictions that occurred over ten years ago.

TEV4 000040

I certify that the foregoing statements are accurate and complete to the best of my knowledge, and I understand that I am subject to dismissal if any information provided by me is false. Teva Pharmaceuticals Industries Ltd and its subsidiaries ("Teva") is hereby authorized to make any investigation of my personal history through any investigative or credit agencies or bureaus of their choice. This investigation can be conducted prior to or during my employment. I understand that Teva may contact the Drug Enforcement Administration and other regulatory or law enforcement agencies to secure such information and I waive any rights I may have regarding the obtainment of such information. I further understand that my employment is contingent upon satisfactory reference information whenever obtained, and upon passing a physical examination.

I have not been excluded, debarred, suspended, or otherwise ruled ineligible to participate in any Federal health care program (as in defined in 42 U.S.C. § 1320a-7b(f)) and I have not engaged in any activity that could lead to me becoming excluded, debarred, suspended, or otherwise ruled ineligible to participate in any Federal health care program.

In particular:

    I have not been debarred under Section 306(a) or Section 306(b) of the Federal Food, Drug and Cosmetic Act, as it may be amended from time to time, or any other local, state or federal law applicable to the pharmaceutical industry.

    I have not been excluded from participation in any federal healthcare program under Section 1128 of the Social Security Act, as it may be amended from time to time, or any other local, state or federal Health Care Fraud and Abuse Laws or False Claims Acts or applicable regulations.

    I have not been convicted of a criminal offense that falls within the scope of the federal Anti-kickback Statute (42 U.S.C. § 1320a-7(a)).

I have not been debarred, and I have not worked for any company that has been debarred, under the Generic Drug Enforcement Act of 1992. I have not been convicted of any crime of the types listed in Section 2(a) and 2(b) of the Generic Drug Enforcement Act of 1992 within the five years prior to this date.

I will notify Teva immediately if I should, in the future, be excluded, debarred, suspended, or otherwise ruled ineligible to participate in any Federal health care program or if any action is taken that could lead toward my being excluded, debarred, suspended, or otherwise ruled ineligible to participate in any Federal health care program.

Teva is also authorized to circulate my application to other divisions of Teva. I certify that to the best of my knowledge and belief, all statements in this application are true and correct, and I understand that any misrepresentation is cause for dismissal.

My signature below indicates that I have read, understood, and consented to the above statements and that I affirm the accuracy of all answers I have given to the questions on the application. This authorization or photocopy of it shall serve as consent for Teva to request any information concerning my application.

Signature:   RANDOLPH KEUCH                                                    Date:   12/24/2013 12:08 PM

The symbol above, authorized by the individual is the legally binding equivalent of the individual's handwritten signature.

TEVA 000041

## NOTICE REGARDING BACKGROUND INVESTIGATION
## PURSUANT TO CALIFORNIA LAW

**Teva Pharmaceuticals Industries Ltd and its subsidiaries ("Teva")** intends to obtain information about you for employment purposes from a consumer reporting agency. Thus, you can expect to be the subject of "investigative consumer reports" and "consumer credit reports" obtained for employment purposes. Such reports may include information about your character, general reputation, personal characteristics and mode of living. With respect to any investigative consumer report from an investigative consumer reporting agency ("ICRA"), the Company may investigate the information contained in your employment application and other background information about you, including but not limited to obtaining a criminal record report, verifying references, work history, your social security number, your educational achievements, licensure, and certifications, your driving record, and other information about you, and interviewing people who are knowledgeable about you. The results of this report may be used as a factor in making employment decisions. The source of any investigative consumer report (as that term is defined under California law) will be Orange Tree Employment Screening, 7275 Ohms Lane, Minneapolis, MN 55439, 800-886-4777. The source of any credit report will be Orange Tree Employment Screening, 7275 Ohms Lane, Minneapolis, MN 55439, 800-886-4777. The Company agrees to provide you with a copy of an investigative consumer report when required to do so under California law.

Under California Civil Code section 1786.22, you are entitled to find out from an ICRA what is in the ICRA's file on you with proper identification, as follows:

- In person, by visual inspection of your file during normal business hours and on reasonable notice. You also may request a copy of the information in person. The ICRA may not charge you more than the actual copying costs for providing you with a copy of your file.

- A summary of all information contained in the ICRA's file on you that is required to be provided by the California Civil Code will be provided to you via telephone, if you have made a written request, with proper identification, for telephone disclosure, and the toll charge, if any, for the telephone call is prepaid by or charged directly to you.

- By requesting a copy be sent to a specified addressee by certified mail. ICRAs complying with requests for certified mailings shall not be liable for disclosures to third parties caused by mishandling of mail after such mailings leave the ICRAs.

"Proper Identification" includes documents such as a valid driver's license, social security account number, military identification card, and credit cards. Only if you cannot identify yourself with such information may the ICRA require additional information concerning your employment and personal or family history in order to verify your identity.

The ICRA will provide trained personnel to explain any information furnished to you and will provide a written explanation of any coded information contained in files maintained on you. This written explanation will be provided whenever a file is provided to you for visual inspection.

You may be accompanied by one other person of your choosing, who must furnish reasonable identification. An ICRA may require you to furnish a written statement granting permission to the ICRA to discuss your file in such person's presence.



TEVA 000042

 Pharmaceuticals

December 20, 2013

Mr. Randolph W. Keuch
409 Wynstone Drive
Wexford, PA 15090

Dear Randy,

On behalf of Teva Pharmaceutical Industries LTD, I am very pleased to offer you the position of Senior Director, Total Rewards – Americas located in North Wales, PA. This position would report directly to Yonit Landskroner – VP, Global Compensation & Benefits. Your anticipated start date is Monday, January 6, 2014. The initial terms of employment are as follows:

- <u>Base Pay</u>:  You will be paid a base pay of $9,615.38 bi-weekly, which when annualized is equivalent to $250,000 (the "Annual Base Salary"), payable in accordance with our standard payroll practices for salaried employees.  You will receive a paycheck or electronic payment every two weeks.

- <u>Bonus</u>:  You will be eligible to participate in the Teva 2014 Bonus Program with an incentive opportunity equal to 30% of your Annual Base Salary, subject to the terms and conditions in the 2014 Bonus Program.

- <u>Sign-on Bonus</u>:  You will be paid a sign-on bonus of $50,000 to be paid one year after your start date, assuming a successful performance within that year.  Voluntary termination within the first 24 months of employment will require repayment of such sign-on bonus payable to Teva.

- <u>Merit Increases</u>:   You will be eligible to participate in our 2014 Teva Performance Management Program, subject to the guidelines for active employees.

- <u>Benefits</u>:   You shall be eligible to participate in our health and dental plans, our 401(k) savings plan, profit sharing plan, and flexible spending accounts, subject to the applicable plan terms.   Additionally, you shall be eligible to participate in our life insurance, travel insurance and short-term and long-term disability plans.  You acknowledge that participation in our benefit programs may require payroll deductions and/or direct contributions by you.

- <u>Paid Time-Off</u>:  You will be eligible for Teva paid holidays and 20 days of vacation time, prorated in the first partial year of employment, in accordance with the applicable policy guidelines.

TEVA 000047

Mr. Randolph W. Keuch
December 20, 2013
Page 2 of 3

- ▪ <u>Relocation:</u>  You are being offered relocation benefits under our current policy, which is enclosed.

- • <u>Long Term Equity-Based Incentive Plan</u>: During your employment with the company, and subject to demonstrated high potential and sustained high performance, you will be considered for equity compensation awards (Options and/or Restricted Share Units) under Teva 2010 Long Term Equity-Based Incentive Plan ("The Plan"), in accordance with the terms at the discretion of Teva's management and the HR and Compensation Committee of Teva's Board (the "Committee").  Please note that equity compensation may be discontinued at anytime as determined by the company.

The nature of your employment with us is and will be "at will," as defined by applicable law, meaning that either we or you may terminate your employment at any time, with or without notice and with or without cause, for any reason or for no reason, without further obligation or liability.  Teva reserves the right to change, end or alter the terms of your employment and/or the terms of any plans at any time without prior notice.

This offer letter sets forth the full and complete agreement between you and us regarding your employment, and supersedes all prior negotiations, discussions, correspondence, communications, understandings and agreements between the parties relating to the subject matter contained herein.

We have enclosed two copies of the offer letter and confidentiality agreement.  Please formally accept this offer by signing and returning one copy of the offer letter and confidential agreement to my attention.

As a condition of your employment, you agree to the following:

- • Execution of this offer letter.
- • Execution of our standard form of Employee Confidentiality Agreement applicable to similarly situated positions.
- • Provide proof of your identity and legal right to work in the United States, pursuant to the Immigration Reform and Control Act.
- • Successful completion of the background check.
- • Completion of reference checks satisfactory to Teva.

This offer of employment is contingent upon successfully completing and passing a medical evaluation prior to your agreed upon start date.  This evaluation will include a physical exam and drug test.   Please contact Health Services, at (215) 591-8679 to schedule your appointment.

I have enclosed information about the benefits plans available to Teva employees.  Additional information will be provided at your orientation.  If you have any questions, please feel free to contact me.

TEVA 000048

Mr. Randolph W. Keuch
December 20, 2013
Page 3 of 3

We are very excited to have you as a part of our management team. We have many exciting challenges ahead and we are confident you can make a significant contribution to our future growth.

Sincerely yours,

*Anis Baig*

Anis Baig
VP, Global Talent Acquisition & Mobility

Acknowledged and agreed:

_____          12/23/2013
Mr. Randolph W. Keuch                                    Date

TEVA 000049

## TEVA PHARMACEUTICALS USA, INC.

### EMPLOYEE PROPRIETARY INFORMATION AND INVENTIONS AGREEMENT

I, Randolph W. Keuch, in consideration of my employment or continued employment by Teva Pharmaceuticals USA, Inc., its subsidiaries, parents, affiliates, successors and assigns throughout the world (collectively, the "**Company**") and the compensation now and hereafter paid to me, I, on December 20, 2013, hereby enter into this Employee Proprietary Information and Inventions Agreement (the "**Agreement**") and agree as follows:

1. **NONDISCLOSURE.**

**1.1 Recognition of Company's Rights; Nondisclosure.** I understand and acknowledge that my employment by the Company creates a relationship of confidence and trust with respect to the Company's Proprietary Information (defined below) and that the Company has a protectable interest therein. At all times during my employment and thereafter, I will hold in strictest confidence and will not disclose, use, lecture upon or publish any of the Company's Proprietary Information, except disclosure, use or publication to Company personnel who need to know the Company's Proprietary Information in connection with their work for the Company, or unless an officer of the Company expressly authorizes such in writing. I will obtain the written approval from a designated officer of the Company before publishing or submitting for publication any material (written, verbal, or otherwise) that relates to my work at the Company and/or incorporates or might incorporate any Proprietary Information. I agree to be bound by and to comply fully with the terms of the Company's Social Media Policy, and/or any similar published policy, now or hereafter in effect. I hereby assign to the Company any rights I may have or acquire in such Proprietary Information and recognize that all Proprietary Information shall be the sole property of the Company and its assigns. I will take all reasonable precautions to prevent the inadvertent or accidental disclosure of Proprietary Information.

**1.2 Proprietary Information.** The term "**Proprietary Information**" shall mean any and all confidential and/or proprietary knowledge, data or information of the Company, its affiliates, parents and subsidiaries, whether having existed, now existing, or to be developed during my employment. By way of illustration but not limitation, "**Proprietary Information**" includes (a) trade secrets, inventions, innovations, mask works, ideas, processes, formulas, source and object codes, data, programs, other works of authorship, know-how, improvements, discoveries, developments, designs and techniques and any other proprietary technology and all Proprietary Rights therein (hereinafter collectively referred to as "**Inventions**"); (b) information regarding research, development, new products, marketing and selling, business plans, budgets and unpublished financial statements, licenses, prices and costs, margins, discounts, credit terms, pricing and billing policies, quoting procedures, methods of obtaining business, forecasts, future plans and potential strategies, financial projections and business strategies, operational plans, financing and capital-raising plans, activities and agreements, internal services and operational manuals, methods of conducting Company business, suppliers and supplier information, and purchasing; (c) information regarding customers and potential customers of the Company, including customer lists, names, representatives, their needs or desires with respect to the types of products or services offered by the Company, proposals, bids, contracts and their contents and parties, the type and quantity of products and services provided or sought to be provided to customers and potential customers of the Company and other non-public information relating to customers and potential customers; (d) public and non-public information regarding any of the Company's business partners and their services, including names, representatives, proposals, bids, contracts and their contents and parties, the type and quantity of products and services received by the Company, and other non-public information relating to business partners; (e) information regarding personnel, employee lists, compensation, and employee skills; and (f) any other non-public information which a competitor of the Company could use to the competitive disadvantage of the Company. Notwithstanding the foregoing, it is understood that, at all such times, I am free to use information which is generally known in the trade or industry through no breach of this agreement or other act or omission by me.

**1.3 Third Party Information.** I understand, in addition, that the Company has received and in the future will receive from third parties confidential and/or proprietary knowledge, data, or information ("**Third Party Information**") subject to a duty on the Company's part to maintain the confidentiality of such information and to use it only for certain limited purposes. During my employment and thereafter, I will hold Third Party Information in the strictest confidence and will not disclose to anyone (other than Company personnel who need to know and/or are authorized to know such information in connection with their work for the Company) or use, except in connection with my work for the Company, Third Party Information unless expressly authorized by an officer of the Company in writing.

**1.4 Term of Nondisclosure Restrictions.** I understand that Proprietary Information and Third Party Information are never to be used or disclosed by me,

TEVA 000069

except as provided in this Section 1. If, however, a court decides that this Section 1 or any of its provisions is unenforceable for lack of reasonable temporal limitation and the Agreement or its restriction(s) cannot otherwise be enforced, I agree and the Company agrees that the five (5) year period after the date my employment ends shall be the temporal limitation relevant to the contested restriction, provided, however, that this sentence shall not apply to trade secrets protected without temporal limitation under applicable law.

**1.5 No Improper Use of Information of Prior Employers and Others.** During my employment by the Company I will not improperly use or disclose any confidential information or trade secrets, if any, of any former employer or any other person to whom I have an obligation of confidentiality, and I will not bring onto the premises of the Company or introduce into the Company's email or other information systems, or its devices or storage media of any type (e.g., smart phones, PDAs and memory sticks) any unpublished documents or any property belonging to any former employer or any other person to whom I have an obligation of confidentiality unless consented to in writing by that former employer or person.

## 2. ASSIGNMENT OF INVENTIONS.

**2.1 Proprietary Rights.** The term "**Proprietary Rights**" shall mean all trade secrets, patents, copyrights, trade marks, mask works and other intellectual property rights throughout the world.

**2.2 Prior Inventions.** Inventions, if any, patented or unpatented, which I made prior to the commencement of my employment with the Company are excluded from the scope of this Agreement. To preclude any possible uncertainty, I have set forth on *Exhibit A* (Prior Inventions) attached hereto a complete list of all Inventions that relate to the Company's actual or anticipated business, research or development that I have, alone or jointly with others, conceived or developed or caused to be conceived or developed prior to the commencement of my employment with the Company, that I consider to be my property or the property of third parties, and that I wish to have excluded from the scope of this Agreement (collectively referred to as "**Prior Inventions**"). If disclosure of any such Prior Invention would cause me to violate any prior confidentiality agreement, I understand that I am not to list such Prior Inventions in *Exhibit A* but am only to disclose a cursory name for each such invention, a listing of the party(ies) to whom it belongs, the nature of my relationship to the party(ies), the business interest of the party(ies), and the fact that full disclosure as to such inventions has not been made for that reason. To further preclude any possible uncertainty, I have set forth in Exhibit A a list of all publicly available publications related to inventions that I have, alone or jointly with others, conceived or developed

or caused to be conceived or developed prior to the commencement of my employment with the Company, that I consider to disclose my property or the property of a third party. A space is provided on *Exhibit A* for such purpose. If no such disclosure is attached, I represent that there are no Prior Inventions. If, in the course of my employment with the Company, I incorporate a Prior Invention into a Company product, process or machine, the Company is hereby granted and shall have a nonexclusive, royalty-free, irrevocable, perpetual, fully-paid, worldwide license (with rights to sublicense through multiple tiers of sublicensees) to make, have made, modify, make derivative works of, publicly perform, use, sell, import, and exercise any and all present and future rights in such Prior Invention, but only to the extent I have the right to grant such rights. Notwithstanding the foregoing, I agree that I will not incorporate, or permit to be incorporated, Prior Inventions in any Company Inventions without the Company's prior written consent.

**2.3 Assignment of Inventions.** Subject to Subsections 2.4 and 2.6, I hereby assign and agree to assign in the future (when any such Inventions or Proprietary Rights are first reduced to practice or first fixed in a tangible medium, as applicable) to the Company all my right, title and interest in and to any and all Inventions (and all Proprietary Rights with respect thereto) whether or not patentable or registrable under copyright or similar statutes, made or conceived or reduced to practice, either alone or jointly with others, during the period of my employment with the Company. Inventions assigned (or that should be assigned pursuant to this Agreement) to the Company, or to a third party as directed by the Company pursuant to this Section 2, are hereinafter referred to as "**Company Inventions**."

**2.4 Unassigned or Nonassignable Inventions.** I recognize that this Agreement will not be deemed to require disclosure or assignment of any Invention that I developed entirely on my own time without using the Company's equipment, supplies, facilities, trade secrets, or Proprietary Information, except for those Inventions that either (i) relate to the Company's actual or anticipated business, research or development, or (ii) result from or are connected with work performed by me for the Company. In addition, this Agreement does not apply to any Invention which qualifies fully for protection from assignment to the Company under any specifically applicable state law, regulation, rule, or public policy ("**Specific Inventions Law**").

**2.5 Obligation to Keep Company Informed.** During the period of my employment and for one (1) year after termination of my employment with the Company, I will promptly disclose to the Company fully and in writing all Inventions authored, conceived or reduced to practice by me, either alone or jointly with others; provided, however, that I may lawfully make such disclosures without violating my obligations to one or more third

TEVA 000070

parties. In addition, I will promptly disclose to the Company all patent applications filed by me or on my behalf within a year after termination of employment. At the time of each such disclosure, I will advise the Company in writing of any Inventions that I believe fully qualify for protection under the provisions of a Specific Inventions Law; and I will at that time provide to the Company in writing all evidence necessary to substantiate that belief. The Company will keep in confidence and will not use for any purpose or disclose to third parties without my consent any confidential information disclosed in writing to the Company pursuant to this Agreement relating to Inventions that qualify fully for protection under a Specific Inventions Law. I will preserve the confidentiality of any Invention that does not fully qualify for protection under a Specific Inventions Law. I agree to promptly disclose orally and in writing to any third party for whom I subsequently work and/or otherwise provide services my belief that the work and/or services I perform are likely to breach my obligations to the Company under this Agreement.

**2.6 Government or Third Party.** I also agree to assign all my right, title and interest in and to any particular Company Invention to a third party, including without limitation the United States, as directed by the Company.

**2.7 Works for Hire.** I acknowledge that all original works of authorship which are made by me (solely or jointly with others) within the scope of my employment and which are protectable by copyright are "works made for hire," pursuant to United States Copyright Act (17 U.S.C., Section 101).

**2.8 Enforcement of Proprietary Rights.** I will assist the Company in every proper way to obtain, and from time to time enforce, United States and foreign Proprietary Rights relating to Company Inventions in any and all countries. To that end I will execute, verify and deliver such documents and perform such other acts (including appearances as a witness) as the Company may reasonably request for use in applying for, obtaining, perfecting, evidencing, sustaining and enforcing such Proprietary Rights and the assignment thereof. In addition, I will execute, verify and deliver assignments of such Proprietary Rights to the Company or its designee. My obligation to assist the Company with respect to Proprietary Rights relating to such Company Inventions in any and all countries shall continue beyond the termination of my employment, but the Company shall compensate me at a reasonable rate after my termination for the time actually spent by me at the Company's request on such assistance.

**2.9** In the event the Company is unable for any reason, after reasonable effort, to secure my signature on any document needed in connection with the actions specified in the preceding paragraph, I hereby irrevocably designate and appoint the Company and its duly authorized officers and agents as my agent and attorney in fact, which

appointment is coupled with an interest, to act for and in my behalf to execute, verify and file any such documents and to do all other lawfully permitted acts to further the purposes of the preceding paragraph with the same legal force and effect as if executed by me. I hereby waive and quitclaim to the Company any and all claims, of any nature whatsoever, which I now or may hereafter have for infringement of any Proprietary Rights assigned hereunder to the Company.

**3. RECORDS.** I agree to keep and maintain adequate and current records (in the form of notes, sketches, drawings and in any other form that may be required by the Company) in conformance with Company policies, procedures, and practices of all Proprietary Information developed by me and all Inventions made by me during the period of my employment at the Company, which records shall be available to and remain the sole property of the Company at all times.

**4.   DUTY OF LOYALTY DURING EMPLOYMENT; BEST EFFORTS; NON-SOLICITATION.**

**4.1 Duty of Loyalty**. I agree that during the period of my employment by the Company I will not, without the Company's express written consent, directly or indirectly engage in any employment or business activity which is directly or indirectly competitive with, or would otherwise conflict with, my employment by the Company.

**4.2 Best Efforts**. I agree that during the period of my employment by the Company I will abide by all Company policies and devote my best efforts to the services of the Company. To that end, I agree not to participate in the planning, operation, or management of any activity competitive with the Company's interests and will not otherwise engage in any activity in conflict with the Company's interests, except as permitted and authorized in writing by a designated officer of the Company, during the period of my Company employment.

**5.   REASONABLENESS OF RESTRICTIONS.**

**5.1** I agree that I have read this entire Agreement and understand it. I agree that this Agreement does not prevent me from earning a living or pursuing my career. I agree that the restrictions contained in this Agreement are reasonable, proper, and necessitated by the Company's legitimate business interests. I represent and agree that I am entering into this Agreement freely and with knowledge of its contents with the intent to be bound by the Agreement and the restrictions contained in it.

**5.2** In the event that a court finds this Agreement, or any of its restrictions, to be ambiguous, unenforceable, or invalid, I and the Company agree that the court shall read the Agreement as a whole and interpret the restriction(s) at issue to be enforceable and valid to the maximum extent allowed by law.

TEVA 000071

**5.3** If the court declines to enforce this Agreement in the manner provided in subsection 7.2, I and the Company agree that this Agreement will be automatically modified to provide the Company with the maximum protection of its business interests allowed by law and I agree to be bound by this Agreement as modified.

**6. RETURN OF COMPANY PROPERTY.** When I leave the employ of the Company, or at any time at the Company's request, I will deliver to the Company any and all drawings, notes, memoranda, specifications, devices, formulas, and documents, together with all copies thereof, and any other material containing or disclosing any Company Inventions, Third Party Information or Proprietary Information of the Company, as well as any other Company property. I further agree that any property situated on the Company's premises and owned by the Company, including disks and other storage media, filing cabinets or other work areas, is subject to inspection by Company personnel at any time with or without notice. I further agree that I also will be subject to any other Company policy regarding searches of my person and property adopted by the Company from time to time. Prior to leaving, I will cooperate with the Company in completing and signing the Company's termination statement if requested to do so by the Company.

**7. LEGAL AND EQUITABLE REMEDIES.**

**7.1** I agree that it may be impossible to assess the damages caused by my violation of this Agreement or any of its terms. I agree that any threatened or actual violation of this Agreement or any of its terms will constitute immediate and irreparable injury to the Company and the Company shall have the right to enforce this Agreement and any of its provisions by injunction, specific performance or other equitable relief, without bond and without prejudice to any other rights and remedies that the Company may have for a breach or threatened breach of this Agreement.

**7.2** I agree that if the Company is successful in whole or in part in any legal or equitable action against me under this Agreement, the Company shall be entitled to payment of all costs, including reasonable attorney's fees, from me.

**8. NONDISPARAGEMENT.** I agree that I will not make any disparaging statements to current, former or prospective Company customers, contractors, vendors or employees, to any media or to any other person about the Company, its affiliates or parent, their officers, directors or employees. A disparaging statement is any communication, oral or written, that would cause or tend to cause the recipient of the communication to question the business condition, integrity, competence, fairness or good character of the person or entity to which the communication relates. This includes but is not limited to

statements made on blogs, surveys, internet discussion groups, personal web pages, and social networking sites.

**9. NOTICES.** Any notices required or permitted hereunder shall be given to the appropriate party at the address specified below, at my address as listed in the Company records, or at such other address as the party shall specify in writing. Such notice shall be deemed given upon personal delivery to the appropriate address or if sent by certified or registered mail, three (3) days after the date of mailing.

**If to the Company:**

Teva Pharmaceuticals USA, Inc.
425 Privet Road
Horsham, PA 19044
Attn: General Counsel

**If to the Employee (print legibly):**

Name: _____
Address: _____
Address: _____

**10. NOTIFICATION OF NEW EMPLOYER.** In the event that I leave the employ of the Company, I authorize the Company to provide notice of my rights and obligations under this Agreement to my subsequent employer and to any other entity or person to whom I provide services.

**11. GENERAL PROVISIONS.**

**11.1 Governing Law; Consent to Personal Jurisdiction.** This Agreement will be governed by and construed according to the laws of the Commonwealth of Pennsylvania without regard to conflicts of laws principles. I hereby expressly consent to the personal jurisdiction and venue of the state and federal courts located in the Commonwealth of Pennsylvania for any lawsuit filed there against me by Company (or vice versa) arising from or related to this Agreement, and agree that any lawsuit by me against Company will be brought solely in such courts.

**11.2 Severability.** In case any one or more of the provisions, subsections, or sentences contained in this Agreement shall, for any reason, be held to be invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect the other provisions of this Agreement, and this Agreement shall be construed as if such invalid, illegal or unenforceable provision had never been contained herein. If moreover, any one or more of the provisions contained in this Agreement shall for any reason be held to be excessively broad as to duration, geographical scope, activity or subject, it shall be construed by limiting and reducing it, so as to be enforceable to the extent compatible with the applicable law as it shall then appear.

TEVA 000072

**11.3Successors and Assigns.** This Agreement is for my benefit and the benefit of the Company, its successors, assigns, parent corporations, subsidiaries, affiliates, and purchasers, and will be binding upon my heirs, executors, administrators and other legal representatives.

**11.4Survival.** The provisions of this Agreement shall survive the termination of my employment, regardless of the reason, and the assignment of this Agreement by the Company to any successor in interest or other assignee.

**11.5Employment At-Will.** I agree and understand that nothing in this Agreement shall change my at-will employment status or confer any right with respect to continuation of employment by the Company, nor shall it interfere in any way with my right or the Company's right to terminate my employment at any time, with or without cause or advance notice.

**11.6Waiver.** No waiver by the Company of any breach of this Agreement shall be a waiver of any preceding or succeeding breach. No waiver by the Company of any right under this Agreement shall be construed as a waiver of any other right. The Company shall not be required to give notice to enforce strict adherence to all terms of this Agreement.

**11.7Advice of Counsel. I ACKNOWLEDGE THAT, IN EXECUTING THIS AGREEMENT, I HAVE HAD THE OPPORTUNITY TO SEEK THE ADVICE OF INDEPENDENT LEGAL COUNSEL, AND I HAVE READ AND UNDERSTOOD ALL OF THE TERMS AND PROVISIONS OF THIS AGREEMENT. THIS AGREEMENT SHALL NOT BE CONSTRUED AGAINST ANY PARTY BY REASON OF THE DRAFTING OR PREPARATION HEREOF.**

**11.8Entire Agreement.** The obligations pursuant to Sections 1 and 2 (except Subsection 2.7) of this Agreement shall apply to any time during which I was previously engaged, or am in the future engaged, by the Company as an employee and/or consultant if no other agreement governs nondisclosure and assignment of inventions during such period. This Agreement is the final, complete and exclusive agreement of the parties with respect to the subject matter hereof and supersedes and merges all prior discussions between the parties. No modification of or amendment to this Agreement, nor any waiver of any rights under this Agreement, will be effective unless in writing and signed by the party to be charged. Any subsequent change or changes in my duties, salary or compensation will not affect the validity or scope of this Agreement.

This Agreement shall be effective as of the first day of my employment with the Company or, in the alternative, on the day that I execute this Agreement as a current employee of the Company.

**I HAVE READ THIS AGREEMENT CAREFULLY AND UNDERSTAND ITS TERMS. I HAVE COMPLETELY FILLED OUT EXHIBIT A TO THIS AGREEMENT.**

Dated: 12 / 23 / 2013

_Randolph Wm Kerch_
**(Signature)**

Randolph Wm Kerch
**(Printed Name)**

**ACCEPTED AND AGREED TO:**

**TEVA PHARMACEUTICALS USA, INC.**

By: _____
Title: Sr Mgr, Talent Acq.
Dated: 1/6/14

TEVA 000073

**Archived:** Wednesday, March 3, 2021 7:24:28 AM
**From:** MarkSabag
**Sent:** Thu, 14 Dec 2017 14:50:48
**To:** Tal Zorman
**Subject:** Global HR Leadership Updates
**Sensitivity:** Normal

View web version

 

Mark Sabag
Group EVP and Chief Human Resources Officer

## Global HR Leadership Team Updates

**To: Global HR Community**

Dear HR Colleagues,

Teva is embarking on a period of significant change that will affect all aspects of our business, our structure, and most critically, our people. Today our CEO provided the details of a substantial restructuring plan, driven by the need to unify and simplify our organization. The challenges we are currently facing require us to take significant and decisive steps to restore our financial security and stabilize our business with a sense of urgency, and it will affect every part of Teva.

In full alignment with today's CEO message, our main objective as a global HR function in 2018 will be to **drive the organizational design and people aspects of Teva's restructuring**. Our approach will focus the HR operating model and an updated structure on three key principles:

1. **Business HR alignment** - combine Regional and Business support to more closely align our HR activities in each region with the new Teva structure.
2. **Integrated Talent** - transition from separate CoEs to a more integrated and consistent approach to talent solutions.
3. **Operations & Services** - focus on end-to-end delivery of HR services.

These changes will enable a sharper focus on business needs, and will help to further simplify our current operating model, reduce bureaucracy and improve HR productivity.

**HR Global Leadership Team (GLT)**
In alignment with Teva's new Executive Team and organizational structure, as well as the above-mentioned changes to our HR operating model, the following appointments and updates to our HR leadership and global organization are effective immediately:

**Business HR:**
- HR for North America will be led by Daniel Lawlor

TEVA 000113

- HR for Europe will be led by Niels Walch
- HR for Growth Markets will be led by Moshe Netzer until March 31, 2018, after which Orly Pascal will lead HR for Growth Markets, including Israel
- HR for Global Operations will be led by Glenn Gerecke
- HR for Global R&D and Global Marketing & Portfolio will be led by Vikki Conway

In addition to their primary roles, the Regional HRMs will provide leadership insight and coordination for Teva's executive leaders within their respective regions, in alignment with Teva's new structure.

Integrated Talent Management will be led by Tal Zorman. This function will combine Talent Acquisition and Mobility, Leadership and Development and Total Rewards to provide HR leading practices and solutions.

The HR Operations & Service organization will be led by Anat Markus, and will be responsible for the delivery of consistent and systematic HR services across Teva.

All members of the global HRBP teams for GGM and GSM will now report into their corresponding regional HR teams noted above. Similarly, the HR Centers of Expertise will become part of the Integrated Talent Management organization Additional detailed announcements will be communicated soon to all colleague impacted by the revised reporting structures.

As a result of the above organizational changes, we have had to make some very difficult decisions. We will be parting from the following members of the GLT, and I would like to thank them for their significant contribution and years dedicated service to Teva:

**Moshe Netzer**, SVP, HRBP Growth Markets - with 27 years of service in Teva, Moshe has been a tremendous asset to the Company, to HR and to the many partners he has supported during this time. Moshe made a significant impact our HR organization throughout his career of key HR leadership roles, including SVP HR for Teva Global Operations, establishing Teva's European Regional H organization as well as leading Corporate Training & Organization Development during a period of global growth and integration I would like t convey my sincere appreciation for his many contributions and the long-te professional insights he has brought to our HR practice, and on a more personal note, I will always value the perspective and wisdom he has provided to me especially in times of tough decisions. Moshe will continue to lead HR for t Growth Markets over the coming months as it is transitioned to Orly Pascal, an his last day at Teva will be March 31, 2018.

**Raffi Hrs**, SVP, HRBP for Global Specialty Medicines - Raffi has played instrumental role in HR for over 21 years with Teva, most recently in GSM, and in previous roles leading HR for Global Specialty R&D as well as building the HR organization to support earlier innovative and branded commercial business units in Teva. Raffi's deep professional expertise as a multi-faceted HR le has supported the exponential growth of our specialty capabilities over t years, and I would like to extend my personal gratitude and wish him grea success in his future endeavors. Raffi's last day with Teva will be December 3 2017.

**Ron Yaniv**, SVP of Global Total Rewards - for over 2 ½ years since joining Teva, Ron has applied extensive experience from his previous roles at Intel and Marvell to lead a culture change in Teva's approach to Total Rewards. He has done this through a wide range of initiatives, including alignment of glob Reward and Benefits policies with Teva's strategic goals, building a infrastructure of benchmark practices, and maintaining a strong partnership wit Teva's Board of Directors. I would like to take this opportunity to thank Ron for the collaborative efforts he has led in our approach to global rewards across H Ron's last day with Teva will be December 31, 2017.

TEVA 000114

**Simon Kelner**, VP Global Talent Acquisition and Mobility - while Simon may be the newest member of the HR GLT, he has made tremendous contributions to our HR organization and our internal talent acquisition capabilities in the year since he joined Teva, through the launch of a consistent and impactful One Teva hiring and recruitment approach globally, including a global recruitment policy, interview toolkit and global job board. As the Global Talent Acquisition an Mobility team merges into the Integrated Talent function additional detail about Simon's transition will be provided at a later stage.

*Please join me in wishing all of our colleagues success in their new roles and new beginnings.*

## Next steps

Human Resources will continue to play a critical role throughout this restructuring period. There will be more difficult decisions ahead both within and as we support our business and regional partners, and as always, we will conduct all processes fairly and respectfully. Putting people at the center everything we do continues to be a key aspect of our work at Teva.

In order to support the organizational restructuring process and significant changes ahead – in both HR and in Teva overall - we have established a People Office as well as HR work streams to support all aspects of these changes.

Thank you for your continued efforts, engagement and endurance as we move into the swift and challenging period ahead. Although we do not yet have all the answers and details, I am committed to keeping you updated continually and transparently throughout this process. The people of Teva have proven time an again their ability to be resilient and view change as an opportunity. I know it will not be easy, but it is important to understand that these changes are crucial to ensure Teva's stabilization and our future.

Yours
Mark

Click on the HR Organization Chart to view it on teva.net >>

**FOR INTERNAL USE ONLY – NOT FOR DISTRIBUTION OR USE WITH CUSTOMERS**



TEVA 000115

**Archived:** Wednesday, March 3, 2021 7:24:32 AM
**From:** Randy Keuch
**Sent:** Wed, 20 Dec 2017 14:33:50
**To:** Tal Zorman
**Subject:** How Can I help?
**Sensitivity:** Normal
**Attachments:**
Randolph_Keuch 2017.doc; 2017 Americas TR Ops Review.pptx;

---

Hi Tal,

I am not sure how familiar you are with my background, so I have attached my CV for your review. As Ron will be departing next week, I would like to offer my services to "fill in" for Ron to help get Teva through the next 6 months or so. If needed to reside in Israel on a temporary basis, I can also do that. Recognize that I held the global Total Rewards position for a large consumer goods organization – The HJ Heinz Comany – and I worked closely with senior leadership and the Compensation Committee of the board. Not sure what your thoughts are, but wanted to share my desire to help manage Teva TR through these difficult times.

Enjoy the holiday.

Best regards,

**Randy Keuch** Head of Total Rewards - Americas
Tel: 267-468-4325 Cell: 215-272-9816
Randy.Keuch@tevapharm.com sip:Randolph.Keuch@tevapharm.com www.tevapharm.com

BEHL_Silver_2016

TEVA 000116

# RANDOLPH WM. KEUCH

111 Rose Lane  •  Chalfont, PA  18914  •  Cell:  412.225.8000
Randy.Keuch@gmail.com

*As a recognized global leader in Compensation, Health and Wellbeing, Retirement Plans, and Global Mobility, I am seeking a senior position where my board experience and my international and domestic expertise both as a practitioner and as a consultant will enable me to collaborate with business leaders and team members to deliver exceptional value to customers, stakeholders, and employees.*

### PROFESSIONAL EXPERIENCE – Senior Corporate Positions (1994 – Present)

TEVA PHARMACEUTICALS, North Wales, PA                                       January 2014 - Present

Lead the Total Rewards Center of Expertise for the Americas providing subject matter expertise and cutting edge solutions to all facets of total rewards issues within the region.  Teva is going through a major HR transformation, implementing new tools and technology to support our employees and to enable HR to better support the business.  Over the last 3 years my team and I:

- Were recognized in 2016 and 2017 by NBGH and Fortune Magazine as one of the Best Employers for Healthy Lifestyles
- Successfully integrated 3 major acquisitions in the Americas Region (Rimsa-Mexico, Actavis-Global, and Anda-US)
- Developed and launched a global recognition program for Teva
- As a US issuer, manage SEC proxy aspect for US-based NEOs
- Developed global long-term incentive plan for Biologics
- Developed and launched an innovative Total Rewards Portal for all US and Canadian employees
- Developed and implemented a rolling 3-yr benefits strategy for the U.S that saved over $30 in 2015 and 2016 while driving employee knowledge and positive perspective on their benefits to levels that are 20 percentage points above the norm for high performing companies
- Developed and implemented pay alignment strategies for the US and Canada resulting in a significant decline in turnover and improved new hire acceptance ratios
- Designed and approved all sales compensation programs and contests within the region
- Implemented the Willis Towers Watson Global Grading System and their REWARD tool throughout the region

H.J. HEINZ COMPANY, Pittsburgh, PA                                       April 2005 – September 2013

**Vice President, Total Rewards (2005 – 2013)**

Working directly with senior management and the Management Development & Compensation Committee of the Board, established the position of VP, Total Rewards and in that role, transformed many of the Company's executive pay programs into effective drivers of business success.  My team's efforts reduced benefit and turnover costs and helped position the Company to have one of its best financial performance years in its history.  We also built a world-class HR portal, MyHeinzPlace that aggregated current and historical employee information regarding their health, wealth and career, and provided SSO to specific benefit websites.  Much of my team's work in executive compensation is described in the 2012 Annual Proxy – which has earned considerable acclaim as one of the better Compensation Discussion & Analysis filed to date.  Heinz also received the highest positive Say-on-Pay vote (78%) of any company when receiving a NO vote recommendation from ISS.   Heinz is a recognized leader in health and wellness as reflected in the many awards we have earned for innovation, communications and cost management (Heinz received the Platinum Award from NBGH and the US Surgeon General's Medallion in 2012, a Gold Quill in 2011 and a Hermes in 2012).  My team oversaw all global retirement plans; drove our global pension strategy; drove our US health care strategy; oversaw HR technology; and managed expatriates, our regional total rewards centers of excellence, our aviation function (3 fixed wing aircraft and hangar), a fleet of over 450 vehicles, and participated in labor contract negotiations.

THE HARTFORD, Hartford, CT                                       2004 – 2005

**AVP, Compensation – P&C Division (2004 – 2005)**
Led development of a rewards strategy for the enterprise, integrating talent management and compensation programs to drive business success, including realignment of our executive compensation programs.  Developed new sales organization and compensation programs to achieve lower costs and increased premiums while minimizing risk.  Explored new pay systems for our venture capital organization and our investment entities.

TEVA 000117

# RANDOLPH WM. KEUCH

Page 2

PFIZER, INC., New York, NY (left due to Warner-Lambert and Pharmacia acquisitions)          1998-2004

**Corporate Director, Strategic Rewards (2002 - 2004)**
Led the redesign of all reward and recognition programs globally, including Pfizer's annual incentive plan, stock option program, performance share program, colleague recognition program, and other short-term incentive plans. Led a team tasked with developing a global compensation approach for the company, which included introducing broad banding or "super grades" as the compensation structure; establishing financial metrics at senior levels; communications; and directing the design of our PeopleSoft systems, reporting tools, and HR portal. Redesign was focused on reallocating compensation and benefit expenditures into programs that increased employee engagement - resulting in over $100 million in increased profitability.

**Director, Pfizer Consumer Group (PCG) Compensation (1998-2002)**
Built the compensation organization for PCG and each division within it, including the redesign of all compensation programs to facilitate the sale of three consumer businesses (Adams, Schick & Tetra) at a premium price. Developed the PCG global rewards strategy, incorporating pay data from 23 countries and using this strategy to develop U.S. and global pay processes for delivering merit increases, annual bonuses and stock options. Also drove change through teams to redesign remuneration programs globally for all lines of business to enhance efficiencies and enable effective talent management. Provided vision and established infrastructure for launching broadbanding pay structure in the U.S., Asia, Australia and South Africa as well as building global total remuneration survey groups for each key geographic region. Revamped both U.S. and European sales compensation programs, resulting in a 20% sales increase and a 35% drop in turnover. Developed reward & retention program for critical scientists being relocated from Morris Plains, NJ to Ann Arbor, Michigan, resulting in substantially reduced turnover and hiring costs. Provided leadership to launch PeopleSoft; upgrade U.S. benefits programs; and develop a global employee data analysis tool.

SMITHKLINE BEECHAM, Philadelphia, PA (left due to merger with Glaxo)          1994-1998

**Corporate Director, Compensation Strategy & Development (1996-1998)**
Designed remuneration programs and processes globally for all divisions resulting in substantial cost-savings and a stronger linkage between pay and performance. Established infrastructure for launching global shared service for compensation function (staff of 20) resulting in vastly improved customer service and a 22% reduction in cost of services. Developed and implemented a cash and stock-based reward & retention program for SB's high technology professionals worldwide that saved the company over $40 million in turnover costs and resulted in no major business disruption due to Year 2K issues; and worked with compensation committee of board to develop elite retention program for executives that took advantage of transferable options and deferred compensation arrangements.

**Director, Human Resource Planning, Systems, & Compensation (1994-1996)**
*Worldwide Research & Development Organization*
Led the compensation and HRIS function globally (2 major sites: Philadelphia & London with staff of 10) and added value to the organization by designing and implementing the following major new initiatives:
- Designed and launched career development and remuneration program for most of R&D's over 4,000 employees.
- Developed and launched R&D's People Measures – an executive information system that provides scorecard for optimizing R&D's people asset.
- Developed and launched reward and recognition program for three SB businesses.

## PROFESSIONAL EXPERIENCE – Senior Consulting Positions (1988 - 1994)

COMPENSATION RESOURCES, INC., Upper Saddle River, NJ          1993-1994

**Principal**
With the successful public offering of Opinion Research Corporation, I moved the compensation consulting practice to Compensation Resources, Inc. and managed executive compensation and human resource consulting assignments for my clients. Served as expert witness for U.S. government in executive compensation-related matters and have been credited with much of the case law in this area. Developed compensation system for large investment firm and provided compensation services to major financial institutions, consumer goods companies and pharmaceuticals.

TEVA 000118

# RANDOLPH WM. KEUCH

Page 3

OPINION RESEARCH CORPORATION, Princeton, NJ                                      1992-1993
**Partner/Owner**
Provided compensation and business solutions to clients and their Boards.  Supported quality improvement efforts of clients from business perspective through fact-based measurement framework that encompassed customer satisfaction, employee satisfaction/commitment, business processes, and financial performance.  Created innovative organizational structures and compensation arrangements that enabled companies to support and sustain selling strategies.  Participated in IPO of the company in 1993 and left as company exited the compensation consulting business.

- Designed powerful measurement tool, The Balanced Scorecard, for a top 10 financial institution.
- Developed unique methodology to examine sales force effectiveness and link sales compensation to key drivers of customer satisfaction resulting in substantial sales increases.
- Developed worldwide internal customer satisfaction measurement system for internal infrastructure organizations within Fortune 50 pharmaceutical/healthcare company.

KPMG PEAT MARWICK, Short Hills, NJ (left as benefits and compensation practices were being sold)      1988-1992
**Manager**
- Led the marketing, selling and managing of client engagements in all areas of compensation, particularly executive, sales and incentive compensation; computer-aided job evaluation, and quality improvement.
- Established national reputation for compensation and related human resource consulting in the high technology industry.
- Sold and managed global research study for IBM on pay and employee involvement resulting in major redesign of IBM recognition programs…authored a book "Learning from the Leaders" about the results of this study, that was sold by the Society for Human Resource Management.
- Developed supplemental retirement plans, deferred compensation arrangements and Board of Director stock option plans for a variety of organizations, including a major credit card provider.

**Previous Professional Experience:**

TOWERS-PERRIN, Detroit, MI, **Executive Compensation Consultant**

GENERAL ELECTRIC, Information Services Unit, Rockville, MD, **Compensation Manager**

PLANNING RESEARCH CORPORATION, McLean, VA, **Executive Compensation Director** (co. acquired)

SIBSON & COMPANY, Princeton, NJ, **Compensation Analyst/Consultant/Senior Consultant** (co. sold)

## EDUCATION

HARVARD BUSINESS SCHOOL, Cambridge, MA, Completed Executive Education Program, 2002

GEORGE MASON UNIVERSITY, Fairfax, VA, post-graduate work in Human Resource Management, 1990-1992

STEVENS INSTITUTE OF TECHNOLOGY, Hoboken, NJ
   **MS Degree**, Applied Psychology
   **BS Degree**, Industrial & Organizational Psychology (with Honors & Thesis)

Recipient of the American Compensation Association's Lifetime Achievement Award, 2000
Served on the Board of Directors for the National Business Group on Health (2010 – 2014)
Served on the Customer Advisory Board for Fidelity Investments (2009 – 2013)
Chaired the Executive Compensation Advisory Board for WorldAtWork (2008 – 2011)
Certified Executive Compensation Professional (2010)
Adjunct Professor at Trenton State University

TEVA 000119

Americas Total Rewards Team
Operational Review – June, 2017

# Working together to achieve our 2017 goals

# Agenda

- Summary
- Key statistics
- Key accomplishments
- How we are organized
- What we do
- North American differentiators
- Recommendations - Staffing Total Rewards in the Americas
- 2017 must wins
- Future

APPENDIX

- NA TR Staffing details

JOINT APPX - 0075

TEVA 000121

# Summary

**ALL** of the members of the Americas Total Rewards team were hired over the past 3 years, except for the Head of NA Benefits – Diane Rohach.  Over that period, the team has exceeded all of its Must Wins; delivered over $30 million in cost savings; and has developed both strong relationships and high credibility with senior business leaders, other COEs, and HR in general.

We manage a very large employee population (plus dependents); have the most complex and expensive healthcare system in the world; have a sales force of over 1,500 ee's; and  in the near future, may have the largest executive population.  We were also recognized by Fortune Magazine and NBGH for our wellness programs.

We have accomplished all of this with a team that, by US standards, is extremely lean.  Our Compensation team is struggling the most and our Benefits team is managing a 40% increase in employees without any increase in staff, and now has one resignation and one team member returning from medical leave.  *It is our expectation that our solutions to better manage our workload will be implemented.*

# America's Region – Key Statistics

## US & Puerto Rico

- 22,000 ee's & dependents

- About $1 billion salaried payroll

- $250 million annual spend on benefits

- COL is $1.3 Billion

- High % of TEC members and Senior Leaders in US

## Canada

- 3,810 ee's & dependents

- $80.7 million USD salaried payroll

- $9.0 million USD annual spend on benefits

- COL is $

## LatAm

- 10,200+ ee's & dependents

- $130 million USD salaried payroll

- $71 million US annual spend on benefits

- COL is $225 million USD

- Five countries in the Top 10 Revenue of Growth Markets (23 countries in total)

> We are accountable for the well-being of 36,000 ee's & dependents with a salaried payroll of $1.2 billion and annual benefits spend of $330 million

JOINT APPX - 0077

TEVA 000123



# America's Region – Key Accomplishments

## US

- Committed to reduce costs for 2017 by $6 million plus additional cost avoidance of $2 million; and delivered 3-yr cost savings and cost avoidance approaching $30 million

- Managed CONNECT process; successfully integrated 3 large acquisitions; completed GCA and C&B reviews; and launched MyTevaRewards

- At or above High Performing Norm on ALL TR-related questions in employee survey

- Recognized by the National Business Group on Health and Fortune Magazine

- Settled IRS audit with no fees

## Canada

- Successfully integrated Actavis

- Implemented employee contribution to prevalent health/dental plan (350K savings YOY)

- Harmonized vacation schedule

- Reduced overly competitive sick day policy by 40% allowing business to better meet production targets

- Through strict claims management of our ASO program, found cost savings sufficient  to fund 1% critical increase to grade 1 to 9 target bonus

- Partially aligned bonus structure within Canada between BUs and closer to competitive market through cost savings

## LatAm

- Managed CONNECT process: April and bonus global formula in all Countries

- Successfully integrated Actavis (Brazil) and Rimsa (Mexico) acquisitions; completed GCA and C&B reviews

- Pay range and Merit matrix since 2014-15 YE process

- Launched STARS in Argentina in 2016 and implementation in Brazil, Chile, Peru, Venezuela and Uruguay in Q3/Q4 2017

- TR Training in all countries

- Adopted cluster structure: Argentina/Chile/Uruguay and Peru/Venezuela (HC redistribution)

JOINT APPX - 0078

TEVA 000124

# Total Rewards Americas – The Teva TR Team



JOINT APPX - 0079

TEVA 000125

# Workload Peaks - Americas

The chart below shows the major annual initiatives that require considerable resources.  By moving transactional work out of the NA Benefits team, we believe ½ of an FTE will now be available within the team to handle the increased volume and to help the NA Compensation team, particularly when the NA Compensation team has a workload peak and the Benefits team does not.



TEVA 000126

# What we do – NA Benefits & Puerto Rico

| Work  Manager 1 |
|---|
| Budget |
| Ensure benefits are Compliant |
| Work with legal on Employment litigation |
| Disability Management |
| Website |
| Second level appeals |

| Work  Manager 2 |
|---|
| Communications |
| Vendor relations for medical, dental and Prescription |
| Set up and improve on current file feeds |
| Oversee new Wellness program |
| Website oversite |
| Mergers and Acquisitions |
| Acquisition and Divestitures |
| Expats & VPs |

| Work Manager 3 |
|---|
| 401(k) and 1165(e) compliance and strategy and design |
| Working on controls |
| DC plan administration /DC-Cephalon |
| SERP |
| *QDRO* |
| ESPP Administration |
| Audit FSA and HSA |
| Financial Planning |
| Wires |

| Analyst 1 |
|---|
| Maintains files to vendors |
| Manages COBRA |
| Audits FSA and HSA |
| File loads |
| Maintain Benefits Mailbox |

| Analyst 2 |
|---|
| Manages disability for 8,000 employees |
| Works with legal on issues related to return to work |
| Invoicing |

JOINT APPX - 0081

TEVA 000127

teva

# What we do – NA Compensation

➤ The chart to the right indicates the resources available to support the over 11,000 ee's in US/PR and Canada , and the current split of work among the group.

➤ The following is a breakdown of employees per group

   ➤ GSF (IT, Finance, HR, Compliance, Legal)– 1,500 employees

   ➤ GGM  – 1,500 employees

   ➤ GSM - 2,200 employees

   ➤ TGO –  5,000 employees

   ➤ R&D – 1,000 employees



CURRENT

9

TEVA 000128

# What we do – NA Compensation

➢ Each Compensation Manager role requires the following:

- Client Support – 50% of the role
  - ✓ Day to day market reviews for Talent Acquisition & HR, including possible equity analysis
  - ✓ Participation in HR team meetings to ensure compensation updates are shared with the team, and comp team member is updated on the business
  - ✓ Retention reviews
- Project Support – 50% of the role
  - ✓ Reward – Towers Watson Tool & Survey participation (Miriam/Veronica)
  - ✓ FLSA (Each team member reviews his/her area)
  - ✓ Sales Incentives – GSM (Kent)
  - ✓ Sales Incentives – GGM (Elise)
  - ✓ Pay Equity – US & Canada – Very complex as different Country, State and Local laws (Each team member reviews his/her area)
  - ✓ Year End – Connect (Miriam/Elise)
  - ✓ GCA – (Miriam/Veronica)
  - ✓ MyTeva portal (Kent)

JOINT APPX - 0083

TEVA 000129



# What we do – LatAm

| Every Manager in every country |
|---|
| Budget |
| Ensure benefits are Compliant |
| Work with legal on Employment litigation |
| Disability Management |
| Communications |
| Vendor relations for medical, life and dental |
| Oversee new Wellness program |
| Mergers and Acquisitions |
| Working on controls |
| Audits |
| Financial Planning |
| C&B Review / AOP |
| Surveys participation |
| Expats and Job offers |



Head of Total Rewards – Americas

Randy Keuch

ALL HR Headcount

Head of Total Rewards –LATAM
Edu Nasi

TR Manager (AR/CL/UY)
Analia Gritta

TR/LE Manager (BR)
Enzo Cruz (50%)

TR Manager (PE/VE)  OPEN

TR Manager (MX)
Elizabeth Juarez

JOINT APPX - 0084

TEVA 000130

teva

# NA Differentiators - Compensation

The NA Compensation Team is engaged with the following tasks and activities that are not performed by other country compensation/TR teams:

1. The team is directly engaged in the design and competitiveness of ALL sales compensation incentives and contests for GSM, GGM, and now Anda.

   ✓ *With a sales population approaching 4,000 ee's and a spend of over $600 million, the business has asked that TR apply their expertise to design incentive programs, sales contests, and keep compensation competitive.  **TR must approve ALL incentive plans and contests, and currently works with local finance to administer all GGM US & CA incentive programs as well as all Canadian GSM incentive programs**.*

2. As there are just a small number of union ee's, virtually all factory and distribution center employee compensation is managed directly by NA compensation team

   ✓ *With so few unionized ee's, the NA TR team works closely with each BU and site to manage the competitiveness of pay, local incentives, and special programs.*

3. The presence of several TEC members in the US (and possibly the CEO) will require substantial resources to support corporate Executive Compensation team, and with new US reporting requirements due to being an issuer of US securities, workload will increase

   ✓ *The NA Compensation team, working with our Benefits team, is directly involved in equity and other compensation issues unique to the US for each TEC member.  The data required for preparation of a US proxy will be significant.*

TEVA 000131

teva

# NA Differentiators - Compensation, cont'd

The US & CA Compensation Team is engaged with the following tasks and activities that are not performed by other country compensation/TR teams:

4.  Management and maintenance of GCA for these 9,000 ee's will continue to require resources.

    ✓  *With 3 major acquisitions, the resources needed to have all positions aligned to GCA is substantial, and without this being competed, all systems linked to GCA grade will not operate correctly.  Resources will also be necessary for all the system workarounds required to complete the Year-End process.*

5.  High turnover, coupled with business transformation, involves ongoing reorganizations, retention bonuses, and offers for new hires (as well as promotions), all of which requires substantial resources.

    ✓  *With turnover around 23%; Reductions in Force; offers and counteroffers; realignments, etc. the involvement of the TR team has proven to be a valuable partner to HR and the business*

    ✓  *MyTevaRewards is currently only available in the US and the response has been terrific.  Over two-thirds of ee's have used it, and in the first month, the site had over 60,000 hits. This site is critical to our wellness programs and cost reductions, and to improving the effectiveness of our sales organization.  As the US and NA have the highest engagement scores in the C&B topics, this technology will help sustain those record levels.  The site will open to Canadian employees by Q4.*

6.  In an effort to pay in close alignment with the external market, the local TR team market prices each role where possible.

    ✓  *By applying market data to each role and providing this information to Talent Acquisition & HR, we are enabling the business to pay at market for new hires and promotions.  Hopefully ensuring compensation is not a reason why an employee would choose to leave Teva.*

TEVA 000132

13



# NA Differentiators - Benefits

The NA Benefits Team is engaged with the following tasks and activities that are not performed by other country benefit/TR teams:

1. U.S. benefits are self-insured.  As such, Teva pays over 80% of the cost for every medical service received by an employee and the employee's dependents.  With hundreds of millions of dollars being spent on medical services, and medical costs rising at 7%+ annually, managing medical costs is extremely important.

   ✓ *The NA benefits team spends significant time and resources finding ways to reduce medical spend and administration costs. We also work with the business, negotiating with AmWell to provide no-cost medical, behavioral health and nutrition visit with physicians to our ee's and their dependants.  Creating a culture of wellness helps drive medical costs down.  Most other countries are either fully insured or have socialized medicine managed by the government and paid for through taxes.*

2. Many of our benefits are regulated by various government agencies, and therefore require monitoring and compliance.

   ✓ *With so many regulations and required reports, with financial penalties for non-compliance, we spend considerable time and resources working with the IRS, auditors, Finance, etc. to be compliant.*

3. The US spend on prescription drugs is approaching $35 million – a cost that we must manage.

   ✓ *The NA Benefits Team, is working directly with the business to provide Copaxone to our employees directly from the US Teva pharmacy – saving over $2 million per year in spend.  We hope to expand this program to include more medications.*

4. The US also manages the Teva SERP, ESPP, and Deferred Compensation Plan, and on-board Senior leaders and expats.

   ✓ *The US and Canada are the only countries with an ESPP.  Given the high profile of SERP and deferred compensation plan participants, these plans require ongoing maintenance and communications.  Considerable time is also spent onboarding expats into the most complex and expensive haeth care system in the world.*

5. Working directly with the business and senior leaders to create an new business for Teva

TEVA 000133



# Recommendations for Staffing TR in the Americas

The NA TR team would benefit from being allowed to fill the frozen Compensation Manager position and reduce their dependence on contractors/consultants.

In addition, we believe that by adding a headcount to HR Ops & Svcs that performs many of the transactional operations performed by the NA TR team, will:

- Allow the benefits team to function more efficiently and manage their workload better
- Provide some relief to the NA Compensation team
- Provide developmental opportunities for team members

Finally, we believe the staffing of the TR team for LatAm needs further review.  However, we need greater stability in the LatAm businesses and greater knowledge of future growth plans before making any recommendations.

JOINT APPX - 0088

TEVA 000134

# 2017 America's TR Must Wins

**Global**

**Support Teva in the next level of evolution**

- Lead TR harmonization aspects for all **integrations**
- Embed cost awareness in compensation and benefits programs
- Support the business with HC **synergies & restructuring**
- Redesign Global Performance Management system approach

**Region**

- Deliver benefit AOP cost savings of $6 Mil in US and $60k in Mexico
- Finalize GCS in the US (Anda)
- Extend MyTevaRewards to legacy Actavis & Anda ee's, and to Canada

**Maintain a healthy work environment**

- Reinforce our holistic performance and rewards ("Connect") mindset
- Develop a Global Health and Well-being Strategy and conduct Health and Well-being activities
- Mapping strategic roles – special \ deferential retention programs, tailored made programs
- Global framework for recognition and spot bonus

- Launch STARS for legacy Actavis & Anda ee's
- Review pay alignment strategies by country
- Launch a spot bonus process
- Develop next 3-yr health & well-being strategy for US and Canada; refresh Mexico and LatAm
- Contribute to global retention strategy
- Explore new health & well-being vendors and brokers to reduce costs
- Review situation in Puerto Rico

**Simplify core HR processes**

- Develop Global C&B philosophy
- Enhancing benchmarking methodology and salary ranges
- Successfully manage executive compensation as a first-time US domestic issuer
- Enhance TR capability and effectiveness- Leverage Success factors technology in alignment with TR Operating Model

- Deliver C&B reviews for all countries
- REWARD tool fully operational
- Power BI tool integrated into TR analytics
- Leverage EC compensation module

TEVA 000135



# Total Rewards Americas – The Teva TR Team in Future



JOINT APPX - 0090

TEVA 000136

# Future

- The future requires:

  - More focus on well-being with someone leading this effort, which includes:

    - Culture Clubs and well-being champions at every site (I.e., Frazier Pilot)

  - A competent, motivated and fully staffed Compensation Team focused on:

    - GCA maintenance
    - Pay alignment strategy
    - New hire offers
    - Sales incentives
    - Growth strategies
    - Retention/Attraction

  - A Benefits Team that:

    - Optimizes benefits spend
    - Creates a culture of well-being
    - Reduces stress for employees
    - Outperforms competitors
    - Maintains high levels of employee engagement and satisfaction with benefits offering

JOINT APPX - 0091

TEVA 000137

Everything we have done during the last three years will serve us in the way we respond to these immediate and long-term challenges…We have a terrific team!



JOINT APPX - 0092

TEVA 000138

# APPENDIX

TEVA 000139



# Situation – North America

➢ The Total Rewards team has an approved headcount that is frozen and needs to be filled, and with the increase in responsibilities (Actavis, Anda, and Puerto Rico), needs to off-load a portion of this substantial increase in workload.

➢ Feedback from customers reflects a decline in service capacity.

➢ A headcount has been identified within the US HR team that can be allocated to the HRO&S group to absorb task driven work from the US Total Rewards team.

➢ The Total Rewards team is comprised of skilled benefits professionals being asked to perform administrative functions which leads to job dissatisfaction and poor allocation of resources. It also takes away from their ability to move forward with strategic initiatives.

➢ An example being Susan Duff who worked in Benefits is leaving  team because she wants to have a more strategic, less administrative  role

TEVA 000140

21

teva

# Filling the Frozen Open Position

➢ The chart to the right indicates the resources split with the headcount filled.

➢ With this additional headcount  the project breakdown would be:

    ➢ Pay Equity – Miriam

    ➢ Year End – Connect – Elise

    ➢ Reward – Veronica

    ➢ Sales Incentives , including Portal– Kent

    ➢ GCA – new team member

    ➢ Executive Compensation - Randy

• This is the optimum staffing for this team and is strongly recommended



22

TEVA 000141

# Adding a Headcount to HR Ops & Services



**Current State**

1 Director/1 Associate Director
6 Total Rewards Managers
➢ 3 Compensation
➢ 3 Benefits-possibly move one manager to
2 Benefits Analysts



**Change**

1 Benefits Manager shifts 50% to (new) benefits analyst
1  Benefits Analyst  shift 50% work to Ops services
Splits time between Comp/Benefits
1 Compensation Manager shifts 100% of sales admin work (20% of an FTE)
to OPS/Services

**Future State**

1 Director/1 Associate Director
6 Total Rewards Managers
➢   3 1/2  Compensation
➢   2 1/2 Benefits
2 Benefits Analysts

JOINT APPX - 0096

TEVA 000142



# Movement of Work to HR Ops & Svcs

| Benefits Managers | Current | Future |
|---|---|---|
| 401(k) and 1165(e) compliance and strategy and design | = | = |
| Working on controls | = | = |
| DC plan administration /DC-Cephalon | = | = |
| SERP | = | = |
| QDRO | = | = |
| ESPP Administration | = | = |
| Audit FSA and HSA | = | = |
| Financial Planning | = | = |
| Bonus Accrual (5%) | = → | |
| Compensation Client Support | = | = |
| Disability Management | = | → = |
| Task related work for disability | = | |

Work being moved →

### New Job
| |
|---|
| Task orientated work for disability-Enter leaves and returns |
| Payroll Deductions 401k/ESPP/DC/Medical/Dental/Life |
| Bonus Accruals |
| Sales Incentive Administration |

| Future | Current | Benefits Analysts |
|---|---|---|
| ← | = | Payroll Deductions (401k/Deferred Comp/ESPP/Medical/Dental/Life ) |
| ← | = | Run reports for voluntary deductions |
| = | = | COBRA administration |
| = | = | Maintain Benefits Mailbox |
| = | = | File feeds |
| Future | Current | Compensation Manager |
| ← | = | Sales Incentives Administration (20%) |



## Rappoport, Larry J.

| | |
|---|---|
| **From:** | Randy Keuch <Randy.Keuch@tevapharm.com> |
| **Sent:** | Thursday, December 14, 2017 2:07 PM |
| **To:** | Tal Zorman |
| **Cc:** | Daniel Lawlor; Ron Yaniv |
| **Subject:** | Minimal TR Organization for North America |
| **Attachments:** | Minimal TR Organization Final.pptx |

Hello Tal,

Attached is a deck that provides my bare bones recommendation for my team. I have included options that suggest elimination of my position or Miriam's position. I strongly urge you not to make any leadership changes in Q1, as there is much work for the team to perform and the risks are very high. I also ask that you consult with Legal to validate the risks and our exposure. An error on our 401k could result in disqualification of the entire plan, which has $1.2 billion in assets, so disqualification will result in the loss of huge tax benefits to Teva. If a leadership change (job elimination) is needed, better to do this in Q2 when work has transitioned to HR Ops & Services, and the organization has stabilized. This is not a personal request nor is it made out of concern for having my position eliminated. Rather, it is a business decision as to how much risk Teva is willing to take by moving too quickly or having inexperienced people in key decision-making roles.

Thanks for your consideration and let me know if you have any questions.

Best regards,

 **Randy Keuch** Head of Total Rewards - Americas
Tel: 267-468-4325 Cell: 215-272-9816
Randy.Keuch@tevapharm.com sip:Randolph.Keuch@tevapharm.com www.tevapharm.com

  

TEVA 000144



# Proposed Headcount Reduction for the North American TR Team

December 15, 2017



TEVA 000145

## Situation

Teva is reducing the headcount for the Total Rewards Team that supports North America (US, Canada, & Puerto Rico) and needs help determining what is the minimum team required to provide minimum support.  Factors to consider with regard to **benefits** include:

- Compliance with country laws and regulations - This requires substantial experienced resources as the penalties could be well into the millions of US dollars
  - ❑ Strongly suggest that this concern be discussed with Legal (details are in Appendix)
- Leadership required to manage $220 million in spend and sign weekly wires/invoices in excess of $1million
  - ❑ This is managed daily by the team
- Over $50 million in cost savings generated over last 3 yrs.  Team gave $8.2 million to the US businesses in benefits savings so far for 2017 and will save over $10 million for entire year.  These savings are directly related to the daily actions of team members managing providers and employee healthcare behaviors
- Team is designing and implementing a new Severance Benefit Plan, which is qualified under ERISA, that will save Teva about $10 million in 2018
- Other cost savings initiatives (several million in savings) require resources to research and implement
- Substantial headcount reductions will trigger contract re-negotiations with some vendors driving costs up if not properly managed or creative solutions not identified and put into place
- Management of the benefits (COBRA) for the 1,100+ US employees severed as well as plant closings
- Handling employee escalations of medical and other issues that cannot be adjudicated by our providers
- Canadian benefits headcount not in TR headcount



TEVA 000146

# Situation, cont'd

Factors to consider with regard to **compensation** include:
- Compliance with country laws and regulations (FLSA - US and Pay Equity – US and Canada)
- Partnering on job offers, promotions, etc. and performing market pricings at all levels
- Contributing to restructurings
- Managing pay surveys, sales compensation, and executive compensation
- Partnering with HR and the business on job grading
- Union avoidance in Canada

For both benefits and compensation, we have new legislation that will impact workload including US Tax Reform, US Affordable Care Act modifications, Canadian Pay Equity and Provincial Legislation (just passed in Ontario), US Pay Equity Legislation at the Federal, State and Local levels



TEVA 000147

# Total Rewards – North America
# Current (12 FTEs)*



* Excludes Jan Gustavsen who is in HR headcount for Canada and manages all Canadian benefits



TEVA 000148

# Proposal – Summary (See Appendix for Details)

The North American TR team currently has 13 employees, if you include Jan Gustavsen, who is the Benefits Manager for Canada and 2 contractors.  We believe we can reduce that headcount from 13 to 6 for a 54% reduction.  To do this, the key changes will be as follows:

- 401k fiduciary responsibility will be outsourced to new vendor and actually reduce current spend by $30,000
- Some benefit administrative responsibilities will be moved to HR Ops & Services (disability, COBRA, wires, etc.) NOTE – US Law (HIPPA) regulates access to employee medical information
- Shift market pricing of jobs from job specific survey data to salary structure pricing
- Eliminate participation in:
    - Sales compensation
    - Executive pay and benefits

The next slide reflects the proposed organization structure.

Reducing headcount below these levels in Q1 will impair achievement of current cost-savings initiatives (discussed later); impair severance process for Q1; and create greater risks by taking the people out without taking the work out – Proposal is to revisit these headcount levels in Q2.



TEVA 000149

## Total Rewards – North America
## Proposed (6 FTEs or 54% reduction*)



The Benefits team will retain the lowest graded employees

* Assumes Canadian benefits headcount is severed with full responsibility transferred to NA TR team



TEVA 000150

# Proposal – Summary (See Appendix for Details), cont'd

If further reductions are required, the only positions that can be cut would be leadership roles.

The NA Benefits Associate Director – Diane Rohach - should be considered the most valuable leader, as the compliance requirements combined with the impact of noncompliance (many millions). Remaining staff does not have expertise to handle all benefits and needed compliance for Teva.

The Region TR Head – Randy Keuch – is probably the next most valuable leader given his knowledge and experience in both compensation and benefits and having managed situations similar to Teva's and is at a level appropriate to manage a $220 million spend as well as oversee compliance

The NA Compensation Director – Miriam Weinstein – is also a valuable compensation resource.  Recognize that under Canadian law, any employee can request a full pay analysis for their position.  This pay analysis must include market data plus internal pay data for all of their peers.  No one on the team is experienced with this new legislation

Reducing headcount below 6 employees substantially raises the level of risk (noncompliance resulting in fines and possibly disqualification of our plans).  It is the leadership team that fully understands the compliance issues and without them, Teva is entrusting over $220 million in spend to non-managers.  Suggestion is to confer with legal counsel regarding this exposure and to make any headcount reductions below 6 at a later date.

teva

TEVA 000151

# Total Rewards – North America
# Proposed (5 FTEs or 62% reduction*)



**Eliminate Region Head**

**Report Directly to Corporate**

**Head of Benefits**
Diane Rohach

**Ben Analyst**
Sandra Milito

**Ben Specialist**
Courtney Stevenson

**Head of Compensation**
Miriam Weinstein

**Comp Manager**
Veronica Ferrante

**Eliminate Compensation Head**

**Head of Total Rewards – Americas**
Randy Keuch

**Head of Benefits**
Diane Rohach

**Ben Analyst**
Sandra Milito

**Ben Specialist**
Courtney Stevenson

**Comp Manager**
Veronica Ferrante

* Assumes Canadian benefits headcount is severed with full responsibility transferred to NA TR team



TEVA 000152

## Proposal – Compensation: What Will be Left

- Manage:
  - ❑ CONNECT Year-End process
  - ❑ Compliance with pay laws in all countries
    - ▪ Canadian Pay Equity provides that ee's must receive a pay analysis of their job as well as the pay of their peers if they request it, and can file litigation if pay is not equitable
- Analyze pay based on salary structures and market surveys as needed
- Contribute to:
  - ❑ Grade and pay issues associated with organizational changes and restructurings
  - ❑ Site closures (i.e., PR)
- Work with business leaders to address compensation-related business issues
- Partner with HR in job offers, counter-offers, promotions and pay adjustments
- Develop solutions with regard to retention, attraction and motivation issues
- Complete pay surveys and manage Reward system
- Perform modeling and cost analysis for headcount and pay issues

> This work requires 1 Director and 1 Manager with oversight and leadership from 1 Sr. Director



TEVA 000153

# Proposal – Benefits: What Will be Left

- Manage the remaining $200 million in spend for the following:

  | | | | | |
  |---|---|---|---|---|
  | - 401(k) | - Deferred Comp | - 2 SERPs | - Medical | - Annual Enrollment |
  | - Telemedicine | - Employee Escalations | - Legal Filings | - ACA Reporting | - Biometric Screenings |
  | - Flu Shots | - Employee Physicals | - Health Strategy | - Life Ins & AD&D | - Regulatory Inquiries |
  | - EAP | - Dental | - Vision | - Imaging | - 2nd Medical Opinion |
  | - Wires | - College Savings Plan | - ESPP | - COBRA | - Financial Planning |
  | - Stars | | | | |

- Manage Voluntary Benefits
  - Individual Disability Insurance
  - Critical Illness
  - Group Umbrella Liability Ins.
  - Accident coverage
  - Hospital Indemnity

- Other benefits activities include:
  - TevaFit Fitness Centers
  - Tobacco Cessation
  - Cafeteria Offerings
  - Communications (legal)
  - Weight Watchers
  - Monitor Health Dashboard

- Vendor Contracting and Management – See slide on next page

This work requires 1 Assoc Director and 1 Analyst and 1 Specialist with oversight and leadership from 1 Sr. Director



TEVA 000154

# Vendor Contracting and Management



*We manage over 24 vendors with an annual spend of over $220 million*

11



TEVA 000155

# Proposal – Key Cost Savings Initiatives for 2018

- Design and implement severance solution.            Potential 2018 savings of $10 million
- Select and contract with a new advisor for the 401(k).   Potential annual savings of $30,000
- Conduct RFP for Enrollment/Eligibility Administrator    Potential annual savings of $TBD
- Conduct RFP for Life & Disability (US & Canada)       Potential annual savings of $TBD
- Address potential stop loss premium increase          Potential annual savings of $1-3 million
- Impact and compliance with US Tax Reform            TBD
- Model costing of Ontario Pension Plan legal requirement changes
- Produce the US booklet attached below and manage every benefit and every vendor for the US, Canada and PR



2018
Comprehensive Benefits Guide



TEVA 000156



# Appendix - Compensation

teva

TEVA 000157

# Compensation

| Action | Requirement | Impacts of Non-Compliance |
|---|---|---|
| Fair Labor Standards Act – US Overtime Eligibility - CA | Legally Required | Monetary Penalties for company and manager |
| Pay Equity – US Inc. Audits | Legally Required | Monetary Penalties for company |
| Pay Equity – Canada Inc. Audits & Employee Requests | Legally Required | Monetary Penalties, Company Name released publically as a violator |
| Ad Hoc Compensation Reviews | Legally Required | Pay Equity regulations will require this to continue |
| Severance Plan Management and Plan Qualification Inc. File IRS Form 5500s | Legally Required | Plan qualification leading to inability to process Severance in alignment with State Unemployment Insurance – loss of about $6M in cost avoidance |

14



TEVA 000158

# Compensation

| Action | Requirement | Impacts of Non-Compliance |
|---|---|---|
| Mergers, Acquisitions & Divestitures | Requirement based on current practice | This work will need to be completed by someone to provide compensation information for divestitures |
| Year End Process – Connect | Requirement based on current practice | Merit programs will need to run for 2018, and Connect will continue in 2019 and beyond |
| Survey Participation | Requirement based on current practice | Teva is bound to participate in certain surveys in 2018 |
| C&B Reviews | Requirement based on current practice | Merit, Market Adjustment and Promotion Planning for AOP |
| Salary Ranges – US & CA | Requirement based on current practice | Teva US & CA currently uses salary ranges where Market Reference Points do not exist, and in these cases this is used for pay equity |
| Market Reference Points at the GCA Job Level | Requirement based on current practice | Teva US & CA currently reviews each role in relation to the Market Reference Point for each GCA job to review market alignment for Connect and Hiring, and in these cases this is used for pay equity |
| Survey Output | Requirement based on current practice | Ensuring market data is added to WTW tool and roles are updated properly in country so that roles do not have drastic shifts against the market. |

15

TEVA 000159

# Compensation

| Action | Requirement | Impacts of Non-Compliance |
|---|---|---|
| WTW Comp Tool – Survey Admin – US & CA | Requirement based on current practice | Job specific market data will not be able to be created and maintained |
| Job Offers | Requirement based on current practice | Currently TA has set guidelines for recruitment and only comes to TR for offers outside the given framework. If not overseen, pay equity issues can arise. |
| Promotion Reviews | Requirement based on current practice | |
| Maintenance of GCA within NA | Requirement based on current practice | Possible inequities across groups within country |
| Sales Compensation Design Team Member | Requirement based on current practice | Sales team will have full ownership over sales incentive plan |
| Group Re-organization Compensation Assistance | Requirement based on current practice | Decreased Client Experience and realignment not inline with GCA or external compensation |
| Retention Reviews | Requirement based on current practice | Possible inequities |

16

teva

TEVA 000160

# Compensation

| Action | Requirement | Impacts of Non-Compliance |
|---|---|---|
| Spot Bonus Administration | Requirement based on current practice | Possible inequities |
| Proactive Compensation Client Support | Not Required | Decreased Client Experience |
| Compensation Mailbox | Not Required | Decreased Client Experience |
| Pay Alignment Strategy | Not Required | Decreased Client Experience |
| Training | Not Required | Currently supports HR with Union Avoidance |

17



TEVA 000161

# Appendix - Benefits



teva

TEVA 000162

# Benefits

| Action | Requirement | Impacts of Non-Compliance |
|---|---|---|
| Partner with Legal on Employment Litigation | Legally Required-complex must remain in benefits | Employee lawsuits |
| ACA Compliance | Legally Required-complex must remain in benefits | Fines and penalties that could be in the millions |
| Second Level Appeals | Legally Required-complex must remain in benefits | All medical plans require appeals so non-compliance leads to lawsuits and fines |
| 401(K) compliance | Legally Required-complex must remain in benefits | Fines and penalties from either IRS and/or DOL and possible disqualification of 1.7 billion plan |
| 1165 (e) Compliance – PR | Legally Required- complex must remain in benefits | Non compliance can lead to fines and disqualification of the plan |
| DC Plan Administration including Accruals | Legally Required-complex must remain in benefits | Non compliance can lead to fines and disqualification of the plan |
| SERP | Legally Required- complex must remain in benefits | Non compliance can lead to fines and disqualification of the plan |
| QDRO | Legally Required-complex must remain in benefits | Non compliance can lead to fines and disqualification of the plan |

19

TEVA 000163

# Benefits

| Action | Requirement | Impacts of Non-Compliance |
|---|---|---|
| FSA Administration | Legally Required | Not funding could lead to |
| HSA Administration | Legally Required | Non-compliance with rules could disqualify tax-exemption status |
| Audit – IRS & DOL | Legally Required-complex must remain in benefits | Fines and penalties from either IRS and/or DOL and possible disqualification of 1.7 billion plan |
| Disclosure Requirements – Executive Management Team | Legally Required-complex must remain in benefits | Highly regulated must be done with knowledge and expertise in benefits |
| Compliance for Heath and Wealth Plans – 5500s | Legally Required-complex must remains in benefits | Fines and penalties from either IRS and/or DOL and possible disqualification of 1.7 billion plan |
| Open Enrollment | Legally Required | Non compliance with section 125 |
| Maintenance of Contracts and Business Associate Agreements | Legally Required | Can lead to fines and penalties if confidentiality is compromised |



TEVA 000164

# Benefits

| Action | Requirement | Impacts of Non-Compliance |
|---|---|---|
| COBRA | Legally Required- but can move | Fines and penalties from the DOL for non-compliance and possible lawsuits |
| Wires | Legally Required- but can move | 401(k) funding must be competed timely and if not done timely could lead to plan audits as well as non-compliance of the plan which could lead to disqualification of 1.7 billion dollar plan |
| Disability Management/FMLA | Legally Required- but can move | Employment related lawsuits if not compliant with FMLA |
| Invoices | Legally Required-but can move | Need to honor signed contracts and non-payment could lead to disruption of services |
| All Payroll Medical Deductions | Legally Required- but can move | Under the cafeteria plan deductions need |

21



TEVA 000165

# Benefits

| Action | Requirement | Impacts of Non-Compliance |
|---|---|---|
| Maintain files to Vendors | Requirement based on current practice | Not legally required but mistakes on file feeds leads to coverage being dropped for employees |
| Benefits Mailbox – Tier 2 Employee Support | Requirement based on current practice-Must remain in benefits | Escalated questions not getting resolved and possibly compromising health of our employees |
| Mergers, Acquisitions & Divestitures | Requirement based on current practice | |
| Vendor relations for Medical, Dental & Prescription | Requirement based on current practice- Must remain in benefits | Could impact how services are received by employees if vendors are not properly managed |
| Vendor Summit | Requirement based on current practice | |
| Negotiations with Vendors | Requirement based on current practice | Leads to higher spend if not monitored |



TEVA 000166

# Benefits

| Action | Requirement | Impacts of Non-Compliance |
|---|---|---|
| Budget | Requirement based on current practice | Over spend if not monitoring the budget |
| Website – My Teva Reward | Requirement based on current practice | |
| Manage Voluntary Deductions | Not legally required but strongly recommend | |
| Process/Procedure Controls for 401K | Not legally required but strongly recommend | |
| Policy Management | Requirement based on current practice- some legal implications | Non active management can lead to potential lawsuits |

23



TEVA 000167

# Benefits

| Action | Requirement | Impacts of Non-Compliance |
|---|---|---|
| ESPP Administration | Requirement based on current practice-but can move | |
| Weekly New Hire Benefits Orientation | Requirement based on current practice-but can move | |
| Weekly New Hire Benefits Orientation | Requirement based on current practice-but can move | |
| Employee Recognition – STARS | Requirement based on current practice-but can move | |

24



TEVA 000168

# Benefits

| Action | Requirement | Impacts of Non-Compliance |
|---|---|---|
| Expat TR assistance | Not required | Employee disruption |
| VP Orientation | Not required | Employee disruption |
| E&Y Administration | Not required | |
| Health & Wellbeing Strategy | Not required | Health & Wellbeing strategy leads to better health of employees and dependents which could lead to lower spend. Considering the challenging time we are in this is important to keep employees engaged |
| Wellbeing Champions | Not required | Health & Wellbeing strategy leads to better health of employees and dependents which could lead to lower spend |
| Wellness Program | | |
| C&B Reviews | | |

25



TEVA 000169

# Typical Compliance Changes – This is for a US City

*December 14, 2017*
*San Francisco Increases Employer Mandate Amount for 2018*
**Important for Employers with Employees in the City of San Francisco**
Recently, the San Francisco Board of Supervisors increased the amount that employers must spend on health care in 2018 and made other changes to the Health Care Security Ordinance (HCSO). The Board of Supervisors made the following changes that impact large employers:

Increased the health care expenditure rate for "large businesses" (100 or more employees total) to $2.83 per hour (up from $2.64 in 2017), and the rate for "medium-sized businesses" (20-99 employees total) to $1.89 per hour (up from $1.76) beginning January 1, 2018; and

Released a notice that employers must post by 1/1/18.

As of January 1, 2017, all health expenditures had to be irrevocable (i.e., could not revert back to the employer) if they were to count toward the employer spending requirement under the HCSO. In addition, in October of 2017, the San Francisco Office of Labor Standards Enforcement issued new rules applying the irrevocability standard to self-insured plan expenditures.

26



TEVA 000170

# Teva Dashboard – Paid Data 7/2016 – 6/2017 & 7/2015 – 6/2016



2

9/18/17

TEVA 000171

## SEPARATION AGREEMENT AND GENERAL RELEASE

THIS SEPARATION AGREEMENT AND GENERAL RELEASE ("Agreement") is made between Randolph Keuch ("Employee") and Teva Pharmaceuticals USA, Inc. ("Teva").

WHEREAS, Employee's employment will terminate, effective as of March 18, 2018 ("Separation Date") and Employee and Teva desire to make a full and final settlement of any and all potential claims by Employee with respect to Employee's employment by and employment termination from Teva,

NOW THEREFORE, in consideration of the mutual promises contained in this Agreement and for other good and valuable consideration, the parties agree as follows:

1. <u>Termination of Employment Relationship</u>.  Employee's employment with Teva is terminated effective the Separation Date under the terms and conditions set forth in this Agreement.

2. <u>Separation Payments and Benefits</u>.  Teva will provide Employee with the following payments and benefits in consideration for:

(a) Employee's execution and non-revocation of this Agreement, and with it Employee's agreement to release all claims that can be released, as set forth in Paragraphs 5 and 6 in this Agreement, and in exchange for Employee's agreement to abide by the restrictions set forth in this Agreement, following receipt of Employee's signed copy of this Agreement and the expiration of the seven (7) day revocation period referenced in Paragraph 7(e) without revocation of this Agreement; and

(b) Employee's conformance with the requirements, terms, and conditions of the Teva Pharmaceuticals USA, Inc. Supplemental Unemployment Benefit Plan or Teva Pharmaceuticals USA, Inc. Employment Transition Plan, whichever is applicable:

(i) <u>Separation Payments</u>.  Subject to satisfaction of the two (2) conditions stated above, Employee shall receive separation payments in the aggregate totaling $71,400.00 equal to thirteen(13) weeks of gross salary "(Separation Payments"), less all applicable deductions, which shall be paid pursuant to Paragraph 2(iii) below.  All Separation Payments will be made in accordance with the terms and conditions of the Teva Pharmaceuticals USA, Inc. Supplemental

TEVA 000172

Unemployment Benefit Plan or Teva Pharmaceuticals USA, Inc. Employment Transition Plan, whichever is applicable.

      (ii)  <u>Transitional Health Coverage Allowance</u>**.** To be eligible for this Transitional Health Coverage Allowance, Employee must be enrolled in one (1) or more of Teva's health insurance plans as of Employee's Separation Date.  Employee shall receive a Transitional Health Coverage Allowance equal to $8,250.34, less all applicable deductions, which shall be paid pursuant to Paragraph 2(iii) below.   It is the Employee's responsibility to timely elect COBRA or other coverage and pay monthly premiums.

      (iii)  <u>Payment Schedule</u>.   The Separation Payment and Transitional Health Coverage Allowance, as described above, totaling $79,650.34, will be aggregated and paid in seven(7) equal bi-weekly installments beginning as soon as administratively possible following receipt of <u>Employee's signed</u> copy of this Agreement and the expiration of the seven (7) day revocation period referenced in Paragraph 7(e) without revocation of this Agreement, and subject to Paragraph 14 below. All payments made under this Agreement are subject to applicable deductions, including without limitation federal (including the federal supplemental tax), state, and/or local taxes.

      (iv)  <u>Outplacement</u>.   Teva shall select an outplacement firm to provide career transition services to Employee and Teva shall be solely responsible for the fees charged by the outplacement firm for providing such services.   Employee must begin Employee's participation in such services within ninety (90) days of Employee's Separation Date.

      For purposes of this paragraph, "consideration" means something of value to which Employee is not already entitled.

    3.  <u>Claim for State Unemployment Insurance</u>.  Employee agrees to timely apply for State Unemployment Insurance ("SUI") as required by the Teva Pharmaceuticals USA, Inc. Supplemental Unemployment Benefit Plan ("SUB Plan"), unless expressly excepted from doing so under the terms of the SUB Plan.  In exchange, Teva agrees not to dispute any claim that <u>Employee</u> may make for SUI to commence on or after the Separation Date; provided, Teva will make reasonable efforts to comply with all legal requirements as to providing information relating to Employee's Teva employment.   Teva agrees that it will not state or imply that

TEVA 000173

Employee's separation was for cause.  Teva does not and cannot guarantee that Employee will receive SUI.

    4.  <u>Return of Teva's Property.</u>  Employee agrees to return to Teva on or before the Separation Date any items of Teva's property listed on **Exhibit "A,"** to the extent Employee has such items, as well as any other personal property of Teva in Employee's possession.  Teva shall make a good faith effort to return Employee's personal property to Employee.

    5.  <u>General Release and Waiver of Claims.</u>  In consideration for the payments and commitments referred to in Paragraphs 2 and 3 of this Agreement, Employee hereby releases and forever discharges Teva and all of its past and present subsidiaries, parent and related corporations, companies, joint ventures, partnerships, and divisions, and their past and present directors, trustees, officers, partners, members, managers, supervisors, employees, attorneys, and agents and their predecessors, successors and assignees (sometimes referred to collectively in this Agreement, together with Teva, as "Releasees"), from any and all legal, equitable or other claims, debts, contracts, complaints or causes of action (hereinafter referred to collectively as "Claims"), whether known or unknown, asserted or unasserted, that Employee ever had, now has or hereafter may have against Teva or any or all of the other Releasees, by reason of any cause, matter, thing or event whatsoever arising out of Employee's employment by Teva and/or Employee's separation from employment with Teva occurring at any time up to and including the date and time Employee signs this Agreement.

    6.  <u>Specific Release and Waiver of Claims.</u>  Employee acknowledges and agrees that the Claims being released in Paragraph 5 of this Agreement include, but are not limited to, any claim arising out of the Employee's employment by Teva which could be asserted now or in the future, whether brought individually, in a representative capacity or as a member of any class of claimants, or in a collective action, under: (i) the common law, including but not limited to theories of breach of express or implied contract or duty, tort, wrongful termination, defamation or violation of public policy; (ii) any policies, practices or procedures of Teva and/or Releasees; (iii) any federal, state and/or local statutes or regulations including but not limited to, the Employee Retirement Income Security Act of 1974, as amended, 29 U.S.C. § 1001 *et seq.*; the Americans with Disabilities Act of 1990, 42 U.S.C.§ 12101 *et. seq.*; Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*; Executive Order 11246, as amended; the Equal Pay Act, 29 U.S.C. § 206 (d) *et seq.*; the Family and Medical Leave Act, 29 U.S.C. § 2601 *et seq.*; the

TEVA 000174

Genetic Information Non-Discrimination Act, 42 U.S.C. § 2000ff-1 *et seq.*; 42 U.S.C. § 1981; the Age Discrimination in Employment Act, 29 U.S.C. § 621 *et seq.*; the Consolidated Omnibus Budget Reconciliation Act, 29 U.S.C. § 1021 *et seq.*; the Worker Adjustment and Retraining Notification Act, 29 U.S.C. § 2101 *et seq.*; the Pennsylvania Human Relations Act, 43 P.S. § 951 *et seq.*; and/or any applicable federal, state or local laws, regulations, or ordinances; (iv) any contract of employment, express or implied; (v) any provision of the Constitution of the United States, and any applicable state constitution(s); (vi) any and all claims or actions for attorneys' fees and/or costs; (vii) any claims for unpaid or withheld wages, severance pay, bonuses, overtime, stock or stock options, commissions or other compensation, leave, reinstatement, sick pay, insurance coverage or non-vested and/or non-accrued employee benefits of any kind; and (viii) any provision of any other law, common or statutory, of the United States, or any applicable state or locality.

     7.  <u>Notice of Special Rights Under the ADEA.</u>  In addition to the release of Teva and the other Releasees from any and all Claims arising out of Employee's employment by Teva which arose up to and including the date of this Agreement, Employee further acknowledges with respect to the release of Claims under the Age Discrimination in Employment Act, 29 U.S.C. § 621 *et seq.* ("ADEA") (to the extent that Employee may have any Claims under the ADEA based upon Employee's age) that:

     (a)  Employee waives these Claims knowingly and voluntarily in exchange for severance and other benefits which are of value, and that Employee would not otherwise have been entitled to receive;

     (b)  Employee is hereby advised in writing by Releasees to consult with an attorney in connection with this Agreement;

     (c)  Employee hereby acknowledges that this waiver does not apply to any rights or Claims that may arise in the future.

     (d)  Employee has been given information regarding the job titles and ages of all individuals eligible or selected to receive benefits under this Reduction in Force Program ("Program") at this time and the ages of all individuals in the organizational unit who are not eligible for benefits at this time, such information being attached as **Exhibit "C;"**

TEVA 000175

(e) Employee has been given a period of Forty-Five (45) days within which to consider this Release but understands that Employee need not consider this Agreement for that full period before signing it;

(f) Employee understands that Employee may revoke this waiver of Claims under the ADEA for a period of seven (7) days following the date Employee signs this Agreement and that Employee's waiver of ADEA Claims will not become effective until the revocation period has expired;

(g) If Employee wishes to revoke the waiver of Claims under the ADEA, that revocation shall be made by forwarding the document attached as **Exhibit "B"** to Teva Pharmaceuticals USA, Inc., attn:  Elaine McGee, Human Resources Department, 1070 Horsham Road, North Wales, PA 19454, no later than the close of business on the seventh (7th) day following the date on which Employee has signed this Agreement; and

(h) If Employee timely revokes the waiver of ADEA Claims in accordance with the above Paragraph 7(g), Employee will no longer be eligible for the payments and Teva commitments referred to in Paragraphs 2 and 3 of this Agreement, but such revocation will not be effective with respect to Employee's release of all other Claims covered by this Agreement and shall remain subject to all other commitments set forth in this Agreement.  The other Claims covered under this Agreement and any consideration Employee received prior to Employee's revocation is valid and adequate consideration with respect to the remainder of this Agreement and Employee's waiver of such other Claims.

(i) This Agreement complies in all respects with Section 7(f) of the ADEA, that is, the waiver provisions of the Older Worker Benefit Protection Act.

8. <u>Non-Released Claims</u>.  The General Release and Waiver of Claims set forth above in Paragraph 5 and the Specific Release and Waiver of Claims set forth in Paragraph  6 above below do <u>not</u> apply to:

(a) Any Claims for vested benefits under Teva's 401(k) plan;

(b) Any Claims to require Teva to honor its commitments set forth in this Agreement;

TEVA 000176

(c) Any Claims to interpret or to determine the scope, meaning, or effect of this Agreement;

(d) Any Claims arising out of any conduct, matter, event, or omission existing or occurring after Employee signed this Agreement; and

(e) Any Claims that may not be waived pursuant to applicable law.

9. <u>Successors</u>.  This Agreement is for the benefit of and is binding upon Employee and Employee's heirs, administrators, representatives, executors, successors, beneficiaries and assigns, and is also for the benefit of the Releasees and their successors and assigns.

10. <u>Effective Date</u>.  This Agreement will be effective when Employee signs and returns it to Teva Pharmaceuticals USA's Human Resources Department, except as otherwise provided in Paragraph 7(g) above.

11. <u>Violation</u>.  If Employee violates Paragraphs 12 or 13 of this Agreement (except as regards to any Claims under the ADEA), Releasees, unless prohibited by applicable law or regulation, will be entitled to the immediate repayment to it of all payments and the cost of all benefits provided to Employee under this Agreement and may discontinue any unpaid payments and benefits.  Should Employee fail to make such repayment, Employee will be deemed conclusively to be bound by the terms of this Agreement and waives any right to seek to overturn or avoid it.  Employee agrees that this repayment will not invalidate this Agreement.

12. <u>Complaints and Whistleblower Claims</u>.

(a) <u>Protected Class Claims of Harassment, Discrimination, and/or Retaliation</u>. Employee represents and warrants that neither Employee nor anyone acting on Employee's behalf has filed any complaint against Teva or any other Releasees with any local, state, or federal court or any other governmental or regulatory body.  Employee acknowledges that neither Employee nor anyone acting on Employee's behalf has to date filed any charge or complaint with the Equal Employment Opportunity Commission or any local or state agency authorized to investigate charge or complaints of unlawful employment discrimination, harassment, and/or retaliation (together, "Agency").  Employee understands that nothing in this Agreement bars Employee or anyone acting on Employee's behalf from filing a charge or complaint of unlawful employment discrimination, harassment, and/or discrimination with an Agency, or assisting in an investigation

TEVA 000177

of a charge or complaint of such unlawful conduct by an Agency.  However, if any Agency or court has now assumed or later assumes jurisdiction of any complaint or charge on Employee's behalf against any Releasees, Employee will disclaim entitlement to any relief.

(b)    Whistleblower Claims.    Nothing in this Agreement prohibits Employee from reporting possible violations of United States federal law or regulation to any governmental agency or entity, including but not limited to, the United States Department of Justice, the United States Securities and Exchange Commission, the United States Congress, and any Inspector General of any United States federal agency, or making other disclosures that are protected under the whistleblower provisions of United States federal, state, and/or local law or regulation; provided, that Employee will use his or her reasonable best efforts to (1) disclose only information that is reasonably related to such possible violations or that is requested by such agency or entity, and (2) request that such agency or entity treat such information as confidential.  Employee does not need the prior authorization from the Company to make any such reports or disclosures and is not required to notify the Company that Employee has made such reports or disclosures.   This Agreement does not limit Employee's right to receive an award for information provided to any governmental agency or entity within the scope of this Paragraph 12(b).

13.  Proprietary Information;  Trade  Secrets;  Non-Solicitation;  Non-Disparagement; Cooperation; and Non-Interference.

(a)  Proprietary Information.  Employee agrees and acknowledges that, during Employee's Teva employment Employee acquired and was privy to confidential information, trade secrets, confidential processes and confidential "know-how" relating to, or concerned with, the past, present, or future business, finances, manufacturing, operations, services, customers, suppliers, sources of leads and methods of obtaining new business, methods of pricing, systems, processes, methods, products, discoveries, designs, inventions, manufacturing, marketing and sales techniques and policies of Teva and the Releasees ("Proprietary Information").  Employee further agrees and acknowledges that during the performance of Employee's duties, Employee had access and was privy to confidential or Proprietary Information belonging to third parties which is subject to a duty to Teva or Releasees to maintain the confidentiality of such information and to use such information only for certain limited purposes ("Third Party Information").  Employee agrees that Employee will not, unless required by court order, judgment or decree, directly or indirectly use, divulge, furnish or make accessible any Proprietary Information or

Third Party Information to any other person or entity.  This condition shall not prevent Employee from using or divulging Proprietary Information or Third Party Information that is now in the public domain or hereafter becomes part of the public domain.  This provision survives the termination of this Agreement. Employee further agrees and acknowledges that the Proprietary Information is a unique asset of great value to Teva, and therefore Employee agrees that the restriction imposed herein is reasonable and necessary for the protection of the goodwill of Teva and not unduly restrictive of Employee's rights.  Employee further agrees and acknowledges that the any confidential information  or other similar agreement signed by Employee continues to be in effect and that Employee will comply with said agreement.

(b)  Trade Secrets:

(i) Notwithstanding any provisions of this Agreement or Employee Confidential Information Agreement, Employee acknowledges that Teva has advised Employee regarding potential immunity under the Defend Trade Secrets Act for disclosing a trade secret under limited circumstances, as set forth in Teva's Confidential Information Policy.

(ii) Notwithstanding any provisions of this Agreement or the Employee Confidential Information Agreement signed by Employee, Employee further acknowledges that if Employee files a lawsuit for retaliation by Teva for reporting a suspected violation of the law, under limited circumstances Employee may disclose Teva's trade secrets to Employee's attorney and use the trade secret information in related court proceedings if Employee: (A) files any document containing the trade secret under seal; and (B) do not disclose the trade secret, except pursuant to court order.

(c)  Non-solicitation. Employee agrees and covenants that, for twelve (12) months after the date of this Agreement, Employee will not directly or indirectly try to solicit or entice any individual who is, at that time, an employee of Teva or of any affiliate of Teva, which Employee knows to be such an affiliate, to leave employment with Teva or such affiliate.

(d)  Non-disparagement. Employee agrees not to engage in any deprecating conduct and/or make any negative comments or disparaging remarks, in writing, orally, or electronically, about Teva or any other Releasee and their respective officers, directors, employees, and agents and their respective products and services, to the media or any entity or individual.  Nothing in this Agreement shall be interpreted to restrict Employee's right and/or obligation to (A) testify

TEVA 000179

truthfully in any forum or (B) contact, provide information to, and/or cooperate fully in any investigation by a government agency.

(e)  Cooperation.

(i)  Employee agrees to cooperate with Teva in connection with any ongoing administrative, regulatory, or litigation proceedings or such like matters that may arise in the future, about which Employee may have personal knowledge and/or subject matter expertise because of employment with Teva.  Such cooperation will include being interviewed by representatives of Teva and participating in legal proceedings by deposition or testimony.  Teva will reimburse Employee for reasonable expenses incurred by Employee by reason of such cooperation.

(ii)  Employee agrees that if served with an order, subpoena, or any other document which purports to potentially require the disclosure of any information relating to Employee's employment with or separation from employment with Teva, this Agreement, and/or any matter otherwise protected from disclosure under this Agreement including confidential and/or proprietary information which Employee acquired in the course of Employee's employment with Teva and which is not generally known by or readily accessible to the public, within three (3) business days of such service, Employee shall so inform Teva and deliver to Teva a copy thereof.  Notice to Teva and a copy of the subpoena, order or other document shall be sent via facsimile and certified mail to the persons identified in Paragraph 18 of this Agreement.

(f)  Non-interference.  Subject to paragraphs 8 and 12 of this Agreement, Employee agrees not to visit any Teva facility, premises, or event unless first obtaining written approval from Teva and further agrees to permit Teva, and its officers, employees, agents, and partners, to continue Teva's day-to-day business without unnecessary and/or unreasonable disruption.

14.  Waiver of Employment or Re-Employment & Re-Employment Generally.  Employee acknowledges that Employee has no right to employment or re-employment with Teva or any of the other Releasees, and, other than with respect to other rights and benefits specifically reserved in this Agreement, Employee has no right to participate in any of Teva's benefit plans which Employee ever had, may now have, or may hereinafter have, whether known or unknown to Employee at the time of the execution of this Agreement.  In the event Employee seeks

TEVA 000180

employment or re-employment with Teva or any parent, subsidiary, related or affiliated company, Teva and any parent, subsidiary, related or affiliated company are not obligated to employ or re-employ Employee.  However, if Employee is hired or re-hired by Teva and/or its affiliates while receiving payments under the Payments Schedule set forth in Paragraph 2(iii), Employee's Separation Payment stop as of the Employee's new hire or re-hire date consistent with this Paragraph 14.

15.  Breach; Legal Capacity; No Coercion.  In the event any party shall be found by a court of competent jurisdiction to have breached this Agreement, the other party shall be entitled to damages, including reasonable attorneys' fees and costs of suit, and shall also return all monetary consideration exchanged hereunder.  However, nothing in this Paragraph 15 shall be considered or interpreted to be a requirement that Employee return any payments or reimburse Teva for the cost of any benefits received under this Agreement before filing a lawsuit or a charge of discrimination with an Agency.  The parties further state that they are signing this Agreement completely, willingly and voluntarily and that there are no medical or other conditions that would prevent them from doing so.  Neither party has subjected the other party to any coercion or duress, and has done nothing to force the other party to sign this Agreement.

16.  No Admission.  This Agreement shall not in any way be construed as an admission by Teva that it has acted wrongfully with respect to Employee or any other person, or that Employee has any rights or claims whatsoever against Teva or any of the other Releasees through the date that Employee signed this Agreement, and Teva specifically disclaims any liability with regard to any wrongful acts against Employee or any other person, on the part of itself, its employees or its agents.

17.  Confidentiality of this Agreement.  Confidentiality of this Agreement.  Employee shall not disclose the existence of this Agreement or any information contained in this Agreement without prior written consent of Teva, except as required by law, or as necessary to implement this Agreement.  Employee agrees not to discuss either the existence of or any aspect of this Agreement with any employee or ex-employee of Releasees, or any other third parties without Releasees' or their successors' or assigns' prior written authorization.  Notwithstanding the above, Employee may disclose this Agreement to Employee's attorneys, health care providers, financial advisers and tax advisers advising Employee and to members of

TEVA 000181

Employee's immediate family, provided <u>such persons</u> agree to keep such information confidential and comply with the terms of this Paragraph.

18.   <u>Notices</u>.  All notices, requests, demands and other communications required or permitted under this Agreement or necessary or convenient in connection with this Agreement shall be in writing and marked confidential.  Any such notice and other communication under this Agreement shall be deemed to have been duly given if delivered by hand or deemed to have been duly given on the third business day following the mailing within the continental United States by first class mail, postage prepaid, addressed as follows:

> Teva Pharmaceuticals USA, Inc.
> Human Resources Department
> 1070 Horsham Road
> North Wales, PA  19454
> Attention:  Elaine McGee, Associate Director, HR
> Facsimile:  215.795.4056
> E-mail: NA_HR_Compliance@tevapharm.com

19.   <u>Governing Law</u>.   This Agreement and any disputes arising thereunder shall be governed by and construed and enforced in accordance with the laws of the Commonwealth of Pennsylvania, both substantive and remedial, without regard to conflicts of laws principles.

20.   <u>Acknowledgements</u>.

(a)  <u>Employee</u> represents that <u>Employee</u> has carefully read and fully understands all the provisions of this Agreement, is entering into this Agreement voluntarily, and that <u>Teva</u> advised <u>Employee</u> in writing, <u>by giving Employee a draft of this Agreement for Employee's review and consideration,</u> to consult with an attorney of <u>Employee's</u> choice and at <u>Employee's</u> expense before <u>signing this Agreement</u>.

(b)  Employee agrees and acknowledges that, by accepting benefits under this Agreement and signing this Agreement, Employee is giving up any right Employee might have to bring a Claim against Teva or any of the other Releasees arising from or in any way related to Employee's employment relationship or the termination of such employment relationship. Employee also agrees and acknowledges that Employee would not receive benefits under this Agreement if Employee did not knowingly and voluntarily enter into this Agreement.

TEVA 000182

(c)  Employee agrees and understands that should Employee sign this Agreement before Employee's Separation Date that (i) this Agreement will be null, void, and unenforceable and (ii) Teva will provide to Employee an unexecuted copy of this Agreement for Employee's signature no sooner than Employee's Separation Date.

21.  <u>Entire Agreement</u>.  This Agreement represents the entire Agreement between the parties and supersedes any and all prior oral and written agreements between Teva and <u>Employee, except for the Employee Confidential Information Agreement</u>.  No variations or modifications of this Agreement shall be deemed valid unless reduced to writing and signed by both parties.

22.  <u>Interpretation of Agreement</u>.  Nothing in this Agreement is intended to violate any law or shall be interpreted to violate any law.  If any paragraph or part or subpart of any paragraph in this Agreement or the application thereof is construed to be overbroad and/or unenforceable, then the court making such determination shall have the authority to narrow the paragraph or part or subpart of the paragraph as necessary to make it enforceable and the paragraph or part or subpart of the paragraph shall then be enforceable in its/their narrowed form.  Moreover, each paragraph or part or subpart of each paragraph in this Agreement is independent of and severable (separate) from each other.  In the event that any paragraph or part or subpart of any paragraph in this Agreement is determined to be legally invalid or unenforceable by a court and is not modified by a court to be enforceable, the affected paragraph or part or subpart of such paragraph shall be stricken from the Agreement, and the remaining paragraphs or parts or subparts of such paragraphs of this Agreement shall remain in full, force and effect.

23.  <u>Facsimile/Electronic Signatures/Counterparts</u>.  This Agreement may be <u>signed</u> in counterparts, each of which will be deemed to be an original of this Agreement.  Any party to this Agreement may deliver a signed copy of this Agreement by facsimile or electronic transmission to any other party and any such delivery shall have the same force and effect as any other delivery of a manually signed copy of this Agreement.

TEVA 000183

EMPLOYEE ACKNOWLEDGES THAT EMPLOYEE HAS READ THIS AGREEMENT AND THAT EMPLOYEE FULLY KNOWS, UNDERSTANDS AND APPRECIATES THE CONTENTS OF THIS AGREEMENT AND THAT EMPLOYEE SIGNS THE SAME AND MAKES THE SETTLEMENT PROVIDED FOR IN THIS AGREEMENT VOLUNTARILY AND OF EMPLOYEE'S FREE WILL.

IN WITNESS WHEREOF, and intending to be legally bound, Employee and Teva have signed this Separation Agreement and General Release on the dates indicated below.

_____
Date

_____
Employee Signature

_____
Employee Printed Name (Global ID#: 929502)

_____
Date

Teva Pharmaceuticals USA, Inc.

_____
Authorized Human Resources Signature

Director, HR Shared Services - Americas
Printed Name and Title

**LEGAL/HR O&S ONLY:**

Initial:_____|Date:_____

TEVA 000184

**EXHIBIT "A"**

## ALL PERSONNEL

Credit cards, telephone cards and purchase cards in Employee's name
Keys to the office, buildings, desks and filing cabinets
All Teva files and documents or copies thereof
All keys to any Company car and related documents
All Product Samples
Leather Demo Case (with Contents)
All files (including business cards)
Phone Calling Card
Pager
Auto Insurance Forms
Car Rental Card
Car Keys and Car
Car Maintenance Book
Car Insurance Card/ Owners Card

## NON-FIELD PERSONNEL COMPUTER EQUIPMENT

Laptop/Desktops, docking station(s), and all peripherals
Mobile device (iPhone, Blackberry)
Mobile Tablet device (Apple iPads)

## FIELD PERSONNEL COMPUTER EQUIPMENT

Laptop Computer
iPad
Ultrabase, DVD drive, ultrabase keys
AC Adapter
JAMBOX Speaker with carry case and cables. (if applicable)
Projector with carry case and cables.  (if applicable)
Auto Adapter
Verizon Wireless Modem (if applicable)
Corp Phone & Charger (if applicable)
External Hard Drive (if applicable)
Monitor

TEVA 000185

**EXHIBIT "B"**

**Waiver and Release Revocation**

NOTE: DO <u>NOT</u> SIGN OR RETURN THIS DOCUMENT UNLESS YOU HAVE SIGNED THE SEPARATION AGREEMENT AND GENERAL RELEASE LESS THAN SEVEN (7) DAYS AGO AND NOW WISH TO CHANGE YOUR MIND AND REVOKE YOUR EARLIER AGREEMENT TO THE WAIVER AND RELEASE OF CLAIMS UNDER THE AGE DISCRIMINATION IN EMPLOYMENT ACT.

I, _____, hereby revoke the Separation Agreement and General Release ("Agreement") which I signed on _____, 20__, to the extent that I waived and released any "Claims" (as that term is defined in the Agreement) under the Age Discrimination in Employment Act I might have against the "Releasees" (as that term is defined in the Agreement).

_____
(Signature of Employee)

_____
Date

_____
Witness

_____
Date

IN ORDER TO BE EFFECTIVE YOU MUST SIGN THIS REVOCATION FORM NO LATER THAN SEVEN DAYS AFTER YOU SIGNED THE SEPARATION AGREEMENT AND GENERAL RELEASE.

Received on _____, 20__ by Teva Human Resources Department by

_____Teva Representative Signature

TEVA 000186

**EXHIBIT "C"**

TEVA 000187

TEVA 000188



# Teva Announces Restructuring Plan and Additional Measures to Improve Its Business and Financial Performance

📅 **DECEMBER 14, 2017**     🏷️ **CORPORATE**

- Total cost base to be reduced by $3 billion by the end of 2019
- Workforce to be reduced by over 25%
- Dividend suspended on ordinary shares and ADSs

Teva Pharmaceutical Industries Ltd. (NYSE & TASE: TEVA) announced today a comprehensive restructuring plan to significantly reduce its cost base, unify and simplify its organization and improve business performance, profitability, cash flow generation and productivity.

Kåre Schultz, Teva's President and CEO, said, "Two weeks ago we announced a new organizational structure and executive management team. Today we are launching a comprehensive restructuring plan, crucial to restoring our financial security and stabilizing our business. We are taking immediate and decisive actions to reduce our cost base across our global business and become a more efficient and profitable company."

"We will execute this plan in a timely and prudent manner, remaining focused on revenue and cash flow generation, in order to make sure Teva is ready to meet all of its financial commitments. Teva will optimize its cost base while ensuring that we protect our revenues and preserve our core capabilities in generics and in select specialty assets, in order to secure long-term growth. In 2018, we expect to secure the successful launches of Austedo and fremanezumab."

The two year restructuring plan announced today is intended to reduce Teva's total cost base by $3 billion by the end of 2019, out of an estimated cost base for 2017 of $16.1 billion. More than half of the reduction is expected to be achieved by the end of 2018. The company expects to record a restructuring charge as a result of the implementation of the plan in 2018 of at least $700 million, mainly related to severance costs, with additional charges possible following decisions on closures or divestments of manufacturing plants, R&D facilities, headquarters and other office locations.

The restructuring plan will focus on:

- The immediate deployment of the new unified and simplified organizational structure, announced on November 27. It will deliver cost savings and increase internal efficiencies by reducing layers of management, and simplifying business structures and processes across the company's global operations. The new structure will support our continued commitment to compliance and business integrity
- Substantial optimization of the generics portfolio globally, and most specifically in the United States, through price adjustments and/or product discontinuation. This will enable the company to accelerate the restructuring of its manufacturing and supply network, including the closures or divestments of a significant number of manufacturing plants in the United States, Europe, Israel and Growth Markets
- Closures or divestments of a significant number of R&D facilities, headquarters and other office locations across all geographies, delivering efficiencies and substantial cost savings

**JOINT APPX - 0143**

Teva 000242

9/17/21, 3:35 PM    Teva Announces Restructuring Plan and Additional Measures to Improve its Business and Financial Performance

Case 2:19-cv-05488-JMG   Document 51-3   Filed 06/21/22   Page 146 of 361

- Teva will work to significantly improve profitability in all existing markets by optimizing their cost base
- A thorough review of all R&D programs across the entire company, in generics and specialty, to prioritize core projects and terminate others immediately, while maintaining a substantial pipeline

These steps are expected to result in the reduction of 14,000 positions globally – excluding the impact of any future divestments – over 25% of Teva's total workforce – over the next two years.

The majority of the reductions are expected to occur in 2018, with most of the affected employees being notified within the next 90 days. Restructuring efforts will be done in accordance with applicable local requirements. Consultations with the relevant employee representatives will begin in the near term.

In addition to the restructuring plan, Teva is announcing the following measures to address the company's financial situation:

- The company will immediately suspend dividends on ordinary shares and ADSs, while dividends on mandatory convertible preferred shares will be evaluated on a quarterly basis per current practice
- Teva's annual bonus for 2017 will not be paid due to the fact that the company's financial results are significantly below our original guidance for the year.
- The company will continue to review the potential for additional divestment of non-core assets

Teva will provide full guidance for 2018 in February with the annual results and will share a longer-term strategic direction for the company later in 2018.

Schultz concluded, "These are decisions I don't take lightly but they are necessary to secure Teva's future. We will implement these changes with fairness and the utmost respect for our colleagues worldwide. Today's announcement is about positioning Teva for a sustainable future which we will achieve with our talented people. We will ensure that we continue to provide high quality medicines to the many patients we serve every day, while adhering to the highest standards of GMP compliance."

The plans were outlined in an email from the CEO to Teva's employees. The message can be accessed here (http://cts.businesswire.com/ct/CT?id=smartlink&url=http%3A%2F%2Ftevapharm.com%2Ffiles%2FRestructuringPlan%2FCEO_note_to_Teva_employees.PDF&esheet=51730198&newsitemid=20171214005653&lan=en-US&anchor=here&index=1&md5=192a92248575dc948718a47e9add97a3).

### About Teva

Teva Pharmaceutical Industries Ltd. (NYSE and TASE: TEVA) is a leading global pharmaceutical company that delivers high-quality, patient-centric healthcare solutions used by approximately 200 million patients in over 60 markets every day. Headquartered in Israel, Teva is the world's largest generic medicines producer, leveraging its portfolio of more than 1,800 molecules to produce a wide range of generic products in nearly every therapeutic area. In specialty medicines, Teva has the world-leading innovative treatment for multiple sclerosis as well as late-stage development programs for other disorders of the central nervous system, including movement disorders, migraine, pain and neurodegenerative conditions, as well as a broad portfolio of respiratory products. Teva is leveraging its generics and specialty capabilities in order to seek new ways of addressing unmet patient needs by combining drug development with devices, services and technologies. Teva's net revenues in 2016 were $21.9 billion. For more information, visit www.tevapharm.com (http://cts.businesswire.com/ct/CT?

id=smartlink&url=http%3A%2F%2Fwww.tevapharm.com&esheet=51730198&newsitemid=201712
14005653&lan=en-
US&anchor=www.tevapharm.com&index=2&md5=74a3a1c3c3e0473d255407fa324414b7).

**Cautionary Note Regarding Forward-Looking Statements**

*This press release contains forward-looking statements within the meaning of the Private
Securities Litigation Reform Act of 1995, which are based on management's current beliefs and
expectations and are subject to substantial risks and uncertainties, both known and unknown, that
could cause our future results, performance or achievements to differ significantly from that
expressed or implied by such forward-looking statements. Important factors that could cause or
contribute to such differences include risks relating to:*

- *uncertainties relating to our ability to effectively execute a restructuring plan, including: the
  effects of such restructuring plan, including facilities and workforce reductions, on our
  business, operations, revenues and profitability; potential disruptions to our business as a
  result of the restructuring and management attention to the restructuring; uncertainty
  regarding the timing and amount of exit and disposal costs and severance, and the potential
  amount and timing of future cost savings, associated with the restructuring and the related
  workforce reduction; our ability to manage the costs and liabilities associated with a
  restructuring plan, including exit and disposal costs and severance; the potential loss of tax
  benefits in Israel as a result of our restructuring plan; and potential labor unrest as a result of
  our planned workforce reductions*
- *uncertainties relating to the potential benefits and success of our new organizational
  structure and recent senior management changes;*
- *our generics medicines business, including: that we are substantially more dependent on this
  business, with its significant attendant risks, following our acquisition of Allergan plc's
  worldwide generic pharmaceuticals business ("Actavis Generics"); our ability to realize the
  anticipated benefits of the acquisition (and any delay in realizing those benefits) or
  difficulties in integrating Actavis Generics; the increase in the number of competitors
  targeting generic opportunities and seeking U.S. market exclusivity for generic versions of
  significant products; price erosion relating to our generic products, both from competing
  products and as a result of increased governmental pricing pressures; and our ability to take
  advantage of high-value biosimilar opportunities;*
- *our specialty medicines business, including: competition for our specialty products,
  especially Copaxone®, our leading medicine, which faces competition from existing and
  potential additional generic versions and orally-administered alternatives; our ability to
  achieve expected results from investments in our product pipeline; competition from
  companies with greater resources and capabilities; and the effectiveness of our patents and
  other measures to protect our intellectual property rights;*
- *our substantially increased indebtedness and significantly decreased cash on hand, which
  may limit our ability to incur additional indebtedness, engage in additional transactions or
  make new investments, and may result in a downgrade of our credit ratings;*
- *our business and operations in general, including: our ability to develop and commercialize
  additional pharmaceutical products; manufacturing or quality control problems, which may
  damage our reputation for quality production and require costly remediation; interruptions in
  our supply chain; disruptions of our or third party information technology systems or
  breaches of our data security; the failure to recruit or retain key personnel; the restructuring
  of our manufacturing network, including potential related labor unrest; the impact of
  continuing consolidation of our distributors and customers; variations in patent laws that may
  adversely affect our ability to manufacture our products; our ability to consummate
  dispositions on terms acceptable to us; adverse effects of political or economic instability,
  major hostilities or terrorism on our significant worldwide operations; and our ability to
  successfully bid for suitable acquisition targets or licensing opportunities, or to consummate
  and integrate acquisitions;*
- *compliance, regulatory and litigation matters, including: costs and delays resulting from the
  extensive governmental regulation to which we are subject; the effects of reforms in*

9/17/21, 3:35 PM                    Teva Announces Restructuring Plan and Additional Measures to Improve its Business and Financial Performance

Case 2:19-cv-05488-JMG   Document 51   Filed 06/21/22   Page 148 of 361

*healthcare regulation and reductions in pharmaceutical pricing, reimbursement and coverage; potential additional adverse consequences following our resolution with the U.S. government of our FCPA investigation; governmental investigations into sales and marketing practices; potential liability for sales of generic products prior to a final resolution of outstanding patent litigation; product liability claims; increased government scrutiny of our patent settlement agreements; failure to comply with complex Medicare and Medicaid reporting and payment obligations; and environmental risks;*

- *other financial and economic risks, including: our exposure to currency fluctuations and restrictions as well as credit risks; the significant increase in our intangible assets, which may result in additional substantial impairment charges; potentially significant increases in tax liabilities; and the effect on our overall effective tax rate of the termination or expiration of governmental programs or tax benefits, or of a change in our business;*

*and other factors discussed in our Annual Report on Form 20-F for the year ended December 31, 2016 ("Annual Report"), including in the section captioned "Risk Factors," and in our other filings with the U.S. Securities and Exchange Commission, which are available at* www.sec.gov (http://cts.businesswire.com/ct/CT?id=smartlink&url=http%3A%2F%2Fwww.sec.gov&esheet=51730198&newsitemid=20171214005653&lan=en-US&anchor=www.sec.gov&index=3&md5=efe846cde91bd7c0e70a52574f6f24a1) *and* www.tevapharm.com (http://cts.businesswire.com/ct/CT?id=smartlink&url=http%3A%2F%2Fwww.tevapharm.com&esheet=51730198&newsitemid=20171214005653&lan=en-US&anchor=www.tevapharm.com&index=4&md5=8a3bdce42452d61b7fd6641182e23f05). *Forward-looking statements speak only as of the date on which they are made, and we assume no obligation to update or revise any forward-looking statements or other information contained herein, whether as a result of new information, future events or otherwise. You are cautioned not to put undue reliance on these forward-looking statements.*

Teva Pharmaceutical Industries Ltd.
IR Contacts:
United States
Kevin C. Mannix, 215-591-8912
Ran Meir, 215-591-3033
or
Israel
Tomer Amitai, 972 (3) 926-7656
or
PR Contacts:
Israel
Iris Beck Codner, 972 (3) 926-7208
or
United States
Denise Bradley, 215-591-8974
Kaelan Hollon, 202-412-7076

# Teva Announces Restructuring Plan and Additional Measures to Improve its Business and Financial Performance

December 14, 2017

JOINT APPX - 0147

Teva 000246

# Cautionary Note Regarding Forward-Looking Statements

This presentation contains forward-looking statements within the meaning of the Private Securities Litigation Reform Act of 1995, which are based on management's current beliefs and expectations and are subject to substantial risks and uncertainties, both known and unknown, that could cause our future results, performance or achievements to differ significantly from that expressed or implied by such forward-looking statements. Important factors that could cause or contribute to such differences include risks relating to:

• uncertainties relating to our ability to effectively execute a restructuring plan, including: the effects of such restructuring plan, including facilities and workforce reductions, on our business, operations, revenues and profitability; potential disruptions to our business as a result of the restructuring and management attention to the restructuring; uncertainty regarding the timing and amount of exit and disposal costs and severance, and the potential amount and timing of future cost savings, associated with the restructuring and the related workforce reduction; our ability to manage the costs and liabilities associated with a restructuring plan, including exit and disposal costs and severance; the potential loss of tax benefits in Israel as a result of our restructuring plan; and potential labor unrest as a result of our planned workforce reductions;

• uncertainties relating to the potential benefits and success of our new organizational structure and recent senior management changes;

• our generics medicines business, including: that we are substantially more dependent on this business, with its significant attendant risks, following our acquisition of Allergan plc's worldwide generic pharmaceuticals business ("Actavis Generics"); our ability to realize the anticipated benefits of the acquisition (and any delay in realizing those benefits) or difficulties in integrating Actavis Generics; the increase in the number of competitors targeting generic opportunities and seeking U.S. market exclusivity for generic versions of significant products; price erosion relating to our generic products, both from competing products and as a result of increased governmental pricing pressures; and our ability to take advantage of high-value biosimilar opportunities;

• our specialty medicines business, including: competition for our specialty products, especially Copaxone®, our leading medicine, which faces competition from existing and potential additional generic versions and orally-administered alternatives; our ability to achieve expected results from investments in our product pipeline; competition from companies with greater resources and capabilities; and the effectiveness of our patents and other measures to protect our intellectual property rights;

• our substantially increased indebtedness and significantly decreased cash on hand, which may limit our ability to incur additional indebtedness, engage in additional transactions or make new investments, and may result in a downgrade of our credit ratings;

• our business and operations in general, including: uncertainties relating to our recent senior management changes; our ability to develop and commercialize additional pharmaceutical products; manufacturing or quality control problems, which may damage our reputation for quality production and require costly remediation; interruptions in our supply chain, including due to labor unrest; disruptions of our or third party information technology systems or breaches of our data security; the failure to recruit or retain key personnel, including those who joined us as part of the Actavis Generics acquisition; the restructuring of our manufacturing network, including potential related labor unrest and workers' strikes; the impact of continuing consolidation of our distributors and customers; variations in patent laws that may adversely affect our ability to manufacture our products; our ability to consummate dispositions on terms acceptable to us; adverse effects of political or economic instability, major hostilities or terrorism on our significant worldwide operations; and our ability to successfully bid for suitable acquisition targets or licensing opportunities, or to consummate and integrate acquisitions;

• compliance, regulatory and litigation matters, including: costs and delays resulting from the extensive governmental regulation to which we are subject; the effects of reforms in healthcare regulation and reductions in pharmaceutical pricing, reimbursement and coverage; potential additional adverse consequences following our resolution with the U.S. government of our FCPA investigation; governmental investigations into sales and marketing practices; potential liability for sales of generic products prior to a final resolution of outstanding patent litigation; product liability claims; increased government scrutiny of our patent settlement agreements; failure to comply with complex Medicare and Medicaid reporting and payment obligations; and environmental risks;

• other financial and economic risks, including: our exposure to currency fluctuations and restrictions as well as credit risks; the significant increase in our intangible assets, which may result in additional substantial impairment charges; potentially significant increases in tax liabilities; and the effect on our overall effective tax rate of the termination or expiration of governmental programs or tax benefits, or of a change in our business; and other factors discussed in our Annual Report on Form 20-F for the year ended December 31, 2016 ("Annual Report"), including in the section captioned "Risk Factors," and in our other filings with the U.S. Securities and Exchange Commission, which are available at www.sec.gov and www.tevapharm.com. Forward-looking statements speak only as of the date on which they are made, and we assume no obligation to update or revise any forward-looking statements or other information contained herein, whether as a result of new information, future events or otherwise. You are cautioned not to put undue reliance on these forward-looking statements. Non-GAAP Financial Measures This presentation includes certain non-GAAP financial measures as defined by SEC rules. Please see our Annual Report on Form 20-F for the year ended December 31, 2016 for a reconciliation of those historical measures to the most directly comparable GAAP measures. The estimates contained in this presentation are non-GAAP financial measures, which exclude the amortization of purchased intangible assets, costs related to certain regulatory actions, inventory step-up, legal settlements and reserves, impairments and other costs and related tax effects. The non-GAAP data presented by Teva are the results used by Teva's management and board of directors to evaluate the operational performance of the company, to compare against the company's work plans and budgets, and ultimately to evaluate the performance of management. Teva provides such non-GAAP data to investors as supplemental data and not in substitution or replacement for GAAP measure, because management believes such data provides useful information to investors. A reconciliation of such forward-looking non-GAAP estimates to the corresponding GAAP measures is not being provided, due to the unreasonable efforts required to prepare it.

2

Teva 000247

# Teva Participants

- Kåre Schultz - President and CEO

- Mike McClellan - EVP, CFO

- Kevin Mannix - SVP, Investor Relations

JOINT APPX - 0149

Teva 000248

# Teva's current reality

**Challenges ahead of us require us to take significant steps with a sense of urgency**

- Significant financial obligations in the coming 4 years

- Generic competition to our largest branded product COPAXONE®

- Challenging environment in our largest generic market - the U.S.

- Fewer than anticipated Gx product launches in the U.S.



We believe we can turn Teva around in the short to medium term by significantly reducing our cost base, closely managing our liabilities, and divesting non-core assets

4

Teva 000249

# Highlights of the restructuring plan - By the numbers

## Teva is planning to reduce its current cost base (~$16 billion) by $3 billion*

– More than half of the cost reductions are expected to be achieved by end of 2018; full $3 billion by end of 2019

– Reductions to come from all elements of the cost base

– Global workforce to be reduced by approximately 14,000* – more than 25% of the workforce – over the next two years; majority will happen in 2018

– Cost of restructuring program expected to result in a one-time restructuring charge and cash outlay of $700 million in 2018

**Savings will allow for a more efficient Teva to meet all of its financial commitments**

5   *Includes divestment of Women's Health and closure of distribution business in Hungary

Teva 000250

# Key areas of focus

## The restructuring plan will focus on:

– Deployment of a new unified and simplified organizational structure

– Substantial optimization of the generics portfolio globally

– Closures or divestments of a significant number of facilities

– Thorough review of all R&D programs across the entire company

**Teva expects to optimize its cost base while protecting revenues and preserving core capabilities in generics and in select specialty assets, in order to secure LT growth**

JOINT APPX - 0152

Teva 000251

# A key step - New organizational structure

| From… | To… |
|---|---|
| Two separate global commercial groups for generics and specialty medicines | **One integrated commercial organization**, **operating through three regions** – North America, Europe and Growth Markets |
| Regions have direct P&L accountability only | Each region manages the entire portfolio, including generics, specialty and OTC, with **full end-to-end P&L accountability** |
| Separate generic and specialty R&D organizations | **One global R&D group** , which has overall responsibility for **all R&D activities** – generic, specialty and biologics |
| Insufficient alignment and integration between commercial, operations and R&D across the portfolio | A newly formed **Marketing & Portfolio function**, which oversees the interface between regions, R&D and operations throughout all product lifecycle stages; optimizing generic and specialty portfolios and marketing strategies across the therapeutic areas |
| Extensive global supporting layer | **One, lean organizational infrastructure supporting the commercial structure** that includes Finance, HR, Legal and Corporate Brand & Communications |

JOINT APPX - 0153

Teva 000252

# Substantial optimization of the global generics portfolio

**Discontinuation of products that do not meet Teva's new profitability benchmark**

**Downsizing of the manufacturing, supply and R&D network**

**Adjust pricing of certain portfolio segments to better reflect current cost structure and market conditions**

JOINT APPX - 0154

Teva 000253

# Additional measures

In addition to the restructuring plan, Teva is announcing the following measures to address the company's financial situation:

– Immediate suspension of dividends on ordinary shares and ADRs

– The company will continue to review additional divestment opportunities of non-core assets

– Annual bonus for 2017 will not be paid out due to the company not achieving its pre-set financial goals for the year

JOINT APPX - 0155

Teva 000254

# Concerted effort to improve our financial profile

Our absolute priority is to improve our financial profile through the stabilization of the company's operating profit and cash flow:

– Committed to utilizing cash flow to pay down debt over the next four years

– Initial focus will be on the remaining bank debt subject to covenants (~4B)

– Targeting leverage (Net Debt / EBITDA) of below 4x by YE 2020

## We do not plan to raise equity

JOINT APPX - 0156

Teva 000255

# Debt Movements

## Teva remains focused on deleveraging

– Proceeds from Women's Health U.S. divestitures (Paragard & Plan B) used to make prepayment of $1.77 billion on our 5Y and 3Y term loans maturities



***5 Year Debt Maturities ($b)***

JOINT APPX - 0157

Teva 000256

# Clear path forward – What to look for in 2018

– Simpler, leaner and more agile organization

– More than half of $3 billion in cost reductions  is expected to be achieved by end of 2018

– Continued debt reduction

– Focused support of fremanezumab and AUSTEDO®

– R&D spend that maximizes ROI

**We will ensure that we continue to provide high quality medicines to the many patients we serve every day**

JOINT APPX - 0158

Teva 000257

# Question and Answer Session

JOINT APPX - 0159

Teva 000258



# Teva's Code of Conduct

Our Values.
Our Strength.
Our Code.

JOINT APPX - 0160

TEVA 000518



Our Values.
Our Strength.
Our Code.

TEVA 000519

# Table of Contents

## Introduction

Our Mission. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

## Section 1:
## Our Values in Action

Our Values in Action . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Leading the Way. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Focus and Accountability . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Getting It Done Together . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Innovating Where We Create Value . . . . . . . . . . . . . . . . . . . . . 5

Caring. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Making Our Families Proud . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Application and Expectations of the Code of Conduct  . . . . . . 6

Personal Responsibility for Compliance & Ethics . . . . . . . . . . 6

Resources. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

## Section 2:
## Teva's Code of Conduct

### Our Industry

Avoiding Conflicts of Interest. . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Prohibition on Insider Trading and on Use
of Non-Public Information . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Antitrust, Unfair Competition and Business Intelligence. . . . . . 11

Anti-Corruption . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Promotional Materials; Scientific Exchanges  . . . . . . . . . . . . . 15

Political Activities and Contributions . . . . . . . . . . . . . . . . . . . . 17

Trade Controls . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Prohibition on Money Laundering . . . . . . . . . . . . . . . . . . . . . . 18

### Our Company

Equal Employment Opportunity . . . . . . . . . . . . . . . . . . . . . . . 19

Safe and Healthy Workplace. . . . . . . . . . . . . . . . . . . . . . . . . . 19

Freedom from Workplace Harassment. . . . . . . . . . . . . . . . . . . 20

Freedom of Opinion, Speech and Association . . . . . . . . . . . . 20

Refraining from Substance Abuse; Freedom
from Workplace Violence . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

## Our People

Supportive and Collaborative Work Environment . . . . . . . . . . 22

Interactions with Governments and Their People . . . . . . . . . . 22

Interactions with Business Partners . . . . . . . . . . . . . . . . . . . . . 23

Protecting the Proprietary Information of Third Parties . . . . . . 24

Communications with Media Representatives,
Analysts and the General Public. . . . . . . . . . . . . . . . . . . . . . . . 24

Social Media  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

## Our Business

Quality and Safety . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

Protecting Company Confidential Information,
Intellectual Property and Company Assets . . . . . . . . . . . . . . . 27

Privacy and Protection of Personal Information . . . . . . . . . . . . 28

Designing and Maintaining Effective Business
Controls; Accurate Reporting . . . . . . . . . . . . . . . . . . . . . . . . . 29

Use of Company Systems . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

Records Management . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

Innovation and Creativity. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

Research and Development; Clinical Trials . . . . . . . . . . . . . . . 33

Philanthropy and Community Involvement
and Contributions. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

Safeguarding the Environment and Animal Welfare . . . . . . . . 35

Ethical Labor Practices . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

## Guidelines for Implementation
## of Our Values

Making Sound Decisions. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

Recognizing a Potential Violation of the Code . . . . . . . . . . . . 38

Channels for Raising Concerns. . . . . . . . . . . . . . . . . . . . . . . . 39

Consequences of Code Violation . . . . . . . . . . . . . . . . . . . . . . 40

Retaliation is Prohibited. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

Continuous Improvement  . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

## Contact Information

Officers, Office of Business Integrity,
and Teva Integrity Hotline . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41



Thousands of people, across many countries, speaking a multitude of languages, with one mission.

# Introduction

There is real power in our mission and values. When we live our values and strive towards our mission as one, we can become a real positive force in healthcare. It gives meaning to everything we do, and it is the reason we come to work each morning.

# Our Mission

One company: Generics, Specialty, OTC and TAPI working together

We want to be among the best in the industry and drive significant shareholder value

**Our mission** is to be **a global leader** in **generics** and **biopharmaceuticals**, improving the **lives of patients**

We are the leader in generics and strive to outperform our competitors

The science and value is moving to biologics. We have the capabilities to succeed in this space and will make the necessary investments

Our purpose is to help patients around the world to access affordable medicines and benefit from innovations to improve their health

JOINT APPX - 0163

TEVA 000521

# Our Values in Action

At Teva, our mission and values are put into action through our Code of Conduct. When we interact with patients, doctors, stakeholders, and each other, our conduct determines how we are perceived. What we do is important, but how we do it is just as important. Every decision we make and every action we take should reflect our collective values and culture. Our values define who we are. They express what we collectively believe in, they represent the best in us, and they guide us in all we do.

We will not waver in our commitment to do what is right, while striving to reach our financial and business goals. No objective is worth compromising our values or ethical standards. Our values are universal across every role, every business unit and throughout all of our locations around the world.

## What we do everyday matters.

Our values express what we believe in, they represent the best in us, and they guide us in all we do.

Our mission and values were uncovered by our people. They evolved from stories that demonstrate our special spirit and culture, and they represent those qualities that make us unique. They guide the way we think, act and make decisions, as we learn to work better together.



The foundation of Teva's Code of Conduct is focused on Our Values in Action.



JOINT APPX - 0165

TEVA 000523

# Leading the Way

**We aspire to be an industry leader and a mark of excellence in a constantly changing environment.** We are passionate about being first to market and realizing opportunities. We believe that leadership happens with and through people.

We lead the way at Teva.

- We proactively take initiatives and adapt to change.
- We identify opportunities and lead the way for ourselves and others to execute effectively.

# Focus and Accountability

**We are focused in everything we do.** We define clear objectives and concentrate our efforts, attention and energy to deliver. We do what we say and we hold ourselves accountable for our actions and results.

For us, this is how we focus on delivery.

- We execute with focus and determination.
- We hold ourselves accountable for our own actions and results.

# Getting It Done Together

**We all work for one company, Teva.** By working together more effectively, in close collaboration and alignment, we tap into our full potential and drive our success.

At Teva, we work collaboratively and in synergy as one team.

- We build productive internal and external relationships to learn, share and execute with others toward one set of priorities.
- We take personal responsibility to deliver on goals in alignment with unit priorities for effective results and enhanced team success.

# Innovating Where We Create Value

**We innovate to create value for patients, our partners in the healthcare system and our stakeholders.** We constantly look for original and better ways to excel, creating solutions for current and future unmet needs.

For us, this is bringing new ways to improve.

- We challenge ourselves and others to find achievable, innovative solutions that address a business need.
- We look at new ways of working that can deliver value.
- We initiate improved ways to excel and grow.

# Caring

**We care.** We care about the wellbeing of patients, care-givers and the communities we touch. We care about our colleagues; creating a respectful, diverse and inclusive working environment.

Everyday we care about others.

- We care about people and improving people's lives.
- We build trust-based working relationships, showing empathy and respect.
- We work well with people of diverse backgrounds, leveraging individual differences.

# Making Our Families Proud

**Teva improves health and contributes to people's wellbeing each and every day.** We do so by acting with integrity and maintaining the highest standards of quality, ethics and compliance.

We act as an ambassador every day to represent Teva.

- We act with integrity and responsibility.
- We hold ourselves and others to the highest professional and ethical standards.
- We uphold quality in all that we do.

Action  |  **5**

# Application and Expectations of the Code of Conduct

Each policy in the Code is centered on our values, and is designed to explain and identify areas in which acting in accordance with our values is particularly important. These explanations are followed by short and practical guidance, including questions and answers that illuminate the particular issue. It is important to note that our values are not exclusive to a particular policy – our values apply to all of our policies and are universal to everything we do.

The principles in this Code apply to all Teva employees and members of our Board of Directors. They bring our values and beliefs to life by defining clear expectations for our behavior. In addition, we expect that our business partners will adhere to the principles of the Code.

While the Code helps us address some of the most typical ethical and legal issues and dilemmas we may face, it cannot cover every situation. Our values serve as an internal compass. With these as our guide and with our good judgment, we are all expected to do what is right, to use the resources

described in this Code and to take responsibility for our actions. Each of us has the responsibility for adhering to the Code and for maintaining Teva's values.

Given that this is a Company-wide document, some sections and topics may be more relevant to certain functions or departments. However, it is important for all of us to be aware of how business is conducted in different areas across the Company. Also, thinking about our values provides additional tools for carrying out our activities at Teva.

## Personal Responsibility for Compliance & Ethics

Ethical behavior means more than complying with the law and Teva policies - but it starts there. Each of us must learn and follow the law and Teva policies that pertain to our jobs, because compliance with the laws and Teva policies is the responsibility of each and every one of us.

In certain cases, this Code of Conduct is supplemented by additional policies that cover specific topics in more detail or deal with certain local or regional issues. While this Code of Conduct is designed to familiarize us with many of the relevant policies, it is not as comprehensive as these supplemental policies and therefore does not supersede them or act as a substitute for reviewing each policy that applies to our specific job.

## Resources

We have provided resources to address specific issues in a particular region. These include your manager, Human Resources representatives, the Legal and Compliance & Ethics Departments, Finance directors, internal auditors, and the Office of Business Integrity, which is in charge of the Teva Integrity Hotline. Guidelines for Implementation of our Values and Contact Information are found at the end of this Code.

We strive to improve health and make people feel better.

JOINT APPX - 0167

TEVA 000525



Together, we succeed by living our values.

If you think you are being asked to behave or conduct business in an illegal, unethical or otherwise inappropriate manner, or you suspect others of such behavior, you should immediately report your concerns through the channels described above. You will not be penalized or retaliated against for reporting what you believe, in good faith, to be a breach of this Code – even if it later turns out that a violation has not occurred. Any act or threat of retaliation will in itself be considered a serious violation of this Code. Any information you provide will be shared only on a "need-to-know" basis with those responsible for resolving the concern. You may also remain anonymous (subject to the laws of your country; any reporting restrictions in your country will be described when you call the Teva Integrity Hotline).





**My group is seeking the advice of a neurologist on a project. Can I suggest retention of a neurologist who is a family member?**

Since this may present a conflict of interest, you must disclose the relationship according to the Global Conflicts of Interest Policy to have the matter reviewed and to determine what steps should be taken to manage the potential conflict.

# Teva's Code of Conduct

## Avoiding Conflicts of Interest

Conflicts of interest arise when we place personal, social, financial or political interests before those of the Company. Members of our Board of Directors and employees are responsible for avoiding situations that present – or create the appearance of – a conflict between their interests and those of Teva. Whether on the job or otherwise, nothing should conflict with our responsibilities to Teva.

### Why it is important

By avoiding actual conflicts of interest as well as the appearance of a conflict of interest, we will be able to act according to sound business judgment in Teva's best interests, rather than due to personal interest, relationship, pressure or gain.

JOINT APPX - 0169

TEVA 000527

## Our way

- We make decisions in the best interests of Teva.

- We avoid situations where anyone could question whether we were inappropriately influenced in making a business decision.

- We resolve any potential conflicts of interest in a transparent and open manner.

- We inform and seek approval from our Compliance & Ethics and Legal Departments upon commencement of negotiations or contacts relating to a potential transaction between our Company and an entity or person affiliated with members of the Board of Directors or employees — regardless of size or substance. Some of these transactions may be subject to further approval prior to signature.

- We acknowledge that certain related party transactions may require approval pursuant to applicable laws.

- We avoid using Company opportunities, Company property and information or our position for personal gain.

- We do not seek, and avoid accepting, payments, fees, loans or services from any person or company as a condition of doing business with Teva.

- We may accept gifts or entertainment as part of the normal business process only to the extent they are permitted under the law, are of nominal value and would not influence or appear to influence our business decisions. We do not accept gifts of cash or cash equivalents.

- We receive our Human Resources Department's approval before engaging in outside employment, consulting, or serving on the board of directors (or comparable position) of an external organization.



**A Teva supplier invited me to a sporting event. Can I accept this invitation?**

You should consult with your manager before accepting any invitation from a supplier because such an offer may compromise your objectivity in decision-making. Generally (subject to applicable local laws and industry codes), accepting an entertainment invitation is not prohibited as long as the nature and frequency of such occasions are reasonable and not excessive.

**Can I invest in a company that does business with Teva?**

It depends on your position, your influence over applicable decisions, the investment size, the importance of Teva as a customer and other factors. Before investing, you should disclose this according to the Global Conflicts of Interest Policy to be advised on how to handle the situation.

**What should I do if I am concerned that I need to make a decision that might pose a conflict of interest?**

When in doubt, disclose it according to the Global Conflicts of Interest Policy. Sometimes, disclosing and recording the potential conflict may be enough.



**JOINT APPX - 0170**

Teva's Code of Conduct in the Industry | 9

TEVA 000528



**A potential vendor wants to discuss his services over lunch. Can I accept?**

You should consult with your manager before accepting any invitation from a supplier, because such an offer may affect your decision-making or compromise your judgment and Teva's independence. Generally, accepting dining invitations is not prohibited as long as the nature and frequency of such occasions are reasonable and not excessive.

We aspire to do the right thing.

## Prohibition on Insider Trading and on Use of Non-Public Information

We may come across material non-public information about our Company, customers or partners during our work. Buying or selling the securities of a company while being aware of such information is considered "insider trading." We may not buy or sell Teva securities or the securities of any other company based on such non-public information. In addition, we may not provide such "inside" information to anyone else ("tipping") so that they can profit from it. This restriction applies no matter where we live, or where the person who might receive the information lives.

Information is considered non-public if it has not been adequately disclosed to the public. Examples of material non-public information (prior to adequate disclosure) include:

- earnings and other financial information;
- changes in dividends;
- changes in senior management;
- significant regulatory developments;
- mergers, acquisitions, dispositions and joint ventures;
- approval or denial of a significant product;
- results, whether or not favorable, of a clinical trial or significant litigation;
- commencement, acquisition or loss of a major contract;
- information confidentially obtained about another company during the course of work; and
- other significant developments or an important financial transaction.

### Why it is important

We believe in the integrity of the capital markets. In addition, in most countries it is against the law to exploit insider information when buying or selling securities. Securities law violations are taken very seriously. Therefore, in addition to potentially causing great harm to Teva's reputation, violation of these legal requirements could subject Teva and the individuals involved to large monetary penalties and even criminal liability, including imprisonment.

### Our way

- We understand that the insider trading restrictions apply to each of our family members, members of our households and to us.

TEVA 000529

We do not buy or sell the securities of Teva or any other company, either directly or through family members, members of our households or other people or entities, while being aware of material non-public information related to such a company.

- Members of the Board of Directors, Teva officers, and employees involved in the preparation of the Company's financial statements understand the trading limitations in Teva securities to which we are subject ("blackout periods").

- We maintain the confidentiality of Teva information and do not convey it to anyone outside the Company unless it is necessary for business activities.

- We consult the Legal and Compliance & Ethics Departments whenever we have a question or a concern that an event or activity may be considered insider trading.

- We consult Teva's Insider Trading and Blackout Period Policy even if the contemplated activities are not illegal in the country where we are based.

## Antitrust, Unfair Competition and Business Intelligence

Antitrust and competition laws focus on ways to ensure that businesses compete on the basis of quality, price and service. This area of law is extremely complex, and varies from country to country (and within certain countries, from state to state). These laws are referred to as antitrust, monopoly, restrictive or unfair trade, competition, price discrimination or cartel laws. In general, they seek to protect competition (and occasionally small-scale competitors). They prohibit, among other things, agreements to fix prices, allocation of markets or customers, participation in group boycotts, and efforts to obtain or maintain a monopoly through something other than competition on the merits.

**Fair Dealing** – It is important for us to be recognized in the marketplace as a company that operates ethically and in a fair manner. We do not attempt to obtain information of or about our competitors in an illegal or unfair way. Accordingly, stealing proprietary information, possessing trade secret information that was obtained without the owner's consent, or inducing such disclosures by past or present employees of other companies is prohibited.



I know that Teva is acquiring a company in a developing country. This deal will be very good for both companies, but has not yet been announced publicly. Can I buy shares of the company as long as I do not buy shares of Teva?

No. You may have material non-public information, and you should not buy or sell the shares of either Teva or the company until the transaction has been publicly announced and any applicable period under the Insider Trading and Blackout Policy has passed. Until then, you must not share this confidential information with anyone who does not have a business need to know, including fellow employees, family and friends.



TEVA 000530



**I am working in the regulatory department, and have learned that Teva is about to receive FDA approval to market a new product, but that this information will not be made public for another few weeks. In order to manufacture this new product, I know that Teva will need to purchase large quantities of raw materials from one particular supplier that is a publicly traded company. Based on this information, can I or my spouse purchase stock in the supplier company?**

Absolutely not. Neither you nor your spouse can purchase this stock until the information you have has been made public. You should not share this information with anyone. If you use this information or convey it to others, you will be violating Company policy and may be violating securities laws, exposing you, your spouse and possibly others to civil and criminal penalties.

**How can I recognize anti-competitive behavior?**

Actions that might violate applicable antitrust or competition laws can take many forms. You should become familiar with the Teva Antitrust Guidelines and seek advice from the Legal and Compliance & Ethics Departments if you are in doubt about what to do.

**What should I do if I am at an industry meeting and a competitor starts to discuss pricing pressure from buyers? What if that same person says: "Buyers have to buy products from someone, and, if no one is discounting, all sellers will have sales and be better off"?**

If anyone raises the issue of pricing at a meeting that includes competitors, you should state that pricing is not an appropriate topic for such a discussion. If someone makes a specific statement regarding pricing, it is important that you leave the conversation before any agreement might be reached and make clear that you are not participating in any such agreement. You should also promptly report the incident to the Legal and Compliance & Ethics Departments.

## Why it is important

We believe that customers and society as a whole benefit from fair, free and open markets. Therefore, we compete on the merits of our products and services and conduct business with integrity. We recognize that the potential harm to Teva's reputation and the penalties for breaching competition laws are severe, and can subject Teva, members of the Board of Directors and employees to severe civil fines and criminal penalties.

## Our Way

- We conduct our business to serve the interests of Teva and our customers in a manner that does not unfairly restrict trade and without anti-competitive understandings or agreements with competitors.

- We do not communicate with competitors about competitive business matters such as prices, costs, discounts, expansion plans, pipeline-related information, customers, suppliers, and any terms or conditions of sale that could create the appearance of improper agreements or understandings.

- We do not make agreements or reach understandings with our competitors regarding our products, customers, distributors or territories.

- We do not take unfair advantage of anyone through manipulation, concealment, abuse of privileged information, misrepresentation or other unfair practices.

- We do not gather information about our competitors via deception, theft, misrepresentation, or other illegal or unethical means.

- We conduct our business in accordance with Teva's Competition Guidelines, local laws and applicable regulations. If we face a situation that may raise antitrust and competition issues, we contact the Legal and Compliance & Ethics Departments to determine whether or not a particular course of action might violate antitrust and competition laws.

TEVA 000531

- We abide by all applicable antitrust and competition laws in our participation in third-party organizations, including professional and trade associations, and we avoid situations that could create even the appearance of impropriety.

- We treat Teva's suppliers and customers with fairness and respect, ensuring that our agreements with these entities comply with all applicable antitrust and competition laws.

## Anti-Corruption

We prohibit bribery and corruption. None of us or anyone acting on our behalf may offer or pay a bribe, kickback or other improper payment. We are also not allowed to provide anything of value that is intended to win business, improperly influence a decision, or gain an unfair business advantage – or even appear to do so.

### Why it is important

Bribery and corruption damage our business and conflict with our core beliefs regarding the right way to conduct business. Anyone who engages in corrupt activities will be subject to discipline up to and including termination. In addition, they and Teva may be subject to civil fines and criminal penalties. Teva also may be held liable for the corrupt activities of third parties acting on its behalf.

### Our way

- We conduct our business openly and transparently, in accordance with Teva's Global Prevention of Corruption Policy, other anti-corruption policies and applicable laws.

- We never bribe, or offer, provide or promise anything of value (directly or indirectly) that is intended to improperly influence the action of government or private individuals. Examples of "anything of value" may include, among other things, sponsorships to attend congresses, speaking fees, consultancies, services, charitable donations, political contributions, travel and/or entertainment expenses, gifts, meals, commissions and rebates.

- We do not retain third parties, including representatives, contractors or advisors, to engage in conduct that we would not be involved with ourselves.



**I am a manager recruiting a new employee. One of the candidates is a researcher who currently works for one of Teva's competitors. She is an expert in her area and knows a lot about the competitor's pipeline. Is there anything wrong with hiring her?**

Typically, we can hire from a competitor. However, we cannot hire someone with the expectation that she will reveal confidential or proprietary information or trade secrets belonging to the competitor, and we must take steps to ensure that we do not improperly elicit or receive such information from her.



We are transparent in our actions.





My manager wants me to find out what patient recruitment exclusion criteria a competitor is using in an important clinical trial. This information is not publicly available. Can I pose as a potential patient recruit, call the competitor's clinical research site and simply ask some questions?

No. Misrepresentation – in this case, not disclosing that you work for Teva – is an unethical way of gaining access to a competitor's confidential information. Before attempting to gather any business intelligence, you should consult with the Legal and Compliance & Ethics Departments to confirm that your strategy is legal and ethical.

A head of a department in a well-known hospital has requested that Teva donate equipment to the hospital and funds for the hospital's emergency care unit. Can I authorize these donations by our Company?

Equipment donation is considered to be something of value. While it may be permissible for Teva to make contributions to improve hospital services that will benefit patients, you must ensure that Teva's approval process has been followed. You should review the request with your manager and the Compliance & Ethics Department.

I invited a healthcare professional (HCP) who is a recognized key opinion leader to a meeting abroad. The HCP asked if her spouse could join the trip and that Teva book the cheapest flight possible so that the total cost of the journey would not exceed what Teva was willing to pay for the HCP's flight. The HCP advises that other pharma companies structure flights in this manner. Is it okay to proceed as requested?

Under Teva's anti-corruption policies, such a request is not acceptable. You should explain to the HCP that this is not allowed under Company policies and, therefore, you cannot approve such a request.

Our team wants to hire a local consultant to advise us about our proposed tender in a province of a particular country. The consultant is the son of the provincial minister of health. Since the son is not a member of the government, this is OK, right?

The hiring of a government official's relative may raise issues under Teva's anti-corruption policies. Before engaging in such a transaction, you should contact the Compliance & Ethics Department.

A new distributor has asked me to provide an unusual discount so that he can take care of "extra" expenses. What should I do?

You are right that this raises a concern. The Legal and Compliance & Ethics Departments should be alerted immediately to "red flags" with respect to the activities of those who represent our Company and our products.

JOINT APPX - 0175

TEVA 000533

## Promotional Materials; Scientific Exchanges

All of our scientific and promotional activities with healthcare professionals and organizations are intended to ensure the effective use of our products and enhance patient care. This can include advancing medical research, enhancing medical knowledge or practice management, promoting our products and services and gathering necessary feedback about our products and services. We use a wide variety of communication channels in providing information. Whatever methods are used, we must provide information accurately and in a proper manner.

### Why it is important

Our stakeholders have a legitimate interest in being informed not only on the quality of our products and services, but also on the quality of information we provide to healthcare professionals and organizations. Our objective is to provide scientifically accurate, pertinent and timely information that informs the choice of treatment made between a physician and patient. We wish to safeguard public confidence in healthcare professionals to make decisions solely on the basis of patient health.

### Our way

- Our sales and marketing practices worldwide must meet or exceed the minimum standards set by applicable laws, regulations, industry codes and Company policies.

- We ensure that our promotional discussions and information are useful, accurate, supported by scientific evidence where relevant



**As a pharmaceutical sales representative, I think it may be effective to give all healthcare providers in my territory iPads containing presentations on Teva's products. Can I do this?**

No. We do not provide gifts or other incentives to healthcare providers other than educational items and items that are of nominal value, medically relevant, and permitted under applicable local laws and Company policies.

**It is customary in my country to discuss pharmaceutical products with a healthcare professional over a meal in a restaurant. Is this acceptable?**

The preferred location to discuss our products with a healthcare professional is in her office, a hospital or other clinical setting. In certain instances, it may be appropriate to conduct a product discussion beyond such settings. You will need to ensure that inviting the healthcare professional for a meal comports with applicable laws, regulations, industry codes and Company policies and is properly documented. In case of doubt, please consult the Compliance & Ethics Department.



We deliver on our promises.

TEVA 000534



**I found a public website that discusses issues related to a Teva product. Is it okay to forward the site to one of the healthcare professionals with whom I work who likes using the Internet?**

No. All communications between a sales representative and healthcare professional are part of detailing, and all detailed pieces must be approved through Teva's promotional materials review process before they are used.

**I am a sales representative and a healthcare professional asked me how to use our drug for one of his patients for an off-label use. What should I do?**

Your obligation is to refer the healthcare professional's question to the Medical Affairs Department so that medical professionals can communicate medical information directly to such professional. Our promotional efforts to healthcare professionals must be "on-label," and everything a sales representative says is considered promotional.

**When presenting clinical trial data to a healthcare professional, can I restrict my discussion to the positive outcomes of the trial only?**

No, we must proactively ensure that all clinical data communications are accurate and complete. Oversimplification, overgeneralization, overstatement, opinions and characterizations can easily be misunderstood.

and presented honestly, are fairly balanced and are consistent with country-specific approved labeling and prescribing information.

- We do not communicate publicly with the intent of promoting products for use before the product is approved for use under applicable laws. However, we may engage in a proper exchange of scientific information that is non-promotional in nature and intent, and is not communicated by our sales representatives.

- When engaging in scientific exchange, we present information that is complete, accurate and not misleading.

- We never promise or provide anything of value for the purpose of encouraging or inducing any healthcare professional to purchase, prescribe or recommend our products.

- We engage the services of healthcare professionals and organizations only when they are legitimately needed, and we pay according to fair market rate for services rendered.

Each and everyday, we are making a difference to the lives of people around the world.



JOINT APPX - 0177

TEVA 000535

## Political Activities and Contributions

We respect the right of members of the Board of Directors and employees to participate in the political process and engage in political activities of their choosing.

Many governments prohibit or regulate corporate monetary or in-kind political contributions. Any proposed corporate contribution or political activity should be reviewed and approved by Teva's Global Government Affairs and Public Policy Department.

### Why it is important

Lobbying activity on behalf of the interests of our Company is permissible, but highly regulated by law.

### Our way

- We treat regulators in a professional manner and with respect.
- We notify and work with the appropriate Teva departments to provide information to regulators or law enforcement authorities.
- We obtain approval from Teva's Global Government Affairs and Public Policy Department before:
  - lobbying or meeting with a government official, whether individually or as part of a group (e.g., a trade association);
  - engaging a lobbyist at any level of government; or
  - inviting a government official to a Teva facility.
- We ensure the preservation of Company documents that relate to a known or suspected government audit or inquiry.
- Employees' lawful, personal political activity in support of candidates or parties is allowed, as long as it is not on Company time and is not funded by Company resources.
- When employees are involved in their personal civic and political affairs, they make it clear at all times that the views and actions are their own and not those of Teva.
- We do not use corporate funds, resources or facilities to support a governmental entity, political organization, party or candidate, except where permitted by law. All political contributions made by Teva must comply with Company policies, including obtaining the prior written approval of the Global Government Affairs and Public Policy Department.



**I support a particular political candidate in my community and would like to send a few emails via Teva's system to other employees in Teva and friends to encourage their support. Is this okay?**

Teva respects your right to be involved in the political process. However, you should not use Company funds, equipment or materials to support a particular candidate, and you should not engage in political activities while on the job.

**A customer asked me if Teva would make a contribution to support the political campaign of a candidate for public office in our country. Can I do so?**

Most countries in which we do business have strict and complex laws regulating political contributions. Any request for contributions requires the prior written approval of Teva's Global Government Affairs and Public Policy Department and the Compliance & Ethics Department.

Teva's Code ~~of Conduct~~ Industry | 17

TEVA 000536

# Trade Controls

Teva is committed to maintaining compliance with applicable laws controlling imports, exports, re-exports and diversion of its products, goods, services and technical data, including import and customs laws, export controls, economic sanctions, denied parties lists, anti-boycott laws and diversion of products.

## Why it is important

Teva does business all over the world, and the laws of one country or jurisdiction may apply to transactions or activities that occur elsewhere. Many countries maintain a program of economic and trade sanctions and embargoes against certain countries and certain parties. Prohibitions on certain exports and imports are also often in place. In addition, various governments have enacted laws that prohibit companies from participating in, or cooperating with, any international boycott that the government does not approve. Failure to comply with international trade laws can subject Teva and its employees to civil and criminal penalties, including suspension or denial of trade privileges.

## Our way

- We check the export classification and follow relevant international trade control regulations of all countries in which Teva operates as they relate to importing and exporting goods, technology, software, services and financial transactions.

- We do not cooperate with any restrictive trade practice or boycott that is prohibited or penalized under applicable laws.

- All activities involving sanctioned countries must be reviewed by the Legal and Compliance & Ethics Departments to ensure compliance with trade control laws.

- We conduct our business in accordance with our Global Customs and Trade Controls Policy and applicable trade control laws.

# Prohibition on Money Laundering

Money laundering involves disguising funds derived from criminal or terrorist activity, so that illegitimate or "dirty" money appears legitimate or "clean." Many governments have anti-money laundering laws that prohibit engaging in transactions that attempt to hide the proceeds of crimes by making those proceeds look legitimate.

## Why it is important

Adherence to anti-money laundering principles helps us prevent the use of Teva resources to conceal crimes.

## Our way

- We conduct business only with customers willing to provide us with proper information so that we can determine whether the payments are appropriate.

- We do not make a payment to an entity or accept a payment from an entity that is not a party to the transaction or is not legally entitled to receive payment, unless we receive prior approval of the Legal and Compliance & Ethics Departments.

- We do not accept payments in cash, unless we receive the prior approval of the Legal and Compliance & Ethics Departments.



**What is fraud?**

Fraud is the deliberate practice of deception in order to receive unfair or unlawful gain. Fraud may incorporate falsified financial reporting, misappropriation of assets, bribery and corruption. We may not engage in fraudulent behavior, and we must report any suspicion or discovery of fraud by using one of the reporting channels described in this Code.

JOINT APPX - 0179

TEVA 000537

## Equal Employment Opportunity

Teva highly values the diversity of backgrounds, skills and abilities that a global workforce brings to our business. We hire employees with sound character and judgment, whom we trust will act responsibly. We are committed to supporting diversity in our workforce and leadership, and to developing all the talent within our organization.

### Why it is important

Diversity is not only a key prerequisite for innovation; it is also a personal and cultural job enrichment for each and every employee. We seek to hire employees who can contribute to the Company's success. Providing people with equal opportunities to develop their full potential encourages higher quality and more productive work, reduces employee turnover, and increases employee morale and engagement.

### Our way

- We make all employment-related decisions and actions without regard to personal characteristics that are protected by applicable law.

- We prohibit discrimination in our selection, training and promotion processes and base Company employment decisions on our business needs, job qualifications and employee competencies and expertise.

- Since we believe that friends and family of our employees are a good source of potential candidates to work at Teva, we encourage their referral. However, we will not show favoritism to family members or friends, and employees and directors must be sensitive to avoid exercising influence on the hiring process following the initial referral. Family members may not have direct or indirect reporting relationships with other family members. Every referral of a candidate by employees in senior management positions or by members of the Board of Directors must be reviewed and approved in accordance with Human Resources global policy.



**I saw that there is an open position in my department; I know that my cousin is interested in working at Teva. Can I recommend to my manager or the Human Resources Department that my cousin be hired for this position?**

Teva encourages referrals of qualified candidates, regardless of their relationship to current employees. Nevertheless, the Company will not show a preference for your cousin, who will undergo the same recruitment process as any other candidate.

## Safe and Healthy Workplace

Teva cares about the safety of its employees and conducts its activities with the highest regard for the safety and health of its employees and the general public. We are continuously working to improve our safety record by instilling a strong safety culture worldwide. Our goal is to avoid any accident in the workplace through our rigorous compliance with global safety standards. Each of us is responsible for, and shares in the benefits of, a safe and healthy workplace.

### Why it is important

Teva values its employees and strives to protect them. Any behavior and activities that undermine employee safety must be avoided.

We believe in the value generated from diversity and inclusion.

Teva's Code of ~~~~~~~~~~~~ pany | **19**

TEVA 000538



**I am new to Teva and don't understand all of the safety rules. I feel awkward asking questions. What should I do?**

Teva encourages employees to ask questions, particularly when safety is involved. Talk to your manager; he or she knows that you are required to be trained to do your job, and is obligated to ensure you receive the appropriate training.

**One of my co-workers emailed an inappropriate joke to me and some fellow employees. I found it offensive, but don't know if I should approach my co-worker with my concern.**

We are committed to maintaining a professional work environment in which all Teva employees are treated with care, respect and dignity. Therefore, offensive or inappropriate behavior is not acceptable. If you feel uncomfortable speaking with your co-worker directly, please contact your manager and/or the Human Resources Department for assistance.

### Our way

- We do not start working with equipment before we have received the required training. If our job requires it, we wear necessary protective equipment at all times.

- We seek to understand the hazards associated with our work, in order to manage these risks responsibly.

- We comply with all employment, safety, health and security policies and procedures.

- We promptly report any accidents, incidents of non-compliance, or any other matter posing a threat to safety or health of Company employees or of the general public.

- We take action to correct unsafe activities or facilities.

## Freedom from Workplace Harassment

Workplace harassment is any physical or verbal act that creates an offensive, hostile or intimidating work environment.

### Why it is important

Harassing behavior or action is destructive to the workplace and team environment we seek to foster. Teva seeks to provide a workplace that is free from harassment of any kind.

### Our way

- Any type of harassment – whether words, actions or behavior – that creates an intimidating, hostile or offensive environment – is prohibited at Teva and will not be tolerated.

- We refrain from making remarks, telling offensive jokes, or displaying materials that offend a particular characteristic protected by applicable law, such as age, gender, race, ethnicity, national origin, religion, sexual orientation, disability, etc.

- We do not use sexually suggestive language, and do not send any emails containing sexual content.

- We encourage the immediate reporting of offensive, threatening or violent behavior, whether verbal or physical.

## Freedom of Opinion, Speech and Association

We care about and respect employees' right to hold their own opinions, to express these in an appropriate manner in the workplace, to join a trade union and to have recognized employee representation in accordance with local law.

## Why it is important

We believe that employees need to be able to speak freely, to feel safe in the workplace and not to fear harm for any reason, including their opinions or their membership in any legally recognized trade union.

### Our way

- We recognize that employees are entitled to freedom of opinion, association, expression and speech, provided that these do not interfere with their ability to fulfill their job responsibilities or conflict with this Code of Conduct and other Company policies.

- In exercising our freedom of speech, we bear in mind that we are part of the workplace and we respect the rights of our fellow employees.

## Refraining from Substance Abuse; Freedom from Workplace Violence

The possession, use, sale, or purchase of illegal or unauthorized drugs, whether on or off duty or on or off Teva's premises or work-sites, is prohibited.

Workplace violence of any type, including acts or threats of violence to another person, intentional damaging of Company property or the property of an employee, or behavior that causes others to feel unsafe is prohibited and will not be tolerated.

### Why it is important

Our ability to perform our jobs well requires that we work in a professional manner free from the influence of drugs or alcohol and from the threat of physical violence. These substances and such threats adversely affect job performance, and can risk our health and safety and that of others.

### Our way

- We do not buy, sell, possess or use illegal drugs or create a safety risk through drug use or intoxication while conducting Teva business.



**One of my team members has a habit of complimenting a particular employee's appearance. It seems harmless, but is it appropriate?**

An occasional, general compliment is probably acceptable. However, repetitive comments may lead to a hostile work environment. If you have any questions, you should contact the Human Resources Department or the Compliance & Ethics Department.

- We do not bring firearms, explosives or any other weapons or dangerous materials to any work location or function without express permission to do so.

- We encourage the immediate reporting of offensive, threatening or violent behavior, whether verbal or physical.

### Reporting Procedure

Anyone who believes that he or she has been subjected to prohibited conduct from other personnel or third parties connected to the Company, or who observes or learns of such conduct, must report the matter immediately to his or her manager, the Human Resources Department or the Compliance & Ethics Department so that suitable action can be taken to address the situation. Each person is encouraged to speak with the representative(s) with whom he or she is most comfortable.

Individuals need not report the matter to their immediate supervisor before bringing the matter to the Human Resources Department or the Compliance & Ethics Department.

TEVA 000540

## Supportive and Collaborative Work Environment

We are committed to a supportive and collaborative work environment where our employees work together to fulfill Company goals. We coordinate our resources in ways that benefit the whole. We provide support systems, organizational tools and procedures, and relevant infrastructure to encourage such collaboration within the organization.

### Why it is important

We understand that our decisions and our work have an impact on others and on the Company and we act accordingly, sharing responsibility for outcomes. We understand that in order to achieve our common goals we need to engage our employees around the world, across different divisions and in different functional areas.

### Our way

- We embrace processes that provide us with the freedom to create and the ability to define goals and solve problems together.

- We encourage multidisciplinary group discussions given the complexity of the business in which we operate.

- We prioritize our work according to the stated mission and goals of the Company and adjust timelines, budgets and people in response to changes in our corporate priorities.

- We ensure that the information people need to do their job is available and accessible.

- We are accessible to each other and communicate mindfully, acknowledging cultural norms of tone, time zone and responsiveness.

We open opportunities for the personal and professional growth of our employees.

## Interactions with Governments and Their People

Working with government entities, their officials and employees (including locally, state and federally owned hospitals) and complying with the numerous complex regulations governing the healthcare industry are routine for many of us at Teva. In addition, we help government officials in countries in which we operate understand our business. It is important for us to share our experiences and insights on matters of public policy and regulations, which may affect how we conduct business and assist patients in obtaining safe and cost-effective health care.

### Why it is important

Effectively working with regulators as they establish regulations and audits for compliance is critical to maintaining our reputation for adherence to our values. In addition, many of our government-related customers have conflicts of interest rules with which we are required to comply.

### Our way

- We understand the regulatory requirements that affect our business and work and keep abreast of regulatory developments.

- We embed regulatory requirements into key operating processes and manage regulatory risks.

- We obtain business with government entities through bona fide, transparent means.

- We expect anyone providing goods or services for Teva on a government project or contract – such as consultants, sales representatives, distributors or suppliers – to meet Teva's standards on interactions with government officials and employees.

- We communicate honestly and cooperate with investigations conducted by governmental bodies, as well as those undertaken by our internal auditor or the Compliance & Ethics Department.

TEVA 000541

## Interactions with Business Partners

We believe that our business is best served by responsible business behavior and adherence to our values, which apply regardless of local culture or challenges that may come our way. We conduct business with individuals and organizations ("business partners") who share our commitment to high ethical standards, and who operate in a socially and environmentally responsible manner.

### Why it is important

Since we believe that our values and standards have always formed the basis of our success, we ensure that our business partners share our commitments and values.

### Our way

- We select goods and services that best contribute to the long-term well being of Teva: we choose our suppliers based on price, quality, delivery, service, reputation, environmental and business practices.

- We treat our business partners with fairness and integrity. We respect the terms and conditions of agreements with business partners, and we honor our commitments.

- We review the background and qualifications of our business partners and their principals to assure ourselves of quality and ethical business practices.

- We seek to ensure that business partners follow all applicable laws, legal requirements and Company policies in their dealings on behalf of Teva.

- To ensure that suppliers are given an opportunity to compete for our business, we obtain competitive bids in accordance with Teva's procurement policies.



**A fellow employee has repeatedly refused to provide me with information that is essential for my job, has called me derogatory names, and has told other employees that I am not qualified to do my job. How should I handle the situation?**

Harassment and intimidation can occur in many forms. In this situation, it appears that this is intentional and persistent bullying and harassment. You should contact your manager and/or the Human Resources Department for assistance.



Our success depends on our ability to work together and keep communication lines open.

## Protecting the Proprietary Information of Third Parties

Just as we value and protect our own proprietary information and trade secrets, it is also our policy to respect the intellectual property rights of others. In the course of our work we may receive sensitive or proprietary information from third parties such as our suppliers, customers and other business partners that is confidential. We respect and maintain the confidentiality of such information.

### Why it is important

Respecting the sensitivity or confidentiality of such information is essential to our relationships, our productivity, and fruitful collaborations with third parties.

### Our way

- We respect the confidentiality of third-party information as though it were Company information.

- We do not use material copyrighted by third parties without first obtaining or confirming copyright permission.

- We respect proprietary information of our business partners and ensure that any required license is in place before making use of such information.

- Some of us may have come to Teva from other companies, and some of us may leave Teva to work for someone else during our career. If we leave Teva, we may not take any confidential information or reveal it to our new employer. Likewise, we may not reveal a previous employer's confidential information to Teva.

## Communications with Media Representatives, Analysts and the General Public

We are committed to providing timely, accurate and credible information to media representatives, analysts and the general public. To ensure that we are clear and accurate, we have defined specific functions and designated individuals with responsibility for communicating with media representatives, financial analysts and the general public.

### Why it is important

Providing timely, accurate and credible information is important to our investors and also enables us to maintain integrity in our relationships with the public and other stakeholders.

### Our way

- We do not speak to the general public, analysts or media representatives about the Company unless we are specifically designated to do so under Teva's Corporate Communications Policy.

- We contact the Corporate Communications Department before posting any Company information in any format or via any means of communication, or participating in media interviews or in events or forums where members of the media will be present.

- We contact the Investor Relations Department before participating in interviews or in events or forums where analysts will be present.

- We consult the Corporate Communications Department whenever we learn about an event or activity that may be of interest to the media and investors.

We are accountable for our actions and decisions.

JOINT APPX - 0185

TEVA 000543

## Social Media

Social media are digital technologies and practices that enable people to create and share content, opinions, insights, experiences and perspectives in different ways (for example, blogs, social networks, etc.). Social media are used by Teva for business purposes and by employees for various personal purposes.

### Why it is important

Teva seeks to use the newest forms of technology and communication to reach our stakeholders. The Company also respects the rights of employees to engage in personal use of social media. Whether such use is for Company or personal purposes, we must adhere to our values and ensure ongoing compliance with applicable laws and Company policies.

### Our way

- We use discretion and common sense regarding the potential consequences of our social media use.

- We are open and honest about our affiliation with Teva when it is relevant to the issue. While disclosing our Teva employment status, we make it clear that our ideas or opinions are personal, and may not represent the position of the Company on the issue.

- We refrain from using social media to discuss issues that involve Teva's confidential and proprietary information.

- We adhere to marketing and promotional laws and guidelines in all Teva-sponsored social media.



**I follow a number of pharma blogs, and recently came across one that included what I think is confidential Teva information. What should I do?**

Unauthorized disclosure of confidential Teva information is forbidden. You should discuss your observation with your manager. You may also call the Office of Business Integrity ("OBI"), which is in charge of the Teva Integrity Hotline, or you may contact one of the other resources listed in this Code.

**I maintain a personal blog that covers a number of topics including healthcare-related issues. I express only my personal opinions. Do I need to indicate my affiliation with Teva?**

Ask yourself whether a reader who discovers your position with the Company might think a particular comment of yours was biased or that you might be hiding your affiliation. In this situation, reconsider whether you want to post the particular item or disclose your affiliation. When disclosing your affiliation, make clear that your ideas or opinions are personal and may not represent the position of the Company.



To stay ahead of the game in a constantly changing environment, we dare to be different.

## Quality and Safety

We are committed to meeting or exceeding customer and regulatory requirements regarding the research, development, procurement, manufacturing, packaging, testing, supplying, maintenance and marketing of our products and services. Quality means consistently satisfying requirements by delivering products and services of the highest value in a timely manner.

We do not stop at quality assurance. We are also committed to continuous improvement in the development, production and delivery of high-quality products for our customers. We believe in creating a culture of quality by raising individual awareness to the importance of quality, in every single action, every single day.

### Why it is important

At the very heart of Teva's mission is our commitment to develop and manufacture high-quality, safe products and services that promote good health and well-being across the globe.

### Our way

- We are committed to meeting all applicable regulatory requirements across all our facilities and at all stages of the product life cycle.

- To ensure we are in compliance and working in accordance with sound quality principles in our research laboratories, in our clinical trials, and in our manufacturing plants and distribution centers, we adhere to the systems and internal controls for "Good Operating Practices," or "GxP," including Good Laboratory Practices (GLP), Good Clinical Practices (GCP), Good Manufacturing Practices (GMP) Good Pharmacovigilance Practices (GVP) and Good Distribution Practices (GDP).

- We take quality-related complaints seriously, and ensure that they are properly investigated and reported, as required, to the appropriate regulatory authorities.

We maintain our focus on the task at hand, while not losing sight of the "bigger picture".



**I work on a production line. What should I do if I notice that a finished product coming off the line does not meet Teva's quality standards?**

The Teva brand stands for high-quality products. If a product does not meet our standards, immediately inform your manager and the Quality Assurance Department.

**I read a blog on the Internet in which the blogger claimed that he had used a Teva product and experienced back pains. Do I need to inform the Company?**

Yes. You should promptly inform the Company's Pharmacovigilance Department in your country any time you become aware of an event, regardless of how you became aware of it. You can do this through the TevAlert procedure via the "Teva.net" website.

**I work in a laboratory and was asked to perform a new GLP test with a specific chemical. I do not feel trained enough to do this GLP test, and I am concerned as to how to handle the specific chemical. What should I do?**

You should not conduct the test if you do not feel adequately trained to do it and are not familiar with the specific chemical's characteristics. You should always perform your work in accordance with all regulations, including those regarding good safety and environmental practices as well as the handling of potent and controlled substances. You should contact your direct manager prior to commencing the test and ask him to guide you and to supervise you while you perform the test. In addition, you should repeat the GLP training that is provided to laboratory employees. If you still have questions, you should contact the QA Department.

JOINT APPX - 0187

TEVA 000545

- We maintain a Pharmacovigilance system that includes an Adverse Event Report database. In accordance with applicable global regulations, we have also appointed drug safety officers who monitor and detect changes in the benefit profiles of our marketed products. Furthermore, we follow appropriate safety-monitoring procedures for products in development as well as marketed products.

- We work to combat the growing problem of counterfeit drugs, which can adversely affect the health and well-being of patients worldwide. We report any counterfeit or suspected counterfeit drugs through the established procedures.

- We never compromise quality or safety in anything we do – including to meet deadlines.

## Protecting Company Confidential Information, Intellectual Property and Company Assets

The Company's property and assets, and especially our Intellectual Property (IP), are key drivers of our success. All employees must work to safeguard our patents, trademarks, copyrights, trade secrets and other proprietary information and know-how.

Confidential information can include sales, marketing and other corporate databases; intellectual property strategy and plans; marketing strategies and plans; pricing information; sales information; non-public financial information; customer and employee records; manufacturing techniques, research and technical data and information regarding new product development.

### Why it is important

"Assets" means more than buildings or desks. Much of the information that we conceive or develop as part of our job is proprietary, that is, a valuable Teva asset. Once confidential information has been disclosed, it enters the public domain and may be difficult to safeguard. Unauthorized disclosure could destroy its value and may give unfair advantage to others outside Teva.

### Our way

- We respect and safeguard the Company's tangible and intangible assets, including buildings, furniture, vehicles, computers, personal electronic devices, and confidential information.

- We use the Company's tangible and intangible assets for legitimate Company purposes only. Any loss, misuse, fraud or theft must be reported to a manager or by using one of the means outlined in this Code of Conduct.

- We obtain appropriate authorization to access confidential information.

- All proprietary information must be maintained in strict confidence, except when disclosure is authorized by the Company or required by law. This obligation continues even after we stop working for the Company.



**I have just started a new role in Teva and have a friend who has worked for several years at another life sciences company. I would like to ask her a question and learn from her experience. Can I do so?**

You should be very careful what you say. You may disclose only publicly available information. The fact that she is your friend does not protect Teva's confidential information.

**I overheard Teva employees discussing Company development plans in an airport lounge. What, if anything, should I do?**

You should present yourself as a Company employee and advise them that they can be overheard. All of us have a responsibility to ensure that confidential and proprietary information is not discussed in public.

TEVA_000546



**I would like to invite physicians from multiple countries to a conference. Can I use information about these physicians from Company databases located in different countries?**

Many countries have privacy and data protection laws that apply when one transfers or accesses personal information about individuals, regardless of whether they are customers, consumers, patients or employees. In some cases, even transferring names of individuals from country to country may require authorization. Before taking any action, you should consult with your manager, who will review the details with the appropriate department.

**I am involved in a clinical trial, and an academic investigator has contacted me asking if she could receive blood samples collected from patients participating in the trial for use in her laboratory research. Is this acceptable?**

Every use of patient samples and disclosure of data collected in clinical trials is subject to the patient's prior consent. You should contact the Legal and Compliance & Ethics Departments for further guidance.

- We obtain Legal Department (Patent Group) approval when there is any doubt about whether particular information is Company confidential information.

- We ensure that a non-disclosure agreement has been signed by all parties before disclosing any confidential and proprietary information.

- We avoid discussions of confidential information in places where others can overhear.

## Privacy and Protection of Personal Information

During normal business activities, we may collect personal information about various individuals, including employees, patients, customers and other persons or entities with whom we do business. Teva is committed to collecting and keeping only personal information that is legitimately needed to carry out our business, and to implementing measures designed to protect that information.

### Why it is important

Collection and use of personal information is important to our business, but its unlawful use or disclosure could hurt the person to whom the information pertains, our Company and other stakeholders. As such, it is a breach of our Global Data Privacy Policy and other privacy policies, and in some cases of the law, to use personal information for anything other than legitimate Teva business purposes.

### Our way

- We protect the confidentiality of personal information entrusted to us.

- We collect, use, and retain personal information only to the extent we need it for legitimate business, human resource or scientific purposes, or as otherwise required or permitted by applicable law.

- We comply with all applicable privacy laws, including any requirements to inform or obtain consent from individuals regarding collecting, processing, accessing and disclosing their personal information.

- We do not share or entrust personal information to third parties in or outside of Teva unless they have a legitimate need to know it and such third parties maintain at least the same standards of confidentiality that we maintain.

## Designing and Maintaining Effective Business Controls; Accurate Reporting

We are committed to delivering accurate full, fair, timely and reliable information to regulatory authorities, shareholders, customers, healthcare professionals, media representatives, financial analysts, brokers and the general public. Our system of internal controls over financial reporting and disclosure is designed to provide reasonable assurance that financial statements for external use are prepared in accordance with generally accepted accounting principles, and fairly present the Company's financial condition. We provide full and accurate disclosure as to the business and financial condition of Teva.

### Why it is important

Each of our stakeholders makes decisions every day based on the information recorded by our Company. Business controls ensure the overall quality of financial reporting and disclosures. Business controls also establish a foundation for achieving business objectives and facilitating compliance with laws, regulations and Company policies. Business controls help us prevent fraud and mitigate other risks by preventing, detecting and correcting problems.

### Our way

- We maintain complete and accurate records, and ensure that they are managed and maintained properly as required by law and Company policies.

- We ensure that our financial and other records accurately and fairly reflect the Company's assets, liabilities, revenues and expenses.

- We record all financial and business transactions in the proper account and during the proper accounting period. We also avoid entering into any transaction or arrangement that improperly accelerates, postpones or otherwise manipulates the accurate and timely recording of business revenue or expenses.

- We ensure that the description regarding any payment or account established on behalf of Teva accurately reflects the purpose described by the supporting documentation.

- We avoid improperly influencing the work carried out by our external or internal auditors.

- We immediately report to the Company any unrecorded funds or assets, or false or artificial entries in the books and records of the Company. We also immediately report to the Company any person who we believe may have engaged in questionable accounting, internal accounting controls or auditing practices, whether or not material.



We make the decisions required to take our business forward, and execute on them with focus and determination.



**Our department is under pressure to meet quarterly earnings projections. I think someone in my department reported numbers last quarter to meet the projections thinking we could make it up this quarter. What should I do?**

It is never acceptable to report earnings that are inaccurate. The Company requires accuracy of all of our books and records. You should report questionable entries immediately to your manager, or use one of the other methods outlined in this Code of Conduct.

**In order to meet year-end sales targets, can I offer my customers a discount if they overstock their supply so I can book the sales this year?**

No. It is inappropriate to manipulate sales orders in order to show better results in a certain financial period. This type of intentional misconduct, whether for your benefit or the benefit of others, constitutes fraud, which is strictly prohibited by law and Company policies.

**I have financial approval authority of up to $50,000. I need to have a $100,000 invoice from a major, long-term supplier paid immediately. My manager has approved these invoices in the past, but is currently out of town. Is it all right for me to split the invoice into two separate invoices?**

No, employees may not split invoices or expenses to avoid exceeding approval limitations. You must wait until your manager or someone else with sufficient approval authority can approve the invoice.

**I don't have time to check all the vouchers and reports that come across my desk for approval. Surely it is the responsibility of the person who prepared them to make sure invoices are correct?**

No, each of us is responsible for ensuring that all vouchers, invoices, bills, time reports, and other documents are filled out correctly. If you are approving an invoice, you are responsible for its accuracy.

## Use of Company Systems

Computer technology – hardware, software, networks and the information that runs on them – is critical to our business success and must be protected. Everyone who uses a computer has the responsibility to use these resources appropriately, securely and for intended business uses. Teva's communications systems may be monitored or accessed by the Company to ensure integrity and to protect against fraud and abuse. In addition, monitoring may be used to detect unauthorized access or use, or for other business purposes.

### Why it is important

Like every other company today, global electronic communications and resources are an integral part of our business activities. It is essential that electronic resources used to conduct business are protected so as to ensure that they are accessible for business purposes.

TEVA 000549

## Our way

- Our electronic communications systems such as email, Intranet, Internet, voice mail and facsimile should be used primarily for Company business.

- We are allowed to use Teva's Internet access, email, facsimile, telephone and copying systems for incidental or occasional personal use as long as it does not affect job performance or disrupt others. Also, such use should not further the business activity of any entity other than Teva, and must not violate this Code of Conduct or Teva policies.

- We understand that, where legally permitted, Teva has the right to access and review all communications, records and information created at work or with Company resources without advance notice or consent. We do not expect confidentiality or privacy when using Company systems, except as provided by applicable law.

- We must comply with applicable license agreements for software and published material. Only software authorized by the IT Department can be added to Teva computers.

- When using Company systems, we should never access or transmit material that is likely to offend fellow employees, may negatively reflect upon Teva or that contains anything prohibited by law.

- We comply with Teva's IT security standards.



**Is it okay for me to browse the Web from my office or email a family member to make personal plans for the weekend?**

Yes, occasional and limited personal use of Company systems is acceptable if it does not interfere with our job responsibilities. However, recreational Internet "surfing" is much like browsing through a magazine. Just as you would not sit at your desk reading magazines instead of working, you should not use Teva time or equipment to browse the Internet. Furthermore, you cannot expect confidentiality or privacy when using Company systems. If you do not want to expose personal information to the possibility of access and review as described above and in Teva policies, you should refrain from any personal use of Company systems.

**I received a chain letter offering to sell personal merchandise at prices that I think will interest a number of my fellow employees. Can I share this with them?**

You should refrain from forwarding chain emails of any type.

**I work in the Finance Department and submitted a file to my manager before going on vacation. During my trip, I remembered that I had forgotten to include certain data. Can I share my password with a fellow employee who works in a different department so that she can access my computer and make the appropriate changes?**

Employees must not share their computer log-in information with anyone. Any exception must be justified to and approved by the appropriate manager. Furthermore, employees should not enable other employees to modify documents outside the scope of their responsibility.

**I need to remotely access my files and computer. Can I use one of those services I hear advertised on the radio to access my computer?**

Use of unauthorized remote-access or file-sharing software is a security risk and is not permitted. You should contact the IT Department for assistance in this area.

TEVA 000550



We bring out the best in each other and celebrate shared wins.



**I have inherited documents from my predecessor that could have been destroyed since the legally specified retention period has expired. Now I have heard there is a legal case, and I think that the documents could be used against Teva. Am I allowed to discard them?**

No. You must not destroy any records that relate to any actual or imminent legal proceeding or regulatory investigation. The discarding of these documents would be considered obstruction of justice, which is subject to severe sanctions, including criminal fines and imprisonment. Therefore, you must preserve the records. You should contact the Legal Department for further advice.

## Records Management

We create, manage, retain and dispose of our business records and information in compliance with Teva's policies.

### Why it is important

The proper use of records is important to our work at Teva: it facilitates decision-making, supports our legal, financial, regulatory and contractual obligations and promotes organizational efficiency. Furthermore, many business records that we create or receive at work are valuable Company assets, regardless of format (e.g. paper, electronic, audio/video). Efficient and accurate records management is vital for the protection of the Company's business interests. In addition, some government agencies regulate the retention and disposition of documents. Failure to comply with Teva policies, government regulations or court orders can lead to serious consequences.

### Our way

When creating a document, we adhere to the following standards of care:

- We avoid misleading or suggestive wording, embarrassing the recipient, exaggeration or inappropriate characterizations.
- We ensure that we are familiar with Teva's record retention schedule and retain all records for the time needed to comply with applicable laws and Teva's policies.
- We follow Teva policies regarding the preservation of documents and data relating to potential or pending litigation or investigations or in response to court orders.

JOINT APPX - 0193

TEVA 000551

## Innovation and Creativity

Given our belief that what we do improves the lives of others, we are committed to finding innovative and creative solutions. We seek to change the course of human health through bold pursuits in science and a promise to always put patients first. We harness our entrepreneurial drive, embrace the challenges that come our way and strive to overcome them.

### Why it is important

Creativity is a key driver for our innovation and helps to form the core of our business as a healthcare company. Our willingness to challenge the status quo enables us to pursue new standards in medicine and in the broader world of human health. Innovation and creativity are closely tied to our continued success and growth.

### Our way

- We strive as individuals and as a company for creative and constructive growth, transformation and renewal as a source of inspiration and vitality.

- We are encouraged to seek to apply our knowledge, talent and resources to yield new insights and bold ideas in the advancement of our mission while ensuring that we follow all applicable laws, regulations and Company policies in all of our activities.

- We focus on being proactive; we take the initiative; we think "out-of-the-box."

- We take ownership of our role in contributing to the success of Teva.

## Research and Development; Clinical Trials

Research and Development (R&D) is the systematic activity combining both basic and applied research aimed at discovering new solutions to healthcare issues or creating new pharmaceutical products and services. R&D starts with laboratory work and continues through pre-clinical animal toxicology and to human studies involving pre- and post-marketing clinical trials that determine the safety and efficacy of our products.

### Why it is important

Every Teva product is the result of Teva's R&D activities, which reflect our innovative approaches to creating new products and services to combat illness, to expand accessibility to such therapies and promote worldwide well-being.

Patient welfare is the very reason for our existence. We share a belief that what we do matters to the world – that it is essential to the advancement of healthcare.

### Our way

- We are committed to developing and marketing drugs that provide benefit to patients and ensure their safety as defined in the product label.

- We have the utmost regard for the safety of participants in our clinical trials and ensure that they are not subject to unnecessary risks, and that they understand the risks, nature and purpose of the clinical trial.

- We ensure that we follow the proper procedures for gaining informed consent, and that appropriate confidentiality rules are applied.

- We do not commence any trial prior to receipt of all necessary legal, regulatory and Company approvals.

- We ensure that all necessary parties that engage in clinical trials have been trained according to a study's protocol and procedures.

- We comply with international standards of good practice, including the Declaration of Helsinki and Good Clinical Practice.

- We ensure that all information from clinical trials is recorded, handled and stored in a way that complies with applicable data protection laws, and enables accurate and transparent reporting, interpretation and verification.

TEVA 000552



**A researcher from a university contacted me and stated that she had an idea for a clinical trial involving the use of one of Teva's products. What should I do?**

Teva encourages the conduct of research to promote science. Any such research must be conducted in accordance with legal requirements, ethical considerations and maintaining and safeguarding Teva's interests. Any such request should be forwarded to the Legal Department and the relevant business representative within the Company.

**I am in sales and marketing and a doctor has asked us if she can use our samples to conduct a small clinical trial with a group of patients. Is this acceptable?**

No. Samples may not be used for clinical trials. While the Company provides product to study sites in accordance with a clinical trial protocol, the product is provided generally via the Company or its agent that is managing the study and not via the sales and marketing team.

We are imaginative and inventive, striving to apply our creativity where it matters most: where we can improve health and make people feel better.

- We maintain an Adverse Event Report database, and employ drug safety officers to ensure compliance with global regulations. Furthermore, we follow special safety monitoring procedures for products in research and development phases.

## Philanthropy and Community Involvement and Contributions

In addition to our general commitment to improving global healthcare, we provide support to charitable or philanthropic organizations that benefit society. We also seek to give back to the communities of which we are a part and to support communities in need. Furthermore, we encourage and are also proud of our many employees who volunteer in the community and support them in many ways.

### Why it is important

We believe in being a good corporate citizen and in acting in a socially responsible manner. We also believe that our employees enrich themselves when they participate actively in their communities and support worthwhile causes.

### Our way

- We volunteer in communities in which we live and work.

- We partner with leading non-profit organizations to advance worthy causes.

- We support various non-profit organizations and community programs worldwide through cash donations and donations in-kind (e.g., products, equipment and services).

- We follow the proper approval procedures for all corporate donations and for all partnerships that the Company seeks to establish.

JOINT APPX - 0195

TEVA 000553



We enjoy playing with meaningful new ideas and exploring unfamiliar ground.

## Safeguarding the Environment and Animal Welfare

While our primary way of contributing to a better world is through our Company's mission, we remain committed to safeguarding the environment and animal welfare and to contributing to social progress in all of our global operations. As we develop, manufacture and market our products, we steadily work to reduce the environmental impact of our processes. We are committed to providing humane care and treatment of research animals.

### Why it is important

Protecting the environment and ensuring animal welfare is the law and the right thing to do.

### Our way

- We comply with all environment-related rules and regulations and aspire to adopt "best practices" in environmental procedures and standards.

- We maintain a global operation for identifying and handling our environmental footprint.

- We abide by generally accepted standards of animal care, including through the review and approval by our internal ethical committee on animal welfare. All of our animal studies are closely monitored to ensure the animals' well-being.

- All employees involved in designing and conducting studies involving animals must be properly qualified.

- We fully evaluate all planned animal studies to minimize the use of research animals by seeking alternatives whenever feasible. We aim to reduce, refine or cease the use of animals in our research as alternative methods are validated and accepted by regulatory authorities.

## Ethical Labor Practices

Teva is committed to upholding ethical labor practices and procedures across all of its locations around the world. Our responsibility in this area includes creating awareness and understanding of human rights, employment and labor practices. *By incorporating these principles into strategies, policies and procedures, and living out our values, Teva will uphold our basic responsibilities to our people, our environment, and set the stage for our long-term success.*

Teva supports and respects the protection of internationally proclaimed human rights, and we strive to ensure that we are not complicit in human rights abuses. We also uphold the freedom of association and the effective recognition of the right to collective bargaining, the elimination of all forms of forced and compulsory labor, and the effective abolition of child labor. Child labor is a form of exploitation that is a violation of a human right and it is recognized and defined by international instruments. It is the declared policy of the international community and of almost all Governments to abolish child labor.

### Why it is important

Ensuring that we maintain the highest moral and ethical standards regarding labor practices is a top priority at Teva. Simply put, it's the right thing to do – as an industry, as an organization, as an employer, and as human beings.

### Our way

At Teva, our responsibility extends beyond our own employees and internal facilities, to the people and companies we partner with around the world. This means identifying any issues and determining whether or not human rights are being compromised anywhere within our business. We must be particularly vigilant when sourcing in specific industry sectors with geographically distant supply chains.

Some of the actions Teva can take in the workplace are as follows:

- Being aware of countries, regions, sectors, economic activities where there is a greater likelihood of human rights or labor abuses, and responding accordingly with policies and procedures
- Using adequate and verifiable mechanisms for age verification in recruitment procedures
- Developing and implementing mechanisms to detect labor violations
- Working in partnership with other companies, associations and employers' organizations to develop an industry-wide approach to address human rights issues

Awareness and understanding are the first steps that a company can take toward ethical labor practices and human rights.

JOINT APPX - 0197

TEVA 000555



# Guidelines for Implementation of Our Values

## Making Sound Decisions

We want to be known as a company in which all of us conduct ourselves in accordance with our values and in compliance with our policies. This helps us earn the trust of our stakeholders – employees, customers, business partners, shareholders, regulators and neighbors in the communities in which we do business.

The Code applies to all members of the Board of Directors and employees of Teva and its subsidiaries and controlled affiliates. In addition, Teva expects that its business partners will meet the standards embodied in this Code.

No code can anticipate every possible question in every country or culture in which we operate.

Specific questions will undoubtedly arise in the course of our activities. When faced with such questions, we must bear in mind the spirit of this Code and recognize the need to bring them to the attention of others within the Company. Taking time and having the courage to find appropriate answers to questions that arise is not always easy, but it is essential. At times we might sacrifice some immediate advantage, but in the long run, adherence to high ethical standards benefits all of our stakeholders.

All members of the Board of Directors and employees can contribute to Teva's culture of compliance and ethics by understanding this Code, embracing Teva's commitment to our Values, and acting to enforce compliance and avoid violations. No

If you think you are being asked to behave or conduct business in an illegal, unethical or otherwise inappropriate manner, or you suspect others of such behavior, you can report your concerns through the channels described below. Teva encourages and supports employees' speaking up. **You will not be penalized for reporting what you believe, in good faith, to be a breach of the Code – even if it later turns out that a violation has not occurred.**

code of business conduct and ethics can replace thoughtful and ethical behavior by the members of our Board of Directors and our employees. Raising a concern protects our Company, our members of the Board of Directors, our employees and our stakeholders.

In certain cases this Code of Conduct is supplemented by additional policies that cover specific topics in more detail or deal with certain local or regional issues. While this Code of Conduct is designed to familiarize us with many of the relevant policies, it is not as comprehensive as these supplemental policies and therefore does not supersede them or act as a substitute for reviewing each policy that applies to our specific job. Any waiver of our Code requires the prior written approval of the Chief Compliance & Ethics Officer or, in certain circumstances, the Board of Directors or a committee thereof. If required by applicable law, waivers will be promptly disclosed. Our Code is not a contract. It does not convey any specific employment rights or guarantee employment for any specific period of time.

## Recognizing a Potential Violation of the Code

Faced with issues that are difficult to resolve and for which there are no specific answers, it may be helpful to ask yourself the following five questions before proceeding:

- Is the decision or action I am going to take in line with our Values and this Code of Conduct?
- Have I thought through the risks and possible implications of what I am doing?
- If necessary, have I sought advice to help me make an informed decision?
- How will I feel if the action I take today is featured in the media tomorrow?
- Have I considered any potential impact on Teva's reputation?

JOINT APPX - 0199

TEVA 000557

## Channels for Raising Concerns

Teva management is responsible for implementing and monitoring compliance with this Code and for ensuring proper training with respect to this Code for all employees.

There are a variety of channels available to you to ask questions about the Code of Conduct for guidance on the right behavior.

If you have a question about making sound decisions, your supervisor, your manager, or the Human Resources Department will usually be the best resource to address your question, and you may also contact the Compliance & Ethics Department for further guidance.

If you have knowledge or a concern regarding potential violations of this Code, you can report the issue via one of the channels outlined below, and you may choose the channel which you are most comfortable with:

- Next level of management
- Human Resources Department
- Compliance & Ethics Department
- Legal Department
- Internal Auditor in your country

*It should be noted that any Teva Personnel receiving a Report of Noncompliance alleging serious misconduct, including potential violation of law, violation of anti-corruption, anti-bribery, or anti-trust laws in particular, fraud, or financial misconduct, should promptly forward complete details of the Report to the Office of Business Integrity (OBI).*

If you choose not to use the channels outlined above, or if you've previously reported the issues with unsatisfactory results, or if your concern involves your manager, you may report directly to the OBI through the Teva Integrity Hotline and web-based reporting tool. The OBI is responsible for addressing all reports of misconduct, including those reported via the Teva Integrity Hotline.

Employees can contact the OBI for more information in person, by letter, phone, email (Office.BusinessIntegrity@tevapharm.com) or through the Teva Integrity Hotline and web-based reporting tool.

Please refer to the OBI section of the Code of Conduct page on Teva.net for further information regarding OBI telephone numbers and reporting channels.

**You will have the opportunity to receive feedback once you have raised a concern:**

The OBI will ensure that all reports are addressed in a timely and confidential manner. All reports will receive an objective and complete assessment and, if warranted, an investigation. In addition, corrective action will be implemented when appropriate, and you will have the opportunity to receive feedback (including, as applicable, feedback delivered via a method that will not compromise your confidentiality).

**When you report a violation or suspected violation of the Code of Conduct, confidentiality is respected:**

Your identity and the information you provide will be shared only on a "need-to-know" basis with those responsible for resolving the concern.





# Consequences of Code Violation

**I have been thinking about calling the Office of Business Integrity via the Teva Integrity Hotline, but I'm not sure if I should. My manager told me to do something that I feel is wrong because it could be a violation of applicable accounting rules. I think I should tell someone who can look into this, but I'm afraid that my manager will make my job difficult for me if I do. What should I do?**

You have identified what you believe is a potential violation of the Code. Our Values require us to speak up if something does not seem right. Management is often the best place to raise concerns, but because it is your manager's request that concerns you, your choice to call the OBI is a good option. Your concern will be investigated. Teva will not retaliate or tolerate your manager or anyone else retaliating against you for providing such information. This may take courage, but the right thing to do is to report your concerns.

**An employee has raised an ethical concern to me as her manager. After reading the Code, I'm still not sure I have the best answer, but I also feel like I have to give an answer to show I'm a good manager. What should I do?**

If you are unsure of your answer, you should seek guidance from the Compliance & Ethics Department. That way, you will be able to provide the best answer and demonstrate the importance of asking questions and making sound decisions.

Members of the Board of Directors and employees who violate the Code will be held accountable and sanctioned appropriately. This may include termination of employment or membership on the Board of Directors. Misconduct that may result in discipline includes:

- violation of the Code;
- requesting others to violate the Code;
- failure to cooperate in Teva investigations of possible Code violations or disclosing confidential information regarding investigations;
- retaliation against another employee for reporting a concern regarding a potential violation of the Code; and
- failure to demonstrate leadership and diligence to ensure compliance with the Code and law.

## Retaliation is Prohibited

Anyone who raises in good faith a concern about a possible compliance violation will be supported by management and will not be subject to retaliation. Any act or threat of retaliation will in itself be considered a serious violation of the Code and Company Values.

## Continuous Improvement

We are continuously examining and refining our Code, our policies and procedures, and our compliance and ethics program. If you have a suggestion as to how to improve our controls and processes in order to detect violations of the law or Company policies, we encourage you to bring it to our attention through any of the previously described mechanisms. The same holds true if you believe there is a need for training in a particular area or that other areas should be covered by the Code.



# Contact Information

**Chief Compliance & Ethics Officer**

The name and contact details of the Chief Compliance & Ethics Officer can be found on the Global Compliance & Ethics page of Teva.net, under "Contacts & Resources".

**Regional and Local Compliance & Ethics Officers**

The name and contact details of the Regional and local Compliance & Ethics Officers can be found on the Global Compliance & Ethics page of Teva.net, under "Contacts & Resources".

**Office of Business Integrity (OBI)**

Information on contacting the OBI, to include options on reporting misconduct, can be found in both the "Office of Business Integrity" and the "Contacts & Resources" areas of the Global Compliance & Ethics page of Teva.net. You may also email the OBI at Office.BusinessIntegrity@tevapharm.com

## Teva Integrity Hotline

Information on how to make a report through the Teva Integrity Hotline can be found in both the "Office of Business Integrity" and the "Report Misconduct" areas of the Global Compliance & Ethics page of Teva.net.

*If you do not have access to Teva.net and need assistance locating a Compliance & Ethics Officer, reporting a violation, or other resources, please email the Office of Business Integrity at* Office.BusinessIntegrity@tevapharm.com

Contact Information  |  **41**



████████████

**From:** Randy Keuch
**Sent:** Thursday, December 21, 2017 11:59 AM
**To:** Eduardo Nasi Cheide Da Graca
**Subject:** RE: FYI, I will be contacting Edu

Hi Edu,

Thanks!  I think Tal is trying to determine whether you or Gaurav or perhaps Amir should lead TR for Emerging Markets.

Have a great holiday with your family and we will know more in early January.

Best regards,


Randy Keuch   Head of Total Rewards - Americas
Tel: 267-468-4325    Cell: 215-272-9816
Randy.Keuch@tevapharm.com    sip:Randolph.Keuch@tevapharm.com    www.tevapharm.com


-----Original Message-----
From: Eduardo Nasi Cheide Da Graca
Sent: Thursday, December 21, 2017 11:46 AM
To: Randy Keuch
Subject: RE: FYI, I will be contacting Edu

Hi Randy, it went pretty well. She wanted to know more about TR LATAM in general and also my background, etc. not sure what is going to happen but the conversation overall was good!
Hope we have some good news soon! Any news from your side?
Thanks and regards,
Edu

-----Original Message-----
From: Randy Keuch
Sent: Thursday, December 21, 2017 9:00 AM
To: Eduardo Nasi Cheide Da Graca
Subject: Re: FYI, I will be contacting Edu

Let me know how it goes

Sent from my iPhone

> On Dec 20, 2017, at 6:18 PM, Eduardo Nasi Cheide Da Graca <Eduardo.Nasi@tevapharm.com> wrote:
>
> Thanks Randy. She sent me a message this afternoon and we are going to talk tomorrow morning!
> Regards,
> Edu

TEVA000608

>
> -----Original Message-----
> From: Randy Keuch
> Sent: Wednesday, December 20, 2017 11:40 AM
> To: Eduardo Nasi Cheide Da Graca
> Subject: FW: FYI, I will be contacting Edu
>
> FYI
>
> Best regards,
>
>
>
> Randy Keuch   Head of Total Rewards - Americas
> Tel: 267-468-4325     Cell: 215-272-9816 Randy.Keuch@tevapharm.com    sip:Randolph.Keuch@tevapharm.com
www.tevapharm.com
>
>
>
> -----Original Message-----
> From: Tal Zorman
> Sent: Wednesday, December 20, 2017 11:38 AM
> To: Randy Keuch
> Subject: FYI, I will be contacting Edu
>
> Dear Randy,
>
> Only FYI, I will be reaching out to Edu to better understand the TR LATAM support needed as part of the growth
markets.
>
> Thanks, Tal
>

TEVA000609

**Subject:**            Topics for Ron

**Start:**              Thu 10/26/2017 09:00
**End:**                Thu 10/26/2017 09:30

**Recurrence:**         (none)

**Organizer:**          Daniel Lawlor


Social Impact EHS sub-committee = level of interest good, but ensure information/participation is balanced
Concerns with Randy
-   I've personally had concerns since he was hired, dating back to when I was NA HRBP and voluminous time consuming analyses that were not really needed and missed the crux of the issue despite several pre-calls and meetings
-   Has one playbook and doesn't adjust mindset or behavior when circumstances warrant, a bit arrogant that he knows best and doesn't accept feedback in a constructive way
-   Publicly and privately places blame on Corp Total Rewards for certain decisions, which I don't believe is always true (i.e. example of life insurance take-away and needing to find so much savings for Corporate); clearly demonstrates and us vs. them mindset in my interactions with him
-   Didn't seriously follow up on the message conveyed on our last call, proceeded with communication plans w/o highlighting to communication consultants/partners concern about take-a-way on life insurance; now it may be too late
-   Defensive when given feedback on issues, turns to point the fingers at others (i.e. example of Linda, Pam when feedback on Contractor he wanted to hire was not good)
-   Had to stop him from hiring contractor full-time and request that he get more feedback from others and discuss with Talent Acquisition some new approaches, leveraging Teva HR community more broadly
-   Technically good, but an overused strength that does offset other concerns
-   Tendency to give too many details/updates with a degree of bragging when in front of the business of HR community, rather than use it for opportunity for input and dialogue (HR MAC meeting, Americas HRLT); had to convince him to adjust HR MAC agenda to permit time for dialogue and input
-   Overall caliber of talent in group is not strong, but I think under his leadership it has been difficult to attract strong talent that does exist in the market, whereas he attributes it to Teva not being an attractive employer; note we had 50 external applicants for Nancy's role

**From:**          Yonatan Vitman
**Sent:**          Wednesday, February 21, 2018 06:07
**To:**            Tal Zorman
**Subject:**       Salary Recommendation

Hi Tal,

Following our discussion here is my recommendation:

- Edu's salary today is **$168,895** which puts him at the entry of the range (mid-point is at ~$200K)
- There is no GG16 at Total Rewards US so I cannot see the range for this grade
- For other HR jobs in GG16 the mid-point is at ~$210K which means the entry is ~$180K; average salary is ~$210K
    - Total Rewards tends to have higher ranges by 5% to 10%
- Randy's salary was $285K
- Given the above I would recommend an increase of 15% to 20% to bring Edu to the range **($195K)**

Thanks

 **Yonatan Vitman,** Senior Director, Global Compensation
Tel: +972 (3) 9267143    Cell: +972 (54) 5790996
Yonatan.vitman@teva.co.il

**From:**        Assaf Ehrenreich
**Sent:**        Friday, December 15, 2017 01:46
**To:**          Tal Zorman
**Subject:**     Fwd: Minimal TR Organization for North America
**Attachments:** image001.png; ATT00001.htm; image008.jpg; ATT00002.htm; image009.jpg;
                 ATT00003.htm; image010.jpg; ATT00004.htm; Minimal TR Organization Final.pptx;
                 ATT00005.htm

I respect Randy and his inputs should be taken seriously.
Main takeaways from my side:
- Agree on the criticality of Diane, most of the risk is on her shoulders and it can't be managed from distance or by a
junior/ new role
- wouldn't change Miriam's position in the first few months as well
Assaf

Begin forwarded message:

> **From:** "Tal Zorman" <Tal.Zorman@teva.co.il>
> **To:** "Assaf Ehrenreich" <Assaf.Ehrenreich@teva.co.il>
> **Subject: Fwd: Minimal TR Organization for North America**
>
> Let me know if you have any remarks/insights
> I am mtg with Dan today to discuss
>
> Thanks, Tal
>
>
> Begin forwarded message:
>
> > **From:** "Randy Keuch" <Randy.Keuch@tevapharm.com>
> > **To:** "Tal Zorman" <Tal.Zorman@teva.co.il>
> > **Cc:** "Daniel Lawlor" <Daniel.Lawlor@tevapharm.com>, "Ron Yaniv"
> > <Ron.Yaniv01@teva.co.il>
> > **Subject: Minimal TR Organization for North America**
> >
> > Hello Tal,
> >
> > Attached is a deck that provides my bare bones recommendation for my team.  I have
> > included options that suggest elimination of my position or Miriam's position.  I strongly
> > urge you not to make any leadership changes in Q1, as there is much work for the team
> > to perform and the risks are very high.  I also ask that you consult with Legal to validate
> > the risks and our exposure.  An error on our 401k could result in disqualification of the
> > entire plan, which has $1.2 billion in assets, so disqualification will result in the loss of
> > huge tax benefits to Teva.  If a leadership change (job elimination) is needed, better to
> > do this in Q2 when work has transitioned to HR Ops & Services, and the organization has
> > stabilized.  This is not a personal request nor is it made out of concern for having my
> > position eliminated.  Rather, it is a business decision as to how much risk Teva is willing

to take by moving too quickly or having inexperienced people in key decision-making roles.

Thanks for your consideration and let me know if you have any questions.

Best regards,



# Pay Letter
*Performance year January 1 to December 31, 2017*

| | |
|---|---|
| **Employee Name:** | Eduardo Nasi Cheide da Graca |
| **Employee Global ID:** | 901055 |

Congratulations! We are pleased to confirm your promotion to the position of  Sr Dir Total Rewards as of March 26, 2018.
Your new job title is: Sr Dir Total Rewards I
Your new job grade is: 16

I would like to inform you about the compensation adjustments offered to you which are outlined below, resulting from a combination of Teva's overall achievements, your business unit's achievements, and your individual performance throughout the year, reflected in your Performance Rating of:  Successful Performance

## Salary
**Your new annual base salary is 199,296.90 USD as of March 26, 2018**

| Current Annual Base Salary | Salary Increase % | New Salary |
|---|---|---|
| 168,895.68  USD | 18.00% | 199,296.90  USD |

## Equity
**The number of options granted to you is 8,500**

| Estimated USD fair value | Grant date | Vesting Schedule |
|---|---|---|
| 63,920 | March 2, 2018 | 25% Mar 2019, 25% Mar 2020, 25% Mar 2021, 25% Mar 2022 |

50% of your grant will be automatically converted into restricted share units  ("RSU")  according to the conversion methodology set forth in the plan.
The award is subject to:

The terms of Teva's 2015 Long-Term Equity-Based Incentive Plan (including any applicable sub-plan);
an award agreement that will be made available to you on Equate+, which includes additional terms and conditions; and any applicable law.

You will receive an e-mail from Stock Administration with a link to access your award agreement. The award agreement shall be deemed automatically accepted by you and you shall be subject to all its terms and conditions, unless you click the "I decline" button at the end of the award agreement on Equate+ within 30 days following the grant date.
*Fair Value may change depending stock price on grant date

All payments referred in this letter are gross and subject to applicable tax and other deductions.  To the extent permitted by applicable law, please keep the terms of this letter confidential.

Best regards,

Tal Zorman

TEVA 000853

**Global Talent Management - Leadership Structure Updates**

Dear Colleagues,

I would like to update you on changes to our global **Talent Management COE** structure.

The **Global Talent Management Center of Expertise** will combine Talent Acquisition and Mobility, Learning, Leadership and Development and Total Rewards to provide HR leading practices and solutions. The following appointments and updates to the Talent Management leadership team and structure are effective immediately:

### Talent Acquisition & Mobility

**Carolyn Maye** will lead Executive Hiring and will continue to manage the centralized Top Management (GCA 17+) recruiting function, working closely with global business unit leadership in support of their organization strategy, overseeing all aspects of global Top Management recruitment while providing visible metrics that help drive business value.

**Gregory Sullivan** will lead Talent Acquisition activities as subject matter expert with direct accountability for designing global TA processes, policies and tools, while collaborating with HROS on implementation.

**Michelle Durkin** will lead Global Mobility which continues to be an SME function across all businesses and functions, to provide cost effective mobility solutions, strengthen current processes and service partner performance, re-position Global Mobility within a talent management approach, educate key stakeholders, and review global mobility policies to meet future needs of the business.

### Learning, Leadership & Development

The Learning, Leadership & Development function will provide 'just in time' leadership, talent and organizational development solutions to support the organizational restructuring and rebuild employee engagement. There will be no dedicated L&D support/presence in the region/BU and the corporate team will hold a strong partnership with the business to ensure global, regional and BU alignment. The Learning team will provide learning governance across Teva and ensure the Learning Management System & technologies' sustainability.

**Ravit Eshed** will lead Talent, Leadership Development and Engagement; **Lior Porat** will lead the Organizational Development; and **Avital Szarfman** will lead the Learning function (as well as the CoE Planning, Governance and Processes management).

### Total Rewards

The Total Rewards CoE will focus on designing and leading programs, processes and policies, combining best market practices and Teva's needs.

With a continued, smaller regional presence, the team will focus on supporting Teva's Business and HR in achieving their strategic and operational objectives, providing solutions in the Total Rewards space, such as Compensation, Benefits and Equity.

KEUCH000009

**Yonatan Vitman** will lead Global Compensation & Equity Design. **Eduardo Nasi** will lead Total Rewards in the North America region;  **Amir Haim Zeirah** will lead Total Rewards in the Growth Markets region (Israel, LATAM and Asia); and the European region will be announced at a later stage.

The following Total Rewards team members will continue their roles:

- **Gaurav Gulati** is responsible for APAC, reporting to Amir Haim Zeirah.
- **Roni Percik** will join the Global Compensation & Equity team responsible for Equity Design, reporting to Yonatan Vitman.
- **Lian Ben Ezra** will join the Global Compensation & Equity team and will assume responsibilities for leading key projects and processes in the Compensation domain, reporting to Yonatan Vitman.

The Executive Compensation team, **Shlomit Ronn-Agler** and **Ephie Nissenfeld**, will move to the HR Office, reporting to Assaf Ehrenreich.

<u>Planning & Process Management</u>

This function will provide cross CoE planning, governing and implementing processes and tools, to enable metrics-based strategic decision making.  Avital will lead this area, in addition to the Learning COE.

---

**Orit Amores**, my personal assistant, is transitioning into a new role in the HR Operations & Services organization. **Donna Perry** will replace Orit to provide administrative support for both the Global Talent Management team as well as the HR Operations & Services team.

As a result of the above organizational changes, we will be parting from **Randy Keuch**.  I would like to thank Randy for his significant contributions and dedication to Teva. In the last four years Randy led the Total Rewards Center of Expertise for the Americas providing subject matter expertise and cutting edge solutions to all facets of Total Rewards issues within the region.  Randy's last day with Teva will be February 23.

Updates regarding additional team members will be provided at a later stage.

I appreciate your patience and commitment as we continue to work through this difficult process, and I thank you for your ongoing support and understanding. I am confident in our team's ability to move forward and create a new path to become a stronger and more agile team.

Tal Zorman
SVP Global Talent Management

KEUCH000010



KEUCH000017

 Pharmaceuticals

DATE:  5/26/2016

TO:     Randy Keuch

We are very pleased to inform you that in your current position as Sr Dir Total Rewards, Americas (grade 17), you will receive an adjustment to your base salary.

This letter is to confirm this change to your employee record.

The effective date for this change is: May 23, 2016

The following outlines the details of your role at Teva:

|  | Previous | New |
|---|---|---|
| Salary | $280,000.00 Annually | $285,600.00 Annually |

- Bonus:  You will continue to be eligible to participate in the Teva 2016 Bonus Program with an incentive opportunity equal to 30% of your Annual Base Salary, subject to the terms and conditions in the 2016 Bonus Program.

- Merit Increases: You will continue to be eligible to participate in our 2016 Teva Performance Management Program, subject to the guidelines for active employees.

*This letter sets forth the full and complete agreement between you and us regarding your employment, and supersedes all prior negotiations, discussions, correspondence, communications, understandings and agreements between the parties relating to the subject matter contained herein.*

*The nature of your employment with us is and will be "at will," as defined by applicable law, meaning that either we or you may terminate your employment at any time, with or without notice and with or without cause, for any reason or for no reason, without further obligation or liability.  Teva reserves the right to change, end or alter the terms of your employment and/or the terms of any plans at any time without prior notice.*

KEUCH000024



August 6, 2015

VIA EMAIL
Randy Keuch

Re:     **Base Salary Increase and Retention Bonus**

Dear Randy:

As discussed today and earlier this week, on behalf of Teva Pharmaceuticals USA, Inc. ( *Teva*"), I wish to assure you that you are a highly valued colleague and to encourage your continued employment with Teva. We at Teva are looking forward to your continued contributions to Teva in the years to come. In recognition of your past accomplishments and commitment to Teva, it is my pleasure to formally present to you the following retention offer.

If you accept this offer, effective as of August 1, 2015, your annual base salary will be increased from U.S. $257,000 to U.S. $280,000. Please note that, while I am unfortunately unable to offer you an increase in your other compensation (including annual bonus and equity compensation) or a promotion to Vice President at this time, given the constraints of Teva's guidelines and your position's Global Grade. However, in the next coming months, I will review and consider a potential promotion of your position to Vice President and Global Grade 18.

In recognition of your years of dedicated service and to encourage you to continue at Teva, I am pleased to inform you that Teva has determined to offer you a retention bonus, subject to the terms and conditions outlined below. The amount of the potential retention bonus is U.S. $60,000 and will be earned, if at all, in two equal installments. Provided that you remain continuously employed with Teva through August 6, 2016, and are not promoted to Vice President on or before such date, you will entitled to receive the first such installment, payable in a lump sum cash payment in an amount equal to U.S. $30,000 on the first regularly scheduled payroll date following such date. Provided that you remain continuously employed with Teva through August 6, 2017, and are not promoted to Vice President on or before such date, you will entitled to receive the second such installment, payable in a lump sum cash payment in an amount equal to $30,000 on the first regularly scheduled payroll date following such date. Any amount payable to you pursuant to this letter will be in addition to (and will not be in lieu of) any annual bonus or other incentive compensation amounts you may otherwise be entitled to receive from Teva and made less any applicable taxes and other legally permissible and regular payroll deductions.

Each retention bonus installment described herein is conditioned upon you keeping all terms and conditions of the retention bonus and this letter strictly confidential except as required to discuss with immediate family members and for the purpose of obtaining legal and financial advice (provided that, to the maximum extent permitted by applicable law, rule, code or regulation, they agree to maintain the strict confidentiality of the terms and conditions of this retention bonus).

KEUCH000028

Please note that this letter does not constitute a contract of employment for any specific period of time, and your employment will continue on an "at-will" basis. This means that either you or Teva will be entitled to terminate your employment at any time for any reason, with or without cause, subject to the terms of this letter. You should disregard any comments to the contrary as ineffective.

This letter may be executed in two or more counterparts, each of which will be deemed to be an original but all of which together will constitute one and the same instrument. The execution of this letter may be by actual signature or by signature delivered by facsimile or by e-mail as a portable document format (.pdf) file or image file attachment. This letter replaces all prior and contemporaneous communications, agreements and understandings, written or oral, with respect to the subject matter set forth herein.

Please review the contents of this letter carefully. If you agree to these terms, please sign the enclosed copy of this letter agreement and return it to me no later than August 7, 2015.

Sincerely,

**TEVA PHARMACEUTICALS USA**

By _____
Ron Yaniv
SVP, Global Compensation & Benefits

Acknowledged and Agreed:

_____
**Randy Keuch**

Dated: _____

- 2 -

KEUCH000029

**Randy Keuch**

| | |
|---|---|
| **From:** | Tal Zorman |
| **Sent:** | Friday, December 15, 2017 7:10 AM |
| **To:** | Randy Keuch |
| **Cc:** | Daniel Lawlor; Ron Yaniv |
| **Subject:** | Re: Minimal TR Organization for North America |

Thanks much Randy, will review and be in touch with you today/next week

Thanks, Tal


On 14 Dec 2017, at 21:07, Randy Keuch <Randy.Keuch@tevapharm.com> wrote:

Hello Tal,

Attached is a deck that provides my bare bones recommendation for my team. I have included options that suggest elimination of my position or Miriam's position. I strongly urge you not to make any leadership changes in Q1, as there is much work for the team to perform and the risks are very high. I also ask that you consult with Legal to validate the risks and our exposure. An error on our 401k could result in disqualification of the entire plan, which has $1.2 billion in assets, so disqualification will result in the loss of huge tax benefits to Teva. If a leadership change (job elimination) is needed, better to do this in Q2 when work has transitioned to HR Ops & Services, and the organization has stabilized. This is not a personal request nor is it made out of concern for having my position eliminated. Rather, it is a business decision as to how much risk Teva is willing to take by moving too quickly or having inexperienced people in key decision-making roles.

Thanks for your consideration and let me know if you have any questions.

Best regards,

<image001.png>   Randy Keuch   Head of Total Rewards - Americas
Tel: 267-468-4325   Cell: 215-272-9816
Randy.Keuch@tevapharm.com   sip:Randolph.Keuch@tevapharm.com   www.tevapharm.com
<image008.jpg><image009.jpg> <image010.jpg>


<Minimal TR Organization Final.pptx>

KEUCH000050



# Proposed Headcount Reduction for the North American TR Team

December 15, 2017

teva

KEUCH000051

# Situation

Teva is reducing the headcount for the Total Rewards Team that supports North America (US, Canada, & Puerto Rico) and needs help determining what is the minimum team required to provide minimum support. Factors to consider with regard to **benefits** include:

- Compliance with country laws and regulations – This requires substantial experienced resources as the penalties could be well into the millions of US dollars
  - ☐ Strongly suggest that this concern be discussed with Legal (details are in Appendix)
- Leadership required to manage $220 million in spend and sign weekly wires/invoices in excess of $1 million
  - ☐ This is managed daily by the team
- Over $50 million in cost savings generated over last 3 yrs. Team gave $8.2 million to the US businesses in benefits savings so far for 2017 and will save over $10 million for entire year. These savings are directly related to the daily actions of team members managing providers and employee healthcare behaviors
- Team is designing and implementing a new Severance Benefit Plan, which is qualified under ERISA, that will save Teva about $10 million in 2018
- Other cost savings initiatives (several million in savings) require resources to research and implement
- Substantial headcount reductions will trigger contract re-negotiations with some vendors driving costs up if not properly managed or creative solutions not identified and put into place
- Management of the benefits (COBRA) for the 1,100+ US employees severed as well as plant closings
- Handling employee escalations of medical and other issues that cannot be adjudicated by our providers
- Canadian benefits headcount not in TR headcount



KEUCH000052

teva

# Situation, cont'd

Factors to consider with regard to **compensation** include:

- Compliance with country laws and regulations (FLSA – US and Pay Equity – US and Canada)
- Partnering on job offers, promotions, etc. and performing market pricings at all levels
- Contributing to restructurings
- Managing pay surveys, sales compensation, and executive compensation
- Partnering with HR and the business on job grading
- Union avoidance in Canada

For both benefits and compensation, we have new legislation that will impact workload including US Tax Reform, US Affordable Care Act modification, Canadian Pay Equity and Provincial legislation (just passed in Ontario), US Pay Equity Legislation at the Federal, State and Local levels

KEUCH000053

# Total Rewards – North America Current (12 FTEs)*



**teva**

**Head of Total Rewards – Americas** – Randy Keith

**Head of Compensation – US & CA** – Gillian Weissbein

- **Comp Manager** Veronica Ferrante
- **Comp Manager** Kent Schurr
- **Comp Manager** Rose Ricioli (contractor)

**Head of Benefits – Americas** – Brian Kovack

- **Ben Manager** Stephanie Gallacher
- **Ben Manager** Sue Penesso
- **Ben Analyst** Sandra Millito
- **Ben Specialist** Courtney Stevenson
  - **Ben Analyst** Darlene Robinson-stratford
- **Sr. Benefits Analyst** Lynn McConaghy (Contractor)

* Excludes Jan Gustavsen who is in HR headcount for Canada and manages all Canadian benefits

KEUCH000054

# Proposal – Summary (See Appendix for Details)

teva

The North American TR team currently has 13 employees, if you include Jan Gustavsen, who is the Benefits Manager for Canada and 2 contractors. We believe we can reduce that headcount from 13 to 6 for a 54% reduction. To do this, the key changes will be as follows:

- 401k fiduciary responsibility will be outsourced to new vendor and actually reduce current spend by $30,000
- Some benefit administrative responsibilities will be moved to HR Ops & Services (disability, COBRA, wires, etc.) NOTE – US Law (HIPPA) regulates access to employee medical information
- Shift market pricing of jobs from job specific survey data to salary structure pricing
- Eliminate participation in:
  - Sales compensation
  - Executive pay and benefits

The next slide reflects the proposed organization structure.

Reducing headcount below these levels in Q1 will impair achievement of current cost savings initiatives (discussed later). Impair severance process for Q1, and create greater risks by taking the people out without taking the work out – Proposal is to revisit these headcount levels in Q2.

KEUCH000055



# Total Rewards – North America
## Proposed (6 FTEs or 54% reduction*)



Head of Total Rewards – Americas
Randy Keuch

Head of Compensation
Miriam Webster

Comp Manager
Veronica Ferrante

Head of Benefits
Diane Ronald

Ben Analyst
Sandra Miller

Ben Specialist
Courtney Stevenson



The Benefits team will retain the lowest graded employees

* Assumes Canadian benefits headcount is severed with full responsibility transferred to NA TR team

KEUCH000056

# Proposal – Summary (See Appendix for Details), cont'd

If further reductions are required, the only positions that can be cut would be leadership roles.

The NA Benefits Associate Director – Diane Rohach - should be considered the most valuable leader, as the compliance requirements combined with the impact of noncompliance (many millions). Remaining staff does not have expertise to handle all benefits and needed compliance for Teva.

The Region TR Head – Randy Keuch – is probably the next most valuable leader given his knowledge and experience in both compensation and benefits and having managed situations similar to Teva's and is at a level appropriate to manage a $220 million spend as well as oversee compliance

The NA Compensation Director – Miriam Weinstein – is also a valuable compensation resource.  Recognize that under Canadian law, any employee can request a full pay analysis for their position.  This pay analysis must include market data plus internal pay data for all of their peers.  No one on the team is experienced with this new legislation

Reducing headcount below 6 employees substantially raises the level of risk (noncompliance resulting in fines and possibly disqualification of our plans).  It is the leadership team that fully understands the compliance issues and without them, Teva is endangering over $220 million in spend for our managers.  Suggestions is to confer with legal counsel regarding this exposure and to make any headcount reductions below 6 at a later date

teva

KEUCH000057

# Total Rewards – North America Proposed (5-FTEs or 62% reduction*)



**Eliminate Region Head**

**Eliminate Compensation Head**

\* Assumes Canadian benefits headcount is severed with full responsibility transferred to NA TR team

KEUCH000058

# Proposal – Compensation: What Will be Left

- Manage:
  - ☐ CONNECT Year-End process
  - ☐ Compliance with pay laws in all countries
    - ▪ Canadian Pay Equity provides that ee's must receive a pay analysis of their job as well as the pay of their peers if they request it, and can file litigation if pay is not equitable
- Analyze pay based on salary structures and market surveys as needed
- Contribute to:
  - ☐ Grade and pay issues associated with organizational changes and restructurings
  - ☐ Site closures (i.e., PR)
- Work with business leaders to address compensation-related business issues
- Partner with HR in job offers, counter-offers, promotions and pay adjustments
- Develop solutions with regard to retention, attraction and motivation issues
- Complete pay surveys and manage Reward system
- Perform modeling and cost analysis for headcount and pay issues

This work requires a Director and a Manager, with oversight and leadership from 1 Sr. Director

teva

KEUCH000059

# Proposal – Benefits: What Will be Left

- Manage the remaining $200 million in spend for the following:

  - 401(k)
  - Telemedicine
  - Flu Shots
  - EAP
  - Wires
  - Stars

  - Deferred Comp
  - Employee Escalations
  - Employee Physicals
  - Dental
  - College Savings Plan

  - 2 SERPs
  - Legal Filings
  - Health Strategy
  - Vision
  - ESPP

  - Medical
  - ACA Reporting
  - Life Ins & AD&D
  - Imaging
  - COBRA

  - Annual Enrollment
  - Biometric Screenings
  - Regulatory Inquiries
  - 2nd Medical Opinion
  - Financial Planning

- Manage Voluntary Benefits
  - Individual Disability Insurance
  - Critical Illness

  - Group Umbrella Liability Ins.
  - Accident coverage

  - Hospital Indemnity

- Other benefits activities include:
  - TevaFit Fitness Centers
  - Tobacco Cessation

  - Cafeteria Offerings
  - Communications (legal)

  - Weight Watchers
  - Monitor Health Dashboard

- Vendor Contracting and Management – See slide on next page

This work requires a Assoc Director and 1 Analyst and a Specialist with Oversight and Leadership from 1 Sr. Director

teva

JOINT APPX - 0227

KEUCH000060

# Vendor Contracting and Management

*We manage over 24 vendors with an annual spend of over $220 million*



JOINT APPX - 0228

KEUCH000061

teva

# Proposal – Key Cost Savings Initiatives for 2018

- Design and implement severance solution.                                    Potential 2018 savings of $10 million
- Select and contract with a new advisor for the 401(k).                      Potential annual savings of $30,000
- Conduct RFP for Enrollment/Eligibility Administrator                        Potential annual savings of $TBD
- Conduct RFP for Life & Disability (US & Canada)                             Potential annual savings of $TBD
- Address potential stop loss premium increase                                Potential annual savings of $1-3 million
- Impact and compliance with US Tax Reform                                    TBD
- Model costing of Ontario Pension Plan legal requirement changes
- Produce the US booklet attached below and manage every benefit and every vendor for the US, Canada and PR


2018
Comprehensive Benefits Guide

KEUCH000062



Appendix - Compensation

teva

KEUCH000063

# Compensation

teva

| Action | Requirement | Impacts of Non-Compliance |
|---|---|---|
| Fair Labor Standards Act – US Overtime Eligibility – CA | Legally Required | Monetary Penalties for company and manager |
| Pay Equity – US Inc. Audits | Legally Required | Monetary Penalties for company |
| Pay Equity – Canada Inc. Audits & Employee Requests | Legally Required | Monetary Penalties; Company Name released publicly as a violator |
| Ad Hoc Compensation Reviews | Legally Required | Pay Equity regulations will require this to continue |
| Severance Plan Management and Plan Qualification Inc. File IRS Form 5500s | Legally Required | Plan qualification leading to inability to process Severance in alignment with State Unemployment Insurance – loss of about $6M in cost avoidance |

14

KEUCH000064

# Compensation

| Action | Requirement | Impacts of Non-Compliance |
|---|---|---|
| Mergers, Acquisitions & Divestitures | Requirement based on current practice | This work will need to be completed by someone to provide compensation information for divestitures |
| Year End Process — Connect | Requirement based on current practice | Merit programs will need to run for 2018, and Connect will continue in 2019 and beyond |
| Survey Participation | Requirement based on current practice | Teva is bound to participate in certain surveys in 2018 |
| C&B Reviews | Requirement based on current practice | Merit, Market Adjustment and Promotion Planning for AOP |
| Salary Ranges — US & GCA | Requirement based on current practice | Teva US & CA currently uses salary ranges where Market Reference Points do not exist, and in these cases this is used for pay equity |
| Market Reference Points at the GCA Job Level | Requirement based on current practice | Teva US & CA currently reviews each role in relation to the Market Reference Point for each GCA job to review market alignment for Connect and Hiring, and in these cases this is used for pay equity |
| Survey Output | Requirement based on current practice | Ensuring market data is added to WtW tool and roles are updated properly in country so that roles do not have drastic shifts against the market |

t5

KEUCH000065

# Compensation

**teva**

| Action | Requirement | Impacts of Non-Compliance |
|---|---|---|
| WWV Comp Tool – Survey Admin – US & CA | Requirement based on current practice | Job specific market data will not be able to be created and maintained |
| Job Offers | Requirement based on current practice | Currently TA has set guidelines for recruitment and only comes to TR for offers outside the given framework if not overseen, pay equity issues can arise. |
| Promotion Reviews | Requirement based on current practice | |
| Maintenance of GCA within NA | Requirement based on current practice | Possible inequities across groups within country |
| Sales Compensation Design Team Member | Requirement based on current practice | Sales team will have full ownership over sales incentive plan |
| Group Re-organization Compensation Assistance | Requirement based on current practice | Decreased Client Experience and realignment not inline with GCA or external compensation |
| Retention Reviews | Requirement based on current practice | Possible inequities |

16

KEUCH000066

# Compensation

**teva**

| Action | Requirement | Impacts of Non-Compliance |
|---|---|---|
| Spot Bonus Administration | Requirement based on current practices | Possible Inequities |
| Proactive Compensation Client Support | Not Required | Decreased Client Experience |
| Compensation Mailbox | Not Required | Decreased Client Experience |
| Pay Alignment Strategy | Not Required | Decreased Client Experience |
| Training | Not Required | Currently supports HR with Union Avoidance |

17

KEUCH000067



# Appendix - Benefits

teva

KEUCH000068

# Benefits

| Action | Requirement | Impacts of Non-Compliance |
|---|---|---|
| Partner with Legal on Employment Litigation | Legally Required-complex must remain in benefits | Employee lawsuits |
| ACA Compliance | Legally Required-complex must remain in benefits | Fines and penalties that could be in the millions |
| Second level Appeals | Legally Required-complex must remain in benefits | All medical plans require appeals so non-compliance leads to lawsuits and fines |
| 401(K) compliance | Legally Required-complex must remain in benefits | Fines and penalties from either IRS and/or DOL and possible disqualification of 1.7 billion plan |
| 1165 (e) compliance – PR | Legally Required-complex must remain in benefits | Non compliance can lead to fines and disqualification of the plan |
| DC Plan Administration including Accruals | Legally Required-complex must remain in benefits | Non compliance can lead to fines and disqualification of the plan |
| SERP | Legally Required-complex must remain in benefits | Non compliance can lead to fines and disqualification of the plan |
| QDRO | Legally Required-complex must remain in benefits | Non compliance can lead to fines and disqualification of the plan |

19

KEUCH000069

# Benefits

teva

| Action | Requirement | Impacts of Non-Compliance |
|---|---|---|
| FSA Administration | Legally Required | Not funding could lead to |
| HSA Administration | Legally Required | Non-compliance with rules could disqualify tax-exemption status |
| Audit – IRS & DOL | Legally Required complex must remain in benefits | Fines and penalties from either IRS and/or DOL and possible disqualification of 1.7 billion plan |
| Disclosure Requirements – Executive Management Team | Legally Required complex must remain in benefits | Highly regulated must be done with knowledge and expertise in benefits |
| Compliance for Health and Wealth Plans – 5500s | Legally Required complex must remain in benefits | Fines and penalties from either IRS and/or DOL and possible disqualification of 1.7 billion plan |
| Open Enrollment | Legally Required | Non compliance with section 125 |
| Maintenance of contracts and Business Associate Agreements | Legally Required | Can lead to fines and penalties if confidentiality is compromised |

20

KEUCH000070

# Benefits

teva

| Action | Requirement | Impacts of Non-Compliance |
|---|---|---|
| COBRA | Legally Required - but can move | Fines and penalties from the DOL for non-compliance and possible lawsuits |
| Wires | Legally Required - but can move | 401(k) funding must be completed timely and if not done timely could lead to plan audits as well as non-compliance of the plan which could lead to disqualification of 1.7 billion dollar plan |
| Disability Management/FMLA | Legally Required - but can move | Employment related lawsuits if non compliant with FMLA |
| Invoices | Legally Required - but can move | Need to honor signed contracts and non-payment could lead to disruption of services |
| All Payroll Medical Deductions | Legally Required - but can move | Under the cafeteria plan deductions need |

21

KEUCH000071

# Benefits

**teva**

| Action | Requirement | Impacts of Non-Compliance |
|---|---|---|
| Maintain files to Vendors | Requirement based on current practice | Not legally required for mistakes on file feeds. Leads to coverage being dropped for employees |
| Benefits Mailbox – Tier 2 Employee Support | Requirement based on current practice- Must remain in benefits | Escalated questions not getting resolved and possibly compromising health of our employees |
| Mergers, Acquisitions & Divestitures | Requirement based on current practice | |
| Vendor relations for Medical, Dental & Prescription | Requirement based on current practice- Must remain in benefits | Could impact how services are received by employees if vendors are not properly managed |
| Vendor Summit | Requirement based on current practice | |
| Negotiations with Vendors | Requirement based on current practice | Leads to higher spend if not monitored |

22

KEUCH000072

# Benefits

teva

| Action | Requirement | Impacts of Non-Compliance |
|---|---|---|
| Budget | Requirement based on current practice | Over spend if not monitoring the budget |
| Website – My Teva Reward | Requirement based on current practice | |
| Manage Voluntary Deductions | Not legally required but strongly recommend | |
| Process/Procedure Controls for 401K | Not legally required but strongly recommend | |
| Policy Management | Requirement based on current practice, some legal implications | Non active management can lead to potential lawsuits |

23

KEUCH000073

# Benefits

| Action | Requirement | Impacts of Non-Compliance |
|---|---|---|
| ESPP Administration | Requirement based on current practice-but can move | |
| Weekly New Hire Benefits Orientation | Requirement based on current practice-but can move | |
| Weekly New Hire Benefits Orientation | Requirement based on current practice-but can move | |
| Employee Recognition – STARS | Requirement based on current practice-but can move | |

teva

24

KEUCH000074

# Benefits

| Action | Requirement | Impacts of Non-Compliance |
|---|---|---|
| Expat/Reassistance | Not required | Employee disruption |
| VP Orientation | Not required | Employee disruption |
| E&Y Administration | Not required | |
| Health & Wellbeing Strategy | Not required | Health & Wellbeing strategy leads to better health of employees and dependents which could lead to lower spend. Considering the challenging time we are in this is important to keep employees engaged |
| Wellbeing Champions | Not required | Health & Wellbeing strategy leads to better health of employees and dependents which could lead to lower spend |
| Wellness Program | | |
| C&B Reviews | | |

teva

25

KEUCH000075

KEUCH000076

# Typical Compliance Changes – This is for a US City

**December 14, 2017**
*San Francisco Increases Employer Mandate Amount for 2018*
**Important for Employers with Employees in the City of San Francisco**

Recently, the San Francisco Board of Supervisors increased the amount that employers must spend on health care in 2018 and made other changes to the Health Care Security Ordinance (HCSO). The Board of Supervisors made the following changes that impact large employers:

Increased the health care expenditure rate for "large businesses" (100 or more employees total) to $2.83 per hour (up from $2.64 in 2017), and the rate for "medium-sized businesses" (20-99 employees total) to $1.89 per hour (up from $1.76) beginning January 1, 2018; and

Released a notice that employers must post by 1/1/18.

As of January 1, 2017, all health expenditures had to be irrevocable (i.e., could not revert back to the employer) if they were to count toward the employer spending requirement under the HCSO. In addition, in October of 2017, the San Francisco Office of Labor Standards Enforcement issued new rules applying the irrevocability standard to self-insured plan expenditures.

26

KEUCH000077

# Teva Dashboard – Paid Data 7/2016 – 6/2017 & 7/2015 – 6/2016



KEUCH000078

**Subject:** FW: How Can I help?
**Date:** Wednesday, January 17, 2018 at 11:24:15 AM Eastern Standard Time
**From:** Randy Keuch
**To:** Randolph Keuch (External)


Best regards,

  

**Randy Keuch** Head of Total Rewards - Americas
Tel: 267-468-4325 Cell: 215-272-9816
Randy.Keuch@tevapharm.com    sip:Randolph.Keuch@tevapharm.com    www.tevapharm.com

---

**From:** Tal Zorman
**Sent:** Wednesday, December 20, 2017 9:40 AM
**To:** Randy Keuch
**Subject:** RE: How Can I help?

Thanks much Randy, appreciate the note. We will be in touch after the holidays, enjoy the holiday.
Best regards, Tal

---

**From:** Randy Keuch
**Sent:** Wednesday, December 20, 2017 4:34 PM
**To:** Tal Zorman
**Subject:** How Can I help?

Hi Tal,

I am not sure how familiar you are with my background, so I have attached my CV for your review. As Ron will be departing next week, I would like to offer my services to "fill in" for Ron to help get Teva through the next 6 months or so. If needed to reside in Israel on a temporary basis, I can also do that. Recognize that I held the global Total Rewards position for a large consumer goods organization – The HJ Heinz Comany – and I worked closely with senior leadership and the Compensation Committee of the board. Not sure what your thoughts are, but wanted to share my desire to help manage Teva TR through these difficult times.

Enjoy the holiday.

Best regards,

**Randy Keuch** Head of Total Rewards - Americas
Tel: 267-468-4325 Cell: 215-272-9816
Randy.Keuch@tevapharm.com    sip:Randolph.Keuch@tevapharm.com    www.tevapharm.com

KEUCH000079

## SEPARATION AGREEMENT AND GENERAL RELEASE

THIS SEPARATION AGREEMENT AND GENERAL RELEASE ("Agreement") is made between Randolph Keuch ("Employee") and Teva Pharmaceuticals USA, Inc. ("Teva").

WHEREAS, Employee's employment will terminate, effective as of March 18, 2018 ("Separation Date") and Employee and Teva desire to make a full and final settlement of any and all potential claims by Employee with respect to Employee's employment by and employment termination from Teva,

NOW THEREFORE, in consideration of the mutual promises contained in this Agreement and for other good and valuable consideration, the parties agree as follows:

1.  <u>Termination of Employment Relationship</u>.  Employee's employment with Teva is terminated effective the Separation Date under the terms and conditions set forth in this Agreement.

2.  <u>Separation Payments and Benefits</u>.  Teva will provide Employee with the following payments and benefits in consideration for:

(a)  Employee's execution and non-revocation of this Agreement, and with it Employee's agreement to release all claims that can be released, as set forth in Paragraphs 5 and 6 in this Agreement, and in exchange for Employee's agreement to abide by the restrictions set forth in this Agreement, following receipt of Employee's signed copy of this Agreement and the expiration of the seven (7) day revocation period referenced in Paragraph 7(e) without revocation of this Agreement; and

(b)  Employee's conformance with the requirements, terms, and conditions of the Teva Pharmaceuticals USA, Inc. Supplemental Unemployment Benefit Plan or Teva Pharmaceuticals USA, Inc. Employment Transition Plan, whichever is applicable:

(i)  <u>Separation Payments</u>.  Subject to satisfaction of the two (2) conditions stated above, Employee shall receive separation payments in the aggregate totaling $71,400.00 equal to thirteen(13) weeks of gross salary "(Separation Payments"), less all applicable deductions, which shall be paid pursuant to Paragraph 2(iii) below.  All Separation Payments will be made in accordance with the terms and conditions of the Teva Pharmaceuticals USA, Inc. Supplemental

KEUCH000135

Randolph Keuch

Unemployment Benefit Plan or Teva Pharmaceuticals USA, Inc. Employment Transition Plan, whichever is applicable.

        (ii) <u>Transitional Health Coverage Allowance</u>. To be eligible for this Transitional Health Coverage Allowance, Employee must be enrolled in one (1) or more of Teva's health insurance plans as of Employee's Separation Date. Employee shall receive a Transitional Health Coverage Allowance equal to $8,250.34, less all applicable deductions, which shall be paid pursuant to Paragraph 2(iii) below. It is the Employee's responsibility to timely elect COBRA or other coverage and pay monthly premiums.

        (iii) <u>Payment Schedule</u>. The Separation Payment and Transitional Health Coverage Allowance, as described above, totaling $79,650.34, will be aggregated and paid in seven(7) equal bi-weekly installments beginning as soon as administratively possible following receipt of Employee's signed copy of this Agreement and the expiration of the seven (7) day revocation period referenced in Paragraph 7(e) without revocation of this Agreement, and subject to Paragraph 14 below. All payments made under this Agreement are subject to applicable deductions, including without limitation federal (including the federal supplemental tax), state, and/or local taxes.

        (iv) <u>Outplacement</u>. Teva shall select an outplacement firm to provide career transition services to Employee and Teva shall be solely responsible for the fees charged by the outplacement firm for providing such services. Employee must begin Employee's participation in such services within ninety (90) days of Employee's Separation Date.

        For purposes of this paragraph, "consideration" means something of value to which Employee is not already entitled.

        3. <u>Claim for State Unemployment Insurance</u>. Employee agrees to timely apply for State Unemployment Insurance ("SUI") as required by the Teva Pharmaceuticals USA, Inc. Supplemental Unemployment Benefit Plan ("SUB Plan"), unless expressly excepted from doing so under the terms of the SUB Plan. In exchange, Teva agrees not to dispute any claim that Employee may make for SUI to commence on or after the Separation Date; provided, Teva will make reasonable efforts to comply with all legal requirements as to providing information relating to Employee's Teva employment. Teva agrees that it will not state or imply that

KEUCH000136

Employee's separation was for cause. Teva does not and cannot guarantee that Employee will receive SUI.

4. <u>Return of Teva's Property.</u>  Employee agrees to return to Teva on or before the Separation Date any items of Teva's property listed on **Exhibit "A,"** to the extent Employee has such items, as well as any other personal property of Teva in Employee's possession.  Teva shall make a good faith effort to return Employee's personal property to Employee.

5. <u>General Release and Waiver of Claims.</u>  In consideration for the payments and commitments referred to in Paragraphs 2 and 3 of this Agreement, Employee hereby releases and forever discharges Teva and all of its past and present subsidiaries, parent and related corporations, companies, joint ventures, partnerships, and divisions, and their past and present directors, trustees, officers, partners, members, managers, supervisors, employees, attorneys, and agents and their predecessors, successors and assignees (sometimes referred to collectively in this Agreement, together with Teva, as "Releasees"), from any and all legal, equitable or other claims, debts, contracts, complaints or causes of action (hereinafter referred to collectively as "Claims"), whether known or unknown, asserted or unasserted, that Employee ever had, now has or hereafter may have against Teva or any or all of the other Releasees, by reason of any cause, matter, thing or event whatsoever arising out of Employee's employment by Teva and/or Employee's separation from employment with Teva occurring at any time up to and including the date and time Employee signs this Agreement.

6. <u>Specific Release and Waiver of Claims.</u>  Employee acknowledges and agrees that the Claims being released in Paragraph 5 of this Agreement include, but are not limited to, any claim arising out of the Employee's employment by Teva which could be asserted now or in the future, whether brought individually, in a representative capacity or as a member of any class of claimants, or in a collective action, under: (i) the common law, including but not limited to theories of breach of express or implied contract or duty, tort, wrongful termination, defamation or violation of public policy; (ii) any policies, practices or procedures of Teva and/or Releasees; (iii) any federal, state and/or local statutes or regulations including but not limited to, the Employee Retirement Income Security Act of 1974, as amended, 29 U.S.C. § 1001 *et seq.*; the Americans with Disabilities Act of 1990, 42 U.S.C.§ 12101 *et. seq.*; Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*; Executive Order 11246, as amended; the Equal Pay Act, 29 U.S.C. § 206 (d) *et seq.*; the Family and Medical Leave Act, 29 U.S.C. § 2601 *et seq.*; the

3

KEUCH000137

Genetic Information Non-Discrimination Act, 42 U.S.C. § 2000ff-1 *et seq.*; 42 U.S.C. § 1981; the Age Discrimination in Employment Act, 29 U.S.C. § 621 *et seq.*; the Consolidated Omnibus Budget Reconciliation Act, 29 U.S.C. § 1021 *et seq.*; the Worker Adjustment and Retraining Notification Act, 29 U.S.C. § 2101 *et seq.*; the Pennsylvania Human Relations Act, 43 P.S. § 951 *et seq.*; and/or any applicable federal, state or local laws, regulations, or ordinances; (iv) any contract of employment, express or implied; (v) any provision of the Constitution of the United States, and any applicable state constitution(s); (vi) any and all claims or actions for attorneys' fees and/or costs; (vii) any claims for unpaid or withheld wages, severance pay, bonuses, overtime, stock or stock options, commissions or other compensation, leave, reinstatement, sick pay, insurance coverage or non-vested and/or non-accrued employee benefits of any kind; and (viii) any provision of any other law, common or statutory, of the United States, or any applicable state or locality.

7. <u>Notice of Special Rights Under the ADEA.</u>  In addition to the release of Teva and the other Releasees from any and all Claims arising out of Employee's employment by Teva which arose up to and including the date of this Agreement, Employee further acknowledges with respect to the release of Claims under the Age Discrimination in Employment Act, 29 U.S.C. § 621 *et seq.* ("ADEA") (to the extent that Employee may have any Claims under the ADEA based upon Employee's age) that:

(a) Employee waives these Claims knowingly and voluntarily in exchange for severance and other benefits which are of value, and that Employee would not otherwise have been entitled to receive;

(b) Employee is hereby advised in writing by Releasees to consult with an attorney in connection with this Agreement;

(c) Employee hereby acknowledges that this waiver does not apply to any rights or Claims that may arise in the future.

(d) Employee has been given information regarding the job titles and ages of all individuals eligible or selected to receive benefits under this Reduction in Force Program ("Program") at this time and the ages of all individuals in the organizational unit who are not eligible for benefits at this time, such information being attached as **Exhibit "C;"**

KEUCH000138

Randolph Keuch

(e) Employee has been given a period of Fourty-Five (45) days within which to consider this Release but understands that Employee need not consider this Agreement for that full period before signing it;

(f) Employee understands that Employee may revoke this waiver of Claims under the ADEA for a period of seven (7) days following the date Employee signs this Agreement and that Employee's waiver of ADEA Claims will not become effective until the revocation period has expired;

(g) If Employee wishes to revoke the waiver of Claims under the ADEA, that revocation shall be made by forwarding the document attached as **Exhibit "B"** to Teva Pharmaceuticals USA, Inc., attn: Elaine McGee, Human Resources Department, 1070 Horsham Road, North Wales, PA 19454, no later than the close of business on the seventh (7th) day following the date on which Employee has signed this Agreement; and

(h) If Employee timely revokes the waiver of ADEA Claims in accordance with the above Paragraph 7(g), Employee will no longer be eligible for the payments and Teva commitments referred to in Paragraphs 2 and 3 of this Agreement, but such revocation will not be effective with respect to Employee's release of all other Claims covered by this Agreement and shall remain subject to all other commitments set forth in this Agreement. The other Claims covered under this Agreement and any consideration Employee received prior to Employee's revocation is valid and adequate consideration with respect to the remainder of this Agreement and Employee's waiver of such other Claims.

(i) This Agreement complies in all respects with Section 7(f) of the ADEA, that is, the waiver provisions of the Older Worker Benefit Protection Act.

8. <u>Non-Released Claims</u>. The General Release and Waiver of Claims set forth above in Paragraph 5 and the Specific Release and Waiver of Claims set forth in Paragraph 6 above below do <u>not</u> apply to:

(a) Any Claims for vested benefits under Teva's 401(k) plan;

(b) Any Claims to require Teva to honor its commitments set forth in this Agreement;

KEUCH000139

Randolph Keuch

(c) Any Claims to interpret or to determine the scope, meaning, or effect of this Agreement;

(d) Any Claims arising out of any conduct, matter, event, or omission existing or occurring after Employee signed this Agreement; and

(e) Any Claims that may not be waived pursuant to applicable law.

9. <u>Successors</u>.  This Agreement is for the benefit of and is binding upon Employee and Employee's heirs, administrators, representatives, executors, successors, beneficiaries and assigns, and is also for the benefit of the Releasees and their successors and assigns.

10. <u>Effective Date</u>.  This Agreement will be effective when Employee signs and returns it to Teva Pharmaceuticals USA's Human Resources Department, except as otherwise provided in Paragraph 7(g) above.

11. <u>Violation</u>.  If Employee violates Paragraphs 12 or 13 of this Agreement (except as regards to any Claims under the ADEA), Releasees, unless prohibited by applicable law or regulation, will be entitled to the immediate repayment to it of all payments and the cost of all benefits provided to Employee under this Agreement and may discontinue any unpaid payments and benefits.  Should Employee fail to make such repayment, Employee will be deemed conclusively to be bound by the terms of this Agreement and waives any right to seek to overturn or avoid it.  Employee agrees that this repayment will not invalidate this Agreement.

12. <u>Complaints and Whistleblower Claims</u>.

(a) <u>Protected Class Claims of Harassment, Discrimination, and/or Retaliation</u>. Employee represents and warrants that neither Employee nor anyone acting on Employee's behalf has filed any complaint against Teva or any other Releasees with any local, state, or federal court or any other governmental or regulatory body.  Employee acknowledges that neither Employee nor anyone acting on Employee's behalf has to date filed any charge or complaint with the Equal Employment Opportunity Commission or any local or state agency authorized to investigate charge or complaints of unlawful employment discrimination, harassment, and/or retaliation (together, "Agency").  Employee understands that nothing in this Agreement bars Employee or anyone acting on Employee's behalf from filing a charge or complaint of unlawful employment discrimination, harassment, and/or discrimination with an Agency, or assisting in an investigation

KEUCH000140

of a charge or complaint of such unlawful conduct by an Agency.  However, if any Agency or court has now assumed or later assumes jurisdiction of any complaint or charge on Employee's behalf against any Releasees, Employee will disclaim entitlement to any relief.

(b)   Whistleblower Claims.   Nothing in this Agreement prohibits Employee from reporting possible violations of United States federal law or regulation to any governmental agency or entity, including but not limited to, the United States Department of Justice, the United States Securities and Exchange Commission, the United States Congress, and any Inspector General of any United States federal agency, or making other disclosures that are protected under the whistleblower provisions of United States federal, state, and/or local law or regulation; provided, that Employee will use his or her reasonable best efforts to (1) disclose only information that is reasonably related to such possible violations or that is requested by such agency or entity, and (2) request that such agency or entity treat such information as confidential.  Employee does not need the prior authorization from the Company to make any such reports or disclosures and is not required to notify the Company that Employee has made such reports or disclosures.  This Agreement does not limit Employee's right to receive an award for information provided to any governmental agency or entity within the scope of this Paragraph 12(b).

13. Proprietary   Information;   Trade   Secrets;   Non-Solicitation;   Non-Disparagement; Cooperation; and Non-Interference.

(a) Proprietary Information.  Employee agrees and acknowledges that, during Employee's Teva employment Employee acquired and was privy to confidential information, trade secrets, confidential processes and confidential "know-how" relating to, or concerned with, the past, present, or future business, finances, manufacturing, operations, services, customers, suppliers, sources of leads and methods of obtaining new business, methods of pricing, systems, processes, methods, products, discoveries, designs, inventions, manufacturing, marketing and sales techniques and policies of Teva and the Releasees ("Proprietary Information").  Employee further agrees and acknowledges that during the performance of Employee's duties, Employee had access and was privy to confidential or Proprietary Information belonging to third parties which is subject to a duty to Teva or Releasees to maintain the confidentiality of such information and to use such information only for certain limited purposes ("Third Party Information").  Employee agrees that Employee will not, unless required by court order, judgment or decree, directly or indirectly use, divulge, furnish or make accessible any Proprietary Information or

Randolph Keuch

Third Party Information to any other person or entity. This condition shall not prevent Employee from using or divulging Proprietary Information or Third Party Information that is now in the public domain or hereafter becomes part of the public domain. This provision survives the termination of this Agreement. Employee further agrees and acknowledges that the Proprietary Information is a unique asset of great value to Teva, and therefore Employee agrees that the restriction imposed herein is reasonable and necessary for the protection of the goodwill of Teva and not unduly restrictive of Employee's rights. Employee further agrees and acknowledges that the any confidential information or other similar agreement signed by Employee continues to be in effect and that Employee will comply with said agreement.

(b) Trade Secrets:

(i) Notwithstanding any provisions of this Agreement or Employee Confidential Information Agreement, Employee acknowledges that Teva has advised Employee regarding potential immunity under the Defend Trade Secrets Act for disclosing a trade secret under limited circumstances, as set forth in Teva's Confidential Information Policy.

(ii) Notwithstanding any provisions of this Agreement or the Employee Confidential Information Agreement signed by Employee, Employee further acknowledges that if Employee files a lawsuit for retaliation by Teva for reporting a suspected violation of the law, under limited circumstances Employee may disclose Teva's trade secrets to Employee's attorney and use the trade secret information in related court proceedings if Employee: (A) files any document containing the trade secret under seal; and (B) do not disclose the trade secret, except pursuant to court order.

(c) Non-solicitation. Employee agrees and covenants that, for twelve (12) months after the date of this Agreement, Employee will not directly or indirectly try to solicit or entice any individual who is, at that time, an employee of Teva or of any affiliate of Teva, which Employee knows to be such an affiliate, to leave employment with Teva or such affiliate.

(d) Non-disparagement. Employee agrees not to engage in any deprecating conduct and/or make any negative comments or disparaging remarks, in writing, orally, or electronically, about Teva or any other Releasee and their respective officers, directors, employees, and agents and their respective products and services, to the media or any entity or individual. Nothing in this Agreement shall be interpreted to restrict Employee's right and/or obligation to (A) testify

KEUCH000142

Randolph Keuch

truthfully in any forum or (B) contact, provide information to, and/or cooperate fully in any investigation by a government agency.

(e) <u>Cooperation</u>.

(i) Employee agrees to cooperate with Teva in connection with any ongoing administrative, regulatory, or litigation proceedings or such like matters that may arise in the future, about which Employee may have personal knowledge and/or subject matter expertise because of employment with Teva. Such cooperation will include being interviewed by representatives of Teva and participating in legal proceedings by deposition or testimony. Teva will reimburse Employee for reasonable expenses incurred by Employee by reason of such cooperation.

(ii) Employee agrees that if served with an order, subpoena, or any other document which purports to potentially require the disclosure of any information relating to Employee's employment with or separation from employment with Teva, this Agreement, and/or any matter otherwise protected from disclosure under this Agreement including confidential and/or proprietary information which Employee acquired in the course of Employee's employment with Teva and which is not generally known by or readily accessible to the public, within three (3) business days of such service, Employee shall so inform Teva and deliver to Teva a copy thereof. Notice to Teva and a copy of the subpoena, order or other document shall be sent via facsimile and certified mail to the persons identified in Paragraph 18 of this Agreement.

(f) <u>Non-interference</u>. Subject to paragraphs 8 and 12 of this Agreement, Employee agrees not to visit any Teva facility, premises, or event unless first obtaining written approval from Teva and further agrees to permit Teva, and its officers, employees, agents, and partners, to continue Teva's day-to-day business without unnecessary and/or unreasonable disruption.

14. <u>Waiver of Employment or Re-Employment & Re-Employment Generally</u>. Employee acknowledges that Employee has no right to employment or re-employment with Teva or any of the other Releasees, and, other than with respect to other rights and benefits specifically reserved in this Agreement, Employee has no right to participate in any of Teva's benefit plans which Employee ever had, may now have, or may hereinafter have, whether known or unknown to Employee at the time of the execution of this Agreement. In the event Employee seeks

KEUCH000143

Randolph Keuch

employment or re-employment with Teva or any parent, subsidiary, related or affiliated company, Teva and any parent, subsidiary, related or affiliated company are not obligated to employ or re-employ Employee.  However, if Employee is hired or re-hired by Teva and/or its affiliates while receiving payments under the Payments Schedule set forth in Paragraph 2(iii), Employee's Separation Payment stop as of the Employee's new hire or re-hire date consistent with this Paragraph 14.

15.  <u>Breach; Legal Capacity; No Coercion</u>.  In the event any party shall be found by a court of competent jurisdiction to have breached this Agreement, the other party shall be entitled to damages, including reasonable attorneys' fees and costs of suit, and shall also return all monetary consideration exchanged hereunder.  However, nothing in this Paragraph 15 shall be considered or interpreted to be a requirement that Employee return any payments or reimburse Teva for the cost of any benefits received under this Agreement before filing a lawsuit or a charge of discrimination with an Agency.  The parties further state that they are signing this Agreement completely, willingly and voluntarily and that there are no medical or other conditions that would prevent them from doing so.  Neither party has subjected the other party to any coercion or duress, and has done nothing to force the other party to sign this Agreement.

16.  <u>No Admission</u>.  This Agreement shall not in any way be construed as an admission by Teva that it has acted wrongfully with respect to Employee or any other person, or that Employee has any rights or claims whatsoever against Teva or any of the other Releasees through the date that Employee signed this Agreement, and Teva specifically disclaims any liability with regard to any wrongful acts against Employee or any other person, on the part of itself, its employees or its agents.

17.  <u>Confidentiality of this Agreement</u>.   <u>Confidentiality of this Agreement</u>.  <u>Employee</u> shall not disclose the existence of this Agreement or any information contained <u>in this Agreement</u> without prior written consent of Teva, except as required by law, or as necessary to implement this Agreement.  Employee agrees not to discuss either the existence of or any aspect of this Agreement with any employee or ex-employee of Releasees, or any other third parties without Releasees' or their successors' or assigns' prior written authorization.  Notwithstanding the above, <u>Employee</u> may disclose this Agreement to Employee's attorneys, health care providers, financial advisers and tax advisers advising <u>Employee</u> and to members of

KEUCH000144

Employee's immediate family, provided such persons agree to keep such information confidential and comply with the terms of this Paragraph.

18. Notices. All notices, requests, demands and other communications required or permitted under this Agreement or necessary or convenient in connection with this Agreement shall be in writing and marked confidential.  Any such notice and other communication under this Agreement shall be deemed to have been duly given if delivered by hand or deemed to have been duly given on the third business day following the mailing within the continental United States by first class mail, postage prepaid, addressed as follows:

> Teva Pharmaceuticals USA, Inc.
> Human Resources Department
> 1070 Horsham Road
> North Wales, PA  19454
> Attention:  Elaine McGee, Associate Director, HR
> Facsimile:  215.795.4056
> E-mail: NA_HR_Compliance@tevapharm.com

19. Governing Law.   This Agreement and any disputes arising thereunder shall be governed by and construed and enforced in accordance with the laws of the Commonwealth of Pennsylvania, both substantive and remedial, without regard to conflicts of laws principles.

20.  Acknowledgements.

(a)  Employee represents that Employee has carefully read and fully understands all the provisions of this Agreement, is entering into this Agreement voluntarily, and that Teva advised Employee in writing, by giving Employee a draft of this Agreement for Employee's review and consideration, to consult with an attorney of Employee's choice and at Employee's expense before signing this Agreement.

(b)  Employee agrees and acknowledges that, by accepting benefits under this Agreement and signing this Agreement, Employee is giving up any right Employee might have to bring a Claim against Teva or any of the other Releasees arising from or in any way related to Employee's employment relationship or the termination of such employment relationship. Employee also agrees and acknowledges that Employee would not receive benefits under this Agreement if Employee did not knowingly and voluntarily enter into this Agreement.

KEUCH000145

Randolph Keuch

(c) Employee agrees and understands that should Employee sign this Agreement before Employee's Separation Date that (i) this Agreement will be null, void, and unenforceable and (ii) Teva will provide to Employee an unexecuted copy of this Agreement for Employee's signature no sooner than Employee's Separation Date.

21. <u>Entire Agreement</u>.   This Agreement represents the entire Agreement between the parties and supersedes any and all prior oral and written agreements between Teva and Employee, except for the Employee Confidential Information Agreement.   No variations or modifications of this Agreement shall be deemed valid unless reduced to writing and signed by both parties.

22. <u>Interpretation of Agreement</u>.   Nothing in this Agreement is intended to violate any law or shall be interpreted to violate any law.   If any paragraph or part or subpart of any paragraph in this Agreement or the application thereof is construed to be overbroad and/or unenforceable, then the court making such determination shall have the authority to narrow the paragraph or part or subpart of the paragraph as necessary to make it enforceable and the paragraph or part or subpart of the paragraph shall then be enforceable in its/their narrowed form.   Moreover, each paragraph or part or subpart of each paragraph in this Agreement is independent of and severable (separate) from each other.   In the event that any paragraph or part or subpart of any paragraph in this Agreement is determined to be legally invalid or unenforceable by a court and is not modified by a court to be enforceable, the affected paragraph or part or subpart of such paragraph shall be stricken from the Agreement, and the remaining paragraphs or parts or subparts of such paragraphs of this Agreement shall remain in full, force and effect.

23. <u>Facsimile/Electronic Signatures/Counterparts</u>.   This Agreement may be signed in counterparts, each of which will be deemed to be an original of this Agreement.   Any party to this Agreement may deliver a signed copy of this Agreement by facsimile or electronic transmission to any other party and any such delivery shall have the same force and effect as any other delivery of a manually signed copy of this Agreement.

KEUCH000146

Randolph Keuch

EMPLOYEE ACKNOWLEDGES THAT EMPLOYEE HAS READ THIS AGREEMENT AND THAT EMPLOYEE FULLY KNOWS, UNDERSTANDS AND APPRECIATES THE CONTENTS OF THIS AGREEMENT AND THAT EMPLOYEE SIGNS THE SAME AND MAKES THE SETTLEMENT PROVIDED FOR IN THIS AGREEMENT VOLUNTARILY AND OF EMPLOYEE'S FREE WILL.

IN WITNESS WHEREOF, and intending to be legally bound, Employee and Teva have signed this Separation Agreement and General Release on the dates indicated below.

_____
Date

_____
Employee Signature

_____
Employee Printed Name (Global ID#: 929502)

Teva Pharmaceuticals USA, Inc.

_____
Date

*Lauren Benner*

_____
Authorized Human Resources Signature

*Director, HR Shared Services - Americas*

_____
Printed Name and Title

**LEGAL/HR O&S ONLY:**

Initial:_____ |Date:_____

KEUCH000147

### EXHIBIT "A"

**ALL PERSONNEL**

Credit cards, telephone cards and purchase cards in Employee's name
Keys to the office, buildings, desks and filing cabinets
All Teva files and documents or copies thereof
All keys to any Company car and related documents
All Product Samples
Leather Demo Case (with Contents)
All files (including business cards)
Phone Calling Card
Pager
Auto Insurance Forms
Car Rental Card
Car Keys and Car
Car Maintenance Book
Car Insurance Card/ Owners Card

**NON-FIELD PERSONNEL COMPUTER EQUIPMENT**

Laptop/Desktops, docking station(s), and all peripherals
Mobile device (iPhone, Blackberry)
Mobile Tablet device (Apple iPads)

**FIELD PERSONNEL COMPUTER EQUIPMENT**

Laptop Computer
iPad
Ultrabase, DVD drive, ultrabase keys
AC Adapter
JAMBOX Speaker with carry case and cables. (if applicable)
Projector with carry case and cables.  (if applicable)
Auto Adapter
Verizon Wireless Modem (if applicable)
Corp Phone & Charger (if applicable)
External Hard Drive (if applicable)
Monitor

KEUCH000148

Randolph Keuch

## EXHIBIT "B"

### Waiver and Release Revocation

NOTE: DO <u>NOT</u> SIGN OR RETURN THIS DOCUMENT UNLESS YOU HAVE SIGNED THE SEPARATION AGREEMENT AND GENERAL RELEASE LESS THAN SEVEN (7) DAYS AGO AND NOW WISH TO CHANGE YOUR MIND AND REVOKE YOUR EARLIER AGREEMENT TO THE WAIVER AND RELEASE OF CLAIMS UNDER THE AGE DISCRIMINATION IN EMPLOYMENT ACT.

I, _____, hereby revoke the Separation Agreement and General Release ("Agreement") which I signed on _____, 20__, to the extent that I waived and released any "Claims" (as that term is defined in the Agreement) under the Age Discrimination in Employment Act I might have against the "Releasees" (as that term is defined in the Agreement).

_____
(Signature of Employee)

_____
Date

_____
Witness

_____
Date

IN ORDER TO BE EFFECTIVE YOU MUST SIGN THIS REVOCATION FORM NO LATER THAN SEVEN DAYS AFTER YOU SIGNED THE SEPARATION AGREEMENT AND GENERAL RELEASE.

Received on _____, 20__ by Teva Human Resources Department by

_____Teva Representative Signature

Randolph  Keuch

# EXHIBIT "C"

KEUCH000150

Randolph Keuch

## EXHIBIT "C"

## INFORMATION MADE AVAILABLE PURSUANT TO THE
## OLDER WORKER BENEFIT PROTECTION ACT OF 1990

The following information is provided in accordance with the Older Worker Benefit Protection Act of 1990 to permit affected employees age forty (40) and older to evaluate whether to execute a Separation Agreement and General Release in return for the receipt of a severance payment and benefits.

(A)     For purposes of this Exhibit "C," the Decisional Unit consists of the entire Global HR Department of Teva Pharmaceuticals USA, Inc.

(B)     The eligibility factors for this program are (1) whether the employee's individual position is unnecessary at this time for on-going operations; (2) whether the employee's individual's position is at a site that is slated to close; or (3) whether an individual position's occupant is performing below expectations.

(C)     Each employee who is being laid off because his or her position is not necessary at this time for on-going operations or because of a site closure are eligible for the severance payment and benefits set forth in paragraph 2 of his or her Separation Agreement and General Release.  However, to receive the severance payment and benefits, the employee must sign the Separation Agreement and General Release and return it to Elaine McGee, Human Resources Department, Teva Pharmaceuticals USA, Inc., 1070 Horsham Road, North Wales, PA 19454 no later than forty-five (45) days after receiving the Separation Agreement and General Release. Once the signed Separation Agreement and General Release is returned to Teva, an employee has seven (7) days to revoke it.

(D)     The following is a listing of the ages and job titles of employees in the Decisional Unit who were selected for lay off and the offer of a separation payment and benefits as set forth in paragraph 2 of their Separation Agreement and General Release:

| Job Title | Age | Selected |
|---|---|---|
| Sr Mgr Human Resources | 60 | Y |
| HR Specialist | 60 | Y |
| MD Recruiter | 58 | Y |
| Sr Mgr Mobility US | 57 | Y |
| Mgr Human Resources | 57 | Y |
| Global LMS Specialist | 57 | Y |
| Benefits Analyst | 57 | Y |
| Sr Dir Human Resources | 55 | Y |
| Manager of Talent Acquisition LATAM | 55 | Y |

KEUCH000159

Randolph Keuch

| Job Title | Age | Selected |
|---|---|---|
| Mgr Human Resources | 55 | Y |
| Sr Dir Global Mobility | 54 | Y |
| Sr Dir HRBP NA GSM | 54 | Y |
| Sr Executive Assistant | 54 | Y |
| Sr Mgr Talent Acquisition, R&D | 54 | Y |
| Manager, Compensation | 54 | Y |
| Sr Dir TGO Latam Region HRBP | 53 | Y |
| Director, Leadership & Development Business Partner | 53 | Y |
| Talent Acquisition Mgr | 53 | Y |
| Dir HR Program Management | 53 | Y |
| Sr Dir Human Resources | 52 | Y |
| Sr Dir Human Resources | 52 | Y |
| Dir Leadship & Dev LatAm | 52 | Y |
| HR Generalist | 52 | Y |
| Head of HR - Latin America | 51 | Y |
| Dir HR Ops & Services, LatAm | 51 | Y |
| Senior Director, Talent Acquisition - Americas | 48 | Y |
| Sr Dir Human Resources Operations & Services | 48 | Y |
| Mgr Talent Acquisition | 45 | Y |
| Senior Talent Acquisition Partner | 44 | Y |
| L&D Coordinator | 44 | Y |
| HR Manager | 44 | Y |
| HR Shared Services Supervisor | 44 | Y |
| Senior Talent Acquisition Partner | 42 | Y |
| HR Customer Service Representative | 42 | Y |
| Dir Leadership & Development | 39 | Y |
| Senior HR Generalist | 37 | Y |

KEUCH000160

Randolph Keuch

| Job Title | Age | Selected |
|---|---|---|
| HR Data Governance Analyst | 36 | Y |
| HR Customer Service Representative | 36 | Y |
| HR Global Analytics | 35 | Y |
| HR Manager | 35 | Y |
| Mgr Benefits | 34 | Y |
| Mgr Benefits | 34 | Y |
| HR Services Specialist | 34 | Y |
| HR Coordinator | 33 | Y |
| HR Shared Services Team Leader | 33 | Y |
| HR Shared Services Rep | 33 | Y |
| Senior Manager, L&D | 33 | Y |
| HR Shared Services Rep | 32 | Y |
| HR Customer Service Rep | 31 | Y |
| HR Generalist I | 31 | Y |
| HR Customer Service Representative | 31 | Y |
| Analyst - HR Operations and Services | 30 | Y |
| HR Shared Services Rep | 30 | Y |
| HR Services Specialist | 29 | Y |
| HR Customer Service Representative | 29 | Y |
| HR Customer Service Representative | 29 | Y |
| Recruiting Coordinator | 27 | Y |

   (E)   The following is a listing of job titles and ages of the employees in the Decisional Unit who are not being laid off and who are not eligible for separation benefits:

| Job Title | Age | Not Selected |
|---|---|---|
| Assoc Dir HR Ops & Services | 58 | N |
| Sr Mgr Human Resources | 58 | N |
| Benefits Analyst | 57 | N |

KEUCH000161

Randolph Keuch

| Job Title | Age | Not Selected |
|---|---|---|
| SVP HRBP - GGM | 55 | N |
| Sr Mgr Human Resources | 55 | N |
| Associate Director, HR | 54 | N |
| Sr Dir HR Planning & Economics | 54 | N |
| Associate Director, Human Resources | 54 | N |
| Dir Talent Acquisition & Mobility | 53 | N |
| Sr Dir HR R&D | 53 | N |
| Associate Director, Global Talent Acquisition | 53 | N |
| Senior Director, Regional HRBP - TGO | 52 | N |
| HR Services Specialist | 52 | N |
| Director, HR Program Management | 51 | N |
| Sr Dir Leadership & Development II | 51 | N |
| Dir Exec Recruit & Emp Brndng | 51 | N |
| VP HR TGO Global Units | 51 | N |
| Mgr Human Resources | 51 | N |
| Assoc Dir Human Resources | 48 | N |
| Senior HR Generalist | 48 | N |
| Senior Manager, Human Resources | 45 | N |
| Vice President, HR BP TGO Americas | 42 | N |
| Director, HR Site Lead | 42 | N |
| Associate Director, Human Resources | 39 | N |
| HR Services Analyst | 39 | N |
| Mgr Compensation | 39 | N |
| HR Shared Services Rep | 39 | N |
| Sr Mgr HR (Small) | 38 | N |
| Dir Total Rewards, LatAm | 38 | N |
| Mgr Talent Acquisition | 38 | N |
| Mgr Human Resources | 38 | N |

KEUCH000162

Randolph Keuch

| Job Title | Age | Not Selected |
|---|---|---|
| Mgr, HR Planning & Economics | 37 | N |
| Mgr Talent Acquisition | 35 | N |
| HR Generalist | 35 | N |
| HR Shared Services Rep | 35 | N |
| HR Data Governance Analyst | 34 | N |
| Benefits Analyst | 34 | N |
| Mgr Employee Relations | 33 | N |
| HR Manager | 33 | N |
| HR Shared Services Supervisor | 32 | N |
| Sr Mgr HR Shared Services | 31 | N |
| Mgr HR Data Governance – Europe & Americas | 30 | N |
| Analyst - HR Operations and Services | 30 | N |
| HR Data Governance Analyst | 29 | N |
| HR Services Specialist | 26 | N |
| HR Shared Services Rep | 25 | N |

KEUCH000163



**Separation Notification and Benefits Summary**

January 9, 2018

Global ID: 929502
Randy Keuch ("Employee")
111 Rose Lane
Chalfont, Pennsylvania 18914

This letter confirms that your employment with Teva Pharmaceuticals USA, Inc. and/or its affiliates ("Teva or "Company") will be terminated effective March 18, 2018 ("Separation Date"). Your targeted last day worked will be February 23, 2018, and you will remain an active employee through your Separation Date.

Teva currently anticipates that you will be entitled to Separation Pay, a Transitional Health Coverage Allowance, and Outplacement Services upon separation from the Company, provided that you satisfy certain criteria that are summarized briefly in this letter and are explained in detail in the Separation Agreement and General Release ("Agreement") that the Company will give to you on a later date. To qualify for these benefits, you must remain an employee in good standing through your Separation Date and timely execute and not revoke a Separation Agreement and General Release ("Agreement"). If you satisfy these conditions, your severance payment, totaling $71,400.00 (less applicable taxes, offsets and withholdings), equal to thirteen (13) weeks of gross salary, will commence following the expiration of the revocation period described in the Agreement and on the condition that you have not exercised your right to revoke the Agreement. Please note this amount will be offset by unemployment benefits received, as applicable, with further details to be provided closer to your Separation Date. In the event anything in this notice differs from the terms of your Agreement, the terms of your Agreement are controlling and supersede this notice.

Should you leave Teva voluntarily or be terminated for cause prior to your Separation Date, you will not be eligible to receive severance pay benefits.

## SEVERANCE DISBURSEMENT PAYMENTS
The Separation Payment described above will commence one to two pay periods following the return of your signed Separation Agreement and General Release, provided that you do not timely revoke the Agreement. This payment will be subject to the withholding of appropriate Federal, State, and local taxes as well as offset by any state unemployment benefits. The Company will withhold taxes as required, and the above payments will be taxed as supplemental wages subject to flat-rate withholding (not taking into account any exemptions).

Severance Disbursement is calculated based on your weeks of severance divided by two, and rounded up to the nearest integer. For example, someone who has 13 weeks of severance will receive seven (7) bi-weekly severance payments, provided they have timely signed, and have not revoked their Severance Agreement and General Release. More information can be found in the Separation FAQ provided.

## TRANSITIONAL HEALTH CARE ALLOWANCE:
Teva will pay Employee a Transitional Health Care Allowance which shall be calculated based on the monthly rates for COBRA continuation coverage in each of the Teva employee welfare plans Employee was a participant in, as of the Separation Date. The Transitional Health Care Allowance shall be paid for the period of time Employee receives Separation Payments, up to a maximum of 6 months. After your employment with Teva ends, you will receive a COBRA package with enrollment instructions and insurance coverage rates. To elect COBRA coverage, you must timely elect and pay for coverage as instructed.

## OUTPLACEMENT SERVICES:
You are eligible to participate in a three (3) Month Program provided by Lee Hecht Harrison. Information regarding these services is included in the materials provided. You may also find more information online at www.lhh.com/career-transition/register.aspx or by calling Lee Hecht Harrison at 888-279-7329.

KEUCH000183

Randy Keuch
Page 2

**FINAL PAY CHECKS:**

Your last regular paycheck will be paid during the payroll cycle that follows your Separation Date, or earlier if required by state law. This payment will be subject to all applicable tax withholdings and all standard deductions that you have elected as an active employee (i.e. 401(k) elections, FSA elections, etc.) Attached you will find a Direct Deposit form. Should your account information change while you are receiving bi-weekly severance payments it is critical you complete the form and send to our Payroll Department.

**EMPLOYEE ASSISTANCE PLAN (EAP):**

If you have any concerns or problems with which you need assistance, you may contact the Employee Assistance Program during your severance period at 866-513-7249 or via the web at www.mylifevalues.com; Username: Teva Password: EAP

**CHANGE OF ADDRESS:**

If your mailing address changes during the year, please notify Teva's HR Department at AskHR@tevapharm.com. Failure to do so may delay any income tax or other documents which are delivered to you at a later date

**CHANGE OF DIRECT DEPOSIT:**

In the attached materials you will find a Direct Deposit Form. Should your account information change while you are still receiving severance disbursement payments, please send the following form to AskHR@tevapharm.com

**Administrative Offices:**

1090 Horsham Road, P.O. Box 1090, North Wales, PA 19454-1090

KEUCH000184



## DEPARTING EMPLOYEE DOCUMENT RETENTION CHECKLIST

Dear Departing Employee:

As you prepare to leave the Company, Teva Legal would like to remind you of your ongoing record management obligations pursuant to Teva's Code of Conduct, record retention policies and/or schedules, as well as applicable law. Moreover, if you are subject to any litigation hold notices (sometimes referred to as "Do Not Destroy" Notices), please note that your obligations under those notices (to maintain and not destroy and/or delete relevant documents) survive beyond your tenure with the Company. Thus, you must continue to preserve relevant documents – to the extent they remain in your possession or control – even after you have left the company. The checklist below was prepared to help you exercise your record retention obligations responsibly **and to ensure you remain an employee in good standing through your Separation Date (and thus fully eligible to receive your severance benefits).**

Thus, before you leave the Company, please re-familiarize yourself with any applicable record retention requirements (including whether you are subject to active litigation holds). And please ensure that your documents, devices and/or electronic communications (including but not limited to emails, electronic documents, hard copy documents, computers, phones, text messages and tablets) are preserved and maintained (including notifying your supervisors and/or Human Resources ("HR") as to where such documents exist). Please do not delete and/or destroy any applicable documents or information.

If you have any questions regarding your retention and preservation obligations, please contact your manager, AskHR@tevapharm.com or your HR Representative. If you reach out to Ask HR, please note your question is related to "legal document retention" in the email subject line to ensure prompt assistance.

Thank you in advance for your full cooperation in filling out and returning the checklist below as soon as possible. We wish you the best in your future endeavors.

Best regards,
Teva Legal Management

**PLEASE FILL OUT THE FORM BELOW, INCLUDING PROVIDING THE REQUESTED PERSONAL CONTACT INFORMATION. ONCE ALL ANSWERS ARE COMPLETED, PLEASE DETACH AND RETURN IN THE ENVELOPE PROVIDED ALONG WITH YOUR EXECUTED SEPARATION AGREEMENT AND GENERAL RELEASE.**

Departing Employee Name (please print): _Randolph W Keuch_

Title: _Head of Total Rewards, Americas_

Manager: _Tal Zorman_

Home Address: _111 Rose Ln, Chalfont PA 18914_

Personal phone number (do not provide Teva contact info): _412-225-8000_

Personal Email (do not provide Teva email): _Randy.Keuch@gmail.com_

Please provide password information for all Company controlled devices:

iPhone (both login and iTunes passwords): _Fired 1_          iPad: _____

Laptop: _Fired 123_          Others: _____

**Please check and sign if applicable.**

☒ I hereby certify that I understand and will comply with all applicable record retention requirements as set forth in Teva's Policies, its Code of Conduct and applicable law. To the extent I am subject to a litigation hold notice, I understand that my obligations to preserve relevant documents survive beyond my employment at Teva (and/or its affiliates), and I will respect all preservation requirements accordingly. By checking the box above, I certify that I have ~~discussed maintaining such documents as applicable with my HR manager and/or supervisor and~~ returned all Company owned equipment and data.

_[signature]_          _2/22/2018_

Departing Employee Signature          Date

KEUCH000251

*IT Equipment Return Inventory for Internal Employees*       te**va** | Global IT Operations

**Employee Name:** _Randolph W Keuch_

**Employee Office/Cubicle Location:** _Nwl - Conference Center_

All Teva-issued equipment must be returned on your last day of work.
1. Complete the below "IT Equipment Return Inventory" by providing the asset tag number or serial number for each piece of equipment assigned to you, as available.
2. Reference your email from IT for instructions on how to return your IT equipment.

**Mobile phone and iPad users:**
1. Please provide your device passcode:
   Mobile Phone Passcode: _Fired 1_            Ipad Passcode: _____
2. Apple /iTunes ID and password : _____
3. Do you want to retain your Teva mobile number?  Yes _____  No _✗_
   If yes, list your Teva mobile number: _____

**IT Equipment Return Inventory Instructions:**
1. List appropriate identifying information for each Teva asset assigned to you.
2. Place "N/A" for anything listed that you were not assigned.
3. Follow your specific asset return process instructions.

| Asset | Asset Tag/Serial #/Phone # | Password | Reason Not Returned | Received (IT Only) |
|---|---|---|---|---|
| Desktop | | | | |
| Laptop | 27454 | Fired123 | | |
| Monitor | | | | |
| Monitor | | | | |
| Docking Station | B7303 | — | | |
| iPad | | | | |
| iPhone | 215-272-9816 | Fired1 | | |
| Accessories | Headset | | | |
| Teva Badge | | | | |
| Car Transponder | | | | |

My signature confirms all items recorded above have been returned.

_Randy Keuch_          _Randy, Keuch_          _2/22/2018_
**Employee's Signature**          **Print Name**          **Date**

_____

**Local Site Contact**          **Name**          **Phone/email**

**For additional assistance, please contact** Carlyn.Vickers@tevapharm.com.

v.1/10/18

KEUCH000252

Feel free to use my personal email for follow up: lesleybillow@gmail.com. I still monitor the BMS email but I'm actively transitioning out so I'm not working there daily anymore.

Have a great weekend!

Lesley

Sent from my iPhone. Please excuse any typos or errors.

> On Nov 13, 2019, at 8:03 AM, Randolph Keuch<randy.keuch@gmail.com> wrote:
>
> **[Use CAUTION when opening links/attachments]**
> *Hi Lesley,*
>
> *I hope this note finds you well.  You may recall that about a year ago, I left Teva Pharmaceuticals and started my consulting practice.  I am thrilled to be following up with you and letting you know that I am truly having fun leading The Total Rewards Consulting Group (TTRCG).*
>
> *Over my years with Pfizer, Heinz and Teva, I led teams and projects in multiple areas including: Rewards, Compensation, Benefits and HR.*
>
> *Throughout my career, I have come to know the best and the brightest partner resources in a number of disciplines including: Healthcare Cost Containment, Dental, Life, Disability, Benefits Administration, Wellbeing and Essential Benefits aka Voluntary Benefits.*
>
> *One of my Trusted Advisor resources is Jim Turner, copied here, a SVP with Tompkins (one o0f the 100 largest brokers in the country).  Jim and his team helped me successfully implement multiple new and enhanced solutions for various rewards programs at Teva, including: Group Personal Excess, Wellbeing and Essential Benefits.*
>
> *The goal of my practice is to combine my experience with the expertise of Tompkins, to benefit businesses such as BMS.  The impact being a higher level of service, support*

4

KEUCH000388

*and advice, resulting in a stronger bottom line through greater efficiencies and reductions in expenses. The strategies I have developed and implemented have earned national recognition while creating win-win results for both employers and employees.*

*Jim and I would be delighted to meet with you and your colleagues to understand the current challenges you are facing and share TTRCG's unique value proposition when combined with the resources of Tompkins. I believe you will be impressed and pleasantly surprised with the value we can bring to your organization.*

*If you could, please let me know your availability for getting together at your offices in the next few weeks, I will send a calendar invite.*

*Thank you so much,*

*Randy*

*P.S. – I would also be delighted to just spend some time with you over lunch or coffee to catch up on "life after Teva"*

This message (including any attachments) may contain confidential, proprietary, privileged and/or private information. The information is intended to be for the use of the individual or entity designated above. If you are not the intended recipient of this message, please notify the sender immediately, and delete the message and any attachments. Any disclosure, reproduction, distribution or other use of this message or any attachments by an individual or entity other than the intended recipient is prohibited.

This message (including any attachments) may contain confidential, proprietary, privileged and/or private information. The information is intended to be for the use of the individual or entity designated above. If you are not the intended recipient of this message, please notify the sender immediately, and delete the message and any attachments. Any disclosure, reproduction, distribution or other use of this message or any attachments by an individual or entity other than the intended recipient is prohibited.

This message (including any attachments) may contain confidential, proprietary, privileged and/or private information. The information is intended to be for the use of the individual or entity designated above. If you are not the intended recipient of this message, please notify the sender immediately, and delete the message and any attachments. Any disclosure, reproduction, distribution or other use of this message or any attachments by an individual or entity other than the intended recipient is prohibited.

KEUCH000389

**teva** | My Teva Rewards

## ☆ Total Rewards at Teva

Teva strives to support your health, financial security and career goals. This section highlights the value of Teva's target total rewards investment in you for 2017.

| MY PROFILE | |
|---|---|
| Miriam Weinstein | Last Performance Rating: Successful Performance |
| | Grade: 15 |
| 150 Belle Circle | Salary: $166,860 |
| Blue Bell, PA 19422 | Target Bonus %: 25% |
| USA | Age: 39 |
| | Years of Service: 2 |

**MY Total Rewards**
These are estimated rewards you receive on an annual basis. Some amounts have performance, vesting, and other requirements that must be met prior to payout. For details regarding these requirements, please refer to award and/or plan documents.



| | | |
|---|---|---|
| ■ Compensation | $243,855 | (76.7%) |
| ■ Health & Well-Being | $20,214 | (6.4%) |
| ■ Financial Security | $36,898 | (11.6%) |
| ■ Other Rewards & Benefits | $17,140 | (5.4%) |
| **Total** | **$318,107** | |

| MY TOTAL REWARDS | 2018 Target |
|---|---|
| ▼ Compensation | $243,855 |
| Annual Salary | $166,860 |
| Target Bonus (25%) | $41,715 |
| Equity Mid-Value (not all eligible employees receive) | $35,280 |
| ▼ Health & Well-Being | $20,214 |
| Medical and prescription drugs premiums | $16,391 |
| Wellness Incentives | $300 |
| Dental Premiums | $1,104 |
| Vision Premiums | $0 |
| Teva Medicare Payment | $2,419 |
| ▼ Financial Security | $36,898 |
| Employer 401(k) Match | $12,514 |
| Teva 3.75% Defined Contribution | $7,822 |
| Teva 2% Defined Contribution | $1,628 |
| Employee Stock Purchase Plan (ESPP) Maximum | $1,043 |
| Teva Social Security Contribution | $7,886 |
| Life Insurance | $343 |
| Disability | $5,662 |
| ▼ Other Rewards & Benefits | $17,140 |
| Vacation (26 days) | $16,640 |
| ▶ Tuition Reimbursement | $0 |
| ▶ Adoption Assistance | $0 |
| STARS Target Value | $500 |
| **Total** | **$318,107** |

©Teva Pharmaceuticals 2018

Jan 5, 2018

KEUCH000514

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

- - -

RANDOLPH W. KEUCH      :    CIVIL ACTION
                       :
        v.             :
                       :
TEVA PHARMACEUTICALS:
USA, INC., and TEVA :
PHARMACEUTICAL      :
INDUSTRIES, Ltd.    :    NO. 2:19-cv-05488

- - -

April 4, 2022

- - -

        Oral deposition of TAL
ZORMAN taken pursuant to notice, was held
via videoconference beginning at 10:50
a.m., on the above date, before JoAnn
Cheli, a Professional Court Reporter and
Notary Public in the Commonwealth of
Pennsylvania.

- - -

MAGNA LEGAL SERVICES
www.MagnaLS.com
(215) 207-9460



Page 8

```
 1          in the event that she's no longer

 2          an employee or an agent of Teva.

 3                  MR. EPSTEIN:  Thank you.

 4  BY MR. EPSTEIN:

 5          Q.    What is your date of birth

 6  Ms. Zorman?

 7          A.    December 1st, '69.

 8                  MR. RAPPAPORT:  Before you

 9          begin asking questions I want to

10          make sure that the court reporter

11          knows that we reserve the right to

12          read and sign.  We're going to

13          waive our right to object except

14          as to the form of the question.

15          All other objections to be

16          determined at the time of trial.

17                  I'm sorry to interrupt.

18                  MR. EPSTEIN:  No problem.

19  BY MR. EPSTEIN:

20          Q.    Where were you born, Ms.

21  Zorman?

22          A.    Israel.

23          Q.    And have you been a resident

24  of Israel since 1969?
```



Page 18

1    Team and I also met Randy.

2           Q.    So he was part of that

3    Leadership Team in North America?

4           A.    Yes.

5           Q.    When did it come to your

6    attention that there was going to be a

7    cut in personnel in 2017 going into 2018?

8           A.    I think it was approximately

9    in October of 2017.

10          Q.    And what did you learn?

11          A.    I learned that we're going

12   to restructure and we will need to reduce

13   approximately 25 percent of our workforce

14   on average.

15          Q.    Who did you learn that from?

16          A.    From my manager, Mark Sabag.

17   He was the CHR.

18          Q.    Did you talk to anybody else

19   about it?

20          A.    Sorry?

21          Q.    Did you learn the

22   information from anybody other than Mr.

23   Sabag?

24          A.    No.



1          Q.    And what did you learn was

2    going to be the structure of that cut or

3    how it would implemented?

4                MR. RAPPAPORT:  Objection to

5          form of the question.  Why don't

6          you ask one at a time?

7    BY MR. EPSTEIN:

8          Q.    What did you learn as to how

9    that cut would be implemented?

10         A.    I learned that we're going

11   to have 50 percent cut on average in HR.

12         Q.    Is Total Rewards part of HR?

13         A.    Yes.

14         Q.    What did you learn

15   specifically about Total Rewards North

16   America other than the average would be

17   50 percent?

18         A.    I learned that I need to do

19   -- once I received the nomination of

20   Global Talent Rewards -- Global Talent

21   Management, sorry, I had to come up with

22   the structure and to meet on average 50

23   percent, but there were some functions

24   that I needed to reduce even more.  But



Page 20

1   on Total Rewards the target was 50

2   percent.

3          Q.    And with regard to the 50

4   percent target, that was just a target,

5   or was it a hard cutoff that you had to

6   do 50 percent in each area?

7          A.    No, it was overall 50

8   percent.

9          Q.    Was that a head count 50

10  percent or was that tied to a dollar

11  amount?

12         A.    It was both.

13         Q.    Well, which one was supposed

14  to control?  You said it was both, but

15  which one was supposed to control?  Was

16  it supposed to be both of them absolute

17  50 percent head count and combined with

18  dollar amount, or was it discretionary

19  with you?

20         A.    The leading indicator was

21  head count reduction.  And then we also

22  looked at cost of labor overall.

23         Q.    Were there any more

24  specifics as to specific job titles or



Page 24

1    which consists of Asia, Israel and Latin

2    America and Europe.  And also Israel was

3    part of the Global Markets and India.  So

4    Europe, North America and all the rest

5    were part of the Growth Markets.

6           Q.    At that time before the cuts

7    were made who was the head of the

8    European sector?

9           A.    Noel, I don't remember his

10   last name.

11          Q.    And how about North America

12   Total Rewards?

13          A.    Randy Keuch.

14          Q.    How about the Growth

15   Markets?

16          A.    There weren't Growth

17   Markets.  It was separate.  We had

18   Israel.  We had Latin America part of the

19   Americas, and the rest were also

20   separate.  We didn't have the Growth

21   Market.  This was a business change.

22          Q.    So at the time before these

23   reductions were made it was Europe, North

24   America, Latin America?



Page 25

```
 1          A.    Latin America was part of
 2   North America with the Americas.
 3          Q.    And before the changes were
 4   made it was Europe, the Americas, Israel?
 5          A.    Yes.
 6          Q.    Who is the head of Total
 7   Rewards in Israel?
 8          A.    Amir Zirah.
 9          Q.    Spell that please.
10          A.    Amir is the first name,
11   A-M-I-R.  And the last name I have to
12   look up.  I don't remember.
13               MR. RAPPAPORT:  Z-I-R-A-H.
14               THE WITNESS:  Thank you.
15   BY MR. EPSTEIN:
16          Q.    Were there any other heads
17   of Total Rewards, that is compensation
18   and benefits anywhere else?
19          A.    There was another function
20   in Israel that led global
21   responsibilities by other people in
22   addition to the regional
23   responsibilities.  We had a few positions
24   that were responsible for Global Total
```



```
 1          object to the form of the
 2          question.  But you can answer.
 3          You've already answered.  Thank
 4          you.
 5  BY MR. EPSTEIN:
 6          Q.   Was there any plan for
 7  placing the individuals in the various
 8  areas on some form of lattice or toto, as
 9  it's often called, where you would put in
10  place those persons that you felt were
11  most qualified down to the least
12  qualified?
13          A.   I'm not sure I understand
14  the question.  Sorry.
15          Q.   Was there any plan in place
16  that evaluated the individuals by past
17  achievement, by performance, performance
18  ratings that placed them in their
19  particular areas a hierarchy of who was
20  most qualified?
21          A.   It was done differently.  We
22  started from the structure and then we
23  looked at which individuals are qualified
24  for that.
```



1          Q.    Did you talk to Mr. Keuch as

2   to Mr. Nasi's ability to control the

3   compensation and benefits package for the

4   United States?

5          A.    Yes, after I made the

6   decision, yes.

7          Q.    After you made the decision?

8          A.    The decision of the

9   structure, yes.

10         Q.    Did you talk to Mr. Keuch

11   about this?

12         A.    Yes.

13         Q.    And what did Mr. Keuch tell

14   you about Mr. Nasi's knowledge of

15   compensation and benefits in the United

16   States?

17         A.    That he has very limited

18   knowledge.

19         Q.    Now when you decided the

20   structure, what was the structure that

21   you decided on?

22         A.    That we are eliminating the

23   head of Total Rewards and we follow the

24   business changes, meaning that North



Page 51

```
 1   America is without Latin America.  Latin
 2   America moved under the Growth Market and
 3   North America stayed just U.S. and Canada
 4   so the cost was reduced.
 5               And, also, given the
 6   restructuring we had to reduce 50 percent
 7   of our head count and, therefore, the
 8   role was very operational and tactic, and
 9   not strategic and design oriented like
10   what Randy was doing.  And, also, the
11   grade level was Grade 15.
12        Q.    Did you have any
13   conversations with Mr. Nasi about these
14   changes and what you were about to do?
15        A.    Yes.
16        Q.    When did you first talk to
17   Mr. Nasi?
18        A.    I don't have the exact date,
19   but I spoke with him after I wanted to
20   evaluate him as a potential candidate for
21   this position.
22        Q.    At that time what level was
23   Mr. Nasi?
24        A.    15.
```



Page 52

1          Q.    Did you discuss with Mr.
2    Nasi at that time whether or not there
3    would be availability to move him to a 16
4    level?
5          A.    No.
6          Q.    Did you talk to him at all
7    whether or not if he was to be considered
8    for this new position, what you labeled
9    as a procedural position, did you talk to
10   him at all about whether or not he would
11   have to move from Florida to the North
12   America headquarters?
13              MR. RAPPAPORT:  I'm going to
14         object to the use of the term
15         procedural position.  She never
16         used that term. But with that
17         objection noted, you can answer.
18              THE WITNESS:  Yes.  The
19         answer is yes.
20   BY MR. EPSTEIN:
21         Q.    Did you talk to him about
22   what compensation he would receive for
23   making that move?
24         A.    Not at that time.



Page 53

```
 1            Q.    Was there a procedure in
 2     place to compensate people to move them
 3     from one location to another, a
 4     relocation plan?
 5            A.    There was a site
 6     consolidation effort in North America,
 7     Parsippany, and there were very clear
 8     guidelines in terms of compensating
 9     people outside of New Jersey into New
10     Jersey.
11            Q.    When did that plan take
12     place?  Was that before or after the
13     consolidation?
14            A.    This is part of the site
15     consolidation initiative.
16            Q.    And when did that take
17     place, 2017, 2018?
18            A.    '18, '18.
19            Q.    Was there a plan in place
20     that would move Mr. Nasi if he took the
21     position as the head of Total Rewards for
22     North America, was there a plan in place
23     to move him from Florida up to wherever
24     it was that the headquarters would be?
```



Page 60

```
 1          for the clarification.
 2  BY MR. EPSTEIN:
 3          Q.    In what way did that enter
 4  into your decision?
 5          A.    I looked into the
 6  professional experience, as well as the
 7  leadership and management capabilities.
 8  And when I looked at both, I chose Edu
 9  Nasi for the position.
10          Q.    What document did use other
11  than the statements made by either Mr.
12  Lawlor or Mr. Yaniv?  What documents did
13  review of Mr. Nasi that gave you the
14  impression that he would be able to
15  handle issues relating to compensation
16  and benefits for United States employees?
17          A.    Discussing it with my
18  colleague in the U.S., Dan Lawlor and,
19  also, his supervisor of Latin America.  I
20  forgot the name back then.  I received
21  some reference from his professional and
22  also leadership maturity.
23          Q.    Do you know how old Mr. Nasi
24  was at the time when you made your
```



Page 61

1    decision?

2         A.    No.

3         Q.    Did you have any knowledge

4    as to how old Mr. Keuch was at the time?

5         A.    No.

6         Q.    But you said that you

7    reviewed documents from his personnel

8    file.  Did you have any knowledge as to

9    when it was that he had been employed at

10   various places during his career?

11        A.    What's the question?

12        Q.    Did you have knowledge of

13   the various places that Mr. Keuch had

14   worked?

15        A.    Yes, yes.

16        Q.    And based upon that and,

17   again, I'm going to show you what has

18   been marked as the Keuch CV.  That had

19   dates as to all the places he had worked

20   prior to the time that he came to work at

21   Teva, correct?

22        A.    Correct.

23        Q.    And you knew that he was

24   employed from this document, specifically



Page 78

1    January?

2         A.    When he started to report to

3    me, I think it was mid-January.

4         Q.    And what were those e-mails

5    about?

6         A.    The changes, the execution.

7    Are we staying in Pennsylvania, are we

8    moving to New Jersey.  The site

9    consolidation introduced many changes and

10   challenges in terms of who is staying and

11   who can move to New Jersey.

12        Q.    Did those e-mails in any way

13   address the issue of any promises made to

14   move his position from a 15 to a 16, to

15   your recollection?

16        A.    What's the question?

17        Q.    Did the e-mails that you're

18   referring to, did they address in any way

19   the promise to move him from a 15 to a

20   16?

21        A.    It wasn't a promise.  We

22   decided to move him.  From when I made

23   the offer to him, it was obvious that he

24   was Grade 15.  But it became obvious to



Page 79

```
 1   us in March that the grade level had to

 2   be 16 due to the complexity of mainly the

 3   site consolidation.  So it wasn't a

 4   promise in the beginning.

 5             THE WITNESS:  Is there any

 6        way we can take a one-minute bio

 7        break?

 8             MR. EPSTEIN:  Sure, why

 9        don't we make a five-minute break.

10        It is now 12:35.  We'll come back

11        at 12:40.

12             (A recess occurred.)

13             MR. EPSTEIN:  I have no

14        other questions of the witness?

15             MR. RAPPAPORT:  I just have

16        a couple.

17                  -  -  -

18             EXAMINATION

19                  -  -  -

20   BY MR. RAPPAPORT:

21        Q.   Ms. Zorman, when you were

22   making the decisions with regard to the

23   structure that you created, did you

24   consider the cost of relocation as part
```



Page 80

1    of that decision making process?

2         A.    Yes.

3         Q.    And why did you consider the

4    cost of relocation?

5         A.    Because it was obvious that

6    the head of North America Total Rewards

7    will have to be based in North America.

8         Q.    Now the plan or structure

9    that you developed, did it result in the

10   elimination of the senior director level

11   position?

12        A.    Yes.

13        Q.    Was that just true of North

14   America, or was that true elsewhere?

15        A.    It was true also in Europe.

16        Q.    And had there been an

17   incumbent senior director in Europe who

18   was responsible for Total Rewards?

19        A.    Yes.

20        Q.    And was his position

21   eliminated?

22        A.    Yes.

23        Q.    And who would then be

24   responsibile by job title for Total



Page 81

1   Rewards in Europe?

2          A.     Director for Europe.

3          Q.     Was that the same decision

4   making, or was it different decision

5   making in eliminating the senior

6   directors in both North America and in

7   Europe?

8          A.     Similar.

9          Q.     What made you think in

10  December of 2017 that you could eliminate

11  the senior director positions and still

12  operate with just a director at the Total

13  Rewards level?

14         A.     The challenge that we had,

15  and we knew that we had to cut 50 percent

16  and just execute what is needed.  Keep

17  the business running without any strategy

18  or special new program designs.  So the

19  scope was very operational.  Just to keep

20  the business running we had no choice

21  back then.

22         Q.     Well, if the scope was to

23  become more operational, how does that

24  factor into eliminating senior director



Page 82

1    level positions and operating with just

2    directors both in North America and in

3    Europe?

4            A.    The scope was smaller in

5    terms of number of direct reports.  And,

6    also, more execution and operational,

7    rather than strategy and design.

8            Q.    Did you think that you could

9    operate that way both in North America

10   and in Europe with just directors?

11           A.    Yes.

12           Q.    Who would be responsible for

13   the strategy and design piece, if there

14   was one?

15           A.    I would.

16           Q.    And what occurred in North

17   America and Europe that made you decide

18   that you wanted to advance Mr. Nasi from

19   a director in labor Grade 15 to senior

20   director of labor Grade 16?

21           A.    The complexity of the

22   restructuring at Teva created a huge

23   challenge from comp and ben, especially

24   North America with the site



Page 83

1    consolidation.

2            Q.    Can you explain how site

3    consolidation created more work or more

4    direction or more responsibilities at

5    Total Rewards position?

6            A.    Sure.  We had to come up

7    with a plan, first of all, to evaluate

8    what's the right location if it's

9    Parsippany for the headquarters in North

10   America, if it's Parsippany or

11   Pennsylvania.

12               And then once the decision

13   was made, to understand the implications

14   of all our people that have to move into

15   the headquarters to New Jersey in terms

16   of comp.  And if they're moving, from

17   which location what we need to compensate

18   them with.  So there was a lot of work.

19               And, also, the restructuring

20   in terms of letting go of a quarter of

21   our workforce created a lot of work to

22   the comp and ben team.  But the site

23   consolidation was the main factor that

24   was changed in March in the U.S.



Page 84

1          Q.    Who made the decision to
2    adjust the position from a director to a
3    senior director position?

4          A.    I made the recommendation
5    and Mark approved it.

6          Q.    Are those the only two
7    people that would be involved in that
8    decision making method?

9          A.    And Dan Lawlor, the HR
10   responsible for North America.

11         Q.    Was a similar adjustment
12   made in Europe where you took the
13   incumbent at the director level and made
14   that a senior director position as well?

15         A.    We had done it in Europe a
16   little bit after North America.  I
17   believe it was August that we changed the
18   position into a director.

19         Q.    From a director to what?
20   You said to a director.  Did you mean
21   from a director?

22         A.    From a director, from 15 to
23   16.

24         Q.    And was it for the same



Page 85

1    reasons?

2          A.    It was, yes, due to the

3    complexity of the restructuring.

4          Q.    Mr. Epstein asked you at

5    some point whether or not you gave any

6    consideration moving Mr. Keuch from a

7    senior director labor Grade 17 into the

8    director position.  Do you recall that

9    question?

10         A.    Yes.

11         Q.    Why wasn't in your mind Mr.

12   Keuch suitable for the director of Total

13   Rewards at the labor Grade 15 level?

14         A.    Because of his vast

15   experience and also ambition to become

16   even a VP at Teva, and to expand his

17   role.  And we knew that we needed

18   someone, you know, much more operational.

19               And, also, from my

20   experience demoting someone two grade

21   levels is not a good decision for the

22   individual and for the organization.

23         Q.    Why is that --

24         A.    Since --



Page 86

```
1          Q.    -- as a general rule?

2          A.    I'm sorry?

3          Q.    I said, why is that as a

4    general rule?  And now specifically

5    talking about Mr. Keuch.

6          A.    Because it's demotivating

7    taking somebody that is over qualified to

8    a position that is less impactful and

9    strategic.  Or, you know, reduced scope

10   is usually demotivating.  Again, from my

11   experience to the individual and, also,

12   to the organization.

13              And throughout the

14   restructuring we tried to eliminate even

15   one role.  In my organization, I did not

16   demote people.  I just did that in the

17   past and it never worked well.

18         Q.    When you were making your

19   decision to do the restructuring, were

20   you looking at age information with

21   regard to the incumbents in the Total

22   Rewards organization?

23         A.    No.

24         Q.    Was age ever a factor or
```



**Tal Zorman Deposition Transcript Errata**

| Page | Line | Correction | Reason |
|------|------|------------|--------|
| 16 | 21 | Change "market" to "markets" | Transcription error |
| 18 | 4 | Add "he was part of the HR Leadership Team" following the word "yes" | Clarifying testimony |
| 18 | 9 | Change "October" to "November" | Clarifying testimony |
| 18 | 17 | Change "CHR" to "CHRO" | Transcription error |
| 23 | 16 | Change "took" to "made" | Clarifying testimony |
| 26 | 6 | Delete the word "we" | Clarifying testimony |
| 29 | 8 | Change "evaluate" to "evaluations" | Clarifying testimony |
| 51 | 8 | Change "tactic" to "tactical" | Transcription error |
| 56 | 12 | Add "At the time of his selection—no" | Clarifying testimony |
| 77 | 15 | Change "CO" to CEO | Transcription error |
| 82 | 23 | Change "ben" to "benefits" | Clarifying testimony |
| 83 | 22 | Change "ben" to "benefits" | Clarifying testimony |
| 84 | 9 | Add "VP" after "HR" | Clarifying testimony |
| 86 | 14 | Add "not" following the word "tried" | Clarifying testimony |



1    ACKNOWLEDGMENT OF DEPONENT

2
      I, _Tal Zorman_ , do

3    hereby certify that I have read the
    foregoing pages,  1 - PGS, and that the

4    same is a correct transcription of the
    answers given by me to the questions

5    therein propounded, except for the
    corrections or changes in form or

6    substance, if any, noted in the attached
    Errata Sheet.

7

8    _____    May 18, 2022
    WITNESS NAME            DATE

9

10

11

12

13

14

15

16

17

18

19

20

21

22

**www.MagnaLS.com**

**866-624-6221**

**Seven Penn Center**
**1635 Market Street – 8th Floor**
**Philadelphia, PA 19103**

JOINT APPX - 0299
Scanned with CamScanner

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

- - -

RANDOLPH W. KEUCH      :
                      : CASE NO.
v                     : 2:19-CV-05488
                      :
TEVA PHARMACEUTICALS :
USA, INC., And TEVA   :
PHARMACEUTICAL        :
INDUSTRIES, Ltd.      :

- - -

WEDNESDAY, APRIL 13, 2022

- - -

Virtual deposition of MARK
SABAG, taken pursuant to Notice,
commencing at 8:10 a.m., on the above
date, before Benjamin Moebius, a Court
Reporter and Notary Public in and for the
Commonwealth of Pennsylvania.

- - -

MAGNA LEGAL SERVICES
(866) 624 6221



Page 4

```
 1                    - - -
 2              (It is hereby stipulated and
 3         agreed by and between counsel for
 4         the respective parties that
 5         reading, signing, sealing, filing
 6         and certification are waived; and
 7         that all objections, except as to
 8         the form of questions, be reserved
 9         until the time of trial.)
10                    - - -
11              MARK SABAG, after having been
12         duly sworn, was examined and
13         testified as follows:
14              THE WITNESS:  Yes.
15                    - - -
16                 EXAMINATION
17                    - - -
18   BY MR. EPSTEIN:
19         Q.    Mr. Sabag, am I pronouncing
20   your name correctly?
21         A.    Yes, thank you.
22         Q.    What is your date of birth?
23         A.    March 8th, 1970.
24         Q.    And where were you born?
```



Page 17

```
 1        Q.    Who was that?

 2        A.    Lesley Billow and Ron Yaniv.

 3        Q.    Ron Yaniv, you said?

 4        A.    Correct.

 5              MR. EPSTEIN:  To the

 6        reporter, that's Y-A-N-I-V.  Billow

 7        is B-I-L-L-O-W.

 8  BY MR. EPSTEIN:

 9        Q.    Now, in terms of the overall

10  decision by Mr. Schultz to cut people

11  from employment with Teva and setting

12  goals of 25 percent, what role did you

13  play in that?

14        A.    I basically, as the head of

15  HR, orchestrated this entire program.

16        Q.    When you say you orchestrated

17  it, what did you mean by that?  Did you

18  make the decision about 25 percent, or

19  did Mr. Schultz do that?

20        A.    Mr. Schultz came with the --

21  with the desire -- with the need of Teva

22  to reduce significantly the cost based

23  and the head count and the conclusion was

24  that it needs to have -- it needs to be
```



Page 18

```
 1   25 percent, and me as an executive member

 2   and head of HR together with the CFO, we

 3   built the detailed plan on how that is

 4   going to be cascaded in terms of goals to

 5   the entire organization.  And then, once

 6   the plan was set, I was responsible

 7   together with the -- with the business

 8   leaders but as the HR organization

 9   basically facilitate this process through

10   Teva in '18 and '19.

11        Q.   Did you make the decisions as

12   to who got what roles at Teva as part of

13   this reorganization plan?

14        A.   No.

15        Q.   Did you have a hand in

16   deciding that Tal Zorman should be placed

17   in her current role?

18        A.   Yes.

19        Q.   What decision making did you

20   engage in in that regard?

21        A.   So, like any other function,

22   HR got the target of 50 percent reduction

23   in workforce as part of this

24   restructuring, and we needed to do it
```



Page 19

1    actually in a -- in a rapid timeframe

2    because HR was supposed to lead this

3    process, so we wanted to create that

4    clarity in HR as fast as we can to allow

5    HR to get back to business.

6                    I came to the conclusion that

7    in order to do so, I need also -- and to

8    convey the message around this tough

9    decision, I basically needed to reduce my

10   leadership team in half.  As a result of

11   that, I basically decided to merge couple

12   of global functions into a one global

13   function and to eliminate several

14   leadership roles in HR to allow me to

15   maintain this 50 percent target.  And

16   once I decided to merge those functions,

17   I came to the conclusion that the best

18   person that can do the job moving forward

19   is Tal Zorman.

20        Q.    Did you work with Tal Zorman

21   at Intel?

22        A.    To some extent.  She was in

23   other function, but I -- but I know her,

24   yeah.  I knew her, yeah.



Page 29

```
 1        A.    I think it was related to
 2   the -- to the big project that back then
 3   was driven globally around benefit
 4   harmonization, as far as I remember, and
 5   there was some other struggle that
 6   relates to whether he see Ron Yaniv as an
 7   appropriate manager due to level of
 8   seniority.
 9        Q.    I'm not understanding what
10   you mean by that.
11              Would you explain?
12        A.    The feel back then was that
13   he believed that -- that he is more
14   qualified than Ron Yaniv.
15        Q.    Did you hear anything about
16   Randy not being able to get along with
17   other persons -- excuse me -- in the
18   organization other than Ron Yaniv?
19        A.    Not that I recall.
20        Q.    When did Ron Yaniv leave
21   Teva?
22        A.    Ron Yaniv left Teva as part
23   of the restructuring that I explained
24   before.  So he was one of the senior HR
```



JOINT APPX - 0305

**MAGNA**
LEGAL SERVICES

```
1        - - - - - -
             E R R A T A
2        - - - - - -

3

4 PAGE  LINE      CHANGE  FROM          CHANGE TO          REASON

5  ____  ____  _____See Attached Errata Sheet_____  _____

6  ____  ____  _____  _____  _____

7  ____  ____  _____  _____  _____

8  ____  ____  _____  _____  _____

9  ____  ____  _____  _____  _____

10 ____  ____  _____  _____  _____

11 ____  ____  _____  _____  _____

12 ____  ____  _____  _____  _____

13 ____  ____  _____  _____  _____

14 ____  ____  _____  _____  _____

15 ____  ____  _____  _____  _____

16 ____  ____  _____  _____  _____

17 ____  ____  _____  _____  _____

18 ____  ____  _____  _____  _____

19 ____  ____  _____  _____  _____

20 ____  ____  _____  _____  _____

21 ____  ____  _____  _____  _____

22 ____  ____  _____  _____  _____

23 ____  ____  _____  _____  _____

24 ____  ____  _____  _____  _____
```

**www.MagnaLS.com**                               **866-624-6221**

Seven Penn Center
1635 Market Street – 8th Floor
Philadelphia, PA 19103

**Mark Sabag Deposition Transcript Errata**

| Page | Line | Correction | Reason |
|------|------|------------|--------|
| 11 | 20 | Replace "Mr. Shemtob" with "Mr. Rappoport" | Transcription Error |
| 20 | 4 | Replace "Mr. Shemtob" with "Mr. Rappoport" | Transcription Error |
| 20 | 17 | Change "that what Tal were" to "that's what Tal was" | Clarifying testimony |
| 22 | 5 | Replace "Mr. Shemtob" with "Mr. Rappoport" | Transcription Error |
| 23 | 14 | Replace "Mr. McDonough" with "Mr. Rappoport" | Transcription Error |
| 23 | 17 | Replace "Mr. McDonough" with "Mr. Rappoport" | Transcription Error |
| 30 | 7 | Replace "Mr. Shemtob" with "Mr. Rappoport" | Transcription Error |
| 30 | 23 | Replace "Mr. Shemtob" with "Mr. Rappoport" | Transcription Error |
| 33 | 3 | Replace "Ron Lollar" with "Dan Lawlor" | Transcription Error |
| 33 | 8 | Replace "Lollar" with "Lawlor" | Transcription Error |
| 33 | 19 | Replace "Lollar" with "Lawlor" | Transcription Error |
| 34 | 8 | Replace "Lollar" with "Lawlor" | Transcription Error |
| 34 | 11 | Replace "Lollar" with "Lawlor" | Transcription Error |
| 46 | 4 | Replace "Don Lollar" to "Dan Lawlor" | Transcription Error |
| 46 | 14 | Replace "Mr. Shemtob" with "Mr. Rappoport" | Transcription Error |
| 47 | 9 | Replace "Renner" with "Brenner" | Transcription Error |
| 49 | 7 | Replace "Mr. Shemtob" with "Mr. Rappoport" | Transcription Error |
| 49 | 16 | Replace "Mr. Shemtob" with "Mr. Rappoport" | Transcription Error |

**MAGNA**
LEGAL SERVICES

1        ACKNOWLEDGMENT OF DEPONENT

2
         I,  Mark Sabag            , do
3    hereby certify that I have read the
     foregoing pages,  1 - PGS, and that the
4    same is a correct transcription of the
     answers given by me to the questions
5    therein propounded, except for the
     corrections or changes in form or
6    substance, if any, noted in the attached
     Errata Sheet.
7
8    _Mark Sabag_____    May 29, 2022_____
     WITNESS NAME              DATE
9

10

11

12

13

14

15

16

17

18

19

20

21

22

**www.MagnaLS.com**                                    **866–624–6221**

Seven Penn Center
1635 Market Street – 8th Floor
Philadelphia, PA 19103

JOINT APPX - 0308

Page 1

```
      IN THE UNITED STATES DISTRICT COURT
  FOR THE EASTERN DISTRICT OF PENNSYLVANIA

                  -  -  -
RANDOLPH W. KEUCH      :
                       : CASE NO.
v                      : 2:19-CV-05488
                       :
TEVA PHARMACEUTICALS :
USA, INC., And TEVA  :
PHARMACEUTICAL         :
INDUSTRIES, Ltd.       :




              -  -  -

       FRIDAY, APRIL 15, 2022

              -  -  -


       Virtual deposition of

DANIEL LAWLER, taken pursuant to Notice,

commencing at 10:02 a.m., on the above

date, before Benjamin Moebius, a Court

Reporter and Notary Public in and for the

Commonwealth of Pennsylvania.




              -  -  -

       MAGNA LEGAL SERVICES
         (866) 624 6221
```



Page 5

1          MR. EPSTEIN:  Thank you, sir.

2          MR. RAPPAPORT:  You're

3     welcome.

4               -  -  -

5               EXAMINATION

6               -  -  -

7   BY MR. EPSTEIN:

8     Q.    Mr. Lawler, would you state

9   your full name for the record?

10    A.    Yes.  Daniel Patrick Lawler.

11    Q.    And what is your date of

12  birth, sir?

13    A.    November 8th, 1963.

14    Q.    Can you give me a summary of

15  your education after high school?

16    A.    Yes.  I have a bachelor's

17  degree in personnel and labor relations

18  from La Salle University and a master's

19  in business administration concentration

20  in finance and investments from Drexel

21  University.

22    Q.    And when did you graduate

23  from La Salle?

24    A.    In 1986 -- May of '86.



**MAGNA**
**Legal Services**

```
1        - - - - - -
              E R R A T A
2        - - - - - -

3

4 PAGE  LINE      CHANGE  FROM        CHANGE TO         REASON

5 ____  ____    ___See Attached Errata Sheet___    _____

6 ____  ____    _____    _____    _____

7 ____  ____    _____    _____    _____

8 ____  ____    _____    _____    _____

9 ____  ____    _____    _____    _____

10 ____  ____    _____    _____    _____

11 ____  ____    _____    _____    _____

12 ____  ____    _____    _____    _____

13 ____  ____    _____    _____    _____

14 ____  ____    _____    _____    _____

15 ____  ____    _____    _____    _____

16 ____  ____    _____    _____    _____

17 ____  ____    _____    _____    _____

18 ____  ____    _____    _____    _____

19 ____  ____    _____    _____    _____

20 ____  ____    _____    _____    _____

21 ____  ____    _____    _____    _____

22 ____  ____    _____    _____    _____

23 ____  ____    _____    _____    _____

24 ____  ____    _____    _____    _____
```

**www.MagnaLS.com**                                    **866−624−6221**

Seven Penn Center
1635 Market Street – 8th Floor
Philadelphia, PA 19103

## Daniel Lawlor Deposition Transcript Errata

| Page | Line | Correction | Reason |
|---|---|---|---|
| 1 | - | Change "Lawler" to "Lawlor" | Transcription Error |
| 8 | 3 | Add "HR Business Partner" after Associate Director | Clarifying Testimony |
| 8 | 14 | Add "Associate" before Director, and then Director (i.e. I started as an Associate Director and then became a Director for their…") | Clarifying Testimony |
| 8 | 16 | Change "Princeton" to "Princeton/Cranbury" | Clarifying Testimony |
| 11 | 1 | Change "March" to "April" | Clarifying Testimony |
| 11 | 4 | Change "two" to "two and a half" | Clarifying Testimony |
| 11 | 14-15 | Change "That was again for about two years and it was during that time that I was promoted to an SVP" to "During the same two and a half years and it was after that time that I was promoted to an SVP" | Clarifying Testimony |
| 14 | 22 | Change "January" to "April" | Clarifying Testimony |
| 14 | 23 | Change "April" to "July" | Clarifying Testimony |
| 23 | 17 | Add "and Elaine McGee" after the phrase "So, he" | Clarifying Testimony |
| 48 | 10-11 | Change "roughly between 12,000 and 13,000" to "roughly between 9,500 and 10,000" | Clarifying Testimony |
| 48 | 13-14 | Change "somewhere in the 8,000 to 9,000 range" to "somewhere in the 7,500 to 8,000 range" | Clarifying Testimony |
| 49 | 1 | Change "I would say 45,000 to 50,000" to "I would say 40,000 to 45,000" | Clarifying Testimony |
| 49 | 19 | Add "Europe had more and" after the word "but" | Clarifying Testimony |
| 50 | 5 | The affirmative answer reflects the revised numbers provided in this Errata Sheet. | Clarifying Testimony |

1      ACKNOWLEDGMENT OF DEPONENT

2
          I, _DANIEL LAWLOR_, do
3    hereby certify that I have read the
     foregoing pages,  1 - PGS, and that the
4    same is a correct transcription of the
     answers given by me to the questions
5    therein propounded, except for the
     corrections or changes in form or
6    substance, if any, noted in the attached
     Errata Sheet.
7
8    _Daniel Lawlor  5/31/2022_
     WITNESS NAME          DATE
9

10

11

12

13

14

15

16

17

18

19

20

21

22

Page 1

1        IN THE UNITED STATES DISTRICT COURT
        FOR THE EASTERN DISTRICT OF PENNSYLVANIA

2

3    RANDOLPH W. KEUCH,        *

4              Plaintiff      *

5    v.                       *   CASE NO. 2:19-CV-05488

6    TEVA PHARMACEUTICALS      *
     USA, INC., And TEVA

7    PHARMACEUTICAL            *
     INDUSTRIES, Ltd.,

8                              *

              Defendants

9    *        *        *        *        *        *

10

11     VIDEOCONFERENCE DEPOSITION OF RANDOLPH KEUCH

12                PARTY/FACT WITNESS

13              BALTIMORE, MARYLAND

14                APRIL 12, 2022

15

16

17

18

19    Reported by Kathleen E. Manes, Court Reporter

20

21

22

23

24

25

Page 8

1    So I would ask that all of your responses be

2    verbal responses.  Are you capable of that?

3         A    I am.

4         Q    Okay.  Have you ever had your

5    deposition taken prior to today?

6         A    Not to my recollection.

7         Q    Okay.  Where were you born,

8    Mr. Keuch?

9         A    I was born in Glen Ridge, New Jersey.

10        Q    And when were you born?

11        A    May 27, 1954.

12        Q    How many job offers have you received

13   since your separation from Teva?

14        A    None.

15        Q    How many job interviews have you had

16   since your separation from Teva?

17        A    I don't know.  It was well over a

18   dozen.

19        Q    Can you identify who you interviewed

20   with and when?

21        A    I can recall a few names.  I believe

22   that I provided a list to counsel of the

23   companies I met with or spoke with.  So if you

24   want me to basically give you my recollection,

25   or we can pull up the Bates document and go

Page 34

1   benefits after leaving Teva?

2       A    I received no severance benefits from

3   Teva.

4       Q    Do you have an understanding as to

5   why not?

6       A    Because I did not sign a release.

7       Q    Okay.  And is there a reason why you

8   didn't sign the release?

9       A    I was advised.

10          MS. CHALAL:  I'm just going to object

11  it's attorney-client privilege.  Don't -- don't

12  reveal anything discussed with your attorney.

13  But if you can, answer that.

14          THE WITNESS:  Can you restate the

15  question?

16          BY MR. RAPPOPORT:

17      Q    Is there a reason why once presented

18  with the release, you chose not to sign it?

19      A    The released said to speak to legal

20  counsel, which I did, and was advised not to

21  sign it.

22      Q    Did you ever call Thomas McDonough to

23  find out about your severance benefits?

24      A    I believe I sent him an email.

25      Q    Okay.  And what do you recall the

Page 36

1      Q    Did you meet with them all together?

2      A    I believe on January 2nd when I was

3   told that I was being terminated, I believe I

4   spoke to Edu first.  But again, I'm not clear.

5   And he wanted to speak to the team.  And I

6   asked for some time to speak to the team

7   myself, which I did.  And then he I believe

8   spoke to them individually.

9      Q    What happened on January 2nd, 2018?

10     A    I believe Tal Zorman called me and

11  told me that -- that I was being terminated and

12  replaced by Edu.

13     Q    Do you recall anything else that she

14  may have said during the course of that

15  conversation?

16     A    I do not.

17     Q    And was Edu the next person that you

18  spoke to?

19     A    I believe that was the correct order.

20  I'm not totally clear, but I believe it was Edu

21  and then -- and then my staff.

22     Q    Describe to me as best you can recall

23  what you said to Edu after having spoken to

24  Ms. Zorman on January 22nd.

25     A    The gist of the call would have been,

Page 39

1      Q    And did you stick around until the
2    February 18th date that you testified to?
3      A    Yeah, it was -- I don't know if it
4    was the 18th or the 24th, but there was --
5    you know, it did end in the later part of
6    February.
7      Q    And during that period of time, what
8    did you do to assist Mr. Nasi with respect to
9    the assumption of some or all of the duties
10   that you had been handling?
11     A    We had a number of vendor meetings
12   and Edu attended them.  So it was a -- a
13   transferring of the baton so he would get to
14   meet the -- you know, the people that we were
15   working as our -- as our vendors and understand
16   sort of the role they played and -- and what we
17   were working on with them.
18     Q    About how many vendor meetings were
19   there?
20     A    I -- I don't recall.
21     Q    And were the vendor meetings in North
22   Wales, Pennsylvania?
23     A    Yes.
24     Q    And did Mr. Nasi attend them in
25   person?

Page 42

```
 1            MR. RAPPOPORT:  Ms. Court Reporter,
 2   read back my question, please.
 3            (Whereupon, the court reporter read
 4   the question.)
 5            BY MR. RAPPOPORT:
 6       Q    If you're not able to answer the
 7   question, I'll ask you another one.
 8       A    Okay.  Please do.
 9       Q    Did you share your opinion with
10   Ms. Weinstein as to how they came to select
11   Mr. Nasi?
12       A    No.
13       Q    Did you have an opinion as to how
14   they came to select Mr. Nasi?
15       A    Other than his age and he was a male,
16   no.
17       Q    Okay.  So it was your opinion that
18   him being a male and him being whatever age he
19   was, were to contributing factors to his
20   selection?
21       A    Yes.
22       Q    And what's basis of that opinion?
23       A    The fact that he's a male and he was
24   much younger than I was.  And I was being
25   terminated because of my age.
```

Page 62

1        Q     Is that different than Total Rewards?

2        A     Not necessarily.

3        Q     Well, does compensation plus benefits

4   equal Total Rewards?  Or is there something

5   that I'm missing in the equation?

6        A     No.  I think that's the general

7   scope.

8        Q     So when I asked you the question

9   whether he had a Total Rewards background and

10  you responded by saying he had a background in

11  compensation and benefits, is there some reason

12  why you answered it that way?

13       A     No.  It's just that that's -- that

14  was my knowledge of his -- of his skill set.

15       Q     When did you begin reporting to him?

16       A     I did.  When, again I'm not

17  100 percent clear whether it was the latter

18  part of 2018 or the early part of 2019.

19       Q     Were you a candidate for the position

20  that Mr. Yaniv filled?

21       A     I -- I'm unaware of whether I was or

22  was not.

23       Q     Did you self-identify as someone who

24  would be interested in that role?

25       A     I did not.

Page 75

1    And, you know, I was given an offer from a
2    competitor of that company that I -- that I did
3    not accept at age 62.  So, you know, it --
4    it -- I'm not sure how to answer your question,
5    but, yes, I did tell Lesley that it appears
6    that I'm not being hired because of my age.
7          Q    What was the Airgas competitor that
8    gave you an offer at age 62?
9          A    I honestly don't recall.  I'd have to
10   look it up.
11         Q    Is that while you were still --
12         A    That's Allentown --
13         Q    -- employed --
14         A    New Jersey -- Allentown,
15   Pennsylvania.  They're headquartered there.
16   And there's an offer letter that's part of what
17   you have in -- that's been Bates stamped.
18         Q    All right.  The offer that you
19   received from the Airgas competitor in
20   Allentown, Pennsylvania, was that while you
21   were still employed at Teva?
22         A    I received an offer while I was still
23   employed at Teva, yes.
24         Q    Were you looking for employment
25   opportunity during the period of time that you

Page 76

```
 1   were employed by Teva, which is as I understand
 2   it, was from 2014 to 2018.
 3         A    Not -- not aggressively, no.
 4         Q    Well, how is it that you received an
 5   offer while un-aggressively not looking for
 6   other opportunities?
 7         A    I received a call and decided that it
 8   was worthwhile to explore.  And I explored it.
 9   And I got the job, got the offer.
10         Q    Was it at a senior director level?
11         A    It would have been a vice president
12   position, yes.
13         Q    Was it a global opportunity?
14         A    It was.
15         Q    Okay.  But you declined the position
16   because of what?
17         A    I met with Ron Yaniv and discussed
18   the situation with him.  And he didn't want me
19   to -- he did not want me to leave.  He valued
20   my -- my expertise, my skill set, what I
21   brought to Teva.  And so again, it was a
22   question because I'd have to move further away
23   from the Philadelphia hub that I -- you know,
24   that my wife's father was situated in.  And
25   Teva had -- had made some interesting comments.
```

Page 77

1    Mr. Yaniv had told me that he would look into
2    the grading of my position.  And so he gave me
3    a salary increase.  He gave me a retention
4    bonus.  And since my work at Teva was not
5    really done, I had built a strategy for the
6    benefits programs and was in the process of
7    implementing that strategy that -- and enjoying
8    the work I did, so it didn't make sense to
9    leave.
10        Q    Do I understand your testimony
11   correctly that the reason that you were given
12   the salary increase and the retention bonus was
13   in response to you sharing with Mr. Yaniv that
14   you had received a competitive offer from
15   another company?
16        A    Yes.
17        Q    Do I understand you correctly that
18   Mr. Yaniv also shared with you that he would
19   look into the possibility of a different job
20   title and labor grade for you?
21        A    A different grade, yes.
22        Q    What grade were you?
23        A    I was a 17.
24        Q    Wasn't that the highest grade for a
25   senior director?

Page 109

1   any information at all as to how the decision

2   was made to retain Lauren Benner?

3        A    I do not.

4        Q    And with respect to Elaine McGee, was

5   she separated by Teva as part of the global

6   restructuring?

7        A    No.  Lauren Benner left Teva and then

8   Elaine McGee was offered that position.

9        Q    And Elaine McGee I believe you said

10  was in her late 40s, about the same age as

11  Daniela Shea?

12       A    No.  I said she was probably in her

13  40s.

14       Q    Okay.  Was the decision to offer

15  Elaine McGee the position vacated by Lauren

16  Benner's departure evidence of age

17  discrimination?

18       A    I don't know.

19       Q    Let's talk about Rose Riccioli.

20       A    Riccioli, yes.

21       Q    Okay.  Thank you for the correction.

22            What was Rose Riccioli's association

23  to Teva prior to her being separated?

24       A    She was a contractor.

25       Q    Did she work in Total Rewards comp --

Page 110

1    in Total Rewards?

2         A    She did.

3         Q    On the comp side or on the benefit

4    side?

5         A    Compensation side.

6         Q    How long did she work as a contract

7    employee?

8         A    I want to think she was there for at

9    least a year.

10        Q    Okay.  And by "contract employee," do

11   you mean that she was actually hired by a

12   third-party vendor but provided service

13   entirely or exclusively to Teva?

14        A    I believe so.  I really do not.  I

15   don't know.

16        Q    But you believe that she was treated

17   in a way that evidences age discrimination.

18   Isn't that correct?

19        A    That's correct.

20        Q    Now, at some point in time, was there

21   a decision that was being discussed to change

22   her status from contract employee to Teva

23   employee?

24        A    We had an open position.  And she

25   interviewed for the position as did others.

Page 111

1       Q     Okay.  And the others who
2   interviewed, were they likewise working either
3   at or for Teva?
4       A     I'm not sure.  There may have been
5   one or two Teva employees, and I actually don't
6   believe we had any -- we may have had one other
7   external employee.
8       Q     And when she interviewed, were you
9   among the people she interviewed with?
10      A     Yes.
11      Q     Okay.  Were there others who
12  interviewed her?
13      A     Yes.
14      Q     Who were the others?
15      A     Well, Miriam Weinstein was the comp
16  director, compensation director.  And I'm not
17  sure who in HR or whether talent acquisition
18  interviewed her.  I would believe it could --
19  could have been Pam Daknis who interviewed her.
20  But she was interviewed one or two human
21  resource employees.
22      Q     Okay.  Did you make a recommendation
23  on her behalf?
24      A     I don't understand the concept of a
25  recommendation.

Page 112

```
 1        Q    Did you have hiring authority?
 2        A    No.
 3        Q    Who had hiring authority?
 4        A    Well, that's a good question.  The --
 5    the authorities changed from time to time.  You
 6    had to have the head count approved.  And once
 7    that was approved, then you had to go ahead and
 8    look for a candidate.  And once you had an
 9    offer, a candidate you wanted to hire, the
10    offer had to be approved typically by me, but
11    because it was HR and it was Total Rewards, I
12    believe my manager would have to get involved.
13    And generally it -- it went through.  But given
14    the -- the times, I believe this was Q3 of
15    2017.  And Lesley was gone, I believe for
16    whatever reason Dan Lawlor decided that he
17    wanted to see it before it went through.
18        Q    Did you recommend to Dan Lawlor that
19    Rose Riccioli be considered for the opened
20    vacant Teva position?
21        A    Yes.
22        Q    Was that recommendation in writing or
23    was it orally?
24        A    We would not have prepared an offer
25    if it wasn't in writing.  And I believe we
```

1  prepared a full offer for her.

2        Q    Was that offer ever extended?

3        A    No.

4        Q    Why wasn't it extended?

5        A    Again, my recollection is that I was

6  called into Dan's office.  And Dan basically

7  knew her, had worked with her, had also given

8  me compliments on the quality of her work.

9  And -- but he asked me if she had long-term

10  potential.  And he asked me if she could fill

11  my position in the near future.

12        Q    And how did you respond to his

13  questions?

14        A    I basically told him that she could

15  clearly aspire to be the director of

16  compensation, so she could succeed Miriam.  As

17  far as my role, she would need a lot of

18  training and development to be brought up on,

19  you know, the international aspects of my

20  position and some of the details in the

21  benefits area.

22        Q    Wasn't one of the questions whether

23  she had long-term potential?

24        A    That's correct.  What I said.

25        Q    (Inaudible) question.

Page 120

1  As I said, Rose had been with us for -- for a

2  year.  So Diane could have told me her age when

3  she had a conversation with Rose.  So 55 is

4  probably the number -- is the number that was

5  once shared with me.  I don't know at what

6  time, but it was around that time and around

7  that -- that age.  And I don't know how

8  accurate Diane is.  I only know what she shared

9  with me.

10     Q    Would you agree with me that there

11 was no communication that you were a part of

12 where Mr. Lawlor inquired about her age or was

13 advised what her age was?

14     A    To the best of my knowledge, no he

15 did not inquire about her age.

16     Q    Can you explain your earlier answer

17 where you indicated that among HR folk, using

18 the long-term potential really means age?

19     A    That's just -- that's just common

20 knowledge.  I believe if you would ask people

21 in the search business, you will get that

22 response.  I believe if you Google it, you will

23 get that response.

24     Q    When did you learn that Teva had

25 assumed considerable debt and would be taking

```
                                        Page 122
 1   their own in response to the potential for a
 2   likely bankruptcy?
 3       A    I'm not sure the word "bankruptcy" is
 4   not a word that -- that I'm not familiar with
 5   in the --
 6       Q    Prior --
 7       A    -- Teva --
 8       Q    -- to Kare's -- prior to Kare's
 9   arrival, were there any suggestions that you
10   were aware of, either formerly or informally,
11   that a global reduction in force was imminent?
12       A    Only rumors.
13       Q    And what were the rumors that you had
14   heard?
15       A    That, you know, Teva was -- was
16   struggling financially.  They -- I had worked
17   on an acquisition of Rimsa down in Mexico with
18   them.  And apparently senior management got
19   snookered on that deal because the Mexican
20   government stepped in.  There were a lot of
21   issues around the drugs they were producing.
22   It was just I guess a nightmare for Teva.
23       Q    And certainly you were watching the
24   stock price, were you not?
25       A    I definitely watched the stock price,
```

Page 123

```
 1   yes.
 2        Q     And you would agree with me that the
 3   stock price declined after the purchase of
 4   Actavis?
 5        A     It did, yes.
 6        Q     Now, in your role as the head of
 7   Total Rewards, did you have responsibility for
 8   Canada?
 9        A     I did.
10        Q     For Latin America?
11        A     Yes.
12        Q     And did Latin America also include
13   South America?
14        A     Yes, I believe it would have.  Yes.
15        Q     Peru, Chile, Brazil?
16        A     Yes, those countries were part of
17   Latin America.
18        Q     I'd like to show you an org chart
19   that you provided that was Bates stamped
20   Keuch 017.
21             MR. EPSTEIN:  Would you repeat that,
22   please, Larry?  You broke up.
23             BY MR. RAPPOPORT:
24        Q     I would like to show you an org chart
25   that you produced that was Bates stamped
```

```
                                      Page 141
 1   for the position, did you?
 2        A    Correct.
 3        Q    And your testimony is that Ron Yaniv
 4   was a one-off and his garden leave was
 5   unrelated to the global restructuring that
 6   followed later in the year?
 7        A    No, that's not correct.
 8        Q    What's incorrect about it?
 9        A    I do not know why Ron was leaving the
10   organization.  It may have been again related
11   to a reduction in force.  But the
12   communications that I had and the conversations
13   I had did not suggest that -- that he would not
14   be replaced at least prior to the announcement
15   of Tal.
16        Q    When did you first start talking to
17   Ron Yaniv about the possibility of you being
18   upgraded from a senior director to a vice
19   president?
20        A    I believe it would have been around
21   2016.  And it was not a conversation to be
22   ungraded to a vice president.  It was to have
23   my job looked at given the fact that the job
24   responsibilities had grown substantially with
25   the acquisitions.
```

1        Q    And as a result of the change to your

2    job responsibilities, did you feel that you

3    were not properly rated in your labor grade 17

4    role?

5        A    I felt that with the new global

6    grading system that if you ran my job through

7    that system, you would come up with a different

8    grade.

9        Q    And the different grade would have

10   been a higher grade?

11       A    Correct.

12       Q    And that would have been a labor

13   grade 18?

14       A    Correct.

15       Q    And that would have necessarily

16   required you to become a vice president?

17       A    That's correct.

18       Q    Okay.  Did you have counterparts in

19   the global organization who were heading

20   global -- I'm sorry -- heading -- or Total

21   Rewards who were at the vice president level?

22       A    No.

23       Q    Everyone was at the senior director

24   level?

25       A    Correct.  So you had a senior vice

1    president as Ron.  And I believe he was a 19.

2    No one in 18.  And then you had 17s.

3         Q     All right.  And the 17 would have

4    been a 17 in Europe, a 17 in North America, a

5    17 in Asia-Pacific, and a 17 in Israel.

6         A     Correct.

7         Q     Okay.  Did you have more than one

8    conversation with Mr. Sabag about your desire

9    to be evaluated and perhaps upgraded?

10        A     I never had that conversation.

11        Q     There were no conversations?

12        A     That's correct.

13        Q     Okay.  So there was no discussion

14   between you and mister -- Mr. Yaniv about

15   becoming a vice president?

16        A     There was one conversation, maybe

17   two.

18        Q     But with no one other than Mr. Yaniv?

19        A     With mister -- with Ron.  That's

20   correct.

21        Q     And did Ron ever indicate to you that

22   it could not happen?

23        A     He never did.

24              MR. RAPPOPORT:  Let me show you

25   what's marked as an exhibit.  It's going to be

1   Bates stamped Keuch 028.

2           BY MR. RAPPOPORT:

3       Q    This is a letter dated August 6,

4   2015, via mail to you from Ron Yaniv, subject

5   base salary increase and retention bonus.  And

6   I'd like for you to just read to yourself the

7   second paragraph of the letter.

8           MR. EPSTEIN:  Would you repeat

9   what -- what number this is in terms of exhibit

10  and what Bates stamp it is?

11          MR. RAPPOPORT:  It's Bates stamped

12  Keuch 028.  And it would be Exhibit 3.

13          MR. MCDONOUGH:  Org chart to be two?

14          MR. RAPPOPORT:  Yeah.

15          (Keuch Deposition Exhibit Nos. 2 and

16  3 were marked for identification.)

17          THE WITNESS:  Okay.  I have read it.

18          BY MR. RAPPOPORT:

19      Q    Did he ever get back to you after

20  sending you the letter that's been marked as

21  Exhibit 3 as it relates to considering you for

22  a potential promotion to vice president at a

23  global grade 18?

24      A    Yes.

25      Q    And what did -- when he got back to

1    you, what did he tell you?

2         A    That it would be challenging in the

3    current environment.

4         Q    Okay.  And what did you understand

5    that to mean?

6         A    I understood it to mean that it was

7    going to be a hard sell.

8         Q    And who would he have to sell it to?

9         A    He would have to sell it to Mark

10   Sabag.

11        Q    And did you have a working

12   relationship with Mr. Sabag.

13        A    I had minimal contact with Mr. Sabag.

14        Q    The retention bonus that you received

15   at this time of $60,000, were those retention

16   bonuses being paid to others or was this

17   something special for you?

18        A    There was -- there was a list that

19   circulated and worked through the organization.

20   And, yes, there were others who also received

21   the retention bonuses.

22        Q    And were they retention bonuses in

23   differing amounts?

24        A    To the best of my knowledge, yes.

25        Q    And what do you recall the range of

Page 147

1   in varying amounts?

2        A    I believe so, yes.

3        Q    Did you ever discuss the amount of

4   retention bonuses with anyone other than

5   yourself while at Teva?

6        A    I don't recall.

7        Q    Did any of your direct reports

8   receive retention bonuses?

9        A    I don't believe so.

10       Q    Were counterparts in Europe, Asia,

11  and Israel given retention bonuses?

12       A    I would not know that information so

13  I don't know.

14       Q    Did you agree to the terms that were

15  set forth within what's been marked Exhibit 3?

16       A    Yes.

17       Q    And did you receive the

18  $60,000 that's referenced therein?

19       A    I received two payments of $30,000,

20  yes.

21       Q    And did you understand this to be as

22  a result of services that you provided above

23  and beyond what are required given your

24  position?

25       A    It wasn't a bonus for performance as

Page 152

1      Q     What caused you to prepare it?

2      A     I was asked by Tal Zorman to do that.

3      Q     And when were you asked by Tal Zorman

4   to do that?

5      A     It would have been only a few days

6   before the date of this memo.  So if this memo

7   is December 14th, then it would have been in

8   early December.  I was not given a -- I don't

9   think I was given much lead time.

10      Q     In early December 2017, what

11   specifically did Tal Zorman request of you?

12      A     She asked me to put together some

13   options to basically reduce my staff by

14   50 percent.

15      Q     But wouldn't that have been the first

16   communication that you had with anyone at Teva

17   that a reduction in force was imminent and that

18   it would be 50 percent of the workforce?

19      A     I'm not sure that was the first

20   communication that -- you know, we were not

21   made aware that there were going to be -- there

22   was going to be a reduction in force.  I have a

23   sense that -- that I knew earlier, but did not

24   know the ramifications for my team.

25      Q     See even earlier then, about a week

Page 155

1  that you prepared the deck, which has been
2  marked as Exhibit 5, you had conversations with
3  both Miriam and with Diane?
4       A    That's correct.
5       Q    But not with Edu?
6       A    Edu was not -- Tal had told me that,
7  you know, I would -- the job would no longer
8  have responsibilities for Latin America.  So
9  Edu was not on my -- on my list.
10      Q    Was that in the same conversation
11 when she asked you to prepare the deck?
12      A    Yes, it was.
13      Q    Did she explain why Edu would no
14 longer be part of North America?
15      A    I believe the conversation was that
16 it was being moved to -- I think to Gaurav, who
17 was Asia-Pac.
18      Q    Did she indicate why?
19      A    No.  Just simply this was how they
20 were changing.  I had a sense it was dealing
21 more with business alignment.
22      Q    Did she indicate to you that there
23 was a realignment and Latin America would no
24 longer go through North America?
25      A    That's what I just said, yes.

Page 173

1    of, you know, Latin America would no longer be

2    reporting to me.  So we did not dwell on it

3    other than it was simply a matter of fact.

4        Q    Did you tell Mr. Nasi at some point

5    in time that he was going to be interviewed by

6    Ms. Zorman?

7        A    No.

8        Q    Did Ms. Zorman ever ask you your

9    opinion of Mr. Nasi?

10       A    No, not that I can recall.

11       Q    Did Ms. Zorman ever ask to see the

12   reviews that you prepared for Mr. Nasi?

13       A    No.

14       Q    When you had the conversation with

15   her on December the 7th or thereabouts, a week

16   before you prepared it, did you give any

17   consideration at all at that time that Mr. Nasi

18   may be identified as the next director for

19   Total Rewards in North America?

20       A    No.

21       Q    So if his name came up at all, it was

22   only to share with you that Latin America would

23   not be reporting in through North America?

24       A    That's correct.

25       Q    Okay.  If you look at the chart you

1   prepared, which is on 58, which is part of

2   Exhibit 5, in the first chart you have

3   eliminate the region head.  That would be you.

4   Correct?

5        A    That's correct.

6        Q    Okay.  And you're suggesting that as

7   a proposal retaining both Rohach and Weinstein.

8   Is that correct?

9        A    That is correct.

10       Q    And both Rohach and Weinstein were

11  both younger than you, weren't they?

12       A    That's correct.

13       Q    Okay.  Notwithstanding the fact that

14  they were younger than you, you felt that one

15  scenario would see you leave and the two

16  younger people stay on?

17       A    And they would report to corporate,

18  yes.

19       Q    And by "corporate," what did you

20  mean?

21       A    Tal Zorman.  Or -- or whoever became

22  the global head of Total Rewards.  Again, it

23  was not clear that Tal was permanently going to

24  be the head of Total Rewards.  It was simply

25  the fact that Ron was leaving and the duties

Page 175

1   were then shifted to her and the tenure for the

2   shift was never disclosed.  It could have been

3   temporary.

4        Q    And on the same org chart you have

5   instead of eliminating the region head,

6   eliminate the compensation head and that would

7   have been Miriam Weinstein.

8        A    That is correct.

9        Q    So there were at least three

10  scenarios that you painted for Ms. Zorman to

11  choose from?

12       A    That is correct.

13       Q    Okay.  And in all of the scenarios,

14  Rohach stays on?

15       A    That is correct.

16       Q    And in one of the scenarios, you

17  leave?

18       A    That is correct.

19       Q    So when you send this to her, does

20  she respond and talk to you about the options

21  that you've painted?

22       A    No.

23       Q    No follow-up at all?

24       A    I didn't say that.  I believe you

25  have emails in your files that say thank you --

Page 191

1        A    I don't believe so.  I believe Edu

2   took charge of that.  They hadn't been decided

3   at the time that -- that my termination

4   happened.

5              MR. RAPPOPORT:  Let he show you what

6   I'm marking as Keuch Exhibit 6, which is Bates

7   stamped Keuch 183.  And it's a letter dated

8   January 9, 2018.

9              MR. SHEMTOB:  Seven.

10             MR. RAPPOPORT:  Seven.  I'm sorry.

11             (Keuch Deposition Exhibit No. 7 was

12   marked for identification.)

13             BY MR. RAPPOPORT:

14        Q    Do you recall receiving this letter?

15        A    I -- I do.

16        Q    Was it received by mail?

17        A    That I -- I -- I don't recall.  It

18   was a large package.  So I'll assume it was

19   received by mail but I don't -- I don't recall.

20        Q    And it would -- is that your

21   separation date, does it not?

22        A    Yes.

23        Q    And that was March 18 of 2018?

24        A    Yes.  Well -- yes.

25        Q    You were paid through that date, were

1  you not?

2       A    Yes, I was.

3       Q    And the targeted last day of work as

4  set forth in the first paragraph was

5  February 23 of 2018.  Isn't that correct?

6       A    That's correct.

7       Q    Now, you testified earlier this

8  morning that other people being separated were

9  not expected to continue to work was active

10 employees.  Is there a reason why you were

11 expected to do so?

12      A    I believe that because of the lack of

13 experience and qualifications that Mr. Nasi

14 had, that they wanted me to stay on board and

15 make a smooth transition.

16      Q    What is the basis of that answer, who

17 told you that was the reason that they wanted

18 you had to stay on board?

19      A    That was a conversation that I had

20 with Tal Zorman.

21      Q    When was that conversation?

22      A    Sometime after January 2nd because

23 that's how the February 23rd date got set.

24      Q    So sometime after January 2nd, but

25 before February 23rd, you had still another

Page 200

1   Rohach.  And it would have been in -- in March.

2        Q    You stopped work in February but you

3   kept in touch with Diane Rohach?

4        A    I did.

5        Q    And did she tell you that?

6        A    She did.

7        Q    Well, I didn't finish my question.

8   What did she tell you as it relates to

9   Mr. Nasi?

10       A    She simply told me that he was -- he

11  had been promoted to a grade 16, senior

12  director.

13       Q    Was that bothersome to you?

14       A    Yes.

15       Q    Why?

16       A    I knew from the start that if Teva

17  had used their global grading system and

18  established the grade for the new job or the

19  revised position or the shortened position of

20  Total Rewards for now North America, that it

21  would not have come up as a grade 15.  It's

22  also very uncommon to have a 15 reporting to a

23  15, which Miriam was a grade 15.

24       Q    You had an expectation that at some

25  point in time, he would be evaluated as a labor

1    grade 16?

2         A    I felt that the labor grading system

3    was basically administer -- manipulated to

4    basically get rid of me.

5         Q    Can you explain your answer?

6         A    It's quite simple.  If you run that

7    job through the grading system, you would not

8    come up -- have come up with a 15.  But by

9    making it a 15, it was a two-grade reduction,

10   which gave Teva much more clarity that I -- I

11   wouldn't accept the two-grade deduction and

12   maybe more of a legitimate claim, but then once

13   I was gone, they moved it to a 16.  It seems a

14   little bit deceptive.

15        Q    Are you speculating or did someone

16   share with you that that was in fact the

17   scheme?

18        A    A little -- I'm speculating.

19        Q    You have no real evidence to support

20   your speculation, do you?

21        A    I think if you ran the system, you

22   would find that it was not being used

23   accurately, that it was being manipulated to

24   get whatever senior leadership wanted to get

25   out of it at least in the HR organization.

Page 1

IN THE UNITED STATES DISTRCIT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA


RANDOLPH W. KEUCH,           )
                             )
        Plaintiff,           )
                             )
vs.                          ) Case No. 2:19-CV-05488
                             )
TEVA PHARMACEUTICALS USA,    )
INC. and TEVA PHARMACEUTICAL)
INDUSTRIES, LTD.,            )
                             )
        Defendants.          )



        VIDEOCONFERENCE DEPOSITION OF EDUARDO NASI,

   taken on behalf of the Plaintiff, pursuant to

   Notice, on Monday, June 13, 2022, commencing at

   1:00 p.m., all parties appearing remotely via

   Microsoft Teams, before Janice D. Burness,

   Registered Professional Reporter, Certified Court

   Reporter, and Notary Public.



Page 30

```
 1            Did you have any conversations with her as
 2    to what Randy's long-term goals were either on the
 3    21st or the 22nd?
 4        A.   Not on the 21st, and not about what would
 5    happen to him.  But I asked her if I could talk to
 6    him about me taking the North American position;
 7    that was the only thing that I asked.
 8        Q.   What did she say to that?
 9        A.   To leave that to her and Dan Lawlor.  They
10    would communicate anything about any change.
11        Q.   So they told you not to talk to Randy
12    about it.
13        A.   Correct.
14        Q.   Did you ask why you couldn't talk to Randy
15    about it?
16        A.   No.  I understood why I shouldn't.  So ...
17        Q.   When you talked to her on 22nd, did you
18    give her an answer as to whether or not you would
19    be willing to undertake that responsibility for
20    heading up North America Total Rewards?
21        A.   I said that I would have to talk to my
22    wife because that would involve relocation.
23    Right?  I said that I was really excited about the
24    opportunity, but I need to talk to my wife first.
25            That's when I sent the email to her, I
```



Page 31

1    would say, on December 24th saying that we were

2    okay, you know, with the relocation, so I would

3    take the position.

4        Q.   Do you know what time of day that that

5    conversation took place?

6        A.   Between me and who?  My wife or --

7        Q.   No, with Tal.

8        A.   I would say in the morning our time.

9        Q.   Okay.  What time in the morning?  Do you

10   know?

11       A.   I don't remember.  I do believe it was in

12   the morning.

13       Q.   Give me just a moment.

14       A.   Sure.

15       Q.   I'd like you to look again in the pile of

16   documents marked as Teva documents, and

17   specifically that which is marked -- that which is

18   marked Teva 581.  Again, it's right near the top

19   of the documents.

20       A.   Okay.

21       Q.   Maybe ten down.

22       A.   Okay.

23       Q.   Do you know what, go two up from that and

24   look at 579.  I'd like you to pull out 579 through

25   581.



1    Q.   When did it become clear to you that you

2    had to move, in context, close to the North Jersey

3    location?

4    A.   Since December 21st, 22nd.

5    Q.   As opposed to the Pennsylvania location,

6    correct?

7    A.   Oh.  No.  So since the beginning of

8    December I knew that I would have to relocate.

9         Honestly, I can't recollect at what point

10   or time I would have to be in Parsippany not in

11   North Wales.  I think even in March -- there is a

12   higher chance that I would be in Parsippany.

13        So yes, probably in March there was some

14   kind of announcement or communication saying that

15   we would be in Parsippany and not in North Wales.

16   Q.   At that time you were living in the

17   Fort Lauderdale area?

18   A.   Yes.

19   Q.   Specifically where, what town?

20   A.   Miramar.

21   Q.   And in Miramar did you own the family

22   home?

23   A.   Yes.

24   Q.   And when it was sold, what was the value

25   of that home?



Page 79

```
 1                 (A recess was taken.)
 2            MR. EPSTEIN:  I'm sorry to disappoint you,
 3       Mr. Nasi, but I have no further questions.
 4            MR. RAPPAPORT:  That was an opportune
 5       break.  I have some questions, so I won't be
 6       disappointing you.
 7            MR. EPSTEIN:  I assumed that you would.
 8            MR. RAPPAPORT:  Thanks, Al.
 9                      EXAMINATION
10  BY MR. RAPPAPORT:
11       Q.   When you worked for Teva and were
12       responsible for what you call LatAm, which I guess
13       is Latin America, who was your employer at that
14       time?
15       A.   What do you mean?
16       Q.   Were you employed by Teva USA?
17       A.   Yes, Teva USA.  Everybody based in the
18       U.S. was basically Teva USA.
19       Q.   And is Teva a wholly owned subsidiary of
20       TPI?
21       A.   Yes.
22       Q.   And is it in the same business that TPI is
23       in?
24       A.   Yes.
25       Q.   And how would you describe TPI's business?
```



Page 80

```
 1      A.   It's a pharmaceutical.  Right?  So in both
 2   generics and speciality and also biologics.  We
 3   have a large, let's say, spectrum of different TAs
 4   and products across the globe.
 5      Q.   Does it both manufacture and market these
 6   products?
 7      A.   Yes.
 8      Q.   And are there different therapies that it
 9   has responsibility for?
10      A.   Yes.
11      Q.   Can you identify what those therapies are,
12   as many as you can recall?
13      A.   Oncology, respiratory, CNS, neuro,
14   neuroscience, psychiatric.  So there is a range of
15   different TAs.
16      Q.   Now, Mr. Keuch was the person who was
17   primarily responsible for hiring you?
18      A.   Yes.
19      Q.   And do I understand that you had a prior
20   relationship with him?
21      A.   Yes.  Correct.
22      Q.   And where did that relationship begin?
23      A.   When I was with Mercer already in the U.S.
24   So probably around 2010, '11.  I was with Mercer,
25   and I was responsible for the compensation
```



Page 82

```
1        Q.   And had Mr. Keuch been in the Teva
2   position for a long period of time before he hired
3   you?
4        A.   I can't recall when Randy did start at
5   Teva, but I would say it was also in 2014.  So it
6   was not a long time before hiring me.
7        Q.   So you both were hired by Teva in 2014?
8        A.   I would say yes.
9        Q.   And was Mr. Keuch responsible for
10  designing and overseeing compensation and benefits
11  policies for U.S., Canada, and Latin America?
12       A.   Yes.  Correct.
13       Q.   And did Latin America include Mexico?
14       A.   Yes.
15       Q.   Okay.  You responded to some questions
16  that Mr. Epstein asked you by referring to labor
17  grades.
18            What was your first labor grade at Teva?
19       A.   15.
20       Q.   And what's the scale?  What's the lowest
21  and what's the highest number?
22       A.   So we have very low-level jobs, a Grade 1
23  or 2, depending on the area.
24            We can go up to 23, globally speaking.
25            In the U.S. we have a maximum of 22, but
```



Page 83

```
 1    we don't really touch those because these are
 2    really executive management.
 3            So I would say up to 20 it is what we
 4    manage in general.
 5    Q.    And do the labor grades match up with
 6    certain job titles?
 7    A.    Yes.
 8    Q.    So starting at 15, can you tell me what
 9    the labor grade is and what the associated job
10    title would be.
11    A.    So 15 is director.  Senior director we
12    have two different grades, so 16 and 17.  VP would
13    be 18.  And then for senior VPs we have 19, 20.
14            And we don't currently have anyone, but it
15    could go up to 21 as well.
16    Q.    Before you heard the announcement that you
17    testified to, had there been any speculation or
18    discussions or gossip or rumors during the course
19    of 2017 with respect to Teva's financial
20    condition?
21    A.    We lost our CEO, the previous CEO, I would
22    say, February, March, 2017.  So we stayed pretty
23    much the entire year without a CEO.  It was an
24    intervening guy from the board.
25            So, yes, everybody was somehow afraid or
```



Page 84

```
 1      interested to know what was going to happen
 2      throughout the year.
 3              And then of course, as you said, with Kåre
 4      it became clear that, you know, changes were going
 5      to happen as soon as possible.
 6      Q.   Were you expecting reductions before you
 7      heard that reductions were coming?
 8      A.   No.  I think we had some hire freezings
 9      during 2017 due to the business situation.
10              But I can't recall right now if there were
11      any talk about reductions, you know, before Kåre.
12      Q.   How about discussions about bankruptcy?
13      Were they being discussed within the Teva
14      community?
15      A.   Not at my level at least.
16              And of course we were in the news after
17      that with Kåre, et cetera, but not that I was
18      aware of prior to Kåre's arrival.
19      Q.   When Kåre joined the company in late 2017,
20      did he share with the Teva community that
21      bankruptcy was a potential?
22      A.   Yes, if we didn't do a big, big
23      restructuring, cost savings.
24              I think especially there was a lot of
25      pressure from the Israel government, et cetera,
```



Page 85

1    why he was taking that approach at the time.

2        Q.    Okay.   Did you ever have any concern that

3    your job could be lost?

4        A.    From the Latin America perspective, yes.

5        Q.    And when you talked to Tal Zorman in

6    December of 2017, was that the first time you had

7    ever spoken to her?

8        A.    I would say probably, yes.  I don't think

9    there was any reason why as a Total Rewards LatAm

10   I would have talked to Tal before that.

11       Q.    Did you know who she was or what she did?

12       A.    Yes.

13       Q.    Was she new in her role?

14       A.    Yes.   As the global talent management

15   person, yes.

16       Q.    Who did she replace?

17       A.    We had three different COEs; one for Total

18   Rewards, one for L&D, one for talent acquisition

19   and global mobility, and her position combined all

20   of those COEs.

21            So it was somehow a new position, but she

22   replaced Ron Yaniv.  And I can't recall the name

23   of the guy who is leading talent acquisition right

24   now.

25       Q.    And what is a COE?



**MAGNA**
LEGAL SERVICES

```
1        - - - - - -
            E R R A T A
2        - - - - - -

3

4  PAGE  LINE      CHANGE  FROM            CHANGE TO              REASON

5  ____  ____  _____ See Attached Errata Sheet _____

6  ____  ____  _____    _____    _____

7  ____  ____  _____    _____    _____

8  ____  ____  _____    _____    _____

9  ____  ____  _____    _____    _____

10 ____  ____  _____    _____    _____

11 ____  ____  _____    _____    _____

12 ____  ____  _____    _____    _____

13 ____  ____  _____    _____    _____

14 ____  ____  _____    _____    _____

15 ____  ____  _____    _____    _____

16 ____  ____  _____    _____    _____

17 ____  ____  _____    _____    _____

18 ____  ____  _____    _____    _____

19 ____  ____  _____    _____    _____

20 ____  ____  _____    _____    _____

21 ____  ____  _____    _____    _____

22 ____  ____  _____    _____    _____

23 ____  ____  _____    _____    _____

24 ____  ____  _____    _____    _____
```

**www.MagnaLS.com**                                    **866−624−6221**

Seven Penn Center
1635 Market Street – 8th Floor
Philadelphia, PA 19103

1    ACKNOWLEDGMENT OF DEPONENT

2
          I, _Eduardo Nasi Cheide da Graca_ , do
3    hereby certify that I have read the
     foregoing pages, 1 - PGS, and that the
4    same is a correct transcription of the
     answers given by me to the questions
5    therein propounded, except for the
     corrections or changes in form or
6    substance, if any, noted in the attached
     Errata Sheet.
7
8    _Eduardo Nasi Cheide da Graca_ 06/18/2022
     WITNESS NAME            DATE
9

10

11

12

13

14

15

16

17

18

19

20

21

22

**www.MagnaLS.com**                    **866-624-6221**

Seven Penn Center
1635 Market Street – 8th Floor
Philadelphia, PA 19103

JOINT APPX - 0358

## Eduardo Nasi Cheide da Graca Deposition Transcript Errata

| Page | Line | Correction | Reason |
|------|------|------------|--------|
| The deponents correct legal name should be changed to Eduardo Nasi Cheide da Graca | | | |
| 11 | 21-22 | Change "they had accounts that" to "the headcounts" | Transcription Error |
| 13 | 12 | Change "intervening" to "interim" | Transcription Error |
| 17 | 15 | Change "patient" to "pension" | Transcription Error |
| 34 | 11 | Change "joking even with friends" to "joke even with Randy" | Transcription Error |
| 34 | 15 | Change "change" to "manage" | Transcription Error |
| 38 | 16 | Change "change" to "move" | Transcription Error |
| 41 | 10 | Change "to Mexico" to "domestic" | Transcription Error |
| 41 | 23 | Change "vetted" to "checked" | Transcription Error |
| 42 | 12 | Change "commutation" to "documentation" | Transcription Error |
| 45 | 16 | Change "will" to "would not" | Transcription Error |
| 53 | 1 | Change "work counts" to "works councils" | Transcription Error |
| 53 | 3 | Change "Karolina Bloch" to "Karolina Block" | Transcription Error |
| 53 | 7 | Change "Ms. Bloch" to "Ms. Block" | Transcription Error |
| 59 | 5 | Change "lose" to "reduce" | Transcription Error |
| 59 | 15 | Change "Jen" to "Jan" | Transcription Error |
| 67 | 21 | Change "real-world" to "real global" | Transcription Error |
| 70 | 6 | Change "people" to "person" | Transcription Error |
| 75 | 24 | Change "author's" to "auditor" | Transcription Error |
| 83 | 24 | Change "intervening" to "interim" | Transcription Error |

JOINT APPX - 0359