IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| RANDOLPH W. KEUCH : | |
|         Plaintiff, : | CIVIL ACTION |
| v. : | |
| TEVA PHARMACEUTICALS USA, INC., : | CASE NO. 2:19-CV-05488 (JMG) |
| And TEVA PHARMACEUTICAL : | |
| INDUSTRIES, Ltd., : | |
|         Defendants. : | |

**PLAINTIFF'S COUNTERSTATEMENT OF MATERIAL FACTS
IN SUPPORT OF HIS RESPONSE IN OPPOSITION TO
<u>DEFENDANT'S MOTION FOR SUMMARY JUDGMENT</u>**

      Plaintiff, Randolph W. Keuch ("Keuch" or "Plaintiff"), submits this Counterstatement of Undisputed Material Facts in further Support of his Response in Opposition to Defendants' Motion For Summary Judgment on all counts of Plaintiffs Complaint as follows:

      1.      On March 15, 2021, Plaintiff Randolph W. Keuch ("Keuch" or "Plaintiff") filed his Amended Complaint against Teva Pharmaceuticals USA, Inc. ("TUSA") and Teva Pharmaceuticals Industries, Ltd. ("TPI") (collectively "Teva" or "Defendants") pursuant to the applicable provisions of the federal Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621, *et seq.* and the Pennsylvania Human Relations Act ("PHRA"), 43 P.S. §§ 951 *et seq.* *See* generally the Docket Report, Joint Appendix ("JA"), 0360-0369; Amended Complaint, ¶ 1, (JA 0370) as admitted in ¶ 1 of the Answer of TUSA, (JA 0388) and in ¶ 1 of the Answer of TPI, (JA 0404).

      2.      Plaintiff brought this action with the intention of remedying past discrimination against him affected by and at the overall direction of TPI CEO Kare Schultz ("Schultz") and Marc Sabag ("Sabag") and affected specifically by TUSA Human Resources Director Daniel

1

Lawler ("Lawler") and TPI Integrated Management head Tal Zorman ("Zorman") as it relates to the decision to select Keuch for termination and replace him with a substantially younger, far less credentialed and far less qualified individual who was previously Plaintiff's direct report. Amended Complaint, ¶ 3, (JA 0370) as admitted in ¶ 3 of the Answer of TUSA (JA 0388) and in ¶ 3 of the Answer of TPI, (JA 0405).

3. Keuch has exhausted all administrative remedies and has taken all other steps necessary to bring this action before this Court, having filed a timely Charge of age-based discrimination in employment with the Equal Employment Opportunity Commission [EEOC Charge No. 530-20804759] which was cross-filed with the PHRC and having received the requisite Notice of Suit Rights within 90 days of the time the original Complaint was filed in this Court. Amended Complaint, uncontested ¶ 6 (JA 0371).

4. Plaintiff Randolph W. Keuch was born on May 27, 1954 and is currently 68 years of age. Amended Complaint at 119 (JA 0372) as admitted in the Answer of TUSA at ¶ 9 (JA 0390) and in the Answer of TPI at ¶ 9 (JA 0406).

5. Plaintiff and his wife Mary have raised eight children, of which seven are adopted and three have special needs. (JA 1264).

6. Plaintiff was employed by Teva as Senior Director of Total Rewards (compensation and benefits) for the Americas. Amended Complaint at ¶ 10 as admitted in the Answer of TUSA at ¶ 10 (JA 390) and in the Answer of TPI, at ¶ 10 (JA 0406).

7. Plaintiff was last employed by Teva as Senior Director of Total Rewards (compensation and benefits) for the Americas. Sworn Affidavit of Plaintiff (Plaintiff's Aff.,) ¶ 5, (JA 1265).

8. From the inception of his employment in January 2014, Plaintiff worked at the Teva U.S. Headquarters in North Wales, Pennsylvania. Plaintiff's Aff., at ¶ 6 (JA 1265).

