# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| RANDOLPH W. KEUCH, | : | |
| Plaintiff, | : | CASE NO. 2:19-CV-05488 |
| | : | |
| v. | : | |
| | : | |
| TEVA PHARMACEUTICALS USA, INC., | : | |
| And TEVA PHARMACEUTICAL | : | |
| INDUSTRIES, Ltd., | : | |
| | : | |
| | : | |
| Defendants. | : | |

## DEFENDANTS' FIRST SET OF DOCUMENT REQUESTS ADDRESSED TO PLAINTIFF REGRADING PLAINTIFF RANDOLPH KEUCH

Pursuant to Rule 34 of the Federal Rules of Civil Procedure, Defendants, Teva Pharmaceuticals USA, Inc. ("TUSA") and Teva Pharmaceutical Industries, Inc. ("TPI" and together with TUSA, the "Defendants"), request Plaintiff to produce the following documents within thirty (30) days from the date of service.

### Definitions

The following definitions are applicable to and incorporated by reference into each production request:

The following definitions are applicable to and incorporated by reference into each production request:

1.      The term "person," as used herein, means any natural person, partnership, corporation, or other business entity and all present and former officers, directors, agents, employees, attorneys and others acting or purporting to act on behalf of such natural person, partnership, corporation or other business entity.

1

2.      The term "Complaint," as used herein, means the Amended Complaint filed in the above-captioned action.

3.      The terms "Plaintiff," "you" and "your," as used herein, mean the named Plaintiff and each person acting or authorized to act on behalf of the named Plaintiff, including but not limited to Plaintiff's counsel.

4.      The term "Defendants," means, TUSA and TPI.

5.      The term "policy," as used herein, means each rule, procedure, or directive, formal or informal, and each common understanding of a course of conduct which was recognized as such by you or other persons acting on your behalf, that was in effect at any time during the period covered by these production requests.

6.      The terms "and" and "or," as used herein, shall be construed conjunctively or disjunctively as required to include within the scope of each discovery request any information that might be excluded by the opposite construction.

7.      The term "identify" or "identity" when used in reference to:

a. An individual or natural person, means to give the person's full name; all known aliases; the present or the last known business and home addresses; present position or business affiliation, and position or business affiliation at all times during the time period covered by the Complaint;

b. Any other "person" as defined herein, means to give the person's official, legal and formal name or the name under which the person acts or conducts business; the address of the person's place of business, profession, commerce or home; and the identity of the person's principal or chief executive officer or person who occupies the position most closely analogous to a chief executive;

c. A document, means to describe specifically the "document," its date, its author (and, if different, the signer or signers), type of document (e.g., "letter"), each addressee and known recipient, its present or last known location and custodian, the manner and date of its disposition if any such "document" was, but is no longer, in your possession or subject to your control, and all other means of identifying it with sufficient particularity to satisfy the requirements for its inclusion in a demand for its production pursuant to a subpoena duces tecum; and

d. A communication, means to identify the pertinent "document" or "documents" if the communication is written, or to identify the participants and set forth the date, manner, place and substance of the communication if it is non-written.

8. The term "document," as used herein, means the original and all copies of any written, printed, typed or other graphic matter of any kind or nature and any other tangible thing in your possession, custody or control, wherever located. Any copy containing thereon or having attached thereto any alterations, notes, comments, or other material not included in the originals or copies referred to in the preceding sentence shall be deemed a separate document within the foregoing definition. The term "documents" includes, but is not limited to:

a. All contracts, agreements, letter agreements, representations, warranties, certificates and opinions;

b. All letters or other forms of correspondence or communication, including envelopes and notes, telegrams, cables, telex messages, electronic communications and other messages, including reports, notes, notations and memoranda of or relating to telephone conversations or conferences;

c.  All memoranda, reports, test results, financial statements or reports, notes, scripts, transcripts, tabulations, studies, analyses, evaluations, projections, work papers, corporate records or copies thereof, expressions or statements of policy, lists, comparisons, questionnaires, surveys, charts, graphs, summaries, extracts, statistical statements or records, compilations and opinions or reports of consultants;

d.  All desk calendars, appointment books, logs and diaries;

e.  All minutes, records or transcripts of meetings and conferences, and lists of persons attending meetings or conferences;

f.  All reports and summaries of interviews and negotiations;

g.  All books, articles, press releases, magazines, newspapers, booklets, brochures, pamphlets, circulars, bulletins, notices, instructions and manuals;

h.  All motion pictures and photographs (whether developed or undeveloped), tape recordings, microfilms, phonographs, tapes or other records, punch cards, magnetic tapes, discs, data cells, drums, print-outs and other data compilations from which information can be obtained; and

i.  Drafts of any document, revisions of drafts of any document and original or preliminary notes.

9.  The term "communications," as used herein, means all statements, admissions, denials, inquiries, discussions, conversations, negotiations, agreements, contracts, understandings, meetings, telephone conversations, letters, correspondence, notes, telegrams, telexes, advertisements, or any other form of written or verbal intercourse.

10.     The term "relate(s) to," as used herein, means constitute(s), refer(s) to, reflect(s), concern(s), pertain(s) to or in any way logically or factually connect(s) with the matter described in the production request.

## Rules of Construction

In construing these production requests:

1.     The singular shall include the plural and the plural shall include the singular.

2.     A masculine, feminine or neuter pronoun shall not exclude the others.

## Instructions

1. To the extent any information for which these production requests call is unknown to you, so state, and set forth such remaining information as is known.  If any estimate can reasonably be made in place of unknown information, also set forth your best estimate, clearly designated as such, in place of unknown information, and describe the basis upon which the estimate is made.

2. To the extent you object to any production request, set forth all reasons for your objection.  If you claim privilege as a ground for not answering any production request in whole or in part, describe the factual basis for your claim of privilege in sufficient detail to permit the court to adjudicate the validity of the claim.  If you object in part to any production request, answer the remainder completely.

3. These production requests shall be deemed continuing and require additional responses if further information is obtained between the time the responses are served and the time of trial.  Such additional responses shall be served from time to time, but not later than 20 days prior to the first date fixed for trial, or immediately upon obtaining such information if it is first discovered thereafter.

4. If you no longer possess a requested document, explain the reason you no longer have it.

5. If a requested document has been destroyed, indicate:

    a. the reason for the destruction;

    b. the date of destruction; and

    c. the identity of the person who destroyed the document.

## REQUESTS FOR PRODUCTION OF DOCUMENTS

1. Each and every document, item, material and thing identified in your Responses to Defendants' First Set of Interrogatories Addressed to Plaintiff Regarding Plaintiff Randolph Keuch

2. All documents that you created and/or maintained as business or personal records, notes and/or diaries, including documentation, e-mails, text messages, notes, records, writings, and video or audio tape recordings, of communications, conversations, and/or discussions with any former or current supervisors, managers, agents, representatives or employees of Defendants, evidencing, supporting, refuting, referring or relating in any way to your claims in this case and/or your alleged employment at Defendants and/or separation from employment.

3. All emails and other documents to or from Kåre Schultz that you have retained.

4. All emails and other documents to or from Tal Zorman that you have retained.

5. All emails and other documents to or from Eduardo Nasi that you have retained.

6. All emails and other documents to or from Daniel Lawlor that you have retained.

7. All emails and other documents to or from individuals who worked in Total Rewards that you have retained.

8. All documents that support, evidence, refute, refer or relate in any way to the allegations in the Complaint.

9.  All documents that support, evidence, refute, refer or relate in any way to the damages and other relief you are seeking in this action, including but not limited to compensatory damages, back pay, front pay, insurance benefits, other benefits, actual damages, damages for pain, emotional distress, suffering and humiliation, punitive damages, attorney's fees, costs and expenses, injunctive relief and all other legal and equitable relief you are seeking.

10. All documents that you submitted to, filed with, sent to, referred to, provided to, or which you received from any administrative agency relating or referring in any way to the allegations in your Complaint against Defendants, including, but not limited to, intake forms, answers to questionnaires, charges, correspondence, notices, notes, memos, records, and statements by you, any witness or other former or current employees of Defendants.

11. All documents, including all medical, psychological, psychiatric, and counseling records and charts, identifying, showing, referring, or relating to all doctors, psychiatrists, psychologists, medical providers, hospitals, clinics, treatment centers, counselors, health care facilities and/or personnel, and all other persons, providers, or entities who saw, examined, treated and/or counseled you for any mental condition, mental injury, mental problem, mental distress, mental or emotional issues, mental anguish, anxiety, emotional distress, depression, mental pain and suffering, and/or any other mental state or condition you claim you suffered as a result of Defendants' conduct as alleged in your Complaint.

12. All documents, including all medical, psychological, psychiatric, and counseling records and charts, identifying, showing, referring, or relating to all doctors, psychiatrists, psychologists, medical providers, hospitals, clinics, treatment centers, counselors, health

care facilities and/or personnel, and all other persons, providers, or entities who saw, examined, treated and/or counseled you for any mental condition, mental injury, mental problem, mental distress, mental or emotional issues, mental anguish, anxiety, emotional distress, depression, mental pain and suffering, and/or any other mental state or condition at any point in your life.

13. All documents, including, but not limited to, federal, state and local income tax forms and returns, W-2 forms, and payroll check stubs, that show, evidence, relate or refer to all of your employers and/or self-employment, and the amount and all sources of income received by you, or accruing to you, from March 18, 2018 to the present.

14. All documents that evidence, support, relate or refer to your attempts to find new employment from March 18, 2018 to the present, including a list of the names and addresses of all such employers with whom you sought employment, copies of applications you submitted, documents showing where and when you applied and/or were interviewed for employment, and copies of advertisements for positions to which you responded or applied.

15. All documents identifying your employers, and any wages and salary, earnings, hours worked, insurance and other benefits, and terms and conditions of employment for any employment, or self-employment, that you now have, or previously had, from March 18, 2018 to the present time.

16. A copy of the financial statements evidencing the profits and losses, total revenue and amount of compensation or equity (if any) that you derive from any and all businesses, partnerships, companies, or organizations in which you, own, are a member of or have any ownership/management interest in.

17. All documents showing, relating, or referring to your claim(s) for and receipt of unemployment compensation benefits, if any, after March 18, 2018.

18. All documents that you contend support your belief that you were subjected to discrimination because of your age by Defendants during your alleged employment at Defendants and/or in connection with your separation from employment.

19. All documents showing, relating, or referring to your communications with Defendants as relates to the allegations in your Complaint.

20. All documents identified in your Initial Disclosures pursuant to Fed. R. Civ. P. 26(a).

21. All documents from or by you on electronic social media, including but not limited to Facebook, Twitter and Instagram, regarding Defendants or your alleged employment with or termination of employment by Defendants.  "Documents" as used in this request, specifically includes, but is not limited to, copies of all statements, posts, status updates, messages, comments, "tweets" and photographs.

22. All documents from or by you on electronic social media, including but not limited to Facebook, Twitter and Instagram regarding Kåre Schultz, Ron Yaniv, Daniel Lawlor, Tal Zorman or Eduardo Nasi.  "Documents" as used in this request, specifically includes, but is not limited to, copies of all statements, posts, status updates, messages, comments, "tweets" and photographs.

23. All documents that relate or pertain to all communications (except for communications solely between you and your lawyers) that you have had with any person regarding this action, and/or your allegations that you were treated wrongly or unlawfully by Defendants or one or more of their employees.

JOINT APPX - 0009

24. All documents showing, supporting, relating or referring to your claim that as a result of the allegations in the Complaint you are entitled to damages for "emotional distress and humiliation."

25. Regarding all experts retained and/or engaged on your behalf in connection with this action, provide all of the following documents (a) copies of each expert's resume and curriculum vitae, (b) all reports, correspondence, and other documents they prepared, relied on, produced, utilized, referred to, transmitted, or communicated in connection with this matter, including all drafts of reports, correspondence and other documents, including all mark ups of each, (c) all texts, treatises, or articles relied upon by your experts or which they intend to rely upon at trial, (d) all bills from each such expert witness, (e) all payments, and documents referring to payments, made to each expert witness and (f) each article and/or other writing published by each such expert in the last five years.

26. All agreements for the retention and/or engagement of each and every expert witness whose services you intend to utilize in connection with this action.

27. A list of all of the witnesses, including their addresses and phone numbers, whom you believe would support your claims in this matter and/or whom you would call to testify on your behalf at the trial in this case and/or depose or communicate with about this case.

28. All documents relating to your allegations in Paragraph 41 of your Complaint that Defendants implemented compensation policies that disfavored older employees.

29. All documents relating to your allegations in Paragraph 42 of your Complaint that Defendants raised the age of retirement in the 2010 and 2015 equity plans to adversely effect older employees.

30. All documents relating to your allegations in Paragraph 43 of your Complaint that Defendants instituted a punitive severance plan in 2017 that adversely affected older workers.

31. All documents relating to your allegations in Paragraph 43 of your Complaint that support your allegation that "US Teva leadership espoused a belief that those over age 62 would no longer be employable and could not properly apply for unemployment compensation benefits."

32. All documents relating to your allegations in Paragraph 44 of your Complaint that support your allegation that you witnessed age bias in Defendants hiring of employees.

33. All documents relating to your allegations in Paragraph 44 of your Complaint that support your allegation that Daniel Lawlor stated that a candidate working as a contractor did not have "long term potential" because of her advanced age.

34. All documents relating to any "alternate proposals" you allege you made as discussed in Paragraph 46 of your Complaint.

35. All documents supporting your allegation in Paragraph 46 of your Complaint that you volunteered to be relocated to Israel.

36. All documents supporting your allegation in Paragraph 47 of your Complaint that you would have accepted a demotion in lieu of termination.

37. All documents supporting your allegation in Paragraph 48 that Eduardo Nasi replaced you.

38. All documents supporting your allegation in Paragraph 51 of your Complaint that Mr. Nasi's employment "in your position" did not affect any monetary savings for Defendants.

39. Please complete and submit one fully executed original of the attached Authorization for Release of Medical Record Information of Randolph Keuch.

40. To the extent not previously produced in response to the other Requests contained herein, produce all documents that refer or relate to the allegations contained in the Complaint, Defendants' defenses thereto, the subject matter of the Complaint, and/or the relief sought by Plaintiff

**STEVENS & LEE, P.C.**

Dated: August 27, 2021

By: _Brandon S. Shemtob_____
    Larry J. Rappoport, Esquire
    Brandon S. Shemtob, Esquire
    STEVENS & LEE
    A PA Professional Corporation
    1500 Market Street, East Tower, Suite 1800
    Philadelphia, PA 19102
    Phone: (215) 751-1949
    Fax: (610) 371-7906

    *Attorneys for Defendants*

**STEVENS & LEE**
**AUTHORIZATION FOR RELEASE OF MEDICAL RECORD INFORMATION**[1]

I hereby authorize the release of my health information as listed below.

**Patient name:** Randolph W. Keuch   **Social Security No.** _____   **Date of Birth:**

**Address** _____

_____

**Telephone:** _____

**Provider or facility authorized to release information:** Any health care provider or entity that has provided any medical, psychological, chiropractic or psychiatric services to Randolph Keuch.

**Person or entity authorized to receive information:**
Stevens & Lee P.C., 1500 Market Street, East Tower, Suite 1800, Philadelphia, PA 19102

**Dates of Service:** ☒ All   ☐ Specific Dates of Service:

**Description of information:**

☒ Entire Record   ☒ Other: All medical records, medical documents, medical charts, psychological records, psychiatric records, charts, prescriptions, reports, notes, diagnoses, prognoses, X-rays, test results, medical bills, statements of account, and all other documents and records in your possession pertaining to the care and treatment of Randolph Keuch.

**Special Records:** Include the following medical records if such information is included in your records. Checking the boxes is not a representation that such information exists.

☒ Include drug and alcohol records   ☒ Include Mental Health Records   ☐ Include all confidential HIV-related Records

☐ Include sexual abuse/assault counseling records.

**Purpose of Release of Information:**
Legal Proceedings – Randolph W. Keuch  v. Teva Pharmaceuticals USA, Inc. et al,
United States District Court, Eastern District of Pennsylvania, Civil Action No. 22:19-CV-05488

1.  This authorization will expire: ☐ Date:_____ ☐ Event:_____ ☒ One year

    Unless otherwise specified, this authorization will expire 1 year after the date of this request.

2.  I understand that I may revoke this authorization at any time by notifying Stevens & Lee, P.C., 1500 Market Street, East Tower, Suite 1800, Philadelphia, PA 19102 or by notifying the provider or entity that is authorized to release these records. I understand that revocation will not have any effect on actions taken prior to any revocation.

3.  This authorization is voluntary.

4.  I understand that if the organization authorized to receive the information is not a health plan or a health care provider, the information may no longer be protected by federal privacy regulations.

_____      _____
**Signature of patient or patient's representative**      **Date**

**Printed name of patient's representative:**_____

**Relationship to the patient:**_____

_____

[1] This authorization complies with the HIPAA privacy regulations, specifically 45 C.F.R. § 164.508

## CERTIFICATE OF SERVICE

I, Brandon Shemtob, certify that on this 27th day of August 2021, I served

Defendants First Set of Document Requests Regarding Plaintiff Randolph Keuch upon

counsel for Plaintiff, via email, addressed as follows:

> Alan Epstein, Esquire
> Jennifer Myers Chalal, Esquire
> 1635 Market Street, 7th Floor
> Philadelphia, PA 19103
> aepstein@sgrvlaw.com
> jmyers@sgrvlaw.com

_/s/ Brandon Shemtob_
Brandon Shemtob

14

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

RANDOLPH W. KEUCH,         :

           Plaintiff,       :

       v.              :

TEVA PHARMACEUTICALS USA, INC.,   :
And TEVA PHARMACEUTICAL
INDUSTRIES, Ltd.,            :

                 :

           Defendants.      :

CASE NO. 2:19-CV-05488

### DEFENDANTS' FIRST SET OF INTERROGATORIES ADDRESSED TO PLAINTIFF REGRADING PLAINTIFF RANDOLPH KEUCH

Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure, Defendants, Teva Pharmaceuticals USA, Inc. ("TUSA") and Teva Pharmaceutical Industries, Inc. ("TPI" and together with TUSA, the "Defendants"), serve the following interrogatories upon the Plaintiff, Randolph Keuch, to be answered separately and fully in writing under oath, within thirty (30) days from the date of service hereof.

### Definitions

The following definitions are applicable to and incorporated by reference into each interrogatory:

A. The term "person," as used herein, means any natural person, partnership, corporation, or other business entity and all present and former officers, directors, agents, employees, attorneys and others acting or purporting to act on behalf of such natural person, partnership, corporation or other business entity.

B. The term "Complaint," as used herein, means the Amended Complaint filed in the above-captioned action.

1

C.  The terms "Plaintiff," "you" and "your," as used herein, mean the named Plaintiff and each other person acting or authorized to act on behalf of the named Plaintiff, including Plaintiff's counsel.

D.  The term "Defendants," means, TUSA and TPI.

E.  The term "policy," as used herein, means each rule, procedure, or directive, formal or informal, and each common understanding of a course of conduct which was recognized as such by you or other persons acting on your behalf, which was in effect at any time during the period covered by these interrogatories.

F.  The terms "and" and "or," as used herein, shall be construed conjunctively or disjunctively as required to include within the scope of each interrogatory any information which might be excluded by the opposite construction.

G.  The term "identify" or "identity" when used in reference to:  (1) an individual or natural person, means to give the person's full name; all known aliases; the present or the last known business and home addresses; present position or business affiliation, and position or business affiliation at all times during the time period covered by the Complaint; (2) any other "person" as defined herein, means to give the person's official, legal and formal name or the name under which the person acts or conducts business; the address of the person's place of business, profession, commerce or home; and the identity of the person's principal or chief executive officer or person who occupies the position most closely analogous to a chief executive; (3) a document, means to describe specifically the "document," its date, its author (and, if different, the signer or signers), type of document (e.g., "letter") each addressee and known recipient, its present or last known location and custodian, the manner and date of its disposition if any such "document" was, but is no longer, in your possession or subject to your

2

control, and all other means of identifying it with sufficient particularity to satisfy the

requirements for its inclusion in a demand for its production pursuant to a subpoena duces

tecum; and (4) a communication, means to identify the pertinent "document" or "documents" if

the communication is written, or to identify the participants and set forth the date, manner, place

and substance of the communication if it is non-written.

  H.  The term "document," as used herein, means the original and all copies of any

written, printed, typed or other graphic matter of any kind or nature and any other tangible thing

in your possession, custody or control, wherever located.  Any copy containing thereon or having

attached thereto any alterations, notes, comments, or other material not included in the originals

or copies referred to in the preceding sentence shall be deemed a separate document within the

foregoing definition.  The term "document" or "documents" include, but are not limited to:

  1.  All contracts, agreements, letter agreements, representations, warranties,

certificates and opinions;

  2.  All letters or other forms of correspondence or communication, including

envelopes and notes, telegrams, cables, telex messages, electronic communications and other

messages, including reports, notes, notations and memoranda of or relating to telephone conversations

or conferences;

  3.  All memoranda, reports, test results, financial statements or reports, notes,

scripts, transcripts, tabulations, studies, analyses, evaluations, projections, work papers, corporate

records or copies thereof, expressions or statements of policy, lists, comparisons, questionnaires,

surveys, charts, graphs, summaries, extracts, statistical statements or records, compilations and

opinions or reports of consultants;

  4.  All desk calendars, appointment books, logs and diaries;

3

5.  All minutes, records or transcripts of meetings and conferences, and lists of persons attending meetings or conferences;

6.  All reports and summaries of interviews and negotiations;

7.  All books, articles, press releases, magazines, newspapers, booklets, brochures, pamphlets, circulars, bulletins, notices, instructions and manuals;

8.  All motion pictures and photographs (whether developed or undeveloped), tape recordings, microfilms, phonographs, tapes or other records, punch cards, magnetic tapes, discs, data cells, drums, print-outs and other data compilations from which information can be obtained; and

9.  Drafts of any document, revisions of drafts of any document and original or preliminary notes.

I.  The term "communications," as used herein, means all statements, admissions, denials, inquiries, discussions, conversations, negotiations, agreements, contracts, understandings, meetings, telephone conversations, letters, correspondence, notes, telegrams, telexes, advertisements, or any other form of written or verbal intercourse.

J.  The term "relate(s) to," as used herein, means constitute(s), refer(s) to, reflect(s), concern(s), pertain(s) to or in any way logically or factually connect(s) with the matter described in the interrogatory.

### Rules of Construction

In construing these interrogatories:

A.  The singular shall include the plural and the plural shall include the singular.

B.  A masculine, feminine or neuter pronoun shall not exclude the others.

### Instructions

A.  To the extent any information called for by these interrogatories is unknown to you, so state, and set forth such remaining information as is known.  If any estimate can

4

reasonably be made in place of unknown information, also set forth your best estimate, clearly

designated as such, in place of unknown information, and describe the basis upon which the

estimate is made.

   B.  To the extent you object to any interrogatory, set forth all reasons for your

objection.  If you claim privilege as a ground for not answering any interrogatory in whole or in

part, describe the factual basis for your claim of privilege in sufficient detail to permit the court

to adjudicate the validity of the claim.  If you object in part to any interrogatory, answer the

remainder completely.

   C.  These interrogatories shall be deemed continuing and require additional

responses if further information is obtained between the time the responses are served and the

time of trial.  Such additional responses shall be served from time to time, but not later than 20

days prior to the first date fixed for trial, or immediately upon obtaining such information if it is

first discovered thereafter.

01/05/2021 SL1 1670921v2 113731.00002

## INTERROGATORIES

1.  With regard to your allegations in Paragraph 41 of your Complaint, (a) identify and explain which compensation policies Defendants' implemented that disfavored older workers; (b) how these policies harmed older works; (c) what specific changes were made to the these policies; (d) how and when you learned of these policies; (e) what involvement, if any, you had in the formulation of these policies; and (f) who you contend made the decision to implement these policies.

**ANSWER:**

2.  With regard to Paragraph 42 of your Complaint, (a) identify when you allege the retirement age was increased; (b) how and when you learned of these changes; (c) what involvement, if any, you had in the formulation of these changes; (d) who you contend made the decision to change these policies; (e) how you allege that these changes adversely affected older workers; and (f) how these policy-changes negatively impacted the equity compensation of older employees.

**ANSWER:**

3.  With regard to your allegations in Paragraph 43 of your Complaint, (a) identify when you allege the "putative severance plan" was instituted; (b) how and when you learned of this plan; (c) what involvement, if any, you had in the formulation of plan; (d) who you contend made the decision to implement this plan; (e) how you allege that this plan

6

adversely affected older workers given your admission that those over the age of 62 were exempt
from the deduction.

> **ANSWER:**

4. With regard to your allegation in Paragraph 43 of your Complaint that "US
Teva leadership espoused the belief that those over age 62 would no longer be employable and
could not properly apply for unemployment compensation benefits," (a) identify who you heard
espouse this belief; (b) when you heard these statements made; (c) state what, if any, responses
were made to this statement; (d) identify any witnesses that heard these statements; (e) state
whether these statements were made orally or in writing; and (f) if in writing, provide a copy of
all such documents.

> **ANSWER:**

7

5.   With regard to your allegation in Paragraph 44 of your Complaint, identify every instance in which you witnessed age bias in the hiring of employees. For each instance identified:

(a)  Provide the name of the person or persons who allegedly were involved in the incident;

(b)  Provide the name or names of the persons who allegedly were discriminated against;

(c)  Provide the date of the incident;

(d)  Describe, in detail, how the person or persons were discriminated against;

(e)  Provide the names of all witnesses to the incident;

(f)  Identify all documents that support your allegation that age bias was a factor in the hiring decision.

**ANSWER:**

6.   With regard to your allegation in Paragraph 44 of your Complaint that Dan Lawlor stated that a candidate working as a contractor did not have "long term potential" because of her advanced age, identify (a) when this occurred; (b) who he was speaking about; (c) if there were any witnesses to this statement; (d) whether this statement was oral or written; (e) what if anything was said in response to Mr. Lawlor's alleged statement; and (f) all documents that support your allegation that Mr. Lawlor made this statement.

8

**ANSWER:**

7. With regard to your allegations in Paragraph 46 of your Complaint, (a) identify who asked you to outline alternate proposals that would meet the needs of the Defendants and not break the laws of the countries and states where Total Rewards employees were employed; (b) describe what, if any, proposals you made; (c) identify to whom you made these proposals; (d) state what, if any, response your received to these proposals.

**ANSWER:**

8. With regard to your allegations in Paragraph 46 of your Complaint, (a) identify to whom you stated that you were volunteering to be relocated to Israel to help plan cost saving measures; (b) when you made this offer; (c) what title you would have if you were relocated to Israel; (d) whose position you would be filing if you relocated to Israel; and (e) whether your compensation would change if you relocated to Israel.

**ANSWER:**

9. With regard to your allegations in Paragraph 47 of your Complaint, (a) state whether you volunteered to accept a demotion in lieu of termination; (b) if so, identify, who you volunteered this offer to; (c) state when you volunteered this offer; (d) identify any employee

9

that you contend was offered a demotion in lieu of termination as it relates to the 2017-2018 reduction in force.

**ANSWER:**


10. With regards to the allegations in Paragraph 48 of your Complaint, explain your contention that Eduardo Nasi replaced you.

**ANSWER:**


11. With regards to the allegations in Paragraph 51 of your Complaint, explain your contention that the employment of Mr. Nasi did not affect any monetary savings for Defendants.

**ANSWER:**


12. Describe, in detail, all incidents related to the allegations in your Complaint that you suffered age based discrimination. For each incident:

10

(a) Provide the name of the person or persons who allegedly discriminated against you on the basis of your age;

(b) Provide the date of the incident;

(c) Describe, in detail, how the person or persons discriminated against you;

(d) Provide the names of all witnesses to the incident;

(e) If you allege you complained to anyone regarding the alleged discrimination, state whom you complained to and when you complained to him/her;

(f) Identify all documents that support your allegation that age bias was a factor in the hiring decision.

**ANSWER:**

13. Identify and explain how Kåre Schultz was involved in your selection for termination as you allege in Paragraph 25 of your Complaint.

