## Prohibition on Insider Trading and on Use of Non-Public Information



**A potential vendor wants to discuss his services over lunch. Can I accept?**

You should consult with your manager before accepting any invitation from a supplier, because such an offer may affect your decision-making or compromise your judgment and Teva's independence. Generally, accepting dining invitations is not prohibited as long as the nature and frequency of such occasions are reasonable and not excessive.

We may come across material non-public information about our Company, customers or partners during our work. Buying or selling the securities of a company while being aware of such information is considered "insider trading." We may not buy or sell Teva securities or the securities of any other company based on such non-public information. In addition, we may not provide such "inside" information to anyone else ("tipping") so that they can profit from it. This restriction applies no matter where we live, or where the person who might receive the information lives.

Information is considered non-public if it has not been adequately disclosed to the public. Examples of material non-public information (prior to adequate disclosure) include:

- earnings and other financial information;
- changes in dividends;
- changes in senior management;
- significant regulatory developments;
- mergers, acquisitions, dispositions and joint ventures;
- approval or denial of a significant product;
- results, whether or not favorable, of a clinical trial or significant litigation;
- commencement, acquisition or loss of a major contract;
- information confidentially obtained about another company during the course of work; and
- other significant developments or an important financial transaction.

### Why it is important

We believe in the integrity of the capital markets. In addition, in most countries it is against the law to exploit insider information when buying or selling securities. Securities law violations are taken very seriously. Therefore, in addition to potentially causing great harm to Teva's reputation, violation of these legal requirements could subject Teva and the individuals involved to large monetary penalties and even criminal liability, including imprisonment.

### Our way

- We understand that the insider trading restrictions apply to each of our family members, members of our households and to us.

We aspire to do the right thing.

We do not buy or sell the securities of Teva or any other company, either directly or through family members, members of our households or other people or entities, while being aware of material non-public information related to such a company.

- Members of the Board of Directors, Teva officers, and employees involved in the preparation of the Company's financial statements understand the trading limitations in Teva securities to which we are subject ("blackout periods").

- We maintain the confidentiality of Teva information and do not convey it to anyone outside the Company unless it is necessary for business activities.

- We consult the Legal and Compliance & Ethics Departments whenever we have a question or a concern that an event or activity may be considered insider trading.

- We consult Teva's Insider Trading and Blackout Period Policy even if the contemplated activities are not illegal in the country where we are based.

## Antitrust, Unfair Competition and Business Intelligence

Antitrust and competition laws focus on ways to ensure that businesses compete on the basis of quality, price and service. This area of law is extremely complex, and varies from country to country (and within certain countries, from state to state). These laws are referred to as antitrust, monopoly, restrictive or unfair trade, competition, price discrimination or cartel laws. In general, they seek to protect competition (and occasionally small-scale competitors). They prohibit, among other things, agreements to fix prices, allocation of markets or customers, participation in group boycotts, and efforts to obtain or maintain a monopoly through something other than competition on the merits.

**Fair Dealing** – It is important for us to be recognized in the marketplace as a company that operates ethically and in a fair manner. We do not attempt to obtain information of or about our competitors in an illegal or unfair way. Accordingly, stealing proprietary information, possessing trade secret information that was obtained without the owner's consent, or inducing such disclosures by past or present employees of other companies is prohibited.



I know that Teva is acquiring a company in a developing country. This deal will be very good for both companies, but has not yet been announced publicly. Can I buy shares of the company as long as I do not buy shares of Teva?

No. You may have material non-public information, and you should not buy or sell the shares of either Teva or the company until the transaction has been publicly announced and any applicable period under the Insider Trading and Blackout Policy has passed. Until then, you must not share this confidential information with anyone who does not have a business need to know, including fellow employees, family and friends.





I am working in the regulatory department, and have learned that Teva is about to receive FDA approval to market a new product, but that this information will not be made public for another few weeks. In order to manufacture this new product, I know that Teva will need to purchase large quantities of raw materials from one particular supplier that is a publicly traded company. Based on this information, can I or my spouse purchase stock in the supplier company?

Absolutely not. Neither you nor your spouse can purchase this stock until the information you have has been made public. You should not share this information with anyone. If you use this information or convey it to others, you will be violating Company policy and may be violating securities laws, exposing you, your spouse and possibly others to civil and criminal penalties.

**How can I recognize anti-competitive behavior?**

Actions that might violate applicable antitrust or competition laws can take many forms. You should become familiar with the Teva Antitrust Guidelines and seek advice from the Legal and Compliance & Ethics Departments if you are in doubt about what to do.

**What should I do if I am at an industry meeting and a competitor starts to discuss pricing pressure from buyers? What if that same person says: "Buyers have to buy products from someone, and, if no one is discounting, all sellers will have sales and be better off"?**

If anyone raises the issue of pricing at a meeting that includes competitors, you should state that pricing is not an appropriate topic for such a discussion. If someone makes a specific statement regarding pricing, it is important that you leave the conversation before any agreement might be reached and make clear that you are not participating in any such agreement. You should also promptly report the incident to the Legal and Compliance & Ethics Departments.

## Why it is important

We believe that customers and society as a whole benefit from fair, free and open markets. Therefore, we compete on the merits of our products and services and conduct business with integrity. We recognize that the potential harm to Teva's reputation and the penalties for breaching competition laws are severe, and can subject Teva, members of the Board of Directors and employees to severe civil fines and criminal penalties.

## Our Way

- We conduct our business to serve the interests of Teva and our customers in a manner that does not unfairly restrict trade and without anti-competitive understandings or agreements with competitors.

- We do not communicate with competitors about competitive business matters such as prices, costs, discounts, expansion plans, pipeline-related information, customers, suppliers, and any terms or conditions of sale that could create the appearance of improper agreements or understandings.

- We do not make agreements or reach understandings with our competitors regarding our products, customers, distributors or territories.

- We do not take unfair advantage of anyone through manipulation, concealment, abuse of privileged information, misrepresentation or other unfair practices.

- We do not gather information about our competitors via deception, theft, misrepresentation, or other illegal or unethical means.

- We conduct our business in accordance with Teva's Competition Guidelines, local laws and applicable regulations. If we face a situation that may raise antitrust and competition issues, we contact the Legal and Compliance & Ethics Departments to determine whether or not a particular course of action might violate antitrust and competition laws.

TEVA 000531

- We abide by all applicable antitrust and competition laws in our participation in third-party organizations, including professional and trade associations, and we avoid situations that could create even the appearance of impropriety.

- We treat Teva's suppliers and customers with fairness and respect, ensuring that our agreements with these entities comply with all applicable antitrust and competition laws.

## Anti-Corruption

We prohibit bribery and corruption. None of us or anyone acting on our behalf may offer or pay a bribe, kickback or other improper payment. We are also not allowed to provide anything of value that is intended to win business, improperly influence a decision, or gain an unfair business advantage – or even appear to do so.

### Why it is important

Bribery and corruption damage our business and conflict with our core beliefs regarding the right way to conduct business. Anyone who engages in corrupt activities will be subject to discipline up to and including termination. In addition, they and Teva may be subject to civil fines and criminal penalties. Teva also may be held liable for the corrupt activities of third parties acting on its behalf.

### Our way

- We conduct our business openly and transparently, in accordance with Teva's Global Prevention of Corruption Policy, other anti-corruption policies and applicable laws.

- We never bribe, or offer, provide or promise anything of value (directly or indirectly) that is intended to improperly influence the action of government or private individuals. Examples of "anything of value" may include, among other things, sponsorships to attend congresses, speaking fees, consultancies, services, charitable donations, political contributions, travel and/or entertainment expenses, gifts, meals, commissions and rebates.

- We do not retain third parties, including representatives, contractors or advisors, to engage in conduct that we would not be involved with ourselves.



I am a manager recruiting a new employee. One of the candidates is a researcher who currently works for one of Teva's competitors. She is an expert in her area and knows a lot about the competitor's pipeline. Is there anything wrong with hiring her?

Typically, we can hire from a competitor. However, we cannot hire someone with the expectation that she will reveal confidential or proprietary information or trade secrets belonging to the competitor, and we must take steps to ensure that we do not improperly elicit or receive such information from her.



We are transparent in our actions.

JOINT APPX - 0174

Teva's Code of Conduct. Leading the Industry | **13**

TEVA-000532

ment 51-3   Filed          Page 177 o





**My manager wants me to find out what patient recruitment exclusion criteria a competitor is using in an important clinical trial. This information is not publicly available. Can I pose as a potential patient recruit, call the competitor's clinical research site and simply ask some questions?**

No. Misrepresentation – in this case, not disclosing that you work for Teva – is an unethical way of gaining access to a competitor's confidential information. Before attempting to gather any business intelligence, you should consult with the Legal and Compliance & Ethics Departments to confirm that your strategy is legal and ethical.

**A head of a department in a well-known hospital has requested that Teva donate equipment to the hospital and funds for the hospital's emergency care unit. Can I authorize these donations by our Company?**

Equipment donation is considered to be something of value. While it

may be permissible for Teva to make contributions to improve hospital services that will benefit patients, you must ensure that Teva's approval process has been followed. You should review the request with your manager and the Compliance & Ethics Department.

**I invited a healthcare professional (HCP) who is a recognized key opinion leader to a meeting abroad. The HCP asked if her spouse could join the trip and that Teva book the cheapest flight possible so that the total cost of the journey would not exceed what Teva was willing to pay for the HCP's flight. The HCP advises that other pharma companies structure flights in this manner. Is it okay to proceed as requested?**

Under Teva's anti-corruption policies, such a request is not acceptable. You should explain to the HCP that this is not allowed under Company policies and, therefore, you cannot approve such a request.

**Our team wants to hire a local consultant to advise us about our proposed tender in a province of a particular country. The consultant is the son of the provincial minister of health. Since the son is not a member of the government, this is OK, right?**

The hiring of a government official's relative may raise issues under Teva's anti-corruption policies. Before engaging in such a transaction, you should contact the Compliance & Ethics Department.

**A new distributor has asked me to provide an unusual discount so that he can take care of "extra" expenses. What should I do?**

You are right that this raises a concern. The Legal and Compliance & Ethics Departments should be alerted immediately to "red flags" with respect to the activities of those who represent our Company and our products.

## Promotional Materials; Scientific Exchanges

All of our scientific and promotional activities with healthcare professionals and organizations are intended to ensure the effective use of our products and enhance patient care. This can include advancing medical research, enhancing medical knowledge or practice management, promoting our products and services and gathering necessary feedback about our products and services. We use a wide variety of communication channels in providing information. Whatever methods are used, we must provide information accurately and in a proper manner.

### Why it is important

Our stakeholders have a legitimate interest in being informed not only on the quality of our products and services, but also on the quality of information we provide to healthcare professionals and organizations. Our objective is to provide scientifically accurate, pertinent and timely information that informs the choice of treatment made between a physician and patient. We wish to safeguard public confidence in healthcare professionals to make decisions solely on the basis of patient health.

### Our way

- Our sales and marketing practices worldwide must meet or exceed the minimum standards set by applicable laws, regulations, industry codes and Company policies.

- We ensure that our promotional discussions and information are useful, accurate, supported by scientific evidence where relevant





We deliver on our promises.

**As a pharmaceutical sales representative, I think it may be effective to give all healthcare providers in my territory iPads containing presentations on Teva's products. Can I do this?**

No. We do not provide gifts or other incentives to healthcare providers other than educational items and items that are of nominal value, medically relevant, and permitted under applicable local laws and Company policies.

**It is customary in my country to discuss pharmaceutical products with a healthcare professional over a meal in a restaurant. Is this acceptable?**

The preferred location to discuss our products with a healthcare professional is in her office, a hospital or other clinical setting. In certain instances, it may be appropriate to conduct a product discussion beyond such settings. You will need to ensure that inviting the healthcare professional for a meal comports with applicable laws, regulations, industry codes and Company policies and is properly documented. In case of doubt, please consult the Compliance & Ethics Department.



**I found a public website that discusses issues related to a Teva product. Is it okay to forward the site to one of the healthcare professionals with whom I work who likes using the Internet?**

No. All communications between a sales representative and healthcare professional are part of detailing, and all detailed pieces must be approved through Teva's promotional materials review process before they are used.

**I am a sales representative and a healthcare professional asked me how to use our drug for one of his patients for an off-label use. What should I do?**

Your obligation is to refer the healthcare professional's question to the Medical Affairs Department so that medical professionals can communicate medical information directly to such professional. Our promotional efforts to healthcare professionals must be "on-label," and everything a sales representative says is considered promotional.

**When presenting clinical trial data to a healthcare professional, can I restrict my discussion to the positive outcomes of the trial only?**

No, we must proactively ensure that all clinical data communications are accurate and complete. Oversimplification, overgeneralization, overstatement, opinions and characterizations can easily be misunderstood.

and presented honestly, are fairly balanced and are consistent with country-specific approved labeling and prescribing information.

- We do not communicate publicly with the intent of promoting products for use before the product is approved for use under applicable laws. However, we may engage in a proper exchange of scientific information that is non-promotional in nature and intent, and is not communicated by our sales representatives.

- When engaging in scientific exchange, we present information that is complete, accurate and not misleading.

- We never promise or provide anything of value for the purpose of encouraging or inducing any healthcare professional to purchase, prescribe or recommend our products.

- We engage the services of healthcare professionals and organizations only when they are legitimately needed, and we pay according to fair market rate for services rendered.

Each and everyday, we are making a difference to the lives of people around the world.



# Political Activities and Contributions

We respect the right of members of the Board of Directors and employees to participate in the political process and engage in political activities of their choosing.

Many governments prohibit or regulate corporate monetary or in-kind political contributions. Any proposed corporate contribution or political activity should be reviewed and approved by Teva's Global Government Affairs and Public Policy Department.

## Why it is important

Lobbying activity on behalf of the interests of our Company is permissible, but highly regulated by law.

## Our way

- We treat regulators in a professional manner and with respect.

- We notify and work with the appropriate Teva departments to provide information to regulators or law enforcement authorities.

- We obtain approval from Teva's Global Government Affairs and Public Policy Department before:

  - lobbying or meeting with a government official, whether individually or as part of a group (e.g., a trade association);

  - engaging a lobbyist at any level of government; or

  - inviting a government official to a Teva facility.

- We ensure the preservation of Company documents that relate to a known or suspected government audit or inquiry.

- Employees' lawful, personal political activity in support of candidates or parties is allowed, as long as it is not on Company time and is not funded by Company resources.

- When employees are involved in their personal civic and political affairs, they make it clear at all times that the views and actions are their own and not those of Teva.

- We do not use corporate funds, resources or facilities to support a governmental entity, political organization, party or candidate, except where permitted by law. All political contributions made by Teva must comply with Company policies, including obtaining the prior written approval of the Global Government Affairs and Public Policy Department.



**I support a particular political candidate in my community and would like to send a few emails via Teva's system to other employees in Teva and friends to encourage their support. Is this okay?**

Teva respects your right to be involved in the political process. However, you should not use Company funds, equipment or materials to support a particular candidate, and you should not engage in political activities while on the job.

**A customer asked me if Teva would make a contribution to support the political campaign of a candidate for public office in our country. Can I do so?**

Most countries in which we do business have strict and complex laws regulating political contributions. Any request for contributions requires the prior written approval of Teva's Global Government Affairs and Public Policy Department and the Compliance & Ethics Department.

## Trade Controls

Teva is committed to maintaining compliance with applicable laws controlling imports, exports, re-exports and diversion of its products, goods, services and technical data, including import and customs laws, export controls, economic sanctions, denied parties lists, anti-boycott laws and diversion of products.

### Why it is important

Teva does business all over the world, and the laws of one country or jurisdiction may apply to transactions or activities that occur elsewhere. Many countries maintain a program of economic and trade sanctions and embargoes against certain countries and certain parties. Prohibitions on certain exports and imports are also often in place. In addition, various governments have enacted laws that prohibit companies from participating in, or cooperating with, any international boycott that the government does not approve. Failure to comply with international trade laws can subject Teva and its employees to civil and criminal penalties, including suspension or denial of trade privileges.

### Our way

- We check the export classification and follow relevant international trade control regulations of all countries in which Teva operates as they relate to importing and exporting goods, technology, software, services and financial transactions.

- We do not cooperate with any restrictive trade practice or boycott that is prohibited or penalized under applicable laws.

- All activities involving sanctioned countries must be reviewed by the Legal and Compliance & Ethics Departments to ensure compliance with trade control laws.

- We conduct our business in accordance with our Global Customs and Trade Controls Policy and applicable trade control laws.

## Prohibition on Money Laundering

Money laundering involves disguising funds derived from criminal or terrorist activity, so that illegitimate or "dirty" money appears legitimate or "clean." Many governments have anti-money laundering laws that prohibit engaging in transactions that attempt to hide the proceeds of crimes by making those proceeds look legitimate.

### Why it is important

Adherence to anti-money laundering principles helps us prevent the use of Teva resources to conceal crimes.

### Our way

- We conduct business only with customers willing to provide us with proper information so that we can determine whether the payments are appropriate.

- We do not make a payment to an entity or accept a payment from an entity that is not a party to the transaction or is not legally entitled to receive payment, unless we receive prior approval of the Legal and Compliance & Ethics Departments.

- We do not accept payments in cash, unless we receive the prior approval of the Legal and Compliance & Ethics Departments.



**What is fraud?**

Fraud is the deliberate practice of deception in order to receive unfair or unlawful gain. Fraud may incorporate falsified financial reporting, misappropriation of assets, bribery and corruption. We may not engage in fraudulent behavior, and we must report any suspicion or discovery of fraud by using one of the reporting channels described in this Code.

## Equal Employment Opportunity

Teva highly values the diversity of backgrounds, skills and abilities that a global workforce brings to our business. We hire employees with sound character and judgment, whom we trust will act responsibly. We are committed to supporting diversity in our workforce and leadership, and to developing all the talent within our organization.

### Why it is important

Diversity is not only a key prerequisite for innovation; it is also a personal and cultural job enrichment for each and every employee. We seek to hire employees who can contribute to the Company's success. Providing people with equal opportunities to develop their full potential encourages higher quality and more productive work, reduces employee turnover, and increases employee morale and engagement.

### Our way

- We make all employment-related decisions and actions without regard to personal characteristics that are protected by applicable law.

- We prohibit discrimination in our selection, training and promotion processes and base Company employment decisions on our business needs, job qualifications and employee competencies and expertise.

- Since we believe that friends and family of our employees are a good source of potential candidates to work at Teva, we encourage their referral. However, we will not show favoritism to family members or friends, and employees and directors must be sensitive to avoid exercising influence on the hiring process following the initial referral. Family members may not have direct or indirect reporting relationships with other family members. Every referral of a candidate by employees in senior management positions or by members of the Board of Directors must be reviewed and approved in accordance with Human Resources global policy.



I saw that there is an open position in my department; I know that my cousin is interested in working at Teva. Can I recommend to my manager or the Human Resources Department that my cousin be hired for this position?

Teva encourages referrals of qualified candidates, regardless of their relationship to current employees. Nevertheless, the Company will not show a preference for your cousin, who will undergo the same recruitment process as any other candidate.

## Safe and Healthy Workplace

Teva cares about the safety of its employees and conducts its activities with the highest regard for the safety and health of its employees and the general public. We are continuously working to improve our safety record by instilling a strong safety culture worldwide. Our goal is to avoid any accident in the workplace through our rigorous compliance with global safety standards. Each of us is responsible for, and shares in the benefits of, a safe and healthy workplace.

### Why it is important

Teva values its employees and strives to protect them. Any behavior and activities that undermine employee safety must be avoided.

We believe in the value generated from diversity and inclusion.

## Our way

- We do not start working with equipment before we have received the required training. If our job requires it, we wear necessary protective equipment at all times.
- We seek to understand the hazards associated with our work, in order to manage these risks responsibly.
- We comply with all employment, safety, health and security policies and procedures.
- We promptly report any accidents, incidents of non-compliance, or any other matter posing a threat to safety or health of Company employees or of the general public.
- We take action to correct unsafe activities or facilities.

## Freedom from Workplace Harassment

Workplace harassment is any physical or verbal act that creates an offensive, hostile or intimidating work environment.

### Why it is important

Harassing behavior or action is destructive to the workplace and team environment we seek to foster. Teva seeks to provide a workplace that is free from harassment of any kind.

### Our way

- Any type of harassment — whether words, actions or behavior — that creates an intimidating, hostile or offensive environment — is prohibited at Teva and will not be tolerated.
- We refrain from making remarks, telling offensive jokes, or displaying materials that offend a particular characteristic protected by applicable law, such as age, gender, race, ethnicity, national origin, religion, sexual orientation, disability, etc.
- We do not use sexually suggestive language, and do not send any emails containing sexual content.
- We encourage the immediate reporting of offensive, threatening or violent behavior, whether verbal or physical.

## Freedom of Opinion, Speech and Association

We care about and respect employees' right to hold their own opinions, to express these in an appropriate manner in the workplace, to join a trade union and to have recognized employee representation in accordance with local law.



**I am new to Teva and don't understand all of the safety rules. I feel awkward asking questions. What should I do?**

Teva encourages employees to ask questions, particularly when safety is involved. Talk to your manager; he or she knows that you are required to be trained to do your job, and is obligated to ensure you receive the appropriate training.

**One of my co-workers emailed an inappropriate joke to me and some fellow employees. I found it offensive, but don't know if I should approach my co-worker with my concern.**

We are committed to maintaining a professional work environment in which all Teva employees are treated with care, respect and dignity. Therefore, offensive or inappropriate behavior is not acceptable. If you feel uncomfortable speaking with your co-worker directly, please contact your manager and/or the Human Resources Department for assistance.

## Why it is important

We believe that employees need to be able to speak freely, to feel safe in the workplace and not to fear harm for any reason, including their opinions or their membership in any legally recognized trade union.

## Our way

- We recognize that employees are entitled to freedom of opinion, association, expression and speech, provided that these do not interfere with their ability to fulfill their job responsibilities or conflict with this Code of Conduct and other Company policies.

- In exercising our freedom of speech, we bear in mind that we are part of the workplace and we respect the rights of our fellow employees.

## Refraining from Substance Abuse; Freedom from Workplace Violence

The possession, use, sale, or purchase of illegal or unauthorized drugs, whether on or off duty or on or off Teva's premises or work-sites, is prohibited.

Workplace violence of any type, including acts or threats of violence to another person, intentional damaging of Company property or the property of an employee, or behavior that causes others to feel unsafe is prohibited and will not be tolerated.

## Why it is important

Our ability to perform our jobs well requires that we work in a professional manner free from the influence of drugs or alcohol and from the threat of physical violence. These substances and such threats adversely affect job performance, and can risk our health and safety and that of others.

## Our way

- We do not buy, sell, possess or use illegal drugs or create a safety risk through drug use or intoxication while conducting Teva business.



**One of my team members has a habit of complimenting a particular employee's appearance. It seems harmless, but is it appropriate?**

An occasional, general compliment is probably acceptable. However, repetitive comments may lead to a hostile work environment. If you have any questions, you should contact the Human Resources Department or the Compliance & Ethics Department.

- We do not bring firearms, explosives or any other weapons or dangerous materials to any work location or function without express permission to do so.

- We encourage the immediate reporting of offensive, threatening or violent behavior, whether verbal or physical.

### Reporting Procedure

Anyone who believes that he or she has been subjected to prohibited conduct from other personnel or third parties connected to the Company, or who observes or learns of such conduct, must report the matter immediately to his or her manager, the Human Resources Department or the Compliance & Ethics Department so that suitable action can be taken to address the situation. Each person is encouraged to speak with the representative(s) with whom he or she is most comfortable.

Individuals need not report the matter to their immediate supervisor before bringing the matter to the Human Resources Department or the Compliance & Ethics Department.

TEVA-000540

## Supportive and Collaborative Work Environment

We are committed to a supportive and collaborative work environment where our employees work together to fulfill Company goals. We coordinate our resources in ways that benefit the whole. We provide support systems, organizational tools and procedures, and relevant infrastructure to encourage such collaboration within the organization.

**Why it is important**

We understand that our decisions and our work have an impact on others and on the Company and we act accordingly, sharing responsibility for outcomes. We understand that in order to achieve our common goals we need to engage our employees around the world, across different divisions and in different functional areas.

**Our way**

- We embrace processes that provide us with the freedom to create and the ability to define goals and solve problems together.

- We encourage multidisciplinary group discussions given the complexity of the business in which we operate.

- We prioritize our work according to the stated mission and goals of the Company and adjust timelines, budgets and people in response to changes in our corporate priorities.

- We ensure that the information people need to do their job is available and accessible.

- We are accessible to each other and communicate mindfully, acknowledging cultural norms of tone, time zone and responsiveness.

We open opportunities for the personal and professional growth of our employees.

## Interactions with Governments and Their People

Working with government entities, their officials and employees (including locally, state and federally owned hospitals) and complying with the numerous complex regulations governing the healthcare industry are routine for many of us at Teva. In addition, we help government officials in countries in which we operate understand our business. It is important for us to share our experiences and insights on matters of public policy and regulations, which may affect how we conduct business and assist patients in obtaining safe and cost-effective health care.

**Why it is important**

Effectively working with regulators as they establish regulations and audits for compliance is critical to maintaining our reputation for adherence to our values. In addition, many of our government-related customers have conflicts of interest rules with which we are required to comply.

**Our way**

- We understand the regulatory requirements that affect our business and work and keep abreast of regulatory developments.

- We embed regulatory requirements into key operating processes and manage regulatory risks.

- We obtain business with government entities through bona fide, transparent means.

- We expect anyone providing goods or services for Teva on a government project or contract – such as consultants, sales representatives, distributors or suppliers – to meet Teva's standards on interactions with government officials and employees.

- We communicate honestly and cooperate with investigations conducted by governmental bodies, as well as those undertaken by our internal auditor or the Compliance & Ethics Department.

## Interactions with Business Partners

We believe that our business is best served by responsible business behavior and adherence to our values, which apply regardless of local culture or challenges that may come our way. We conduct business with individuals and organizations ("business partners") who share our commitment to high ethical standards, and who operate in a socially and environmentally responsible manner.

### Why it is important

Since we believe that our values and standards have always formed the basis of our success, we ensure that our business partners share our commitments and values.

### Our way

- We select goods and services that best contribute to the long-term well being of Teva: we choose our suppliers based on price, quality, delivery, service, reputation, environmental and business practices.

- We treat our business partners with fairness and integrity. We respect the terms and conditions of agreements with business partners, and we honor our commitments.

- We review the background and qualifications of our business partners and their principals to assure ourselves of quality and ethical business practices.

- We seek to ensure that business partners follow all applicable laws, legal requirements and Company policies in their dealings on behalf of Teva.

- To ensure that suppliers are given an opportunity to compete for our business, we obtain competitive bids in accordance with Teva's procurement policies.



**A fellow employee has repeatedly refused to provide me with information that is essential for my job, has called me derogatory names, and has told other employees that I am not qualified to do my job. How should I handle the situation?**

Harassment and intimidation can occur in many forms. In this situation, it appears that this is intentional and persistent bullying and harassment. You should contact your manager and/or the Human Resources Department for assistance.



Our success depends on our ability to work together and keep communication lines open.

Teva's Code of Values and People  |  **23**

TEVA 000542

## Protecting the Proprietary Information of Third Parties

Just as we value and protect our own proprietary information and trade secrets, it is also our policy to respect the intellectual property rights of others. In the course of our work we may receive sensitive or proprietary information from third parties such as our suppliers, customers and other business partners that is confidential. We respect and maintain the confidentiality of such information.

### Why it is important

Respecting the sensitivity or confidentiality of such information is essential to our relationships, our productivity, and fruitful collaborations with third parties.

