SPECIAL

# United States District Court
## Eastern District of Pennsylvania (Philadelphia)
## CIVIL DOCKET FOR CASE #: 2:19-cv-05488-JMG

KEUCH v. TEVA PHARMACEUTICALS USA, INC. et al
Assigned to: HONORABLE JOHN M. GALLAGHER
Cause: 29:621 Job Discrimination (Age)

Date Filed: 11/19/2019
Jury Demand: Plaintiff
Nature of Suit: 442 Civil Rights:
Employment
Jurisdiction: Federal Question

**Plaintiff**
**RANDOLPH KEUCH**

represented by **ALAN B. EPSTEIN**
SPECTOR GADON & ROSEN, PC
SEVEN PENN CENTER
1635 MARKET ST
7TH FL
PHILADELPHIA, PA 19103
215-241-8832
Fax: 215-241-8844
Email: aepstein@lawsgr.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**JENNIFER MYERS CHALAL**
SPECTOR, GADON & ROSEN, PC
1635 MARKET ST.
7TH FL SEVEN PENN CNTR.
PHILADELPHIA, PA 19103
215-241-8888
Email: jmyers@lawsgr.com
*ATTORNEY TO BE NOTICED*

V.

**Defendant**
**TEVA PHARMACEUTICALS USA,
INC.**

represented by **BRANDON SHABY SHEMTOB**
STEVENS & LEE
1500 Market Street, East Tower
Suite 1800
Philadelphia, PA 19102
215-495-3835
Fax: 610-988-0865
Email: BSS@stevenslee.com
*ATTORNEY TO BE NOTICED*

**LARRY J. RAPPOPORT**
Stevens & Lee
1500 Market Street
East Tower, Suite 1800

Philadelphia, PA 19102
215-496-3839
Fax: 610-371-7977
Email: larry.rappoport@stevenslee.com
*ATTORNEY TO BE NOTICED*

**Defendant**

**TEVA PHARMACEUTICALS
INDUSTRIES, LTD.**
    represented by    **BRANDON SHABY SHEMTOB**
(See above for address)
*ATTORNEY TO BE NOTICED*

**LARRY J. RAPPOPORT**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**KARE SCHULTZ**
*AS PRESIDENT AND CEO TEVA
PHARMACEUTICALS INDUSTRIES, LTD.*
*TERMINATED: 11/23/2020*
    represented by    **LARRY J. RAPPOPORT**
(See above for address)
*TERMINATED: 11/23/2020*

**Defendant**

**RON YANIV**
*AS SVP GLOBAL COMPENSATION AND
BENEFITS*
*TERMINATED: 11/23/2020*
    represented by    **LARRY J. RAPPOPORT**
(See above for address)
*TERMINATED: 11/23/2020*

| Date Filed | # | Docket Text |
|---|---|---|
| 11/19/2019 | 1 | COMPLAINT against KARE SCHULTZ, TEVA PHARMACEUTICALS INDUSTRIES, LTD., TEVA PHARMACEUTICALS USA, INC., RON YANIV ( Filing fee $ 400 receipt number PPE207206.), filed by RANDOLPH KEUCH.(bw, ) (Entered: 11/22/2019) |
| 11/19/2019 | | DEMAND for Trial by Jury by RANDOLPH KEUCH. (bw, ) (Entered: 11/22/2019) |
| 11/19/2019 | | 4 Summons Issued as to KARE SCHULTZ, TEVA PHARMACEUTICALS INDUSTRIES, LTD., TEVA PHARMACEUTICALS USA, INC., RON YANIV. Forwarded To: COUNSEL on 11/22/2019 (bw, ) (Entered: 11/22/2019) |
| 01/08/2020 | 2 | AFFIDAVIT of Service by Federal Express re: served Complaint upon TEVA Pharmaceuticals USA, Inc. by Overnight Mail on 01/06/2020 (Attachments: # 1 Exhibit Exhibit "A")(EPSTEIN, ALAN) (Entered: 01/08/2020) |
| 01/23/2020 | 3 | MOTION for Leave to File */Effect Service on Defendants TEVA Pharmaceuticals Industries, LTD, Kare Schultz and Ron Yaniv Pursuant to Fed. R. Civ.P. 4(f)(3) and Article 10 of the Hague Convention* filed by RANDOLPH KEUCH.Memorandum, Certificate of Service. (Attachments: # 1 Memorandum Memorandum of Law in Support of Motion for Leave to Effect Service, # 2 Exhibit Exhibit A, # 3 Text of Proposed Order Proposed Order)(EPSTEIN, ALAN) (Entered: 01/23/2020) |
| 01/27/2020 | 4 | NOTICE of Appearance by LARRY J. RAPPOPORT on behalf of TEVA PHARMACEUTICALS USA, INC. with Certificate of Service(RAPPOPORT, LARRY) (Entered: 01/27/2020) |
| 01/27/2020 | 5 | NOTICE of Appearance of Brandon S. Shemtob by LARRY J. RAPPOPORT on behalf of |

| | | |
|---|---|---|
| | | TEVA PHARMACEUTICALS USA, INC., with Certificate of Service.(RAPPOPORT, LARRY) (FILED IN ERROR BY ATTY; REFILED AT PAPER #9) Modified on 1/27/2020 (md). (Entered: 01/27/2020) |
| 01/27/2020 | 6 | First MOTION to Strike *IMMATERIAL, IMPERTINENT AND SCANDALOUS MATTERS FROM PLAINTIFF'S COMPLAINT* filed by TEVA PHARMACEUTICALS USA, INC..Brief in Support. (Attachments: # 1 Brief, # 2 Text of Proposed Order, # 3 Certificate of Service)(RAPPOPORT, LARRY) (Entered: 01/27/2020) |
| 01/27/2020 | 7 | *TEVA PHARMACEUTICALS USA, INC.'S* ANSWER to 1 Complaint *AND AFFIRMATIVE DEFENSES TO PLAINTIFF'S COMPLAINT* by TEVA PHARMACEUTICALS USA, INC.. (Attachments: # 1 Certificate of Service) (RAPPOPORT, LARRY) (Entered: 01/27/2020) |
| 01/27/2020 | 8 | Disclosure *of RULE 7.1* filed by TEVA PHARMACEUTICALS USA, INC..Certificate of Service. (Attachments: # 1 Certificate of Service)(RAPPOPORT, LARRY) Modified on 1/28/2020 (amas, ). (Entered: 01/27/2020) |
| 01/27/2020 | 9 | NOTICE of Appearance by BRANDON SHABY SHEMTOB on behalf of TEVA PHARMACEUTICALS USA, INC. with Certificate of Service(SHEMTOB, BRANDON) (Entered: 01/27/2020) |
| 01/28/2020 | | Disclosure Statement Form pursuant to FRCP 7.1 Identifying Corporate Parent TEVA PHARMACEUTICAL INDUSTRIES LTD. for TEVA PHARMACEUTICALS USA, INC.. by TEVA PHARMACEUTICALS USA, INC. (SEE DOC. NO. 8 FOR PDF)(amas) (Entered: 01/28/2020) |
| 02/11/2020 | 10 | STIPULATION AND ORDER THAT PLAINTIFF IS GRANTED AN EXTENSION OF TIME, UNTIL 2/20/2020, TO RESPOND TO TEVA PHARMACEUTICALS USA, INC.'S MOTION TO STRIKE. SIGNED BY HONORABLE WENDY BEETLESTONE ON 2/10/2020. 2/12/2020 ENTERED AND COPIES E-MAILED.(amas) (Entered: 02/12/2020) |
| 02/20/2020 | 11 | RESPONSE in Opposition re 6 First MOTION to Strike *IMMATERIAL, IMPERTINENT AND SCANDALOUS MATTERS FROM PLAINTIFF'S COMPLAINT* filed by RANDOLPH KEUCH. (Attachments: # 1 Memorandum Memorandum of Law, # 2 Text of Proposed Order Proposed Order)(EPSTEIN, ALAN) (Entered: 02/20/2020) |
| 02/28/2020 | 13 | STIPULATION AND ORDER THAT DEFENDANT TEVA PHARMACEUTICALS USA, INC. IS GRANTED AN EXTENSION OF TIME, UNTIL 3/5/2020, TO REPLY TO PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION TO STRIKE. SIGNED BY HONORABLE WENDY BEETLESTONE ON 2/28/2020. 3/2/2020 ENTERED AND COPIES E-MAILED.(amas) (Entered: 03/02/2020) |
| 03/02/2020 | 12 | ORDER THAT THIS CASE IS REASSIGNED FROM HONORABLE WENDY BEETLESTONE TO HONORABLE JOHN M. GALLAGHER FOR ALL FURTHER PROCEEDINGS. SIGNED BY CLERK OF COURT KATE BARKMAN, CLERK OF COURT ON 03/02/2020. 03/02/2020 ENTERED AND COPIES E-MAILED.(nd, ) (Entered: 03/02/2020) |
| 03/05/2020 | 14 | REPLY to Response to Motion re 6 First MOTION to Strike *IMMATERIAL, IMPERTINENT AND SCANDALOUS MATTERS FROM PLAINTIFF'S COMPLAINT* filed by KARE SCHULTZ, TEVA PHARMACEUTICALS INDUSTRIES, LTD., TEVA PHARMACEUTICALS USA, INC., RON YANIV. (Attachments: # 1 Certificate of Service)(RAPPOPORT, LARRY) Modified on 3/5/2020 (jaa, ). *FILED IN ERROR. REFER TO DOCUMENT #15 FOR CORRECT ENTRY. (Entered: 03/05/2020) |
| 03/05/2020 | 15 | REPLY to Response to Motion re 6 First MOTION to Strike *IMMATERIAL,* |

| | | |
|---|---|---|
| | | *IMPERTINENT AND SCANDALOUS MATTERS FROM PLAINTIFF'S COMPLAINT* filed by TEVA PHARMACEUTICALS USA, INC.. (Attachments: # 1 Certificate of Service) (RAPPOPORT, LARRY) (Entered: 03/05/2020) |
| 03/06/2020 | 16 | CONSENT to Jurisdiction by US Magistrate Judge by KARE SCHULTZ, TEVA PHARMACEUTICALS INDUSTRIES, LTD., TEVA PHARMACEUTICALS USA, INC., RON YANIV.. (RAPPOPORT, LARRY) (Entered: 03/06/2020) |
| 03/24/2020 | 17 | CONSENT AND ORDER TO JURISDICTION BY US MAGISTRATE JUDGE OF 3/24/20 THAT THIS CASE IS REFERRED TO U.S.MAGISTRATE JUDGE TIMOTHY R. RICE TO CONDUCT ALL PROCEEDINGS AND ORDER THE ENTRY OF A FINAL JUDGMENT IN ACCORDANCE WITH 28 U.S.C. 636(c), FRCP 73. SIGNED BY JUDGE: JOHN M. GALLAGHER ON 3/24/20. 3/24/20 ENTERED AND COPIES E-MAILED.(DT) Modified on 4/9/2020 (dt, ). (Main Document 17 replaced on 4/9/2020) (dt, ). ( (Entered: 03/24/2020) |
| 04/13/2020 | 18 | NOTICE of Appearance by JENNIFER MYERS CHALAL on behalf of RANDOLPH KEUCH with Certificate of Service(CHALAL, JENNIFER) (Entered: 04/13/2020) |
| 04/17/2020 | 19 | Minute Entry for proceedings held before MAGISTRATE JUDGE TIMOTHY R. RICE Pretrial Conference held on 4/17/20 (amas, ) (Entered: 04/17/2020) |
| 04/17/2020 | 20 | ORDER THAT PLAINTIFF'S MOTION TO SERVE (DOC. NO. 3 ) IS GRANTED. ONCE ALL INDIVIDUAL DEFENDANTS HAVE BEEN SERVED, PLAINTIFF SHALL FILE NOTICE OF SERVICE OF COMPLETION WITH THE COURT. DEFENDANT'S MOTION TO STRIKE (DOC. NO. 6 ) IS DENIED WITHOUT PREJUDICE. WITHIN 45 DAYS OF NOTICE THAT SERVICE HAS BEEN COMPLETED, DEFENDANTS MAY FILE THEIR RULE 12 MOTIONS, ETC. THE PARTIES SHALL CONTACT THE COURT TO SCHEDULE ANOTHER SCHEDULING CONFERENCE WITHIN 7 DAYS OF THE DISPOSITION OF THOSE MOTIONS. SIGNED BY MAGISTRATE JUDGE TIMOTHY R. RICE ON 4/17/20.4/17/20 ENTERED AND COPIES E-MAILED.(amas, ) (Entered: 04/17/2020) |
| 04/27/2020 | 21 | RESPONSE to Motion re 6 First MOTION to Strike *IMMATERIAL, IMPERTINENT AND SCANDALOUS MATTERS FROM PLAINTIFF'S COMPLAINT* filed by TEVA PHARMACEUTICALS USA, INC.. (Attachments: # 1 Certificate of Service) (RAPPOPORT, LARRY) (Entered: 04/27/2020) |
| 04/28/2020 | 22 | RESPONSE in Opposition re 6 First MOTION to Strike *IMMATERIAL, IMPERTINENT AND SCANDALOUS MATTERS FROM PLAINTIFF'S COMPLAINT* filed by RANDOLPH KEUCH. (CHALAL, JENNIFER) (Entered: 04/28/2020) |
| 04/28/2020 | 23 | ORDER THAT DEFENDANT'S MOTION TO STRIKE (DOC. NOS. 21 - 22 ) IS DENIED AS OUTLINED HEREIN. SIGNED BY MAGISTRATE JUDGE TIMOTHY R. RICE ON 4/28/20. 4/28/20 ENTERED AND COPIES E-MAILED.(amas, ) (Entered: 04/28/2020) |
| 07/07/2020 | 24 | AFFIDAVIT of Service by Federal Express re: served Complaint upon Ron Yaniv, COO by Federal Express on 06/28/2020 (Attachments: # 1 Exhibit Exhibit "A")(EPSTEIN, ALAN) (Entered: 07/07/2020) |
| 08/21/2020 | 25 | MOTION to Dismiss *DEFENDANTS FROM THIS CASE FOR LACK OF PERSONAL JURISDICTION, FAILURE TO EFFECTUATE SERVICE ON RON YANIV AND FAILURE TO EXHAUST ADMINISTRATIVE REMEDIES WITH RESPECT TO RON YANIV* filed by KARE SCHULTZ, TEVA PHARMACEUTICALS INDUSTRIES, LTD., RON YANIV.Brief in Support, Certificate of Service. (Attachments: # 1 Brief in Support of Motion to Dismiss, # 2 Exhibit to Brief in Support of Motion to Dismiss, # 3 Text of Proposed Order, # 4 Certificate of Service)(RAPPOPORT, LARRY) (Entered: 08/21/2020) |

| 09/16/2020 | 26 | STIPULATION AND ORDER THAT PLAINTIFF IS GRANTED AN EXTENSION OF TIME, UNTIL 10/5/20, TO RESPOND TO THE PENDING MOTION TO DISMISS. SIGNED BY MAGISTRATE JUDGE TIMOTHY R. RICE ON 9/16/20. 9/17/20 ENTERED AND COPIES E-MAILED.(amas, ) (Entered: 09/17/2020) |
|---|---|---|
| 10/05/2020 | 27 | RESPONSE in Opposition re 25 MOTION to Dismiss *DEFENDANTS FROM THIS CASE FOR LACK OF PERSONAL JURISDICTION, FAILURE TO EFFECTUATE SERVICE ON RON YANIV AND FAILURE TO EXHAUST ADMINISTRATIVE REMEDIES WITH RESPECT TO RON YANIV* filed by RANDOLPH KEUCH. (Attachments: # 1 Exhibit, # 2 Certificate of Service, # 3 Text of Proposed Order)(EPSTEIN, ALAN) (Entered: 10/05/2020) |
| 10/12/2020 | 28 | REPLY to Response to Motion re 25 MOTION to Dismiss *DEFENDANTS FROM THIS CASE FOR LACK OF PERSONAL JURISDICTION, FAILURE TO EFFECTUATE SERVICE ON RON YANIV AND FAILURE TO EXHAUST ADMINISTRATIVE REMEDIES WITH RESPECT TO RON YANIV AND FAILURE TO EXHAUST ADMINISTRATIVE REMEDIES WITH RESPECT TO RON YANIV* filed by KARE SCHULTZ, TEVA PHARMACEUTICALS INDUSTRIES, LTD., RON YANIV. (RAPPOPORT, LARRY) (Entered: 10/12/2020) |
| 11/23/2020 | 29 | MEMORANDUM OPINION. SIGNED BY MAGISTRATE JUDGE TIMOTHY R. RICE ON 11/19/20. 11/23/20 ENTERED AND COPIES E-MAILED.(amas, ) (Entered: 11/23/2020) |
| 11/23/2020 | 30 | MEMORANDUM OPINION ORDER THAT THE MOTION TO DISMISS (DOC. NO. 25 ) IS GRANTED IN PART AND DENIED IN PART. DEFENDANTS SCHULTZ AND YANIV ARE DISMISSED WITH PREJUDICE. KEUCH MAY SUBMIT NO MORE THAN TEN INTERROGATORIES AND TEN DOCUMENT REQUESTS ON TEVA WORLDWIDE AND/OR TEVA US RELATED TO TEVA WORLDWIDE'S INVOLVEMENT IN KEUCH'S TERMINATION. KEUCH MAY FILE AN AMENDED COMPLAINT BY 1/19/21. SIGNED BY MAGISTRATE JUDGE TIMOTHY R. RICE ON 11/19/20. 11/23/20 ENTERED AND COPIES E-MAILED.(amas, ) (Entered: 11/23/2020) |
| 01/11/2021 | 31 | ORDER THAT IF THE SCHEDULED MEDIATION IS NOT SUCCESSFUL IN DISPOSING OF THE REMAINING CLAIMS IN THIS ACTION KEUCH SHALL BE PERMITTED TO SUBMIT NO MORE THEN 10 INTERROGATORIES AND TEN DOCUMENT REQUESTS ON TEVA WORLDWIDE AND/OR TEVA US RELATED TO TEVA WORLDWIDE'S INVOLVEMENT IN KEUCH'S TERMINATION THROUGH 1/31/21. PLAINTIFF MAY FILE AN AMENDED COMPLAINT ON OR BEFORE 3/15/21. SIGNED BY MAGISTRATE JUDGE TIMOTHY R. RICE ON 1/11/21. 1/11/21 ENTERED AND COPIES E-MAILED.(amas, ) (Entered: 01/11/2021) |
| 03/15/2021 | 32 | AMENDED COMPLAINT against All Defendants All Defendants., filed by RANDOLPH KEUCH. (Attachments: # 1 Certificate of Service)(EPSTEIN, ALAN) (Entered: 03/15/2021) |
| 03/24/2021 | 33 | STIPULATION AND ORDER THAT DEFENDANTS TEVA PHARMACEUTICALS INDUSTRIES, LTD. AND TEVA PHARMACEUTICALS USA, INC., ARE GRANTED AN EXTENSION OF TIME, UNTIL 4/12/21, TO RESPOND TO THE AMENDED COMPLAINT. SIGNED BY MAGISTRATE JUDGE TIMOTHY R. RICE ON 3/24/21. 3/24/21 ENTERED AND COPIES E-MAILED.(amas, ) (Entered: 03/24/2021) |
| 04/12/2021 | 34 | *DEFENDANT TEVA PHARMACEUTICALS USA, INC.'S AFFIRMATIVE DEFENSES AND* ANSWER to 32 Amended Complaint by TEVA PHARMACEUTICALS USA, INC.. (Attachments: # 1 Certificate of Service)(RAPPOPORT, LARRY) (Entered: 04/12/2021) |

| | | |
|---|---|---|
| 04/12/2021 | 35 | *TEVA PHARMACEUTICAL INDUSTRIES, LTD.'S AFFIRMATIVE DEFENSES AND ANSWER to 32 Amended Complaint by TEVA PHARMACEUTICALS INDUSTRIES, LTD.. (Attachments: # 1 Certificate of Service)(RAPPOPORT, LARRY) (Entered: 04/12/2021)* |
| 04/12/2021 | 36 | Disclosure Statement Form pursuant to FRCP 7.1 with Certificate of Service by TEVA PHARMACEUTICALS INDUSTRIES, LTD.. (Attachments: # 1 Certificate of Service) (RAPPOPORT, LARRY) (Entered: 04/12/2021) |
| 05/05/2021 | 37 | ORDER THAT BY 7/30/21 ALL CLASS DISCOVERY SHALL BE COMPLETED. BY 9/17/21 PLAINTIFF SHALL FILE A MOTION FOR CLASS CERTIFICATION. BY 9/17/21 ALL WRITTEN DISCOVERING REGARDING PLAINTIFF KEUCH SHALL BE COMPLETED. BY 11/15/21 ALL DEPOSITION DISCOVERY REGARDING PLAINTIFF LEUCH SHALL BE COMPLETED. MOTIONS FOR SUMMARY JUDGMENT SHALL BE FILED BY 1/3/22. FURTHER DEADLINES OUTLINED HEREIN. SIGNED BY MAGISTRATE JUDGE TIMOTHY R. RICE ON 5/5/21. 5/5/21 ENTERED AND COPIES E-MAILED.(amas, ) (Entered: 05/05/2021) |
| 07/01/2021 | 38 | STIPULATION AND ORDER THAT BY AND BETWEEN PLAINTIFF RANDOLPH LEUCH AND DEFENDANTS TEVA PHARMACEUTICALS USA, INC. AND TEVA PHARMACEUTICAL INDUSTRIES, LTD., THAT THE PREVIOUS DEADLINE OF 7/31/21 SHALL BE EXTENDED FOR AN ADDITIONAL 30 DAYS THROUGH 8/21/21. SIGNED BY MAGISTRATE JUDGE TIMOTHY R. RICE ON 7/1/21. 7/1/21 ENTERED AND COPIES E-MAILED.(amas, ) (Entered: 07/01/2021) |
| 08/27/2021 | 39 | STIPULATION AND ORDER THAT ALL DEADLINES SHALL BE EXTENDED BY 60 DAYS. ALL CLASS DISCOVERY SHALL BE COMPLETED BU 10/28/21. PLAINTIFF SHALL FILE A MOTION FOR CLASS CERTIFICATION BY 11/16/21. ALL WRITTEN DISCOVERY IS DUE BY 11/16/21. ALL DEPOSITION DISCOVERY IS DUE BY 1/14/22. MOTIONS FOR SUMMARY JUDGMENT ARE DUE BY 4/5/21. FURTHER DEADLINES OUTLINED HEREIN. SIGNED BY MAGISTRATE JUDGE TIMOTHY R. RICE ON 8/27/21. 8/27/21 ENTERED AND COPIES E-MAILED.(amas, ) (Entered: 08/27/2021) |
| 11/17/2021 | 40 | STIPULATION AND ORDER THAT PLAINTIFF DISMISSES WITH PREJUDICE ALL CLASS OR COLLECTIVE BASED CLAIMS AGAINST THE DEFENDANTS ARISING OUT OF THE ALLEGATIONS CONTAINED IN THE AMENDED COMPLAINT. THE PARTIES HEREBY AGREE AND STIPULATE THAT THE ABOVE CAPTIONED ACTION SHALL PROCEED AS A SINGLE PLAINTIFF CASE. SIGNED BY MAGISTRATE JUDGE TIMOTHY R. RICE ON 11/17/21. 11/17/21 ENTERED AND COPIES E-MAILED.(amas, ) (Entered: 11/17/2021) |
| 01/18/2022 | 41 | STIPULATION AND ORDER THAT ALL FACT DISCOVERY IS DUE BY 4/15/22. MOTIONS FOR SUMMARY JUDGMENT ARE DUE BY 5/20/22. FURTHER DEADLINES OUTLINED HEREIN. SIGNED BY MAGISTRATE JUDGE TIMOTHY R. RICE ON 1/18/22. 1/18/22 ENTERED AND COPIES E-MAILED.(amas) (Entered: 01/18/2022) |
| 02/17/2022 | 42 | ORDER THAT THIS CASE IS REASSIGNED FROM MAGISTRATE JUDGE TIMOTHY R. RICE TO MAGISTRATE JUDGE CAROL SANDRA MOORE WELLS FOR ALL FURTHER PROCEEDINGS. SIGNED BY CLERK OF COURT KATE BARKMAN, CLERK OF COURT ON 2/17/22. 2/18/22 ENTERED AND COPIES E-MAILED.(amas) (Entered: 02/18/2022) |
| 03/03/2022 | 43 | Notice of Case Assignment (Attachments: # 1 CONSENT)(amas) (Entered: 03/03/2022) |
| 03/04/2022 | 44 | CONSENT to Jurisdiction by US Magistrate Judge by RANDOLPH KEUCH.. (EPSTEIN, |

| | | ALAN) (Entered: 03/04/2022) |
|---|---|---|
| 03/08/2022 | 45 | Notice DECLINING Magistrate Consent by TEVA PHARMACEUTICALS INDUSTRIES, LTD., TEVA PHARMACEUTICALS USA, INC..(SHEMTOB, BRANDON) (Entered: 03/08/2022) |
| 03/09/2022 | 46 | ORDER THAT THIS CASE IS REASSIGNED FROM MAGISTRATE JUDGE CAROL SANDRA MOORE WELLS TO HONORABLE JOHN M. GALLAGHER FOR ALL FURTHER PROCEEDINGS. SIGNED BY CLERK OF COURT KATE BARKMAN, CLERK OF COURT ON 3/9/22. 3/9/22 ENTERED AND COPIES E-MAILED.(amas) (Entered: 03/09/2022) |
| 03/22/2022 | 47 | STIPULATION AND ORDER OF 3/21/22 THAT MOTIONS FOR SUMMARY JUDGMENT SHALL BE FILED ON OR BEFORE JUNE 20, 2022. RESPONSES IN OPPOSITION TO MOTION FOR SUMMARY JUDGMENT SHALL BE FILED ON OR BEFORE JULY 15, 2022. REPLIES IN FURTHER SUPPORT OF SUMMARY JUDGMENT SHALL BE FILED ON OR BEFORE JULY 22, 2022. SIGNED BY JUDGE: JOHN M.GALLAGHER ON 3/21/22. 3/22/22 ENTERED AND COPIES E-MAILED. (DT) (Entered: 03/22/2022) |
| 06/08/2022 | 48 | Consent MOTION for Leave to File *Brief in Support of Motion for Summary Judgment in Excess of Twenty Pages* filed by TEVA PHARMACEUTICALS INDUSTRIES, LTD., TEVA PHARMACEUTICALS USA, INC..Certification of Counsel, Certification of Service. (Attachments: # 1 Local Rule 7.1 (b) Certification, # 2 Certificate of Service, # 3 Text of Proposed Order)(SHEMTOB, BRANDON) (Entered: 06/08/2022) |
| 06/09/2022 | 49 | ORDER OF 6/9/22 THAT DEFENDANTS' MOTION TO EXCEED PAGE LIMIT (DOC. 48) IS GRANTED. SIGNED BY JUDGE: JOHN M. GALLAGHER ON 6/9/22. 6/9/22 ENTERED AND COPIES E-MAILED. (DT) (Entered: 06/09/2022) |
| 06/20/2022 | 50 | MOTION Leave to File Joint Appendix at the Close of Briefing filed by RANDOLPH KEUCH.Certificate of Counsel and Certificate of Service.(EPSTEIN, ALAN) (Entered: 06/20/2022) |
| 06/21/2022 | 51 | MOTION for Summary Judgment filed by TEVA PHARMACEUTICALS INDUSTRIES, LTD., TEVA PHARMACEUTICALS USA, INC..Brief, Certificate of Service. (Attachments: # 1 Statement of Undisputed Material Facts, # 2 Brief in Support of Summary Judgment, # 3 Appendix, # 4 Certificate of Service, # 5 Text of Proposed Order) (RAPPOPORT, LARRY) (Entered: 06/21/2022) |
| 06/21/2022 | 52 | ORDER OF 6/21/22 THAT UPON CONSIDERATION OF PLAINTIFF'S UNCONTESTED MOTION FOR LEAVE TO FILE A JOINT APPENDIX TO THE MOTION FOR SUMMARY JUDGMENT AT THE CONCLUSIONS OF ALL BRIEFING (ECF NO. 50), AND GOOD CAUSE APPEARING, IT IS HEREBY ORDERED THAT THE MOTION (ECF NO. 50) IS GRANTED. SIGNED BY JUDGE: JOHN M. GALLAGHER ON 6/21/22. 6/21/22 ENTERED AND COPIES E-MAILED. (DT) (Entered: 06/21/2022) |
| 07/14/2022 | 53 | MOTION for Extension of Time to File Answer *to Motion for Summary Judgment and to Allow Additional Supporting Memorandum Pages* filed by RANDOLPH KEUCH.Certificate of Service.(EPSTEIN, ALAN) (Entered: 07/14/2022) |
| 07/15/2022 | 54 | ORDER THAT MOTION TO EXTEND TIME FOR THE FILING OF PLAINTIFF'S RESPONSE TO DEFENDANTS MOTION FOR SUMMARY JUDGMENT (ECF NO. 53), IS GRANTED. SIGNED BY HONORABLE JOHN M. GALLAGHER ON 7/15/22. 7/15/22 ENTERED AND COPIES E-MAILED.(er) (Entered: 07/15/2022) |
| 07/28/2022 | 55 | MOTION for Extension of Time to File Response/Reply *to Defendants' Motion for* |

| | | |
|---|---|---|
| | | *Summary Judgment and Defendants' Reply* filed by RANDOLPH KEUCH.Certification of Counsel and Certificate of Service.(CHALAL, JENNIFER) (Entered: 07/28/2022) |
| 07/28/2022 | 56 | ORDER OF 7/28/22 THAT PLAINTIFF'S UNCONTESTED MOTION FOR EXTENSION OF TIME FOR FILING A RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (ECF NO. 55) IS GRANTED. FURTHER ORDERED THAT PLAINTIFF HAS UNTIL AUGUST 8, 2022 TO FILE HIS RESPONSE. THE DEFENDANTS HAVE UNTIL AUGUST 15, 2022 TO FILE ANY REPLIES THERETO. SIGNED BY JUDGE: JOHN M. GALLAGHER ON 7/28/22. 7/29/22 ENTERED AND COPIES E-MAILED. (DT) Modified on 8/3/2022 (lvj). (Entered: 07/29/2022) |
| 08/05/2022 | 57 | MOTION for Extension of Time to File Response/Reply *to Defendants' Motion for Summary Judgment and Defendants' Reply* filed by RANDOLPH KEUCH.Certification of Counsel and Certificate of Service.(CHALAL, JENNIFER) (Entered: 08/05/2022) |
| 08/05/2022 | 58 | ORDER THAT THE UNCONTESTED MOTION TO EXTEND TIME FOR FILING HIS RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND DEFENDANTS' REPLY (ECF NO. 57), IS GRANTED. IT IS FURTHER ORDERED THAT PLAINTIFF HAS UNTIL AUGUST 15, 2022, TO FILE HIS RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND DEFENDANTS HAVE UNTIL AUGUST 22, 2022, TO FILE ANY REPLIES THERETO. SIGNED BY HONORABLE JOHN M. GALLAGHER ON 8/5/22.8/8/22 ENTERED AND COPIES E-MAILED.(er) (Entered: 08/08/2022) |

| PACER Service Center | | |
|---|---|---|
| **Transaction Receipt** | | |
| 08/13/2022 10:44:06 | | |
| **PACER Login:** | epsteinalanb | **Client Code:** | 061264-0001 AE |
| **Description:** | Docket Report | **Search Criteria:** | 2:19-cv-05488-JMG |
| **Billable Pages:** | 6 | **Cost:** | 0.60 |



alan

United States District Court Eastern Di...Court Eastern District of Pennsylvania

08/13/22   10:50 AM

Xerox® AltaLink® B8075 MFP

JOINT APPX 0368

JOINT APPX 0369

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **RANDOLPH W. KEUCH** | : | |
| **Plaintiff** | : | **CIVIL ACTION** |
| **v.** | : | |
| | : | **No. 19-CV-05488** |
| **TEVA PHARMECEUTICALS USA, INC.** | : | |
| **And TEVA PHARMECEUTICALS** | : | |
| **INDUSTRIES, Ltd.** | : | |
| **Defendants** | : | |

## AMENDED COMPLAINT
### Jury Trial Demanded

## INTRODUCTION

1.      Plaintiff Randolph W. Keuch ("Keuch" or "Named Plaintiff") files this Complaint on his own behalf, and on behalf of all similarly situated employees of Teva Pharmaceuticals USA, Inc. ("Teva US") and Teva Pharmaceuticals Industries, Ltd. ("Teva Global") (collectively "Teva" or "Defendants") pursuant to the applicable provisions of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621, *et seq.* and the Pennsylvania Human Relations Act ("PHRA"), 43 P.S. §§ 951 *et seq.*

2.      The claims of Keuch and the putative class that he represents are properly and adequately based upon the failure of Defendants to properly evaluate Plaintiff's performance and the performance of other older employees for retention during a broad reduction of force of individuals employed by Teva US and Teva Global.

3.      The Plaintiff brings this action to remedy past and ongoing discrimination within Teva affected by and at the direction of Teva Global CEO Käre Schultz ("Schultz") generally as

it relates to the decision to eliminate 14,000 positions and employees and Teva Global Integrated

Management head Tal Zorman ("Zorman") within that process as it relates to the decision to

select Keuch for termination and replace him with a substantially younger but far less

credentialed and less qualified individual who was previously Plaintiff's direct report but

employed by Teva Global.

## JURISDICTION

4.      Jurisdiction is invoked pursuant to 28 U.S.C. §1331 and 28 U.S.C. §626(c), each

of which provide for original jurisdiction of Keuch's claims arising under the laws of the

United States and over other actions to recover damages and to secure equitable and other relief

under the appropriate governing statutes.

5.      Pursuant to Rule 5.1.1 of the Local Rules of Civil Procedure of the United States

District Court for the Eastern District of Pennsylvania that prohibits the averment of specific

monetary damages, Plaintiff avers only that the amount in controversy for Keuch exceeds the

jurisdictional amount for arbitration of One Hundred Fifty Thousand Dollars ($150,000)

exclusive of interest and costs in accordance with the Local Rules of the District Court.

6.      Keuch, individually and on behalf of the putative class, has exhausted all

administrative remedies and has taken all other steps necessary to bring this class action before

this Court, having filed a timely class-based Charge of age-based discrimination in employment

with the Equal Employment Opportunity Commission [EEOC Charge No. 530-208-04759]

which was cross-filed with the PHRC and having received the requisite Notice of Suit Rights

within 90 days of the time the original Complaint was filed in this Court.

## VENUE

7.      All actions regarding the termination of Keuch complained of herein occurred

2

within the jurisdiction of this Court and involve Defendants, individually and collectively that regularly do business within its jurisdictional limits.

8.      Venue is accordingly invoked pursuant to the dictates of 28 U.S.C. §§1391(b) and 1391(c).

## THE PARTIES

### The Plaintiff, Randolph W. Keuch

9.      Keuch was born on May 27, 1954 and is currently 65 years of age.

10.      Plaintiff was employed by Teva as Senior Director of Total Rewards (compensation and benefits) for the Americas and from the inception of his employment in January 2014 worked at the U.S. Headquarters at 1090 Horsham Road, North Wales, Pennsylvania.

11.      At all times applicable to the present Complaint, Keuch is and has been an "employee" of Teva as that term is defined in the applicable federal and state anti-discrimination statutes.

12.      Keuch is a nationally recognized leader in compensation and benefits.

13.      Prior to becoming employed by Teva in January 2014, Keuch was employed by: the H.J. Heinz Company (V.P. Total Rewards, 2005-2013); The Hartford (AVP, Compensation-P&C Division, 2004-2005); Pfizer, Inc. (Corporate Director, Strategic Rewards and Director, Pfizer Consumer Group Compensation, 1998-2004); and SmithKline Beecham (Corporate Director, Compensation Strategy and Director, Human Resource Planning, Systems and Compensation,1994-1998).

14.      Plaintiff's educational background also demonstrates excellence in his chosen profession. Plaintiff received both a Bachelor of Science degree (BS, Industrial and

JOINT APPX 0372

Organizational Psychology, with Honors and Thesis) and a Master of Science degree (MS, Applied Psychology) from the Stevens Institute of Technology.  Plaintiff also completed courses and programs in Human Resource Management (George Mason University) and Leadership (Harvard University).

15.    While employed by Teva, Keuch led the Total Rewards Center for the Americas providing subject matter expertise for and cutting-edge solutions to all facets of total rewards issues and with his team achieved, *inter alia*, the following notable results for Teva:

- Secured recognition in 2016 and 2017 by NBGH and *Fortune Magazine* as one of Best Employers for Healthy Lifestyles

- Successfully integrated three (3) major acquisitions in the Americas Region (Rimsa-Mexico, Actavis-Global, and Anda-US)

- Developed and launched a global recognition program for Teva

- As a U.S. issuer, contributed to SEC proxy aspect for U.S.-based NEOs

- Developed a global long-term incentive plan for Biologics

- Developed and launched an innovative Total Rewards Portal for all U.S. and Canadian employees

- Developed and implemented a rolling three-year benefits strategy for Teva U.S. that saved over $30,000,000 in 2015, 2016  and 2017 while driving employee knowledge and positive perspective on their benefits to levels that are twenty percent (20%) above the norm for high performing companies

- Developed and implemented pay alignment strategies for the U.S. and Canada resulting in a significant decline in turnover and improved new hire acceptance ratios

4

- Designed and approved all sales compensation programs and contests within the region
- Implemented the Willis Towers Watson Global Grading System and their REWARD tool throughout the region

16.     Keuch is a Certified Executive Compensation Professional and has received honors and held positions in connection with his chosen profession, *inter alia*, as follows:

- Recipient of the American Compensation Association Lifetime Achievement Award
- Service on the Board of Directors for the National Business Group on Health (2010-2014)
- Service on the Customer Advisory Board for Fidelity Investments (2009-2013)
- Chair of the Executive Compensation Advisory Board for WorldAtWork (2008-2011)
- Adjunct Professor at Trenton State University.

**Defendants**

17.     Defendant, Teva Global is an Israeli publicly held (NYSE) multinational pharmaceutical company headquartered in Petah Tikva, Israel. It specializes primarily in generic medicines, but its other business interests include active pharmaceutical ingredients and proprietary pharmaceuticals.

18.     It is the largest generic drug manufacturer in the world, leveraging its portfolio of more than 1800 molecules to produce a wide range of generic products in every therapeutic area; it is one of the fifteen (15) largest pharmaceutical companies Global.

19.     In its latest annual report, Teva Global celebrates its combined strength of all of its operations stating:

5

> We are a global pharmaceutical company, committed to helping patients around the world to access affordable medicines and benefit from innovations to improve their health. Our mission is to be a global leader in generics, specialty medicines and biopharmaceuticals, improving the lives of patients. We operate Global, with headquarters in Israel and a significant presence in the United States, Europe and many other markets around the world. Our key strengths include our world-leading generic medicines expertise and portfolio, focused specialty medicines portfolio and global infrastructure and scale.

20.    Teva Global further suggests its controls over the individual operations in many countries as a positive asset in its overall operational success:

> Each business segment manages our entire product portfolio in its region, including generics, specialty and over-the-counter ("OTC") products. This structure enables strong alignment and integration between operations, commercial regions, R&D and our global marketing and portfolio function, optimizing our product lifecycle across therapeutic areas.

21.    Simply put, Teva operates its varied interests globally through its published global work force over 41,000 employees in 60 countries around the world, with full time employees in North America (7,752), Europe (19,004); International Markets (excluding Israel) (9,579); Israel (4,843) for a total (excluding contractors) of 41,177.

22.    In the year 2018 that it made the dramatic employment terminations that included Plaintiff Keuch, Teva boasted assets of over Sixty Billion Dollars ($60,683,000,000).

23.    At all times applicable to the present Complaint, Defendant Teva Global, due to its total controls regarding employment policies and procedures, was the joint employer of those persons titularly employed and paid by its wholly-owned subsidiary, Teva US, including the Plaintiff Keuch.

24.    Equally governing liability in the present case, at all time applicable to the present Complaint, Defendant Teva US was the joint employer of Keuch and the putative members of

6

the class as defined herein of nearly 8000 persons and employed nearly 8,000 people in the United States.

25.     Kåre Schultz became the President and CEO of Teva Global in 2017, and at all time relevant to the present Complaint, directed the discriminatory actions that led to the termination of employment of Plaintiff Keuch and other employees operating in the United States who were over the age of forty (40) years.

26.     Tal Zorman, a high-level management employee of Teva Global, was directly responsible for and actually selected Plaintiff Keuch for discharge in 2018. In so doing, she was at all time hereto carrying out the discriminatory directives of Kåre Schultz which led to the termination of the employment of Plaintiff Keuch.

**All Defendants**

27.     At all times applicable to this Complaint of discrimination, Defendants Teva Global and Teva US were jointly the employer of the Plaintiff as that term is defined in the controlling applicable federal and state anti-discrimination laws cited herein.

28.     It is averred that Defendants Teva Global and Teva US, acting in concert, have affected the intentional discrimination against the Plaintiff Keuch and other employees over the age of 40 employed by Defendants in the intentional selection of older employees for termination based on their age during the substantial reduction in its global labor force, including that in the United States first announced in November 2017. Those actions of both Corporate Defendants against the putative class of employees cited herein and Plaintiff Keuch were affected by Schultz and Zorman in violation of the applicable terms of the controlling state and federal statutes.

JOINT APPX 0376

## STATEMENT OF APPLICABLE FACTS

### Historical Events Leading to the Drastic Workforce Reductions

29.    In August 2016, Teva Global completed its $40.5 billion acquisition of Allergan's

generic drug business Actavis, requiring Teva to take out extensive loans. Further regulatory

demands saw Teva sell some of Actavis' most profitable and low-competition products, reducing

much of the acquired company's profitability.

30.    At the same time, consolidation of buyers and greater regulatory fast-tracking of

generics for Teva's competitors hurt Teva's cash flow both by sending generic drug prices

plummeting and by leading to approval of generic versions of Teva's two-decade-long main

revenue producing, brand name multiple sclerosis drug, Copaxone.

31.    Resulting consecutive quarters of lowered financial outlook and diminished

reported and forecasted revenues casted doubts in the marketplace of Teva's ability to adequately

carry the debt load caused by the above circumstances, leading to lowered credit ratings,

negative views from investors and stocks spiraling down to a fifteen-year low.

32.    Additionally, in early 2017, Teva Global was forced to pay fines to the United

States Department of Justice ("DOJ") and the Securities and Exchange Commission ("SEC")

totaling in excess of $520 Million to resolve federal violations of the Foreign Corrupt Practices

Act ("FCPA") arising from bribery charges relating to its operations in Russia, the Ukraine and

Mexico. Teva's settlement was the largest fine ever paid by a pharmaceutical company over

FPCA violations.

33.    These circumstances led to the hiring of Schultz as the President and CEO of

Teva Global who was faced with the alternatives of cutting costs or rapidly growing revenues.

Defendant Schultz chose the former. In December, Teva, at Defendant Schultz's direction

8

approved by Teva's Board, suspended dividends on its common stock, ordered that no annual

bonus payments be made to employees for the year 2017 and announced a reduction in its

employment force of 14,000 people, including 25% of the Teva US workforce.

34.     Despite the imposition of these Draconian measures to save costs on the backs of

employees and common stock investors, Schultz received, in addition to his base salary, a

Twenty Million Dollar ($20,000,000) cash payment included in his contract and entitlement to a

performance-based  target incentive bonus of 140% of his annual base salary.  Those payments

led to broadly-based criticism that he canceled the employee bonuses and ordered the reduction

of the workforce to increase his own bonus that depended on how much money he could save for

Teva.

35.     In fact, the median annual pay of Teva's employees was Sixty-Four Thousand

Eighty-One Dollars ($64,081) compared with Schultz's contractually obligated total

compensation in an amount exceeding Twenty Million Dollars.

36.     Compensation levels for the other executives that caused the problems for Teva

that led to the decision to affect the reductions in the workforce also did not abate.  Teva's senior

management continued to receive inflated salaries and bonuses. The Actavis deal's engineer,

Erez Vigodman who stepped down as CEO in February 2017, continued to receive a salary of

One Million Four Hundred Fifty Thousand Dollars ($1.45) for the next several months and a

bonus of Two Million Dollars ($2,000,000). Interim CEO Yitzhak Peterburg, who replaced

Vigodman, received a salary of Nine Million Two Hundred Thousand Dollars ($9.2 million) for

the eight months he served in that capacity.

9

JOINT APPX 0378

## Historical Perspective of Plaintiff's Employment Experience

37.     Over the entire course of his employment, Plaintiff Keuch met or exceeded the expectations and goals set by his supervisors., who, from the inception of his employment were employees of Teva Global residing in Israel. Additionally, throughout his employment, Plaintiff Keuch was requited to adhere to the mandates of Teva Global policies and procedures.

38.     In 2015, prior to Schultz's hiring, Plaintiff Keuch received a significant increase in base salary and a $60,000 retention bonus in recognition of his value to the Company and to prevent him from accepting employment elsewhere.

39.     From the time of his employment until his discharge from Teva employment, the Americas Region had added approximately 6000 employees in the United States, Canada, Puerto Rico and Latin America due to the Actavis acquisition, another 600 from Teva's acquiring Anda, and approximately 1000 more in Mexico from the acquisition of Rimsa.

40.     Plaintiff Keuch was always considered a valuable managerial asset and his leadership permitted Teva US to experience properly planned and lawful long-range compensation and benefits savings equaling tens of millions of dollars.

41.     However, evidencing a clear age-related bias, Teva implemented compensation policies that disfavored older workers like Plaintiff who were reaching retirement age. That systemic unlawful approach was reflected in unannounced changes in the Teva 2015 Stock Plan that also revised the 2010 Plan by conditioning full vesting on ten years of service when the employee reaches 65 years (five years more than the earlier plan versions that previous set the bar at age 65 plus 5 years of service).

42.     Age bias was also evidenced in the raising of the age of retirement in the 2010 and 2015 equity plans to age 55 for those employees who had fifteen (15) or more years of

JOINT APPX 0379

service as compared to the previous policy of the rule of 70 that permitted retirement at any

combination of age and service that equaled 70.  Moreover, that policy-change also negatively

impacted the equity compensation of older employees.

43.     In addition, Teva initiated a punitive severance plan in 2017 that reduced all

severance paid to US employees by Teva by the amount of unemployment compensation

benefits that they were lawfully entitled to, once again creating savings by taking income away

from employees.  While employees who were age 62 or older were exempt from this deduction,

US Teva leadership espoused the belief that those over age 62 would no longer be employable

and could not properly apply for unemployment compensation benefits, and therefore, the

exemption should not be honored.

44.     Plaintiff Keuch additionally witnessed an age bias in the form of age bias in the

hiring of employees.  An example of that discriminatory animus was the rejection by Senior Vice

President of Human Resources, Daniel Lawler, of a candidate working as a contractor based

upon his clearly discriminatory view that at her more advanced age she did not have "long term

potential".

## Plaintiff's Selection for Firing

45.     Based upon the calamitous circumstances caused by executive mismanagement,

in November 2017, Schultz announced the intention to fire up to 25% of its global workforce and

halt all 2017 bonuses as part of the streamlining plan aimed at countering the poor financial

results described above, with most of the international firings expected to be in the United States

as opposed to the company's European sites.

46.     As part of the effort to meet the financial needs of Teva, in December 2017,

Plaintiff Keuch was asked to and outlined several alternate proposals that would meet the needs

11

of Teva and not break the laws of the countries and states where Total Rewards employees were employed.  Plaintiff Keuch also volunteered to be relocated to the Israeli headquarters to help plan cost saving measures that would reduce employee headcounts to levels that were existent at the time Plaintiff was hired.

47.     The suggested proposals made by Plaintiff Keuch were not addressed, and instead, on January 2, 2018, Plaintiff was advised that his employment would be terminated without any opportunity to accept a demotion to a position that would be retained.

48.     The decision to terminate Plaintiff Keuch and to retain a substantially younger, less qualified employee Eduardo Nasi in his place was made by Tal Zorman, a high-level management employee employed by Teva Global in concert with other age-based employment terminations of Teva US employees affected by other Teva Global managers as part of the Teva reduction in force strategy. Zorman had only just been installed as the Head of Integrated Talent Management, replacing Ron Yaniv, Plaintiff's previous direct supervisor who was also employed by Teva Global.

49.     Plaintiff's termination became effective March 18, 2018.

50.     Plaintiff was replaced by Mr. Nasi, a South American direct report of the Plaintiff who was and is 27 years younger than the Plaintiff and had substantially less experience and ability than Plaintiff to lead a diverse Total Rewards.

51.     The age-based animus that led to Mr. Nasi's employment in Plaintiff's position is further evidenced by the fact that it did not affect any monetary savings for Teva.  Simply stated, age was the motivating and determinative factor in the decision to promote Mr. Nasi and fire Plaintiff.

12

52.     At the time that his employment was terminated, Plaintiff was compensated at a

salary of $286,000 with cash and equity bonus targets of 30% and 40% respectively.  Plaintiff

was also provided healthcare benefits in the amount of $2,196.54 per month.

53.     As a direct result of the improper and unlawful actions of the Defendants, Plaintiff

has suffered and will continue to suffer losses of compensation and benefits.  More specifically

based on his intended age, Plaintiff's losses will exceed millions of dollars and Plaintiff will lose

retirement benefits and suffer a loss of net worth over his anticipated lifetime equaling more than

$13 million.

**Class Allegations**

55.     Plaintiff files this Complaint of Discrimination for all individuals over the age of

forty years who have been terminated as a result of the discriminatory practices of Teva Global

and Teva US.

55.     The claims of those persons who share the same denial of rights with the Plaintiff

share a commonality of interest, fact and law and arise from the same policies and practices that

caused the termination of the employment of the Plaintiff.

56.     The investigation required to fully explore the unlawful actions of the Defendants

will not be increased if the issues raised by the actions against the Plaintiff are expanded to

review the systemic nature of Defendants' discrimination against all workers over the age of

forty who have been affected by their collective discriminatory actions, policies and practices.

57.     Plaintiff Keuch seeks certification of a class of older workers under the terms and

requirements of Rules 23(a)( 1) (2) (3)and (4) fo the Federal Rules of Civil Procedure.

58.     The applicable class is defined as:

        Older workers over the age of forty (40) years employed by Defendant

13

Teva in the United States who have suffered termination from January 1, 2017 to date.

59.     Plaintiff reserves the right to amend the Class definition if further investigation and discovery indicates that the class definition should be narrowed, expanded , or otherwise modified.

60.     The class as defined above is so numerous that joinder would be impracticable and the number is far greater than can be feasibly addressed through joinder.

61.     There are questions of law and fact common to the class, including the systemic discharge of persons over the age of forty employed by the Defendants in the United States.

62.     Certification of this class action is appropriate under Federal Rule of Civil Procedure 23 because the questions of law or fact common to the respective members of the class and any subclass predominate over questions of law or fact affecting only individual members. This predominance makes class litigation superior to any other method available for a fair and efficient decree of the claims.

63.     The claims asserted by Plaintiff in this action are typical of the claims of the members of the Plaintiff Class and any subclass, as the claims arise from the same course of conduct by Defendants and the relief sought within the Class and any subclass is common to the members of each.

64.     The Defendant Teva has acted and/ or failed to take action generally applicable to the class, making appropriate declaratory and injunctive relief with respect to the Plaintiff and the class as a whole appropriate.

65.     The policies and practices of Defendant Teva discriminate against persons in the protected class, violate the employment discrimination statute and ordinance at issue and

14

JOINT APPX 0383

thereby permit the award of monetary damages, injunctive relief, and other equitable remedies on a class-wide basis are warranted.

66.     The class members are entitled to injunctive relief to end the Defendants' common, uniform, and / or unfair personnel policies and practices that discriminate on the basis of a protected traits enumerated herein.

67.     The class members have been damaged and are entitled to relief including the recovery of damages as a result of the Defendants" common, uniform, and unfair discriminatory personnel policies and practices. Moreover, the sophisticated computerized payroll and personnel data will make calculation of damages for specific class members relatively simple and the propriety and amount of punitive damages are issues common to the class.

68.     The named Plaintiff can and will fairly and adequately represent and protect the interests of the members of the class without conflict with potential class members.

69.     The Plaintiff has retained counsel competent and experienced in complex class actions, employment discrimination litigation, and the intersection thereof.

70.     Further, the prosecution of separate actions by individual members of the class: (1) would create a risk that inconsistent or varying adjudications with respect to individual members of the class would establish incompatible standards of conduct for the parties opposing the class, or (2) would substantially impair or impede the interests of the other members of the class to protect their interests.

**Statement Of Legal Liability**

71.     At all times applicable to this Complaint, Plaintiff Keuch was and is an older worker entitled to the full protections provided to older similarly situated employees over the

15

age of 40 years, by the terms of the Age Discrimination in Employment Act ("ADEA"), 29

U.S.C. § 621, et seq. and the Pennsylvania Human Relations Act, 43 P.S. §§ 951 et seq.

72.     The actions of the Defendants, in causing the aforesaid losses based upon their

discrimination against Plaintiff Keuch and other older workers similarly situated employed by

Defendants in the United States, while treating younger, similarly situated employees better,

constitute unlawful violations of the provisions of the ADEA and the PHRA.

73.     The unlawful actions of the Defendants constitute a continuing unlawful systemic

pattern and practice of discrimination against older employees, in the terms and conditions of

their employment, including decisions relating discharge, including constituting discrimination

against the named Plaintiff specifically.

74.     The actions of the Defendants have been and continue to be willful and deliberate

against older workers and were affected in deliberate indifference to the rights of the Plaintiff

Keuch and other similarly situated persons employed by Defendants and were affected in willful

discrimination against Plaintiff Keuch individually.

<div align="center">

**COUNT I**
**Violations of the Age Discrimination in**
**Employment Act**

</div>

75.     Plaintiff repeats and re-alleges the averments made in the paragraphs above as

though fully set forth herein.

76.     The Defendants violated the Age Discrimination in Employment Act, 29 U.S.C.

§621, et seq., in that they discriminated against Plaintiff Keuch and members of the defined class

on account of their age.

<div align="center">

16

</div>

## COUNT II

## Violations of the Pennsylvania Human Relations Act

77.     Plaintiff Keuch repeats and re-alleges the averments made in the paragraphs

above as though fully set forth herein.

78.     The Defendants violated the Pennsylvania Human Relations Act, 43 P.S. §§ 951

et seq., in that they discriminated against Plaintiff Keuch and or aided and abetted discrimination

against him and members of the defined class on account of their age.

## RELIEF SOUGHT

WHEREFORE, as a direct result of the unlawful actions of the Defendants, it is

submitted that Plaintiff Keuch is entitled to and seeks the following relief:

(a)     appropriate injunctive and monetary relief in an appropriate amount for

Plaintiff Keuch and  each member of the class of employees over the age of 40 who he

represents;

(b)     a monetary award to Plaintiff Keuch and to the members of

the class of employees over the age of 40 who he represents in an amount equal to: (i) any losses

they have suffered and will suffer as a result of the unlawful actions of Defendant; and (ii) any

losses Plaintiff Keuch will suffer as a result of his separation from his employment with the

Defendant employers;

(c)     a monetary award for compensatory damages for

emotional distress and humiliation suffered by Plaintiff for the discrimination affected against

him by the Defendants, as well as that suffered by any member of the class of employees over

the age of 40 who he represents, in an appropriate amount for each member of the class;

(d)     a monetary award for liquidated damages as allowed

17

under the ADEA in an appropriate amount for Plaintiff Keuch and each member of the class who

he represents; and

(e)     the award of reasonable attorneys' fees and the costs associated with the

pursuit of this Complaint.

Respectfully submitted,                         _____

By: /s/ *Alan B. Epstein*

Alan B. Epstein, Esquire (02346)
Jennifer Myers Chalal, Esquire (77841)
SPECTOR, GADON ROSEN VINCI P.C.
Seven Penn Center
1635 Market Street, Seventh Floor
Philadelphia, PA  19103
(215) 241-8832/8817
aepstein@sgrvlaw.com
jchalal@sgrvlaw.com

*Attorneys for Plaintiff,*
*Randolph W. Keuch*

March 15, 2021

18

JOINT APPX 0387

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| RANDOLPH W. KEUCH, | : |
| Plaintiff, | : CASE NO. 2:19-CV-05488 |
| | : |
| v. | : |
| | : [ELECTRONICALLY FILED] |
| TEVA PHARMACEUTICALS USA, INC., | : |
| And TEVA PHARMACEUTICAL | : |
| INDUSTRIES, Ltd., | : |
| | : |
| Defendants. | : |

### DEFENDANT TEVA PHARMACEUTICALS USA, INC.'S ANSWER AND
### AFFIRMATIVE DEFENSES TO PLAINTIFF'S AMENDED COMPLAINT

Defendant Teva Pharmaceuticals USA, Inc.[1] ("Defendant TUSA") hereby answers the

above-captioned Amended Complaint of Plaintiff Randolph Keuch ("Plaintiff" or "Keuch") in

accordance with the numbered paragraphs thereof as follows:

### JURY TRIAL

Defendant TUSA admits that Plaintiff demands a trial by jury in this matter.

### INTRODUCTION

1.  Admitted in part, denied in part.  Defendant TUSA admits only that Plaintiff purports

to bring this action on his own behalf, and on behalf of all similarly situated employees pursuant

to the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §621, *et seq.* and the

Pennsylvania Human Relations Act ("PHRA"), 43 P.S. §§ 951 *et seq.*  Defendant TUSA denies

that it engaged in any unlawful conduct under any of these laws and denies that Plaintiff is

---

[1] In Plaintiff's Amended Complaint, Plaintiff defines "Teva" to include both Defendant TUSA and Teva
Pharmaceuticals Industries, Ltd ("TPI"). For the avoidance of any doubt, this answer is being filed on behalf of
Defendant TUSA only.  The Plaintiff was employed by Defendant TUSA and was never an employee of TPI.
Nothing contained herein shall be intended to be a response on behalf of TPI.  Further, by responding to paragraphs
directed toward the collective "Teva" Defendant TUSA does not admit that it is a joint employer or single entity
with TPI.

entitled to any relief from Defendant TUSA. By way of further response, Defendant TUSA denies that this matter is properly a class action matter.

2. Admitted in part, denied in part. Defendant TUSA admits only that Plaintiff purports to bring the claims referenced in Paragraph 2 of the Amended Complaint. Defendant TUSA denies that any of Plaintiff's claims have merit and specifically denies that it has discriminated against Plaintiff or any other employee on the basis of such employee's age or that it failed to properly evaluate any employee's performance.

3. Admitted in part, denied in part. Defendant TUSA admits only that Plaintiff purports to bring the claims referenced in Paragraph 3 of the Amended Complaint. Defendant TUSA denies that any of Plaintiff's claims have merit and specifically denies that it has discriminated against Plaintiff or any employee on the basis of such employee's age, that it replaced Plaintiff, or that Kåre Schultz directed any discriminatory behavior.

## JURISDICTION

4. Paragraph 4 of the Amended Complaint states only conclusions of law to which no response is required. To the extent a response is required, Defendant TUSA does not contest subject matter jurisdiction.

5. Paragraph 5 of the Amended Complaint states only conclusions of law to which no response is required. To the extent a response is required, Defendant TUSA does not contest subject matter jurisdiction.

6. Paragraph 6 of the Amended Complaint states only conclusions of law to which no response is required. To the extent that a response is required, Defendant TUSA denies that this matter is properly a class action matter.

2

JOINT APPX 0389

## VENUE

7.  Paragraph 7 of the Amended Complaint states only conclusions of law to which no response is required.  To the extent a response is required, Defendant TUSA does not contest venue.

8.  Paragraph 8 of the Amended Complaint states only conclusions of law to which no response is required.  To the extent a response is required, Defendant TUSA does not contest venue.

## THE PARTIES

### The Plaintiff, Randolph W. Keuch

9.  Admitted upon information and belief.  By way of further response, Plaintiff was hired by Defendant TUSA just months before his 60th birthday.

10.  Admitted in part, denied in part.  By way of further response, Defendant TUSA admits that Plaintiff was employed by Defendant TUSA only as Senior Director of Total Rewards for the Americas and worked at 1090 Horsham Road, North Wales, Pennsylvania.  By way of further response, Defendant TUSA is no longer headquartered at 1090 Horsham Road, North Wales, Pennsylvania.

11.  Paragraph 11 of the Amended Complaint states only conclusions of law to which no response is required.

12.  Denied.  By way of further response, the term "leader" is overly vague and ambiguous because it does not provide a definition of what constitutes a "leader."

13.  Denied.  Defendant TUSA lacks knowledge or information sufficient to form a belief as to Plaintiff's prior employment history, and therefore denies those allegations.

14.  Denied.  Defendant TUSA lacks knowledge or information sufficient to form a belief as to Plaintiff's prior educational history, and therefore deny those allegations.

3

JOINT APPX 0390

15. Admitted in part, denied in part. Defendant TUSA admits that Plaintiff led the Total Rewards Center for the Americas and achieved many of the results listed in the bullet points as he alleges in the Amended Complaint. Defendant TUSA denies Plaintiff's characterizations contained in each bullet point.

16. Denied. Defendant TUSA lacks knowledge or information sufficient to form a belief as to what awards Plaintiff may have received or achieved prior to his employment at Defendant TUSA began, and therefore deny those allegations.

**Defendants**

17. Denied. The allegations in Paragraph 17 are directed to a party other than Defendant TUSA.

18. Denied. The allegations in Paragraph 18 are directed to a party other than Defendant TUSA.

19. Denied. The allegations in Paragraph 19 are directed to a party other than Defendant TUSA.

20. Denied. The allegations in Paragraph 20 are directed to a party other than Defendant TUSA.

21. Denied. The allegations in Paragraph 21 are directed to a party other than Defendant TUSA.

22. Denied. The allegations in Paragraph 22 are directed to a party other than Defendant TUSA

23. Paragraph 23 of the Amended Complaint states only conclusions of law to which no response is required. To the extent a response is required, Defendant TUSA denies these allegations.

4

JOINT APPX 0391

24. Denied.  By way of further response Defendant TUSA denies that this matter is properly a class action matter.  The remaining allegations contained in Paragraph 24 of the Amended Complaint state only conclusions of law to which no response is required.  To the extent a response is deemed required, Defendant TUSA denies that it is a joint employer with TPI.

25. Denied.  The allegations in Paragraph 25 are directed to a party other than Defendant TUSA.

26. Denied.  The allegations in Paragraph 26 are directed to a party other than Defendant TUSA.

**All Defendants**

27. The allegations contained in Paragraph 27 of the Amended Complaint state only conclusions of law to which no response is required.  To the extent a response is deemed required, Defendant TUSA denies that it is a joint employer with TPI.

28. The allegations contained in Paragraph 28 of the Amended Complaint state only conclusions of law to which no response is required.  To the extent a response is deemed required, Defendant TUSA denies that it discriminated against Plaintiff or any employee on the basis of age.  Furthermore, the term "Corporate Defendants" is not defined in the Amended Complaint and therefore is vague, ambiguous. The remaining allegations contained in Paragraph 28 are directed to a party other than Defendant TUSA, and are therefore denied.

## STATEMENT OF APPLICABLE FACTS

**Historical Events Leading to the Drastic Workforce Reductions**

29. Denied.  The allegations in Paragraph 29 are directed to a party other than Defendant TUSA.

30. Denied.

5

JOINT APPX 0392

31. Denied. The allegations in Paragraph 31 are directed to a party other than Defendant TUSA.

32. Denied. The allegations in Paragraph 32 are directed to a party other than Defendant TUSA.

33. Denied. The allegations in Paragraph 33 are directed to a party other than Defendant TUSA.

34. Denied. To the extent Plaintiff references Schultz's contract, said contract is a written document that speaks for itself and, therefore, Defendant TPI denies any characterizations of same. By way of further response, the averments contained in Paragraph 34 are wholly irrelevant to the matters at hand.

35. Denied. By way of further response, the averments contained in Paragraph 35 are wholly irrelevant to the matters at hand.

36. Denied. The allegations in Paragraph 36 are directed to a party other than Defendant TUSA.

**Historical Perspective of Plaintiff's Employment Experience**

37. Denied. The allegations in Paragraph 37 are directed to a party other than Defendant TUSA.

38. Admitted in part, denied in part. Defendant TUSA admits only that Plaintiff received an increase in his base salary and a $60,000 retention bonus. Defendant TUSA denies that Plaintiff received these remunerations for the reasons stated in the Amended Complaint.

39. Denied. The allegations in Paragraph 39 are directed to a party other than Defendant TUSA.

6

JOINT APPX 0393

40. Denied.  The allegations that Plaintiff was a "valuable managerial asset" or that Defendant TUSA accomplished "properly planned" savings are vague, ambiguous, and incapable of a response as phrased, because it does not define what a "valuable managerial asset" is or what constitutes a "properly planned" savings.  Defendant TUSA admits that Plaintiff was generally competent and capable in his job performance.

41. Denied.  The allegations in Paragraph 41 are directed to a party other than Defendant TUSA.

42. Denied.  The allegations in Paragraph 42 are directed to a party other than Defendant TUSA.

43. Denied.  Defendant TUSA's severance plans are written documents that speak for themselves, and, therefore, Defendant TUSA denies any characterizations of same.  Defendant TUSA denies that any such modifications were motivated by a desire to discriminate against any employee, including Plaintiff, on the basis of age.  Defendant TUSA denies all remaining allegations contained in Paragraph 43.

44. Denied.

**Plaintiff's Selection for Firing**

45. Denied.  The allegations in Paragraph 45 are directed to a party other than Defendant TUSA.

46. Admitted in part, denied in part.  Defendant TUSA admits only that Plaintiff was asked to and did provide his view on how the structure of the Total Rewards Center for the Americas could be altered to reduce employee headcount.  Defendant TUSA denies that Plaintiff volunteered to be relocated to Israel.  Defendant TUSA denies all remaining allegations contained in Paragraph 46.

7

JOINT APPX 0394

47. Admitted in part, denied in part. Defendant TUSA admits that on or about January 2,
2018 Plaintiff was advised that his employment with Defendant TUSA would be terminated.
Defendant TUSA further admits that Plaintiff was not offered a demotion prior to his
termination. Defendant TUSA denies all remaining allegations contained in Paragraph 47.

48. Denied. The allegations in Paragraph 48 are directed to a party other than Defendant
TUSA.

49. Admitted.

50. Denied. By way of further response, Defendant TUSA denies that Plaintiff was
"replaced." To the contrary, Plaintiff's position was eliminated in its entirety.

51. Denied. By way of further response, by eliminating Plaintiff's position in its entirety,
Defendant TUSA saved money. Further, the allegation that "age was the motivating and
determinative factor in the decision to promote Mr. Nasi and fire Plaintiff" is a conclusion of law
to which no response is required. To the extent a response is deemed required, Defendant TUSA
denies that age was the motivating or a determinative factor in Plaintiff's separation. Defendant
TUSA further denies all remaining allegations contained in Paragraph 51.

52. Admitted in part, denied in part. Defendant TUSA admits only that Plaintiff was
eligible to receive a cash bonus targeted at 30% of his base salary and that his healthcare benefits
were $2,196.54 per month. Defendant TUSA denies that Plaintiff's salary was $286,000 at the
time of his termination or that there is a specific target for equity bonuses.

53. Denied.

8

JOINT APPX 0395

## CLASS ALLEGATIONS

55.  Admitted[2] in part, denied in part.  Defendant TUSA admits only that Plaintiff purports to bring his Amended Complaint on behalf of all individuals over the age of forty years who have been terminated by Defendant TUSA.  Defendant TUSA denies that it engaged in any unlawful conduct.  By way of further response, Defendant TUSA denies that certification of a class action is appropriate and denies that it is liable to Plaintiff or to any putative member of the class for age discrimination.  Further, the remaining allegations are directed to a party other than Defendant TUSA and are therefore denied.

55.  Paragraph 55 of the Amended Complaint states only conclusions of law to which no response is required.  To the extent a response is required, Defendant TUSA denies that this is properly a class action matter, that certification of a class action is appropriate, and that it is liable to Plaintiff or to any putative member of the class.

56.  Paragraph 56 of the Amended Complaint states only conclusions of law to which no response is required.  To the extent a response is required, Defendant TUSA denies Plaintiff's allegation that the investigation into the allegations will not be increased if the issues raised are expanded to a class action.  Further, Defendant TUSA denies that it engaged in any unlawful conduct.  By way of further response, Defendant TUSA denies that this is properly a class action matter, that certification of a class action is appropriate and that it is liable to Plaintiff or to any putative member of the class.

57.  Paragraph 57 of the Amended Complaint states only conclusions of law to which no response is required.  To the extent a response is required, Defendant TUSA denies that this is

---

[2] Plaintiff's Amended Complaint omits a Paragraph 54 and includes two Paragraphs labeled 55. Defendant TUSA therefore omits a response to missing Paragraph 54 and provides a separate response to each Paragraph 55.

9

JOINT APPX 0396

properly a class action matter, that certification of a class action is appropriate, and that it is

liable to Plaintiff or to any putative member of the class.

58.   Admitted in part, denied in part.   Defendant TUSA admits only that Plaintiff purports

to define the class as though stated in Paragraph 58 of the Amended Complaint.   Defendant

TUSA denies the remaining allegations contained in Paragraph 58 of the Amended Complaint.

By way of further response, Paragraph 58 of the Amended Complaint states only conclusions of

law to which no response is required.   To the extent a response is required, Defendant TUSA

denies that this is properly a class action matter, that certification of a class action is appropriate,

and that it is liable to Plaintiff or to any putative member of the class.

59.   Admitted in part, denied in Part. Defendant TPI admits only that Plaintiff purports to

reserve his right to amend the Class definition. Defendant TPI denies that this is properly a class

action matter, that certification of a class action is appropriate, and that it is liable to Plaintiff or

to any putative member of the class.

60.   Paragraph 60 of the Amended Complaint states only conclusions of law to which no

response is required.   To the extent a response is required, Defendant TUSA denies that this is

properly a class action matter, that certification of a class action is appropriate, and that it is

liable to Plaintiff or to any putative member of the class.

61.   Paragraph 61 of the Amended Complaint states only conclusions of law to which no

response is required.   To the extent a response is required, Defendant TUSA denies that this is

properly a class action matter, that certification of a class action is appropriate, and that it is

liable to Plaintiff or to any putative member of the class.

62.   Paragraph 62 of the Amended Complaint states only conclusions of law to which no

response is required.   To the extent a response is required, Defendant TUSA denies that this is

04/12/2021 SL1 1683778v3 030421.00713

JOINT APPX 0397

properly a class action matter, that certification of a class action is appropriate, and that it is liable to Plaintiff or to any putative member of the class.

63. Paragraph 63 of the Amended Complaint states only conclusions of law to which no response is required. To the extent a response is required, Defendant TUSA denies that this is properly a class action matter, that certification of a class action is appropriate, and that it is liable to Plaintiff or to any putative member of the class.

64. Paragraph 64 of the Amended Complaint states only conclusions of law to which no response is required. To the extent a response is required, Defendant TUSA denies that this is properly a class action matter, that certification of a class action is appropriate, and that it is liable to Plaintiff or to any putative member of the class.

65. Paragraph 65 of the Amended Complaint states only conclusions of law to which no response is required. To the extent a response is required, Defendant TUSA denies that this is properly a class action matter, that certification of a class action is appropriate, and that it is liable to Plaintiff or to any putative member of the class.

66. Paragraph 66 of the Amended Complaint states only conclusions of law to which no response is required. To the extent a response is required, Defendant TUSA denies that this is properly a class action matter, that certification of a class action is appropriate, and that it is liable to Plaintiff or to any putative member of the class.

67. Paragraph 67 of the Amended Complaint states only conclusions of law to which no response is required. To the extent a response is required, Defendant TUSA denies that this is properly a class action matter, that certification of a class action is appropriate, and that it is liable to Plaintiff or to any putative member of the class.

04/12/2021 SL1 1683778v3 030421.00713

JOINT APPX 0398

68.  Paragraph 68 of the Amended Complaint states only conclusions of law to which no response is required.  To the extent a response is required, Defendant TUSA denies that this is properly a class action matter, that certification of a class action is appropriate, and that it is liable to Plaintiff or to any putative member of the class.

69.  Paragraph 69 of the Amended Complaint states only conclusions of law to which no response is required.  To the extent a response is required, Defendant TUSA denies that this is properly a class action matter, that certification of a class action is appropriate, and that it is liable to Plaintiff or to any putative member of the class.

70.  Paragraph 70 of the Amended Complaint states only conclusions of law to which no response is required.  To the extent a response is required, Defendant TUSA denies that this is properly a class action matter, that certification of a class action is appropriate, and that it is liable to Plaintiff or to any putative member of the class.

## STATEMENT OF LEGAL LIABILITY

71.  Paragraph 71 of the Amended Complaint states only conclusions of law to which no response is required.  To the extent a response is required, Defendant TUSA admits that Plaintiff is over the age of forty.

72.  Paragraph 72 of the Amended Complaint states only conclusions of law to which no response is required.  To the extent a response is required, Defendant TUSA denies these allegations.

73.  Paragraph 73 of the Amended Complaint states only conclusions of law to which no response is required.  To the extent a response is required, Defendant TUSA denies these allegations.

12

JOINT APPX 0399

74. Paragraph 74 of the Amended Complaint states only conclusions of law to which no response is required. To the extent a response is required, Defendant TUSA denies these allegations.

## COUNT I

### VIOLATIONS OF THE AGE DISCRIMINATION IN EMPLOYMENT ACT

75. Defendant TUSA incorporates by reference its responses to the averments of Paragraphs 1 through 74, above, as if fully set forth at length herein.

76. Paragraph 76 of the Amended Complaint states only conclusions of law to which no response is required. To the extent a response is required, Defendant TUSA denies these allegations.

## COUNT II

### VIOLATIONS OF THE PENNSYLVANIA HUMAN RELATIONS ACT

77. Defendant TUSA incorporates by reference its responses to the averments of Paragraphs 1 through 76, above, as if fully set forth at length herein.

78. Paragraph 78 of the Amended Complaint states only conclusions of law to which no response is required. To the extent a response is required, Defendant TUSA denies these allegations.

## RELIEF SOUGHT

Defendant TUSA denies that Plaintiff is entitled to any relief or damages and specifically denies the allegations of the "WHEREFORE" clause contained in the "Relief Sought" portion of the Amended Complaint as it relates to his or their entitlement to relief. Defendant TUSA demands that judgment be entered in favor of Defendant TUSA and against Plaintiff, that the Court dismiss Plaintiff's Amended Complaint in its entirety, and that the Court award Defendant TUSA reimbursement for its attorneys' fees, costs and expenses incurred in this action.

13

JOINT APPX 0400

    a.  Denied.

    b.  Denied.

    c.  Denied.

    d.  Denied.

    e.  Denied.

## AFFIRMATIVE DEFENSES

Defendant TUSA incorporates by reference in each Affirmative Defense set forth below the admissions, denials, and averments of the above paragraphs of this Answer as if fully set forth herein.

1.  Plaintiff's Amended Complaint fails to state a claim upon which relief can be granted.

2.  Defendant TUSA did not engage in any unlawful or wrongful conduct with respect to Plaintiff, is not liable to Plaintiff in any manner, and Plaintiff is not entitled to any relief or damages.

3.  Defendant TUSA acted in good faith at all times relevant to this action and did not engage in any discrimination or unlawful or wrongful conduct.

4.  Plaintiff was an at-will employee for the entire duration of his employment with Defendant TUSA.

5.  Plaintiff has not suffered any damages or, in the alternative, any damages suffered by Plaintiff were not proximately caused by Defendant TUSA.

6.  Plaintiff is not entitled to an award of attorneys' fees and costs.

7.  All decisions made by Defendant TUSA with respect to Plaintiff were legitimate, good-faith, lawful business decisions that were not based on, connected to, or related to Plaintiff's age.

14

JOINT APPX 0401

8. Teva did not violate the Age Discrimination in Employment Act, the Pennsylvania

Human Relations Act, or any other statutory or common law with respect to Plaintiff.

9. Plaintiff has failed to mitigate his alleged damages.

10. Plaintiff's termination was based on reasonable factors other than age.

11. Plaintiff's claim for punitive damages are barred to the extent that award of such

damages would violate any of the provisions of the Constitution of the United States, or any of

the provisions of the Constitution of the Commonwealth of Pennsylvania, or any other law.

12. Any claim for liquidated damages is barred because the actions allegedly taken by

Defendant TUSA were not willful.

13. Defendant TUSA specifically reserve the right to assert any additional Affirmative

Defenses in this matter, including those arising under the doctrine of after-acquired evidence.

WHEREFORE, Defendant TUSA demands that judgment be entered in its favor and

against Plaintiff, that the Court dismiss Plaintiff's Amended Complaint in its entirety, and that

the Court award Defendant TUSA reimbursement for its attorneys' fees, costs and expenses

incurred in this action.

Dated: April 12, 2021                    STEVENS & LEE


                                         By: */s/ Larry J. Rappoport*_____
                                             Larry J. Rappoport (ID No. 26922)
                                             ljr@stevenslee.com
                                             Brandon S. Shemtob (ID No. 319246)
                                             bss@stevenslee.com
                                             1800 Market Street, East Tower, Suite 1800
                                             Philadelphia, PA  19102
                                             (215) 496-3839

                                             *Attorneys for Defendant Teva Pharmaceuticals*
                                             *USA, Inc.*

04/12/2021 SL1 1683778v3 030421.00713

JOINT APPX 0402

## **CERTIFICATION OF SERVICE**

I, Larry J. Rappoport, Esquire, certify that on this date, a certified true and correct copy of the foregoing Defendant Teva Pharmaceuticals USA Inc.'s Answer and Affirmative Defenses to Plaintiff's Amended Complaint was filed electronically and is available for viewing on the Court's ECF system.

*/s/ Larry J. Rappoport*
Larry J. Rappoport, Esquire

Dated:  April 12, 2021

04/12/2021 SL1 1683778v3 030421.00713

JOINT APPX 0403

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

RANDOLPH W. KEUCH,                    :

          Plaintiff,            :       CASE NO. 2:19-CV-05488

                  :

        v.                    :

                  :       [ELECTRONICALLY FILED]

TEVA PHARMACEUTICALS USA, INC.,       :
And TEVA PHARMACEUTICAL              :
INDUSTRIES, Ltd.,                    :

                  :

          Defendants.           :

### DEFENDANT TEVA PHARMACEUTICAL INDUSTRIES, LTD.'S ANSWER
### AND AFFIRMATIVE DEFENSES TO PLAINTIFF'S AMENDED COMPLAINT

Defendant Teva Pharmaceutical Industries, Ltd.[1] ("Defendant TPI") hereby answers the

above-captioned Amended Complaint of Plaintiff Randolph Keuch ("Plaintiff" or "Keuch") in

accordance with the numbered paragraphs thereof as follows:

### JURY TRIAL

Defendant TPI admits that Plaintiff demands a trial by jury in this matter.

### INTRODUCTION

1. Admitted in part, denied in part. Defendant TPI admits only that Plaintiff purports

to bring this action on his own behalf, and on behalf of all similarly situated employees

pursuant to the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §621, *et seq.*

and the Pennsylvania Human Relations Act ("PHRA"), 43 P.S. §§ 951 *et seq.* Defendant TPI

---

[1] By answering this Amended Complaint, TPI does not waive its right to challenge this Court's exercise of
jurisdiction over it in other litigations. To the contrary, TPI specifically reserves its rights and defenses as to the
exercise of jurisdiction in all other regards, litigations, and legal matters. In Plaintiff's Amended Complaint,
Plaintiff defines "Teva" to include both Defendant TUSA and TPI. For the avoidance of any doubt, this answer is
filed on behalf of Defendant TPI only. Further, by responding to paragraphs directed toward the collective "Teva"
Defendant TPI does not admit that it is a joint employer or single legal entity with TUSA. Furthermore, Plaintiff
refers to the Israeli corporation throughout his Amended Complaint as "Teva Global" which is an entity that does
not exist.

04/12/2021 SL1 1683782v3 030421.00713

denies that it engaged in any unlawful conduct under any of these laws and denies that Plaintiff

is entitled to any relief from Defendant TPI.  By way of further response, Defendant TPI denies

that this matter is properly a class action matter.

2.   Admitted in part, denied in part.  Defendant TPI admits only that Plaintiff purports

to bring the claims referenced in Paragraph 2 of the Amended Complaint.  Defendant TPI

denies that any of Plaintiff's claims have merit and specifically denies that it has discriminated

against Plaintiff or any employee on the basis of such employee's age or that it failed to

properly evaluate any employee's performance.

3.   Admitted in part, denied in part.  Defendant TPI admits only that Plaintiff purports

to bring the claims referenced in Paragraph 3 of the Amended Complaint.  Defendant TPI

denies that any of Plaintiff's claims have merit.  Defendant TPI specifically denies that it has

discriminated against Plaintiff or any employee on the basis of such employee's age, that it

replaced Plaintiff, that Kåre Schultz directed any discriminatory behavior or that it employed

anyone who allegedly replaced Plaintiff.

## **JURISDICTION**

4.   Paragraph 4 of the Amended Complaint states only conclusions of law to which no

response is required.  To the extent a response is required, Defendant TPI does not contest

subject matter jurisdiction.

5.   Paragraph 5 of the Amended Complaint states only conclusions of law to which no

response is required.  To the extent a response is required, Defendant TPI does not contest

subject matter jurisdiction.

6.   Paragraph 6 of the Amended Complaint states only conclusions of law to which no

response is required.  To the extent that a response is required, Defendant TPI denies that this

matter is properly a class action matter.

04/12/2021 SL1 1683782v3 030421.00713

JOINT APPX 0405

## VENUE

7. Paragraph 7 of the Amended Complaint states only conclusions of law to which no response is required. To the extent a response is required, Defendant TPI does not contest venue.

8. Paragraph 8 of the Amended Complaint states only conclusions of law to which no response is required. To the extent a response is required, Defendant TPI does not contest venue.

## THE PARTIES

### The Plaintiff, Randolph W. Keuch

9. Admitted upon information and belief.

10. Denied. By way of further response, Defendant TPI did not employ Plaintiff and therefore the allegations in Paragraph 10 are directed to a party other than Defendant TPI.

11. Denied. By way of further response, Defendant TPI did not employ Plaintiff and therefore the allegations in Paragraph 11 are directed to a party other than Defendant TPI.

12. Denied. By way of further response, Defendant TPI did not employ Plaintiff and is therefore unfamiliar with his background qualifications. Furthermore, the term "leader" is overly vague and ambiguous because it does not provide a definition of what constitutes a "leader."

13. Denied. Defendant TPI lacks knowledge or information sufficient to form a belief as to Plaintiff's prior employment history, and therefore denies those allegations.

14. Denied. By way of further response, Defendant TPI did not employ Plaintiff and therefore the allegations in Paragraph 14 are directed to a party other than Defendant TPI. Additionally, Defendant TPI lacks knowledge or information sufficient to form a belief as to Plaintiff's prior educational history, and therefore deny those allegations.

04/12/2021 SL1 1683782v3 030421.00713

JOINT APPX 0406

15. Denied. By way of further response, Defendant TPI did not employ Plaintiff and therefore the allegations in Paragraph 15 are directed to a party other than Defendant TPI.

16. Denied. Defendant TPI lacks knowledge or information sufficient to form a belief as to what awards Plaintiff may have received or achieved and therefore denies those allegations.

**Defendants**

17. Denied. By way of further response, Defendant TPI is an Israeli, publicly held (NYSE), multinational pharmaceutical company headquartered in Tel Aviv.

18. Admitted. By way of further response, there is no entity by the name of Teva Global.

19. Denied. Defendant TPI's annual report is a written document that speaks for itself, and, therefore, Defendant TPI denies any characterization of same.

20. Denied. Defendant TPI's annual report is a written document that speaks for itself, and, therefore, Defendant TPI denies any characterization of same.

21. Denied. Defendant TPI's annual report is a written document that speaks for itself, and, therefore, Defendant TPI denies any characterization of same. By way of further response, the averments contained in Paragraph 21 are wholly irrelevant to the matters at hand.

22. Denied. Defendant TPI's annual report is a written document that speaks for itself, and, therefore, Defendant TPI denies any characterization of same. By way of further response, the averments contained in Paragraph 22 are wholly irrelevant to the matters at hand

23. Paragraph 23 of the Amended Complaint states only conclusions of law to which no response is required. To the extent a response is required, Defendant TPI denies these allegations.

4

JOINT APPX 0407

24. Denied.  By way of further response Defendant TPI denies that this matter is properly a class action matter.  The remaining allegations contained in Paragraph 24 of the Amended Complaint state only conclusions of law to which no response is required.  To the extent a response is deemed required, Defendant TPI denies that it is a joint employer with Defendant TUSA.

25. Admitted in part, denied in part.  Defendant TPI admits only that in 2017 Kåre Schultz became the President and CEO of Defendant TPI.  The remaining allegations contained in Paragraph 25 state only conclusions of law to which no response is required.  To the extent a response is deemed required, Defendant TPI denies that it discriminated against Plaintiff or any employee.

26. Admitted in part, denied in part.  Defendant TPI admits only that Ms. Zorman is and was a management level employee of TPI and that Ms. Zorman selected Plaintiff, among others, to be included in the reduction in force.  Defendant TPI denies the remaining allegations contained in Paragraph 26 of the Amended Complaint and specifically denies that the selection of Plaintiff to be included in the reduction in force was discriminatorily motivated.

**All Defendants**

27. The allegations contained in Paragraph 27 of the Amended Complaint state only conclusions of law to which no response is required.  To the extent a response is deemed required, Defendant TPI denies that it is a joint employer with Defendant TUSA.

28. The allegations contained in Paragraph 28 of the Amended Complaint state only conclusions of law to which no response is required.  To the extent a response is deemed

5

JOINT APPX 0408

required, Defendant TPI denies that it discriminated against Plaintiff or any employee on the

basis of age.

## STATEMENT OF APPLICABLE FACTS

### Historical Events Leading to the Drastic Workforce Reductions

29.   Admitted in part, denied in part. Defendant TPI admits only that in 2016 it acquired

Actavis.  Defendant TPI denies the irrelevant averments including the characterization that TPI

was required to take out "extensive" loans or that it was required to sell Actavis's "most

profitable" and "low competition" products.

30.   Denied. By way of further response, the averments contained in Paragraph 30 are

wholly irrelevant to the matters at hand.

31.   Denied. By way of further response, the averments contained in Paragraph 31 are

wholly irrelevant to the matters at hand.

32.   Admitted in part, denied in part. Defendant TPI admits only that it paid to the

United States Department of Justice and the Securities and Exchange Commission an amount

to settle certain charges against it. Defendant TPI denies Plaintiff's characterization of same.

By way of further response, the averments contained in Paragraph 32 are wholly irrelevant to

the matters at hand.

33.   Admitted in part, denied in part. Defendant TPI admits only that it hired Schultz as

President and CEO, that it suspended dividends for common stock, that it did not pay annual

bonus payments for 2017, and announced a reduction in force.  Defendant TPI denies

Plaintiff's characterization of same.  By way of further response, the averments contained in

Paragraph 33 are wholly irrelevant to the matters at hand.

34.   Denied. To the extent Plaintiff references Schultz's contract, said contract is a

written document that speaks for itself and, therefore, Defendant TPI denies any

6

04/12/2021 SL1 1683782v3 030421.00713

characterizations of same. By way of further response, the averments contained in Paragraph

34 are wholly irrelevant to the matters at hand.

35.   Denied.  By way of further response, the averments contained in Paragraph 35 are

wholly irrelevant to the matters at hand.

36.   Denied By way of further response, the averments contained in Paragraph 36 are

wholly irrelevant to the matters at hand.

**Historical Perspective of Plaintiff's Employment Experience**

37.   Denied.

38.   Denied.  By way of further response, Defendant TPI did not employ Plaintiff and

therefore the allegations in Paragraph 38 are directed to a party other than Defendant TPI.

39.   Denied. By way of further response, this allegation is entirely irrelevant to the

instant matter.

40.   Denied.  By way of further response, Defendant TPI did not employ Plaintiff and

therefore the allegations in Paragraph 40 are directed to a party other than Defendant TPI.

41.   Denied.  Defendant TPI's equity plans are written document that speak for

themselves, and, therefore, Defendant TPI denies any characterizations of same. Defendant TPI

denies that any such modifications were motivated by a desire to discriminate against any

employee, including Plaintiff, on the basis of age.  Defendant TPI denies all remaining

allegations contained in Paragraph 41.

42.   Denied.  Defendant TPI's equity plans are written document that speak for

themselves, and, therefore, Defendant TPI denies any characterizations of same. Defendant TPI

denies that any such modifications were motivated by a desire to discriminate against any

7

JOINT APPX 0410

employee, including Plaintiff, on the basis of age.  Defendant TPI denies all remaining

allegations contained in Paragraph 42.

    43.  Denied.  By way of further response, the allegations in Paragraph 43 are directed to

a party other than Defendant TPI.

    44.  Denied.  Defendant TPI lacks information or knowledge of what Plaintiff allegedly

witnessed.  By way of further response, Defendant TPI did not employ Plaintiff nor Daniel

Lawler and therefore the allegations in Paragraph 44 are directed to a party other than

Defendant TPI.

**Plaintiff's Selection for Firing**

    45.  Admitted in part, denied in part.  Defendant TPI admits that in November 2017

Kåre Schultz announced a reduction in force that would affect approximately 25% of Teva

Pharmaceuticals Industries, Ltd.'s global workforce and that bonuses would not be paid for

2017.  Defendant TPI denies Plaintiff's characterization that "executive mismanagement" led

to the decisions and the remaining allegations in Paragraph 45.

    46.  Admitted in part, denied in part.  Defendant TPI admits only that Plaintiff was

asked to and did provide his view on how the structure of the Total Rewards Center for the

Americas could be altered to reduce employee headcount.  By way of further response,

Defendant TPI did not employ Plaintiff and therefore the remaining allegations in Paragraph 46

are directed to a party other than Defendant TPI.  Defendant TPI denies the remaining

allegations in Paragraph 46.

    47.  Denied. Defendant TPI did not employ Plaintiff and therefore the allegations in

Paragraph 47 are directed to a party other than Defendant TPI.

04/12/2021 SL1 1683782v3 030421.00713

JOINT APPX 0411

48. Admitted in part, denied in Part. Defendant TPI admits only that Tal Zorman made the decision to terminate Plaintiff's employment and that Ms. Zorman was employed by Defendant TPI. Defendant TPI denies the remaining allegations contained in Paragraph 48.

49. Admitted upon information and belief. By way of further response, Defendant TPI did not employ Plaintiff and, therefore, the allegations in Paragraph 49 are directed to a party other than Defendant TPI.

50. Denied. By way of further response, Defendant TPI did not employ Plaintiff nor does it employ Mr. Nasi and therefore the allegations in Paragraph 50 are directed to a party other than Defendant TPI.

51. Denied.

52. Denied. By way of further response, Defendant TPI did not employ Plaintiff and, therefore, the allegations in Paragraph 52 are directed to a party other than Defendant TPI.

53. Denied.

### CLASS ALLEGATIONS

55. Admitted[2] in part, denied in part. Defendant TPI admits only that Plaintiff purports to bring his Amended Complaint on behalf of all individuals over the age of forty years who have been terminated by Defendant TPI and [he alleges Teva US]. Defendant TPI denies that it engaged in any unlawful conduct. By way of further response, Defendant TPI denies that certification of a class action is appropriate and denies that it is liable to Plaintiff or to any putative member of the class for age discrimination. Further, the remaining allegations are directed to a party other than Defendant TPI and are therefore denied.

---

[2] Plaintiff's Amended Complaint omits a Paragraph 54 and includes two Paragraphs labeled 55. Defendant TPI therefore omits a response to missing Paragraph 54 and provides a separate response to each Paragraph 55.

04/12/2021 SL1 1683782v3 030421.00713

JOINT APPX 0412

55.   Paragraph 55 of the Amended Complaint states only conclusions of law to which no response is required.  To the extent a response is required, Defendant TPI denies that this is properly a class action matter, certification of a class action is appropriate, and that it is liable to Plaintiff or to any putative member of the class.

56.   Paragraph 56 of the Amended Complaint states only conclusions of law to which no response is required.  To the extent a response is required, Defendant TPI denies Plaintiff's allegation that the investigation into the allegations will not be increased if the issues raised are expanded to a class action.  Further, Defendant TPI denies that it engaged in any unlawful conduct.  By way of further response, Defendant TPI denies that this is properly a class action matter, that certification of a class action is appropriate, and that it is liable to Plaintiff or to any putative member of the class.

57.   Admitted in part, denied in part, Defendant TPI admits that Plaintiff "seeks certification of a class of older workers under the terms and requirements of Rules 23(a)(1)(2)(3) and (4) fo [sic] the Federal Rules of Civil Procedure."  By way of further response, Defendant TPI denies that this is properly a class action matter, that certification of a class action is appropriate, and that it is liable to Plaintiff or to any putative member of the class.

58.   Admitted in part, denied in part.  Defendant TPI admits only that Plaintiff purports to define the class as stated in Paragraph 58 of the Amended Complaint.  Defendant TPI denies the remaining allegations contained in Paragraph 58 of the Amended Complaint.  By way of further response, Paragraph 58 of the Amended Complaint states only conclusions of law to which no response is required.  To the extent a response is required, Defendant TPI denies that this is properly a class action matter, that certification of a class action is appropriate, and that it is liable to Plaintiff or to any putative member of the class.

10

JOINT APPX 0413

59. Admitted in part, denied in part. Defendant TPI admits only that Plaintiff purports
to reserve his right to amend the Class definition. Defendant TPI denies that this is properly a
class action matter, that certification of a class action is appropriate, and that it is liable to
Plaintiff or to any putative member of the class.

60. Paragraph 60 of the Amended Complaint states only conclusions of law to which no
response is required. To the extent a response is required, Defendant TPI denies that this is
properly a class action matter, that certification of a class action is appropriate, and that it is
liable to Plaintiff or to any putative member of the class.

61. Paragraph 61 of the Amended Complaint states only conclusions of law to which no
response is required. To the extent a response is required, Defendant TPI denies that this is
properly a class action matter, that certification of a class action is appropriate, and that it is
liable to Plaintiff or to any putative member of the class.

62. Paragraph 62 of the Amended Complaint states only conclusions of law to which no
response is required. To the extent a response is required, Defendant TPI denies that this is
properly a class action matter, that certification of a class action is appropriate, and that it is
liable to Plaintiff or to any putative member of the class.

63. Paragraph 63 of the Amended Complaint states only conclusions of law to which no
response is required. To the extent a response is required, Defendant TPI denies that this is
properly a class action matter, that certification of a class action is appropriate, and that it is
liable to Plaintiff or to any putative member of the class.

64. Paragraph 64 of the Amended Complaint states only conclusions of law to which no
response is required. To the extent a response is required, Defendant TPI denies that this is

JOINT APPX 0414

properly a class action matter, that certification of a class action is appropriate, and that it is liable to Plaintiff or to any putative member of the class.

65. Paragraph 65 of the Amended Complaint states only conclusions of law to which no response is required. To the extent a response is required, Defendant TPI denies that this is properly a class action matter, that certification of a class action is appropriate, and that it is liable to Plaintiff or to any putative member of the class.

66. Paragraph 66 of the Amended Complaint states only conclusions of law to which no response is required. To the extent a response is required, Defendant TPI denies that this is properly a class action matter, that certification of a class action is appropriate, and that it is liable to Plaintiff or to any putative member of the class.

67. Paragraph 67 of the Amended Complaint states only conclusions of law to which no response is required. To the extent a response is required, Defendant TPI denies that this is properly a class action matter, that certification of a class action is appropriate, and that it is liable to Plaintiff or to any putative member of the class.

68. Paragraph 68 of the Amended Complaint states only conclusions of law to which no response is required. To the extent a response is required, Defendant TPI denies that this is properly a class action matter, that certification of a class action is appropriate, and that it is liable to Plaintiff or to any putative member of the class.

69. Paragraph 69 of the Amended Complaint states only conclusions of law to which no response is required. To the extent a response is required, Defendant TPI denies that this is properly a class action matter, that certification of a class action is appropriate, and that it is liable to Plaintiff or to any putative member of the class.

04/12/2021 SL1 1683782v3 030421.00713

JOINT APPX 0415

70. Paragraph 70 of the Amended Complaint states only conclusions of law to which no response is required. To the extent a response is required, Defendant TPI denies that this is properly a class action matter, that certification of a class action is appropriate, and that it is liable to Plaintiff or to any putative member of the class.

## STATEMENT OF LEGAL LIABILITY

71. Paragraph 71 of the Amended Complaint states only conclusions of law to which no response is required. To the extent a response is required, Defendant TPI admits that Plaintiff is over the age of forty.

72. Paragraph 72 of the Amended Complaint states only conclusions of law to which no response is required. To the extent a response is required, Defendant TPI denies these allegations.

73. Paragraph 73 of the Amended Complaint states only conclusions of law to which no response is required. To the extent a response is required, Defendant TPI denies these allegations.

74. Paragraph 74 of the Amended Complaint states only conclusions of law to which no response is required. To the extent a response is required, Defendant TPI denies these allegations.

## COUNT I

## VIOLATIONS OF THE AGE DISCRIMINATION IN EMPLOYMENT ACT

75. Defendant TPI incorporates by reference its responses to the averments of Paragraphs 1 through 74, above, as if fully set forth at length herein.

76. Paragraph 76 of the Amended Complaint states only conclusions of law to which no response is required. To the extent a response is required, Defendant TPI denies these allegations.

04/12/2021 SL1 1683782v3 030421.00713

JOINT APPX 0416

## COUNT II

### VIOLATIONS OF THE PENNSYLVANIA HUMAN RELATIONS ACT

77. Defendant TPI incorporates by reference its responses to the averments of Paragraphs 1 through 76, above, as if fully set forth at length herein.

78. Paragraph 78 of the Amended Complaint states only conclusions of law to which no response is required. To the extent a response is required, Defendant TPI denies these allegations.

### RELIEF SOUGHT

Defendant TPI denies that Plaintiff is entitled to any relief or damages and specifically denies the allegations of the "WHEREFORE" clause contained in the "Relief Sought" portion of the Amended Complaint as it relates to his or their entitlement to relief. Defendant TPI demands that judgment be entered in favor of Defendant TPI and against Plaintiff, that the Court dismiss Plaintiff's Amended Complaint in its entirety, and that the Court award Defendant TPI reimbursement for its attorneys' fees, costs and expenses incurred in this action.

    a. Denied.

    b. Denied.

    c. Denied.

    d. Denied.

    e. Denied.

### AFFIRMATIVE DEFENSES

Defendant TPI incorporates by reference in each Affirmative Defense set forth below the admissions, denials, and averments of the above paragraphs of this Answer as if fully set forth herein.

1. Plaintiff's Amended Complaint fails to state a claim upon which relief can be granted.

14

JOINT APPX 0417

2.   Defendant TPI did not engage in any unlawful or wrongful conduct with respect to Plaintiff, is not liable to Plaintiff in any manner, and Plaintiff is not entitled to any relief or damages.

3.   Defendant TPI acted in good faith at all times relevant to this action and did not engage in any discrimination or unlawful or wrongful conduct.

4.   Plaintiff was an at-will employee for the entire duration of his employment with another defendant, Defendant TUSA.

5.   Plaintiff has not suffered any damages or, in the alternative, any damages suffered by Plaintiff were not proximately caused by Defendant TPI.

6.   Plaintiff is not entitled to an award of attorneys' fees and costs.

7.   Defendant TPI is not an "employer" as that term is defined in the Age Discrimination in Employment Act or the Pennsylvania Human Relations Act.

8.   All decisions made by Defendant TPI with respect to Plaintiff were legitimate, good-faith, lawful business decisions that were not based on, connected to, or related to Plaintiff's age.

9.   Teva did not violate the Age Discrimination in Employment Act, the Pennsylvania Human Relations Act, or any other statutory or common law with respect to Plaintiff.

10.   Plaintiff has failed to mitigate his alleged damages.

11.   Plaintiff's termination was based on reasonable factors other than age.

12.   Plaintiff's claim for punitive damages are barred to the extent that award of such damages would violate any of the provisions of the Constitution of the United States, or any of the provisions of the Constitution of the Commonwealth of Pennsylvania, or any other law.

13.   Any claim for liquidated damages is barred because the actions allegedly taken by Defendant TPI were not willful.

04/12/2021 SL1 1683782v3 030421.00713

JOINT APPX 0418

14.   Defendant TPI challenges this Court's ability to exercise jurisdiction over it in this or any other matter.

15.   Defendant TPI specifically reserve the right to assert any additional Affirmative Defenses in this matter, including those arising under the doctrine of after-acquired evidence.

WHEREFORE, Defendant TPI demands that judgment be entered in its favor and against Plaintiff, that the Court dismiss Plaintiff's Amended Complaint in its entirety, and that the Court award Defendant TPI reimbursement for its attorneys' fees, costs and expenses incurred in this action.

Dated:  April 12, 2021                              STEVENS & LEE


                                    By: /s/ *Larry J. Rappoport*
                                           Larry J. Rappoport (ID No. 26922)
                                           ljr@stevenslee.com
                                           Brandon S. Shemtob (ID No. 319246)
                                           bss@stevenslee.com
                                           1800 Market Street, East Tower, Suite 1800
                                           Philadelphia, PA  19102
                                           (215) 496-3839

                                           *Attorneys for Defendant* Teva Pharmaceutical
                                           Industries, Ltd.

04/12/2021 SL1 1683782v3 030421.00713

JOINT APPX 0419

## <u>CERTIFICATION OF SERVICE</u>

     I, Larry J. Rappoport, Esquire, certify that on this date, a certified true and correct copy of the foregoing Defendant Teva Pharmaceutical Industries Ltd.'s Answer and Affirmative Defenses to Plaintiff's Amended Complaint was filed electronically and is available for viewing on the Court's ECF system.


                                                */s/ Larry J. Rappoport*
                                               Larry J. Rappoport, Esquire


Dated:  April 12, 2021

04/12/2021 SL1 1683782v3 030421.00713

JOINT APPX 0420

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **STEPHEN MIDDLEBROOKS** | : | **CIVIL ACTION** |
| | : | |
| **v.** | : | **NO. 17-412** |
| | : | |
| **TEVA PHARMACEUTICALS USA,** | : | |
| **INC.,** *et al.* | | |

## MEMORANDUM

**KEARNEY, J.**                                             **August 31, 2018**

Within two weeks of reviewing an internal investigation report of complaints from American employees alleging cultural bias and persistent questions regarding the ages of the American employees, an international employer based and managed in Israel issued a first-ever negative performance review and then placed the supervising 58-year-old American executive on a performance improvement plan citing deficient performance. Ninety days later, the Israel-based employer fired him for deficient performance – a decision it now characterizes as partially based on buyer's remorse in promoting him into a senior position after years of growth in a lesser executive position. The American executive sued the Israeli employer for discriminating against him based on his age and American national origin and in retaliation for complaints of discrimination. After extensive discovery, the American executive has now adduced evidence raising genuine issues of material fact for the jury as to the reasons for his former employer's decisions adversely affecting his employment. Finding genuine issues of material fact on the executive's retaliation and discrimination claims based on age and national origin, we deny Teva's motion.[1]

## I.   Undisputed Facts[2]

Teva Pharmaceuticals USA, Inc. hired Mr. Middlebrooks, an American born in 1957, as a Director, Facilities Engineering in its North Wales, Pennsylvania office in 2001.[3]  By 2013, Mr. Middlebrooks grew into the position of North American Director of Facilities.[4]  In September 2013, Teva selected Nir Aharoni, an Israeli born in 1970 and based in Israel, to lead Teva's newly created Global Facilities Management Group ("Global Group").[5]

On November 7, 2014, Mr. Aharoni selected Mr. Middlebrooks as Senior Director, Facility Management for the newly created North American Facilities Management Group ("North American Group").[6]   Before this selection, Mr. Aharoni asked Mr. Middlebrooks his age and when he planned to retire.[7]  Mr. Aharoni selected Mr. Middlebrooks for the position despite the opinion of Karin Shanahan, Teva USA's Senior Vice President of the Americas and European Sterile Operations, who did not believe Mr. Middlebrooks the best candidate for the position, an opinion she shared with Mr. Aharoni.[8]   Ms. Shanahan had no role in Mr. Middlebrooks's subsequent Performance Improvement Plan ("PIP") or termination and she did not document concerns regarding Mr. Middlebrooks's performance before November 2014 because he did not directly report to her.[9]

In January 2015, two months after Teva promoted him to Senior Director, Mr. Aharoni provided Mr. Middlebrooks with his 2014 annual review.[10]   Mr. Aharoni assessed Mr. Middlebrooks's overall performance rating as a "mostly meets" on a scale of "below," "mostly meets," "meets," "exceeds," and "exceptional."[11]   Before this 2014 review, Teva supervisors graded Mr. Middlebrooks's overall performance ratings at "meets" or "exceeds"[12] and recommended salary increases and bonuses every year.[13]

JOINT APPX 0422

In March 2015, Teva retained an outside recruiting agency to search for a replacement for Mr. Middlebrooks's position.[14]  Between April and December 2015, "gaps in communication" between the outside search firm and Mr. Aharoni "essentially halt[ed] the search efforts," with the search "re-started" in March 2016, after Mr. Middlebrooks's termination.[15]  Herminia Rodriguez, a Teva Human Resources Senior Manager, testified no one raised the issue of terminating Mr. Middlebrooks before she left Teva's employ on December 11, 2015.[16]

In June 2015, two Israeli-based members of the Global Group, Roni Kafre and Shimrit Shemtov, travelled to Teva USA's North Wales facility to meet with Mr. Middlebrooks and his team in the North American Group to discuss the 2016 Annual Operating Plan and to review the 2015 Annual Operating Plan.[17]  The meeting with the Global Group raised concerns among Mr. Middlebrooks and his team regarding perceived age and cultural bias prompting them to meet with Ms. Rodriguez to complain about treatment by the Israeli-based Global Group.[18]  One employee complained of being asked her age and another employee reported a hostile work environment.[19]

After receiving these complaints, Ms. Rodriguez concluded allegations of "bias[ed] treatment, violations of employment labor practices, and possible hostile work environment claims" warranted further investigation.[20]  Ms. Rodriguez told Mr. Aharoni a formal investigation would be made in response to the North American Group's complaints, including of a hostile work environment.[21]  The parties dispute whether the investigation angered Mr. Aharoni; Mr. Aharoni testified an investigation into complaints did not anger him while Mr. Middlebrooks testified Mr. Aharoni became angry at him for the investigation, telling Mr. Middlebrooks "a good manager would have controlled his people and it never would have gotten

JOINT APPX 0423

this far."[22]   It is undisputed Mr. Aharoni was not told any complaints were made about his conduct.[23]

On July 31, 2015, Ms. Rodriguez asked Leander Jones, Teva's Director of Human Resources in Virginia, to investigate allegations of the North American Group's complaints (the "Investigation").[24]   In September 2015, Mr. Jones interviewed Mr. Middlebrooks, his team members, and Global Group Israeli-based managers Mr. Kafre, Ms. Shemtov, and Mr. Aharoni.[25] The Investigation included findings Teva's Israeli-based management asked Mr. Middlebrooks and some of his team members to supply the ages of employees or directly asked for their ages.[26]   Ms. Shemtov admitted she asked one employee her age during an interview.[27] Mr. Middlebrooks told Mr. Jones he "went to Management" to ask the requests for age-related information stop, but later received "a memo from Israel to send them all this information" and, after refusing to provide information, he "continu[ed] to get the request," telling "those making the request that if I got another one like this, I would make sure somebody got fired," and the requests stopped.[28]   Mr. Jones additionally noted comments regarding a perceived bias among Mr. Middlebrooks and his team against Americans by Israeli management.[29]

The Investigation shows Mr. Middlebrooks told Mr. Jones "he would have hoped that Managers at a certain level in Global roles would be able to understand cultural challenges and gaps that exist"; "Managers and individuals he works with who are his bosses don't have that level of understanding, sensitivities, and need training to help."[30]   In summarizing responses to his question of whether a hostile work environment existed, Mr. Jones noted most of the team attributed the term "hostile work environment" to "the number of issues cited with interactions between the [US team] and the Global Group," citing to "incidents involving employment practice questions about age as a problem given it shouldn't play a part in decision making for

4

management" and "comments about biases perceived" showing "a level of favoritism for one group vs. another that had to do more with heritage than with knowledge and skill (e.g. Israeli v. American.)"[31]

Mr. Jones's Investigation ultimately found no hostile work environment, but identified areas of concern including "legal issues" such as "personally being asked my age in a formal interview"; "on-going requests made by Israel for age and demographic information"; and "perceived discrimination due to ethnic bias."[32]   Mr. Jones recommended Mr. Aharoni, Mr. Kafre, and Ms. Shemtov be provided with "cultural and sensitivity training . . . [e]specially on US practices/law, culture, and ways of working" and "address the topic of retaliation," and recommended counseling to Mr. Kafre and Ms. Shemtov "regarding their behavior and interaction with the team and the need for adherence to US laws and statutes" and "[e]xpress need for accountability and sincere desire to change."[33] Although Mr. Jones's Investigation recommended Ilanit Shtrouchler, the Human Resources business partner for the Global Group based in Israel, provide counseling to Mr. Kafre and Ms. Shemtov, Ms. Shtrouchler testified she did not give either Mr. Kafre or Ms. Shemtov anything in writing regarding counseling and she did not give either any performance warnings for their conduct as reported in the Investigation.[34]

Mr. Jones sent his 32-page report of the Investigation to Ms. Rodriguez and other Teva Human Resource personnel on September 28, 2015.[35] Mr. Aharoni received a condensed report of the Investigation on October 14, 2015.[36]

One week later, on October 21, 2015, Mr. Aharoni gave Mr. Middlebrooks a negative mid-year review.[37] Teva's Human Resources Management Guideline policy provides employees who receive a rating of "mostly meets" expectations receive a Performance Consistency Plan

5

("PCP") and those receiving a rating of "below expectations" receive a PIP.[38]  Teva's Senior

Director of Human Resources, Jennifer Flaisher, testified a PIP is worse than a PCP.[39]

The parties dispute the reason why Mr. Aharoni chose to give a "mid-year" review in

October rather than in June or July 2015. Teva contends Mr. Middlebrooks's ongoing

performance deficiencies noted in the mid-year review covered the same concerns raised in the

2014 annual review given in January 2015.[40]  Three months earlier, on July 23, 2015, Mr.

Middlebrooks provided Mr. Aharoni with a self-evaluation for his mid-year review noting

improved performance and either meeting or exceeding 2015 goals.[41]  Mr. Aharoni never

contacted or responded to Mr. Middlebrooks regarding the July 23, 2015 self-evaluation of his

2015 goals.[42]

One week after the mid-year review, Mr. Aharoni placed Mr. Middlebrooks on a PIP on

October 29, 2015.[43]  On November 12, 2015, Mr. Middlebrooks sent Mr. Aharoni, Ms.

Rodriguez, and Ms.  Flaisher an email objecting to the PIP, including his belief he received the

PIP based on his age and national origin and in retaliation for complaints about the Global

Group's request for age information and perceived bias.[44]  Mr. Middlebrooks filed a charge with

the Equal Employment Opportunity Commission ("EEOC") and Pennsylvania Human Relations

Commission ("PHRC") on November 25, 2015 and sent a copy of the charge to Mr. Aharoni,

Ms. Rodriguez, and Ms. Flaisher.[45]

On January 14, 2016, Teva extended Mr. Middlebrooks's PIP to the end of February.[46]

Teva fired Mr. Middlebrooks on February 29, 2016.[47]  Teva replaced Mr. Middlebrooks with 38-

year old Dan Ramirez, born in 1978 and twenty-one years younger than Mr. Middlebrooks.

6

Mr. Middlebrooks timely sued alleging Teva violated the Age Discrimination in Employment Act ("ADEA"),[48] Title VII of the Civil Rights Act of 1964 ("Title VII")[49] and the Pennsylvania Human Rights Act ("PHRA").[50]

## II. Analysis

Teva moves for summary judgment, arguing Mr. Middlebrooks has not established a *prima facie* case of retaliation or discrimination based on age or national origin and, even if he satisfies a *prima facie* case, he cannot show pretext.[51] Mr. Middlebrooks responds there is evidence in the record to make out a *prima facie* case of discrimination based on both age and national origin and to show pretext, there are material facts in dispute, and the motivations for Teva's conduct as well as credibility issues must be resolved by a jury.

### A. We deny summary judgment on claims of discrimination based on age and national origin.

We apply the familiar three-part framework of *McDonnell Douglas*[52] to Mr. Middlebrooks's claims of discrimination under both ADEA and Title VII.[53] To establish a *prima facie* case of discrimination under ADEA, Mr. Middlebrooks must show (1) he is forty years of age or older; (2) he suffered an adverse employment action; (3) he is qualified for the position; and (4) he was replaced by another employee sufficiently younger to support an inference of discrimination.[54] To establish a *prima facie* case of discrimination under Title VII, Mr. Middlebrooks must show (1) he is a member of a protected class; (2) he was qualified for the position he sought to attain or retain; (3) he suffered an adverse employment action; and (4) the action occurred under circumstances that could give rise to an inference of intentional discrimination.[55] "To establish a *prima facie* case at summary judgment, 'the evidence must be sufficient to convince a reasonable factfinder to find all of the elements of [the] *prima facie* case.'"[56]

7

If Mr. Middlebrooks establishes a *prima facie* case of age or national origin discrimination, the burden shifts to Teva to show a legitimate, non-discriminatory reason for its adverse employment action.[57] If Teva meets its burden, the burden shifts back to Mr. Middlebrooks to show Teva's proffered reason is pretext.[58] Teva asserts its legitimate, non-discriminatory reason for terminating Mr. Middlebrooks is his failure to successfully complete the terms of his PIP and failure to perform well in his new role as Senior Director of the North American Group, pointing to Mr. Aharoni's deposition testimony.

At the summary judgment stage, Mr. Middlebrooks can show pretext in two ways: (1) he "may point to evidence in the record that would cause a reasonable juror to disbelieve [Teva's] articulated legitimate non-discriminatory reason, thereby creating a genuine dispute of material fact as to the credibility of that reason"; or (2) "by pointing to evidence that indicates that [Teva] acted with discriminatory animus."[59] In an age discrimination case, a plaintiff must show age was the "but-for" cause of the employer's adverse employment action.[60]

### 1. Mr. Middlebrooks established a *prima facie* case of age and national origin discrimination.

Teva asserts Mr. Middlebrooks fails to establish a *prima facie* case of both age and national origin discrimination because the October 2014 mid-year poor performance review and the PIP are not adverse actions. It is undisputed Teva terminated Mr. Middlebrooks, an adverse action Teva does not address. With no other argument on an asserted failure to establish a *prima facie* case of discrimination in violation of ADEA and Title VII, we find Mr. Middlebrooks established a *prima facie* case of age discrimination.

8

**2. There are genuine issues of material fact on whether Teva's reasons for termination are pretext for age discrimination.**

Teva asserts Mr. Middlebrooks cannot establish the reason for his termination is pretextual. Teva cites to Mr. Aharoni's testimony he terminated Mr. Middlebrooks for failure to successfully complete the terms of his PIP and for poor performance in his role as Senior Director documented in his 2014 annual review and continuing into 2015. Teva argues there is no genuine issue of material fact under either prong of *Fuentes*: (1) there is no evidence Mr. Aharoni took any action based on Mr. Middlebrooks's age, pointing to Mr. Aharoni's decision to promote Mr. Middlebrooks knowing his age and the "same actor" theory weighs heavily against any pretext finding;[61] (2) once Mr. Middlebrooks complained to Teva's Human Resources about age questions, the conduct stopped; and (3) simply making an age inquiry in and of itself is not age discrimination.

Mr. Middlebrooks responds he demonstrates evidence supporting both prongs of *Fuentes*: there are weaknesses, implausibilities and contradictions such that a jury could disbelieve Teva's proffered reasons for its adverse actions or believe the real reason for Teva's adverse actions is Mr. Middlebrooks's age.

We find there are genuine issues of material fact on pretext including the lack of any performance- related documentation between January and October 2015 when Mr. Aharoni gave Mr. Middlebrooks a negative mid-year review; placement on a PIP rather than a PCP for a "mostly meets expectations" mid-year review contrary to Teva's own Human Resources guidelines; testimony from Ray Duggan, 57 years old and one of Mr. Middlebrooks's direct reports, who testified he did not receive an equity bonus although eligible for it and when Mr. Duggan asked Mr. Aharoni why he did not receive an equity award, Mr. Aharoni responded the awards are "only for employees that will be with us for a long time"; of the three employees in

9

Mr. Middlebrooks's group – Mr. Middlebrooks, Mr. Duggan, and Troy Gaugler – eligible for an equity award, only 48-year old Mr. Gaugler received the award; inconsistencies in Mr. Aharoni's explanation for why Mr. Middlebrooks did not receive an equity award because only employees who receive a "meets" expectations to be eligible versus Mr. Duggan's rating of "fully meets" performance review for 2014; questions of age, including Mr. Aharoni's testimony he wanted to know if an employee is thinking about retirement so he could make future plans; testimony from multiple witnesses in Mr. Middlebrooks's group regarding age-related questions; and replacing Mr. Middlebrooks with a 38-year old.

Finding evidence a jury could either disbelieve Teva's articulated legitimate non-discriminatory reason for its adverse actions or believe the real reason for its adverse action is based on age, we deny summary judgment on claims of age discrimination.

### 3. There are genuine issues of material fact on whether Teva's reasons for termination are pretext for national origin discrimination.

Mr. Middlebrooks's claim of pretext based on national origin discriminatory animus passes the summary judgment standard. Mr. Middlebrooks contends Mr. Aharoni and other Israeli management had a bias against Americans.

Mr. Middlebrooks cites the following evidence: one of Mr. Middlebrooks's direct reports, Kristin Macone, believed Mr. Aharoni and his team members thought Americans "stupid" and treated Middlebrooks poorly, including being disrespectful and dismissive of his opinions and recommendations because he is American; Mr. Aharoni told Mr. Middlebrooks he believed Americans have a "narrow-minded perception of Israelis" and Americans "did a poor job of supporting Israel in its military actions in the Middle East"; when another employee in Mr. Middlebrooks's group returned from a work trip to Israel and reported when she told Mr. Aharoni she had a wonderful time in Israel, he responded "now [you] know [we are] not just a

10

bunch of guys riding camels"; one of Mr. Middlebrooks's direct reports believed there is a bias against Americans in how Mr. Aharoni and his Israel team treated them, including Israelis are higher on the "totem pole" than Americans, the Israeli team micromanaging the American team , failing to give Americans information when requests, and changing the group's objectives when other regions failed to meet goals; after Mr. Middlebrooks's termination, his group went to Israel for a meeting with Mr. Aharoni during which another employee made a comment about people of different ethnicities perceived as derogatory and insulting to Americans, and after Americans expressed discomfort with the comment, the offending employee (who reported to Mr. Aharoni) said "she was sorry they [the Americans] didn't know what funny was"; Mr. Aharoni's dismissiveness of their concerns, telling the American group it is the kind of thing the Israelis think funny and the Americans "needed to be OK with it"; and another employee in Mr. Middlebrooks's group believed there is an implicit bias against Americans because, when the American group asked for information from Mr. Aharoni, Mr. Kafre, and Ms. Shemtov, they denied information.

Mr. Middlebrooks also cites Teva's failure to act in response to complaints of bias against Americans pointing to the lack of discipline for Israeli–based Mr. Kafre and Ms. Shemtov for their conduct at the June 2015 meeting and Teva's failure to document Mr. Aharoni's performance deficiencies. Mr. Middlebrooks argues the Investigation recommended Mr. Kafre, Ms. Shemtov, and Mr. Aharoni receive cultural and sensitivity training on "US practices/law, culture and ways of working" and, for Mr. Kafre and Ms. Shemtov, receive counseling, but were not given performance warnings while Mr. Middlebrooks was placed on a PIP for alleged performance deficiencies.

11

Mr. Middlebrooks also cites evidence Mr. Aharoni, his younger Israeli supervisor, also had performance issues but did not receive any discipline or a PIP. For example, a document authored by Ms. Flaisher around the time of Mr. Middlebrooks's termination stated she believed Mr. Aharoni "has a serious credibility issue among the US leaders" and "has some credibility gaps."[62] Christopher Swartz, the Human Resources business partner for Mr. Middlebrooks's group in late 2015, agreed with Ms. Flaisher's statement Mr. Aharoni "had some capability gaps," explaining Mr. Aharoni "could have probably been, at times, a better communicator in getting information, you know, out in a timely manner to his team."[63] Ms. Shtrouchler testified she had concerns about Mr. Aharoni's performance, including "taking too long for him to take decisions [sic]," describing it as "one of the major barrier [sic]" for him and that he "was too soft."[64]

We find this evidence on pretext relating to national origin, albeit not overwhelming compared to evidence on age, a sufficient basis for a jury to reasonably either (1) disbelieve Teva's proffered legitimate non-discriminatory reason for its actions or (2) believe an invidious discriminatory reason is more likely than not a motivating or determinative cause of Teva's actions based on Mr. Middlebrooks's national origin.[65]

**B.    Fact issues preclude summary judgment on the retaliation claim.**

To establish a *prima facie* claim of retaliation, Mr. Middlebrooks must show (1) protected employee activity; (2) "adverse action by [Teva] either after or contemporaneous with the employee's protective activity"; and (3) a causal connection between the protected activity and the adverse action.[66] In the context of an adverse action in a retaliation claim, Teva's retaliatory conduct must be one "that . . . well might have dissuaded a reasonable worker from making or supporting a charge of discrimination."[67] For the causation prong, Mr. Middlebrooks

12

may rely on temporal proximity if "unusually suggestive."[68]   In the absence of temporal proximity, we consider "timing plus other evidence" allowing us to "consider the circumstances as a whole, including any intervening antagonism by the employer, inconsistences in the reasons the employer gives for its adverse action, and any other evidence suggesting that the employer had a retaliatory animus when taking the adverse action."[69]

Applying the *McDonnell Douglas* framework to retaliation claims, once Mr. Middlebrooks establishes a *prima facie* case of retaliation the burden shifts to Teva to articulate a legitimate, non-discriminatory reason for its action.  If the employer does so, the burden shifts to Mr. Middlebrooks to show the reason is merely pretext and retaliation is the real reason for the adverse employment action.[70]  We analyze ADEA, Title VII, and PHRA retaliation claims coextensively.[71]

Teva argues Mr. Middlebrooks fails to establish all three elements of a *prima facie* claim of retaliation.  Beginning with the first prong, Teva argues there is no protected activity until November 12, 2015 when Mr. Middlebrooks emailed Mr. Aharoni, Ms. Rodriguez, and Ms. Flaisher of Teva Human Resources objecting to the imposition of the PIP as discriminatory based on age and national origin and in retaliation for the complaints made regarding the June 2015 meeting.  If there is no protected activity until November 12, 2015, all actions before that date – namely the October 2015 negative mid-year review and PIP – would not be considered an adverse action occurring "either after or contemporaneous with" protected activity.

Although Teva recognizes complaints made to its Human Resources department in June 2015, it contends Mr. Middlebrooks himself did not make any such complaints instead, complaints were made by his team; the one person on his team who complained of a hostile work

JOINT APPX 0433

environment testified he did not actually mean hostility based on age or national origin; and, after Teva's Investigation, it did not find a hostile work environment.

But Mr. Middlebrooks cites competent evidence showing a factual issue regarding when he first complained about discriminatory treatment. Mr. Middlebrooks complained to Ms. Rodriguez of discriminatory treatment by the Global Group in the summer of 2015; Teva's Investigation finding Mr. Middlebrooks complained of "numerous requests for data that is not acceptable (age) . . ." and inappropriate comments regarding marital status; the Investigation reporting Mr. Middlebrooks's statement to Mr. Jones on September 3, 2015 he "went to [Ms. Rodriguez] about 9 weeks or so and she attended a meeting we had" where Ms. Rodriguez "asked questions and got honest answers" and Mr. Middlebrooks's belief allegations of a hostile work environment "warranted a more thorough investigation right at that time and felt 9 weeks was too long"; and the Investigation reporting Mr. Middlebrooks's complaint to "Management" regarding requests for age information from the Israeli-based Global Group. This evidence shows Mr. Middlebrooks complained of age-related questions and cultural bias before November 12, 2015.

Teva next argues Mr. Middlebrooks fails to show an adverse action sufficient to satisfy the second prong of the *prima facie* retaliation claim. It contends the October 2015 mid-year review and PIP are not adverse actions because (a) those events did not "dissuade" Mr. Middlebrooks from complaining as evidenced by his November 12, 2015 email and November 25, 2015 EEOC charge; and (b) a PIP is not an adverse action unless accompanied by a decrease in pay, benefits, or employment status. Even if the October 2015 mid-year review and PIP are not adverse actions for purposes of a retaliation claim, there is no dispute Teva terminated Mr.

14

Middlebrooks and there is at least a fact question about whether the termination "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination."

Finally, Teva argues there is no evidence of a causal link required for the third prong of the *prima facie* case because (a) the temporal proximity is not "unusually suggestive"; and (b) Mr. Middlebrooks's performance issues pre-dated protected activity precluding a finding of a causal link. We find there are genuine issues of material fact on causation.

The record, subject to credibility questions at trial, shows Mr. Middlebrooks and his team complained to Teva USA's Human Resources after the June 2015 meeting about the behavior of the Israeli-based Global Group, including complaints objecting to questions of age and cultural bias; Ms. Rodriguez, after meeting with Mr. Middlebrooks and his team, concluded the complaints required further investigation; Mr. Jones conducted an investigation documenting age-related questions including the admission by Ms. Shemtov she asked one person about her age during an interview; one week after Mr. Aharoni received the written report of the Investigation, he gave Mr. Middlebrooks a negative mid-year review followed by the PIP; and, after Mr. Middlebrooks's November 12, 2015 email objecting to the PIP on the basis of discrimination and his November 25, 2015 EEOC charge, Mr. Aharoni terminated Mr. Middlebrooks in February 2016.

Teva answers by citing Mr. Middlebrooks's alleged history of poor performance predating even the June 2015 complaints precluding a finding of the requisite causal link. Teva points to a "poor rating" on his 2014 annual performance review and an "ongoing effort to find his replacement." The record shows Mr. Middlebrooks received overall reviews of "meets" or "exceeds" in the years before his 2014 review; despite alleged poor performance, Mr. Aharoni nevertheless promoted Mr. Middlebrooks to Senior Director in November 2014; Mr.

15

Middlebrooks scored an overall "mostly meets" on his 2014 annual performance review with individual categories scoring "meets" and "exceed"; in July 2015, Mr. Middlebrooks sent Mr. Aharoni a self-assessment of his 2015 goals for a mid-year review, assessing improved performance and Mr. Middlebrooks's belief he is meeting or exceeding his 2015 goals and asking for Mr. Aharoni's comments and suggestions for further improvement; although Teva asserts poor performance by Mr. Middlebrooks during 2015, Mr. Aharoni did not respond to Mr. Middlebrooks's self-assessment or administer a mid-year review until October 21, 2015, one week after receiving the report of Investigation; there is no documentation of any performance deficiencies after the January 2015 review and before the October 21, 2015 mid-year review; and, although Teva engaged an outside search agency to find his replacement, the agency's document shows a delay and suspension of the search for four months in 2015.

The timeline of Teva's actions towards Mr. Middlebrooks further raises issues of material fact. We reviewed competent evidence of a negative mid-year performance review issued one week after Mr. Aharoni received the report of the Investigation and a PIP issued one week after the mid-year review. Our court of appeals holds a temporal proximity of two days is unusually suggestive of causation but a temporal proximity of greater than ten days requires supplementary evidence of retaliatory motive.[72] We find a period of seven days between Mr. Aharoni's receipt of the Investigation and the negative mid-year review usually suggestive, but even if we applied the "time plus" standard, we find sufficient supplementary evidence to create a genuine issue of material fact on causation. This evidence includes Mr. Aharoni's failure to respond to Mr. Middlebrooks's July 2015 self-assessment of meeting or exceeding all 2015 goals; the absence of any documentation of poor performance between January and October 2015; and Teva's policy those receiving a "mostly meets" expectations receive a PCP rather than a PIP.

16

## III. Conclusion

Teva Pharmaceuticals USA, Inc. and Teva Pharmaceutical Industries Ltd. move for summary judgment on Stephen Middlebrooks's claims alleging they issued an unprecedented (for him) negative performance review, performance improvement plan, and termination in February 2016 on the basis of age and national origin and in retaliation for complaining about discrimination. Teva argues Mr. Middlebrooks has not established a *prima facie* case of retaliation or discrimination based on age or national origin and, even if he satisfies a *prima facie* case, he cannot show pretext under federal law. Mr. Middlebrooks adduced sufficient evidence of age and national origin discrimination leading to his termination by Teva. He also adduced sufficient evidence his supervisor, Mr. Aharoni, issued a negative mid-year review serving as the basis of a PIP and ultimately leading to termination after he, and others working with him, complained about age and national origin discrimination. The disputed facts require our jury's credibility determinations. We deny Teva's motion for summary judgment in the accompanying Order.

---

[1] We refer to Teva Pharmaceuticals USA, Inc. and Teva Pharmaceutical Industries Ltd. collectively as "Teva."

[2] The Clerk reassigned this matter to us upon Chief Judge Stengel's retirement after Teva moved for summary judgment. Our Chambers' Policies require a Statement of Undisputed Material Facts ("SUMF") and an appendix in support of summary judgment. Teva filed its 214-paragraph SUMF (ECF Doc. No. 42-2) and an appendix (ECF Doc. Nos. 43-55). Mr. Middlebrooks responded to Teva's SUMF (ECF Doc. No. 63-1) ("Response to SUMF"), and added 273 paragraphs of additional facts he contends are material to summary judgment ("SOAF") (ECF Doc. No. 63-2), and supplemented the appendix with additional exhibits (ECF Doc. Nos. 63-5 to 63-12). The parties' appendices are not consecutively Bates stamped as required by our Policies

17

JOINT APPX 0437

but we do not strike the appendices given Chief Judge Stengel's earlier assignment. Accordingly, references to the appendices are to each party's exhibit and Bates number.

[3] Response to SUMF at ¶¶ 1-4 (ECF Doc. No. 63-1).

[4] Response to SUMF at ¶ 5 (ECF Doc. No. 63-1).

[5] Response to SUMF at ¶¶ 7-9 (ECF Doc. No. 63-1).

[6] Response to SUMF at ¶¶ 10-12 (ECF Doc. No. 63-1); Middlebrooks Ex. 34 (ECF Doc. No. 63-9).

[7] Response to SUMF at ¶ 18 (ECF Doc. No. 63-1).

[8] Response to SUMF at ¶¶ 21-27 (ECF Doc. No. 63-1).

[9] Response to SUMF at ¶¶ 21-27 (ECF Doc. No. 63-1).

[10] Response to SUMF at ¶ 71 (ECF Doc. No. 63-1).

[11] Teva Ex. 21 at Teva 674 (ECF Doc. No. 48).

[12] Middlebrooks Exs. 27-31 (ECF Doc. Nos. 63-8).

[13] Middlebrooks SOAF at ¶ 9 (ECF Doc. No. 63-2).

[14] Teva Ex. 22 at Teva 567 (ECF Doc. No. 48-1).

[15] Teva Ex. 22 at Teva 568, 570 (ECF Doc. No. 48-1).

[16] Teva Ex. 5 at p. 198 (ECF Doc. No. 45).

[17] Response to SUMF at ¶¶ 87-88 (ECF Doc. No. 63-1).

[18] Response to SUMF at ¶¶ 89-93 (ECF Doc. No. 63-1); Teva Ex. 26 (ECF Doc. No. 50-2).

[19] Teva Ex. 26 (ECF Doc. No. 50-2).

[20] Teva Ex. 28 at Teva 246 (ECF Doc. No. 51).

[21] Response to SUMF at ¶ 107 (ECF Doc. No. 63-1).

[22] Response to SUMF at ¶ 108 (ECF Doc. No. 63-1).

[23] Response to SUMF at ¶ 109 (ECF Doc. No. 63-1).

JOINT APPX 0438

[57] *Vaughn v. Boeing Co.*, --- F.App'x ---, No. 17-1398, 2018 WL 2324224 *3 (3d Cir. May 22, 2018) (citing *McDonnell Douglas*, 411 U.S. at 802).

[58] *Id.*

[59] *Burton*, 707 F.3d at 430-31 (citing *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994)).

[60] *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 177-78 (2009).

[61] The "same actor" inference allows an employer to argue it did not act with discriminatory intent where the same person hired and terminated an employee. In *Waldron v. SL Indus., Inc.*, 56 F.3d 491 (3d Cir. 1995), our court of appeals addressed whether it should apply the "same actor" inference first articulated in a decision by the United States Court of Appeals for the Fourth Circuit in *Proud v. Stone*, 945 F.3d 796 (4th Cir. 1991). Our court of appeals declined to adopt such an inference, holding instead to consider the "same actor" who both hired and fired an employee as "simply evidence like any other and should not be accorded any presumptive value." *Waldron*, 56 F.3d at 496, n.6. While it is undisputed Mr. Aharoni promoted Mr. Middlebrooks and later terminated him, "like other evidence in the record, [it] is important but not dispositive." *Wurtz v. Day and Zimmerman, Inc.*, No. 08-3503, 2009 WL 2178013, at *4 (E.D. Pa. Dec. 28, 2009).

[62] Middlebrooks SOAF at ¶¶ 45, 46 (ECF Doc. No. 63-2); Middlebrooks Ex. 39 (ECF Doc. No. 63-10).

[63] Middlebrooks SOAF at ¶ 48 (ECF Doc. No. 63-2).

[64] Middlebrooks SOAF at ¶ 53 (ECF Doc. No. 63-2).

[65] *Fuentes*, 32 F.3d at 764.

[66] *Daniels v. Sch. Dist. of Phila.*, 776 F.3d 181, 193 (3d Cir. 2015).

[67] *Moore v. City of Phila.*, 461 F.3d 331, 341 (3d Cir. 2006) (citing *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006)).

[68] *Daniels*, 776 F.3d at 196.

[69] *Id.*; *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 280-81 (3d Cir. 2000).

[70] *Daniels*, 776 F.3d at 193.

[71] *Fogelman v. Mercy Hosp., Inc.*, 283 F.3d 561, 567 (3d Cir. 2002).

[72] *Blakney v. City of Phila.*, 559 F.App'x 183, 186 (3d Cir. 2014).

JOINT APPX 0439

# Performance Management Evaluation



## Keuch, Randolph

**Overall evaluation**

| | |
|---|---|
| **Planning Period** | 2014 |
| **Plan owner** | Landskroner, Yonit |
| **Overall evaluation** | Meets |
| **Performance Evaluation Session Date** | 02/17/2015 |

**Manager comments**

Randy joined at the beginnig of 2014. He has demonstrated high capability in the area of Total Rewards. He has shown creativity in trying to bring new ideas forward for managing our Total Rewards programs. He has also demonstrated the ability to execute. He is responsive to requests, and understands how to prioritize urgent needs of the business. He has the credibility with our managers, and is earning the trust of leadership with the high quality of his work. As acknowledged by Lesley - matrix manager.

1. Knowledgeable of US Compensation amp; Benefits components

2. Creativity in trying to bring new ideas forward for managing US Total Rewards programs

3. Credibility with US managers, and is earning trust of leadership with the high quality of his work.

For the future . Working in a more collaborative , sensitive amp; respectful way with colleagues and management. Openness to wider perspectives.

**Employee comments**

I believe I had an excellent first year. Much has been accomplished and the Americas is poised to do even better in 2015. We delivered terrific results as evidenced in the AOP sessions and in our sessions with the various TEC members. We have approved multi-year Camp;B strategies that will significantly impact Teva US cost structure and turnover. Employees have responded positively to many of the benefit changes, and our customers speak highly of most of the team and we are just beginning to experience the support and knowledge that we bring to the business. I am very pleased with the results for 2014 and proud of the team that delivered those results.

**Employee Acknowledgement comments**

**Goals**

**Goal Title**

Benefits Strategy and Execution

**Goal Decription**

US Benefits represent a significant cost component in our Cost of Labor. In recent years these costs have been addressed through various approaches. To gain further cost savings, the US needs a strategy for the next 3-5 years as well as an accurate reading on how competitive current benefits are. Once we know where we are and where we are going, then we can develop a roadmap as to how we will get there and when.

Load Canada on BDS and begin Camp;B competitive analysis.

| | |
|---|---|
| **Goal Weighting** | 30% |
| **Goal Overall Evaluation** | Exceeds |
| **Interim Review Rating** | |
| **Interim Review comments** | |
| **Manager comments** | |
| **Employee comments** | |

Working with Gal and the US HRBPs, developed a 3-yr strategy to save about $15 million over the next 3 years. Completed a benefits evaluations for the US and for Canada that provided excellent guidance for our strategy proposals. Input from business leaders was slated for June, but was delayed to the point where changes to the 2015 benefits program could not be made without significant costs and disruptions. Subsequently we met with each TEC member, repaired the communication damage and now have a senior leader forum for future issues to be discussed. To date, benefit changes are being accepted by employees, with little negative feedback, and considerable support for the positive changes. Documented savings are at $7.0 million with expected additional savings in 2015 of $1 million from the elimination of ineligible dependents and $0.75 million ($ 1million annually) from our imaging strategy which will be launched in Q2. Additional savings may come from the claims audit that is underway; the introduction of Advance Medical for ee's to get 2nd opinions on major health issues; and some additional audits and new services (Teledoc). We also have a possible pension plan change for the US that will reduce costs and impact only new hires who terminate within their first 3 years with Teva.

Completed a similar process in Canada and identified a significant pension issue that we hope to address and have implemented a 3-yr strategy for healthcare that should create some savings in future years.

Developed a proposal for the ESPP for the US and Canada. US proposal will save over $3 million and should be implemented in 2015 or replaced with a more efficient vehicle. More discussion is forthcoming.

US communications for open enrollment have been outstanding.

**Goal Title**

Establish COE for the Americas

**Goal Decription**

Working with Corporate Total Rewards and the Shared Service Organization, develop and staff an organization that will meet the needs of the various organizations that comprise the Americas.

| | |
|---|---|
| **Goal Weighting** | 20% |
| **Goal Overall Evaluation** | Meets |
| **Interim Review Rating** | |
| **Interim Review comments** | |
| **Manager comments** | |

TEVA 000002

JOINT APPX 0441

**Employee comments**

The Americas COE has taken shape and established itself as SMEs for HR and business leaders. We have a Head of TR for LatAm and a structure with competent Camp;B personnel in most countries (terrific new hire in Venezuela). We are also setting up multi-country COEs in LatAm, with the first one located in Argentina. We are now responsible for day-to-day compensation activities in Canada. Business leaders have reached out to our team to help solve retention and attraction issues and in the sales area, motivation issues. We have strong relationships with HRBPs and we have an approved roadmap for the next several years designed to reduce costs and support our pay for performance culture aspirations. While we are not yet a high performing team, we have the talent to become one and we are addressing the issues with our weaker team members. We have replaced most of the benefits team and made one key hire – Head of TR for LatAm. We also have another critical hire – Head of Compensation for the US – in search mode. The new team is technologically savvy and prepared to take us to the next level of performance with new technology (Reward, GGS, Success Factors) and a plan for the future. The key issue facing the team is the drain on our talent, as our team members are in demand to help out our GCA and SF teams.

**Goal Title**

Market Pricing/Global Grading for the Americas

**Goal Decription**

Establish confidence in market-pricing of all jobs in the US and Canada as well as senior positions in LATAM while ensuring a smooth transition to global grades. This initiative will be supported by market pricing technology selected in collaboration with Corporate TR.

In addition, inventory total reward programs, CLAs and policies in the region for the purpose of creating greater consistency across the region. Where feasible, conduct gap anlysis and prioritize actions needed as well as establish governance framework.

| | |
|---|---|
| **Goal Weighting** | 25% |
| **Goal Overall Evaluation** | Meets |
| **Interim Review Rating** | |
| **Interim Review comments** | |
| **Manager comments** | |
| **Employee comments** | |

Initiative has been slightly delayed due to lack of tools and commitment of increased US-TR resources to GCA. However, team has completed market-pricing of 92% of US jobs and is positioned to load this information into the Rewards tool once it is released. Work has been well done and well received by Mark Sabag and various TEC members as well as US-based business leaders. This analysis formed the AOP submission for 2015 and was accompanied by a 3-year implementation plan.

A similar process was conducted in Canada with a strategy to implement changes over the next 2-3 years. Again, well received by key Teva executives.

In LatAm, we hired a Head of TR and have made considerable progress inventorying programs and identifying issues. Have laid foundation for upcoming Year-End process and capturing benefits information through BenTrack. We also will have major countries participating in key pay surveys and prepared for GCA.

Team has committed significant resources to GCA and now expect that project to be completed in March, 2015. With the many demands on the team (Mamp;A, hiring of TEC members/sr leaders, etc.), not much progress has been made on establishing enhanced policies and practices.

Overall, work is of high quality, very insightful, well received, and will be acted upon over the next several years.

**Goal Title**

People Development

PLEASE DEFINE YOUR SMART GOAL USING THE FOLLOWING:
===============================================
Actively and continuously develop employees through effective and timely feedback and by providing them with learning opportunities. Provide coaching, feedback and use other appropriate techniques to improve productivity and engagement. Goals include:

* Be a role model to all Teva employees, actively engage them to foster their engagement and development
* Encourage collaboration to deliver excellent results across all parts of the business
* Empower employees to take calculated risks and increase innovative thinking
* Focus development opportunities and feedback to align to strategic business goals
* Actively seek opportunities to provide coaching in order to develop capabilities and/or leadership skills, improve productivity, performance, engagement and innovative thinking
* Provide employees with opportunities to be accountable and learn new skills/areas of expertise by taking ownership and initiative within a safe and constructive environment
* Provide positive and developmental feedback to others (both formal and informal) to build upon their strengths and development efforts

**Goal Weighting**                                    10%
**Goal Overall Evaluation**                           Meets
**Interim Review Rating**
**Interim Review comments**
**Manager comments**
**Employee comments**

I believe the team has substantially grown, both professionally and personally over the year. We have enhanced the expertise of key team members and have gained considerable respect from our HRBPs and business leaders. I believe Diane and the Canadian benefits team have learned much over the past year, primarily with regard to competitive analysis and benefit design. The compensation team has also experienced growth technically, as we have agreed benchmarking standards and are applying new concepts and principles into the work we do. I believe the compensation team has also grown in both their knowledge and expertise. The concept of "that's the way we have always done it" is fading, being replaced by competitive prevalence and alignment to the business issues facing us. When I joined Teva, Latin America was a black hole. I believe we have shed considerable light on those countries and now have a strong communication network of competent Camp;B personnel. However, I have not established development plans for my direct reports. I plan to correct this as part of the annual review and have taken the opportunity to coach my directs as appropriate.

**Goal Title**

Sales Force Compensation

**Goal Decription**

Work with the various sales forces in the US to design consistent sales incentive programs and contests.
Establish magnitude of incentives.
Assist in restucturings.
Maintain competitiveness of compensation for sales forces.

**Goal Weighting**                                    15%
**Goal Overall Evaluation**                           Exceeds
**Interim Review Rating**
**Interim Review comments**
**Manager comments**

TEVA 000004

JOINT APPX 0443

The team has devoted considerable resources to the GSM sales force, developing numerous sales contests, incentive plan governance, and annual sales incentive plans coupled with a comprehensive market analysis. We have responded successfully to changes in business direction, product launch delays, and the issues regarding Copaxone. We created a 4th level of MSLs to reduce turnover and enhanced their bonus targets to more competitive levels. GSM is having a very good year in the US and I'd like to think that we made a contribution to that success. I believe Larry Downey or Jay Rojohn could provide feedback, as could Darren Teeter.

TEVA 000005

JOINT APPX 0444

**Competencies**

| | |
|---|---|
| **Competency** | A - Excellence in Execution |
| **Overall Evaluation** | Exceeds |
| **Interim Review Rating** | |
| **Manager comments** | |
| **Interim Review comments** | |
| **Employee comments** | |

Very well done in most instances. Last years merit and bonus process was not well done, and the initial Benefits Advisory Board meeting suffered due to timing. However, the outcomes/results were very well done and very well received and we are executing our Camp;B strategies in the US and Canada flawlessly. Our execution plans also have considerable flexibility to adjust to changes in timing and approvals.

| | |
|---|---|
| **Competency** | B - Customer Orientation |
| **Overall Evaluation** | Exceeds |
| **Interim Review Rating** | |
| **Manager comments** | |
| **Interim Review comments** | |
| **Employee comments** | |

We have a strong and healthy relationship with our customers. Some are "bullies" in that they want to make the decisions and tend not to be open to suggestions, while others appreciate the thoughtfulness and creativity that we put into our recommendations. We are adjusting our approach to each type of customer and have made substantial progress. In addition, we are often given demands with unreasonable timelines – but to date, we have met almost all of them. We are also just starting to become more pro-active and fact-based, which is a refreshing change. We have made progress, but we have a ways to go.

| | |
|---|---|
| **Competency** | C - Strategic Vision |
| **Overall Evaluation** | Exceeds |
| **Interim Review Rating** | |
| **Manager comments** | |
| **Interim Review comments** | |
| **Employee comments** | |

This is demonstrated in the 3-year strategies we developed and are now implementing in Camp;B programs in the US and Canada, as well as out contributions to the new Reward tool, GCA, etc.

| | |
|---|---|
| **Competency** | D - Change Leadership |
| **Overall Evaluation** | Meets |
| **Interim Review Rating** | |
| **Manager comments** | |
| **Interim Review comments** | |
| **Employee comments** | |

We are challenged by our ability to find the right pace of change. When we move too fast, there is not enough time to capture input and ownership from key leaders and when we move too slow, we accomplish very little change. As a new team working with a mix of new and longer-tenured Teva leaders and HRBPs, we are all trying to establish the best pace of change. Despite this issue of pace, we are driving a culture of health in the US and Canada and we are changing our approach to compensation.

| | |
|---|---|
| **Competency** | E - Team Leadership |
| **Overall Evaluation** | Meets |
| **Interim Review Rating** | |
| **Manager comments** | |
| **Interim Review comments** | |
| **Employee comments** | |

At present, I am providing significant SME leadership with my team. We are working well together and learning daily about each other's strengths and weaknesses. We have made some excellent new hires and have been given full responsibility for Canadian compensation. While I coach my directs and other team members frequently, I am now beginning to enter the phase where I have formed an assessment of each individual and can begin a more focused career development plan.

TEVA 000006

**Competency** F - Professional Expertise

**Overall Evaluation** Exceeds

**Interim Review Rating**

**Manager comments**

**Interim Review comments**

**Employee comments**

I am an SME in a number of disciplines and have a style that encourages dialogue in these areas. Much of my expertise has been demonstrated in the terrific work my team accomplished in 2014. I am also very much aware that if this knowledge is not properly presented, it can come across as arrogance and I work very hard at trying to prevent that perception.

**Competency** G - Collaboration and Influencing

**Overall Evaluation** Meets

**Interim Review Rating**

**Manager comments**

**Interim Review comments**

**Employee comments**

I do my best to involve my peers, customers and team in identifying problems and searching for the best solutions. I believe the compensation and benefits strategies demonstrate this, as have a number on initiatives within the Americas. Being able to work with the HRBPs and capture input from business leaders is critical to success, and we are greatly improving in this area. Also recognizing that there are multiple solutions to most issues and that each solution has its pros and cons.

**Competency** H - Business Acumen

**Overall Evaluation** Exceeds

**Interim Review Rating**

**Manager comments**

**Interim Review comments**

**Employee comments**

I have over 11 years in Sr positions in the industry, which I use every day at Teva. Our Copaxone strategy and the introduction of new branded products all require a knowledge of how we sell/launch branded products. In addition, understanding our market for talent has been most helpful. I have also been involved in several acquisitions and two divestitures, all requiring considerable knowledge of our business requirements.

TEVA 000007

JOINT APPX 0446

# Performance Management Evaluation



## Keuch, Randolph

| Overall evaluation | |
|---|---|
| **Planning Period** | 2015 |
| **Plan owner** | Yaniv, Ron |
| **Overall evaluation** | Exceeds |
| **Performance Evaluation Session Date** | |
| **Manager comments** | |
| **Employee comments** | |

> It has been a great year with terrific results gained through teamwork and collaboration and support from senior leaders. Teva is not an easy environment to get things done...But I have managed to make progress despite the barriers I have faced.

**Employee Acknowledgement comments**

**Goals**

**Goal Title**

2014 Year-End Process

**Goal Decription**

Conduct a successful year-end process for the Americas ensuring compliance with global guidelines and established governance protocols.

**Goal Weighting**                                     25%

**Goal Overall Evaluation**

**Interim Review Rating**

**Interim Review comments**

**Manager comments**

**Employee comments**

The 2014-2015 YE process was one of the best for the Americas. The process went smoothly, on time and with no known errors. The 2015-2016 process is also looking to be an excellent one. In making the upcoming YE process a great success, the Americas TR CoE has delivered the following: 1)Conducted detailed, strategic Camp;B reviews designed to identify the competitive positioning of pay and benefits within each country and provide a multi-year approach to address the issues raised while taking into consideration budget restraints. The Camp;B work was well received by senior leaders and most of what was requested was approved. The team also implemented in 2015, what was approved in the 2014 Camp;B review. That is, they prepared over 100 spreadsheets and sat down with HR and managers to agree individual employee market adjustments to align the workforce with our pay alignment strategy. The data we have seen post market adjustments, indicates that we are making good progress in both the US and Canada. For the 2014-2015 cycle, we built an Excel process for LatAm and for the upcoming cycle will implement G-TOP in all countries. The work performed by this team over the last 12 months has earned them greater respect from the business as a partner and greatly contributed to the success of these businesses. 2) In addition, I personally oversee all of the US and Canada sales incentive programs and contests. These programs have significantly contributed to the outstanding performance we are enjoying from the GSM sales force in 2015. We have addressed numerous poaching issues from competitors, while reaching and exceeding aggressive sales targets.

**Goal Title**

Develop, Modify and Implement Benefit Strategies for the US and Canada and certain LatAm countries

**Goal Decription**

Develop benefit strategies for key Latin American countries; Modify and implement year 2 of the 3-year US and the Canadian Benefits Strategies;

**Goal Weighting**                                     25%

**Goal Overall Evaluation**

**Interim Review Rating**

**Interim Review comments**

**Manager comments**

TEVA 000009

JOINT APPX 0448

U.S. - This has been a terrific year, with documented savings of over $35 million over 3 years with employees embracing the new design. In 2016, as an employee of Teva, you will be able to: 1) call a physician, behavioral health doctor, dermatologist, and Nutritionist any time any where and receive treatment at little to no cost - and in some locations, you can visit the on-site kiosk and see these doctors on a monitor. The best part is that this service is provided through American Well - a company in which Teva has made a significant investment in. 2) Call a concierge service; speak to a health care professional (HCP) about your medical situation/needs; and have that HCP find the specialist/doctor or service you need, schedule appointments for you, speak to the doctor about your situation, and follow up with your doctor and you. The best part of this service is that the employee is receiving all of these services through the best providers at the best price and at times, with providers we have negotiated the best prices (referred to as narrow networks). As such, Teva reduces its costs and so does the employee. 3) Speak with an HCP about a diagnosis or planned surgery and receive a 2nd opinion, at no cost, from a nationally recognized specialist regarding the accuracy of your diagnosis and possible treatments. Since over 1/3 of diagnosis in the US are wrong, having a 2nd opinion reduces unnecessary medical costs and improves quality of life for ee's. 4) Have an annual physical and biometric screening at no cost, with a follow-up from a health coach and receive an incentive for you and your spouse to have these screenings and make improvements over the prior year 5) Receive a complimentary flu shot either on site or at the location of your choosing. 6)find a culture of health leader (volunteer) at every Teva site, who will lead wellness activities at the site both locally and across the country. 7)Find free or nominal cost fruit at sites with mini-marts. And finally, for the 2016 open enrollment you will find the choices are exceptional, the process simple - aided by an animated friend named Alex - and educational as we are hosting town hall meetings at most sites. With regard to retirement savings, We have reduced the ESPP match from 15% to 5%, saving Teva over $1 million in taxes and then redistributed those savings to all ee's by increasing the match from 3.0% to 3.75%. In addition, we implemented a deferred compensation plan to enhance retention and make our overall retirement program competitive. And finally, we are implementing a global recognition program aligned with our newly released values and on a platform that can be used globally. The launch will occur in January of 2016 and include Canada as well as Argentina and later, UK. As part of the transition to the new program, we believe Teva will save $1.5 - $5 million in the US by not issuing the budgeted October point deposits into manager accounts and from forfeitures of the $3.9 million in points already in the system and not awarded.

Canada - We made significant breakthroughs in Canada by implementing a contribution for benefits under some health care plans and driving greater consumerism towards these benefits. The savings was then moved into the retirement program match to increase both competitiveness and retention. Overall, these changes combined with no changes to the ESPP, greatly improved our competitiveness in that country.

LatAm - As part of the Camp;B review, the benefits in all LatAm countries were reviewed. Key changes included: 1)Venezuela sr leader bonus paid partially in USD to retain ee's. 2) Severance benefits to reduce sales force also paid partially in USD to avoid litigation. 3) Brazilian pension plan proposal finalized and pending final approval. 4) Mexico has revamped entire benefit program to drive towards a culture of health.

**Goal Title**

Implement Technology

**Goal Decription**

Implement GGS and Rewards Tools

**Goal Weighting**                    15%

**Goal Overall Evaluation**

**Interim Review Rating**

**Interim Review comments**

**Manager comments**

TEVA 000010

JOINT APPX 0449

Employee comments

The Americas TR CoE is leading the Americas to a much higher level of technology. We will have fully operationalized the REWARDS tool and did our part to launch Employee Central. Our benefits programs utilize smart phones and have introduce a number of APPS from our health providers. We have introduced G-TOP for merit amp; Bonus into LatAm and we are building a global platform for our global recognition program that will initially launch in the US and Canada and then Argentina. We have introduced a new annual enrollment portal as well as an animated guide (Alex) to help ee's through the enrollment process. Finally, we have begun construction of a total rewards portal for the US and Canada that will provide significant benefits to employees as their quot;total rewards life at Tevaquot; will now be captured in one single location. We also expect to have the sales organization rely heavily on this portal for their sales programs. The portal will push key messages regarding health and compensation to employees, while reflecting almost every aspect of their compensation and benefit values; what they would forfeit upon termination, etc.

**Goal Title**

People Development

**Goal Decription**

PLEASE DEFINE YOUR SMART GOAL USING THE FOLLOWING:
=================================================

Actively and continuously develop employees through effective and timely feedback and by providing them with learning opportunities. Provide coaching, feedback and use other appropriate techniques to improve productivity and engagement. Goals include:

* Be a role model to all Teva employees, actively engage them to foster their engagement and development.
* Encourage collaboration to deliver excellent results across all parts of the business.
* Empower employees to take calculated risks and increase innovative thinking.
* Focus development opportunities and feedback to align to strategic business goals.
* Actively seek opportunities to provide coaching in order to develop capabilities and/or leadership skills, improve productivity, performance, engagement and innovative thinking.
* Provide employees with opportunities to be accountable and learn new skills/areas of expertise by taking ownership and initiative within a safe and constructive environment.
* Provide positive and developmental feedback to others (both formal and informal) to build upon their strengths and development efforts.

**Goal Weighting**                                    10%

**Goal Overall Evaluation**

**Interim Review Rating**

**Interim Review comments**

**Manager comments**

**Employee comments**

The Americas Total Rewards CoE is almost fully staffed, with openings in Mexico and Canada waiting to be filled. The team has earned considerable credibility with HR partners, business leaders and others with whom we work and collaborate with. We have staffed the team with exceptional talent and the feedback is very positive. Every team member has a development plan and progress on those plans is being made. Team members also experience considerable exposure to sr leaders as well as our customers.

**Goal Title**

Transition to Global Grades

**Goal Decription**

Perform Impact Analysis (cost) on transition from local grades to global grades throughout Americas; plan country-by-country strategies to transition to global grades and integrate those strategies into annual Camp;B Review;

**Goal Weighting**                                    25%

TEVA 000011

**Goal Overall Evaluation**

**Interim Review Rating**

**Interim Review comments**

**Manager comments**

**Employee comments**

The Americas has been a leader in driving implementation of GCA. The TR CoE has spent hundreds of hours meeting with HR and managers to map jobs and align pay. The US will be completed in November, as will Canada (ahead of schedule), and LatAm will be completed in December. Over 1,000 US employees are impacted and about 200 in Canada are impacted. The TR CoE has a clear quot;Can Doquot; approach to GCA as they identify and solve issues such as Canada car policy and US bonuses. They pioneered the approach to handling bonus changes (piloted approach in GSM in 2015) and have worked tirelessly with partners from the GCA team, Employee Central and Success factors to gat these systems aligned. In addition, they have integrated GCA into the REWARD tool to address issues related to key surveys and GGS. LatAm has followed a similar approach and working with the country managers, we have agreed how best to manage pay and benefit changes in each country.

TEVA 000012

JOINT APPX 0451

**Competencies**

**Competency**                                    Leadership Framework
**Overall Evaluation**
**Interim Review Rating**
**Manager comments**
**Interim Review comments**
**Employee comments**

Generally I refer to my accomplishments as the results delivered by my team, which are described in the Goals section. For this section, I have highlighted a few self observations as follows:

DESIGN amp; ACT

- I believe I do all 4 of the bulleted items shown above. With budget challenges throughout the region, I have fostered partnerships with senior leaders and HR, and together, we have identified issues, evaluated alternatives from a cost and employee perspective, and made the right decision. Normally, reducing costs for benefits, recognition, etc. is a painful undertaking. However, in the US, we reduced our spend by over $35 million and that may increase to $40 million by year end (depends on claims data and recognition savings). and we did it with very very little employee unhappiness. Current feedback suggests that employees embraced the changes! Given the limited staff and budget, the TR CoE delivered a huge amount of work product and contributions and they did it together and in an empowered environment, as I could not be involved in all of these contributions. My role was to remove roadblocks (I captured approvals for benefit and pay changes) and capture sr leader support (Camp;B Reviews and TR Portal approval and global recognition)

IMAGINE amp; INSPIRE - I also believe that I excelled in this aspect of leadership, although I may be a bit weak in the playful aspect of getting out of one's comfort zone. Much of what we do in the region involves a multi-year strategy, envisioning the future and working backwards. And these are winning strategies as we strive towards being a company of healthier ee's; aligning pay to the market focusing first on our best performers; implementing technology; finding innovative ways to improve financial wellness for employees; and of course recognizing those who excel using a global platform. Much of our work involves colleagues from different Businesses, countries and perspectives, as evidenced in the global recognition initiative.

EXPERIMENT amp; ADAPT - Again, this is an area where I excel. In 2016 we have taken risks (new Open Enrollment vendor, new Recognition vendor, etc.) and have experimented with new communications (ALEX) and new programs (recognition, Deferred comp, etc.). We have listened to our employees and leaders (focus groups, HR Mgmt Advisory Board, Americas HRLT) and responded to their concerns and accolades. The TR CoE members and myself volunteer for many projects and share our best practices as well as our failures. The pace of change is fast and I am very cognizant that we need to maintain a steady pace so as to keep our employees with us and not lose them.

CONNECT amp; BUILD - As a TRLT member and as the leader of the Americas TR CoE, we are just beginning to realize our full potential. The benefits team is clearly leading in this area and I am contributing to that growth through thoughtful leadership and empowerment and involvement. I have a terrific team that I have built through new hires and terminations, and by coaching those whom I inherited. This team has grown and delivered much more than could be expected. We have challenged the status quo (ESPP, healthcare, etc.) and reduced costs to sustain these programs as well as move us to a healthier place. While there is and always will be more to do, we have a great start. As a member of the TRLT and Americas HRLT and the Regions HR Mgmt Advisory Council, my POV is regularly requested and respected. And if my POV does not win the day, I am 100% committed to the solution or approach agreed upon.

teva | HR | Employee Central

# 2016 Mid-Year Review for Randy William Keuch

## Introduction

During Mid Year review, we have an opportunity to discuss performance with our employees through an open and honest conversation, both on what was achieved and on what needs to be done towards achieving the goals by the end of the year. This stage allows us to guide our employees and align their goals' direction with the priorities of the team/business/organization, as well as discuss progress towards achievement.

## Employee Information

| First Name | Randy | Last Name | Keuch |
|---|---|---|---|
| Supervisor | Ron Yaniv | Position Title | Sr Dir Total Rewards, Americas |
| Department | Americas Total Rewards (US) (76121) | Job Code | Sr Dir Total Rewards II (1183) |
| Job Grade | J17 (17) | Hire Date | 01/06/2014 |

## Overall Summary

Please review the employees' set of goals and highlight the main insights of what was achieved/done so far, what are the main areas where the employee's focus is needed for achieving the goals and how should the employee move forward towards a successful performance by the end of the year. Conduct a dialog with your employee and provide guidance regarding the actions the employee need to do in order to achieve the goals. Please summarize the Mid Year evaluation and fill in the review form accordingly. (It is possible to comment per each goal separately)

## Goals 2016

### 1.1 Deliver smooth Actavis & Rimsa Total Rewards integration

Not Started

Benefits continuity (expectations to be adjusted relative to when critical data requests are received)
Apply Teva GCA to Actavis & Rimsa populations
Contribute to the Development of a global TR harmonization Strategy and its Execution

### Goal Details

| | | | |
|---|---|---|---|
| Goal | Deliver smooth Actavis & Rimsa Total Rewards integration | Success Measure | Benefits continuity (expectations to be adjusted relative to when critical data requests are received) Apply Teva GCA to Actavis & Rimsa populations Contribute to the Development of a global TR harmonization Strategy and its Execution |
| Start Date | 01/01/2016 | Due Date | 12/31/2016 |
| Status | Not Started | Progress | |

Other Details

## Tasks

### 1.2 Improve the way we work by implementing our core belief

Not Started

Market competitiveness- Continue with Year 2 of Pay Alignment Strategy for the US and Canada. Develop Pay Alignment Strategy for Mexico, Brazil and Venezuela
Streamlining Americas region policies, guidelines
Stabilize GCA as a global infrastructure tool for our Managers and HR, begin alignment with rewards
Benefits optimization and enhancement- The right benefit through the right vehicle at the right price

TEVA 000014

JOINT APPX 0453

## Goal Details

| | | | |
|---|---|---|---|
| Goal | Improve the way we work by implementing our core belief | Success Measure | Market competitiveness– Continue with Year 2 of Pay Alignment Strategy for the US and Canada. Develop Pay Alignment Strategy for Mexico, Brazil and Venezuela Streamlining Americas region policies, guidelines<br>Stabilize GCA as a global infrastructure tool for our Managers and HR, begin alignment with rewards<br>Benefits optimization and enhancement- The right benefit through the right vehicle at the right price |
| Start Date | 01/01/2016 | Due Date | 12/31/2016 |
| Status | Not Started | Progress | |

Other Details

---

## Tasks

### 1.3 Drive rewards for performance by Performance and Rewards next generation implementation

Not Started

2017 Pay alignment strategies aligned with new performance evaluation scale

---

## Goal Details

| | | | |
|---|---|---|---|
| Goal | Drive rewards for performance by Performance and Rewards next generation implementation | Success Measure | 2017 Pay alignment strategies aligned with new performance evaluation scale |
| Start Date | 01/01/2016 | Due Date | 12/31/2016 |
| Status | Not Started | Progress | |

Other Details

---

## Tasks

### 1.4 Engaging employees through attractive, well defined and well-communicated Employee Value Proposition

Not Started

Total Rewards Portal for North America operational and well received by ee's
Recognition program operational and well-received by ee's in North America
Establish culture of well-being in the US as a pilot
Making our employees feel better, develop country by country health and wellbeing strategy for the Americas Region

---

## Goal Details

| | | | |
|---|---|---|---|
| Goal | Engaging employees through attractive, well defined and well-communicated Employee Value Proposition | Success Measure | Total Rewards Portal for North America operational and well received by ee's<br>Recognition program operational and well-received by ee's in North America<br>Establish culture of well-being in the US as a pilot<br>Making our employees feel better, develop country by country health and wellbeing strategy for the Americas Region |
| Start Date | 01/01/2016 | Due Date | 12/31/2016 |
| Status | Not Started | Progress | |

Other Details

TEVA 000015

## 1.5 Streamlined core Total Reward processes

<div style="border:1px solid;">Not Started</div>

Conduct 2016 YE process conforming to Allergan EMA and incorporating Rimsa.
Conduct C&B reviews for each country within the Americas Region
Design and implement Success Factors compensation module and continue Employee Central implementation within the Region

### Goal Details

| Goal | Streamlined core Total Reward processes | Success Measure | Conduct 2016 YE process conforming to Allergan EMA and incorporating Rimsa. Conduct C&B reviews for each country within the Americas Region Design and implement Success Factors compensation module and continue Employee Central implementation within the Region. |
|------|------|------|------|
| Start Date | 01/01/2016 | Due Date | 12/31/2016 |
| Status | Not Started | Progress | |

Other Details

### Tasks

## 1.6 Evolve the TR Operating Model & Enhance Capabilities

<div style="border:1px solid;">Not Started</div>

Resource the TR team within the region relative to the increased workload from Allergan and Rimsa
Establish developmental program for team members

### Goal Details

| Goal | Evolve the TR Operating Model & Enhance Capabilities | Success Measure | Resource the TR team within the region relative to the increased workload from Allergan and Rimsa Establish developmental program for team members |
|------|------|------|------|
| Start Date | 01/01/2016 | Due Date | 12/31/2016 |
| Status | Not Started | Progress | |

Other Details

### Tasks

## Summary

Use this section to summarize the employee's performance during the review period.

**Overall Form Rating:**

☆ ☆ ☆ ☆

Select One...

**Overall Performance Rating**

Select One...

TEVA 000016

JOINT APPX 0455

# 2016 Performance Review for Randy William Keuch

## Introduction

The Year End Review is an opportunity to conduct an honest dialogue with employees about their performance.  It is an opportunity to discuss both WHAT was achieved and HOW it was achieved.  The employee's role is to review their own performance throughout the year, while the manager's role is to identify and communicate to their employee his/her main achievements, areas of strength and areas for development, taking into account the feedback from all stakeholders.  The dialogue that occurs with this review will allow the employee to better understand what is needed to enhance his/her performance.

## Employee Information

| | | | |
|---|---|---|---|
| First Name | Randy | Last Name | Keuch |
| Supervisor | Ron Yaniv | Position Title | Sr Dir Total Rewards, Americas |
| Department | Americas Total Rewards (US) (76121) | Job Code | Sr Dir Total Rewards II (1183) |
| Job Grade | J17 (17) | Hire Date | 01/06/2014 |

## Goals 2016

### 1.1 Deliver smooth Actavis & Rimsa Total Rewards integration

> Not Started

Benefits continuity (expectations to be adjusted relative to when critical data requests are received)
Apply Teva GCA to Actavis & Rimsa populations
Contribute to the Development of a global TR harmonization Strategy and its Execution

### Comments by Randy William Keuch:

My TR Team very successfully managed 3 major acquisitions this year (Rimsa / Actavis / Anda), transitioning all ee's to one benefits platform in each country to begin 2017.  We completed all US agreements with Actavis, Actavis vendors and Mercer to continue providing legacy Actavis ee's benefits for the remainder of 2016 and for Actavis to accept liability for all pre-close medical claims that are presented post-close.  Extended all of these arrangements to include Anda.  During these transitions, numerous innovative accommodations were developed to comply with the EMA and enhance the employee experience.  In addition, many of these changes will significantly reduce costs and are strategically aligned with our benefits and pay alignment strategies.  Recognize that we had to manage Allergen issues on their 27 medical plans through 3 providers for about 5,000 ee's with no support from Allergen.  And we did this by hiring only 1 of the 2 contractors authorized to handle these issues. The transition of retirement programs and deferrals were also exceptionally well-managed.  Employee feedback has been extremely positive.

We also completed Brazilian and Canadian agreements with Actavis and Actavis vendors to continue providing legacy Actavis ee's benefits until they are transitioned to Teva benefit programs.

We conducted Annual Enrollment in the US and Canada for both Teva and legacy Actavis and Anda ee's for 2017 benefits.  We also enrolled legacy Actavis and Anda ee's into Teva's US retirement plans and deferred compensation plans.

As for GCA, The US and Canada will be one of the few countries where all L5 and below jobs will be graded under GCA by the end of 2016. Mexico would have also been completed, but due to the situation with Rimsa, we now expect completion by Q1 of 2017.

In addition, the Americas continues to be a major contributor to the global TR harmonization strategy.  My team has participated on several global teams, which have brought us PRNG, CONNECT and the new Year-End tools.  We continue to contribute significantly to GCA and the development of REWARD tool.  We have developed a global platform for recognition (STARS) and have an excellent working relationship with our corporate colleagues, having Lian spend time with us in the US.

Despite the substantial workload, the team rose to the occasion and delivered results well above expectations.

## Goal Details

| Goal | | Success Measure | |
|---|---|---|---|
| Goal | Deliver smooth Actavis & Rimsa Total Rewards integration | Success Measure | Benefits continuity (expectations to be adjusted relative to when critical data requests are received) Apply Teva GCA to Actavis & Rimsa populations Contribute to ... |

TEVA_000017

JOINT APPX 0456

TR harmonization Strategy and its
Execution

| Start Date | 01/01/2016 | Due Date | 12/31/2016 |
| Status | Not Started | Progress | |

**Other Details**

---

## Tasks

1.2 Improve the way we work by implementing our core belief

| Not Started |
|---|

Market competitiveness- Continue with Year 2 of Pay Alignment Strategy for the US and Canada. Develop Pay Alignment Strategy for Mexico, Brazil and Venezuela
Streamlining Americas region policies, guidelines
Stabilize GCA as a global infrastructure tool for our Managers and HR, begin alignment with rewards
Benefits optimization and enhancement- The right benefit through the right vehicle at the right price

**Comments by Randy William Keuch:**

Three major acquisitions have served as a catalyst for harmonizing and streamlining our region and country-specific C&B policies. Specifically, we have addressed PTO in the US and Canada, eligibility requirements for certain benefits, recognition and spot bonuses, etc., as well as the benefit programs we offer to ee's.
With regard to GCA, we will have all ee's with correct GCA grades by the end of the year in the US and Canada. In addition, we have embarked on a comprehensive training program for managers and have begun linking grades to selected benefits (deferred comp, group umbrella liability coverage, cars, etc.) and appropriate policies such as PTO. We have also organized our LatAm team into clusters to reduce headcount and better harmonize policies and practices.

With regard to US benefits, Teva was selected amongst the hundreds of applications as a winner of the NBGH SILVER Award as a Best Employer for Healthy Lifestyles in the US. In addition, FORTUNE magazine did a spotlight on Teva in their November, 2016 issue. We also believe that we have enhanced both our benefits and employee experience, while reducing costs. Our Q3 report indicates that medical and RX claims are down another $2.5 million for 2016 (we were down about $5 million in 2015), with total savings of about $10 million. And for 2017, we will have the impact of the near 5,000 legacy Actavis and Anda ee's and their families. Yet, we expect to save $2-$3 million in Rx, an additional $1 million on Rx through our KC pharmacy, beat trend, and save significantly through our AmWell partnership. When we reach the end of 2017, the work we began in 2013 will have saved about $60 million in three years. We also implemented a health care concierge model designed to help ee's navigate the complex and expensive US healthcare system. This should greatly enhance the employer experience while driving costs down as ee's get the right benefit through the right provider at the right cost.

We have also improved our benefits in Canada while driving down costs. Much of these savings will go toward the target bonus alignment under our pay strategy. In LatAm, we implemented a pension in Brazil and continue to develop initiatives to align better with the market (i.e., cars).

It should also be recognized that Joe and I have put forth a proposal regarding how we purchase shares for the ESPP that could potentially reduce costs by perhaps $5 million or increase cashflow by $20 to $30 million USD.

And finally, I personally spent significant time on execute ve compensation matters that are often very sensitive and very technical, ranging from the taxation of RSUs, job offers and severance, to TEC member death benefits and disclosure issues.

---

## Goal Details

| | | | |
|---|---|---|---|
| Goal | Improve the way we work by implementing our core belief | Success Measure | Market competitiveness- Continue with Year 2 of Pay Alignment Strategy for the US and Canada. Develop Pay Alignment Strategy for Mexico, Brazil and Venezuela Streamlining Americas region policies, guidelines Stabilize GCA as a global infrastructure tool for our Managers and HR, begin alignment with rewards Benefits optimization and enhancement- The right benefit through the right vehicle at the right |
| Start Date | 01/01/2016 | Due Date | 12/31/2016 |

TEVA 000018

JOINT APPX 0457

Other Details

---

## Tasks

---

### 1.3 Drive rewards for performance by Performance and Rewards next generation implementation

2017 Pay alignment strategies aligned with new performance evaluation scale

| Not Started |

#### Comments by Randy William Keuch:

The 2016 C&B reviews were well done and well received by our business leaders throughout the region and by the HR community. With the transition to a 3 point rating scale combined with a global pay strategy that targets 80% or less of market as below market (previously we had used the 85% of market), much of our analytics and strategies required adjustment. Those adjustments were made and implemented except for GSM, which was allowed to stay with the original 3-year strategy. We also developed solutions to better manage the below market merit / promotion / market adjustment budget to better pay for both performance and market position.

My team and I participated in a number of global teams such as PRNG, EC, CONNECT, GCA, etc. to help shape these programs.

---

## Goal Details

| | | | |
|---|---|---|---|
| Goal | Drive rewards for performance by Performance and Rewards next generation implementation | Success Measure | 2017 Pay alignment strategies aligned with new performance evaluation scale |
| Start Date | 01/01/2016 | Due Date | 12/31/2016 |
| Status | Not Started | Progress | |

Other Details

---

## Tasks

---

### 1.4 Engaging employees through attractive, well defined and well-communicated Employee Value Proposition

Total Rewards Portal for North America operational and well received by ee's
Recognition program operational and well-received by ee's in North America
Establish culture of well-being in the US as a pilot
Making our employees feel better, develop country by country health and wellbeing strategy for the Americas Region

| Not Started |

#### Comments by Randy William Keuch:

After a year of technical and political/philosophical challenges, the US launched MyTevaRewards in October of 2016. I personally drove this technology, often on my own personal time and at my own peril. Over two-thirds of ee's have accessed it, with 58,500 hits in the first 5 weeks. Of the 127 ee's surveyed, 97% agree or strongly agree that the site provides valuable information; 71% agree or strongly agree that they learned new information about their total rewards from the site; and 92% said they will return regularly. This is the 1st Teva site that contains personal information and can be accessed by all ee's on any computer or mobile device. Site will be enhanced at the end of 2016 to contain new vendor information and include Actavis/Anda ee's. Will also roll-out to Canada in Q1 of 2017. This platform was delivered on time and on budget.

Stars program is very well received in US and Canada. We are completing roll-out for Argentina and since we just received EU Safety Shield certification, will also roll out in UK in December. We also contributed to the design of the integration bonuses for the Actavis integration and have developed a similar design for the Anda acquisition. And we have developed an approach for spot bonuses and interim assignment bonuses for global consideration. From January through October of 2016, North America had 22,000 Recognitions; 25% of ee's nominated by a colleague; and overall, 72% of ee's have received a recognition this year.

I have developed an early design for a global program to reward and recognize R&D employees. The initial design is specifically for US Biologics, as a pilot, with expansion to other parts of discovery and development. This plan is currently under consideration.

I oversee all of the incentive programs and contests in the US, Canada, and Mexico. We have made great strides in creating both consistency amongst plans and alignment with the competitive market. We are also encouraging more alignment between GSM and GGM sales forces. The resulting sales have historically been above target of which some credit should be given to the plan design.

TEVA_000019

JOINT APPX 0458

Given our resource constraints, progressing our vision of well-being down to the local level has been challenging. However, working with Jen Flaisher and her team, we have made significant progress towards a US strategy and have an emerging U.S. structure that will be finalized and piloted in 2017. The design includes TRE, Inclusion & Divrsity, HR policies, and Facilities.

The North America Benefits Team did submit for the global P&V awards and will use the same submission for the HR P&V awards. The well-being strategy we have developed and are implementing is making a difference in the lives of our employees and their families. Our partnership with AmWell, and now Quantum Health (our concierge service) will make a difference in 2017. Also, our focus on mental health - stress - represents another major opportunity to make our ee's feel better. We are confident that our benefits/well-being programs will have a positive impact on legacy Activas and Anda ee's and drive costs down while improving their healthcare.

## Goal Details

| | | | |
|---|---|---|---|
| Goal | Engaging employees through attractive, well defined and well-communicated Employee Value Proposition | Success Measure | Total Rewards Portal for North America operational and well received by ee's Recognition program operational and well-received by ee's in North America Establish culture of well-being in the US as a pilot Making our employees feel better, develop country by country health and wellbeing strategy for the Americas Region |
| Start Date | 01/01/2016 | Due Date | 12/31/2016 |
| Status | Not Started | Progress | |

Other Details

## Tasks

1.5 Streamlined core Total Reward processes

<div style="text-align:right">Not Started</div>

Conduct 2016 YE process conforming to Allergan EMA and incorporating Rimsa.
Conduct C&B reviews for each country within the Americas Region
Design and implement Success Factors compensation module and continue Employee Central implementation within the Region

**Comments by Randy William Keuch:**

The region is prepared to conduct the 2016 CONNECT or Year-End process for all Teva employees, including those from Activas, Anda, and Rimsa. We expect all legacy Activas and Anda ee's to be assigned a GCA grade by the end of 2016.

The team completed all C&B reviews for every country (except Puerto Rico) in the region. The data indicates that we have made progress in aligning our pay with the strategy we implemented in the US and Canada. The LatAm countries are still in the early stages of developing these strategies, with Mexico near completion and Argentina completed and now in execution mode. All of our pay alignment strategies have been revised to reflect the new performance rating scale and desired market position of each BU and function.

Both Miriam and Edu greatly contributed to the design and development of CONNECT, the SF compensation module, completion of PRNG, and the implementation of EC. Miriam in particular focused significantly on the use and upgrade to the REWARD tool.

I worked on the global team asked to help HR reduce barriers and my benefits team worked closely with Gal on his efforts to establish a global well-being strategy.

Working with Talent Acquisition and HR, developed and launched a regional framework for the recruitment and offer process that streamlines the process and eliminates most barriers.

TEVA 000020

## Goal Details

| | | | |
|---|---|---|---|
| Goal | Streamlined core Total Reward processes | Success Measure | Conduct 2016 YE process conforming to Allergan EMA and incorporating Rimsa. Conduct C&B reviews for each country within the Americas Region Design and implement Success Factors compensation module and continue Employee Central implementation within the Region |
| Start Date | 01/01/2016 | Due Date | 12/31/2016 |
| Status | Not Started | Progress | |

Other Details

## Tasks

### 1.6 Evolve the TR Operating Model & Enhance Capabilities

<div style="text-align:right">Not Started</div>

Resource the TR team within the region relative to the increased workload from Allergan and Rimsa
Establish developmental program for team members

**Comments by Randy William Keuch:**

For 2016, we were able to have Lian Benezra join our team in the US for about 8 weeks.  I am very appreciative to have had that opportunity and believe it afforded deeper understanding of the US and Israel cultures, as well as providing professional development to  those who worked with Lian.

My team members have also grown personally and professionally by the work challenges thay have faced due to the 3 major acquisitions.  They had to learn the C&B programs of another company, interface with new vendors, and orchestrate a transition from various C&B programs to one strategically aligned set of programs.  And they had to do this while maintaining compliance with the EMA and managing costs.  As our US salary payroll approaches $1 billion we are very aware that efficiently and effectively managing our compensation spend is a key priority.

The Americas TR team has an open TR Manager position in Venezuela; an open Compensation Manager/Analyst position in North America and would very much benefit from a well-being position for the Region.  We also are utilizing only 1 of 2 approved contractor positions to manage the almost 4,000 US Actavis and Anda medical issues no longer managed by Allergan.

## Goal Details

| | | | |
|---|---|---|---|
| Goal | Evolve the TR Operating Model & Enhance Capabilities | Success Measure | Resource the TR team within the region relative to the increased workload from Allergan and Rimsa Establish developmental program for team members |
| Start Date | 01/01/2016 | Due Date | 12/31/2016 |
| Status | Not Started | Progress | |

Other Details

## Tasks

TEVA 000021

**Main Achievements**

Summary of employee's main achievements. An overview of this year's main highlights as well as challenge areas for enhancement.

**Main Achievements by Randy William Keuch:**

It was a terrific year and the many achievements are listed in the above summaries, and include:

1. Successful Integration of Actavis, Anda and Rimsa
2. Successful launch of MyTevaRewards
3. Expansion of Stars global recognition program
4. Approximately $30 million in benefits savings in 2015 and 2016 with $60 million projected for 2015 - 2017
5. Recognized by NBGH and FORTUNE for our benefits programs
6. Will complete GCA in the US and Canada
7. Design and execution of CONNECT and related technologies to support Year End Process in 2015 and 2016
8. Revamped entire benefits portfolio to reduce costs and enhance benefits offering...Outstanding scores in Employee Survey
9. Developed an ESPP Bulk purchase proposal to reduce Teva costs by several million USD
10. Enrolled over 8,000 ee's into our benefits programs
11. Established benefits strategy for LatAm and implemented the first year of that strategy
12. Increased credibility of TR team with customers and established a more collaborative environment
13. Contributed to the development of our employees through the 2 mo. visit by Lian

## Main Areas of Strength

Summary of employee's main strengths. An overview of this year's behaviors (HOW) which contributed and enabled employees' performance.
While reviewing employees' goal achievements throughout the year, it is important we relate to both what was achieved as well as How it was achieved. To support your review of employees' main strengths, please refer to the Leadership Framework and/or values. For more information, follow the links Leadership Framework reference and Teva Values reference.

**Main Strengths by Randy William Keuch:**

Much of what was achieved in 2016 can be attributed to the strengths of the members of my team.  Recognize that almost every team member has been replaced over the past 3 years.  I believe my leadership has contributed to the success of the team and the professional growth of each team member.

I drive my team to look for solutions and work arounds when confronted with barriers and adversity.  We all have a "can do" attitude toward these challenges.  I do not recall many situations where the team took the easy way by saying it can't be done.

My team and I personally work well with our corporate colleagues and our challenging customers.  I believe that I have strengthened my personal and working relationships with the corporate team; our US and Canada business leaders; and the overall  HR community (although I continue to have challenges with the US HR Lead).  I recognize that as an approver and at times a disapprover, my team and I have earned the respect of our customers.

## Main Areas for Development

Summary of employee's areas for development and/or improvement, to allow employees' Performance enhancement.
While reviewing employees' goal achievements throughout the year, it is important we relate to both what was achieved as well as How it was achieved. To support your review of employees' areas for development, please refer to the Leadership Framework and/or values. For more information, follow the links Leadership Framework reference and Teva Values reference.

**Main Areas for Development by Randy William Keuch:**

My major area for development is to be more collaborative and inclusive in all that I and my team do.  The Teva culture combined with the HR transformation combined with very limited resources, combined with multiple large acquisitions is not very conducive to collaboration and inclusivity, as it takes considerably more time and resources.  My approach has been to progress initiatives quickly and to capture 80% of the benefit and then go through a fully collaborative and inclusive refinement to capture the remaining 20%.  I may need to move to a 70%/30% ratio.

## Overall Review

This section provides the key insights of the overall review of employees' performance and behaviors throughout the year.
Employees' performance should be evaluated relatively, to create discretion and fairness and to allow supporting the pay for

TEVA_000022

performance process. For completion of the review form, employees' performance should be evaluated and rated according to the following definitions :

- **Outstanding Performance:** Consistently delivers results that exceed performance expectations. The individual not only makes an outstanding contribution, but inspires others by role modeling the behaviors based on Teva's Leadership Framework & Values.

- **Successful Performance:** The individual has either met all performance goals or met most and exceeded in other goals. Consistently demonstrates expected behaviors based on Teva's Leadership Framework & Values. A level of performance to be proud of.

- **Needs Improvement:** Some or most of the individual's performance goals have been missed. Significant effort needs to take place in one or more performance areas. The individual does not demonstrate the behaviors expected based on Teva's Leadership Framework & Values.

### Overall Rating

Successful Performance

**Calculated Form Rating:**

Select a rating...

### Overall Rating Comments by Ron Yaniv :

Dear Randy,

It was a great year for you and for your team. and the many achievements are listed below, and include:

1.  Successful Integration of Actavis, Anda and Rimsa

2.  Successful launch of MyTevaRewards

3.  Expansion of Stars global recognition program

4.  Approximately $30 million in benefits savings in 2015 and 2016 with $60 million projected for 2015 - 2017

5.  Recognized by NBGH and FORTUNE for our benefits programs

6.  Will complete GCA in the US and Canada

7.  Design and execution of CONNECT and related technologies to support Year End Process in 2015 and 2016

8.  Revamped entire benefits portfolio to reduce costs and enhance benefits offering...Outstanding scores in Employee Survey

9.  Enrolled over 8,000 ee's into our benefits programs

10. Established benefits strategy for LatAm and implemented the first year of that strategy

11. Increased credibility of TR team with customers and established a more collaborative environment

You established a very strong team and did performance management to improve the team.

Your deliverables to Teva are well appreciated and valuable. The professionalism you bring is important and appreciated by both the COE and the Americas team.

You drive your team to look for solutions and work arounds when confronted with barriers and adversity.  You all have a "can do" attitude toward these challenges. You need to continue and coach your team and growth them..

I agree that your team and you personally work well with corporate colleagues and your challenging customers. You have strengthened your personal and working relationships with the corporate team; US and Canada business leaders; and the overall  HR community you need to continue focusing on interfaces across the company.

Your major area for development is to be more collaborative and inclusive in all that you and your team do.  You need to focus on what your customers are looking for and try to collaborate more. It looks that you are focusing on area where you choose which sometime are not aligned with what is request.

Randy, it is great working with you and you covered a major region with great execution.

Looking forward to continue working with you.

Thank you
Ron

## Employee Acknowledgement

Acknowledging the Year End review indicates that the employee has received the review form. It does not necessarily indicate that employee agrees with the evaluation. Comments may be added to the form.

Employee:   Randy William Keuch                              03/24/2017

TEVA 000023

JOINT APPX 0462

**Objective Competency Summary**

**OCOC Rating:** unrated

TEVA 000024

JOINT APPX 0463

**teva** | HR | Employee Central

# 2017 Mid-Year Review for Randy William Keuch

## Introduction

During Mid Year review, we have an opportunity to discuss performance with our employees through an open and honest conversation, both on what was achieved and on what needs to be done towards achieving the goals by the end of the year. This stage allows us to guide our employees and align their goals' direction with the priorities of the team/business/organization, as well as discuss progress towards achievement.

## Employee Information

| | | | |
|---|---|---|---|
| First Name | Randy | Last Name | Keuch |
| Supervisor | Ron Yaniv | Position Title | Sr Dir Total Rewards, Americas |
| Department | Americas Total Rewards (US) (76121) | Job Code | Sr Dir Total Rewards II (1183) |
| Job Grade | J17 (17) | Hire Date | 01/06/2014 |

## Overall Summary

Please review the employees' set of goals and highlight the main insights of what was achieved/done so far, what are the main areas where the employee's focus is needed for achieving the goals and how should the employee move forward towards a successful performance by the end of the year. Conduct a dialog with your employee and provide guidance regarding the actions the employee need to do in order to achieve the goals. Please summarize the Mid Year evaluation and fill in the review form accordingly. (It is possible to comment per each goal separately)

## Goals 2017

### 1.1 Support Teva in the next level of evolution

> Not Started

1. Finalize GCA in the US, Brazil & Mexico
2. Deliver AOP benefits savings of $6 mil in the US and $60k in LatAm
3. Achieve NBGH Silver designation for Best Employers Healthy Lifestyles in US
4. Expand MyTevaRewards to Actavis & Anda ee's, and to Canada
5. Finalize TR harmonization in Brazil (Actavis) and Mexico (Rimsa)

### Goal Details

| | | | |
|---|---|---|---|
| Goal | Support Teva in the next level of evolution | Success Measure | 1. Finalize GCA in the US, Brazil & Mexico<br>2. Deliver AOP benefits savings of $6 mil in the US and $60k in LatAm<br>3. Achieve NBGH Silver designation for Best Employers Healthy Lifestyles in US<br>4. Expand MyTevaRewards to Actavis & Anda ee's, and to Canada<br>5. Finalize TR harmonization in Brazil (Actavis) and Mexico (Rimsa) |
| Start Date | 03/19/2017 | Due Date | 12/31/2017 |
| Status | Not Started | Progress | |

### Other Details

## Tasks

### 1.2 Employees retention and engagement

> Not Started

1. Launch Stars for legacy Actavis & Anda ee's in Q2
2. Develop next 3-yr health & well-being strategy for US and Canada; refresh Mexico and LatAm
3.Launch a spot bonus process in the region
4, Support retention efforts within the region

## Goal Details

| | | | |
|---|---|---|---|
| Goal | Employees retention and engagement | Success Measure | 1. Launch Stars for legacy Actavis & Anda ee's in Q2<br>2. Develop next 3-yr health & well-being strategy for US and Canada; refresh Mexico and LatAm<br>3.Launch a spot bonus process in the region<br>4, Support retention efforts within the region |
| Start Date | 03/19/2017 | Due Date | 12/31/2017 |
| Status | Not Started | Progress | |

Other Details

## Tasks

### 1.3 Simplify core HR processes

Not Started

1. Deliver C&B reviews for all major countries
2. REWARD tool fully operational within Region
3. Power BI tool integrated into TR analytics
4. Leverage EC compensation module

## Goal Details

| | | | |
|---|---|---|---|
| Goal | Simplify core HR processes | Success Measure | 1. Deliver C&B reviews for all major countries<br>2. REWARD tool fully operational within Region<br>3. Power BI tool integrated into TR analytics<br>4. Leverage EC compensation module |
| Start Date | 03/19/2017 | Due Date | 12/31/2017 |
| Status | Not Started | Progress | |

Other Details

## Tasks

### 1.4 Meet HR AOP budget

Not Started

Manage Region TR budget

## Goal Details

| | | | |
|---|---|---|---|
| Goal | Meet HR AOP budget | Success Measure | Manage Region TR budget |
| Start Date | 01/01/2017 | Due Date | 12/31/2017 |
| Status | Not Started | Progress | |

Other Details

## Tasks

TEVA 000026

JOINT APPX 0465

**Summary**

Use this section to summarize the employee's performance during the review period.

**Overall Form Rating:**

☆ ☆ ☆ ☆

Select One...

**Overall Performance Rating**

Select One...

TEVA 000027

JOINT APPX 0466

**teva** | HR | Employee Central

# 2017 Performance Review for Randy William Keuch

## Introduction

The Year End Review is an opportunity to conduct an honest dialogue with employees about their performance.  It is an opportunity to discuss both WHAT was achieved and HOW it was achieved.  The employee's role is to review their own performance throughout the year, while the manager's role is to identify and communicate to their employee his/her main achievements, areas of strength and areas for development, taking into account the feedback from all stakeholders.  The dialogue that occurs with this review will allow the employee to better understand what is needed to enhance his/her performance.

## Employee Information

| | | | |
|---|---|---|---|
| First Name | Randy | Last Name | Keuch |
| Supervisor | | Position Title | Sr Dir Total Rewards, Americas |
| Department | Americas Total Rewards (US) (76121) | Job Code | Sr Dir Total Rewards II (1183) |
| Job Grade | J17 (17) | Hire Date | 01/06/2014 |

## Goals 2017

### 1.1 Support Teva in the next level of evolution

Not Started

1. Finalize GCA in the US, Brazil & Mexico
2. Deliver AOP benefits savings of $6 mil in the US and $60k in LatAm
3. Achieve NBGH Silver designation for Best Employers Healthy Lifestyles in US
4. Expand MyTevaRewards to Actavis & Anda ee's, and to Canada
5. Finalize TR harmonization in Brazil (Actavis) and Mexico (Rimsa)

**Comments by Randy William Keuch:**

1. GCA finalized within Region, however additional work will be required to correct some jobs that were not graded correctly

2. AOP savings in the US are projected to be close to $10 billion (167% of target) and LatAm savings also exceeded goal with more than double the savings

3. Recognized nationally with NBGH Silver designation for Best Employers Healthy Lifestyles in US

4. MyTevaRewards launched in December for Canada.  Launch for Actavis and Anda delayed until January of 2018 for a savings of $50,000

5. TR harmonization completed for Mexico and Brazil

Overall, a terrific effort with HUGE cost savings as well as being positively received by employees.  The US team introduced Quantum Health as our Health coordinators; Meritain as our new health claims administrator; ESI as our PBM; and now have ee's receiving Copaxone directly from our KC pharmacy.  We also worked on the expansion of the KC pharmacy for ee's and contracting with an external severance vendor to save an additional $6 - $10 million in severance payments.  Truly outstanding!

## Goal Details

| | | | |
|---|---|---|---|
| Goal | Support Teva in the next level of evolution | Success Measure | 1. Finalize GCA in the US, Brazil & Mexico 2. Deliver AOP benefits savings of $6 mil in the US and $60k in LatAm 3. Achieve NBGH Silver designation for Best Employers Healthy Lifestyles in US 4. Expand MyTevaRewards to Actavis & Anda ee's, and to Canada 5. Finalize TR harmonization in Brazil (Actavis) and Mexico (Rimsa) |
| Start Date | 03/19/2017 | Due Date | 12/31/2017 |
| Status | Not Started | Progress | |

TEVA 000028

JOINT APPX 0467

## Tasks

### 1.2 Employees retention and engagement

| Not Started |
|---|

1. Launch Stars for legacy Actavis & Anda ee's in Q2
2. Develop next 3-yr health & well-being strategy for US and Canada; refresh Mexico and LatAm
3. Launch a spot bonus process in the region
4. Support retention efforts within the region

**Comments by Randy William Keuch:**

1. Stars launched for legacy Actavis & Anda ee's in April and was well received

2. Develop next 3-yr health & well-being strategy for US and Canada working with HR-MAC and Corp TR to further reduce costs while remaining competitive; refreshed Mexico and LatAm health & Well-being strategies while reflecting current business financial situation

3. The Americas Region designed and launched a spot bonus process for the Region. It has been very well received by management and serves as the corporate model.

4. Supported retention efforts in the Region by designing a retention program for Womens Heal that in the end retained the ee's and cost Teva nothing, as the retention was based on a larger severance payment should Teva terminate the employee. Considerable time was spent analyzing the GSM sales force and addressing retention efforts.

Overall, outstanding work by the team as they were able to reduce costs with little "noise" from ee's.

## Goal Details

| Goal | Employees retention and engagement | Success Measure | 1. Launch Stars for legacy Actavis & Anda ee's in Q2<br>2. Develop next 3-yr health & well-being strategy for US and Canada; refresh Mexico and LatAm<br>3. Launch a spot bonus process in the region<br>4. Support retention efforts within the region |
|---|---|---|---|
| Start Date | 03/19/2017 | Due Date | 12/31/2017 |
| Status | Not Started | Progress | |

Other Details

## Tasks

### 1.3 Simplify core HR processes

| Not Started |
|---|

1. Deliver C&B reviews for all major countries
2. REWARD tool fully operational within Region
3. Power BI tool integrated into TR analytics
4. Leverage EC compensation module

**Comments by Randy William Keuch:**

1. C&B Reviews conducted for all countries in Region in accordance with Corporate template and some supplemental materials - All were considered excellent.

2. REWARD Tool is fully operational using all tool capabilities available during the year

3. Power BI tool used early in year, but is being replaced with a different tool

4. EC compensation module is fully utilized within the region

TEVA 000029

JOINT APPX 0468

Overall, very good work performed by the team, as available technology is being fully utilized and the C&B reviews were thoughtful as well as insightful.

## Goal Details

| | | | |
|---|---|---|---|
| Goal | Simplify core HR processes | Success Measure | 1. Deliver C&B reviews for all major countries<br>2. REWARD tool fully operational within Region<br>3. Power BI tool integrated into TR analytics<br>4. Leverage EC compensation module |
| Start Date | 03/19/2017 | Due Date | 12/31/2017 |
| Status | Not Started | Progress | |

Other Details

## Tasks

### 1.4 Meet HR AOP budget

Not Started

Manage Region TR budget

**Comments by Randy William Keuch:**

Despite all of the cuts and budget issues, I believe I came in at or under budget.

## Goal Details

| | | | |
|---|---|---|---|
| Goal | Meet HR AOP budget | Success Measure | Manage Region TR budget |
| Start Date | 01/01/2017 | Due Date | 12/31/2017 |
| Status | Not Started | Progress | |

Other Details

## Tasks

## Main Achievements

Summary of employee's main achievements. An overview of this year's main highlights as well as challenge areas for enhancement.

## Main Areas of Strength

Summary of employee's main strengths. An overview of this year's behaviors (HOW) which contributed and enabled employees' performance.
While reviewing employees' goal achievements throughout the year, it is important we relate to both what was achieved as well as How it was achieved. To support your review of employees' main strengths, please refer to the Leadership Framework and/or values. For more information, follow the links Leadership Framework reference and Teva Values reference.

## Main Areas for Development

Summary of employee's areas for development and/or improvement, to allow employees' Performance enhancement.
While reviewing employees' goal achievements throughout the year, it is important we relate to both what was achieved as well as How it was achieved. To support your review of employees' areas for development, please refer to the Leadership Framework and/or values. For more information, follow the links Leadership Framework reference and Teva Values reference.

## Overall Review

TEVA-000030

JOINT APPX 0469

This section provides the key insights of the overall review of employees' performance and behaviors throughout the year. Employees' performance should be evaluated relatively, to create discretion and fairness and to allow supporting the pay for performance process. For completion of the review form, employees' performance should be evaluated and rated according to the following definitions :

- **Outstanding Performance:** Consistently delivers results that exceed performance expectations. The individual not only makes an outstanding contribution, but inspires others by role modeling the behaviors based on Teva's Leadership Framework & Values.

- **Successful Performance:** The individual has either met all performance goals or met most and exceeded in other goals. Consistently demonstrates expected behaviors based on Teva's Leadership Framework & Values. A level of performance to be proud of.

- **Needs Improvement:** Some or most of the individual's performance goals have been missed. Significant effort needs to take place in one or more performance areas. The individual does not demonstrate the behaviors expected based on Teva's Leadership Framework & Values.

**Overall Rating**

Successful Performance

**Calculated Form Rating:**

Select a rating...

## Employee Acknowledgement

Acknowledging the Year End review indicates that the employee has received the review form. It does not necessarily indicate that employee agrees with the evaluation. Comments may be added to the form.

Employee: _____        04/15/2018

## Objective Competency Summary

**OCOC Rating:** unrated

Americas Total Rewards Team
Operational Review – June, 2017

# Working together to achieve our 2017 goals

JOINT APPX 0471

# Agenda

- Summary
- Key statistics
- Key accomplishments
- How we are organized
- What we do
- North American differentiators
- Recommendations - Staffing Total Rewards in the Americas
- 2017 must wins
- Future

APPENDIX

- NA TR Staffing details

teva

TEVA 000121

2

# Summary

**ALL** of the members of the Americas Total Rewards team were hired over the past 3 years, except for the Head of NA Benefits – Diane Rohach. Over that period, the team has exceeded all of its Must Wins; delivered over $30 million in cost savings; and has developed both strong relationships and high credibility with senior business leaders, other COEs, and HR in general.

We manage a very large employee population (plus dependents); have the most complex and expensive healthcare system in the world; have a sales force of over 1,500 ee's; and  in the near future, may have the largest executive population.  We were also recognized by Fortune Magazine and NBGH for our wellness programs.

We have accomplished all of this with a team that, by US standards, is extremely lean.  Our Compensation team is struggling the most and our Benefits team is managing a 40% increase in employees without any increase in staff, and now has one resignation and one team member returning from medical leave.  *It is our expectation that our solutions to better manage our workload will be implemented.*

teva

TEVA 0001\overline{2}2

3

# America's Region – Key Statistics



US & Puerto Rico

- 22,000 ee's & dependents
- About $1 billion salaried payroll
- $250 million annual spend on benefits
- COL is $1.3 Billion
- High % of TEC members and Senior Leaders in US

Canada

- 3,810 ee's & dependents
- $80.7 million USD salaried payroll
- $9.0 million USD annual spend on benefits
- COL is $

LatAm

- 10,200+ ee's & dependents
- $130 million USD salaried payroll
- $71 million US annual spend on benefits
- COL is $225 million USD
- Five countries in the Top 10 Revenue of Growth Markets (23 countries in total)



4

TEVA 000123

# America's Region – Key Accomplishments

## US

- Committed to reduce costs for 2017 by $6 million plus additional cost avoidance of $2 million; and delivered 3-yr cost savings and cost avoidance approaching $30 million

- Managed CONNECT process; successfully integrated 3 large acquisitions; completed GCA and C&B reviews; and launched MyTevaRewards

- At or above High Performing Norm on ALL TR-related questions in employee survey

- Recognized by the National Business Group on Health and Fortune Magazine

- Settled IRS audit with no fees

## Canada

- Successfully integrated Actavis

- Implemented employee contribution to prevalent health/dental plan (350K savings YOY)

- Harmonized vacation schedule

- Reduced overly competitive sick day policy by 40% allowing business to better meet production targets

- Through strict claims management of our ASO program, found cost savings sufficient to fund 1% critical increase to grade 1 to 9 target bonus

- Partially aligned bonus structure within Canada between BUs and closer to competitive market through cost savings

## LatAm

- Managed CONNECT process: April and bonus global formula in all Countries

- Successfully integrated Actavis (Brazil) and Rimsa (Mexico) acquisitions; completed GCA and C&B reviews

- Pay range and Merit matrix since 2014-15 YE process

- Launched STARS in Argentina in 2016 and implementation in Brazil, Chile, Peru, Venezuela and Uruguay in Q3/Q4 2017

- TR Training in all countries

- Adopted cluster structure: Argentina/Chile/Uruguay and Peru/Venezuela (HC redistribution)

teva

TEVA 000124

5

# Total Rewards Americas – The Teva TR Team



TEVA 000125

# Workload Peaks - Americas

The chart below shows the major annual initiatives that require considerable resources. By moving transactional work out of the NA Benefits team, we believe ½ of an FTE will now be available within the team to handle the increased volume and to help the NA Compensation team, particularly when the NA Compensation team has a workload peak and the Benefits team does not.





TEVA 000126

7

# What we do – NA Benefits & Puerto Rico

**Work Manager 1**
- Budget
- Ensure benefits are Compliant
- Work with legal on Employment litigation
- Disability Management
- Website
- Second level appeals

**Work Manager 2**
- Communications
- Vendor relations for medical, dental and Prescription
- Set up and improve on current file feeds
- Oversee new Wellness program
- Website oversite
- Mergers and Acquisitions
- Acquisition and Divestitures
- Expats & VPs

**Work Manager 3**
- 401(k) and 1165(e) compliance and strategy and design
- Working on controls
- DC plan administration /DC-Cephalon
- SERP
- QDRO
- ESPP Administration
- Audit FSA and HSA
- Financial Planning
- Wires

**Analyst 1**
- Maintains files to vendors
- Manages COBRA
- Audits FSA and HSA
- File loads
- Maintain Benefits Mailbox

**Analyst 2**
- Manages disability for 8,000 employees
- Works with legal on issues related to return to work
- Invoicing

TEVA 000122

8

# What we do – NA Compensation

⋏ The chart to the right indicates the resources available to support the over 11,000 ee's in US/PR and Canada , and the current split of work among the group.

⋏ The following is a breakdown of employees per group

⋏ GSF (IT, Finance, HR, Compliance, Legal)– 1,500 employees

⋏ GGM – 1,500 employees

⋏ GSM - 2,200 employees

⋏ TGO – 5,000 employees

⋏ R&D – 1,000 employees

## CURRENT

**teva**

| Head of Total Rewards – Americas |
| Randy Keuch |

| Head of Compensation – US GSF |
| Miriam Weinstein |

| Comp Manager GGM & R&D |
| Elise Cartledge |

| Comp Manager TGO |
| Veronica Ferrante |

| Comp Manager GSM |
| Kent Schurr |

| Comp Manager OPEN |

TEVA 000128

9

# What we do – NA Compensation



Each Compensation Manager role requires the following:

- Client Support – 50% of the role
  - ✓ Day to day market reviews for Talent Acquisition & HR, including possible equity analysis
  - ✓ Participation in HR team meetings to ensure compensation updates are shared with the team, and comp team member is updated on the business
  - ✓ Retention reviews
- Project Support – 50% of the role
  - ✓ Reward – Towers Watson Tool & Survey participation (Miriam/Veronica)
  - ✓ FLSA (Each team member reviews his/her area)
  - ✓ Sales Incentives – GSM (Kent)
  - ✓ Sales Incentives – GGM (Elise)
  - ✓ Pay Equity – US & Canada – Very complex as different Country, State and Local laws (Each team member reviews his/her area)
  - ✓ Year End – Connect (Miriam/Elise)
  - ✓ GCA – (Miriam/Veronica)
  - ✓ MyTeva portal (Kent)

TEVA 000129

10

# What we do – LatAm

| Every Manager in every country |
|---|
| Budget |
| Ensure benefits are Compliant |
| Work with legal on Employment litigation |
| Disability Management |
| Communications |
| Vendor relations for medical, life and dental |
| Oversee new Wellness program |
| Mergers and Acquisitions |
| Working on controls |
| Audits |
| Financial Planning |
| C&B Review / AOP |
| Surveys participation |
| Expats and Job offers |

**Head of Total Rewards – Americas**
Randy Keuch

**Head of Total Rewards –LATAM**
Edu Nasi

ALL HR Headcount

TR Manager (AR/CL/UY)
Analia Gritta

TR/LE Manager (BR)
Enzo Cruz (50%)

TR Manager (PE/VE) OPEN

TR Manager (MX)
Elizabeth Juarez

teva

TEVA 0001301

11

JOINT APPX 0481



# NA Differentiators – Compensation

The NA Compensation Team is engaged with the following tasks and activities that are not performed by other country compensation/TR teams:

1. The team is directly engaged in the design and competitiveness of ALL sales compensation incentives and contests for GSM, GGM, and now Anda.

   ✓ *With a sales population approaching 4,000 ee's and a spend of over $600 million, the business has asked that TR apply their expertise to design incentive programs, sales contests, and keep compensation competitive. **TR must approve ALL incentive plans and contests, and currently works with local finance to administer all GGM US & CA incentive programs as well as all Canadian GSM incentive programs.***

2. As there are just a small number of union ee's, virtually all factory and distribution center employee compensation is managed directly by NA compensation team

   ✓ *With so few unionized ee's, the NA TR team works closely with each BU and site to manage the competitiveness of pay, local incentives, and special programs.*

3. The presence of several TEC members in the US (and possibly the CEO) will require substantial resources to support corporate Executive Compensation team, and with new US reporting requirements due to being an issuer of US securities, workload will increase

   ✓ *The NA Compensation team, working with our Benefits team, is directly involved in equity and other compensation issues unique to the US for each TEC member. The data required for preparation of a US proxy will be significant.*

12

TEVA 00013[?]

# NA Differentiators - Compensation, cont'd

The US & CA Compensation Team is engaged with the following tasks and activities that are not performed by other country compensation/TR teams:

4.   Management and maintenance of GCA for these 9,000 ee's will continue to require resources.

   ✓   *With 3 major acquisitions, the resources needed to have all positions aligned to GCA is substantial, and without this being competed, all systems linked to GCA grade will not operate correctly. Resources will also be necessary for all the system workarounds required to complete the Year-End process.*

5.   High turnover, coupled with business transformation, involves ongoing reorganizations, retention bonuses, and offers for new hires (as well as promotions), all of which requires substantial resources.

   ✓   *With turnover around 23%; Reductions in Force; offers and counteroffers; realignments, etc. the involvement of the TR team has proven to be a valuable partner to HR and the business*

   ✓   *MyTevaRewards is currently only available in the US and the response has been terrific. Over two-thirds of ee's have used it, and in the first month, the site had over 60,000 hits. This site is critical to our wellness programs and cost reductions, and to improving the effectiveness of our sales organization. As the US and NA have the highest engagement scores in the C&B topics, this technology will help sustain those record levels. The site will open to Canadian employees by Q4.*

6.   In an effort to pay in close alignment with the external market, the local TR team market prices each role where possible.

   ✓   *By applying market data to each role and providing this information to Talent Acquisition & HR, we are enabling the business to pay at market for new hires and promotions. Hopefully ensuring compensation is not a reason why an employee would choose to leave Teva.*



TEVA 00013

13



# NA Differentiators - Benefits

The NA Benefits Team is engaged with the following tasks and activities that are not performed by other country benefit/TR teams:

1. U.S. benefits are self-insured. As such, Teva pays over 80% of the cost for every medical service received by an employee and the employee's dependents. With hundreds of millions of dollars being spent on medical services, and medical costs rising at 7%+ annually, managing medical costs is extremely important.

   ✓ *The NA benefits team spends significant time and resources finding ways to reduce medical spend and administration costs. We also work with the business, negotiating with AmWell to provide no-cost medical, behavioral health and nutrition visit with physicians to our ee's and their dependants. Creating a culture of wellness helps drive medical costs down. Most other countries are either fully insured or have socialized medicine managed by the government and paid for through taxes.*

2. Many of our benefits are regulated by various government agencies, and therefore require monitoring and compliance.

   ✓ *With so many regulations and required reports, with financial penalties for non-compliance, we spend considerable time and resources working with the IRS, auditors, Finance, etc. to be compliant.*

3. The US spend on prescription drugs is approaching $35 million – a cost that we must manage.

   ✓ *The NA Benefits Team, is working directly with the business to provide Copaxone to our employees directly from the US Teva pharmacy – saving over $2 million per year in spend. We hope to expand this program to include more medications.*

4. The US also manages the Teva SERP, ESPP, and Deferred Compensation Plan, and on-board Senior leaders and expats.

   ✓ *The US and Canada are the only countries with an ESPP. Given the high profile of SERP and deferred compensation plan participants, these plans require ongoing maintenance and communications. Considerable time is also spent onboarding expats into the most complex and expensive haeth care system in the world.*

5. Working directly with the business and senior leaders to create an new business for Teva

TEVA 000138

14



# Recommendations for Staffing TR in the Americas

The NA TR team would benefit from being allowed to fill the frozen Compensation Manager position and reduce their dependence on contractors/consultants.

In addition, we believe that by adding a headcount to HR Ops & Svcs that performs many of the transactional operations performed by the NA TR team, will:

- Allow the benefits team to function more efficiently and manage their workload better
- Provide some relief to the NA Compensation team
- Provide developmental opportunities for team members

Finally, we believe the staffing of the TR team for LatAm needs further review. However, we need greater stability in the LatAm businesses and greater knowledge of future growth plans before making any recommendations.

TEVA 000134

15

# 2017 America's TR Must Wins

**teva**

## Support Teva in the next level of evolution

### Global

- Lead TR harmonization aspects for all **integrations**
- Embed cost awareness in compensation and benefits programs
- Support the business with HC **synergies & restructuring**
- Redesign Global Performance Management system approach

### Region

- Deliver benefit AOP cost savings of $6 Mil in US and $60k in Mexico
- Finalize GCS in the US (Anda)
- Extend MyTevaRewards to legacy Actavis & Anda ee's, and to Canada

## Maintain a healthy work environment

### Global

- Reinforce our holistic performance and rewards ("Connect") mindset
- Develop a Global Health and Well-being Strategy and conduct Health and Well-being activities
- Mapping strategic roles – special \ deferential retention programs, tailored made programs
- Global framework for recognition and spot bonus

### Region

- Launch STARS for legacy Actavis & Anda ee's
- Review pay alignment strategies by country
- Launch a spot bonus process
- Develop next 3-yr health & well-being strategy for US and Canada; refresh Mexico and LatAm
- Contribute to global retention strategy
- Explore new health & well-being vendors and brokers to reduce costs
- Review situation in Puerto Rico

## Simplify core HR processes

### Global

- Develop Global C&B philosophy
- Enhancing benchmarking methodology and salary ranges
- Successfully manage executive compensation as a first-time US domestic issuer
- Enhance TR capability and effectiveness- Leverage Success factors technology in alignment with TR Operating Model

### Region

- Deliver C&B reviews for all countries
- REWARD tool fully operational
- Power BI tool integrated into TR analytics
- Leverage EC compensation module

TEVA 000135

16

# Total Rewards Americas – The Teva TR Team in Future

**teva**

TEVA 000136

**Shared Admin Asst**
Diane Matusiak

**Head of Total Rewards – Americas**
Randy Keiuch

**Head of Benefits – No Americas**
Diane Rohach

**Head of Total Rewards – LATAM**
Edu Nas

**Head of Compensation - US**
Miriam Weinstein

TR Headcount?

HR Headcount

Puerto Rico

**Well Being Leader**
Filed

**Sr Benefits Analyst**
Eliminated

**Benefits Analyst**
Sandra Milito

**Benefits Analyst**
Darlene Robinson-Stratford

**Canada Sr. Benefits Manager**
Jan Gustavsen

**Benefits Manager**
Samantha Kelleher

**Benefits Manager**
Flex Analyst

**Benefits Manager**
Joe Ferrigno

**TR Manager (AR/CL/UY)**
Amalia Gritto

**TR/LE Manager (BR)**
Enzo Cruz

**TR Manager (PE/VE)**
Filed

**TR Manager (MX)**
Elizabeth Juarez

**Comp Manager**
Replaced

**Comp Manager**
Veronica Ferrante

**Comp Manager**
Replaced

**Comp Manager**
Filed

17



TEVA 000137

# Future

- The future requires:

  - More focus on well-being with someone leading this effort, which includes:

    - Culture Clubs and well-being champions at every site (I.e., Frazier Pilot)

  - A competent, motivated and fully staffed Compensation Team focused on:

    - GCA maintenance
    - Pay alignment strategy
    - New hire offers
      - Sales incentives
      - Growth strategies
      - Retention/Attraction

  - A Benefits Team that:

    - Optimizes benefits spend
    - Creates a culture of well-being
      - Reduces stress for employees
      - Outperforms competitors
    - Maintains high levels of employee engagement and satisfaction with benefits offering

18

Everything we have done during the last three years will serve us in the way we respond to these immediate and long-term challenges...We have a terrific team!

19

JOINT APPX 0489



APPENDIX

teva

# Situation – North America

➤ The Total Rewards team has an approved headcount that is frozen and needs to be filled, and with the increase in responsibilities (Actavis, Anda, and Puerto Rico), needs to off-load a portion of this substantial increase in workload.

➤ Feedback from customers reflects a decline in service capacity.

➤ A headcount has been identified within the US HR team that can be allocated to the HRO&S group to absorb task driven work from the US Total Rewards team.

➤ The Total Rewards team is comprised of skilled benefits professionals being asked to perform administrative functions which leads to job dissatisfaction and poor allocation of resources. It also takes away from their ability to move forward with strategic initiatives.

➤ An example being Susan Duff who worked in Benefits is leaving team because she wants to have a more strategic, less administrative role

21

TEVA 0001448

# Filling the Frozen Open Position

- The chart to the right indicates the resources split with the headcount filled.

- With this additional headcount  the project breakdown would be:

  - Pay Equity – Miriam
  - Year End – Connect – Elise
  - Reward – Veronica
  - Sales Incentives , including Portal– Kent
  - GCA – new team member
  - Executive Compensation - Randy

- This is the optimum staffing for this team and is strongly recommended



Head of Total Rewards – Americas
Randy Keuch

Head of Compensation – US
GSF
Miriam Weinstein

Comp Manager
TGO
Veronica Ferrante

Comp Manager
GGM
Elise Cartledge

Comp Manager
R&D and Finance
OPEN

Comp Manager
GSM
Kent Schurr

teva

TEVA 000141

22

# Adding a Headcount to HR Ops & Services



**Current State**

1 Director/1 Associate Director
6 Total Rewards Managers
➤ 3 Compensation
➤ 3 Benefits-possibly move one manager to
2 Benefits Analysts

**Change**

1 Benefits Manager shifts 50% to (new) benefits analyst
1 Benefits Analyst shift 50% work to Ops services
Splits time between Comp/Benefits
1 Compensation Manager shifts 100% of sales admin work (20% of an FTE)
to OPS/Services

**Future State**

1 Director/1 Associate Director
6 Total Rewards Managers
➤ 3 1/2 Compensation
➤ 2 1/2 Benefits
2 Benefits Analysts

TEVA 000142

23

# Movement of Work to HR Ops & Svcs



| | | |
|---|---|---|
| 401(k) and 1165(e) compliance and strategy and design | | = |
| Working on controls | = | = |
| DC plan administration /DC-Cephalon | | = |
| SERP | = | = |
| QDRO | = | = |
| ESPP Administration | = | = |
| Audit FSA and HSA | = | = |
| Financial Planning | = | = |
| Bonus Accrual (5%) | = | ⬆ |
| Compensation Client Support | | = |
| Disability Management | = | ⬆ |
| Task related work for disability | = | |

Work being moved →

Task orientated work for disability-Enter leaves and returns

Payroll Deductions 401k/ESPP/DC/Medical/Dental/Life

Bonus Accruals

Sales Incentive Administration

| | |
|---|---|
| ⬇ | Payroll Deductions (401k/Deferred Comp/ESPP/Medical/Dental/Life ) |
| ⬇ | Run reports for voluntary deductions |
| = | COBRA administration |
| = | Maintain Benefits Mailbox |
| = | File feeds |
| ⬇ | Sales Incentives Administration (20%) |

TEVA 000143

24

**Rappoport, Larry J.**

| | |
|---|---|
| **From:** | Randy Keuch <Randy.Keuch@tevapharm.com> |
| **Sent:** | Thursday, December 14, 2017 2:07 PM |
| **To:** | Tal Zorman |
| **Cc:** | Daniel Lawlor; Ron Yaniv |
| **Subject:** | Minimal TR Organization for North America |
| **Attachments:** | Minimal TR Organization Final.pptx |

Hello Tal,

Attached is a deck that provides my bare bones recommendation for my team. I have included options that suggest elimination of my position or Miriam's position. I strongly urge you not to make any leadership changes in Q1, as there is much work for the team to perform and the risks are very high. I also ask that you consult with Legal to validate the risks and our exposure. An error on our 401k could result in disqualification of the entire plan, which has $1.2 billion in assets, so disqualification will result in the loss of huge tax benefits to Teva. If a leadership change (job elimination) is needed, better to do this in Q2 when work has transitioned to HR Ops & Services, and the organization has stabilized. This is not a personal request nor is it made out of concern for having my position eliminated. Rather, it is a business decision as to how much risk Teva is willing to take by moving too quickly or having inexperienced people in key decision-making roles.

Thanks for your consideration and let me know if you have any questions.

Best regards,

Randy Keuch Head of Total Rewards - Americas
Tel: 267-468-4325 Cell: 215-272-9816
Randy.Keuch@tevapharm.com sip:Randolph.Keuch@tevapharm.com www.tevapharm.com





1



Question and Answer Session

Teva 000258

THOMSON REUTERS STREETEVENTS

# EDITED TRANSCRIPT

TEVA.TA - Teva Pharmaceutical Industries Ltd to Discuss Restructuring Plan and Additional Measures to Improve Its Business and Financial Performance Conference Call

EVENT DATE/TIME: DECEMBER 14, 2017 / 1:00PM GMT

**OVERVIEW:**

Co. provided an update on its restructuring plan.

©2017 Thomson Reuters. All rights reserved. Republication or redistribution of Thomson Reuters content, including by framing or similar means, is prohibited without the prior written consent of Thomson Reuters. 'Thomson Reuters' and the Thomson Reuters logo are registered trademarks of Thomson Reuters and its affiliated companies.

**THOMSON REUTERS**

Teva 000259

**DECEMBER 14, 2017 / 1:00PM, TEVA.TA - Teva Pharmaceutical Industries Ltd to Discuss Restructuring Plan and Additional Measures to Improve Its Business and Financial Performance Conference Call**

## CORPORATE PARTICIPANTS

**Kåre Schultz** *Teva Pharmaceutical Industries Limited - President, CEO & Director*

**Kevin C. Mannix** *Teva Pharmaceutical Industries Limited - Head of Global IR*

**Michael McClellan** *Teva Pharmaceutical Industries Limited - Executive VP & CFO*

## CONFERENCE CALL PARTICIPANTS

**Aaron Gal** *Sanford C. Bernstein & Co., LLC., Research Division - Senior Research Analyst*

**Christopher Thomas Schott** *JP Morgan Chase & Co, Research Division - Senior Analyst*

**David Reed Risinger** *Morgan Stanley, Research Division - MD in Equity Research and United States Pharmaceuticals Analyst*

**David William Maris** *Wells Fargo Securities, LLC, Research Division - Senior Analyst*

**Gregory B. Gilbert** *Deutsche Bank AG, Research Division - MD and Senior Analyst*

**Jamilu E. Rubin** *Goldman Sachs Group Inc., Research Division - Equity Analyst*

**Jason Matthew Gerberry** *BofA Merrill Lynch, Research Division - MD in US Equity Research*

**Kenneth Charles Cacciatore** *Cowen and Company, LLC, Research Division - MD and Senior Research Analyst*

**Liav Abraham** *Citigroup Inc, Research Division - Director*

**Marc Harold Goodman** *UBS Investment Bank, Research Division - MD and United States Healthcare Analyst*

**Rohit Govind Vanjani** *Guggenheim Securities, LLC, Research Division - Senior Analyst*

**Timothy Chiang** *BTIG, LLC, Research Division - MD and Specialty Pharmaceutical Research Analyst*

**Umer Raffat** *Evercore ISI, Research Division - Senior MD and Fundamental Research Analyst*

## PRESENTATION

**Operator**

Ladies and gentlemen, welcome to the Teva conference call to discuss restructuring plan. I must advise you today's session is being recorded. I would now like to hand the floor to Mr. Kevin Mannix, Senior Vice President Investor Relations.

---

**Kevin C. Mannix** - *Teva Pharmaceutical Industries Limited - Head of Global IR*

Thank you, operator. And thank you, everyone, for joining us today to discuss Teva's earlier announcement regarding its restructuring. On the call with us, today are Kåre Schultz, Teva's President and CEO; and Mike McClellan, our Chief Financial Officer.

We're going to begin the call with Kåre taking you through a short presentation before opening up for questions and answers. A copy of the slides can be found on our website at www.tevapharm.com as well as on our Investor Relations app, under Teva Investor Relations. During this call, we will be making forward-looking statements, which are predictions, projections or other statements about future events. These estimates reflect management's current expectations for Teva's performance. Actual results may vary, whether as a result of exchange rate differences, market conditions or other factors. In addition, the non-GAAP figures exclude the amortization of purchased intangible assets, costs related to certain regulatory actions, inventory step up, legal settlements and reserves, impairments and related tax effects. The non-GAAP data presented by Teva are used by Teva's management and Board of Directors to evaluate the operational performance of the company to compare against the company's work plans and budgets, and ultimately to evaluate the performance of management. Teva provides such non-GAAP data to investors as a supplement of data and not in substitution or in replacement for GAAP results because management believes such data provides useful information to investors.

THOMSON REUTERS STREETEVENTS | www.streetevents.com | Contact Us

©2017 Thomson Reuters. All rights reserved. Republication or redistribution of Thomson Reuters content, including by framing or similar means, is prohibited without the prior written consent of Thomson Reuters. 'Thomson Reuters' and the Thomson Reuters logo are registered trademarks of Thomson Reuters and its affiliated companies.

**THOMSON REUTERS**
Teva 000260

**DECEMBER 14, 2017 / 1:00PM, TEVA.TA - Teva Pharmaceutical Industries Ltd to Discuss Restructuring Plan and Additional Measures to Improve Its Business and Financial Performance Conference Call**

And with that, I'll now turn the call over to our CEO, Kåre Schultz. Kåre, please.

---

**Kåre Schultz** - *Teva Pharmaceutical Industries Limited - President, CEO & Director*

Thank you, and welcome everybody to this call. I'll start by addressing our current situation.

In broad terms, you can say that we have 4 main challenges in our current situation. We have a significant depth that we want to service over the coming years and where we have some clear commitments. We have generic competition to our largest branded product COPAXONE that started just recently. So we are anticipating to see reduced sales of COPAXONE over the coming quarters.

We have had a challenging environment as has the whole market in our largest generic marketplace, the U.S., where we have seen significant price erosion recently. And we have also seen that we have had less generics launched, less first launches in the U.S. compared to what we've seen in future or in the years past.

So all these 4 challenges have led us to review our business and to develop a restructuring plan, which will significantly reduce our cost base. I'm confident that with the reduction in the cost base and with us protecting our revenue line, we will be able to manage in the short and medium term in a way where we can both address our financial obligations and ensure a solid sustainable base for our business going forward.

So supplement to the ongoing operations of the business, we will continue to divest noncore assets to the extent that we find this advantageous.

Now let me highlight the restructuring plan. We are planning to reduce our current cost base, which in 2017 will be just above USD 16 billion by USD 3 billion. One-half of these reductions will be achieved by the end of 2018, and they will be fully achieved by the end of 2019. The reductions will come from all elements of our cost base, so from the entire P&L so to speak. And they will, of course, be linked to reductions in the overall manning and overall estimated reduction of 14,000. This is more than 25% of our workforce. And this will be geographically split over all the markets where we operate and all the functions in the company.

The majority of these reductions will happen in 2018 and the majority of the changes in 2018 will happen within the next 3 months.

As inevitable in a reconstruction programs, there will be onetime cost, onetime restructuring charges, and we expect there will be a cash outlay of around USD 700 million in 2018 for this.

These savings will allow us to be more efficient, to be more operationally effective and to meet our financial commitments.

Now let me talk about the key areas that we are focusing on. How are we doing the restructuring? First of all, there's a link to the organizational structure that we revealed at the end of November. We are basically moving from a situation where we had 2, you could say, divisions and a lot of staff areas that were globalized to a much more unified and simplified organizational structure. Where we basically have 1 P&L. We have 1 situation, market by market, where we sell different products. It could be OTC. It could be generics, branded generics, specialty products. And we optimized the markets one by one. We optimized the products one by one, all leading to higher-end margins for the products that stay in the market, stay in the portfolio and at more profitable organization going forward.

We can see that our generics portfolio due to price pressure in several markets has a very mixed profitability and that there's a need for optimization, and I'll address that further in a minute. As a consequence of portfolio optimization and of optimizing the general footprint of our manufacturing, we will see the closure of a significant number of manufacturing facilities worldwide.

We will also see closures by the way of office sites and also of R&D sites. We are doing a thorough review of our R&D programs across the entire company. As you know, we have merged our 2 R&D organizations, so that all the things that are shared between the R&D process for generics and for Specialty Products can be done in a synergistic way. We do, of course, keep something separate, and we will ensure that we have a sustainable portfolio throughout the different development phases for both our generic pipeline and our specialty pipeline.

3

©2017 Thomson Reuters. All rights reserved. Republication or redistribution of Thomson Reuters content, including by framing or similar means, is prohibited without the prior written consent of Thomson Reuters 'Thomson Reuters' and the Thomson Reuters logo are registered trademarks of Thomson Reuters and its affiliated companies.

**THOMSON REUTERS**

Teva 000261

JOINT APPX 0499

Client Id: 77

**DECEMBER 14, 2017 / 1:00PM, TEVA.TA - Teva Pharmaceutical Industries Ltd to Discuss Restructuring Plan and Additional Measures to Improve Its Business and Financial Performance Conference Call**

We're expecting through this restructuring to optimize our cost base in a way where we are protecting our revenues, we'll be serving our core capabilities in generics and in the specialty area. And in doing so we are securing the long-term growth of Teva.

Now a few comments to the new organizational structure. As I've already said, we're moving from 2 separate global commercial groups into 1 integrated organization. This ensures that we can effectively execute on the cost reductions, and we can effectively execute on the portfolio optimization, without having any risk of siloed or suboptimal analysis. We will be looking at the business from a holistic point of view, ensuring strong profitability long term.

That's also why we make sure that each region and each market has the full P&L accountability, which means that we can measure the markets on a comparable basis, and we can ensure that the totality of our activities are sustainable and profitable in all markets.

I just alluded to the merger of the 2 R&D groups. The thinking here is, of course, that by utilizing the synergistic effect of all the many aspects that are similar, whether you develop a drug for a generic launch or for a branded specialty launch that we get the synergistic effect there while keeping, of course, a research focus in specialty and a separate from the generic activities.

We have had a need for strong and available capabilities in addressing our portfolio throughout the lifecycle of our generic products, but also in connection with the planning and launch of new specialty products.

To this end, we are establishing a marketing and portfolio function that will have the global responsibility of integrating the inputs from R&D, manufacturing, markets, in order to obtain the optimal portfolio for both our generics and our specialty products.

We will ensure that we have 1 lean organizational infrastructure to support our business, basically having a lean setup for all staff functions, ensuring the high level of compliance, but in an effective and simplified way.

Now let me talk a bit about the global generics portfolio. There's been a lot of pricing dynamics on generic products in United States and elsewhere in the last couple of years. If you have a very dynamic situation, sometimes you have the risk that some of your products will not really meet a sustainable profitability benchmark.

In order to secure that we have a long-term sustainable portfolio, we are reviewing each and every product worldwide, and we will make pricing adjustments to the extent that this is necessary.

When we do that, we will in some cases experience that we will improve the profitability of the individual product and it will remain in the marketplace. In other cases, we might have to conclude that the product is not one that we will keep on manufacturing, and we will, therefore, discontinue these loss-making products.

This, combined with our general synergistic way of merging our manufacturing sites, optimizing our manufacturing sites will lead to a reduced number of manufacturing sites with reduced overheads. And at the same time, we will also optimize our R&D network.

In the same way, we will look at different parts of our portfolio to better reflect the current cost structures and the current market condition, all in all optimizing the profitability of our portfolio.

Now, we're also taking some additional measures. In order to secure the best possible cash flow, in order to be able to service our commitments related to our depth in the best possible way, we are immediately spending dividends on ordinary shares and ADRs. We will continue, as I said in the beginning, to look for additional divestment opportunities of noncore assets. We will, however, only do so if the price we achieve is improving our overall financial situation, both from a liquidity and a earnings point of view also longer term.

We will as a consequence of the very negative development of our financial performance in 2017, not be paying out any annual bonuses for those people who are having an annual bonus system. I should say this will, of course, not affect the normal bonuses paid out to sales representatives around the world.

4

©2017 Thomson Reuters. All rights reserved. Republication or redistribution of Thomson Reuters content, including by framing or similar means, is prohibited without the prior written consent of Thomson Reuters. 'Thomson Reuters' and the Thomson Reuters logo are registered trademarks of Thomson Reuters and its affiliated companies.

**THOMSON REUTERS**

Teva 000262

JOINT APPX 0500

**DECEMBER 14, 2017 / 1:00PM, TEVA.TA - Teva Pharmaceutical Industries Ltd to Discuss Restructuring Plan and Additional Measures to Improve Its Business and Financial Performance Conference Call**

In terms of our financial profile, we will, of course, utilize the cash flow from both the improved operating performance and from divestments, to continue to pay down debt over the coming years. Initially, we'll be focusing on the remaining bank debt, which is subject to covenants, roughly 4 billion, and we will pay that down within a relative short number of years.

We will be targeting a significant reduction of our leverage of going below 4x the EBITDA to net debt by the end of 2020. And I would like to stress at this point in time that we do not plan to raise equity in any of the forms that you could imagine. We will safeguard the value if at all possible for the current shareholders.

Talking about the debts, let me just restate once more that we are and we'll remain focused on deleveraging paying down the debt.

We have done so already within the last months, and we will continue to do so in the coming years.

Here you have a picture of our debt maturities over the next 5 years. And, of course, we need a strong cash flow and strong liquidity in order to service this debt and that is our aim to ensure that.

So what should you look out for in 2018? What can you expect? You can expect a simpler, leaner and more agile organization, organized in a much more straightforward way. You can expect that more than half of the $3 billion in cost reductions will be executed and will be achieved. You can expect the continued debt reduction. You can expect a very strong focus on protecting our top line and also on supporting the continued successful launch of AUSTEDO and the planning for and successful execution on the launch of fremanezumab. And you can expect us to continue to ensure a spend in the R&D area that maximizes the return on equity or the return on investment and secures a long-term sustainable pipeline for both our generics and our specialty business.

So we will ensure that we continue to provide high-quality medicines to the many millions of patients we serve every day. And we will ensure that we remain strong in terms of our operating performance and on our financial performance.

So with this, I would like to hand over for the question-and-answer session.

---

## QUESTIONS AND ANSWERS

**Operator**

(Operator Instructions) Your first question comes from the line of Umer Raffat from ISI.

---

**Umer Raffat** - *Evercore ISI, Research Division - Senior MD and Fundamental Research Analyst*

My question is really just to make sure we understand the cost cut properly. The $3 billion in cost cut announced, is that net reduction out of the system? I just want to be very clear about that one. And then also if -- it will be really helpful to understand and frame for us, what parts of the organization are being cut deep into versus not, and what are the takeaways from similar programs? Kåre, you may have done that. Lundbeck, for example? And then finally, is CGRP launch a top focus for you because I know some of your competitors are putting in some very serious resources going into 2018 into that?

---

**Kåre Schultz** - *Teva Pharmaceutical Industries Limited - President, CEO & Director*

Thank you very much for these 3 questions, Umer. First of all, the USD 3 billion is a net reduction. So if I should make it very simplistically, I would say in 2017, you should expect us to report just above $16 billion in cost. So 2 years from now, you should expect us to report $3 billion less, so that's $13 billion. If we were to sell off major parts of the business in the meantime then, of course, that cost reduction would come on top of this. So that's the way you should understand it. In terms of what parts of the business, it's everything that we are optimizing, basically. The only thing

---

THOMSON REUTERS STREETEVENTS | www.streetevents.com | Contact Us

©2017 Thomson Reuters. All rights reserved. Republication or redistribution of Thomson Reuters content, including by framing or similar means, is prohibited without the prior written consent of Thomson Reuters. 'Thomson Reuters' and the Thomson Reuters logo are registered trademarks of Thomson Reuters and its affiliated companies.

**THOMSON REUTERS**

Teva 000263

JOINT APPX 0501

**DECEMBER 14, 2017 / 1:00PM, TEVA.TA - Teva Pharmaceutical Industries Ltd to Discuss Restructuring Plan and Additional Measures to Improve Its Business and Financial Performance Conference Call**

that we are really protecting is the product flow. So making sure that the sales efforts are not hampered, that we can continue to move our products as much as possible. And then, of course, the manufacturing of the products that make a profit that they are not hampered. So of course, we're keeping a very close eye on that. And then your last question about fremanezumab, we are packing fremanezumab 100%. We think we have an excellent clinical profile. You have probably noticed that we are the only one which can have a dosing only every 3 months, which we think will be an advantage. So we're very much focused on that. And we have, of course, made sure that we have the resources to continue the successful launch of AUSTEDO and to make a really successful launch of fremanezumab.

---

**Operator**

Your next question comes from the line of Ken Cacciatore from Cowen and Company.

---

**Kenneth Charles Cacciatore** - *Cowen and Company, LLC, Research Division - MD and Senior Research Analyst*

Wanted to drill down a little bit more nuance on the cost reductions, hoping that maybe you can give a little bit of thought between SG&A and R&D versus cost of goods. And kind of relative to that, trying to understand the reductions over the next couple of years and the impact, specifically, on revenues, excluding, obviously, any divestitures. If you can give any nuance as we try to work through the P&L implications from revenues, the cost of goods and the reductions in SG&A and R&D? And I guess, dovetailing on that, just some perspective on 2018, you're giving us a good sense of the spending side, maybe if you could, any nuance on top line as we try to work through the model?

---

**Kåre Schultz** - *Teva Pharmaceutical Industries Limited - President, CEO & Director*

Thank you very much for that question. So first of all, I'll say that we won't -- as you probably realize, we won't give any financial guidance today. We'll be talking about the restructuring program. We will, of course, give you a clear set of guidance once we get to February, and we announce the full year results for '17. We will also give you clear-cut guidance on '18. But trying to give you a bit more nuances on where the cost cuts are coming from. And first of all, they are coming from the entire P&L, as you also correctly stated. They are partly related to the 14,000 people that are leaving the company, and they are leaving the company basically in all functions. So there's not any function where we don't have a reduction. I would say, there's a reduction between 10% and 75% in the individual functions. So it's all over the place. Geographically, it's everywhere. So it's a very broad set of actions we're taking. And you referred to previous -- I don't want -- also to previous restructurings that I've done. So it's very much following the same pattern, where you basically look at everything and you try to optimize everything in one go, involving the management of each part of the organization, making sure that the plans you make are highly executable. And you can trust that they will be executed and they are sort of borne out of specific targets for specific units at a relatively low level. So that's how we're doing it. The majority will be, you would say, not in the cost of goods area, but they'll still be a large chunk there, as you know. Out of our total cost base, COGS are a very large part. So you will see COGS there as well. And some of them will, of course, be coming from the closure of sites. That's a major part of it. And some of them will coming from the optimization of profitability on individual products. Now when it comes to sales, I can't give you any specific guidance today, but I can tell you that there are some elements that are mentioned already that are pushing a downward pressure on sales. And those are the generic erosion on COPAXONE. And it is the pricing in the U.S. generic space. In the rest of the world, you have minor elements that could give some swings up and down. And then, of course, you have the launch of AUSTEDO, which is still small. So it won't have a big impact. You have the launch of fremanezumab that will be sort of probably around the middle of the year. So that will not have a huge impact either. So those are sort of the key elements. And in totality, with the divestments that, of course, gives a downward pressure on the top line. But I don't know if you -- Mike, if you want to add something?

---

**Michael McClellan** - *Teva Pharmaceutical Industries Limited - Executive VP & CFO*

Just let me add a couple more comments. First, on the costs side. You'll see the majority impact in 2018 coming more out of the operating expenses, the cost of good impact will be much more weighted towards the second year because of the time it takes. And a few other things to think about when you're modeling 2018, we did have the divestments, which will total -- in total, about $900 million in revenue, specifically, almost $800 million in the women's health that comes out, plus the Hungarian distribution business that we're going to take out. And then we had $150 million in the

THOMSON REUTERS STREETEVENTS | www.streetevents.com | Contact Us

©2017 Thomson Reuters. All rights reserved. Republication or redistribution of Thomson Reuters content, including by framing or similar means, is prohibited without the prior written consent of Thomson Reuters. 'Thomson Reuters' and the Thomson Reuters logo are registered trademarks of Thomson Reuters and its affiliated companies.



**THOMSON REUTERS**

Teva 000264

JOINT APPX 0502

Client Id: 77

**DECEMBER 14, 2017 / 1:00PM, TEVA.TA - Teva Pharmaceutical Industries Ltd to Discuss Restructuring Plan and Additional Measures to Improve Its Business and Financial Performance Conference Call**

first half of 2017 related to the NINLARO royalty stream that will not repeat going forward. I also remind you that, that we could be facing a generic competition to our ProAir franchise in the U.S. as early as mid-2018. So we're not sure that will happen, but it is a risk that you need to be considerate of.

---

**Operator**

Your next question comes from the line of Ronny Gal from Bernstein.

---

**Aaron Gal** - *Sanford C. Bernstein & Co., LLC., Research Division - Senior Research Analyst*

Two for me. First one around the Israeli tax rate. Based on discussion, the Israeli media about negotiations, you're currently undergoing with the Israeli authorities about tax rate. And understanding what the impacts of the Israeli statutory tax, which we believe is 16% and the -- at center in the country and 8% in the periphery will be -- if we assume that, that will be the net tax that you would have? And second, Kåre, coming from the outside, one of the things surprises in 2018 was the lack of significant generic launches despite the acceleration of FDA's general approvals. Any diagnosis from you so far about what might be the problem with Teva in that respect?

---

**Kåre Schultz** - *Teva Pharmaceutical Industries Limited - President, CEO & Director*

Thank you, Ronny, for those 2 questions. First, on the Israeli tax rate then -- tax is always a complicated issue, as you know, with many moving parts. I think the short version I can give you is that, I don't expect to see any major political initiatives that would significantly change our tax rate on a global scale. That doesn't mean that we can't have some discussions here in Israel. But I don't see that as a risk to us that we will have a dramatic change there. And then when it comes to generic launches, I don't think that there's one simple explanation for why some years we have more launches than others. I think there's a dynamic at play here, which I've been discussing with my colleagues, which is that branded players, or you would say, also us with COPAXONE and other players with other products, they are getting more sophisticated in how to prolong, you could say the commercialization through different rebating schemes, authorized generics, different moves that happens in the marketplace where you blur the red line in a way between the original product and then the follow-on generics. And the originated companies are utilizing that in a way to maintain more turnover as we can see right now, where we are also seeing that we don't lose everything, you know, in our prediction in the first quarter that we have generic competition on COPAXONE. Now that works both ways for us because it also works the way that when we launch new generic products, we also have the risk that we will have a slower ramp up or get less market share than we would have gotten 10 years ago. So you could say that the dynamics are being slowed down for various reasons. And that's maybe one of the reasons that we see less income from the generic launches. Another reason is that there's a certain gamble in this because you know when you do a first-to-file you make a lot of assumptions and you need to do a lot of things very fast. So being first-to-file, then needs to be followed up by being first to launch in order to get the value out of it. And it is a clear focus of mine and of the whole organization going forward that we do not only manage to get first-to-file, which I think we are excellent at, probably the best in the industry, but we also manage to be first to launch.

---

**Michael McClellan** - *Teva Pharmaceutical Industries Limited - Executive VP & CFO*

Ronny, let me -- this is Mike. Let me add a little more flavor to the tax rate. I think, Kåre answered the Israeli impact. But just to be clear, as we go from this year, where we have in 2017 roughly a tax rate of 15.5%, we would expect that to go up a little bit to next year, mainly due to the reduction of COPAXONE revenues, which are enjoying those favorable rates in Israel. So overall, we would expect tax rate in 2018 to be a few points higher than the tax rate we see in 2017. But we'll give you a full analysis when we do the earnings and the guidance in February.

---

**Operator**

Your next question comes from the line of Jami Rubin from Goldman Sachs.

---

THOMSON REUTERS STREETEVENTS | www.streetevents.com | Contact Us

©2017 Thomson Reuters. All rights reserved. Republication or redistribution of Thomson Reuters content, including by framing or similar means, is prohibited without the prior written consent of Thomson Reuters 'Thomson Reuters' and the Thomson Reuters logo are registered trademarks of Thomson Reuters and its affiliated companies.

**THOMSON REUTERS**

Teva 000265

JOINT APPX 0503

Client Id: 77

**DECEMBER 14, 2017 / 1:00PM, TEVA.TA - Teva Pharmaceutical Industries Ltd to Discuss Restructuring Plan and Additional Measures to Improve Its Business and Financial Performance Conference Call**

**Jamilu E. Rubin** - *Goldman Sachs Group Inc., Research Division - Equity Analyst*

Can you hear me, all right? Just was wondering, if you can walk through some math with me, Kåre. So you're talking about a $3 billion reduction all dropping to the bottom line, $16 billion in expenses dropping to $13 billion in expenses. If I look at consensus numbers for EBITDA in both 2019 and 2020, The Street, and we assume about $5 billion in EBITDA. You also said that you expected net leverage by 2020 to reach about 4x. That implies an EBITDA of $6 billion. So recognizing that there's going to be some hit to revenues because of the sharp cost reductions, I'm wondering if you can kind of square the difference between the additional $3 billion, which should boost EBITDA by maybe that much or maybe not quite that much and the $6 billion that you're sort of referring to or implying when you talk about 4x net leverage by 2020?

**Kåre Schultz** - *Teva Pharmaceutical Industries Limited - President, CEO & Director*

Yes, I can try, Jami, to give you a little bit of flavor to it, but I can't give you the real specifics because, we will, of course, give the guidance on the EBITDA for 2018 in February. So I can't really comment on that right now. But the way you should think about it is, of course, that we will be focused on using basically all our cash flow, both the operating cash flow and the divestment cash flow to reduce debt. That's #1 priority for us to do that. So that will hopefully, by the end of 2020 see us reducing debt significantly. And then, of course, we will use all our energy to also optimize the operating profit of the organization, thereby ensuring we can reach that situation that you're alluding to. And, of course, there's 2 factors: there's how much is the net debt at that point in time; and how much is our EBITDA at that point in time. But I'm confident that in the balance of those things we can make it, how it's going to look exactly, I can't say right now because imagine we do a lot of divestments of the noncore assets that will reduce the debt, but also the EBITDA, so that's one scenario. Or the other scenario, let's say, we don't divest anything, as an example, and we just improve the EBITDA to the maximum of what we can. That's another scenario. So I can't tell you exactly how it's going to look, but I can tell you that I'm convinced that it's very realistic that we will be able to achieve this. I hope this clarifies. And I know it's not completely precise, but it will be more precise in February.

**Jamilu E. Rubin** - *Goldman Sachs Group Inc., Research Division - Equity Analyst*

Can I follow-up with a quick question on revenues? What sort of -- if you look at consensus revenues by 2020, that's around $20 billion to $21 billion. To what extent would you anticipate this cost-cutting program to impact those revenues? I mean, how -- to what extent do you think you can preserve revenues in the context of this rather significant cost-cutting program?

**Kåre Schultz** - *Teva Pharmaceutical Industries Limited - President, CEO & Director*

Yes, that's a good question. What I expect is that revenues on profitable product lines will not be impacted. So I don't expect this to, in any way, impact all the good solid products we have. But there will be an impact from the optimization exercise because we will take nonprofitable product lines, try to increase the pricing to make them profitable. Some of them we will succeed, some we will not. And those where we will not, we will discontinue. That will take out both cost and revenue, but it will be sort of neutral on the EBITDA level. So it's a little difficult for me to say, but there will, of course, be a negative effect on revenues, that's for sure.

**Jamilu E. Rubin** - *Goldman Sachs Group Inc., Research Division - Equity Analyst*

And I guess, one more follow-up. Go ahead. Go ahead. And also, if you could just touch on your conversations with the rating agencies. And go ahead, Mike.

**Michael McClellan** - *Teva Pharmaceutical Industries Limited - Executive VP & CFO*

No, I just -- when you're looking at the consensus revenue, we really need to restress that we do have these divestments that are coming out, and I've talked about those earlier. We also have variability on the COPAXONE. So we're being very conservative in our initial thoughts, and we'll follow that up in the February guidance because we will have more information about how well Mylan is doing. It's still early days on that. And then we

THOMSON REUTERS STREETEVENTS | www.streetevents.com | Contact Us

©2017 Thomson Reuters. All rights reserved. Republication or redistribution of Thomson Reuters content, including by framing or similar means, is prohibited without the prior written consent of Thomson Reuters 'Thomson Reuters' and the Thomson Reuters logo are registered trademarks of Thomson Reuters and its affiliated companies.



**THOMSON REUTERS**

Teva 000266

JOINT APPX 0504

**DECEMBER 14, 2017 / 1:00PM, TEVA.TA - Teva Pharmaceutical Industries Ltd to Discuss Restructuring Plan and Additional Measures to Improve Its Business and Financial Performance Conference Call**

could face additional generic competition to the ProAir franchise in the U.S. And there is also a risk in 2019 around the Treanda franchise. So you got to take in to consider all of those when you're looking out into those years. In terms of the rating agencies, yes, we've had preliminary discussions with them. We're going to have a much more in-depth discussion with them and Kåre next week. They're still sifting through the information that we've given to them. And we will keep in a constant dialogue. So I can't really give you any indications right now, but we will be in a constant dialogue with them and lay out our plans, and show them that we're on a path to continuing our efforts of cost cutting, divestments. Moving to delever. We do have to deal, of course, with the slightly earlier-than-expected generic entry into the COPAXONE 40 milligram. And that will be a headwind as well as the U.S. generic environment. So it will take us some time to deleverage -- to the leverages that we want to get to. And I think being under 4x by 2020, hopefully, we'll be significantly under, but at this time, that's our target.

---

**Operator**

Your next question comes from the line of Greg Gilbert from Deutsche Bank.

---

**Gregory B. Gilbert** - *Deutsche Bank AG, Research Division - MD and Senior Analyst*

I was hoping you could provide the total cash cost of the restructuring. I think, you just talked about the cost for the 2018 portion. Secondly, on the product rationalization or optimization exercise, I'm very interested in that, in terms of its implications for you and the industry. Are you simply going to go through products that are unprofitable, try to raise price, and then discontinue if you can't? Or could you give us any more context around that? And lastly, Kåre, other than having fewer people and a lower cost base, a few years out, can you give us a preliminary glimpse of your vision for Teva? I think, most folks know you to be someone with a branded background, someone with a cost optimization and efficiency background, but maybe you could provide a preliminary glimpse of what you think is core to Teva longer term?

---

**Kåre Schultz** - *Teva Pharmaceutical Industries Limited - President, CEO & Director*

Yes. Mike, will you comment on the cash cost?

---

**Michael McClellan** - *Teva Pharmaceutical Industries Limited - Executive VP & CFO*

Yes. So we've put a number of $700 million in for 2018. We've also, you may have seen in the press release, said this could go a little bit higher as we get into 2019 and have a more definite list of which sites administrative and manufacturing to close. So the rest of it, we don't have an accurate enough estimate to give to you, but the $700 million will be the majority of the program. There could be some extra as we get into 2019 that we'll disclose as soon as we have a reliable estimate.

---

**Kåre Schultz** - *Teva Pharmaceutical Industries Limited - President, CEO & Director*

And on the product optimization, very good question. I would put it a simplistic way first, and then try to explain a little bit more. Basically, I'm a big believer in margins more than just volume. So rather than just try to get the world's biggest volume, I would like to get a good margin and a real good profitability on our portfolio. Now when you do that, of course, there's a lot of technicalities in how you do it, but in principal, you take it product by product, market by market, and you ensure that in totality, you have a good margin on your business in a geography. But also, that individual products are sustainable and profitable. And I'm not a believer in that you can have a couple of lost leaders and then you make it up somewhere else. That's not a good way to do business. So we will be looking at specific products where we will conclude that these products are being sold at a nonsustainable, noneconomical price level. And then we will, of course, in a polite and well-organized way discuss with our customers, how we can rectify this. Whether they prefer us to phase out of that product and discontinue it. Or whether we can adjust the pricing to a sustainable level. With regard to the vision, it's a little too early for me to bring forward a sort of clear-cut vision for the company. I'll be working with my executive management on it, and with the Board of Directors on it. And a comprehensive strategy will be communicated sometime after the first half of this year when we had good times to discuss it with the Board of Directors. But I can give you a hint that I think Teva has unique capabilities from a overall point of view in terms of being able to develop and manufacture medicines in many -- in different shapes and forms. And that is still

9

©2017 Thomson Reuters. All rights reserved. Republication or redistribution of Thomson Reuters content, including by framing or similar means, is prohibited without the prior written consent of Thomson Reuters. 'Thomson Reuters' and the Thomson Reuters logo are registered trademarks of Thomson Reuters and its affiliated companies.


**THOMSON REUTERS**
Teva 000267

JOINT APPX 0505

**DECEMBER 14, 2017 / 1:00PM, TEVA.TA - Teva Pharmaceutical Industries Ltd to Discuss Restructuring Plan and Additional Measures to Improve Its Business and Financial Performance Conference Call**

a very valuable thing, which can be used both to bring branded specialty products to the market because you have the whole value chain, but also to bring complex generics, biologics, biosimilars, standard old-fashioned generics, and even OTC products to the marketplace. So I see us as being able to utilize that broad capability base in a way which will secure a strong financial performance, strong operational performance, but also strong benefits for millions of patients every day.

**Operator**

Your next question comes from the line of Liav Abraham from Citi.

**Liav Abraham** - *Citigroup Inc, Research Division - Director*

I understand that you're not giving 2018 guidance and you have provided some color on dynamics in 2018. But as it relates to the restructuring plan and your -- the cost cuts that you've outlined. How conservative are the revenue assumptions behind this cost plan? And how comfortable are you that -- this is not something that you'll have to redo again, you'll have to reassess and cut more costs, a year from now, for example? And then secondly, Kåre, you did talk about the impact on longer-term revenues from product discontinuations. I'm curious as to your thoughts and your philosophy on R&D and balancing cuts in R&D with optionality -- preserving optionality for longer-term growth?

**Kåre Schultz** - *Teva Pharmaceutical Industries Limited - President, CEO & Director*

Thank you. So if we talk about the top line and how to assist that and maybe also the execution of the restructuring, then, I think, it's fair to say that I'm traditionally conservative on that. So you would not find that I would be basing this analysis on a very optimistic outlook for revenues. And I think you will also find that I'm pretty conservative and strict on implementation of restructuring. So it would be very surprising if we did not meet the exact targets in terms of cost reductions. So I think on that, I can tell you, it's conservative on both accounts. In terms of the R&D and the philosophy there, then the philosophy is to have a sustainable balance pipeline, which is balanced both in terms of risk, but also in terms of timing. So that you have throughout the pipeline, you have early projects, you have mid-stage and you have late-stage projects. That's what we have right now. So -- but on the other hand, I'm also a big believer in that, in specialty, in branded research, you can't be good in everything, so you need to focus in and specialize in the areas where you have core competencies. And that's what we are going to do and what we are doing in the research and development of specialty. And in the space of generics, it's very much, of course, about being focused on the right products on the first-to-files, but then also following through and being the first to launch.

**Operator**

Your next question comes from David Maris from Wells Fargo.

**David William Maris** - *Wells Fargo Securities, LLC, Research Division - Senior Analyst*

I have 2 questions. The first is just a simple yes or no question. Based on what you know now, do you think Teva retains its investment-grade rating? In response to a previous question, you said, well, we've had some initial talks, we've had this feedback, we've laid out our plan. We get all that. Just based on what you know now, do you think Teva retains its investment-grade rating? And then secondly, the idea of raising price to increase profitability on commodity products that are seeing massive price pressure from buying groups and others in the U.S., seems like that would be a strategy that someone would have thought of before. So maybe can you answer how you'd address an investor that says, well, why wasn't that done before? And doesn't that sound like that's going to be futile?

THOMSON REUTERS STREETEVENTS | www.streetevents.com | Contact Us

©2017 Thomson Reuters. All rights reserved. Republication or redistribution of Thomson Reuters content, including by framing or similar means, is prohibited without the prior written consent of Thomson Reuters. 'Thomson Reuters' and the Thomson Reuters logo are registered trademarks of Thomson Reuters and its affiliated companies.

**THOMSON REUTERS**
Teva 000268

JOINT APPX 0506

**DECEMBER 14, 2017 / 1:00PM, TEVA.TA - Teva Pharmaceutical Industries Ltd to Discuss Restructuring Plan and Additional Measures to Improve Its Business and Financial Performance Conference Call**

**Kåre Schultz** - *Teva Pharmaceutical Industries Limited - President, CEO & Director*

So on the first question, I'm going to disappoint you. And I have to answer that, "I don't know," because I don't do that decision. So all I can say is, I -- I'm laying out the facts. And then, of course, I leave it for the rating agencies to take that decision. On the second one, I think it's a good point. Why the race to the bottom? That's not sustainable, not for the patients either. So if you want to have a society where you have sustainable supplies of high-quality medicines, which is what we all want. Then, of course, it's good to have price competition. But you also need to be responsible as a company and make sure that you're supplying the products in a way that is sustainable. And rather than supplying something at a loss, it's better not to supply it. So I think it's because of the dynamics that the dynamics have been unleashed, you could say, in a very extraordinary way in the U.S. marketplace, the consolidation on the payer side, the actions from FDA to approve a lot of products from manufacturers in India and China and so on. The total dynamics have just led to that -- my guess is that not only Teva, but other manufacturers have ended up competing to the bottom where it's not really sustainable or profitable. This is not a new phenomenon. If you look into economics here in history, then, of course, it's a classic. And then there comes a period where less producers, less manufactures are active in certain areas and then prices normalize and stabilize at some point in time at a sustainable level. So I just think it's a normal economic cycle of rapidly changing competitive environment. And hopefully, we will end up seeing us having some product lines that will then be sustainable and profitable and all our product lines where we are no longer manufacturing these products.

**Operator**

Your next question comes from the line of Chris Schott from JPMorgan.

**Christopher Thomas Schott** - *JP Morgan Chase & Co, Research Division - Senior Analyst*

Just had 2 questions here. Coming back to optimization process, you're going to go through in the generic portfolio. I appreciate it's very hard to quantify a sales impact at this point. But is there any more color you can provide in times of either how many products or what percent of your current sales fit into that bucket of either you need to raise price or you need to exit the business? Just anything about -- just how big a piece of the portfolio does this encompass? And then second question was on asset divestitures and how that fits into the picture at Teva at this point? I know you alluded to this in your commentary. Are there specific assets you have in mind for divestiture? Or is this kind of a wait-and-see process where you have to see how the restructuring plays out? And really evaluate how well assets fit into the mix versus what doesn't fit in anymore?

**Kåre Schultz** - *Teva Pharmaceutical Industries Limited - President, CEO & Director*

Thank you very much, Chris. Good questions. With regard to the optimization, I can't get into the very specific details, but being an old consultant, I can tell you the 80-20 rule probably applies here as anywhere else. So that basically means that 20% of your products will make up 80% of your profits, that's quite normal for all pharmaceutical companies. And I'm sure it's also the case here. And that is, of course, not where you're looking. You're looking at the tail end where I'm sure that probably, the last 20% of your products might make up 80% of your losing products. And that's why you're going to be looking. So you take it from the tail so to speak, you look at the least profitable products and that's where you're going to start. And I think it happens in all industries, if you have a very broad portfolio. And if nobody is really focused on it, then it's not the most popular thing to do to be looking at the loss-making products and making sure that they get optimized. It's more fun to launch a new product at a high price and make a big splash out of that. So I'm a believer in that you should optimize everything, and that's why I'm also focusing in that end. And hopefully, that is something that can lead to better total profitability of the portfolio. In terms of the assets, then I'm also a believer in keeping all the good products we have. All the good assets we have in terms of actual products we're supplying. So you will not see us doing big asset sales that are linked to pharmaceutical product sales, so to speak, the generic or specialty pharmaceuticals. But you will see us look at sort of side things like, it could be distribution or could be other, sort of, side businesses that are not directly linked into product sales.

**Operator**

Your next question comes from the line of Jason Gerberry from Bank of America.

11

THOMSON REUTERS STREETEVENTS | www.streetevents.com | Contact Us

©2017 Thomson Reuters. All rights reserved. Republication or redistribution of Thomson Reuters content, including by framing or similar means, is prohibited without the prior written consent of Thomson Reuters. 'Thomson Reuters' and the Thomson Reuters logo are registered trademarks of Thomson Reuters and its affiliated companies.



**THOMSON REUTERS**
Teva 000269

JOINT APPX 0507

Client Id: 77

**DECEMBER 14, 2017 / 1:00PM, TEVA.TA - Teva Pharmaceutical Industries Ltd to Discuss Restructuring Plan and Additional Measures to Improve Its Business and Financial Performance Conference Call**

**Jason Matthew Gerberry** - *BofA Merrill Lynch, Research Division - MD in US Equity Research*

Kåre, first question is for you is, can you talk a little bit about your observations regarding Teva's manufacturing network? You've got a global business, brands and generics. And my recollection from the last downsizing of the facility footprint was that you'd be pretty close to Mylan, but Mylan's reducing their spend as well. So just as you think about a business of your size, where do we net out following the cost reductions, just from a manufacturing footprint? And if I can squeeze another one in, your fasinumab partnership with Regeneron I think you guys are on the hook for about $0.5 billion of R&D with that program. Are you still committed to that program?

**Kåre Schultz** - *Teva Pharmaceutical Industries Limited - President, CEO & Director*

Thank you very much. So on the manufacturing footprint, it is, of course, no secret that Teva's manufacturing network is the result of numerous acquisition and mergers of the company over a long period of time. And roughly, today we have around 80 manufacturing sites. Now with my sort of insight into the volumes we do and how we do them and my insight into manufacturing over many years, pharmaceutical manufacturing, if you took it the other way around and said if you start it from scratch, how much would you have? You'll probably have 2 to 4 API sites, and you'll probably have 6 to 8 finished manufacturing sites with different technologies to cover broadly. So there would be sort of -- around sort of 8 to 12 sites all together. Now that's not realistic where we're coming from historically. But it's just to give you a feel for that there's a big difference between the setup we have and what would be the ideal setup. Then, of course, it's also well known that it takes time. It's costly to establish pharmaceutical manufacturing. And therefore, in that total optimization, we will most likely not go from 80 to 12 in the next 5 years, right? But we will move in that direction. So directional, you should expect us probably over the next 10 years to keep on moving in the direction of consolidation, optimization, improvement of our manufacturing network. With regard to fasinumab then we are, of course, totally committed to that program. and very excited about the fact that we potentially can develop a product that is a very effective painkiller without having misuse issues that we see with certain opioid-based products.

**Operator**

Your next question comes from the line of Marc Goodman from UBS.

**Marc Harold Goodman** - *UBS Investment Bank, Research Division - MD and United States Healthcare Analyst*

So just on the comment about cutting the plants. I just want to make sure I understand, what -- we should expect a pretty significant cut even in 2 years? Because previously, when companies have tried to take plants out, it usually takes even longer than 2 years. So maybe just you can come back to what's a realistic expectation for within this $3 billion cost cutting? And then second, when you talk about areas that you are committed to, do you think about the business and franchises, like the old Teva did, like we're going to stay in respiratory, we're going to stay in women's health, we're going to stay in oncology? And if so, can you just talk about what franchises you're committed to?

**Kåre Schultz** - *Teva Pharmaceutical Industries Limited - President, CEO & Director*

So first on the number of plants, then we, of course, in an ongoing process of optimizing this. And this will continue and it will be accelerated as a consequence of the restructuring program. It's a huge parcel as you can imagine because there's a lot of moving parts. But you will see a significant double-digit number of plant closures within the next 2 years. So that's on the plant side. On the sort of, you could say the -- whether we have a therapeutic focus, whether we have some specific areas where we are very strong. It's a little different whether you talk about the generic strategy or whether you talk about the specialty strategy. In specialties, I would say that, our key areas, as you all know, are in the sort of CNS/neurology area, and that's where, I think, we have the biggest chances of bringing new innovation to the marketplace. On the other hand, in the, sort of, all the territory between generics and complex generics within respiratory and oncology, I also think that we will be able to bring very, very valuable products into the marketplace. Women's healthcare, we have divested and it's not an area where we will be focusing neither strongly on the generic side, nor on the specialty side. So I hope that gives you some idea about it.

THOMSON REUTERS STREETEVENTS | www.streetevents.com | Contact Us

©2017 Thomson Reuters. All rights reserved. Republication or redistribution of Thomson Reuters content, including by framing or similar means, is prohibited without the prior written consent of Thomson Reuters. 'Thomson Reuters' and the Thomson Reuters logo are registered trademarks of Thomson Reuters and its affiliated companies.



**THOMSON REUTERS**

Teva 000270

JOINT APPX 0508

Client Id: 77

**DECEMBER 14, 2017 / 1:00PM, TEVA.TA - Teva Pharmaceutical Industries Ltd to Discuss Restructuring Plan and Additional Measures to Improve Its Business and Financial Performance Conference Call**

**Operator**

Your next question comes from David Risinger from Morgan Stanley.

**David Reed Risinger** - *Morgan Stanley, Research Division - MD in Equity Research and United States Pharmaceuticals Analyst*

I have a couple questions. First, with respect to the U.S. generic price adjustment initiative, could you just sort of put that in perspective relative to the fact that, I think, there are over 3,000 ANDAs pending at the FDA. And it would seem that it might be a little bit different to try to raise price in a generics market that the FDA intends to further commoditize then, let's say, in other industries where there isn't so much incremental new supply coming on when a company decides to raise prices. So maybe you could just contextualize that for us, so that we understand it? And then, I guess, the second question is, you mentioned good solid generic products that you plan to continue to sell those. How do you think about the clearing of the backlog implications for those products? And whether what's a good, solid generic product today will be a good, solid generic product in 2 years? And then third, with respect to generic and brand R&D, they've typically been separate at Teva and most other companies. And so how will you be able to employ and retain people that want to focus on innovation, if they're also working on generics?

**Kåre Schultz** - *Teva Pharmaceutical Industries Limited - President, CEO & Director*

Thanks for those 3 questions, David. If we talk about the first thing, so the U.S. generics and the number of competitors and how that might play into the whole pricing. Then if you go down and analyze in detail, then of course, for each specific product, there's a difference in how many suppliers there are, and there's a difference in the manufacturing cost and the challenges of manufacturing the products. And the more complex the products get, typically the lower the number of manufacturers that provide the product, the bigger the quality and technical challenges in manufacturing the products become. So that means that you could say that for the more complex products, there's a high likelihood that you will be able to command a price that is equal to the value, and that makes sense from an overall profitability point of view. There will certainly be products where there's a high number of suppliers, and where it's relatively easy to manufacture. And in those cases, of course, if you have a margin loss on a product, it doesn't make any sense to manufacture it. And that means, you can actually improve your EBIT, your EBITDA, by simply not manufacturing the product anymore. So that's one element. The backlog, I think, a lot of the backlog that you will see will be on the simple products that will come to the market from -- as I said before, from manufacturers in places such as China and India. And I don't think that will have a sort of major impact to the areas where we see that we have a strong situation. And then, of course, we have to remember that a big part of the annual revenue generation in generics is from the first-to-file, first to launch. And that's, of course, where we have a lead. And we need to just make sure we execute to the maximum of our ability, so that we get a lot of the first-to-files also resulting in a first to launch. With regard to the research and development, maybe I didn't explain it well enough. We are not going to mix up the research groups in specialty with the research groups in generics. That's exactly where we are not going to mix it up completely. But we are going to have people working on CMC, people executing clinical trials, people doing PK/PD, all these kind of practical things that you do. We are going to have synergies in those areas. And I believe that that's a rational way to do it, which will sort of safeguard the creativity and the intellectual dynamics, both in the generic space and the specialty space with, of course, different groups of people.

**Operator**

Your next question comes from the line of Tim Chiang from BTIG.

**Timothy Chiang** - *BTIG, LLC, Research Division - MD and Specialty Pharmaceutical Research Analyst*

Kåre, I just had 2 questions, really big picture. First and foremost, how long do you think it will take? I know, you've just joined the company. How long do you think it will take to sort of find the inflection point for Teva's generic and specialty businesses, certainly like the market's highly skeptical of the company's current growth trajectory? And obviously, you're sort of an outsider to the Teva organization. You're announcing some disruptive cost cuts right off the bat. And I sort of wanted to get your thoughts, just looking at your experience in the business. Is this a 2- to 3-year turnaround plan? Or is this a 5-year turnaround plan for you?

THOMSON REUTERS STREETEVENTS | www.streetevents.com | Contact Us

©2017 Thomson Reuters. All rights reserved. Republication or redistribution of Thomson Reuters content, including by framing or similar means, is prohibited without the prior written consent of Thomson Reuters. 'Thomson Reuters' and the Thomson Reuters logo are registered trademarks of Thomson Reuters and its affiliated companies.



**THOMSON REUTERS**

Teva 000271

JOINT APPX 0509

Client Id: 77

**DECEMBER 14, 2017 / 1:00PM, TEVA.TA - Teva Pharmaceutical Industries Ltd to Discuss Restructuring Plan and Additional Measures to Improve Its Business and Financial Performance Conference Call**

**Kåre Schultz** - *Teva Pharmaceutical Industries Limited - President, CEO & Director*

Yes. Is that your question? That's great, Tim. So I'll give you my completely subjective take on it, right. I think, it's a 2-year turnaround restructuring. So in 2 years from now, it's going to look good. If we do well, then in 5 years, it's going to look great. But I can guarantee you in 2 years, it's going to look good because we will be handling the debt. We will be handling the operational challenge of declining revenues on COPAXONE and generics. But in the meantime, we will be sort of doing everything to regenerate growth from AUSTEDO, from fremanezumab, from a beta and more-focused generic strategy and execution. And that's why I'm saying that 2 years from now, we will have the cost down, we'll have optimized the operational performance. But the real sort of the big development in a positive sense then -- will then be 2 to 5 years out. So good in 2 years, and hopefully, great in 5 years.

**Timothy Chiang** - *BTIG, LLC, Research Division - MD and Specialty Pharmaceutical Research Analyst*

And Kåre, just one follow-up question, if I may. On fremanezumab, you certainly come from a background on the CNS side, how do you think you can optimize this product, assuming it's approved and launched next year?

**Kåre Schultz** - *Teva Pharmaceutical Industries Limited - President, CEO & Director*

Well, I think it's a great product. You know that it's a great product class with 4 products in the class. And we have the most flexibility in terms of dosing. And we've seen, in the CNS area, I don't know if you follow the LAIs, but we have seen this move from once monthly to once every 3 months. And there's a move in that direction in several areas. And I believe that, that flexibility combined with best-in-class efficacy, that is a real edge that fremanezumab has.

**Operator**

We will take one further question. It comes from Rohit Vanjani from Guggenheim Securities.

**Rohit Govind Vanjani** - *Guggenheim Securities, LLC, Research Division - Senior Analyst*

Kåre, you mentioned $700 million of onetime payments. Just from a cash flow perspective, how do we think about the timing of those payments? Are the bulk happening at the beginning of 2018 because of severance? And then secondly, as a result of the cost cuts, do you feel like you can remain within the covenant even if another 1 to 2 additional COPAXONE generics come to market in 2018? Or what's the threshold there? And then, lastly, you mentioned taking price increases on products, some will win, some will lose, and maybe it'll be -- you'll have to discontinue and maybe it'll be a wash. But have you started those talks with the consortiums, or have any sense of what that's going to look like?

**Kåre Schultz** - *Teva Pharmaceutical Industries Limited - President, CEO & Director*

So, Rohit, thanks for those 3 questions. I think, the first 2 ones, Mike will handle and then I'll take the price at the end.

**Michael McClellan** - *Teva Pharmaceutical Industries Limited - Executive VP & CFO*

Thanks. Thanks, Rohit. So the severance cost of $700 million, I think, would be concentrated mainly in Qs 2 and 3, as we have salary continuation for the employees that leave. That will be the bulk of it. You will also see some in Q4, but I think the majority will be there. When it comes to covenants, we're in good shape for the end of this year. We're doing our evaluation as we look at the revenues of 2018 combined with the costs. We may be, of course, in active dialogue with our banking partners. And if we see that we do not have enough cushion as we go into 2018 on those, we will be getting a little more active in a dialogue to see if we need to make adjustments. So we're looking at that very closely, but that will probably come together with the finalization of our 2018. And we will update the market in February on that one.

THOMSON REUTERS STREETEVENTS | www.streetevents.com | Contact Us

©2017 Thomson Reuters. All rights reserved. Republication or redistribution of Thomson Reuters content, including by framing or similar means, is prohibited without the prior written consent of Thomson Reuters. 'Thomson Reuters' and the Thomson Reuters logo are registered trademarks of Thomson Reuters and its affiliated companies.

**THOMSON REUTERS**

Teva 000272

JOINT APPX 0510

**DECEMBER 14, 2017 / 1:00PM, TEVA.TA - Teva Pharmaceutical Industries Ltd to Discuss Restructuring Plan and Additional Measures to Improve Its Business and Financial Performance Conference Call**

**Kåre Schultz** - *Teva Pharmaceutical Industries Limited - President, CEO & Director*

And with regard to the discussions with the consortium, with the customers, we are initiating those discussions as we speak. So we haven't been through that yet, so it's too early for us to say exactly what's going to happen. And I guess, it also depends on the dynamics in the marketplace. So we will just have to see how it plays out over the coming months. Thank you, everybody, for listening in.

**Operator**

Ladies and gentlemen, that concludes today's session. For those wishing to review this conference, the replay facility can be accessed by dialing from the United States, (631) 510-7499; from the United Kingdom, (0845) 245-5205; or from elsewhere, country code (0044) 1452-55-0000. The on-call access code is 3888788. Thank you for your participation. You may disconnect.

**DISCLAIMER**

Thomson Reuters reserves the right to make changes to documents, content, or other information on this web site without obligation to notify any person of such changes.

In the conference calls upon which Event Transcripts are based, companies may make projections or other forward-looking statements regarding a variety of items. Such forward-looking statements are based upon current expectations and involve risks and uncertainties. Actual results may differ materially from those stated in any forward-looking statement based on a number of important factors and risks, which are more specifically identified in the companies' most recent SEC filings. Although the companies may indicate and believe that the assumptions underlying the forward-looking statements are reasonable, any of the assumptions could prove inaccurate or incorrect and, therefore, there can be no assurance that the results contemplated in the forward-looking statements will be realized.

THE INFORMATION CONTAINED IN EVENT TRANSCRIPTS IS A TEXTUAL REPRESENTATION OF THE APPLICABLE COMPANY'S CONFERENCE CALL AND WHILE EFFORTS ARE MADE TO PROVIDE AN ACCURATE TRANSCRIPTION, THERE MAY BE MATERIAL ERRORS, OMISSIONS, OR INACCURACIES IN THE REPORTING OF THE SUBSTANCE OF THE CONFERENCE CALLS. IN NO WAY DOES THOMSON REUTERS OR THE APPLICABLE COMPANY ASSUME ANY RESPONSIBILITY FOR ANY INVESTMENT OR OTHER DECISIONS MADE BASED UPON THE INFORMATION PROVIDED ON THIS WEB SITE OR IN ANY EVENT TRANSCRIPT. USERS ARE ADVISED TO REVIEW THE APPLICABLE COMPANY'S CONFERENCE CALL ITSELF AND THE APPLICABLE COMPANY'S SEC FILINGS BEFORE MAKING ANY INVESTMENT OR OTHER DECISIONS.

©2017, Thomson Reuters. All Rights Reserved.

THOMSON REUTERS STREETEVENTS | www.streetevents.com | Contact Us

©2017 Thomson Reuters. All rights reserved. Republication or redistribution of Thomson Reuters content, including by framing or similar means, is prohibited without the prior written consent of Thomson Reuters. 'Thomson Reuters' and the Thomson Reuters logo are registered trademarks of Thomson Reuters and its affiliated companies.

**THOMSON REUTERS**
Teva 000273

JOINT APPX 0511

| | |
|---|---|
| **From:** | Shannon Phillips <Shannon.Phillips@tevapharm.com> |
| **Sent:** | Thursday, November 30, 2017 10:12 AM |
| **To:** | Carlos Benitez; Kimberley West; Pamela Daknis; Ellen Mcmahon; Bonnie Grant; Randy Keuch; Daniela Shea |
| **Cc:** | Daniel Lawlor; Diane Matusiak |
| **Subject:** | Upcoming America's HR Town Hall |

Hello Everyone,

We are in the process of finalizing the agenda for the upcoming town hall meeting.  Based on the recent communications and the expected next round of announcements the week of the 11th, we have re-focused the agenda.  Dan will review the state business and provide additional context to the communications that have come out.  Additionally, we will discuss the role of HR in supporting the business through an upcoming turbulent time while also caring for ourselves, ie readying ourselves for change.  We will close with a focus on recognition, highlighting our many accomplishments during the year.

We would like to create an atmosphere for our employees that is open and encourages dialogue.  To support us in this effort, we are highly encouraging our HR colleagues to come together to centralized sites where at all possible (not incurring travel).  As an example, we would ask all our PA colleagues to be present at North Wales and Florida colleagues to come together in Weston.   Your help in communicating this with your teams and securing rooms (where required) would be greatly appreciated.

Finally, Diane and I are trying to bring in a bit of holiday cheer to the North Wales meeting setting.  Not sure what this will look like, but possibly something for you to consider in bringing your teams together at other sites.


Very best,
Shannon

1



# Americas Town Hall

December 14, 2017

teva

JOINT APPX 0513

teva

# Today's Announcements

Confidential

JOINT APPX 0514

# Teva's current reality

**Challenges ahead of us require us to take significant steps with a sense of urgency**

- Significant financial obligations in the coming 4 years

- Generic competition to our largest branded product COPAXONE®

- Challenging environment in our largest generic market - the U.S.

- Fewer than anticipated Gx product launches in the U.S.

- Loss of stakeholders' trust



We believe we can turn Teva around by significantly reducing our cost base, closely managing our liabilities, and divesting non-core assets

Confidential

Teva 000196

**teva**

# A key step - New organizational structure

| From... | To... |
|---|---|
| Two separate global commercial groups for generics and specialty medicines | **One integrated commercial organization, operating through three regions** – North America, Europe and Growth Markets |
| Regions have direct P&L accountability only | Each region manages the entire portfolio, including generics, specialty and OTC, with **full end-to-end P&L accountability** |
| Separate generic and specialty R&D organizations | **One global R&D group** , which has overall responsibility for **all R&D activities** – generic, specialty and biologics |
| Insufficient alignment and integration between commercial, operations and R&D across the portfolio | A newly formed **Marketing & Portfolio function**, which oversees the interface between regions, R&D and operations throughout all product lifecycle stages; optimizing generic and specialty portfolios and marketing strategies across the therapeutic areas |
| Extensive global supporting layer | **One, lean organizational infrastructure supporting the commercial structure** that includes Finance, HR, Legal and Corporate Brand & Communications |

**teva**

Teva 0001920

Confidential

# Highlights of the restructuring plan - by the numbers

Teva is planning to reduce its current cost base (~$16 billion) by $3 billion* by end of 2019

– More than half of the cost reductions are expected to be achieved by end of 2018

– Reductions to come from all elements of the cost base

– Global workforce to be reduced by approximately 14,000* – more than 25% of the workforce – over the next two years; majority will happen in 2018

– Cost of restructuring program expected to result in a one-time restructuring charge and cash outlay of $700 million in 2018

**Savings will allow for a more efficient Teva to meet all of its financial commitments**

*Includes divestment of Women's Health and closure of distribution business in Hungary

Confidential

teva

Teva 000200

# Key areas of focus

## The restructuring plan will focus on:

– Deployment of a new unified and simplified organizational structure

– Substantial optimization of the generics portfolio globally

– Closures or divestments of a significant number of facilities

– Thorough review of all R&D programs across the entire company

**There is no alternative to these drastic steps in the current situation**

Teva expects to optimize its cost base while protecting revenues and preserving core capabilities in generics and in select specialty assets, in order to secure long term growth



Teva 00020

Confidential

JOINT APPX 0518

# Substantial optimization of the global generics portfolio



Discontinuation of products that do not meet Teva's new profitability benchmark

Downsizing of the manufacturing, supply and R&D network

Adjust pricing of certain portfolio segments to better reflect current cost structure and market conditions

Confidential

Teva 0002??



# Additional measures

In addition to the restructuring plan, Teva is announcing the following measures to address the company's financial situation:

– Immediate suspension of dividends on ordinary shares and ADRs

– The company will continue to review additional divestment opportunities of non-core assets

– Annual bonus for 2017 will not be paid out due to the company not achieving its pre-set financial goals for the year

Confidential

Teva 000208

# People

## We will keep everyone up to date in as timely, open a manner as possible

— For impacted employees

  – All processes will be conducted with respect and sensitivity

  – We expect to inform most of the affected employees within 90 days from December 14

  – Severance offered in accordance as per all local requirements, as well as outplacement services

— For employees who will continue

  – Intention to provide certain annual salary increases based on performance

  – Sales commissions will be paid in accordance with existing plans

  – Where positions are available, we will first look to fill internally

## We will regretfully be parting from good, dedicated people
## We do not take this lightly and sincerely appreciate their contributions

Confidential

Teva 000294

teva

# Clear path forward

— Simpler, leaner and more agile organization

— Continued debt reduction

— Focused support of fremanezumab and AUSTEDO®

— R&D spend that maximizes ROI

— Clear strategy in 2018

**Thank you for your continued commitment**

**We will ensure that we continue to provide high quality medicines to the many patients we serve every day**



Teva 000290

Confidential



Our Organization

teva

Teva_0002.06

# HR Org Design Rationale

**Primary objective as an HR organization in 2018:**

Drive the organizational design and people aspects of Teva's restructuring.

**Our approach will focus the HR operating model and updated structure on (3) key principles:**

➢ <u>Business HR Alignment</u>:  Combine Regional and Business support to more closely align our HR activities in the region with the new Teva structure.

➢ <u>Integrated Talent</u>:  Transition from separate CoEs to a more integrated and consistent approach to talent solutions.

➢ <u>Operations & Services</u>:  Focus on end to end delivery of HR services.

Confidential

Teva 00020?



# Human Resources: Global Leadership Team



EVP and CHRO
Human Resources
**Mark Sabag**

Personal
Assistant
**Idmit Kabilo**

Chief Operating
Officer
**Assaf Ehrenreich**

HR Operations
& Services
**Anat Markus**

Integrated Talent
Management
**Tal Zorman**

HRBP R&D, GM&P
**Vikki Conway**

HRBP TGO
**Glenn Gerecke**

Regional HRM
Growth Markets
**Orly Pascal**

Regional HRM
Europe
**Niels Walch**

Regional HRM
North America
**Dan Lawlor**

Teva 000208



# Global People Office

Restructuring Plans

Americas HR

teva

JOINT APPX 0526

# Global Governance



**Project Sponsorship**

Mark Sabag

**Project Champion**

Assaf Ehrenreich
Orly Pascal

Ari Siegmann (PMO)

**Org Design**

- Lior Porat (Owner)
- Orly Pascal
- Dan Lawlor
- Niels Walch
- Glenn Gerecke
- Vikki Conway
- Moshe Netzer

Weekly

**Global People Office**

- Arie Rabinovich – Lead
- Ellen McMahon - NA
- Ivana Drkelic - EU
- Yeva Markovitch - Israel
- Julia Askarova- RU
- Moshe Netzer- Japan, Turkey, S.Africa
- Stephanie Chua- APAC
- Mimmo Rossi – Latam
- Reshma Parida - India

Weekly

**Other Stakeholders**

- Alex Profis – HR Finance
- Idan Hevion – Data Management
- Yonatan Vitman – Total Rewards
- Rachel Yehezkel - Communications

Per need

teva

Teva 0002110

Confidential

# Restructuring | Work plan (as of Dec 13th)

| | Nov | | December | | | | January | | | | | February | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 25 | 04 | 11 | 18 | 25 | 01 | 08 | 15 | 22 | 29 | 05 | 12 | 19 | 26 |

**Prep**

**L2**
Org design & talent selection
▲ Approval
▲ Announcements

Notifications
▲ AOP submission

**L3**
L3 org design & talent selection
▲ Submit Mark's lists L3 review
Notifications
▲ Org Announcements
**L3-L4 Org Approval**
Notifications (cont. Union obligations)

**L4**
L4 org design
▲ Submit lists L4 full
Notifications
Notifications (cont. Union obligations)

**L5-below**
L4 talent selection
Org design & talent selection
▲ Submit Lists L4 full
Notifications
Notifications (cont. Union obligations)

# Teva Restructuring HR Key Success Factors

- Commitment to global timelines and ensure accuracy of employee mapping

- Work closely with BU / regional / country counterparts

- Assume positive intent and listen first to understand

- Maintain confidentiality relative to the information shared

- Recognize that our timeline is short; we will quickly apply learnings and continue to move forward

- Support each another and our collective well-being

Confidential

Teva 00021

TEVA 000145



# Proposed Headcount Reduction for the North American TR Team

December 15, 2017

teva

# Situation

Teva is reducing the headcount for the Total Rewards Team that supports North America (US, Canada, & Puerto Rico) and needs help determining what is the minimum team required to provide minimum support. Factors to consider with regard to **benefits** include:

- Compliance with country laws and regulations - This requires substantial experienced resources as the penalties could be well into the millions of US dollars
  - ☐ Strongly suggest that this concern be discussed with Legal (details are in Appendix)
- Leadership required to manage $220 million in spend and sign weekly wires/invoices in excess of $1million
  - ☐ This is managed daily by the team
- Over $50 million in cost savings generated over last 3 yrs. Team gave $8.2 million to the US businesses in benefits savings so far for 2017 and will save over $10 million for entire year. These savings are directly related to the daily actions of team members managing providers and employee healthcare behaviors
- Team is designing and implementing a new Severance Benefit Plan, which is qualified under ERISA, that will save Teva about $10 million in 2018
- Other cost savings initiatives (several million in savings) require resources to research and implement
- Substantial headcount reductions will trigger contract re-negotiations with some vendors driving costs up if not properly managed or creative solutions not identified and put into place
- Management of the benefits (COBRA) for the 1,100+ US employees severed as well as plant closings
- Handling employee escalations of medical and other issues that cannot be adjudicated by our providers
- Canadian benefits headcount not in TR headcount



# Situation, cont'd

Factors to consider with regard to **compensation** include:

- Compliance with country laws and regulations (FLSA - US and Pay Equity – US and Canada)
- Partnering on job offers, promotions, etc. and performing market pricings at all levels
- Contributing to restructurings
- Managing pay surveys, sales compensation, and executive compensation
- Partnering with HR and the business on job grading
- Union avoidance in Canada

For both benefits and compensation, we have new legislation that will impact workload including US Tax Reform, US Affordable Care Act modifications, Canadian Pay Equity and Provincial Legislation (just passed in Ontario), US Pay Equity Legislation at the Federal, State and Local levels

teva

TEVA 000147

# Total Rewards – North America Current (12 FTEs)*



**Head of Total Rewards – Americas**
– Randy Keuch

**Head of Compensation – US & CA**
Miriam Weinstein

**Comp Manager**
Veronica Ferrante

**Comp Manager**
Kent Schurr

**Comp Manager**
Rose Riciolli
(Contractor)

**Head of Benefits – Americas**
Diane Rohach

Ben Manager
Samantha Kalisher

Ben Manager
Joe Ferrigno

**Ben Analyst**
Sandra Milito

**Ben Specialist**
Courtney Stevenson

**Ben Analyst**
Darlene Robinson-stratford

**Sr. Benefits Analyst**
Lynn McConaghy
(Contractor)

* Excludes Ian Gustavsen who is in HR headcount for Canada and manages all Canadian benefits

teva

TEVA 000148



# Proposal – Summary (See Appendix for Details)

The North American TR team currently has 13 employees, if you include Jan Gustavsen, who is the Benefits Manager for Canada and 2 contractors. We believe we can reduce that headcount from 13 to 6 for a 54% reduction. To do this, the key changes will be as follows:

- 401k fiduciary responsibility will be outsourced to new vendor and actually reduce current spend by $30,000
- Some benefit administrative responsibilities will be moved to HR Ops & Services (disability, COBRA, wires, etc.) NOTE – US Law (HIPPA) regulates access to employee medical information
- Shift market pricing of jobs from job specific survey data to salary structure pricing
- Eliminate participation in:
  - Sales compensation
  - Executive pay and benefits

The next slide reflects the proposed organization structure.

Reducing headcount below these levels in Q1 will impair achievement of current cost-savings initiatives (discussed later); impair severance process for Q1; and create greater risks by taking the people out without taking the work out – Proposal is to revisit these headcount levels in Q2.

TEVA 000149

# Total Rewards – North America
## Proposed (6 FTEs or 54% reduction*)



Head of Total Rewards – Americas
Randy Keuch

Head of Benefits
Diane Rohach

Ben Analyst
Sandra Milito

Ben Specialist
Courtney Stevenson

Head of Compensation
Miriam Weinstein

Comp Manager
Veronica Ferrante



The Benefits team will
retain the lowest
graded employees

* Assumes Canadian benefits headcount is severed with full responsibility transferred to NA TR team

**teva**

TEVA 000150

# Proposal – Summary (See Appendix for Details), cont'd

If further reductions are required, the only positions that can be cut would be leadership roles.

The NA Benefits Associate Director – Diane Rohach - should be considered the most valuable leader, as the compliance requirements combined with the impact of noncompliance (many millions). Remaining staff does not have expertise to handle all benefits and needed compliance for Teva.

The Region TR Head – Randy Keuch – is probably the next most valuable leader given his knowledge and experience in both compensation and benefits and having managed situations similar to Teva's and is at a level appropriate to manage a $220 million spend as well as oversee compliance

The NA Compensation Director – Miriam Weinstein – is also a valuable compensation resource. Recognize that under Canadian law, any employee can request a full pay analysis for their position. This pay analysis must include market data plus internal pay data for all of their peers. No one on the team is experienced with this new legislation

Reducing headcount below 6 employees substantially raises the level of risk (noncompliance resulting in fines and possibly disqualification of our plans). It is the leadership team that fully understands the compliance issues and without them, Teva is entrusting over $220 million in spend to non-managers. Suggestion is to confer with legal counsel regarding this exposure and to make any headcount reductions below 6 at a later date.

teva

TEVA 000151



Total Rewards – North America
Proposed (5 FTEs or 62% reduction*)

**Eliminate Region Head**

Report Directly to Corporate

Head of Compensation
Miriam Weinstein

Comp Manager
Veronica Ferrante

Head of Benefits
Diane Rohach

Ben Analyst
Sandra Milito

Ben Specialist
Courtney Stevenson

**Eliminate Compensation Head**

Head of Total Rewards – Americas
Randy Keuch

Comp Manager
Veronica Ferrante

Head of Benefits
Diane Rohach

Ben Analyst
Sandra Milito

Ben Specialist
Courtney Stevenson

teva

* Assumes Canadian benefits headcount is severed with full responsibility transferred to NA TR team

TEVA 000152

# Proposal – Compensation: What Will be Left

- Manage:
  - ☐ CONNECT Year-End process
  - ☐ Compliance with pay laws in all countries
    - ▪ Canadian Pay Equity provides that ee's must receive a pay analysis of their job as well as the pay of their peers if they request it, and can file litigation if pay is not equitable
- Analyze pay based on salary structures and market surveys as needed
- Contribute to:
  - ☐ Grade and pay issues associated with organizational changes and restructurings
  - ☐ Site closures (i.e., PR)
- Work with business leaders to address compensation-related business issues
- Partner with HR in job offers, counter-offers, promotions and pay adjustments
- Develop solutions with regard to retention, attraction and motivation issues
- Complete pay surveys and manage Reward system
- Perform modeling and cost analysis for headcount and pay issues

This work requires 1 Director and 1 Manager with oversight and leadership from 1 Sr. Director

**teva**

TEVA 000153

# Proposal – Benefits: What Will be Left

- Manage the remaining $200 million in spend for the following:

  - 401(k)
  - Telemedicine
  - Flu Shots
  - EAP
  - Wires
  - Stars

  - Deferred Comp
  - Employee Escalations
  - Employee Physicals
  - Dental
  - College Savings Plan

  - 2 SERPs
  - Legal Filings
  - Health Strategy
  - Vision
  - ESPP

  - Medical
  - ACA Reporting
  - Life Ins & AD&D
  - Imaging
  - COBRA

  - Annual Enrollment
  - Biometric Screenings
  - Regulatory Inquiries
  - 2nd Medical Opinion
  - Financial Planning

- Manage Voluntary Benefits
  - Individual Disability Insurance
  - Critical Illness

  - Group Umbrella Liability Ins.
  - Accident coverage

  - Hospital Indemnity

- Other benefits activities include:
  - TevaFit Fitness Centers
  - Tobacco Cessation

  - Cafeteria Offerings
  - Communications (legal)

  - Weight Watchers
  - Monitor Health Dashboard

- Vendor Contracting and Management – See slide on next page

This work requires 1 Assoc Director and 1 Analyst and 1 Specialist with oversight and leadership from 1 Sr. Director



TEVA 000154

# Vendor Contracting and Management

*We manage over 24 vendors with an annual spend of over $220 million*



TEVA 000155

11

# Proposal – Key Cost Savings Initiatives for 2018

- Design and implement severance solution.                                   Potential 2018 savings of $10 million
- Select and contract with a new advisor for the 401(k).                      Potential annual savings of $30,000
- Conduct RFP for Enrollment/Eligibility Administrator                        Potential annual savings of $TBD
- Conduct RFP for Life & Disability (US & Canada)                             Potential annual savings of $TBD
- Address potential stop loss premium increase                               Potential annual savings of $1-3 million
- Impact and compliance with US Tax Reform                                    TBD
- Model costing of Ontario Pension Plan legal requirement changes
- Produce the US booklet attached below and manage every benefit and every vendor for the US, Canada and PR



2018
Comprehensive Benefits Guide

teva

TEVA 000156

TEVA 000157



# Appendix - Compensation

teva

# Compensation

| Action | Requirement | Impacts of Non-Compliance |
|---|---|---|
| Fair Labor Standards Act – US Overtime Eligibility - CA | Legally Required | Monetary Penalties for company and manager |
| Pay Equity – US Inc. Audits | Legally Required | Monetary Penalties for company |
| Pay Equity – Canada Inc. Audits & Employee Requests | Legally Required | Monetary Penalties,  Company Name released publically as a violator |
| Ad Hoc Compensation Reviews | Legally Required | Pay Equity regulations will require this to continue |
| Severance Plan Management and Plan Qualification Inc. File IRS Form 5500s | Legally Required | Plan qualification leading to inability to process Severance in alignment with State Unemployment Insurance – loss of about $6M in cost avoidance |

teva

TEVA 000158

14

# Compensation

| Action | Requirement | Impacts of Non-Compliance |
|---|---|---|
| Mergers, Acquisitions & Divestitures | Requirement based on current practice | This work will need to be completed by someone to provide compensation information for divestitures |
| Year End Process – Connect | Requirement based on current practice | Merit programs will need to run for 2018, and Connect will continue in 2019 and beyond |
| Survey Participation | Requirement based on current practice | Teva is bound to participate in certain surveys in 2018 |
| C&B Reviews | Requirement based on current practice | Merit, Market Adjustment and Promotion Planning for AOP |
| Salary Ranges – US & CA | Requirement based on current practice | Teva US & CA currently uses salary ranges where Market Reference Points do not exist, and in these cases this is used for pay equity |
| Market Reference Points at the GCA Job Level | Requirement based on current practice | Teva US & CA currently reviews each role in relation to the Market Reference Point for each GCA job to review market alignment for Connect and Hiring, and in these cases this is used for pay equity |
| Survey Output | Requirement based on current practice | Ensuring market data is added to WTW tool and roles are updated properly in country so that roles do not have drastic shifts against the market. |

15

TEVA 000159

# Compensation

| Action | Requirement | Impacts of Non-Compliance |
|---|---|---|
| WTW Comp Tool – Survey Admin – US & CA | Requirement based on current practice | Job specific market data will not be able to be created and maintained |
| Job Offers | Requirement based on current practice | Currently TA has set guidelines for recruitment and only comes to TR for offers outside the given framework. If not overseen, pay equity issues can arise. |
| Promotion Reviews | Requirement based on current practice | |
| Maintenance of GCA within NA | Requirement based on current practice | Possible inequities across groups within country |
| Sales Compensation Design Team Member | Requirement based on current practice | Sales team will have full ownership over sales incentive plan |
| Group Re-organization Compensation Assistance | Requirement based on current practice | Decreased Client Experience and realignment not inline with GCA or external compensation |
| Retention Reviews | Requirement based on current practice | Possible inequities |

**teva**

16

TEVA 000160

# Compensation

| Action | Requirement | Impacts of Non-Compliance |
|---|---|---|
| Spot Bonus Administration | Requirement based on current practice | Possible inequities |
| Proactive Compensation Client Support | Not Required | Decreased Client Experience |
| Compensation Mailbox | Not Required | Decreased Client Experience |
| Pay Alignment Strategy | Not Required | Decreased Client Experience |
| Training | Not Required | Currently supports HR with Union Avoidance |

teva

17

TEVA 000161



Appendix - Benefits

teva

TEVA 000162

# Benefits

| Action | Requirement | Impacts of Non-Compliance |
|---|---|---|
| Partner with Legal on Employment Litigation | Legally Required-complex must remain in benefits | Employee lawsuits |
| ACA Compliance | Legally Required-complex must remain in benefits | Fines and penalties that could be in the millions |
| Second Level Appeals | Legally Required-complex must remain in benefits | All medical plans require appeals so non-compliance leads to lawsuits and fines |
| 401(K) compliance | Legally Required-complex must remain in benefits | Fines and penalties from either IRS and/or DOL and possible disqualification of 1.7 billion plan |
| 1165 (e) Compliance – PR | Legally Required- complex must remain in benefits | Non compliance can lead to fines and disqualification of the plan |
| DC Plan Administration including Accruals | Legally Required-complex must remain in benefits | Non compliance can lead to fines and disqualification of the plan |
| SERP | Legally Required- complex must remain in benefits | Non compliance can lead to fines and disqualification of the plan |
| QDRO | Legally Required-complex must remain in benefits | Non compliance can lead to fines and disqualification of the plan |

19

TEVA 000163

# Benefits

| Action | Requirement | Impacts of Non-Compliance |
|---|---|---|
| FSA Administration | Legally Required | Not funding could lead to |
| HSA Administration | Legally Required | Non-compliance with rules could disqualify tax-exemption status |
| Audit – IRS & DOL | Legally Required–complex must remain in benefits | Fines and penalties from either IRS and/or DOL and possible disqualification of 1.7 billion plan |
| Disclosure Requirements – Executive Management Team | Legally Required–complex must remain in benefits | Highly regulated must be done with knowledge and expertise in benefits |
| Compliance for Heath and Wealth Plans – 5500s | Legally Required–complex must remains in benefits | Fines and penalties from either IRS and/or DOL and possible disqualification of 1.7 billion plan |
| Open Enrollment | Legally Required | Non compliance with section 125 |
| Maintenance of Contracts and Business Associate Agreements | Legally Required | Can lead to fines and penalties if confidentiality is compromised |

teva

20

TEVA 000164

# Benefits

| Action | Requirement | Impacts of Non-Compliance |
|---|---|---|
| COBRA | Legally Required- but can move | Fines and penalties from the DOL for non-compliance and possible lawsuits |
| Wires | Legally Required- but can move | 401(k) funding must be competed timely and if not done timely could lead to plan audits as well as non-compliance of the plan which could lead to disqualification of 1.7 billion dollar plan |
| Disability Management/FMLA | Legally Required- but can move | Employment related lawsuits if not compliant with FMLA |
| Invoices | Legally Required-but can move | Need to honor signed contracts and non-payment could lead to disruption of services |
| All Payroll Medical Deductions | Legally Required- but can move | Under the cafeteria plan deductions need |

teva

21

TEVA 000165

# Benefits

| Action | Requirement | Impacts of Non-Compliance |
|---|---|---|
| Maintain files to Vendors | Requirement based on current practice | Not legally required but mistakes on file feeds leads to coverage being dropped for employees |
| Benefits Mailbox – Tier 2 Employee Support | Requirement based on current practice-Must remain in benefits | Escalated questions not getting resolved and possibly compromising health of our employees |
| Mergers, Acquisitions & Divestitures | Requirement based on current practice | |
| Vendor relations for Medical, Dental & Prescription | Requirement based on current practice- Must remain in benefits | Could impact how services are received by employees if vendors are not properly managed |
| Vendor Summit | Requirement based on current practice | |
| Negotiations with Vendors | Requirement based on current practice | Leads to higher spend if not monitored |

teva

22

TEVA 000166

# Benefits

| Action | Requirement | Impacts of Non-Compliance |
|---|---|---|
| Budget | Requirement based on current practice | Over spend if not monitoring the budget |
| Website – My Teva Reward | Requirement based on current practice | |
| Manage Voluntary Deductions | Not legally required but strongly recommend | |
| Process/Procedure Controls for 401K | Not legally required but strongly recommend | |
| Policy Management | Requirement based on current practice- some legal implications | Non active management can lead to potential lawsuits |

teva

TEVA 000167

23

# Benefits

| Action | Requirement | Impacts of Non-Compliance |
|---|---|---|
| ESPP Administration | Requirement based on current practice-but can move | |
| Weekly New Hire Benefits Orientation | Requirement based on current practice-but can move | |
| Weekly New Hire Benefits Orientation | Requirement based on current practice-but can move | |
| Employee Recognition – STARS | Requirement based on current practice-but can move | |

teva

TEVA 000168

24

# Benefits

| Action | Requirement | Impacts of Non-Compliance |
|---|---|---|
| Expat TR assistance | Not required | Employee disruption |
| VP Orientation | Not required | Employee disruption |
| E&Y Administration | Not required | |
| Health & Wellbeing Strategy | Not required | Health & Wellbeing strategy leads to better health of employees and dependents which could lead to lower spend. Considering the challenging time we are in this is important to keep employees engaged |
| Wellbeing Champions | Not required | Health & Wellbeing strategy leads to better health of employees and dependents which could lead to lower spend |
| Wellness Program | | |
| C&B Reviews | | |

teva

25

TEVA 000169

# Typical Compliance Changes – This is for a US City

*December 14, 2017*

*San Francisco Increases Employer Mandate Amount for 2018*

**Important for Employers with Employees in the City of San Francisco**

Recently, the San Francisco Board of Supervisors increased the amount that employers must spend on health care in 2018 and made other changes to the Health Care Security Ordinance (HCSO). The Board of Supervisors made the following changes that impact large employers:

Increased the health care expenditure rate for "large businesses" (100 or more employees total) to $2.83 per hour (up from $2.64 in 2017), and the rate for "medium-sized businesses" (20-99 employees total) to $1.89 per hour (up from $1.76) beginning January 1, 2018; and

Released a notice that employers must post by 1/1/18.

As of January 1, 2017, all health expenditures had to be irrevocable (i.e., could not revert back to the employer) if they were to count toward the employer spending requirement under the HCSO. In addition, in October of 2017, the San Francisco Office of Labor Standards Enforcement issued new rules applying the irrevocability standard to self-insured plan expenditures.

teva

26

TEVA 000170



TEVA 000171

JOINT APPX 0556



CONFIDENTIAL

# NA Human Resources
# Final L3 Org Structure

Dan Lawlor

Jan 4, 2018

teva

JOINT APPX 0557



Teva 0002372



## Org Design Criteria & Principles

### Criteria

- 50% reduction in HRBP/HRM HC and budget
- Maintain HR operating model but with some flexibility
- Fewer global and regional COE resources, HRO&S is E2E
- Focus only on critical priorities for next 2 years
- HR/EE ratios improve with business restructuring

### Principles

- Align HR structure to new business structure
- Ensure all HR roles have personal linkage to the business
- Select very agile talent possessing HR depth and breadth
- Enable strong HR alignment across the different HR pillars
- Leverage core HR strengths across the NA HR team

JOINT APPX 0558

# Proposed new organizational structure (HC reduced from 60 to 30)



- **Lead HRM function for NA region and member of HR GLT.**
- **HRBP to EMT (B. O'Grady) and member of NA Commercial LT supporting business strategy and intersection between L1 & L2.**

SVP HR North America
NA Commercial HRBP
Dan Lawlor (1)

HR Specialist (1)

HRD Lead
Global Operations
(12)

HRD Lead
Global R&D,
Marketing &
Portfolio (5)

HRD Lead
Global Support
Functions (4)

HRD Lead
NA Commercial
(7)

- **Labor Economics, Budget, and varied multi HR-Specialist department support.**

- **Sr. Director level based on size and complexity of business/function supported.**
- **Select ion based on business knowledge, agility, and HR SME in one or more of the following: TR, TA, L&D, I&D, EE Relations/Policy, Labor Economics, HR Systems/Data, PMO.**
- **Hands-on leaders with team size proportionate to forecasted 2018 YE overall unit/function employee HC and complexity.**
- **Scope includes  U.S. and Canada.**
- **Projected NA HC estimated to drop from current 9,700 to 6,000.  HR ratio = 6,000/30 equals 200/1**
  - TGO = 3,200, R&D/Portfolio = 800, GSF = 600, NA Commercial = 1,400
  - Rough allocation of HRMs 50% TGO, 15% R&D/Portfolio, 10% GSF, 25% NA Commercial
  - = 12 TGO, =5 R&D/Portfolio, = 4 GSF, = 7 NA Commercial

Teva 000233

teva

# Offered and Accepted Candidates



**SVP HR North America**
NA Commercial HRBP
Dani Taylor

**HR Specialist**
Jana Haon

**HR M Lead**
Global Operations
Jim McMahon
(SME - L&D, I&D)
- L3 and below support
- Mixture of site based and global L3/L4 in NA
- HRBP's will cover all L2

**HRM Lead**
Global R&D, Marketing & Portfolio
Pam Caldas
(SME - TA)
- L3 and below support
- Many global L3/L4 in NA
- HRBP coverage of L2 adequate?

**HRM Lead**
Global Support Functions
Imtiya Hynd
(SME - Policy & EE Relations)
- L1 Legal/Compliance and L2 and below full support
- Many global L3/L4 in NA

**HRM Lead**
NA Commercial
Linda Misialek
(SME - TR, LE, Data/Systems)
- L2 and below full support

Teva 000234

# De-Selected L3

| Full Name | Layer | Manager's Full Name | Job Level | Position Title |
|---|---|---|---|---|
| Christopher Swartz | 3 | Daniel Lawlor | 16 | Sr Dir Human Resources |
| Earl Major | 3 | Raffi Hirsch | 16 | Sr Dir HRBP NA GSM |
| Kimberley West | 3 | Daniel Lawlor | 16 | Sr Dir HR Canada |
| Stacey Bunce | 3 | Daniel Lawlor | 16 | Sr Dir Human Resources |

teva

Teva 000235

5   | CONFIDENTIAL

# Risks & Mitigations

| Risks | Mitigations |
|---|---|
| The size of the business units/functions will fluctuate over the next two years and will be hard to predict. | Ongoing modification of HR structure will be needed.  Agile HR talent will make shifting and redeploying team members possible. |
| Loss of key HR talent and HIPOs due to site consolidation. | Budget for relocation and commuting assistance where applicable. Leverage flexible working arrangements  (i.e.  telecommuting , flex time, etc.). |
| Insufficient global and regional COE support. | Leverage materials created over the last few years via SMEs within the HR regional team (agile talent). |
| Business expectations for HR support cannot be met. | Educate HR and business (all organizational levels) early in 2018 regarding HR structure, model, and new scope of services given business restructuring; jointly establish/agree top HR priorities. |
| Canada fully integrated into NA HRM business structure, not country model | Ensure COE and HRO&S E2E support is planned for accordingly. Selected HRMs in Canada to be diversified and agile HR Generalists with SME in one or more HR disciplines |

**teva**

Teva 000236

JOINT APPX 0562



| | |
|---|---|
| **TEVA** | **Human Resources Management Guidelines** |

| | |
|---|---|
| Guideline Title: | Relocation Policy |
| Coverage: | All Employees |
| Location: | All Locations |
| Date: | January 1, 2013 |
| Supersedes: | October 1, 2011 |

## POLICY

The Company provides financial assistance to full-time exempt employees and Manager level and above new hires who incur necessary and reasonable expenses as the result of being relocated at the request of the company. To be eligible under this policy, the distance from the employee's current residence to the new Teva work location must be at least fifty miles greater than the distance to the former work location. Allowance and/or reimbursement in accordance with this policy may be made based on the recommendation of the site or unit's Head of Human Resources, and the designated HR Business Partner.

Group transfers/relocations that result from an organizational restructure or facility move will have special provisions established for each specific group relocation.

Moving at company expense applies to a household unit. If more than one Teva employee residing in the same household moves to a single residence, any dual request will be treated as a request for a single household move.

It is the responsibility of the local Human Resources department to be involved in each relocation situation prior to any move to ensure proper handling in accordance with Company policy.

> **Teva has contracted with a professional relocation organization to administer your relocation benefits. This organization will issue your reimbursements and payments, and coordinate the services Teva has authorized. A relocation counselor will contact you to review all aspects of your benefits and help to get your relocation started in a positive direction. You are required to speak with your relocation counselor prior to making any plans or talking to real estate agents, either in the old or new location.**

This policy applies to only company-initiated transfers of employees or new hires, to new locations for assignments of continuing duration.

**Tier 1 Benefits**
Exempt employees being transferred or new hires below Manager level, (up to salary grade 14) may receive a lump sum of $15,000 to help offset relocation expenses. This payment will be grossed up to cover the estimated tax liability for the employee.

Field-based employees, regardless of grade, who transfer to Teva home office facilities will be eligible for the full relocation policy applicable to their home ownership or renter status, as well as a buyout of their fleet car and protection of their field bonus compensation for a period of time following the Field Transition Incentive Plan. Field-based employees are included in Tier 2.

Transferred employees are eligible to receive relocation benefits one time during a 36 month period. Employees may be eligible for a second relocation in the event the employee accepts a Company-initiated transfer during the initial 36 month period.

In order to qualify for coverage the relocation must meet the requirements of the current Internal Revenue

| | | |
|---|---|---|
| Approved By: | *Laura K. Oden* | Page: 1 |



| | **Human Resources Management Guidelines** |
|---|---|

**Guideline Title:** Relocation Policy
**Coverage:** All Employees
**Location:** All Locations
**Date:** January 1, 2013
**Supersedes:** October 1, 2011

Code with regard to qualified moving expenses. Normally the cost center to which the individual is being transferred will bear the cost of the relocation. It is the responsibility of that cost center manager to ensure that the transferring individual understands and complies with the provisions of this policy. All expenses submitted for reimbursement are subject to established review and approval procedures.

In consideration of Teva's agreement to pay these moving and relocation expenses or a lump sum payment, the employee agrees to refund to Teva a pro-rated amount paid by Teva in moving and relocation expenses or a lump sum in the event the employee voluntarily leaves the employ of Teva before completing twelve (12) months of employment after this relocation. The Repayment Agreement must be signed and returned to the relocation coordinator prior to implementing any relocation services.

**Tier 2 Benefits**
Employees or new hires at the Manager level as well as field-based employees are eligible for Tier 2 benefits. Home sale and purchase benefits apply to relocatees who are homeowners at the time that relocation is initiated. Renters at the time of initiation are eligible for "Renter" level benefits.

## TRAVEL, HOME SEARCH AND SALE OF HOME

*Home Search*: Transferees who visit to search for a new home before transferring are eligible for the following reimbursements:

- Two home search trips not to exceed seven days/six nights total
- Trip includes transferee and one other adult household member and dependent children
- Round trip airfare – coach class
- Hotel cost not to exceed $150 per night
- Meals allowance of $40 per person per day (receipts are not required)
- Rental car, up to full size OR mileage at current IRS rate
- Tolls (receipts are not required)
- Fuel for rental car
- Reasonable dependent care expenses up to 7 days paid to eligible caregivers for the care of dependent children under age 13 and the employee's spouse or domestic partner*, parent or child(ren) of any age who are physically or mentally unable to care for themselves AND who qualify as a dependent on the employee's federal tax return.
- Except where indicated, receipts are required on all above expenses, regardless of amount. (*certain criteria must be met)

*Homeowners:*

Transferred employees and new hires who own a home in the old location are eligible to be reimbursed for certain expenses related to both the sale of the old home and the purchase of a new home. Normally, to be eligible for reimbursement, the old home is to be sold or contracted for sale no later than twelve months from the date of transfer or date of employment. This period may be extended with prior written approval of the designated Human Resources Business Partner. Transferred employees and new hires who rent rather than own their primary residence in the former location are not eligible for reimbursements related to the sale of a secondary home or the purchase of a home in the new location.

**Approved By:** *Laura L. Odom*

**Page: 2**

TEVA 000058

JOINT APPX 0564



| | **Human Resources Management Guidelines** |

**Guideline Title:** Relocation Policy
**Coverage:** All Employees
**Location:** All Locations
**Date:** January 1, 2013
**Supersedes:** October 1, 2011

Teva provides a qualified Home Sale Program through its designated relocation partner to assist you with closing the sale on your former residence. Utilizing this Program (called a Buyer Value Option) and working the transaction with your relocation counselor's assistance could minimize the income tax liability that you would otherwise incur when reimbursed directly for home selling costs. Your counselor will help you manage the home selling process more effectively and serve as your advocate throughout.

Reimbursement of the home sale expenses paid directly to the employee will be reported as taxable income to the transferee, subject to appropriate withholding requirements and will not be tax assisted by Teva unless the home was ineligible for the qualified Home Sale Program.

*Marketing Your Home:*

Teva will provide you with professional assistance on how to market your home to ensure optimum success. **You are not to contact a Realtor prior to talking with your Company-assigned relocation counselor** who will recommend a broker experienced in working on corporate relocation transactions and the specific requirements of these transactions. They recommend only those brokers who have a proven track record of market knowledge and sales success. Your relocation counselor will recommend brokers who are familiar with the nuances of a corporate relocation transaction and who have been trained in the Company's service delivery expectations.

If you do not list with a company-approved real estate broker, your relocation benefits may be reduced to cover the additional cost to Teva.

Teva's designated relocation partner requires its brokers to meet the following standards:
- ✓ Brokerage must have a Relocation Department or proven relocation-related experience.
- ✓ Real Estate firm must have no interest (actual or contemplated) in the Company, departure property, or home to be purchased, including any business or family relationship with the owners of the properties.
- ✓ Broker must have a proven track record in the selling community. Teva's relocation partner tracks list price to sales price ratio, number of current listings and number of recent sales.

Your counselor will contact two qualified brokers in your area and ask them to complete a Broker's Market Analysis (BMA) on your home, which will include suggested marketing tips, competing listing information and recent sales in the neighborhood. Based on the data they gather and their knowledge of the marketplace, they will provide a most probable sales price range. Your counselor will review and analyze the market data contained in the BMA's to help you formulate a competitive list price and marketing strategy to achieve the highest possible sales price within a reasonable timeframe. If the recommended list price indicated by the BMA's are not within 5% of each other, a third one will be ordered and the two closest will be used to formulate listing and marketing strategies. You and your relocation counselor will work with the agent you select to list and market your home and identify potential buyers. You will receive continuous feedback and updates on marketing activity throughout the process. To assist with a successful sale, Teva requires that you:
- Use an agent or broker who has been qualified by the Company's designated relocation counselor. If you have a preferred agent, please submit the name of that agent for qualification and consideration, realizing that you cannot list the house with a relative or friend as this may cause a conflict of interest.
- List the home for sale at a price that does not exceed 105% of the most probable sales price

Approved By: *Laura L. O线*                                      Page: 3

TEVA 000059

JOINT APPX 0565



| **TEVA** | **Human Resources Management Guidelines** |

| | |
|---|---|
| Guideline Title: | Relocation Policy |
| Coverage: | All Employees |
| Location: | All Locations |
| Date: | January 1, 2013 |
| Supersedes: | October 1, 2011 |

based on the average of the 2 Broker Market Analyses (BMA)
- Allow reasonable showings and allow open houses as suggested and maintain the home in marketing condition

## DISCLOSURE

Real estate transactions are governed by laws and regulations designed to protect the interests of both sellers and buyers. Every home seller has certain duties and obligations to a buyer, including full disclosure of all pertinent information about the condition of the home and its surroundings. In this regard, you can protect both yourself and Teva from potential litigation by the timely and thorough completion of all forms and documents pertaining to the condition of the property. It is not the intent of Teva to relieve you of your duties and obligations including completing all necessary repairs and full disclosure. You will be asked to complete property disclosure forms for the real estate agent and for your designated relocation counselor. You must complete and return these forms at the beginning of the listing period.

If you successfully negotiate sale terms with a bona fide buyer through the Home Marketing Assistance Program, you will receive a special incentive payment of 2%, not to exceed $6,500, of the selling price of the home. To qualify for the incentive payment you must:
- List the home for up to 60 days or until an approved outside offer is obtained;
- Obtain a buyer's purchase offer of at least 95% of the average of the 2 Broker Market Analyses (BMA);
- Inform the home marketing company of all bona fide purchase offers;
- Complete the sale through the home sale provider, which is then, in turn, finalized with the new buyer.

If the home does not receive a bona fide purchase offer at the end of the initial 60-day marketing period, the home sale incentive may convert to either an Agent and/or Buyer Incentive. The Human Resources Business Partner will review the marketing feedback and decide on the appropriate marketing tactic with these dollars. The Home Sale Incentive is not eligible for tax assistance.

*When you Find a Buyer – The Buyer Value Option Process:*

If you are successful in selling your home, Teva's relocation partner will present an offer equal to the offer presented by the buyer.

**REMEMBER: DO NOT SIGN ANY CONTRACT OR ACCEPT ANY DEPOSIT MONIES BEFORE CONTACTING YOUR RELOCATION COUNSELOR TO DISCUSS ALL OFFERS.**

Your relocation counselor will determine whether the offer is bona fide and will also determine whether the buyer is likely to qualify for any financing terms included in the contract.

If it is determined that the offer is bona fide and that all contingencies can be met, the contract will be sent to and signed by Teva's relocation partner as the Seller.

| | | |
|---|---|---|
| Approved By: *Laura K. Oden* | | Page: 4 |

TEVA 000060

JOINT APPX 0566



| | Human Resources Management Guidelines |
|---|---|

**Guideline Title:** Relocation Policy
**Coverage:** All Employees
**Location:** All Locations
**Date:** January 1, 2013
**Supersedes:** October 1, 2011

### Acquisition of the Home

Once Teva's relocation partner has executed its contract with you, they will assume responsibility for the sale of the home. You will remain responsible for maintaining the home if your vacate date is after the date it is purchased from you. Repairs must be completed before the contract can be fully executed.

You will be relieved of the necessity of attending the closing, as all documents will be pre-signed. A representative of Teva's relocation partner will attend the closing and finalize the sale documents with the buyers.
Usual and customary one-time closing costs for the sale of the home to the buyer will be paid by Teva's relocation partner and subsequently billed to Teva. These costs are not taxable or reportable for you.

Upon receipt of the documents, Teva's relocation partner will compute your net equity based on the date it executed its contract with you or the actual vacate date, whichever is later. The equity will be disbursed and an equity statement and copy of the contract will be mailed to you. You will not need reimbursement, as all eligible costs are billed to Teva's relocation partner.

Eligible expenses for reimbursement related to the sale of the old home are as follows:
- Commission paid to licensed real estate broker, not to exceed 6% of the sale price
- Normal, customary or reasonable attorney's fees directly related to the sale
- Federal documentary tax stamps
- Recording of discharge of mortgage
- Penalty for prepayment of mortgage
- Transfer tax
- Abstract and title fees
- Other settlement expenses must have prior approval of the designated Human Resources Business Partner

*Loss On Sale:*

If the sales price of the former residence is less than the original purchase price as listed on the original HUD-1 document, you may be entitled to reimbursement to offset some of the loss you may face as a result of selling the home. You must fully participate in the Home Marketing Assistance Program to be eligible for the loss on sale assistance.

Reimbursement will be made for 85% of the difference between your original purchase price and the sale price up to a maximum payment of $35,000. Only the straight loss will be considered; improvements/additions to the home will not be taken into consideration. You will need to submit a copy of the original HUD-1 Settlement Statement to document the loss on sale. Reimbursement of loss on sale will be grossed up for tax purposes.

The term "sale of the old home" should be interpreted to mean the employee's principal place of residence immediately prior to transfer or date of employment. This provision does not apply to secondary residences such as summer cottages, or to real estate owned for investment or rental purposes including a former principal residence if it was taken off the market, or never put on the market,

| Approved By: *Laura K. Odom* | Page: 5 |
|---|---|

TEVA 000061

JOINT APPX 0567



|  | Human Resources Management Guidelines |
|---|---|

Guideline Title:    Relocation Policy
Coverage:    All Employees
Location:    All Locations
Date:    January 1, 2013
Supersedes:    October 1, 2011

and rented. A mobile home would only be considered to be eligible for any expense reimbursement if it were the employee's principal residence.

NOTE: Often to induce a sale, a seller may offer to pay some of the buyer's closing costs. This is typically considered to be a reduction of the selling price and as such not typically reimbursable. However, you should discuss any selling strategies with your relocation counselor to help affect a sale.

*Closing Cost Reimbursement for New Home:*

If a transferred employee or new hire owned a home at the old location and purchases or contracts to purchase a home at the new location within twelve (12) months following the transfer date, customary home purchase costs will be reimbursed. Any extensions must be approved in advance, in writing by the designated Human Resources Business Partner.

- Attorney's fees
- Document /closing fees
- Surveys
- Mortgage Originator's fees (points) discount points and VA seller points up to:
    o 0% if the 30 year fixed rate is lower than 5%
    o 1% if the 30 year fixed rate is between 5% and 7%
    o 2% if the 30 year fixed rate is above 7%
- Recording fees
- Mandated appraisal and inspection fees
- Bank or escrow service fees (not actual escrow funds)
- Other closing costs which are normally charged to the buyer such as:
    o Property survey expense (if required by lender)
    o Tax on transfer or real estate
    o Home inspection fee
    o Title report and title insurance

Construction loan procurement expenses and interest, as well as mortgage loan credit insurance are not reimbursable.

*Lease Cancellation Assistance:*

Should a transferred employee or new hire incur a cost in the cancellation of a residential lease, the employee will be reimbursed for the full cancellation cost (not to exceed two (2) months' rent). The individual must present the lessee cancellation arrangement in writing, signed by the landlord, in order to obtain reimbursement.

*Apartment Finding Fee:*

Broker services and payment of a corresponding fee may be required to obtain an apartment in some locations. If this is the case, the company will reimburse any necessary and reasonable apartment finding fee up to a maximum amount of one month's rent or the standard fee in the area to which the transferred employee or new hire is moving, whichever is less.

Approved By: *Laura L. Odin*    Page: 6

TEVA 000062



| | |
|---|---|
| **TEVA** | **Human Resources Management Guidelines** |

**Guideline Title:** Relocation Policy
**Coverage:** All Employees
**Location:** All Locations
**Date:** January 1, 2013
**Supersedes:** October 1, 2011

*Temporary Living:*

If the transferred employee or new hire must begin work at the new location prior to finalizing permanent housing arrangements, the employee will be reimbursed for the following expenses:

- Lodging costs up to 30 days (renters) or 60 days (homeowners), not to exceed $150 per night before tax.
- Meal allowance of $40 per day per family member residing in temporary housing. Receipts are not required.
- Reasonable phone calls home

Receipts are required on all above expenses, regardless of amount unless otherwise indicated above.. The transferee's family should not proceed to the new location until permanent housing plans have been finalized.

*Return Trips:*

During the temporary living period, the company will also reimburse the following return trips:
- One return trip per month (most direct route)
- Round trip airfare – coach class or
- Mileage at current IRS rate

Receipts are required on all above expenses, regardless of amount

*Household Goods:*

Transportation (including packing, loading, shipment and unloading) of the household and personal goods of the transferred employee or new hire and immediate family from the old to the new location will be handled by Teva's relocation partner. While this is intended to include all reasonable personal effects it is not to include unusually expensive items that are of a strictly personal or other business nature. Examples of excluded items are large boats, antique (or large number of) automobiles, livestock, farm or construction equipment, lawn ornaments and bulky items of nominal value. Due to state transportation restrictions, firewood cannot be moved. The employee is responsible for the removal of any item that is secured to walls or ceilings, including but not limited to artwork, mirrors, bookshelves, light fixtures and televisions. Any items which may be questionable should have prior approval. Insurance on household effects will be obtained from the carrier used.

- Teva will ship up to two automobiles that the employee owns or leases, provided the distance exceeds 400 miles and the book value of the vehicle exceeds shipping costs. Mileage reimbursement at the current IRS rate will apply to automobiles driven to the new location by the employee or members of the immediate family.
- While personal vehicles are in transport to the new location, relocatees will be eligible for reimbursement of a mid-size rental car until the personal vehicle has been delivered.
- Teva will provide storage of household goods for a period not to exceed 30 days for renters and 60 days for homeowners from the date of arrival in the new location. Only those items on the original bill

Approved By: *Laura K Olin*     Page: 7



| | **Human Resources Management Guidelines** |
|---|---|

| Guideline Title: | Relocation Policy |
|---|---|
| Coverage: | All Employees |
| Location: | All Locations |
| Date: | January 1, 2013 |
| Supersedes: | October 1, 2011 |

of lading are eligible for storage at company expense. Goods will be delivered from storage to the new home. Access to stored items will be at your personal expense. Household goods will not be delivered or picked up from self-storage facilities.

*Final Move:*

Reimbursement for the family's hotel/motel, meals and incidental living expenses will be reimbursed for a maximum of two (2) weeks in the new location while awaiting the arrival of household goods or availability of permanent housing. Except where indicated, receipts are required on the following expenses, regardless of amount.

The following expenses will be reimbursed to transport the transferee and family to the new location:

- Travel by most direct route
- Airfare – coach class or mileage at current IRS rate
- Hotel cost (if necessary) *not to exceed $150 per night*
- Meals allowance of $40 per day per person. Receipts are not required.

*Miscellaneous Expenses:*

Teva realizes there are some costs associated with moving that do not fall into the other reimbursable areas. To help cover these costs, Teva authorizes a miscellaneous expense reimbursement of $5,000. The Company intends for relocatees to spend these dollars in connection with their relocation either in the former or new location. Miscellaneous relocation expenses must not be submitted for expense reimbursement through the Company or Teva's relocation partner.

*Taxable Income Reimbursement:*

Some of the reimbursements and allowances provided in the relocation policy will be taxable income to you and must be included in your W-2 summary of earnings. Because the taxable benefits are incurred as a consequence of your company move, your non-deductible relocation expenses will be grossed-up and the appropriate taxes will be paid directly to the appropriate government agencies ("grossed up"). This allowance appears as additional income and withholding on your W-2. (This is not income for any benefit plan calculations or pension plan benefits.)

It is Teva's intent to keep you reasonably whole with respect to tax liabilities incurred on the reimbursements made during your relocation. The tax gross-up is intended to be an approximation of your tax liability and not an exact calculation. You will be asked to provide tax information to Teva's designated relocation partner so that the gross-up amount can be determined. Since some allowances, such as mortgage discount points, moving costs or home search and certain interim living expenses (up to designated limits) are deductible on personal income tax returns; no tax gross-up is required. For tax purposes, all payments/reimbursements will be treated as if paid by the receiving location. State tax, if any, will be calculated on the receiving state. If your spouse or partner is also employed, salary for tax protection will be determined by your income alone. Tax gross-up benefits are limited to income derived directly from employment at Teva. Earnings outside of Teva will not be considered when calculating tax gross-ups.

| Approved By: | *Laura L. Olin* | Page:  8 |
|---|---|---|

TEVA 000064

JOINT APPX 0570

 | **Human Resources Management Guidelines**

| | |
|---|---|
| **Guideline Title:** | Relocation Policy |
| **Coverage:** | All Employees |
| **Location:** | All Locations |
| **Date:** | January 1, 2013 |
| **Supersedes:** | October 1, 2011 |

The Company will advance the employee the reimbursable moving expenses as a loan until a twelve (12) month employment milestone has been reached.. In the event the employee voluntarily leaves the employ of Teva before completing twelve (12) months of employment, the employee agrees to refund to Teva a pro-rated amount paid by Teva in moving and relocation expenses. Current tax law allows a moving expense deduction on your personal tax return either in the year of the move or the year the reimbursement is received (loan forgiven).

*Method of Reimbursement:*

Teva's designated relocation partner will assist the new hire or transferee throughout the entire relocation process, and will supply all necessary instructions and forms to be completed by the employee. Business expenses should be submitted through the expenses reporting system; relocation expenses should be submitted through Teva's relocation partner.

In addition, meals, lodging or airfare connected to your relocation, or other relocation expense must not be included in a business expense report. Relocation and business expense reports will be audited to ensure expenses are accurately reported for tax and compliance purposes.

If the local Human Resource Department will be coordinating the relocation, all relocation related expenses are to be submitted on a company Moving Expense Statement account form and designated as relocation expenses. Once approved by the appropriate manager, relocation expenses forms are to be forwarded to the local Human Resources office for review prior to submission for reimbursement to the Accounting Department. Receipts for all expenditures must be attached. No regular business expenses are to be included on a relocation expense report form.

**RELOCATION COMPLETION:** *Relocation must be fully completed, and all expenses submitted, within one year of transfer/hire to qualify for benefits.*

| | | |
|---|---|---|
| Approved By: *Laura K. Cohen* | | **Page:** 9 |



| | |
|---|---|
| **TEVA** | **Human Resources Management Guidelines** |

Guideline Title:     Relocation Policy
Coverage:            All Employees
Location:            All Locations
Date:                January 1, 2013
Supersedes:          October 1, 2011

## Relocation Repayment Agreement

In consideration of the relocation payments provided under the Teva Relocation Policy paid to me in connection with my relocation, I agree to repay Teva for all payments made to me or on my behalf if I voluntarily terminate my employment within twelve months from completion of this relocation pro-rated for the number of months worked.  Voluntary termination for the purpose of this agreement means any termination that is initiated by me and not by the Company.  Also, I understand that I will be asked to repay all payments if I do not complete my eligible move.  I understand that all scheduled payments will cease upon termination from the Company.  I agree to repay to the Company the relocation dollars, including tax gross up, paid to me or on my behalf within 30 days of written request from the Company.

I understand that I will not receive any payments until I sign and return the Relocation Repayment Agreement to Human Resources.

I further understand that this Relocation Repayment Agreement does not create a contract for employment.  I further understand that this Agreement does not imply that my employment will last for any period of time or otherwise create any obligation on the part of the Company, and that either the Company or I may terminate the employment relationship at any time.

_____
Employee's Signature

Randolph W Kevch
_____
Print Employee's Name

12 / 23 / 2013
_____
Date

| | | |
|---|---|---|
| Approved By: _Laura K Olin_ | | Page:   10 |

TEVA 000066

JOINT APPX 0572



| | |
|---|---|
| | **HUMAN RESOURCES MANAGEMENT GUIDELINE** |

Guideline Title:      Harassment, Discrimination and Retaliation Prevention and Reporting
                      Policy
Coverage:             All US Employees
Location:             All US Locations
Date:                 March 24, 2014
Reviewed:             March 24, 2014
Supersedes:           January 1, 2012

## Our Commitment

Teva ("the Company") is committed to establishing a productive work environment through a policy for employees, applicants, (and third parties, vendors, visitors, customers, contractors, etc.) that

- ensures a workplace free of harassment, discrimination and retaliation based on protected characteristics including: age, race, creed, color, religion, sex, disability, pregnancy, medical condition, genetic information, marital status, sexual orientation, gender identity or expression, ancestry, national or ethnic origin, citizenship status, military status or status as a disabled veteran or veteran of the Vietnam era, or any legally recognized status entitled to protection under applicable federal, state or local laws;
- provides for the prompt and effective investigation of harassment, discrimination and retaliation reports; and
- provides a process for eliminating any such conduct.

A violation of this policy does not necessarily constitute a violation of the law.

## Prohibited Conduct

Harassment, discrimination and retaliation, either intentional or unintentional, of, or against any employee or third party has no place in the work environment and will not be tolerated. Accordingly, Teva neither authorizes nor tolerates any form of harassment, discrimination or retaliation by employees (or third parties, vendors, customers, contractors, etc.). Prohibited conduct includes but is not limited to verbal, physical, visual, and/or derogatory conduct based on protected characteristics including: age, race, creed, color, religion, sex, disability, pregnancy, medical condition, genetic information, marital status, sexual orientation, gender identity or expression, ancestry, national or ethnic origin, citizenship status, military status or status as a disabled veteran or protected veteran, or any legally recognized status entitled to protection under applicable federal, state or local laws.

## Definition and Prohibition of Sexual Harassment

Sexual harassment deserves special mention. It is a coercive form of harassment where a supervisor or any other individual with authority over an employee conditions the grant or denial of some tangible employment benefit (e.g. such as hiring, promotion, firing, discipline, performance evaluation, pay increase or decrease, or transfer) upon a subordinate's acceptance of unwelcome attention, such as sexual favors, and is prohibited by Teva even if it leads to no tangible or economic job consequences. In addition, any pervasive conduct where the purpose or effect is to create a hostile, abusive or intimidating environment whether committed by supervisors, managers, non-supervisors, employees, or non-employees, is prohibited by Teva. This definition encompasses a broad range of physical or verbal conduct that may include the following, although, this is not an all inclusive list:

Verbal Conduct such as epithets, derogatory jokes or comments, slurs or unwanted sexual advances, invitations or comments;

Visual Conduct such as derogatory and/or sexually oriented posters, photography, cartoons, calendars, screen savers, drawings or gestures;

Teva 000189

JOINT APPX 0573

*Teva Pharmaceuticals - Harassment, Discrimination and Retaliation Prevention and Reporting Policy*

<u>Physical Conduct</u> such as assault, unwanted touching, blocking normal movement or interfering with work because of any protected status;

<u>Threats and Demands</u> to submit to sexual requests as a condition of continued employment, or to avoid some other loss, and offers of employment benefits in return for sexual conducts; and

<u>Retaliation</u> such as threats, firing, demotion, transfer, etc. for having reported or threatened to report harassment.

The Company prohibits sexual harassment, which includes but is not limited to: unwelcome sexual flirtations; advances or propositions; requests for sexual favors; verbal abuse of a sexual nature; display of derogatory or sexually suggestive posters, cartoons, drawings or objects; sexual comments about an individual's body; other verbal or physical conduct of a sexual nature by supervisors, fellow employees or others in the workplace, such as when:
- the conduct is made a condition of employment;
- the conduct is unwelcome;
- the conduct is used as the basis for an employment decision; or
- the harassment significantly interferes with a employee's performance by creating an intimidating, hostile or offensive work environment.

### Definition of Employment Discrimination
Employment Discrimination is the unlawful treatment of a person, whether an employee, applicant, or other person, based on a characteristic protected by federal, state, and/or local law, including without limitation age, race, creed, color, religion, sex, disability, pregnancy, medical condition, genetic information, marital status, sexual orientation, gender identity or expression, ancestry, national or ethnic origin, citizenship status, military status or status as a disabled veteran or protected veteran. The term, "unlawful treatment," is broadly defined for the purpose of this policy to include among other things refusal to hire, demotion, employment termination, layoff, suspension, pay reduction, hours reduction, transfer, and unequal discipline based in whole or part on one or more of the protected characteristics set forth above.

### Reporting Procedures
The Company has adopted a no tolerance policy against harassment, discrimination, and retaliation including sexual harassment. Employees must immediately report any conduct inconsistent with this policy to the following designated individuals: immediate supervisor, the next higher level of management, the department head, any supervisor within the organization, or the Human Resources Department. If the person that you believe to be engaging in the conduct inconsistent with this policy is a member of the designated list, you may address your concern to any of the other designated individuals.

All complaints of harassment, discrimination, and retaliation are to be investigated promptly and in as impartial and confidential manner as possible. Employees are required to cooperate in any investigation. A timely resolution of each complaint should be reached and communicated to the parties involved.

### Management - includes, but is not limited to: Immediate Supervisor, Manager, Director, & Vice President

Management is responsible for taking prompt and effective action under this policy to eliminate known or observed situations of conduct inconsistent with this policy and to advise employees to report violations of the policy. When a violation of the policy is brought to the attention of anyone on the designated reporting list, he/she shall promptly bring the complaint to the attention of the Human Resources Department.

Teva 000190

JOINT APPX 0574

*Teva Pharmaceuticals - Harassment, Discrimination and Retaliation Prevention and Reporting Policy*

Current telephone extensions and email addresses for these individuals can be obtained from the receptionist or Human Resources. Employees may also utilize the 24 Hour Teva Integrity Hotline at: 877-277-3220.

## Confidentiality

The Company will, to the maximum extent feasible, maintain the confidentiality of any reported complaint.

## Discipline and Consequences

If the Company determines that any conduct inconsistent with this policy has occurred, prompt effective remedial action will be taken. Anyone, regardless of position or title, whom the Company determines has engaged in conduct that is inconsistent with this policy, will be subject to discipline, up to and including immediate termination of employment.

Violation of this policy, if substantiated, may result in termination of employment on the first offense.

## Retaliation

Retaliation is strictly prohibited. Retaliation can include but is not limited to, actions such as threats, firing, demotion, and other detrimental changes to the terms and conditions of employment, for having reported or threatened to report harassment. The Company absolutely prohibits any retaliation or reprisal against you for making a complaint or for participating in an investigation.

Protection from retaliation: No employee will be subject to, and the Company prohibits, any form of discipline or retaliation by management, employees or co-workers for reporting any conduct which an employee reasonably believes is inconsistent with this policy, pursuing any such claim, or cooperating in any way in the investigation of such claims.

Employees should immediately report any conduct inconsistent with this policy to the following designated individuals: their immediate supervisor, the next higher level of management, the department head, any supervisor within the organization, or the Human Resources Department. If the person that you believe to be engaging in the conduct inconsistent with this policy is a member of the designated list, you may go to any other individual designated above.

**Management - includes, but is not limited to: Immediate Supervisor, Manager, Director, & Vice President**

In addition, management is responsible for taking prompt and effective action under this policy to eliminate known or observed situations of conduct inconsistent with this policy and to advise employees to report violations of the policy. When a violation of the policy is brought to the attention of anyone on the designated reporting list, he/she shall promptly bring the complaint to the attention of the Human Resources Department.

## Training

To ensure compliance with the Company's anti-harassment policies, the Company will conduct periodic mandatory training for all employees, including supervisors and managers. A supervisor and /or Human Resources will notify employees when they are scheduled for anti-harassment training.

Teva 000191

JOINT APPX 0575

EEOC Form 161-B (11/16)

## U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

### NOTICE OF RIGHT TO SUE (ISSUED ON REQUEST)

To:  **Randolph Keuch**
**111 Rose Lane**
**Chalfont, PA 18914**

From:  **Philadelphia District Office**
**801 Market Street**
**Suite 1300**
**Philadelphia, PA 19107**

☐ On behalf of person(s) aggrieved whose identity is CONFIDENTIAL (29 CFR §1601.7(a))

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| **530-2018-04759** | **Legal Unit,** **Legal Technician** | **(267) 589-9700** |

(See also the additional information enclosed with this form.)

**NOTICE TO THE PERSON AGGRIEVED:**

**Title VII of the Civil Rights Act of 1964, the Americans with Disabilities Act (ADA), or the Genetic Information Nondiscrimination Act (GINA):** This is your Notice of Right to Sue, issued under Title VII, the ADA or GINA based on the above-numbered charge. It has been issued at your request. Your lawsuit under Title VII, the ADA or GINA **must be filed in a federal or state court WITHIN 90 DAYS of your receipt of this notice**; or your right to sue based on this charge will be lost. (The time limit for filing suit based on a claim under state law may be different.)

☐ More than 180 days have passed since the filing of this charge.

☐ Less than 180 days have passed since the filing of this charge, but I have determined that it is unlikely that the EEOC will be able to complete its administrative processing within 180 days from the filing of this charge.

☐ The EEOC is terminating its processing of this charge.

☐ The EEOC will continue to process this charge.

**Age Discrimination in Employment Act (ADEA):** You may sue under the ADEA at any time from 60 days after the charge was filed until 90 days after you receive notice that we have completed action on the charge. In this regard, **the paragraph marked below applies to your case:**

☒ The EEOC is closing your case. Therefore, your lawsuit under the ADEA **must be filed in federal or state court WITHIN 90 DAYS** of your receipt of this Notice. Otherwise, your right to sue based on the above-numbered charge will be lost.

☐ The EEOC is continuing its handling of your ADEA case. However, if 60 days have passed since the filing of the charge, you may file suit in federal or state court under the ADEA at this time.

**Equal Pay Act (EPA):** You already have the right to sue under the EPA (filing an EEOC charge is not required.) EPA suits must be brought in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that **backpay due for any violations that occurred more than 2 years (3 years)** before you file suit may not be collectible.

If you file suit, based on this charge, please send a copy of your court complaint to this office.

On behalf of the Commission

*Jamie R Williamson*                    10/31/2019

**Jamie R. Williamson,**        (Date Mailed)
**District Director**

Enclosures(s)

cc:  **Larry Rappoport**
**STEVENS & LEE**
**1818 Market Street**
**29th Floor**
**Philadelphia, PA 19103**

**Alan B. Epstein**
**SPECTOR GADON & ROSEN, P.C.**
**1635 Market Street, Seventh floor**
**Seven Penn Center**
**Philadelphia, PA 19103**

Enclosure with EEOC
Form 161-B (11/16)

## INFORMATION RELATED TO FILING SUIT
## UNDER THE LAWS ENFORCED BY THE EEOC

*(This information relates to filing suit in Federal or State court under Federal law.*
*If you also plan to sue claiming violations of State law, please be aware that time limits and other*
*provisions of State law may be shorter or more limited than those described below.)*

**PRIVATE SUIT RIGHTS   --   Title VII of the Civil Rights Act, the Americans with Disabilities Act (ADA), the Genetic Information Nondiscrimination Act (GINA), or the Age Discrimination in Employment Act (ADEA):**

In order to pursue this matter further, you must file a lawsuit against the respondent(s) named in the charge **within 90 days** of the date you *receive* this Notice. Therefore, you should **keep a record of this date**. Once this 90-day period is over, your right to sue based on the charge referred to in this Notice will be lost. If you intend to consult an attorney, you should do so promptly. Give your attorney a copy of this Notice, and its envelope, and tell him or her the date you received it. Furthermore, in order to avoid any question that you did not act in a timely manner, it is prudent that your suit be filed **within 90 days of the date** this Notice was *mailed* to you (as indicated where the Notice is signed) or the date of the postmark, if later.

Your lawsuit may be filed in U.S. District Court or a State court of competent jurisdiction. (Usually, the appropriate State court is the general civil trial court.) Whether you file in Federal or State court is a matter for you to decide after talking to your attorney. Filing this Notice is not enough. You must file a "complaint" that contains a short statement of the facts of your case which shows that you are entitled to relief. Courts often require that a copy of your charge must be attached to the complaint you file in court. If so, you should remove your birth date from the charge. Some courts will not accept your complaint where the charge includes a date of birth. Your suit may include any matter alleged in the charge or, to the extent permitted by court decisions, matters like or related to the matters alleged in the charge. Generally, suits are brought in the State where the alleged unlawful practice occurred, but in some cases can be brought where relevant employment records are kept, where the employment would have been, or where the respondent has its main office. If you have simple questions, you usually can get answers from the office of the clerk of the court where you are bringing suit, but do not expect that office to write your complaint or make legal strategy decisions for you.

**PRIVATE SUIT RIGHTS   --   Equal Pay Act (EPA):**

EPA suits must be filed in court within 2 years (3 years for willful violations) of the alleged EPA underpayment: back pay due for violations that occurred **more than 2 years (3 years)** before you file suit may not be collectible. For example, if you were underpaid under the EPA for work performed from 7/1/08 to 12/1/08, you should file suit **before 7/1/10** – *not* 12/1/10 -- in order to recover unpaid wages due for July 2008. This time limit for filing an EPA suit is separate from the 90-day filing period under Title VII, the ADA, GINA or the ADEA referred to above. Therefore, if you also plan to sue under Title VII, the ADA, GINA or the ADEA, in addition to suing on the EPA claim, suit must be filed within 90 days of this Notice **and** within the 2- or 3-year EPA back pay recovery period.

**ATTORNEY REPRESENTATION   --   Title VII, the ADA or GINA:**

If you cannot afford or have been unable to obtain a lawyer to represent you, the U.S. District Court having jurisdiction in your case may, in limited circumstances, assist you in obtaining a lawyer. Requests for such assistance must be made to the U.S. District Court in the form and manner it requires (you should be prepared to explain in detail your efforts to retain an attorney). Requests should be made well before the end of the 90-day period mentioned above, because such requests do <u>not</u> relieve you of the requirement to bring suit within 90 days.

**ATTORNEY REFERRAL AND EEOC ASSISTANCE   --   All Statutes:**

You may contact the EEOC representative shown on your Notice if you need help in finding a lawyer or if you have any questions about your legal rights, including advice on which U.S. District Court can hear your case. If you need to inspect or obtain a copy of information in EEOC's file on the charge, please request it promptly in writing and provide your charge number (as shown on your Notice). While EEOC destroys charge files after a certain time, all charge files are kept for at least 6 months after our last action on the case. Therefore, if you file suit and want to review the charge file, **please make your review request <u>within 6 months</u>** of this Notice. (Before filing suit, any request should be made within the next 90 days.)

*IF YOU FILE SUIT, PLEASE SEND A COPY OF YOUR COURT COMPLAINT TO THIS OFFICE.*

JOINT APPX 0577

KEUCH000813



**Air Products and Chemicals, Inc.**
7201 Hamilton Boulevard
Allentown, PA 18195-1501
Telephone (610) 481-4911

July 27, 2015

Randolph Keuch
111 Rose Lane
Chalfont, PA 18914

Dear Randy,

I am pleased to present our offer to you to join Air Products and Chemicals, Inc. as Global Head, Total Rewards, reporting to me. Upon joining Air Products, you will receive a Base Salary of $290,000 per year. Your Target Bonus opportunity under the Annual Incentive Plan will be 40 percent of your Base Salary, beginning fiscal year 2016 (October 1-September 30). Cash bonus awards are delivered after the end of the fiscal year, typically in December. You will also be eligible to receive stock awards under the Long-Term Incentive Plan (LTIP). The target value of your fiscal year 2016 annual LTIP award will be $160,000 and is typically delivered in December 2015.

We are offering a one-time hire on bonus of $55,000, which will be paid to you within the first three weeks of employment.

A payment will be made in the amount of $50,000 if your current employer (Teva Pharmaceuticals) requires reimbursement of the sign-on bonus paid to you at the commencement of your employment with Teva in 2014. Appropriate supporting documentation will be required in order to initiate this payment.

The following hire-on stock grants will be made to you upon joining Air Products, contingent upon your confirmation that your long-term incentive awards at your current employer are forfeited.

- $55,000 of performance shares granted on your first day of employment. Performance Shares are deferred stock awards that pay out upon achievement of pre-defined performance targets over a three year performance period. The payout factor will be based on Air Products Total Shareholder Return relative to our Company Peer Group for the fiscal year 2015-2017 performance period with the award being distributed after the end of the deferral period (1 December 2017).

- $25,000 of restricted stock units will be granted on your first day of employment and will cliff vest in four years from the grant date. Shares of Air Products common stock will be distributed to you, along with accrued dividends, when the grants vest.

- $20,000 of stock options will be granted on your first day of employment. Stock options vest in one-third increments at each of the first three anniversaries of the grant date and are, therefore, fully vested after three years. Once vested, they are exercisable up until the tenth anniversary from the date of grant.

KEUCH000132

A cash retention award of $90,000 will also be granted to you on your first day of employment and will vest one year from your start date, contingent on your continued employment with Air Products.

You will receive more information on the terms and conditions of these stock and cash retention awards in the award agreements.

Air Products offers a broad range of employee benefit plans that are a valuable part of your total compensation. Current information on our salaried benefits including the medical plan, is attached. Eligibility for most benefits begins after completing 30 days of employment.

Our salaried benefits program includes a Retirement Savings Plan. The company will make Company Core Contributions and Company Matching Contributions to your account as explained in the attached material. As an employee eligible for the Annual Incentive Plan, you are also eligible to participate in the Deferred Compensation Plan. The Deferred Compensation Plan allows you to continue to save on a pretax basis and to receive Company Matching Contributions when your contributions to the Retirement Savings Plan are restricted by tax law limits. In addition, Company Core Contributions on your annual bonus from the Annual Incentive Plan will be deposited into your account in the Deferred Compensation Plan. You also will have the option to defer any portion of your annual bonus to this Plan.

Air Products is committed to a safe and healthful workplace, therefore, we have policies requiring completion of an employment application, background check, reference checks and a drug test for all new employees. This offer of employment will remain contingent until there is satisfactory completion of these items. Please review the Drug Screen information and once you have selected your start date, contact us to receive a list of approved testing facilities near your residence. Your drug screen must be completed within thirty (30) days prior to your start date. We will contact you when we receive your result, which typically takes three to five business days.

Randy, we are impressed with your credentials and professional experience, and are excited about the contributions you will make and the impact you will have on our Company. If you have any other questions, please call me at (610) 481-8979.

Sincerely,



Jennifer Grant
Vice President and Chief Human Resources Officer


Accepted:



_____          _____
Randy Keuch                                        Date

KEUCH000133



August 6, 2015

VIA EMAIL
Randy Keuch

Re:   **Base Salary Increase and Retention Bonus**

Dear Randy:

As discussed today and earlier this week, on behalf of Teva Pharmaceuticals USA, Inc. ( "*Teva*"), I wish to assure you that you are a highly valued colleague and to encourage your continued employment with Teva.  We at Teva are looking forward to your continued contributions to Teva in the years to come.  In recognition of your past accomplishments and commitment to Teva, it is my pleasure to formally present to you the following retention offer.

If you accept this offer, effective as of August 1, 2015, your annual base salary will be increased from U.S. $257,000 to U.S. $280,000.  Please note that, while I am unfortunately unable to offer you an increase in your other compensation (including annual bonus and equity compensation) or a promotion to Vice President at this time, given the constraints of Teva's guidelines and your position's Global Grade.  However, in the next coming months, I will review and consider a potential promotion of your position to Vice President and Global Grade 18.

In recognition of your years of dedicated service and to encourage you to continue at Teva, I am pleased to inform you that Teva has determined to offer you a retention bonus, subject to the terms and conditions outlined below.  The amount of the potential retention bonus is U.S. $60,000 and will be earned, if at all, in two equal installments.  Provided that you remain continuously employed with Teva through August 6, 2016, and are not promoted to Vice President on or before such date, you will entitled to receive the first such installment, payable in a lump sum cash payment in an amount equal to U.S. $30,000 on the first regularly scheduled payroll date following such date.  Provided that you remain continuously employed with Teva through August 6, 2017, and are not promoted to Vice President on or before such date, you will entitled to receive the second such installment, payable in a lump sum cash payment in an amount equal to $30,000 on the first regularly scheduled payroll date following such date.  Any amount payable to you pursuant to this letter will be in addition to (and will not be in lieu of) any annual bonus or other incentive compensation amounts you may otherwise be entitled to receive from Teva and made less any applicable taxes and other legally permissible and regular payroll deductions.

Each retention bonus installment described herein is conditioned upon you keeping all terms and conditions of the retention bonus and this letter strictly confidential except as required to discuss with immediate family members and for the purpose of obtaining legal and financial advice (provided that, to the maximum extent permitted by applicable law, rule, code or regulation, they agree to maintain the strict confidentiality of the terms and conditions of this retention bonus).

Please note that this letter does not constitute a contract of employment for any specific period of time, and your employment will continue on an "at-will" basis. This means that either you or Teva will be entitled to terminate your employment at any time for any reason, with or without cause, subject to the terms of this letter. You should disregard any comments to the contrary as ineffective.

This letter may be executed in two or more counterparts, each of which will be deemed to be an original but all of which together will constitute one and the same instrument. The execution of this letter may be by actual signature or by signature delivered by facsimile or by e-mail as a portable document format (.pdf) file or image file attachment. This letter replaces all prior and contemporaneous communications, agreements and understandings, written or oral, with respect to the subject matter set forth herein.

Please review the contents of this letter carefully. If you agree to these terms, please sign the enclosed copy of this letter agreement and return it to me no later than August 7, 2015.

Sincerely,

**TEVA PHARMACEUTICALS USA**

By _____

Ron Yaniv
SVP, Global Compensation & Benefits

Acknowledged and Agreed:

_____

Randy Keuch

Dated: _____

- 2 -

KEUCH000029



DATE: 5/26/2016

TO:    Randy Keuch

We are very pleased to inform you that in your current position as Sr Dir Total Rewards, Americas (grade 17), you will receive an adjustment to your base salary.

This letter is to confirm this change to your employee record.

The effective date for this change is: May 23, 2016

The following outlines the details of your role at Teva:

| | Previous | New |
|---|---|---|
| Salary | $280,000.00 Annually | $285,600.00 Annually |

- Bonus: You will continue to be eligible to participate in the Teva 2016 Bonus Program with an incentive opportunity equal to 30% of your Annual Base Salary, subject to the terms and conditions in the 2016 Bonus Program.

- Merit Increases: You will continue to be eligible to participate in our 2016 Teva Performance Management Program, subject to the guidelines for active employees.

*This letter sets forth the full and complete agreement between you and us regarding your employment, and supersedes all prior negotiations, discussions, correspondence, communications, understandings and agreements between the parties relating to the subject matter contained herein.*

*The nature of your employment with us is and will be "at will," as defined by applicable law, meaning that either we or you may terminate your employment at any time, with or without notice and with or without cause, for any reason or for no reason, without further obligation or liability. Teva reserves the right to change, end or alter the terms of your employment and/or the terms of any plans at any time without prior notice.*

KEUCH000024

JOINT APPX 0582



| | |
|---|---|
| **Torrillo &** | Torrillo & Associates, LLC   Phone: 484-574-8782 |
| **Associates** Certified Public Accountants | 36 Regency Plaza   Fax 484-574-8785 |
| | Glen Mills, PA 19342   www.TorrilloCPA.com |

August 23, 2017

Mr. Randolph Keuch
Head of Total Rewards
Teva Pharmaceuticals USA
1090 Horsham Road
PO Box 1090
North Wales, PA 19454-1090

Dear Randy:

I wanted to congratulate you and your team on receiving a no adjustment letter from the Internal Revenue Service on its examination of the Teva Pharmaceuticals Retirement Savings Plan. It is a tremendous accomplishment.

At recent conferences we have attended, the IRS representatives have said that they find issues on over 75% of the examinations they perform on employee benefit plans and they have a particular focus on large plans such as Teva's. Plans can then be hit with penalties and even threatened with disqualification if they are found not to be in compliance with the many rules and regulations to which they are subject. From our audits of the Plan, your team always demonstrates its commitment to the Plan participants and compliance. The results of the IRS examination continue to demonstrate your team and Teva's commitment to ensuring the benefits of participants are properly administered.

Keep up the great work!

Sincerely,

Dave Torrillo, CPA/ABV, CVA
Torrillo & Associates, LLC





Employee Name: Randy Keuch
Employee Global ID: 929502

I would like to inform you about the compensation adjustments offered to you which are outlined below, resulting from a combination of Teva's overall achievements, your business unit's achievements, and your individual performance throughout the year, reflected in your Performance Rating of Successful Performance.

**Bonus**
Your bonus payout amount is $93,908.71

 ✕  ✕  ✕  = 

| Eligible Annual Base Salary ($) | | Bonus Target (% of ABS) | | Business Performance Factor (BPF) (%) | | Individual Performance Factor (IPF) (%) | | Bonus Payout ($) |
|---|---|---|---|---|---|---|---|---|

| Eligible Annual Base Salary | Bonus Target % | Business Performance Pool | Business Performance Factor (BPF) % | Individual Performance Factor (IPF) % | Bonus Amount |
|---|---|---|---|---|---|
| $285,600.00 | 30.00% | Global HR L3 | 99.64% | 110.00% | $93,908.71 |

Please be advised that the bonus is not considered a salary component for the purpose of calculating fringe benefits.

**Equity**
The number of options granted to you is 11,500

| Estimated USD fair value | Grant date | Vesting Schedule |
|---|---|---|
| 67,620 | 03/03/2017 | 25% Mar 2018, 25% Mar 2019, 25% Mar 2020, 25% Mar 2021 |
| 50 % of which will be converted to restricted share units ("RSUs"). The award is subject to: Approval of HRCC of Teva BOD , the terms of the Teva's 2015 Long-Term Equity-Based Incentive Plan (including any applicable sub-plan) and any additional terms and approvals as may be determined by HRCC, your acceptance of the award agreement, which will be provided to you and which will include additional terms and conditions, and any applicable law. | | |

All payments referred in this letter are gross and subject to applicable tax and other deductions.

To the extent permitted by applicable law, please keep the terms of this letter confidential.

Best regards,

Ron Yaniv

Personal Compensation Statement                                    Page 1 of 1

KEUCH000016

JOINT APPX 0584

 

September 2016

Dear Randy,

Congratulations on the successful completion of the Teva-Actavis Generics transaction!
It has been an incredibly long journey, and we would not have reached this point without the significant collaboration and contribution of everyone involved in the integration preparations.

On behalf of Teva's leadership team, I would like to express my sincere appreciation for your efforts and involvement throughout the integration planning process. Your work has helped both our organizations reach this stage, ready to move into the future to deliver on our shared purpose – improving health, making people feel better. This combination of talent, expertise and commitment will enable us to build the new Teva together.

In recognition of your personal contribution to the integration planning process, you are being awarded the gross lump sum amount of 23,800 USD.

The award will be transferred to you in the next payroll cycle.

To the extent permitted by applicable law, please keep the terms of this award confidential.

Thank you again for helping to lead the way to our new future.

Kind Regards,

Mark Sabag
Group Executive Vice President,
Human Resources

The award shall be subject to applicable tax and other legally required deductions. This award payable to you pursuant to this letter is one off opportunity and shall not in any way give rise to a right to receive the same or similar payments in the future. For the avoidance of any doubt, this award will not be considered as a salary component, including for the purpose of calculating any fringe benefits.

KEUCH000025

JOINT APPX 0585

**Randy Keuch**

| | |
|---|---|
| **From:** | Ron Yaniv |
| **Sent:** | Thursday, September 28, 2017 4:07 AM |
| **To:** | Roni Percik; Chen Yehudai; Randy Keuch |
| **Subject:** | FW: 65 and 5 and not yet 65 and 10 |

Hi Roni,
Please see below my e-mail and Mark approval.
Randy,

- I recommend to treat tem same as we
- I want to see clear implementation plan – as you know Mark expectation is that HR will talk with the employees

If you have any questions please let me know.
Thanks,
Ron

---

**From:** Mark Sabag
**Sent:** Wednesday, September 27, 2017 8:18 PM
**To:** Ron Yaniv
**Cc:** Daniel Lawlor
**Subject:** Re: 65 and 5 and not yet 65 and 10

Hi approved mark

On 27 Sep 2017, at 18:23, Ron Yaniv <Ron.Yaniv01@teva.co.il> wrote:

Hi Mark,
Those are the employees who meet the rule of 65 and 5 however not the 65 and 10. (the first one already left and approved by Dan for full continued vesting)
As you have the ability to approve exceptions based on their age and seniority (excluding the last one which is under 5 years) I recommend to approve

| Employee Global ID | Last Name | First Name | Global Job | Age | Seniority |
|---|---|---|---|---|---|
| 196684 | Cappola | Joan | Mgr Medical Communications | 65.9 | 8.9 |
| 104234 | Carl | Arlene | Sr Dir Market Research | 65.0 | 8.4 |
| 771090 | Tlush | Joan | Sr Mgr Market Research | 69.0 | 5.2 |
| 34889 | Rabinovich | Laura | Dir Clinical Program | 68.0 | 4.3 |

Of course – we will have more over the coming years however I do believe these are the amounts we are talking about, meaning – very few.
We should address this in the recommnedation going forward (in our longer term solution).

1

KEUCH000080

JOINT APPX 0586



# Qualifying Retirement Rules – for Equity Treatment

## November 2017

teva

KEUCH000114

teva

# Objectives

- Review current Qualifying Retirement policy and challenges

- Define Qualifying Retirement objectives

- Recommendation on designated guidelines for Qualifying Retirement Equity Treatment

2   Equity Grant Recommendations | Privileged and Confidential

KEUCH000115

JOINT APPX 0588

# Objectives of Qualifying Retirement – Current Policy

– Company's recognition for employees' long term contribution

– Set guidelines for a suitable retirement package

– Motivate and retain for long term service

– Strengthen equity compensation competitiveness



**1** Age>65 and YOS>10 → full continued vesting

**2** YOS>15 and Age>55 and "involuntary" → full continued vesting

**3** Age+YOS>70 and Age>55 and "involuntary" → one year continued vesting

teva

KEUCH000116

teva

# Challenges under Current Policy

– Employee perception of 2015 LTI plan rules vs. 2010 LTI plan

– Lack of communication of the 2015 plan rules

– Differentiation between involuntary and voluntary termination

– Employees perception for the transition from 65&5 to 65&10

– Competitiveness

4   Equity Grant Recommendations | Privileged and Confidential

KEUCH000117

JOINT APPX 0590

teva

# GLT Main Inputs

– Variety of Opinions:

– Set minimal requirement both for Age and Year of service– 55 and 10

– Differentiation between voluntary to involuntary – different views, however may be perceived positively if we set minimal age and years of service



1 Age

2 Seniority

3 Termination Reason

5   Equity Grant Recommendations | Privileged and Confidential

KEUCH000118

JOINT APPX 0591

teva

# Suggested Objectives for Future Policy

1. Recognition of long term contribution to the company

2. Offer competitive and adequate retirement package

6   Equity Grant Recommendations | Privileged and Confidential

KEUCH000119

JOINT APPX 0592

# Recommended Approach

**teva**

## – Qualifying Retirement:

1. **Age >= 65 & Years of service >5**
   - Rationale: perceived as retirement age with sufficiency YOS to avoid avoidance of older employees

2. **Rule of 70 (age + years of service >= 70) with minimum age of 55 and minimum years of service 10 → full continued vesting**
   - Recognize significant contribution to the company however avoid and enhance retention

3. HR EVP Discretion: allow full continued vesting to employees who meet the rule of 70 bellow age of 55 on exception cases

**Treatment of qualifying retirement: Full Continued Vesting**

**Excluded:**
- Treatment of qualifying retirement: Full continued vesting
- Employees who meet rule of 70 and 50<age<65 with less than 10 years of service

7   Equity Grant Recommendations | Privileged and Confidential

KEUCH000120

JOINT APPX 0593

teva

# Next Steps

– Obtain HRCC approval

– Change Management Process:

  – Update the policy and upload it to Equatex

  – Education sessions to the HR community

  – Communication to TEC members and management (L2s)

  – Employees communication: emails, Equatex and related portals

  – Define administration process

  – Align US tax requirements where applicable

KEUCH000121

JOINT APPX 0594



KEUCH000122

teva

# Background

## 2015 LTI Plan – Policy Steps:

**September 2015** - Qualifying Retirement **policy approved** by the HRCC

**February 2017 – Revised Threshold** (from 5 to 10 years of service) approved by the HRCC

**June 2017** – Alignment of the 2010 policy implementation to 2015 policy

**August 2017** - Communication updates to Equatex (including Canada and 2016 grant disclaimers) however, employees were not actively aware of this

— Prior to this communication – there was no communication, only an appendix to US grants

**August 17th 2017** – Mark's request to return to the 70 Rule, as described in 2010 omnibus plan

**September 2017** – HRCC approval of Mark discretion on exception cases

10 **Equity Grant Recommendations** | **Privileged and Confidential**

KEUCH000123

JOINT APPX 0596

# Current Approved Policy - Summary

teva

| | Definition | Treatment of Unvested Options | Treatment of Unvested Restricted Shares / RSUs | Treatment of Unvested Performance Awards |
|---|---|---|---|---|

11 Privileged and Confidential

KEUCH000124

JOINT APPX 0597

# Benchmark Based on Proxies

**teva**

| Company | Rule | Treatment | Comments |
|---|---|---|---|
| AbbVie | age>55 and yos>10 or age>65 and yos>5 | Full Continued Vesting Full Exercisability | |
| Amgen | age>55 and yos>5 or age>65 | Full Continued Vesting Full Exercisability | awards granted in the same calendar year are pro-rated |
| Biogen | age>55 and yos>10 | Greater of either 50% of unvested, additional 10% for every additional 10 years of service 36 months Exercisability | |
| BMS | age>65 (Retirement) Age>55 and yos>10 or Rule 70 (Early retirement) | Options: Full Continued Vesting, Full Exercisability RSUs: Prorated continued vesting | awards granted prior to the termination calendar year only |
| Celgene | age>55 and yos>10 | Full Continued Vesting 12 month Exercisability | |
| Gelgene | age>55 and yos>5 or Rule 65 and yos>5 | Full continued vesting 36 month exercisability | 60 month Exercisability if death or Partipant is named to terminate |
| Gilead | Rule 70 and yos>5 | Full Continued vesting 36 months Exercisability | |

12 Equity Grant Recommendations | Privileged and Confidential

# Benchmark Based on Proxies

teva

| Company | Rule | Treatment | Comments |
|---|---|---|---|
| [J&J] | age≥55 and YoS≥10, Normal Retirement age ≥55, or age ≥65, Early Retirement | Full Continued vesting, Full Exercisability | |
| Merck | age≥55 and YoS≥10 | 1-year continued vesting, 5 years exercisability, RSUs – prorated vesting | The pro rata portion is the number of complete months of employment beginning on the Grant Date and ending on the date employment terminates divided by 36. |
| Pfizer | age≥55 and YoS≥10 | Full continued vesting, Full Exercisability | |
| Zoetis | age≥55 and YoS≥10, Retirement age≥65 and YoS≥10, Early Retirement | Full Continued vesting, Full Exercisability | awards granted prior to one common calendar year only |
| Intel | Rule of 75, Rule of 60 | | |

13 Equity Grant Recommendations | Privileged and Confidential

KEUCH000126

# Example Of Cases

| Name | Age | Seniority | Termination Type | Justification for Correction | Correction |
|---|---|---|---|---|---|
| Fredik Bliman | 70 | 43 | Retirement | 2017 Communicated | Full Continued Vesting |
| Varadharajan Sundararajan | 61.8 | 15.3 | Voluntary, Career Development / Change | Not decided No issue raised by mentor by EE | Revesting |
| Guru Reddy | 65 | | Restructuring | EE asked for more | Revesting |
| Andy | 53 | 28 | Divestment | | Full Continue Vesting |
| Arthur Kung | 67 | 15 | Voluntary | Old age of 70 Retirement | Full Continued Vesting |
| Joan Cappola | 65 and 5 | 5+6 | Involuntary | 65 and 5 | Full Continued Vesting |
| Jonathan McClan | 59 | 59 | Retirement | | Full Continued Vesting |

teva

KEUCH000127

JOINT APPX 0600

**Randy Keuch**

| | |
|---|---|
| **From:** | Jason S French (External) <Jason.French@ey.com> |
| **Sent:** | Thursday, March 10, 2016 12:44 PM |
| **To:** | Anna Khais; Randy Keuch; Yael Elbaz; Kristina Devericks |
| **Cc:** | Jp English; Jerry Tammaro; Stuart E Stone; Catherine L Creech |
| **Subject:** | RE: Teva - Code Section 409A considerations |
| **Attachments:** | 409A and Retirement Eligibility 10-March-16.pdf |
| | |
| **Importance:** | High |

Anna, Randy, Kristina and Yael

Please find enclosed the memorandum with respect to Code Section 409A and retirement eligibility considerations.

As highlighted in the memorandum and as summarized during our conference call -

- The retirement vesting provisions, *by themselves*, do not trigger a Section 409A violation.
  - However, because retirement vesting means that the awards are earned in one year and payable in a later year, they are subject to Section 409A considerations and must comply with Section 409A.
- We believe that the disability provisions are not necessarily problematic from a Section 409A perspective, but we recommend that Teva consider amending the Equity Plan to specify that "disability" is defined consistent with Section 409A and the regulations thereunder.
- Because the Equity Plan gives the Compensation Committee the discretion to make payments on awards on the occurrence of certain corporate events that do not meet the definition of a change in control, Teva should consider including an addendum to its Award Agreement for US touching participants clarifying the provision for corporate events and resolving any ambiguity.
  - We believe that Teva should address the corporate transaction language for US purposes.
  - Teva will contact counsel and arrange for a time for EY and Teva to discuss the possibility of an addendum for US participants.

Please do not hesitate to contact us with any questions.

Yael – Please let us know times that you would like to propose a call with legal counsel.

Sincerely

**Jason S. French | Senior Manager | People Advisory Services**
Ernst and Young LLP
Office: +1 216 583 2126 | jason.french@ey.com

**From:** Jason S French
**Sent:** Tuesday, March 08, 2016 11:39 AM
**To:** 'Anna Khais'; 'Randy.Keuch@tevapharm.com'; 'Yael.Elbaz-Roiter@teva.co.il'; 'Kristina.Devericks@tevapharm.com'
**Cc:** Jp English; Jerry Tammaro; Stuart E Stone
**Subject:** Teva discussion today - Follow up notes

Anna, Randy, Kristina and Yael

Thank you for your time today to discuss the retirement eligibility considerations and Code Section 409A considerations associated with the *2015 Long-Term Equity Based Incentive Plan* and *Qualifying Retirement and Qualifying Termination*

1

KEUCH000109

JOINT APPX 0601

*Policy* documents you have asked us to review. As noted, we are in the process of procuring sign-off from our National Tax Partner in Washington D.C. and will send the memo to you as soon as possible.

discussed -

1. Yael, Jason and JP to coordinate a discussion with legal counsel with respect to the language in Section 11(b) (Corporate Events) contained in the *2015 Long-Term Equity Based Incentive Plan.*
   a. We have discussed Thursday 10 March 2016 and
   b. Friday 11 March 2016 as dates to arrange a discussion.
2. Anna, Jason and JP will follow up to coordinate a discussion with UBS regarding processes for tracking retirement eligible participants in the system. We will walk through the technical considerations with UBS and work to understand processes that are in place (and/or may need to be set in place) to track these participants.
   a. These discussions should take place before the end of the first week in April.
   b. Anna to send UBS process to EY prior to call
3. There were some other considerations which we may wish to discuss at a later date based on our meeting in Philadelphia, including but not limited to:
   a. Review of Awards to Canadian participants with a focus on the Canadian Salary Deferral Arrangement (SDA) rules and impact (if applicable and if any) on retirement eligibility provisions
   b. EY GOES (formerly SMS) tracking of equity awards for globally mobile participants.
   c. Considerations regarding Form 1099 and Form W-2 compliance

As noted – Should you have any additional questions, please do not hesitate to contact us.

Sincerely




**Jason S. French** | Senior Manager | People Advisory Services

Ernst and Young LLP
950 Main Street, Flats East Tower Suite 1800, Cleveland, OH 44113, United States of America
Office: +1 216 583 2126 | Fax: +1-866-867-2045 | jason.french@ey.com
EY/Comm: 66537376
Website: http://www.ey.com
Mary Dalic | Phone: +1-216-583-1874 | mary.dalic@ey.com



**JP English** | Manager | People Advisory Services

Ernst & Young LLP
950 Main Street, Flats East Tower, Cleveland, OH 44113, United States of America
Office: 216-583-4159 | jp.english@ey.com
Website: http://www.ey.com

Any tax advice in this e-mail should be considered in the context of the tax services we are providing to you. Preliminary tax advice should not be relied upon and may be insufficient for penalty protection.

The information contained in this message may be privileged and confidential and protected from disclosure. If the reader of this message is not the intended recipient, or an employee or agent responsible for delivering this message to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by replying to the message and deleting it from your computer.

2

KEUCH000110

Notice required by law: This e-mail may constitute an advertisement or solicitation under U.S. law, if its primary purpose is to advertise or promote a commercial product or service. You may choose not to receive advertising and promotional messages from Ernst & Young LLP (except for EY Client Portal and the ey.com website, which track e-mail preferences through a separate process) at this e-mail address by forwarding this message to no-more-mail@ey.com. If you do so, the sender of this message will be notified promptly. Our principal postal address is 5 Times Square, New York, NY 10036. Thank you. Ernst & Young LLP

3

KEUCH000111

JOINT APPX 0603

# teva

*New Rules*

# Stock plans management



## Dear Colleague,

**Subject:** Equity Incentive Awards upon retirement

## Rules for different plans:

| | Plan 2005 (plans till July 2010) | 2010 Plan (Aug 2010-June 2015) | 2015 Plan June 2015 onwards |
|---|---|---|---|
| Expiry - Options | Options - 7 years from grant day | 10 years from grant day | 10 years from grant day |
| | | | |
| Vesting | Continued vesting upon retirement | Continued vesting upon retirement | — If employee's age is at least 65, and at least 10 years of service: Full Continued vesting of unvested options and unvested RSUs Continued exercisability for full term<br><br>— If the company initiated retirement (or by mutual agreement) and participant's age is at least 55 and at least 15 years of service: Full Continued vesting of unvested options and unvested RSUs. Continued exercisability for full term<br><br>— If the company initiated retirement (or by mutual agreement) and employee's age plus years of service at least 70 and age is greater than 55: Unvested options and RSUs: Continued vesting of tranches vesting in next 12 months and Continued exercisability for 12 month+90 day from termination date |

KEUCH000112

JOINT APPX 0604

Please note the exercise process can be done from any computer and does not require a connection to Teva's network.

**For any further assistance, please contact E+ call center:**

Global Toll Free Number (International Prefix)

**+800-40-20-00-47**

For the International Prefix, please use the dial code specific to your country

00 - CH, EU countries, MY, KP, SK              010 - JP        001 - SG

**Best regards,**
**Stock Plans Management Department**

**Teva. Stock Plans Management**
5 Basel St., Petach Tikva, Israel. 4951033. Tel: +972.3.9148094. Fax: +972.3.9148678 www.tevapharm.com

KEUCH000113

**Randy Keuch**

| | |
|---|---|
| **From:** | Jason S French (External) <Jason.French@ey.com> |
| **Sent:** | Monday, December 12, 2016 5:17 PM |
| **To:** | Randy Keuch |
| **Cc:** | Jp English; Debbie Spyker; Jerry Tammaro; Anna Khais; Thomas McDonough; Lesley Billow |
| **Subject:** | RE: 409A and Retirement Eligibility follow up |
| | |
| **Importance:** | High |

Randy

Thank you for your patience as I have been out of the office.

- If the intent is that 7 out of 10 individuals would get the requested early retirement, then FICA tax withholding would be proper for the retirement eligible population. This is the route that the US company has chosen based on our last conference call.
- With respect on the possibility of a refund on FICA taxes where the Company has established a practice of granting early retirement (in your example, 7 of 10 individuals).
  - As you know, there is a "special timing rule" with respect to the timing of FICA taxation which differs from the timing rule for federal income tax for nonqualified deferred compensation amounts.
  - Statutory and regulatory guidance is unfortunately silent with respect to obtaining a refund in the event that FICA wages are never received.
  - The Courts have recognized that the plain meaning of Section 3121(v)(2) (the Code provision dealing with withholding on nonqualified deferred compensation) produces a result where certain benefits are taxable as FICA wages before they have been paid to an employee as income.
  - Generally, employees may not be entitled to a refund of FICA taxes paid upon the lapse of a substantial risk of forfeiture despite the fact that a portion of benefits will never be distributed to the employee.
    - See e.g., *Balestra v. United States*, 119 Fed. Cl. 109 (2014); *Affirmed* 803 F.3d 1363, (Fed. Cir. 2015), See also, CCA200823001
    - Both *Balestra* and the Chief Counsel Advice dealing with bankruptcy situations where FICA was withheld on nonqualified deferred compensation at the time such amounts were deemed no longer subject to a substantial risk of forfeiture. Refunds were later requested, and denied on the portion of benefits that would never be distributed due to plan termination.

Please let us know if you would like to arrange a quick call and I will coordinate at your convenience.

Sincerely

--

**Jason S. French | Senior Manager | People Advisory Services**

**Ernst and Young LLP**
Office: +1 216 583 2126 | jason.french@ey.com

**From:** Randy Keuch [mailto:Randy.Keuch@tevapharm.com]
**Sent:** Friday, December 02, 2016 2:30 PM
**To:** Jason S French
**Cc:** Anna Khais; Thomas McDonough; Lesley Billow; Jerry Tammaro; Jp English; Debbie Spyker
**Subject:** RE: 409A and Retirement Eligibility follow up

1

Hi Jason,

Can you research the ability to recoup the paid FICA taxes if an individual paid them and then the Company did not allow them to vest? My concern is that we would not deny 7 out of every 10 who qualified and requested early retirement.

Best regards,



Randy Keuch Head of Total Rewards - Americas
Tel: 267 468 4325 Cell: 215 872 5816
Randolph.Keuch@tevapharm.com slh.Randolph.Keuch@tevapharm.com www.tevapharm.com

---

**From:** Jason S French (External) [mailto:Jason.French@ey.com]
**Sent:** Friday, December 02, 2016 2:15 PM
**To:** Randy Keuch
**Cc:** Anna Khais; Thomas McDonough; Lesley Billow; Jerry Tammaro; Jp English; Debbie Spyker
**Subject:** RE: 409A and Retirement Eligibility follow up
**Importance:** High

Randy

Under the proposed scenario

- In the event that the participant would be granted consent to retire upon reaching (i) 55&15 (full vesting period) (ii) 55 age& service 70 (12 month period)
  - FICA tax withholding upon reaching eligibility age and service would be proper.

- In the event that for some reason, consent would be delayed by the Parent entity
  - the employee would still be required to perform services over the vesting period to receive their award
  - If the participant took a hard stand and advised "I do not want to continue working, I am quitting" -- Would the company force the participant to forfeit his/her remaining awards?
    - If so, then these awards are technically subject to a substantial risk of forfeiture and FICA would be due at the actual vesting date.
    - If FICA is taken out on these awards at the time the individual reaches the age and service thresholds (i.e. earlier) your instincts are correct. However, there may be a position to amend and potentially recoup. We would need some additional time to unfold the process to determine whether such a position is possible under the circumstances.

Please let us know if you would like to have a follow up discussion.

Sincerely

--
**Jason S. French | Senior Manager | People Advisory Services**

2

KEUCH000091

JOINT APPX 0607

Ernst and Young LLP
ce: +1 216 583 2126 | jason.french@ey.com

**From:** Randy Keuch [mailto:Randy.Keuch@tevapharm.com]
**Sent:** Wednesday, November 30, 2016 12:17 PM
**To:** Jason S French; Jerry Tammaro; Jp English
**Cc:** Anna Khais; Thomas McDonough; Lesley Billow
**Subject:** RE: 409A and Retirement Eligibility follow up
**Importance:** High

Hi E&Y Colleagues,

I spoke to Ron Yaniv this morning and we tried to find a win-win to resolve the RSU taxation issue. I believe we found one, but not being a tax expert, wanted to get the thinking of E&Y. Our solutions is to include a disclaimer in the RSU tax letter to affected employees (excluding those who are age 65 with 5 years of service) that indicates that while they are obligated to pay these taxes, Teva is not obligated to grant early retirement treatment to the continued vesting of these RSUs, should they choose to request such treatment. We would then explain the implications (I assume they lose their FICA contributions and Teva loses its FICA contributions?).

Can we make something like this work? This approach shows compliance with the spirit of the board retirement criteria decision — That early retirement will not be automatic — and it aligns with the US position that the probability of the request being refused is low, but will receive due consideration.

Best regards,



Randy Keuch Head of Total Rewards -Americas
Tel: 267-768-4315 Cell: 215-272-8516
Randolph.Keuch@tevapharm.com JpRandolph.Keuch@tevapharm.com www.tevapharm.com

---

**From:** Jason S French (External) [mailto:Jason.French@ey.com]
**Sent:** Monday, November 28, 2016 10:19 AM
**To:** Ron Yaniv; Chen Yehudai; Randy Keuch; Roni Percik; Yael Elbaz
**Cc:** Kristina Devericks; Jerry Tammaro; Jp English; Anna Khais
**Subject:** RE: 409A and Retirement Eligibility follow up

Ron

For US tax purposes and at a very-high level,

- if the company does not customarily enforce the mutual agreement provision, or
- the company does not have a history of enforcing the mutual agreement provision

3

there is a risk that the requirement of future services could be deemed non-substantial, and FICA tax (Social Security and Medicare) would have to be taken into account on the date of grant for participants that have met the retirement age ● years of service requirements.

We would want to review the board minutes and assess against US regulatory provisions.

Thanks

Sincerely

--

Jason S. French | Senior Manager | People Advisory Services

Ernst and Young LLP
Office: +1 216 583 2126 | jason.french@ey.com

**From:** Ron Yaniv [mailto:Ron.Yaniv01@teva.co.il]
**Sent:** Monday, November 28, 2016 10:09 AM
**To:** Chen Yehudai; Jason S French; Randy Keuch; Roni Percik; Yael Elbaz
**Cc:** Kristina Devericks; Jerry Tammaro; Jp English; Anna Khais
**Subject:** RE: 409A and Retirement Eligibility follow up

Randy and all
This was discussed and agreed in details before we took the final decision and bring it to the HRCC.
I don't understand why we are reopening it.
●anks,
●n

**From:** Chen Yehudai
**Sent:** Monday, November 28, 2016 4:55 PM
**To:** Jason S French (External); Randy Keuch; Roni Percik; Yael Elbaz
**Cc:** Kristina Devericks; Jerry Tammaro; Jp English; Anna Khais; Ron Yaniv
**Subject:** RE: 409A and Retirement Eligibility follow up

Roni, can you please send the presentation that was presented to the board? I am copying Ron since he may want to weigh in as well.

**From:** Jason S French (External) [mailto:Jason.French@ey.com]
**Sent:** Monday, November 28, 2016 4:41 PM
**To:** Chen Yehudai; Randy Keuch; Roni Percik; Yael Elbaz
**Cc:** Kristina Devericks; Jerry Tammaro; Jp English; Anna Khais
**Subject:** RE: 409A and Retirement Eligibility follow up

Can you provide us with a copy of the board resolution language in this regard?

●ank you

Sincerely

--

4

KEUCH000093

JOINT APPX 0609

**Jason S. French | Senior Manager | People Advisory Services**

st and Young LLP
Office: +1 216 583 2126 | jason.french@ey.com

**From:** Chen Yehudai [mailto:Chen.Yehudai@teva.co.il]
**Sent:** Monday, November 28, 2016 9:40 AM
**To:** Randy Keuch; Roni Percik; Yael Elbaz
**Cc:** Kristina Devericks; Jerry Tammaro; Jp English; Anna Khais; Jason S French
**Subject:** RE: 409A and Retirement Eligibility follow up

Maybe it is the right thing to do from your perspective but it was not what the board approved.


**From:** Randy Keuch
**Sent:** Monday, November 28, 2016 4:34 PM
**To:** Chen Yehudai; Roni Percik; Yael Elbaz
**Cc:** Kristina Devericks; Jerry Tammaro; Jp English; Anna Khais; Jason S French (External)
**Subject:** RE: 409A and Retirement Eligibility follow up

Hi Chen,

That may be the intention from a global perspective, but that is not our practice nor intention in the US going forward. I o believe it is the right thing to do. Apparently, Teva ee's forfeited their awards not because they were not approved, but because they failed to ask and no one reminded them to ask. I believe that Teva employees who qualify for early retirement should be made aware of their situation and therefore ask for Early Retirement treatment. As stated, these requests would not be refused. It is the right thing to do.

Best regards,



**From:** Chen Yehudai
**Sent:** Monday, November 28, 2016 9:28 AM
**To:** Randy Keuch; Roni Percik; Yael Elbaz
**Cc:** Kristina Devericks; Jerry Tammaro; Jp English; Anna Khais; Jason S French (External)
**Subject:** RE: 409A and Retirement Eligibility follow up

The intention as I understand it is that if employee has decided to retire but the company is still interested to retain such employee- no approval is granted even if employee meets the 70 criteria. Roni, please confirm.

5

KEUCH000094

**From:** Randy Keuch
**Sent:** Monday, November 28, 2016 4:25 PM
**To:** Chen Yehudai; Roni Percik; Yael Elbaz
**Cc:** Kristina Devericks; Jerry Tammaro; Jp English; Anna Khais; Jason S French (External)
**Subject:** RE: 409A and Retirement Eligibility follow up

Hi Chen,

I will leave this response to E&Y, but offer the following for consideration. If an employee meets the Rule of 70 and asks if he/she can retire, we would not deny that individual early retirement. Now that employee may actually be going to work for a competitor, but is under no obligation to tell us that. As such, the employee will not tell us he/she is resigning and therefore will qualify for early retirement. As such, there is little risk of forfeiture.

Best regards,



**From:** Chen Yehudai
**Sent:** Monday, November 28, 2016 9:17 AM
**To:** Randy Keuch; Roni Percik; Yael Elbaz
**Cc:** Kristina Devericks; Jerry Tammaro; Jp English; Anna Khais; Jason S French (External)
**Subject:** RE: 409A and Retirement Eligibility follow up

> I actually do not understand what EY means by stating that " Because it is highly unlikely that the Company would withhold consent to resignation, the possibility of forfeiture may not be considered as substantial for tax purposes." The intention of termination by mutual consent is **not to include resignation** but only to include situations where it is in the interest of the company that the employee will leave and but for this interest the employment relationship would not have been terminated.

**From:** Randy Keuch
**Sent:** Monday, November 28, 2016 4:11 PM
**To:** Chen Yehudai; Roni Percik; Yael Elbaz
**Cc:** Kristina Devericks; Jerry Tammaro; Jp English; Anna Khais; Jason S French (External)
**Subject:** RE: 409A and Retirement Eligibility follow up
**Importance:** High

6

KEUCH000095

JOINT APPX 0611

 Everyone,

Based on all of the information and guidance provided, it appears that we all agree that if you reach age 65 with 5 years of service, you should have your unvested RSUs taxed for FICA purposes.

Where we disagree is as follows:

1. 55 years of age and 15 years of full service
   a. Requires approval to receive continued vesting upon termination
      i. Roni & Chen believe this represents a significant risk of forfeiture
      ii. E&Y believe that under US Treasury regulations, this risk is not substantial
      iii. Randy & Lesley have indicated that they will not withhold consent to continued vesting if this criteria is met
   ***Anna has indicated that Finance supports the E&Y position and wants to proceed with the attached letter.***
2. 55 years of age with age and service combination equal to 70
   a. Requires approval to receive continued vesting upon termination
      i. Roni & Chen believe this represents a significant risk of forfeiture
      ii. E&Y believe that under US Treasury regulations, this risk is not substantial
      iii. Randy & Lesley have indicated that they will not withhold consent to continued vesting if this criteria is met
   ***Anna has indicated that Finance supports the E&Y position and wants to proceed with the attached letter.***

 these individuals need to be notified this week, **please let me know if you are okay with sending the attached letter** to the affected individuals by Tuesday, November 29th. I believe this will be less than 200 employees. I support the position of Finance, as it is conservative and addresses a known tax compliance issue.

Best regards,

Randy Keuch Head of Total Rewards - Americas
Tel: 267 468 4325 Cell: 215 272 9816
Randolph.Keuch@tevapharm.com|p:Randolph.Keuch@tevapharm.com|www.tevapharm.com|

---

**From:** Jason S French (External) [mailto:Jason.French@ey.com]
**Sent:** Sunday, November 27, 2016 5:59 PM
**To:** Anna Khais; Randy Keuch
**Cc:** Kristina Devericks; Jerry Tammaro; Yael Elbaz; Jp English; Roni Percik; Chen Yehudai
**Subject:** RE: 409A and Retirement Eligibility follow up
**Importance:** High

**Anna and Randy**

7

I hope you are well.

Please find enclosed our draft considerations to your employee communication. I have also addressed questions raised in Roni's email for reference purposes as the US federal income tax rules will be a consideration for the Company's policy.

We will continue to work with your team to get a call with all parties.

_Email considerations from Roni_

**This is not aligned with the plans rules and the board approvals.**

- grants under 2015 plan – the letter should be sent only to employees who meet the rule of are greater than 65 **and** years of service greater than 5 year.

We understand that your legal advisor has noted that termination under the other two scenarios,

1. **55 years of age and 15 years of full services**
2. **55 years of age with age and service combination equal to 70**

will require mutual consent and legal/Teva team has advised you that they would consider such mutual consent to be considered a risk of forfeiture.

We note from a US federal income tax perspective that such position is not without risk.

Whether the condition that resignation be made under mutual agreement is a substantial risk of forfeiture turns on whether, under current US treasury regulations, the possibility of forfeiture is substantial.

- Because it is highly unlikely that the Company would withhold consent to resignation, the possibility of forfeiture may not be considered as substantial for tax purposes.
- The RSUs would generally vest at the time that the grantee satisfies the Favorable Early Retirement age and length of service requirements for tax purposes.

Sincerely

--
**Jason S. French | Senior Manager | People Advisory Services**

Ernst and Young LLP
Office: +1 216 583 2126 | jason.french@ey.com

**From:** Anna Khais [mailto:Anna.Khais@tevapharm.com]
**Sent:** Tuesday, November 22, 2016 8:54 PM
**To:** Randy Keuch; Jason S French
**Cc:** Kristina Devericks; Jerry Tammaro; Yael Elbaz; Jp English; Roni Percik; Chen Yehudai
**Subject:** RE: 409A and Retirement Eligibility follow up

Hello

Attached please see the revised document, with changes tracked. Thank you

Best regards,

8



**From:** Randy Keuch
**Sent:** Tuesday, November 22, 2016 5:15 PM
**To:** Anna Khais; Jason S French (External)
**Cc:** Kristina Devericks; Jerry Tammaro; Yael Elbaz; Jp English; Roni Percik; Chen Yehudai
**Subject:** RE: 409A and Retirement Eligibility follow up

Hi Everyone,

Attached is a revised version of the RSU tax letter. Please provide your comments to me prior to our call on Monday.

st regards,

---

**From:** Anna Khais
**Sent:** Thursday, November 17, 2016 10:05 AM
**To:** Jason S French (External)
**Cc:** Kristina Devericks; Randy Keuch; Jerry Tammaro; Yael Elbaz; Jp English
**Subject:** RE: 409A and Retirement Eligibility follow up

Hello Jason
The intent on retro treatment is something that Randy would need to advise on, so I definitely think that we need to cle back asap, so that we can start calculating the exposure and communicate to the relevant group asap. I am not sure that we would go back to people, who have already retired, and change the executed treatment. Perhaps I am missing your question....

I am on vacation next week, but can make myself available 11-12 Monday or Tuesday.

9

KEUCH000098

JOINT APPX 0614

Randy, please advise on your availability for these two days.

Thank you!

Best regards,



IMPROVING HEALTH, MAKING PEOPLE FEEL BETTER

CREATIVITY WHERE IT MATTERS    CARING    MAKING OUR FAMILIES PROUD    LEADING THE WAY

OUR PURPOSE & VALUES

**From:** Jason S French (External) [mailto:Jason.French@ey.com]
**Sent:** Thursday, November 17, 2016 9:05 AM
**To:** Anna Khais
Kristina Devericks; Randy Keuch; Jerry Tammaro; Yael Elbaz; Jp English
**Subject:** RE: 409A and Retirement Eligibility follow up
**Importance:** High

Anna

I hope you are well.

1. You are correct that we would need a schedule of unvested RSU awards for this participant group
   a. Ideally a column with the number of awards granted and a column of unvested RSU awards would be preferable
   b. For Retirement individuals, the vesting schedule would also be helpful with the number of unvested awards outstanding.

2. For individuals who are on qualified retirement
   a. For former employees – the payroll reporting and tax withholding obligations are generally the same as for current employees (i.e. if granted RSUs for services, the character of payroll reporting and tax withholding obligations would not change because they are now retired).
   b. Question – Since the Retirement Policy was drafted in 2015 -
      i. Is the intention that policy going to be retroactive for participants who retired prior to the implementation of the policy? If so, we need will need some time to review tax considerations.
   c. Generally, the FICA tax statute of limitations goes back three years and there are correction mechanisms. We will review these considerations and provide an outline to your team.
   d. I also note that there is an individual who retired due to Mutual understanding. As noted in the comments to the employee statement, if it highly unlikely that the Company would withhold consent to resignation, the possibility of forfeiture would not be substantial. As a result, 55&15 or 55 with age and service equal to 70 may need consideration.

10

KEUCH000099

JOINT APPX 0615

Charleston SC for client meetings later this morning and will be in Charleston all day Friday in a
.n.

.ease advise on availability Monday or Tuesday of next week to follow up and discuss? Our team will set the

Thank you

Sincerely

--

**Jason S. French | Senior Manager | People Advisory Services**

Ernst and Young LLP
Office: +1 216 583 2126 | jason.french@ey.com

**From:** Anna Khais [mailto:Anna.Khais@tevapharm.com]
**Sent:** Wednesday, November 16, 2016 10:29 AM
**To:** Yael Elbaz
**Cc:** Kristina Devericks; Jason S French; Randy Keuch
**Subject:** RE: 409A and Retirement Eligibility follow up

Thanks Yael

The report contains 212 employees, and I don't see their unvested RSU balances as of Nov 15th. We need to have their ____nces in order to calculate their taxability.

In addition, per our last discussions, RSUs are subject to FICA tax in the year that ee's attain age <u>65 with at least 5 years of service.</u> The list must be modified to only reflect this population. Please resend the revised report, along with balances. Is this something that Equate Plus can configure so that there are no manual manipulations of reports for this purpose?

Jason, what is the requirement for employees with unvested RSU balances, who are on "qualified retirement"? Since they are no longer employed by Teva, we can't tax them through payroll. I would also suspect that we would exclude them, since their shares were not forfeited at time of separation and they are allowed to vest over time?

Best regards,

Anna Khais Sr Director, Finance
Tel: 215-591-8597 Fax: +1 215-793-1013
Anna.Khais@tevapharm.com Cfo.Anna.Khais@tevapharm.com www.tevapharm.com

IMPROVING HEALTH,
MAKING PEOPLE FEEL BETTER

CREATIVITY WHERE IT MATTERS    CARING    MAKING OUR FAMILIES PROUD    LEADING THE WAY

OUR PURPOSE & VALUES ____ ____

11

KEUCH000100

JOINT APPX 0616

**From:** Yael Elbaz
**Sent:** Wednesday, November 16, 2016 8:52 AM
**To:** Anna Khais
**Cc:** Kristina Devericks; Jason S French (External); Randy Keuch
**Subject:** RE: 409A and Retirement Eligibility follow up

Hi Anna,

We lock only on the second sheet – pps with holdings.
We took the age (based on birthday) and seniority (based on hire date) and summed it together to see who is under rule 70.
The list shows age + seniority greater than 70 – use this file as I added from age 55 and on as shown on plan doc.

Please let me know if you need any further explanation or call me.

Thank y☺U!

Have a **lovely** day,
Yael



   **Before printing, kindly consider the forests!**

---

**From:** Anna Khais
**Sent:** Wednesday, November 16, 2016 1:49 PM
**To:** Yael Elbaz
**Cc:** Kristina Devericks; Jason S French (External); Randy Keuch
**Subject:** Re: 409A and Retirement Eligibility follow up

Thanks Yael

Can you please explain the file and what the shadings represent? I tried to figure it out but it's not consistent so don't want to make assumptions.

Anna Khais
Sr Director, Finance
Teva Pharmaceuticals
(215) 591-8997 office

On Nov 16, 2016, at 5:18 AM, Yael Elbaz <Yael.Elbaz-Roiter@teva.co.il> wrote:

> Hi Anna,
>
> I am sorry, I was thinking I sent you this file earlier, but can't find the email, so I most have missed it.
> Let me know if you need any further info.

12

KEUCH000101

JOINT APPX 0617

Thank y☺U!

Have a lovely day,
Yael



Yael Elbaz Rolter ● Director, Head of Teva Stock Plans Management
Tel: +972 (3) 914893 | Cell: +972 (54) 8885213 | Fax: +972 (3) 914875 |
Yael.ElbazRolter@teva.co | www.tevapharm.com

**From:** Anna Khais
**Sent:** Friday, November 04, 2016 7:50 PM
**To:** Yael Elbaz
**Cc:** Kristina Devericks; Jason S French (External); Randy Keuch
**Subject:** RE: 409A and Retirement Eligibility follow up

Hello Yael
Following up on my email below, as we need to understand the eligible population asap. thanks

Best regards,

Anna Khais Sr Director, Finance
Tel: 215-591-8997 Fax: 1-215-795-4018
Anna.Khais@tevapharm.com To:Anna.Khais@tevapharm.com www.tevapharm.com

**From:** Anna Khais
**Sent:** Friday, October 28, 2016 3:27 PM
**To:** Yael Elbaz
**Cc:** Kristina Devericks; 'Jason S French (External)'; Randy Keuch
**Subject:** RE: 409A and Retirement Eligibility follow up

Hello Yael
As we are approaching the end of 2016 and the need to execute on the required taxation rules
pertaining to Teva's compliance with 409A, we are now in immediate need of the US population
meeting the retirement eligibility requirements outlined in the 2010 and 2015 Teva Long-Term Equity-
Based Incentive Plans.
Please send us the list as soon as you can.

For your benefit, below are the steps we plan on taking in the next few weeks, Kristie will discuss the
process and requirements with you in person during her visit.

| Task | |
|------|--|
| Receive and validate the eligible employee population. | Yael to |

KEUCH000102

JOINT APPX 0618

| | |
|---|---|
| Communicate the new process to the group identified above – memo ready for distribution | HR |
| Determine the date to be used in valuation of taxable earnings – mid November – to be finalized upon receipt of population | Finance |
| Perform individual calculations and distribute to employees in scope | Finance |
| Process withholdings and remit to taxing authorities in Dec 9th and Dec 23rd pay (reporting on Dec 29th, collection of tax over two pay periods) | Finance |

Let us know if you have any questions.

Best regards,

Anna Khais Sr Director, Finance
Tel: 215-591-8997 Fax: 1 215-793-1013
Anna.Khais@tevapharm.com lb-Anna_Khais@tevapharm.com www.tevapharm.com

---

**From:** Jason S French (External) [mailto:Jason.French@ey.com]
**Sent:** Thursday, July 28, 2016 2:30 PM
**To:** Anna Khais
**Cc:** Kristina Devericks; Yael Elbaz; Jerry Tammaro; Cathy Goonetilleke
**Subject:** RE: 409A and Retirement Eligibility follow up
**Importance:** High

Anna

I hope you are well and it is always a pleasure to touch base. I am glad we can reconnect.

Following our memorandum regarding the RSUs and Code Section 409A considerations, we agreed that we would coordinate a discussion with UBS regarding processes for tracking retirement eligible participants in the system. As you may recall, Teva's current 2015 Long-Term Incentive Plan provides for a "Qualifying Retirement" which will generally occur if:

- Separation from service, other than for cause, having reached age 65 and having worked at the Company for five full years ("Full Retirement");
- Individual has reached age 55, and has worked at the Company for 15 full years ("Favorable Early Retirement"); or
- Individual has reached age 55, and the sum of age and years worked at the Company equals or exceeds 70 ("Other Early Retirement").

We noted in the memorandum that there are considerations with respect to the timing of FICA withholding for retirement eligible employees. For retirement eligible participants, since there is no longer a substantial risk of forfeiture, FICA withholding would arise, the timing of which will depend upon the retirement age and service as there are different vesting conditions.

14

KEUCH000103

JOINT APPX 0619

We discussed at our last face to face meeting some of the considerations associated with this timing rule and potential alternatives.

**Next Steps**

I would propose that Jerry and I meet live with your team the week of August 8th if the timing is acceptable to you. If you need an earlier meeting, please advise and I will try to move conflicts I have if I can.

We will walk through the technical considerations with your team and UBS with the goals of -

- Reviewing the retirement eligibility considerations based on our understanding of the current plan and policy
- Walk through some examples depending on the three Qualifying Retirement scenarios
- Understand processes that are currently in place (and/or may need to be set in place) to track these participants
- Arrive at a process that will work for Teva to track these individuals going forward

In anticipation of our meeting, could you please verify that we have the latest *Qualifying Retirement and Qualifying Termination Policy*. The last document we reviewed was a draft and noted that the document was *Effective as of October [ ], 2015.*

Please do not hesitate to contact us with any questions.

Thank you


Sincerely


--

**Jason S. French | Senior Manager | People Advisory Services**

**Ernst and Young LLP**
Office: +1 216 583 2126 | jason.french@ey.com

**From:** Anna Khais [mailto:Anna.Khais@tevapharm.com]
**Sent:** Thursday, July 28, 2016 10:14 AM
**To:** Jason S French
**Cc:** Kristina Devericks; Yael Elbaz
**Subject:** 409A

Hi Jason
Thanks again for your assistance with understanding the background and requirements associated with tax withholding on equity transactions.

Can you please let us know when we can proceed with our discussion on 409A compliance. We just received the FTC clearance and Actavis participants will be joining the Teva plan shortly, so we really need to get our hands around setting up a process for tax withholding on awards of retirement-eligible participants. We would prefer to have a F2F session to document our options and fully understand the compliance and monitoring requirements. Please let us know how soon we can get together to accomplish this. thanks!

Best regards,

KEUCH000104

JOINT APPX 0620

Anna Khalsa Director, Finance
Tel: 215.591.8997 Fax: +1 215.795.1014
Anna.Khalsa@tevapharm.com;ko:Anna.Khalsa@tevapharm.com; www.tevapharm.com

This message is intended solely for the designated recipient(s). It may contain confidential or proprietary information and may be subject to attorney-client privilege or other confidentiality protections. If you are not a designated recipient you may not review, copy or distribute this message. If you receive this in error, please notify the sender by reply e-mail and delete this message. Thank you.

Any tax advice in this e-mail should be considered in the context of the tax services we are providing to you. Preliminary tax advice should not be relied upon and may be insufficient for penalty protection.

The information contained in this message may be privileged and confidential and protected from disclosure. If the reader of this message is not the intended recipient, or an employee or agent responsible for delivering this message to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by replying to the message and deleting it from your computer.

Notice required by law: This e-mail may constitute an advertisement or solicitation under U.S. law, if its primary purpose is to advertise or promote a commercial product or service. You may choose not to receive advertising and promotional messages from Ernst & Young LLP (except for EY Client Portal and the ey.com website, which track e-mail preferences through a separate process) at this e-mail address by forwarding this message to no-more-mail@ey.com. If you do so, the sender of this message will be notified promptly. Our principal postal address is 5 Times Square, New York, NY 10036. Thank you. Ernst & Young LLP

This message is intended solely for the designated recipient(s). It may contain confidential or proprietary information and may be subject to attorney-client privilege or other confidentiality protections. If you are not a designated recipient you may not review, copy or distribute this message. If you receive this in error, please notify the sender by reply e-mail and delete this message. Thank you.

y tax advice in this e-mail should be considered in the context of the tax services we are providing to you. Preliminary tax advice should not be relied upon and may be insufficient for penalty protection.

The information contained in this message may be privileged and confidential and protected from disclosure. If the reader of this message is not the intended recipient, or an employee or agent responsible for delivering this message to

16

KEUCH000105

JOINT APPX 0621

the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by replying to the message and deleting it from your computer.

Notice required by law: This e-mail may constitute an advertisement or solicitation under U.S. law, if its primary purpose is to advertise or promote a commercial product or service. You may choose not to receive advertising and promotional messages from Ernst & Young LLP (except for EY Client Portal and the ey.com website, which track e-mail preferences through a separate process) at this e-mail address by forwarding this message to no-more-mail@ey.com. If you do so, the sender of this message will be notified promptly. Our principal postal address is 5 Times Square, New York, NY 10036. Thank you. Ernst & Young LLP

This message is intended solely for the designated recipient(s). It may contain confidential or proprietary information and may be subject to attorney-client privilege or other confidentiality protections. If you are not a designated recipient you may not review, copy or distribute this message. If you receive this in error, please notify the sender by reply e-mail and delete this message. Thank you.

Any tax advice in this e-mail should be considered in the context of the tax services we are providing to you. Preliminary tax advice should not be relied upon and may be insufficient for penalty protection.

The information contained in this message may be privileged and confidential and protected from disclosure. If the reader of this message is not the intended recipient, or an employee or agent responsible for delivering this message to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by replying to the message and deleting it from your computer.

Notice required by law: This e-mail may constitute an advertisement or solicitation under U.S. law, if its primary purpose is to advertise or promote a commercial product or service. You may choose not to receive advertising and promotional messages from Ernst & Young LLP (except for EY Client Portal and the ey.com website, which track e-mail preferences through a separate process) at this e-mail address by forwarding this message to no-more-mail@ey.com. If you do so, the sender of this message will be notified promptly. Our principal postal address is 5 Times Square, New York, NY 10036. Thank you. Ernst & Young LLP

This message is intended solely for the designated recipient(s). It may contain confidential or proprietary information and may be subject to attorney-client privilege or other confidentiality protections. If you are not a designated recipient you may not review, copy or distribute this message. If you receive this in error, please notify the sender by reply e-mail and delete this message. Thank you.

Any tax advice in this e-mail should be considered in the context of the tax services we are providing to you. Preliminary tax advice should not be relied upon and may be insufficient for penalty protection.

The information contained in this message may be privileged and confidential and protected from disclosure. If the reader of this message is not the intended recipient, or an employee or agent responsible for delivering this message to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by replying to the message and deleting it from your computer.

KEUCH000106

JOINT APPX 0622

Notice required by law: This e-mail may constitute an advertisement or solicitation under U.S. law, if its primary purpose is to advertise or promote a commercial product or service. You may choose not to receive advertising and promotional messages from Ernst & Young LLP (except for EY Client Portal and the ey.com website, which track e-mail preferences through a separate process) at this e-mail address by forwarding this message to no-more-mail@ey.com. If you do so, the sender of this message will be notified promptly. Our principal postal address is 5 Times Square, New York, NY 10036. Thank you. Ernst & Young LLP

This message is intended solely for the designated recipient(s). It may contain confidential or proprietary information and may be subject to attorney-client privilege or other confidentiality protections. If you are not a designated recipient you may not review, copy or distribute this message. If you receive this in error, please notify the sender by reply e-mail and delete this message. Thank you.

Any tax advice in this e-mail should be considered in the context of the tax services we are providing to you. Preliminary tax advice should not be relied upon and may be insufficient for penalty protection.

The information contained in this message may be privileged and confidential and protected from disclosure. If the reader of this message is not the intended recipient, or an employee or agent responsible for delivering this message to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by replying to the message and deleting it from your computer.

Notice required by law: This e-mail may constitute an advertisement or solicitation under U.S. law, if its primary purpose to advertise or promote a commercial product or service. You may choose not to receive advertising and promotional messages from Ernst & Young LLP (except for EY Client Portal and the ey.com website, which track e-mail preferences through a separate process) at this e-mail address by forwarding this message to no-more-mail@ey.com. If you do so, the sender of this message will be notified promptly. Our principal postal address is 5 Times Square, New York, NY 10036. Thank you. Ernst & Young LLP

This message is intended solely for the designated recipient(s). It may contain confidential or proprietary information and may be subject to attorney-client privilege or other confidentiality protections. If you are not a designated recipient you may not review, copy or distribute this message. If you receive this in error, please notify the sender by reply e-mail and delete this message. Thank you.

Any tax advice in this e-mail should be considered in the context of the tax services we are providing to you. Preliminary tax advice should not be relied upon and may be insufficient for penalty protection.

The information contained in this message may be privileged and confidential and protected from disclosure. If the reader of this message is not the intended recipient, or an employee or agent responsible for delivering this message to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by replying to the message and deleting it from your computer.

Notice required by law: This e-mail may constitute an advertisement or solicitation under U.S. law, if its primary purpose is to advertise or promote a commercial product or service. You may choose not to receive advertising and promotional messages from Ernst & Young LLP (except for EY Client Portal and the ey.com website, which track e-mail preferences through a separate process) at this e-mail address by forwarding this message to no-more-mail@ey.com. If you do so,

KEUCH000107

JOINT APPX 0623

the sender of this message will be notified promptly. Our principal postal address is 5 Times Square, New York, NY 10036. Thank you. Ernst & Young LLP

This message is intended solely for the designated recipient(s). It may contain confidential or proprietary information and may be subject to attorney-client privilege or other confidentiality protections. If you are not a designated recipient you may not review, copy or distribute this message. If you receive this in error, please notify the sender by reply e-mail and delete this message. Thank you.

Any tax advice in this e-mail should be considered in the context of the tax services we are providing to you. Preliminary tax advice should not be relied upon and may be insufficient for penalty protection.

The information contained in this message may be privileged and confidential and protected from disclosure. If the reader of this message is not the intended recipient, or an employee or agent responsible for delivering this message to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by replying to the message and deleting it from your computer.

Notice required by law: This e-mail may constitute an advertisement or solicitation under U.S. law, if its primary purpose is to advertise or promote a commercial product or service. You may choose not to receive advertising and promotional messages from Ernst & Young LLP (except for EY Client Portal and the ey.com website, which track e-mail preferences through a separate process) at this e-mail address by forwarding this message to no-more-mail@ey.com. If you do so, the sender of this message will be notified promptly. Our principal postal address is 5 Times Square, New York, NY 10036. Thank you. Ernst & Young LLP

19

KEUCH000108

JOINT APPX 0624

**Randy Keuch**

**From:** Roni Percik
**Sent:** Thursday, March 23, 2017 7:57 AM
**To:** Randy Keuch
**Cc:** Jan Gustavsen; Eduardo Nasi Cheide Da Graca; Miriam Weinstein; Roni Percik
**Subject:** RE: Equity treatment at Qualifying Retirement - Update

Hi All,

Thanks for the inputs.
There should be no communication – we never communicated broadly the retirement policy and we are not planning to broadly communicate the change. For any employee that may be impacted and addresses you for questions – the adjusted policy is the one to address.

The second question – (or the 2 Qs from Canada) – the Canadian retirement rule – I am very surprised to be aware of this it is not aligned with our plan (not 2010 nor 2015), I need to understand the background of this urgently – Jan lets set a meeting to discuss this urgently please. Regarding disability – I am not sure I understand the question – lets discuss as well over the meeting.

The third issue (409A) – this doesn't change the required administration it only reduced the number of impacted employees under the first rule – the only rule for which you need to collect the tax. The second and third rules do not guarantee the vest. Please schedule a meeting with me Yael E, and Chen if needed to discuss this again. We have to make sure we are in compliance.

Please let me know if you have any questions,
Thanks, Roni

Best regards,



From: Randy Keuch
Sent: Wednesday, March 22, 2017 7:58 PM
To: Roni Percik
Cc: Jan Gustavsen; Eduardo Nasi Cheide Da Graca; Miriam Weinstein
Subject: RE: Equity treatment at Qualifying Retirement - Update

Hi Roni,

See Jan's note below. The 1st question is on the minds of all mmbers of my team. That is, how will this be communicated, as letters to accept awards go out on March 31st? Clearly this is very negative news for my region. The 2nd question pertains specifically to Canada, but since we administer Canadian compensation, we all would appreciate understanding how to handle this issue.

KEUCH000086

JOINT APPX 0625

A 3rd issue, which is a US issue, is regarding the taxation of RSUs under this new policy. We have an Opinion Letter from E&Y that indicates that we are out of compliance. Now that the rule has changed, it simply reduces the number of ee's impacted, but we are still out of compliance.

Let me know if you want to set up a call or handle via email.

Best regards,





---

**From:** Jan Gustavsen
**Sent:** Tuesday, March 21, 2017 6:08 PM
**To:** Randy Keuch; Eduardo Nasi Chelde Da Graca; Miriam Weinstein
**Subject:** RE: Equity treatment at Qualifying Retirement - Update

Thank you Randy; no, not good news. Can you confirm the 'Restructuring' rules are still in place?

I have two other questions and I am not sure the best way to get the answers. You may have some information and for those specific to Canada only - Miriam, I know you have a great relationship with Roni (but let me know if you want me to go directly to her).

1. How is this information communicated to participants? As you know, retirement rules under the 2010 LTIP were very different for Canada and those rules were communicated to those participating in all grants under this plan. To remind you, terminating Canadian participants who are deemed 'eligible' to retire (age 55 and 2 years' service) allow for a continuation of vesting and exercisability through to expiry (or death). I don't believe our employees know there was a change in definition of 'retiree' under the 2015 LTIP. *The prospectus nor the FAQs posted to participant accounts do not provide the definition for qualifying retirement.* It simply refers to 'the Plan'.

2. The reference, definition and rules for 'disability' are not appropriate for Canada. The prospectus speaks to employment terminating by reason of disability. We don't terminate disabled employees. Although we have not had the situation come up, it's bound to at some point. We need to be ready to provide a definition of 'disabled' for Canada.

Just as a FYI, our Director of Tax, Claire Kellow, is in the midst of updating taxation for RSUs and Options for Canada and there will be a requirement to communicate to participants in the next month or so (we don't feed employee's tax rates to Equate +). We will try to accommodate this through messaging on the Equate + home page. I will provide full details when they are available.

Thank you,

Jan

2

KEUCH000087

JOINT APPX 0626



Jan Gustavsen Senior Manager, Benefits
Tel: +1-416-910-6829 Fax: +1-416-291-1138
Jan.Gustavsen@tevacanada.com AskHR@tevapharm.com www.tevapharm.com

AskHR is available to provide assistance related to matters in Human Resources including HR Policies, Employee Programs, Benefits, Careers, Leadership & Development, Payroll and more!

Have a question? *AskHR* Or call internally, Extension 100-4500.

IMPROVING HEALTH, MAKING PEOPLE FEEL BETTER

CREATING WHERE IT MATTERS    CARING    MAKING OUR FAMILIES PROUD    LEADING THE WAY

OUR PURPOSE & VALUES

---

**From:** Randy Keuch
**Sent:** Tuesday, March 21, 2017 4:29 PM
**To:** Eduardo Nasi Chelde Da Graca; Jan Gustavsen; Miriam Weinstein
**Subject:** FW: Equity treatment at Qualifying Retirement - Update

FYI – Not good news.

Best regards,



Randy Keuch Head of Total Rewards - Americas
Tel: 267-468-4325 Cell: 215-272-9816
Randy.Keuch@tevapharm.com sby:Randolph.Keuch@tevapharm.com www.tevapharm.com

---

**From:** Roni Percik
**Sent:** Tuesday, March 21, 2017 10:46 AM
**To:** Anat Markus01; Brenda Vesey; Chen Yehudai; Daniel Lawlor; Glenn Gerecke; Hadas Reisbaum; Keren Nitzan Dyir; Lesley Billow; Lilach Shmueli; Mark Sabag; Moshe Netzer; Niels Walch; Orly Pascal; Rachel Yehezkel; Raffi Hirsch; Ron Yaniv; Simon Kelner; Tal Zorman; Vikki Conway
**Cc:** Assaf Ehrenreich; Gaurav Gulati; Amir Haim Zeirah; Gal Fain; Noel Mulvihill; Randy Keuch; Yonatan Vitman; Kristinn Haraldsson; Shlomit Ronn-Agler
**Subject:** Equity treatment at Qualifying Retirement - Update

Hlo,

Following the approval of the 2015 LTI plan, a separate Qualifying Retirement Policy was designed and approved by the HRCC on September 2015.

3

KEUCH000088

JOINT APPX 0627

Following further reviews, considerations and business environment changes the HRCC has approved an adjustment to the Qualifying Retirement Policy as follows:

- the threshold of the first definition of "Qualifying Retirement" was revised
  - **from** age greater than 65 years and at least **5** years of service
  - **to** age greater than 65 years and at least **10** years of service

This change will be effective to any award granted under the 2015 LTI plan.
This is the only change to the policy, other terms of the policy remain unchanged.

For your convenience, please find attached and bellow the updated three qualifying retirement rules:

1. **Any Termination other than death, disability or cause** that meets the following rule: Participant's age is at least **65**, and at least **10** years of service → Full Continued vesting of all grants and Continued exercisability for full term
2. **Company initiated retirement (or by mutual agreement)** meeting the following rule: Participant's age is at least **55** and at least **15** years of service → Full Continued vesting of all grants and Continued exercisability for full term
3. **Company initiated retirement (or by mutual agreement)** meeting the following rule: Participant's age plus years of service at least **70** and age is greater than **55** → Continued vesting of tranches vesting in next **12 months** *and* Continued exercisability for full term

Please note that the second and third rules should only be implemented if the company initiated the retirement or by mutual agreement. The intention of termination by mutual consent is not to include resignation but only to include situations where the termination is the interest of the company.

●ase let me know if you have any questions,

Best regards,

Roni Perelis, Senior Director, Global Equity Compensation
Tel: 972 2 692 7277 | Cell: 972 52 121 3767
roni.perelis@teva.co.il | www.tevapharm.com

KEUCH000089

JOINT APPX 0628

**Randy Keuch**

| | |
|---|---|
| **From:** | Jason S French (External) <Jason.French@ey.com> |
| **Sent:** | Tuesday, August 22, 2017 3:29 PM |
| **To:** | Yael Elbaz; Anna Khais; Kristina Devericks |
| **Cc:** | Randy Keuch; Jerry Tammaro; Debbie Spyker |
| **Subject:** | RE: FICA Withholding - Timing considerations |
| | |
| **Importance:** | High |

Anna, Christina and Yael

As a follow up to the correspondence below, there appears to be four (4) retirement eligibility considerations

1. Age 65 and 10 years of service – continued vesting period is the full vesting period of the award
2. Age 55 with 15 years of service – continued vesting period is the full vesting period of the award
3. Age 55 with
    a. Minimum age 55 and b. Age and service equal to 70 – continued vesting period is the 12 month period following termination
4. For 2016 Awards only – If age greater than 65 and years of service greater than 5 years - continued vesting period is the full vesting period of the award

***FICA timing considerations***

As noted in our correspondence and discussions to date -

- For FICA (collectively Social Security and Medicare) withholding purposes, there is a special timing rule which provides that awards are subject to FICA tax on the later of the date that services are provided *or when there is no longer a substantial risk of forfeiture.*
- If an individual can resign without forfeiting the award, the award will no longer be subject to a substantial risk of forfeiture.
- Under the nonduplication rule, once compensation is taken into account for FICA purposes, the amounts will not be subject to FICA in the future

As an example –

- Employee A is granted 100 RSUs, vesting ratably over the next four years, on 1 February 2018. She is age 64 and turns 65 on 15 November 2019
- She has worked for Teva for 11 years
    o At the date of grant, Employee A is age 64 with 11 years of service which means she will continue to vest over the 12 month period following termination. If she can resign with the mutual agreement of the Company, she would receive 25 RSUs on 1 February 2019. Under the special timing rule, there is no longer a substantial risk of forfeiture and the 25 RSUs must be taken into account.
    o Under the rule of administrative convenience, the RSUs that are not subject to a substantial risk of forfeiture may be taken into account at any time prior to 31 December 2019

When she turns 65 on 15 November 2019, she will be eligible for Full Retirement and could retire and receive all 100 RSUs on the normal vesting dates

1

KEUCH000084

JOINT APPX 0629

options and unvested RSUs. **Continued exercisability for full term**

the company initiated retirement (or by mutual agreement) and employee's age plus years of service at least 70 and age is greater than 55: **Full Continued vesting of unvested options and unvested RSUs. Continued exercisability for full term**

agreement) and employee's age plus years of service at least 70 and age is greater than 55: *Unvested options and RSUs: Continued vesting of tranches vesting in next 12 months and Continued exercisability for 12 month+90 day from termination date*

nly for grants during 2016: If the age is greater than 65 and the years of service is greater than 5 (voluntary/involuntary) - **Full continued vesting, full exercisability**

Thank y☺U!

Have a lovely day,
Yael




Yael Elbaz-Roiter @ Director, Head of Teva Stock Plans Management
Tel: +972 (3) 914302 | Cell: +972 (6) 3385213 Fax: +972 (0) 9148761
Yael.Elbaz-Roiter@teva.co.il www.tevapharm.com

Before printing, kindly consider the forests!

-----Original Appointment-----
**From:** Anna Khais
**Sent:** Tuesday, August 01, 2017 9:36 PM
**To:** Anna Khais; Yael Elbaz; Kristina Devericks; jason.french@ey.com
**Cc:** Randy Keuch
**Subject:** FICA Withholding - 409A Compliance
**When:** סאוגוס 02 יום רביעי 2017 10:00-11:00 (UTC-05:00) Eastern Time (US & Canada).
**Where:** https://teva.globalmeet.com/AnnaKhais

<< OLE Object: Picture (Device Independent Bitmap) >>

<< OLE Object: Picture (Device Independent Bitmap) >>

**You're Invited.**

3

KEUCH000085

JOINT APPX 0630

**Randy Keuch**

| | |
|---|---|
| **From:** | Anna Khais |
| **Sent:** | Thursday, September 21, 2017 10:26 AM |
| **To:** | Randy Keuch |
| **Subject:** | RE: Rule 70 - Qualified Retirement |

Hi Randy

You are referring to an email that you plan to send to employees, but it's not below or attached. I agree with your statements below and reviewed the Excel attachment provided by Yael. You can go ahead and send the proposed language to Jason at EY and just cc me so that I can be aware of progress as well as content of what will go out to ee's. As we agreed on our last discussion, we will calculate value and associated taxes on November 1st, to be processed with November 10th payroll.

Thank you

Best regards,





OUR PURPOSE & VALUES

---

**From:** Randy Keuch
**Sent:** Wednesday, September 20, 2017 1:55 PM
**To:** Anna Khais
**Subject:** RE: Rule 70 - Qualified Retirement
**Importance:** High

Hi Anna,

Please ignore my earlier email on this topic. Below is an email that I plan to send to everyone on Yael's email below. I would like to have E&Y weigh in on the content of this email for accuracy. If you agree, would you prefer that I send to Jason or do you want to send? Also, do you agree with this email?

Let me know if you wish to discuss.

Randy

1

KEUCH000081

JOINT APPX 0631

Hi Yael and Roni,

To be in compliance with US tax laws, Teva is required to collect FICA taxes from all employees who meet the definition of Qualifying Retirement under our equity plans.  Currently, we have the following employee counts as to who meet the current criteria:

- 10 employees meet the Qualifying Retirement requirements for both the 2010 and 2015 plans
- 127 employees who meet the Qualifying Retirement requirements for the 2010 plan

Based on an opinion letter from Ernst & Young combined with the reality that over the past several years, every US employee who met the Rule of 70 and asked for this equity treatment was approved.  The research we conducted on the equity history file indicates that **in all cases** where the employee was terminated (not for cause or performance) and the employee met the Rule of 70, the employee was not notified of their retirement qualification status, as the HR managers handling terminations do not have access to equity grants and therefore would not know if the employee had any unvested equity.  As such, stock administration cancelled their equity without informing the employee or the HR Manager.

With this in mind, E&Y believes that to be in compliance, we need to do the following:

1. Collect FICA taxes from all unvested RSU grants from the 10 employees who meet the Qualifying Retirement requirements for both the 2010 and 2015 plans
2. Collect FICA taxes from all unvested RSUs under the 2010 plan from the 127 employees who meet the Qualifying Retirement requirements for the 2010 plan

Recognize that once we collect these taxes, we cannot disqualify these employees from future vesting of these RSUs (except where termination is due to cause) as they will have paid taxes on them, which will not be returned by the US government.

I am writing to everyone to create awareness of the situation.  In addition, if further changes to Qualifying Retirement is being considered, we may need to grandfather these employees.

Best regards,



---

**From:** Yael Elbaz
**Sent:** Thursday, August 17, 2017 9:14 AM
**To:** Roni Percik; Randy Keuch; Sharon Blau01; Sergey Bukler; Ron Yaniv; Lesley Billow; Mark Sabag
**Subject:** Rule 70 - Qualified Retirement

Hi all,

2

KEUCH000082

JOINT APPX 0632

Further to a discussion between Mark and Ron, we are now freezing the implementation of the new qualified retirement rules.

e will go back to use the old Rule 70, as described on 2010 omnibus plan.

Each case will require an approval from Lesley **and Mark**.
As well, we will need **the committee** to approve the change, as the previous rule was approved by them.

Until an internal HR discussion will be made in regards to this rule, and rethinking of the whole process, we will go back to work **by Rule70 as describes under 2010 in the attached doc.**

Corporate HR together with the US HR leadership, will review all the cases - new ones and ones that were **refused**, including those who were already informed and grants were forfeited.
In the next couple of weeks, the Stock Plans Management team, will undo the process to all the approved cases, and will inform HR accordingly for communication purposes.

Thank you for your understanding and cooperation!

Thank y☺U!

Have a lovely day,
Yael



Yael Elbaz-Rolter   Director, Head of Teva Stock Plans Management
Tel: +972 (8) 914 8024    Cell: +972 (54) 888 5213    Fax: +972 (8) 914 8751
Yael.ElbazRolter@teva.co.il    www.tevapharm.com



**Before printing, kindly consider the forests!**

KEUCH000083

JOINT APPX 0633

Dear Larry,

Historically, Teva has required US employees who meet the definition of "Qualified Retirement" under our equity plans to receive approval from the SVP Human Resources, Americas to receive "Qualified Retirement" treatment for their unvested equity awards. This letter is to inform you that should you elect to retire at any time in the future, you are approved for "Qualified Retirement" treatment and as such, your unvested equity awards will continue to vest (unless you are terminated for cause) with no forfeiture of any awards.

**IMPACT**

While this is good news, I must also advise you that this approval virtually eliminates any chance of forfeiture and, under the US tax code - Section 409A, your unvested RSUs are now subject to FICA taxes. FICA taxes include the following:

| | Tax | Comments |
|---|---|---|
| Social Security | 6.20% | only on first $127,200 in income |
| Medicare | 1.45% | |
| Medicare Surcharge | 0.90% | |
| TOTAL | 8.55% | |

Since you have already paid the Social Security wage base maximum tax, your unvested RSUs will only be taxed for Medicare and the Medicare Surcharge, which equals a total tax of 2.35%.

**CALCULATING AND COLLECTING THE TAX**

The attached worksheet is an estimate of the tax that you owe on your unvested RSUs for 2017 based on a stock price of $15.00. Please review it for accuracy. Our timeline for calculating and collecting this tax is as follows:

| | |
|---|---|
| November 1, 2017 | The closing stock price on this date will be used to calculate taxes |
| November 6, 2017 | You will receive your worksheet indicating the taxes you owe |
| November 24, 2017 | These taxes will be deducted from your November 24 paycheck |

KEUCH000011

**FUTURE AWARDS**

This is a 1-time tax and as such, you will not be taxed again when these shares vest (you may recall that our stock administrator typically sells some of the shares that are vesting to pay this tax). However, all future RSU awards will be taxed upon issuance. Should you receive an RSU award in 2018, you will be taxed the full FICA tax of 8.55% unless you have already paid the Social Security wage base maximum tax. As most equity awards are granted after bonus payouts, you should have exceeded the Social Security wage base maximum and therefore, not be required to pay any additional Social Security taxes. Again, these taxes will be deducted from your paycheck within a few weeks following any future awards.

Should you have any questions or wish to discuss, please contact me directly.

Best Regards,

Randy Keuch

Head of Total Rewards, Americas

267-468-4325

# RSU Tax Worksheet Estimate

| Grant Date | Shares Granted | Grant Price | Vested Shares | Unvested Shares | Vested Value | Unvested Value | | Medicare | Medicare Total | Med Surcharge tax | Surcharge Total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 3/3/2017 | 1,515 | $34.70 | 0 | 1,515 | $0 | $22,725 | | 1.45% | $329.51 | 0.90% | $204.53 |
| 3/3/2017 | 1,515 | $34.70 | 0 | 1,515 | $0 | $22,725 | | 1.45% | $329.51 | 0.90% | $204.53 |
| 3/3/2017 | 1,518 | $34.70 | 0 | 1,518 | $0 | $22,770 | | 1.45% | $330.17 | 0.90% | $204.93 |
| 3/3/2017 | 1,515 | $34.70 | 0 | 1,515 | $0 | $22,725 | | 1.45% | $329.51 | 0.90% | $204.53 |
| 3/17/2016 | 1,415 | $53.50 | 0 | 1,415 | $0 | $21,225 | | 1.45% | $307.76 | 0.90% | $191.03 |
| 3/17/2016 | 1,415 | $53.50 | 0 | 1,415 | $0 | $21,225 | | 1.45% | $307.76 | 0.90% | $191.03 |
| 3/17/2016 | 1,415 | $53.50 | 0 | 1,415 | $0 | $21,225 | | 1.45% | $307.76 | 0.90% | $191.03 |
| 3/12/2015 | 1,430 | $60.21 | 0 | 1,430 | $0 | $21,450 | | 1.45% | $311.03 | 0.90% | $193.05 |
| 3/12/2015 | 1,428 | $60.21 | 0 | 1,428 | $0 | $21,420 | | 1.45% | $310.59 | 0.90% | $192.78 |
| | | | | | | $197,490 | | | $2,863.61 | | $1,777.41 |
| | | | | | | | | | | Grand Total | $4,641.02 |
| | | | | | | | | | | Teva Stock Price | $15.00 |

KEUCH000013

JOINT APPX 0636

# RANDOLPH WM. KEUCH

111 Rose Lane • Chalfont, PA 18914 • Cell: 412.225.8000
Randy.Keuch@gmail.com

*As a recognized global leader in Compensation, Health and Wellbeing, Retirement Plans, and Global Mobility, I am seeking a senior position where my board experience and my international and domestic expertise both as a practitioner and as a consultant will enable me to collaborate with business leaders and team members to deliver exceptional value to customers, stakeholders, and employees.*

## PROFESSIONAL EXPERIENCE – Senior Corporate Positions (1994 – Present)

**TEVA PHARMACEUTICALS, North Wales, PA**                                January 2014 - Present

Lead the Total Rewards Center of Expertise for the Americas providing subject matter expertise and cutting edge solutions to all facets of total rewards issues within the region. Teva is going through a major HR transformation, implementing new tools and technology to support our employees and to enable HR to better support the business. Over the last 3 years my team and I:

- Were recognized in 2016 and 2017 by NBGH and Fortune Magazine as one of the Best Employers for Healthy Lifestyles
- Successfully integrated 3 major acquisitions in the Americas Region (Rimsa-Mexico, Actavis-Global, and Anda-US)
- Developed and launched a global recognition program for Teva
- As a US issuer, manage SEC proxy aspect for US-based NEOs
- Developed global long-term incentive plan for Biologics
- Developed and launched an innovative Total Rewards Portal for all US and Canadian employees
- Developed and implemented a rolling 3-yr benefits strategy for the U.S that saved over $30 in 2015 and 2016 while driving employee knowledge and positive perspective on their benefits to levels that are 20 percentage points above the norm for high performing companies
- Developed and implemented pay alignment strategies for the US and Canada resulting in a significant decline in turnover and improved new hire acceptance ratios
- Designed and approved all sales compensation programs and contests within the region
- Implemented the Willis Towers Watson Global Grading System and their REWARD tool throughout the region

**H.J. HEINZ COMPANY, Pittsburgh, PA**                                April 2005 – September 2013

**Vice President, Total Rewards (2005 – 2013)**

Working directly with senior management and the Management Development & Compensation Committee of the Board, established the position of VP, Total Rewards and in that role, transformed many of the Company's executive pay programs into effective drivers of business success. My team's efforts reduced benefit and turnover costs and helped position the Company to have one of its best financial performance years in its history. We also built a world-class HR portal, MyHeinzPlace that aggregated current and historical employee information regarding their health, wealth and career, and provided SSO to specific benefit websites. Much of my team's work in executive compensation is described in the 2012 Annual Proxy – which has earned considerable acclaim as one of the better Compensation Discussion & Analysis filed to date. Heinz also received the highest positive Say-on-Pay vote (78%) of any company when receiving a NO vote recommendation from ISS. Heinz is a recognized leader in health and wellness as reflected in the many awards we have earned for innovation, communications and cost management (Heinz received the Platinum Award from NBGH and the US Surgeon General's Medallion in 2012, a Gold Quill in 2011 and a Hermes in 2012). My team oversaw all global retirement plans; drove our global pension strategy; drove our US health care strategy; oversaw HR technology; and managed expatriates, our regional total rewards centers of excellence, our aviation function (3 fixed wing aircraft and hangar), a fleet of over 450 vehicles, and participated in labor contract negotiations.

**THE HARTFORD, Hartford, CT**                                2004 – 2005

**AVP, Compensation – P&C Division (2004 – 2005)**
Led development of a rewards strategy for the enterprise, integrating talent management and compensation programs to drive business success, including realignment of our executive compensation programs. Developed new sales organization and compensation programs to achieve lower costs and increased premiums while minimizing risk. Explored new pay systems for our venture capital organization and our investment entities.

KEUCH000039

# RANDOLPH WM. KEUCH
### Page 2

**PFIZER, INC.**, New York, NY (left due to Warner-Lambert and Pharmacia acquisitions)          1998-2004

**Corporate Director, Strategic Rewards (2002 - 2004)**
Led the redesign of all reward and recognition programs globally, including Pfizer's annual incentive plan, stock option program, performance share program, colleague recognition program, and other short-term incentive plans. Led a team tasked with developing a global compensation approach for the company, which included introducing broad banding or "super grades" as the compensation structure; establishing financial metrics at senior levels; communications; and directing the design of our PeopleSoft systems, reporting tools, and HR portal. Redesign was focused on reallocating compensation and benefit expenditures into programs that increased employee engagement - resulting in over $100 million in increased profitability.

**Director, Pfizer Consumer Group (PCG) Compensation (1998-2002)**
Built the compensation organization for PCG and each division within it, including the redesign of all compensation programs to facilitate the sale of three consumer businesses (Adams, Schick & Tetra) at a premium price. Developed the PCG global rewards strategy, incorporating pay data from 23 countries and using this strategy to develop U.S. and global pay processes for delivering merit increases, annual bonuses and stock options. Also drove change through teams to redesign remuneration programs globally for all lines of business to enhance efficiencies and enable effective talent management. Provided vision and established infrastructure for launching broadbanding pay structure in the U.S., Asia, Australia and South Africa as well as building global total remuneration survey groups for each key geographic region. Revamped both U.S. and European sales compensation programs, resulting in a 20% sales increase and a 35% drop in turnover. Developed reward & retention program for critical scientists being relocated from Morris Plains, NJ to Ann Arbor, Michigan, resulting in substantially reduced turnover and hiring costs. Provided leadership to launch PeopleSoft; upgrade U.S. benefits programs; and develop a global employee data analysis tool.

**SMITHKLINE BEECHAM**, Philadelphia, PA (left due to merger with Glaxo)          1994-1998

**Corporate Director, Compensation Strategy & Development (1996-1998)**
Designed remuneration programs and processes globally for all divisions resulting in substantial cost-savings and a stronger linkage between pay and performance. Established infrastructure for launching global shared service for compensation function (staff of 20) resulting in vastly improved customer service and a 22% reduction in cost of services. Developed and implemented a cash and stock-based reward & retention program for SB's high technology professionals worldwide that saved the company over $40 million in turnover costs and resulted in no major business disruption due to Year 2K issues; and worked with compensation committee of board to develop elite retention program for executives that took advantage of transferable options and deferred compensation arrangements.

**Director, Human Resource Planning, Systems, & Compensation (1994-1996)**
*Worldwide Research & Development Organization*
Led the compensation and HRIS function globally (2 major sites: Philadelphia & London with staff of 10) and added value to the organization by designing and implementing the following major new initiatives:
- Designed and launched career development and remuneration program for most of R&D's over 4,000 employees.
- Developed and launched R&D's People Measures – an executive information system that provides scorecard for optimizing R&D's people asset.
- Developed and launched reward and recognition program for three SB businesses.

## PROFESSIONAL EXPERIENCE – Senior Consulting Positions (1988 - 1994)

**COMPENSATION RESOURCES, INC.**, Upper Saddle River, NJ          1993-1994

**Principal**
With the successful public offering of Opinion Research Corporation, I moved the compensation consulting practice to Compensation Resources, Inc. and managed numerous executive compensation and human resource consulting assignments for my clients. Served as expert witness for U.S. government in executive compensation-related matters and have been credited with much of the case law in this area. Developed compensation system for large investment firm and provided compensation services to major financial institutions, consumer goods companies and pharmaceuticals.

KEUCH000038

JOINT APPX 0638

# RANDOLPH WM. KEUCH

Page 3

**OPINION RESEARCH CORPORATION**, Princeton, NJ                           1992-1993

**Partner/Owner**

Provided compensation and business solutions to clients and their Boards.  Supported quality improvement efforts of clients from business perspective through fact-based measurement framework that encompassed customer satisfaction, employee satisfaction/commitment, business processes, and financial performance.  Created innovative organizational structures and compensation arrangements that enabled companies to support and sustain selling strategies.  Participated in IPO of the company in 1993 and left as company exited the compensation consulting business.

- Designed powerful measurement tool, The Balanced Scorecard, for a top 10 financial institution.
- Developed unique methodology to examine sales force effectiveness and link sales compensation to key drivers of customer satisfaction resulting in substantial sales increases.
- Developed worldwide internal customer satisfaction measurement system for internal infrastructure organizations within Fortune 50 pharmaceutical/healthcare company.

**KPMG PEAT MARWICK**, Short Hills, NJ (left as benefits and compensation practices were being sold)       1988-1992

**Manager**

- Led the marketing, selling and managing of client engagements in all areas of compensation, particularly executive, sales and incentive compensation; computer-aided job evaluation, and quality improvement.
- Established national reputation for compensation and related human resource consulting in the high technology industry.
- Sold and managed global research study for IBM on pay and employee involvement resulting in major redesign of IBM recognition programs…authored a book "Learning from the Leaders" about the results of this study, that was sold by the Society for Human Resource Management.
- Developed supplemental retirement plans, deferred compensation arrangements and Board of Director stock option plans for a variety of organizations, including a major credit card provider.

**Previous Professional Experience:**

TOWERS-PERRIN, Detroit, MI, **Executive Compensation Consultant**

GENERAL ELECTRIC, Information Services Unit, Rockville, MD, **Compensation Manager**

PLANNING RESEARCH CORPORATION, McLean, VA, **Executive Compensation Director** (co. acquired)

SIBSON & COMPANY, Princeton, NJ, **Compensation Analyst/Consultant/Senior Consultant** (co. sc¹⁻¹)

## EDUCATION

HARVARD BUSINESS SCHOOL, Cambridge, MA, Completed Executive Education Program, 2002

GEORGE MASON UNIVERSITY, Fairfax, VA, post-graduate work in Human Resource Management,

STEVENS INSTITUTE OF TECHNOLOGY, Hoboken, NJ
   **MS Degree**, Applied Psychology
   **BS Degree**, Industrial & Organizational Psychology (with Honors & Thesis)

Recipient of the American Compensation Association's Lifetime Achievement Award, 2000
Served on the Board of Directors for the National Business Group on Health (2010 – 2014)
Served on the Customer Advisory Board for Fidelity Investments (2009 – 2013)
Chaired the Executive Compensation Advisory Board for WorldAtWork (2008 – 2011)
Certified Executive Compensation Professional (2010)
Adjunct Professor at Trenton State University

KEUCH000040

JOINT APPX 0639

# RANDOLPH WM. KEUCH

Page 2

**PFIZER, INC.**, New York, NY (left due to Warner-Lambert and Pharmacia acquisitions)                    1998-2004

**Corporate Director, Strategic Rewards (2002 - 2004)**
Led the redesign of all reward and recognition programs globally, including Pfizer's annual incentive plan, stock option program, performance share program, colleague recognition program, and other short-term incentive plans. Led a team tasked with developing a global compensation approach for the company, which included introducing broad banding or "super grades" as the compensation structure; establishing financial metrics at senior levels; communications; and directing the design of our PeopleSoft systems, reporting tools, and HR portal. Redesign was focused on reallocating compensation and benefit expenditures into programs that increased employee engagement - resulting in over $100 million in increased profitability.

**Director, Pfizer Consumer Group (PCG) Compensation (1998-2002)**
Built the compensation organization for PCG and each division within it, including the redesign of all compensation programs to facilitate the sale of three consumer businesses (Adams, Schick & Tetra) at a premium price. Developed the PCG global rewards strategy, incorporating pay data from 23 countries and using this strategy to develop U.S. and global pay processes for delivering merit increases, annual bonuses and stock options. Also drove change through teams to redesign remuneration programs globally for all lines of business to enhance efficiencies and enable effective talent management. Provided vision and established infrastructure for launching broadbanding pay structure in the U.S., Asia, Australia and South Africa as well as building global total remuneration survey groups for each key geographic region. Revamped both U.S. and European sales compensation programs, resulting in a 20% sales increase and a 35% drop in turnover. Developed reward & retention program for critical scientists being relocated from Morris Plains, NJ to Ann Arbor, Michigan, resulting in substantially reduced turnover and hiring costs. Provided leadership to launch PeopleSoft; upgrade U.S. benefits programs; and develop a global employee data analysis tool.

**SMITHKLINE BEECHAM**, Philadelphia, PA (left due to merger with Glaxo)                    1994-1998

**Corporate Director, Compensation Strategy & Development (1996-1998)**
Designed remuneration programs and processes globally for all divisions resulting in substantial cost-savings and a stronger linkage between pay and performance. Established infrastructure for launching global shared service for compensation function (staff of 20) resulting in vastly improved customer service and a 22% reduction in cost of services. Developed and implemented a cash and stock-based reward & retention program for SB's high technology professionals worldwide that saved the company over $40 million in turnover costs and resulted in no major business disruption due to Year 2K issues; and worked with compensation committee of board to develop elite retention program for executives that took advantage of transferable options and deferred compensation arrangements.

**Director, Human Resource Planning, Systems, & Compensation (1994-1996)**
*Worldwide Research & Development Organization*
Led the compensation and HRIS function globally (2 major sites: Philadelphia & London with staff of 10) and added value to the organization by designing and implementing the following major new initiatives:
- Designed and launched career development and remuneration program for most of R&D's over 4,000 employees.
- Developed and launched R&D's People Measures – an executive information system that provides scorecard for optimizing R&D's people asset.
- Developed and launched reward and recognition program for three SB businesses.

## PROFESSIONAL EXPERIENCE – Senior Consulting Positions (1988 - 1994)

**COMPENSATION RESOURCES, INC.**, Upper Saddle River, NJ                    1993-1994

**Principal**
With the successful public offering of Opinion Research Corporation, I moved the compensation consulting practice to Compensation Resources, Inc. and managed numerous executive compensation and human resource consulting assignments for my clients. Served as expert witness for U.S. government in executive compensation-related matters and have been credited with much of the case law in this area. Developed compensation system for large investment firm and provided compensation services to major financial institutions, consumer goods companies and pharmaceuticals.

KEUCH000041

## Eduardo Nasi Cheide da Graça

3520 SW 174th Way
Miramar, FL 33029, USA
1 954 225 9356
edu.nasi@gmail.com

## Objective

- Compensation & Benefits / Total Rewards Management positions.

## Summary of Qualifications

- A motivated and team-oriented professional with a proven track of references, built on experience and expertise gained in 11 years working as Human Capital consultant serving companies in Brazil and Latin America and two years as Compensation & Benefits Manager for Latina America.
- Regional project manager with very strong interpersonal and verbal communication skills.
- Ability to transit and interact across all functional levels and areas in order to achieve a shared success for the targeted objectives.
- Total Compensation Management: base salary, short and long-term incentives, sales incentives, and benefits. Compensation diagnosis and implementation of new compensation schemes and structure aligned to the market and company strategy.
- Knowledge of work/life balance projects, recognition and rewards plans and expatriate management programs.

## Education

February/1999
June/2004

- Bachelor Degree in Business Administration - Pontifícia Universidade Católica (PUC-SP) São Paulo, Brazil

## Professional Experience

October/2012
Actual

### General Mills – Latin America Regional Office (Doral, FL)

*Compensation & Benefits Manager, LATAM*

- Responsible for Latin America compensation and benefit strategies and design to ensure that company's policies and practices are linked to global and regional organization strategy.
- Merit budget definition in partnership with HQ for all countries, especially Argentina and Venezuela.
- Compensation review for all countries and training to all HR team in the region.
- LTI training to the Leadership team in each country.
- Acting as Compensation & Benefits Manager for Brazil after Yoki's acquisition – USD 500mi Brazilian company. Main projects and achievements:
  - Job leveling for all 5,500 Yoki employees and new salary structure for all locations
  - Inclusion of all Yoki Managers and Directors in the STI plan
  - Inclusion of the Yoki Leadership team in the LTI plan

KEUCH000516

JOINT APPX 0641

- New profit sharing plan implementation being responsible also for the negotiation with the Union and employee committee
- New relocation policy for transfers in country (9 different locations)
- Harmonization of the two companies' health insurance plans (8,300 lives) and implementation of a plan for four plants/locations with no coverage before the acquisition (4,700 lives)
- Other benefits harmonization: dental plan, parking, meal voucher and Christmas voucher

## BlackBerry – Latin America Regional Office (Sunrise, FL)

March/2012
October/2012

### Compensation & Benefits Manager, LATAM

- Responsible for Latin America compensation and benefit strategies and design to ensure that company's policies and practices are linked to global and regional organization strategy.
- Provide direction to Global Rewards team and Regional Leaders in setting compensation and benefits strategies for LATAM.
- Provide input in the development, enhancement of global incentive, sales compensation plan and recognition and rewards programs, assisting with the implementation of approved programs changes in LATAM.
- Implementation of Savings Fund in Mexico, changed medical insurance approach in Argentina and car plan/model offering in Brazil and Mexico with very important savings.
- Partnership with people managers and HR business partners during annual compensation planning process.
- Approval of all recruitment offers in order to establish the best compensation package to each candidate.
- Application of RIM's job description and job classification approach in LATAM in order to be aligned with Global standards to maintain consistency for internal comparisons and external benchmarking.
- Support contract negotiations with local service providers.

## Mercer, Human Capital – Latin America Regional Office (Miami, FL)

August/2009
March/2012

### Senior Consultant – HC Miami Office Leader and C&B CoE Leader for LA

- Responsible for US$ 1.9 million sales budget and 4 direct reports.
- Compensation & Benefits CoE Leader in Latin America. Lead development and deployment of the offering line by building intellectual capital, enhancing the brand, developing cross offering linkages and new products/services, and helping to develop a community of professionals in the region. 11 local consultants were members of the CoE and they are indirect reports.
- Latin America representative in Global groups: Global Compensation & Benefits CoE, Global Benefits team, Global Commercial Governance Council and WIN Global group. Long-term strategy.
- Regional Industry Leader. Responsible for regional forums of consumer goods, life sciences and High Tech/Telecomm industries. Also participated in global industry groups.
- Member of Latin America Human Capital Leaders' Team, group responsible for defining the business strategy, business model, target and goals for the fiscal year and people development for the region.

**October/2008
September/2009**

### *Senior Consultant – Regional Sales and Client Service Manager*

- Responsible for global and regional relationship with clients which participate in multi-country compensation and benefit surveys, conducted by Mercer in 20 countries in the region.
- TRS (Total Remuneration Survey) Product Manager for Latin America, main product of Human Capital Business.
- End-to-end strategic project executions – from planning to delivery, including proposal, development, comprehensive management and consulting.
- Coordination and participation in compensation and benefits surveys, benchmarks, job pricings, gap analysis and salary structure projects.
- Coordination and participation in job description and job evaluation projects using IPE (International Position Evaluation), Mercer methodology. Simulation of adjustment on the new policy through individual analysis with the purpose of adequate the employees on the new salary structure.

### Mercer, Human Capital – São Paulo, Brazil

**March/2001
September/2008**

### *Intern, Analyst, Consultant and Senior Consultant*

- TRS (Total Remuneration Survey) local Product Manager.
- Coordination and participation in compensation and benefits surveys, benchmarks, job pricings, gap analysis and salary structure projects for national and multinational companies.
- Executive compensation package design for national companies.
- Coordination and participation in job description and job evaluation projects using IPE methodology.
- Participation in short and long-term program design projects.
- Coordination and participation in qualitative surveys as such benefits, compensation for commercial area, interns and trainees.
- Participation in organizational climate projects.

**June/1999
October/2000**

### Ford Motors – São Paulo, Brazil

### *Events Coordinator*

Responsible for coordinating Ford events in several regions in Brazil with the objective of promoting Ford brand and products around the country.

## Languages and Other Knowledge and Skills

- **Portuguese** Native / **English** Fluent / **Spanish** Fluent
- General Mills International Orientation – one-week meeting with C-level and Senior Vice Presidents
- Mercer Signature Event Speaker – LACHR Forum Miami
- Short-term assignment – Mercer Miami Office (February – April 2008)
- English course – EF School – Miami, USA – (January 2008)
- Proficient with Microsoft Office tools and Internet applications
- SAP user

KEUCH000518

JOINT APPX 0643

**Randy Keuch**

| | |
|---|---|
| **From:** | MarkSabag <PleaseDoNotReply@comms.teva-pharm.com> |
| **Sent:** | Tuesday, October 03, 2017 9:33 AM |
| **To:** | Randy Keuch |
| **Subject:** | Update on year-end compensation processes |

View web version



**Mark Sabag**
Group EVP and Chief Human Resources Officer



# Update on year-end compensation processes

**To: Teva Top Managers**

Dear Colleagues

As we make our way forward through the current business challenges, your efforts to get Teva back on track have been remarkable. As leaders, we must continue to focus not only on delivery but also on engaging and motivating our employees. Listening to our people, maintaining open communication, and creating the space to work in new ways are leadership challenges that we must accomplish together in order to move from this turning point into a new outlook and mindset across Teva.

More specifically, one of the main concerns we are hearing is around compensation. As managers, you should be aware of these concerns as well as the understanding that compensation is not the only tool to retain and engage talented employees. While compensation is important, it is also important that

1

people stay in Teva because this is a culture they want to be part of, because they want to contribute to building our future together.

Our 'pay for performance' approach remains the same. We intend to provide annual salary increases with eligibility at all grades based on performance and benchmark. And yes, as part of our annual bonus scheme, there is a corporate component where we expect lower results and it will affect the bonus for top management and the entire organization, but, a significant component of the bonus is based on your individual performance and that of your unit – places where you make an impact.

Many of you have also pointed out that our equity compensation is not as valuable and attractive as it used to be. We are certainly aware of the gaps, and are working to increase its competitiveness. A number of suggestions are being evaluated relating to both past and future awards. They need to go through further review and approvals, but we are addressing this matter – we understand how important it is to you and I will communicate to you once decisions have been made.

I am keenly aware – aware that you are doing your best to deliver and to keep your employees motivated; aware of the uncertainties and of the demands we are putting on you and your people; aware that you have a choice. I am committed to continuing the effort to reach out and speak with you to hear your feedback and concerns - I know how difficult it is to be a leader at this time. I believe in every one of you, and I believe in Teva. Together, we can take the organization forward and build an amazing future for our company.

Sincerely
Mark



KEUCH000129

JOINT APPX 0645

**Randy Keuch**

| | |
|---|---|
| **From:** | Tal Zorman |
| **Sent:** | Friday, December 15, 2017 7:10 AM |
| **To:** | Randy Keuch |
| **Cc:** | Daniel Lawlor; Ron Yaniv |
| **Subject:** | Re: Minimal TR Organization for North America |

Thanks much Randy, will review and be in touch with you today/next week

Thanks, Tal


On 14 Dec 2017, at 21:07, Randy Keuch <Randy.Keuch@tevapharm.com> wrote:

Hello Tal,

Attached is a deck that provides my bare bones recommendation for my team. I have included options that suggest elimination of my position or Miriam's position. I strongly urge you not to make any leadership changes in Q1, as there is much work for the team to perform and the risks are very high. I also ask that you consult with Legal to validate the risks and our exposure. An error on our 401k could result in disqualification of the entire plan, which has $1.2 billion in assets, so disqualification will result in the loss of huge tax benefits to Teva. If a leadership change (job elimination) is needed, better to do this in Q2 when work has transitioned to HR Ops & Services, and the organization has stabilized. This is not a personal request nor is it made out of concern for having my position eliminated. Rather, it is a business decision as to how much risk Teva is willing to take by moving too quickly or having inexperienced people in key decision-making roles.

Thanks for your consideration and let me know if you have any questions.

Best regards,



<image001.png>

<image008.jpg><image009.jpg> <image010.jpg>


<Minimal TR Organization Final.pptx>

1

KEUCH000050

JOINT APPX 0646

**Global Talent Management - Leadership Structure Updates**

Dear Colleagues,

I would like to update you on changes to our global Talent Management COE structure.

The **Global Talent Management Center of Expertise** will combine Talent Acquisition and Mobility, Learning, Leadership and Development and Total Rewards to provide HR leading practices and solutions. The following appointments and updates to the Talent Management leadership team and structure are effective immediately:

<u>Talent Acquisition & Mobility</u>

**Carolyn Maye** will lead Executive Hiring and will continue to manage the centralized Top Management (GCA 17+) recruiting function, working closely with global business unit leadership in support of their organization strategy, overseeing all aspects of global Top Management recruitment while providing visible metrics that help drive business value.

**Gregory Sullivan** will lead Talent Acquisition activities as subject matter expert with direct accountability for designing global TA processes, policies and tools, while collaborating with HROS on implementation.

**Michelle Durkin** will lead Global Mobility which continues to be an SME function across all businesses and functions, to provide cost effective mobility solutions, strengthen current processes and service partner performance, re-position Global Mobility within a talent management approach, educate key stakeholders, and review global mobility policies to meet future needs of the business.

<u>Learning, Leadership & Development</u>

The Learning, Leadership & Development function will provide 'just in time' leadership, talent and organizational development solutions to support the organizational restructuring and rebuild employee engagement. There will be no dedicated L&D support/presence in the region/BU and the corporate team will hold a strong partnership with the business to ensure global, regional and BU alignment. The Learning team will provide learning governance across Teva and ensure the Learning Management System & technologies' sustainability.

**Ravit Eshed** will lead Talent, Leadership Development and Engagement; **Lior Porat** will lead the Organizational Development; and **Avital Szarfman** will lead the Learning function (as well as the CoE Planning, Governance and Processes management).

<u>Total Rewards</u>

The Total Rewards CoE will focus on designing and leading programs, processes and policies, combining best market practices and Teva's needs.

With a continued, smaller regional presence, the team will focus on supporting Teva's Business and HR in achieving their strategic and operational objectives, providing solutions in the Total Rewards space, such as Compensation, Benefits and Equity.

KEUCH000009

Yonatan Vitman will lead Global Compensation & Equity Design. Eduardo Nasi will lead Total Rewards in the North America region;  Amir Haim Zeirah will lead Total Rewards in the Growth Markets region (Israel, LATAM and Asia); and the European region will be announced at a later stage.

The following Total Rewards team members will continue their roles:

- **Gaurav Gulati is responsible for APAC, reporting to Amir Haim Zeirah.**
- **Roni Percik will join the Global Compensation & Equity team responsible for Equity Design, reporting to Yonatan Vitman.**
- **Lian Ben Ezra will join the Global Compensation & Equity team and will assume responsibilities for leading key projects and processes in the Compensation domain, reporting to Yonatan Vitman.**

The Executive Compensation team, **Shlomit Ronn-Agler and Ephie Nissenfeld**, will move to the HR Office, reporting to Assaf Ehrenreich.

<u>Planning & Process Management</u>

This function will provide cross CoE planning, governing and implementing processes and tools, to enable metrics-based strategic decision making.  Avital will lead this area, in addition to the Learning COE.

---

**Orit Amores**, my personal assistant, is transitioning into a new role in the HR Operations & Services organization. **Donna Perry** will replace Orit to provide administrative support for both the Global Talent Management team as well as the HR Operations & Services team.

As a result of the above organizational changes, we will be parting from **Randy Keuch**.  I would like to thank Randy for his significant contributions and dedication to Teva. In the last four years Randy led the Total Rewards Center of Expertise for the Americas providing subject matter expertise and cutting edge solutions to all facets of Total Rewards issues within the region.  Randy's last day with Teva will be February 23.

Updates regarding additional team members will be provided at a later stage.

I appreciate your patience and commitment as we continue to work through this difficult process, and I thank you for your ongoing support and understanding. I am confident in our team's ability to move forward and create a new path to become a stronger and more agile team.

Tal Zorman
SVP Global Talent Management

KEUCH000010

Randolph Keuch

**EXHIBIT "C"**

**INFORMATION MADE AVAILABLE PURSUANT TO THE
OLDER WORKER BENEFIT PROTECTION ACT OF 1990**

The following information is provided in accordance with the Older Worker Benefit Protection Act of 1990 to permit affected employees age forty (40) and older to evaluate whether to execute a Separation Agreement and General Release in return for the receipt of a severance payment and benefits.

(A)    For purposes of this Exhibit "C," the Decisional Unit consists of the entire Global HR Department of Teva Pharmaceuticals USA, Inc.

(B)    The eligibility factors for this program are (1) whether the employee's individual position is unnecessary at this time for on-going operations; (2) whether the employee's individual's position is at a site that is slated to close; or (3) whether an individual position's occupant is performing below expectations.

(C)    Each employee who is being laid off because his or her position is not necessary at this time for on-going operations or because of a site closure are eligible for the severance payment and benefits set forth in paragraph 2 of his or her Separation Agreement and General Release. However, to receive the severance payment and benefits, the employee must sign the Separation Agreement and General Release and return it to Elaine McGee, Human Resources Department, Teva Pharmaceuticals USA, Inc., 1070 Horsham Road, North Wales, PA 19454 no later than forty-five (45) days after receiving the Separation Agreement and General Release. Once the signed Separation Agreement and General Release is returned to Teva, an employee has seven (7) days to revoke it.

(D)    The following is a listing of the ages and job titles of employees in the Decisional Unit who were selected for lay off and the offer of a separation payment and benefits as set forth in paragraph 2 of their Separation Agreement and General Release:

| Job Title | Age | Selected |
|---|---|---|
| Sr Mgr Human Resources | 60 | Y |
| HR Specialist | 60 | Y |
| MD Recruiter | 58 | Y |
| Sr Mgr Mobility US | 57 | Y |
| Mgr Human Resources | 57 | Y |
| Global LMS Specialist | 57 | Y |
| Benefits Analyst | 57 | Y |
| Sr Dir Human Resources | 55 | Y |
| Manager of Talent Acquisition LATAM | 55 | Y |

Randolph Keuch

| Job Title | Age | Selected |
|---|---|---|
| Mgr Human Resources | 55 | Y |
| Sr Dir Global Mobility | 54 | Y |
| Sr Dir HRBP NA GSM | 54 | Y |
| Sr Executive Assistant | 54 | Y |
| Sr Mgr Talent Acquisition, R&D | 54 | Y |
| Manager, Compensation | 54 | Y |
| Sr Dir TGO Latam Region HRBP | 53 | Y |
| Director, Leadership & Development Business Partner | 53 | Y |
| Talent Acquisition Mgr | 53 | Y |
| Dir HR Program Management | 53 | Y |
| Sr Dir Human Resources | 52 | Y |
| Sr Dir Human Resources | 52 | Y |
| Dir Leadship & Dev LatAm | 52 | Y |
| HR Generalist | 52 | Y |
| Head of HR - Latin America | 51 | Y |
| Dir HR Ops & Services, LatAm | 51 | Y |
| Senior Director, Talent Acquisition - Americas | 48 | Y |
| Sr Dir Human Resources Operations & Services | 48 | Y |
| Mgr Talent Acquisition | 45 | Y |
| Senior Talent Acquisition Partner | 44 | Y |
| L&D Coordinator | 44 | Y |
| HR Manager | 44 | Y |
| HR Shared Services Supervisor | 44 | Y |
| Senior Talent Acquisition Partner | 42 | Y |
| HR Customer Service Representative | 42 | Y |
| Dir Leadership & Development | 39 | Y |
| Senior HR Generalist | 37 | Y |

KEUCH000160

Randolph Keuch

| Job Title | Age | Selected |
|---|---|---|
| HR Data Governance Analyst | 36 | Y |
| HR Customer Service Representative | 36 | Y |
| HR Global Analytics | 35 | Y |
| HR Manager | 35 | Y |
| Mgr Benefits | 34 | Y |
| Mgr Benefits | 34 | Y |
| HR Services Specialist | 34 | Y |
| HR Coordinator | 33 | Y |
| HR Shared Services Team Leader | 33 | Y |
| HR Shared Services Rep | 33 | Y |
| Senior Manager, L&D | 33 | Y |
| HR Shared Services Rep | 32 | Y |
| HR Customer Service Rep | 31 | Y |
| HR Generalist I | 31 | Y |
| HR Customer Service Representative | 31 | Y |
| Analyst - HR Operations and Services | 30 | Y |
| HR Shared Services Rep | 30 | Y |
| HR Services Specialist | 29 | Y |
| HR Customer Service Representative | 29 | Y |
| HR Customer Service Representative | 29 | Y |
| Recruiting Coordinator | 27 | Y |

(E)   The following is a listing of job titles and ages of the employees in the Decisional Unit who are not being laid off and who are not eligible for separation benefits:

| Job Title | Age | Not Selected |
|---|---|---|
| Assoc Dir HR Ops & Services | 58 | N |
| Sr Mgr Human Resources | 58 | N |
| Benefits Analyst | 57 | N |

KEUCH000161

JOINT APPX 0651

Randolph Keuch

| Job Title | Age | Not Selected |
|---|---|---|
| SVP HRBP - GGM | 55 | N |
| Sr Mgr Human Resources | 55 | N |
| Associate Director, HR | 54 | N |
| Sr Dir HR Planning & Economics | 54 | N |
| Associate Director, Human Resources | 54 | N |
| Dir Talent Acquisition & Mobility | 53 | N |
| Sr Dir HR R&D | 53 | N |
| Associate Director, Global Talent Acquisition | 53 | N |
| Senior Director, Regional HRBP - TGO | 52 | N |
| HR Services Specialist | 52 | N |
| Director, HR Program Management | 51 | N |
| Sr Dir Leadership & Development II | 51 | N |
| Dir Exec Recruit & Emp Brndng | 51 | N |
| VP HR TGO Global Units | 51 | N |
| Mgr Human Resources | 51 | N |
| Assoc Dir Human Resources | 48 | N |
| Senior HR Generalist | 48 | N |
| Senior Manager, Human Resources | 45 | N |
| Vice President, HR BP TGO Americas | 42 | N |
| Director, HR Site Lead | 42 | N |
| Associate Director, Human Resources | 39 | N |
| HR Services Analyst | 39 | N |
| Mgr Compensation | 39 | N |
| HR Shared Services Rep | 39 | N |
| Sr Mgr HR (Small) | 38 | N |
| Dir Total Rewards, LatAm | 38 | N |
| Mgr Talent Acquisition | 38 | N |
| Mgr Human Resources | 38 | N |

Randolph Keuch

| Job Title | Age | Not Selected |
|---|---|---|
| Mgr, HR Planning & Economics | 37 | N |
| Mgr Talent Acquisition | 35 | N |
| HR Generalist | 35 | N |
| HR Shared Services Rep | 35 | N |
| HR Data Governance Analyst | 34 | N |
| Benefits Analyst | 34 | N |
| Mgr Employee Relations | 33 | N |
| HR Manager | 33 | N |
| HR Shared Services Supervisor | 32 | N |
| Sr Mgr HR Shared Services | 31 | N |
| Mgr HR Data Governance – Europe & Americas | 30 | N |
| Analyst - HR Operations and Services | 30 | N |
| HR Data Governance Analyst | 29 | N |
| HR Services Specialist | 26 | N |
| HR Shared Services Rep | 25 | N |

KEUCH000163

JOINT APPX 0653

Teva Pharmaceuticals USA, Inc.'s
**COBRA Summary And Election Form**

Mail To: Cobra Control Services, LLC
P. O. Box 62407
King of Prussia, PA 19406

 **BAS** CobraControl

## TO ACTIVATE COBRA COVERAGE

1. You must complete, sign, and date this Form, and have it postmarked for delivery to Cobra Control Services, LLC (CCS) within 60 days from the later of the date of your Qualifying Event letter provided with this form or your actual loss of coverage.

2. Provided that this election form is postmarked before the end of the 60-day election period (see SUMMARY #10 below), you will have up to 45 days from this form's postmark date to mail/provide CCS with your Initial Premium Payment.

3. Your Initial Premium Payment must include payment in full for each coverage month, retroactively to the loss of coverage date that becomes due on or before the earlier of (1) the date that is 45 days from this election form's postmark date (this is called the Initial Premium Payment Grace Period) or (2) the postmark date of your Initial Premium Payment.

4. Your Initial Premium Payment must be sufficient to pay for each month of retroactive coverage you desire. CCS will process partial payments for the purpose of maintaining the necessary accounting data, in anticipation that you will follow up with the balance due prior to the end of the 45-day grace period. However, your coverage will be requested to be reinstated only for months for which you have made payment in full. In the event that you fail to pay any unpaid coverage month balance by the end of the 45-day grace period, your partial payment will be returned.

5. The 45-day Initial Premium Payment Grace Period only applies to your Initial Premium Payment and not future premium payments.

6. Important item to note: If your continuation coverage begins on any day other than the 1st of the month (see #7 below), your first month's premium will be prorated. You may contact Cobra Control Services for confirmation on the amount of the prorated first month.

## SUMMARY

1. Employee Name:    **Randolph W. Keuch (Ref #: 1003549)**
2. COBRA Qualifier(s):    **Randolph W. Keuch; Mary KEUCH; Brianna KEUCH; Christopher KEUCH; Patrick KEUCH; Nicolas KEUCH**
3. Home Address:    **111 ROSE LANE, CHALFONT, PA 18914**
4. Qualifying Event:    **Termination of Employment**
5. Qualifying Event Date:    **3/18/2018**
6. Last Day of Current Coverage:    **3/31/2018**
7. First Day Without Current Coverage:    **4/1/2018**
8. COBRA Notification Date:    **3/27/2018**
9. Available Months of COBRA Coverage:    **18**
10. Last Day to Elect (Postmark) COBRA coverage:    **May 31, 2018**

## MONTHLY PREMIUMS

Insurance Plan
Delta Dental - (Single)$42.05;(Employee & Spouse)$102.20;(Employee & Child)$84.12;(Family)$144.26;(Employee & Children)$84.12;
Meritain Option 2 w/ HSA - (Single)$574.83;(Employee & Spouse)$1,271.42;(Employee & Child)$1,027.89;(Family)$1,758.49;(Employee & Children)$1,027.89;
Aetna Vision - (Single)$8.36;(Employee & Spouse)$15.88;(Employee & Child)$16.72;(Family)$24.58;(Employee & Children)$16.72;
Health Care FSA - (Selected)$42.50;

## COBRA ELECTION FORM

Employee Name:    **Randolph W. Keuch (Ref #: 1003549)**

Address:    lll Rose Ln

City, State, Zip:    Chalfont, PA 18914

Phone Number:    412-225-8000    Email Address:    Randy.Keuch@gmail.com

| List All Family Members To Insure Including Employee | Date Of Birth | Social Security No. | Selected Plan(s) From Insurance Plans Above | Premium As Shown Above | |
|---|---|---|---|---|---|
| Randolph Keuch | 5/27/1954 | 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 | Meritain Option 2 w/HSA | 1,758.49 | Family Meritain |
| Mary Keuch | 7/13/1955 | ~~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~~ | Dental / Aetna Vision | 144.26 | Dental |
| Brianna Keuch | 3/29/1996 | 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 | ~~Health~~ | 24.58 | Vision |
| Signature: Randall Keuch | Date: 3/31/2018 | | | Total Premium: 1,927.33 | |
| Christopher Keuch | 3/29/1996 | 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 | All get some | | |
| Patrick Keuch | 12/29/1995 | 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 | coverage | | |

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

KEUCH000253

 Pharmaceuticals

January 09, 2018

**Via Hand Delivery**

Randy Keuch
111 Rose Lane,
Chalfont, Pennsylvania  18914

**Re:**   **Worker Adjustment and Retraining Notification Act ("WARN") Notification**

Dear Randy:

This letter dated and delivered on January 09, 2018, informs you that Teva Pharmaceuticals USA, Inc. and/or its corporate affiliates (collectively "Teva") plans a layoff at 1070 Horsham Rd.  North Wales, Pennsylvania as a result of a comprehensive restructuring that is crucial to restoring Teva's financial security and stability.  This notice is being provided in conformity with 20 CFR 639.7 of the Worker Adjustment and Retraining Notification Act ("WARN").  The information contained in this notice is based on the best information available to Teva at this time. Teva believes that the planned action eventually will constitute a "mass layoff" or "plant closing" for the purposes of WARN.  Teva does not currently expect to permanently lay off all of the employees at its North Wales location.  Additional information about these personnel reductions may be obtained by contacting Elaine McGee at the address listed below or at 215-591-8539.

Elaine McGee
Assoc Director,HR
1070 Horsham Rd.
North Wales, PA  19454

Specifically, Teva plans to lay you off during the 14-day period commencing on March 18, 2018 and ending on April 01, 2018 and your layoff will be permanent.  To be eligible for separation benefits you are required to: (1) report to work through your last date of Teva employment, (2) remain an employee in good standing through your last date of Teva employment, and (3) timely execute and not revoke the Separation Agreement and General Release that Teva will provide to you.

It is expected that all layoffs will commence on January 03, 2018 and be completed on or before December 31, 2018 and the layoffs will be permanent.  There are no bumping rights.

Notice is being provided to: (a) all affected Teva employees; (b) the chief elected official of local government unit(s); and (c) the appropriate state official(s).  No employees to be laid off are represented by a union.

Teva encourages all affected employees to apply for any and all open positions in which they are interested.  Please refer to https://jobs-tevapharm.icims.com/jobs/intro for information concerning open positions and application instructions.

You will receive additional information from Teva's Human Resources staff within the next several weeks about your employment benefits and related issues.

Very truly yours,

Daniel Lawlor

KEUCH000219

10/22/2018                    Teva's (NYSE: TEVA) move of North American HQ to N.J. takes another step forward - Philadelphia Business Journal

*KEUCH*

≡ MENU                                                                      🔍   ☞ Account ⌄

FOR THE EXCLUSIVE USE OF AEPSTEIN@LAWSGR.COM

From the Philadelphia Business Journal:
https://www.bizjournals.com/philadelphia/news/2018/10/22/tevas-move-of-n-american-hq-from-montco-to-n-j.html

# Teva's move of N. American HQ from Montco to N.J. takes another step forward

Oct 22, 2018, 10:42am EDT

The relocation of Teva Pharmaceutical Industries Ltd.'s North America headquarters out of North Wales in Montgomery County to North Jersey moved one step closer this weekend.

New Jersey Gov. Phil Murphy was in at Teva's global headquarters in Petach Tikva, Israel, on Sunday to meet with Teva President and CEO Kåre Schultz and Executive Vice President Brendan O'Grady to participate in a ceremony that formalized Teva's commitment to



JOHN GEORGE
Teva's North American headquarters in North Wales, Pa., will soon shift to North Jersey.

consolidate its North American commercial business areas in New Jersey.

Earlier this year, Teva (NYSE: TEVA), as part of a global restructuring process, unveiled plans to establish its North America headquarters in Parsippany-Troy Hills, where the company already has 232 workers and will transfer or create more than 800 positions.

Teva is getting 10-year, $40 million tax savings incentives from the N.J. Economic Development Authority to make the move.

"New Jersey offers Teva North America a value proposition of a unique biopharma cluster of universities and life sciences organizations in which Teva can build its

KEUCH000378

JOINT APPX 0656

Case 2:19-cv-05488-JMG    Document 59-9    Filed 08/17/22    Page 298 of 418

10/22/2018                    Teva's (NYSE: TEVA) move of North American HQ to N.J. takes another step forward - Philadelphia Business Journal

future in North America," said O'Grady, who is also head of North America commercial operations at Teva.

Murphy called the presence of global life sciences companies like Teva "critical" to the state's ability to strengthen its innovation ecosystem.

Teva's plans for the Philadelphia region remain unclear. The company said for the next two years it intends to maintain the employment of 500 to 600 employees at Teva's research-and-development facility in the Frazer-West Chester area. Teva is also expected to maintain its distribution facilities in North Wales and Chalfont. The company is expected to vacate a 120,290-square-foot building it leases on Private Road in Horsham.

**John George**
Senior Reporter
*Philadelphia Business Journal*



KEUCH000379

JOINT APPX 0657

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
## Washington, D.C. 20549

## FORM 10-K

(Mark One)

☒ **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the fiscal year ended December 31, 2017**

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the transition period from          to

Commission file number 001-16174

# TEVA PHARMACEUTICAL INDUSTRIES LIMITED
### (Exact name of registrant as specified in its charter)

| | |
|---|---|
| **Israel** | **Not Applicable** |
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |

**5 Basel Street, Petach Tikva, ISRAEL, 4951033**
(Address of principal executive offices and Zip Code)

**+972 (3) 914-8171**
(Registrant's telephone number, including area code)

Securities registered pursuant to Section 12(b) of the Act:

| | |
|---|---|
| **American Depositary Shares, each representing one Ordinary Share** | **New York Stock Exchange** |
| (Title of each class) | (Name of each exchange on which registered) |

Securities registered pursuant to Section 12(g) of the Act:

**None**

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act.   Yes ☐   No ☒

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act.   Yes ☐   No ☒

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.   Yes ☒   No ☐

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files.)   Yes ☒   No ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. ☒

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, smaller reporting company, or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company" and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| | |
|---|---|
| Large accelerated filer ☒ | Accelerated filer ☐ |
| Non-accelerated filer ☐ (Do not check if a smaller reporting company) | Smaller reporting company ☐ |
| | Emerging growth company ☐ |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act).   Yes ☐   No ☒

The aggregate market value of the voting common equity held by non-affiliates of the registrant, computed by reference to the closing price at which the American Depositary Shares were last sold on the New York Stock Exchange, as of the last business day of the registrant's most recently completed second fiscal quarter (June 30, 2017), was approximately $35.8 billion. Teva Pharmaceutical Industries Limited has no non-voting common equity. For purpose of this calculation only, this amount excludes ordinary shares and American Depositary Shares held by directors and executive officers and by each person who owns or may be deemed to own 10% or more of the registrant's common equity at June 30, 2017.

As of December 31, 2017, the registrant had 1,016,877,139 ordinary shares outstanding.

KEUCH000291

# TABLE OF CONTENTS

| | Page |
|---|---|
| Introduction and Use of Certain Terms | 1 |
| Forward-Looking Statements | 1 |

## PART I

| | | Page |
|---|---|---|
| Item 1. | Business | 2 |
| Item 1A. | Risk Factors | 28 |
| Item 1B. | Unresolved Staff Comments | 51 |
| Item 2. | Properties | 52 |
| Item 3. | Legal Proceedings | 52 |
| Item 4. | Mine Safety Disclosures | 53 |

## PART II

| | | Page |
|---|---|---|
| Item 5. | Market for the Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities | 53 |
| Item 6. | Selected Financial Data | 56 |
| Item 7. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 57 |
| Item 7A. | Quantitative and Qualitative Disclosures about Market Risk | 101 |
| Item 8. | Financial Statements and Supplementary Data | 105 |
| Item 9. | Changes in and Disagreements with Accountants on Accounting and Financial Disclosure | 194 |
| Item 9A. | Controls And Procedures | 194 |
| Item 9B. | Other Information | 194 |

## PART III

| | | Page |
|---|---|---|
| Item 10. | Directors, Executive Officers and Corporate Governance | 195 |
| Item 11. | Executive Compensation | 204 |
| Item 12. | Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters | 263 |
| Item 13. | Certain Relationships and Related Transactions, and Director Independence | 265 |
| Item 14. | Principal Accounting Fees and Services | 266 |

## PART IV

| | | Page |
|---|---|---|
| Item 15. | Exhibits, Financial Statement Schedules | 267 |
| Item 16. | Form 10-K Summary | 275 |

KEUCH000292

JOINT APPX 0659

**Individual Level:** The remaining 20% of the measures under the annual cash incentive plan are individual performance measures established by the Compensation Committee and the Board early in the year in the following areas:

- Strategy
- Collaboration
- Culture
- Leadership

Strategy measures are primarily related to key planned strategic actions, such as transformation. Collaboration, culture and leadership measures are generally related to cross business unit collaboration, talent development and building organizational capability, and personal development. The Compensation Committee and the Board evaluate performance with respect to the individual measures using a rating system that equates to a level of performance, which is then used as a component for determination of the overall performance factor.

**Overall Performance Factor:** The Compensation Committee and the Board then determine the weighted average of the performance factors for Company-, business unit- and individual-level performance. Based on the weighted average performance, the overall performance factor is then determined based on the following table for each executive officer, and for the CEO, the former CEO and the former interim CEO:

| Level of Achievement of Objectives | Weighted Average % Achievement of Category Measures (1)(2) | Overall Performance Factor: Potential Annual Cash Incentive as a % of Annual Base Salary |
|---|---|---|
| Threshold ................... | 85% (90% for CEOs) and below | No annual cash incentive payment |
| Target ...................... | 100% | 100% (140% for CEOs) |
| Maximum Cash Incentive ..... | 120% (125% for former CEO and former interim CEO) | 200% |

---

(1)  Payouts for performance for the CEO and former CEOs are determined linearly based on a straight line interpolation of the applicable payout range (i.e., 14% for each percentile change in performance between threshold and target, 2.4% for each percentile change in performance between target and maximum for former CEOs, and 3% for each percentile change in performance between target and maximum for the current CEO). No additional payout is made for performance achievement in excess of 125% for former CEOs and 120% for the current CEO.

(2)  Payouts for performance for other executive officers are determined linearly based on a straight-line interpolation of the applicable payout range (i.e., 6.67% for each percentile change in performance between threshold and target and 5% for each percentile change in performance between target and maximum). No additional payout is made for performance in excess of 120% achievement of the performance criteria.

As described above, the Compensation Committee and the Board reviewed our company performance against our 2017 objectives. Due to the fact that our financial results were significantly below our original financial targets for the year, the Compensation Committee and the Board determined not to make any payouts under the executive officers' annual cash incentive plan for 2017.

220

KEUCH000293

JOINT APPX 0660

The table below sets forth the calculation of the annual cash incentive plan for our interim CEO, CEO, and other NEOs which is reflected in the "Non-Equity Incentive Plan Compensation" column of the Summary Compensation Table presented in this Executive Compensation section.

| Name | Eligible Base Salary ($) | Target Annual Cash Incentive (% of Base Salary) | Target Award ($) | Overall Performance Factor | Payout ($) | Cash Incentive Payout as a % of Base Salary |
|---|---|---|---|---|---|---|
| **Current NEOs** | | | | | | |
| Kåre Schultz . . . . . . . . . . . . . . | $2,000,000 | 140% | $2,800,000 | 0% | $ 0 | 0% |
| Michael McClellan [1] . . . . . . . . | $ 219,519 | 100% | $ 219,519 | 0% | $ 0 | 0% |
| Dr. Carlo de Notaristefani . . . . . . | $ 836,400 | 100% | $ 836,400 | 0% | $ 0 | 0% |
| Dr. Hafrun Fridriksdottir [1] . . . . | $ 630,577 | 100% | $ 630,577 | 0% | $ 0 | 0% |
| Mark Sabag . . . . . . . . . . . . . . . . | $ 604,637 | 100% | $ 604,637 | 0% | $ 0 | 0% |
| **Former NEOs** | | | | | | |
| Erez Vigodman [2] . . . . . . . . . . . | N/A | N/A | N/A | N/A | N/A | N/A |
| Dr. Yitzhak Peterburg [1] . . . . . . . | $1,199,750 | 140% | $1,679,650 | 0% | $ 0 | 0% |
| Eyal Desheh [3] . . . . . . . . . . . . . . | $ 408,300 | 100% | $ 408,300 | 0% | $ 0 | 0% |
| Dr. Rob Koremans [4] . . . . . . . . . | $ 783,215 | 100% | $ 783,215 | 0% | $ 0 | 0% |
| Dr. Michael Hayden [4] . . . . . . . . | $1,071,000 | 100% | $1,071,000 | 0% | $ 0 | 0% |

(1)  The payouts for Mr. McClellan, Dr. Fridriksdottir and Dr. Peterburg would have been pro-rated based on the partial period of the year during which they held their positions as NEOs. The eligible base salaries above reflect the portion of their respective salaries that would have been used for executive officer annual incentive plan calculation purposes. Mr. McClellan and Dr. Fridriksdottir were also eligible for a cash incentive payout under the non-executive officer annual incentive plan in respect of their service during 2017 prior to becoming executive officers. They did not receive a payout under this plan for 2017.

(2)  Mr. Vigodman was not eligible for a cash incentive in 2017.

(3)  Mr. Desheh was eligible for a pro-rated cash incentive based on the partial period of the year that he held his position pursuant to his employment agreement. The eligible base salary above reflects the portion of his salary that would have been used for annual incentive plan calculation purposes.

(4)  Dr. Koremans and Dr. Hayden were eligible for a full annual incentive plan award as they were supporting the transition through end of year.

**Equity-Based Compensation**

**Purpose:** Equity-based compensation is intended to reward future performance, as reflected by the market price of our shares and/or other performance criteria, and is used to foster a long-term link between executive officers' interests and the interests of Teva and its shareholders, as well as to attract, motivate and retain executive officers for the long-term by:

- providing executive officers with a meaningful interest in Teva's share performance;

- linking equity-based compensation to potential and sustained performance; and

- spreading benefits over a longer performance cycle through the vesting period mechanism.

**Equity-based awards:** Equity-based awards are generally granted to executive officers on an annual basis, and at other times as the Compensation Committee and the Board deem appropriate, including for newly hired or promoted executive officers or due to special retention needs. Notwithstanding the foregoing, the Compensation Committee and the Board may determine with respect to a specific year that no equity-based awards will be granted to all or any particular executive officers.

KEUCH000294

JOINT APPX 0661

**Parameters:** Equity-based awards are granted pursuant to Teva's 2015 Long-Term Equity-Based Incentive Plan, and/or any other long-term incentive plan(s) that we may adopt in the future, and generally on terms and conditions provided for therein and as determined by the Compensation Committee and the Board, provided that any such terms and conditions are consistent with the following:

- **Performance-based equity awards:** The amount and/or vesting of performance-based awards are subject to achievement of pre-determined performance criteria. Performance measurement periods for performance-based equity awards are for specified periods that express the long-term performance goals that we seek to achieve. Following the performance measurement period, additional time-based vesting requirements may also apply. The performance vesting criteria for performance-based equity awards are based on measurable performance criteria, such as financial and/or non-financial parameters, which may be determined as an absolute parameter (e.g., EPS, TSR, share price and strategic goals) and/or a parameter that is relative to a peer group (e.g., ratio of Teva's TSR to the peer group TSR). These types of awards may include performance share units, shares and/or other share-based awards.

- **Time-based equity awards:** Equity-based awards structured as time-based awards (aimed to reward long-term performance, as reflected by the market price of Teva shares) include a time-vesting period. Time-based equity awards have an overall exercise term of several years, structured in order to retain executive officers and maintain their commitment to increasing Company and shareholder value over the long-term. These types of awards may include share options, restricted stock, restricted share units and/or other share-based awards.

- **Vesting of equity-based awards:** The minimum vesting period of all equity-based awards, other than performance share units (if granted), is two years from the date of grant. The minimum vesting period of performance share units (if granted) is three years from the date of grant.

The monetary grant value of executive officers' equity-based awards is determined by the Compensation Committee and the Board, taking into account, among other things, our pay mix targets, the desired mix of equity-based vehicles, the executive officer's contribution to Company performance, desired competitive compensation levels and dilution or pool limits. When establishing the monetary grant value, the Compensation Committee and the Board also determine the mix of equity-based vehicles for each grant, which may include various types of time-based and performance-based equity-based vehicles, such as share options, restricted share units, performance share units and/or other share-based awards. The value of each type of equity-based vehicle is determined in accordance with accepted valuation and accounting principles, as they apply to the relevant type of equity-based vehicle, and might differ from the value determined for other purposes.

The mix of equity-based vehicles and the relative weight assigned to each type of equity-based vehicle out of the total equity-based grant is structured to enhance the executive officers' commitment to increasing Company and shareholder value and is designed to encourage balanced and effective business risk-taking. The Compensation Committee and the Board may change the distribution and elements of the equity mix from time to time.

Caps on equity-based compensation:

- **Equity budget:** The Compensation Committee and the Board may set an annual budget for annual equity-based compensation granted to executive officers, based on the CEO's recommendation. The CEO also recommends how to allocate the annual equity budget among the other executive officers, subject to approval by the Compensation Committee and the Board. In circumstances determined by the Compensation Committee and the Board (e.g., regulatory changes or significant changes in our business environment), the Compensation Committee and the Board may amend or modify the budget during the applicable period.

- **Cap at grant date:** The maximum monetary grant value of the annual equity-based compensation granted to the CEO shall not exceed $6.0 million at target and to any other executive officer $3.5 million at target.

222

KEUCH000295

JOINT APPX 0662

- **Cap at exercise date**: The Compensation Committee and the Board may from time to time consider determining a cap for the benefit deriving from the exercise of equity-based compensation.

*2017 Long-Term Equity Incentives—Annual Grant*

As described above, the Compensation Committee and the Board intend for long-term equity-based compensation to reward executive officers based on our future performance, as reflected by the market price of Teva's shares, to foster a long-term link between executive officers' interests and the interests of Teva and its shareholders, as well as to attract, motivate and retain executive officers for the long-term by:

- providing executive officers with a meaningful interest in our share performance;

- linking equity-based compensation to potential and sustained performance; and

- spreading benefits over a longer performance cycle through the vesting period mechanism.

In making determinations about 2017 long-term equity incentive grants to executive officers, the Compensation Committee and the Board considered, among other things:

- sustained performance;

- criticality of contributions to Teva;

- comparison against our Peer Group;

- role, skills, experience and development;

- internal fairness among executive officers; and

- pay mix.

The sizes of the grants to executive officers vary based on the factors above. The portion of executive officer compensation that is composed of these equity vehicles is "at risk" and directly aligned with shareholder value creation.

223

KEUCH000296

JOINT APPX 0663

For the 2017 long-term equity incentive grants to executive officers, the Compensation Committee and the Board used the terms and mix set forth in the following table:

| Type of Long- Term Incentive Vehicle | Proportion of Long-Term Incentive Grant | Vesting Cycle | Performance Metrics (Weighting) | Rationale for Use of Performance Metric |
|---|---|---|---|---|
| Performance Share Units | 33.3% | Three year cliff vesting | 1) 2017-2019 Non-GAAP EPS (50%) | 1) Leading indicator of profitability, expense control and sustained short and long-term performance. |
| | | | 2) 2017-2019 Free Cash Flow (50%) | 2) Serves to focus executive officers on generating cash in the short and long-term to fund operations; focuses executive officers on expense control and on improvement in working capital; and is an indicator of long-term shareholder value creation. |
| | | | 3) 2017-2019 Relative TSR (Modifier) | 3) Strong performance as measured by the other two operating metrics is fully rewarded only if it also results in above average shareholder returns. |
| Restricted Share Units | 33.3% | Three annual tranches vesting on the second, third and fourth anniversaries of the date of grant | N/A | N/A |
| Share Options | 33.3% | Three annual tranches vesting on the second, third and fourth anniversaries of the date of grant | N/A | N/A |

The PSU performance measures were selected because (i) Free Cash Flow and Non-GAAP EPS focus management on metrics that align with our most critical strategic priorities of servicing debt, controlling expenses and improving profitability, (ii) relative TSR is an important measure for shareholders and (iii) they give recipients a clear line of sight into how executing on operating measures drives the achievement of performance and earning awards.

The Compensation Committee and the Board utilize RSUs to encourage ownership and retention while immediately aligning executive officers' interests with those of our shareholders, and options are meant to focus executive officers on share price appreciation.

### PSU Calculation Methodology

In connection with the 2017 PSU grants, the number of shares earned by the CEO, former interim CEO, and to the other executive officers will be determined in two steps as follows.

There are two performance measures, in step 1, 2017-2019 Non-GAAP EPS and 2017-2019 Free Cash Flow, each of which is weighted an equal 50%. For each of these two measures, the Compensation Committee

224

KEUCH000297

JOINT APPX 0664

determines the Company's performance for the measure for the three-year period. The Company's performance with respect to each measure is compared to the target for the measure, and the proportion of achievement is converted to a factor as set forth below.

| Level of Achievement of Objectives(*) | % Achievement of Target | Earning Percentage |
|---|---|---|
| Threshold | Up to 85% | 0% |
| Target | 100% | 100% |
| Maximum | 120% | 200% |

(*)   Linear interpolation will be used to determine the applicable earning percentage.

The Compensation Committee then calculates the average of the earning percentages for the two performance measures.

In step two, this average of the earning percentages is multiplied by a modifier that has been determined based on our relative TSR performance for the three year period as set forth below. See "—III. Compensation Determination Process—Compensation Peer Group and Peer Selection Process" for a list of the peer group companies used for this purpose.

| Level of Achievement of Relative TSR(*) | Relative TSR Ranking | Modifier |
|---|---|---|
| Threshold | Up to 25th percentile | 80% |
| Target | 50th percentile | 100% |
| Maximum | 100th percentile | 120% |

(*) Linear interpolation will be used to determine the applicable modifier.

The product of (1) the average of the earning percentages and (2) the modifier is multiplied by the target number of PSUs granted to the CEO, former interim CEO, and to each of the executive officers, respectively, to determine the final number of shares earned by each individual, except that the number of shares to be issued may not exceed 200% of the target number of PSUs.

The Compensation Committee approves and presents the achievement relative to target performance measures, the calculation of the earning percentage and the TSR modifier, and the determination of the number of earned PSUs to the Board for its review and approval.

KEUCH000298

JOINT APPX 0665

*2017 Long-Term Incentive Award Values—Annual Grant*

In connection with determinations of the appropriate level of annual equity grants for 2017, the Compensation Committee and the Board took into account the factors outlined above as well as information regarding the Peer Group. The Compensation Committee and the Board determined that it was consistent with our performance-based compensation philosophy and appropriate to structure the equity grants to executive officers such that (1) 33% are earned and vest only if the CEO and executive officers achieve specified levels of performance as measured by certain metrics, and (2) 67% are earned and vest over four years. The following table sets forth the 2017 annual award values approved by the Compensation Committee and the Board for the NEOs.

| Name | PSUs ($) (1/3) | RSUs ($) (1/3) | Share Options ($) (1/3) | Total ($) |
|---|---|---|---|---|
| **Current NEOs** | | | | |
| Kåre Schultz . . . . . . . . . . . . . . . . . . . . . . . . | $1,999,998 | $1,999,993 | $2,000,009 | $6,000,000 |
| Michael McClellan [(1)] . . . . . . . . . . . . . . . . . | N/A | $ 132,331 | $ 132,329 | $ 264,660 |
| Dr. Carlo de Notaristefani . . . . . . . . . . . . . . | $ 866,657 | $ 866,659 | $ 866,688 | $2,600,004 |
| Dr. Hafrun Fridriksdottir . . . . . . . . . . . . . . . | $ 499,979 | $ 499,979 | $ 500,047 | $1,500,005 |
| Mark Sabag . . . . . . . . . . . . . . . . . . . . . . . . . | $ 533,310 | $ 533,319 | $ 533,375 | $1,600,004 |
| **Former NEOs** | | | | |
| Erez Vigodman [(2)] . . . . . . . . . . . . . . . . . . . . | N/A | N/A | N/A | N/A |
| Dr. Yitzhak Peterburg . . . . . . . . . . . . . . . . . | $1,499,992 | $1,499,999 | $1,500,009 | $4,500,000 |
| Eyal Desheh . . . . . . . . . . . . . . . . . . . . . . . . . | $ 666,666 | $ 666,649 | $ 666,686 | $2,000,001 |
| Dr. Rob Koremans . . . . . . . . . . . . . . . . . . . . | $ 833,326 | $ 833,319 | $ 833,361 | $2,500,006 |
| Dr. Michael Hayden . . . . . . . . . . . . . . . . . . . | $ 666,666 | $ 666,649 | $ 666,686 | $2,000,001 |

(1)   The long-term incentive award to Mr. McClellan was made prior to his appointment as Interim CFO in July 2017 pursuant to our program for non-executive officers.

(2)   Mr. Vigodman did not receive an equity grant in 2017.

Consistent with historical practice, the dollar value allocated to PSUs was converted to a number of units, based on the fair market value on the grant dates as determined in accordance with the Financial Accounting Standards Board Accounting Standards Codification Topic 718. The dollar amount allocated to RSUs was converted to a number of shares using the fair market value on the grant date. The dollar amount allocated to share options was converted to a number of shares using the Black Scholes valuation method as of the grant dates.

*2015-2017 Performance Share Unit Payout*

In 2015, the Compensation Committee and the Board granted PSUs with performance-based vesting requirements for the three-year performance period 2015-2017. The threshold level of achievement was 90%, the target level of achievement was 100%, and the maximum level of achievement was 120% of the PSU performance goals as defined below, with a maximum payout of 150% of the target number of PSUs. Payouts for performance between threshold and target and between target and maximum were determined based on a straight-line linear interpolation of the applicable payout range (i.e., 10% for each percentile change in performance between threshold and target and 2.5% for each percentile change in performance between target and maximum).

The Compensation Committee and the Board set the three-year performance targets ("PSU Performance Goals") for net revenues and non-GAAP operating profit at the beginning of 2015, subject to adjustment for the effect of changes in currency exchange rates. The Compensation Committee and the Board set these targets based on certain assumptions about our performance. Pursuant to the 2015 award agreements, the Compensation

226

KEUCH000299

JOINT APPX 0666

Committee and the Board have the discretion to adjust (increase or decrease) the PSU Performance Goals and their relative weights if one or more of the following items of gain, loss, profit or expense, having a material impact on the PSU Performance Goals, is: (i) determined to be extraordinary, unusual or non-recurring in nature; (ii) related to changes in accounting principles under U.S. GAAP or tax laws; (iii) related to currency fluctuations; (iv) related to productivity initiatives or new business initiatives; (v) related to discontinued operations that do not qualify as a segment of business under U.S. GAAP; or (vi) attributable to the business operations or assets of any entity acquired or licensed by the Company during the fiscal year, to the extent the Compensation Committee or the Board, as applicable, determines that the adjustment is necessary or advisable to preserve the intended incentives and benefits of the PSUs, or if such adjustments were reflected in our public non-GAAP financial results.

In connection with evaluating our achievement of the 2015-2017 performance metrics, the Compensation Committee and the Board determined that in order for the PSU Performance Goals to operate as they were intended to, they would make adjustments by increasing the targets due primarily to the 2016 acquisition of Actavis Generics. The aggregate effect of these adjustments was an increase of approximately 16% in the net revenue target and an increase of approximately 22% in the non-GAAP operating profit target. For the performance period, our actual net revenue achievement was 91% and our actual non-GAAP operating profit achievement was 86%, resulting in a weighted average achievement of 88.5%. This level of achievement was below the threshold level of performance of 90%, resulting in no payout, a 122% decrease compared to what would have been if the upward adjustments had not been taken into account.

| Weighting | Performance Metric | Target (100%) ($MM) Excluding FX Effect | Adjusted Target (100%) ($MM) | Actual Results ($MM) | % Achievement |
|---|---|---|---|---|---|
| 50% . . . . . . . . . . . . . . . . . . . . . . . | Net Revenue | 58,654 | 67,992 | 62,045 | 91% |
| 50% . . . . . . . . . . . . . . . . . . . . . . . | Non-GAAP Operating Profit | 17,557 | 21,461 | 18,406 | 86% |
| | | | Weighted Average: | | 88.5% |

Based on this outcome, the NEOs did not earn any Teva shares in respect of their 2015-2017 PSU awards:

| Name | Target Award (# of PSUs) | Payout Factor | Final Award (# of PSUs) |
|---|---|---|---|
| **Current NEOs** | | | |
| Kåre Schultz [1] . . . . . . . . . . . . . . . . . . . . . . . . . | N/A | N/A | N/A |
| Michael McClellan [1] . . . . . . . . . . . . . . . . . . . . . | N/A | N/A | N/A |
| Dr. Carlo de Notaristefani . . . . . . . . . . . . . . . . . | 16,838 | 0% | 0 |
| Dr. Hafrun Fridriksdottir [1] . . . . . . . . . . . . . . . . | N/A | N/A | N/A |
| Mark Sabag . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 12,628 | 0% | 0 |
| **Former NEOs** | | | |
| Erez Vigodman [2] . . . . . . . . . . . . . . . . . . . . . . . . | 30,869 | 0% | 0 |
| Dr. Yitzhak Peterburg [1] . . . . . . . . . . . . . . . . . . . | N/A | N/A | N/A |
| Eyal Desheh [2] . . . . . . . . . . . . . . . . . . . . . . . . . . | 16,838 | 0% | 0 |
| Dr. Rob Koremans [2] . . . . . . . . . . . . . . . . . . . . . | 17,773 | 0% | 0 |
| Dr. Michael Hayden [2] . . . . . . . . . . . . . . . . . . . . | 17,773 | 0% | 0 |

(1)   Because it was prior to their appointments as executive officers, we did not grant Mr. Schultz, Mr. McClellan, Dr. Fridriksdottir or Dr. Peterburg PSUs under the 2015 PSU plan.

(2)   Mr. Vigodman, Mr. Desheh, Dr. Koremans and Dr. Hayden were eligible for a 2015 PSU payout pursuant to the terms of their employment agreements as described below.

KEUCH000300

JOINT APPX 0667

**Performance, Promotion and Other One-Time Grants**

In connection with a performance-based cash award earned by Dr. Fridriksdottir when she was an employee of Actavis Generics prior to its acquisition by Teva in 2016, we assumed the obligation to pay a cash incentive of $535,000 based on Actavis Generics shareholder return performance metrics. Also, pursuant to a legacy 2014 Actavis Generics retention plan that we also assumed, we fulfilled the assumed obligation under the plan by making payment of a $900,000 cash award to Dr. Fridriksdottir.

In connection with the promotion of Mr. McClellan to the position of Interim CFO in July 2017 (before his promotion to Executive Vice President, CFO in November 2017), we awarded Mr. McClellan a one-time promotion cash award of $202,500 in recognition of his increased responsibility. One-half of the award was paid in November 2017, and the remaining half was paid in February 2018. In order to secure the services of Mr. McClellan during a time of transition while he served as Interim CFO, we granted him 12,341 options, 4,091 RSUs, and a cash award totaling $67,500. One-half of the cash award will be paid in September 2018 and the remaining half will be paid in September 2019. The options and RSUs will vest in September 2019. All payments and vesting are subject to continued employment through the applicable vesting dates. These grants were part of a broader program to secure the services of key employees during a period of uncertainty for our Company.

In addition, in May 2017, we granted Dr. de Notaristefani 30,875 RSUs due to his significance and key role during the transition period and the importance of securing his services. The RSUs will vest in May 2019.

Information regarding the sign-on equity and cash grants for Kåre Schultz is provided in the leadership transitions section below.

**Leadership Transitions**

*Appointment of Mr. Kåre Schultz as President and CEO*

In September 2017, our Board successfully completed its global search process (with the assistance of a search firm) for our next President and CEO when it appointed Kåre Schultz to the position. In its search, the Board sought a leader with extensive global pharmaceutical experience and a strong track record in corporate turnarounds, as well as in driving growth and leading international expansion. Mr. Schultz is a seasoned leader in the health care industry with an extensive background leading global companies' financial and restructuring initiatives.

Since 2015, and prior to his appointment as our President and CEO, Mr. Schultz served as the President and CEO of H. Lundbeck A/S, which he joined as the company was facing the loss of critical patents. Mr. Schultz conducted a top to bottom evaluation of the business and implemented a robust turnaround strategy that involved cutting operating costs while targeting new product launches. As a result of his leadership, H. Lundbeck A/S is on track to achieve all-time high revenue and earnings with significant stock price appreciation and increased market cap. Prior to joining Lundbeck, Mr. Schultz worked for nearly three decades at Novo Nordisk, where he served in a number of leadership roles, including Chief Operating Officer, Vice President in Product Supply and Director of Product Planning and Customer Services in the Diabetes Care Division.

Based on this outstanding profile, our Board selected Mr. Schultz as the best candidate to lead Teva presently and to participate in the establishment of, and steer the execution of, our strategic and operational goals. The Board appointed Mr. Schultz as President and CEO effective November 1, 2017, and he joined the Board at that time.

The terms of the employment agreement with Mr. Schultz were negotiated in order to induce him to accept the Board's offer to become our President and CEO at this critical time, including relocation to our headquarters in Israel. The Board was mindful of the challenges currently facing our Company in its various business segments, product lines and markets, the advent of generic competition for one of our key branded specialty

KEUCH000301

JOINT APPX 0668

products, the fierce competition for talented executives in the pharmaceutical industry and the extreme pressure on, and vast duties of, the leader of an international organization of the size and complexity of Teva in approving the components of the compensation package, including the annual base salary, target annual incentive, annual equity grants, and inducement equity grants and cash awards to Mr. Schultz. The Board also took into account the difficulty not just in identifying an individual with the desired skills and experience, but also retaining the person throughout the period of transition and significant change being driven by the Board. Accordingly, the Board, with the assistance of its independent compensation consultant, developed a compensation package that considered pay structures for CEOs at peer companies, and which includes pay that depends on long-term Company performance as well as the opportunity to accumulate a significant ownership interest in Teva upon the creation of sustained shareholder value.

In light of all of these factors, we entered into an employment agreement with Mr. Schultz which provides for an initial employment term of five years, subject to automatic renewal for subsequent one-year periods (or until the second anniversary following a change in control of the Company, if later than the otherwise applicable term end date) until a notice of non-renewal is provided or other termination circumstances occur.

Under the employment agreement, Mr. Schultz received an annual base salary of $2 million, a performance-based target annual incentive opportunity equal to 140% of his annual base salary (and a maximum opportunity of 200% of his annual base salary), annual long-term equity incentives with a total target grant date fair value of $6 million with vesting terms similar to other senior executive officers, a meaningful portion of which are performance-based, and the same employee benefits as are provided to similarly situated senior executives of the Company.

Upon commencing employment on November 1, 2017, Mr. Schultz received the following sign-on equity awards over the five year term of the agreement, which are designed to align his interests with those of Teva and its shareholders over the long term (like our stock ownership guidelines to which he is subject): (i) a restricted share unit award with a grant date fair value of $5 million (as determined based on the closing price of Teva's shares on the date prior to the announcement of Mr. Schultz's hire), which will vest and settle in equal installments on the third, fourth and fifth anniversaries of the employment commencement date (the "Effective Date"); and (ii) two sign-on performance share unit awards, each with a target grant date fair value of $7.5 million (as determined based on the closing price of Teva's shares on the date prior to the announcement of Mr. Schultz's hire), which will be earned based on the achievement of performance goals related to the absolute increase in the price of Teva's shares over three- and five-year periods following the Effective Date, which range from a 16% increase to a 158% increase for the three-year performance period and from a 28% increase to a 385% increase for the five-year period, and generally vest on the third, fourth and fifth anniversaries of the Effective Date (in the case of the award with a three-year performance period) and on the fifth anniversary of the Effective Date (in the case of the award with a five-year performance period). In addition, Mr. Schultz received a sign-on cash award of $20 million, which will vest and be paid in two equal installments three and six months following the Effective Date. In connection with his relocation to Israel, Mr. Schultz will also receive a housing reimbursement and certain relocation benefits.

As the grant date value of equity awards for accounting purposes depends on, among other things, stock price, the actual grant date fair values of these sign-on equity awards that appear in our Summary Compensation Table are lower than the intended target values described in the preceding paragraph since the number of units was set based on the closing price of Teva's shares on the date prior to the announcement of Mr. Schultz's hire, but the grant date fair value of the awards for accounting purposes were determined when they were actually granted. The Compensation Committee believed that fixing the number of units was appropriate and consistent with the aforementioned focus on aligning executives' compensation with long-term shareholder value creation. See "—Additional Compensation Information—2017 Grant of Plan-Based Awards."

KEUCH000302

JOINT APPX 0669

*Appointment of Mr. Michael McClellan as CFO; Previous Appointment as Interim CFO*

Effective as of November 27, 2017, we entered into an employment agreement with Mr. McClellan. For the preceding two years, Mr. McClellan served as the Senior Vice President and CFO of Teva's Global Specialty Medicines division. Prior to joining Teva, he was the U.S. CFO at Sanofi. The agreement provides that Mr. McClellan will be employed as Executive Vice President, CFO, until his death, disability, termination with or without cause or resignation with or without good reason. He will continue his international assignment in Amsterdam, Netherlands, and on or about September 1, 2018, he will relocate to our corporate headquarters in Israel. The agreement provides for an initial base salary of $700,000. Mr. McClellan is eligible to be considered for an annual cash incentive with a target of 100% of his then current base salary, and for equity-based awards under our equity compensation plan.

In July 2017, in connection with the promotion of Mr. McClellan to the position of Interim CFO (before his promotion to Executive Vice President, CFO in November 2017), we awarded Mr. McClellan a one-time promotion cash award of $202,500 in recognition of his increased responsibility. One-half of the award was paid in November 2017, and the remaining half was paid in February 2018. In order to retain the services of Mr. McClellan during a time of transition while he served as Interim CFO, we granted him 12,341 options, 4,091 RSUs, and a cash award totaling $67,500. One-half of the cash award will be paid in September 2018 and the remaining half will be paid in September 2019. The options and RSUs will vest in September 2019. All payments and vesting are subject to continued employment through the applicable vesting dates.

*Appointment of Dr. Hafrun Fridriksdottir as Executive Vice President, Global R&D*

On November 27, 2017, we appointed Dr. Hafrun Fridriksdottir as Executive Vice President, Global R&D. Since February 2017, she served as Executive Vice President, President of Global Generics R&D, after serving as Senior Vice President and President of Global Generics R&D since August 2016. Prior to joining Teva, Dr. Fridriksdottir served as Senior Vice President of Global Generics R&D of Allergan plc, where she held several positions of increasing responsibility in the Actavis group within Allergan.

On June 18, 2017, we entered into an employment agreement with Dr. Fridriksdottir. The agreement provides that Dr. Fridriksdottir will serve in a senior R&D position until her death, disability, termination with or without cause or resignation with or without good reason. The agreement provided for an initial base salary of $720,000. Dr. Fridriksdottir is eligible to be considered for an annual cash incentive (prorated for 2017 and under the applicable plan prior to being appointed an executive officer for the time period before such appointment), and for equity-based awards under our equity compensation plan.

*Separation of former President and CEO Erez Vigodman*

In February 2017, Erez Vigodman stepped down as President and CEO.

Pursuant to the terms of our employment agreement with Mr. Vigodman, in connection with his termination of employment, Mr. Vigodman was entitled to receive nine months' notice, payments associated with termination as required pursuant to Israeli law, certain previously accrued obligations, and a payment that, together with severance amounts accumulated in his existing pension insurance funds, equals the product of twice his monthly base salary multiplied by the number of his years of service. Mr. Vigodman is also receiving an amount equal to eighteen times his monthly base salary in consideration for compliance with certain non-competition covenants.

Under his employment agreement, Mr. Vigodman is also entitled to continued vesting of equity-based awards for twelve months following termination and an extension of the exercise period of outstanding options for a period of ninety days after the twelve month period.

KEUCH000303

JOINT APPX 0670

### Appointment and Separation of Dr. Yitzhak Peterburg as Interim President and CEO

Dr. Yitzhak Peterburg served as Interim President and CEO from February 2017 until November 2017. Prior to that, Dr. Peterburg served as Chairman of the Board since January 2015. When Mr. Schultz began his service as President and CEO on November 1, 2017, Dr. Peterburg continued to serve as a member of our Board and then resigned from the Board on December 12, 2017.

Pursuant to Dr. Peterburg's terms of employment, during his service as Interim President and CEO, Dr. Peterburg was compensated in a manner comparable to our former President and CEO, Mr. Vigodman, subject to certain differences relating to his interim status, as described below.

Dr. Peterburg's compensation included (i) a monthly base salary of 488,250 Israeli shekels (approximately $135,608 using a 2017 average monthly exchange rate of 3.60 shekels per U.S. dollar); (ii) an annual cash incentive (pro-rated for service for the partial period of the year) with an annual target amount equal to 140% of annual base salary and a maximum amount equal to 200% of annual base salary; (iii) an annual equity award with an aggregate target fair market value of $4.5 million under terms consistent with those of the previous President and CEO, with one third of the annual award being granted in the form of options to purchase Teva shares, one third in the form of PSUs and one third in the form of RSUs, calculated in accordance with accepted valuation and accounting principles, as they apply to the relevant type of equity-based vehicle and in accordance with Teva practice; and (iv) termination arrangements as described below.

Pursuant to Dr. Peterburg's terms of employment, in connection with his termination of employment, Dr. Peterburg is entitled to receive nine months' notice, payments associated with termination as required pursuant to Israeli law, certain previously accrued obligations, and a payment that, together with severance amounts accumulated in his existing pension insurance funds, equals the product of twice his monthly base salary multiplied by the number of his years of service as Interim President and CEO.

Under his employment terms, Dr. Peterburg will also be entitled to continued vesting in full of all equity based awards granted as Interim President and CEO and continued exercisability of vested options through their expiration dates.

### Separation of former CFO Eyal Desheh

In July 2017, Eyal Desheh stepped down as Group Executive Vice President and CFO.

Pursuant to the terms of our employment agreement with Mr. Desheh, in connection with his termination of employment, Mr. Desheh is entitled to receive nine months' notice, payments associated with termination as required pursuant to Israeli law, certain previously accrued obligations, a make-up payment equal to his monthly base salary multiplied by the number of his years of service, that together with severance amounts accumulated in his pension insurance fund account cannot exceed twice his monthly base salary multiplied by the number of his years of service, and eligibility to a pro-rata annual cash incentive for the term active in position. Mr. Desheh is also receiving an amount equal to twelve times his monthly base salary, conditioned upon his undertaking not to compete with Teva for one year following termination.

Mr. Desheh is also entitled to continued vesting in full of equity-based awards and continued exercisability of vested options through their expiration dates due to our qualifying retirement and qualifying termination policy.

### Separation of Dr. Rob Koremans

As a result of the new organization and leadership structure, on November 27, 2017, Dr. Rob Koremans stepped down as President and CEO, Global Specialty Medicines.

KEUCH000304

JOINT APPX 0671

Pursuant to the terms of our employment agreement with Dr. Koremans, in connection with his termination of employment, Dr. Koremans is entitled to receive six months' notice, a severance payment equal to 12 monthly salaries and target annual cash incentive (for a total of 24 monthly salaries).

Dr. Koremans is also entitled to continued vesting of equity-based awards until March 1, 2020 and continued exercisability of vested options through their expiration dates.

### Separation of Dr. Michael Hayden

As a result of the new organization and leadership structure, on November 27, 2017, Dr. Michael Hayden stepped down as President of Global R&D and Chief Scientific Officer.

Pursuant to the terms of our employment agreement with Dr. Hayden, in connection with his termination of employment, Dr. Hayden is entitled to receive nine months' notice, payments associated with termination as required pursuant to Israeli law, certain previously accrued obligations, a payment equal to 12 monthly salaries, a payment that, together with severance amounts accumulated in his existing pension insurance funds, equals the product of twice his monthly base salary multiplied by the number of his years of service, a payment equal to the premium for continued health insurance coverage for eighteen months following the termination date and certain relocation benefits in the event of a move back to Canada within one year following the termination date.

Dr. Hayden is also entitled to continued vesting of certain equity-based awards and continued exercisability of vested options through their expiration dates due to our qualifying retirement and qualifying termination policy.

## Supplemental Non-GAAP Income Data

We utilize certain non-GAAP financial measures to evaluate performance, in conjunction with other performance metrics. The following are examples of how we utilize the non-GAAP measures:

- our executives and Board use non-GAAP measures to evaluate our operational performance, to compare against work plans and budgets, and ultimately to evaluate the performance of our executives;

- our annual budgets are prepared on a non-GAAP basis; and

- senior executive's annual compensation is derived, in part, using these non-GAAP measures. While qualitative factors and judgment also affect annual cash incentives, the principal quantitative element in the determination of the cash incentives is various performance targets tied to the work plan, and thus is based on the non-GAAP presentation set forth below.

Non-GAAP financial measures have no standardized meaning and accordingly have limitations in their usefulness to investors. We provide this non-GAAP data because our executives believe that the data provide useful information to investors. However, investors are cautioned that, unlike financial measures prepared in accordance with U.S. GAAP, non-GAAP measures may not be comparable with the calculation of similar measures for other companies. Please see "Item 7—Management's Discussion and Analysis—Supplemental Non-GAAP Income Data" for additional information.

## V. Additional Compensation Policies and Practices

## Equity Ownership Policy

Teva and its shareholders are best served by executives that manage the business with a long-term perspective. Therefore, we adopted share ownership guidelines, as we believe share ownership is an important tool to strengthen the alignment of interests among shareholders and our executive officers. The policy provides

KEUCH000305

JOINT APPX 0672

that Teva expects the applicable required level of equity ownership to be satisfied by our executive officers within five years of the later of the date the guidelines were adopted in June 2016 or the date of appointment as an executive officer. If an executive officer's holding requirement increases because of a change in annual base salary, the executive officer is expected to achieve the higher holding requirement within one year of the date of the increase.

The Compensation Committee receives periodic reports of the ownership achieved by each executive officer. For purposes of determining compliance with the guidelines, the value of an executive officer's share holdings is based on the closing price of Teva's American Depositary Shares reported on the principal U.S. national securities exchange on which the shares are listed on the last trading day of the year.

The following table represents the required salary multiples:

| Current Position | Required Salary Multiple |
| --- | --- |
| CEO | 4x |
| All other executive officers | 2x |

The value of all of the following types of Teva shares or share options owned by or granted to an executive officer qualifies toward the participant's attainment of the target multiple of pay:

- shares owned outright by the executive officer or jointly with, or separately by, his or her immediate family members residing in the same household;

- shares held in a grantor trust or under a similar arrangement for the economic benefit of the executive officer or his or her immediate family members residing in the same household;

- shares held in any Teva retirement plan;

- time-based vesting restricted shares and restricted share units issued as part of the executive officer's long-term compensation, whether or not vested;

- the target number of shares subject to any performance shares or units issued as part of the executive officer's long-term compensation; and

- the in-the-money value of vested but unexercised in-the-money share options.

**Clawback Policy**

Our executive officers are required to return any compensation paid to them on the basis of results included in financial statements that turned out to be erroneous and were subsequently restated, during the three year period following filing thereof. In such case, compensation amounts will be returned net of taxes that were withheld thereon, unless the executive officer has reclaimed or is able to reclaim such tax payments from the relevant tax authorities (in which case the executive officer will also be obligated to return such tax amounts). In addition, in the event that it is discovered that an executive officer engaged in conduct that resulted in a material inaccuracy in Teva's financial statements or caused severe financial or reputational damage to Teva, or in the event that it is discovered that an executive officer breached confidentiality and/or non-compete obligations to Teva (as determined by the Compensation Committee), the Compensation Committee shall have broad remedial and disciplinary authority. Such disciplinary action or remedy would vary depending on the facts and circumstances, and may include, without limitation, (i) termination of employment, (ii) initiating an action for breach of fiduciary duty, and (iii) seeking reimbursement of performance-based or incentive compensation paid or awarded to the executive officer. The Compensation Committee will determine applicable terms to enforce repayment of clawback amounts and may modify this clawback policy in accordance with applicable law and regulations.

KEUCH000306

JOINT APPX 0673

**Anti-Hedging and Pledging Policies**

Directors and executive officers are prohibited from hedging their equity-based awards and any other Teva securities held by them (whether they are subject to transfer restrictions or not), such as purchasing or selling options on Teva securities, purchasing or selling puts, calls, straddles, equity swaps or other derivative securities linked to Teva's securities, or engaging in "short" sales on Teva securities. This policy applies to each director and each executive officer until one year after the director's or executive officer's termination or retirement.

Directors and executive officers are subject to certain restrictions on pledging or using their equity-based awards and any other Teva securities held by them (whether they are subject to transfer restrictions or not) as collateral for loans.

**Tax Deductibility**

Prior to the Tax Cuts and Jobs Act (the "TCJA") signed into law in December 2017, Section 162(m) of the Internal Revenue Code of 1986, as amended (the "Code"), generally limited the corporate tax deduction for compensation paid to the CEO and the three other most highly compensated executives (other than the CFO) to $1.0 million annually, unless certain requirements were satisfied. To maximize the corporate tax deduction, incentive plans were designed so that certain awards under those plans would constitute "qualified performance-based compensation" for purposes of Section 162(m) of the Code and preserve our corporate tax deductibility for those amounts.

The TCJA contained significant changes to Section 162(m) of the Code, including the elimination of the performance-based compensation exception to Section 162(m) for corporate tax years beginning after December 31, 2017 and an expansion of employees covered by the provision. Section 162(m) now covers the CFO or any individual who served as the CFO in the relevant taxable year. In addition, once an individual becomes a covered employee under Section 162(m) for any taxable year beginning after December 31, 2016, this status carries forward to all future years, even in the event of the employee's termination or death. The act provides limited transition relief for certain "performance-based" compensation, specifying that compensation payable pursuant to a written binding contract which was in effect on November 2, 2017 and which was not modified in any material respect on or after that date will remain eligible for the "performance-based" pay exception to Section 162(m) (i.e., may remain deductible even if in excess of $1 million). The U.S. Internal Revenue Service is expected to provide guidance on the application of the transition relief to specific situations. However, given the changes to Section 162(m), we expect that the U.S.-based tax deductibility of performance-based compensation in excess of $1.0 million will be less of a consideration for us when designing and implementing our executive officers' compensation program in future years.

**Other Benefits and Perquisites**

We generally provide to our CEO and executive officers the same benefits that are provided to all employees, including certain retirement benefits, health and welfare benefits, and other benefits. In addition, our executive officers are provided with certain additional benefits, intended to be competitive with the practices of our peer companies.

Our Compensation Policy provides that:

Benefit plans and perquisites have three main objectives:

- Compliance with legal requirements to provide certain benefits that are mandatory under applicable law (e.g., paid vacation, sick leave and pension plans);

- Attracting, motivating and retaining high level professionals; and

- Enabling recruitment of executive officers from various locations and their relocation.

KEUCH000307

JOINT APPX 0674

Benefit plans and perquisites are intended to supplement cash compensation and often involve non-monetary rewards, coverage of certain business-related expenses, insurance, pension and savings plans and other deferred monetary savings. These benefits and perquisites may vary depending on geographic location and other circumstances. Global, regional and local units may develop their own benefit plans and procedures, consistent with Teva's principles and guidelines and subject to any required Company approvals. Benefits and perquisites may include, in addition to benefits that are mandated by applicable law and/or generally provided to other employees (including related costs and expenses): car, transportation and accommodations, telecommunication devices, media and computer equipment and expenses, travel and relocation (including family-related expenses, such as tuition and commuting) and life and medical insurance and benefits (including executive officers' families).

### Health and Welfare Benefits

We offer health and welfare benefits to all eligible employees, including the President and CEO and executive officers, which are tailored to each location's competitive market. Health and welfare benefits may include medical, dental, prescription drug, vision, life insurance, accidental death and dismemberment, short- and long-term disability coverage and an employee assistance program.

### Retirement and Other Local Benefits

### Israel

Israeli law generally requires severance pay equal to one month's salary for each year of employment upon the termination of an employee's employment due to retirement, death, termination without cause (and other circumstances as defined under Israeli law). We make monthly contributions on behalf of our Israel-based executive officers to a pension plan known as Managers' Insurance or to a Pension Fund. These funds provide a combination of pension allowance and/or insurance and severance pay benefits to the executive officers. We contribute 7.5% of the monthly salary to the pension component (including disability insurance) and 8.33% of the monthly salary to the severance component and the employee contributes an amount between 6% and 7% of salary to the pension component. These contributions are on account of Teva's obligation to pay severance upon termination as referenced above. Our President and CEO is entitled to similar contributions on behalf of the Company as pension contribution and on account of severance. Accordingly, a substantial part of our statutory severance obligation is covered by these monthly contributions.

Generally, in addition, our Israel-based executive officers (excluding the current President and CEO), are entitled to participate in an study fund plan, pursuant to which each employee who participates in the plan contributes an amount equal to 2.5% of his or her monthly salary to the study fund and Teva contributes 7.5% of his or her monthly salary to this fund.

### North America

Our North American subsidiaries mainly provide various defined contribution plans for the benefit of their employees. Under these plans, contributions are based on specified percentages of pay. In addition, Teva USA offers a supplemental deferred compensation plan to eligible employees. The plan is a nonqualified plan which is intended to work as a complement to the qualified 401(k) Retirement Savings Plan. The plan has been designed to address the "retirement gap" that many highly compensated individuals face, primarily due to IRS imposed limits on qualified Plans and IRAs. Finally, certain executive officers located in the United States participate in a defined contribution supplemental executive retirement plan. No new executive officers are enrolled in this plan.

### Expatriate Benefits / International Assignment and Relocation Benefits

Teva provides benefits to our employees, who either accept an expatriate assignment or relocate internationally. The benefits are designed to provide ongoing assignment management, where applicable, and

235

KEUCH000308

physical relocation support services. These benefits can vary depending on the nature of the assignment or relocation, but generally include a housing allowance, transportation support, a cost of living allowance (where applicable), home leave, global health insurance, and company paid education for approved dependents in locations where public education is not suitable. Additionally, we provide tax preparation and tax support services, dependent on the nature of the assignment (e.g., tax equalization for home-based assignments or tax gross up of relocation benefits and ongoing assignment allowances for host-based assignments), as well as immigration services to manage compliance within all global jurisdictions.

Details regarding benefits and perquisites specific to each NEO can be found in the footnotes to the Summary Compensation Table.

**Committee Report**

The Compensation Committee has reviewed and discussed this "Compensation Discussion and Analysis" section of Teva's Annual Report on Form 10-K with our executives. Based upon this review and discussions, the Compensation Committee recommended to the Board that the "Compensation Discussion and Analysis" be included in this Annual Report on Form 10-K.

*Members of the Compensation Committee:*
Rosemary A. Crane, Chair
Gerald M. Lieberman
Jean-Michel Halfon
Nechemia (Chemi) J. Peres

KEUCH000309

JOINT APPX 0676

## ADDITIONAL COMPENSATION INFORMATION

### 2017 Summary Compensation Table

| Name and Principal Position | Year | Salary ($) (1) | Bonus ($) (2) | Stock Awards ($) (3) | Option Awards ($) (4) | Non-Equity Incentive Plan Compensation ($) (5) | Change in Pension Value and Nonqualified Deferred Compensation Earnings ($) | All Other Compensation ($) (6) | Total ($) |
|---|---|---|---|---|---|---|---|---|---|
| **Kåre Schultz** .............. *President and Chief Executive Officer* | 2017 | 333,333 | 0 | 14,229,808 | 2,000,009 | 0 | 0 | 464,591 | 17,027,741 |
| **Michael McClellan** ........ *Executive Vice President, Chief Financial Officer* | 2017 | 397,058 | 101,250 | 199,260 | 195,515 | 0 | 0 | 199,579 | 1,092,662 |
| **Dr. Carlo de Notaristefani** ... *Executive Vice President, Global Operations* | 2017 | 836,400 | 0 | 2,569,720 | 866,688 | 0 | 0 | 189,551 | 4,462,359 |
| | 2016 | 835,832 | 0 | 1,074,937 | 1,075,070 | 872,532 | 0 | 191,766 | 4,050,137 |
| | 2015 | 877,231 | 0 | 899,991 | 900,016 | 1,189,398 | 0 | 178,988 | 4,045,624 |
| **Dr. Hafrun Fridriksdottir** ... *Executive Vice President, Global Research and Development* | 2017 | 696,346 | 900,000 | 999,957 | 500,047 | 535,000 | 0 | 77,492 | 3,708,842 |
| **Mark Sabag** .............. *Executive Vice President, Global Human Resources* | 2017 | 604,637 | 0 | 1,066,630 | 533,375 | 0 | 0 | 317,108 | 2,521,750 |
| **Erez Vigodman** ............ *Former President and CEO* | 2017 | 1,378,702 | 0 | 0 | 0 | 0 | 0 | 1,455,704 | 2,834,406 |
| | 2016 | 1,528,437 | 0 | 2,249,948 | 2,250,061 | 0 | 0 | 478,671 | 6,507,117 |
| | 2015 | 1,363,692 | 0 | 1,649,948 | 1,650,060 | 2,253,581 | 0 | 435,942 | 7,353,223 |
| **Dr. Yitzhak Peterburg** ...... *Former Interim President and CEO* | 2017 | 1,534,467 | 0 | 2,999,991 | 1,500,009 | 0 | 0 | 737,071 | 6,771,538 |
| **Eyal Desheh** .............. *Former Group Executive Vice President and Chief Financial Officer* | 2017 | 831,428 | 0 | 1,333,315 | 666,686 | 0 | 0 | 1,369,101 | 4,200,530 |
| | 2016 | 779,399 | 0 | 1,124,934 | 1,125,072 | 591,775 | 0 | 269,231 | 3,890,411 |
| | 2015 | 733,863 | 0 | 899,991 | 900,016 | 1,110,824 | 0 | 253,068 | 3,897,762 |
| **Dr. Rob Koremans** ......... *Former President and CEO, Global Specialty Medicines* | 2017 | 783,215 | 0 | 1,666,644 | 833,361 | 0 | 0 | 1,807,975 | 5,091,195 |
| **Dr. Michael Hayden** ....... *Former President of Global R&D and Chief Scientific Officer* | 2017 | 1,071,000 | 0 | 1,333,315 | 666,686 | 0 | 0 | 1,152,537 | 4,223,538 |
| | 2016 | 1,071,000 | 500,000 | 1,149,956 | 1,150,055 | 970,202 | 0 | 2,638,012 | 7,479,225 |
| | 2015 | 1,050,000 | 500,000 | 949,967 | 950,034 | 1,608,239 | 0 | 1,045,992 | 6,104,232 |

**Salary**

(1)  Mr. Schultz commenced employment with the Company on November 1, 2017. Mr. McClellan was appointed Executive Vice President, CFO on November 27, 2017, after having served as Interim CFO since July 2017. Dr. Fridriksdottir was appointed Executive Vice President, Global R&D, on November 27, 2017, after having been appointed as Executive Vice President, President of Global Generics R&D in February 2017. Mr. Vigodman stepped down as President and CEO in February 2017 and terminated following the completion of his applicable notice period in November 2017. Dr. Peterburg stepped down as Interim President and CEO on November 1, 2017 and will terminate in July 2018 following the completion of his applicable notice period. The amount presented as salary for Dr. Peterburg includes director fees of $56,358, which were paid in respect of his service as Chairman of the Board prior to his appointment as Interim President and CEO. Mr. Desheh stepped down as Group Executive Vice President and CFO in July 2017 and will terminate in April 2018 following his notice period and usage of a portion of accrued vacation days. Dr. Koremans and Dr. Hayden each stepped down as executive officers on November 27, 2017 and will terminate in May 2018 and August 2018, respectively, following the completion of their notice periods. Salary payments made in 2017 during the notice periods for all terminating employees are included in the salary displayed in this column. The Company paid the salaries of Dr. Peterburg and Messrs. Sabag, Vigodman and Desheh in Israeli shekels. The U.S. dollar amounts in the table above were converted from Israeli shekels using a 2017 monthly average exchange rate for the month of each salary payment, ranging from 3.50 to 3.82 shekels per U.S. dollar; a 2016 monthly average exchange rate for the month of each payment, ranging from 3.77 to 3.94 shekels per U.S. dollar; and a 2015 monthly average exchange rate for the month of each payment, ranging from 3.79 to 4.00 shekels per U.S. dollar. The Company paid Dr. Koremans' salary in euros. The U.S. dollar amounts in the table above for Dr. Koremans were converted from euros using a monthly average exchange rate for the month of each payment, ranging from 0.84 to 0.94 euros per U.S. dollar.

KEUCH000310

JOINT APPX 0677

**Bonus**

(2)   In connection with the promotion of Mr. McClellan to the position of Interim CFO in July 2017 (before his appointment as Executive Vice President, CFO in November 2017), the Company awarded Mr. McClellan a one-time promotion cash award. The amount reflected in the table above represents half of the full cash award for Mr. McClellan. The remaining half was awarded in February 2018. Dr. Fridriksdottir was entitled to receive payment of the remaining portion of the retention award Teva assumed pursuant to a legacy 2014 Actavis Generics retention plan, and the Company fulfilled its assumed obligation to Dr. Fridriksdottir under the plan during 2017.

**Stock Awards**

(3)   The amounts shown in the Stock Awards column represent the aggregate grant date fair value of the Performance Share Units ("PSUs") and Restricted Share Units ("RSUs") awarded to our NEOs, computed in accordance with FASB Accounting Standards Codification Topic 718 ("Topic 718"). Valuations of PSUs and RSUs were determined based on the fair market value of a Teva share on the grant date, less the net present value of dividends, and by applying a discount factor for PSUs. Valuations of sign-on PSUs granted to Mr. Schultz were determined using a Monte Carlo simulation valuation model. For information regarding assumptions, factors and methodologies used in our computations pursuant to Topic 718, see note 14c. to our consolidated financial statements for the year ended December 31, 2017.

The PSUs granted as part of the executive officer annual grants have a three-year performance period and vest in full on the third anniversary of the date of grant. The RSUs granted as part of the executive officer annual grants vest in equal installments on the second, third and fourth anniversaries of the date of grant. For more information on these and other share awards granted during 2017, see the table entitled "2017 Grants of Plan-Based Awards" and related narrative and footnotes.

Under the employment agreement with Mr. Schultz, the Company made two sign-on grants of PSUs, one of which has a three-year performance period and thereafter vests in equal installments generally on the third, fourth, and fifth anniversaries of the date of grant, and the other of which has a five year performance period and thereafter vests in full on the fifth anniversary of the date of grant. In addition, under the employment agreement with Mr. Schultz, the Company made a sign-on grant of RSUs that vest in equal installments on the third, fourth and fifth anniversaries of the date of grant.

The grant date fair value of PSUs displayed above is determined based upon achievement of performance at "target" level, which is the probable outcome of the performance metrics associated with each award of PSUs. If performance were to be achieved at "maximum" level, the grant date fair value of the PSU awards as of the respective grant dates would have been as follows: Mr. Schultz: five year PSUs—$10,840,293; three year PSUs—$9,105,295; annual PSUs—$3,999,996; Mr. McClellan: NA; Dr. de Notaristefani: $1,733,315; Dr. Fridriksdottir: $999,957; Mr. Sabag: $1,066,621; Mr. Vigodman: NA; Dr. Peterburg: $2,999,983; Mr. Desheh: $1,333,332; Dr. Koremans: $1,666,651; and Dr. Hayden: $1,333,332. These values and the values in the table do not include the impact of shares that will be forfeited upon the conclusion of the notice period currently in effect for applicable former NEOs.

**Options**

(4)   The amounts shown above in the Option Awards column represent the aggregate grant date fair value of share options computed in accordance with Topic 718. Valuations of options were determined using the Black-Scholes option pricing model. For information regarding assumptions, factors and methodologies used in our computations pursuant to Topic 718, see note 14c. to our consolidated financial statements for the year ended December 31, 2017. The values in this column do not include the impact of options that will be forfeited upon the conclusion of the notice period currently in effect for applicable former NEOs. For more information regarding options granted during 2017, see the table entitled "2017 Grants of Plan-Based Awards" and related narrative and footnotes.

**Non-Equity Incentive Awards**

(5)   The amounts shown in the Non-Equity Incentive Plan Compensation column are comprised of amounts paid in respect of the executive officer annual incentive plan, as determined by the Compensation Committee and the Board in accordance with the plan and the awards thereunder, except the amount for Dr. Fridriksdottir, which is derived from a plan Teva assumed from her prior employer in the Actavis Generics acquisition. Payments pursuant to the executive officer annual incentive plan are generally made early in the year following the year in which they are earned. For the 2017 performance year, the Compensation Committee and the Board determined not to make any payouts under the executive officer annual incentive plan due to the fact that the Company's financial results were significantly below our original financial targets for the year.

The amount reported for Dr. Fridriksdottir was paid in respect of a performance-based cash award granted when she was an employee of Actavis Generics prior to its acquisition by Teva in 2016. In conjunction with the Actavis Generics acquisition, Teva assumed the obligation to pay the cash incentive based on Actavis Generics shareholder return performance metrics.

The Company paid the amounts reported in 2016 and 2015 for Messrs. Vigodman and Desheh and Dr. Hayden in Israeli shekels. The 2016 U.S. dollar amounts in the table above were converted from Israeli shekels using a 2016 annual average exchange rate of 3.84 shekels per U.S. dollar, and the 2015 U.S. dollar amounts were converted using a 2015 annual average exchange rate of 3.89 shekels per U.S. dollar.

KEUCH000311

JOINT APPX 0678

## All Other Compensation (6)

| Name | Defined Contribution and Post Separation Plans($) | Automobile($) | Life and Other Insurance($) | Housing and Relocation Expenses and Allowances($) | Tax Gross-Ups($) | Study Funds($) | Termination Payments($) | Other($) | Total($) |
|---|---|---|---|---|---|---|---|---|---|
| | (a) | (b) | (c) | (d) | (e) | (f) | (g) | (h) | |
| Kåre Schultz ........... | 52,922 | 15,232 | 0 | 41,393 | 201,339 | 0 | 0 | 153,705 | 464,591 |
| Michael McClellan ....... | 46,114 | 13,748 | 1,080 | 99,311 | 39,326 | 0 | 0 | 0 | 199,579 |
| Dr. Carlo de Notaristefani ......... | 154,641 | 30,330 | 1,080 | 0 | 0 | 0 | 0 | 3,500 | 189,551 |
| Dr. Hafrun Fridriksdóttir .. | 54,104 | 20,308 | 1,080 | 0 | 0 | 0 | 0 | 2,000 | 77,492 |
| Mark Sabag ............. | 98,058 | 42,443 | 103 | 44,434 | 82,801 | 45,348 | 0 | 3,921 | 317,108 |
| Erez Vigodman ......... | 210,953 | 66,135 | 0 | 0 | 33,761 | 103,403 | 1,038,539 | 2,913 | 1,455,704 |
| Dr. Yitzhak Peterburg ..... | 235,237 | 91,024 | 0 | 0 | 40,896 | 111,451 | 253,620 | 4,843 | 737,071 |
| Eyal Desheh ............. | 131,460 | 48,122 | 0 | 0 | 43,261 | 62,357 | 1,080,471 | 3,430 | 1,369,101 |
| Dr. Rob Koremans ....... | 52,588 | 17,673 | 0 | 54,210 | 21,585 | 0 | 1,641,994 | 19,925 | 1,807,975 |
| Dr. Michael Hayden ..... | 160,230 | 48,118 | 39,255 | 241,742 | 219,565 | 80,344 | 359,702 | 3,581 | 1,152,537 |

(a) Amounts disclosed in this column reflect Company contributions and/or payments related to tax-qualified and non-qualified retirement plans and Israeli post-separation contributions which include pension and severance.

(b) Amounts disclosed in this column reflect automobile allowances, participation in the Company's car lease program, or use of a Company car and/or reimbursement of non-business automobile expenses. The amount disclosed for Dr. Peterburg includes car expenses incurred in connection with his service as Chairman of the Board prior to his appointment as Interim President and CEO.

(c) Amounts disclosed in this column reflect life insurance premium payments made by the Company on behalf of the NEOs. The amount disclosed for Dr. Hayden includes life and disability insurance premium reimbursements.

(d) Amounts disclosed in this column reflect housing accommodation costs for Mr. Schultz ($21,169), Mr. McClellan ($41,710), Mr. Sabag ($44,434), Dr. Koremans ($54,210) and Dr. Hayden ($96,023) and costs related to relocation such as travel, tax services, and general allowance payments.

(e) Amounts disclosed in this column reflect tax gross-ups paid to our NEOs as follows: Mr. Schultz—gross-ups are provided for the income associated with accommodation in Israel, travel costs associated with travel allowance, legal fees associated with negotiation of his employment contract, and other items related to his relocation (paid in accordance with Teva's relocation policy); Mr. McClellan—gross-ups are provided for the income associated with his relocation (paid in accordance with Teva's relocation policy), such as housing, travel, and automobile costs; Mr. Sabag—gross-ups are provided for the income associated with accommodation; Dr. Koremans—gross-ups are provided for the income associated with a flexible benefit plan provided in Dr. Koremans' country of residence; and Dr. Hayden—gross-ups are provided for the income associated with his accommodation in Israel and his relocation in general; gross-ups are provided for all Israel-based NEOs as follows—costs associated with the Company-provided or leased automobile and Company-provided cell phone. In addition, Israel-based NEOs receive gross-ups for miscellaneous fringe benefits, as are generally provided to other eligible employees in Israel.

(f) Amounts disclosed in this column reflect a Company contribution equal to 7.5% of the applicable NEO's annual base salary to Study Fund (savings fund) maintained for Israel-based NEOs (except Mr. Schultz), as provided to other eligible employees in Israel.

(g) Amounts disclosed in this column reflect termination payments paid to Mr. Vigodman, who terminated during 2017, and termination payments to be made in 2018 to our former NEOs, who were provided notice in 2017 and will terminate in 2018, that are not subject to any additional conditions on the receipt of payment, such as statutory severance payments (less contributions already made to severance funds as of the conclusion of the 2017 calendar year) and the estimated payment of accrued vacation as of the termination date for Israel-based NEOs. The amounts for Mr. Desheh and Dr. Koremans include payment of their full severance.

(h) Amounts disclosed in this column reflect reimbursement of legal fees associated with the negotiation of the employment contract for Mr. Schultz ($125,000, excluding VAT), a cash payment associated with a flexible benefit plan provided in Dr. Koremans' country of residence and miscellaneous cash fringe benefits provided generally to all eligible employees in applicable countries, such as a children's education allowance and service recognition awards.

The U.S. dollar amounts in the table above were converted from local currency using the relevant 2017 monthly average exchange rates of 3.50 to 3.82 Israeli shekels per U.S. dollar and 0.84 to 0.94 euros per U.S. dollar.

## Employment Agreements

We have entered into employment agreements with all of our current and former NEOs that provide for, among other things, the term of employment, the position and duties, the compensation and benefits payable during the term of the agreement and certain restrictive covenants. The agreements also set forth the terms in the event that the NEO's employment is terminated under various conditions. The material provisions pertaining to termination of employment of the NEOs are set forth below under "—2017 Potential Payments Upon Termination or Change in Control."

239

KEUCH000312

JOINT APPX 0679

### *Kåre Schultz*

On September 7, 2017, we entered into an employment agreement with Mr. Schultz to serve as our President and CEO. He is eligible for benefit plans provided to similarly situated executive officers, including medical, dental, group life and other programs, pension and severance contributions required under Israeli law, relocation benefits in accordance with our policy, housing reimbursement up to 40,000 Israeli shekels per month ($11,110 using a 2017 average monthly exchange rate of 3.60 shekels per U.S. dollar) and personal travel reimbursement up to $100,000 per year. We agreed to provide Mr. Schultz with a company car. For a summary of the material terms of Mr. Schultz's employment agreement, see "—Compensation Discussion and Analysis—IV. Components of Our Compensation Program—Leadership Transitions—Appointment of Mr. Kåre Schultz as President and CEO" above. Mr. Schultz agreed to noncompetition (except in the event of expiration of his term) and nonsolicitation covenants, for 24 months, and a nondisparagement covenant for 10 years after termination. Mr. Schultz also agreed to an assignment of inventions.

### *Michael McClellan*

Effective as of November 27, 2017, we entered into an employment agreement with Mr. McClellan. The agreement provides that Mr. McClellan will be employed as Executive Vice President, CFO. He is eligible for benefit plans provided to similarly situated executive officers, including medical, disability, dental, life, 401(k) plan, deferred compensation and other programs. In conjunction with Mr. McClellan's relocations to the Netherlands and then to Israel, he will be entitled to relocation benefits in accordance with the terms of our relocation policy. While he is based in the Netherlands, he is entitled to a housing allowance of up to €3,250 per month ($3,663 using a 2017 average monthly exchange rate of 0.89 euros per U.S. dollar). For a summary of the material terms of Mr. McClellan's employment agreement, see "—Compensation Discussion and Analysis—IV. Components of Our Compensation Program—Leadership Transitions—Appointment of Mr. Michael McClellan as CFO; Previous Appointment as Interim CFO" above.

The agreement also contains noncompetition and nonsolicitation covenants during and for 12 months after the term of the agreement and nondisclosure and nondisparagement covenants and assignment of inventions.

### *Dr. Carlo de Notaristefani*

On August 6, 2012, we entered into an employment agreement with Dr. de Notaristefani which was amended and restated on February 7, 2018. The agreement provides that Dr. de Notaristefani will serve in a senior global operations position, until his death, disability, termination with or without cause or resignation with or without good reason. The agreement provided for an initial base salary of $836,400. Dr. de Notaristefani is eligible to participate in the Company's annual cash incentive plan with a target of 100% of his then current base salary, and for equity-based awards under our equity compensation plan. He is eligible for benefit plans provided to similarly situated executive officers, including medical, disability, dental, life, 401(k) plan, deferred compensation and other programs. We agreed to furnish a car or a car allowance. In May 2017, we granted Dr. de Notaristefani 30,875 RSUs due to his significance and key role during a critical transition period for us and the importance of securing his services. The RSUs will vest in May 2019.

The agreement also contains noncompetition and nonsolicitation covenants during and for 12 months after the term of the agreement and nondisclosure and nondisparagement covenants and assignment of inventions.

### *Dr. Hafrun Fridriksdottir*

On June 18, 2017, we entered into an employment agreement with Dr. Fridriksdottir. The agreement provides that Dr. Fridriksdottir will serve in a senior R&D position. She is eligible for benefit plans provided to similarly situated executive officers, including medical, disability, dental, life, 401(k) plan, deferred compensation and other programs. We agreed to provide a car allowance. For a summary of the material terms of

KEUCH000313

JOINT APPX 0680

Dr. Fridriksdottir's employment agreement, see "—Compensation Discussion and Analysis—IV. Components of Our Compensation Program—Leadership Transitions— Appointment of Dr. Hafrun Fridriksdottir as Executive Vice President, Global R&D" above.

The agreement also contains noncompetition and nonsolicitation covenants during and for 12 months after the term of the agreement and nondisclosure and nondisparagement covenants and assignment of inventions.

### Mark Sabag

On December 22, 2013, we entered into an employment agreement with Mr. Sabag. The agreement provides that Mr. Sabag will serve as Group Executive Vice President, Human Resources until his death, disability, aged retirement, termination with or without cause or resignation with or without good reason. The agreement provided for an initial base monthly salary of 126,500 Israeli shekels (approximately $35,134 using a 2017 average monthly exchange rate of 3.60 shekels per U.S. dollar). Mr. Sabag is eligible to be considered for an annual cash incentive and for equity-based awards under our equity compensation plan. We agreed to provide Mr. Sabag with a company or leased car and grossed-up for applicable taxes. We also agreed to provide certain pension and severance fund contributions required in Israel, and group life insurance and other benefits customary for executives in Israel. Mr. Sabag is also eligible for reimbursement of rent up to $3,000 per month, and utilities, grossed-up for applicable taxes. The agreement also contains provisions covering Mr. Sabag's contributions to a choice of a pension fund, managers' insurance fund or provident fund.

Mr. Sabag also agreed to a noncompetition covenant during and for 12 months after termination, nondisparagement and nondisclosure covenants and an assignment of inventions.

### Erez Vigodman

Effective as of February 11, 2014, we entered into an employment agreement with Mr. Vigodman. The agreement provided that Mr. Vigodman would serve as President and CEO until his death, disability, termination with or without cause or resignation with or without good reason. The agreement provided for an initial annual base salary in the amount of Israeli shekels that is equivalent to $1,350,000, adjusted according to increases in the consumer price index. Mr. Vigodman was eligible for an annual cash incentive and for equity-based awards under our equity compensation plan as decided by the Compensation Committee and the Board and subject to the applicable framework approved by shareholders. We also agreed to provide certain pension and severance fund contributions required in Israel, medical, dental, group life insurance and other benefits customary for senior executives in Israel. The agreement also contains provisions covering Mr. Vigodman's contributions to a choice of a pension fund, managers' insurance fund or provident fund. We agreed to provide Mr. Vigodman with a company car and grossed-up for applicable taxes.

Mr. Vigodman also agreed to a noncompetition covenant during and for 12 months after the term of the agreement, a nondisparagement covenant for 10 years, a nondisclosure covenant and an assignment of inventions.

### Dr. Yitzhak Peterburg

Effective as of February 6, 2017, we entered into an employment agreement with Dr. Peterburg. The agreement provided that Dr. Peterburg would serve as Interim President and CEO until his death, disability, termination with or without cause or resignation with or without good reason. The agreement provided for an initial base monthly salary of 488,250 Israeli shekels (approximately $135,608 using a 2017 average monthly exchange rate of 3.60 shekels per U.S. dollar), adjusted according to increases in the consumer price index. From the appointment of Dr. Peterburg as Interim President and CEO and for as long as he continued to serve in such position, Dr. Peterburg was not entitled to any payments in his capacity as a member of the Board or any committee thereof. Dr. Peterburg was eligible for a pro-rata annual cash incentive in 2017. Dr. Peterburg

241

KEUCH000314

JOINT APPX 0681

received an equity grant of $4.5 million, comprised of 1/3 options, 1/3 RSUs and 1/3 PSUs. The options and RSUs will vest in three equal installments on the second, third and fourth anniversaries of the grant date and the PSUs will have a cliff vesting on the third anniversary of the grant date subject to meeting the PSU performance goals and in accordance with the formula approved by the Committee and the Board. We agreed to furnish a car and grossed-up for applicable taxes and to provide certain pension and severance fund contributions required in Israel, medical, dental, group life insurance and other benefits customary for senior executives in Israel. The agreement also contains provisions covering Dr. Peterburg's contributions to a choice of a pension fund, managers' insurance fund or provident fund.

Dr. Peterburg also agreed to a noncompetition covenant during and for 12 months after termination, a nondisparagement covenant for 10 years, a nondisclosure covenant and an assignment of inventions.

### Eyal Desheh

Effective as of April 28, 2008, we entered into an employment agreement (as subsequently amended) with Mr. Desheh. The agreement provided that Mr. Desheh will serve as CFO until his death, disability, aged retirement, termination with or without cause or resignation with or without good reason. The agreement provided for an initial base monthly salary of 110,000 Israeli shekels (approximately $30,552 using a 2017 average monthly exchange rate of 3.60 shekels per U.S. dollar). Mr. Desheh was eligible for an annual cash incentive and for equity-based awards under our equity compensation plan. We agreed to provide Mr. Desheh with a company or leased car and grossed-up for applicable taxes. We also agreed to provide certain pension and severance fund contributions required in Israel, and group life insurance and other benefits customary for executives in Israel. The agreement also contains provisions covering Mr. Desheh's contributions to a choice of a pension fund, managers' insurance fund or provident fund.

Mr. Desheh also agreed to a noncompetition covenant during and for 12 months after termination, nondisclosure and nondisparagement covenants and an assignment of inventions.

### Dr. Rob Koremans

Effective as of March 1, 2012, we entered into an employment agreement (as subsequently amended) with Dr. Rob Koremans. The agreement provided that Dr. Koremans would serve as Teva Pharmaceuticals Europe President and CEO for an indefinite period of time, subject to termination by Dr. Koremans or the Company. The agreement provided for an initial fixed gross annual base salary of €550,000 (approximately $619,896 using a 2017 average monthly exchange rate of 0.89 euro per U.S. dollar). Dr. Koremans was eligible to be considered for an annual cash incentive and for the long term incentive plan. We provided Dr. Koremans with the right to use a Company-leased apartment for which the lease value would not exceed €4,200 per month, until March 31, 2018 (approximately $4,734 using a 2017 average monthly exchange rate of 0.89 euro per U.S. dollar) and a company car for which the annual all-in costs would not exceed an amount of €33,000 (approximately $37,194 using a 2017 average monthly exchange rate of 0.89 euro per U.S. dollar). We also agreed to provide certain group medical, life and disability insurance.

Generally, Dr. Koremans also agreed to noncompetition and nonsolicitation covenants during and for 12 months after termination. If he breaches his obligations, he owes us a penalty of €100,000 and €5,000 for each day that such breach continues (approximately $112,708 and $5,635, respectively, using a 2017 average monthly exchange rate of 0.89 euro per U.S. dollar).

### Dr. Michael Hayden

On May 8, 2012, we entered into an employment agreement with Dr. Michael Hayden which was amended and restated on May 22, 2015. The agreement provided that Dr. Hayden would serve as President of R&D and Chief Scientific Officer and will continue on an at-will basis. The agreement provided for an initial base annual

KEUCH000315

JOINT APPX 0682

salary of $1,050,000. Dr. Hayden was eligible to participate in the Company's annual cash incentive plan and to be considered for equity awards under the long term incentive plan. We also agreed to be responsible for the costs of existing pension coverage of up to $40,000, grossed-up for taxes, and the balance between such amount and the amount required by Israeli law is contributed to a certain pension fund of his choice. We also agreed to provide certain medical, dental, group life insurance, and other benefits. Dr. Hayden is also entitled to certain benefits associated with his relocation to Israel.

Dr. Hayden also agreed to a noncompetition covenant during and for 12 months after termination, nondisclosure and nondisparagement covenants and an assignment of inventions.

**2017 Pay Ratio**

Under the Dodd-Frank Wall Street Reform and Consumer Protection Act, we are required to disclose the median of the annual total compensation of our employees, the annual total compensation of our principal executive officer, President and CEO Mr. Kåre Schultz, and the ratio of these two amounts.

We have estimated the median of the 2017 annual total compensation of our employees, excluding Mr. Schultz, to be $64,081. The annualized total compensation of our President and CEO, who was hired in 2017, was $19,374,347. The ratio of the annualized total compensation of our President and CEO to the estimated median of the annual total compensation of our employees was 302 to 1. We believe this pay ratio is a reasonable estimate calculated in a manner consistent with SEC rules. We note that a substantial portion of our President and CEO's total compensation for 2017 was the sign-on equity awards he received in accordance with his employment agreement, which had a grant date fair value of approximately $10.2 million. Excluding the sign-on equity awards, the ratio would have been 143 to 1.

The following paragraphs provide important context related to our employee population and describe the methodology and the material assumptions, adjustments, and estimates that we used to calculate this ratio.

Teva is a global company, with complex operations worldwide and with many of its executive officers and a majority of its employees located outside of Israel, the country in which our headquarters office is located.

As of November 1, 2017, Teva's workforce consisted of approximately 52,419 full-time and part-time employees, including hourly employees, who worked for our parent company and consolidated subsidiaries. Approximately 45% of these employees are located in Europe, approximately 17% are located in the U.S., approximately 12% are located in Israel, and approximately 26% are located throughout the rest of the world. Approximately 50,441 individuals are full-time employees, with the remainder employed on a part-time basis.

In determining the employee population to be used to calculate the compensation of the median employee, we included employees in all countries except for 424 employees in Venezuela, who represented less than 5% of our total employees, as permitted under the applicable SEC de minimis rule. As a result, the employee population that we used for purposes of determining the compensation of our median employee was 51,995 employees.

We selected November 1, 2017, which is within the last three months of 2017, as the date upon which we would identify the "median employee," because it enabled us to make such identification in a reasonably efficient and economical manner, and it was also the date that our new CEO commenced employment.

We included all of our full-time, part-time, and temporary employees globally, but excluded our President and CEO. We annualized the compensation of approximately 2,562 full-time and part-time employees who were

243

KEUCH000316

JOINT APPX 0683

hired in 2017 but did not work for us for the entire fiscal year. Earnings of our employees outside the U.S. were converted to U.S. dollars using the currency exchange rates used for organizational planning purposes, which consider historic and forecasted rates as well as other factors. We did not make any cost of living adjustments.

To identify the "median employee," we utilized the annualized 2017 base salary and target annual cash incentive for our consistently applied compensation measure because we believe that this measure reasonably reflects the annual compensation of our employees. We do not grant equity to a large percentage of our employee population, so using base salary plus target annual incentive is representative.

Using this measure, we identified a "median employee" who is a full-time, salaried employee located in Israel. Initially, a different employee had been identified, but in the process of determining that employee's total compensation in accordance with applicable SEC rules, we recognized that there were anomalous elements in that employee's compensation which we believe did not reasonably reflect the annual compensation of our employees generally. Consequently, we identified an employee whose amount for the consistently applied compensation measure was very close to the initial employee, but who did not have such unusual elements. Once we identified this median employee, we totaled all of the elements of the employee's compensation for 2017 in accordance with the requirements of the applicable SEC rules and converted the amounts from Israeli shekels to U.S. dollars using the relevant monthly average currency exchange rate of 3.50 to 3.82 shekels per U.S. dollar. This resulted in an annual total compensation of $64,081, of which $29,159 is base salary and $34,922 is comprised of Company contributions to a pension fund, as is required by Israeli law, and other compensation such as overtime pay, travel and other cash allowances, and Company contributions to a study fund, as is common practice for Israel-based employees of the Company.

With respect to the annual total compensation of our President and CEO, we adjusted the amount reported in the "Total" column of our 2017 Summary Compensation Table included in this Annual Report on Form 10-K, by annualizing his base salary and certain components of "all other compensation" to account for the fact that he only commenced employment with us on November 1, 2017, resulting in an adjusted total amount of $19,374,347. As indicated above, we note that a substantial portion of the total compensation of our newly-hired President and CEO for 2017 was the sign-on equity awards he received in accordance with his employment agreement, which had a grant date fair value of approximately $10.2 million.

Because the SEC rules for identifying the median of the annual total compensation of our employees and calculating the pay ratio based on that employee's annual total compensation allow companies to adopt a variety of methodologies, to apply certain exclusions, and to make reasonable estimates and assumptions that reflect their employee populations and compensation practices, the pay ratio reported by other companies may not be comparable to the pay ratio for our Company, as other companies have headquarters offices in different countries, have different employee populations and compensation practices and may utilize different methodologies, exclusions, estimates and assumptions in calculating their pay ratios.

KEUCH000317

JOINT APPX 0684

## 2017 Grants of Plan-Based Awards

| Name | Approval Date | Grant Date | Award Type | Estimated Future Payouts Under Non-Equity Incentive Plan Awards (1) | | | Estimated Future Payouts Under Equity Incentive Plan Awards (2) | | | All Other Share Awards: Number of Shares or Share Units (#) (2) | All Other Option Awards: Number of Securities Underlying Options (#) (2) | Exercise or Base Price of Option Awards ($/Sh) | Grant Date Fair Value of Share and Option Awards ($) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Threshold ($) | Target ($) | Maximum ($) | Threshold (#) | Target (#) | Maximum (#) | | | | |
| Kåre Schultz | 9/6/2017 | 11/1/2017 | Annual Incentive | 0 | 2,800,000 | 4,000,000 | | | | | | | |
| | 9/6/2017 | 11/3/2017 | PSU (5) | | | | 0 | 649,914 | 1,949,742 | | | | 3,035,098 |
| | 9/6/2017 | 11/3/2017 | PSU (5) | | | | 0 | 751,504 | 2,254,512 | | | | 3,629,764 |
| | 9/6/2017 | 11/3/2017 | RSU (5) | | | | | | | 349,163 | | | 3,564,954 |
| | 9/6/2017 | 11/3/2017 | PSU | | | | 0 | 212,314 | 424,628 | | | | 1,999,998 |
| | 9/6/2017 | 11/3/2017 | RSU | | | | | | | 190,839 | | | 1,999,993 |
| | 9/6/2017 | 11/3/2017 | Options | | | | | | | | 591,719 | 11.40 | 2,000,009 |
| Michael McClellan | 7/12/2017 | 7/12/2017 | Annual Incentive | 0 | 219,519 | 439,038 | | | | | | | |
| | 2/28/2017 | 3/3/2017 | RSU | | | | | | | 4,197 | | | 132,331 |
| | 2/28/2017 | 3/3/2017 | Options | | | | | | | | 22,505 | 34.70 | 132,329 |
| | 9/18/2017 | 9/18/2017 | RSU | | | | | | | 4,091 | | | 66,929 |
| | 9/18/2017 | 9/18/2017 | Options | | | | | | | | 12,341 | 16.99 | 63,186 |
| Dr. Carlo de Notaristefani | 3/31/2017 | 3/31/2017 | Annual Incentive | 0 | 836,400 | 1,672,800 | | | | | | | |
| | 2/7/2017 | 2/14/2017 | PSU | | | | 0 | 30,941 | 61,882 | | | | 866,657 |
| | 2/7/2017 | 2/14/2017 | RSU | | | | | | | 27,840 | | | 866,659 |
| | 2/7/2017 | 2/14/2017 | Options | | | | | | | | 147,396 | 34.90 | 866,688 |
| | 3/31/2017 | 5/18/2017 | RSU | | | | | | | 30,875 | | | 836,404 |
| Dr. Hafrun Fridriksdottir | 3/31/2017 | 3/31/2017 | Annual Incentive | 0 | 630,577 | 1,261,154 | | | | | | | |
| | 2/7/2017 | 2/14/2017 | PSU | | | | 0 | 17,850 | 35,700 | | | | 499,979 |
| | 2/7/2017 | 2/14/2017 | RSU | | | | | | | 16,061 | | | 499,979 |
| | 2/7/2017 | 2/14/2017 | Options | | | | | | | | 85,042 | 34.90 | 500,047 |
| Mark Sabag | 3/31/2017 | 3/31/2017 | Annual Incentive | 0 | 604,637 | 1,209,274 | | | | | | | |
| | 2/7/2017 | 2/14/2017 | PSU | | | | 0 | 19,040 | 38,080 | | | | 533,310 |
| | 2/7/2017 | 2/14/2017 | RSU | | | | | | | 17,132 | | | 533,319 |
| | 2/7/2017 | 2/14/2017 | Options | | | | | | | | 90,710 | 34.90 | 533,375 |
| Dr. Yitzhak Peterburg | 3/31/2017 | 3/31/2017 | Annual Incentive | 0 | 1,679,650 | 2,351,510 | | | | | | | |
| | 2/8/2017 | 2/14/2017 | PSU | | | | 0 | 53,552 | 107,104 | | | | 1,499,992 |
| | 2/8/2017 | 2/14/2017 | RSU | | | | | | | 48,185 | | | 1,499,999 |
| | 2/8/2017 | 2/14/2017 | Share Options | | | | | | | | 255,104 | 34.90 | 1,500,009 |
| Eyal Desheh | 3/31/2017 | 3/31/2017 | Annual Incentive | 0 | 408,300 | 816,600 | | | | | | | |
| | 2/7/2017 | 2/14/2017 | PSU | | | | 0 | 23,801 | 47,602 | | | | 666,666 |
| | 2/7/2017 | 2/14/2017 | RSU | | | | | | | 21,415 | | | 666,649 |
| | 2/7/2017 | 2/14/2017 | Options | | | | | | | | 113,382 | 34.90 | 666,686 |
| Dr. Rob Koremans | 3/31/2017 | 3/31/2017 | Annual Incentive | 0 | 783,215 | 1,566,430 | | | | | | | |
| | 2/7/2017 | 2/14/2017 | PSU | | | | 0 | 29,751 | 59,502 | | | | 833,326 |
| | 2/7/2017 | 2/14/2017 | RSU | | | | | | | 26,769 | | | 833,319 |
| | 2/7/2017 | 2/14/2017 | Options | | | | | | | | 141,728 | 34.90 | 833,361 |
| Dr. Michael Hayden | 3/31/2017 | 3/31/2017 | Annual Incentive | 0 | 1,071,000 | 2,142,000 | | | | | | | |
| | 2/7/2017 | 2/14/2017 | PSU | | | | 0 | 23,801 | 47,602 | | | | 666,666 |
| | 2/7/2017 | 2/14/2017 | RSU | | | | | | | 21,415 | | | 666,649 |
| | 2/7/2017 | 2/14/2017 | Options | | | | | | | | 113,382 | 34.90 | 666,686 |

Mr. Vigodman did not receive any grants of plan-based awards in 2017. In addition, the annual equity award granted to Mr. McClellan was made prior to his appointment as Interim CFO in July 2017 pursuant to our program for non-executive officers.

### Annual Incentive Plan

(1)   The amounts disclosed in these columns reflect the target and maximum annual cash incentive opportunities for 2017 under the executive officer annual incentive plan. The amounts of the annual cash incentive opportunities depend on the eligible base salary of the NEO for the year, which, for those NEOs who were appointed during 2017, reflect a partial annual based salary. Because the Company's financial results were significantly below our original financial targets for the year, the Compensation Committee and the Board determined not to make any payouts under the executive officer annual incentive plan for 2017.

Mr. McClellan and Dr. Fridriksdottir were eligible for annual incentive award opportunities under the Company's plan for non-executive officers in respect of pro-rated salary earned prior to being appointed

KEUCH000318

JOINT APPX 0685

executive officers. Pursuant to this plan for non-executive officers, Mr. McClellan and Dr. Fridriksdottir had pro-rated target opportunities of $88,769 and $52,615, respectively, and maximum pro-rated incentive opportunities of $177,538 and $105,230, respectively. Because the Company's financial results were significantly below our original financial targets for the year, no payouts were made for Mr. McClellan and Dr. Fridriksdottir under this incentive plan.

### Performance Share Units (PSUs)

(2)    Amounts disclosed in these columns reflect the target and maximum number of PSUs awarded in 2017 to each NEO. The PSUs granted as part of the executive officer annual equity grant have a three-year performance period and vest in full on the third anniversary of the date of grant. The PSUs vest subject to the achievement of two performance measures: Non-GAAP EPS, and Free Cash Flow (adjusted to exclude legal settlements), each of which is weighted an equal 50%. Each performance measure has specified threshold, target and maximum performance levels such that performance below the threshold level results in an earning percentage of 0%, performance at target level results in an earning percentage of 100%, and performance at or above the maximum level results in an earning percentage of 200%. Linear interpolation will be used to determine the applicable earning percentage. In order to determine the total payout for the PSUs, the Compensation Committee and the Board calculate the average of the earning percentages for the two performance measures and multiplies by an 80% to 120% modifier determined based on the percentile rank of the Company's TSR performance for the three year period ending in 2019 relative to its peer group. See "—Compensation Discussion and Analysis—III. Compensation Determination Process— Compensation Peer Group and Peer Selection Process" for a list of the peer group companies used for this purpose. The resulting percentage is multiplied by the target number of PSUs to determine the final number of shares to be earned by each NEO in respect of the applicable performance period, except that the number of shares to be earned may not exceed 200% of the target number of PSUs. Valuations of annual PSUs disclosed in this table were determined based on the fair market value of a Teva share on the grant date, less the net present value of dividends, and then applying a discount factor. Generally, the aggregate grant date fair value is the amount that the Company expects to expense in its financial statements over the award's vesting schedule. Please see footnote (5) below for information regarding Mr. Schultz's sign-on equity grant.

### Restricted Share Units (RSUs)

(3)    Amounts disclosed in this column reflect the number of RSUs granted to our NEOs in 2017. The RSUs granted as part of the executive officer annual equity grant vest in equal annual installments on the second, third and fourth anniversaries of the grant date. Valuations of RSUs were determined based on the fair market value of a Teva share on the grant date, less the net present value of dividends. The Company granted Dr. de Notaristefani a one-time grant of RSUs, which will vest in May 2019, due to his significance and key-role during the transition period and the importance of securing his services. In addition, the Company made a one-time grant of RSUs to Mr. McClellan during his service as Interim CFO, which will vest in September 2019, as part of a broader program to secure the services of key employees during a period of uncertainty for our Company. Please see footnote (5) below for information regarding Mr. Schultz's sign-on equity grant.

### Share Options

(4)    Amounts disclosed in this column reflect the number of share options granted to our NEOs in 2017. The options granted as part of the executive officer annual equity grant vest in equal installments on the second, third and fourth anniversaries of the grant date. The options generally expire ten years from the date of grant, and have an exercise price of no less than 100% of the fair market value of a Teva share on the date of grant. The grant date fair values were calculated using the Black-Scholes value of each option on the respective grant dates. The Company also granted Mr. McClellan a one-time grant of options during his service as Interim CFO, which will vest in September 2019, as part of a broader program to secure the services of key employees during a period of uncertainty for our Company.

KEUCH000319

JOINT APPX 0686

**Sign-On Grants to Mr. Schultz of PSUs and RSUs**

(5)    Amounts disclosed in these rows reflect sign-on PSUs and RSUs awarded pursuant to the employment agreement with Mr. Schultz. Pursuant to his employment agreement, Mr. Schultz received two PSU grants, one of which has a three-year performance period and the other of which has a five year performance period. Both PSU grants vest if, and to the extent, Teva's stock price exceeds specified thresholds during the performance period. The three-year PSUs and the RSUs generally vest following the conclusion of the three-year performance period on the third, fourth and fifth anniversaries of the grant date and the five-year PSUs vest in full on the fifth anniversary of the grant date. Under the employment agreement, the number of sign-on PSUs awarded for both grants and the number of RSUs were determined based on the fair market value of a Teva share on the date prior to the public announcement of Mr. Schultz's hiring, September 8, 2017. The fair values of the two PSU grants were determined as of the grant date using a Monte Carlo simulation valuation performed by a third party, and the fair value of the RSUs was determined based on the fair market value of a Teva share on the grant date, less the net present value of dividends.

KEUCH000320

JOINT APPX 0687

## 2017 Outstanding Equity Awards at Fiscal Year-End

| Name | Award Type | Grant Date | Number of Securities Underlying Unexercised Options Exercisable (#) (1) | Number of Securities Underlying Unexercised Options Unexercisable (#) (2) | Option Exercise Price ($) | Option Expiration Date | Number of Shares or Units of Shares That Have Not Vested (#) (3) | Market Value of Shares or Units of Shares That Have Not Vested ($) (4) | Equity Incentive Plan Awards: Number of Unearned Shares, Units or Other Rights That Have Not Vested (#) (5) | Equity Incentive Plan Awards: Market or Payout Value of Unearned Shares, Units or Other Rights That have Not Vested ($) (6) | Vesting Schedule (7) |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Kåre Schultz | Options | 11/3/2017 | | 591,719 | 11.40 | 11/2/2027 | | | | | 33% in 2019, 2020 and 2021 |
| | RSUs | 11/3/2017 | | | | | 190,839 | 3,616,399 | | | 33% in 2019, 2020 and 2021 |
| | | 11/3/2017 | | | | | 349,163 | 6,616,639 | | | 33% in 2020, 2021 and 2022 |
| | PSUs | 11/3/2017 | | | | | | | 649,914 | 12,315,870 | 33% in 2020, 2021 and 2022, subject to performance |
| | | 11/3/2017 | | | | | | | 751,504 | 14,241,001 | 100% in 2022, subject to performance |
| | | 11/3/2017 | | | | | | | 212,314 | 4,023,350 | 100% in 2020, subject to performance |
| Michael McClellan | Options | 11/5/2015 | 6,962 | 6,965 | 60.92 | 11/4/2025 | | | | | 25% in 2016, 2017, 2018 and 2019 |
| | | 3/17/2016 | 3,500 | 10,503 | 53.50 | 3/16/2026 | | | | | 25% in 2017, 2018, 2019 and 2020 |
| | | 3/3/2017 | | 22,505 | 34.70 | 3/2/2027 | | | | | 25% in 2018, 2019, 2020 and 2021 |
| | | 9/18/2017 | | 12,341 | 16.99 | 9/17/2027 | | | | | 100% in 2019 |
| | RSUs | 11/5/2015 | | | | | 1,390 | 26,341 | | | 25% in 2016, 2017, 2018 and 2019 |
| | | 3/17/2016 | | | | | 1,981 | 37,540 | | | 25% in 2017, 2018, 2019 and 2020 |
| | | 3/3/2017 | | | | | 4,197 | 79,533 | | | 25% in 2018, 2019, 2020 and 2021 |
| | | 9/18/2017 | | | | | 4,091 | 77,524 | | | 100% in 2019 |
| Dr. Carlo de Notaristefani | Options | 8/1/2012 | 150,003 | | 40.87 | 7/31/2022 | | | | | vested |
| | | 3/12/2014 | 65,720 | 32,861 | 48.76 | 3/11/2024 | | | | | 33% in 2016, 2017 and 2018 |
| | | 2/12/2015 | 29,792 | 59,584 | 57.35 | 2/11/2025 | | | | | 33% in 2017, 2018 and 2019 |
| | | 2/12/2016 | | 99,904 | 55.75 | 2/11/2026 | | | | | 33% in 2018, 2019 and 2020 |
| | | 5/16/2016 | | 8,346 | 50.43 | 5/15/2026 | | | | | 33% in 2018, 2019 and 2020 |
| | | 2/14/2017 | | 147,396 | 34.90 | 2/13/2027 | | | | | 33% in 2019, 2020 and 2021 |
| | RSUs | 2/14/2017 | | | | | 27,840 | 527,568 | | | 33% in 2019, 2020 and 2021 |
| | | 5/18/2017 | | | | | 30,875 | 585,081 | | | 100% in 2019 |
| | PSUs | 2/12/2016 | | | | | | | 19,219 | 364,200 | 100% in 2019, subject to performance |
| | | 5/16/2016 | | | | | | | 1,603 | 30,377 | 100% in 2019, subject to performance |
| | | 2/14/2017 | | | | | | | 30,941 | 586,332 | 100% in 2020, subject to performance |
| Dr. Hafrun Fridriksdottir | Options | 7/1/2014 | 7,603 | 15,206 | 48.69 | 6/30/2024 | | | | | 33% in 2017, 2018 and 2019 |
| | | 8/2/2016 | 3,997 | 11,993 | 52.96 | 8/1/2026 | | | | | 25% in 2017, 2018, 2019 and 2020 |
| | | 9/9/2016 | 1,388 | 4,165 | 50.21 | 9/8/2026 | | | | | 25% in 2017, 2018, 2019 and 2020 |
| | | 11/30/2016 | | 57,167 | 37.70 | 11/29/2026 | | | | | 25% in 2018, 75% in 2019 |
| | | 2/14/2017 | | 85,042 | 34.90 | 2/13/2027 | | | | | 33% in 2019, 2020 and 2021 |
| | RSUs | 5/8/2014 | | | | | 3,432 | 65,036 | | | 50% in 2017 and 2018 |
| | | 7/1/2014 | | | | | 9,280 | 175,856 | | | 33% in 2017, 2018 and 2019 |
| | | 3/4/2015 | | | | | 2,330 | 44,154 | | | 33% in 2017, 2018 and 2019 |
| | | 8/2/2016 | | | | | 2,242 | 42,486 | | | 25% in 2017, 2018, 2019 and 2020 |
| | | 9/9/2016 | | | | | 796 | 15,084 | | | 25% in 2017, 2018, 2019 and 2020 |
| | | 11/30/2016 | | | | | 10,844 | 205,494 | | | 25% in 2018, 75% in 2019 |
| | | 2/14/2017 | | | | | 16,061 | 304,356 | | | 33% in 2019, 2020 and 2021 |
| | PSUs | 2/14/2017 | | | | | | | 17,850 | 338,258 | 100% in 2020, subject to performance |

248

KEUCH000321

JOINT APPX 0688

| Name | Award Type | Grant Date | Option Awards | | | | Stock Awards | | | | Vesting Schedule (7) |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Number of Securities Underlying Unexercised Options (#) Exercisable (1) | Number of Securities Underlying Unexercised Options (#) Unexercisable (2) | Option Exercise Price ($) | Option Expiration Date | Number of Shares or Units of Shares That Have Not Vested (#) (3) | Market Value of Shares or Units of Shares That Have Not Vested ($) (4) | Equity Incentive Plan Awards: Number of Unearned Shares, Units or Other Rights That Have Not Vested (#) (5) | Equity Incentive Plan Awards: Market or Payout Value of Unearned Shares, Units or Other Rights That Have Not Vested ($) (6) | |
| Mark Sabag | Options | 1/7/2011 | 4001 | | 41.72 | 11/6/2021 | | | | | vested |
| | | 2/24/2012 | 3,201 | | .44.59 | 2/23/2022 | | | | | vested |
| | | 12/13/2012 | 4,501 | | 38.84 | 12/12/2022 | | | | | vested |
| | | 2/24/2013 | 4,502 | | 38.08 | 2/23/2023 | | | | | vested |
| | | 11/11/2013 | 100,002 | | 37.26 | 11/10/2023 | | | | | vested |
| | | 3/12/2014 | 49,288 | 24,644 | 48.76 | 3/11/2024 | | | | | 33% in 2016, 2017 and 2018 |
| | | 2/12/2015 | 22,345 | 44,690 | 57.35 | 2/11/2025 | | | | | 33% in 2017, 2018 and 2019 |
| | | 2/12/2016 | | 64,940 | 55.75 | 2/11/2026 | | | | | 33% in 2018, 2019 and 2020 |
| | | 2/14/2017 | | 90,710 | 34.90 | 2/13/2027 | | | | | 33% in 2019, 2020 and 2021 |
| | RSUs | 2/14/2017 | | | | | 17,132 | 324,651 | | | 33% in 2019, 2020 and 2021 |
| | PSUs | 2/12/2016 | | | | | | | 12,492 | 236,723 | 100% in 2019, subject to performance |
| | | 2/14/2017 | | | | | | | 19,040 | 360,808 | 100% in 2020, subject to performance |
| Erez Vigodman | Options | 1/8/2014 | 187,134 | 93,568 | 41.05 | 1/7/2024 | | | | | 33% in 2016, 2017 and 2018 |
| | | 2/12/2015 | 54,619 | 54,619 | 57.35 | 2/11/2025 | | | | | 33% in 2017 and 2018 (2019 tranche forfeited) |
| | | 2/12/2016 | | 58,276 | 55.75 | 2/11/2026 | | | | | 33% in 2018 (2019 and 2020 tranches forfeited) |
| | | 5/16/2016 | | 18,540 | 50.43 | 5/15/2026 | | | | | 33% in 2018 (2019 and 2020 tranches forfeited) |
| | RSUs | 1/8/2014 | | | | | 5,220 | 98,919 | | | 33% in 2016, 2017 and 2018 |
| Dr. Yitzhak Peterburg | Options | 8/31/2010 | 198,752 | | 50.62 | 8/30/2020 | | | | | vested |
| | | 2/14/2017 | | 255,104 | 34.90 | 2/13/2027 | | | | | 33% in 2019, 2020 and 2021 |
| | RSUs | 2/14/2017 | | | | | 48,185 | 913,106 | | | 33% in 2019, 2020 and 2021 |
| | PSUs | 2/14/2017 | | | | | | | 53,552 | 1,014,810 | 100% in 2020, subject to performance |
| Eyal Desheh | Options | 11/7/2011 | 198,003 | | 41.72 | 11/6/2021 | | | | | vested |
| | | 3/12/2014 | 65,720 | 32,861 | 48.76 | 3/11/2024 | | | | | 33% in 2016, 2017 and 2018 |
| | | 2/12/2015 | 29,792 | 59,584 | 57.35 | 2/11/2025 | | | | | 33% in 2017, 2018 and 2019 |
| | | 2/12/2016 | | 99,904 | 55.75 | 2/11/2026 | | | | | 33% in 2018, 2019 and 2020 |
| | | 5/16/2016 | | 13,908 | 50.43 | 5/15/2026 | | | | | 33% in 2018, 2019 and 2020 |
| | | 2/14/2017 | | 113,382 | 34.90 | 2/13/2027 | | | | | 33% in 2019, 2020 and 2021 |
| | RSUs | 2/14/2017 | | | | | 21,415 | 405,814 | | | 33% in 2019, 2020 and 2021 |
| | PSUs | 2/12/2016 | | | | | | | 19,219 | 364,200 | 100% in 2019, subject to performance |
| | | 5/16/2016 | | | | | | | 2,672 | 50,634 | 100% in 2019, subject to performance |
| | | 2/14/2017 | | | | | | | 23,801 | 451,029 | 100% in 2020, subject to performance |
| Dr. Rob Koremans | Options | 3/1/2012 | 250,001 | | 45.29 | 2/28/2022 | | | | | vested |
| | | 3/12/2014 | 65,720 | 32,861 | 48.76 | 3/11/2024 | | | | | 33% in 2016, 2017 and 2018 |
| | | 2/12/2015 | 31,447 | 62,896 | 57.35 | 2/11/2025 | | | | | 33% in 2017, 2018 and 2019 |
| | | 2/12/2016 | | 99,904 | 55.75 | 2/11/2026 | | | | | 33% in 2018, 2019 and 2020 |
| | | 5/16/2016 | | 8,346 | 50.43 | 5/15/2026 | | | | | 33% in 2018, 2019 and 2020 |
| | | 2/14/2017 | | 141,728 | 34.90 | 2/13/2027 | | | | | 33% in 2019, 2020 and 2021 |
| | RSUs | 2/14/2017 | | | | | 26,769 | 507,273 | | | 33% in 2019, 2020 and 2021 |
| | PSUs | 2/12/2016 | | | | | | | 19,219 | 364,200 | 100% in 2019, subject to performance |
| | | 5/16/2016 | | | | | | | 1,603 | 30,377 | 100% in 2019, subject to performance |
| | | 2/14/2017 | | | | | | | 29,751 | 563,781 | 100% in 2020, subject to performance |

KEUCH000322

JOINT APPX 0689

| | | | Option Awards | | | | Stock Awards | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Name | Award Type | Grant Date | Number of Securities Underlying Unexercised Options (#) Exercisable [1] | Number of Securities Underlying Unexercised Options (#) Unexercisable [3] | Option Exercise Price ($) | Option Expiration Date | Number of Shares or Units of Stock That Have Not Vested (#) [2] | Market Value of Shares or Units of Stock That Have Not Vested ($) [4] | Equity Incentive Plan Awards: Number of Unearned Shares, Units or Other Rights That Have Not Vested (#) [5] | Equity Incentive Plan Awards: Market or Payout Value of Unearned Shares, Units or Other Rights That have Not Vested ($) [6] | Vesting Schedule [7] |

| Name | Award Type | Grant Date | Exercisable | Unexercisable | Exercise Price | Expiration Date | Not Vested (#) | Not Vested ($) | Not Vested (#) | Not Vested ($) | Vesting Schedule |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Dr. Michael Hayden | Options | 5/9/2012 | 275,000 | | 42.19 | 5/8/2022 | | | | | vested |
| | | 3/12/2014 | 65,720 | 32,861 | 48.76 | 3/11/2024 | | | | | 33% in 2016, 2017 and 2018 |
| | | 2/12/2015 | 31,447 | 62,896 | 57.35 | 2/11/2025 | | | | | 33% in 2017, 2018 and 2019 |
| | | 2/12/2016 | | 99,904 | 55.75 | 2/11/2026 | | | | | 33% in 2018, 2019 and 2020 |
| | | 5/16/2016 | | 16,687 | 50.43 | 5/15/2026 | | | | | 33% in 2018, 2019 and 2020 |
| | | 2/14/2017 | | 113,382 | 34.90 | 2/13/2027 | | | | | 33% in 2019, 2020 and 2021 |
| | RSUs | 2/14/2017 | | | | | 21,415 | 405,814 | | | 33% in 2019, 2020 and 2021 |
| | PSUs | 2/12/2016 | | | | | | | 19,219 | 364,200 | 100% in 2019, subject to performance |
| | | 5/16/2016 | | | | | | | 3,207 | 60,773 | 100% in 2019, subject to performance |
| | | 2/14/2017 | | | | | | | 23,801 | 451,029 | 100% in 2020, subject to performance |

(1)  Amounts disclosed in this column reflect the number of options granted to our NEOs that were subject to time based vesting and have vested. The options generally expire ten years from the date of grant, and have an exercise price of no less than 100% of the fair market value of a Teva share on the date of grant. See "—2017 Potential Payments Upon Termination or Change in Control" for information on the treatment of options upon retirement, death, disability, termination or change in control.

(2)  Amounts disclosed in this column reflect the number of options granted to our NEOs that were subject to time based vesting that had not vested as of December 31, 2017.

(3)  Amounts disclosed in this column reflect the number of unvested RSUs granted to our NEOs that were subject to time based vesting. See "—2017 Potential Payments Upon Termination or Change in Control" for information on the treatment of RSUs upon retirement, death, disability, termination or change in control.

(4)  Amounts disclosed in this column reflect the market value of the RSUs reported in the preceding column using the closing price of a Teva share as reported on the New York Stock Exchange on December 29, 2017, the last trading day of the year, multiplied by the number of shares underlying each award. This column does not include the value of dividends paid on our ordinary shares during the performance period as no dividends accrue on unvested RSUs.

(5)  Amounts disclosed in this column reflect the number of unvested PSUs held by our NEOs, based on achievement of all applicable performance goals at target level for open performance cycles ending in 2018 and 2019. PSUs vest following completion of the year indicated and following the date on which the Compensation Committee and Board certifies that the performance conditions have been achieved. The actual number of PSUs that will be earned in respect of these unvested awards, if any, will be determined at the end of each performance cycle and might be less or more than the number shown in this column. See footnote (2) to "2017 Grants of Plan-Based Awards" above for information regarding the nature of the performance measures incorporated in the 2017-2019 PSU grant. See "—2017 Potential Payments Upon Termination or Change in Control" for information on the treatment of PSUs upon retirement, death, disability, termination or change in control.

(6)  Amounts disclosed in this column reflect the market value of the unvested PSUs held by our NEOs and reported in the preceding column using the closing price of a Teva share as reported on the New York Stock Exchange on December 29, 2017, the last trading day of the year, multiplied by the target number of shares underlying each award. This column does not include the value of dividends paid on our ordinary shares during the performance period as no dividends accrue on unvested PSUs.

(7)  This column discloses the vesting dates of outstanding awards held by our NEOs at year end. These dates do not include the impact of shares that may be forfeited upon the conclusion of the notice period currently in effect for applicable former NEOs.

KEUCH000323

JOINT APPX 0690

**2017 Option Exercises and Stock Vested**

The table below shows the number of shares each of our NEOs acquired and the values they realized upon the vesting of PSUs and RSUs, during 2017. Values are shown before payment of any applicable withholding taxes or brokerage commissions. There were no share options exercised by the NEOs in 2017.

| Name | Stock Awards | |
|---|---|---|
| | Number of Shares Acquired on Vesting (#) [1] | Value Realized on Vesting ($) [2] |
| Michael McClellan | 1,355 | 30,827 |
| Dr. Carlo de Notaristefani | 22,642 | 753,979 |
| Dr. Hafrun Fridriksdottir | 10,252 | 270,496 |
| Mark Sabag | 23,703 | 644,405 |
| Erez Vigodman | 5,220 | 177,480 |
| Dr. Yitzhak Peterburg | 14,369 | 237,376 |
| Eyal Desheh | 22,642 | 753,979 |
| Dr. Rob Koremans | 22,642 | 753,979 |
| Dr. Michael Hayden | 22,642 | 753,979 |

(1)   Amounts disclosed in this column reflect the number of PSUs and RSUs that vested during 2017. This column does not include the value of dividends paid on our ordinary shares during the performance period as no dividends accrue on unvested PSUs or RSUs. The amounts reported for Dr. Peterburg include shares that he received in his capacity as a director prior to 2017 that were accelerated and vested in connection with his resignation from the Board.

(2)   Amounts disclosed in this column reflect the value realized upon vesting of the PSUs and RSUs, as calculated based on the price of a Teva share on the vesting date, multiplied by the number of shares underlying each award.

**2017 Pension Benefits**

None of our NEOs participate in or have accrued benefits under qualified or non-qualified defined benefit plans sponsored by us.

**2017 Nonqualified Deferred Compensation**

| Name | Plan Name | Executive Contributions in Last FY ($) [1] | Company Contributions in Last FY ($) [2] | Aggregate Earnings in Last FY ($) [3] | Aggregate Withdrawals/ Distributions ($) | Aggregate Balance at Last FY ($) [4] |
|---|---|---|---|---|---|---|
| Michael McClellan | Supplemental Deferred Compensation Plan | 121,476 | 16,933 | 26,269 | 0 | 228,560 |
| Dr. Carlo de Notaristefani | Supplemental Deferred Compensation Plan | 1,059,731 | 0 | 162,992 | 0 | 1,666,236 |
| | Defined Contribution Supplemental Executive Retirement Plan | 0 | 125,460 | 80,664 | 0 | 582,120 |
| Hafrun Fridriksdottir | Supplemental Deferred Compensation Plan | 59,289 | 24,923 | 10,087 | 0 | 129,381 |

(1)   Amounts disclosed in this column reflect elective deferrals made by our NEOs and are included in the amounts reported as "Salary" in the Summary Compensation Table above except for Dr. de Notaristefani for whom $405,332 is reported as "Salary" and $654,399 is reported as "Non-Equity Incentive Plan Compensation."

251

KEUCH000324

(2) Amounts disclosed in this column are included within the amount reported in the "All Other Compensation" column of the Summary Compensation Table.

(3) Amounts disclosed in this column include earnings on the Supplemental Deferred Compensation Plan and the Defined Contribution Supplemental Executive Retirement Plan as well as changes in the values of the underlying accounts. None of the amounts disclosed in this column were reported in the Summary Compensation Table because the Company does not credit above-market or preferential earnings on deferred compensation.

(4) Amounts disclosed in this column reflect the cumulative value of applicable NEO's contributions, Company matching contributions and investment earnings thereon. None of the amounts in this column have been disclosed in previous Summary Compensation Table disclosures as this is the Company's first report to include this table.

Teva's North American subsidiaries provide a tax qualified defined contribution 401(k) Retirement Savings Plan for the benefit of employees. Under this plan, contribution amounts have been determined based on specified percentages of pay. The Internal Revenue Code limits the benefits that may be contributed into the 401(k) plan. As a complement to this plan, the Company maintains two supplemental retirement plans to bridge the gap between legally mandated limits on qualified plan benefits and the retirement benefits offered at comparable public companies, and to provide participants with supplemental benefits. The two plans include the Supplemental Deferred Compensation Plan, which is a broad-based plan, and the Defined Contribution Supplemental Executive Retirement Plan ("DC SERP"), which is available to grandfathered U.S. executive officers (no new U.S. executive officers are enrolled in this plan). While the Company has formally funded the 401(k) plan match contribution, the Supplemental Deferred Compensation Plan and the DC SERP are not formally funded.

### Supplemental Deferred Compensation Plan

The Supplemental Deferred Compensation Plan is a nonqualified, unfunded deferred compensation plan under which certain eligible employees may defer up to 75% of base salary, annual bonuses and sales bonuses. The Company matches 100% of the first 6% of all eligible compensation deferred above the IRS qualified compensation limit, and makes restorative matching contributions to restore the Company match that were lost to the participant under the Retirement Savings Plan. Participants are vested in 100% of Company contributions once three years of service are completed. There are 27 investment options, and participants may change their investment allocations. Contributions plus earnings are paid out of the general assets of the Company. Participants that are age 55 with at least 15 years of service or age 65 with five years of service are retirement eligible, and may receive payment from the Plan in a lump sum or in annual installments for up to 20 years beginning on the first distribution date (January or July) that is at least 13 months after retirement. Participants that terminate employment prior to retirement receive a lump sum beginning on the first distribution date that is at least six months after termination. Participants may change their distribution election at least 12 months prior to the originally scheduled payment date and as long as the change results in the payment date being delayed at least five years.

### Defined Contribution Supplemental Executive Retirement Plan

The DC SERP is a nonqualified, unfunded plan in which certain executive officers may participate. Under this plan, the Company establishes an account on behalf of each participant and credits that account on the last day of the year with an amount equal to 15% of the participant's base salary paid during the year as a future retirement benefit. If the participant has a separation from service after age 65 or dies or becomes disabled, the Company will credit the account with a pro-rata amount in respect of the portion of the year during which the participant qualified as a participant. The participant may direct percentages of the amounts credited to the participant's account to be notionally invested in notional investment funds, and the account is credited with earnings that mirror the investment results of such investment funds. As of a valuation date, the notional realized and unrealized gains and losses and the notional income are allocated for the benefit of the participant's account.

252

KEUCH000325

JOINT APPX 0692

Participants vest in their accounts upon either the earliest of five full years as a participant, attaining age 65 while employed by the Company, death, disability, or a change in control as defined under Code Section 409A. If a participant separates from service before they are 100% vested, they will forfeit the entire account balance. If a participant breaches any noncompete or nonsolicit or other covenants under the plan, is terminated for cause or fails to execute a release of claims against the Company upon a termination of employment, they will forfeit their account balance. A participant may receive the vested benefit in the account in a lump sum following their separation from service or, if the participant so elects, in installments. If a participant does not have 10 years of service and is 55 at the time of separation from service, payment will be in the form of a single lump sum. If a participant dies after separation from service and prior to benefits being paid, such benefits will continue to be paid in the same form as elected by the participant. If the participant dies or becomes disabled, the vested value of the account will be distributed in a single lump sum. If installment payments are elected, the installment amounts are determined as the remaining balance divided by the number of years over which the installments will be paid. Payments may be delayed due to certain tax rules or deferral elections made by the executive.

**2017 Potential Payments Upon Termination or Change in Control**

In connection with any termination of employment, including if there is a termination in connection with a change in control of the Company, our NEO's would be eligible to receive certain payments, benefits and treatment of the various forms of equity that such NEO holds (provided, in some cases, that certain conditions are met).

The amounts that the NEOs would receive are set forth below for the following types of termination of employment: termination for cause, death, disability, retirement, termination without cause, resignation for good reason, resignation without good reason and a change in control of the Company.

In accordance with SEC rules, we have used certain assumptions in determining the amounts shown. We have assumed that the termination of employment or change in control occurred on December 31, 2017, and that the value of a Teva share on that day was $18.95, the closing price on the NYSE on December 29, 2017, the last trading day of 2017.

Under these SEC rules, the potential payments upon termination do not include certain distributions or benefits which are not enhanced by a qualifying termination of employment or change in control. These payments and benefits are referred to as "vested benefits" and include:

- Amounts payable when employment terminates under programs generally applicable to the Company's salaried employees;

- Vested benefits accrued under the 401(k) and pension plans; and

- Vested benefits under the Supplemental Deferred Compensation Plan and the Defined Contribution Supplemental Executive Retirement Plan provided to the NEOs on the same basis as all other employees eligible for such plans, as previously described in the section entitled "2017 Nonqualified Deferred Compensation."

Current NEOs

*Kåre Schultz*

Mr. Schultz's employment terms generally require the Company and Mr. Schultz to provide three months' notice of termination of employment, other than in connection with a termination for cause, death or disability. We may waive Mr. Schultz's services during such notice period or any part thereof, on the condition that we pay him his monthly base salary and all additional compensation and benefits in respect of such waived period.

253

KEUCH000326

JOINT APPX 0693

Mr. Schultz's employment terms provide that in connection with his termination of employment, Mr. Schultz will be entitled to receive payments associated with termination as required pursuant to applicable Israeli law and certain accrued obligations. Upon termination by the Company without cause or by Mr. Schultz with good reason, Mr. Schultz will generally be entitled to receive cash severance, together with severance amounts accumulated in his severance account, equal to the product of twelve times his monthly base salary (or the minimum amount required under applicable law, if greater). Mr. Schultz is also entitled to receive an amount equal to twenty-four times his monthly base salary, in consideration for, and conditioned upon, his undertaking not to compete with Teva for two years following termination and other restrictive covenants, and his compliance with such undertaking, which amount would be paid in connection with terminations other than in the event of his termination by the Company for cause or his death. In the event that his employment is terminated without cause within one year following certain mergers and as a result thereof, Mr. Schultz will be entitled to an additional lump sum cash payment equal to his current annual salary.

Upon his termination due to death, disability, termination without cause and resignation with good reason, Mr. Schultz will receive payment of any unvested portion of his sign-on cash award, vesting of his sign-on RSU award on the later of the date of termination and the first anniversary of the grant date, and continued vesting of his sign-on PSU awards (which will ultimately be settled based on actual performance through the end of the applicable three-year and five-year performance periods). In the event of a change in control before the terminations listed above, Mr. Schultz's sign-on PSU awards will be treated as earned based on the price paid per share to shareholders (or if none, then based on the last per share trading price before the change in control). The awards may then either continue as time-vested awards over the remainder of the required vesting period or, if not assumed, settled upon the change in control. If the sign-on PSU awards are assumed and continue as time-vested awards, they will be immediately settled upon termination following the change in control due to death, disability, termination without cause and resignation with good reason.

All termination payments and benefits in excess of those required to be paid pursuant to applicable law are subject to the execution of a release of claims, and shall immediately terminate without further obligation of Teva, in the event that he breaches his restrictive covenants.

### Michael McClellan

Mr. McClellan's employment terms generally require the Company and Mr. McClellan to provide three months' notice of termination of employment, other than in connection with a termination for cause, death or disability. We may waive Mr. McClellan's services during such notice period or any part thereof, on the condition that we pay him his monthly base salary and all additional compensation and benefits in respect of such waived period.

Upon termination by the Company without cause or by Mr. McClellan for good reason, Mr. McClellan will generally be entitled to receive cash severance equal to the product of six times his monthly base salary and payment of certain costs associated with continued medical insurance for eighteen months. Mr. McClellan is also entitled to receive an amount equal to twelve times his monthly base salary, in consideration for, and conditioned upon, his undertaking not to compete with Teva for one year following termination and other restrictive covenants. In the event that his employment is terminated without cause within one year following certain mergers and as a result thereof, Mr. McClellan will be entitled to an additional lump sum cash payment of $1.5 million.

All termination payments and benefits in excess of those required to be paid pursuant to applicable law are subject to the execution of a release of claims, and shall immediately terminate without further obligation of Teva, and Mr. McClellan shall promptly repay Teva any such payments or benefits provided, in the event that he breaches his restrictive covenants.

254

KEUCH000327

### *Dr. Carlo de Notaristefani*

Dr. de Notaristefani's employment terms generally require the Company and Dr. de Notaristefani to provide six months' notice of termination of employment, other than in connection with a termination for cause, death or disability. We may waive Dr. de Notaristefani's services during such notice period or any part thereof, on the condition that we pay him his monthly base salary and all additional compensation and benefits in respect of such waived period.

Upon termination by the Company without cause, by Dr. de Notaristefani for good reason, or by Dr. de Notaristefani without good reason on or after July 1, 2020, Dr. de Notaristefani will generally be entitled to receive cash severance equal to the product of twelve times his monthly base salary and payment of certain costs associated with continued medical insurance for eighteen months. Dr. de Notaristefani is also entitled to receive an amount equal to twelve times his monthly base salary, in consideration for, and conditioned upon, his undertaking not to compete with Teva for one year following termination and other restrictive covenants. In the event that his employment is terminated without cause within one year following certain mergers and as a result thereof, Dr. de Notaristefani will be entitled to an additional lump sum cash payment of $1.5 million.

Dr. de Notaristefani is also entitled to continued vesting in full of equity-based awards following termination without cause and continued vesting in full of equity-based awards following resignation with or without good reason on or after July 1, 2020.

All termination payments and benefits in excess of those required to be paid pursuant to applicable law are subject to the execution of a release of claims, and shall immediately terminate without further obligation of Teva, and Dr. de Notaristefani shall promptly repay Teva any such payments or benefits provided, in the event that he breaches his restrictive covenants.

### *Dr. Hafrun Fridriksdottir*

Dr. Fridriksdottir's employment terms generally require the Company and Dr. Fridriksdottir to provide six months' notice of termination of employment, other than in connection with a termination for cause, death or disability. We may waive Dr. Fridriksdottir's services during such notice period or any part thereof, on the condition that we pay her the monthly base salary and all additional compensation and benefits in respect of such waived period.

Upon termination by the Company without cause or by Dr. Fridriksdottir for good reason, Dr. Fridriksdottir will generally be entitled to receive cash severance equal to the product of twelve times her monthly base salary if terminated before August 3, 2018, and cash severance equal to the product of six times her monthly base salary if terminated on or after August 3, 2018. In addition, Dr. Fridriksdottir will be entitled to payment of certain costs associated with continued medical insurance for eighteen months. Dr. Fridriksdottir is also entitled to receive an amount equal to twelve times her monthly base salary, in consideration for, and conditioned upon, her undertaking not to compete with Teva for one year following termination and other restrictive covenants. In the event that her employment is terminated without cause within one year following certain mergers and as a result thereof, Dr. Fridriksdottir will be entitled to an additional lump sum cash payment of $1.5 million.

Because Dr. Fridriksdottir meets the requirements for a qualifying retirement and termination under the Company's policy pursuant to its 2015 Long-term Equity-Based Incentive Plan, if she is terminated without cause and current retirement policy is in effect, she will be entitled to continued vesting of her outstanding awards granted by the Company after the acquisition of Actavis Generics. In addition, if she is terminated without cause (or resigns for good reason) before August 3, 2018, she will also be entitled to immediate vesting of unvested equity awards originally granted to her by Allergan plc and converted into Company equity awards at the time she joined the Company following Teva's acquisition of Actavis Generics ("Rollover Awards"). If she resigns without good reason, she will be entitled to continued exercisability of vested options until the earlier of the applicable expiration date or two years after termination for Rollover Awards only due to the legacy Allergan qualifying retirement policy.

KEUCH000328

JOINT APPX 0695

All termination payments and benefits in excess of those required to be paid pursuant to applicable law are subject to the execution of a release of claims, and shall immediately terminate without further obligation of Teva, and Dr. Fridriksdottir shall promptly repay Teva any such payments or benefits provided, in the event that she breaches her restrictive covenants.

### Mark Sabag

Mr. Sabag's employment terms generally require the Company and Mr. Sabag to provide nine months' notice of termination of employment, other than in connection with a termination for cause, death or disability. We may waive Mr. Sabag's services during such notice period or any part thereof, on the condition that we pay him his monthly base salary and all additional compensation and benefits in respect of such waived period.

Mr. Sabag's employment terms provide that in connection with his termination of employment, Mr. Sabag will be entitled to receive payments associated with termination as required pursuant to applicable Israeli law. In the event of retirement to pension at the statutory age, termination due to death or disability, termination without cause, or resignation for good reason, Mr. Sabag will be entitled to a make-up payment equal to his monthly base salary multiplied by the number of his years of service, that together with severance amounts accumulated in his pension insurance fund account cannot exceed twice his monthly base salary multiplied by the number of his years of service. In the event of a resignation without good reason, the make-up payment will be equal to half his monthly base salary multiplied by the number of his years of service, that together with severance amounts accumulated in his pension insurance fund account cannot exceed 1.5 times his monthly base salary multiplied by the number of his years of service. Mr. Sabag is also entitled to receive an amount equal to twelve times his monthly base salary, in consideration for and conditioned upon his undertaking not to compete with Teva for one year following termination. This amount would not be paid upon termination for cause or death. In the event that his employment is terminated without cause within one year following certain mergers and as a result thereof, Mr. Sabag will be entitled to an additional lump sum payment of $1.5 million.

Mr. Sabag is also entitled to continued vesting of equity-based awards for twenty-four months following termination without cause. In addition, in the event that his employment is terminated without cause within one year following certain mergers and as a result thereof, Mr. Sabag will be entitled to accelerated vesting of unvested equity upon termination.

The non-compete payment is subject to compliance with the non-compete covenant. In the event of a material breach, payment will cease and the Company will be entitled to reclaim amounts already paid.

### Former NEOs

For all of the former NEOs, the employment terms generally require the parties to provide notice of termination of employment (ranging from 6 to 9 months), other than in connection with a termination for cause, death or disability. We may waive services during such notice period or any part thereof, on the condition that we pay the executive the monthly base salary and all additional compensation and benefits in respect of such waived period. We did not waive the notice period for any former NEO. All of the former NEOs received notice during 2017, and with the exception of Mr. Vigodman, who completed the notice period during 2017, all of the former NEOs will complete their notice periods during 2018.

### Erez Vigodman

Pursuant to Mr. Vigodman's terms of employment, in connection with his termination of employment, Mr. Vigodman was entitled to receive nine months' notice, payments associated with termination as required pursuant to Israeli law, certain previously accrued obligations, including payout of accrued vacation, and a payment that, together with severance amounts accumulated in his existing pension insurance funds, equals the product of twice his monthly base salary multiplied by the number of his years of service. Mr. Vigodman is also

256

KEUCH000329

JOINT APPX 0696

receiving an amount equal to eighteen times his monthly base salary in consideration for compliance with certain non-competition covenants.

Under his employment agreement, Mr. Vigodman is also entitled to continued vesting of equity-based awards for twelve months following termination.

The severance, other than statutory severance, the non-compete payment and the equity benefits, are subject to compliance with non-compete and other restrictive covenants. In the event of a breach, payment and vesting cease and in the event of a material breach the Company will be entitled to reclaim amounts of the non-compete payment already paid.

### Dr. Yitzhak Peterburg

Pursuant to Dr. Peterburg's terms of employment, in connection with his termination of employment, Dr. Peterburg is entitled to receive nine months' notice, payments associated with termination as required pursuant to Israeli law, certain previously accrued obligations, including payout of accrued vacation, and a payment that, together with severance amounts accumulated in his existing pension insurance funds, equals the product of twice his monthly base salary multiplied by the number of his years of service as Interim President and CEO.

Under his employment agreement, Dr. Peterburg will also be entitled to continued vesting in full of all equity based awards granted to him as Interim President and CEO.

The severance, other than statutory severance, and equity benefits are subject to compliance with non-compete and other restrictive covenants. In the event of a breach, payment and vesting cease and in the event of a material breach the Company will be entitled to reclaim any such benefits.

### Eyal Desheh

Pursuant to Mr. Desheh's terms of employment, in connection with his termination of employment, Mr. Desheh is entitled to receive nine months' notice, payments associated with termination as required pursuant to Israeli law, certain previously accrued obligations, including payout of accrued vacation, a make-up payment equal to his monthly base salary multiplied by the number of his years of service, that together with severance amounts accumulated in his pension insurance fund account cannot exceed twice his monthly base salary multiplied by the number of his years of service, and eligibility to a pro-rata annual cash incentive for the term active in position. Mr. Desheh is also receiving an amount equal to twelve times his monthly base salary, conditioned upon his undertaking not to compete with Teva for one year following termination.

Mr. Desheh is also entitled to continued vesting in full of equity-based awards due to our qualifying retirement and qualifying termination policy.

The non-compete payment is subject to compliance with the non-compete covenant. In the event of a material breach, payment will cease and the Company will be entitled to reclaim amounts already paid.

### Dr. Rob Koremans

Pursuant to Dr. Koremans' terms of employment, in connection with his termination of employment, Dr. Koremans is entitled to receive six months' notice, a severance payment equal to 12 monthly salaries and target annual cash incentive (for a total of 24 monthly salaries).

Dr. Koremans is also entitled to continued vesting of equity-based awards until March 1, 2020.

KEUCH000330

JOINT APPX 0697

*Dr. Michael Hayden*

Pursuant to Dr. Hayden's terms of employment, in connection with his termination of employment, Dr. Hayden is entitled to receive nine months' notice, payments associated with termination as required pursuant to Israeli law, certain previously accrued obligations, including payout of accrued vacation, a payment equal to 12 monthly salaries, a payment that, together with severance amounts accumulated in his existing pension insurance funds, equals the product of twice his monthly base salary multiplied by the number of his years of service, a payment equal to the premium for continued health insurance coverage for eighteen months following the termination date, and certain relocation benefits in the event of a move back to Canada within one year following the termination date.

Dr. Hayden is also entitled to continued vesting of certain equity-based awards due to our qualifying retirement and qualifying termination policy.

The severance amount, other than statutory severance, as well as the medical benefits, equity benefits and the relocation benefits are subject to the execution of a release of claims. These payments and benefits (other than the components required to be paid under applicable law) shall immediately terminate, and the Company shall have no further obligations to Dr. Hayden with respect thereto, in the event that he breaches any provisions related to confidentiality or his covenant not to compete.

### Potential Payments Upon Termination or Change In Control

The following tables summarize the payments the current NEOs would receive upon termination and completion of the required notice period at December 31, 2017 and the payments the former NEOs are eligible to receive upon termination and completion of the required notice period, as applicable. As the former NEOs have already received notice of termination, amounts for other termination events such as death, disability or change in control are not included. The U.S. dollar amounts in the tables below were converted from local currency, where needed, using the December monthly average exchange rate of 3.50 Israeli shekels per U.S. dollar and 0.84 euros per U.S. dollar, except accrued vacation for Mr. Vigodman since this payment was made in November 2017 (monthly average exchange rate of 3.52 shekels per U.S. dollar).

Current NEOs

*Payments Resulting From Termination without Cause or Resignation with Good Reason*

| Category | Kåre Schultz | Michael McClellan | Dr. Carlo de Notaristefani | Dr. Hafrun Fridriksdottir | Mark Sabag |
|---|---|---|---|---|---|
| Severance payments [1] | 1,972,120 | 350,000 | 836,400 | 720,000 | 872,505 |
| Non-compete payments [2] | 4,000,000 | 700,000 | 836,400 | 720,000 | 621,262 |
| Accrued vacation | 6,364 | 0 | 0 | 0 | 245,304 |
| Health benefits continuation | 0 | 36,937 | 27,123 | 11,254 | 0 |
| Sign-on cash award [3] | 20,000,000 | 0 | 0 | 0 | 0 |
| Post termination equity vesting [4][5] | 33,173,510 | 0 | 2,093,558 | 1,190,723 | 344,928 |
| Total amount without merger | $59,151,994 | $1,086,937 | $3,793,481 | $2,641,977 | $2,083,999 |
| Post-merger termination payment [6] | 2,000,000 | 1,500,000 | 1,500,000 | 1,500,000 | 1,500,000 |
| Post-merger equity acceleration [7] | 0 | 0 | 0 | 0 | 922,183 |
| Total amount with merger | $61,151,994 | $2,586,937 | $5,293,481 | $4,141,977 | $4,506,182 |

(1)  In addition to the amounts reported above, Mr. Schultz would receive $27,880, and Mr. Sabag would receive $302,141, which amounts are already held in severance accounts on their behalf. For Mr. Sabag, the severance amount in the table would also be payable upon retirement to pension at the statutory age, or termination due to death or disability. Upon resignation without good reason Mr. Sabag would be entitled to a severance payment amount of $293,661 in addition to the amount accumulated in his severance accounts.

258

KEUCH000331

JOINT APPX 0698

(2) For Mr. Schultz, the non-compete payment would be paid, assuming his compliance with the non-compete covenant, in connection with terminations other than his termination by the Company for cause or his death. For Mr. Sabag the non-compete payment is also paid upon retirement to pension at the statutory age, termination due to disability, or resignation without good reason.

(3) For Mr. Schultz, the sign-on cash award is also paid in the event of death or disability.

(4) Amounts reported are based on the price of a Teva share on December 29, 2017, the last trading day of 2017 ($18.95) and, with respect to PSUs, target performance, except for 2015-2017 PSUs, with respect to which no PSUs were earned.

(5) For Mr. Schultz the equity vesting also applies in the event of death or disability. For Dr. de Notaristefani and Mr. Sabag, the equity vesting does not apply to resignation with good reason. For Dr. Fridriksdottir, only her "Rollover Awards" would vest upon resignation with good reason ($285,046).

(6) Assumes merger, followed by a termination without cause on December 31, 2017.

(7) Mr. Sabag's employment agreement provides for equity acceleration upon a post-merger involuntary termination without cause. Amounts reported are based on the end of year stock price ($18.95) and, with respect to PSUs, target performance, except for 2015-2017 PSUs, with respect to which no PSUs were earned.

### Accelerated/Continued Equity Vesting Upon Death or Disability

Under our 2015 Long-Term Equity-Based Incentive Plan, upon death or disability, performance awards, such as PSUs, will immediately vest and pay out based on the target level of performance as of the date of termination, RSUs will immediately be vested and settled and options will immediately vest and remain exercisable through the original expiration date. For treatment of Mr. Schultz's sign-on equity awards upon death or disability, see the summary of his termination terms above.

Under our 2010 Long-Term Equity-Based Incentive Plan, upon death or disability, RSUs, restricted shares and options will continue to vest, as if no termination had occurred, and will remain exercisable through their original expiration date or settle in accordance with the schedule set forth in the applicable award agreement.

| Category | Kåre Schultz | Michael McClellan | Dr. Carlo de Notaristefani | Dr. Hafrun Fridriksdottir | Mark Sabag |
|---|---|---|---|---|---|
| Value (1) | $45,280,738 | $245,126 | $2,093,558 | $1,190,723 | $922,183 |

(1) Amounts reported are based on the price of a Teva share on December 29, 2017, the last trading day of 2017 ($18.95) and, with respect to PSUs, target performance, except for 2015-2017 PSUs, with respect to which no PSUs were earned.

### Former NEOs

### Payments Resulting From Termination without Cause

| Category | Erez Vigodman | Dr. Yitzhak Peterburg | Eyal Desheh | Dr. Rob Koremans | Dr. Michael Hayden |
|---|---|---|---|---|---|
| Severance payments (1) . . . . . . . . . . . . . . . | 528,836 | 286,549 | 967,056 | 1,641,994 | 1,658,877 |
| Non-compete payments (1) . . . . . . . . . . . . . | 2,511,139 | 0 | 854,289 | 0 | 0 |
| Accrued vacation (1) . . . . . . . . . . . . . . . . . . . | 370,195 | 174,396 | 113,416 | 0 | 335,523 |
| Health benefits continuation . . . . . . . . . . . . | 0 | 0 | 0 | 0 | 18,666 |
| Post termination equity vesting (2) . . . . . . . . | 98,919 | 1,927,916 | 1,271,678 | 1,296,540 | 560,238 |
| Total . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $3,509,089 | $2,388,861 | $3,206,439 | $2,938,534 | $2,573,304 |

(1) Amounts reported as "Termination Payments" in the footnote to All Other Compensation are included in the table above. In addition to the amounts above, the individuals will receive the following amounts already held in severance funds on their behalf: Mr. Vigodman, $513,597; Dr. Peterburg, $128,099; Mr. Desheh, $457,552; and Dr. Hayden, $539,519.

KEUCH000332

JOINT APPX 0699

**2017 Director Compensation**

| Name | Fees Earned or Paid in Cash ($) [1] | Stock Awards ($) [2] | Total ($) |
|---|---|---|---|
| Dr. Sol J. Barer [3] | 243,389 | 454,884 | 698,273 |
| Roger Abravanel [4] | 104,445 | 0 | 104,445 |
| Dr. Arie Belldegrun [5] | 12,110 | 0 | 12,110 |
| Rosemary A. Crane | 201,681 | 130,001 | 331,682 |
| Amir Elstein | 190,592 | 130,001 | 320,593 |
| Murray A. Goldberg [6] | 85,957 | 130,001 | 215,958 |
| Jean-Michel Halfon | 198,116 | 130,001 | 328,117 |
| Gerald M. Lieberman | 208,343 | 130,001 | 338,344 |
| Galia Maor | 196,417 | 130,001 | 326,418 |
| Roberto A. Mignone [6] | 81,712 | 130,001 | 211,713 |
| Dr. Perry D. Nisen [6] | 81,712 | 130,001 | 211,713 |
| Joseph Nitzani [7] | 163,397 | 32,500 | 195,897 |
| Nechemia J. Peres [6] | 83,753 | 130,001 | 213,754 |
| Ory Slonim [8] | 106,103 | 0 | 106,103 |
| Dan Suesskind [9] | 50,357 | 103,889 | 154,246 |
| Gabrielle Sulzberger | 196,788 | 130,001 | 326,789 |

(1)  The amounts shown include the cash portion of the annual fee for the Chairman of the Board and Board membership fees and committee service fees for other non-employee directors.

(2)  In August 2017, each non-employee director serving at that time, excluding the Chairman of the Board, was granted 7,956 RSUs, based on the grant date fair value of a share of $16.34. Non-employee directors that join after the general meeting are eligible for an equity grant value that is pro-rated in an amount equal to the difference between (i) an annual grant and (ii) the product of (x) an annual grant divided by 12 and (y) the number of months (including partial months) in the period between the last annual meeting of shareholders and the date of such appointment. In November 2017, Dan Suesskind was granted 9,575 RSUs based on the grant date fair value of a share of $10.85. The amounts shown in the Stock Awards column represent the aggregate grant date fair values of RSUs computed in accordance with FASB Accounting Standards Codification Topic 718 ("Topic 718"). Valuations of RSUs were determined based on the fair market value of a Teva share on the grant date, less the net present value of dividends. For information regarding assumptions, factors and methodologies used in our computations pursuant to Topic 718, see note 14c. to our consolidated financial statements for the year ended December 31, 2017. These RSUs vest three years from the grant date. As of December 31, 2017, the aggregate number of unvested RSUs held by each current non-employee director was as follows: Dr. Sol J. Barer: 30,545; Rosemary A. Crane: 12,898; Amir Elstein: 12,898; Murray A. Goldberg: 7,956; Jean-Michel Halfon: 12,898; Gerald M. Lieberman: 12,898; Galia Maor: 12,898; Roberto A. Mignone: 7,956; Dr. Perry D. Nisen: 7,956; Nechemia J. Peres: 7,956; Dan Suesskind: 9,575; and Gabrielle Sulzberger: 12,898. Upon completion of a non-employee director's service as a director, other than removal pursuant to a shareholder resolution due to a breach of fiduciary duties, any unvested awards granted to such director in virtue of such position and held by such director will immediately become vested. In 2017, Roger Abravanel, Dr. Arie Belldegrun, Joseph Nitzani and Ory Slonim received accelerated vesting of equity in connection with their completion of Board service.

(3)  During his service as Chairman of the Board, Dr. Barer is entitled to an annual fee of $567,000 and an annual equity-based award with a total value of $378,000, in accordance with the general framework for equity-awards for our directors approved at our 2015 annual general meeting of shareholders. Upon his appointment as Chairman of the Board on February 6, 2017, Dr. Barer was granted a pro-rata equity-based award with respect to his service as Chairman of the Board from February 6, 2017 until the 2017 annual meeting on July 13, 2017 and a pro-rata amount of the annual cash fee of $567,000 for his service as Chairman of the Board during such period. Dr. Barer waived $283,500 of his annual fee as Chairman of the Board payable in 2017.

KEUCH000333

JOINT APPX 0700

(4) Mr. Abravanel stepped down from Board service in July 2017.
(5) Dr. Belldegrun ceased Board service in February 2017.
(6) Mr. Goldberg, Mr. Mignone, Dr. Nisen, and Mr. Peres were elected to the Board at the 2017 annual meeting on July 13, 2017.
(7) Mr. Nitzani's term expired in September 2017.
(8) Mr. Slonim's term expired in July 2017.
(9) Mr. Suesskind was appointed to the Board on September 25, 2017.

Mr. Schultz was not and will not be entitled to any compensation in his capacity as a member of the Board or any committee thereof.

## Compensation Committee Interlocks and Insider Participation

The Compensation Committee currently consists of Rosemary A. Crane (chair), Jean-Michel Halfon, Gerald M. Lieberman and Nechemia (Chemi) J. Peres. During fiscal year 2017, no member of the Compensation Committee was an employee, officer or former officer of Teva or any of its subsidiaries. During fiscal year 2017, no member of the Compensation Committee had a relationship that must be described under the SEC rules relating to disclosure of related party transactions. During fiscal year 2017, none of our executive officers served on the Board of Directors or compensation committee of any entity that had one or more of its executive officers serving on Teva's Board of Directors or Compensation Committee.

262

KEUCH000334

JOINT APPX 0701

Case 2:19-cv-05488-JMG   Document 59-9   Filed 08/17/22   Page 343 of 418



Portfolio Media. Inc. | 111 West 19th Street, 5th floor | New York, NY 10011 | www.law360.com
Phone: +1 646 783 7100 | Fax: +1 646 783 7161 | customerservice@law360.com

# Former Teva Exec Nabs $6.2M Bias Verdict After Firing

**By Cara Salvatore**

Law360 (November 20, 2018, 3:46 PM EST) -- A Pennsylvania federal jury awarded $6.16 million Monday to a former Teva Pharmaceuticals USA Inc. executive who said the Israel-based generics maker fired him because of his age and American nationality.

The jury found that former Senior Director of U.S. Facilities Management Stephen Middlebrooks' complaints of discrimination drove Teva's decision to fire him, and that the company subjected Middlebrooks to a hostile work environment because of his complaints.

Teva acted with "malice or reckless indifference" to Middlebrooks' workplace rights and should pay $5 million in punitive damages, the jury found.

The panel also awarded $200,000 for emotional pain and suffering, $182,000 in back pay dating from his firing, $332,000 in back pay dating from his "denial of equity" in 2015 and $450,000 in future wages. It also answered "yes" to a final question about liquidated damages, but no dollar amount was attached and the parties did not immediately respond to requests for clarification.

Middlebrooks said he was given a negative performance review and fired in 2016 because of his age, national origin or complaints he and his team made about supervisors in Israel.

After Israel-based supervisor Nir Aharoni had asked Middlebrooks about his age and retirement plans before promoting him in November 2014, Middlebrooks, then in his late 50s, was given a middling, "mostly meets expectations" yearly performance review in early 2015.

Six months later, he and other employees based outside Philadelphia raised questions with Teva human resources about whether employees within the "Global Group" had created a hostile work environment by making comments perceived as anti-American or asking questions and requesting data about U.S. employees' ages, according to the judge's listing of undisputed facts.

In October 2015, a week after Aharoni got a copy of the resulting HR report, which recommended cultural-sensitivity training for some Israeli supervisors, Aharoni gave Middlebrooks a negative midyear review and put him on a performance improvement plan. Middlebrooks was fired at the end of February 2016, allegedly for failing to complete the terms of the improvement plan, and was replaced by a man 20 years younger.

The jury found Monday that national origin — American — was "a motivating factor" in the firing but was not "a determinative factor." Middlebrooks' complaints and the retaliation for those complaints were what garnered the win for Middlebrooks.

Middlebrooks argued that Aharoni and the other Israeli supervisors were never disciplined or sent to counseling for their own issues identified in the HR report. Other employees under Middlebrooks had alleged that their counterparts and supervisors in Israel treated them poorly or disregarded their opinions, the judge wrote in a **summary judgment opinion**.

Although Teva had argued Middlebrooks couldn't claim retaliation because he hadn't engaged in the "protected activity" of complaining about discriminatory treatment until after he got his negative review and improvement plan, Judge Kearney said Middlebrooks submitted sufficient evidence that he had gone to HR about the company asking inappropriate questions about employees' age and

JOINT APPX 0702

Former Teva Exec Nabs $6.2M Bias Verdict After Firing - Law360

marital status the previous summer, triggering the investigation.

Middlebrooks is represented by Laura Mattiacci, Caren Gurmankin, Kevin Console and Ortal Mendelawe of Console Mattiacci Law LLC.

Teva is represented by Jennifer Ermilio of Stevens & Lee.

The case is Stephen Middlebrooks v. Teva Pharmaceuticals USA Inc. et al., case number 2:17-cv-00412, in the U.S. District Court for the Eastern District of Pennsylvania.

--Additional reporting by Matthew Santoni. Editing by Jack Karp.

All Content © 2003-2018, Portfolio Media, Inc.

KEUCH000342                                    2/2

JOINT APPX 0703

# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| BRIAN MCMANUS, | : | CIVIL ACTION |
| Plaintiff | : | |
| | : | |
| v. | : | |
| | : | |
| TEVA PHARMACEUTICALS | : | |
| USA, INC., *et al.* | : | |
| Defendants | : | NO. 19-3890 |

## MEMORANDUM

CAROL SANDRA MOORE WELLS
UNITED STATES MAGISTRATE JUDGE                                    August 13, 2021

The Plaintiff, Brian McManus ("Plaintiff" or "McManus"), filed suit against his former employer, Teva Pharmaceuticals USA, Inc. ("Defendant" or "Teva"), alleging age discrimination, in violation of the Age Discrimination in Employment Act ("ADEA") and the Pennsylvania Human Relations Act ("PHRA"), retaliation under ADEA and PHRA, violations of the Pennsylvania Wage Payment Collection Law ("WPCL"), and three state contract claims.

This case was referred by the Honorable Timothy Savage to Magistrate Judge Jacob Hart on February 6, 2020 to conduct all proceedings. ECF Doc. No. 21. On September 25, 2020, Defendant filed its Motion for Summary Judgment, ECF Doc. No. 27, and, on October 23, 2020, Plaintiff filed his Response and Cross Motion for Partial Summary Judgment. ECF Doc. No 27. On January 6, 2020, while those motions remained pending, the case was reassigned to this Court[1] for all further proceedings. ECF Doc. No. 31.

A genuine issue of material fact exists regarding Plaintiff's discrimination and retaliation claims; therefore, Defendant's motion for summary judgment will be denied in part. This Court will, however, grant Defendant's motion as to dismiss Plaintiff's remaining state contract claims.

---

[1] This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§§§ 1331, 1367, and 636.

Finally, Plaintiff has not produced evidence of entitlement to any alleged unpaid wages under the WPCL; thus, Defendant's motion is granted as to the WPCL claim as well.

## I. FACTUAL AND PROCEDURAL HISTORY[2]

While unemployed, Plaintiff interviewed with Defendant in 2016, for the position of Oncology Director in its Strategic Customer Group ("SCG"). Def. Br. at ¶ 2; Pl. Br. at ¶ 3. Jessica An from Human Resources, Thomas Rainey ("Rainey"), Senior VP of Specialty Sales & Marketing, and Fred Vitale ("Vitale"), VP of Marketing Oncology, interviewed McManus. *Id.* During the interview, Plaintiff sought and received assurances of job security from Rainey. *See* Plaintiff's Exhibit A, McManus Deposition at 28:24-33:19.

On March 21, 2016, Teva offered McManus the position and furnished an official "Offer Letter" that outlined the terms of his employment. Def. Br. at ¶ 6, *see also* Def. Exhibit C. The Offer Letter documented his position, salary, bonus structure, merit increases, and benefits. Def. Exhibit C. The letter further explained that:

> The first 90 calendar days of employment with Teva are an initial probationary period for all non-union employees. The nature of your employment with us is and *will be* "at will," as defined by applicable law, meaning that either we or you may terminate your employment at any time, with or without notice and with or without cause, for any reason or no reason, without further obligation or liability. Teva reserves the right to change or alter the terms of your employment and/or the terms of any plans at any time without prior notice.

Def. Exhibit C (emphasis added); *see also* Pl. Exhibit A.

McManus also received an Employee Confidentiality Agreement ("the Agreement"), which included an "At-Will" clause. Def. Exhibits C and D. This document stated, in relevant

---

[2] The Court has reviewed and considered the following documents in analyzing this case: Defendant's Brief and Statement of Issues in Support of its Motion ("Def. Br."), Plaintiff's Response and Cross Motion for Partial Summary Judgment ("Pl. Br."), Defendant's Reply in Support of Summary Judgment and Brief in Opposition to Plaintiff's Partial Motion for Summary Judgment ("Def. Reply"), and the parties attached exhibits ("Ex.").

KEUCH000362

JOINT APPX 0705

part:

> Employment At-Will. I agree and understand that nothing in this Agreement shall change my at-will employment status or confer any right with respect to continuation of employment by the Company, nor shall it interfere in any way with my right or the Company's right to terminate my employment at any time, with or without cause or advance notice.

Def. Exhibit D.  Plaintiff signed the Agreement and the Offer Letter.  *See* Def. Exhibits C and D.

Plaintiff worked as Director in the SCG.  Def. Br. at ¶ 2; Pl. Br. at ¶ 3.  This unit was responsible for contacting and establishing professional relationships with organizations, developing convention strategies for the oncology business unit, and developing non-products-based promotional resources.  Def Exhibit A.  As SCG Director, McManus reported directly to Rainey who then reported to Paul Rittman ("Rittman"), the General Manager of Oncology.  Pl. Br. at ¶ 3; Def. Br. at ¶ 15-17.  A year after McManus was hired, the company restructured their departments, and laid people off.  Pl. Br. at ¶ 7.  Plaintiff alleges that he was expressly advised that he would not be adversely impacted by the restructuring and reduction in force.  *Id.*

Rittman created a "Pilot Program" which changed the role of the SCG department to an oncology contracting organization which focused on oncology clinics.  Def. Br. at ¶ 18.  SCG employees transitioned to become oncology key account managers ("OKAMs") who were directed to focus entirely on contracting[3].  Def. Br. at ¶ 22-23; McManus Dep. at 56:7-17.  The SCG also took on a new hierarchy – McManus, as the new Director of Oncology Key Account Manager[4], would report to Michael Vaupel ("Vaupel"), the Director of Oncology Contracting Strategy, who in turn would report to Vitale.  McManus Dep. at 68:13-69:24; *see also* Pl. Br. at ¶ 17.  At first, McManus' job was not considered to be "at-risk," even though there were two directors in place.

---

[3] The Pilot Program was initially constructed to be a hybrid position – 50% or more of the employees would be devoted to contracting and 50% or less devoted to the old SCG role.  McManus Dep at 73:9-17.
[4] In his new position, Plaintiff was expected to function as a "player/coach;" he served as an OKAM function and also led other OKAMs.  McManus Dep. at 58:6-23; *see also* Pl Br. at ¶ 17.

3

KEUCH000363

JOINT APPX 0706

Vitale Dep. at 41:5-17.

Prior to this new structure, Plaintiff and Vaupel had scant personal interaction; Vaupel was based in San Diego, California, and Plaintiff worked from Frazier, Pennsylvania. Pl. Br. at ¶ 10; Def. Br. at ¶ 30. They did not develop a strong relationship. McManus Dep. at 65:19-66:21.

First, McManus believed that the OKAMs role should remain a combination of the former SCG role, instead of solely contracting. *Id.* Second, McManus believed that Vaupel attempted to "sidestep required legal, regulatory, and compliance steps;" Vaupel would "snap" and call Plaintiff a "fossil that needed to get with the program." Pl. Br. at ¶ 11-12. Third, Plaintiff testified that Vaupel called him an "old man," on numerous occasions. McManus Dep. at 62:10-14, 62:18-20; *see also* Pl. Br. at ¶ 12. Vaupel referenced Plaintiff's age and insulted him nearly every day. Pl. Br. at ¶ 13. He insinuated that Plaintiff was "old fashioned," too slow, too stuffy, and "by the book." *Id.* Notably, McManus was in his late forties at the time of these events and Vaupel, born in 1963, was five years older than him. Def. Exhibit F[5].

Plaintiff confronted Vaupel and complained to Deb Macaleer, VP of Sales, and Vitale about the name-calling. Pl. Br. at ¶ 15-16; *see also* McManus Dep. at 170:20-171:2. Both advised him to ignore Vaupel's comments and said Plaintiff would "soon" be promoted to Senior Director[6]. Pl. Br. at ¶ 16. Plaintiff remained with Teva even as he watched employees leave due to the changing structure, because of "representations" that his job was safe. Pl. Br. at ¶ 18.

Later, Teva decided that it needed a "flatter" organization structure and determined that the Pilot Program did not need two directors; OKAMs would report directly to Vaupel, who possessed more oncology contracting experience. Def. Br. at ¶ 42-3; *see also* Vitale Dep. 99:1-5; 105:12-21; 130:11-21. Thus, on June 28, 2018, after discussing the matter with Macaleer, Vitale, age

---

[5] Plaintiff objects to Defendant's Exhibit, however, this objection is overruled.
[6] It should be noted that Plaintiff solely cites his own Declaration and no other evidence to support this promotion claim.

KEUCH000364

JOINT APPX 0707

sixty, terminated the forty-nine-year-old McManus[7]. McManus Dep. at 122:4-12; Vitale Dep. at 99:1-5.

Teva gave Plaintiff a termination notice which stated that he was let go "as a result of a comprehensive restructuring that is crucial to restoring Teva's financial security and stability." Pl. Exhibit 3. Vitale, however, testified that McManus was not terminated, because of restructuring, and that "cost was never a consideration of [his,] in that decision." Vitale Dep. 44:3-5, 99:17-25, 131:17-21. Vitale stated that Vaupel was "part of the decision" to terminate McManus. Vitale Dep. at 100:3-18.

On August 27, 2019, Plaintiff filed this Complaint which alleges a violation of: (1) age discrimination under ADEA and (2) PHRA; (3) breach of contract; (4) promissory estoppel; (5) fraudulent misrepresentations and omissions; (6) a violation of Pennsylvania's WPCL; and (7) retaliation in violation of ADEA and (8) Title VII of the Civil Rights Act of 1964. *See* ECF Doc. No. 1 - Plaintiff's Complaint.

## III. LEGAL STANDARD

A federal court shall grant a motion for summary judgment when the movant demonstrates "that there is no genuine dispute as to any material fact." Fed. R. Civ. P. 56(a). "A dispute is 'genuine' if 'a reasonable jury could not return a verdict for the nonmoving party,' *Santini v. Fuentes*, 795 F.3d 410, 416 (3d Cir. 2015)(quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)), and a fact is 'material' where 'its existence or nonexistence might impact the outcome of the suit under the applicable substantive law." *Baloga v. Pittston Area Sch. Dist.*, 927 F.3d 742, 752 (3d Cir. 2019)(*citing Anderson*, 477 U.S. at 248). Furthermore, a court "must review the facts in the light most favorable to the non-moving party." *Id.* (*citing Hugh v. Butler Cty. Family YMVA*,

---

[7] Plaintiff alleges that his termination was a "last second" decision. Pl. Br. at ¶ 19. Specifically, he states that: (1) the OKAM team was set to "go live," days later on July 2, 2018; and (2) his company car, that was ordered and paid for through deductions from his paycheck, was in the company lot. *Id.*

KEUCH000365

JOINT APPX 0708

418 F.3d 265, 267 (3d Cir. 2005).

## IV. ANALYSIS

A.   Counts One and Two - Discrimination Under ADEA and PHRA

"Claims premised on direct evidence of age discrimination do not require a *prima facie* case at all." *Martinez v. UPMC Susquehanna*, No. 19-2866, at *8 (citing *Swierkiewics v. Sorema N.A.*, 534 U.S. 506, 511 (2002)). However, to prove an age discrimination case on direct evidence, a plaintiff must produce evidence "sufficient to allow the jury to find that 'the decision makers placed substantial negative reliance on the plaintiff's age in reaching their decision to fire him.'" *Fakete v. Aetna*, 308 F.3d 335, 338 (3d. Cir. 2002) (citing *Connors v. Chrysler Fin. Corp.*, 160 F.3d 971, 976 (3d Cir. 1998)). Plaintiff herein is unable to provide direct evidence. Although Vaupel made derogatory remarks that referenced Plaintiff's age, he cannot show that Vaupel, Rainey or Macleer decided to terminate McManus based on his age. Vitale Dep at 99:17-25, 100:9-25. In fact, Vitale specifically testified that the decision terminate Plaintiff was to flatten the organizational structure, removing an extra director in the process. Vitale Dep. 130:11-21. Thus, this Court must apply the *McDonnell-Douglass* burden-shifting analysis.

The Supreme Court and the Third Circuit have held that the *McDonnell-Douglass* burden-shifting analysis governs when a federal court must decide summary judgment motion under either Title VII or the ADEA[8]. *McDonnell-Douglass v. Green*, 411 U.S. 792 (1973); *see also Reeves v. Sandersons Plumbing Prods.*, 530 U.S. 133 (2000). Under this framework, a plaintiff "relying on circumstantial evidence must first make out a *prima facie* case of discrimination." *Martinez*, No.

---

[8] The Third Circuit has held that courts can analyze PHRA claims under the same legal standard as ADEA claims. *Gress v. Temple Univ. Health Sys.*, 784 F, App'x 100, 104 (3d Cir 2019) (*citing Glanszman v. Metropolitan Mgmt. Corp.*, 391 506, 509 n.2 (3d Cir, 2004)).

6

KEUCH000366

JOINT APPX 0709

19-2866 at *6, 2021 U.S. App. LEXIS 2520 (3d Cir. Jan. 29, 2021); see *also Reeves*, 530 U.S. at

142.

If a plaintiff can successfully establish a *prima facie* case, the burden shifts to the defendant

to produce or articulate a legitimate, non-discriminatory reason for the adverse action. *Reeves*,

530 U.S. at 142. However, a defendant's burden is "relatively light" and "is satisfied if [it]

provides evidence, which, if true, would permit a conclusion that it took the adverse employment

action for a non-discriminatory reason." *Carroll v. Guardant Health, Inc.*, No. 20-3183, 2021 U.S.

Dist. LEXIS 852, *24 (E.D. Pa. Jan, 5, 2021)(*citing Burton b. Telefex, Inc.*, 707 F. 3d 417, 426 (3d

Cir. 2013)). If the defendant satisfies this requirement, the burden shifts back to the plaintiff. *Id.*

The only way the plaintiff can survive summary judgment is to present evidence that the proffered

reason for the termination was pretextual. *Id.*

Although both the ADEA discrimination and Title VII retaliation claims require a *prima*

*facia* showing, requirements for each vary slightly. Under ADEA, a plaintiff must show that: (1)

they are a member of a protected class (forty years of age or older); (2) who was discharged; (3)

they were qualified for the job at issue; and (4) the employer filled the position with a person who

was sufficiently younger to create an inference of age discrimination. *Narin v. Lower Merion*

*Township Sch. Dist.*, 206 F.3d 323, 331 (3d Cir. 2000).

Here, Plaintiff was over the age of forty at the time of his termination, thus, he qualifies as

a member of a protected class. Pl. Br. at ¶ 2. Furthermore, elements two and three were satisfied;

McManus was terminated from a job he was qualified to perform when Teva let him go to create

a "flatter" organizational structure. *See* Vitale Dep. 130:11-21. Thus, the only element at issue

here is whether Defendant filled Plaintiff's position with a person who was sufficiently younger.

7

KEUCH000367

JOINT APPX 0710

The Third Circuit has not set a specific age-gap needed when examining a plaintiff's replacement. *Martinez*, No. 19-2866, at *8 (citing *Barber v. CSX Distrib. Servs.*, 68 F. 3d 694, 699 (3d Cir. 1995). Instead, "any proof that the replacement is [']sufficiently younger['] can satisfy the fourth prong." *Id.* Here, Defendant has produced evidence that not only was Plaintiff not replaced at all, to flatten their organizational structure, but his direct supervisor, Vaupel, is five years older than him. Def. Exhibit F. According to Defendant's Reply Brief, Plaintiff failed to depose Vaupel, the main antagonist in this ageism suit; however, that omission does not bar this Court from considering evidence of Vaupel's age, especially since age is the crux of the *McDonnell-Douglass* analysis' fourth element[9]. Vaupel's age, a relevant issue at hand, would foreclose Plaintiff from satisfying the fourth prong.

Other circuits, however, have held that a defendant hiring someone younger is not an absolute requirement; instead, other evidence of discrimination is sufficient to satisfy the fourth prong. The Second Circuit has held that plaintiff can still present a *prima facia* case when an employer replaces a plaintiff with an older individual, as long as they can show other evidence of discrimination. *McCarthy v. N.Y.C. Tech. Coll.*, 202 F.3d 161 (2d Cir. 2000). Meanwhile, the Eleventh Circuit held that other evidence can satisfy the fourth element even if the plaintiff was replaced by someone older. *Wright v. Southland Corp.*, 187 F.3d 1287 (11th Cir. 1999). Our sister court in the Middle District of Pennsylvania has held the same. *Grabosky v. Tammaz*, 127 F. Supp. 2d 610 (M.D. Pa. 2000).

Although the Third Circuit has held that proof of a younger replacement satisfies the fourth prong, it has not definitively ruled that strict adherence to the "sufficiently younger" requirement is the sole approach; in fact, several decisions suggest that the fourth element is flexible. *See Narin*

---

[9] In the alternative, even if this Court decided to bar evidence of Vaupel's age, Plaintiff still fails to prove the fourth element as he cannot show that he was replaced by someone younger.

KEUCH000368

JOINT APPX 0711

*v. Lower Merion Township Sch. Dist.*, 206 F.3d 323, 331 (3d Cir. 2000)("we recognize that the

elements of the *prima facia* case are not applied rigidly…"); *see also Torre v. Casio*, 42 F.3d 825,

831 n.6 (3d Cr. 1994)("This statement did not purport to create an inflexible rule. First, our later

opinion…undercuts such a reaching, since it speaks in the more flexible and permissive 'may'

rather than the mandatory 'must.' Additionally, [to] create a rigid *prima facie* burden would be

inconsistent with Supreme Court authority requiring a contextual approach."). Thus, this Court

will not strictly apply the fourth element, but draw on other evidence in the record to determine

whether inferences of age discrimination exist.

Plaintiff argues that, Vaupel's participation in Teva's decision to terminate him is sufficient

evidence to show that a discriminatory animus possibly influenced the termination decision, citing

*Abramson v. William Paterson Coll.*, 260 F.3d 265, 286 (3d Cir. 2001). Defendant counters that

Vitale decided to terminate McManus, not Vaupel. Def. Reply at 6. This Court agrees with

Plaintiff. Vitale testified that Vaupel was "part of the decision." Vitale Dep. at 100:14-18. Such

an answer satisfies the fourth prong, allowing Plaintiff to establish a *prima facia* case.

The burden now shifts to the Defendant to present a legitimate, non-discriminatory reason

for the adverse action. *Reeves*, 530 U.S. at 142. Defendant argues that its actions were not

pretextual but, instead, eliminating "a redundancy." Def. Br. at 11. It asserts that there were

changes in Teva's business and budget, which necessitated the need to "flatten" its organization,

by removing one director while keeping the older, more experienced director. *Id.* at 12; *see also*

Vitale Dep. at 99:1-5; 105:12-21; 120:11-21; 132:7-16. Defendant contends that McManus's

position was eliminated, not because of his performance or any alleged age discrimination, but

because the program did not need two directors and Vaupel had "superior" experience with

oncology contracting, which was the group's focus. Def. Br. at 12. Furthermore, Defendant

KEUCH000369

JOINT APPX 0712

highlights Plaintiff's own testimony, which conceded that he thought there would be an "overlap or redundancy." Def. Br. at 12-13; *see also* McManus Dep. at 75:6-13.

Plaintiff argues that Defendant has not presented a legitimate, non-discriminatory reason for his termination. First, he asserts that Vaupel, as Plaintiff's supervisor, constantly made age-based taunts. Pl. Br. at 28-29. Second, Defendant altered the alleged reason for his termination during litigation. At the time of his termination, Teva gave Plaintiff a letter, which stated the release was "a result of a comprehensive restructuring that is crucial to restoring Teva's financial security and stability." Pl. Br. at 29; *see also* Pl. Exhibit 3. However, at Vitale's deposition, he testified that the termination had absolutely nothing to do with financial considerations. Pl. br. at 29; *see also* Vitale Dep. 44:3-5, 99:17-25.

Finally, Plaintiff points to discrepancies that would lead to an inference of discrimination. Pl. Br. at 30. First, Defendant broke company policy which traditionally allowed a direct supervisor to terminate an employee; here, Plaintiff was terminated by Vitale and not Vaupel. *Id.* Next, McManus asserts he was treated "dramatically" different than other employees. *Id.* He was: (1) escorted from the building by security; and (2) was never offered other available positions, like other similarly situated people were. *Id.*

This Court finds that Defendant has provided a legitimate, non-discriminatory reason for their adverse action. *Reeves*, 530 U.S. at 142. Defendant has consistently argued an intent to "flatten" the organizational structure and terminate Plaintiff's position as part of that strategy. Vitale Dep. 44:3-5, 99:17-25, 131:17-21. Vitale testified that Teva "didn't need the middle layer of manager level between Mike Vaupel and the four people who reported to him." Vitale Dep at 99:1-9; 103.

However, this Court finds that the Defendant's stated reason could be pretextual, which

10

KEUCH000370

JOINT APPX 0713

would preclude summary judgment at this point.  Specifically, Vaupel was "part of the decision."

Vitale Dep. at 100:3-18.  A supervisor who has made numerous age-discriminatory comments to

an employee and participates in the decision-making process to terminate them creates a genuine

issue of material fact sufficient to allow Plaintiff's age discrimination case to be presented to a

jury.  Thus, this Court denies Defendant's Motion for Summary Judgment as to Count One and

Two of the Complaint.  Fed. R. Civ. P. 56(c); *see also Anderson v. Liberty*, 477 U.S. 242, 256

(1986).

  **B.**     Counts Seven and Eight - Retaliation Under Title VII and the ADEA

         This Court next addresses Counts Seven and Eight of Plaintiff's Complaint, McManus's

retaliation claims. [10]  To establish a *prima facie* case of retaliation, "a plaintiff must show that: (1)

[they] engaged in a protected activity; (2) the employer took an adverse employment action against

[them]; and (3) there is a causal connection between the two." *Bartholomew v. St. Luke's Hosp.*,

No. 02-2876, 2003 U.S. LEXIS 7695, *16 (E.D. Pa. Apr. 29, 2003) (*citing Goosby v. Johnson &*

*Johnson*, 228 F. 3d 313, 323 (3d Cir. 2000); *Weston v. Pennsylvania*, 251 F.3d 420, 430 (3d Cir.

2001).

         The burden then shifts to the defendant to show a legitimate non-retaliatory reason for the

adverse action. *Kargbo v. Philadelphia Corp. for Aging*, 16 F. Supp. 3d 512, 531 (E.D. Pa. 2014)

(*citing Krouse v. Am. Sterilizer Co.*, 126 F.3d 494, 500 (3d Cir. 1997).  If a defendant can provide

a legitimate, non-retaliatory reason, the burden shifts back to the plaintiff who, then, must show

that "both the employer's proffered explanation was false, and that retaliation was the reason for

the adverse employment action." *Id.* (*citing Moore v. City of Philadelphia*, 461 F.3d 331, 342 (3d

---

[10] Although the claims are not in chronological order, they arise out of the same facts, evidence, and exhibits as Counts
One and Two, above.  Furthermore, the parties make similar arguments, thus, this Court will address these two issues
next.

KEUCH000371

JOINT APPX 0714

Cir. 2006).

Defendant, the moving party, argues that even if Vaupel made derogatory age jokes, they were "stray comments" at best.   Teva cites *Carilli v. Mut. Of Omaha Ins. Co.*, to argue that stray remarks by non-decision makers are "inadequate to support an inference of discrimination by the employer."   67 F. App'x 133, 135 (3d Cir. 2003).   Teva further argues that, although McManus claims that he was terminated because he complained about Defendant's "treatment of the Opioid Crisis," *see* Plaintiff's Complaint at ¶ 73, he failed to show a nexus between his termination and those complaints.   Def. Br. at 14.   Defendant contends that it already presented a legitimate non-retaliatory reason for his termination and that Plaintiff failed to cite evidence that shows an improper motive or that individuals outside of his protected class were treated more favorably.   *Id.* Again, Defendant cites McManus' own testimony which expressed concerns about redundancy when he learned that he would report to another director.   Def. Br. at 14-15.

Plaintiff counters that the same record above supports his claim of retaliation: (1) Vaupel discriminated against him between March and June of 2018; (2) he complained about his discrimination to Vaupel, Macaleer, and Vitale; and (3) he was terminated on June 28, 2018, "a mere [two] business days before he would have had to report to Vaupel on a regular basis."   Pl. Br. at 31.   McManus contends that Teva provided inconsistent reasons for his termination that ranged from financial considerations to restructuring.   Plaintiff further asserts that he engaged in protected activity when he complained to Macaleer and Vitale about Vaupel's discriminatory remarks and was fired for that activity.   Pl. Br. at 32.

For the same reasons stated *infra* pp. 10-11, this Court finds a genuine issue of material fact and denies Defendant's motion.   First, Vitale testified that Vaupel was "part of the decision." Vitale Dep. at 100:3-18.   Since Vaupel was a part of the decision, his remarks cannot be construed as merely "stray comments."   Further, although Defendant has tried to portray Vaupel as a non-

12

decision-maker, even citing *Carilli*, 67 F. App'x 133, 135 (3d Cir. 2003), that position is inconsistent with the facts presently before this Court. Vitale's testimony points to Vaupel, Plaintiff's supervisor, as "part of the decision." Vitale Dep. at 100:3-18. A genuine issue of material fact exists, hence, this Court denies Defendant's Motion for Summary Judgment in regards to Plaintiff's ADEA and Title IV retaliation claims.

C.    Count Three - Breach of Contract Claim

McManus seeks summary judgment on his Count Three, breach of contract claim. He argues that Teva breached its employment agreement when he was terminated. Pl. Br. at 33. Plaintiff contends that Defendant has misinterpreted Plaintiff's Offer Letter and that the Agreement states, in clear terms, he can only be terminated for cause. *Id.* Specifically, Plaintiff reads the Agreement to mean that his status as an "at-will" employee was only for the first 90-calendar day probationary period. Pl. Br. at 35.

Defendant's motion for summary judgment on this claim argues that Plaintiff remained an at-will employee. Def. Br. at 15. Teva argues that McManus misreads the agreement to limit the at-will employment status to only the 90-day probationary period. Def. Reply at 2. The parties' dispute concerns an employment contract in Pennsylvania, therefore, this Court will apply Pennsylvania law. *See Edward v. Geisinger Clinic*, 459 F. App'x. 125, 129 (3d Cir. 2012).

In Pennsylvania, it is presumed that employment is at-will. *See Scully v. US WATS, Inc.*, 238 F.3d 497, 505 (3d Cir. 2001); *see also Geisinger Clinic*, 459 F. App'x at 129. Thus, an employee can be terminated without cause or reason. *Roberts v. Mercy Catholic Med. Ctr.*, No. 16-1894, 2019 U.S. Dist. LEXIS 68443, *22 (E.D. Pa. Apr. 23, 2019) (*citing Raines v. Haverford College*, 849 F. Supp. 1009, 2011 (E.D. Pa. 1994). A plaintiff can overcome the presumption that their employment is at-will if they are able to show "either: (1) an express contract, (2) an implied contract where circumstances around the hiring indicate that the parties did not intend the

13

employment to be 'at-will,' or (3) that the employee gave the employer some additional consideration from which the court can infer that the parties intended to overcome the presumption of at-will employment." *Id.* (*citing Veno v. Meredith*, 357 Pa. Super. 85, 515 A.2d 571, 577 (Pa. 1986). Furthermore, an employee's "subjective expectation of…guaranteed employment…based on [an] employer practices or vague employer superlatives" does not prove an employment contract for a definite term. *Edwards*, 459 F. App'x. at 129 (*citing Scully*, 238 F.3d at 505).

This Court disagrees with Plaintiff's reading of the contract. The Offer Letter clearly states that "[t]he nature of your employment with us is and **will be** 'at-will.'" Def. Exhibit C (emphasis add). It did not specifically limit the at-will relationship to the first 90 days of his employment. The Agreement also said that it "supersedes all prior negotiations, discussions, correspondence, communications, understandings and agreements between the parties…" *Id.* Thus, even if Teva and its employees orally guaranteed the job and made assurances that McManus' would not be fired, the signed and dated agreement supersedes it. Plaintiff was fully aware of his status as an "at-will" employee; he signed the Confidentiality Agreement which reiterated his at-will employment status, without the 90-day probationary language. Def. Exhibit D. Because two expressly written and signed agreements show Plaintiff's "at-will" status, his breach of contract claim, Count III, is dismissed.

D.   Count Four – Promissory Estoppel

Plaintiff claims that he provided evidence that Teva made numerous verbal representations that: (1) his position was safe, (2) he would not be terminated, and (3) he would not be subject to restructuring. Pl. Br. at 36. He contends that he relied on these representations when he initially accepted the position, and later, when he passed on "countless other opportunities" to work for other companies. *Id.*

14

Pennsylvania courts have held that a plaintiff has proven promissory estoppel if they establish that: "(1) the promisor made a promise that he should have reasonably expected to induce action or forbearance on the part of the promise; (2) the promise actually took action or refrained from taking action in reliance on the promise; and (3) injustice can be avoided only by enforcing the promise." *Crouse v. Cyclops Indus.*, 560 Pa. 394, 745 A.2d 606, 610 (Pa. 2000). However, "an employee may not invoke promissory estoppel against an employer for termination of an at-will employment relationship. *Yellovich v. Ahold USA*, No. 14-4665, 2014 U.S. Dist. LEXIS 164922, at *11 (E.D. Pa. Nov. 2014)(*citing Paul v. Lankenau Hosp.*, 524 Pa. 90 A.2d 346, 348 (Pa. 1990); *see also Dyche v. Bonney*, 277 F. App'x. 244, 246 n.1 (3d Cir. 2008)("[U]nder the Pennsylvania Supreme Court's decision in *Paul*, [plaintiff's] promissory estoppel theory is not a legally cognizable cause of action in Pennsylvania.")

As stated *infra* p. 14, Plaintiff was an "at-will" employee for Defendant. *See* Def. Exhibit C and D.   Moreover, Plaintiff cannot prove the third promissory estoppel element articulated in *Crouse*. Plaintiff testified that he is currently working and has engaged in sporadic consulting work. McManus Dep. 12:1-7. Thus, there is no injustice to be avoided. Thus, Count Four of the Complaint must also be dismissed, and summary judgment granted in favor of Defendant.

E.   Count Five - Fraudulent Misrepresentation

Count Five of Plaintiff's Complaint alleges fraudulent misrepresentation. ECF Doc. No. 1. To prove a claim for fraudulent misrepresentation, a plaintiff must show: "(a representation; (2) material to the transaction at hand; (3) made falsely, with knowledge of its falsity or recklessness as to whether it is true or false; (4) with the intent of misleading another into relying on it; (5) justifiable reliance on the misrepresentation; and (6) the resulting injury was proximately caused by the reliance." *Yellovich*, No.14-4665 at *8 (*citing Gibbs v. Ernst*, 538 Pa. 193, 647 A.2d

KEUCH000375

JOINT APPX 0718

882, 889 (Pa. 1994).

In fraud or misrepresentation cases, "deceit must be of an existing fact, not the breach of a promise to do something in the future. A promise to do something in the future, which is not subsequently complied with, does not constitute fraud." *Scaife Co. v. Rockwell-Standard Corp.,* 446 Pa. 280, 285 A.2d 451, 454 (1971). Plaintiff points to his testimony that to show that there were multiple representations or assurances made to him, however, this alone is not enough. He fails to present evidence to show that Vitale made a knowingly false statement or spoke with reckless disregard for the truth. In fact, the evidence before this Court shows that Vitale initially, thought the program would grow, but due to restructuring, Teva was forced to lay people off. Vitale Dep. at 40-44. A plaintiff cannot "avert summary judgment with speculation or by resting on the allegations in [their] pleadings, but rather must present competent evidence from which a jury could reasonably find in [their] favor." *O'Bryant v. City of Reading,* No. 03-6635, 2004 U.S. Dist. LEXIS 17013, at *16 (E.E. Pa. Aug. 11, 2005) (*citing Ridgewood Board of Ed. v. N.E. for M.E.,* 172 F.3d 238, 252 (3d Cir. 1999)). Plaintiff attempts to avoid summary judgment by pointing solely to own assertions and nothing else to indicate fraud or an intent to mislead. No genuine issue of material fact exists, therefore, this Court grants Defendant's motion to dismiss Count Five.

F.   Count Six – Pennsylvania WCPL

Plaintiff asserts, in Count Six, a claim for a violation of WPCL, 43 P.S. § 260.1 *et seq* for alleged unpaid wages relating to his *pro rata* share of the 2018 bonus. Plaintiff's statement of facts alleges that he was never paid but fails to further address or cite any evidence to support this argument. Defendant argues that, under Teva's Separation Benefits Policy, McManus was only eligible for an incentive bonus if: a) he worked for over 1,000 hours; and b) was an active employee

16

KEUCH000376

JOINT APPX 0719

on February 1, 2019.  Def. Br. at 20.  Plaintiff was discharged on June 2018, thus, he was not

entitled to any bonus.  Def. Br. at 20-21.  Defendant further asserts that Plaintiff thought he was

entitled to this *pro rate* share of the bonus, because it was an "industry norm;" it was not Teva's

policy.  Def. Br. at 21.

Plaintiff has not provided any evidence that a genuine issue of material fact exists as to his

bonus claim.  Nor did he even address this argument in his brief.  Thus, a genuine issue of material

fact does not exist and this Court hereby grants Defendant's motion for summary judgment and

dismisses Count Six.

## IV.   CONCLUSION

Plaintiff, Brian McManus, alleges that his former employer, Teva Pharmaceuticals USA,

Inc., fired him, because of age discrimination and retaliation.  After considering the parties

extensive briefings, this Court denies Defendant's motion as to the discrimination and retaliation

claims (Counts One, Two, Seven and Eight).  However, because there are no genuine issues of

material fact, this Court also grants Defendant's motion for summary judgment and denies

Plaintiff's cross-motion for partial summary judgment regarding Breach of Contract (Count

Three), Promissory Estoppel (Count Four); Fraudulent Misrepresentation (Count Five), and his

WPCL claim (Count Six).

KEUCH000377

JOINT APPX 0720

Page 1

IN THE UNITED STATES DISTRCIT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA


RANDOLPH W. KEUCH,              )
                               )
        Plaintiff,             )
                               )
vs.                            )  Case No. 2:19-CV-05488
                               )
TEVA PHARMACEUTICALS USA,      )
INC. and TEVA PHARMACEUTICAL)
INDUSTRIES, LTD.,              )
                               )
        Defendants.            )


VIDEOCONFERENCE DEPOSITION OF EDUARDO NASI,
taken on behalf of the Plaintiff, pursuant to
Notice, on Monday, June 13, 2022, commencing at
1:00 p.m., all parties appearing remotely via
Microsoft Teams, before Janice D. Burness,
Registered Professional Reporter, Certified Court
Reporter, and Notary Public.



1          Did you have any conversations with her as

2     to what Randy's long-term goals were either on the

3     21st or the 22nd?

4     A.    Not on the 21st, and not about what would

5     happen to him.  But I asked her if I could talk to

6     him about me taking the North American position;

7     that was the only thing that I asked.

8     Q.    What did she say to that?

9     A.    To leave that to her and Dan Lawlor.  They

10    would communicate anything about any change.

11    Q.    So they told you not to talk to Randy

12    about it.

13    A.    Correct.

14    Q.    Did you ask why you couldn't talk to Randy

15    about it?

16    A.    No.  I understood why I shouldn't.  So ...

17    Q.    When you talked to her on 22nd, did you

18    give her an answer as to whether or not you would

19    be willing to undertake that responsibility for

20    heading up North America Total Rewards?

21    A.    I said that I would have to talk to my

22    wife because that would involve relocation.

23    Right?  I said that I was really excited about the

24    opportunity, but I need to talk to my wife first.

25          That's when I sent the email to her, I



Page 31

1     would say, on December 24th saying that we were

2     okay, you know, with the relocation, so I would

3     take the position.

4          Q.   Do you know what time of day that that

5     conversation took place?

6          A.   Between me and who?  My wife or --

7          Q.   No, with Tal.

8          A.   I would say in the morning our time.

9          Q.   Okay.  What time in the morning?  Do you

10    know?

11         A.   I don't remember.  I do believe it was in

12    the morning.

13         Q.   Give me just a moment.

14         A.   Sure.

15         Q.   I'd like you to look again in the pile of

16    documents marked as Teva documents, and

17    specifically that which is marked -- that which is

18    marked Teva 581.  Again, it's right near the top

19    of the documents.

20         A.   Okay.

21         Q.   Maybe ten down.

22         A.   Okay.

23         Q.   Do you know what, go two up from that and

24    look at 579.  I'd like you to pull out 579 through

25    581.



Page 39

1      Q.    When did it become clear to you that you

2      had to move, in context, close to the North Jersey

3      location?

4      A.    Since December 21st, 22nd.

5      Q.    As opposed to the Pennsylvania location,

6      correct?

7      A.    Oh.   No.   So since the beginning of

8      December I knew that I would have to relocate.

9            Honestly, I can't recollect at what point

10     or time I would have to be in Parsippany not in

11     North Wales.   I think even in March -- there is a

12     higher chance that I would be in Parsippany.

13           So yes, probably in March there was some

14     kind of announcement or communication saying that

15     we would be in Parsippany and not in North Wales.

16     Q.    At that time you were living in the

17     Fort Lauderdale area?

18     A.    Yes.

19     Q.    Specifically where, what town?

20     A.    Miramar.

21     Q.    And in Miramar did you own the family

22     home?

23     A.    Yes.

24     Q.    And when it was sold, what was the value

25     of that home?



Page 79

```
 1              (A recess was taken.)
 2              MR. EPSTEIN:  I'm sorry to disappoint you,
 3      Mr. Nasi, but I have no further questions.
 4              MR. RAPPAPORT:  That was an opportune
 5      break.  I have some questions, so I won't be
 6      disappointing you.
 7              MR. EPSTEIN:  I assumed that you would.
 8              MR. RAPPAPORT:  Thanks, Al.
 9                       EXAMINATION
10      BY MR. RAPPAPORT:
11          Q.   When you worked for Teva and were
12      responsible for what you call LatAm, which I guess
13      is Latin America, who was your employer at that
14      time?
15          A.   What do you mean?
16          Q.   Were you employed by Teva USA?
17          A.   Yes, Teva USA.  Everybody based in the
18      U.S. was basically Teva USA.
19          Q.   And is Teva a wholly owned subsidiary of
20      TPI?
21          A.   Yes.
22          Q.   And is it in the same business that TPI is
23      in?
24          A.   Yes.
25          Q.   And how would you describe TPI's business?
```



Page 80

1      A.   It's a pharmaceutical.  Right?  So in both

2  generics and speciality and also biologics.  We

3  have a large, let's say, spectrum of different TAs

4  and products across the globe.

5      Q.   Does it both manufacture and market these

6  products?

7      A.   Yes.

8      Q.   And are there different therapies that it

9  has responsibility for?

10      A.   Yes.

11      Q.   Can you identify what those therapies are,

12  as many as you can recall?

13      A.   Oncology, respiratory, CNS, neuro,

14  neuroscience, psychiatric.  So there is a range of

15  different TAs.

16      Q.   Now, Mr. Keuch was the person who was

17  primarily responsible for hiring you?

18      A.   Yes.

19      Q.   And do I understand that you had a prior

20  relationship with him?

21      A.   Yes.  Correct.

22      Q.   And where did that relationship begin?

23      A.   When I was with Mercer already in the U.S.

24  So probably around 2010, '11.  I was with Mercer,

25  and I was responsible for the compensation



Page 82

```
 1        Q.    And had Mr. Keuch been in the Teva
 2    position for a long period of time before he hired
 3    you?
 4        A.    I can't recall when Randy did start at
 5    Teva, but I would say it was also in 2014.  So it
 6    was not a long time before hiring me.
 7        Q.    So you both were hired by Teva in 2014?
 8        A.    I would say yes.
 9        Q.    And was Mr. Keuch responsible for
10    designing and overseeing compensation and benefits
11    policies for U.S., Canada, and Latin America?
12        A.    Yes.  Correct.
13        Q.    And did Latin America include Mexico?
14        A.    Yes.
15        Q.    Okay.  You responded to some questions
16    that Mr. Epstein asked you by referring to labor
17    grades.
18              What was your first labor grade at Teva?
19        A.    15.
20        Q.    And what's the scale?  What's the lowest
21    and what's the highest number?
22        A.    So we have very low-level jobs, a Grade 1
23    or 2, depending on the area.
24              We can go up to 23, globally speaking.
25              In the U.S. we have a maximum of 22, but
```



Page 83

```
 1    we don't really touch those because these are
 2    really executive management.
 3            So I would say up to 20 it is what we
 4    manage in general.
 5       Q.   And do the labor grades match up with
 6    certain job titles?
 7       A.   Yes.
 8       Q.   So starting at 15, can you tell me what
 9    the labor grade is and what the associated job
10    title would be.
11       A.   So 15 is director.  Senior director we
12    have two different grades, so 16 and 17.  VP would
13    be 18.  And then for senior VPs we have 19, 20.
14            And we don't currently have anyone, but it
15    could go up to 21 as well.
16       Q.   Before you heard the announcement that you
17    testified to, had there been any speculation or
18    discussions or gossip or rumors during the course
19    of 2017 with respect to Teva's financial
20    condition?
21       A.   We lost our CEO, the previous CEO, I would
22    say, February, March, 2017.  So we stayed pretty
23    much the entire year without a CEO.  It was an
24    intervening guy from the board.
25            So, yes, everybody was somehow afraid or
```



Page 84

```
1      interested to know what was going to happen
2      throughout the year.
3              And then of course, as you said, with Kåre
4      it became clear that, you know, changes were going
5      to happen as soon as possible.
6         Q.   Were you expecting reductions before you
7      heard that reductions were coming?
8         A.   No.  I think we had some hire freezings
9      during 2017 due to the business situation.
10             But I can't recall right now if there were
11     any talk about reductions, you know, before Kåre.
12        Q.   How about discussions about bankruptcy?
13     Were they being discussed within the Teva
14     community?
15        A.   Not at my level at least.
16             And of course we were in the news after
17     that with Kåre, et cetera, but not that I was
18     aware of prior to Kåre's arrival.
19        Q.   When Kåre joined the company in late 2017,
20     did he share with the Teva community that
21     bankruptcy was a potential?
22        A.   Yes, if we didn't do a big, big
23     restructuring, cost savings.
24             I think especially there was a lot of
25     pressure from the Israel government, et cetera,
```



Page 85

1    why he was taking that approach at the time.

2        Q.    Okay.  Did you ever have any concern that

3    your job could be lost?

4        A.    From the Latin America perspective, yes.

5        Q.    And when you talked to Tal Zorman in

6    December of 2017, was that the first time you had

7    ever spoken to her?

8        A.    I would say probably, yes.  I don't think

9    there was any reason why as a Total Rewards LatAm

10   I would have talked to Tal before that.

11       Q.    Did you know who she was or what she did?

12       A.    Yes.

13       Q.    Was she new in her role?

14       A.    Yes.  As the global talent management

15   person, yes.

16       Q.    Who did she replace?

17       A.    We had three different COEs; one for Total

18   Rewards, one for L&D, one for talent acquisition

19   and global mobility, and her position combined all

20   of those COEs.

21           So it was somehow a new position, but she

22   replaced Ron Yaniv.  And I can't recall the name

23   of the guy who is leading talent acquisition right

24   now.

25       Q.    And what is a COE?



MAGNA

LEGAL SERVICES

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

- - -

RANDOLPH W. KEUCH       :
                        : CASE NO.
v                       : 2:19-CV-05488
                        :
TEVA PHARMACEUTICALS :
USA, INC., And TEVA     :
PHARMACEUTICAL          :
INDUSTRIES, Ltd.        :

- - -

WEDNESDAY, APRIL 13, 2022

- - -

        Virtual deposition of MARK
SABAG, taken pursuant to Notice,
commencing at 8:10 a.m., on the above
date, before Benjamin Moebius, a Court
Reporter and Notary Public in and for the
Commonwealth of Pennsylvania.

- - -

MAGNA LEGAL SERVICES
(866) 624 6221



1      Q.    Who was that?

2      A.    Lesley Billow and Ron Yaniv.

3      Q.    Ron Yaniv, you said?

4      A.    Correct.

5            MR. EPSTEIN:  To the

6      reporter, that's Y-A-N-I-V.  Billow

7      is B-I-L-L-O-W.

8  BY MR. EPSTEIN:

9      Q.    Now, in terms of the overall

10  decision by Mr. Schultz to cut people

11  from employment with Teva and setting

12  goals of 25 percent, what role did you

13  play in that?

14     A.    I basically, as the head of

15  HR, orchestrated this entire program.

16     Q.    When you say you orchestrated

17  it, what did you mean by that?  Did you

18  make the decision about 25 percent, or

19  did Mr. Schultz do that?

20     A.    Mr. Schultz came with the --

21  with the desire -- with the need of Teva

22  to reduce significantly the cost based

23  and the head count and the conclusion was

24  that it needs to have -- it needs to be



1    25 percent, and me as an executive member

2    and head of HR together with the CFO, we

3    built the detailed plan on how that is

4    going to be cascaded in terms of goals to

5    the entire organization.  And then, once

6    the plan was set, I was responsible

7    together with the -- with the business

8    leaders but as the HR organization

9    basically facilitate this process through

10   Teva in '18 and '19.

11        Q.    Did you make the decisions as

12   to who got what roles at Teva as part of

13   this reorganization plan?

14        A.    No.

15        Q.    Did you have a hand in

16   deciding that Tal Zorman should be placed

17   in her current role?

18        A.    Yes.

19        Q.    What decision making did you

20   engage in in that regard?

21        A.    So, like any other function,

22   HR got the target of 50 percent reduction

23   in workforce as part of this

24   restructuring, and we needed to do it



Page 19

1    actually in a -- in a rapid timeframe

2    because HR was supposed to lead this

3    process, so we wanted to create that

4    clarity in HR as fast as we can to allow

5    HR to get back to business.

6              I came to the conclusion that

7    in order to do so, I need also -- and to

8    convey the message around this tough

9    decision, I basically needed to reduce my

10   leadership team in half.  As a result of

11   that, I basically decided to merge couple

12   of global functions into a one global

13   function and to eliminate several

14   leadership roles in HR to allow me to

15   maintain this 50 percent target.  And

16   once I decided to merge those functions,

17   I came to the conclusion that the best

18   person that can do the job moving forward

19   is Tal Zorman.

20        Q.    Did you work with Tal Zorman

21   at Intel?

22        A.    To some extent.  She was in

23   other function, but I -- but I know her,

24   yeah.  I knew her, yeah.



Page 29

```
 1        A.     I think it was related to
 2    the -- to the big project that back then
 3    was driven globally around benefit
 4    harmonization, as far as I remember, and
 5    there was some other struggle that
 6    relates to whether he see Ron Yaniv as an
 7    appropriate manager due to level of
 8    seniority.
 9        Q.     I'm not understanding what
10    you mean by that.
11               Would you explain?
12        A.     The feel back then was that
13    he believed that -- that he is more
14    qualified than Ron Yaniv.
15        Q.     Did you hear anything about
16    Randy not being able to get along with
17    other persons -- excuse me -- in the
18    organization other than Ron Yaniv?
19        A.     Not that I recall.
20        Q.     When did Ron Yaniv leave
21    Teva?
22        A.     Ron Yaniv left Teva as part
23    of the restructuring that I explained
24    before.  So he was one of the senior HR
```



Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

- - -

RANDOLPH W. KEUCH     :   CIVIL ACTION
                      :
        v.            :
                      :
TEVA PHARMACEUTICALS :
USA, INC., and TEVA  :
PHARMACEUTICAL        :
INDUSTRIES, Ltd.     :   NO. 2:19-cv-05488

- - -

April 4, 2022

- - -

Oral deposition of TAL ZORMAN taken pursuant to notice, was held via videoconference beginning at 10:50 a.m., on the above date, before JoAnn Cheli, a Professional Court Reporter and Notary Public in the Commonwealth of Pennsylvania.

- - -

MAGNA LEGAL SERVICES
www.MagnaLS.com
(215) 207-9460



Page 18

1    Team and I also met Randy.

2         Q.    So he was part of that

3    Leadership Team in North America?

4         A.    Yes.

5         Q.    When did it come to your

6    attention that there was going to be a

7    cut in personnel in 2017 going into 2018?

8         A.    I think it was approximately

9    in October of 2017.

10        Q.    And what did you learn?

11        A.    I learned that we're going

12   to restructure and we will need to reduce

13   approximately 25 percent of our workforce

14   on average.

15        Q.    Who did you learn that from?

16        A.    From my manager, Mark Sabag.

17   He was the CHR.

18        Q.    Did you talk to anybody else

19   about it?

20        A.    Sorry?

21        Q.    Did you learn the

22   information from anybody other than Mr.

23   Sabag?

24        A.    No.



Page 19

```
 1          Q.     And what did you learn was
 2   going to be the structure of that cut or
 3   how it would implemented?
 4                 MR. RAPPAPORT:  Objection to
 5          form of the question.  Why don't
 6          you ask one at a time?
 7   BY MR. EPSTEIN:
 8          Q.     What did you learn as to how
 9   that cut would be implemented?
10          A.     I learned that we're going
11   to have 50 percent cut on average in HR.
12          Q.     Is Total Rewards part of HR?
13          A.     Yes.
14          Q.     What did you learn
15   specifically about Total Rewards North
16   America other than the average would be
17   50 percent?
18          A.     I learned that I need to do
19   -- once I received the nomination of
20   Global Talent Rewards -- Global Talent
21   Management, sorry, I had to come up with
22   the structure and to meet on average 50
23   percent, but there were some functions
24   that I needed to reduce even more.  But
```



Page 20

1    on Total Rewards the target was 50

2    percent.

3        Q.    And with regard to the 50

4    percent target, that was just a target,

5    or was it a hard cutoff that you had to

6    do 50 percent in each area?

7        A.    No, it was overall 50

8    percent.

9        Q.    Was that a head count 50

10   percent or was that tied to a dollar

11   amount?

12       A.    It was both.

13       Q.    Well, which one was supposed

14   to control?  You said it was both, but

15   which one was supposed to control?  Was

16   it supposed to be both of them absolute

17   50 percent head count and combined with

18   dollar amount, or was it discretionary

19   with you?

20       A.    The leading indicator was

21   head count reduction.  And then we also

22   looked at cost of labor overall.

23       Q.    Were there any more

24   specifics as to specific job titles or



Page 24

```
 1    which consists of Asia, Israel and Latin
 2    America and Europe.  And also Israel was
 3    part of the Global Markets and India.  So
 4    Europe, North America and all the rest
 5    were part of the Growth Markets.
 6          Q.    At that time before the cuts
 7    were made who was the head of the
 8    European sector?
 9          A.    Noel, I don't remember his
10    last name.
11          Q.    And how about North America
12    Total Rewards?
13          A.    Randy Keuch.
14          Q.    How about the Growth
15    Markets?
16          A.    There weren't Growth
17    Markets.  It was separate.  We had
18    Israel.  We had Latin America part of the
19    Americas, and the rest were also
20    separate.  We didn't have the Growth
21    Market.  This was a business change.
22          Q.    So at the time before these
23    reductions were made it was Europe, North
24    America, Latin America?
```



Page 25

```
 1          A.     Latin America was part of
 2    North America with the Americas.
 3          Q.     And before the changes were
 4    made it was Europe, the Americas, Israel?
 5          A.     Yes.
 6          Q.     Who is the head of Total
 7    Rewards in Israel?
 8          A.     Amir Zirah.
 9          Q.     Spell that please.
10          A.     Amir is the first name,
11    A-M-I-R.  And the last name I have to
12    look up.  I don't remember.
13                 MR. RAPPAPORT:  Z-I-R-A-H.
14                 THE WITNESS:  Thank you.
15    BY MR. EPSTEIN:
16          Q.     Were there any other heads
17    of Total Rewards, that is compensation
18    and benefits anywhere else?
19          A.     There was another function
20    in Israel that led global
21    responsibilities by other people in
22    addition to the regional
23    responsibilities.  We had a few positions
24    that were responsible for Global Total
```



Page 27

```
 1          object to the form of the

 2          question.  But you can answer.

 3          You've already answered.  Thank

 4          you.

 5  BY MR. EPSTEIN:

 6          Q.    Was there any plan for

 7  placing the individuals in the various

 8  areas on some form of lattice or toto, as

 9  it's often called, where you would put in

10  place those persons that you felt were

11  most qualified down to the least

12  qualified?

13          A.    I'm not sure I understand

14  the question.  Sorry.

15          Q.    Was there any plan in place

16  that evaluated the individuals by past

17  achievement, by performance, performance

18  ratings that placed them in their

19  particular areas a hierarchy of who was

20  most qualified?

21          A.    It was done differently.  We

22  started from the structure and then we

23  looked at which individuals are qualified

24  for that.
```



Page 50

1          Q.     Did you talk to Mr. Keuch as

2    to Mr. Nasi's ability to control the

3    compensation and benefits package for the

4    United States?

5          A.     Yes, after I made the

6    decision, yes.

7          Q.     After you made the decision?

8          A.     The decision of the

9    structure, yes.

10         Q.     Did you talk to Mr. Keuch

11   about this?

12         A.     Yes.

13         Q.     And what did Mr. Keuch tell

14   you about Mr. Nasi's knowledge of

15   compensation and benefits in the United

16   States?

17         A.     That he has very limited

18   knowledge.

19         Q.     Now when you decided the

20   structure, what was the structure that

21   you decided on?

22         A.     That we are eliminating the

23   head of Total Rewards and we follow the

24   business changes, meaning that North


MAGNA
LEGAL SERVICES

Page 51

1    America is without Latin America.  Latin

2    America moved under the Growth Market and

3    North America stayed just U.S. and Canada

4    so the cost was reduced.

5              And, also, given the

6    restructuring we had to reduce 50 percent

7    of our head count and, therefore, the

8    role was very operational and tactic, and

9    not strategic and design oriented like

10   what Randy was doing.  And, also, the

11   grade level was Grade 15.

12        Q.    Did you have any

13   conversations with Mr. Nasi about these

14   changes and what you were about to do?

15        A.    Yes.

16        Q.    When did you first talk to

17   Mr. Nasi?

18        A.    I don't have the exact date,

19   but I spoke with him after I wanted to

20   evaluate him as a potential candidate for

21   this position.

22        Q.    At that time what level was

23   Mr. Nasi?

24        A.    15.



Page 53

```
 1          Q.     Was there a procedure in

 2   place to compensate people to move them

 3   from one location to another, a

 4   relocation plan?

 5          A.     There was a site

 6   consolidation effort in North America,

 7   Parsippany, and there were very clear

 8   guidelines in terms of compensating

 9   people outside of New Jersey into New

10   Jersey.

11          Q.     When did that plan take

12   place?  Was that before or after the

13   consolidation?

14          A.     This is part of the site

15   consolidation initiative.

16          Q.     And when did that take

17   place, 2017, 2018?

18          A.     '18, '18.

19          Q.     Was there a plan in place

20   that would move Mr. Nasi if he took the

21   position as the head of Total Rewards for

22   North America, was there a plan in place

23   to move him from Florida up to wherever

24   it was that the headquarters would be?
```



Page 60

1          for the clarification.

2     BY MR. EPSTEIN:

3          Q.     In what way did that enter

4     into your decision?

5          A.     I looked into the

6     professional experience, as well as the

7     leadership and management capabilities.

8     And when I looked at both, I chose Edu

9     Nasi for the position.

10         Q.     What document did use other

11    than the statements made by either Mr.

12    Lawlor or Mr. Yaniv?  What documents did

13    review of Mr. Nasi that gave you the

14    impression that he would be able to

15    handle issues relating to compensation

16    and benefits for United States employees?

17         A.     Discussing it with my

18    colleague in the U.S., Dan Lawlor and,

19    also, his supervisor of Latin America.  I

20    forgot the name back then.  I received

21    some reference from his professional and

22    also leadership maturity.

23         Q.     Do you know how old Mr. Nasi

24    was at the time when you made your



Page 61

1    decision?

2            A.    No.

3            Q.    Did you have any knowledge

4    as to how old Mr. Keuch was at the time?

5            A.    No.

6            Q.    But you said that you

7    reviewed documents from his personnel

8    file.  Did you have any knowledge as to

9    when it was that he had been employed at

10   various places during his career?

11           A.    What's the question?

12           Q.    Did you have knowledge of

13   the various places that Mr. Keuch had

14   worked?

15           A.    Yes, yes.

16           Q.    And based upon that and,

17   again, I'm going to show you what has

18   been marked as the Keuch CV.  That had

19   dates as to all the places he had worked

20   prior to the time that he came to work at

21   Teva, correct?

22           A.    Correct.

23           Q.    And you knew that he was

24   employed from this document, specifically



Page 78

1    January?

2         A.    When he started to report to

3    me, I think it was mid-January.

4         Q.    And what were those e-mails

5    about?

6         A.    The changes, the execution.

7    Are we staying in Pennsylvania, are we

8    moving to New Jersey.  The site

9    consolidation introduced many changes and

10   challenges in terms of who is staying and

11   who can move to New Jersey.

12        Q.    Did those e-mails in any way

13   address the issue of any promises made to

14   move his position from a 15 to a 16, to

15   your recollection?

16        A.    What's the question?

17        Q.    Did the e-mails that you're

18   referring to, did they address in any way

19   the promise to move him from a 15 to a

20   16?

21        A.    It wasn't a promise.  We

22   decided to move him.  From when I made

23   the offer to him, it was obvious that he

24   was Grade 15.  But it became obvious to


MAGNA
LEGAL SERVICES

JOINT APPX 0748

1    us in March that the grade level had to

2    be 16 due to the complexity of mainly the

3    site consolidation.  So it wasn't a

4    promise in the beginning.

5              THE WITNESS:  Is there any

6          way we can take a one-minute bio

7          break?

8              MR. EPSTEIN:  Sure, why

9          don't we make a five-minute break.

10         It is now 12:35.  We'll come back

11         at 12:40.

12             (A recess occurred.)

13             MR. EPSTEIN:  I have no

14         other questions of the witness?

15             MR. RAPPAPORT:  I just have

16         a couple.

17                 -   -   -

18                 EXAMINATION

19                 -   -   -

20   BY MR. RAPPAPORT:

21        Q.    Ms. Zorman, when you were

22   making the decisions with regard to the

23   structure that you created, did you

24   consider the cost of relocation as part



Page 80

1   of that decision making process?

2          A.      Yes.

3          Q.      And why did you consider the

4   cost of relocation?

5          A.      Because it was obvious that

6   the head of North America Total Rewards

7   will have to be based in North America.

8          Q.      Now the plan or structure

9   that you developed, did it result in the

10  elimination of the senior director level

11  position?

12         A.      Yes.

13         Q.      Was that just true of North

14  America, or was that true elsewhere?

15         A.      It was true also in Europe.

16         Q.      And had there been an

17  incumbent senior director in Europe who

18  was responsible for Total Rewards?

19         A.      Yes.

20         Q.      And was his position

21  eliminated?

22         A.      Yes.

23         Q.      And who would then be

24  responsibile by job title for Total



1   Rewards in Europe?

2        A.    Director for Europe.

3        Q.    Was that the same decision

4   making, or was it different decision

5   making in eliminating the senior

6   directors in both North America and in

7   Europe?

8        A.    Similar.

9        Q.    What made you think in

10  December of 2017 that you could eliminate

11  the senior director positions and still

12  operate with just a director at the Total

13  Rewards level?

14       A.    The challenge that we had,

15  and we knew that we had to cut 50 percent

16  and just execute what is needed.  Keep

17  the business running without any strategy

18  or special new program designs.  So the

19  scope was very operational.  Just to keep

20  the business running we had no choice

21  back then.

22       Q.    Well, if the scope was to

23  become more operational, how does that

24  factor into eliminating senior director



Page 82

1    level positions and operating with just

2    directors both in North America and in

3    Europe?

4         A.    The scope was smaller in

5    terms of number of direct reports.  And,

6    also, more execution and operational,

7    rather than strategy and design.

8         Q.    Did you think that you could

9    operate that way both in North America

10   and in Europe with just directors?

11        A.    Yes.

12        Q.    Who would be responsible for

13   the strategy and design piece, if there

14   was one?

15        A.    I would.

16        Q.    And what occurred in North

17   America and Europe that made you decide

18   that you wanted to advance Mr. Nasi from

19   a director in labor Grade 15 to senior

20   director of labor Grade 16?

21        A.    The complexity of the

22   restructuring at Teva created a huge

23   challenge from comp and ben, especially

24   North America with the site



Page 83

1    consolidation.

2        Q.    Can you explain how site

3    consolidation created more work or more

4    direction or more responsibilities at

5    Total Rewards position?

6        A.    Sure.  We had to come up

7    with a plan, first of all, to evaluate

8    what's the right location if it's

9    Parsippany for the headquarters in North

10   America, if it's Parsippany or

11   Pennsylvania.

12            And then once the decision

13   was made, to understand the implications

14   of all our people that have to move into

15   the headquarters to New Jersey in terms

16   of comp.  And if they're moving, from

17   which location what we need to compensate

18   them with.  So there was a lot of work.

19            And, also, the restructuring

20   in terms of letting go of a quarter of

21   our workforce created a lot of work to

22   the comp and ben team.  But the site

23   consolidation was the main factor that

24   was changed in March in the U.S.



Page 84

1         Q.     Who made the decision to

2    adjust the position from a director to a

3    senior director position?

4         A.     I made the recommendation

5    and Mark approved it.

6         Q.     Are those the only two

7    people that would be involved in that

8    decision making method?

9         A.     And Dan Lawlor, the HR

10   responsible for North America.

11        Q.     Was a similar adjustment

12   made in Europe where you took the

13   incumbent at the director level and made

14   that a senior director position as well?

15        A.     We had done it in Europe a

16   little bit after North America.  I

17   believe it was August that we changed the

18   position into a director.

19        Q.     From a director to what?

20   You said to a director.  Did you mean

21   from a director?

22        A.     From a director, from 15 to

23   16.

24        Q.     And was it for the same



Page 85

1    reasons?

2           A.    It was, yes, due to the

3    complexity of the restructuring.

4           Q.    Mr. Epstein asked you at

5    some point whether or not you gave any

6    consideration moving Mr. Keuch from a

7    senior director labor Grade 17 into the

8    director position.  Do you recall that

9    question?

10          A.    Yes.

11          Q.    Why wasn't in your mind Mr.

12   Keuch suitable for the director of Total

13   Rewards at the labor Grade 15 level?

14          A.    Because of his vast

15   experience and also ambition to become

16   even a VP at Teva, and to expand his

17   role.  And we knew that we needed

18   someone, you know, much more operational.

19                And, also, from my

20   experience demoting someone two grade

21   levels is not a good decision for the

22   individual and for the organization.

23          Q.    Why is that --

24          A.    Since --



Page 86

```
 1          Q.     -- as a general rule?
 2          A.     I'm sorry?
 3          Q.     I said, why is that as a
 4    general rule?  And now specifically
 5    talking about Mr. Keuch.
 6          A.     Because it's demotivating
 7    taking somebody that is over qualified to
 8    a position that is less impactful and
 9    strategic.  Or, you know, reduced scope
10    is usually demotivating.  Again, from my
11    experience to the individual and, also,
12    to the organization.
13                 And throughout the
14    restructuring we tried to eliminate even
15    one role.  In my organization, I did not
16    demote people.  I just did that in the
17    past and it never worked well.
18          Q.     When you were making your
19    decision to do the restructuring, were
20    you looking at age information with
21    regard to the incumbents in the Total
22    Rewards organization?
23          A.     No.
24          Q.     Was age ever a factor or
```



Page 1

1              IN THE UNITED STATES DISTRICT COURT
          FOR THE EASTERN DISTRICT OF PENNSYLVANIA

2

3    RANDOLPH W. KEUCH,          *

4              Plaintiff        *

5    v.                          *    CASE NO. 2:19-CV-05488

6    TEVA PHARMACEUTICALS         *
     USA, INC., And TEVA

7    PHARMACEUTICAL              *
     INDUSTRIES, Ltd.,

8                                *

          Defendants

9    *          *          *          *          *          *

10

11      VIDEOCONFERENCE DEPOSITION OF RANDOLPH KEUCH

12              PARTY/FACT WITNESS

13              BALTIMORE, MARYLAND

14              APRIL 12, 2022

15

16

17

18

19   Reported by Kathleen E. Manes, Court Reporter

20

21

22

23

24

25

JOINT APPX 0757

Page 8

```
1    So I would ask that all of your responses be
2    verbal responses.  Are you capable of that?
3         A    I am.
4         Q    Okay.  Have you ever had your
5    deposition taken prior to today?
6         A    Not to my recollection.
7         Q    Okay.  Where were you born,
8    Mr. Keuch?
9         A    I was born in Glen Ridge, New Jersey.
10        Q    And when were you born?
11        A    May 27, 1954.
12        Q    How many job offers have you received
13   since your separation from Teva?
14        A    None.
15        Q    How many job interviews have you had
16   since your separation from Teva?
17        A    I don't know.  It was well over a
18   dozen.
19        Q    Can you identify who you interviewed
20   with and when?
21        A    I can recall a few names.  I believe
22   that I provided a list to counsel of the
23   companies I met with or spoke with.  So if you
24   want me to basically give you my recollection,
25   or we can pull up the Bates document and go
```

Page 34

```
 1   benefits after leaving Teva?
 2        A    I received no severance benefits from
 3   Teva.
 4        Q    Do you have an understanding as to
 5   why not?
 6        A    Because I did not sign a release.
 7        Q    Okay.  And is there a reason why you
 8   didn't sign the release?
 9        A    I was advised.
10             MS. CHALAL:  I'm just going to object
11   it's attorney-client privilege.  Don't -- don't
12   reveal anything discussed with your attorney.
13   But if you can, answer that.
14             THE WITNESS:  Can you restate the
15   question?
16             BY MR. RAPPOPORT:
17        Q    Is there a reason why once presented
18   with the release, you chose not to sign it?
19        A    The released said to speak to legal
20   counsel, which I did, and was advised not to
21   sign it.
22        Q    Did you ever call Thomas McDonough to
23   find out about your severance benefits?
24        A    I believe I sent him an email.
25        Q    Okay.  And what do you recall the
```

Page 36

```
 1        Q     Did you meet with them all together?
 2        A     I believe on January 2nd when I was
 3   told that I was being terminated, I believe I
 4   spoke to Edu first.  But again, I'm not clear.
 5   And he wanted to speak to the team.  And I
 6   asked for some time to speak to the team
 7   myself, which I did.  And then he I believe
 8   spoke to them individually.
 9        Q     What happened on January 2nd, 2018?
10        A     I believe Tal Zorman called me and
11   told me that -- that I was being terminated and
12   replaced by Edu.
13        Q     Do you recall anything else that she
14   may have said during the course of that
15   conversation?
16        A     I do not.
17        Q     And was Edu the next person that you
18   spoke to?
19        A     I believe that was the correct order.
20   I'm not totally clear, but I believe it was Edu
21   and then -- and then my staff.
22        Q     Describe to me as best you can recall
23   what you said to Edu after having spoken to
24   Ms. Zorman on January 22nd.
25        A     The gist of the call would have been,
```

JOINT APPX 0760

Page 39

1      Q     And did you stick around until the
2   February 18th date that you testified to?
3      A     Yeah, it was -- I don't know if it
4   was the 18th or the 24th, but there was --
5   you know, it did end in the later part of
6   February.
7      Q     And during that period of time, what
8   did you do to assist Mr. Nasi with respect to
9   the assumption of some or all of the duties
10  that you had been handling?
11     A     We had a number of vendor meetings
12  and Edu attended them.  So it was a -- a
13  transferring of the baton so he would get to
14  meet the -- you know, the people that we were
15  working as our -- as our vendors and understand
16  sort of the role they played and -- and what we
17  were working on with them.
18     Q     About how many vendor meetings were
19  there?
20     A     I -- I don't recall.
21     Q     And were the vendor meetings in North
22  Wales, Pennsylvania?
23     A     Yes.
24     Q     And did Mr. Nasi attend them in
25  person?

Page 62

```
 1        Q    Is that different than Total Rewards?
 2        A    Not necessarily.
 3        Q    Well, does compensation plus benefits
 4   equal Total Rewards?  Or is there something
 5   that I'm missing in the equation?
 6        A    No.  I think that's the general
 7   scope.
 8        Q    So when I asked you the question
 9   whether he had a Total Rewards background and
10   you responded by saying he had a background in
11   compensation and benefits, is there some reason
12   why you answered it that way?
13        A    No.  It's just that that's -- that
14   was my knowledge of his -- of his skill set.
15        Q    When did you begin reporting to him?
16        A    I did.  When, again I'm not
17   100 percent clear whether it was the latter
18   part of 2018 or the early part of 2019.
19        Q    Were you a candidate for the position
20   that Mr. Yaniv filled?
21        A    I -- I'm unaware of whether I was or
22   was not.
23        Q    Did you self-identify as someone who
24   would be interested in that role?
25        A    I did not.
```

Page 75

1   And, you know, I was given an offer from a
2   competitor of that company that I -- that I did
3   not accept at age 62. So, you know, it --
4   it -- I'm not sure how to answer your question,
5   but, yes, I did tell Lesley that it appears
6   that I'm not being hired because of my age.
7          Q    What was the Airgas competitor that
8   gave you an offer at age 62?
9          A    I honestly don't recall. I'd have to
10  look it up.
11         Q    Is that while you were still --
12         A    That's Allentown --
13         Q    -- employed --
14         A    New Jersey -- Allentown,
15  Pennsylvania. They're headquartered there.
16  And there's an offer letter that's part of what
17  you have in -- that's been Bates stamped.
18         Q    All right. The offer that you
19  received from the Airgas competitor in
20  Allentown, Pennsylvania, was that while you
21  were still employed at Teva?
22         A    I received an offer while I was still
23  employed at Teva, yes.
24         Q    Were you looking for employment
25  opportunity during the period of time that you

JOINT APPX 0763

Page 76

1    were employed by Teva, which is as I understand

2    it, was from 2014 to 2018.

3         A    Not -- not aggressively, no.

4         Q    Well, how is it that you received an

5    offer while un-aggressively not looking for

6    other opportunities?

7         A    I received a call and decided that it

8    was worthwhile to explore.  And I explored it.

9    And I got the job, got the offer.

10         Q    Was it at a senior director level?

11         A    It would have been a vice president

12    position, yes.

13         Q    Was it a global opportunity?

14         A    It was.

15         Q    Okay.  But you declined the position

16    because of what?

17         A    I met with Ron Yaniv and discussed

18    the situation with him.  And he didn't want me

19    to -- he did not want me to leave.  He valued

20    my -- my expertise, my skill set, what I

21    brought to Teva.  And so again, it was a

22    question because I'd have to move further away

23    from the Philadelphia hub that I -- you know,

24    that my wife's father was situated in.  And

25    Teva had -- had made some interesting comments.

1    Mr. Yaniv had told me that he would look into

2    the grading of my position.  And so he gave me

3    a salary increase.  He gave me a retention

4    bonus.  And since my work at Teva was not

5    really done, I had built a strategy for the

6    benefits programs and was in the process of

7    implementing that strategy that -- and enjoying

8    the work I did, so it didn't make sense to

9    leave.

10       Q    Do I understand your testimony

11   correctly that the reason that you were given

12   the salary increase and the retention bonus was

13   in response to you sharing with Mr. Yaniv that

14   you had received a competitive offer from

15   another company?

16       A    Yes.

17       Q    Do I understand you correctly that

18   Mr. Yaniv also shared with you that he would

19   look into the possibility of a different job

20   title and labor grade for you?

21       A    A different grade, yes.

22       Q    What grade were you?

23       A    I was a 17.

24       Q    Wasn't that the highest grade for a

25   senior director?

Page 122

1    their own in response to the potential for a

2    likely bankruptcy?

3         A    I'm not sure the word "bankruptcy" is

4    not a word that -- that I'm not familiar with

5    in the --

6         Q    Prior --

7         A    -- Teva --

8         Q    -- to Kare's -- prior to Kare's

9    arrival, were there any suggestions that you

10   were aware of, either formerly or informally,

11   that a global reduction in force was imminent?

12        A    Only rumors.

13        Q    And what were the rumors that you had

14   heard?

15        A    That, you know, Teva was -- was

16   struggling financially.  They -- I had worked

17   on an acquisition of Rimsa down in Mexico with

18   them.  And apparently senior management got

19   snookered on that deal because the Mexican

20   government stepped in.  There were a lot of

21   issues around the drugs they were producing.

22   It was just I guess a nightmare for Teva.

23        Q    And certainly you were watching the

24   stock price, were you not?

25        A    I definitely watched the stock price,

Page 123

1    yes.

2        Q    And you would agree with me that the

3    stock price declined after the purchase of

4    Actavis?

5        A    It did, yes.

6        Q    Now, in your role as the head of

7    Total Rewards, did you have responsibility for

8    Canada?

9        A    I did.

10       Q    For Latin America?

11       A    Yes.

12       Q    And did Latin America also include

13   South America?

14       A    Yes, I believe it would have.  Yes.

15       Q    Peru, Chile, Brazil?

16       A    Yes, those countries were part of

17   Latin America.

18       Q    I'd like to show you an org chart

19   that you provided that was Bates stamped

20   Keuch 017.

21            MR. EPSTEIN:  Would you repeat that,

22   please, Larry?  You broke up.

23            BY MR. RAPPOPORT:

24       Q    I would like to show you an org chart

25   that you produced that was Bates stamped

Page 141

1    for the position, did you?

2         A    Correct.

3         Q    And your testimony is that Ron Yaniv

4    was a one-off and his garden leave was

5    unrelated to the global restructuring that

6    followed later in the year?

7         A    No, that's not correct.

8         Q    What's incorrect about it?

9         A    I do not know why Ron was leaving the

10   organization.  It may have been again related

11   to a reduction in force.  But the

12   communications that I had and the conversations

13   I had did not suggest that -- that he would not

14   be replaced at least prior to the announcement

15   of Tal.

16        Q    When did you first start talking to

17   Ron Yaniv about the possibility of you being

18   upgraded from a senior director to a vice

19   president?

20        A    I believe it would have been around

21   2016.  And it was not a conversation to be

22   ungraded to a vice president.  It was to have

23   my job looked at given the fact that the job

24   responsibilities had grown substantially with

25   the acquisitions.

JOINT APPX 0768

Page 142

```
 1        Q    And as a result of the change to your
 2   job responsibilities, did you feel that you
 3   were not properly rated in your labor grade 17
 4   role?
 5        A    I felt that with the new global
 6   grading system that if you ran my job through
 7   that system, you would come up with a different
 8   grade.
 9        Q    And the different grade would have
10   been a higher grade?
11        A    Correct.
12        Q    And that would have been a labor
13   grade 18?
14        A    Correct.
15        Q    And that would have necessarily
16   required you to become a vice president?
17        A    That's correct.
18        Q    Okay.  Did you have counterparts in
19   the global organization who were heading
20   global -- I'm sorry -- heading -- or Total
21   Rewards who were at the vice president level?
22        A    No.
23        Q    Everyone was at the senior director
24   level?
25        A    Correct.  So you had a senior vice
```

JOINT APPX 0769

Page 143

1  president as Ron.  And I believe he was a 19.

2  No one in 18.  And then you had 17s.

3      Q    All right.  And the 17 would have

4  been a 17 in Europe, a 17 in North America, a

5  17 in Asia-Pacific, and a 17 in Israel.

6      A    Correct.

7      Q    Okay.  Did you have more than one

8  conversation with Mr. Sabag about your desire

9  to be evaluated and perhaps upgraded?

10     A    I never had that conversation.

11     Q    There were no conversations?

12     A    That's correct.

13     Q    Okay.  So there was no discussion

14  between you and mister -- Mr. Yaniv about

15  becoming a vice president?

16     A    There was one conversation, maybe

17  two.

18     Q    But with no one other than Mr. Yaniv?

19     A    With mister -- with Ron.  That's

20  correct.

21     Q    And did Ron ever indicate to you that

22  it could not happen?

23     A    He never did.

24         MR. RAPPOPORT:  Let me show you

25  what's marked as an exhibit.  It's going to be

Page 144

1    Bates stamped Keuch 028.

2              BY MR. RAPPOPORT:

3        Q    This is a letter dated August 6,

4    2015, via mail to you from Ron Yaniv, subject

5    base salary increase and retention bonus.  And

6    I'd like for you to just read to yourself the

7    second paragraph of the letter.

8              MR. EPSTEIN:  Would you repeat

9    what -- what number this is in terms of exhibit

10   and what Bates stamp it is?

11             MR. RAPPOPORT:  It's Bates stamped

12   Keuch 028.  And it would be Exhibit 3.

13             MR. MCDONOUGH:  Org chart to be two?

14             MR. RAPPOPORT:  Yeah.

15             (Keuch Deposition Exhibit Nos. 2 and

16   3 were marked for identification.)

17             THE WITNESS:  Okay.  I have read it.

18             BY MR. RAPPOPORT:

19       Q    Did he ever get back to you after

20   sending you the letter that's been marked as

21   Exhibit 3 as it relates to considering you for

22   a potential promotion to vice president at a

23   global grade 18?

24       A    Yes.

25       Q    And what did -- when he got back to

JOINT APPX 0771

Page 145

1  you, what did he tell you?

2      A    That it would be challenging in the

3  current environment.

4      Q    Okay.  And what did you understand

5  that to mean?

6      A    I understood it to mean that it was

7  going to be a hard sell.

8      Q    And who would he have to sell it to?

9      A    He would have to sell it to Mark

10  Sabag.

11      Q    And did you have a working

12  relationship with Mr. Sabag.

13      A    I had minimal contact with Mr. Sabag.

14      Q    The retention bonus that you received

15  at this time of $60,000, were those retention

16  bonuses being paid to others or was this

17  something special for you?

18      A    There was -- there was a list that

19  circulated and worked through the organization.

20  And, yes, there were others who also received

21  the retention bonuses.

22      Q    And were they retention bonuses in

23  differing amounts?

24      A    To the best of my knowledge, yes.

25      Q    And what do you recall the range of

Page 147

1   in varying amounts?

2       A    I believe so, yes.

3       Q    Did you ever discuss the amount of

4   retention bonuses with anyone other than

5   yourself while at Teva?

6       A    I don't recall.

7       Q    Did any of your direct reports

8   receive retention bonuses?

9       A    I don't believe so.

10      Q    Were counterparts in Europe, Asia,

11  and Israel given retention bonuses?

12      A    I would not know that information so

13  I don't know.

14      Q    Did you agree to the terms that were

15  set forth within what's been marked Exhibit 3?

16      A    Yes.

17      Q    And did you receive the

18  $60,000 that's referenced therein?

19      A    I received two payments of $30,000,

20  yes.

21      Q    And did you understand this to be as

22  a result of services that you provided above

23  and beyond what are required given your

24  position?

25      A    It wasn't a bonus for performance as

Page 152

1        Q     What caused you to prepare it?

2        A     I was asked by Tal Zorman to do that.

3        Q     And when were you asked by Tal Zorman

4    to do that?

5        A     It would have been only a few days

6    before the date of this memo.  So if this memo

7    is December 14th, then it would have been in

8    early December.  I was not given a -- I don't

9    think I was given much lead time.

10       Q     In early December 2017, what

11   specifically did Tal Zorman request of you?

12       A     She asked me to put together some

13   options to basically reduce my staff by

14   50 percent.

15       Q     But wouldn't that have been the first

16   communication that you had with anyone at Teva

17   that a reduction in force was imminent and that

18   it would be 50 percent of the workforce?

19       A     I'm not sure that was the first

20   communication that -- you know, we were not

21   made aware that there were going to be -- there

22   was going to be a reduction in force.  I have a

23   sense that -- that I knew earlier, but did not

24   know the ramifications for my team.

25       Q     See even earlier then, about a week

Page 155

1    that you prepared the deck, which has been

2    marked as Exhibit 5, you had conversations with

3    both Miriam and with Diane?

4         A    That's correct.

5         Q    But not with Edu?

6         A    Edu was not -- Tal had told me that,

7    you know, I would -- the job would no longer

8    have responsibilities for Latin America.  So

9    Edu was not on my -- on my list.

10        Q    Was that in the same conversation

11   when she asked you to prepare the deck?

12        A    Yes, it was.

13        Q    Did she explain why Edu would no

14   longer be part of North America?

15        A    I believe the conversation was that

16   it was being moved to -- I think to Gaurav, who

17   was Asia-Pac.

18        Q    Did she indicate why?

19        A    No.  Just simply this was how they

20   were changing.  I had a sense it was dealing

21   more with business alignment.

22        Q    Did she indicate to you that there

23   was a realignment and Latin America would no

24   longer go through North America?

25        A    That's what I just said, yes.

JOINT APPX 0775

Page 191

1          A       I don't believe so.  I believe Edu

2     took charge of that.  They hadn't been decided

3     at the time that -- that my termination

4     happened.

5                MR. RAPPOPORT:  Let he show you what

6     I'm marking as Keuch Exhibit 6, which is Bates

7     stamped Keuch 183.  And it's a letter dated

8     January 9, 2018.

9                MR. SHEMTOB:  Seven.

10               MR. RAPPOPORT:  Seven.  I'm sorry.

11               (Keuch Deposition Exhibit No. 7 was

12    marked for identification.)

13               BY MR. RAPPOPORT:

14         Q       Do you recall receiving this letter?

15         A       I -- I do.

16         Q       Was it received by mail?

17         A       That I -- I -- I don't recall.  It

18    was a large package.  So I'll assume it was

19    received by mail but I don't -- I don't recall.

20         Q       And it would -- is that your

21    separation date, does it not?

22         A       Yes.

23         Q       And that was March 18 of 2018?

24         A       Yes.  Well -- yes.

25         Q       You were paid through that date, were

Page 192

1   you not?

2        A    Yes, I was.

3        Q    And the targeted last day of work as

4   set forth in the first paragraph was

5   February 23 of 2018.  Isn't that correct?

6        A    That's correct.

7        Q    Now, you testified earlier this

8   morning that other people being separated were

9   not expected to continue to work was active

10  employees.  Is there a reason why you were

11  expected to do so?

12       A    I believe that because of the lack of

13  experience and qualifications that Mr. Nasi

14  had, that they wanted me to stay on board and

15  make a smooth transition.

16       Q    What is the basis of that answer, who

17  told you that was the reason that they wanted

18  you had to stay on board?

19       A    That was a conversation that I had

20  with Tal Zorman.

21       Q    When was that conversation?

22       A    Sometime after January 2nd because

23  that's how the February 23rd date got set.

24       Q    So sometime after January 2nd, but

25  before February 23rd, you had still another