9. Plaintiff is a nationally recognized leader in the complex field of worker compensation and benefits. Plaintiff's Aff., at ¶ 7 (JA 1265).

10. Prior to becoming employed by Teva in January 2014, Plaintiff was employed by: the H.J. Heinz Company (V.P. Total Rewards, 2005-2013); The Hartford (AVP, Compensation-P&C Division, 2004-2005); Pfizer, Inc. (Corporate Director, Strategic Rewards and Director, Pfizer Consumer Group Compensation, 1998-2004); and SmithKline Beecham (Corporate Director, Compensation Strategy and Director, Human Resource Planning, Systems and Compensation,1994-1998). Plaintiff's Aff., at ¶ 8 (JA1265).

11. Plaintiff is the recipient of both a Bachelor of Science degree (BS, Industrial and Organizational Psychology, with Honors and Thesis) and a Masters of Science degree (MS, Applied Psychology) from the Stevens Institute of Technology and have also completed courses and programs in Human Resource Management (George Mason University) and Leadership (Harvard University School of Business). Plaintiff's Aff., at ¶ 9 (JA 1265).

12. Plaintiff was hired at Teva by Leslie Billow, the head of North American Human Resources and Global Senior Vice President Yonit Landskroner in 2014. Those decision makers were no longer employed when my employment was terminated years later. Plaintiff's Aff., at ¶10 (JA 1266)

13. While employed by Teva, Plaintiff led the Total Rewards Region for the Americas, providing subject matter expertise for and cutting-edge solutions to all facets of total rewards issues relating to all employees in the United States, Canada and all South American countries. Plaintiff's Aff., at ¶ 11 (JA 1266)

14. With the help of the team that Plaintiff led, he achieved notable results for Teva including the following:

- Secured recognition in 2016 and 2017 by NBGH (National Business Group on Health) and *Fortune Magazine* as one of Best Employers for Healthy Lifestyles
- Successfully integrated three (3) major acquisitions in the Americas Region (Rimsa-Mexico, Actavis-Global, and Anda-US)
- Developed and launched a global recognition program
- As a U.S. issuer, contributed to SEC proxy aspect for U.S. based NEOs
- Established a relationship with Amwell senior management to provide virtual medical care (telemedicine) and virtual behavioral care to all Teva employees at no cost to the employee and no cost to Teva for a period of 5 years
- Developed and launched an innovative Total Rewards Portal for all U.S. and Canadian Employees
- With responsibility for $1.2 billion in retirement fund assets and an annual spend of $220 million for health care, I developed and implemented a rolling three-year benefits strategy for the United States employees that saved over $30,000,000 in 2015, 2016 and 2017, while driving employee knowledge and positive perspective on their benefits to levels that are twenty percent (20%) above the norm for high performing companies
- Developed and implemented pay alignment strategies for the U.S. and Canada resulting in a significant decline in turnover and improved new hire acceptance ratios designed and approved all sales compensation programs and contests within North America
- Implemented the Willis Towers Watson Global Grading System and their REWARD tool throughout the region

Plaintiff's Aff., at ¶ 12 (JA 1266).

15. Plaintiff's industry wide credentials include Certification as an Executive Compensation Professional, Honors including the American Compensation Association Lifetime Achievement Award, Service on the Board of Directors for the National Business Group on Health (2010- 2014), Service on the Customer Advisory Board for Fidelity Investments (2009-2013), Chair of the Executive Compensation Advisory Board for WorldAtWork (2008-2011), and an Adjunct Professorship at Trenton State University. Plaintiff's Aff., at ¶ 13 (JA 1266-67)

16. Defendant, TPI is an Israeli publicly held (NYSE) multinational pharmaceutical company headquartered in Petah Tikva, Israel. Incorporated in Israel in 1944, it is the successor to a number of Israeli corporations, the oldest of which was established in 1901. (JA 0782).