**ANSWER:**

14. Identify: (a) each person who either was a witness to the facts alleged in your Complaint and/or has knowledge of or relating to the facts alleged in your Complaint or the claims set forth therein including, but not limited to, your allegations that you were subjected to age-based discrimination, and, (b) for each such person identified, describe in detail the facts, allegations or claims in the Complaint regarding which the person has knowledge or witnessed.

**ANSWER:**

11

15.  Identify, including stating their names, addresses and phone numbers, all doctors, psychiatrists, counselors, psychologists, chiropractors, medical personnel, hospitals, medical facilities, clinics, health care facilities and institutions, and all other medical/health care personnel or providers who saw, examined, or treated you, or where you were seen, examined, or treated, for your alleged "compensatory damages," and/or for mental anguish, emotional distress, humiliation, damages to reputation or other nonpecuniary losses, for any time in your life.

**ANSWER:**

16.  If you have obtained treatment or care or been examined for any type of emotional or psychological problem, illness, sickness, distress, anguish or condition (including, but not limited to, any general therapy or counseling and/or counseling or treatment for substance abuse) related to the allegations in the Complaint, provide the following information:

(a)  Identify each person providing the treatment or care or examination; Specify the dates on which you received any such treatment or care or examination;

(b)  Describe each problem, illness, sickness, distress, anguish or condition for which you received treatment or care or have been examined;

(c)  Identify all documents relating to or concerning the treatment or care or examination for any such problem, illness, sickness, distress, anguish or condition.

**ANSWER:**

12

17. Prior to March 18, 2018, had you ever obtained treatment or care or been examined for any medical, mental, psychological, emotional, or intellectual problem, illness, sickness, distress, anguish or condition (including any treatment and/or care for alcohol and/or drug abuse)? If your answer is "yes," provide the following information:

(a) Identify each institution and/or person providing the treatment or care or examination;

(b) Specify the dates on which you received any such treatment or care or examination;

(c) Describe each problem, illness, sickness, distress, anguish or condition for which you received treatment or care or have been examined;

(d) Identify all documents relating to or concerning the treatment or care or examination for any such problem, illness, sickness, distress, anguish or condition.

**ANSWER:**

18. With respect to your claims for damages and other relief other in this action:

(a) set forth the specific relief and damages sought, including the amount of each item of damages and other relief, and the factual basis upon which you seek such damages and other relief; and

(b) identify all individuals whom you know or have reason to believe have information regarding these claims.

**ANSWER:**

01/05/2021 SL1 1670921v2 113731.00002

19.  With respect to any employment or self-employment you hold or have held since March 18, 2018, set forth the following:

    (a)  each position held, including the name and address of the employer;

    (b)  the date of commencement of each such position; and,

    (c)  the wages, salary and fringe benefits of each such position.

**ANSWER:**

20.  Identify every potential employer you have contacted since March 18, 2018, in order to secure employment and the result of such contacts.  With respect to any search for employment you commenced on or following March 18, 2018 identify the following:

    (a)  each employer or employment agency you contacted;

    (b)  any responses you received from such employers or employment agency;

    (c)  the identity of the individual who made the decision;

    (d)  the reasons given for the decision; and,

    (e)  any offers of employment you received and the terms of such offers.

**ANSWER:**

21.  Identify any business, partnership, company, or organization in which you, own, are a member of or have any ownership/management interest in. For each such entity:

(a) identify what goods or services it provides;

(b) identify all clients that it services and all potential clients that it solicits,

(a) provide a copy of the entity's financial statements evidencing its profits and losses, its total revenue and the amount of compensation or equity (if any) that you derive from it.

**ANSWER:**

22.   Identify the name and address of each person whom you have retained, or intend to retain, as an expert in this matter, and separately for each such expert provide the following information:

(a)  state the subject matter on which each such expert is expected to testify;

(b)  describe in detail the substance of the facts and opinions to which each such expert is expected to testify and the grounds for each such opinion;

(c)  set forth the qualifications of each such expert, listing the schools attended, years of attendance, degrees received and experience in any particular field of specialization or expertise; and

(d)  describe in detail all prior retentions, relationships, dealings, and transactions between each such expert and you, if any.

**ANSWER:**

15

**STEVENS & LEE, P.C.**

Dated: August 27, 2021

By: _Brandon S. Shemtob_

Larry J. Rappoport, Esquire
Brandon S. Shemtob, Esquire
STEVENS & LEE
A PA Professional Corporation
1500 Market Street, East Tower, Suite 1800
Philadelphia, PA 19102
Phone: (215) 751-1949
Fax: (610) 371-7906

*Attorneys for Defendants*

16

## CERTIFICATE OF SERVICE

I, Brandon Shemtob, certify that on this 27th day of August 2021, I served

Defendants First Set of Interrogatories Regarding Plaintiff Randolph Keuch upon counsel for

Plaintiff, via email, addressed as follows:

Alan Epstein, Esquire
Jennifer Myers Chalal, Esquire
1635 Market Street, 7th Floor
Philadelphia, PA 19103
aepstein@sgrvlaw.com
jmyers@sgrvlaw.com

*/s/ Brandon Shemtob*
Brandon Shemtob

01/05/2021 SL1 1670921v2 113731.00002

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| RANDOLPH W. KEUCH, | : | CASE NO. 2:19-CV-05488 |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| TEVA PHARMACEUTICALS USA, INC., | : | |
| And TEVA PHARMACEUTICAL | : | |
| INDUSTRIES, Ltd., | : | |

## PLAINTIFF'S ANSWERS TO DEFENDANTS' FIRST SET OF INTERROGATORIES

    1.    With regard to your allegations in Paragraph 41 of your Complaint, (a) identify and explain which compensation policies Defendants' implemented that disfavored older workers; (b) how these policies harmed older works; (c) what specific changes were made to the these policies; (d) how and when you learned of these policies; (e) what involvement, if any, you had in the formulation of these policies; and (f) who you contend made the decision to implement these policies.

    2.    With regard to Paragraph 42 of your Complaint, (a) identify when you allege the retirement age was increased; (b) how and when you learned of these changes; (c) what involvement, if any, you had in the formulation of these changes; (d) who you contend made the decision to change these policies; (e) how you allege that these changes adversely affected older workers; and (f) how these policy-changes negatively impacted the equity compensation of older employees.

    3.    With regard to your allegations in Paragraph 43 of your Complaint, (a) identify when you allege the "putative severance plan" was instituted; (b) how and when you learned of this plan; (c) what involvement, if any, you had in the formulation of plan; (d) who you contend made the decision to implement this plan; (e) how you allege that this plan adversely affected older workers given your admission that those over the age of 62 were exempt from the deduction.

    4.    With regard to your allegation in Paragraph 43 of your Complaint that "US Teva leadership espoused the belief that those over age 62 would no longer be employable and could not properly apply for unemployment compensation benefits," (a) identify who you heard espouse this belief; (b) when you heard these statements made; (c) state what, if any, responses were made to this statement; (d) identify any witnesses that heard these statements; (e) state

1

whether these statements were made orally or in writing; and (f) if in writing, provide a copy of all such documents.

## COLLECTIVE ANSWER TO INTERROGATORIES 1-4:

### Equity treatment and Qualifying Retirement

Prior to 2015, the definition of qualifying retirement under the Teva long-term incentive plans was Age plus years of service equal to or greater than 70 plus country Human Resources approval In 2015, the definition was changed to age greater than 65 and at least 5 years of service.

On March 21, 2017 Roni Percik sent a memo to US HR leaders informing them that the HRCC approved an adjustment to the Qualifying Retirement Policy for equity awards. Specifically, the definition of "Qualifying Retirement" under the equity plans was changed from age greater than 65 years and at least 5 years of service to age greater than 65 years and at least 10 years of service.

As a result, the following three qualifying retirement rules were changed to reflect these changes:

1. Any termination other than death, disability or cause that meets the following rule: Participant's age is at least 65, and at least 10 years of service will receive full continued vesting of all grants and continued exercisability for full term.

2. Company initiated retirement (or by mutual agreement) meeting the following rule: Participant's age is at least 65, and at least 15 years of service will receive full continued vesting of all grants and continued exercisability for full term.

3. Company initiated retirement (or by mutual agreement) meeting the following rule: Participant's age plus years of service is at least 70, and age is greater than 55 will receive full continued vesting of tranches vesting in the next 12 months and continued exercisability for full term.

Plaintiff was hired in January 2014 at age 60.  under the original retirement plan under which he was hired, he could retire (assuming that he was 55 or older) at any time the combination of his age and service equaled a numerical total of 70. In Plaintiff's case he could retire at any time he reached the age of 65 years.  However, under the plan change announced in 2017, he could not choose to retire until he reached age 70.

The revised plan effective in 2017 had additional impacts on TEVA employees.  It disallowed US Teva employees who became employed by the Company after the age of 56 and who were eligible to receive equity grants or had actually received those grants from retiring at age 65 and retaining their equity.  The policy clearly effectively had a discriminatory impact on older employees.

2

Additionally, under the TEVA bonus plans, when an employee meets the definition of retirement under the equity plans and holds RSUs, these RSUs immediately vest and taxes are assessed. When the retirement rules changed, any taxes paid upon meeting the old retirement rules were not refunded and if the employee were terminated before actual retirement under the new rule, equity upon which taxes were paid would be forfeited.

Finally, Canadian employees, who had been permitted to retire when they reached age 55 and had at least two years of service, would under the new plan be greatly age disadvantaged.

When Plaintiff was consulted on the change, he stated that the new plan discriminates against older employees, and without any success, railed against not fully advising employees regarding the potential impact on their ability to retire and the tax ramifications of the new plan. adversely affected older workers given your admission that those over the age of 62 were exempt from the deduction.

## US Separation Policy Changes

On January 2, 2018 Daniel Lawlor, SVP HR North America sent out an email on the US Separation Policy Updates to US Top Management and US HR Leadership Team. That policy which required a severed employee to apply for state unemployment benefits and reduced any severance paid by TEVA by the amount received by the separated employee from the state unemployment agency exempted severed employees over the age of 62 based upon Mr. Lawlor's view that persons over the age of 62 are unemployable:

"I do not want to have those employees over age 62 to have to suffer the humiliation and embarrassment of filing for unemployment.  They should simply retire as they probably will not find another job."

Teva also excluded target bonuses in the calculation of severance pay. As older workers tend to be in more senior positions which include target bonus eligibility, the older workers are greatly impacted.

5.      With regard to your allegation in Paragraph 44 of your Complaint, identify every instance in which you witnessed age bias in the hiring of employees. For each instance identified:

(a)     Provide the name of the person or persons who allegedly were involved in the incident;

(b)     Provide the name or names of the persons who allegedly were discriminated against;

(c)     Provide the date of the incident;

(d)     Describe, in detail, how the person or persons were discriminated against;

3

     (e)     Provide the names of all witnesses to the incident;

     (f)     Identify all documents that support your allegation that age bias was a factor in the hiring decision.

6.     With regard to your allegation in Paragraph 44 of your Complaint that Dan Lawlor stated that a candidate working as a contractor did not have "long term potential" because of her advanced age, identify (a) when this occurred; (b) who he was speaking about; (c) if there were any witnesses to this statement; (d) whether this statement was oral or written; (e) what if anything was said in response to Mr. Lawlor's alleged statement; and (f) all documents that support your allegation that Mr. Lawlor made this statement.

**COLLECTIVE ANSWER TO INTERROGATORIES 5 and 6:**

**When a Compensation Manager position became available in the Total Awards group, after candidate interviews were completed, Plaintiff and Miriam Weinstein received the "green light" to hire Rose Riciolli, age 55, Daniel Lawler expressed deep concern that she was too old ("Does Rose have enough long-term potential for us") and vetoed her being hired.**

7.     With regard to your allegations in Paragraph 46 of your Complaint, (a) identify who asked you to outline alternate proposals that would meet the needs of the Defendants and not break the laws of the countries and states where Total Rewards employees were employed; (b) describe what, if any, proposals you made; (c) identify to whom you made these proposals; (d) state what, if any, response your received to these proposals.

**ANSWER:**

**In November of 2017, Teva Corporate was engaged in determining how to reduce headcount in the US and other countries. As part of that process, Plaintiff was requested to develop a PowerPoint presentation describing several approaches to reducing headcount by 50% That presentation was sent on December 15th, 2017 to Plaintiff's newly appointed Manager Tal Zorman who was employed by the parent Company in Israel. Rejecting the suggestion that selection for severance should be based on ability and competence, Plaintiff was directed that the reduction would not be so guided and each manager was to make the final decision, allowing personal or corporate bias be injected into the process.**

8.     With regard to your allegations in Paragraph 46 of your Complaint, (a) identify to whom you stated that you were volunteering to be relocated to Israel to help plan cost saving measures; (b) when you made this offer; (c) what title you would have if you were relocated to Israel; (d) whose position you would be filing if you relocated to Israel; and (e) whether your compensation would change if you relocated to Israel.

9.     With regard to your allegations in Paragraph 47 of your Complaint, (a) state whether you volunteered to accept a demotion in lieu of termination; (b) if so, identify, who you volunteered this offer to; (c) state when you volunteered this offer; (d) identify any employee that you contend was offered a demotion in lieu of termination as it relates to the 2017-2018 reduction in force.

4

10.     With regards to the allegations in Paragraph 48 of your Complaint, explain your contention that Eduardo Nasi replaced you.

11.     With regards to the allegations in Paragraph 51 of your Complaint, explain your contention that the employment of Mr. Nasi did not affect any monetary savings for Defendants.

12.     Describe, in detail, all incidents related to the allegations in your Complaint that you suffered age based discrimination. For each incident:

**COLLECTIVE ANSWER TO INTERROGATORIES 8 - 12:**

On December 20th, 2017 Plaintiff sent an email to Tal Zorman, attaching his resume and volunteering to go to Israel on temporary assignment to assist with urgent matters relating to the global benefits function during the planned layoffs internationally. There was no suggestion that job title or compensation would change. Unbeknownst to Plaintiff, Ms. Zorman, Daniel Lawlor and Ron Yanov had already made the decision to replace Plaintiff as the head of Total Rewards for the Americas with Edu Nasi, an employee who Plaintiff supervised and reject the offer of Plaintiff to serve the parent global company in Israel. On January 2, 2018, Plaintiff was first advised that his offer was rejected. In a conversation with Mr. Nasi, Plaintiff learned the details of the deception and that he would be replaced by Edu Nasi. Plaintiff would have accepted a demotion to a Grade level 16 (the Grade level to which Mr. Nasi was subsequently elevated since in accordance with Teva practice and policy such action would not have reduced his then current compensation). Plaintiff was far more qualified to maintain the position at the helm of Total Rewards than Mr. Nasi and had prior to his termination achieved outstanding results in saving Teva money while elevating the benefits paid to employees.

13.     Identify and explain how Kåre Schultz was involved in your selection for termination as you allege in Paragraph 25 of your Complaint.

**ANSWER:**

Kare Schultz became the President and CEO of Teva Global in 2017 and thereafter directed the discriminatory actions that led directly to the termination of Plaintiff's employment and the policies that allowed the discriminatory practices that resulted in the termination of over 1000 Teva Americas employees.

14.     Identify: (a) each person who either was a witness to the facts alleged in your Complaint and/or has knowledge of or relating to the facts alleged in your Complaint or the claims set forth therein including, but not limited to, your allegations that you were subjected to age-based discrimination, and, (b) for each such person identified, describe in detail the facts, allegations or claims in the Complaint regarding which the person has knowledge or witnessed.

**ANSWER:**

Prior to the layoffs, a senior HR leader (Pam Daknis) held a meeting with other HR leaders and other HR function leaders to discuss how they would analyze the termination

5

data to address discrimination, a typical practice at Teva which performed at all Reductions in Force initiatives prior to Plaintiff's employment termination. At that meeting, Daniel Lawlor, Head of HR for North America, entered the meeting and told the group not to perform that analysis

Daniella Shea, a native Brazilian, was a grade 17 Sr. Director and the Head of Shared Services for Teva Americas who was nearly 50 years old. While she had excellent performance ratings, throughout her employment with Teva, she was terminated and replaced by Laura Brenner, a far less experienced manager in her 20's who she supervised. Elaine McGee was a grade 14 Associate Director who reported to Daniella Shea. Her title was Associate Director, HROS North America. She is also in her late 40's and should have been considered for the job vacated by Daniella Shea when Daniella was terminated. Laura Brenner, 20 years younger with far less experience received the open position involuntarily vacated by Ms. Shea.

The following are additional witnesses to the facts set forth in Plaintiff's complaint that are or were employed at Teva and Teva has their full contact information:

| | |
|---|---|
| Miriam Weinstein | Head of Compensation for North America was present at the meeting where Mr. Lawlor ordered the HR community to not track or analyze discrimination throughout the Reduction in Force. She was also involved in Mr. Lawlor's age discrimination of Rose Riciolli. |
| Pamela Daknis | HR Director was also present at this meeting where Mr. Lawlor ordered the HR community to not track or analyze discrimination throughout the Reduction in Force, as were other HR employees. She also may have been one of the HR members who interviewed Rose Riciolli and approved her being hired. |
| Edu Nasi | Current Head of Total Rewards for North America was involved in the circumstances involved in Plaintiff's termination.in Plaintiff's termination |
| Samantha Blattler | Conduent Lead for the Unemployment Supplemental Plan at Teva |
| Samantha Rivello | Former Benefits Manager for Teva |
| Sandra Malito | Benefits Analyst for Teva |
| Kent Schurr | Former Compensation Manager for Teva |
| Lesley Billow | CHRO for Hayward Holdings and previously Head of HR for the Americas |
| Noel Mulvihill | Head of Total Rewards for Pandora and previously Head of Total Rewards for Teva Europe |
| Randy Miller | Former Teva HR Director |

6

**Rose Riciolli**          Contract employee for the Teva Total Rewards team.

**Financial Planners from Beacon Trust, Adam Goldberg and Christopher Perrine who may be called upon to provide damages information regarding the potential of Plaintiff's lifetime wealth accumulation**

     15.     Identify, including stating their names, addresses and phone numbers, all doctors, psychiatrists, counselors, psychologists, chiropractors, medical personnel, hospitals, medical facilities, clinics, health care facilities and institutions, and all other medical/health care personnel or providers who saw, examined, or treated you, or where you were seen, examined, or treated, for your alleged "compensatory damages," and/or for mental anguish, emotional distress, humiliation, damages to reputation or other nonpecuniary losses, for any time in your life.

**ANSWER:**

     **As set forth in Plaintiff's responses to Defendants Request for documents, Plaintiff's distress in being fired and unable to secure another position is of the "garden variety" emotional distress usually attendant to such circumstances and information regarding past medical conditions will not be supplied.**

     16.     If you have obtained treatment or care or been examined for any type of emotional or psychological problem, illness, sickness, distress, anguish or condition (including, but not limited to, any general therapy or counseling and/or counseling or treatment for substance abuse) related to the allegations in the Complaint, provide the following information:

     (a)     Identify each person providing the treatment or care or examination; Specify the dates on which you received any such treatment or care or examination;

     (b)     Describe each problem, illness, sickness, distress, anguish or condition for which you received treatment or care or have been examined;

     (c)     Identify all documents relating to or concerning the treatment or care or examination for any such problem, illness, sickness, distress, anguish or condition.

**ANSWER:**

**Plaintiff has not received any medical treatment for emotional distress or other medical conditions related to his discharge from employment or his inability to secure a corporate position thereafter.**

     17.     Prior to March 18, 2018, had you ever obtained treatment or care or been examined for any medical, mental, psychological, emotional, or intellectual problem, illness, sickness, distress, anguish or condition (including any treatment and/or care for alcohol and/or drug abuse)? If your answer is "yes," provide the following information:

JOINT APPX - 0038

(a)     Identify each institution and/or person providing the treatment or care or examination;

(b)     Specify the dates on which you received any such treatment or care or examination;

(c)     Describe each problem, illness, sickness, distress, anguish or condition for which you received treatment or care or have been examined;

(d)     Identify all documents relating to or concerning the treatment or

(e)     care or examination for any such problem, illness, sickness, distress, anguish or condition.

**ANSWER:**

As set forth in Plaintiff's responses to Defendants Request for documents, Plaintiff's distress in being fired and unable to secure another position is of the "garden variety" emotional distress usually attendant to such circumstances and information regarding past medical conditions will note be supplied.

18.     With respect to your claims for damages and other relief other in this action:

(a)     set forth the specific relief and damages sought, including the amount of each item of damages and other relief, and the factual basis upon which you seek such damages and other relief; and

(b)     identify all individuals whom you know or have reason to believe have information regarding these claims.

**ANSWER:**

*See* documents previously supplied that detail Plaintiffs employment, job searchs, networks, earnings and lost earnings calculations, Bates Nos. 380-508

19.     With respect to any employment or self-employment you hold or have held since March 18, 2018, set forth the following:

(a)     each position held, including the name and address of the employer;

(b)     the date of commencement of each such position; and,

(c)     the wages, salary and fringe benefits of each such position.

**ANSWER:**

**President**
**The Total Rewards Consulting Group**
**7 Summer Dunes Lane**
**Isle of Palms, SC29451**

8

*See also* **documents previously supplied that detail Plaintiffs employment, job searchs, networks, earnings and lost earnings calculations, Bates Nos. 380-508**

20.     Identify every potential employer you have contacted since March 18, 2018, in order to secure employment and the result of such contacts. With respect to any search for employment you commenced on or following March 18, 2018 identify the following:

(a)     each employer or employment agency you contacted;

(b)     any responses you received from such employers or employment agency;

(c)     the identity of the individual who made the decision;

(d)     the reasons given for the decision; and,

(e)     any offers of employment you received and the terms of such offers

**ANSWER:**

*See* **documents previously supplied that detail Plaintiffs job searchs AND networking, Bates Nos. 380-498**

21.     Identify any business, partnership, company, or organization in which you, own, are a member of or have any ownership/management interest in. For each such entity:

(a)     identify what goods or services it provides;

(b)     identify all clients that it services and all potential clients that it solicits,

(c)     provide a copy of the entity's financial statements evidencing its profits and losses, its total revenue and the amount of compensation or equity (if any) that you derive from it.

**ANSWER:**

> **President**
> **The Total Rewards Consulting Group**
> **7 Summer Dunes Lane**
> **Isle of Palms, SC29451**

22.     Identify the name and address of each person whom you have retained, or intend to retain, as an expert in this matter, and separately for each such expert provide the following information:

(a)     state the subject matter on which each such expert is expected to testify;

9

(b)     describe in detail the substance of the facts and opinions to which each such expert is expected to testify and the grounds for each such opinion;

(c)     set forth the qualifications of each such expert, listing the schools attended, years of attendance, degrees received and experience in any particular field of specialization or expertise; and

(d)     describe in detail all prior retentions, relationships, dealings, and transactions between each such expert and you, if any.

**ANSWER:**

**None**

SPECTOR GADON ROSEN VINCI P.C.
/s/ *Alan B. Epstein*

Alan B. Epstein, Esquire
Jennifer M. Chalal, Esquire
Pa. Atty. I.D. No. 77481
SPECTOR GADON & ROSEN, P.C.
1635 Market Street, Seventh Floor
Philadelphia, PA  19103
(215) 241-/8817
Attorney for Plaintiff, Jeanne Pace

Dated:  December 30, 2021

10

## VERIFICATION

I, Randolph W. Keuch, hereby verify that I am the Plaintiff in this action and that the facts set forth in the foregoing Answers to Defendants' First Set of Interrogatories are true and correct to the best of my knowledge, information and belief. I understand that the statements herein are made subject to the penalties of 18 Pa.C.S.A. § 4904 relating to unsworn falsification to authorities.

_____
Randolph W. Keuch

Dated: December 30, 2021

11

# STEVENS & LEE
## LAWYERS & CONSULTANTS

1500 Market Street, East Tower, Suite 1800
Philadelphia, PA  19102
(215) 575-0100 Fax (215) 851-0214
www.stevenslee.com

Direct Dial:       (215) 496-3835
Email:        bss@stevenslee.com
Direct Fax:        (610) 371-7977

January 11, 2022

**Via Electronic Mail Only**
Alan B. Epstein, Esquire
Spector, Fagon Rosen Vinci, P.C.
Seven Penn Center
1635 Market Street, Seventh Floor
Philadelphia, PA 19103
aepstein@sgrvlaw.com

**Re:  Keuch, Randolph V. vs. Teva Pharmaceuticals USA, Inc.,** *et al*

Dear Alan,

        We are writing to address issues with your client's objections and responses to Teva Pharmaceuticals USA, Inc. ("TUSA") and Teva Pharmaceutical Industries, Ltd ("TPI" and together with TUSA the "Defendants") First Set of Interrogatories and First Set of Document Requests in the above-referenced action. Below, please find a discussion regarding the specific deficiencies we have observed with the responses that we have received to date.

        Relatedly and as I am sure you are aware, the parties current deadline to complete discovery is January 14, 2022. Given the delays encountered thus far in obtaining discovery responses and the outstanding deficiencies that remain, it is unlikely that we will be able to complete discovery in this timeframe. Therefore, we propose filing a joint motion to the Court with the following revised deadlines:

  1.  The deadline for the completion of all fact discovery be extended through February 28, 2022.

  2.  During this extension period the parties agree that no new written discovery requests may be submitted, however, deficiency letters and requests to fully respond to outstanding discovery requests may be exchanged.

  3.  Any depositions of fact witnesses shall be completed by February 28, 2022.

  4.  Motions for Summary Judgment shall be filed by: April 8, 2022.

Philadelphia   •   Reading   •   Valley Forge   •   Lehigh Valley   •   Harrisburg   •   Lancaster   •   Scranton
Williamsport   •   Wilkes-Barre   •   Princeton   •   Cherry Hill   •   New York   •   Wilmington

A PROFESSIONAL CORPORATION

## STEVENS & LEE

### A PA Professional Corporation

Alan B. Epstein, Esquire
January 11, 2022

5. Responses in Opposition to Motions for Summary Judgement shall be filed by: April 22, 2022.

6. Replies in further support of Summary Judgment shall be filed by: April 29, 2022.

Given this revised proposed schedule, we would be unable to complete discovery prior to Magistrate Judge Rice's announced retirement. Therefore, we would suggest informing Magistrate Judge Rice that the matter be reassigned to a different magistrate judge per his e-mail from December 20, 2021.

**Discovery Deficiencies:**

1.   Document Request 12, Interrogatory Requests 15 and 17, and the Authorization for Release of Medical Record Information all relate to Defendants' request for information relating to Plaintiff's emotional and medical state at any point during Plaintiff's life. In response to these requests, Plaintiff has consistently responded, "Plaintiff's distress in being fired and unable to secure another position is of the "garden variety" emotion distress usually attendant to such circumstances and information regarding past medical conditions will not be supplied."