### Our way

- We respect the confidentiality of third-party information as though it were Company information.
- We do not use material copyrighted by third parties without first obtaining or confirming copyright permission.
- We respect proprietary information of our business partners and ensure that any required license is in place before making use of such information.
- Some of us may have come to Teva from other companies, and some of us may leave Teva to work for someone else during our career. If we leave Teva, we may not take any confidential information or reveal it to our new employer. Likewise, we may not reveal a previous employer's confidential information to Teva.

## Communications with Media Representatives, Analysts and the General Public

We are committed to providing timely, accurate and credible information to media representatives, analysts and the general public. To ensure that we are clear and accurate, we have defined specific functions and designated individuals with responsibility for communicating with media representatives, financial analysts and the general public.

### Why it is important

Providing timely, accurate and credible information is important to our investors and also enables us to maintain integrity in our relationships with the public and other stakeholders.

### Our way

- We do not speak to the general public, analysts or media representatives about the Company unless we are specifically designated to do so under Teva's Corporate Communications Policy.
- We contact the Corporate Communications Department before posting any Company information in any format or via any means of communication, or participating in media interviews or in events or forums where members of the media will be present.
- We contact the Investor Relations Department before participating in interviews or in events or forums where analysts will be present.
- We consult the Corporate Communications Department whenever we learn about an event or activity that may be of interest to the media and investors.

We are accountable for our actions and decisions.

JOINT APPX - 0185

TEVA 000543

## Social Media

Social media are digital technologies and practices that enable people to create and share content, opinions, insights, experiences and perspectives in different ways (for example, blogs, social networks, etc.). Social media are used by Teva for business purposes and by employees for various personal purposes.

### Why it is important

Teva seeks to use the newest forms of technology and communication to reach our stakeholders. The Company also respects the rights of employees to engage in personal use of social media. Whether such use is for Company or personal purposes, we must adhere to our values and ensure ongoing compliance with applicable laws and Company policies.

### Our way

- We use discretion and common sense regarding the potential consequences of our social media use.

- We are open and honest about our affiliation with Teva when it is relevant to the issue. While disclosing our Teva employment status, we make it clear that our ideas or opinions are personal, and may not represent the position of the Company on the issue.

- We refrain from using social media to discuss issues that involve Teva's confidential and proprietary information.

- We adhere to marketing and promotional laws and guidelines in all Teva-sponsored social media.



**I follow a number of pharma blogs, and recently came across one that included what I think is confidential Teva information. What should I do?**

Unauthorized disclosure of confidential Teva information is forbidden. You should discuss your observation with your manager. You may also call the Office of Business Integrity ("OBI"), which is in charge of the Teva Integrity Hotline, or you may contact one of the other resources listed in this Code.

**I maintain a personal blog that covers a number of topics including healthcare-related issues. I express only my personal opinions. Do I need to indicate my affiliation with Teva?**

Ask yourself whether a reader who discovers your position with the Company might think a particular comment of yours was biased or that you might be hiding your affiliation. In this situation, reconsider whether you want to post the particular item or disclose your affiliation. When disclosing your affiliation, make clear that your ideas or opinions are personal and may not represent the position of the Company.

To stay ahead of the game in a constantly changing environment, we dare to be different.




## Quality and Safety

We are committed to meeting or exceeding customer and regulatory requirements regarding the research, development, procurement, manufacturing, packaging, testing, supplying, maintenance and marketing of our products and services. Quality means consistently satisfying requirements by delivering products and services of the highest value in a timely manner.

We do not stop at quality assurance. We are also committed to continuous improvement in the development, production and delivery of high-quality products for our customers. We believe in creating a culture of quality by raising individual awareness to the importance of quality, in every single action, every single day.

### Why it is important

At the very heart of Teva's mission is our commitment to develop and manufacture high-quality, safe products and services that promote good health and well-being across the globe.

### Our way

- We are committed to meeting all applicable regulatory requirements across all our facilities and at all stages of the product life cycle.

- To ensure we are in compliance and working in accordance with sound quality principles in our research laboratories, in our clinical trials, and in our manufacturing plants and distribution centers, we adhere to the systems and internal controls for "Good Operating Practices," or "GxP," including Good Laboratory Practices (GLP), Good Clinical Practices (GCP), Good Manufacturing Practices (GMP) Good Pharmacovigilance Practices (GVP) and Good Distribution Practices (GDP).

- We take quality-related complaints seriously, and ensure that they are properly investigated and reported, as required, to the appropriate regulatory authorities.

We maintain our focus on the task at hand, while not losing sight of the "bigger picture".



**I work on a production line. What should I do if I notice that a finished product coming off the line does not meet Teva's quality standards?**

The Teva brand stands for high-quality products. If a product does not meet our standards, immediately inform your manager and the Quality Assurance Department.

**I read a blog on the Internet in which the blogger claimed that he had used a Teva product and experienced back pains. Do I need to inform the Company?**

Yes. You should promptly inform the Company's Pharmacovigilance Department in your country any time you become aware of an event, regardless of how you became aware of it. You can do this through the TevAlert procedure via the "Teva.net" website.

**I work in a laboratory and was asked to perform a new GLP test with a specific chemical. I do not feel trained enough to do this GLP test, and I am concerned as to how to handle the specific chemical. What should I do?**

You should not conduct the test if you do not feel adequately trained to do it and are not familiar with the specific chemical's characteristics. You should always perform your work in accordance with all regulations, including those regarding good safety and environmental practices as well as the handling of potent and controlled substances. You should contact your direct manager prior to commencing the test and ask him to guide you and to supervise you while you perform the test. In addition, you should repeat the GLP training that is provided to laboratory employees. If you still have questions, you should contact the QA Department.

- We maintain a Pharmacovigilance system that includes an Adverse Event Report database. In accordance with applicable global regulations, we have also appointed drug safety officers who monitor and detect changes in the benefit profiles of our marketed products. Furthermore, we follow appropriate safety-monitoring procedures for products in development as well as marketed products.

- We work to combat the growing problem of counterfeit drugs, which can adversely affect the health and well-being of patients worldwide. We report any counterfeit or suspected counterfeit drugs through the established procedures.

- We never compromise quality or safety in anything we do – including to meet deadlines.

## Protecting Company Confidential Information, Intellectual Property and Company Assets

The Company's property and assets, and especially our Intellectual Property (IP), are key drivers of our success. All employees must work to safeguard our patents, trademarks, copyrights, trade secrets and other proprietary information and know-how.

Confidential information can include sales, marketing and other corporate databases; intellectual property strategy and plans; marketing strategies and plans; pricing information; sales information; non-public financial information; customer and employee records; manufacturing techniques, research and technical data and information regarding new product development.

### Why it is important

"Assets" means more than buildings or desks. Much of the information that we conceive or develop as part of our job is proprietary, that is, a valuable Teva asset. Once confidential information has been disclosed, it enters the public domain and may be difficult to safeguard. Unauthorized disclosure could destroy its value and may give unfair advantage to others outside Teva.

### Our way

- We respect and safeguard the Company's tangible and intangible assets, including buildings, furniture, vehicles, computers, personal electronic devices, and confidential information.

- We use the Company's tangible and intangible assets for legitimate Company purposes only. Any loss, misuse, fraud or theft must be reported to a manager or by using one of the means outlined in this Code of Conduct.

- We obtain appropriate authorization to access confidential information.

- All proprietary information must be maintained in strict confidence, except when disclosure is authorized by the Company or required by law. This obligation continues even after we stop working for the Company.



I have just started a new role in Teva and have a friend who has worked for several years at another life sciences company. I would like to ask her a question and learn from her experience. Can I do so?

You should be very careful what you say. You may disclose only publicly available information. The fact that she is your friend does not protect Teva's confidential information.

I overheard Teva employees discussing Company development plans in an airport lounge. What, if anything, should I do?

You should present yourself as a Company employee and advise them that they can be overheard. All of us have a responsibility to ensure that confidential and proprietary information is not discussed in public.



**I would like to invite physicians from multiple countries to a conference. Can I use information about these physicians from Company databases located in different countries?**

Many countries have privacy and data protection laws that apply when one transfers or accesses personal information about individuals, regardless of whether they are customers, consumers, patients or employees. In some cases, even transferring names of individuals from country to country may require authorization. Before taking any action, you should consult with your manager, who will review the details with the appropriate department.

**I am involved in a clinical trial, and an academic investigator has contacted me asking if she could receive blood samples collected from patients participating in the trial for use in her laboratory research. Is this acceptable?**

Every use of patient samples and disclosure of data collected in clinical trials is subject to the patient's prior consent. You should contact the Legal and Compliance & Ethics Departments for further guidance.

- We obtain Legal Department (Patent Group) approval when there is any doubt about whether particular information is Company confidential information.

- We ensure that a non-disclosure agreement has been signed by all parties before disclosing any confidential and proprietary information.

- We avoid discussions of confidential information in places where others can overhear.

## Privacy and Protection of Personal Information

During normal business activities, we may collect personal information about various individuals, including employees, patients, customers and other persons or entities with whom we do business. Teva is committed to collecting and keeping only personal information that is legitimately needed to carry out our business, and to implementing measures designed to protect that information.

### Why it is important

Collection and use of personal information is important to our business, but its unlawful use or disclosure could hurt the person to whom the information pertains, our Company and other stakeholders. As such, it is a breach of our Global Data Privacy Policy and other privacy policies, and in some cases of the law, to use personal information for anything other than legitimate Teva business purposes.

### Our way

- We protect the confidentiality of personal information entrusted to us.

- We collect, use, and retain personal information only to the extent we need it for legitimate business, human resource or scientific purposes, or as otherwise required or permitted by applicable law.

- We comply with all applicable privacy laws, including any requirements to inform or obtain consent from individuals regarding collecting, processing, accessing and disclosing their personal information.

- We do not share or entrust personal information to third parties in or outside of Teva unless they have a legitimate need to know it and such third parties maintain at least the same standards of confidentiality that we maintain.

## Designing and Maintaining Effective Business Controls; Accurate Reporting

We are committed to delivering accurate full, fair, timely and reliable information to regulatory authorities, shareholders, customers, healthcare professionals, media representatives, financial analysts, brokers and the general public. Our system of internal controls over financial reporting and disclosure is designed to provide reasonable assurance that financial statements for external use are prepared in accordance with generally accepted accounting principles, and fairly present the Company's financial condition. We provide full and accurate disclosure as to the business and financial condition of Teva.

### Why it is important

Each of our stakeholders makes decisions every day based on the information recorded by our Company. Business controls ensure the overall quality of financial reporting and disclosures. Business controls also establish a foundation for achieving business objectives and facilitating compliance with laws, regulations and Company policies. Business controls help us prevent fraud and mitigate other risks by preventing, detecting and correcting problems.

### Our way

- We maintain complete and accurate records, and ensure that they are managed and maintained properly as required by law and Company policies.

- We ensure that our financial and other records accurately and fairly reflect the Company's assets, liabilities, revenues and expenses.

- We record all financial and business transactions in the proper account and during the proper accounting period. We also avoid entering into any transaction or arrangement that improperly accelerates, postpones or otherwise manipulates the accurate and timely recording of business revenue or expenses.

- We ensure that the description regarding any payment or account established on behalf of Teva accurately reflects the purpose described by the supporting documentation.

- We avoid improperly influencing the work carried out by our external or internal auditors.

- We immediately report to the Company any unrecorded funds or assets, or false or artificial entries in the books and records of the Company. We also immediately report to the Company any person who we believe may have engaged in questionable accounting, internal accounting controls or auditing practices, whether or not material.



We make the decisions required to take our business forward, and execute on them with focus and determination.

Teva's Code of Conduct: Integrity in Business  |  29

TEVA_000548



**Our department is under pressure to meet quarterly earnings projections. I think someone in my department reported numbers last quarter to meet the projections thinking we could make it up this quarter. What should I do?**

It is never acceptable to report earnings that are inaccurate. The Company requires accuracy of all of our books and records. You should report questionable entries immediately to your manager, or use one of the other methods outlined in this Code of Conduct.

**In order to meet year-end sales targets, can I offer my customers a discount if they overstock their supply so I can book the sales this year?**

No. It is inappropriate to manipulate sales orders in order to show better results in a certain financial period. This type of intentional misconduct, whether for your benefit or the benefit of others, constitutes fraud, which is strictly prohibited by law and Company policies.

**I have financial approval authority of up to $50,000. I need to have a $100,000 invoice from a major, long-term supplier paid immediately. My manager has approved these invoices in the past, but is currently out of town. Is it all right for me to split the invoice into two separate invoices?**

No, employees may not split invoices or expenses to avoid exceeding approval limitations. You must wait until your manager or someone else with sufficient approval authority can approve the invoice.

**I don't have time to check all the vouchers and reports that come across my desk for approval. Surely it is the responsibility of the person who prepared them to make sure invoices are correct?**

No, each of us is responsible for ensuring that all vouchers, invoices, bills, time reports, and other documents are filled out correctly. If you are approving an invoice, you are responsible for its accuracy.

## Use of Company Systems

Computer technology – hardware, software, networks and the information that runs on them – is critical to our business success and must be protected. Everyone who uses a computer has the responsibility to use these resources appropriately, securely and for intended business uses. Teva's communications systems may be monitored or accessed by the Company to ensure integrity and to protect against fraud and abuse. In addition, monitoring may be used to detect unauthorized access or use, or for other business purposes.

### Why it is important

Like every other company today, global electronic communications and resources are an integral part of our business activities. It is essential that electronic resources used to conduct business are protected so as to ensure that they are accessible for business purposes.

## Our way

- Our electronic communications systems such as email, Intranet, Internet, voice mail and facsimile should be used primarily for Company business.

- We are allowed to use Teva's Internet access, email, facsimile, telephone and copying systems for incidental or occasional personal use as long as it does not affect job performance or disrupt others. Also, such use should not further the business activity of any entity other than Teva, and must not violate this Code of Conduct or Teva policies.

- We understand that, where legally permitted, Teva has the right to access and review all communications, records and information created at work or with Company resources without advance notice or consent. We do not expect confidentiality or privacy when using Company systems, except as provided by applicable law.

- We must comply with applicable license agreements for software and published material. Only software authorized by the IT Department can be added to Teva computers.

- When using Company systems, we should never access or transmit material that is likely to offend fellow employees, may negatively reflect upon Teva or that contains anything prohibited by law.

- We comply with Teva's IT security standards.



**Is it okay for me to browse the Web from my office or email a family member to make personal plans for the weekend?**

Yes, occasional and limited personal use of Company systems is acceptable if it does not interfere with our job responsibilities. However, recreational Internet "surfing" is much like browsing through a magazine. Just as you would not sit at your desk reading magazines instead of working, you should not use Teva time or equipment to browse the Internet. Furthermore, you cannot expect confidentiality or privacy when using Company systems. If you do not want to expose personal information to the possibility of access and review as described above and in Teva policies, you should refrain from any personal use of Company systems.

**I received a chain letter offering to sell personal merchandise at prices that I think will interest a number of my fellow employees. Can I share this with them?**

You should refrain from forwarding chain emails of any type.

**I work in the Finance Department and submitted a file to my manager before going on vacation. During my trip, I remembered that I had forgotten to include certain data. Can I share my password with a fellow employee who works in a different department so that she can access my computer and make the appropriate changes?**

Employees must not share their computer log-in information with anyone. Any exception must be justified to and approved by the appropriate manager. Furthermore, employees should not enable other employees to modify documents outside the scope of their responsibility.

**I need to remotely access my files and computer. Can I use one of those services I hear advertised on the radio to access my computer?**

Use of unauthorized remote-access or file-sharing software is a security risk and is not permitted. You should contact the IT Department for assistance in this area.



We bring out the best in each other and celebrate shared wins.



**I have inherited documents from my predecessor that could have been destroyed since the legally specified retention period has expired. Now I have heard there is a legal case, and I think that the documents could be used against Teva. Am I allowed to discard them?**

No. You must not destroy any records that relate to any actual or imminent legal proceeding or regulatory investigation. The discarding of these documents would be considered obstruction of justice, which is subject to severe sanctions, including criminal fines and imprisonment. Therefore, you must preserve the records. You should contact the Legal Department for further advice.

## Records Management

We create, manage, retain and dispose of our business records and information in compliance with Teva's policies.

### Why it is important

The proper use of records is important to our work at Teva: it facilitates decision-making, supports our legal, financial, regulatory and contractual obligations and promotes organizational efficiency. Furthermore, many business records that we create or receive at work are valuable Company assets, regardless of format (e.g. paper, electronic, audio/video). Efficient and accurate records management is vital for the protection of the Company's business interests. In addition, some government agencies regulate the retention and disposition of documents. Failure to comply with Teva policies, government regulations or court orders can lead to serious consequences.

### Our way

When creating a document, we adhere to the following standards of care:

- We avoid misleading or suggestive wording, embarrassing the recipient, exaggeration or inappropriate characterizations.
- We ensure that we are familiar with Teva's record retention schedule and retain all records for the time needed to comply with applicable laws and Teva's policies.
- We follow Teva policies regarding the preservation of documents and data relating to potential or pending litigation or investigations or in response to court orders.

## Innovation and Creativity

Given our belief that what we do improves the lives of others, we are committed to finding innovative and creative solutions. We seek to change the course of human health through bold pursuits in science and a promise to always put patients first. We harness our entrepreneurial drive, embrace the challenges that come our way and strive to overcome them.

### Why it is important

Creativity is a key driver for our innovation and helps to form the core of our business as a healthcare company. Our willingness to challenge the status quo enables us to pursue new standards in medicine and in the broader world of human health. Innovation and creativity are closely tied to our continued success and growth.

### Our way

- We strive as individuals and as a company for creative and constructive growth, transformation and renewal as a source of inspiration and vitality.

- We are encouraged to seek to apply our knowledge, talent and resources to yield new insights and bold ideas in the advancement of our mission while ensuring that we follow all applicable laws, regulations and Company policies in all of our activities.

- We focus on being proactive; we take the initiative; we think "out-of-the-box."

- We take ownership of our role in contributing to the success of Teva.

## Research and Development; Clinical Trials

Research and Development (R&D) is the systematic activity combining both basic and applied research aimed at discovering new solutions to healthcare issues or creating new pharmaceutical products and services. R&D starts with laboratory work and continues through pre-clinical animal toxicology and to human studies involving pre- and post-marketing clinical trials that determine the safety and efficacy of our products.

### Why it is important

Every Teva product is the result of Teva's R&D activities, which reflect our innovative approaches to creating new products and services to combat illness, to expand accessibility to such therapies and promote worldwide well-being.

Patient welfare is the very reason for our existence. We share a belief that what we do matters to the world – that it is essential to the advancement of healthcare.

### Our way

- We are committed to developing and marketing drugs that provide benefit to patients and ensure their safety as defined in the product label.

- We have the utmost regard for the safety of participants in our clinical trials and ensure that they are not subject to unnecessary risks, and that they understand the risks, nature and purpose of the clinical trial.

- We ensure that we follow the proper procedures for gaining informed consent, and that appropriate confidentiality rules are applied.

- We do not commence any trial prior to receipt of all necessary legal, regulatory and Company approvals.

- We ensure that all necessary parties that engage in clinical trials have been trained according to a study's protocol and procedures.

- We comply with international standards of good practice, including the Declaration of Helsinki and Good Clinical Practice.

- We ensure that all information from clinical trials is recorded, handled and stored in a way that complies with applicable data protection laws, and enables accurate and transparent reporting, interpretation and verification.

**A researcher from a university contacted me and stated that she had an idea for a clinical trial involving the use of one of Teva's products. What should I do?**

Teva encourages the conduct of research to promote science. Any such research must be conducted in accordance with legal requirements, ethical considerations and maintaining and safeguarding Teva's interests. Any such request should be forwarded to the Legal Department and the relevant business representative within the Company.

**I am in sales and marketing and a doctor has asked us if she can use our samples to conduct a small clinical trial with a group of patients. Is this acceptable?**

No. Samples may not be used for clinical trials. While the Company provides product to study sites in accordance with a clinical trial protocol, the product is provided generally via the Company or its agent that is managing the study and not via the sales and marketing team.

• We maintain an Adverse Event Report database, and employ drug safety officers to ensure compliance with global regulations. Furthermore, we follow special safety monitoring procedures for products in research and development phases.

## Philanthropy and Community Involvement and Contributions

In addition to our general commitment to improving global healthcare, we provide support to charitable or philanthropic organizations that benefit society. We also seek to give back to the communities of which we are a part and to support communities in need. Furthermore, we encourage and are also proud of our many employees who volunteer in the community and support them in many ways.

### Why it is important

We believe in being a good corporate citizen and in acting in a socially responsible manner. We also believe that our employees enrich themselves when they participate actively in their communities and support worthwhile causes.

### Our way

• We volunteer in communities in which we live and work.

• We partner with leading non-profit organizations to advance worthy causes.

• We support various non-profit organizations and community programs worldwide through cash donations and donations in-kind (e.g., products, equipment and services).

• We follow the proper approval procedures for all corporate donations and for all partnerships that the Company seeks to establish.

We are imaginative and inventive, striving to apply our creativity where it matters most: where we can improve health and make people feel better.

JOINT APPX - 0195

TEVA 000553



We enjoy playing with meaningful new ideas and exploring unfamiliar ground.

## Safeguarding the Environment and Animal Welfare

While our primary way of contributing to a better world is through our Company's mission, we remain committed to safeguarding the environment and animal welfare and to contributing to social progress in all of our global operations. As we develop, manufacture and market our products, we steadily work to reduce the environmental impact of our processes. We are committed to providing humane care and treatment of research animals.

**Why it is important**

Protecting the environment and ensuring animal welfare is the law and the right thing to do.

**Our way**

- We comply with all environment-related rules and regulations and aspire to adopt "best practices" in environmental procedures and standards.
- We maintain a global operation for identifying and handling our environmental footprint.
- We abide by generally accepted standards of animal care, including through the review and approval by our internal ethical committee on animal welfare. All of our animal studies are closely monitored to ensure the animals' well-being.
- All employees involved in designing and conducting studies involving animals must be properly qualified.
- We fully evaluate all planned animal studies to minimize the use of research animals by seeking alternatives whenever feasible. We aim to reduce, refine or cease the use of animals in our research as alternative methods are validated and accepted by regulatory authorities.

TEVA 000554

Teva's Code of Ethical Conduct for Business | 35

## Ethical Labor Practices

Teva is committed to upholding ethical labor practices and procedures across all of its locations around the world. Our responsibility in this area includes creating awareness and understanding of human rights, employment and labor practices. *By incorporating these principles into strategies, policies and procedures, and living out our values, Teva will uphold our basic responsibilities to our people, our environment, and set the stage for our long-term success.*

Teva supports and respects the protection of internationally proclaimed human rights, and we strive to ensure that we are not complicit in human rights abuses. We also uphold the freedom of association and the effective recognition of the right to collective bargaining, the elimination of all forms of forced and compulsory labor, and the effective abolition of child labor. Child labor is a form of exploitation that is a violation of a human right and it is recognized and defined by international instruments. It is the declared policy of the international community and of almost all Governments to abolish child labor.

### Why it is important

Ensuring that we maintain the highest moral and ethical standards regarding labor practices is a top priority at Teva. Simply put, it's the right thing to do – as an industry, as an organization, as an employer, and as human beings.

### Our way

At Teva, our responsibility extends beyond our own employees and internal facilities, to the people and companies we partner with around the world. This means identifying any issues and determining whether or not human rights are being compromised anywhere within our business. We must be particularly vigilant when sourcing in specific industry sectors with geographically distant supply chains.

Some of the actions Teva can take in the workplace are as follows:

- Being aware of countries, regions, sectors, economic activities where there is a greater likelihood of human rights or labor abuses, and responding accordingly with policies and procedures
- Using adequate and verifiable mechanisms for age verification in recruitment procedures
- Developing and implementing mechanisms to detect labor violations
- Working in partnership with other companies, associations and employers' organizations to develop an industry-wide approach to address human rights issues

> Awareness and understanding are the first steps that a company can take toward ethical labor practices and human rights.

JOINT APPX - 0197

TEVA 000555



# Guidelines for Implementation of Our Values

## Making Sound Decisions

We want to be known as a company in which all of us conduct ourselves in accordance with our values and in compliance with our policies. This helps us earn the trust of our stakeholders – employees, customers, business partners, shareholders, regulators and neighbors in the communities in which we do business.

The Code applies to all members of the Board of Directors and employees of Teva and its subsidiaries and controlled affiliates. In addition, Teva expects that its business partners will meet the standards embodied in this Code.

No code can anticipate every possible question in every country or culture in which we operate.

Specific questions will undoubtedly arise in the course of our activities. When faced with such questions, we must bear in mind the spirit of this Code and recognize the need to bring them to the attention of others within the Company. Taking time and having the courage to find appropriate answers to questions that arise is not always easy, but it is essential. At times we might sacrifice some immediate advantage, but in the long run, adherence to high ethical standards benefits all of our stakeholders.

All members of the Board of Directors and employees can contribute to Teva's culture of compliance and ethics by understanding this Code, embracing Teva's commitment to our Values, and acting to enforce compliance and avoid violations. No

code of business conduct and ethics can replace thoughtful and ethical behavior by the members of our Board of Directors and our employees. Raising a concern protects our Company, our members of the Board of Directors, our employees and our stakeholders.

In certain cases this Code of Conduct is supplemented by additional policies that cover specific topics in more detail or deal with certain local or regional issues. While this Code of Conduct is designed to familiarize us with many of the relevant policies, it is not as comprehensive as these supplemental policies and therefore does not supersede them or act as a substitute for reviewing each policy that applies to our specific job. Any waiver of our Code requires the prior written approval of the Chief Compliance & Ethics Officer or, in certain circumstances, the Board of Directors or a committee thereof. If required by applicable law, waivers will be promptly disclosed. Our Code is not a contract. It does not convey any specific employment rights or guarantee employment for any specific period of time.

## Recognizing a Potential Violation of the Code

Faced with issues that are difficult to resolve and for which there are no specific answers, it may be helpful to ask yourself the following five questions before proceeding:

- Is the decision or action I am going to take in line with our Values and this Code of Conduct?

- Have I thought through the risks and possible implications of what I am doing?

- If necessary, have I sought advice to help me make an informed decision?

- How will I feel if the action I take today is featured in the media tomorrow?

- Have I considered any potential impact on Teva's reputation?

If you think you are being asked to behave or conduct business in an illegal, unethical or otherwise inappropriate manner, or you suspect others of such behavior, you can report your concerns through the channels described below. Teva encourages and supports employees' speaking up. **You will not be penalized for reporting what you believe, in good faith, to be a breach of the Code – even if it later turns out that a violation has not occurred.**

JOINT APPX - 0199

TEVA 000557

## Channels for Raising Concerns

Teva management is responsible for implementing and monitoring compliance with this Code and for ensuring proper training with respect to this Code for all employees.

There are a variety of channels available to you to ask questions about the Code of Conduct for guidance on the right behavior.

If you have a question about making sound decisions, your supervisor, your manager, or the Human Resources Department will usually be the best resource to address your question, and you may also contact the Compliance & Ethics Department for further guidance.

If you have knowledge or a concern regarding potential violations of this Code, you can report the issue via one of the channels outlined below, and you may choose the channel which you are most comfortable with:

- Next level of management
- Human Resources Department
- Compliance & Ethics Department
- Legal Department
- Internal Auditor in your country

*It should be noted that any Teva Personnel receiving a Report of Noncompliance alleging serious misconduct, including potential violation of law, violation of anti-corruption, anti-bribery, or anti-trust laws in particular, fraud, or financial misconduct, should promptly forward complete details of the Report to the Office of Business Integrity (OBI).*

If you choose not to use the channels outlined above, or if you've previously reported the issues with unsatisfactory results, or if your concern involves your manager, you may report directly to the OBI through the Teva Integrity Hotline and web-based reporting tool. The OBI is responsible for addressing all reports of misconduct, including those reported via the Teva Integrity Hotline.

Employees can contact the OBI for more information in person, by letter, phone, email (Office. BusinessIntegrity@tevapharm.com) or through the Teva Integrity Hotline and web-based reporting tool.