17. It is a global pharmaceutical company that heralds a commitment to access to healthcare around the world manufacturing world-leading genetic and specialty medicines. It

4

specializes primarily in generic medicines, but its other business interests include active pharmaceutical ingredients and proprietary pharmaceuticals. (JA 0782)

18. It is the largest generic drug manufacturer in the world, leveraging its portfolio of more than 1800 molecules to produce a wide range of generic products in every therapeutic area; it is one of the fifteen (15) largest pharmaceutical companies Global. Amended Complaint at ¶ 8 (JA 0374) as admitted in the Answer of TPI at ¶ 8 (JA 0407); (JA 0782-83); (JA 0785).

19. At all times applicable to Plaintiff's employment, Teva employed over 57,000 people around the world, 10,000-14,000 of whom were employed in the United States. (JA 1267).

## Historical Events Leading to the Drastic Workforce Reductions

20. In August 2016, TPI completed its $40.5 billion acquisition of Allergan's generic drug business Actavis, requiring Teva to take out extensive loans. Further regulatory demands saw Teva sell some of Actavis' most profitable and low-competition products, reducing much of the acquired company's profitability. (JA 0815); (JA 0878); (JA 1268).

21. At the same time, consolidation of buyers and greater regulatory fast-tracking of generics for Teva's competitors hurt Teva's cash flow both by sending generic drug prices plummeting and by leading to approval of generic versions of Teva's two-decade-long main revenue producing, brand name multiple sclerosis drug, Copaxone. (JA 0812); (JA 0922-23), Plaintiff's Aff., at ¶ 20 (JA 1267); (JA 0499).

22. Resulting consecutive quarters of lowered financial outlook and diminished reported and forecasted revenues casted doubts in the marketplace of Teva's ability to adequately carry the debt load caused by the above circumstances, leading to lowered credit ratings, negative views from investors and stocks spiraling down to a fifteen-year low. Plaintiff's Aff., at ¶ 21 (JA 1268); (JA 0815); JA 0860).

5

23.     Additionally, in early 2017, TPI was forced to pay fines to the United States Department of Justice ("DOJ") and the Securities and Exchange Commission ("SEC") totaling in excess of $520 Million to resolve federal violations of the Foreign Corrupt Practices Act ("FCPA") (Amended Complaint at ¶ 32 (JA 0377) as admitted in Answer of TPI at ¶ 32 (JA 0409) arising from bribery charges relating to its operations in Russia, the Ukraine and Mexico. Plaintiff's Aff., at ¶ 22 (JA 1268).

24.     Other lawsuits compounded these issues that was of concern to the investment community (JA 0814).

25.     These circumstances led to the hiring of Kare Schultz as the President and CEO of TPI who was faced with creating an immediate strategy to bolster investor confidence and thereby raise the price of Teva stock. *See* generally comments to investment community of Kare Schultz to investors (JA 0496-511).

26.     Contrary to the Defendants' statement through the testimony of Eduardo Nasi that the cuts were about avoiding bankruptcy, the actual impetus for the reduction of force and other actions ordered by Kare Schultz and implemented through Human Resources Vice President Mark Sabag, Human Resources head Daniel Lawler and newly promoted Tal Zorman were raising stock price, soothing the investor community and planning for the future . *See* generally comments to investment community of Kare Schultz to investors (JA 0496-511)

27.     Kare Schultz became the President and CEO of TPI in 2017 [Amended Complaint, ¶ 25 (JA 0376) as admitted in the Answer of TPI at ¶ 25 (JA 0408); (JA 1008); (JA 0985)..

28.     Schultz chose to implement dramatic actions that would sooth the investment community and meet those goals. (JA 0500); (JA 9782-83); (JA 0985); Plaintiff's Aff., at ¶ 24 (JA 1268).

29.     At Schultz's direction and with the approval of Teva's Board, TPI suspended dividends on its common stock, ordered that no annual bonus payments be made to employees

6

for the year 2017 and announced a reduction in its employment force of 14,000 people, including 25% of the TUSA workforce. (JA 0499); (JA 0782-83); (JA 0817-18); (JA 0834); Plaintiff's Aff., at ¶ 25 (JA 1268).