Your objection misses the point of the request. Plaintiff has asserted a claim for emotional distress. Because of this, Defendants are entitled to take discovery regarding his mental state, the extent of any alleged emotional distress, and other potential sources of that alleged distress.  Discovery of all of Plaintiff's physicians and/or medical care providers is therefore appropriate. The below discussion by Judge Tucker of the Eastern District of Pennsylvania in a case addressing this exact topic is instructive.[1] She explained:

> Plaintiff's counsel relies heavily on the assertion that Plaintiff has only filed a "garden variety" claim for emotional distress against Defendants. (Pl.'s Mem. of Law at 1). Plaintiff's reliance on this garden variety language, however, is misplaced. Indeed, courts have consistently made a distinction between the "in controversy" requirement in the context of *Rule 35(a)* and *Rule 26(b)*. *See, e.g., Turner v. Imperial Stores,* 161 F.R.D. 89, 95 (S.D.Cal.1995) (noting that under *Rule 35(a)* "a court will order plaintiffs to undergo mental examinations when, in addition to a claim of emotional distress, one or more of the following elements are present: (1) a cause of action for intentional or negligent infliction of emotional distress; (2) an allegation of specific mental or psychiatric injury or disorder; (3) a claim of unusually severe emotional distress; (4) plaintiff's offer of expert testimony to support a claim of emotional distress; and/or (5) plaintiff's concession that his or her mental condition is 'in controversy' within the meaning

---

[1] *McKinney v. Delaware Cty. Mem'l Hosp.*, No. CIV A 08-1054, 2009 WL 750181, at *5 (E.D. Pa. Mar. 20, 2009)

# STEVENS & LEE

### A PA Professional Corporation

Alan B. Epstein, Esquire
January 11, 2022

of *Rule 35(a).* " ). Notably, Defendants have moved to compel pursuant to *Rule 26(b)* because at issue here is Plaintiff's psychological and medical records—governed by *Rule 26(b)*—not compelling Plaintiff to undergo a psychiatric evaluation—governed by *Rule 35(a). See, e.g., Bowen v. Parking Auth. of City of Camden,* 214 F.R.D. 188, 195 (D.N.J.2003). Thus, while demonstrating the presence of an additional element, other than the mere filing of a claim for emotional distress damages, may be necessary to satisfy the "in controversy" prong when a Defendant moves pursuant to *Rule 35(a),* such is not necessarily the case when a Defendant moves, as here, pursuant to *Rule 26(b).*

Similarly, while Plaintiff's assertion that she can and will establish emotional stress damages without resort to expert testimony is technically sound, it misses the point. Obviously, Plaintiff may establish her emotional stress damages with her own or other lay testimony. The issue, however, is not how Plaintiff intends to prove her emotional distress damages, but, rather Defendants' right to defend themselves fully against Plaintiff's claims. *See Sanchez v. U.S. Airways, Inc.,* 202 F.R.D. 131, 136 n. 7 (E.D.Pa.2001) ("How the Plaintiffs decide to prosecute their claims is a tactical decision for them alone. But, the determination of relevant evidence is outside their purview ... none of the cases stated ... stand for the idea that just because Plaintiffs do not intend to use expert testimony, the records related to their use of a mental health professional is inviolable."); *Lowe v. Philadelphia Newspapers Inc.,* 101 F.R.D. 296, 298 (E.D.Pa.1983) (reasoning that defendants should have a right to inquire into a plaintiff's past for the purpose of showing that their emotional distress was caused, at least in part, by events and circumstances that were not job related). Thus, the Plaintiff's affirmative use, or not, of medical expert testimony is not dispositive. *See Thorne v. Universal Properties, Inc.,* 1987 WL 7683, at *2 (E.D.Pa. Mar.10, 1987) ("If a plaintiff seeks damages for alleged emotional or psychological injuries, the defendant's case ought not be limited by the plaintiff's decision not to introduce available medical or psychological testimony that bears directly on the truth of the claim.")

In light of this explanation of the current case law we hope that you would concede that simply because Plaintiff is alleging a "garden variety" claim for emotional distress damages, Plaintiff is not now shielded from producing relevant documents related to his medical history. Therefore, please provide a supplemental response that accurately and fully responds to this request as well as a signed Authorization for Release of Medical Record Information. Alternatively, if Plaintiff no longer wishes to pursue a claim for emotional distress, please let us know and we will draft an appropriate stipulation for the Court.

# STEVENS & LEE

### A PA Professional Corporation

Alan B. Epstein, Esquire
January 11, 2022

2.      Document Request 13 asked Plaintiff to provide "All documents, including, but
not limited to, federal, state and local income tax forms and returns, W-2 forms, and payroll
check stubs, that show, evidence, relate or refer to all of your employers and/or self-employment,
and the amount and all sources of income received by you, or accruing to you, from March 18,
2018 to the present." Similarly, Document Request 15 asked Plaintiff to provide documents
relating to compensation he has received since March 2018. In response, Plaintiff has provided a
handful of 1099 statements from various years. However, Plaintiff has not provided any tax
returns or any other information relating to his earnings since March 2018. Defendants are
entitled to this information as it goes directly to Plaintiff's efforts to mitigate his damages as well
as what damages Plaintiff would be entitled to. Therefore, please provide a supplemental
response that accurately and fully responds to this request.

3.      Document Request 16 asked Plaintiff to provide a "copy of the financial
statements evidencing the profits and losses, total revenue and amount of compensation or equity
(if any) that you derive from any and all businesses, partnerships, companies, or organizations in
which you, own, are a member of or have any ownership/management interest in." In response,
Plaintiff has stated that he has held the position of "President" for the "Total Rewards
Consultiung Group." Despite this representation, Plaintiff has not provided a copy of any
financial statements evidencing the profits and losses, total revenue and amount of compensation
or equity (if any) that he derives from this entity. Therefore, please provide a supplemental
response that accurately and fully responds to this request.

4.      Document Request 17 asked Plaintiff to provide all documents "showing, relating,
or referring to your claim(s) for and receipt of unemployment compensation benefits, if any, after
March 18, 2018." In response, Plaintiff produced some documents related to his claim for
unemployment but it does not appear to be complete. For example, there is no application for
unemployment compensation included in the production nor is there a determination letter
included. Please provide a supplemental response that accurately and fully responds to this
request.

5.      In Plaintiff's collective response to Defendants' Interrogatories 1-4, Plaintiff
states "When Plaintiff was consulted on the change, he stated that the new plan discriminates
against older employees, and without any success, railed against not fully advising employees
regarding the potential impact on their ability to retire and the tax ramifications of the new plan."
Plaintiff, however, fails to specify to whom he made this statement, when he made this
statement, whether there were any witnesses to this statement and if the statement was made
verbally or written. Therefore, please provide a supplemental response that accurately and fully
responds to this request.

# STEVENS & LEE

## A PA Professional Corporation

Alan B. Epstein, Esquire
January 11, 2022

6.    In Plaintiff's collective response to Defendants' Interrogatories 1-4, Plaintiff attributes the following quote to Daniel Lawlor: "I do not want to have those employees over age 62 to have to suffer the humiliation and embarrassment of filing for unemployment. They should simply retire as they probably will not find another job." Plaintiff, however, fails to specify whether there were any witnesses to this statement and if the statement was made verbally or written. If the statement was allegedly written, please direct Defendants to the bates-label associated with the written documentation. If oral, please provide a supplemental response that accurately and fully responds to this request.

7.    In Plaintiff's collective response to Defendants' Interrogatories 5-6, Plaintiff states "When a Compensation Manager position became available in the Total Awards group, after candidate interviews were completed, Plaintiff and Miriam Weinstein received the "green light" to hire Rose Riciolli, age 55, Daniel Lawlor expressed deep concern that she was too old ("Does not have enough long-term potential for us") and vetoed her being hired. Plaintiff, however, fails to specify to whom Mr. Lawlor allegedly made this statement, when he made this statement, whether there were any witnesses to this statement and if the statement was made verbally or written. Furthermore, Plaintiff fails to identify who allegedly provided the "green light" for Ms. Riciolli's hiring or when this interaction allegedly took place. Lastly, Plaintiff fails to explain how he knew Ms. Riciolli's age. Therefore, please provide a supplemental response that accurately and fully responds to this request.

We thank you in advance for your cooperation in addressing these deficiencies. Additionally, please provide us with a response to the proposed schedule outlined in this letter at your earliest convenience.

Sincerely,

STEVENS & LEE

*/s/ Brandon S. Shemtob*

Brandon Shemtob

Perry, Carl J.

| | |
|---|---|
| **From:** | Alan Epstein <aepstein@sgrvlaw.com> |
| **Sent:** | Tuesday, March 8, 2022 13:55 |
| **To:** | Shemtob, Brandon |
| **Cc:** | Rappoport, Larry J.; Jennifer Myers Chalal |
| **Subject:** | Keuch v. TEVA |



Brandon,


I am finally relieved of matters relating to the trial in the EDPa and the following are the responses to your previous deficiency letter:

**Document Request No. 12, Interrogatory Requests No. 15 and 17**

Plaintiff Randolph W. Keuch has never received any treatment or examination from any physician regarding emotional distress, psychiatric disorders, mental health or any physical manifestations of the same. Accordingly, there are no documents to be supplied and Plaintiff will not sign the requested authorization for release of medical information.

**Document Request No. 13**

Plaintiff has provided all relevant documents related to income received from employment. The requested tax returns contain no income information other than investment income for Plaintiff and his wife and are not relevant or responsive to the request.



**Document Request No. 16**

Plaintiff has submitted all total income earned during the relevant period. The Total Rewards Consulting Group, LLC is an Limited Liability Company formed and wholly owned Plaintiff in January 2021 and there are no financial documents prepared by that entity evidencing any profits and losses, total revenue or compensation or equity.

**Document Request No. 17**

Plaintiff does not possess any application for unemployment compensation benefits or determination letter regarding his receipt of any benefits. All documentation received related to his receipt of unemployment benefits has been produced.

**Interrogatories Nos. 1-4**

In answer to the specific inquiry made in the letter, Plaintiff's statement regarding the age-related impact on older employees was made to Ron Yanis and may also have been communicated orally in the presence of Leslie Billow, Daniel Lawler, Tom McDonough, Esquire and other members of the HR leadership team. Additional information regarding Plaintiff's regarding the subject plan may also have been the subject of email transmissions with Roni Percik. The stated quote of Daniel Lawler in Paragraph 6 of your letter was transmitted orally and was not the subject of a any writing known to Plaintiff. The statement was made by Mr. Lawler in either late December 2017 or January 2018.

**Interrogatories Nos. 5-6**

The HR individuals who interviewed Rose Riciolli (age 55 at the time) for the Compensation Manager position in the Total Awards group and gave the "green light" to Miriam Weinstein for her elevation to that position may have been Linda Misialek, Shannon Phillips and Kriten Krebs. Ms. Riciolli made Plaintiff aware of her age.

In light of the nature of these supplemental responses please advise whether you require a supplemental Verification.

Additionally, I would like to schedule the following persons for deposition during the set discovery period that presently ends on April 15:

1. Mark Sabag
2. Tal Zorman
3. Kare Schultz
4. Daniel Lawler
5. Eduardo Nasi
6. Daniella Shea
7. Ron Percik
8. Pamela Dakis
9. Miraim Weinstein
10. Rose Riciolli
11. Leslie Billow
12. Eleane McGee

I assume you will want to pursue other depositions including Plaintiff's during the applicable discovery period as well. I am relatively flexible (with minor exceptions) for scheduling these depositions virtually during the following weeks:

1. March 22-25
2. March 28-31
3. April 4-8
4. April 11-15

If your schedules do not allow completion of these matters within the current time constraint, would you consider requesting additional discovery time from Judge Gallagher who appears to be the judicial selection for final disposition in light of your declining to have the matter presided over by Judge Wells.

I am available to have a conference call any time this week to further discuss these matters. Just let me know what works best for you.

Alan



**Alan Epstein, Esquire**

## Spector Gadon Rosen Vinci P.C.

**T** +1 215-241-8832
**F** +1 215-531-9103
**E** aepstein@sgrvlaw.com

**www.sgrvlaw.com**   1635 Market Street, 7th Floor, Philadelphia, PA 19103

This communication including attachments, may contain information that is confidential and protected by the attorney/client or other privilege. If you are not the intended recipient of this communication, or if you believe that you have received this communication in error, please notify the sender immediately and kindly delete this email, including attachments, without reading or saving them in any manner.
IRS Circular 230 Disclosure: To ensure compliance with U.S. Treasury Regulations governing tax practice, we inform you that, unless expressly indicated otherwise, any federal tax advice contained in this communication (including attachments) was not written to be used for and cannot be used for (i) purposes of avoiding any tax-related penalties that may be imposed under Federal tax laws, or (ii) the promotion, marketing, or recommending to another party of any tax-related transaction or matter addressed herein.

# TEVA

# EMPLOYMENT APPLICATION

*It is the policy of Teva Pharmaceuticals Industries Ltd and its subsidiaries ("Teva") to promote and assure equal opportunity employment for all current and prospective employees without regard to race, creed, color, religion, sex, age, disability, pregnancy, marital status, sexual orientation, national or ethnic origin, citizenship status, status as a disabled veteran or veteran of the Vietnam era, or any legally recognized status entitled to protection under applicable federal, state, or local anti-discrimination laws. This policy governs all matters related to recruitment, advertising and initial selection of employment. It shall also apply to all other aspects of employment, including, but not limited to, aspects of compensation, promotion, demotion, transfer, lay-offs, terminations, leave of absence and training opportunities.*

Date completed 7/30/2014

| Last Name (please print): | First Name: | Full Middle Name: |
|---|---|---|
| KEUCH | RANDOLPH | William |

Day Time Number: 412.225.8000                     Cell Phone Number: 412.225.8000

E-Mail Address: randy.keuch@gmail.com
Present Address:  Street, City, State, Zip Code, County
409 Wynstone Drive
Wexford PA 15090
Allegheny
How long at this address:
8.5 years

I understand that any material misrepresentation or omission on any employment application materials or within any information fields will be grounds for immediate disqualification of candidacy.  ☑ YES  ☐ NO

Position Applied For or Desired:
Head of Total Rewards - Americas                     Salary Range:

Are you able to perform the essential duties of the job with or without reasonable accommodation?                     Are you under the age of 18?
                                                   ☐ YES  ☑ NO
☑ YES  ☐ NO       Comments:

Have you previously been employed by Teva or a predecessor company of Teva?       ☐ YES  ☑ NO

If yes:
Company:                                          Location:
Job title:                                         Dates employed:  From_____  To_____
List any relatives who are currently employed by Teva:
Name:                          Relationship                          Dept.
Name:                          Relationship                          Dept.
Name:                          Relationship                          Dept.

Have you ever filed an application with Teva?  Please Specify:

☐ YES  ☑ NO     If Yes, When:                Position:

Type of work desired: ☑ Full Time  ☐ Part Time
                      ☐ Temporary  ☐ Summer          Shift Availability: ☑ 1st  ☐ 2nd  ☐ 3rd

When are you available for employment?            Are you available to work overtime, if scheduled?
2014                                              ☑ YES  ☐ NO
Are you currently employed?                       Are you willing to relocate?
☐ YES  ☑ NO                                       ☑ YES  ☐ NO

JOINT APPX - 0051

TEVA 000035

## HIGH SCHOOL / GED

| School Attended | City/State | Did you receive a diploma from High School or a GED? | Last Name Used During High School (if different) |
|---|---|---|---|
| James Caldwell High School | West Caldwell NJ | ☑ High School Diploma  ☐ GED | |

## CONTINUED EDUCATION

| School Attended | City/State | Number of Years Attended | Degree | Degree (i.e.: BA, BS, MD) | Course/Major | Last Name Used During College (if different) |
|---|---|---|---|---|---|---|
| COLLEGE Stevens Institute of Technology | Hoboken NJ | 4 | ☑ YES  ☐ NO | BS | Industrial & Organizational Psychology | |
| COLLEGE Stevens Institute of Technology | Hoboken NJ | 4 | ☑ YES  ☐ NO | MS | Applied Psychology | |
| COLLEGE | | | ☐ YES  ☐ NO | | | |
| COLLEGE | | | ☐ YES  ☐ NO | | | |

Are you able to furnish grade transcripts on request? ☑ YES  ☐ NO

If NO, explain why:

Please identify:

Software regularly used: Microsoft Office

Foreign languages:

| | Write | Speak | Both |
|---|---|---|---|
| | ☐ | ☐ | ☐ |
| | ☐ | ☐ | ☐ |

## PROFESSIONAL LICENSES

Has any professional license held by you ever been revoked or suspended? ☐ YES  ☑ NO

If yes, please explain, including type of license, jurisdiction, and date revoked or suspended.



TEV4 000036

**EMPLOYMENT HISTORY**

P___ list your complete job history for <u>a minimum of the past 10 years</u> starting with your present or most recent employment and noting any periods during which you were not employed in the section below.   Please use an additional sheet of paper, if necessary.

| | |
|---|---|
| **Company Name:**<br>HJ Heinz Company | **Employment**<br>**Dates:**        To<br>       4/2005     9/2013<br>       Month/Year   Month/Year |
| **Address:**<br>1 PPG Place, Suite 3100<br>Pittsburgh PA 15222-2530 | **Last Base**<br>**Salary:**    USD $340,000.00/Yr.<br><br>**Bonus (if**<br>**applicable):**   170000 |
| **Type of Business:**<br>Consumer Products | **Reasons for leaving:**<br>Company was acquired and taken private. |
| **Job Title:**<br>VP, Total Rewards | **May we contact:** ☑ YES  ☐ NO<br>**Supervisor's Name and Title:**<br>Steve Clark |
| **Job Duties:**<br>All facets of compensation, he alt and wellness, retirement plans and mobility as well as aviation function, travel function, fleet, and credit card relationship. | **Email:** stephensanfordclark@gmail.com<br><br>**Telephone #:** (412) 370-1978 |

| | |
|---|---|
| **Company Name:**<br>The Hartford | **Employment**<br>**Dates:**        To<br>      2/2004    4/2005<br>      Month/Year  Month/Year |
| **Address:**<br>___rd CT | **Last Base**<br>**Salary:**<br><br>**Bonus (if**<br>**applicable):** |
| **Type of Business:**<br>Insurance | **Reasons for leaving:** |
| **Job Title:**<br>AVP, Compensation - P&C Division | **May we contact:** ☑ YES  ☐ NO<br>**Supervisor's Name and Title:**<br>Karen Macke |
| **Job Duties:**<br>Responsible for compensation programs for the P&C division | **Email:** MACKEK1@nationwide.com<br><br>**Telephone #:** (860) 810-8645 |

TEVA 000037

| Company Name:<br>Pfizer | Employment Dates: | To |
| | 3/1998    2/2004 | |
| | Month/Year    Month/Year | |
| Address:<br>345 East 42nd Street<br>New York City NY | Last Base Salary: | |
| | Bonus (if applicable): | |
| Type of Business:<br>Pharmaceuticals | Reasons for leaving:<br>Time for a change following 2 very large acquisitions. | |
| Job Title:<br>Corp Director, Strategic Rewards | May we contact: ☑ YES ☐ NO<br>Supervisor's Name and Title:<br>Barry Westlake | |
| Job Duties:<br>Design of global reward and recognition programs | Email: Unknown as he retired<br><br>Telephone #: Unknown as he retired | |

| Company Name: | Employment Dates: | To |
| | | Month/Year    Month/Year |
| Address: | Last Base Salary: | |
| | Bonus (if applicable): | |
| Type of Business: | Reasons for leaving: | |
| Job Title: | May we contact: ☐ YES ☐ NO<br>Supervisor's Name and Title: | |
| Job Duties: | Email:<br><br>Telephone #: | |

Please identify periods in which you were not employed:

TEVA 000038

**PROFESSIONAL REFERENCES**

Please identify three professional references who have observed your work or relevant school performance (if you are a recent graduate) for a period of at least six months.  At least one of your references should be a current or former supervisor.

Name  Steve Clark
Title   Chief People Officer
Company/school  HJ Heinz
Phone  (412) 370-1978
Length of time known  8 years

Address _____
_____
_____
How do you know this person? Prior Manager

Name  Don Lindner
Title   Senior Manager
Company/school  WorldAtWork
Phone  (480) 748-7427
Length of time known  20 years

Address  14040 N. Northsight Blvd
Scottsdale AZ 85260
_____
How do you know this person? Worked together over the years at WorldAtWork

Name  Helen Darling
Title   President & CEO of the National Business Group on Health
Company/school  National Business Group on Health
Phone  (202) 585-1805
Length of time known  4 years

Address  50 F Street, NW
Washington DC 20001
_____
How do you know this person? I sit on the NBGH Board of Directors

---

*(This question is voluntary. Refusal to answer will have no adverse affect on the employment decision.)*

Is there another name under which you have worked and/or attended school that we should use when making such inquires on your behalf?

☐ YES   ☑ NO      If yes, please provide name:

---

Were you in the Military?  ☐ YES  ☑ NO          Can you furnish copies of your DD214?  ☐ YES  ☐ NO

Length of Military Service: Years _____      Months _____

| Rank at Discharge* | Branch of Service | Type of Duty | Special Training | Service Number |
|---|---|---|---|---|
|  |  |  |  |  |

*Dishonorable/general discharge is not an automatic bar to employment.*

---

Are you legally authorized to work in the US?

☑ YES  ☐ NO

---

Do you have a valid driver's license?

☑ YES  ☐ NO

---

Do you have any allergies or sensitivity to medical substances (example: penicillin, latex, bleach, etc.) which preclude you from working in the production facility?

☑ YES  ☐ NO

If YES, describe:
Penicillin

TEVA 000039

*Answering "yes" will not necessarily disqualify you from consideration.)*
*(California applicants should exclude marijuana related convictions that are more than two years old.)*

Have you ever been convicted of or pled guilty or no contest to any crime other than a minor traffic violation?   ☐ YES   ☑ NO
If yes, give details:

Have you ever had your employment involuntarily terminated?   ☑ YES   ☐ NO
If yes, please explain:
4 months following the acquisition of Heinz and after the Company was taken private, my job was eliminated and I was provided a severance package.

Have you ever been asked to resign from any job?   ☐ YES   ☑ NO
If yes, please explain:

Have you ever resigned from any job when confronted with allegations of misconduct, a violation of company policies, or unsatisfactory work performance?   ☐ YES   ☑ NO

If yes, please explain:

Do not report any conviction that has been sealed, expunged, statutorily eradicated, annulled, impounded, erased, dismissed under the First Offender's law, pardoned by the Governor or in which state law allows you to lawfully deny as set forth below.   You are also not required to disclose violations, infractions, petty misdemeanors or summary offenses.

* California applicant/residents: You need not disclose any referral to, and participation in, any pre-trial or post-trial diversion program, or any misdemeanor convictions for which probation has been successfully completed and discharged.  Do not list any marijuana-related misdemeanor convictions over two years old, or felony marijuana convictions under California Health and Safety Code Section 11360 (c) which occurred prior to 1976.

* Connecticut applicants/residents: You need not disclose any conviction record that has been erased pursuant to sections 46b-146, 54-76o or 54-142a of the Connecticut General Statutes. Records subject to erasure under these sections are records pertaining to a finding of delinquency or that a child was a member of a family with service needs, adjudication as a youthful offender, a criminal charge that was dismissed or nolled, or a criminal charge for which the person was found not guilty or received an absolute pardoned conviction.  Any person whose records were erased within the meaning of these three sections may consider such events to have never occurred and may so swear under oath.

*Hawaii applicants/residents: Do not respond to this question until you have been given a conditional offer of employment.

*Kentucky applicants/residents: You do not respond "Yes" as a result of any misdemeanor conviction where the date of conviction was more than five years ago.

*Massachusetts applicants/residents: An applicant for employment with a sealed record on file with the commissioner of probation may answer "no" to the above with respect to an inquiry herein relative to prior arrests, criminal court appearances or convictions.  In addition, any applicant for employment may answer "no" to the above with respect to any inquiry relative to prior arrests, court appearances and adjudications in all cases of delinquency or as a child in need of services which did not result in a complaint transferred to the superior court for criminal prosecution.

You may exclude information regarding first convictions for the following misdemeanors: drunkenness, simple assault, speeding, minor traffic violations, affray, or disturbance of the peace, or a conviction for any misdemeanor where the conviction occurred or any prison sentence ended five or more years ago whichever date is later, unless you have been convicted of another offense within the last 5 years.

*Washington applicants/residents: You may exclude convictions that occurred over ten years ago.

TEV 000040

I certify that the foregoing statements are accurate and complete to the best of my knowledge, and I understand that I am subject to dismissal if any information provided by me is false. Teva Pharmaceuticals Industries Ltd and its subsidiaries ("Teva") is hereby authorized to make any investigation of my personal history through any investigative or credit agencies or bureaus of their choice. This investigation can be conducted prior to or during my employment. I understand that Teva may contact the Drug Enforcement Administration and other regulatory or law enforcement agencies to secure such information and I waive any rights I may have regarding the obtainment of such information. I further understand that my employment is contingent upon satisfactory reference information whenever obtained, and upon passing a physical examination.

I have not been excluded, debarred, suspended, or otherwise ruled ineligible to participate in any Federal health care program (as in defined in 42 U.S.C. § 1320a-7b(f)) and I have not engaged in any activity that could lead to me becoming excluded, debarred, suspended, or otherwise ruled ineligible to participate in any Federal health care program.

In particular:

I have not been debarred under Section 306(a) or Section 306(b) of the Federal Food, Drug and Cosmetic Act, as it may be amended from time to time, or any other local, state or federal law applicable to the pharmaceutical industry.

I have not been excluded from participation in any federal healthcare program under Section 1128 of the Social Security Act, as it may be amended from time to time, or any other local, state or federal Health Care Fraud and Abuse Laws or False Claims Acts or applicable regulations.

I have not been convicted of a criminal offense that falls within the scope of the federal Anti-kickback Statute (42 U.S.C. § 1320a-7(a)).

I have not been debarred, and I have not worked for any company that has been debarred, under the Generic Drug Enforcement Act of 1992. I have not been convicted of any crime of the types listed in Section 2(a) and 2(b) of the Generic Drug Enforcement Act of 1992 within the five years prior to this date.

I will notify Teva immediately if I should, in the future, be excluded, debarred, suspended, or otherwise ruled ineligible to participate in any Federal health care program or if any action is taken that could lead toward my being excluded, debarred, suspended, or otherwise ruled ineligible to participate in any Federal health care program.

Teva is also authorized to circulate my application to other divisions of Teva. I certify that to the best of my knowledge and belief, all statements in this application are true and correct, and I understand that any misrepresentation is cause for dismissal.

My signature below indicates that I have read, understood, and consented to the above statements and that I affirm the accuracy of all answers I have given to the questions on the application. This authorization or photocopy of it shall serve as consent for Teva to request any information concerning my application.


Signature:   **RANDOLPH KEUCH**                                          Date:   12/24/2013 12:08 PM


The symbol above, authorized by the individual is the legally binding equivalent of the individual's handwritten signature.



## NOTICE REGARDING BACKGROUND INVESTIGATION
## PURSUANT TO CALIFORNIA LAW

**Teva Pharmaceuticals Industries Ltd and its subsidiaries ("Teva")** intends to obtain information about you for employment purposes from a consumer reporting agency. Thus, you can expect to be the subject of "investigative consumer reports" and "consumer credit reports" obtained for employment purposes. Such reports may include information about your character, general reputation, personal characteristics and mode of living. With respect to any investigative consumer report from an investigative consumer reporting agency ("ICRA"), the Company may investigate the information contained in your employment application and other background information about you, including but not limited to obtaining a criminal record report, verifying references, work history, your social security number, your educational achievements, licensure, and certifications, your driving record, and other information about you, and interviewing people who are knowledgeable about you. The results of this report may be used as a factor in making employment decisions. The source of any investigative consumer report (as that term is defined under California law) will be Orange Tree Employment Screening, 7275 Ohms Lane, Minneapolis, MN 55439, 800-886-4777. The source of any credit report will be Orange Tree Employment Screening, 7275 Ohms Lane, Minneapolis, MN 55439, 800-886-4777. The Company agrees to provide you with a copy of an investigative consumer report when required to do so under California law.

Under California Civil Code section 1786.22, you are entitled to find out from an ICRA what is in the ICRA's file on you with proper identification, as follows:

- In person, by visual inspection of your file during normal business hours and on reasonable notice. You also may request a copy of the information in person. The ICRA may not charge you more than the actual copying costs for providing you with a copy of your file.

- A summary of all information contained in the ICRA's file on you that is required to be provided by the California Civil Code will be provided to you via telephone, if you have made a written request, with proper identification, for telephone disclosure, and the toll charge, if any, for the telephone call is prepaid by or charged directly to you.

- By requesting a copy be sent to a specified addressee by certified mail. ICRAs complying with requests for certified mailings shall not be liable for disclosures to third parties caused by mishandling of mail after such mailings leave the ICRAs.

"Proper Identification" includes documents such as a valid driver's license, social security account number, military identification card, and credit cards. Only if you cannot identify yourself with such information may the ICRA require additional information concerning your employment and personal or family history in order to verify your identity.

The ICRA will provide trained personnel to explain any information furnished to you and will provide a written explanation of any coded information contained in files maintained on you. This written explanation will be provided whenever a file is provided to you for visual inspection.

You may be accompanied by one other person of your choosing, who must furnish reasonable identification. An ICRA may require you to furnish a written statement granting permission to the ICRA to discuss your file in such person's presence.