Please refer to the OBI section of the Code of Conduct page on Teva.net for further information regarding OBI telephone numbers and reporting channels.

**You will have the opportunity to receive feedback once you have raised a concern:**

The OBI will ensure that all reports are addressed in a timely and confidential manner. All reports will receive an objective and complete assessment and, if warranted, an investigation. In addition, corrective action will be implemented when appropriate, and you will have the opportunity to receive feedback (including, as applicable, feedback delivered via a method that will not compromise your confidentiality).

**When you report a violation or suspected violation of the Code of Conduct, confidentiality is respected:**

Your identity and the information you provide will be shared only on a "need-to-know" basis with those responsible for resolving the concern.



# Consequences of Code Violation



**I have been thinking about calling the Office of Business Integrity via the Teva Integrity Hotline, but I'm not sure if I should. My manager told me to do something that I feel is wrong because it could be a violation of applicable accounting rules. I think I should tell someone who can look into this, but I'm afraid that my manager will make my job difficult for me if I do. What should I do?**

You have identified what you believe is a potential violation of the Code. Our Values require us to speak up if something does not seem right. Management is often the best place to raise concerns, but because it is your manager's request that concerns you, your choice to call the OBI is a good option. Your concern will be investigated. Teva will not retaliate or tolerate your manager or anyone else retaliating against you for providing such information. This may take courage, but the right thing to do is to report your concerns.

**An employee has raised an ethical concern to me as her manager. After reading the Code, I'm still not sure I have the best answer, but I also feel like I have to give an answer to show I'm a good manager. What should I do?**

If you are unsure of your answer, you should seek guidance from the Compliance & Ethics Department. That way, you will be able to provide the best answer and demonstrate the importance of asking questions and making sound decisions.

Members of the Board of Directors and employees who violate the Code will be held accountable and sanctioned appropriately. This may include termination of employment or membership on the Board of Directors. Misconduct that may result in discipline includes:

- violation of the Code;
- requesting others to violate the Code;
- failure to cooperate in Teva investigations of possible Code violations or disclosing confidential information regarding investigations;
- retaliation against another employee for reporting a concern regarding a potential violation of the Code; and
- failure to demonstrate leadership and diligence to ensure compliance with the Code and law.

## Retaliation is Prohibited

Anyone who raises in good faith a concern about a possible compliance violation will be supported by management and will not be subject to retaliation. Any act or threat of retaliation will in itself be considered a serious violation of the Code and Company Values.

## Continuous Improvement

We are continuously examining and refining our Code, our policies and procedures, and our compliance and ethics program. If you have a suggestion as to how to improve our controls and processes in order to detect violations of the law or Company policies, we encourage you to bring it to our attention through any of the previously described mechanisms. The same holds true if you believe there is a need for training in a particular area or that other areas should be covered by the Code.



# Contact Information

**Chief Compliance & Ethics Officer**

The name and contact details of the Chief Compliance & Ethics Officer can be found on the Global Compliance & Ethics page of Teva.net, under "Contacts & Resources".

**Regional and Local Compliance & Ethics Officers**

The name and contact details of the Regional and local Compliance & Ethics Officers can be found on the Global Compliance & Ethics page of Teva.net, under "Contacts & Resources".

**Office of Business Integrity (OBI)**

Information on contacting the OBI, to include options on reporting misconduct, can be found in both the "Office of Business Integrity" and the "Contacts & Resources" areas of the Global Compliance & Ethics page of Teva.net. You may also email the OBI at Office.BusinessIntegrity@tevapharm.com

## Teva Integrity Hotline

Information on how to make a report through the Teva Integrity Hotline can be found in both the "Office of Business Integrity" and the "Report Misconduct" areas of the Global Compliance & Ethics page of Teva.net.

*If you do not have access to Teva.net and need assistance locating a Compliance & Ethics Officer, reporting a violation, or other resources, please email the Office of Business Integrity at Office.BusinessIntegrity@tevapharm.com*



**From:**         Randy Keuch
**Sent:**         Thursday, December 21, 2017 11:59 AM
**To:**            Eduardo Nasi Cheide Da Graca
**Subject:**     RE: FYI, I will be contacting Edu

Hi Edu,

Thanks!  I think Tal is trying to determine whether you or Gaurav or perhaps Amir should lead TR for Emerging Markets.

Have a great holiday with your family and we will know more in early January.

Best regards,


Randy Keuch   Head of Total Rewards - Americas
Tel: 267-468-4325   Cell: 215-272-9816
Randy.Keuch@tevapharm.com   sip:Randolph.Keuch@tevapharm.com   www.tevapharm.com


-----Original Message-----
From: Eduardo Nasi Cheide Da Graca
Sent: Thursday, December 21, 2017 11:46 AM
To: Randy Keuch
Subject: RE: FYI, I will be contacting Edu

Hi Randy, it went pretty well. She wanted to know more about TR LATAM in general and also my background, etc. not
sure what is going to happen but the conversation overall was good!
Hope we have some good news soon! Any news from your side?
Thanks and regards,
Edu

-----Original Message-----
From: Randy Keuch
Sent: Thursday, December 21, 2017 9:00 AM
To: Eduardo Nasi Cheide Da Graca
Subject: Re: FYI, I will be contacting Edu

Let me know how it goes

Sent from my iPhone

> On Dec 20, 2017, at 6:18 PM, Eduardo Nasi Cheide Da Graca <Eduardo.Nasi@tevapharm.com> wrote:
>
> Thanks Randy. She sent me a message this afternoon and we are going to talk tomorrow morning!
> Regards,
> Edu

TEVA000608

>
> -----Original Message-----
> From: Randy Keuch
> Sent: Wednesday, December 20, 2017 11:40 AM
> To: Eduardo Nasi Cheide Da Graca
> Subject: FW: FYI, I will be contacting Edu
>
> FYI
>
> Best regards,
>
>
> Randy Keuch   Head of Total Rewards - Americas
> Tel: 267-468-4325    Cell: 215-272-9816 Randy.Keuch@tevapharm.com    sip:Randolph.Keuch@tevapharm.com
www.tevapharm.com
>
>
>
> -----Original Message-----
> From: Tal Zorman
> Sent: Wednesday, December 20, 2017 11:38 AM
> To: Randy Keuch
> Subject: FYI, I will be contacting Edu
>
> Dear Randy,

> Only FYI, I will be reaching out to Edu to better understand the TR LATAM support needed as part of the growth markets.
>
> Thanks, Tal
>

TEVA000609

| | |
|---|---|
| **Subject:** | Topics for Ron |
| **Start:** | Thu 10/26/2017 09:00 |
| **End:** | Thu 10/26/2017 09:30 |
| **Recurrence:** | (none) |
| **Organizer:** | Daniel Lawlor |

Social Impact EHS sub-committee = level of interest good, but ensure information/participation is balanced
Concerns with Randy
- I've personally had concerns since he was hired, dating back to when I was NA HRBP and voluminous time consuming analyses that were not really needed and missed the crux of the issue despite several pre-calls and meetings
- Has one playbook and doesn't adjust mindset or behavior when circumstances warrant, a bit arrogant that he knows best and doesn't accept feedback in a constructive way
- Publicly and privately places blame on Corp Total Rewards for certain decisions, which I don't believe is always true (i.e. example of life insurance take-away and needing to find so much savings for Corporate); clearly demonstrates and us vs. them mindset in my interactions with him
- Didn't seriously follow up on the message conveyed on our last call, proceeded with communication plans w/o highlighting to communication consultants/partners concern about take-a-way on life insurance; now it may be too late
- Defensive when given feedback on issues, turns to point the fingers at others (i.e. example of Linda, Pam when feedback on Contractor he wanted to hire was not good)
- Had to stop him from hiring contractor full-time and request that he get more feedback from others and discuss with Talent Acquisition some new approaches, leveraging Teva HR community more broadly
- Technically good, but an overused strength that does offset other concerns
- Tendency to give too many details/updates with a degree of bragging when in front of the business of HR community, rather than use it for opportunity for input and dialogue (HR MAC meeting, Americas HRLT); had to convince him to adjust HR MAC agenda to permit time for dialogue and input
- Overall caliber of talent in group is not strong, but I think under his leadership it has been difficult to attract strong talent that does exist in the market, whereas he attributes it to Teva not being an attractive employer; note we had 50 external applicants for Nancy's role

TEVA 000748

**From:**          Yonatan Vitman
**Sent:**          Wednesday, February 21, 2018 06:07
**To:**            Tal Zorman
**Subject:**       Salary Recommendation

Hi Tal,

Following our discussion here is my recommendation:

- Edu's salary today is **$168,895** which puts him at the entry of the range (mid-point is at ~$200K)
- There is no GG16 at Total Rewards US so I cannot see the range for this grade
- For other HR jobs in GG16 the mid-point is at ~$210K which means the entry is ~$180K; average salary is ~$210K
    o Total Rewards tends to have higher ranges by 5% to 10%
- Randy's salary was $285K
- Given the above I would recommend an increase of 15% to 20% to bring Edu to the range **($195K)**

Thanks

**Yonatan Vitman**, Senior Director, Global Compensation
Tel: +972 (3) 9267143   Cell: +972 (54) 5790996
Yonatan.vitman@teva.co.il

| From: | Assaf Ehrenreich |
|---|---|
| Sent: | Friday, December 15, 2017 01:46 |
| To: | Tal Zorman |
| Subject: | Fwd: Minimal TR Organization for North America |
| Attachments: | image001.png; ATT00001.htm; image008.jpg; ATT00002.htm; image009.jpg; ATT00003.htm; image010.jpg; ATT00004.htm; Minimal TR Organization Final.pptx; ATT00005.htm |

I respect Randy and his inputs should be taken seriously.
Main takeaways from my side:
- Agree on the criticality of Diane, most of the risk is on her shoulders and it can't be managed from distance or by a junior/ new role
- wouldn't change Miriam's position in the first few months as well
Assaf

Begin forwarded message:

> **From:** "Tal Zorman" <Tal.Zorman@teva.co.il>
> **To:** "Assaf Ehrenreich" <Assaf.Ehrenreich@teva.co.il>
> **Subject: Fwd: Minimal TR Organization for North America**
>
> Let me know if you have any remarks/insights
> I am mtg with Dan today to discuss
>
> Thanks, Tal
>
>
> Begin forwarded message:
>
>> **From:** "Randy Keuch" <Randy.Keuch@tevapharm.com>
>> **To:** "Tal Zorman" <Tal.Zorman@teva.co.il>
>> **Cc:** "Daniel Lawlor" <Daniel.Lawlor@tevapharm.com>, "Ron Yaniv" <Ron.Yaniv01@teva.co.il>
>> **Subject: Minimal TR Organization for North America**
>>
>> Hello Tal,
>>
>> Attached is a deck that provides my bare bones recommendation for my team. I have included options that suggest elimination of my position or Miriam's position. I strongly urge you not to make any leadership changes in Q1, as there is much work for the team to perform and the risks are very high. I also ask that you consult with Legal to validate the risks and our exposure. An error on our 401k could result in disqualification of the entire plan, which has $1.2 billion in assets, so disqualification will result in the loss of huge tax benefits to Teva. If a leadership change (job elimination) is needed, better to do this in Q2 when work has transitioned to HR Ops & Services, and the organization has stabilized. This is not a personal request nor is it made out of concern for having my position eliminated. Rather, it is a business decision as to how much risk Teva is willing

TEVA 000781

to take by moving too quickly or having inexperienced people in key decision-making roles.

Thanks for your consideration and let me know if you have any questions.

Best regards,

TEVA 000782





# Pay Letter

**Performance year January 1 to December 31, 2017**

| Employee Name: | Eduardo Nasi Cheide da Graca |
|---|---|
| **Employee Global ID:** | 901055 |

Congratulations! We are pleased to confirm your promotion to the position of  Sr Dir Total Rewards as of March 26, 2018.
Your new job title is: Sr Dir Total Rewards I
Your new job grade is: 16

I would like to inform you about the compensation adjustments offered to you which are outlined below, resulting from a combination of Teva's overall achievements, your business unit's achievements, and your individual performance throughout the year, reflected in your Performance Rating of:  Successful Performance

**Salary**
**Your new annual base salary is 199,296.90 USD as of March 26, 2018**

| Current Annual Base Salary | Salary Increase % | New Salary |
|---|---|---|
| 168,895.68 USD | 18.00% | 199,296.90  USD |

**Equity**
**The number of options granted to you is 8,500**

| Estimated USD fair value | Grant date | Vesting Schedule |
|---|---|---|
| 63,920 | March 2, 2018 | 25% Mar 2019, 25% Mar 2020, 25% Mar 2021, 25% Mar 2022 |

50% of your grant will be automatically converted into restricted share units ("RSU")  according to the conversion methodology set forth in the plan.
The award is subject to:

The terms of Teva's 2015 Long-Term Equity-Based Incentive Plan (including any applicable sub-plan);
an award agreement that will be made available to you on Equate+, which includes additional terms and conditions; and any applicable law.

You will receive an e-mail from Stock Administration with a link to access your award agreement. The award agreement shall be deemed automatically accepted by you and you shall be subject to all its terms and conditions, unless you click the "I decline" button at the end of the award agreement on Equate+ within 30 days following the grant date.
*Fair Value may change depending stock price on grant date

All payments referred in this letter are gross and subject to applicable tax and other deductions.  To the extent permitted by applicable law, please keep the terms of this letter confidential.

Best regards,

Tal Zorman

TEVA 000853

**Global Talent Management - Leadership Structure Updates**

Dear Colleagues,

I would like to update you on changes to our global **Talent Management COE** structure.

The **Global Talent Management Center of Expertise** will combine Talent Acquisition and Mobility, Learning, Leadership and Development and Total Rewards to provide HR leading practices and solutions. The following appointments and updates to the Talent Management leadership team and structure are effective immediately:

**Talent Acquisition & Mobility**

**Carolyn Maye** will lead Executive Hiring and will continue to manage the centralized Top Management (GCA 17+) recruiting function, working closely with global business unit leadership in support of their organization strategy, overseeing all aspects of global Top Management recruitment while providing visible metrics that help drive business value.

**Gregory Sullivan** will lead Talent Acquisition activities as subject matter expert with direct accountability for designing global TA processes, policies and tools, while collaborating with HROS on implementation.

**Michelle Durkin** will lead Global Mobility which continues to be an SME function across all businesses and functions, to provide cost effective mobility solutions, strengthen current processes and service partner performance, re-position Global Mobility within a talent management approach, educate key stakeholders, and review global mobility policies to meet future needs of the business.

**Learning, Leadership & Development**

The Learning, Leadership & Development function will provide 'just in time' leadership, talent and organizational development solutions to support the organizational restructuring and rebuild employee engagement. There will be no dedicated L&D support/presence in the region/BU and the corporate team will hold a strong partnership with the business to ensure global, regional and BU alignment. The Learning team will provide learning governance across Teva and ensure the Learning Management System & technologies' sustainability.

**Ravit Eshed** will lead Talent, Leadership Development and Engagement; **Lior Porat** will lead the Organizational Development; and **Avital Szarfman** will lead the Learning function (as well as the CoE Planning, Governance and Processes management).

**Total Rewards**

The Total Rewards CoE will focus on designing and leading programs, processes and policies, combining best market practices and Teva's needs.

With a continued, smaller regional presence, the team will focus on supporting Teva's Business and HR in achieving their strategic and operational objectives, providing solutions in the Total Rewards space, such as Compensation, Benefits and Equity.

KEUCH000009

Yonatan Vitman will lead Global Compensation & Equity Design. Eduardo Nasi will lead Total Rewards in the North America region;  Amir Haim Zeirah will lead Total Rewards in the Growth Markets region (Israel, LATAM and Asia); and the European region will be announced at a later stage.

The following Total Rewards team members will continue their roles:

- **Gaurav Gulati** is responsible for APAC, reporting to Amir Haim Zeirah.
- **Roni Percik** will join the Global Compensation & Equity team responsible for Equity Design, reporting to Yonatan Vitman.
- **Lian Ben Ezra** will join the Global Compensation & Equity team and will assume responsibilities for leading key projects and processes in the Compensation domain, reporting to Yonatan Vitman.

The Executive Compensation team, **Shlomit Ronn-Agler** and **Ephie Nissenfeld**, will move to the HR Office, reporting to Assaf Ehrenreich.

<u>Planning & Process Management</u>

This function will provide cross CoE planning, governing and implementing processes and tools, to enable metrics-based strategic decision making.  Avital will lead this area, in addition to the Learning COE.

---

Orit Amores, my personal assistant, is transitioning into a new role in the HR Operations & Services organization. Donna Perry will replace Orit to provide administrative support for both the Global Talent Management team as well as the HR Operations & Services team.

As a result of the above organizational changes, we will be parting from Randy Keuch.  I would like to thank Randy for his significant contributions and dedication to Teva. In the last four years Randy led the Total Rewards Center of Expertise for the Americas providing subject matter expertise and cutting edge solutions to all facets of Total Rewards issues within the region.  Randy's last day with Teva will be February 23.

Updates regarding additional team members will be provided at a later stage.

I appreciate your patience and commitment as we continue to work through this difficult process, and I thank you for your ongoing support and understanding. I am confident in our team's ability to move forward and create a new path to become a stronger and more agile team.

Tal Zorman
SVP Global Talent Management

KEUCH000010



KEUCH000017

 **Pharmaceuticals**

DATE:  5/26/2016

TO:  Randy Keuch

We are very pleased to inform you that in your current position as Sr Dir Total Rewards, Americas (grade 17), you will receive an adjustment to your base salary.

This letter is to confirm this change to your employee record.

The effective date for this change is: May 23, 2016

The following outlines the details of your role at Teva:

|  | Previous | New |
|---|---|---|
| Salary | $280,000.00 Annually | $285,600.00 Annually |

- Bonus:  You will continue to be eligible to participate in the Teva 2016 Bonus Program with an incentive opportunity equal to 30% of your Annual Base Salary, subject to the terms and conditions in the 2016 Bonus Program.

- Merit Increases: You will continue to be eligible to participate in our 2016 Teva Performance Management Program, subject to the guidelines for active employees.

*This letter sets forth the full and complete agreement between you and us regarding your employment, and supersedes all prior negotiations, discussions, correspondence, communications, understandings and agreements between the parties relating to the subject matter contained herein.*

*The nature of your employment with us is and will be "at will," as defined by applicable law, meaning that either we or you may terminate your employment at any time, with or without notice and with or without cause, for any reason or for no reason, without further obligation or liability.  Teva reserves the right to change, end or alter the terms of your employment and/or the terms of any plans at any time without prior notice.*

KEUCH000024

 Pharmaceuticals

August 6, 2015

VIA EMAIL
Randy Keuch

Re:   **Base Salary Increase and Retention Bonus**

Dear Randy:

As discussed today and earlier this week, on behalf of Teva Pharmaceuticals USA, Inc. ( *"Teva"*), I wish to assure you that you are a highly valued colleague and to encourage your continued employment with Teva. We at Teva are looking forward to your continued contributions to Teva in the years to come. In recognition of your past accomplishments and commitment to Teva, it is my pleasure to formally present to you the following retention offer.

If you accept this offer, effective as of August 1, 2015, your annual base salary will be increased from U.S. $257,000 to U.S. $280,000. Please note that, while I am unfortunately unable to offer you an increase in your other compensation (including annual bonus and equity compensation) or a promotion to Vice President at this time, given the constraints of Teva's guidelines and your position's Global Grade. However, in the next coming months, I will review and consider a potential promotion of your position to Vice President and Global Grade 18.

In recognition of your years of dedicated service and to encourage you to continue at Teva, I am pleased to inform you that Teva has determined to offer you a retention bonus, subject to the terms and conditions outlined below. The amount of the potential retention bonus is U.S. $60,000 and will be earned, if at all, in two equal installments. Provided that you remain continuously employed with Teva through August 6, 2016, and are not promoted to Vice President on or before such date, you will entitled to receive the first such installment, payable in a lump sum cash payment in an amount equal to U.S. $30,000 on the first regularly scheduled payroll date following such date. Provided that you remain continuously employed with Teva through August 6, 2017, and are not promoted to Vice President on or before such date, you will entitled to receive the second such installment, payable in a lump sum cash payment in an amount equal to $30,000 on the first regularly scheduled payroll date following such date. Any amount payable to you pursuant to this letter will be in addition to (and will not be in lieu of) any annual bonus or other incentive compensation amounts you may otherwise be entitled to receive from Teva and made less any applicable taxes and other legally permissible and regular payroll deductions.

Each retention bonus installment described herein is conditioned upon you keeping all terms and conditions of the retention bonus and this letter strictly confidential except as required to discuss with immediate family members and for the purpose of obtaining legal and financial advice (provided that, to the maximum extent permitted by applicable law, rule, code or regulation, they agree to maintain the strict confidentiality of the terms and conditions of this retention bonus).

KEUCH000028

Please note that this letter does not constitute a contract of employment for any specific period of time, and your employment will continue on an "at-will" basis. This means that either you or Teva will be entitled to terminate your employment at any time for any reason, with or without cause, subject to the terms of this letter. You should disregard any comments to the contrary as ineffective.

This letter may be executed in two or more counterparts, each of which will be deemed to be an original but all of which together will constitute one and the same instrument. The execution of this letter may be by actual signature or by signature delivered by facsimile or by e-mail as a portable document format (.pdf) file or image file attachment. This letter replaces all prior and contemporaneous communications, agreements and understandings, written or oral, with respect to the subject matter set forth herein.

Please review the contents of this letter carefully. If you agree to these terms, please sign the enclosed copy of this letter agreement and return it to me no later than August 7, 2015.

Sincerely,

TEVA PHARMACEUTICALS USA

By _____

Ron Yaniv
SVP, Global Compensation & Benefits

Acknowledged and Agreed:

_____

Randy Keuch

Dated: _____

- 2 -

KEUCH000029

**Randy Keuch**

| | |
|---|---|
| **From:** | Tal Zorman |
| **Sent:** | Friday, December 15, 2017 7:10 AM |
| **To:** | Randy Keuch |
| **Cc:** | Daniel Lawlor; Ron Yaniv |
| **Subject:** | Re: Minimal TR Organization for North America |

Thanks much Randy, will review and be in touch with you today/next week

Thanks, Tal

On 14 Dec 2017, at 21:07, Randy Keuch <Randy.Keuch@tevapharm.com> wrote:

Hello Tal,

Attached is a deck that provides my bare bones recommendation for my team. I have included options that suggest elimination of my position or Miriam's position. I strongly urge you not to make any leadership changes in Q1, as there is much work for the team to perform and the risks are very high. I also ask that you consult with Legal to validate the risks and our exposure. An error on our 401k could result in disqualification of the entire plan, which has $1.2 billion in assets, so disqualification will result in the loss of huge tax benefits to Teva. If a leadership change (job elimination) is needed, better to do this in Q2 when work has transitioned to HR Ops & Services, and the organization has stabilized. This is not a personal request nor is it made out of concern for having my position eliminated. Rather, it is a business decision as to how much risk Teva is willing to take by moving too quickly or having inexperienced people in key decision-making roles.

Thanks for your consideration and let me know if you have any questions.

Best regards,

<image001.png> Randy Keuch ▪ Head of Total Rewards - Americas
Tel: 267 468 4325 ▪ Cell: 215 272 9816
Randy.Keuch@tevapharm.com ▪ sip:Randolph.Keuch@tevapharm.com ▪ www.tevapharm.com

<image008.jpg><image009.jpg> <image010.jpg>

<Minimal TR Organization Final.pptx>

KEUCH000050



# Proposed Headcount Reduction for the North American TR Team

December 15, 2017

teva

KEUCH000051

# Situation



Teva is reducing the headcount for the Total Rewards Team that supports North America (US, Canada, & Puerto Rico) and needs help determining what is the minimum team required to provide minimum support.  Factors to consider with regard to **benefits** include:

- Compliance with country laws and regulations - This requires substantial experienced resources as the penalties could be well into the millions of US dollars
  - ☐ Strongly suggest that this concern be discussed with Legal (details are in Appendix)
- Leadership required to manage $220 million in spend and sign weekly wires/invoices in excess of $1million
  - ☐ This is managed daily by the team
- Over $50 million in cost savings generated over last 3 yrs.  Team gave $8.2 million to the US businesses in benefits savings so far for 2017 and will save over $10 million for entire year.  These savings are directly related to the daily actions of team members managing providers and employee healthcare behaviors
- Team is designing and implementing a new Severance Benefit Plan, which is qualified under ERISA, that will save Teva about $10 million in 2018
- Other cost savings initiatives (several million in savings) require resources to research and implement
- Substantial headcount reductions will trigger contract re-negotiations with some vendors driving costs up if not properly managed or creative solutions not identified and put into place
- Management of the benefits (COBRA) for the 1,100+ US employees severed as well as plant closings
- Handling employee escalations of medical and other issues that cannot be adjudicated by our providers
- Canadian benefits headcount not in TR headcount

KEUCH000052

# Situation, cont'd

Factors to consider with regard to **compensation** include:

- Compliance with country laws and regulations (FLSA – US and Pay Equity – US and Canada)
- Partnering on job offers, promotions, etc. and performing market pricings at all levels
- Contributing to restructurings
- Managing pay surveys, sales compensation, and executive compensation
- Partnering with HR and the business on job grading
- Union avoidance in Canada



teva

KEUCH000053



# Total Rewards – North America
## Current (12 FTEs)*

\* Excludes Jan Gustavsen who is in HR headcount for Canada and manages all Canadian benefits

KEUCH000054

# Proposal – Summary (See Appendix for Details)

The North American TR team currently has 13 employees, if you include Jan Gustavsen, who is the Benefits Manager for Canada and 2 contractors. We believe we can reduce that headcount from 13 to 6 for a 54% reduction. To do this, the key changes will be as follows:

- 401k fiduciary responsibility will be outsourced to new vendor and actually reduce current spend by $30,000
- Some benefit administrative responsibilities will be moved to HR Ops & Services (disability, COBRA, wires, etc.) NOTE – US Law (HIPPA) regulates access to employee medical information
- Shift market pricing of jobs from job specific survey data to salary structure pricing
- Eliminate participation in:
  - Sales compensation
  - Executive pay and benefits

The next slide reflects the proposed organization structure.



teva

KEUCH000055



# Total Rewards – North America
# Proposed (6 FTEs or 54% reduction*)




The Benefits team will
retain the lowest
graded employees

* Assumes Canadian benefits headcount is severed with full responsibility transferred to NA TR team

KEUCH000056

# Proposal – Summary (See Appendix for Details), cont'd

If further reductions are required, the only positions that can be cut would be leadership roles.

The NA Benefits Associate Director – Diane Rohach - should be considered the most valuable leader, as the compliance requirements combined with the impact of noncompliance (many millions). Remaining staff does not have expertise to handle all benefits and needed compliance for Teva.