30. Despite the imposition of these Draconian measures to save the investment image of Teva on the backs of its employees, and evidencing that the reductions in head count were not really based on Teva's economic condition, Schultz received a five year contract promising tens of millions of dollars salary and benefits in part depending on his ability to raise the stock price, as well as a Twenty Million Dollar ($20,000,000) cash payment included in his contract and entitlement to a performance-based target incentive bonus of 140% of his annual base salary. (JA 1006-1009); Plaintiff's Aff., at ¶ 26 (JA 1268).

31. In fact, in 2017, the median annual pay of Teva's employees was $64,081 compared with Schultz's contractually obligated total yearly compensation and bonuses in amounts of tens of millions of dollars. Plaintiff's Aff., at ¶ 29 (JA 1269).

32. Compensation levels for the other executives that caused the problems for Teva that led to the decision to affect the reductions in the workforce also did not abate. Teva's senior management continued to receive inflated salaries and bonuses. The Actavis deal's engineer, Erez Vigodman who stepped down as CEO in February 2017, continued to receive a salary of One Million Four Hundred Fifty Thousand Dollars ($1,450,000) for the next several months and a bonus of Two Million Dollars ($2,000,000). Interim CEO Yitzhak Peterburg, who replaced Vigodman, received a salary of nearly ten million dollars for just the eight months he served in that capacity. (JA 1006-09); Plaintiff's Aff., at ¶¶ 31 and 32 (JA 1269).

33. Contrary to the newly hired leaders of Teva, Plaintiff was consistently honored as having added to the success of Teva: in 2015, prior to Schultz's hiring, he had over his entire career been rated as meeting and exceeded the expectations and goals set by his supervisors; he received a significant increase in base salary and a $60,000 retention bonus in recognition of his

7

value to the Company and to prevent him from accepting employment elsewhere; and from the time of his initial employment in 2014 until his discharge from Teva, the Americas Region which he supervised successfully and seamlessly added approximately 6000 employees in the United States, Canada, Puerto Rico and Latin America due to the acquisition of the large pharmaceutical manufacturer Actavis, added seamlessly supervised another 600 from Teva's acquiring the drug company Anda, and successfully welcomed another added approximately 1000 more in Mexico from the acquisition of Rimsa.  Plaintiff's Aff., at ¶ 35,(JA 1269-70).

   34. Plaintiff was always considered a valuable managerial asset and my leadership permitted TUSA to experience properly planned and lawful long-range compensation and benefits savings equaling tens of millions of dollars. Plaintiff's Aff., at ¶ 36 ( JA 1270).

   35. Important in the current allegations of discrimination in this action, during Plaintiff's employment, he witnessed many actions that evidenced a clear age-related bias by the company and its head of North American Human Resources, Daniel Lawler, whose proffered opinions of Plaintiff were the guidance that led to Tal Zorman's promotional and termination decisions. In each of the following circumstances, Daniel Lawler was the driving force of the clear age-bias that he witnessed:

- With Mr. Lawler's aid and direction, Teva frequently implemented compensation policies that disfavored older workers like Plaintiff who were reaching retirement age;
- That systemic, unlawful approach was reflected in unannounced changes in the Teva 2015 Stock Plan that revised the 2010 Plan by conditioning full vesting on ten years of service when the employee reaches 65 years (five years more than the earlier plan versions that previous set the bar at age 65 plus 5 years of service);
- Age bias was also evidenced in the raising of the age of retirement in the 2010 and 2015 equity plans to age 55 for those employees who had fifteen (15) or more years of service as compared to the previous policy of the rule of 70 that permitted retirement at any

8

- combination of age and service that equaled. Moreover, that later policy-change also negatively impacted the equity compensation of older employees;
- In addition, Teva initiated a punitive severance plan in 2017 that reduced all severance paid to US employees by Teva by the amount of unemployment compensation benefits that they were lawfully entitled to, once again creating savings by taking income away from employees.