TEVA 000042



December 20, 2013

Mr. Randolph W. Keuch
409 Wynstone Drive
Wexford, PA 15090

Dear Randy,

On behalf of Teva Pharmaceutical Industries LTD, I am very pleased to offer you the position of Senior Director, Total Rewards – Americas located in North Wales, PA. This position would report directly to Yonit Landskroner – VP, Global Compensation & Benefits. Your anticipated start date is Monday, January 6, 2014. The initial terms of employment are as follows:

- **Base Pay**:  You will be paid a base pay of $9,615.38 bi-weekly, which when annualized is equivalent to $250,000 (the "Annual Base Salary"), payable in accordance with our standard payroll practices for salaried employees.  You will receive a paycheck or electronic payment every two weeks.

- **Bonus**:  You will be eligible to participate in the Teva 2014 Bonus Program with an incentive opportunity equal to 30% of your Annual Base Salary, subject to the terms and conditions in the 2014 Bonus Program.

- **Sign-on Bonus**:  You will be paid a sign-on bonus of $50,000 to be paid one year after your start date, assuming a successful performance within that year.  Voluntary termination within the first 24 months of employment will require repayment of such sign-on bonus payable to Teva.

- **Merit Increases**:    You will be eligible to participate in our 2014 Teva Performance Management Program, subject to the guidelines for active employees.

- **Benefits**:  You shall be eligible to participate in our health and dental plans, our 401(k) savings plan, profit sharing plan, and flexible spending accounts, subject to the applicable plan terms.  Additionally, you shall be eligible to participate in our life insurance, travel insurance and short-term and long-term disability plans.  You acknowledge that participation in our benefit programs may require payroll deductions and/or direct contributions by you.

- **Paid Time-Off**:  You will be eligible for Teva paid holidays and 20 days of vacation time, prorated in the first partial year of employment, in accordance with the applicable policy guidelines.

TEVA 000047

Mr. Randolph W. Keuch
December 20, 2013
Page 2 of 3

- <u>Relocation:</u> You are being offered relocation benefits under our current policy, which is enclosed.

- <u>Long Term Equity-Based Incentive Plan</u>: During your employment with the company, and subject to demonstrated high potential and sustained high performance, you will be considered for equity compensation awards (Options and/or Restricted Share Units) under Teva 2010 Long Term Equity-Based Incentive Plan ("The Plan"), in accordance with the terms at the discretion of Teva's management and the HR and Compensation Committee of Teva's Board (the "Committee"). Please note that equity compensation may be discontinued at anytime as determined by the company.

The nature of your employment with us is and will be "at will," as defined by applicable law, meaning that either we or you may terminate your employment at any time, with or without notice and with or without cause, for any reason or for no reason, without further obligation or liability. Teva reserves the right to change, end or alter the terms of your employment and/or the terms of any plans at any time without prior notice.

This offer letter sets forth the full and complete agreement between you and us regarding your employment, and supersedes all prior negotiations, discussions, correspondence, communications, understandings and agreements between the parties relating to the subject matter contained herein.

We have enclosed two copies of the offer letter and confidentiality agreement. Please formally accept this offer by signing and returning one copy of the offer letter and confidential agreement to my attention.

As a condition of your employment, you agree to the following:

- Execution of this offer letter.
- Execution of our standard form of Employee Confidentiality Agreement applicable to similarly situated positions.
- Provide proof of your identity and legal right to work in the United States, pursuant to the Immigration Reform and Control Act.
- Successful completion of the background check.
- Completion of reference checks satisfactory to Teva.

This offer of employment is contingent upon successfully completing and passing a medical evaluation prior to your agreed upon start date. This evaluation will include a physical exam and drug test. Please contact Health Services, at (215) 591-8679 to schedule your appointment.

I have enclosed information about the benefits plans available to Teva employees. Additional information will be provided at your orientation. If you have any questions, please feel free to contact me.

TEVA 000048

Mr. Randolph W. Keuch
December 20, 2013
Page 3 of 3

We are very excited to have you as a part of our management team.  We have many exciting challenges ahead and we are confident you can make a significant contribution to our future growth.

Sincerely yours,

*Anis Baig*

Anis Baig
VP, Global Talent Acquisition & Mobility

Acknowledged and agreed:

_____          12/23/2013
Mr. Randolph W. Keuch                                       Date

TEVA 000049

# TEVA PHARMACEUTICALS USA, INC.

## EMPLOYEE PROPRIETARY INFORMATION AND INVENTIONS AGREEMENT

I, Randolph W. Keuch, in consideration of my employment or continued employment by Teva Pharmaceuticals USA, Inc., its subsidiaries, parents, affiliates, successors and assigns throughout the world (collectively, the "**Company**") and the compensation now and hereafter paid to me, I, on December 20, 2013, hereby enter into this Employee Proprietary Information and Inventions Agreement (the "**Agreement**") and agree as follows:

## 1. NONDISCLOSURE.

**1.1 Recognition of Company's Rights; Nondisclosure.** I understand and acknowledge that my employment by the Company creates a relationship of confidence and trust with respect to the Company's Proprietary Information (defined below) and that the Company has a protectable interest therein. At all times during my employment and thereafter, I will hold in strictest confidence and will not disclose, use, lecture upon or publish any of the Company's Proprietary Information, except disclosure, use or publication to Company personnel who need to know the Company's Proprietary Information in connection with their work for the Company, or unless an officer of the Company expressly authorizes such in writing. I will obtain the written approval from a designated officer of the Company before publishing or submitting for publication any material (written, verbal, or otherwise) that relates to my work at the Company and/or incorporates or might incorporate any Proprietary Information. I agree to be bound by and to comply fully with the terms of the Company's Social Media Policy, and/or any similar published policy, now or hereafter in effect. I hereby assign to the Company any rights I may have or acquire in such Proprietary Information and recognize that all Proprietary Information shall be the sole property of the Company and its assigns. I will take all reasonable precautions to prevent the inadvertent or accidental disclosure of Proprietary Information.

**1.2 Proprietary Information.** The term "**Proprietary Information**" shall mean any and all confidential and/or proprietary knowledge, data or information of the Company, its affiliates, parents and subsidiaries, whether having existed, now existing, or to be developed during my employment. By way of illustration but not limitation, "**Proprietary Information**" includes (a) trade secrets, inventions, innovations, mask works, ideas, processes, formulas, source and object codes, data, programs, other works of authorship, know-how, improvements, discoveries, developments, designs and techniques and any other proprietary technology and all Proprietary Rights therein (hereinafter collectively referred to as "**Inventions**"); (b) information regarding research, development, new products, marketing and selling, business plans, budgets and unpublished financial statements, licenses, prices and costs, margins, discounts, credit terms, pricing and billing policies, quoting

procedures, methods of obtaining business, forecasts, future plans and potential strategies, financial projections and business strategies, operational plans, financing and capital-raising plans, activities and agreements, internal services and operational manuals, methods of conducting Company business, suppliers and supplier information, and purchasing; (c) information regarding customers and potential customers of the Company, including customer lists, names, representatives, their needs or desires with respect to the types of products or services offered by the Company, proposals, bids, contracts and their contents and parties, the type and quantity of products and services provided or sought to be provided to customers and potential customers of the Company and other non-public information relating to customers and potential customers; (d) public and non-public information regarding any of the Company's business partners and their services, including names, representatives, proposals, bids, contracts and their contents and parties, the type and quantity of products and services received by the Company, and other non-public information relating to business partners; (e) information regarding personnel, employee lists, compensation, and employee skills; and (f) any other non-public information which a competitor of the Company could use to the competitive disadvantage of the Company. Notwithstanding the foregoing, it is understood that, at all such times, I am free to use information which is generally known in the trade or industry through no breach of this agreement or other act or omission by me.

**1.3 Third Party Information.** I understand, in addition, that the Company has received and in the future will receive from third parties confidential and/or proprietary knowledge, data, or information ("**Third Party Information**") subject to a duty on the Company's part to maintain the confidentiality of such information and to use it only for certain limited purposes. During my employment and thereafter, I will hold Third Party Information in the strictest confidence and will not disclose to anyone (other than Company personnel who need to know and/or are authorized to know such information in connection with their work for the Company) or use, except in connection with my work for the Company, Third Party Information unless expressly authorized by an officer of the Company in writing.

**1.4 Term of Nondisclosure Restrictions.** I understand that Proprietary Information and Third Party Information are never to be used or disclosed by me,

except as provided in this Section 1. If, however, a court decides that this Section 1 or any of its provisions is unenforceable for lack of reasonable temporal limitation and the Agreement or its restriction(s) cannot otherwise be enforced, I agree and the Company agrees that the five (5) year period after the date my employment ends shall be the temporal limitation relevant to the contested restriction, provided, however, that this sentence shall not apply to trade secrets protected without temporal limitation under applicable law.

**1.5 No Improper Use of Information of Prior Employers and Others.** During my employment by the Company I will not improperly use or disclose any confidential information or trade secrets, if any, of any former employer or any other person to whom I have an obligation of confidentiality, and I will not bring onto the premises of the Company or introduce into the Company's email or other information systems, or its devices or storage media of any type (e.g., smart phones, PDAs and memory sticks) any unpublished documents or any property belonging to any former employer or any other person to whom I have an obligation of confidentiality unless consented to in writing by that former employer or person.

**2. ASSIGNMENT OF INVENTIONS.**

**2.1 Proprietary Rights.** The term **"Proprietary Rights"** shall mean all trade secrets, patents, copyrights, trade marks, mask works and other intellectual property rights throughout the world.

**2.2 Prior Inventions.** Inventions, if any, patented or unpatented, which I made prior to the commencement of my employment with the Company are excluded from the scope of this Agreement. To preclude any possible uncertainty, I have set forth on *Exhibit A* (Prior Inventions) attached hereto a complete list of all Inventions that relate to the Company's actual or anticipated business, research or development that I have, alone or jointly with others, conceived or developed or caused to be conceived or developed prior to the commencement of my employment with the Company, that I consider to be my property or the property of third parties, and that I wish to have excluded from the scope of this Agreement (collectively referred to as **"Prior Inventions"**). If disclosure of any such Prior Invention would cause me to violate any prior confidentiality agreement, I understand that I am not to list such Prior Inventions in *Exhibit A* but am only to disclose a cursory name for each such invention, a listing of the party(ies) to whom it belongs, the nature of my relationship to the party(ies), the business interest of the party(ies), and the fact that full disclosure as to such inventions has not been made for that reason. To further preclude any possible uncertainty, I have set forth in Exhibit A a list of all publicly available publications related to inventions that I have, alone or jointly with others, conceived or developed

or caused to be conceived or developed prior to the commencement of my employment with the Company, that I consider to disclose my property or the property of a third party. A space is provided on *Exhibit A* for such purpose. If no such disclosure is attached, I represent that there are no Prior Inventions. If, in the course of my employment with the Company, I incorporate a Prior Invention into a Company product, process or machine, the Company is hereby granted and shall have a nonexclusive, royalty-free, irrevocable, perpetual, fully-paid, worldwide license (with rights to sublicense through multiple tiers of sublicensees) to make, have made, modify, make derivative works of, publicly perform, use, sell, import, and exercise any and all present and future rights in such Prior Invention, but only to the extent I have the right to grant such rights. Notwithstanding the foregoing, I agree that I will not incorporate, or permit to be incorporated, Prior Inventions in any Company Inventions without the Company's prior written consent.

**2.3 Assignment of Inventions.** Subject to Subsections 2.4 and 2.6, I hereby assign and agree to assign in the future (when any such Inventions or Proprietary Rights are first reduced to practice or first fixed in a tangible medium, as applicable) to the Company all my right, title and interest in and to any and all Inventions (and all Proprietary Rights with respect thereto) whether or not patentable or registrable under copyright or similar statutes, made or conceived or reduced to practice, either alone or jointly with others, during the period of my employment with the Company. Inventions assigned (or that should be assigned pursuant to this Agreement) to the Company, or to a third party as directed by the Company pursuant to this Section 2, are hereinafter referred to as **"Company Inventions."**

**2.4 Unassigned or Nonassignable Inventions.** I recognize that this Agreement will not be deemed to require disclosure or assignment of any Invention that I developed entirely on my own time without using the Company's equipment, supplies, facilities, trade secrets, or Proprietary Information, except for those Inventions that either (i) relate to the Company's actual or anticipated business, research or development, or (ii) result from or are connected with work performed by me for the Company. In addition, this Agreement does not apply to any Invention which qualifies fully for protection from assignment to the Company under any specifically applicable state law, regulation, rule, or public policy (**"Specific Inventions Law"**).

**2.5 Obligation to Keep Company Informed.** During the period of my employment and for one (1) year after termination of my employment with the Company, I will promptly disclose to the Company fully and in writing all Inventions authored, conceived or reduced to practice by me, either alone or jointly with others; provided, however, that I may lawfully make such disclosures without violating my obligations to one or more third

TEVA 000070

parties. In addition, I will promptly disclose to the Company all patent applications filed by me or on my behalf within a year after termination of employment. At the time of each such disclosure, I will advise the Company in writing of any Inventions that I believe fully qualify for protection under the provisions of a Specific Inventions Law; and I will at that time provide to the Company in writing all evidence necessary to substantiate that belief. The Company will keep in confidence and will not use for any purpose or disclose to third parties without my consent any confidential information disclosed in writing to the Company pursuant to this Agreement relating to Inventions that qualify fully for protection under a Specific Inventions Law. I will preserve the confidentiality of any Invention that does not fully qualify for protection under a Specific Inventions Law. I agree to promptly disclose orally and in writing to any third party for whom I subsequently work and/or otherwise provide services my belief that the work and/or services I perform are likely to breach my obligations to the Company under this Agreement.

### 2.6 Government or Third Party. I also agree to

assign all my right, title and interest in and to any particular Company Invention to a third party, including without limitation the United States, as directed by the Company.

### 2.7 Works for Hire. I acknowledge that all

original works of authorship which are made by me (solely or jointly with others) within the scope of my employment and which are protectable by copyright are "works made for hire," pursuant to United States Copyright Act (17 U.S.C., Section 101).

### 2.8 Enforcement of Proprietary Rights. I will

assist the Company in every proper way to obtain, and from time to time enforce, United States and foreign Proprietary Rights relating to Company Inventions in any and all countries. To that end I will execute, verify and deliver such documents and perform such other acts (including appearances as a witness) as the Company may reasonably request for use in applying for, obtaining, perfecting, evidencing, sustaining and enforcing such Proprietary Rights and the assignment thereof. In addition, I will execute, verify and deliver assignments of such Proprietary Rights to the Company or its designee. My obligation to assist the Company with respect to Proprietary Rights relating to such Company Inventions in any and all countries shall continue beyond the termination of my employment, but the Company shall compensate me at a reasonable rate after my termination for the time actually spent by me at the Company's request on such assistance.

### 2.9 In the event the Company is unable for any

reason, after reasonable effort, to secure my signature on any document needed in connection with the actions specified in the preceding paragraph, I hereby irrevocably designate and appoint the Company and its duly authorized officers and agents as my agent and attorney in fact, which

appointment is coupled with an interest, to act for and in my behalf to execute, verify and file any such documents and to do all other lawfully permitted acts to further the purposes of the preceding paragraph with the same legal force and effect as if executed by me. I hereby waive and quitclaim to the Company any and all claims, of any nature whatsoever, which I now or may hereafter have for infringement of any Proprietary Rights assigned hereunder to the Company.

**3. RECORDS.** I agree to keep and maintain adequate and current records (in the form of notes, sketches, drawings and in any other form that may be required by the Company) in conformance with Company policies, procedures, and practices of all Proprietary Information developed by me and all Inventions made by me during the period of my employment at the Company, which records shall be available to and remain the sole property of the Company at all times.

**4. DUTY OF LOYALTY DURING EMPLOYMENT; BEST EFFORTS; NON-SOLICITATION.**

### 4.1 Duty of Loyalty. I agree that during the

period of my employment by the Company I will not, without the Company's express written consent, directly or indirectly engage in any employment or business activity which is directly or indirectly competitive with, or would otherwise conflict with, my employment by the Company.

### 4.2 Best Efforts. I agree that during the period of

my employment by the Company I will abide by all Company policies and devote my best efforts to the services of the Company. To that end, I agree not to participate in the planning, operation, or management of any activity competitive with the Company's interests and will not otherwise engage in any activity in conflict with the Company's interests, except as permitted and authorized in writing by a designated officer of the Company, during the period of my Company employment.

**5. REASONABLENESS OF RESTRICTIONS.**

### 5.1 I agree that I have read this entire Agreement

and understand it. I agree that this Agreement does not prevent me from earning a living or pursuing my career. I agree that the restrictions contained in this Agreement are reasonable, proper, and necessitated by the Company's legitimate business interests. I represent and agree that I am entering into this Agreement freely and with knowledge of its contents with the intent to be bound by the Agreement and the restrictions contained in it.

### 5.2 In the event that a court finds this Agreement,

or any of its restrictions, to be ambiguous, unenforceable, or invalid, I and the Company agree that the court shall read the Agreement as a whole and interpret the restriction(s) at issue to be enforceable and valid to the maximum extent allowed by law.

TEVA 000071

**5.3** If the court declines to enforce this Agreement in the manner provided in subsection 7.2, I and the Company agree that this Agreement will be automatically modified to provide the Company with the maximum protection of its business interests allowed by law and I agree to be bound by this Agreement as modified.

**6.  RETURN OF COMPANY PROPERTY.** When I leave the employ of the Company, or at any time at the Company's request, I will deliver to the Company any and all drawings, notes, memoranda, specifications, devices, formulas, and documents, together with all copies thereof, and any other material containing or disclosing any Company Inventions, Third Party Information or Proprietary Information of the Company, as well as any other Company property. I further agree that any property situated on the Company's premises and owned by the Company, including disks and other storage media, filing cabinets or other work areas, is subject to inspection by Company personnel at any time with or without notice. I further agree that I also will be subject to any other Company policy regarding searches of my person and property adopted by the Company from time to time. Prior to leaving, I will cooperate with the Company in completing and signing the Company's termination statement if requested to do so by the Company.

**7.  LEGAL AND EQUITABLE REMEDIES.**

**7.1** I agree that it may be impossible to assess the damages caused by my violation of this Agreement or any of its terms. I agree that any threatened or actual violation of this Agreement or any of its terms will constitute immediate and irreparable injury to the Company and the Company shall have the right to enforce this Agreement and any of its provisions by injunction, specific performance or other equitable relief, without bond and without prejudice to any other rights and remedies that the Company may have for a breach or threatened breach of this Agreement.

**7.2** I agree that if the Company is successful in whole or in part in any legal or equitable action against me under this Agreement, the Company shall be entitled to payment of all costs, including reasonable attorney's fees, from me.

**8.  NONDISPARAGEMENT.** I agree that I will not make any disparaging statements to current, former or prospective Company customers, contractors, vendors or employees, to any media or to any other person about the Company, its affiliates or parent, their officers, directors or employees. A disparaging statement is any communication, oral or written, that would cause or tend to cause the recipient of the communication to question the business condition, integrity, competence, fairness or good character of the person or entity to which the communication relates. This includes but is not limited to

statements made on blogs, surveys, internet discussion groups, personal web pages, and social networking sites.

**9.  NOTICES.** Any notices required or permitted hereunder shall be given to the appropriate party at the address specified below, or at my address as listed in the Company records, or at such other address as the party shall specify in writing. Such notice shall be deemed given upon personal delivery to the appropriate address or if sent by certified or registered mail, three (3) days after the date of mailing.

> **If to the Company:**
>
> Teva Pharmaceuticals USA, Inc.
> 425 Privet Road
> Horsham, PA 19044
> Attn: General Counsel
>
> **If to the Employee (print legibly):**
>
> Name:    _____
> Address:  _____
> Address:  _____

**10.  NOTIFICATION OF NEW EMPLOYER.** In the event that I leave the employ of the Company, I authorize the Company to provide notice of my rights and obligations under this Agreement to my subsequent employer and to any other entity or person to whom I provide services.

**11.  GENERAL PROVISIONS.**

**11.1 Governing Law; Consent to Personal Jurisdiction.** This Agreement will be governed by and construed according to the laws of the Commonwealth of Pennsylvania without regard to conflicts of laws principles. I hereby expressly consent to the personal jurisdiction and venue of the state and federal courts located in the Commonwealth of Pennsylvania for any lawsuit filed there against me by Company (or vice versa) arising from or related to this Agreement, and agree that any lawsuit by me against Company will be brought solely in such courts.

**11.2 Severability.** In case any one or more of the provisions, subsections, or sentences contained in this Agreement shall, for any reason, be held to be invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect the other provisions of this Agreement, and this Agreement shall be construed as if such invalid, illegal or unenforceable provision had never been contained herein. If moreover, any one or more of the provisions contained in this Agreement shall for any reason be held to be excessively broad as to duration, geographical scope, activity or subject, it shall be construed by limiting and reducing it, so as to be enforceable to the extent compatible with the applicable law as it shall then appear.

TEVA 000072

**11.3 Successors and Assigns.** This Agreement is for my benefit and the benefit of the Company, its successors, assigns, parent corporations, subsidiaries, affiliates, and purchasers, and will be binding upon my heirs, executors, administrators and other legal representatives.

**11.4 Survival.** The provisions of this Agreement shall survive the termination of my employment, regardless of the reason, and the assignment of this Agreement by the Company to any successor in interest or other assignee.

**11.5 Employment At-Will.** I agree and understand that nothing in this Agreement shall change my at-will employment status or confer any right with respect to continuation of employment by the Company, nor shall it interfere in any way with my right or the Company's right to terminate my employment at any time, with or without cause or advance notice.

**11.6 Waiver.** No waiver by the Company of any breach of this Agreement shall be a waiver of any preceding or succeeding breach. No waiver by the Company of any right under this Agreement shall be construed as a waiver of any other right. The Company shall not be required to give notice to enforce strict adherence to all terms of this Agreement.

**11.7 Advice of Counsel. I ACKNOWLEDGE THAT, IN EXECUTING THIS AGREEMENT, I HAVE HAD THE OPPORTUNITY TO SEEK THE ADVICE OF INDEPENDENT LEGAL COUNSEL, AND I HAVE READ AND UNDERSTOOD ALL OF THE TERMS AND PROVISIONS OF THIS AGREEMENT. THIS AGREEMENT SHALL NOT BE CONSTRUED AGAINST ANY PARTY BY REASON OF THE DRAFTING OR PREPARATION HEREOF.**

**11.8 Entire Agreement.** The obligations pursuant to Sections 1 and 2 (except Subsection 2.7) of this Agreement shall apply to any time during which I was previously engaged, or am in the future engaged, by the Company as an employee and/or consultant if no other agreement governs nondisclosure and assignment of inventions during such period. This Agreement is the final, complete and exclusive agreement of the parties with respect to the subject matter hereof and supersedes and merges all prior discussions between the parties. No modification of or amendment to this Agreement, nor any waiver of any rights under this Agreement, will be effective unless in writing and signed by the party to be charged. Any subsequent change or changes in my duties, salary or compensation will not affect the validity or scope of this Agreement.

This Agreement shall be effective as of the first day of my employment with the Company or, in the alternative, on the day that I execute this Agreement as a current employee of the Company.

**I HAVE READ THIS AGREEMENT CAREFULLY AND UNDERSTAND ITS TERMS. I HAVE COMPLETELY FILLED OUT EXHIBIT A TO THIS AGREEMENT.**

Dated: 12 / 23 / 2013

_Randolph Wm Kevch_
**(Signature)**

Randolph Wm Kevch
**(Printed Name)**

**ACCEPTED AND AGREED TO:**

**TEVA PHARMACEUTICALS USA, INC.**

By: _Amy Smith_
Title: _Sr Mgr. Talent Acq._
Dated: 1/6/14

TEVA 000073

**Archived:** Wednesday, March 3, 2021 7:24:28 AM
**From:** MarkSabag
**Sent:** Thu, 14 Dec 2017 14:50:48
**To:** Tal Zorman
**Su**~~b~~**:** Global HR Leadership Updates
**Sensitivity:** Normal

View web version



**Mark Sabag**
Group EVP and Chief Human Resources Officer



# Global HR Leadership Team Updates

**To: Global HR Community**

Dear HR Colleagues,

Teva is embarking on a period of significant change that will affect all aspects our business, our structure, and most critically, our people. Today our CE provided the details of a substantial restructuring plan, driven by the need to unify and simplify our organization. The challenges we are currently facing require us to take significant and decisive steps to restore our financial securi and stabilize our business with a sense of urgency, and it will affect every part of Teva.

In full alignment with today's CEO message, our main objective as a global H function in 2018 will be to **drive the organizational design and people aspect of Teva's restructuring**. Our approach will focus the HR operating model an updated structure on three key principles:

1. **Business HR alignment** - combine Regional and Business support to more closely align our HR activities in each region with the new Teva structure.
2. **Integrated Talent** - transition from separate CoEs to a more integrated an consistent approach to talent solutions.
3. **Operations & Services** - focus on end-to-end delivery of HR services.

These changes will enable a sharper focus on business needs, and will help to further simplify our current operating model, reduce bureaucracy and improve HR productivity.

**HR Global Leadership Team (GLT)**
In alignment with Teva's new Executive Team and organizational structure, well as the above-mentioned changes to our HR operating model, the followi appointments and updates to our HR leadership and global organization ar effective immediately:

**Business HR:**
- HR for North America will be led by Daniel Lawlor

TEVA 000113

- HR for Europe will be led by Niels Walch
- HR for Growth Markets will be led by Moshe Netzer until March 31, 2018, after which Orly Pascal will lead HR for Growth Markets, including Israel
- HR for Global Operations will be led by Glenn Gerecke
- HR for Global R&D and Global Marketing & Portfolio will be led by Vikki Conway

In addition to their primary roles, the Regional HRMs will provide leadership insight and coordination for Teva's executive leaders within their respective regions, in alignment with Teva's new structure.

Integrated Talent Management will be led by Tal Zorman. This function will combine Talent Acquisition and Mobility, Leadership and Development and Total Rewards to provide HR leading practices and solutions.

The HR Operations & Service organization will be led by Anat Markus, and will be responsible for the delivery of consistent and systematic HR services across Teva.

All members of the global HRBP teams for GGM and GSM will now report into their corresponding regional HR teams noted above. Similarly, the HR Centers of Expertise will become part of the Integrated Talent Management organization Additional detailed announcements will be communicated soon to all colleague impacted by the revised reporting structures.

As a result of the above organizational changes, we have had to make some very difficult decisions. We will be parting from the following members of the GLT, and I would like to thank them for their significant contribution and years dedicated service to Teva:

**Moshe Netzer**, SVP, HRBP Growth Markets - with 27 years of service in Teva, Moshe has been a tremendous asset to the Company, to HR and to the many partners he has supported during this time. Moshe made a significant impact our HR organization throughout his career of key HR leadership roles, including SVP HR for Teva Global Operations, establishing Teva's European Regional H organization as well as leading Corporate Training & Organization Development during a period of global growth and integration I would like to convey my sincere appreciation for his many contributions and the long-term professional insights he has brought to our HR practice, and on a more personal note, I will always value the perspective and wisdom he has provided to me especially in times of tough decisions. Moshe will continue to lead HR for Growth Markets over the coming months as it is transitioned to Orly Pascal, and his last day at Teva will be March 31, 2018.

**Raffi Hrs**, SVP, HRBP for Global Specialty Medicines - Raffi has played instrumental role in HR for over 21 years with Teva, most recently in GSM, and in previous roles leading HR for Global Specialty R&D as well as building the HR organization to support earlier innovative and branded commercial business units in Teva. Raffi's deep professional expertise as a multi-faceted HR le has supported the exponential growth of our specialty capabilities over t years, and I would like to extend my personal gratitude and wish him great success in his future endeavors. Raffi's last day with Teva will be December 3 2017.

**Ron Yaniv**, SVP of Global Total Rewards - for over 2 ½ years since joining Teva, Ron has applied extensive experience from his previous roles at Intel and Marvell to lead a culture change in Teva's approach to Total Rewards. He has done this through a wide range of initiatives, including alignment of global Reward and Benefits policies with Teva's strategic goals, building a infrastructure of benchmark practices, and maintaining a strong partnership wit Teva's Board of Directors. I would like to take this opportunity to thank Ron for the collaborative efforts he has led in our approach to global rewards across H Ron's last day with Teva will be December 31, 2017.