The Region TR Head – Randy Keuch – is probably the next most valuable leader given his knowledge and experience in both compensation and benefits and having managed situations similar to Teva's and is at a level appropriate to manage a $220 million spend as well as oversee compliance

The NA Compensation Director – Miriam Weinstein – is also a valuable compensation resource.  Recognize that under Canadian law, any employee can request a full pay analysis for their position.  This pay analysis must include market data plus internal pay data for all of their peers.  No one on the team is experienced with this new legislation



KEUCH000057

# Total Rewards – North America Proposed (5 FTEs or 62% reduction*)



\* Assumes Canadian benefits headcount is severed with full responsibility transferred to NA TR team

KEUCH000058

**teva**

# Proposal – Compensation: What Will be Left

- Manage:
  - ☐ CONNECT Year-End process
  - ☐ Compliance with pay laws in all countries
    - Canadian Pay Equity provides that ee's must receive a pay analysis of their job as well as the pay of their peers if they request it, and can file litigation if pay is not equitable
- Analyze pay based on salary structures and market surveys as needed
- Contribute to:
  - ☐ Grade and pay issues associated with organizational changes and restructurings
  - ☐ Site closures (i.e., PR)
- Work with business leaders to address compensation-related business issues
- Partner with HR in job offers, counter-offers, promotions and pay adjustments
- Develop solutions with regard to retention, attraction and motivation issues
- Complete pay surveys and manage Reward system
- Perform modeling and cost analysis for headcount and pay issues

This work requires 1 Director and 1 Manager with overlap in the areas shown ed is 1.5 Director

KEUCH000059

# Proposal – Benefits: What Will be Left

- Manage the remaining $200 million in spend for the following:

| | | |
|---|---|---|
| - 401(k) | - Deferred Comp | - 2 SERPs | - Medical | - Annual Enrollment |
| - Telemedicine | - Employee Escalations | - Legal Filings | - ACA Reporting | - Biometric Screenings |
| - Flu Shots | - Employee Physicals | - Health Strategy | - Life Ins & AD&D | - Regulatory Inquiries |
| - EAP | - Dental | - Vision | - Imaging | - 2nd Medical Opinion |
| - Wires | - College Savings Plan | - ESPP | - COBRA | - Financial Planning |
| - Stars | | | | |

- Manage Voluntary Benefits
  - Individual Disability Insurance          - Group Umbrella Liability Ins.          - Hospital Indemnity
  - Critical Illness          - Accident coverage

- Other benefits activities include:
  - TevaFit Fitness Centers          - Cafeteria Offerings          - Weight Watchers
  - Tobacco Cessation          - Communications (legal)          - Monitor Health Dashboard

- Vendor Contracting and Management – See slide on next page

**teva**

This work requires 1 Assoc Director and 1 Analyst and 1 Specialist, with oversight and excluding from HR Director

KEUCH000060

# Vendor Contracting and Management

*We manage over 24 vendors with an annual spend of over $220 million*



11

KEUCH000061

teva

# Proposal – Key Cost Savings Initiatives for 2018

- Design and implement severance solution.                              Potential 2018 savings of $10 million
- Select and contract with a new advisor for the 401(k).               Potential annual savings of $30,000
- Conduct RFP for Enrollment/Eligibility Administrator                 Potential annual savings of $TBD
- Conduct RFP for Life & Disability (US & Canada)                      Potential annual savings of $TBD
- Address potential stop loss premium increase                          Potential annual savings of $1-3 million
- Impact and compliance with US Tax Reform                              TBD
- Model costing of Ontario Pension Plan legal requirement changes
- Produce the US booklet attached below and manage every benefit and every vendor for the US, Canada and PR



2018
Comprehensive Benefits Guide

KEUCH000062



# Appendix - Compensation

teva

KEUCH000063

**teva**

# Compensation

| Action | Requirement | Impacts of Non-Compliance |
|---|---|---|
| Fair Labor Standards Act – US Overtime Eligibility - CA | Legally Required | Monetary Penalties for company and manager |
| Pay Equity – US Inc. Audits | Legally Required | Monetary Penalties for company |
| Pay Equity – Canada Inc. Audits & Employee Requests | Legally Required | Monetary Penalties (company) and be released publically as a Violator |
| Ad Hoc Compensation Reviews | Legally Required | Pay Equity regulations will require this to continue |
| Severance Plan Management and Plan Qualification Inc. File IRS Form 5500s | Legally Required | Plan Qualification leading to inability to process Severance in alignment with State Unemployment Insurance – loss of above $5 Million cost avoidance |

14

KEUCH000064

# Compensation

| Action | Requirement | Impacts of Non-Compliance |
|---|---|---|
| Mergers, Acquisitions & Divestures | Requirement based on current practice | This work will need to be completed by someone to provide for compensation integration for divestitures |
| Year End Process – Connect | Requirement based on current practice | Merit programs will need to run for 2018, and Connect will continue in 2019 and beyond |
| Survey Participation | Requirement based on current practice | Teva is bound to participate in certain survey in 2018 |
| C&B Reviews | Requirement based on current practice | Merit, Market Adjustment and Promotion Planning (or AOP) |
| Salary Ranges – US & CA | Requirement based on current practice | Teva US & CA currently uses salary ranges where Market Reference Points act for existing and new hires cases in US based on pay equity |
| Market Reference Points at the GCA Job Level | Requirement based on current practice | Teva US & CA currently reviews each role in relation to the Market Reference Point to reach GCA job to review market alignment for Connected Hiring and in these cases this is used for pay equity |
| Survey Output | Requirement to use on current practice | Ensuring market data is aligned to WTW tool and more present so roles are properly job sourced so that roles do not have unfair/unfair status against the market |

KEUCH000065

teva

# Compensation

| Action | Requirement | Impacts of Non-Compliance |
|---|---|---|
| WTW Comp tool – Survey Admin – US & CA | Requirement based on current practice | Job specific market data will not be able to be created and maintained. |
| Job Offers | Requirement based on current practice | Currently TA has set guidelines for recruitment and/or outcomes to fit. If offers outside the given framework it not overseen, pay equity issues can arise. |
| Promotion Reviews | Requirement based on current practice | |
| Maintenance of GCA within NA | Requirement based on current practice | Possible inequities across groups within country |
| Sales Compensation Design Team Member | Requirement based on current practice | Sales team will have full oversight over sales incentive plan |
| Group Re-Organization Compensation Assistance | Requirement based on current practice | Decreased client experience and realignment not in line with GCA or external compensation |
| Retention Reviews | Requirement based on current practice | Possible inequities |

16

KEUCH000066

# Compensation

**teva**

| Action | Requirement | Impacts of Non-Compliance |
|---|---|---|
| Spot Bonus Administration | Requirement based on current practice | Possible inequities |
| Proactive Compensation Client Support | Not Required | Decreased Client Experience |
| Compensation Mailbox | Not Required | Decreased Client Experience |
| Pay Alignment Strategy | Not Required | Decreased Client Experience |
| Training | Not Required | Compliant, supports HR with Union Avoidance |

17

KEUCH000067



# Appendix - Benefits

teva

KEUCH000068

# Benefits

| Action | Requirement | Impacts of Non-Compliance |
|---|---|---|
| Perform Alleged for Employment Litigation | Legally Required comply must remain in benefits | Employee lawsuits |
| ACA Compliance | Legally Required comply must remain in benefits | Fines and penalties that could be in the millions |
| Section 1(e) Appeals | Legally Required comply must remain in benefits | 401 federal plans require appeals so long as compliance leads to lawsuits and fines |
| 401(k) Compliance | Legally Required comply must remain in benefits | Fines and penalties from either the IRS and/or DOL and possible disqualification of the plan |
| 403(b) Compliance - PR | Legally Required comply must remain in benefits | Non-compliance can lead to fines and disqualification of the plan |
| DC Plan Administration including Accruals | Legally Required comply must remain in benefits | Non-compliance can lead to fines and disqualification of the plan |
| SERP | Legally Required comply must remain in benefits | Non-compliance can lead to fines and disqualification of the plan |
| QDRO | Legally Required comply must remain in benefits | Non-compliance can lead to fines and disqualification of the plan |
| 19 | | |

# Benefits

**teva**

| Action | Requirement | Impacts of Non-Compliance |
|---|---|---|
| FSA Administration | Legally Required | Non-funding could lead to ... |
| HSA Administration | Legally Required | Non-compliance with rules could disqualify tax exemption status |
| Audit - IRS & DOL | Legally Required as complex must remain in benefits | Fines imposed either from IRS and/or DOL and possible disclosure caution of 1.5/6 million plan |
| Disclosure Requirements – Executive Management Team | Legally Required as complex must remain in benefits | Highly regulated must be done with knowledge and expertise in benefits |
| Compliance for Health and Wealth Plans – 55,000 | Legally Required as complex must remain in benefits | Fines and/or penalties from either IRS and/or DOL and possible disclosure caution of 1.7 billion plan |
| Open Enrollment | Legally Required | Non-compliance with section 125 |
| Maintenance of Contracts and Business Associate Agreements | Legally Required | Can lead to fines and penalties if confidentiality is compromised |

20

KEUCH000070

# Benefits

teva

| Action | Requirement | Impacts of Non-Compliance |
|---|---|---|
| COBRA | Legally Required, but can move | Fines and penalties from the DOL for non-compliance and/or possible lawsuits |
| Wires | Legally Required, but can move | 401(k) funding must be completed timely and if not done timely, could lead to plan audits as well as non-compliance of the plan which could lead to disqualification of a 7 billion dollar plan |
| Disability Management/FMLA | Legally Required, but can move | Employ must meet state laws such as if not compliant with FMLA |
| Invoices | Legally Required, but can move | Need to honor signed contracts and non-payment could lead to disruption of services |
| All Payroll Medical Deductions | Legally Required, but can move | Under a Medical/Dental plan deduction is need |

21

KEUCH000071

# Benefits

teva

| Action | Requirement | Impacts of Non-Compliance |
|---|---|---|
| Maintain rates to Vendors | Requirement based on current practice | Not legally required but mistakes on the fees/fees or coverage being accepted for employees |
| Benefits Mailbox – Tier 2 Employee Support | Requirement based on current practice. Must remain in benefits | Escalated questions for getting resolved and possibly compromising health of our employees |
| Mergers, Acquisitions & Divestitures | Requirement based on current practice | |
| Vendor relations for Medical, Dental & Prescription | Requirement based on current practice. Must remain in benefits | Could impact how services are received by employees if vendors are not properly managed |
| Vendor Summits | Requirement based on current practice | |
| Negotiations with Vendors | Requirement based on current practice | Leads to higher spend if not monitored |

22

KEUCH000072

# Benefits

teva

| Action | Requirement | Impacts of Non-Compliance |
|---|---|---|
| Budget | Requirement based on current practice | Over spend if not monitoring the budget |
| Website – My Teva Reward | Requirement based on current practice | |
| Manage Voluntary Deductions | Not legally required but strongly recommend | |
| Process/Procedure Control for 401K | Not legally required but strongly recommend | |
| Policy Management | Requirement based on current practice. Some legal implications | Non-active management can lead to potential lawsuits |

23

KEUCH000073



# Benefits

| Action | Requirement | Impacts of Non-Compliance |
| --- | --- | --- |
| ESPP Administration | Requirement based on current practice; you can move | |
| Weekly New Hire Benefits Orientation | Requirement based on current practice but can move | |
| Weekly New Hire Benefits Orientation | Requirement based on current practice; can move | |
| Employee Recognition – STARS | Requirement based on current practice but can move | |

24

KEUCH000074

# Benefits

teva

| Action | Requirement | Impacts of Non-Compliance |
|---|---|---|
| Email in assistance | Not required | Employee disruption |
| VP Orientation | Not required | Employee disruption |
| E&J Administration | Not required | |
| Health & Wellbeing Strategy | Not required | Health & Wellbeing strategy lead to better health of employees and dependents which could lead to lower spend. Considering the challenging time we are in this is important to keep employee engaged |
| Wellbeing Champions | Not required | Health & Wellbeing strategy lead to better health of employees and dependents which could lead to lower spend |
| Wellness Program | | |
| C&B Reviews | | |

25

KEUCH000075

KEUCH000076

# Typical Compliance Changes – This is for a US City

**teva**

**December 14, 2017**

***San Francisco Increases Employer Mandate Amount for 2018***

**Important for Employers with Employees in the City of San Francisco**

Recently, the San Francisco Board of Supervisors increased the amount that employers must spend on health care in 2018 and made other changes to the Health Care Security Ordinance (HCSO). The Board of Supervisors made the following changes that impact large employers:

Increased the health care expenditure rate for "large businesses" (100 or more employees total) to $2.83 per hour (up from $2.64 in 2017), and the rate for "medium-sized businesses" (20-99 employees total) to $1.89 per hour (up from $1.76) beginning January 1, 2018; and

Released a notice that employers must post by 1/1/18.

As of January 1, 2017, all health expenditures had to be irrevocable (i.e., could not revert back to the employer) if they were to count toward the employer spending requirement under the HCSO. In addition, in October of 2017, the San Francisco Office of Labor Standards Enforcement issued new rules applying the irrevocability standard to self-insured plan expenditures.

26

KEUCH000077



Thursday, January 18, 2018 at 6:13:33 PM Eastern Standard Time

**Subject:** FW: How Can I help?
**Date:** Wednesday, January 17, 2018 at 11:24:15 AM Eastern Standard Time
**From:** Randy Keuch
**To:** Randolph Keuch (External)

Best regards,

  

**Randy Keuch**  Head of Total Rewards - Americas
Tel: 267-468-4325   Cell: 215-272-9816
Randy.Keuch@tevapharm.com    sip:Randolph.Keuch@tevapharm.com    www.tevapharm.com

---

**From:** Tal Zorman
**Sent:** Wednesday, December 20, 2017 9:40 AM
**To:** Randy Keuch
**Subject:** RE: How Can I help?

Thanks much Randy, appreciate the note.  We will be in touch after the holidays, enjoy the holiday.
Best regards, Tal

---

**From:** Randy Keuch
**Sent:** Wednesday, December 20, 2017 4:34 PM
**To:** Tal Zorman
**Subject:** How Can I help?

Hi Tal,

I am not sure how familiar you are with my background, so I have attached my CV for your review.  As Ron will be departing next week, I would like to offer my services to "fill in" for Ron to help get Teva through the next 6 months or so.  If needed to reside in Israel on a temporary basis, I can also do that.  Recognize that I held the global Total Rewards position for a large consumer goods organization – The HJ Heinz Comany – and I worked closely with senior leadership and the Compensation Committee of the board.  Not sure what your thoughts are, but wanted to share my desire to help manage Teva TR through these difficult times.

Enjoy the holiday.

Best regards,

**Randy Keuch**  Head of Total Rewards - Americas
Tel: 267-468-4325   Cell: 215-272-9816
Randy.Keuch@tevapharm.com    sip:Randolph.Keuch@tevapharm.com    www.tevapharm.com

KEUCH000079

## SEPARATION AGREEMENT AND GENERAL RELEASE

THIS SEPARATION AGREEMENT AND GENERAL RELEASE ("Agreement") is made between Randolph Keuch ("Employee") and Teva Pharmaceuticals USA, Inc. ("Teva").

WHEREAS, Employee's employment will terminate, effective as of March 18, 2018 ("Separation Date") and Employee and Teva desire to make a full and final settlement of any and all potential claims by Employee with respect to Employee's employment by and employment termination from Teva,

NOW THEREFORE, in consideration of the mutual promises contained in this Agreement and for other good and valuable consideration, the parties agree as follows:

1. <u>Termination of Employment Relationship</u>.  Employee's employment with Teva is terminated effective the Separation Date under the terms and conditions set forth in this Agreement.

2. <u>Separation Payments and Benefits</u>.  Teva will provide Employee with the following payments and benefits in consideration for:

(a) Employee's execution and non-revocation of this Agreement, and with it Employee's agreement to release all claims that can be released, as set forth in Paragraphs 5 and 6 in this Agreement, and in exchange for Employee's agreement to abide by the restrictions set forth in this Agreement, following receipt of Employee's signed copy of this Agreement and the expiration of the seven (7) day revocation period referenced in Paragraph 7(e) without revocation of this Agreement; and

(b) Employee's conformance with the requirements, terms, and conditions of the Teva Pharmaceuticals USA, Inc. Supplemental Unemployment Benefit Plan or Teva Pharmaceuticals USA, Inc. Employment Transition Plan, whichever is applicable:

(i) <u>Separation Payments</u>.  Subject to satisfaction of the two (2) conditions stated above, Employee shall receive separation payments in the aggregate totaling $71,400.00 equal to thirteen(13) weeks of gross salary "(Separation Payments"), less all applicable deductions, which shall be paid pursuant to Paragraph 2(iii) below.  All Separation Payments will be made in accordance with the terms and conditions of the Teva Pharmaceuticals USA, Inc. Supplemental

KEUCH000135

Randolph Keuch

Unemployment Benefit Plan or Teva Pharmaceuticals USA, Inc. Employment Transition Plan, whichever is applicable.

(ii) <u>Transitional Health Coverage Allowance</u>. To be eligible for this Transitional Health Coverage Allowance, Employee must be enrolled in one (1) or more of Teva's health insurance plans as of Employee's Separation Date.  Employee shall receive a Transitional Health Coverage Allowance equal to $8,250.34, less all applicable deductions, which shall be paid pursuant to Paragraph 2(iii) below.   It is the Employee's responsibility to timely elect COBRA or other coverage and pay monthly premiums.

(iii) <u>Payment Schedule</u>.   The Separation Payment and Transitional Health Coverage Allowance, as described above, totaling $79,650.34, will be aggregated and paid in seven(7) equal bi-weekly installments beginning as soon as administratively possible following receipt of Employee's signed copy of this Agreement and the expiration of the seven (7) day revocation period referenced in Paragraph 7(e) without revocation of this Agreement, and subject to Paragraph 14 below. All payments made under this Agreement are subject to applicable deductions, including without limitation federal (including the federal supplemental tax), state, and/or local taxes.

(iv) <u>Outplacement</u>.  Teva shall select an outplacement firm to provide career transition services to Employee and Teva shall be solely responsible for the fees charged by the outplacement firm for providing such services.   Employee must begin Employee's participation in such services within ninety (90) days of Employee's Separation Date.

For purposes of this paragraph, "consideration" means something of value to which Employee is not already entitled.

3. <u>Claim for State Unemployment Insurance</u>.  Employee agrees to timely apply for State Unemployment Insurance ("SUI") as required by the Teva Pharmaceuticals USA, Inc. Supplemental Unemployment Benefit Plan ("SUB Plan"), unless expressly excepted from doing so under the terms of the SUB Plan.  In exchange, Teva agrees not to dispute any claim that Employee may make for SUI to commence on or after the Separation Date; provided, Teva will make reasonable efforts to comply with all legal requirements as to providing information relating to Employee's Teva employment.   Teva agrees that it will not state or imply that

KEUCH000136

Randolph Keuch

Employee's separation was for cause.  Teva does not and cannot guarantee that Employee will receive SUI.

4. <u>Return of Teva's Property.</u>  Employee agrees to return to Teva on or before the Separation Date any items of Teva's property listed on **Exhibit "A,"** to the extent Employee has such items, as well as any other personal property of Teva in Employee's possession.  Teva shall make a good faith effort to return Employee's personal property to Employee.

5. <u>General Release and Waiver of Claims.</u>  In consideration for the payments and commitments referred to in Paragraphs 2 and 3 of this Agreement, Employee hereby releases and forever discharges Teva and all of its past and present subsidiaries, parent and related corporations, companies, joint ventures, partnerships, and divisions, and their past and present directors, trustees, officers, partners, members, managers, supervisors, employees, attorneys, and agents and their predecessors, successors and assignees (sometimes referred to collectively in this Agreement, together with Teva, as "Releasees"), from any and all legal, equitable or other claims, debts, contracts, complaints or causes of action (hereinafter referred to collectively as "Claims"), whether known or unknown, asserted or unasserted, that Employee ever had, now has or hereafter may have against Teva or any or all of the other Releasees, by reason of any cause, matter, thing or event whatsoever arising out of Employee's employment by Teva and/or Employee's separation from employment with Teva occurring at any time up to and including the date and time Employee signs this Agreement.

6. <u>Specific Release and Waiver of Claims.</u>  Employee acknowledges and agrees that the Claims being released in Paragraph 5 of this Agreement include, but are not limited to, any claim arising out of the Employee's employment by Teva which could be asserted now or in the future, whether brought individually, in a representative capacity or as a member of any class of claimants, or in a collective action, under: (i) the common law, including but not limited to theories of breach of express or implied contract or duty, tort, wrongful termination, defamation or violation of public policy; (ii) any policies, practices or procedures of Teva and/or Releasees; (iii) any federal, state and/or local statutes or regulations including but not limited to, the Employee Retirement Income Security Act of 1974, as amended, 29 U.S.C. § 1001 *et seq.*; the Americans with Disabilities Act of 1990, 42 U.S.C.§ 12101 *et. seq.*; Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*; Executive Order 11246, as amended; the Equal Pay Act, 29 U.S.C. § 206 (d) *et seq.*; the Family and Medical Leave Act, 29 U.S.C. § 2601 *et seq.*; the

KEUCH000137

Randolph Keuch

Genetic Information Non-Discrimination Act, 42 U.S.C. § 2000ff-1 *et seq.*; 42 U.S.C. § 1981; the Age Discrimination in Employment Act, 29 U.S.C. § 621 *et seq.*; the Consolidated Omnibus Budget Reconciliation Act, 29 U.S.C. § 1021 *et seq.*; the Worker Adjustment and Retraining Notification Act, 29 U.S.C. § 2101 *et seq.*; the Pennsylvania Human Relations Act, 43 P.S. § 951 *et seq.*; and/or any applicable federal, state or local laws, regulations, or ordinances; (iv) any contract of employment, express or implied; (v) any provision of the Constitution of the United States, and any applicable state constitution(s); (vi) any and all claims or actions for attorneys' fees and/or costs; (vii) any claims for unpaid or withheld wages, severance pay, bonuses, overtime, stock or stock options, commissions or other compensation, leave, reinstatement, sick pay, insurance coverage or non-vested and/or non-accrued employee benefits of any kind; and (viii) any provision of any other law, common or statutory, of the United States, or any applicable state or locality.

7. <u>Notice of Special Rights Under the ADEA.</u> In addition to the release of Teva and the other Releasees from any and all Claims arising out of Employee's employment by Teva which arose up to and including the date of this Agreement, Employee further acknowledges with respect to the release of Claims under the Age Discrimination in Employment Act, 29 U.S.C. § 621 *et seq.* ("ADEA") (to the extent that Employee may have any Claims under the ADEA based upon Employee's age) that:

(a) Employee waives these Claims knowingly and voluntarily in exchange for severance and other benefits which are of value, and that Employee would not otherwise have been entitled to receive;

(b) Employee is hereby advised in writing by Releasees to consult with an attorney in connection with this Agreement;

(c) Employee hereby acknowledges that this waiver does not apply to any rights or Claims that may arise in the future.

(d) Employee has been given information regarding the job titles and ages of all individuals eligible or selected to receive benefits under this Reduction in Force Program ("Program") at this time and the ages of all individuals in the organizational unit who are not eligible for benefits at this time, such information being attached as **Exhibit "C;"**

KEUCH000138

Randolph Keuch

(e) Employee has been given a period of Forty-Five (45) days within which to consider this Release but understands that Employee need not consider this Agreement for that full period before signing it;

(f) Employee understands that Employee may revoke this waiver of Claims under the ADEA for a period of seven (7) days following the date Employee signs this Agreement and that Employee's waiver of ADEA Claims will not become effective until the revocation period has expired;

(g) If Employee wishes to revoke the waiver of Claims under the ADEA, that revocation shall be made by forwarding the document attached as **Exhibit "B"** to Teva Pharmaceuticals USA, Inc., attn: Elaine McGee, Human Resources Department, 1070 Horsham Road, North Wales, PA 19454, no later than the close of business on the seventh (7th) day following the date on which Employee has signed this Agreement; and

(h) If Employee timely revokes the waiver of ADEA Claims in accordance with the above Paragraph 7(g), Employee will no longer be eligible for the payments and Teva commitments referred to in Paragraphs 2 and 3 of this Agreement, but such revocation will not be effective with respect to Employee's release of all other Claims covered by this Agreement and shall remain subject to all other commitments set forth in this Agreement. The other Claims covered under this Agreement and any consideration Employee received prior to Employee's revocation is valid and adequate consideration with respect to the remainder of this Agreement and Employee's waiver of such other Claims.

(i) This Agreement complies in all respects with Section 7(f) of the ADEA, that is, the waiver provisions of the Older Worker Benefit Protection Act.

8. <u>Non-Released Claims</u>. The General Release and Waiver of Claims set forth above in Paragraph 5 and the Specific Release and Waiver of Claims set forth in Paragraph 6 above below do <u>not</u> apply to:

(a) Any Claims for vested benefits under Teva's 401(k) plan;

(b) Any Claims to require Teva to honor its commitments set forth in this Agreement;

KEUCH000139

Randolph Keuch

(c) Any Claims to interpret or to determine the scope, meaning, or effect of this Agreement;

(d) Any Claims arising out of any conduct, matter, event, or omission existing or occurring after Employee signed this Agreement; and

(e) Any Claims that may not be waived pursuant to applicable law.

9. <u>Successors</u>.  This Agreement is for the benefit of and is binding upon Employee and Employee's heirs, administrators, representatives, executors, successors, beneficiaries and assigns, and is also for the benefit of the Releasees and their successors and assigns.

10. <u>Effective Date</u>.  This Agreement will be effective when Employee signs and returns it to Teva Pharmaceuticals USA's Human Resources Department, except as otherwise provided in Paragraph 7(g) above.

11. <u>Violation</u>.  If Employee violates Paragraphs 12 or 13 of this Agreement (except as regards to any Claims under the ADEA), Releasees, unless prohibited by applicable law or regulation, will be entitled to the immediate repayment to it of all payments and the cost of all benefits provided to Employee under this Agreement and may discontinue any unpaid payments and benefits.  Should Employee fail to make such repayment, Employee will be deemed conclusively to be bound by the terms of this Agreement and waives any right to seek to overturn or avoid it.  Employee agrees that this repayment will not invalidate this Agreement.

12. <u>Complaints and Whistleblower Claims</u>.

(a) <u>Protected Class Claims of Harassment, Discrimination, and/or Retaliation</u>. Employee represents and warrants that neither Employee nor anyone acting on Employee's behalf has filed any complaint against Teva or any other Releasees with any local, state, or federal court or any other governmental or regulatory body.  Employee acknowledges that neither Employee nor anyone acting on Employee's behalf has to date filed any charge or complaint with the Equal Employment Opportunity Commission or any local or state agency authorized to investigate charge or complaints of unlawful employment discrimination, harassment, and/or retaliation (together, "Agency").  Employee understands that nothing in this Agreement bars Employee or anyone acting on Employee's behalf from filing a charge or complaint of unlawful employment discrimination, harassment, and/or discrimination with an Agency, or assisting in an investigation

KEUCH000140

of a charge or complaint of such unlawful conduct by an Agency. However, if any Agency or court has now assumed or later assumes jurisdiction of any complaint or charge on Employee's behalf against any Releasees, Employee will disclaim entitlement to any relief.

(b)  <u>Whistleblower Claims.</u>  Nothing in this Agreement prohibits Employee from reporting possible violations of United States federal law or regulation to any governmental agency or entity, including but not limited to, the United States Department of Justice, the United States Securities and Exchange Commission, the United States Congress, and any Inspector General of any United States federal agency, or making other disclosures that are protected under the whistleblower provisions of United States federal, state, and/or local law or regulation; provided, that Employee will use his or her reasonable best efforts to (1) disclose only information that is reasonably related to such possible violations or that is requested by such agency or entity, and (2) request that such agency or entity treat such information as confidential. Employee does not need the prior authorization from the Company to make any such reports or disclosures and is not required to notify the Company that Employee has made such reports or disclosures. This Agreement does not limit Employee's right to receive an award for information provided to any governmental agency or entity within the scope of this Paragraph 12(b).