Plaintiff's Aff., at ¶¶ 37-42 (JA 1270-71).

36. At the same time, TUSA HR leader Daniel Lawler, openly demonstrated his discriminatory view of older employees. Espousing the belief that those over age 62 would no longer be employable and therefore should not apply for unemployment compensation benefits, he incredulously elected to establish an exemption for those age 62 or older because he believed that they were no longer employable in the workforce. This exemption prevented those terminated employees age 62 or older from applying for unemployment benefits and enjoying the tax savings provided younger employees. Plaintiff's Aff., at ¶ 43 (JA 1271).

37. Plaintiff also witnessed an age bias in the hiring of employees by Mr. Lawler.

38. An example of his discriminatory animus was the rejection by him of a candidate working as a contractor on my team who had been fully approved for hire by the TUSA HR team, based upon his clearly discriminatory view that at her more advanced age she did not have "long term potential". Plaintiff's Aff., at ¶¶ 44-45 (JA 1271).

39. Additionally, the promotion of Lauren Benner in her 20's replacing Daniela Shea (then in her late 40's) as the Director of HR Services instead of Elaine McGee (then age 46) in 2017 ordered by Danial Lawler is further indicative of his age-based animus. Plaintiff's Aff., at ¶ 46 (JA 1271).

40. In connection with the layoff process, Tal Zorman (mid 40's) was given a new comprehensive job and title and was charged with the responsibility to affect the target 50%

9

downsizing of all senior worldwide Human Resources related cuts in headcount. (Plaintiff's Aff., at ¶ 49 (JA 1272).

41. Plaintiff had no extensive work experience with Ms. Zorman prior to that time and she had no supervisory responsibility for the Americas Total Rewards group, including Plaintiff or Eduardo Nasi prior to the reduction in force. Plaintiff's Aff., at ¶ 50 (JA 1272).

42. Before making her decision regarding Plaintiff's continued employment, Ms. Zorman had not reviewed Plaintiff's Job Position Statement or reviewed Eduardo's resume. Plaintiff's Aff., at ¶51 (JA 1272).

43. Additionally, Ms. Zorman stated that she was not aware of Plaintiff's job history or the honors, bonuses or accolades I had received as a Teva Senior Director of Total Rewards. Plaintiff's Aff., at ¶ 52 (JA 1272).

44. As part of this investor relations effort to cut jobs in December 2017, Plaintiff outlined several alternate proposals that would meet the expressed needs of Teva to affect the reductions in force while not breaking the laws of the countries and states where Total Rewards employees were employed. Recognizing that all US terminated employees were eligible for medical benefits under COBRA for 18 months following termination, it was apparent that Plaintiff's Total Rewards team would be responsible for continuing to administer benefits for over 22,000 participants. Plaintiff's Aff., at ¶ 53 (JA 1272).

45. In that outline, Plaintiff even suggested the elimination of his Job Title and Teva's moving him to a more elevated position in Total Rewards that he was well qualified to handle. Plaintiff's Aff., at ¶53 (JA 1272). Ms Zorman merely thanked Plaintiff for his input, did not respond to Plaintiff further and within days advised Eduardo that he would be taking on my duties as the head of North American compensation and benefits. Plaintiff's Aff., at ¶ 54 (JA 1272).

46.     Prior to any decisions being made, Plaintiff also advised Ms. Zorman, that Eduardo had very little knowledge of compensation and benefits for persons employed by Teva in the United States and Canada who comprised forty-three percent (43%) of all Teva employees (JA 0858); Plaintiff's Aff., at ¶ 56 (JA 1273).

47.     Plaintiff was not aware that just days after he had communicated with her regarding his retention or elevation, Ms. Zorman offered Plaintiff's job to Eduardo. Plaintiff's Aff., at ¶ 57 (JA 1273).