TEVA 000114

**Simon Kelner**, VP Global Talent Acquisition and Mobility - while Simon may be the newest member of the HR GLT, he has made tremendous contributions to our HR organization and our internal talent acquisition capabilities in the year since he joined Teva, through the launch of a consistent and impactful One Teva hiring and recruitment approach globally, including a global recruitment policy, interview toolkit and global job board. As the Global Talent Acquisition an Mobility team merges into the Integrated Talent function additional detail about Simon's transition will be provided at a later stage.

*Please join me in wishing all of our colleagues success in their new roles and new beginnings.*

### Next steps

Human Resources will continue to play a critical role throughout this restructuring period. There will be more difficult decisions ahead, both within and as we support our business and regional partners, and as always, we will conduct all processes fairly and respectfully. Putting people at the center everything we do continues to be a key aspect of our work at Teva.

In order to support the organizational restructuring process and significant changes ahead – in both HR and in Teva overall - we have established a People Office as well as HR work streams to support all aspects of these changes.

Thank you for your continued efforts, engagement and endurance as we move into the swift and challenging period ahead. Although we do not yet have all the answers and details, I am committed to keeping you updated continually an transparently throughout this process. The people of Teva have proven time an again their ability to be resilient and view change as an opportunity. I know it will not be easy, but it is important to understand that these changes are crucial to ensure Teva's stabilization and our future.

Yours
Mark

<u>Click on the HR Organization Chart to view it on teva.net >></u>

**FOR INTERNAL USE ONLY – NOT FOR DISTRIBUTION OR USE WITH CUSTOMERS**



**Archived:** Wednesday, March 3, 2021 7:24:32 AM
**From:** Randy Keuch
**Sent:** Wed, 20 Dec 2017 14:33:50
**To:** Tal Zorman
**Subject:** How Can I help?
**Sensitivity:** Normal
**Attachments:**
Randolph_Keuch 2017.doc; 2017 Americas TR Ops Review.pptx;

---

Hi Tal,
I am not sure how familiar you are with my background, so I have attached my CV for your review. As Ron will be departing next week, I would like to offer my services to "fill in" for Ron to help get Teva through the next 6 months or so. If needed to reside in Israel on a temporary basis, I can also do that. Recognize that I held the global Total Rewards position for a large consumer goods organization – The HJ Heinz Comany – and I worked closely with senior leadership and the Compensation Committee of the board. Not sure what your thoughts are, but wanted to share my desire to help manage Teva TR through these difficult times.
Enjoy the holiday.
Best regards,

Randy Keuch Head of Total Rewards - Americas
Tel: 267-468-4325 Cell: 215-272-9816
RandyKeuch@tevapharm.com sip:Randolph.Keuch@tevapharm.com www.tevapharm.com

BEHL_Silver_2016

TEVA 000116

# RANDOLPH WM. KEUCH

111 Rose Lane • Chalfont, PA  18914 • Cell:  412.225.8000
Randy.Keuch@gmail.com

*As a recognized global leader in Compensation, Health and Wellbeing, Retirement Plans, and Global Mobility, I am seeking a senior position where my board experience and my international and domestic expertise both as a practitioner and as a consultant will enable me to collaborate with business leaders and team members to deliver exceptional value to customers, stakeholders, and employees.*

## PROFESSIONAL EXPERIENCE – Senior Corporate Positions (1994 – Present)

TEVA PHARMACEUTICALS, North Wales, PA                                                       January 2014 - Present

Lead the Total Rewards Center of Expertise for the Americas providing subject matter expertise and cutting edge solutions to all facets of total rewards issues within the region.  Teva is going through a major HR transformation, implementing new tools and technology to support our employees and to enable HR to better support the business.  Over the last 3 years my team and I:

- Were recognized in 2016 and 2017 by NBGH and Fortune Magazine as one of the Best Employers for Healthy Lifestyles
- Successfully integrated 3 major acquisitions in the Americas Region (Rimsa-Mexico, Actavis-Global, and Anda-US)
- Developed and launched a global recognition program for Teva
- As a US issuer, manage SEC proxy aspect for US-based NEOs
- Developed global long-term incentive plan for Biologics
- Developed and launched an innovative Total Rewards Portal for all US and Canadian employees
- Developed and implemented a rolling 3-yr benefits strategy for the U.S that saved over $30 in 2015 and 2016 while driving employee knowledge and positive perspective on their benefits to levels that are 20 percentage points above the norm for high performing companies
- Developed and implemented pay alignment strategies for the US and Canada resulting in a significant decline in turnover and improved new hire acceptance ratios
- Designed and approved all sales compensation programs and contests within the region
- Implemented the Willis Towers Watson Global Grading System and their REWARD tool throughout the region

H.J. HEINZ COMPANY, Pittsburgh, PA                                                   April 2005 – September 2013

### Vice President, Total Rewards (2005 – 2013)

Working directly with senior management and the Management Development & Compensation Committee of the Board, established the position of VP, Total Rewards and in that role, transformed many of the Company's executive pay programs into effective drivers of business success.  My team's efforts reduced benefit and turnover costs and helped position the Company to have one of its best financial performance years in its history.  We also built a world-class HR portal, MyHeinzPlace that aggregated current and historical employee information regarding their health, wealth and career, and provided SSO to specific benefit websites.  Much of my team's work in executive compensation is described in the 2012 Annual Proxy – which has earned considerable acclaim as one of the better Compensation Discussion & Analysis filed to date. Heinz also received the highest positive Say-on-Pay vote (78%) of any company when receiving a NO vote recommendation from ISS.   Heinz is a recognized leader in health and wellness as reflected in the many awards we have earned for innovation, communications and cost management (Heinz received the Platinum Award from NBGH and the US Surgeon General's Medallion in 2012, a Gold Quill in 2011 and a Hermes in 2012).  My team oversaw all global retirement plans; drove our global pension strategy; drove our US health care strategy; oversaw HR technology; and managed expatriates, our regional total rewards centers of excellence, our aviation function (3 fixed wing aircraft and hangar), a fleet of over 450 vehicles, and participated in labor contract negotiations.

THE HARTFORD, Hartford, CT                                                                 2004 – 2005

### AVP, Compensation – P&C Division (2004 – 2005)
Led development of a rewards strategy for the enterprise, integrating talent management and compensation programs to drive business success, including realignment of our executive compensation programs.  Developed new sales organization and compensation programs to achieve lower costs and increased premiums while minimizing risk.  Explored new pay systems for our venture capital organization and our investment entities.

TEVA 000117

# RANDOLPH WM. KEUCH

Page 2

PFIZER, INC., New York, NY (left due to Warner-Lambert and Pharmacia acquisitions)          1998-2004

**Corporate Director, Strategic Rewards (2002 - 2004)**
Led the redesign of all reward and recognition programs globally, including Pfizer's annual incentive plan, stock option program, performance share program, colleague recognition program, and other short-term incentive plans.  Led a team tasked with developing a global compensation approach for the company, which included introducing broad banding or "super grades" as the compensation structure; establishing financial metrics at senior levels; communications; and directing the design of our PeopleSoft systems, reporting tools, and HR portal.  Redesign was focused on reallocating compensation and benefit expenditures into programs that increased employee engagement - resulting in over $100 million in increased profitability.

**Director, Pfizer Consumer Group (PCG) Compensation (1998-2002)**
Built the compensation organization for PCG and each division within it, including the redesign of all compensation programs to facilitate the sale of three consumer businesses (Adams, Schick & Tetra) at a premium price.  Developed the PCG global rewards strategy, incorporating pay data from 23 countries and using this strategy to develop U.S. and global pay processes for delivering merit increases, annual bonuses and stock options.  Also drove change through teams to redesign remuneration programs globally for all lines of business to enhance efficiencies and enable effective talent management.  Provided vision and established infrastructure for launching broadbanding pay structure in the U.S., Asia, Australia and South Africa as well as building global total remuneration survey groups for each key geographic region.  Revamped both U.S. and European sales compensation programs, resulting in a 20% sales increase and a 35% drop in turnover.  Developed reward & retention program for critical scientists being relocated from Morris Plains, NJ to Ann Arbor, Michigan, resulting in substantially reduced turnover and hiring costs.  Provided leadership to launch PeopleSoft; upgrade U.S. benefits programs; and develop a global employee data analysis tool.

SMITHKLINE BEECHAM, Philadelphia, PA (left due to merger with Glaxo)          1994-1998

**Corporate Director, Compensation Strategy & Development (1996-1998)**
Designed remuneration programs and processes globally for all divisions resulting in substantial cost-savings and a stronger linkage between pay and performance.  Established infrastructure for launching global shared service for compensation function (staff of 20) resulting in vastly improved customer service and a 22% reduction in cost of services.  Developed and implemented a cash and stock-based reward & retention program for SB's high technology professionals worldwide that saved the company over $40 million in turnover costs and resulted in no major business disruption due to Year 2K issues; and worked with compensation committee of board to develop elite retention program for executives that took advantage of transferable options and deferred compensation arrangements.

**Director, Human Resource Planning, Systems, & Compensation (1994-1996)**
*Worldwide Research & Development Organization*
Led the compensation and HRIS function globally (2 major sites: Philadelphia & London with staff of 10) and added value to the organization by designing and implementing the following major new initiatives:
- Designed and launched career development and remuneration program for most of R&D's over 4,000 employees.
- Developed and launched R&D's People Measures – an executive information system that provides scorecard for optimizing R&D's people asset.
- Developed and launched reward and recognition program for three SB businesses.

## PROFESSIONAL EXPERIENCE – Senior Consulting Positions (1988 - 1994)

COMPENSATION RESOURCES, INC., Upper Saddle River, NJ          1993-1994

**Principal**
With the successful public offering of Opinion Research Corporation, I moved the compensation consulting practice to Compensation Resources, Inc. and managed numerous executive compensation and human resource consulting assignments for my clients.  Served as expert witness for U.S. government in executive compensation-related matters and have been credited with much of the case law in this area.  Developed compensation system for large investment firm and provided compensation services to major financial institutions, consumer goods companies and pharmaceuticals.

TEVA 000118

# RANDOLPH WM. KEUCH

Page 3

**OPINION RESEARCH CORPORATION, Princeton, NJ**                                              1992-1993

**Partner/Owner**

Provided compensation and business solutions to clients and their Boards.  Supported quality improvement efforts of clients from business perspective through fact-based measurement framework that encompassed customer satisfaction, employee satisfaction/commitment, business processes, and financial performance.  Created innovative organizational structures and compensation arrangements that enabled companies to support and sustain selling strategies.  Participated in IPO of the company in 1993 and left as company exited the compensation consulting business.

- Designed powerful measurement tool, The Balanced Scorecard, for a top 10 financial institution.
- Developed unique methodology to examine sales force effectiveness and link sales compensation to key drivers of customer satisfaction resulting in substantial sales increases.
- Developed worldwide internal customer satisfaction measurement system for internal infrastructure organizations within Fortune 50 pharmaceutical/healthcare company.

**KPMG PEAT MARWICK, Short Hills, NJ (left as benefits and compensation practices were being sold)      1988-1992**

**Manager**
- Led the marketing, selling and managing of client engagements in all areas of compensation, particularly executive, sales and incentive compensation; computer-aided job evaluation, and quality improvement.
- Established national reputation for compensation and related human resource consulting in the high technology industry.
- Sold and managed global research study for IBM on pay and employee involvement resulting in major redesign of IBM recognition programs…authored a book "Learning from the Leaders" about the results of this study, that was sold by the Society for Human Resource Management.
- Developed supplemental retirement plans, deferred compensation arrangements and Board of Director stock option plans for a variety of organizations, including a major credit card provider.

**Previous Professional Experience:**

TOWERS-PERRIN, Detroit, MI, **Executive Compensation Consultant**

GENERAL ELECTRIC, Information Services Unit, Rockville, MD, **Compensation Manager**

PLANNING RESEARCH CORPORATION, McLean, VA, **Executive Compensation Director** (co. acquired)

SIBSON & COMPANY, Princeton, NJ, **Compensation Analyst/Consultant/Senior Consultant** (co. sold)

## EDUCATION

HARVARD BUSINESS SCHOOL, Cambridge, MA, Completed Executive Education Program, 2002

GEORGE MASON UNIVERSITY, Fairfax, VA, post-graduate work in Human Resource Management, 1990-1992

STEVENS INSTITUTE OF TECHNOLOGY, Hoboken, NJ
    **MS Degree**, Applied Psychology
    **BS Degree**, Industrial & Organizational Psychology (with Honors & Thesis)

Recipient of the American Compensation Association's Lifetime Achievement Award, 2000
Served on the Board of Directors for the National Business Group on Health (2010 – 2014)
Served on the Customer Advisory Board for Fidelity Investments (2009 – 2013)
Chaired the Executive Compensation Advisory Board for WorldAtWork (2008 – 2011)
Certified Executive Compensation Professional (2010)
Adjunct Professor at Trenton State University

TEVA 000119

Americas Total Rewards Team
Operational Review – June, 2017

# Working together to achieve our 2017 goals

# Agenda

- Summary
- Key statistics
- Key accomplishments
- How we are organized
- What we do
- North American differentiators
- Recommendations – Staffing Total Rewards in the Americas
- 2017 must wins
- Future
- APPENDIX
- NA TR Staffing details

TEVA 000121

# Summary

**<u>ALL</u>** of the members of the Americas Total Rewards team were hired over the past 3 years, except for the Head of NA Benefits – Diane Rohach. Over that period, the team has exceeded all of its Must Wins; delivered over $30 million in cost savings; and has developed both strong relationships and high credibility with senior business leaders, other COEs, and HR in general.

We manage a very large employee population (plus dependents); have the most complex and expensive healthcare system in the world; have a sales force of over 1,500 ee's; and in the near future, may have the largest executive population. We were also recognized by Fortune Magazine and NBGH for our wellness programs.

We have accomplished all of this with a team that, by US standards, is extremely lean. Our Compensation team is struggling the most and our Benefits team is managing a 40% increase in employees without any increase in staff, and now has one resignation and one team member returning from medical leave. *It is our expectation that our solutions to better manage our workload will be implemented.*

TEVA 000122

3



# America's Region – Key Statistics

**US & Puerto Rico**

- 22,000 ee's & dependents
- About $1 billion salaried payroll
- $250 million annual spend on benefits
- COL is $1.3 Billion
- High % of TEC members and Senior Leaders in US

**Canada**

- 3,810 ee's & dependents
- $80.7 million USD salaried payroll
- $9.0 million USD annual spend on benefits
- COL is $

**LatAm**

- 10,200+ ee's & dependents
- $130 million USD salaried payroll
- $71 million US annual spend on benefits
- COL is $225 million USD
- Five countries in the Top 10 Revenue of Growth Markets (23 countries in total)



We are accountable for the well being of 36,000 ee's & dependents with a salaried payroll of $1.2 billion and annual benefits spend of $330 million.

4

TEVA 000123

# America's Region – Key Accomplishments

## US

- Committed to reduce costs for 2017 by $6 million plus additional cost avoidance of $2 million; and delivered 3-yr cost savings and cost avoidance approaching $30 million

- Managed CONNECT process; successfully integrated 3 large acquisitions; completed GCA and C&B reviews; and launched MyTevaRewards

- At or above High Performing Norm on ALL TR-related questions in employee survey

- Recognized by the National Business Group on Health and Fortune Magazine

## Canada

- Successfully integrated Actavis

- Implemented employee contribution to prevalent health/dental plan (350K savings YOY)

- Harmonized vacation schedule

- Reduced overly competitive sick day policy by 40% allowing business to better meet production targets

- Through strict claims management of our ASO program, found cost savings sufficient to fund 1% critical increase to grade 1 to 9 target bonus

- Partially aligned bonus structure within Canada between BUs and closer to competitive market through cost savings

## LatAm

- Managed CONNECT process: April and bonus global formula in all Countries

- Successfully integrated Actavis (Brazil) and Rimsa (Mexico) acquisitions; completed GCA and C&B reviews

- Pay range and Merit matrix since 2014-15 YE process

- Launched STARS in Argentina in 2016 and implementation in Brazil, Chile, Peru, Venezuela and Uruguay in Q3/Q4 2017

- TR Training in all countries

- Adopted cluster structure: Argentina/Chile/Uruguay and Peru/Venezuela (HC redistribution)

5

Settled IRS audit with no fees

TEVA 000124

# Total Rewards Americas – The Teva TR Team



TEVA 000126

JOINT APPX - 0079

# Workload Peaks - Americas

The chart below shows the major annual initiatives that require considerable resources. By moving transactional work out of the NA Benefits team, we believe ½ of an FTE will now be available within the team to handle the increased volume and to help the NA Compensation team, particularly when the NA Compensation team has a workload peak and the Benefits team does not.



TEVA 000126



# What we do – NA Benefits & Puerto Rico

**Work Manager 1**
Budget
Ensure benefits are Compliant
Work with legal on Employment litigation
Disability Management
Website
Second level appeals

**Work Manager 2**
Communications
Vendor relations for medical, dental and Prescription
Set up and improve on current file feeds
Oversee new Wellness program
Website oversite
Mergers and Acquisitions
Acquisition and Divestitures
Expats & VPs

**Work Manager 3**
401(k) and 1165(e) compliance and strategy and design
Working on controls
DC plan administration /DC-Cephalon
SERP
QDRO
ESPP Administration
Audit FSA and HSA
Financial Planning
Wires

**Analyst 1**
Maintains files to vendors
Manages COBRA
Audits FSA and HSA
File loads
Maintain Benefits Mailbox

**Analyst 2**
Manages disability for 8,000 employees
Works with legal on issues related to return to work
Invoicing

JOINT APPX - 0081

TEVA 000127

# What we do – NA Compensation

➤ The chart to the right indicates the resources available to support the over 11,000 ee's in US/PR and Canada , and the current split of work among the group.

➤ The following is a breakdown of employees per group

➤ GSF (IT, Finance, HR, Compliance, Legal)– 1,500 employees

➤ GGM – 1,500 employees

➤ GSM - 2,200 employees

➤ TGO – 5,000 employees

➤ R&D –1,000 employees



CURRENT

**Head of Total Rewards – Americas**
Randy Keuch

**Head of Compensation – US**
GSF
Miriam Weinstein

**Comp Manager**
GGM & R&D
Elise Cartledge

**Comp Manager**
GSM
Kent Schurr

**Comp Manager**
TGO
Veronica Ferrante

**Comp Manager**
OPEN

teva

TEVA 000128

JOINT APPX - 0082



# What we do – NA Compensation

- Each Compensation Manager role requires the following:

  ▪ Client Support – 50% of the role

  ✓ Day to day market reviews for Talent Acquisition & HR, including possible equity analysis

  ✓ Participation in HR team meetings to ensure compensation updates are shared with the team, and comp team member is updated on the business

  ✓ Retention reviews

  ▪ Project Support – 50% of the role

  ✓ Reward – Towers Watson Tool & Survey participation (Miriam/Veronica)

  ✓ FLSA (Each team member reviews his/her area)

  ✓ Sales Incentives – GSM (Kent)

  ✓ Sales Incentives – GGM (Elise)

  ✓ Pay Equity– US & Canada – Very complex as different Country, State and Local laws (Each team member reviews his/her area)

  ✓ Year End – Connect (Miriam/Elise)

  ✓ GCA – (Miriam/Veronica)

  ✓ MyTeva portal (Kent)

JOINT APPX – 0083

TEVA 0001120

# What we do – LatAm

| Every Manager in every country |
|---|
| Budget |
| Ensure benefits are Compliant |
| Work with legal on Employment litigation |
| Disability Management |
| Communications |
| Vendor relations for medical, life and dental |
| Oversee new Wellness program |
| Mergers and Acquisitions |
| Working on controls |
| Audits |
| Financial Planning |
| C&B Review / AOP |
| Surveys participation |
| Expats and Job offers |

**Head of Total Rewards – Americas**
Randy Keuch

**Head of Total Rewards –LATAM**
Edu Nasi

ALL HR
Headcount

TR Manager (AR/CL/UY)
Analia Gritta

TR/LE Manager (BR)
Enzo Cruz (50%)

TR Manager (PE/VE)  OPEN

TR Manager (MX)
Elizabeth Juarez

teva

TEVA 000130

11



# NA Differentiators - Compensation

The NA Compensation Team is engaged with the following tasks and activities that are not performed by other country compensation/TR teams:

1. The team is directly engaged in the design and competitiveness of ALL sales compensation incentives and contests for GSM, GGM, and now Anda.

   ✓ *With a sales population approaching 4,000 ee's and a spend of over $600 million, the business has asked that TR apply their expertise to design incentive programs, sales contests, and keep compensation competitive.* **TR must approve ALL incentive plans and contests, and currently works with local finance to administer all GGM US & CA incentive programs as well as all Canadian GSM incentive programs.**

2. As there are just a small number of union ee's, virtually all factory and distribution center employee compensation is managed directly by NA compensation team

   ✓ *With so few unionized ee's, the NA TR team works closely with each BU and site to manage the competitiveness of pay, local incentives, and special programs.*

3. The presence of several TEC members in the US (and possibly the CEO) will require substantial resources to support corporate Executive Compensation team, and with new US reporting requirements due to being an issuer of US securities, workload will increase

   ✓ *The NA Compensation team, working with our Benefits team, is directly involved in equity and other compensation issues unique to the US for each TEC member. The data required for preparation of a US proxy will be significant.*

JOINT APPX - 0085

TEVA 000134

# NA Differentiators - Compensation, cont'd

The US & CA Compensation Team is engaged with the following tasks and activities that are not performed by other country compensation/TR teams:

4. Management and maintenance of GCA for these 9,000 ee's will continue to require resources.

   ✓ *With 3 major acquisitions, the resources needed to have all positions aligned to GCA is substantial, and without this being competed, all systems linked to GCA grade will not operate correctly. Resources will also be necessary for all the system workarounds required to complete the Year-End process.*

5. High turnover, coupled with business transformation, involves ongoing reorganizations, retention bonuses, and offers for new hires (as well as promotions), all of which requires substantial resources.

   ✓ *With turnover around 23%; Reductions in Force; offers and counteroffers; realignments, etc. the involvement of the TR team has proven to be a valuable partner to HR and the business*

   ✓ *MyTevaRewards is currently only available in the US and the response has been terrific. Over two-thirds of ee's have used it, and in the first month, the site had over 60,000 hits. This site is critical to our wellness programs and cost reductions, and to improving the effectiveness of our sales organization. As the US and NA have the highest engagement scores in the C&B topics, this technology will help sustain those record levels. The site will open to Canadian employees by Q4.*

6. In an effort to pay in close alignment with the external market, the local TR team market prices each role where possible.

   ✓ *By applying market data to each role and providing this information to Talent Acquisition & HR, we are enabling the business to pay at market for new hires and promotions. Hopefully ensuring compensation is not a reason why an employee would choose to leave Teva.*

JOINT APPX - 0086

TEVA 000132

teva



# NA Differentiators – Benefits

The NA Benefits Team is engaged with the following tasks and activities that are not performed by other country benefit/TR teams:

1.  U.S. benefits are self-insured. As such, Teva pays over 80% of the cost for every medical service received by an employee and the employee's dependents. With hundreds of millions of dollars being spent on medical services, and medical costs rising at 7%+ annually, managing medical costs is extremely important.

    ✓  *The NA benefits team spends significant time and resources finding ways to reduce medical spend and administration costs. We also work with the business, negotiating with AmWell to provide no-cost medical, behavioral health and nutrition visit with physicians to our ee's and their dependants. Creating a culture of wellness helps drive medical costs down. Most other countries are either fully insured or have socialized medicine managed by the government and paid for through taxes.*

2.  Many of our benefits are regulated by various government agencies, and therefore require monitoring and compliance.

    ✓  *With so many regulations and required reports, with financial penalties for non-compliance, we spend considerable time and resources working with the IRS, auditors, Finance, etc. to be compliant.*

3.  The US spend on prescription drugs is approaching $35 million – a cost that we must manage.

    ✓  *The NA Benefits Team, is working directly with the business to provide Copaxone to our employees directly from the US Teva pharmacy – saving over $2 million per year in spend. We hope to expand this program to include more medications.*

4.  The US also manages the Teva SERP, ESPP, and Deferred Compensation Plan, and on-board Senior leaders and expats.

    ✓  *The US and Canada are the only countries with an ESPP. Given the high profile of SERP and deferred compensation plan participants, these plans require ongoing maintenance and communications. Considerable time is also spent onboarding expats into the most complex and expensive haeth care system in the world.*

5.  Working directly with the business and senior leaders to create a new business for Teva

JOINT APPX – 0087

TEVA 000132

# Recommendations for Staffing TR in the Americas

The NA TR team would benefit from being allowed to fill the frozen Compensation Manager position and reduce their dependence on contractors/consultants.

In addition, we believe that by adding a headcount to HR Ops & Svcs that performs many of the transactional operations performed by the NA TR team, will:

- Allow the benefits team to function more efficiently and manage their workload better
- Provide some relief to the NA Compensation team
- Provide developmental opportunities for team members

Finally, we believe the staffing of the TR team for LatAm needs further review.  However, we need greater stability in the LatAm businesses and greater knowledge of future growth plans before making any recommendations.

teva

TEVA 000134

15



# 2017 America's TR Must Wins

## Support Teva in the next level of evolution

**Global**

- Lead TR harmonization aspects for all **integrations**
- Embed cost awareness in compensation and benefits programs
- Support the business with HC **synergies & restructuring**
- Redesign Global Performance Management system approach

**Region**

- Deliver benefit AOP cost savings of $6 Mil in US and $60k in Mexico
- Finalize GCS in the US (Anda)
- Extend MyTevaRewards to legacy Actavis & Anda ee's, and to Canada

## Maintain a healthy work environment

- Reinforce our holistic performance and rewards ("Connect") mindset
- Develop a Global Health and Well-being Strategy and conduct Health and Well-being activities
- Mapping strategic roles – special \ deferential retention programs, tailored made programs
- Global framework for recognition and spot bonus

- Launch STARS for legacy Actavis & Anda ee's
- Review pay alignment strategies by country
- Launch a spot bonus process
- Develop next 3-yr health & well-being strategy for US and Canada; refresh Mexico and LatAm
- Contribute to global retention strategy
- Explore new health & well-being vendors and brokers to reduce costs
- Review situation in Puerto Rico

## Simplify core HR processes

- Develop Global C&B philosophy
- Enhancing benchmarking methodology and salary ranges
- Successfully manage executive compensation as a first-time US domestic issuer
- Enhance TR capability and effectiveness- Leverage Success factors technology in alignment with TR Operating Model

- Deliver C&B reviews for all countries
- REWARD tool fully operational
- Power BI tool integrated into TR analytics
- Leverage EC compensation module

JOINT APPX - 0089

TEVA 000135



Total Rewards Americas – The Teva TR Team in Future

TEVA 000136

JOINT-APPX - 0090



# Future

- The future requires:

  - More focus on well-being with someone leading this effort, which includes:

    - Culture Clubs and well-being champions at every site (I.e., Frazier Pilot)

  - A competent, motivated and fully staffed Compensation Team focused on:

    - GCA maintenance
    - Pay alignment strategy
    - New hire offers

      - Sales incentives
      - Growth strategies
      - Retention/Attraction

  - A Benefits Team that:

    - Optimizes benefits spend
    - Creates a culture of well-being
    - Maintains high levels of employee engagement and satisfaction with benefits offering

      - Reduces stress for employees
      - Outperforms competitors

JOINT APPX - 0091

TEVA 000137

Everything we have done during the last three years will serve us in the way we respond to these immediate and long-term challenges…We have a terrific team!

19



# APPENDIX

JOINT APPX - 0093

# Situation – North America

➤ The Total Rewards team has an approved headcount that is frozen and needs to be filled, and with the increase in responsibilities (Actavis, Anda, and Puerto Rico), needs to off-load a portion of this substantial increase in workload.

➤ Feedback from customers reflects a decline in service capacity.

➤ A headcount has been identified within the US HR team that can be allocated to the HRO&S group to absorb task driven work from the US Total Rewards team.

➤ The Total Rewards team is comprised of skilled benefits professionals being asked to perform administrative functions which leads to job dissatisfaction and poor allocation of resources. It also takes away from their ability to move forward with strategic initiatives.

➤ An example being Susan Duff who worked in Benefits is leaving team because she wants to have a more strategic, less administrative role

21

teva

TEVA 0001140

# Filling the Frozen Open Position



➢ The chart to the right indicates the resources split with the headcount filled.