13. <u>Proprietary Information; Trade Secrets; Non-Solicitation; Non-Disparagement; Cooperation; and Non-Interference.</u>

(a) <u>Proprietary Information.</u> Employee agrees and acknowledges that, during Employee's Teva employment Employee acquired and was privy to confidential information, trade secrets, confidential processes and confidential "know-how" relating to, or concerned with, the past, present, or future business, finances, manufacturing, operations, services, customers, suppliers, sources of leads and methods of obtaining new business, methods of pricing, systems, processes, methods, products, discoveries, designs, inventions, manufacturing, marketing and sales techniques and policies of Teva and the Releasees ("Proprietary Information"). Employee further agrees and acknowledges that during the performance of Employee's duties, Employee had access and was privy to confidential or Proprietary Information belonging to third parties which is subject to a duty to Teva or Releasees to maintain the confidentiality of such information and to use such information only for certain limited purposes ("Third Party Information"). Employee agrees that Employee will not, unless required by court order, judgment or decree, directly or indirectly use, divulge, furnish or make accessible any Proprietary Information or

KEUCH000141

Randolph Keuch

Third Party Information to any other person or entity.  This condition shall not prevent Employee from using or divulging Proprietary Information or Third Party Information that is now in the public domain or hereafter becomes part of the public domain.   This provision survives the termination of this Agreement. Employee further agrees and acknowledges that the Proprietary Information is a unique asset of great value to Teva, and therefore Employee agrees that the restriction imposed herein is reasonable and necessary for the protection of the goodwill of Teva and not unduly restrictive of Employee's rights.  Employee further agrees and acknowledges that the any confidential information  or other similar agreement signed by Employee continues to be in effect and that Employee will comply with said agreement.

(b)  Trade Secrets:

(i)  Notwithstanding  any  provisions  of  this  Agreement  or  Employee Confidential Information Agreement, Employee acknowledges that Teva has advised Employee regarding potential immunity under the Defend Trade Secrets Act for disclosing a trade secret under limited circumstances, as set forth in Teva's Confidential Information Policy.

(ii)  Notwithstanding  any  provisions  of  this  Agreement  or  the  Employee Confidential Information Agreement signed by Employee, Employee further acknowledges that if Employee files a lawsuit for retaliation by Teva for reporting a suspected violation of the law, under limited circumstances Employee may disclose Teva's trade secrets to Employee's attorney and use the trade secret information in related court proceedings if Employee: (A) files any document containing the trade secret under seal; and (B) do not disclose the trade secret, except pursuant to court order.

(c)  Non-solicitation.  Employee agrees and covenants that, for twelve (12) months after the date of this Agreement, Employee will not directly or indirectly try to solicit or entice any individual who is, at that time, an employee of Teva or of any affiliate of Teva, which Employee knows to be such an affiliate, to leave employment with Teva or such affiliate.

(d)  Non-disparagement.  Employee agrees not to engage in any deprecating conduct and/or make any negative comments or disparaging remarks, in writing, orally, or electronically, about Teva or any other Releasee and their respective officers, directors, employees, and agents and their respective products and services, to the media or any entity or individual.  Nothing in this Agreement  shall  be  interpreted  to  restrict  Employee's  right  and/or  obligation  to  (A)  testify

KEUCH000142

Randolph Keuch

truthfully in any forum or (B) contact, provide information to, and/or cooperate fully in any investigation by a government agency.

(e) <u>Cooperation</u>.

(i) Employee agrees to cooperate with Teva in connection with any ongoing administrative, regulatory, or litigation proceedings or such like matters that may arise in the future, about which Employee may have personal knowledge and/or subject matter expertise because of employment with Teva.   Such cooperation will include being interviewed by representatives of Teva and participating in legal proceedings by deposition or testimony.   Teva will reimburse Employee for reasonable expenses incurred by Employee by reason of such cooperation.

(ii) Employee agrees that if served with an order, subpoena, or any other document which purports to potentially require the disclosure of any information relating to Employee's employment with or separation from employment with Teva, this Agreement, and/or any matter otherwise protected from disclosure under this Agreement including confidential and/or proprietary information which Employee acquired in the course of Employee's employment with Teva and which is not generally known by or readily accessible to the public, within three (3) business days of such service, Employee shall so inform Teva and deliver to Teva a copy thereof.  Notice to Teva and a copy of the subpoena, order or other document shall be sent via facsimile and certified mail to the persons identified in Paragraph 18 of this Agreement.

(f) <u>Non-interference</u>.   Subject to paragraphs 8 and 12 of this Agreement, Employee agrees not to visit any Teva facility, premises, or event unless first obtaining written approval from Teva and further agrees to permit Teva, and its officers, employees, agents, and partners, to continue Teva's day-to-day business without unnecessary and/or unreasonable disruption.

14. <u>Waiver of Employment or Re-Employment & Re-Employment Generally</u>.   Employee acknowledges that Employee has no right to employment or re-employment with Teva or any of the other Releasees, and, other than with respect to other rights and benefits specifically reserved in this Agreement, Employee has no right to participate in any of Teva's benefit plans which Employee ever had, may now have, or may hereinafter have, whether known or unknown to Employee at the time of the execution of this Agreement.   In the event Employee seeks

KEUCH000143

Randolph Keuch

employment or re-employment with Teva or any parent, subsidiary, related or affiliated company, Teva and any parent, subsidiary, related or affiliated company are not obligated to employ or re-employ Employee. However, if Employee is hired or re-hired by Teva and/or its affiliates while receiving payments under the Payments Schedule set forth in Paragraph 2(iii), Employee's Separation Payment stop as of the Employee's new hire or re-hire date consistent with this Paragraph 14.

15. <u>Breach; Legal Capacity; No Coercion</u>.  In the event any party shall be found by a court of competent jurisdiction to have breached this Agreement, the other party shall be entitled to damages, including reasonable attorneys' fees and costs of suit, and shall also return all monetary consideration exchanged hereunder. However, nothing in this Paragraph 15 shall be considered or interpreted to be a requirement that Employee return any payments or reimburse Teva for the cost of any benefits received under this Agreement before filing a lawsuit or a charge of discrimination with an Agency. The parties further state that they are signing this Agreement completely, willingly and voluntarily and that there are no medical or other conditions that would prevent them from doing so. Neither party has subjected the other party to any coercion or duress, and has done nothing to force the other party to sign this Agreement.

16. <u>No Admission</u>.  This Agreement shall not in any way be construed as an admission by Teva that it has acted wrongfully with respect to Employee or any other person, or that Employee has any rights or claims whatsoever against Teva or any of the other Releasees through the date that Employee signed this Agreement, and Teva specifically disclaims any liability with regard to any wrongful acts against Employee or any other person, on the part of itself, its employees or its agents.

17. <u>Confidentiality of this Agreement.</u>   <u>Confidentiality of this Agreement.</u>   <u>Employee</u> shall not disclose the existence of this Agreement or any information contained <u>in this Agreement</u> without prior written consent of Teva, except as required by law, or as necessary to implement this Agreement. Employee agrees not to discuss either the existence of or any aspect of this Agreement with any employee or ex-employee of Releasees, or any other third parties without Releasees' or their successors' or assigns' prior written authorization. Notwithstanding the above, <u>Employee</u> may disclose this Agreement to Employee's attorneys, health care providers, financial advisers and tax advisers advising <u>Employee</u> and to members of

KEUCH000144

Randolph Keuch

Employee's immediate family, provided such persons agree to keep such information confidential and comply with the terms of this Paragraph.

18. Notices. All notices, requests, demands and other communications required or permitted under this Agreement or necessary or convenient in connection with this Agreement shall be in writing and marked confidential. Any such notice and other communication under this Agreement shall be deemed to have been duly given if delivered by hand or deemed to have been duly given on the third business day following the mailing within the continental United States by first class mail, postage prepaid, addressed as follows:

> Teva Pharmaceuticals USA, Inc.
> Human Resources Department
> 1070 Horsham Road
> North Wales, PA  19454
> Attention:  Elaine McGee, Associate Director, HR
> Facsimile:  215.795.4056
> E-mail:  NA_HR_Compliance@tevapharm.com

19. Governing Law.  This Agreement and any disputes arising thereunder shall be governed by and construed and enforced in accordance with the laws of the Commonwealth of Pennsylvania, both substantive and remedial, without regard to conflicts of laws principles.

20. Acknowledgements.

(a)  Employee represents that Employee has carefully read and fully understands all the provisions of this Agreement, is entering into this Agreement voluntarily, and that Teva advised Employee in writing, by giving Employee a draft of this Agreement for Employee's review and consideration, to consult with an attorney of Employee's choice and at Employee's expense before signing this Agreement.

(b)  Employee agrees and acknowledges that, by accepting benefits under this Agreement and signing this Agreement, Employee is giving up any right Employee might have to bring a Claim against Teva or any of the other Releasees arising from or in any way related to Employee's employment relationship or the termination of such employment relationship. Employee also agrees and acknowledges that Employee would not receive benefits under this Agreement if Employee did not knowingly and voluntarily enter into this Agreement.

KEUCH000145

Randolph Keuch

(c) Employee agrees and understands that should Employee sign this Agreement before Employee's Separation Date that (i) this Agreement will be null, void, and unenforceable and (ii) Teva will provide to Employee an unexecuted copy of this Agreement for Employee's signature no sooner than Employee's Separation Date.

21. <u>Entire Agreement</u>.   This Agreement represents the entire Agreement between the parties and supersedes any and all prior oral and written agreements between Teva and Employee, except for the Employee Confidential Information Agreement.   No variations or modifications of this Agreement shall be deemed valid unless reduced to writing and signed by both parties.

22. <u>Interpretation of Agreement</u>.  Nothing in this Agreement is intended to violate any law or shall be interpreted to violate any law.  If any paragraph or part or subpart of any paragraph in this Agreement or the application thereof is construed to be overbroad and/or unenforceable, then the court making such determination shall have the authority to narrow the paragraph or part or subpart of the paragraph as necessary to make it enforceable and the paragraph or part or subpart of the paragraph shall then be enforceable in its/their narrowed form.  Moreover, each paragraph or part or subpart of each paragraph in this Agreement is independent of and severable (separate) from each other.  In the event that any paragraph or part or subpart of any paragraph in this Agreement is determined to be legally invalid or unenforceable by a court and is not modified by a court to be enforceable, the affected paragraph or part or subpart of such paragraph shall be stricken from the Agreement, and the remaining paragraphs or parts or subparts of such paragraphs of this Agreement shall remain in full, force and effect.

23. <u>Facsimile/Electronic Signatures/Counterparts</u>.   This Agreement may be signed in counterparts, each of which will be deemed to be an original of this Agreement.   Any party to this Agreement may deliver a signed copy of this Agreement by facsimile or electronic transmission to any other party and any such delivery shall have the same force and effect as any other delivery of a manually signed copy of this Agreement.

KEUCH000146

Randolph Keuch

EMPLOYEE ACKNOWLEDGES THAT EMPLOYEE HAS READ THIS AGREEMENT AND THAT EMPLOYEE FULLY KNOWS, UNDERSTANDS AND APPRECIATES THE CONTENTS OF THIS AGREEMENT AND THAT EMPLOYEE SIGNS THE SAME AND MAKES THE SETTLEMENT PROVIDED FOR IN THIS AGREEMENT VOLUNTARILY AND OF EMPLOYEE'S FREE WILL.

IN WITNESS WHEREOF, and intending to be legally bound, Employee and Teva have signed this Separation Agreement and General Release on the dates indicated below.

_____
Date

_____
Employee Signature

_____
Employee Printed Name (Global ID#: 929502)

_____
Date

Teva Pharmaceuticals USA, Inc.

_____
Authorized Human Resources Signature

Director, HR Shared Services - Americas
_____
Printed Name and Title

| **LEGAL/HR O&S ONLY:** |
| --- |
| Initial:_____ |Date:_____ |

## EXHIBIT "A"

### ALL PERSONNEL

Credit cards, telephone cards and purchase cards in Employee's name
Keys to the office, buildings, desks and filing cabinets
All Teva files and documents or copies thereof
All keys to any Company car and related documents
All Product Samples
Leather Demo Case (with Contents)
All files (including business cards)
Phone Calling Card
Pager
Auto Insurance Forms
Car Rental Card
Car Keys and Car
Car Maintenance Book
Car Insurance Card/ Owners Card

### NON-FIELD PERSONNEL COMPUTER EQUIPMENT

Laptop/Desktops, docking station(s), and all peripherals
Mobile device (iPhone, Blackberry)
Mobile Tablet device (Apple iPads)

### FIELD PERSONNEL COMPUTER EQUIPMENT

Laptop Computer
iPad
Ultrabase, DVD drive, ultrabase keys
AC Adapter
JAMBOX Speaker with carry case and cables. (if applicable)
Projector with carry case and cables.  (if applicable)
Auto Adapter
Verizon Wireless Modem (if applicable)
Corp Phone & Charger (if applicable)
External Hard Drive (if applicable)
Monitor

KEUCH000148

Randolph Keuch

## EXHIBIT "B"

### Waiver and Release Revocation

NOTE: DO <u>NOT</u> SIGN OR RETURN THIS DOCUMENT UNLESS YOU HAVE SIGNED THE SEPARATION AGREEMENT AND GENERAL RELEASE LESS THAN SEVEN (7) DAYS AGO AND NOW WISH TO CHANGE YOUR MIND AND REVOKE YOUR EARLIER AGREEMENT TO THE WAIVER AND RELEASE OF CLAIMS UNDER THE AGE DISCRIMINATION IN EMPLOYMENT ACT.

I, _____, hereby revoke the Separation Agreement and General Release ("Agreement") which I signed on _____, 20__, to the extent that I waived and released any "Claims" (as that term is defined in the Agreement) under the Age Discrimination in Employment Act I might have against the "Releasees" (as that term is defined in the Agreement).


_____
(Signature of Employee)


_____
Date


_____
Witness


_____
Date


IN ORDER TO BE EFFECTIVE YOU MUST SIGN THIS REVOCATION FORM NO LATER THAN SEVEN DAYS AFTER YOU SIGNED THE SEPARATION AGREEMENT AND GENERAL RELEASE.

Received on _____, 20__ by Teva Human Resources Department by

_____ Teva Representative Signature

KEUCH000149

Randolph  Keuch

# EXHIBIT "C"

KEUCH000150

Randolph Keuch

## EXHIBIT "C"

## INFORMATION MADE AVAILABLE PURSUANT TO THE
## OLDER WORKER BENEFIT PROTECTION ACT OF 1990

The following information is provided in accordance with the Older Worker Benefit Protection Act of 1990 to permit affected employees age forty (40) and older to evaluate whether to execute a Separation Agreement and General Release in return for the receipt of a severance payment and benefits.

(A)     For purposes of this Exhibit "C," the Decisional Unit consists of the entire Global HR Department of Teva Pharmaceuticals USA, Inc.

(B)     The eligibility factors for this program are (1) whether the employee's individual position is unnecessary at this time for on-going operations; (2) whether the employee's individual's position is at a site that is slated to close; or (3) whether an individual position's occupant is performing below expectations.

(C)     Each employee who is being laid off because his or her position is not necessary at this time for on-going operations or because of a site closure are eligible for the severance payment and benefits set forth in paragraph 2 of his or her Separation Agreement and General Release.  However, to receive the severance payment and benefits, the employee must sign the Separation Agreement and General Release and return it to Elaine McGee, Human Resources Department, Teva Pharmaceuticals USA, Inc., 1070 Horsham Road, North Wales, PA 19454 no later than forty-five (45) days after receiving the Separation Agreement and General Release. Once the signed Separation Agreement and General Release is returned to Teva, an employee has seven (7) days to revoke it.

(D)     The following is a listing of the ages and job titles of employees in the Decisional Unit who were selected for lay off and the offer of a separation payment and benefits as set forth in paragraph 2 of their Separation Agreement and General Release:

| Job Title | Age | Selected |
|---|---|---|
| Sr Mgr Human Resources | 60 | Y |
| HR Specialist | 60 | Y |
| MD Recruiter | 58 | Y |
| Sr Mgr Mobility US | 57 | Y |
| Mgr Human Resources | 57 | Y |
| Global LMS Specialist | 57 | Y |
| Benefits Analyst | 57 | Y |
| Sr Dir Human Resources | 55 | Y |
| Manager of Talent Acquisition LATAM | 55 | Y |

KEUCH000159

Randolph Keuch

| Job Title | Age | Selected |
|-----------|-----|----------|
| Mgr Human Resources | 55 | Y |
| Sr Dir Global Mobility | 54 | Y |
| Sr Dir HRBP NA GSM | 54 | Y |
| Sr Executive Assistant | 54 | Y |
| Sr Mgr Talent Acquisition, R&D | 54 | Y |
| Manager, Compensation | 54 | Y |
| Sr Dir TGO Latam Region HRBP | 53 | Y |
| Director, Leadership & Development Business Partner | 53 | Y |
| Talent Acquisition Mgr | 53 | Y |
| Dir HR Program Management | 53 | Y |
| Sr Dir Human Resources | 52 | Y |
| Sr Dir Human Resources | 52 | Y |
| Dir Leadship & Dev LatAm | 52 | Y |
| HR Generalist | 52 | Y |
| Head of HR - Latin America | 51 | Y |
| Dir HR Ops & Services, LatAm | 51 | Y |
| Senior Director, Talent Acquisition - Americas | 48 | Y |
| Sr Dir Human Resources Operations & Services | 48 | Y |
| Mgr Talent Acquisition | 45 | Y |
| Senior Talent Acquisition Partner | 44 | Y |
| L&D Coordinator | 44 | Y |
| HR Manager | 44 | Y |
| HR Shared Services Supervisor | 44 | Y |
| Senior Talent Acquisition Partner | 42 | Y |
| HR Customer Service Representative | 42 | Y |
| Dir Leadership & Development | 39 | Y |
| Senior HR Generalist | 37 | Y |

KEUCH000160

Randolph Keuch

| Job Title | Age | Selected |
|---|---|---|
| HR Data Governance Analyst | 36 | Y |
| HR Customer Service Representative | 36 | Y |
| HR Global Analytics | 35 | Y |
| HR Manager | 35 | Y |
| Mgr Benefits | 34 | Y |
| Mgr Benefits | 34 | Y |
| HR Services Specialist | 34 | Y |
| HR Coordinator | 33 | Y |
| HR Shared Services Team Leader | 33 | Y |
| HR Shared Services Rep | 33 | Y |
| Senior Manager, L&D | 33 | Y |
| HR Shared Services Rep | 32 | Y |
| HR Customer Service Rep | 31 | Y |
| HR Generalist I | 31 | Y |
| HR Customer Service Representative | 31 | Y |
| Analyst - HR Operations and Services | 30 | Y |
| HR Shared Services Rep | 30 | Y |
| HR Services Specialist | 29 | Y |
| HR Customer Service Representative | 29 | Y |
| HR Customer Service Representative | 29 | Y |
| Recruiting Coordinator | 27 | Y |

(E)     The following is a listing of job titles and ages of the employees in the Decisional Unit who are not being laid off and who are not eligible for separation benefits:

| Job Title | Age | Not Selected |
|---|---|---|
| Assoc Dir HR Ops & Services | 58 | N |
| Sr Mgr Human Resources | 58 | N |
| Benefits Analyst | 57 | N |

KEUCH000161

Randolph Keuch

| Job Title | Age | Not Selected |
|---|---|---|
| SVP HRBP - GGM | 55 | N |
| Sr Mgr Human Resources | 55 | N |
| Associate Director, HR | 54 | N |
| Sr Dir HR Planning & Economics | 54 | N |
| Associate Director, Human Resources | 54 | N |
| Dir Talent Acquisition & Mobility | 53 | N |
| Sr Dir HR R&D | 53 | N |
| Associate Director, Global Talent Acquisition | 53 | N |
| Senior Director, Regional HRBP - TGO | 52 | N |
| HR Services Specialist | 52 | N |
| Director, HR Program Management | 51 | N |
| Sr Dir Leadership & Development II | 51 | N |
| Dir Exec Recruit & Emp Brndng | 51 | N |
| VP HR TGO Global Units | 51 | N |
| Mgr Human Resources | 51 | N |
| Assoc Dir Human Resources | 48 | N |
| Senior HR Generalist | 48 | N |
| Senior Manager, Human Resources | 45 | N |
| Vice President, HR BP TGO Americas | 42 | N |
| Director, HR Site Lead | 42 | N |
| Associate Director, Human Resources | 39 | N |
| HR Services Analyst | 39 | N |
| Mgr Compensation | 39 | N |
| HR Shared Services Rep | 39 | N |
| Sr Mgr HR (Small) | 38 | N |
| Dir Total Rewards, LatAm | 38 | N |
| Mgr Talent Acquisition | 38 | N |
| Mgr Human Resources | 38 | N |

KEUCH000162

Randolph Keuch

| Job Title | Age | Not Selected |
|---|---|---|
| Mgr, HR Planning & Economics | 37 | N |
| Mgr Talent Acquisition | 35 | N |
| HR Generalist | 35 | N |
| HR Shared Services Rep | 35 | N |
| HR Data Governance Analyst | 34 | N |
| Benefits Analyst | 34 | N |
| Mgr Employee Relations | 33 | N |
| HR Manager | 33 | N |
| HR Shared Services Supervisor | 32 | N |
| Sr Mgr HR Shared Services | 31 | N |
| Mgr HR Data Governance – Europe & Americas | 30 | N |
| Analyst - HR Operations and Services | 30 | N |
| HR Data Governance Analyst | 29 | N |
| HR Services Specialist | 26 | N |
| HR Shared Services Rep | 25 | N |

KEUCH000163

**TEVA** Pharmaceuticals

**Separation Notification and Benefits Summary**

January 9, 2018

Global ID: 929502
Randy Keuch ("Employee")
111 Rose Lane
Chalfont, Pennsylvania 18914

This letter confirms that your employment with Teva Pharmaceuticals USA, Inc. and/or its affiliates ("Teva or "Company") will be terminated effective March 18, 2018 ("Separation Date"). Your targeted last day worked will be February 23, 2018, and you will remain an active employee through your Separation Date.

Teva currently anticipates that you will be entitled to Separation Pay, a Transitional Health Coverage Allowance, and Outplacement Services upon separation from the Company, provided that you satisfy certain criteria that are summarized briefly in this letter and are explained in detail in the Separation Agreement and General Release ("Agreement") that the Company will give to you on a later date. To qualify for these benefits, you must remain an employee in good standing through your Separation Date and timely execute and not revoke a Separation Agreement and General Release ("Agreement"). If you satisfy these conditions, your severance payment, totaling $71,400.00 (less applicable taxes, offsets and withholdings), equal to thirteen (13) weeks of gross salary, will commence following the expiration of the revocation period described in the Agreement and on the condition that you have not exercised your right to revoke the Agreement. Please note this amount will be offset by unemployment benefits received, as applicable, with further details to be provided closer to your Separation Date. In the event anything in this notice differs from the terms of your Agreement, the terms of your Agreement are controlling and supersede this notice.

Should you leave Teva voluntarily or be terminated for cause prior to your Separation Date, you will not be eligible to receive severance pay benefits.

**SEVERANCE DISBURSEMENT PAYMENTS**
The Separation Payment described above will commence one to two pay periods following the return of your signed Separation Agreement and General Release, provided that you do not timely revoke the Agreement. This payment will be subject to the withholding of appropriate Federal, State, and local taxes as well as offset by any state unemployment benefits. The Company will withhold taxes as required, and the above payments will be taxed as supplemental wages subject to flat-rate withholding (not taking into account any exemptions).

Severance Disbursement is calculated based on your weeks of severance divided by two, and rounded up to the nearest integer. For example, someone who has 13 weeks of severance will receive seven (7) bi-weekly severance payments, provided they have timely signed, and have not revoked their Severance Agreement and General Release. More information can be found in the Separation FAQ provided.

**TRANSITIONAL HEALTH CARE ALLOWANCE:**
Teva will pay Employee a Transitional Health Care Allowance which shall be calculated based on the monthly rates for COBRA continuation coverage in each of the Teva employee welfare plans Employee was a participant in, as of the Separation Date. The Transitional Health Care Allowance shall be paid for the period of time Employee receives Separation Payments, up to a maximum of 6 months. After your employment with Teva ends, you will receive a COBRA package with enrollment instructions and insurance coverage rates. To elect COBRA coverage, you must timely elect and pay for coverage as instructed.

**OUTPLACEMENT SERVICES:**
You are eligible to participate in a three (3) Month Program provided by Lee Hecht Harrison. Information regarding these services is included in the materials provided. You may also find more information online at www.lhh.com/career-transition/register.aspx or by calling Lee Hecht Harrison at 888-279-7329.

Randy Keuch
Page 2

**FINAL PAY CHECKS:**
Your last regular paycheck will be paid during the payroll cycle that follows your Separation Date, or earlier if required by state law. This payment will be subject to all applicable tax withholdings and all standard deductions that you have elected as an active employee (i.e. 401(k) elections, FSA elections, etc.) Attached you will find a Direct Deposit form. Should your account information change while you are receiving bi-weekly severance payments it is critical you complete the form and send to our Payroll Department.

**EMPLOYEE ASSISTANCE PROGRAM (EAP):**
If you have any concerns or problems with which you need assistance, you may contact the Employee Assistance Program during your severance period at 866-513-7249 or via the web at www.mylifevalues.com; Username: Teva Password: EAP

**CHANGE OF ADDRESS:**
If your mailing address changes during the year, please notify Teva's HR Department at AskHR@tevapharm.com. Failure to do so may delay any income tax or other documents which are delivered to you at a later date

**CHANGE OF DIRECT DEPOSIT:**
In the attached materials you will find a Direct Deposit Form. Should your account information change while you are still receiving severance disbursement payments, please send the following form to AskHR@tevapharm.com

**Administrative Offices:**
1090 Horsham Road, P.O. Box 1090, North Wales, PA 19454-1090

KEUCH000184



## DEPARTING EMPLOYEE DOCUMENT RETENTION CHECKLIST

Dear Departing Employee:

As you prepare to leave the Company, Teva Legal would like to remind you of your ongoing record management obligations pursuant to Teva's Code of Conduct, record retention policies and/or schedules, as well as applicable law. Moreover, if you are subject to any litigation hold notices (sometimes referred to as "Do Not Destroy" Notices), please note that your obligations under those notices (to maintain and not destroy and/or delete relevant documents) survive beyond your tenure with the Company. Thus, you must continue to preserve relevant documents – to the extent they remain in your possession or control – even after you have left the company. The checklist below was prepared to help you exercise your record retention obligations responsibly **and to ensure you remain an employee in good standing through your Separation Date (and thus fully eligible to receive your severance benefits).**

Thus, before you leave the Company, please re-familiarize yourself with any applicable record retention requirements (including whether you are subject to active litigation holds). And please ensure that your documents, devices and/or electronic communications (including but not limited to emails, electronic documents, hard copy documents, computers, phones, text messages and tablets) are preserved and maintained (including notifying your supervisors and/or Human Resources ("HR") as to where such documents exist. Please do not delete and/or destroy any applicable documents or information.

If you have any questions regarding your retention and preservation obligations, please contact your manager, AskHR@tevapharm.com or your HR Representative. If you reach out to Ask HR, please note your question is related to "legal document retention" in the email subject line to ensure prompt assistance.

Thank you in advance for your full cooperation in filling out and returning the checklist below as soon as possible. We wish you the best in your future endeavors.

Best regards,
Teva Legal Management

**PLEASE FILL OUT THE FORM BELOW, INCLUDING PROVIDING THE REQUESTED PERSONAL CONTACT INFORMATION. ONCE ALL ANSWERS ARE COMPLETED, PLEASE DETACH AND RETURN IN THE ENVELOPE PROVIDED ALONG WITH YOUR EXECUTED SEPARATION AGREEMENT AND GENERAL RELEASE.**

Departing Employee Name (please print): _Randolph W Keuch_

Title: _Head of Total Rewards, Americas_

Manager: _Tal Zorman_

Home Address: _111 Rose Ln , Chalfont PA 18914_

Personal phone number (do not provide Teva contact info): _412-225-8000_

Personal Email (do not provide Teva email): _Randy.Keuch@gmail.com_

Please provide password information for all Company controlled devices:

iPhone (both login and iTunes passwords): _Fired 1_          iPad: _____

Laptop: _Fired 123_          Others: _____

**Please check and sign if applicable.**

☑ I hereby certify that I understand and will comply with all applicable record retention requirements as set forth in Teva's Policies, its Code of Conduct and applicable law. To the extent I am subject to a litigation hold notice, I understand that my obligations to preserve relevant documents survive beyond my employment at Teva (and/or its affiliates), and I will respect all preservation requirements accordingly. By checking the box above, I certify that I have ~~discussed maintaining such documents as applicable with my HR manager and/or supervisor and~~ returned all Company owned equipment and data.