48.     On January 2, 2018, Plaintiff was first advised that his employment would be terminated without any opportunity to accept a demotion to carry on the job given to Eduardo and carry on his North American compensation and benefits job duties that would be carried out by Eduardo. Plaintiff's Aff., at ¶ 58 (JA 1273).

49.     Plaintiff's termination became effective March 18, 2018. Plaintiff's Aff., at ¶59 ( JA 1273).

50.     The Schedule C attached to the proffered Severance Agreement required in accordance with the federal Older Workers Benefits Protect Act provided to Plaintiff at the end of his employment (an Agreement that Plaintiff refused to sign on the basis of its insufficient and restrictive terms) strongly suggests by the age distributions of terminated and retained employees in the relevant employment sector that age of the employees played a role in the termination and retention decisions that were targeted to be uniformly at 50% in the Human Resources areas:

## Terminated Employees

| Age Group | Number of Employees Not Retained |
|---|---|
| **Over the age of 60** | 2 |
| **Age 50-59** | 23 |
| **Age 40-49** | 9 |
| TOTAL OVER 40 YEARS | 34 |
| **Age 30-39** | 19 |
| **Age 20-29** | 4 |

|                         |     |
|-------------------------|-----|
| TOTAL UNDER 40 YEARS    | 23  |

### Retained Employees

| Age Group              | Number of Employees Not Retained |     |
|------------------------|----------------------------------|-----|
| Over the age of 60     | 0                                |     |
| Age 50-59              | 18                               |     |
| Age 40-59              | <u>5</u>                         |     |
| TOTAL OVER 40 YEARS    |                                  | 23  |
| Age 30-39              | 19                               |     |
| Age 20-29              | 4                                |     |
| TOTAL UNDER 40 YEARS   |                                  | 23  |

(¶ 61, JA 1274)

51. In addition to the apparent age-based imbalance, Plaintiff was not included in the schedule as an employee selected for termination, giving rise to a reasonable inference that the age-based imbalance in terminations further favored younger employees. Plaintiff's Aff., at ¶ 60 (JA 1274).

52. Demonstrating the agist animus of TEVA, Mark Sabag, who set the goals for the company, stated that the guiding purpose for the restructuring was to "set ourselves what is the future…to move forward with our business". Sabag Deposition, p 36: 6-12 (JA 1168).

53. Mr. Sabag also conceded that the total drop in US employees only went from 60% to 55% of worldwide employment, a reduction far less than the projection for a 50% reduction in force. Sabag Deposition, p. 41:19-23 (JA 1689).

54. High level Human Resources employee Elaine McGee contradicted the testimony of Eduardo Nasi of rumors of bankruptcy, stating that she and "everybody I know was surprised" by the corporate announce of downsizing. McGee Deposition, p. 20:9-20 (JA 1200)

55. Ms. McGee further confirmed that no skill-based analytics were provided to supervisors to guide them in making the termination decisions (McGee Deposition, p. 26: 8-13

12

(JA 1201)) and that the company did not engage in its usual analysis of whether there was an age impact from the reduction in force. McGee Deposition, p. 23:4-19 (JA 1202).

56. Ms. McGee also confirmed the view that employees were usually allowed to remain during reductions in force and take a lower-level position. McGee Deposition, pp. 23:18-28: 14 (JA 1202).

57. Plaintiff was replaced by Eduardo Nasi, a South American direct report of Plaintiff's who was and is 27 years younger (Date of Birth: July 22, 1980) and who was 37 years old at the time. Plaintiff's Aff., at ¶ 62 (JA 1274).

58. Eduardo had substantially less experience and less ability to lead a diverse Total Rewards workforce, especially during a time when complex severance benefit issues would be needed to be resolved . Plaintiff's Aff., at ¶ 63 (JA 1274).