➢ With this additional headcount  the project breakdown would be:

  ➢ Pay Equity – Miriam

  ➢ Year End – Connect – Elise

  ➢ Reward – Veronica

  ➢ Sales Incentives , including Portal– Kent

  ➢ GCA – new team member

  ➢ Executive Compensation - Randy

• This is the optimum staffing for this team and is strongly recommended

22

TEVA 000141



# Adding a Headcount to HR Ops & Services

**Current State**

1 Director/1 Associate Director
6 Total Rewards Managers
➢ 3 Compensation
➢ 3 Benefits-possibly move one manager to
2 Benefits Analysts

**Change**

1 Benefits Manager shifts 50% to (new) benefits analyst
1 Benefits Analyst  shift 50% work to Ops services
Splits time between Comp/Benefits
1 Compensation Manager shifts 100% of sales admin work (20% of an FTE)
to OPS/Services

**Future State**

1 Director/1 Associate Director
6 Total Rewards Managers
➢  3 1/2 Compensation
➢  2 1/2 Benefits
2 Benefits Analysts

teva

TEVA 000142

23

# Movement of Work to HR Ops & Svcs

| | | |
|---|---|---|
| 401(k) and 1165(e) compliance and strategy and design | = | = |
| Working on controls | = | = |
| DC plan administration /DC-Cephalon | = | = |
| SERP | = | = |
| QDRO | = | = |
| ESPP Administration | = | = |
| Audit FSA and HSA | = | = |
| Financial Planning | = | = |
| Bonus Accrual (5%) | = | ↑ |
| Compensation Client Support | = | = |
| Disability Management | = | ↑ |
| Task related work for disability | = | |

**Work being moved** ↑

- Task orientated work for disability-Enter leaves and returns
- Payroll Deductions 401k/ESPP/DC/Medical/Dental/Life
- Bonus Accruals
- Sales Incentive Administration

**Benefits Analysis**

| | |
|---|---|
| = | Payroll Deductions (401k/Deferred Comp/ESPP/Medical/Dental/Life) |
| = | Run reports for voluntary deductions |
| = | COBRA administration |
| = | Maintain Benefits Mailbox |
| = | File feeds |

**Compensation Manager**

| | |
|---|---|
| = | Sales Incentives Administration (20%) |

teva

TEVA 000142

**Rappoport, Larry J.**

| | |
|---|---|
| **From:** | Randy Keuch <Randy.Keuch@tevapharm.com> |
| **Sent:** | Thursday, December 14, 2017 2:07 PM |
| **To:** | Tal Zorman |
| **Cc:** | Daniel Lawlor; Ron Yaniv |
| **Subject:** | Minimal TR Organization for North America |
| **Attachments:** | Minimal TR Organization Final.pptx |

Hello Tal,

Attached is a deck that provides my bare bones recommendation for my team. I have included options that suggest elimination of my position or Miriam's position. I strongly urge you not to make any leadership changes in Q1, as there is much work for the team to perform and the risks are very high. I also ask that you consult with Legal to validate the risks and our exposure. An error on our 401k could result in disqualification of the entire plan, which has $1.2 billion in assets, so disqualification will result in the loss of huge tax benefits to Teva. If a leadership change (job elimination) is needed, better to do this in Q2 when work has transitioned to HR Ops & Services, and the organization has stabilized. This is not a personal request nor is it made out of concern for having my position eliminated. Rather, it is a business decision as to how much risk Teva is willing to take by moving too quickly or having inexperienced people in key decision-making roles.

Thanks for your consideration and let me know if you have any questions.

Best regards,

Randy Keuch Head of Total Rewards - Americas
Tel: 267-468-4325 Cell: 215-272-9816
Randy.Keuch@tevapharm.com sip:Randolph.Keuch@tevapharm.com www.tevapharm.com





TEVA 000144



# Proposed Headcount Reduction for the North American TR Team

December 15, 2017

**teva**

TEVA 000145

JOINT APPX - 0099

# Situation

Teva is reducing the headcount for the Total Rewards Team that supports North America (US, Canada, & Puerto Rico) and needs help determining what is the minimum team required to provide minimum support. Factors to consider with regard to **benefits** include:

- Compliance with country laws and regulations - This requires substantial experienced resources as the penalties could be well into the millions of US dollars
  - ☐ Strongly suggest that this concern be discussed with Legal (details are in Appendix)
- Leadership required to manage $220 million in spend and sign weekly wires/invoices in excess of $1million
  - ☐ This is managed daily by the team
- Over $50 million in cost savings generated over last 3 yrs. Team gave $8.2 million to the US businesses in benefits savings so far for 2017 and will save over $10 million for entire year. These savings are directly related to the daily actions of team members managing providers and employee healthcare behaviors
- Team is designing and implementing a new Severance Benefit Plan, which is qualified under ERISA, that will save Teva about $10 million in 2018
- Other cost savings initiatives (several million in savings) require resources to research and implement
- Substantial headcount reductions will trigger contract re-negotiations with some vendors driving costs up if not properly managed or creative solutions not identified and put into place
- Management of the benefits (COBRA) for the 1,100+ US employees severed as well as plant closings
- Handling employee escalations of medical and other issues that cannot be adjudicated by our providers
- Canadian benefits headcount not in TR headcount



TEVA 000016

JOINT TX - 0100

# Situation, cont'd

Factors to consider with regard to **compensation** include:

- Compliance with country laws and regulations (FLSA - US and Pay Equity – US and Canada)
- Partnering on job offers, promotions, etc. and performing market pricings at all levels
- Contributing to restructurings
- Managing pay surveys, sales compensation, and executive compensation
- Partnering with HR and the business on job grading
- Union avoidance in Canada

For both benefits and compensation, we have new legislation that will impact workload including US Tax Reform, US Affordable Care Act modifications, Canadian Pay Equity and Provincial Legislation (just passed in Ontario), US Pay Equity Legislation at the Federal, State and Local levels



TEVA 000147

JOINT APPX - 0101

# Total Rewards – North America
## Current (12 FTEs)*



Head of Total Rewards – Americas
- Randy Keuch

**Head of Benefits – Americas**
Diane Rohach

Ben Manager
Samantha Kalisher

Ben Manager
Joe Ferrigno

**Ben Analyst**
Sandra Milito

**Ben Specialist**
Courtney Stevenson

**Ben Analyst**
Darlene Robinson-stratford

**Sr. Benefits Analyst**
Lynn McConaghy
(Contractor)

Head of Compensation – US & CA
Miriam Weinstein

**Comp Manager**
Veronica Ferrante

**Comp Manager**
Kent Schurr

**Comp Manager**
Rose Riciolfi
(Contractor)

* Excludes Jan Gustavsen who is in HR headcount for Canada and manages all Canadian benefits



TEVA 0000

JOINT_TX - 0102

# Proposal – Summary (See Appendix for Details)

The North American TR team currently has 13 employees, if you include Jan Gustavsen, who is the Benefits Manager for Canada and 2 contractors. We believe we can reduce that headcount from 13 to 6 for a 54% reduction. To do this, the key changes will be as follows:

- 401k fiduciary responsibility will be outsourced to new vendor and actually reduce current spend by $30,000
- Some benefit administrative responsibilities will be moved to HR Ops & Services (disability, COBRA, wires, etc.) NOTE – US Law (HIPPA) regulates access to employee medical information
- Shift market pricing of jobs from job specific survey data to salary structure pricing
- Eliminate participation in:
  - Sales compensation
  - Executive pay and benefits

The next slide reflects the proposed organization structure.

Reducing headcount below these levels in Q1 will impair achievement of current cost-savings initiatives (discussed later); impair severance process for Q1; and create greater risks by taking the people out without taking the work out – Proposal is to revisit these headcount levels in Q2.



teva

TEVA 000149

JOINT APPX - 0103

# Total Rewards – North America
## Proposed (6 FTEs or 54% reduction*)



**Head of Total Rewards – Americas**
Randy Keuch

**Head of Compensation**
Miriam Weinstein

**Comp Manager**
Veronica Ferrante

**Head of Benefits**
Diane Rohach

**Ben Analyst***
Sandra Milito

**Ben Specialist**
Courtney Stevenson

The Benefits team will retain the lowest graded employees

\* Assumes Canadian benefits headcount is severed with full responsibility transferred to NA TR team

teva

TEVA 000159

JOINT_TRX - 0104

# Proposal – Summary (See Appendix for Details), cont'd

If further reductions are required, the only positions that can be cut would be leadership roles.

The NA Benefits Associate Director – Diane Rohach - should be considered the most valuable leader, as the compliance requirements combined with the impact of noncompliance (many millions). Remaining staff does not have expertise to handle all benefits and needed compliance for Teva.

The Region TR Head – Randy Keuch – is probably the next most valuable leader given his knowledge and experience in both compensation and benefits and having managed situations similar to Teva's and is at a level appropriate to manage a $220 million spend as well as oversee compliance

The NA Compensation Director – Miriam Weinstein – is also a valuable compensation resource.  Recognize that under Canadian law, any employee can request a full pay analysis for their position.  This pay analysis must include market data plus internal pay data for all of their peers.  No one on the team is experienced with this new legislation

Reducing headcount below 6 employees substantially raises the level of risk (noncompliance resulting in fines and possibly disqualification of our plans).  It is the leadership team that fully understands the compliance issues and without them, Teva is entrusting over $220 million in spend to non-managers.  Suggestion is to confer with legal counsel regarding this exposure and to make any headcount reductions below 6 at a later date.



TEVA 000151

JOINT APPX - 0105



Total Rewards – North America Proposed (5 FTEs or 62% reduction*)

**Eliminate Region Head**

Report Directly to Corporate

Head of Benefits
Diane Rohach

Ben Analyst
Sandra Milito

Ben Specialist
Courtney Stevenson

Head of Compensation
Miriam Weinstein

Comp Manager
Veronica Ferrante

**Eliminate Compensation Head**

Head of Total Rewards – Americas
Randy Keuch

Head of Benefits
Diane Rohach

Ben Analyst
Sandra Milito

Ben Specialist
Courtney Stevenson

Comp Manager
Veronica Ferrante

* Assumes Canadian benefits headcount is severed with full responsibility transferred to NA TR team

teva

JOINT EX - 0106

TEVA 000___

# Proposal – Compensation: What Will be Left

- Manage:
  - CONNECT Year-End process
  - Compliance with pay laws in all countries
    - Canadian Pay Equity provides that ee's must receive a pay analysis of their job as well as the pay of their peers if they request it, and can file litigation if pay is not equitable
- Analyze pay based on salary structures and market surveys as needed
- Contribute to:
  - Grade and pay issues associated with organizational changes and restructurings
  - Site closures (i.e., PR)
- Work with business leaders to address compensation-related business issues
- Partner with HR in job offers, counter-offers, promotions and pay adjustments
- Develop solutions with regard to retention, attraction and motivation issues
- Complete pay surveys and manage Reward system
- Perform modeling and cost analysis for headcount and pay issues

This work requires 1 Director and 1 Manager with oversight and leadership from 1 Sr. Director

teva

TEVA 000153

# Proposal – Benefits: What Will be Left

- Manage the remaining $200 million in spend for the following:

  - 401(k)
  - Telemedicine
  - Flu Shots
  - EAP
  - Wires
  - Stars

  - Deferred Comp
  - Employee Escalations
  - Employee Physicals
  - Dental
  - College Savings Plan

  - 2 SERPs
  - Legal Filings
  - Health Strategy
  - Vision
  - ESPP

  - Medical
  - ACA Reporting
  - Life Ins & AD&D
  - Imaging
  - COBRA

  - Annual Enrollment
  - Biometric Screenings
  - Regulatory Inquiries
  - 2nd Medical Opinion
  - Financial Planning

- Manage Voluntary Benefits
  - Individual Disability Insurance
  - Critical Illness

  - Group Umbrella Liability Ins.
  - Accident coverage

  - Hospital Indemnity

- Other benefits activities include:
  - TevaFit Fitness Centers
  - Tobacco Cessation

  - Cafeteria Offerings
  - Communications (legal)

  - Weight Watchers
  - Monitor Health Dashboard

- Vendor Contracting and Management – See slide on next page

This work requires 1 Assoc Director and 1 Analyst and 1 Specialist with oversight and leadership from 1 Sr. Director



teva

TEVA 0001



# Vendor Contracting and Management

*We manage over 24 vendors with an annual spend of over $220 million*



TEVA 000155

JOINT APPX - 0109

11

# Proposal – Key Cost Savings Initiatives for 2018

- Design and implement severance solution.                                   Potential 2018 savings of $10 million
- Select and contract with a new advisor for the 401(k).                     Potential annual savings of $30,000
- Conduct RFP for Enrollment/Eligibility Administrator                        Potential annual savings of $TBD
- Conduct RFP for Life & Disability (US & Canada)                            Potential annual savings of $TBD
- Address potential stop loss premium increase                               Potential annual savings of $1-3 million
- Impact and compliance with US Tax Reform                                    TBD
- Model costing of Ontario Pension Plan legal requirement changes
- Produce the US booklet attached below and manage every benefit and every vendor for the US, Canada and PR



2018
Comprehensive Benefits Guide





TEVA 0001

JOINT_EX - 0110



Appendix - Compensation

teva

TEVA 000157

JOINT APPX - 0111

Case 2:19-cv-05488-JMG   Document 51-3   Filed 06/21/22   Page 113 of 361

# Compensation

| Action | Requirement | Impacts of Non-Compliance |
|---|---|---|
| Fair Labor Standards Act – US Overtime Eligibility - CA | Legally Required | Monetary Penalties for company and manager |
| Pay Equity – US Inc. Audits | Legally Required | Monetary Penalties for company |
| Pay Equity – Canada Inc. Audits & Employee Requests | Legally Required | Monetary Penalties, Company Name released publicly as a violator |
| Ad Hoc Compensation Reviews | Legally Required | Pay Equity regulations will require this to continue |
| Severance Plan Management and Plan Qualification Inc. File IRS Form 5500s | Legally Required | Plan qualification leading to inability to process Severance in alignment with State Unemployment Insurance – loss of about $6M in cost avoidance |



teva

TEVA 0000 8

JOINT _ X - 0112



# Compensation

| Action | Requirement | Impacts of Non-Compliance |
|---|---|---|
| Mergers, Acquisitions & Divestitures | Requirement based on current practice | This work will need to be completed by someone to provide compensation information for divestitures |
| Year End Process – Connect | Requirement based on current practice | Merit programs will need to run for 2018, and Connect will continue in 2019 and beyond |
| Survey Participation | Requirement based on current practice | Teva is bound to participate in certain surveys in 2018 |
| C&B Reviews | Requirement based on current practice | Merit, Market Adjustment and Promotion Planning for AOP |
| Salary Ranges – US & CA | Requirement based on current practice | Teva US & CA currently uses salary ranges where Market Reference Points do not exist, and in these cases this is used for pay equity |
| Market Reference Points at the GCA Job Level | Requirement based on current practice | Teva US & CA currently reviews each role in relation to the Market Reference Point for each GCA job to review market alignment for Connect and Hiring, and in these cases this is used for pay equity |
| Survey Output | Requirement based on current practice | Ensuring market data is added to WTW tool and roles are updated properly in country so that roles do not have drastic shifts against the market. |

15

TEVA 000159

# Compensation

| Action | Requirement | Impacts of Non-Compliance |
|---|---|---|
| WTW Comp Tool – Survey Admin – US & CA | Requirement based on current practice | Job specific market data will not be able to be created and maintained |
| Job Offers | Requirement based on current practice | Currently TA has set guidelines for recruitment and only comes to TR for offers outside the given framework. If not overseen, pay equity issues can arise. |
| Promotion Reviews | Requirement based on current practice | |
| Maintenance of GCA within NA | Requirement based on current practice | Possible inequities across groups within country |
| Sales Compensation Design Team Member | Requirement based on current practice | Sales team will have full ownership over sales incentive plan |
| Group Re-organization Compensation Assistance | Requirement based on current practice | Decreased Client Experience and realignment not inline with GCA or external compensation |
| Retention Reviews | Requirement based on current practice | Possible inequities |

16



teva

TEVA 0001

JOINT ___ X - 0114

# Compensation

| Action | Requirement | Impacts of Non-Compliance |
|---|---|---|
| Spot Bonus Administration | Requirement based on current practice | Possible inequities |
| Proactive Compensation Client Support | Not Required | Decreased Client Experience |
| Compensation Mailbox | Not Required | Decreased Client Experience |
| Pay Alignment Strategy | Not Required | Decreased Client Experience |
| Training | Not Required | Currently supports HR with Union Avoidance |

teva

17

JOINT APPX - 0115

TEVA 000161

Case 2:19-cv-05488-JMG   Document 51-3   Filed 06/21/22   Page 118 of 361

TEVA 0001

JOINT X - 0116



# Appendix - Benefits

teva

# Benefits

| Action | Requirement | Impacts of Non-Compliance |
|---|---|---|
| Partner with Legal on Employment Litigation | Legally Required-complex must remain in benefits | Employee lawsuits |
| ACA Compliance | Legally Required-complex must remain in benefits | Fines and penalties that could be in the millions |
| Second Level Appeals | Legally Required-complex must remain in benefits | All medical plans require appeals so non-compliance leads to lawsuits and fines |
| 401(K) compliance | Legally Required-complex must remain in benefits | Fines and penalties from either IRS and/or DOL and possible disqualification of 1.7 billion plan |
| 1165 (e) Compliance – PR | Legally Required-complex must remain in benefits | Non compliance can lead to fines and disqualification of the plan |
| DC Plan Administration including Accruals | Legally Required-complex must remain in benefits | Non compliance can lead to fines and disqualification of the plan |
| SERP | Legally Required-complex must remain in benefits | Non compliance can lead to fines and disqualification of the plan |
| QDRO | Legally Required-complex must remain in benefits | Non compliance can lead to fines and disqualification of the plan |

19

TEVA 000163

# Benefits

| Action | Requirement | Impacts of Non-Compliance |
|---|---|---|
| FSA Administration | Legally Required | Not funding could lead to |
| HSA Administration | Legally Required | Non-compliance with rules could disqualify tax-exemption status |
| Audit – IRS & DOL | Legally Required-complex must remain in benefits | Fines and penalties from either IRS and/or DOL and possible disqualification of 1.7 billion plan |
| Disclosure Requirements – Executive Management Team | Legally Required-complex must remain in benefits | Highly regulated must be done with knowledge and expertise in benefits |
| Compliance for Heath and Wealth Plans – 5500s | Legally Required-complex must remains in benefits | Fines and penalties from either IRS and/or DOL and possible disqualification of 1.7 billion plan |
| Open Enrollment | Legally Required | Non compliance with section 125 |
| Maintenance of Contracts and Business Associate Agreements | Legally Required | Can lead to fines and penalties if confidentiality is compromised |



teva

TEVA 0001

JOINT EX - 0118

# Benefits

| Action | Requirement | Impacts of Non-Compliance |
|---|---|---|
| COBRA | Legally Required - but can move | Fines and penalties from the DOL for non-compliance and possible lawsuits |
| Wires | Legally Required - but can move | 401(k) funding must be competed timely and if not done timely could lead to plan audits as well as non-compliance of the plan which could lead to disqualification of 1.7 billion dollar plan |
| Disability Management/FMLA | Legally Required - but can move | Employment related lawsuits if not compliant with FMLA |
| Invoices | Legally Required - but can move | Need to honor signed contracts and non-payment could lead to disruption of services |
| All Payroll Medical Deductions | Legally Required - but can move | Under the cafeteria plan deductions need |

teva

JOINT APPX - 0119

TEVA 000165

21

# Benefits

| Action | Requirement | Impacts of Non-Compliance |
|---|---|---|
| Maintain files to Vendors | Requirement based on current practice | Not legally required but mistakes on file feeds leads to coverage being dropped for employees |
| Benefits Mailbox – Tier 2 Employee Support | Requirement based on current practice-Must remain in benefits | Escalated questions not getting resolved and possibly compromising health of our employees |
| Mergers, Acquisitions & Divestitures | Requirement based on current practice | |
| Vendor relations for Medical, Dental & Prescription | Requirement based on current practice- Must remain in benefits | Could impact how services are received by employees if vendors are not properly managed |
| Vendor Summit | Requirement based on current practice | |
| Negotiations with Vendors | Requirement based on current practice | Leads to higher spend if not monitored |

22

teva

TEVA_0001?6

JOINT_TRX - 0120



# Benefits

| Action | Requirement | Impacts of Non-Compliance |
|---|---|---|
| Budget | Requirement based on current practice | Over spend if not monitoring the budget |
| Website – My Teva Reward | Requirement based on current practice | |
| Manage Voluntary Deductions | Not legally required but strongly recommend | |
| Process/Procedure Controls for 401K | Not legally required but strongly recommend | |
| Policy Management | Requirement based on current practice: some legal implications | Non active management can lead to potential lawsuits |

teva

23

JOINT APPX - 0121

TEVA 000167

# Benefits

| Action | Requirement | Impacts of Non-Compliance |
|---|---|---|
| ESPP Administration | Requirement based on current practice-but can move | |
| Weekly New Hire Benefits Orientation | Requirement based on current practice-but can move | |
| Weekly New Hire Benefits Orientation | Requirement based on current practice-but can move | |
| Employee Recognition – STARS | Requirement based on current practice-but can move | |

teva

24

JOINT X - 0122

TEVA 0001

# Benefits

| Action | Requirement | Impacts of Non-Compliance |
|---|---|---|
| Expat TR assistance | Not required | Employee disruption |
| VP Orientation | Not required | Employee disruption |
| E&Y Administration | Not required | |
| Health & Wellbeing Strategy | Not required | Health & Wellbeing strategy leads to better health of employees and dependents which could lead to lower spend. Considering the challenging time we are in this is important to keep employees engaged |
| Wellbeing Champions | Not required | Health & Wellbeing strategy leads to better health of employees and dependents which could lead to lower spend |
| Wellness Program | | |
| C&B Reviews | | |

teva

25

TEVA 000169

JOINT APPX - 0123

# Typical Compliance Changes – This is for a US City

**December 14, 2017**

*San Francisco Increases Employer Mandate Amount for 2018*

**Important for Employers with Employees in the City of San Francisco**

Recently, the San Francisco Board of Supervisors increased the amount that employers must spend on health care in 2018 and made other changes to the Health Care Security Ordinance (HCSO). The Board of Supervisors made the following changes that impact large employers:

Increased the health care expenditure rate for "large businesses" (100 or more employees total) to $2.83 per hour (up from $2.64 in 2017), and the rate for "medium-sized businesses" (20-99 employees total) to $1.89 per hour (up from $1.76) beginning January 1, 2018; and

Released a notice that employers must post by 1/1/18.

As of January 1, 2017, all health expenditures had to be irrevocable (i.e., could not revert back to the employer) if they were to count toward the employer spending requirement under the HCSO. In addition, in October of 2017, the San Francisco Office of Labor Standards Enforcement issued new rules applying the irrevocability standard to self-insured plan expenditures.



TEVA 0001

26



Case 2:19-cv-05488-JMG   Document 51-3   Filed 06/21/22   Page 127 of 361



TEVA 000171

JOINT APPX - 0125

## SEPARATION AGREEMENT AND GENERAL RELEASE

THIS SEPARATION AGREEMENT AND GENERAL RELEASE ("Agreement") is made between Randolph Keuch ("Employee") and Teva Pharmaceuticals USA, Inc. ("Teva").

WHEREAS, Employee's employment will terminate, effective as of March 18, 2018 ("Separation Date") and Employee and Teva desire to make a full and final settlement of any and all potential claims by Employee with respect to Employee's employment by and employment termination from Teva,

NOW THEREFORE, in consideration of the mutual promises contained in this Agreement and for other good and valuable consideration, the parties agree as follows:

1. <u>Termination of Employment Relationship</u>. Employee's employment with Teva is terminated effective the Separation Date under the terms and conditions set forth in this Agreement.

2. <u>Separation Payments and Benefits</u>. Teva will provide Employee with the following payments and benefits in consideration for:

(a) Employee's execution and non-revocation of this Agreement, and with it Employee's agreement to release all claims that can be released, as set forth in Paragraphs 5 and 6 in this Agreement, and in exchange for Employee's agreement to abide by the restrictions set forth in this Agreement, following receipt of Employee's signed copy of this Agreement and the expiration of the seven (7) day revocation period referenced in Paragraph 7(e) without revocation of this Agreement; and

(b) Employee's conformance with the requirements, terms, and conditions of the Teva Pharmaceuticals USA, Inc. Supplemental Unemployment Benefit Plan or Teva Pharmaceuticals USA, Inc. Employment Transition Plan, whichever is applicable:

(i) <u>Separation Payments</u>. Subject to satisfaction of the two (2) conditions stated above, Employee shall receive separation payments in the aggregate totaling $71,400.00 equal to thirteen(13) weeks of gross salary "(Separation Payments"), less all applicable deductions, which shall be paid pursuant to Paragraph 2(iii) below. All Separation Payments will be made in accordance with the terms and conditions of the Teva Pharmaceuticals USA, Inc. Supplemental

TEVA 000172

Unemployment Benefit Plan or Teva Pharmaceuticals USA, Inc. Employment Transition Plan, whichever is applicable.

(ii) <u>Transitional Health Coverage Allowance</u>. To be eligible for this Transitional Health Coverage Allowance, Employee must be enrolled in one (1) or more of Teva's health insurance plans as of Employee's Separation Date. Employee shall receive a Transitional Health Coverage Allowance equal to $8,250.34, less all applicable deductions, which shall be paid pursuant to Paragraph 2(iii) below. It is the Employee's responsibility to timely elect COBRA or other coverage and pay monthly premiums.

(iii) <u>Payment Schedule</u>. The Separation Payment and Transitional Health Coverage Allowance, as described above, totaling $79,650.34, will be aggregated and paid in seven(7) equal bi-weekly installments beginning as soon as administratively possible following receipt of <u>Employee's signed</u> copy of this Agreement and the expiration of the seven (7) day revocation period referenced in Paragraph 7(e) without revocation of this Agreement, and subject to Paragraph 14 below. All payments made under this Agreement are subject to applicable deductions, including without limitation federal (including the federal supplemental tax), state, and/or local taxes.

(iv) <u>Outplacement</u>. Teva shall select an outplacement firm to provide career transition services to Employee and Teva shall be solely responsible for the fees charged by the outplacement firm for providing such services. Employee must begin Employee's participation in such services within ninety (90) days of Employee's Separation Date.

For purposes of this paragraph, "consideration" means something of value to which Employee is not already entitled.

3. <u>Claim for State Unemployment Insurance</u>. Employee agrees to timely apply for State Unemployment Insurance ("SUI") as required by the Teva Pharmaceuticals USA, Inc. Supplemental Unemployment Benefit Plan ("SUB Plan"), unless expressly excepted from doing so under the terms of the SUB Plan. In exchange, Teva agrees not to dispute any claim that <u>Employee</u> may make for SUI to commence on or after the Separation Date; provided, Teva will make reasonable efforts to comply with all legal requirements as to providing information relating to Employee's Teva employment. Teva agrees that it will not state or imply that

TEVA 000173

Employee's separation was for cause.  Teva does not and cannot guarantee that Employee will receive SUI.

4.  Return of Teva's Property.  Employee agrees to return to Teva on or before the Separation Date any items of Teva's property listed on **Exhibit "A,"** to the extent Employee has such items, as well as any other personal property of Teva in Employee's possession.  Teva shall make a good faith effort to return Employee's personal property to Employee.

5.  General Release and Waiver of Claims.  In consideration for the payments and commitments referred to in Paragraphs 2 and 3 of this Agreement, Employee hereby releases and forever discharges Teva and all of its past and present subsidiaries, parent and related corporations, companies, joint ventures, partnerships, and divisions, and their past and present directors, trustees, officers, partners, members, managers, supervisors, employees, attorneys, and agents and their predecessors, successors and assignees (sometimes referred to collectively in this Agreement, together with Teva, as "Releasees"), from any and all legal, equitable or other claims, debts, contracts, complaints or causes of action (hereinafter referred to collectively as "Claims"), whether known or unknown, asserted or unasserted, that Employee ever had, now has or hereafter may have against Teva or any or all of the other Releasees, by reason of any cause, matter, thing or event whatsoever arising out of Employee's employment by Teva and/or Employee's separation from employment with Teva occurring at any time up to and including the date and time Employee signs this Agreement.