_[signature]_          _2/22/2018_

Departing Employee Signature          Date

KEUCH000251

*IT Equipment Return Inventory for Internal Employees*        te٧a | Global IT Operations

**Employee Name:** _Randolph W Keuch_

**Employee Office/Cubicle Location:** _Nwt - Conference Center_

**All Teva-issued equipment must be returned on your last day of work.**
1. Complete the below "IT Equipment Return Inventory" by providing the asset tag number or serial number for each piece of equipment assigned to you, as available.
2. Reference your email from IT for instructions on how to return your IT equipment.

**Mobile phone and iPad users:**
1. Please provide your device passcode:
   Mobile Phone Passcode: _Fired 1_        Ipad Passcode: _____
2. Apple /iTunes ID and password : _____
3. Do you want to retain your Teva mobile number? Yes _____ No _X_
   If yes, list your Teva mobile number: _____

**IT Equipment Return Inventory Instructions:**
1. List appropriate identifying information for each Teva asset assigned to you.
2. Place "N/A" for anything listed that you were not assigned.
3. Follow your specific asset return process instructions.

| Asset | Asset Tag/Serial #/Phone # | Password | Reason Not Returned | Received (IT Only) |
|---|---|---|---|---|
| Desktop | | | | |
| Laptop | 27454 | Fired123 | | |
| Monitor | | | | |
| Monitor | | | | |
| Docking Station | B7303 | — | | |
| iPad | | | | |
| iPhone | 215-272-9816 | Fired1 | | |
| Accessories | Headset | | | |
| Teva Badge | | | | |
| Car Transponder | | | | |

My signature confirms all items recorded above have been returned.

_Randy Keuch_        _Randy, Keuch_        _2/22/2018_
**Employee's Signature**        **Print Name**        **Date**

_____
**Local Site Contact**        **Name**        **Phone/email**

For additional assistance, please contact Carlyn.Vickers@tevapharm.com.

v.1/10/18

KEUCH000252

Feel free to use my personal email for follow up: lesleybillow@gmail.com. I still monitor the BMS email but I'm actively transitioning out so I'm not working there daily anymore.

Have a great weekend!

Lesley

Sent from my iPhone. Please excuse any typos or errors.

> On Nov 13, 2019, at 8:03 AM, Randolph Keuch<randy.keuch@gmail.com> wrote:
>
> [Use CAUTION when opening links/attachments]
> Hi Lesley,
>
> I hope this note finds you well.  You may recall that about a year ago, I left Teva Pharmaceuticals and started my consulting practice.  I am thrilled to be following up with you and letting you know that I am truly having fun leading The Total Rewards Consulting Group (TTRCG).
>
> Over my years with Pfizer, Heinz and Teva, I led teams and projects in multiple areas including: Rewards, Compensation, Benefits and HR.
>
> Throughout my career, I have come to know the best and the brightest partner resources in a number of disciplines including: Healthcare Cost Containment, Dental, Life, Disability, Benefits Administration, Wellbeing and Essential Benefits aka Voluntary Benefits.
>
> One of my Trusted Advisor resources is Jim Turner, copied here, a SVP with Tompkins (one o0f the 100 largest brokers in the country).  Jim and his team helped me successfully implement multiple new and enhanced solutions for various rewards programs at Teva, including: Group Personal Excess, Wellbeing and Essential Benefits.
>
> The goal of my practice is to combine my experience with the expertise of Tompkins, to benefit businesses such as BMS.  The impact being a higher level of service, support

4

KEUCH000388

*and advice, resulting in a stronger bottom line through greater efficiencies and reductions in expenses. The strategies I have developed and implemented have earned national recognition while creating win-win results for both employers and employees.*

*Jim and I would be delighted to meet with you and your colleagues to understand the current challenges you are facing and share TTRCG's unique value proposition when combined with the resources of Tompkins. I believe you will be impressed and pleasantly surprised with the value we can bring to your organization.*

*If you could, please let me know your availability for getting together at your offices in the next few weeks, I will send a calendar invite.*

*Thank you so much,*

*Randy*

*P.S. – I would also be delighted to just spend some time with you over lunch or coffee to catch up on "life after Teva"*

This message (including any attachments) may contain confidential, proprietary, privileged and/or private information. The information is intended to be for the use of the individual or entity designated above. If you are not the intended recipient of this message, please notify the sender immediately, and delete the message and any attachments. Any disclosure, reproduction, distribution or other use of this message or any attachments by an individual or entity other than the intended recipient is prohibited.

This message (including any attachments) may contain confidential, proprietary, privileged and/or private information. The information is intended to be for the use of the individual or entity designated above. If you are not the intended recipient of this message, please notify the sender immediately, and delete the message and any attachments. Any disclosure, reproduction, distribution or other use of this message or any attachments by an individual or entity other than the intended recipient is prohibited.

This message (including any attachments) may contain confidential, proprietary, privileged and/or private information. The information is intended to be for the use of the individual or entity designated above. If you are not the intended recipient of this message, please notify the sender immediately, and delete the message and any attachments. Any disclosure, reproduction, distribution or other use of this message or any attachments by an individual or entity other than the intended recipient is prohibited.

KEUCH000389

**teva** | My Teva Rewards

## ☆ Total Rewards at Teva

Teva strives to support your health, financial security and career goals. This section highlights the value of Teva's target total rewards investment in you for 2017.

**MY PROFILE**

Miriam Weinstein

150 Belle Circle
Blue Bell, PA 19422
USA

Last Performance Rating: Successful Performance
Grade: 15
Salary: $166,860
Target Bonus %: 25%
Age: 39
Years of Service: 2

**MY Total Rewards**
These are estimated rewards you receive on an annual basis. Some amounts have performance, vesting, and other requirements that must be met prior to payout. For details regarding these requirements, please refer to award and/or plan documents.

| | | |
|---|---|---|
| ■ Compensation | $243,855 | (76.7%) |
| ■ Health & Well-Being | $20,214 | (6.4%) |
| ■ Financial Security | $36,898 | (11.6%) |
| ■ Other Rewards & Benefits | $17,140 | (5.4%) |
| **Total** | **$318,107** | |

| MY TOTAL REWARDS | 2018 Target |
|---|---|
| ▼ Compensation | $243,855 |
| Annual Salary | $166,860 |
| Target Bonus (25%) | $41,715 |
| Equity Mid-Value (not all eligible employees receive) | $35,280 |
| ▼ Health & Well-Being | $20,214 |
| Medical and prescription drugs premiums | $16,391 |
| Wellness Incentives | $300 |
| Dental Premiums | $1,104 |
| Vision Premiums | $0 |
| Teva Medicare Payment | $2,419 |
| ▼ Financial Security | $36,898 |
| Employer 401(k) Match | $12,514 |
| Teva 3.75% Defined Contribution | $7,822 |
| Teva 2% Defined Contribution | $1,628 |
| Employee Stock Purchase Plan (ESPP) Maximum | $1,043 |
| Teva Social Security Contribution | $7,886 |
| Life Insurance | $343 |
| Disability | $5,662 |
| ▼ Other Rewards & Benefits | $17,140 |
| Vacation (26 days) | $16,640 |
| ▶ Tuition Reimbursement | $0 |
| ▶ Adoption Assistance | $0 |
| STARS Target Value | $500 |
| **Total** | **$318,107** |

©Teva Pharmaceuticals 2018

Jan 5, 2018

KEUCH000514

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

- - -

RANDOLPH W. KEUCH      :   CIVIL ACTION
                       :
              v.       :
                       :
TEVA PHARMACEUTICALS:
USA, INC., and TEVA :
PHARMACEUTICAL         :
INDUSTRIES, Ltd.       :   NO. 2:19-cv-05488

- - -

April 4, 2022

- - -

Oral deposition of TAL

ZORMAN taken pursuant to notice, was held

via videoconference beginning at 10:50

a.m., on the above date, before JoAnn

Cheli, a Professional Court Reporter and

Notary Public in the Commonwealth of

Pennsylvania.

- - -

MAGNA LEGAL SERVICES
www.MagnaLS.com
(215) 207-9460



Page 8

```
 1          in the event that she's no longer

 2          an employee or an agent of Teva.

 3               MR. EPSTEIN:  Thank you.

 4    BY MR. EPSTEIN:

 5          Q.    What is your date of birth

 6    Ms. Zorman?

 7          A.    December 1st, '69.

 8               MR. RAPPAPORT:  Before you

 9          begin asking questions I want to

10          make sure that the court reporter

11          knows that we reserve the right to

12          read and sign.  We're going to

13          waive our right to object except

14          as to the form of the question.

15          All other objections to be

16          determined at the time of trial.

17               I'm sorry to interrupt.

18               MR. EPSTEIN:  No problem.

19    BY MR. EPSTEIN:

20          Q.    Where were you born, Ms.

21    Zorman?

22          A.    Israel.

23          Q.    And have you been a resident

24    of Israel since 1969?
```



Page 18

1   Team and I also met Randy.

2          Q.     So he was part of that

3   Leadership Team in North America?

4          A.     Yes.

5          Q.     When did it come to your

6   attention that there was going to be a

7   cut in personnel in 2017 going into 2018?

8          A.     I think it was approximately

9   in October of 2017.

10         Q.     And what did you learn?

11         A.     I learned that we're going

12  to restructure and we will need to reduce

13  approximately 25 percent of our workforce

14  on average.

15         Q.     Who did you learn that from?

16         A.     From my manager, Mark Sabag.

17  He was the CHR.

18         Q.     Did you talk to anybody else

19  about it?

20         A.     Sorry?

21         Q.     Did you learn the

22  information from anybody other than Mr.

23  Sabag?

24         A.     No.



Page 19

1          Q.     And what did you learn was

2     going to be the structure of that cut or

3     how it would implemented?

4                 MR. RAPPAPORT:   Objection to

5          form of the question.   Why don't

6          you ask one at a time?

7     BY MR. EPSTEIN:

8          Q.     What did you learn as to how

9     that cut would be implemented?

10         A.     I learned that we're going

11    to have 50 percent cut on average in HR.

12         Q.     Is Total Rewards part of HR?

13         A.     Yes.

14         Q.     What did you learn

15    specifically about Total Rewards North

16    America other than the average would be

17    50 percent?

18         A.     I learned that I need to do

19    -- once I received the nomination of

20    Global Talent Rewards -- Global Talent

21    Management, sorry, I had to come up with

22    the structure and to meet on average 50

23    percent, but there were some functions

24    that I needed to reduce even more.   But



Page 20

1    on Total Rewards the target was 50

2    percent.

3        Q.    And with regard to the 50

4    percent target, that was just a target,

5    or was it a hard cutoff that you had to

6    do 50 percent in each area?

7        A.    No, it was overall 50

8    percent.

9        Q.    Was that a head count 50

10   percent or was that tied to a dollar

11   amount?

12       A.    It was both.

13       Q.    Well, which one was supposed

14   to control?  You said it was both, but

15   which one was supposed to control?  Was

16   it supposed to be both of them absolute

17   50 percent head count and combined with

18   dollar amount, or was it discretionary

19   with you?

20       A.    The leading indicator was

21   head count reduction.  And then we also

22   looked at cost of labor overall.

23       Q.    Were there any more

24   specifics as to specific job titles or



Page 24

1    which consists of Asia, Israel and Latin

2    America and Europe.  And also Israel was

3    part of the Global Markets and India.  So

4    Europe, North America and all the rest

5    were part of the Growth Markets.

6          Q.    At that time before the cuts

7    were made who was the head of the

8    European sector?

9          A.    Noel, I don't remember his

10   last name.

11         Q.    And how about North America

12   Total Rewards?

13         A.    Randy Keuch.

14         Q.    How about the Growth

15   Markets?

16         A.    There weren't Growth

17   Markets.  It was separate.  We had

18   Israel.  We had Latin America part of the

19   Americas, and the rest were also

20   separate.  We didn't have the Growth

21   Market.  This was a business change.

22         Q.    So at the time before these

23   reductions were made it was Europe, North

24   America, Latin America?



JOINT APPX - 0280

Page 25

1          A.     Latin America was part of

2     North America with the Americas.

3          Q.     And before the changes were

4     made it was Europe, the Americas, Israel?

5          A.     Yes.

6          Q.     Who is the head of Total

7     Rewards in Israel?

8          A.     Amir Zirah.

9          Q.     Spell that please.

10         A.     Amir is the first name,

11    A-M-I-R.  And the last name I have to

12    look up.  I don't remember.

13              MR. RAPPAPORT:  Z-I-R-A-H.

14              THE WITNESS:  Thank you.

15    BY MR. EPSTEIN:

16         Q.     Were there any other heads

17    of Total Rewards, that is compensation

18    and benefits anywhere else?

19         A.     There was another function

20    in Israel that led global

21    responsibilities by other people in

22    addition to the regional

23    responsibilities.  We had a few positions

24    that were responsible for Global Total



Page 27

1        object to the form of the

2        question.  But you can answer.

3        You've already answered.  Thank

4        you.

5   BY MR. EPSTEIN:

6        Q.    Was there any plan for

7   placing the individuals in the various

8   areas on some form of lattice or toto, as

9   it's often called, where you would put in

10  place those persons that you felt were

11  most qualified down to the least

12  qualified?

13       A.    I'm not sure I understand

14  the question.  Sorry.

15       Q.    Was there any plan in place

16  that evaluated the individuals by past

17  achievement, by performance, performance

18  ratings that placed them in their

19  particular areas a hierarchy of who was

20  most qualified?

21       A.    It was done differently.  We

22  started from the structure and then we

23  looked at which individuals are qualified

24  for that.



Page 50

1          Q.     Did you talk to Mr. Keuch as

2     to Mr. Nasi's ability to control the

3     compensation and benefits package for the

4     United States?

5          A.     Yes, after I made the

6     decision, yes.

7          Q.     After you made the decision?

8          A.     The decision of the

9     structure, yes.

10         Q.     Did you talk to Mr. Keuch

11    about this?

12         A.     Yes.

13         Q.     And what did Mr. Keuch tell

14    you about Mr. Nasi's knowledge of

15    compensation and benefits in the United

16    States?

17         A.     That he has very limited

18    knowledge.

19         Q.     Now when you decided the

20    structure, what was the structure that

21    you decided on?

22         A.     That we are eliminating the

23    head of Total Rewards and we follow the

24    business changes, meaning that North



JOINT APPX - 0283

Page 51

1    America is without Latin America.   Latin

2    America moved under the Growth Market and

3    North America stayed just U.S. and Canada

4    so the cost was reduced.

5             And, also, given the

6    restructuring we had to reduce 50 percent

7    of our head count and, therefore, the

8    role was very operational and tactic, and

9    not strategic and design oriented like

10   what Randy was doing.  And, also, the

11   grade level was Grade 15.

12        Q.    Did you have any

13   conversations with Mr. Nasi about these

14   changes and what you were about to do?

15        A.    Yes.

16        Q.    When did you first talk to

17   Mr. Nasi?

18        A.    I don't have the exact date,

19   but I spoke with him after I wanted to

20   evaluate him as a potential candidate for

21   this position.

22        Q.    At that time what level was

23   Mr. Nasi?

24        A.    15.



Page 52

1          Q.     Did you discuss with Mr.

2    Nasi at that time whether or not there

3    would be availability to move him to a 16

4    level?

5          A.     No.

6          Q.     Did you talk to him at all

7    whether or not if he was to be considered

8    for this new position, what you labeled

9    as a procedural position, did you talk to

10   him at all about whether or not he would

11   have to move from Florida to the North

12   America headquarters?

13              MR. RAPPAPORT:  I'm going to

14         object to the use of the term

15         procedural position.  She never

16         used that term. But with that

17         objection noted, you can answer.

18              THE WITNESS:  Yes.  The

19         answer is yes.

20   BY MR. EPSTEIN:

21         Q.     Did you talk to him about

22   what compensation he would receive for

23   making that move?

24         A.     Not at that time.



Page 53

1       Q.      Was there a procedure in

2   place to compensate people to move them

3   from one location to another, a

4   relocation plan?

5       A.      There was a site

6   consolidation effort in North America,

7   Parsippany, and there were very clear

8   guidelines in terms of compensating

9   people outside of New Jersey into New

10  Jersey.

11      Q.      When did that plan take

12  place?  Was that before or after the

13  consolidation?

14      A.      This is part of the site

15  consolidation initiative.

16      Q.      And when did that take

17  place, 2017, 2018?

18      A.      '18, '18.

19      Q.      Was there a plan in place

20  that would move Mr. Nasi if he took the

21  position as the head of Total Rewards for

22  North America, was there a plan in place

23  to move him from Florida up to wherever

24  it was that the headquarters would be?



Page 60

1          for the clarification.

2     BY MR. EPSTEIN:

3          Q.     In what way did that enter

4     into your decision?

5          A.     I looked into the

6     professional experience, as well as the

7     leadership and management capabilities.

8     And when I looked at both, I chose Edu

9     Nasi for the position.

10         Q.     What document did use other

11    than the statements made by either Mr.

12    Lawlor or Mr. Yaniv?  What documents did

13    review of Mr. Nasi that gave you the

14    impression that he would be able to

15    handle issues relating to compensation

16    and benefits for United States employees?

17         A.     Discussing it with my

18    colleague in the U.S., Dan Lawlor and,

19    also, his supervisor of Latin America.  I

20    forgot the name back then.  I received

21    some reference from his professional and

22    also leadership maturity.

23         Q.     Do you know how old Mr. Nasi

24    was at the time when you made your



Page 61

1    decision?

2          A.    No.

3          Q.    Did you have any knowledge

4    as to how old Mr. Keuch was at the time?

5          A.    No.

6          Q.    But you said that you

7    reviewed documents from his personnel

8    file.  Did you have any knowledge as to

9    when it was that he had been employed at

10   various places during his career?

11         A.    What's the question?

12         Q.    Did you have knowledge of

13   the various places that Mr. Keuch had

14   worked?

15         A.    Yes, yes.

16         Q.    And based upon that and,

17   again, I'm going to show you what has

18   been marked as the Keuch CV.  That had

19   dates as to all the places he had worked

20   prior to the time that he came to work at

21   Teva, correct?

22         A.    Correct.

23         Q.    And you knew that he was

24   employed from this document, specifically



Page 78

1     January?

2          A.     When he started to report to

3     me, I think it was mid-January.

4          Q.     And what were those e-mails

5     about?

6          A.     The changes, the execution.

7     Are we staying in Pennsylvania, are we

8     moving to New Jersey.  The site

9     consolidation introduced many changes and

10    challenges in terms of who is staying and

11    who can move to New Jersey.

12         Q.     Did those e-mails in any way

13    address the issue of any promises made to

14    move his position from a 15 to a 16, to

15    your recollection?

16         A.     What's the question?

17         Q.     Did the e-mails that you're

18    referring to, did they address in any way

19    the promise to move him from a 15 to a

20    16?

21         A.     It wasn't a promise.  We

22    decided to move him.  From when I made

23    the offer to him, it was obvious that he

24    was Grade 15.  But it became obvious to



Page 79

1    us in March that the grade level had to

2    be 16 due to the complexity of mainly the

3    site consolidation.  So it wasn't a

4    promise in the beginning.

5                THE WITNESS:  Is there any

6          way we can take a one-minute bio

7          break?

8                MR. EPSTEIN:  Sure, why

9          don't we make a five-minute break.

10          It is now 12:35.  We'll come back

11          at 12:40.

12                (A recess occurred.)

13                MR. EPSTEIN:  I have no

14          other questions of the witness?

15                MR. RAPPAPORT:  I just have

16          a couple.

17                   -   -   -

18                EXAMINATION

19                   -   -   -

20    BY MR. RAPPAPORT:

21          Q.    Ms. Zorman, when you were

22    making the decisions with regard to the

23    structure that you created, did you

24    consider the cost of relocation as part



Page 80

1    of that decision making process?

2         A.    Yes.

3         Q.    And why did you consider the

4    cost of relocation?

5         A.    Because it was obvious that

6    the head of North America Total Rewards

7    will have to be based in North America.

8         Q.    Now the plan or structure

9    that you developed, did it result in the

10   elimination of the senior director level

11   position?

12        A.    Yes.

13        Q.    Was that just true of North

14   America, or was that true elsewhere?

15        A.    It was true also in Europe.

16        Q.    And had there been an

17   incumbent senior director in Europe who

18   was responsible for Total Rewards?

19        A.    Yes.

20        Q.    And was his position

21   eliminated?

22        A.    Yes.

23        Q.    And who would then be

24   responsibile by job title for Total



Page 81

1    Rewards in Europe?

2         A.    Director for Europe.

3         Q.    Was that the same decision

4    making, or was it different decision

5    making in eliminating the senior

6    directors in both North America and in

7    Europe?

8         A.    Similar.

9         Q.    What made you think in

10   December of 2017 that you could eliminate

11   the senior director positions and still

12   operate with just a director at the Total

13   Rewards level?

14        A.    The challenge that we had,

15   and we knew that we had to cut 50 percent

16   and just execute what is needed.  Keep

17   the business running without any strategy

18   or special new program designs.  So the

19   scope was very operational.  Just to keep

20   the business running we had no choice

21   back then.

22        Q.    Well, if the scope was to

23   become more operational, how does that

24   factor into eliminating senior director


JOINT APPX - 0292

Page 82

1    level positions and operating with just

2    directors both in North America and in

3    Europe?

4          A.    The scope was smaller in

5    terms of number of direct reports.  And,

6    also, more execution and operational,

7    rather than strategy and design.

8          Q.    Did you think that you could

9    operate that way both in North America

10   and in Europe with just directors?

11         A.    Yes.

12         Q.    Who would be responsible for

13   the strategy and design piece, if there

14   was one?

15         A.    I would.

16         Q.    And what occurred in North

17   America and Europe that made you decide

18   that you wanted to advance Mr. Nasi from

19   a director in labor Grade 15 to senior

20   director of labor Grade 16?

21         A.    The complexity of the

22   restructuring at Teva created a huge

23   challenge from comp and ben, especially

24   North America with the site



Page 83

1    consolidation.

2         Q.    Can you explain how site

3    consolidation created more work or more

4    direction or more responsibilities at

5    Total Rewards position?

6         A.    Sure.  We had to come up

7    with a plan, first of all, to evaluate

8    what's the right location if it's

9    Parsippany for the headquarters in North

10   America, if it's Parsippany or

11   Pennsylvania.

12              And then once the decision

13   was made, to understand the implications

14   of all our people that have to move into

15   the headquarters to New Jersey in terms

16   of comp.  And if they're moving, from

17   which location what we need to compensate

18   them with.  So there was a lot of work.

19              And, also, the restructuring

20   in terms of letting go of a quarter of

21   our workforce created a lot of work to

22   the comp and ben team.  But the site

23   consolidation was the main factor that

24   was changed in March in the U.S.



Page 84

```
 1          Q.      Who made the decision to

 2     adjust the position from a director to a

 3     senior director position?

 4          A.      I made the recommendation

 5     and Mark approved it.

 6          Q.      Are those the only two

 7     people that would be involved in that

 8     decision making method?

 9          A.      And Dan Lawlor, the HR

10     responsible for North America.

11          Q.      Was a similar adjustment

12     made in Europe where you took the

13     incumbent at the director level and made

14     that a senior director position as well?

15          A.      We had done it in Europe a

16     little bit after North America.    I

17     believe it was August that we changed the

18     position into a director.

19          Q.      From a director to what?

20     You said to a director.    Did you mean

21     from a director?

22          A.      From a director, from 15 to

23     16.

24          Q.      And was it for the same
```



Page 85

1   reasons?

2           A.     It was, yes, due to the

3   complexity of the restructuring.

4           Q.     Mr. Epstein asked you at

5   some point whether or not you gave any

6   consideration moving Mr. Keuch from a

7   senior director labor Grade 17 into the

8   director position.   Do you recall that

9   question?

10          A.     Yes.

11          Q.     Why wasn't in your mind Mr.

12  Keuch suitable for the director of Total

13  Rewards at the labor Grade 15 level?

14          A.     Because of his vast

15  experience and also ambition to become

16  even a VP at Teva, and to expand his

17  role.   And we knew that we needed

18  someone, you know, much more operational.

19               And, also, from my

20  experience demoting someone two grade

21  levels is not a good decision for the

22  individual and for the organization.

23          Q.     Why is that --

24          A.     Since --



Page 86

1          Q.     -- as a general rule?

2          A.     I'm sorry?

3          Q.     I said, why is that as a

4    general rule?  And now specifically

5    talking about Mr. Keuch.

6          A.     Because it's demotivating

7    taking somebody that is over qualified to

8    a position that is less impactful and

9    strategic.  Or, you know, reduced scope

10   is usually demotivating.  Again, from my

11   experience to the individual and, also,

12   to the organization.

13               And throughout the

14   restructuring we tried to eliminate even

15   one role.  In my organization, I did not

16   demote people.  I just did that in the

17   past and it never worked well.

18         Q.     When you were making your

19   decision to do the restructuring, were

20   you looking at age information with

21   regard to the incumbents in the Total

22   Rewards organization?

23         A.     No.

24         Q.     Was age ever a factor or



## Tal Zorman Deposition Transcript Errata

| Page | Line | Correction | Reason |
|------|------|-----------|--------|
| 16 | 21 | Change "market" to "markets" | Transcription error |
| 18 | 4 | Add "he was part of the HR Leadership Team" following the word "yes" | Clarifying testimony |
| 18 | 9 | Change "October" to "November" | Clarifying testimony |
| 18 | 17 | Change "CHR" to "CHRO" | Transcription error |
| 23 | 16 | Change "took" to "made" | Clarifying testimony |
| 26 | 6 | Delete the word "we" | Clarifying testimony |
| 29 | 8 | Change "evaluate" to "evaluations" | Clarifying testimony |
| 51 | 8 | Change "tactic" to "tactical" | Transcription error |
| 56 | 12 | Add "At the time of his selection—no" | Clarifying testimony |
| 77 | 15 | Change "CO" to CEO | Transcription error |
| 82 | 23 | Change "ben" to "benefits" | Clarifying testimony |
| 83 | 22 | Change "ben" to "benefits" | Clarifying testimony |
| 84 | 9 | Add "VP" after "HR" | Clarifying testimony |
| 86 | 14 | Add "not" following the word "tried" | Clarifying testimony |



1    ACKNOWLEDGMENT OF DEPONENT

2       I, _Tal Zorman_ , do

3  hereby certify that I have read the
foregoing pages,  1 - PGS, and that the

4  same is a correct transcription of the
answers given by me to the questions

5  therein propounded, except for the
corrections or changes in form or

6  substance, if any, noted in the attached
Errata Sheet.

7

8               May 18, 2022

9  WITNESS NAME      DATE

10

11

12

13

14

15

16

17

18

19

20

21

22

www.MagnaLS.com                   866-624-6221

Seven Penn Center
1635 Market Street – 8th Floor
Philadelphia, PA 19103

JOINT APPX - 0299
Scanned with CamScanner

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

- - -

RANDOLPH W. KEUCH        :

                         : CASE NO.

v                        : 2:19-CV-05488

                         :

TEVA PHARMACEUTICALS :

USA, INC., And TEVA  :

PHARMACEUTICAL           :

INDUSTRIES, Ltd.         :


- - -

WEDNESDAY, APRIL 13, 2022

- - -

Virtual deposition of MARK
SABAG, taken pursuant to Notice,
commencing at 8:10 a.m., on the above
date, before Benjamin Moebius, a Court
Reporter and Notary Public in and for the
Commonwealth of Pennsylvania.