59. Eduardo had little or no experience with the complex controlling laws that govern employee compensation and benefits in the United States and Canada, nor had he ever guided the company through a large reduction in force relating to the severance payments due to persons employed in the United States and Canada and governed by the unique and complex laws in each of those countries. In fact, his total professional experience before he joined Teva in 2014 dealt with the laws governing compensation and benefits in South American companies. Plaintiff's Aff., at ¶ 64 (JA 1274).

60. Eduardo also had never had any experience in handling closure matters relating to the WARN law in the United States and had no experience in dealing with claims of discrimination, equal pay or overtime under the laws of the United States. Plaintiff's Aff., at ¶ 65 (JA 1274)

61. Moreover, when he assumed Plaintiff's title of Senior Director and job responsibilities at the discretion of TPI, Israeli-based Tal Zorman (who also had little experience in Total Rewards for the United States and Canada), her decision to promote him into Plaintiff's position was apparently guided by only the input of Daniel Lawler. She had not questioned Eduardo regarding his abilities, nor had she reviewed his resume reciting his lack of experience regarding issues that would confront him in his new role. Plaintiff's Aff., at ¶ 66 (JA 1274).

62. Demonstrating that he needed Plaintiff's help and that of others to handle the work, Plaintiff was asked to stay aboard for weeks after he was advised of his termination to help Eduardo with what would have been Plaintiff's job duties if he had been retained. The usual policy is to have terminated employees leave the premises on the same day that they were informed of their termination. Plaintiff's Aff., at ¶ 67 (JA 1274).

63. Following Plaintiff's departure, Teva legal was evidently concerned about Mr. Nasi's depth of knowledge regarding the laws of the United States related to compensation and insisted that he solicit Miriam Weinstein (who had voluntarily left Teva for another job in February because she was advised that she would be demoted as part of the reduction in force) to accompany him to a federal agency audit proceeding regarding compensation issues. At the time Ms. Weinstein, who reported to Plaintiff as a labor grade 15 Director of Compensation for the Americas while she was employed by Teva, was not employed by Teva and was asked to volunteer her time to aid Mr. Nasi to assure that the matter would be handled properly. Plaintiff's Aff., at ¶ 68 ( JA 1274).

64. Despite his inexperience regarding Plaintiff's job duties that he inherited when Plaintiff was fired, Eduardo has received raises and promotions. Plaintiff's Aff., at ¶ 69 (JA 1274).

65. The governing HR policy at Teva required Teva to offer an employee who was advised that he or she would be terminated from their employment to be retained at a one-step

14

lower job level position. Mr. Nasi was a job grade 15 when he accepted the position to Plaintiff's position but was promptly promoted to job level 16 and became entitled to receive the same bonuses and benefits as Plaintiff. But for age discrimination guiding the process, the company could have just allowed Plaintiff to remain in his position instead of giving his job duties to Mr. Nasi who was promptly promoted to a job level 16, a position that Plaintiff would have gladly accepted. Plaintiff's Aff., at ¶ 70 (JA 1274).

66.  Because of the substantial raise Eduardo received after he took over Plaintiff's job duties and title, the frequent travel requirements that caused him to travel to the company headquarters in Pennsylvania twice a month from his home in Florida so Plaintiff could train him and the costly relocation costs in having him move his residence and family from Southern Florida to a home near the company's headquarters, Eduardo's insertion in Plaintiff's position as the Senior Director of North American Total Reward and taking over all of Plaintiff's job duties was more costly to Teva than keeping Plaintiff in that same position. Plaintiff's Aff., at ¶ 71 (JA 1274).

**SPECTOR GADON ROSEN VINCI, P.C.**

By: /s/ *Alan B. Epstein*
Alan B. Epstein, Esquire (Pa. I.D. No. 2346)
Jennifer Myers Chalal, Esquire **(Pa.** I.D. No. 77841)
1635 Market Street, 7th Floor
Philadelphia, PA 19103
(215) 241-8888/(215) 241-8844 (Fax)
aepstein@lawsgr.com
jchalal@sgrvlaw.com
*Counsel for Plaintiff*

Dated: August 16, 2022