6.  Specific Release and Waiver of Claims.  Employee acknowledges and agrees that the Claims being released in Paragraph 5 of this Agreement include, but are not limited to, any claim arising out of the Employee's employment by Teva which could be asserted now or in the future, whether brought individually, in a representative capacity or as a member of any class of claimants, or in a collective action, under: (i) the common law, including but not limited to theories of breach of express or implied contract or duty, tort, wrongful termination, defamation or violation of public policy; (ii) any policies, practices or procedures of Teva and/or Releasees; (iii) any federal, state and/or local statutes or regulations including but not limited to, the Employee Retirement Income Security Act of 1974, as amended, 29 U.S.C. § 1001 *et seq.*; the Americans with Disabilities Act of 1990, 42 U.S.C.§ 12101 *et. seq.*; Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*; Executive Order 11246, as amended; the Equal Pay Act, 29 U.S.C. § 206 (d) *et seq.*; the Family and Medical Leave Act, 29 U.S.C. § 2601 *et seq.*; the

TEVA 000174

Genetic Information Non-Discrimination Act, 42 U.S.C. § 2000ff-1 *et seq.*; 42 U.S.C. § 1981; the Age Discrimination in Employment Act, 29 U.S.C. § 621 *et seq.*; the Consolidated Omnibus Budget Reconciliation Act, 29 U.S.C. § 1021 *et seq.*; the Worker Adjustment and Retraining Notification Act, 29 U.S.C. § 2101 *et seq.*; the Pennsylvania Human Relations Act, 43 P.S. § 951 *et seq.*; and/or any applicable federal, state or local laws, regulations, or ordinances; (iv) any contract of employment, express or implied; (v) any provision of the Constitution of the United States, and any applicable state constitution(s); (vi) any and all claims or actions for attorneys' fees and/or costs; (vii) any claims for unpaid or withheld wages, severance pay, bonuses, overtime, stock or stock options, commissions or other compensation, leave, reinstatement, sick pay, insurance coverage or non-vested and/or non-accrued employee benefits of any kind; and (viii) any provision of any other law, common or statutory, of the United States, or any applicable state or locality.

7. <u>Notice of Special Rights Under the ADEA.</u>  In addition to the release of Teva and the other Releasees from any and all Claims arising out of Employee's employment by Teva which arose up to and including the date of this Agreement, Employee further acknowledges with respect to the release of Claims under the Age Discrimination in Employment Act, 29 U.S.C. § 621 *et seq.* ("ADEA") (to the extent that Employee may have any Claims under the ADEA based upon Employee's age) that:

(a) Employee waives these Claims knowingly and voluntarily in exchange for severance and other benefits which are of value, and that Employee would not otherwise have been entitled to receive;

(b) Employee is hereby advised in writing by Releasees to consult with an attorney in connection with this Agreement;

(c) Employee hereby acknowledges that this waiver does not apply to any rights or Claims that may arise in the future.

(d) Employee has been given information regarding the job titles and ages of all individuals eligible or selected to receive benefits under this Reduction in Force Program ("Program") at this time and the ages of all individuals in the organizational unit who are not eligible for benefits at this time, such information being attached as **Exhibit "C;"**

TEVA 000175

(e) Employee has been given a period of Fourty-Five (45) days within which to consider this Release but understands that Employee need not consider this Agreement for that full period before signing it;

(f) Employee understands that Employee may revoke this waiver of Claims under the ADEA for a period of seven (7) days following the date Employee signs this Agreement and that Employee's waiver of ADEA Claims will not become effective until the revocation period has expired;

(g) If Employee wishes to revoke the waiver of Claims under the ADEA, that revocation shall be made by forwarding the document attached as **Exhibit "B"** to Teva Pharmaceuticals USA, Inc., attn: Elaine McGee, Human Resources Department, 1070 Horsham Road, North Wales, PA 19454, no later than the close of business on the seventh (7th) day following the date on which Employee has signed this Agreement; and

(h) If Employee timely revokes the waiver of ADEA Claims in accordance with the above Paragraph 7(g), Employee will no longer be eligible for the payments and Teva commitments referred to in Paragraphs 2 and 3 of this Agreement, but such revocation will not be effective with respect to Employee's release of all other Claims covered by this Agreement and shall remain subject to all other commitments set forth in this Agreement. The other Claims covered under this Agreement and any consideration Employee received prior to Employee's revocation is valid and adequate consideration with respect to the remainder of this Agreement and Employee's waiver of such other Claims.

(i) This Agreement complies in all respects with Section 7(f) of the ADEA, that is, the waiver provisions of the Older Worker Benefit Protection Act.

8. <u>Non-Released Claims</u>. The General Release and Waiver of Claims set forth above in Paragraph 5 and the Specific Release and Waiver of Claims set forth in Paragraph 6 above below do <u>not</u> apply to:

(a) Any Claims for vested benefits under Teva's 401(k) plan;

(b) Any Claims to require Teva to honor its commitments set forth in this Agreement;

TEVA 000176

(c) Any Claims to interpret or to determine the scope, meaning, or effect of this Agreement;

(d) Any Claims arising out of any conduct, matter, event, or omission existing or occurring after Employee signed this Agreement; and

(e) Any Claims that may not be waived pursuant to applicable law.

9. <u>Successors</u>.  This Agreement is for the benefit of and is binding upon Employee and Employee's heirs, administrators, representatives, executors, successors, beneficiaries and assigns, and is also for the benefit of the Releasees and their successors and assigns.

10. <u>Effective Date</u>.  This Agreement will be effective when Employee signs and returns it to Teva Pharmaceuticals USA's Human Resources Department, except as otherwise provided in Paragraph 7(g) above.

11. <u>Violation</u>.  If Employee violates Paragraphs 12 or 13 of this Agreement (except as regards to any Claims under the ADEA), Releasees, unless prohibited by applicable law or regulation, will be entitled to the immediate repayment to it of all payments and the cost of all benefits provided to Employee under this Agreement and may discontinue any unpaid payments and benefits.  Should Employee fail to make such repayment, Employee will be deemed conclusively to be bound by the terms of this Agreement and waives any right to seek to overturn or avoid it.  Employee agrees that this repayment will not invalidate this Agreement.

12. <u>Complaints and Whistleblower Claims</u>.

(a) <u>Protected Class Claims of Harassment, Discrimination, and/or Retaliation</u>. <u>Employee</u> represents and warrants that <u>neither Employee nor anyone acting on Employee's behalf has</u> filed any complaint against Teva or any other Releasees with any local, state, or federal court or any other governmental or regulatory body.  <u>Employee</u> acknowledges that <u>neither Employee nor anyone acting on Employee's behalf has</u> to date filed any charge or complaint with the Equal Employment Opportunity Commission or any local <u>or state</u> agency authorized to investigate charge or complaints of unlawful employment discrimination, harassment, and/or retaliation (together, "Agency")<u>.  Employee understands that nothing in this Agreement bars Employee or anyone acting on Employee's behalf</u> from filing a charge or complaint of unlawful employment discrimination, harassment, and/or discrimination with an Agency, or assisting in an investigation

TEVA 000177

of a charge or complaint of such unlawful conduct by an Agency. <u>However, if</u> any Agency or court has now assumed or later assumes jurisdiction of any complaint or charge on <u>Employee's</u> behalf against any Releasees, <u>Employee</u> will disclaim entitlement to any relief.

(b) <u>Whistleblower Claims</u>. Nothing in this Agreement prohibits Employee from reporting possible violations of United States federal law or regulation to any governmental agency or entity, including but not limited to, the United States Department of Justice, the United States Securities and Exchange Commission, the United States Congress, and any Inspector General of any United States federal agency, or making other disclosures that are protected under the whistleblower provisions of United States federal, state, and/or local law or regulation; provided, that Employee will use his or her reasonable best efforts to (1) disclose only information that is reasonably related to such possible violations or that is requested by such agency or entity, and (2) request that such agency or entity treat such information as confidential. Employee does not need the prior authorization from the Company to make any such reports or disclosures and is not required to notify the Company that Employee has made such reports or disclosures. This Agreement does not limit Employee's right to receive an award for information provided to any governmental agency or entity within the scope of this Paragraph 12(b).

13. <u>Proprietary Information; Trade Secrets; Non-Solicitation; Non-Disparagement; Cooperation; and Non-Interference</u>.

(a) <u>Proprietary Information</u>. Employee agrees and acknowledges that, during Employee's Teva employment Employee acquired and was privy to confidential information, trade secrets, confidential processes and confidential "know-how" relating to, or concerned with, the past, present, or future business, finances, manufacturing, operations, services, customers, suppliers, sources of leads and methods of obtaining new business, methods of pricing, systems, processes, methods, products, discoveries, designs, inventions, manufacturing, marketing and sales techniques and policies of Teva and the Releasees ("Proprietary Information"). Employee further agrees and acknowledges that during the performance of Employee's duties, Employee had access and was privy to confidential or Proprietary Information belonging to third parties which is subject to a duty to Teva or Releasees to maintain the confidentiality of such information and to use such information only for certain limited purposes ("Third Party Information"). Employee agrees that Employee will not, unless required by court order, judgment or decree, directly or indirectly use, divulge, furnish or make accessible any Proprietary Information or

TEVA 000178

Third Party Information to any other person or entity. This condition shall not prevent Employee from using or divulging Proprietary Information or Third Party Information that is now in the public domain or hereafter becomes part of the public domain. This provision survives the termination of this Agreement. Employee further agrees and acknowledges that the Proprietary Information is a unique asset of great value to Teva, and therefore Employee agrees that the restriction imposed herein is reasonable and necessary for the protection of the goodwill of Teva and not unduly restrictive of Employee's rights. Employee further agrees and acknowledges that the any confidential information  or other similar agreement signed by Employee continues to be in effect and that Employee will comply with said agreement.

(b)  Trade Secrets:

(i)  Notwithstanding any provisions of this Agreement or Employee Confidential Information Agreement, Employee acknowledges that Teva has advised Employee regarding potential immunity under the Defend Trade Secrets Act for disclosing a trade secret under limited circumstances, as set forth in Teva's Confidential Information Policy.

(ii)  Notwithstanding any provisions of this Agreement or the Employee Confidential Information Agreement signed by Employee, Employee further acknowledges that if Employee files a lawsuit for retaliation by Teva for reporting a suspected violation of the law, under limited circumstances Employee may disclose Teva's trade secrets to Employee's attorney and use the trade secret information in related court proceedings if Employee: (A) files any document containing the trade secret under seal; and (B) do not disclose the trade secret, except pursuant to court order.

(c)  Non-solicitation. Employee agrees and covenants that, for twelve (12) months after the date of this Agreement, Employee will not directly or indirectly try to solicit or entice any individual who is, at that time, an employee of Teva or of any affiliate of Teva, which Employee knows to be such an affiliate, to leave employment with Teva or such affiliate.

(d)  Non-disparagement. Employee agrees not to engage in any deprecating conduct and/or make any negative comments or disparaging remarks, in writing, orally, or electronically, about Teva or any other Releasee and their respective officers, directors, employees, and agents and their respective products and services, to the media or any entity or individual. Nothing in this Agreement shall be interpreted to restrict Employee's right and/or obligation to (A) testify

truthfully in any forum or (B) contact, provide information to, and/or cooperate fully in any investigation by a government agency.

(e) Cooperation.

(i) Employee agrees to cooperate with Teva in connection with any ongoing administrative, regulatory, or litigation proceedings or such like matters that may arise in the future, about which Employee may have personal knowledge and/or subject matter expertise because of employment with Teva. Such cooperation will include being interviewed by representatives of Teva and participating in legal proceedings by deposition or testimony. Teva will reimburse Employee for reasonable expenses incurred by Employee by reason of such cooperation.

(ii) Employee agrees that if served with an order, subpoena, or any other document which purports to potentially require the disclosure of any information relating to Employee's employment with or separation from employment with Teva, this Agreement, and/or any matter otherwise protected from disclosure under this Agreement including confidential and/or proprietary information which Employee acquired in the course of Employee's employment with Teva and which is not generally known by or readily accessible to the public, within three (3) business days of such service, Employee shall so inform Teva and deliver to Teva a copy thereof. Notice to Teva and a copy of the subpoena, order or other document shall be sent via facsimile and certified mail to the persons identified in Paragraph 18 of this Agreement.

(f) Non-interference. Subject to paragraphs 8 and 12 of this Agreement, Employee agrees not to visit any Teva facility, premises, or event unless first obtaining written approval from Teva and further agrees to permit Teva, and its officers, employees, agents, and partners, to continue Teva's day-to-day business without unnecessary and/or unreasonable disruption.

14. Waiver of Employment or Re-Employment & Re-Employment Generally. Employee acknowledges that Employee has no right to employment or re-employment with Teva or any of the other Releasees, and, other than with respect to other rights and benefits specifically reserved in this Agreement, Employee has no right to participate in any of Teva's benefit plans which Employee ever had, may now have, or may hereinafter have, whether known or unknown to Employee at the time of the execution of this Agreement. In the event Employee seeks

TEVA 000180

employment or re-employment with Teva or any parent, subsidiary, related or affiliated company, Teva and any parent, subsidiary, related or affiliated company are not obligated to employ or re-employ Employee.  However, if Employee is hired or re-hired by Teva and/or its affiliates while receiving payments under the Payments Schedule set forth in Paragraph 2(iii), Employee's Separation Payment stop as of the Employee's new hire or re-hire date consistent with this Paragraph 14.

   15.  <u>Breach; Legal Capacity; No Coercion</u>.  In the event any party shall be found by a court of competent jurisdiction to have breached this Agreement, the other party shall be entitled to damages, including reasonable attorneys' fees and costs of suit, and shall also return all monetary consideration exchanged hereunder.  <u>However, nothing in this Paragraph 15 shall be considered or interpreted to be a requirement that Employee return any payments or reimburse Teva for the cost of any benefits received under this Agreement before filing a lawsuit or a charge of discrimination with an Agency.</u>  The parties further state that they are signing this Agreement completely, willingly and voluntarily and that there are no medical or other conditions that would prevent them from doing so.  <u>Neither party has</u> subjected the other party to any coercion or duress, and has done nothing to force the other party to sign this Agreement.

   16.  <u>No Admission</u>.  This Agreement shall not in any way be construed as an admission by Teva that it has acted wrongfully with respect to <u>Employee</u> or any other person, or that <u>Employee</u> has any rights <u>or claims </u>whatsoever against Teva<u> or any of the other Releasees through the date that Employee signed this Agreement</u>, and Teva specifically disclaims any liability with regard to any wrongful acts against <u>Employee</u> or any other person, on the part of itself, its employees or its agents.

   17.  <u>Confidentiality of this Agreement.</u>   <u>Confidentiality of this Agreement.</u>  <u>Employee</u> shall not disclose the existence of this Agreement or any information contained <u>in this Agreement</u> without prior written consent of Teva, except as required by law, or as necessary to implement this Agreement.  Employee agrees not to discuss either the existence of or any aspect of this Agreement with any employee or ex-employee of Releasees, or any other third parties without Releasees' or their successors' or assigns' prior written authorization.  Notwithstanding the above, <u>Employee</u> may disclose this Agreement to Employee's attorneys, health care providers, financial advisers and tax advisers advising <u>Employee</u> and to members of

TEVA 000181

Employee's immediate family, provided <u>such persons</u> agree to keep such information confidential and comply with the terms of this Paragraph.

18. <u>Notices</u>.  All notices, requests, demands and other communications required or permitted under this Agreement or necessary or convenient in connection with this Agreement shall be in writing and marked confidential.  Any such notice and other communication under this Agreement shall be deemed to have been duly given if delivered by hand or deemed to have been duly given on the third business day following the mailing within the continental United States by first class mail, postage prepaid, addressed as follows:

> Teva Pharmaceuticals USA, Inc.
> Human Resources Department
> 1070 Horsham Road
> North Wales, PA  19454
> Attention:  Elaine McGee, Associate Director, HR
> Facsimile:  215.795.4056
> E-mail: NA_HR_Compliance@tevapharm.com

19. <u>Governing Law</u>.   This Agreement and any disputes arising thereunder shall be governed by and construed and enforced in accordance with the laws of the Commonwealth of Pennsylvania, both substantive and remedial, without regard to conflicts of laws principles.

20. <u>Acknowledgements</u>.

(a) <u>Employee</u> represents that <u>Employee</u> has carefully read and fully understands all the provisions of this Agreement, is entering into this Agreement voluntarily, and that <u>Teva</u> advised <u>Employee </u>in writing<u>, by giving Employee a draft of this Agreement for Employee's review and consideration,</u> to consult with an attorney of <u>Employee's</u> choice and at <u>Employee's</u> expense before <u>signing this Agreement</u>.

(b) Employee agrees and acknowledges that, by accepting benefits under this Agreement and signing this Agreement, Employee is giving up any right Employee might have to bring a Claim against Teva or any of the other Releasees arising from or in any way related to Employee's employment relationship or the termination of such employment relationship. Employee also agrees and acknowledges that Employee would not receive benefits under this Agreement if Employee did not knowingly and voluntarily enter into this Agreement.

TEVA 000182

(c) Employee agrees and understands that should Employee sign this Agreement before Employee's Separation Date that (i) this Agreement will be null, void, and unenforceable and (ii) Teva will provide to Employee an unexecuted copy of this Agreement for Employee's signature no sooner than Employee's Separation Date.

21.  <u>Entire Agreement</u>.  This Agreement represents the entire Agreement between the parties and supersedes any and all prior oral and written agreements between Teva and <u>Employee, except for the Employee Confidential Information Agreement</u>.  No variations or modifications of this Agreement shall be deemed valid unless reduced to writing and signed by both parties.

22.  <u>Interpretation of Agreement</u>.  Nothing in this Agreement is intended to violate any law or shall be interpreted to violate any law.  If any paragraph or part or subpart of any paragraph in this Agreement or the application thereof is construed to be overbroad and/or unenforceable, then the court making such determination shall have the authority to narrow the paragraph or part or subpart of the paragraph as necessary to make it enforceable and the paragraph or part or subpart of the paragraph shall then be enforceable in its/their narrowed form.  Moreover, each paragraph or part or subpart of each paragraph in this Agreement is independent of and severable (separate) from each other.  In the event that any paragraph or part or subpart of any paragraph in this Agreement is determined to be legally invalid or unenforceable by a court and is not modified by a court to be enforceable, the affected paragraph or part or subpart of such paragraph shall be stricken from the Agreement, and the remaining paragraphs or parts or subparts of such paragraphs of this Agreement shall remain in full, force and effect.

23.  <u>Facsimile/Electronic Signatures/Counterparts</u>.  This Agreement may be <u>signed</u> in counterparts, each of which will be deemed to be an original of this Agreement.  Any party to this Agreement may deliver a signed copy of this Agreement by facsimile or electronic transmission to any other party and any such delivery shall have the same force and effect as any other delivery of a manually signed copy of this Agreement.

TEVA 000183

EMPLOYEE ACKNOWLEDGES THAT EMPLOYEE HAS READ THIS AGREEMENT AND THAT EMPLOYEE FULLY KNOWS, UNDERSTANDS AND APPRECIATES THE CONTENTS OF THIS AGREEMENT AND THAT EMPLOYEE SIGNS THE SAME AND MAKES THE SETTLEMENT PROVIDED FOR IN THIS AGREEMENT VOLUNTARILY AND OF EMPLOYEE'S FREE WILL.

IN WITNESS WHEREOF, and intending to be legally bound, Employee and Teva have signed this Separation Agreement and General Release on the dates indicated below.

_____          _____
Date                             Employee Signature

                                 _____
                                 Employee Printed Name (Global ID#: 929502)

                                 Teva Pharmaceuticals USA, Inc.

                                 _____
_____          Authorized Human Resources Signature
Date
                                 Director, HR Shared Services - Americas
                                 _____
                                 Printed Name and Title

| LEGAL/HR O&S ONLY: |
| --- |
| Initial:_____|Date:_____ |

TEVA 000184

### EXHIBIT "A"

#### ALL PERSONNEL

Credit cards, telephone cards and purchase cards in <u>Employee</u>'s name
Keys to the office, buildings, desks and filing cabinets
All Teva files and documents or copies <u>thereof</u>
All keys to <u>any</u> Company car and related documents
All Product Samples
Leather Demo Case (with Contents)
All files (including business cards)
Phone Calling Card
Pager
Auto Insurance Forms
Car Rental Card
Car Keys and Car
Car Maintenance Book
Car Insurance Card/ Owners Card

#### NON-FIELD PERSONNEL COMPUTER EQUIPMENT

Laptop/Desktops, docking station(s), and all peripherals
Mobile device (iPhone, Blackberry)
Mobile Tablet device (Apple iPads)

#### FIELD PERSONNEL COMPUTER EQUIPMENT

Laptop Computer
iPad
Ultrabase, DVD drive, ultrabase keys
AC Adapter
JAMBOX Speaker with carry case and cables. (if applicable)
Projector with carry case and cables.  (if applicable)
Auto Adapter
Verizon Wireless Modem (if applicable)
Corp Phone & Charger (if applicable)
External Hard Drive (if applicable)
Monitor

TEVA 000185

## EXHIBIT "B"

### Waiver and Release Revocation

NOTE: DO <u>NOT</u> SIGN OR RETURN THIS DOCUMENT UNLESS YOU HAVE SIGNED THE SEPARATION AGREEMENT AND GENERAL RELEASE LESS THAN SEVEN (7) DAYS AGO AND NOW WISH TO CHANGE YOUR MIND AND REVOKE YOUR EARLIER AGREEMENT TO THE WAIVER AND RELEASE OF CLAIMS UNDER THE AGE DISCRIMINATION IN EMPLOYMENT ACT.

I, _____, hereby revoke the Separation Agreement and General Release ("Agreement") which I signed on _____, 20\_\_, to the extent that I waived and released any "Claims" (as that term is defined in the Agreement) under the Age Discrimination in Employment Act I might have against the "Releasees" (as that term is defined in the Agreement).


_____
(Signature of Employee)


_____
Date


_____
Witness


_____
Date

IN ORDER TO BE EFFECTIVE YOU MUST SIGN THIS REVOCATION FORM NO LATER THAN SEVEN DAYS AFTER YOU SIGNED THE SEPARATION AGREEMENT AND GENERAL RELEASE.

Received on _____, 20\_\_ by Teva Human Resources Department by

_____Teva Representative Signature

TEVA 000186

**EXHIBIT "C"**

TEVA 000187

TEVA 000188

9/17/21, 3:35 PM
Case 2:19-cv-05488-JMG   Document 65-3   Filed 06/24/22   Page 143 of 364
Teva Announces Restructuring Plan and Additional Measures to Improve Its Business and Financial Performance

**teva**

# Teva Announces Restructuring Plan and Additional Measures to Improve Its Business and Financial Performance

🗓 **DECEMBER 14, 2017**   |   🔖  **CORPORATE**

- Total cost base to be reduced by $3 billion by the end of 2019
- Workforce to be reduced by over 25%
- Dividend suspended on ordinary shares and ADSs

Teva Pharmaceutical Industries Ltd. (NYSE & TASE: TEVA) announced today a comprehensive restructuring plan to significantly reduce its cost base, unify and simplify its organization and improve business performance, profitability, cash flow generation and productivity.

Kåre Schultz, Teva's President and CEO, said, "Two weeks ago we announced a new organizational structure and executive management team. Today we are launching a comprehensive restructuring plan, crucial to restoring our financial security and stabilizing our business. We are taking immediate and decisive actions to reduce our cost base across our global business and become a more efficient and profitable company."

"We will execute this plan in a timely and prudent manner, remaining focused on revenue and cash flow generation, in order to make sure Teva is ready to meet all of its financial commitments. Teva will optimize its cost base while ensuring that we protect our revenues and preserve our core capabilities in generics and in select specialty assets, in order to secure long-term growth. In 2018, we expect to secure the successful launches of Austedo and fremanezumab."

The two year restructuring plan announced today is intended to reduce Teva's total cost base by $3 billion by the end of 2019, out of an estimated cost base for 2017 of $16.1 billion. More than half of the reduction is expected to be achieved by the end of 2018. The company expects to record a restructuring charge as a result of the implementation of the plan in 2018 of at least $700 million, mainly related to severance costs, with additional charges possible following decisions on closures or divestments of manufacturing plants, R&D facilities, headquarters and other office locations.

The restructuring plan will focus on:

- The immediate deployment of the new unified and simplified organizational structure, announced on November 27. It will deliver cost savings and increase internal efficiencies by reducing layers of management, and simplifying business structures and processes across the company's global operations. The new structure will support our continued commitment to compliance and business integrity
- Substantial optimization of the generics portfolio globally, and most specifically in the United States, through price adjustments and/or product discontinuation. This will enable the company to accelerate the restructuring of its manufacturing and supply network, including the closures or divestments of a significant number of manufacturing plants in the United States, Europe, Israel and Growth Markets
- Closures or divestments of a significant number of R&D facilities, headquarters and other office locations across all geographies, delivering efficiencies and substantial cost savings

https://www.tevapharm.com/news-and-media/latest-news/teva-announces-restructuring-plan-and-additional-measures-to-improve-its-business-and-financial-performan/

9/17/21, 3:35 PM        Case 2:19-cv-05488-JMG Document 59-7 Filed 08/17/22 Page 148 of 361

- Teva will work to significantly improve profitability in all existing markets by optimizing their cost base
- A thorough review of all R&D programs across the entire company, in generics and specialty, to prioritize core projects and terminate others immediately, while maintaining a substantial pipeline

These steps are expected to result in the reduction of 14,000 positions globally – excluding the impact of any future divestments – over 25% of Teva's total workforce – over the next two years.

The majority of the reductions are expected to occur in 2018, with most of the affected employees being notified within the next 90 days. Restructuring efforts will be done in accordance with applicable local requirements. Consultations with the relevant employee representatives will begin in the near term.

In addition to the restructuring plan, Teva is announcing the following measures to address the company's financial situation:

- The company will immediately suspend dividends on ordinary shares and ADSs, while dividends on mandatory convertible preferred shares will be evaluated on a quarterly basis per current practice
- Teva's annual bonus for 2017 will not be paid due to the fact that the company's financial results are significantly below our original guidance for the year.
- The company will continue to review the potential for additional divestment of non-core assets

Teva will provide full guidance for 2018 in February with the annual results and will share a longer-term strategic direction for the company later in 2018.

Schultz concluded, "These are decisions I don't take lightly but they are necessary to secure Teva's future. We will implement these changes with fairness and the utmost respect for our colleagues worldwide. Today's announcement is about positioning Teva for a sustainable future which we will achieve with our talented people. We will ensure that we continue to provide high quality medicines to the many patients we serve every day, while adhering to the highest standards of GMP compliance."

The plans were outlined in an email from the CEO to Teva's employees. The message can be accessed here (http://cts.businesswire.com/ct/CT?id=smartlink&url=http%3A%2F%2Ftevapharm.com%2Ffiles%2FRestructuringPlan%2FCEO_note_to_Teva_employees.PDF&esheet=51730198&newsitemid=20171214005653&lan=en-US&anchor=here&index=1&md5=192a92248575dc948718a47e9add97a3).

**About Teva**

Teva Pharmaceutical Industries Ltd. (NYSE and TASE: TEVA) is a leading global pharmaceutical company that delivers high-quality, patient-centric healthcare solutions used by approximately 200 million patients in over 60 markets every day. Headquartered in Israel, Teva is the world's largest generic medicines producer, leveraging its portfolio of more than 1,800 molecules to produce a wide range of generic products in nearly every therapeutic area. In specialty medicines, Teva has the world-leading innovative treatment for multiple sclerosis as well as late-stage development programs for other disorders of the central nervous system, including movement disorders, migraine, pain and neurodegenerative conditions, as well as a broad portfolio of respiratory products. Teva is leveraging its generics and specialty capabilities in order to seek new ways of addressing unmet patient needs by combining drug development with devices, services and technologies. Teva's net revenues in 2016 were $21.9 billion. For more information, visit www.tevapharm.com (http://cts.businesswire.com/ct/CT?