- - -


MAGNA LEGAL SERVICES
(866) 624 6221



JOINT APPX - 0300

Page 4

```
 1                    -  -  -

 2              (It is hereby stipulated and

 3         agreed by and between counsel for

 4         the respective parties that

 5         reading, signing, sealing, filing

 6         and certification are waived; and

 7         that all objections, except as to

 8         the form of questions, be reserved

 9         until the time of trial.)

10                    -  -  -

11              MARK SABAG, after having been

12         duly sworn, was examined and

13         testified as follows:

14              THE WITNESS:  Yes.

15                    -  -  -

16              EXAMINATION

17                    -  -  -

18    BY MR. EPSTEIN:

19         Q.    Mr. Sabag, am I pronouncing

20    your name correctly?

21         A.    Yes, thank you.

22         Q.    What is your date of birth?

23         A.    March 8th, 1970.

24         Q.    And where were you born?
```



Page 17

1    Q.    Who was that?

2    A.    Lesley Billow and Ron Yaniv.

3    Q.    Ron Yaniv, you said?

4    A.    Correct.

5          MR. EPSTEIN:  To the

6    reporter, that's Y-A-N-I-V.  Billow

7    is B-I-L-L-O-W.

8    BY MR. EPSTEIN:

9    Q.    Now, in terms of the overall

10   decision by Mr. Schultz to cut people

11   from employment with Teva and setting

12   goals of 25 percent, what role did you

13   play in that?

14   A.    I basically, as the head of

15   HR, orchestrated this entire program.

16   Q.    When you say you orchestrated

17   it, what did you mean by that?  Did you

18   make the decision about 25 percent, or

19   did Mr. Schultz do that?

20   A.    Mr. Schultz came with the --

21   with the desire -- with the need of Teva

22   to reduce significantly the cost based

23   and the head count and the conclusion was

24   that it needs to have -- it needs to be



Page 18

1   25 percent, and me as an executive member

2   and head of HR together with the CFO, we

3   built the detailed plan on how that is

4   going to be cascaded in terms of goals to

5   the entire organization.  And then, once

6   the plan was set, I was responsible

7   together with the -- with the business

8   leaders but as the HR organization

9   basically facilitate this process through

10  Teva in '18 and '19.

11       Q.    Did you make the decisions as

12  to who got what roles at Teva as part of

13  this reorganization plan?

14       A.    No.

15       Q.    Did you have a hand in

16  deciding that Tal Zorman should be placed

17  in her current role?

18       A.    Yes.

19       Q.    What decision making did you

20  engage in in that regard?

21       A.    So, like any other function,

22  HR got the target of 50 percent reduction

23  in workforce as part of this

24  restructuring, and we needed to do it



Page 19

1    actually in a -- in a rapid timeframe

2    because HR was supposed to lead this

3    process, so we wanted to create that

4    clarity in HR as fast as we can to allow

5    HR to get back to business.

6              I came to the conclusion that

7    in order to do so, I need also -- and to

8    convey the message around this tough

9    decision, I basically needed to reduce my

10   leadership team in half.  As a result of

11   that, I basically decided to merge couple

12   of global functions into a one global

13   function and to eliminate several

14   leadership roles in HR to allow me to

15   maintain this 50 percent target.  And

16   once I decided to merge those functions,

17   I came to the conclusion that the best

18   person that can do the job moving forward

19   is Tal Zorman.

20        Q.    Did you work with Tal Zorman

21   at Intel?

22        A.    To some extent.  She was in

23   other function, but I -- but I know her,

24   yeah.  I knew her, yeah.



Page 29

1          A.       I think it was related to

2      the -- to the big project that back then

3      was driven globally around benefit

4      harmonization, as far as I remember, and

5      there was some other struggle that

6      relates to whether he see Ron Yaniv as an

7      appropriate manager due to level of

8      seniority.

9          Q.       I'm not understanding what

10     you mean by that.

11                  Would you explain?

12         A.       The feel back then was that

13     he believed that -- that he is more

14     qualified than Ron Yaniv.

15         Q.       Did you hear anything about

16     Randy not being able to get along with

17     other persons -- excuse me -- in the

18     organization other than Ron Yaniv?

19         A.       Not that I recall.

20         Q.       When did Ron Yaniv leave

21     Teva?

22         A.       Ron Yaniv left Teva as part

23     of the restructuring that I explained

24     before.  So he was one of the senior HR



JOINT APPX - 0305

**MAGNA**
LEGAL SERVICES

1       ------
              E R R A T A
2       ------

3

4 PAGE  LINE        CHANGE  FROM           CHANGE  TO              REASON

5  ___   ___   _____See Attached Errata Sheet_____   _____

6  ___   ___   _____   _____   _____

7  ___   ___   _____   _____   _____

8  ___   ___   _____   _____   _____

9  ___   ___   _____   _____   _____

10 ___   ___   _____   _____   _____

11 ___   ___   _____   _____   _____

12 ___   ___   _____   _____   _____

13 ___   ___   _____   _____   _____

14 ___   ___   _____   _____   _____

15 ___   ___   _____   _____   _____

16 ___   ___   _____   _____   _____

17 ___   ___   _____   _____   _____

18 ___   ___   _____   _____   _____

19 ___   ___   _____   _____   _____

20 ___   ___   _____   _____   _____

21 ___   ___   _____   _____   _____

22 ___   ___   _____   _____   _____

23 ___   ___   _____   _____   _____

24 ___   ___   _____   _____   _____

**www.MagnaLS.com**                                    **866-624-6221**

Seven Penn Center
1635 Market Street – 8th Floor
Philadelphia, PA 19103

JOINT APPX - 0306

### Mark Sabag Deposition Transcript Errata

| Page | Line | Correction | Reason |
|------|------|------------|--------|
| 11 | 20 | Replace "Mr. Shemtob" with "Mr. Rappoport" | Transcription Error |
| 20 | 4 | Replace "Mr. Shemtob" with "Mr. Rappoport" | Transcription Error |
| 20 | 17 | Change "that what Tal were" to "that's what Tal was" | Clarifying testimony |
| 22 | 5 | Replace "Mr. Shemtob" with "Mr. Rappoport" | Transcription Error |
| 23 | 14 | Replace "Mr. McDonough" with "Mr. Rappoport" | Transcription Error |
| 23 | 17 | Replace "Mr. McDonough" with "Mr. Rappoport" | Transcription Error |
| 30 | 7 | Replace "Mr. Shemtob" with "Mr. Rappoport" | Transcription Error |
| 30 | 23 | Replace "Mr. Shemtob" with "Mr. Rappoport" | Transcription Error |
| 33 | 3 | Replace "Ron Lollar" with "Dan Lawlor" | Transcription Error |
| 33 | 8 | Replace "Lollar" with "Lawlor" | Transcription Error |
| 33 | 19 | Replace "Lollar" with "Lawlor" | Transcription Error |
| 34 | 8 | Replace "Lollar" with "Lawlor" | Transcription Error |
| 34 | 11 | Replace "Lollar" with "Lawlor" | Transcription Error |
| 46 | 4 | Replace "Don Lollar" to "Dan Lawlor" | Transcription Error |
| 46 | 14 | Replace "Mr. Shemtob" with "Mr. Rappoport" | Transcription Error |
| 47 | 9 | Replace "Renner" with "Brenner" | Transcription Error |
| 49 | 7 | Replace "Mr. Shemtob" with "Mr. Rappoport" | Transcription Error |
| 49 | 16 | Replace "Mr. Shemtob" with "Mr. Rappoport" | Transcription Error |

**MAGNA**
LEGAL SERVICES

1    ACKNOWLEDGMENT OF DEPONENT

2        I, Mark Sabag        , do
3    hereby certify that I have read the
     foregoing pages,  1 - PGS, and that the
4    same is a correct transcription of the
     answers given by me to the questions
5    therein propounded, except for the
     corrections or changes in form or
6    substance, if any, noted in the attached
     Errata Sheet.

7

8    _Mark Sabag_          May 29, 2022
     WITNESS NAME              DATE

9

10

11

12

13

14

15

16

17

18

19

20

21

22

**www.MagnaLS.com**                    **866-624-6221**

Seven Penn Center
1635 Market Street – 8th Floor
Philadelphia, PA 19103

JOINT APPX - 0308

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

- - -

RANDOLPH W. KEUCH      :
                       : CASE NO.
v                      : 2:19-CV-05488
                       :
TEVA PHARMACEUTICALS   :
USA, INC., And TEVA    :
PHARMACEUTICAL         :
INDUSTRIES, Ltd.       :

- - -

FRIDAY, APRIL 15, 2022

- - -

Virtual deposition of

DANIEL LAWLER, taken pursuant to Notice,

commencing at 10:02 a.m., on the above

date, before Benjamin Moebius, a Court

Reporter and Notary Public in and for the

Commonwealth of Pennsylvania.

- - -

MAGNA LEGAL SERVICES
(866) 624 6221



JOINT APPX - 0309

Page 5

1              MR. EPSTEIN:  Thank you, sir.

2              MR. RAPPAPORT:  You're

3       welcome.

4                       -   -   -

5                   EXAMINATION

6                       -   -   -

7    BY MR. EPSTEIN:

8         Q.    Mr. Lawler, would you state

9    your full name for the record?

10        A.    Yes.  Daniel Patrick Lawler.

11        Q.    And what is your date of

12   birth, sir?

13        A.    November 8th, 1963.

14        Q.    Can you give me a summary of

15   your education after high school?

16        A.    Yes.  I have a bachelor's

17   degree in personnel and labor relations

18   from La Salle University and a master's

19   in business administration concentration

20   in finance and investments from Drexel

21   University.

22        Q.    And when did you graduate

23   from La Salle?

24        A.    In 1986 -- May of '86.



**MAGNA** ▶
LEGAL SERVICES

```
1        ------
              E R R A T A
2        ------

3

4  PAGE  LINE        CHANGE  FROM          CHANGE TO              REASON

5  ___  ___   _____See Attached Errata Sheet_____   _____

6  ___  ___   _____   _____   _____

7  ___  ___   _____   _____   _____

8  ___  ___   _____   _____   _____

9  ___  ___   _____   _____   _____

10 ___  ___   _____   _____   _____

11 ___  ___   _____   _____   _____

12 ___  ___   _____   _____   _____

13 ___  ___   _____   _____   _____

14 ___  ___   _____   _____   _____

15 ___  ___   _____   _____   _____

16 ___  ___   _____   _____   _____

17 ___  ___   _____   _____   _____

18 ___  ___   _____   _____   _____

19 ___  ___   _____   _____   _____

20 ___  ___   _____   _____   _____

21 ___  ___   _____   _____   _____

22 ___  ___   _____   _____   _____

23 ___  ___   _____   _____   _____

24 ___  ___   _____   _____   _____
```

### Daniel Lawlor Deposition Transcript Errata

| Page | Line | Correction | Reason |
|---|---|---|---|
| 1 | - | Change "Lawler" to "Lawlor" | Transcription Error |
| 8 | 3 | Add "HR Business Partner" after Associate Director | Clarifying Testimony |
| 8 | 14 | Add "Associate" before Director, and then Director (i.e. I started as an Associate Director and then became a Director for their…") | Clarifying Testimony |
| 8 | 16 | Change "Princeton" to "Princeton/Cranbury" | Clarifying Testimony |
| 11 | 1 | Change "March" to "April" | Clarifying Testimony |
| 11 | 4 | Change "two" to "two and a half" | Clarifying Testimony |
| 11 | 14-15 | Change "That was again for about two years and it was during that time that I was promoted to an SVP" to "During the same two and a half years and it was after that time that I was promoted to an SVP" | Clarifying Testimony |
| 14 | 22 | Change "January" to "April" | Clarifying Testimony |
| 14 | 23 | Change "April" to "July" | Clarifying Testimony |
| 23 | 17 | Add "and Elaine McGee" after the phrase "So, he" | Clarifying Testimony |
| 48 | 10-11 | Change "roughly between 12,000 and 13,000" to "roughly between 9,500 and 10,000" | Clarifying Testimony |
| 48 | 13-14 | Change "somewhere in the 8,000 to 9,000 range" to "somewhere in the 7,500 to 8,000 range" | Clarifying Testimony |
| 49 | 1 | Change "I would say 45,000 to 50,000" to "I would say 40,000 to 45,000" | Clarifying Testimony |
| 49 | 19 | Add "Europe had more and" after the word "but" | Clarifying Testimony |
| 50 | 5 | The affirmative answer reflects the revised numbers provided in this Errata Sheet. | Clarifying Testimony |

**MAGNA**
LEGAL SERVICES

1      ACKNOWLEDGMENT OF DEPONENT

2
         I, _DANIEL LAWLOR_, do
3   hereby certify that I have read the
    foregoing pages,  1 - PGS, and that the
4   same is a correct transcription of the
    answers given by me to the questions
5   therein propounded, except for the
    corrections or changes in form or
6   substance, if any, noted in the attached
    Errata Sheet.

7
                                    5/31/2022
8   WITNESS NAME            DATE
9

10

11

12

13

14

15

16

17

18

19

20

21

22

Page 1

1          IN THE UNITED STATES DISTRICT COURT

        FOR THE EASTERN DISTRICT OF PENNSYLVANIA

2

3    RANDOLPH W. KEUCH,          *

4              Plaintiff        *

5    v.                         *    CASE NO. 2:19-CV-05488

6    TEVA PHARMACEUTICALS        *

    USA, INC., And TEVA

7    PHARMACEUTICAL              *

    INDUSTRIES, Ltd.,

8                               *

        Defendants

9    *         *         *         *         *         *

10

11      VIDEOCONFERENCE DEPOSITION OF RANDOLPH KEUCH

12              PARTY/FACT WITNESS

13            BALTIMORE, MARYLAND

14              APRIL 12, 2022

15

16

17

18

19    Reported by Kathleen E. Manes, Court Reporter

20

21

22

23

24

25

Page 8

1    So I would ask that all of your responses be

2    verbal responses.  Are you capable of that?

3         A    I am.

4         Q    Okay.  Have you ever had your

5    deposition taken prior to today?

6         A    Not to my recollection.

7         Q    Okay.  Where were you born,

8    Mr. Keuch?

9         A    I was born in Glen Ridge, New Jersey.

10        Q    And when were you born?

11        A    May 27, 1954.

12        Q    How many job offers have you received

13   since your separation from Teva?

14        A    None.

15        Q    How many job interviews have you had

16   since your separation from Teva?

17        A    I don't know.  It was well over a

18   dozen.

19        Q    Can you identify who you interviewed

20   with and when?

21        A    I can recall a few names.  I believe

22   that I provided a list to counsel of the

23   companies I met with or spoke with.  So if you

24   want me to basically give you my recollection,

25   or we can pull up the Bates document and go

Page 34

1   benefits after leaving Teva?

2       A    I received no severance benefits from

3   Teva.

4       Q    Do you have an understanding as to

5   why not?

6       A    Because I did not sign a release.

7       Q    Okay.  And is there a reason why you

8   didn't sign the release?

9       A    I was advised.

10          MS. CHALAL:  I'm just going to object

11   it's attorney-client privilege.  Don't -- don't

12   reveal anything discussed with your attorney.

13   But if you can, answer that.

14          THE WITNESS:  Can you restate the

15   question?

16          BY MR. RAPPOPORT:

17       Q    Is there a reason why once presented

18   with the release, you chose not to sign it?

19       A    The released said to speak to legal

20   counsel, which I did, and was advised not to

21   sign it.

22       Q    Did you ever call Thomas McDonough to

23   find out about your severance benefits?

24       A    I believe I sent him an email.

25       Q    Okay.  And what do you recall the

Page 36

1        Q     Did you meet with them all together?

2        A     I believe on January 2nd when I was

3    told that I was being terminated, I believe I

4    spoke to Edu first.  But again, I'm not clear.

5    And he wanted to speak to the team.  And I

6    asked for some time to speak to the team

7    myself, which I did.  And then he I believe

8    spoke to them individually.

9        Q     What happened on January 2nd, 2018?

10       A     I believe Tal Zorman called me and

11   told me that -- that I was being terminated and

12   replaced by Edu.

13       Q     Do you recall anything else that she

14   may have said during the course of that

15   conversation?

16       A     I do not.

17       Q     And was Edu the next person that you

18   spoke to?

19       A     I believe that was the correct order.

20   I'm not totally clear, but I believe it was Edu

21   and then -- and then my staff.

22       Q     Describe to me as best you can recall

23   what you said to Edu after having spoken to

24   Ms. Zorman on January 22nd.

25       A     The gist of the call would have been,

Page 39

1          Q     And did you stick around until the

2     February 18th date that you testified to?

3          A     Yeah, it was -- I don't know if it

4     was the 18th or the 24th, but there was --

5     you know, it did end in the later part of

6     February.

7          Q     And during that period of time, what

8     did you do to assist Mr. Nasi with respect to

9     the assumption of some or all of the duties

10    that you had been handling?

11         A     We had a number of vendor meetings

12    and Edu attended them.  So it was a -- a

13    transferring of the baton so he would get to

14    meet the -- you know, the people that we were

15    working as our -- as our vendors and understand

16    sort of the role they played and -- and what we

17    were working on with them.

18         Q     About how many vendor meetings were

19    there?

20         A     I -- I don't recall.

21         Q     And were the vendor meetings in North

22    Wales, Pennsylvania?

23         A     Yes.

24         Q     And did Mr. Nasi attend them in

25    person?

Page 42

1          MR. RAPPOPORT:  Ms. Court Reporter,

2     read back my question, please.

3          (Whereupon, the court reporter read

4     the question.)

5          BY MR. RAPPOPORT:

6     Q    If you're not able to answer the

7     question, I'll ask you another one.

8     A    Okay.  Please do.

9     Q    Did you share your opinion with

10    Ms. Weinstein as to how they came to select

11    Mr. Nasi?

12    A    No.

13    Q    Did you have an opinion as to how

14    they came to select Mr. Nasi?

15    A    Other than his age and he was a male,

16    no.

17    Q    Okay.  So it was your opinion that

18    him being a male and him being whatever age he

19    was, were to contributing factors to his

20    selection?

21    A    Yes.

22    Q    And what's basis of that opinion?

23    A    The fact that he's a male and he was

24    much younger than I was.  And I was being

25    terminated because of my age.

Page 62

1        Q    Is that different than Total Rewards?

2        A    Not necessarily.

3        Q    Well, does compensation plus benefits

4    equal Total Rewards?  Or is there something

5    that I'm missing in the equation?

6        A    No.  I think that's the general

7    scope.

8        Q    So when I asked you the question

9    whether he had a Total Rewards background and

10   you responded by saying he had a background in

11   compensation and benefits, is there some reason

12   why you answered it that way?

13       A    No.  It's just that that's -- that

14   was my knowledge of his -- of his skill set.

15       Q    When did you begin reporting to him?

16       A    I did.  When, again I'm not

17   100 percent clear whether it was the latter

18   part of 2018 or the early part of 2019.

19       Q    Were you a candidate for the position

20   that Mr. Yaniv filled?

21       A    I -- I'm unaware of whether I was or

22   was not.

23       Q    Did you self-identify as someone who

24   would be interested in that role?

25       A    I did not.

Page 75

1    And, you know, I was given an offer from a
2    competitor of that company that I -- that I did
3    not accept at age 62.  So, you know, it --
4    it -- I'm not sure how to answer your question,
5    but, yes, I did tell Lesley that it appears
6    that I'm not being hired because of my age.
7         Q    What was the Airgas competitor that
8    gave you an offer at age 62?
9         A    I honestly don't recall.  I'd have to
10   look it up.
11        Q    Is that while you were still --
12        A    That's Allentown --
13        Q    -- employed --
14        A    New Jersey -- Allentown,
15   Pennsylvania.  They're headquartered there.
16   And there's an offer letter that's part of what
17   you have in -- that's been Bates stamped.
18        Q    All right.  The offer that you
19   received from the Airgas competitor in
20   Allentown, Pennsylvania, was that while you
21   were still employed at Teva?
22        A    I received an offer while I was still
23   employed at Teva, yes.
24        Q    Were you looking for employment
25   opportunity during the period of time that you

Page 76

1    were employed by Teva, which is as I understand

2    it, was from 2014 to 2018.

3        A    Not -- not aggressively, no.

4        Q    Well, how is it that you received an

5    offer while un-aggressively not looking for

6    other opportunities?

7        A    I received a call and decided that it

8    was worthwhile to explore.  And I explored it.

9    And I got the job, got the offer.

10       Q    Was it at a senior director level?

11       A    It would have been a vice president

12   position, yes.

13       Q    Was it a global opportunity?

14       A    It was.

15       Q    Okay.  But you declined the position

16   because of what?

17       A    I met with Ron Yaniv and discussed

18   the situation with him.  And he didn't want me

19   to -- he did not want me to leave.  He valued

20   my -- my expertise, my skill set, what I

21   brought to Teva.  And so again, it was a

22   question because I'd have to move further away

23   from the Philadelphia hub that I -- you know,

24   that my wife's father was situated in.  And

25   Teva had -- had made some interesting comments.

Page 77

1  Mr. Yaniv had told me that he would look into

2  the grading of my position.  And so he gave me

3  a salary increase.  He gave me a retention

4  bonus.  And since my work at Teva was not

5  really done, I had built a strategy for the

6  benefits programs and was in the process of

7  implementing that strategy that -- and enjoying

8  the work I did, so it didn't make sense to

9  leave.

10      Q   Do I understand your testimony

11  correctly that the reason that you were given

12  the salary increase and the retention bonus was

13  in response to you sharing with Mr. Yaniv that

14  you had received a competitive offer from

15  another company?

16      A   Yes.

17      Q   Do I understand you correctly that

18  Mr. Yaniv also shared with you that he would

19  look into the possibility of a different job

20  title and labor grade for you?

21      A   A different grade, yes.

22      Q   What grade were you?

23      A   I was a 17.

24      Q   Wasn't that the highest grade for a

25  senior director?

Page 109

1    any information at all as to how the decision

2    was made to retain Lauren Benner?

3         A    I do not.

4         Q    And with respect to Elaine McGee, was

5    she separated by Teva as part of the global

6    restructuring?

7         A    No.  Lauren Benner left Teva and then

8    Elaine McGee was offered that position.

9         Q    And Elaine McGee I believe you said

10   was in her late 40s, about the same age as

11   Daniela Shea?

12        A    No.  I said she was probably in her

13   40s.

14        Q    Okay.  Was the decision to offer

15   Elaine McGee the position vacated by Lauren

16   Benner's departure evidence of age

17   discrimination?

18        A    I don't know.

19        Q    Let's talk about Rose Riccioli.

20        A    Riccioli, yes.

21        Q    Okay.  Thank you for the correction.

22             What was Rose Riccioli's association

23   to Teva prior to her being separated?

24        A    She was a contractor.

25        Q    Did she work in Total Rewards comp --

Page 110

1    in Total Rewards?

2          A      She did.

3          Q      On the comp side or on the benefit

4    side?

5          A      Compensation side.

6          Q      How long did she work as a contract

7    employee?

8          A      I want to think she was there for at

9    least a year.

10          Q      Okay.  And by "contract employee," do

11   you mean that she was actually hired by a

12   third-party vendor but provided service

13   entirely or exclusively to Teva?

14          A      I believe so.  I really do not.  I

15   don't know.

16          Q      But you believe that she was treated

17   in a way that evidences age discrimination.

18   Isn't that correct?

19          A      That's correct.

20          Q      Now, at some point in time, was there

21   a decision that was being discussed to change

22   her status from contract employee to Teva

23   employee?

24          A      We had an open position.  And she

25   interviewed for the position as did others.

Page 111

1      Q      Okay.  And the others who

2   interviewed, were they likewise working either

3   at or for Teva?

4      A      I'm not sure.  There may have been

5   one or two Teva employees, and I actually don't

6   believe we had any -- we may have had one other

7   external employee.

8      Q      And when she interviewed, were you

9   among the people she interviewed with?

10     A      Yes.

11     Q      Okay.  Were there others who

12  interviewed her?

13     A      Yes.

14     Q      Who were the others?

15     A      Well, Miriam Weinstein was the comp

16  director, compensation director.  And I'm not

17  sure who in HR or whether talent acquisition

18  interviewed her.  I would believe it could --

19  could have been Pam Daknis who interviewed her.

20  But she was interviewed one or two human

21  resource employees.

22     Q      Okay.  Did you make a recommendation

23  on her behalf?

24     A      I don't understand the concept of a

25  recommendation.

Page 112

1      Q      Did you have hiring authority?

2      A      No.

3      Q      Who had hiring authority?

4      A      Well, that's a good question.  The --

5  the authorities changed from time to time.  You

6  had to have the head count approved.  And once

7  that was approved, then you had to go ahead and

8  look for a candidate.  And once you had an

9  offer, a candidate you wanted to hire, the

10  offer had to be approved typically by me, but

11  because it was HR and it was Total Rewards, I

12  believe my manager would have to get involved.

13  And generally it -- it went through.  But given

14  the -- the times, I believe this was Q3 of

15  2017.  And Lesley was gone, I believe for

16  whatever reason Dan Lawlor decided that he

17  wanted to see it before it went through.

18      Q      Did you recommend to Dan Lawlor that

19  Rose Riccioli be considered for the opened

20  vacant Teva position?

21      A      Yes.

22      Q      Was that recommendation in writing or

23  was it orally?

24      A      We would not have prepared an offer

25  if it wasn't in writing.  And I believe we

Page 113

1    prepared a full offer for her.

2         Q    Was that offer ever extended?

3         A    No.

4         Q    Why wasn't it extended?

5         A    Again, my recollection is that I was

6    called into Dan's office.  And Dan basically

7    knew her, had worked with her, had also given

8    me compliments on the quality of her work.

9    And -- but he asked me if she had long-term

10   potential.  And he asked me if she could fill

11   my position in the near future.

12        Q    And how did you respond to his

13   questions?

14        A    I basically told him that she could

15   clearly aspire to be the director of

16   compensation, so she could succeed Miriam.  As

17   far as my role, she would need a lot of

18   training and development to be brought up on,

19   you know, the international aspects of my

20   position and some of the details in the

21   benefits area.

22        Q    Wasn't one of the questions whether

23   she had long-term potential?

24        A    That's correct.  What I said.

25        Q    (Inaudible) question.

Page 120

1   As I said, Rose had been with us for -- for a

2   year.  So Diane could have told me her age when

3   she had a conversation with Rose.  So 55 is

4   probably the number -- is the number that was

5   once shared with me.  I don't know at what

6   time, but it was around that time and around

7   that -- that age.  And I don't know how

8   accurate Diane is.  I only know what she shared

9   with me.

10      Q    Would you agree with me that there

11  was no communication that you were a part of

12  where Mr. Lawlor inquired about her age or was

13  advised what her age was?

14      A    To the best of my knowledge, no he

15  did not inquire about her age.

16      Q    Can you explain your earlier answer

17  where you indicated that among HR folk, using

18  the long-term potential really means age?

19      A    That's just -- that's just common

20  knowledge.  I believe if you would ask people

21  in the search business, you will get that

22  response.  I believe if you Google it, you will

23  get that response.

24      Q    When did you learn that Teva had

25  assumed considerable debt and would be taking

Page 122

1    their own in response to the potential for a

2    likely bankruptcy?

3        A    I'm not sure the word "bankruptcy" is

4    not a word that -- that I'm not familiar with

5    in the --

6        Q    Prior --

7        A    -- Teva --

8        Q    -- to Kare's -- prior to Kare's

9    arrival, were there any suggestions that you

10   were aware of, either formerly or informally,

11   that a global reduction in force was imminent?

12       A    Only rumors.

13       Q    And what were the rumors that you had

14   heard?

15       A    That, you know, Teva was -- was

16   struggling financially.  They -- I had worked

17   on an acquisition of Rimsa down in Mexico with

18   them.  And apparently senior management got

19   snookered on that deal because the Mexican

20   government stepped in.  There were a lot of

21   issues around the drugs they were producing.