9/17/21, 3:35 PM

id=smartlink&url=http%3A%2F%2Fwww.tevapharm.com&esheet=51730198&newsitemid=201712
14005653&lan=en-
US&anchor=www.tevapharm.com&index=2&md5=74a3a1c3c3e0473d255407fa324414b7).

**Cautionary Note Regarding Forward-Looking Statements**

*This press release contains forward-looking statements within the meaning of the Private
Securities Litigation Reform Act of 1995, which are based on management's current beliefs and
expectations and are subject to substantial risks and uncertainties, both known and unknown, that
could cause our future results, performance or achievements to differ significantly from that
expressed or implied by such forward-looking statements. Important factors that could cause or
contribute to such differences include risks relating to:*

- *uncertainties relating to our ability to effectively execute a restructuring plan, including: the
effects of such restructuring plan, including facilities and workforce reductions, on our
business, operations, revenues and profitability; potential disruptions to our business as a
result of the restructuring and management attention to the restructuring; uncertainty
regarding the timing and amount of exit and disposal costs and severance, and the potential
amount and timing of future cost savings, associated with the restructuring and the related
workforce reduction; our ability to manage the costs and liabilities associated with a
restructuring plan, including exit and disposal costs and severance; the potential loss of tax
benefits in Israel as a result of our restructuring plan; and potential labor unrest as a result of
our planned workforce reductions*
- *uncertainties relating to the potential benefits and success of our new organizational
structure and recent senior management changes;*
- *our generics medicines business, including: that we are substantially more dependent on this
business, with its significant attendant risks, following our acquisition of Allergan plc's
worldwide generic pharmaceuticals business ("Actavis Generics"); our ability to realize the
anticipated benefits of the acquisition (and any delay in realizing those benefits) or
difficulties in integrating Actavis Generics; the increase in the number of competitors
targeting generic opportunities and seeking U.S. market exclusivity for generic versions of
significant products; price erosion relating to our generic products, both from competing
products and as a result of increased governmental pricing pressures; and our ability to take
advantage of high-value biosimilar opportunities;*
- *our specialty medicines business, including: competition for our specialty products,
especially Copaxone®, our leading medicine, which faces competition from existing and
potential additional generic versions and orally-administered alternatives; our ability to
achieve expected results from investments in our product pipeline; competition from
companies with greater resources and capabilities; and the effectiveness of our patents and
other measures to protect our intellectual property rights;*
- *our substantially increased indebtedness and significantly decreased cash on hand, which
may limit our ability to incur additional indebtedness, engage in additional transactions or
make new investments, and may result in a downgrade of our credit ratings;*
- *our business and operations in general, including: our ability to develop and commercialize
additional pharmaceutical products; manufacturing or quality control problems, which may
damage our reputation for quality production and require costly remediation; interruptions in
our supply chain; disruptions of our or third party information technology systems or
breaches of our data security; the failure to recruit or retain key personnel; the restructuring
of our manufacturing network, including potential related labor unrest; the impact of
continuing consolidation of our distributors and customers; variations in patent laws that may
adversely affect our ability to manufacture our products; our ability to consummate
dispositions on terms acceptable to us; adverse effects of political or economic instability,
major hostilities or terrorism on our significant worldwide operations; and our ability to
successfully bid for suitable acquisition targets or licensing opportunities, or to consummate
and integrate acquisitions;*
- *compliance, regulatory and litigation matters, including: costs and delays resulting from the
extensive governmental regulation to which we are subject; the effects of reforms in*

Teva 000244

*healthcare regulation and reductions in pharmaceutical pricing, reimbursement and coverage; potential additional adverse consequences following our resolution with the U.S. government of our FCPA investigation; governmental investigations into sales and marketing practices; potential liability for sales of generic products prior to a final resolution of outstanding patent litigation; product liability claims; increased government scrutiny of our patent settlement agreements; failure to comply with complex Medicare and Medicaid reporting and payment obligations; and environmental risks;*

- *other financial and economic risks, including: our exposure to currency fluctuations and restrictions as well as credit risks; the significant increase in our intangible assets, which may result in additional substantial impairment charges; potentially significant increases in tax liabilities; and the effect on our overall effective tax rate of the termination or expiration of governmental programs or tax benefits, or of a change in our business;*

*and other factors discussed in our Annual Report on Form 20-F for the year ended December 31, 2016 ("Annual Report"), including in the section captioned "Risk Factors," and in our other filings with the U.S. Securities and Exchange Commission, which are available at www.sec.gov (http://cts.businesswire.com/ct/CT? id=smartlink&url=http%3A%2F%2Fwww.sec.gov&esheet=51730198&newsitemid=201712140056 53&lan=en-US&anchor=www.sec.gov&index=3&md5=efe846cde91bd7c0e70a52574f6f24a1) and www.tevapharm.com (http://cts.businesswire.com/ct/CT? id=smartlink&url=http%3A%2F%2Fwww.tevapharm.com&esheet=51730198&newsitemid=201712 14005653&lan=en-US&anchor=www.tevapharm.com&index=4&md5=8a3bdce42452d61b7fd6641182e23f05). Forward-looking statements speak only as of the date on which they are made, and we assume no obligation to update or revise any forward-looking statements or other information contained herein, whether as a result of new information, future events or otherwise. You are cautioned not to put undue reliance on these forward-looking statements.*

Teva Pharmaceutical Industries Ltd.
IR Contacts:
United States
Kevin C. Mannix, 215-591-8912
Ran Meir, 215-591-3033
or
Israel
Tomer Amitai, 972 (3) 926-7656
or
PR Contacts:
Israel
Iris Beck Codner, 972 (3) 926-7208
or
United States
Denise Bradley, 215-591-8974
Kaelan Hollon, 202-412-7076

# Teva Announces Restructuring Plan and Additional Measures to Improve its Business and Financial Performance

December 14, 2017



Teva 000246

JOINT APPX - 0147

# Cautionary Note Regarding Forward-Looking Statements

This presentation contains forward-looking statements within the meaning of the Private Securities Litigation Reform Act of 1995, which are based on management's current beliefs and expectations and are subject to substantial risks and uncertainties, both known and unknown, that could cause our future results, performance or achievements to differ significantly from that expressed or implied by such forward-looking statements. Important factors that could cause or contribute to such differences include risks relating to:

• uncertainties relating to our ability to effectively execute a restructuring plan, including: the effects of such restructuring plan, including: the timing and amount of exit and disposal costs and severance, and the potential amount and timing of future cost savings, associated with the business as a result of the restructuring and management attention to the restructuring; uncertainty regarding the timing and amount of exit and disposal costs and severance, and the potential loss of tax benefits in Israel as a result of our restructuring plan; restructuring and the related workforce reduction; our ability to manage the costs and liabilities associated with a restructuring plan, including exit and disposal costs and severance; the potential loss of tax benefits in Israel as a result of our restructuring plan; and potential labor unrest as a result of our planned workforce reductions;

• uncertainties relating to the potential benefits and success of our new organizational structure and recent senior management changes;

• our generics medicines business, including: that we are substantially more dependent on this business, with its significant attendant risks, following our acquisition of Allergan plc's worldwide generic pharmaceuticals business ("Actavis Generics"); our ability to realize the anticipated benefits of the acquisition (and any delay in realizing those benefits) or difficulties in integrating Actavis Generics; the increase in the number of competitors targeting generic opportunities and seeking U.S. market exclusivity for generic versions of significant products; price erosion relating to our generic products, both from competing products and as a result of increased governmental pricing pressures; and our ability to take advantage of high-value biosimilar opportunities;

• our specialty medicines business, including: competition for our specialty products, especially Copaxone®, our leading medicine, which faces competition from existing and potential additional generic versions and orally-administered alternatives; our ability to achieve expected results from investments in our product pipeline; competition from companies with greater resources and capabilities; and the effectiveness of our patents and other measures to protect our intellectual property rights;

• our substantially increased indebtedness and significantly decreased cash on hand, which may limit our ability to incur additional indebtedness, engage in additional transactions or make new investments, and may result in a downgrade of our credit ratings;

• our business and operations in general, including: uncertainties relating to our recent senior management changes; our ability to develop and commercialize additional pharmaceutical products; manufacturing or quality control problems, which may damage our reputation for quality production and require costly remediation; interruptions in our supply chain, including due to labor unrest; disruptions of our or third party information technology systems or breaches of our data security; the failure to recruit or retain key personnel, including those who joined us as part of the Actavis Generics acquisition; the restructuring of our manufacturing network, including potential related labor unrest and workers' strikes; the impact of continuing consolidation of our distributors and customers; variations in patent laws that may adversely affect our ability to manufacture our products; our ability to consummate dispositions on terms acceptable to us; adverse effects of political or economic instability, major hostilities or terrorism on our significant worldwide operations; and our ability to successfully bid for suitable acquisition targets or licensing opportunities, or to consummate and integrate acquisitions;

• compliance, regulatory and litigation matters, including: costs and delays resulting from the extensive governmental regulation to which we are subject; the effects of reforms in healthcare regulation and reductions in pharmaceutical pricing, reimbursement and coverage; potential additional adverse consequences following our resolution with the U.S. government of our FCPA investigation; governmental investigations into sales and marketing practices; potential liability for sales of generic products prior to a final resolution of outstanding patent litigation; product liability claims; increased government scrutiny of our patent settlement agreements; failure to comply with complex Medicare and Medicaid reporting and payment obligations; and environmental risks;

• other financial and economic risks, including: our exposure to currency fluctuations and restrictions as well as credit risks; the significant increase in our intangible assets, which may result in additional substantial impairment charges; potentially significant increases in tax liabilities; and the effect on our overall effective tax rate of the termination or expiration of governmental programs or tax benefits, or of a change in our business; and other factors discussed in our Annual Report on Form 20-F for the year ended December 31, 2016 ("Annual Report"), including in the section captioned "Risk Factors," and in our other filings with the U.S. Securities and Exchange Commission, which are available at www.sec.gov and www.tevapharm.com. Forward-looking statements speak only as of the date on which they are made, and we assume no obligation to update or revise any forward-looking statements or other information contained herein, whether as a result of new information, future events or otherwise. You are cautioned not to put undue reliance on these forward-looking statements. Non-GAAP Financial Measures This presentation includes certain non-GAAP financial measures as defined by SEC rules. Please see our Annual Report on Form 20-F for the year ended December 31, 2016 for a reconciliation of these historical measures to the most directly comparable GAAP measures. The estimates contained in this presentation are non-GAAP financial measures, which exclude the amortization of purchased intangible assets, costs related to certain regulatory actions, inventory step-up, legal settlements and reserves, impairments and other costs and related tax effects. The non-GAAP data presented by Teva are the results used by Teva's management and board of directors to evaluate the operational performance of the company, to compare against the company's work plans and budgets, and ultimately to evaluate the performance of management. Teva provides such non-GAAP data to investors as supplemental data and not in substitution or replacement for GAAP measures, because management believes such data provides useful information to investors. A reconciliation of such forward-looking non-GAAP estimates to the corresponding GAAP measures is not being provided, due to the unreasonable efforts required to prepare it.

Teva 000247

# Teva Participants

- Kåre Schultz - President and CEO

- Mike McClellan - EVP, CFO

- Kevin Mannix - SVP, Investor Relations

Teva 000248

# Teva's current reality

## Challenges ahead of us require us to take significant steps with a sense of urgency

- Significant financial obligations in the coming 4 years

- Generic competition to our largest branded product COPAXONE®

- Challenging environment in our largest generic market - the U.S.

- Fewer than anticipated Gx product launches in the U.S.



We believe we can turn Teva around in the short to medium term by significantly reducing our cost base, closely managing our liabilities, and divesting non-core assets

4

Teva 000249

JOINT APPX - 0150

# Highlights of the restructuring plan - By the numbers

## Teva is planning to reduce its current cost base (~$16 billion) by $3 billion*

– More than half of the cost reductions are expected to be achieved by end of 2018; full $3 billion by end of 2019

– Reductions to come from all elements of the cost base

– Global workforce to be reduced by approximately 14,000* – more than 25% of the workforce – over the next two years; majority will happen in 2018

– Cost of restructuring program expected to result in a one-time restructuring charge and cash outlay of $700 million in 2018

**Savings will allow for a more efficient Teva to meet all of its financial commitments**

5    *Includes divestment of Women's Health and closure of distribution business in Hungary

JOINT APPX - 0151

Teva 000250

# Key areas of focus

The restructuring plan will focus on:

– Deployment of a new unified and simplified organizational structure

– Substantial optimization of the generics portfolio globally

– Closures or divestments of a significant number of facilities

– Thorough review of all R&D programs across the entire company

**Teva expects to optimize its cost base while protecting revenues and preserving core capabilities in generics and in select specialty assets, in order to secure LT growth**

JOINT APPX - 0152

Teva 000251

6

# A key step - New organizational structure

| From... | To... |
|---------|-------|
| Two separate global commercial groups for generics and specialty medicines | **One integrated commercial organization, operating through three regions** – North America, Europe and Growth Markets |
| Regions have direct P&L accountability only | Each region manages the entire portfolio, including generics, specialty and OTC, with **full end-to-end P&L accountability** |
| Separate generic and specialty R&D organizations | **One global R&D group** , which has overall responsibility for **all R&D activities** – generic, specialty and biologics |
| Insufficient alignment and integration between commercial, operations and R&D across the portfolio | A newly formed **Marketing & Portfolio function**, which oversees the interface between regions, R&D and operations throughout all product lifecycle stages; optimizing generic and specialty portfolios and marketing strategies across the therapeutic areas |
| Extensive global supporting layer | **One, lean organizational infrastructure supporting the commercial structure** that includes Finance, HR, Legal and Corporate Brand & Communications |

7

Teva 000252

TEVA

# Substantial optimization of the global generics portfolio

Discontinuation of products that do not meet Teva's new profitability benchmark

Downsizing of the manufacturing, supply and R&D network

Adjust pricing of certain portfolio segments to better reflect current cost structure and market conditions

# Additional measures

In addition to the restructuring plan, Teva is announcing the following measures to address the company's financial situation:

– Immediate suspension of dividends on ordinary shares and ADRs

– The company will continue to review additional divestment opportunities of non-core assets

– Annual bonus for 2017 will not be paid out due to the company not achieving its pre-set financial goals for the year

Teva 000254

# Concerted effort to improve our financial profile

Our absolute priority is to improve our financial profile through the stabilization of the company's operating profit and cash flow:

– Committed to utilizing cash flow to pay down debt over the next four years

– Initial focus will be on the remaining bank debt subject to covenants (~4B)

– Targeting leverage (Net Debt / EBITDA) of below 4x by YE 2020

## We do not plan to raise equity

10

Teva 000255

# Debt Movements

## Teva remains focused on deleveraging

– Proceeds from Women's Health U.S. divestitures (Paragard & Plan B) used to make prepayment of $1.77 billion on our 5Y and 3Y term loans maturities



*5 Year Debt Maturities ($b)*

| 2018 | 2019 | 2020 | 2021 | 2022 |
|------|------|------|------|------|
| 3.5  | 4.0  | 4.3  | 4.2  | 1.7  |

Teva 000256

# Clear path forward – What to look for in 2018

– Simpler, leaner and more agile organization

– More than half of $3 billion in cost reductions is expected to be achieved by end of 2018

– Continued debt reduction

– Focused support of fremanezumab and AUSTEDO®

– R&D spend that maximizes ROI

**We will ensure that we continue to provide high quality medicines to the many patients we serve every day**

12

Teva 000257

# Question and Answer Session

TEVA



# Teva's Code
of Conduct

Our Values.
Our Strength.
Our Code.

teva



Our Values.
Our Strength.
Our Code.

# Table of Contents

## Introduction

Our Mission. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

## Section 1:
## Our Values in Action

Our Values in Action . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Leading the Way. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Focus and Accountability . . . . . . . . . . . . . . . . . . . . . . 5

Getting It Done Together . . . . . . . . . . . . . . . . . . . . . . . 5

Innovating Where We Create Value . . . . . . . . . . . . . . . 5

Caring. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Making Our Families Proud . . . . . . . . . . . . . . . . . . . . . 5

Application and Expectations of the Code of Conduct . . . . . . . 6

Personal Responsibility for Compliance & Ethics . . . . . . . . . . 6

Resources. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

## Section 2:
## Teva's Code of Conduct

### Our Industry

Avoiding Conflicts of Interest. . . . . . . . . . . . . . . . . . . . . . . . 8

Prohibition on Insider Trading and on Use
of Non-Public Information . . . . . . . . . . . . . . . . . . . . . . . . 10

Antitrust, Unfair Competition and Business Intelligence. . . . . . 11

Anti-Corruption . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Promotional Materials; Scientific Exchanges . . . . . . . . . . . . 15

Political Activities and Contributions . . . . . . . . . . . . . . . . . 17

Trade Controls . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Prohibition on Money Laundering . . . . . . . . . . . . . . . . . . 18

### Our Company

Equal Employment Opportunity . . . . . . . . . . . . . . . . . . . . 19

Safe and Healthy Workplace. . . . . . . . . . . . . . . . . . . . . . . 19

Freedom from Workplace Harassment. . . . . . . . . . . . . . . . . 20

Freedom of Opinion, Speech and Association . . . . . . . . . . . 20

Refraining from Substance Abuse; Freedom
from Workplace Violence . . . . . . . . . . . . . . . . . . . . . . . . 21

### Our People

Supportive and Collaborative Work Environment . . . . . . . . . . 22

Interactions with Governments and Their People . . . . . . . . . . 22

Interactions with Business Partners . . . . . . . . . . . . . . . . . . 23

Protecting the Proprietary Information of Third Parties . . . . . . 24

Communications with Media Representatives,
Analysts and the General Public. . . . . . . . . . . . . . . . . . . 24

Social Media . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

### Our Business

Quality and Safety . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

Protecting Company Confidential Information,
Intellectual Property and Company Assets . . . . . . . . . . . . . 27

Privacy and Protection of Personal Information . . . . . . . . . . . 28

Designing and Maintaining Effective Business
Controls; Accurate Reporting . . . . . . . . . . . . . . . . . . . . . 29

Use of Company Systems . . . . . . . . . . . . . . . . . . . . . . . 30

Records Management . . . . . . . . . . . . . . . . . . . . . . . . . 32

Innovation and Creativity. . . . . . . . . . . . . . . . . . . . . . . . 33

Research and Development; Clinical Trials . . . . . . . . . . . . . . 3

Philanthropy and Community Involvement
and Contributions. . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

Safeguarding the Environment and Animal Welfare . . . . . . . . 35

Ethical Labor Practices . . . . . . . . . . . . . . . . . . . . . . . . . 36

## Guidelines for Implementation
## of Our Values

Making Sound Decisions. . . . . . . . . . . . . . . . . . . . . . . . 37

Recognizing a Potential Violation of the Code . . . . . . . . . . . 38

Channels for Raising Concerns. . . . . . . . . . . . . . . . . . . . . 39

Consequences of Code Violation . . . . . . . . . . . . . . . . . . . 40

Retaliation is Prohibited . . . . . . . . . . . . . . . . . . . . . . . . 40

Continuous Improvement . . . . . . . . . . . . . . . . . . . . . . . 40

## Contact Information

Officers, Office of Business Integrity,
and Teva Integrity Hotline . . . . . . . . . . . . . . . . . . . . . . . 41



Thousands of people, across many countries, speaking a multitude of languages, with one mission.

# Introduction

There is real power in our mission and values. When we live our values and strive towards our mission as one, we can become a real positive force in healthcare. It gives meaning to everything we do, and it is the reason we come to work each morning.

# Our Mission

One company: Generics, Specialty, OTC and TAPI working together

We want to be among the best in the industry and drive significant shareholder value

**Our mission** is to be **a global leader** in **generics** and **biopharmaceuticals**, improving the **lives of patients**

We are the leader in generics and strive to outperform our competitors

The science and value is moving to biologics. We have the capabilities to succeed in this space and will make the necessary investments

Our purpose is to help patients around the world to access affordable medicines and benefit from innovations to improve their health

JOINT APPX - 0163

TEVA 000521

# Our Values in Action

At Teva, our mission and values are put into action through our Code of Conduct. When we interact with patients, doctors, stakeholders, and each other, our conduct determines how we are perceived. What we do is important, but how we do it is just as important. Every decision we make and every action we take should reflect our collective values and culture. Our values define who we are. They express what we collectively believe in, they represent the best in us, and they guide us in all we do.

We will not waver in our commitment to do what is right, while striving to reach our financial and business goals. No objective is worth compromising our values or ethical standards. Our values are universal across every role, every business unit and throughout all of our locations around the world.

## What we do everyday matters.

Our values express what we believe in, they represent the best in us, and they guide us in all we do.

Our mission and values were uncovered by our people. They evolved from stories that demonstrate our special spirit and culture, and they represent those qualities that make us unique. They guide the way we think, act and make decisions, as we learn to work better together.



The foundation of Teva's Code of Conduct is focused on Our Values in Action.

TEVA_000522                   Our Values in Action | 3



## Leading the Way

**We aspire to be an industry leader and a mark of excellence in a constantly changing environment.** We are passionate about being first to market and realizing opportunities. We believe that leadership happens with and through people.

We lead the way at Teva.

- We proactively take initiatives and adapt to change.
- We identify opportunities and lead the way for ourselves and others to execute effectively.

## Focus and Accountability

**We are focused in everything we do.** We define clear objectives and concentrate our efforts, attention and energy to deliver. We do what we say and we hold ourselves accountable for our actions and results.

For us, this is how we focus on delivery.

- We execute with focus and determination.
- We hold ourselves accountable for our own actions and results.

## Getting It Done Together

**We all work for one company, Teva.** By working together more effectively, in close collaboration and alignment, we tap into our full potential and drive our success.

At Teva, we work collaboratively and in synergy as one team.

- We build productive internal and external relationships to learn, share and execute with others toward one set of priorities.
- We take personal responsibility to deliver on goals in alignment with unit priorities for effective results and enhanced team success.

## Innovating Where We Create Value

**We innovate to create value for patients, our partners in the healthcare system and our stakeholders.** We constantly look for original and better ways to excel, creating solutions for current and future unmet needs.

For us, this is bringing new ways to improve.

- We challenge ourselves and others to find achievable, innovative solutions that address a business need.
- We look at new ways of working that can deliver value.
- We initiate improved ways to excel and grow.

## Caring

**We care.** We care about the wellbeing of patients, care-givers and the communities we touch. We care about our colleagues; creating a respectful, diverse and inclusive working environment.

Everyday we care about others.

- We care about people and improving people's lives.
- We build trust-based working relationships, showing empathy and respect.
- We work well with people of diverse backgrounds, leveraging individual differences.

## Making Our Families Proud

**Teva improves health and contributes to people's wellbeing each and every day.** We do so by acting with integrity and maintaining the highest standards of quality, ethics and compliance.

We act as an ambassador every day to represent Teva.

- We act with integrity and responsibility.
- We hold ourselves and others to the highest professional and ethical standards.
- We uphold quality in all that we do.



TEVA 000524
Action | 5

# Application and Expectations of the Code of Conduct

Each policy in the Code is centered on our values, and is designed to explain and identify areas in which acting in accordance with our values is particularly important. These explanations are followed by short and practical guidance, including questions and answers that illuminate the particular issue. It is important to note that our values are not exclusive to a particular policy – our values apply to all of our policies and are universal to everything we do.

The principles in this Code apply to all Teva employees and members of our Board of Directors. They bring our values and beliefs to life by defining clear expectations for our behavior. In addition, we expect that our business partners will adhere to the principles of the Code.

While the Code helps us address some of the most typical ethical and legal issues and dilemmas we may face, it cannot cover every situation. Our values serve as an internal compass. With these as our guide and with our good judgment, we are all expected to do what is right, to use the resources

described in this Code and to take responsibility for our actions. Each of us has the responsibility for adhering to the Code and for maintaining Teva's values.

Given that this is a Company-wide document, some sections and topics may be more relevant to certain functions or departments. However, it is important for all of us to be aware of how business is conducted in different areas across the Company. Also, thinking about our values provides additional tools for carrying out our activities at Teva.

## Personal Responsibility for Compliance & Ethics

Ethical behavior means more than complying with the law and Teva policies - but it starts there. Each of us must learn and follow the law and Teva policies that pertain to our jobs, because compliance with the laws and Teva policies is the responsibility of each and every one of us.

In certain cases, this Code of Conduct is supplemented by additional policies that cover specific topics in more detail or deal with certain local or regional issues. While this Code of Conduct is designed to familiarize us with many of the relevant policies, it is not as comprehensive as these supplemental policies and therefore does not supersede them or act as a substitute for reviewing each policy that applies to our specific job.

## Resources

We have provided resources to address specific issues in a particular region. These include your manager, Human Resources representatives, the Legal and Compliance & Ethics Departments, Finance directors, internal auditors, and the Office of Business Integrity, which is in charge of the Teva Integrity Hotline. Guidelines for Implementation of our Values and Contact Information are found at the end of this Code.

We strive to improve health and make people feel better.

JOINT APPX - 0167

TEVA 000525

# Together, we succeed by living our values.

If you think you are being asked to behave or conduct business in an illegal, unethical or otherwise inappropriate manner, or you suspect others of such behavior, you should immediately report your concerns through the channels described above. You will not be penalized or retaliated against for reporting what you believe, in good faith, to be a breach of this Code – even if it later turns out that a violation has not occurred. Any act or threat of retaliation will in itself be considered a serious violation of this Code. Any information you provide will be shared only on a "need-to-know" basis with those responsible for resolving the concern. You may also remain anonymous (subject to the laws of your country; any reporting restrictions in your country will be described when you call the Teva Integrity Hotline).



# Teva's Code of Conduct

## Avoiding Conflicts of Interest



**My group is seeking the advice of a neurologist on a project. Can I suggest retention of a neurologist who is a family member?**

Since this may present a conflict of interest, you must disclose the relationship according to the Global Conflicts of Interest Policy to have the matter reviewed and to determine what steps should be taken to manage the potential conflict.

Conflicts of interest arise when we place personal, social, financial or political interests before those of the Company. Members of our Board of Directors and employees are responsible for avoiding situations that present – or create the appearance of – a conflict between their interests and those of Teva. Whether on the job or otherwise, nothing should conflict with our responsibilities to Teva.

### Why it is important

By avoiding actual conflicts of interest as well as the appearance of a conflict of interest, we will be able to act according to sound business judgment in Teva's best interests, rather than due to personal interest, relationship, pressure or gain.

JOINT APPX - 0169

TEVA 000527

## Our way

- We make decisions in the best interests of Teva.
- We avoid situations where anyone could question whether we were inappropriately influenced in making a business decision.
- We resolve any potential conflicts of interest in a transparent and open manner.
- We inform and seek approval from our Compliance & Ethics and Legal Departments upon commencement of negotiations or contacts relating to a potential transaction between our Company and an entity or person affiliated with members of the Board of Directors or employees — regardless of size or substance. Some of these transactions may be subject to further approval prior to signature.
- We acknowledge that certain related party transactions may require approval pursuant to applicable laws.
- We avoid using Company opportunities, Company property and information or our position for personal gain.
- We do not seek, and avoid accepting, payments, fees, loans or services from any person or company as a condition of doing business with Teva.
- We may accept gifts or entertainment as part of the normal business process only to the extent they are permitted under the law, are of nominal value and would not influence or appear to influence our business decisions. We do not accept gifts of cash or cash equivalents.
- We receive our Human Resources Department's approval before engaging in outside employment, consulting, or serving on the board of directors (or comparable position) of an external organization.





**A Teva supplier invited me to a sporting event. Can I accept this invitation?**

You should consult with your manager before accepting any invitation from a supplier because such an offer may compromise your objectivity in decision-making. Generally (subject to applicable local laws and industry codes), accepting an entertainment invitation is not prohibited as long as the nature and frequency of such occasions are reasonable and not excessive.

**Can I invest in a company that does business with Teva?**

It depends on your position, your influence over applicable decisions, the investment size, the importance of Teva as a customer and other factors. Before investing, you should disclose this according to the Global Conflicts of Interest Policy to be advised on how to handle the situation.

**What should I do if I am concerned that I need to make a decision that might pose a conflict of interest?**

When in doubt, disclose it according to the Global Conflicts of Interest Policy. Sometimes, disclosing and recording the potential conflict may be enough.

JOINT APPX - 0170

TEVA 000528