22   It was just I guess a nightmare for Teva.

23       Q    And certainly you were watching the

24   stock price, were you not?

25       A    I definitely watched the stock price,

Page 123

1    yes.

2         Q    And you would agree with me that the

3    stock price declined after the purchase of

4    Actavis?

5         A    It did, yes.

6         Q    Now, in your role as the head of

7    Total Rewards, did you have responsibility for

8    Canada?

9         A    I did.

10        Q    For Latin America?

11        A    Yes.

12        Q    And did Latin America also include

13   South America?

14        A    Yes, I believe it would have.  Yes.

15        Q    Peru, Chile, Brazil?

16        A    Yes, those countries were part of

17   Latin America.

18        Q    I'd like to show you an org chart

19   that you provided that was Bates stamped

20   Keuch 017.

21             MR. EPSTEIN:  Would you repeat that,

22   please, Larry?  You broke up.

23             BY MR. RAPPOPORT:

24        Q    I would like to show you an org chart

25   that you produced that was Bates stamped

Page 141

1   for the position, did you?

2       A    Correct.

3       Q    And your testimony is that Ron Yaniv

4   was a one-off and his garden leave was

5   unrelated to the global restructuring that

6   followed later in the year?

7       A    No, that's not correct.

8       Q    What's incorrect about it?

9       A    I do not know why Ron was leaving the

10  organization.  It may have been again related

11  to a reduction in force.  But the

12  communications that I had and the conversations

13  I had did not suggest that -- that he would not

14  be replaced at least prior to the announcement

15  of Tal.

16      Q    When did you first start talking to

17  Ron Yaniv about the possibility of you being

18  upgraded from a senior director to a vice

19  president?

20      A    I believe it would have been around

21  2016.  And it was not a conversation to be

22  ungraded to a vice president.  It was to have

23  my job looked at given the fact that the job

24  responsibilities had grown substantially with

25  the acquisitions.

Page 142

1      Q    And as a result of the change to your

2   job responsibilities, did you feel that you

3   were not properly rated in your labor grade 17

4   role?

5      A    I felt that with the new global

6   grading system that if you ran my job through

7   that system, you would come up with a different

8   grade.

9      Q    And the different grade would have

10  been a higher grade?

11     A    Correct.

12     Q    And that would have been a labor

13  grade 18?

14     A    Correct.

15     Q    And that would have necessarily

16  required you to become a vice president?

17     A    That's correct.

18     Q    Okay.  Did you have counterparts in

19  the global organization who were heading

20  global -- I'm sorry -- heading -- or Total

21  Rewards who were at the vice president level?

22     A    No.

23     Q    Everyone was at the senior director

24  level?

25     A    Correct.  So you had a senior vice

Page 143

1    president as Ron.  And I believe he was a 19.

2    No one in 18.  And then you had 17s.

3         Q    All right.  And the 17 would have

4    been a 17 in Europe, a 17 in North America, a

5    17 in Asia-Pacific, and a 17 in Israel.

6         A    Correct.

7         Q    Okay.  Did you have more than one

8    conversation with Mr. Sabag about your desire

9    to be evaluated and perhaps upgraded?

10        A    I never had that conversation.

11        Q    There were no conversations?

12        A    That's correct.

13        Q    Okay.  So there was no discussion

14   between you and mister -- Mr. Yaniv about

15   becoming a vice president?

16        A    There was one conversation, maybe

17   two.

18        Q    But with no one other than Mr. Yaniv?

19        A    With mister -- with Ron.  That's

20   correct.

21        Q    And did Ron ever indicate to you that

22   it could not happen?

23        A    He never did.

24             MR. RAPPOPORT:  Let me show you

25   what's marked as an exhibit.  It's going to be

Page 144

1    Bates stamped Keuch 028.

2              BY MR. RAPPOPORT:

3         Q    This is a letter dated August 6,

4    2015, via mail to you from Ron Yaniv, subject

5    base salary increase and retention bonus.  And

6    I'd like for you to just read to yourself the

7    second paragraph of the letter.

8              MR. EPSTEIN:  Would you repeat

9    what -- what number this is in terms of exhibit

10   and what Bates stamp it is?

11             MR. RAPPOPORT:  It's Bates stamped

12   Keuch 028.  And it would be Exhibit 3.

13             MR. MCDONOUGH:  Org chart to be two?

14             MR. RAPPOPORT:  Yeah.

15             (Keuch Deposition Exhibit Nos. 2 and

16   3 were marked for identification.)

17             THE WITNESS:  Okay.  I have read it.

18             BY MR. RAPPOPORT:

19        Q    Did he ever get back to you after

20   sending you the letter that's been marked as

21   Exhibit 3 as it relates to considering you for

22   a potential promotion to vice president at a

23   global grade 18?

24        A    Yes.

25        Q    And what did -- when he got back to

Page 145

1    you, what did he tell you?

2        A    That it would be challenging in the

3    current environment.

4        Q    Okay.  And what did you understand

5    that to mean?

6        A    I understood it to mean that it was

7    going to be a hard sell.

8        Q    And who would he have to sell it to?

9        A    He would have to sell it to Mark

10   Sabag.

11       Q    And did you have a working

12   relationship with Mr. Sabag.

13       A    I had minimal contact with Mr. Sabag.

14       Q    The retention bonus that you received

15   at this time of $60,000, were those retention

16   bonuses being paid to others or was this

17   something special for you?

18       A    There was -- there was a list that

19   circulated and worked through the organization.

20   And, yes, there were others who also received

21   the retention bonuses.

22       Q    And were they retention bonuses in

23   differing amounts?

24       A    To the best of my knowledge, yes.

25       Q    And what do you recall the range of

Page 147

1    in varying amounts?

2         A    I believe so, yes.

3         Q    Did you ever discuss the amount of

4    retention bonuses with anyone other than

5    yourself while at Teva?

6         A    I don't recall.

7         Q    Did any of your direct reports

8    receive retention bonuses?

9         A    I don't believe so.

10        Q    Were counterparts in Europe, Asia,

11   and Israel given retention bonuses?

12        A    I would not know that information so

13   I don't know.

14        Q    Did you agree to the terms that were

15   set forth within what's been marked Exhibit 3?

16        A    Yes.

17        Q    And did you receive the

18   $60,000 that's referenced therein?

19        A    I received two payments of $30,000,

20   yes.

21        Q    And did you understand this to be as

22   a result of services that you provided above

23   and beyond what are required given your

24   position?

25        A    It wasn't a bonus for performance as

Page 152

1      Q     What caused you to prepare it?

2      A     I was asked by Tal Zorman to do that.

3      Q     And when were you asked by Tal Zorman

4   to do that?

5      A     It would have been only a few days

6   before the date of this memo.  So if this memo

7   is December 14th, then it would have been in

8   early December.  I was not given a -- I don't

9   think I was given much lead time.

10      Q     In early December 2017, what

11   specifically did Tal Zorman request of you?

12      A     She asked me to put together some

13   options to basically reduce my staff by

14   50 percent.

15      Q     But wouldn't that have been the first

16   communication that you had with anyone at Teva

17   that a reduction in force was imminent and that

18   it would be 50 percent of the workforce?

19      A     I'm not sure that was the first

20   communication that -- you know, we were not

21   made aware that there were going to be -- there

22   was going to be a reduction in force.  I have a

23   sense that -- that I knew earlier, but did not

24   know the ramifications for my team.

25      Q     See even earlier then, about a week

Page 155

1    that you prepared the deck, which has been

2    marked as Exhibit 5, you had conversations with

3    both Miriam and with Diane?

4         A    That's correct.

5         Q    But not with Edu?

6         A    Edu was not -- Tal had told me that,

7    you know, I would -- the job would no longer

8    have responsibilities for Latin America.  So

9    Edu was not on my -- on my list.

10        Q    Was that in the same conversation

11   when she asked you to prepare the deck?

12        A    Yes, it was.

13        Q    Did she explain why Edu would no

14   longer be part of North America?

15        A    I believe the conversation was that

16   it was being moved to -- I think to Gaurav, who

17   was Asia-Pac.

18        Q    Did she indicate why?

19        A    No.  Just simply this was how they

20   were changing.  I had a sense it was dealing

21   more with business alignment.

22        Q    Did she indicate to you that there

23   was a realignment and Latin America would no

24   longer go through North America?

25        A    That's what I just said, yes.

Page 173

1   of, you know, Latin America would no longer be

2   reporting to me.  So we did not dwell on it

3   other than it was simply a matter of fact.

4        Q    Did you tell Mr. Nasi at some point

5   in time that he was going to be interviewed by

6   Ms. Zorman?

7        A    No.

8        Q    Did Ms. Zorman ever ask you your

9   opinion of Mr. Nasi?

10       A    No, not that I can recall.

11       Q    Did Ms. Zorman ever ask to see the

12   reviews that you prepared for Mr. Nasi?

13       A    No.

14       Q    When you had the conversation with

15   her on December the 7th or thereabouts, a week

16   before you prepared it, did you give any

17   consideration at all at that time that Mr. Nasi

18   may be identified as the next director for

19   Total Rewards in North America?

20       A    No.

21       Q    So if his name came up at all, it was

22   only to share with you that Latin America would

23   not be reporting in through North America?

24       A    That's correct.

25       Q    Okay.  If you look at the chart you

Page 174

1    prepared, which is on 58, which is part of

2    Exhibit 5, in the first chart you have

3    eliminate the region head.  That would be you.

4    Correct?

5         A    That's correct.

6         Q    Okay.  And you're suggesting that as

7    a proposal retaining both Rohach and Weinstein.

8    Is that correct?

9         A    That is correct.

10        Q    And both Rohach and Weinstein were

11   both younger than you, weren't they?

12        A    That's correct.

13        Q    Okay.  Notwithstanding the fact that

14   they were younger than you, you felt that one

15   scenario would see you leave and the two

16   younger people stay on?

17        A    And they would report to corporate,

18   yes.

19        Q    And by "corporate," what did you

20   mean?

21        A    Tal Zorman.  Or -- or whoever became

22   the global head of Total Rewards.  Again, it

23   was not clear that Tal was permanently going to

24   be the head of Total Rewards.  It was simply

25   the fact that Ron was leaving and the duties

Page 175

1   were then shifted to her and the tenure for the

2   shift was never disclosed.  It could have been

3   temporary.

4        Q    And on the same org chart you have

5   instead of eliminating the region head,

6   eliminate the compensation head and that would

7   have been Miriam Weinstein.

8        A    That is correct.

9        Q    So there were at least three

10  scenarios that you painted for Ms. Zorman to

11  choose from?

12       A    That is correct.

13       Q    Okay.  And in all of the scenarios,

14  Rohach stays on?

15       A    That is correct.

16       Q    And in one of the scenarios, you

17  leave?

18       A    That is correct.

19       Q    So when you send this to her, does

20  she respond and talk to you about the options

21  that you've painted?

22       A    No.

23       Q    No follow-up at all?

24       A    I didn't say that.  I believe you

25  have emails in your files that say thank you --

Page 191

1       A     I don't believe so.  I believe Edu

2   took charge of that.  They hadn't been decided

3   at the time that -- that my termination

4   happened.

5               MR. RAPPOPORT:  Let he show you what

6   I'm marking as Keuch Exhibit 6, which is Bates

7   stamped Keuch 183.  And it's a letter dated

8   January 9, 2018.

9               MR. SHEMTOB:  Seven.

10              MR. RAPPOPORT:  Seven.  I'm sorry.

11              (Keuch Deposition Exhibit No. 7 was

12   marked for identification.)

13              BY MR. RAPPOPORT:

14      Q     Do you recall receiving this letter?

15      A     I -- I do.

16      Q     Was it received by mail?

17      A     That I -- I -- I don't recall.  It

18   was a large package.  So I'll assume it was

19   received by mail but I don't -- I don't recall.

20      Q     And it would -- is that your

21   separation date, does it not?

22      A     Yes.

23      Q     And that was March 18 of 2018?

24      A     Yes.  Well -- yes.

25      Q     You were paid through that date, were

Page 192

1    you not?

2        A    Yes, I was.

3        Q    And the targeted last day of work as

4    set forth in the first paragraph was

5    February 23 of 2018.  Isn't that correct?

6        A    That's correct.

7        Q    Now, you testified earlier this

8    morning that other people being separated were

9    not expected to continue to work was active

10   employees.  Is there a reason why you were

11   expected to do so?

12       A    I believe that because of the lack of

13   experience and qualifications that Mr. Nasi

14   had, that they wanted me to stay on board and

15   make a smooth transition.

16       Q    What is the basis of that answer, who

17   told you that was the reason that they wanted

18   you had to stay on board?

19       A    That was a conversation that I had

20   with Tal Zorman.

21       Q    When was that conversation?

22       A    Sometime after January 2nd because

23   that's how the February 23rd date got set.

24       Q    So sometime after January 2nd, but

25   before February 23rd, you had still another

Page 200

1    Rohach.  And it would have been in -- in March.

2         Q    You stopped work in February but you

3    kept in touch with Diane Rohach?

4         A    I did.

5         Q    And did she tell you that?

6         A    She did.

7         Q    Well, I didn't finish my question.

8    What did she tell you as it relates to

9    Mr. Nasi?

10        A    She simply told me that he was -- he

11   had been promoted to a grade 16, senior

12   director.

13        Q    Was that bothersome to you?

14        A    Yes.

15        Q    Why?

16        A    I knew from the start that if Teva

17   had used their global grading system and

18   established the grade for the new job or the

19   revised position or the shortened position of

20   Total Rewards for now North America, that it

21   would not have come up as a grade 15.  It's

22   also very uncommon to have a 15 reporting to a

23   15, which Miriam was a grade 15.

24        Q    You had an expectation that at some

25   point in time, he would be evaluated as a labor

Page 201

1    grade 16?

2        A    I felt that the labor grading system

3    was basically administer -- manipulated to

4    basically get rid of me.

5        Q    Can you explain your answer?

6        A    It's quite simple.  If you run that

7    job through the grading system, you would not

8    come up -- have come up with a 15.  But by

9    making it a 15, it was a two-grade reduction,

10   which gave Teva much more clarity that I -- I

11   wouldn't accept the two-grade deduction and

12   maybe more of a legitimate claim, but then once

13   I was gone, they moved it to a 16.  It seems a

14   little bit deceptive.

15       Q    Are you speculating or did someone

16   share with you that that was in fact the

17   scheme?

18       A    A little -- I'm speculating.

19       Q    You have no real evidence to support

20   your speculation, do you?

21       A    I think if you ran the system, you

22   would find that it was not being used

23   accurately, that it was being manipulated to

24   get whatever senior leadership wanted to get

25   out of it at least in the HR organization.

Page 1

IN THE UNITED STATES DISTRCIT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA


RANDOLPH W. KEUCH,              )
                               )
        Plaintiff,             )
                               )
vs.                            )  Case No. 2:19-CV-05488
                               )
TEVA PHARMACEUTICALS USA,      )
INC. and TEVA PHARMACEUTICAL)
INDUSTRIES, LTD.,              )
                               )
        Defendants.            )


        VIDEOCONFERENCE DEPOSITION OF EDUARDO NASI,

taken on behalf of the Plaintiff, pursuant to

Notice, on Monday, June 13, 2022, commencing at

1:00 p.m., all parties appearing remotely via

Microsoft Teams, before Janice D. Burness,

Registered Professional Reporter, Certified Court

Reporter, and Notary Public.



Page 30

1          Did you have any conversations with her as

2     to what Randy's long-term goals were either on the

3     21st or the 22nd?

4          A.   Not on the 21st, and not about what would

5     happen to him.  But I asked her if I could talk to

6     him about me taking the North American position;

7     that was the only thing that I asked.

8          Q.   What did she say to that?

9          A.   To leave that to her and Dan Lawlor.  They

10    would communicate anything about any change.

11         Q.   So they told you not to talk to Randy

12    about it.

13         A.   Correct.

14         Q.   Did you ask why you couldn't talk to Randy

15    about it?

16         A.   No.  I understood why I shouldn't.  So ...

17         Q.   When you talked to her on 22nd, did you

18    give her an answer as to whether or not you would

19    be willing to undertake that responsibility for

20    heading up North America Total Rewards?

21         A.   I said that I would have to talk to my

22    wife because that would involve relocation.

23    Right?  I said that I was really excited about the

24    opportunity, but I need to talk to my wife first.

25             That's when I sent the email to her, I



Page 31

1    would say, on December 24th saying that we were

2    okay, you know, with the relocation, so I would

3    take the position.

4        Q.   Do you know what time of day that that

5    conversation took place?

6        A.   Between me and who?  My wife or --

7        Q.   No, with Tal.

8        A.   I would say in the morning our time.

9        Q.   Okay.  What time in the morning?  Do you

10   know?

11       A.   I don't remember.  I do believe it was in

12   the morning.

13       Q.   Give me just a moment.

14       A.   Sure.

15       Q.   I'd like you to look again in the pile of

16   documents marked as Teva documents, and

17   specifically that which is marked -- that which is

18   marked Teva 581.  Again, it's right near the top

19   of the documents.

20       A.   Okay.

21       Q.   Maybe ten down.

22       A.   Okay.

23       Q.   Do you know what, go two up from that and

24   look at 579.  I'd like you to pull out 579 through

25   581.

Page 39

1     Q.  When did it become clear to you that you

2  had to move, in context, close to the North Jersey

3  location?

4     A.  Since December 21st, 22nd.

5     Q.  As opposed to the Pennsylvania location,

6  correct?

7     A.  Oh.  No.  So since the beginning of

8  December I knew that I would have to relocate.

9         Honestly, I can't recollect at what point

10  or time I would have to be in Parsippany not in

11  North Wales.  I think even in March -- there is a

12  higher chance that I would be in Parsippany.

13         So yes, probably in March there was some

14  kind of announcement or communication saying that

15  we would be in Parsippany and not in North Wales.

16     Q.  At that time you were living in the

17  Fort Lauderdale area?

18     A.  Yes.

19     Q.  Specifically where, what town?

20     A.  Miramar.

21     Q.  And in Miramar did you own the family

22  home?

23     A.  Yes.

24     Q.  And when it was sold, what was the value

25  of that home?



Page 79

1            (A recess was taken.)

2            MR. EPSTEIN:  I'm sorry to disappoint you,

3    Mr. Nasi, but I have no further questions.

4            MR. RAPPAPORT:  That was an opportune

5    break.  I have some questions, so I won't be

6    disappointing you.

7            MR. EPSTEIN:  I assumed that you would.

8            MR. RAPPAPORT:  Thanks, Al.

9                    EXAMINATION

10   BY MR. RAPPAPORT:

11       Q.   When you worked for Teva and were

12   responsible for what you call LatAm, which I guess

13   is Latin America, who was your employer at that

14   time?

15       A.   What do you mean?

16       Q.   Were you employed by Teva USA?

17       A.   Yes, Teva USA.  Everybody based in the

18   U.S. was basically Teva USA.

19       Q.   And is Teva a wholly owned subsidiary of

20   TPI?

21       A.   Yes.

22       Q.   And is it in the same business that TPI is

23   in?

24       A.   Yes.

25       Q.   And how would you describe TPI's business?



Page 80

1      A.   It's a pharmaceutical.  Right?  So in both

2    generics and speciality and also biologics.  We

3    have a large, let's say, spectrum of different TAs

4    and products across the globe.

5      Q.   Does it both manufacture and market these

6    products?

7      A.   Yes.

8      Q.   And are there different therapies that it

9    has responsibility for?

10     A.   Yes.

11     Q.   Can you identify what those therapies are,

12    as many as you can recall?

13     A.   Oncology, respiratory, CNS, neuro,

14    neuroscience, psychiatric.  So there is a range of

15    different TAs.

16     Q.   Now, Mr. Keuch was the person who was

17    primarily responsible for hiring you?

18     A.   Yes.

19     Q.   And do I understand that you had a prior

20    relationship with him?

21     A.   Yes.  Correct.

22     Q.   And where did that relationship begin?

23     A.   When I was with Mercer already in the U.S.

24    So probably around 2010, '11.  I was with Mercer,

25    and I was responsible for the compensation



MAGNA >
LEGAL SERVICES

JOINT APPX - 0352

Page 82

1      Q.   And had Mr. Keuch been in the Teva

2    position for a long period of time before he hired

3    you?

4      A.   I can't recall when Randy did start at

5    Teva, but I would say it was also in 2014.  So it

6    was not a long time before hiring me.

7      Q.   So you both were hired by Teva in 2014?

8      A.   I would say yes.

9      Q.   And was Mr. Keuch responsible for

10   designing and overseeing compensation and benefits

11   policies for U.S., Canada, and Latin America?

12     A.   Yes.  Correct.

13     Q.   And did Latin America include Mexico?

14     A.   Yes.

15     Q.   Okay.  You responded to some questions

16   that Mr. Epstein asked you by referring to labor

17   grades.

18          What was your first labor grade at Teva?

19     A.   15.

20     Q.   And what's the scale?  What's the lowest

21   and what's the highest number?

22     A.   So we have very low-level jobs, a Grade 1

23   or 2, depending on the area.

24          We can go up to 23, globally speaking.

25          In the U.S. we have a maximum of 22, but



Page 83

1   we don't really touch those because these are

2   really executive management.

3          So I would say up to 20 it is what we

4   manage in general.

5     Q.   And do the labor grades match up with

6   certain job titles?

7     A.   Yes.

8     Q.   So starting at 15, can you tell me what

9   the labor grade is and what the associated job

10  title would be.

11    A.   So 15 is director.  Senior director we

12  have two different grades, so 16 and 17.  VP would

13  be 18.  And then for senior VPs we have 19, 20.

14         And we don't currently have anyone, but it

15  could go up to 21 as well.

16    Q.   Before you heard the announcement that you

17  testified to, had there been any speculation or

18  discussions or gossip or rumors during the course

19  of 2017 with respect to Teva's financial

20  condition?

21    A.   We lost our CEO, the previous CEO, I would

22  say, February, March, 2017.  So we stayed pretty

23  much the entire year without a CEO.  It was an

24  intervening guy from the board.

25         So, yes, everybody was somehow afraid or



Page 84

1    interested to know what was going to happen

2    throughout the year.

3         And then of course, as you said, with Kåre

4    it became clear that, you know, changes were going

5    to happen as soon as possible.

6    Q.   Were you expecting reductions before you

7    heard that reductions were coming?

8    A.   No.  I think we had some hire freezings

9    during 2017 due to the business situation.

10        But I can't recall right now if there were

11   any talk about reductions, you know, before Kåre.

12   Q.   How about discussions about bankruptcy?

13   Were they being discussed within the Teva

14   community?

15   A.   Not at my level at least.

16        And of course we were in the news after

17   that with Kåre, et cetera, but not that I was

18   aware of prior to Kåre's arrival.

19   Q.   When Kåre joined the company in late 2017,

20   did he share with the Teva community that

21   bankruptcy was a potential?

22   A.   Yes, if we didn't do a big, big

23   restructuring, cost savings.

24        I think especially there was a lot of

25   pressure from the Israel government, et cetera,



JOINT APPX - 0355

Page 85

1   why he was taking that approach at the time.

2       Q.   Okay.  Did you ever have any concern that

3   your job could be lost?

4       A.   From the Latin America perspective, yes.

5       Q.   And when you talked to Tal Zorman in

6   December of 2017, was that the first time you had

7   ever spoken to her?

8       A.   I would say probably, yes.  I don't think

9   there was any reason why as a Total Rewards LatAm

10  I would have talked to Tal before that.

11      Q.   Did you know who she was or what she did?

12      A.   Yes.

13      Q.   Was she new in her role?

14      A.   Yes.  As the global talent management

15  person, yes.

16      Q.   Who did she replace?

17      A.   We had three different COEs; one for Total

18  Rewards, one for L&D, one for talent acquisition

19  and global mobility, and her position combined all

20  of those COEs.

21          So it was somehow a new position, but she

22  replaced Ron Yaniv.  And I can't recall the name

23  of the guy who is leading talent acquisition right

24  now.

25      Q.   And what is a COE?



**MAGNA**
Legal Services

```
1        - - - - - -
            E R R A T A
2        - - - - - -

3

4 PAGE  LINE       CHANGE FROM          CHANGE TO              REASON

5 ___  ___  _____      See Attached Errata Sheet      _____

6 ___  ___  _____    _____    _____

7 ___  ___  _____    _____    _____

8 ___  ___  _____    _____    _____

9 ___  ___  _____    _____    _____

10 ___  ___  _____    _____    _____

11 ___  ___  _____    _____    _____

12 ___  ___  _____    _____    _____

13 ___  ___  _____    _____    _____

14 ___  ___  _____    _____    _____

15 ___  ___  _____    _____    _____

16 ___  ___  _____    _____    _____

17 ___  ___  _____    _____    _____

18 ___  ___  _____    _____    _____

19 ___  ___  _____    _____    _____

20 ___  ___  _____    _____    _____

21 ___  ___  _____    _____    _____

22 ___  ___  _____    _____    _____

23 ___  ___  _____    _____    _____

24 ___  ___  _____    _____    _____
```

www.MagnaLS.com                                    866-624-6221

Seven Penn Center
1635 Market Street – 8th Floor
Philadelphia, PA 19103

**MAGNA**
LEGAL SERVICES

1    ACKNOWLEDGMENT OF DEPONENT

2        I, Eduardo Nasi Chelde da Graca , do
3    hereby certify that I have read the
     foregoing pages,  1 - PGS, and that the
4    same is a correct transcription of the
     answers given by me to the questions
5    therein propounded, except for the
     corrections or changes in form or
6    substance, if any, noted in the attached
     Errata Sheet.
7
8    *Eduardo Nasi Cheide da Graca* 06/18/2022
     WITNESS NAME            DATE
9

10

11

12

13

14

15

16

17

18

19

20

21

22

### Eduardo Nasi Cheide da Graca Deposition Transcript Errata

| Page | Line | Correction | Reason |
|---|---|---|---|
| **The deponents correct legal name should be changed to Eduardo Nasi Cheide da Graca** | | | |
| 11 | 21-22 | Change "they had accounts that" to "the headcounts" | Transcription Error |
| 13 | 12 | Change "intervening" to "interim" | Transcription Error |
| 17 | 15 | Change "patient" to "pension" | Transcription Error |
| 34 | 11 | Change "joking even with friends" to "joke even with Randy" | Transcription Error |
| 34 | 15 | Change "change" to "manage" | Transcription Error |
| 38 | 16 | Change "change" to "move" | Transcription Error |
| 41 | 10 | Change "to Mexico" to "domestic" | Transcription Error |
| 41 | 23 | Change "vetted" to "checked" | Transcription Error |
| 42 | 12 | Change "commutation" to "documentation" | Transcription Error |
| 45 | 16 | Change "will" to "would not" | Transcription Error |
| 53 | 1 | Change "work counts" to "works councils" | Transcription Error |
| 53 | 3 | Change "Karolina Bloch" to "Karolina Block" | Transcription Error |
| 53 | 7 | Change "Ms. Bloch" to "Ms. Block" | Transcription Error |
| 59 | 5 | Change "lose" to "reduce" | Transcription Error |
| 59 | 15 | Change "Jen" to "Jan" | Transcription Error |
| 67 | 21 | Change "real-world" to "real global" | Transcription Error |
| 70 | 6 | Change "people" to "person" | Transcription Error |
| 75 | 24 | Change "author's" to "auditor" | Transcription Error |
| 83 | 24 | Change "intervening" to "interim" | Transcription Error |

JOINT APPX - 0359

## CERTIFICATE OF SERVICE

I, Larry Rappoport, certify that on this 21st day of June, 2022, Defendants' Motion for Summary Judgment, Statement of Undisputed Material Facts, Brief in Support of Summary Judgment, Joint Appendix, and proposed Order were filed electronically and are available for viewing and downloading from the ECF system.  I further certify that Plaintiff's counsel of record was served as a result of this electronic filing.

/s/ *Larry Rappoport*
Larry Rappoport