Page 1

IN THE UNITED STATES DISTRCIT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA


RANDOLPH W. KEUCH,                  )
                                    )
          Plaintiff,                )
                                    )
vs.                                 ) Case No. 2:19-CV-05488
                                    )
TEVA PHARMACEUTICALS USA,           )
INC. and TEVA PHARMACEUTICAL)
INDUSTRIES, LTD.,                   )
                                    )
          Defendants.               )


          VIDEOCONFERENCE DEPOSITION OF EDUARDO NASI,

taken on behalf of the Plaintiff, pursuant to

Notice, on Monday, June 13, 2022, commencing at

1:00 p.m., all parties appearing remotely via

Microsoft Teams, before Janice D. Burness,

Registered Professional Reporter, Certified Court

Reporter, and Notary Public.



Page 2

APPEARANCES

Appearing on behalf of the Plaintiff:

ALAN B. EPSTEIN, ESQUIRE
SPECTOR, GADON, ROSEN, VINCI, P.C.
1635 Market Street, 7th Floor
Philadelphia, Pennsylvania 19103
aepstein@lawsgr.com
215-241-8888

Appearing on behalf of the Defendants:
LARRY J. RAPPAPORT, ESQUIRE
BRANDON S. SHEMTOB, ESQUIRE
STEVENS & LEE
1500 Market Street, 18th Floor
Philadelphia, Pennsylvania 19102
larry.rappoport@stevenslee.com
brandon.shemtob@stevenslee.com
215-575-0100

Appearing on behalf of Defendants:

THOMAS McDONOUGH, ESQUIRE
TEVA PHARMACEUTICALS
1090 Horsham Road
North Wales, Pennsylvania 19454
888-838-2872

Also present:
Elizabeth Iobst, Stevens & Lee Intern

---

Page 3

TABLE OF CONTENTS

EXAMINATION

Questions By Mr. Epstein                     5
Questions By Mr. Rappaport                  79

EXHIBITS

1 - Curriculum Vitae, KEUCH000516 through      10
    KEUCH000518

2 - Position Description, KEUCH00521 and       10
    KEUCH000522

3 - Email Chain, TEVA000643 and TEVA000644     23

4 - Email Chain, TEVA000579 through TEVA000581 32

5 - Email Chain, TEVA000590 and TEVA000591     38

6 - "Job Changes During Restructuring, Total   45
    Rewards 2017," TEVA000611 and TEVA000612

7 - Global Talent Management - L3 Structure,   51
    TEVA000636

8 - Total Rewards Separation Guidelines,       56
    TEVA000645 through TEVA000650

9 - Working Together to Achieve Our 2017 Goals, 60
    TEVA000654 through TEVA000677

10 - Offered and Accepted Candidates and       71
    Deselected Candidates, TEVA000683 and
    TEVA000684

---

Page 4

TABLE OF CONTENTS (Continued)

11 - Email, TEVA000768                          72
12 - Email, TEVA000776                          72

ERRATA SHEET                                    90
SIGNATURE PAGE                                  91

CERTIFICATE OF REPORTER                         92

Exhibits attached to transcript.

(ph) indicates a phonetic spelling.
[sic] indicates the text is as stated.
Quoted text is as stated by the speaker.

---

Page 5

THE COURT REPORTER:  Any stipulations
before we begin?

MR. RAPPAPORT:  I'm going to waive my
right to object except as to the form of the
question.  All other objections to be determined
at the time of trial.

I'm also going to set forth that we
request the right to read and sign.
* * * * *
EDUARDO NASI,
having been first duly sworn, testified under oath
as follows:
EXAMINATION
BY MR. EPSTEIN:
Q.  Mr. Nasi -- am I pronouncing your name
correctly?
A.  Right, yes, Nasi.
Q.  It sounds more like with a "Z" than with
an "S," correct?
A.  True, yes.
Q.  I just want to make sure.
A.  No problem.
Q.  What is your date of birth, sir?
A.  July 22, 1980.
Q.  And can you give me just an overview of

2  (Pages 2 to 5)



Page 6

1   your personal history as to where you were born
2   and with whom you presently reside.
3       A.   Sure.  So I was born in Brazil, originally
4   in São Paulo.  I lived my -- until I was 27 in
5   Brazil, and then moved to the U.S. for work,
6   myself.  And my wife came with me, she's also from
7   Brazil.
8            At the time we had a one-year-old son,
9   born in Brazil, but he came to the U.S., of
10  course, with us.  And then I have two
11  additional -- two more kids, they were here born
12  in this U.S.
13      Q.   Are you currently married?
14      A.   Yes.
15      Q.   And you live with your wife and children?
16      A.   Correct.
17      Q.   I sent you two sets of documents, and the
18  first set is a set that was marked as Keuch
19  Exhibits.
20           Can you turn to those exhibits, please.
21      A.   Sure.
22      Q.   And specifically to that exhibit which is
23  marked as Bates stamped 516 through 517.  In fact,
24  518.
25      A.   Okay.

Page 7

1       Q.   With regard to that document, is that
2   document a fair and correct statement of your
3   education?
4       A.   Yes.
5       Q.   And your professional experience is there
6   beginning with October 2012 and going through
7   those employments that you had prior to your
8   tenure with Teva.
9            Is that a correct statement of your past
10  work experience?
11      A.   Yes.
12      Q.   When you were dealing with your past
13  experience with General Mills, BlackBerry, Mercer
14  and Ford, were you dealing exclusively with
15  matters that related to South American law,
16  specifically Brazilian law?
17      A.   Yes.
18      Q.   Were there any other laws that you were
19  actively engaged in in those prior employments --
20      A.   No, sir.
21      Q.   -- such as the law of the United States or
22  Canada?
23      A.   No.
24      Q.   When did you first join Teva?
25      A.   July 21, 2014.

Page 8

1       Q.   Prior to the time that you were employed
2   at Teva, did you have any organized coursework in
3   issues relating to North American law, that is
4   either the United States or Canada?
5       A.   Not necessarily the law.  But especially
6   at Mercer I was obviously the representative for
7   Latin America in several global forms, so I did
8   have exposure for North American issues.
9            But to your question about specific law,
10  not really.
11           MR. RAPPAPORT:  The question was about
12  coursework.  To be clear, the question was about
13  coursework, which I think you have answered, but
14  you have gone on and answered about your work
15  experience.
16           THE WITNESS:  Okay.
17           MR. RAPPAPORT:  Just to clarify the
18  record.
19  BY MR. EPSTEIN:
20      Q.   An unexpected clarification, sir, but I'll
21  accept it.
22           With regard to issues, what kind of issues
23  did you experience when you were working with
24  Mercer?
25      A.   Client-related or system-related that --

Page 9

1   when we were launching something on a global
2   basis.
3            Again, that's why we had representatives
4   from each one of the regions, to make sure that it
5   would work well for all the different regions.
6            Again, I was representing Latin America,
7   but I had exposure to other regions.
8       Q.   Okay.  What specific areas of
9   North American compensation law did you have
10  experience with while you were at Mercer?
11      A.   Law?  None from that perspective.
12      Q.   It was internal matters that you
13  participated in while at work at Mercer?
14      A.   Yes.
15      Q.   Did you -- just to specify it, did you
16  have any coursework -- that is, specialized
17  courses either in the HR field or other -- that
18  dealt with North American compensation issues?
19      A.   At that time, no.
20      Q.   After you joined Teva in July of 2014,
21  what was your responsibility?
22      A.   So I was hired to be responsible for Total
23  Rewards for Latin America, based in Florida.
24      Q.   Would you take a look at what has been
25  marked as Keuch 521.

3  (Pages 6 to 9)



Page 10

1  MR. RAPPAPORT: Can I suggest that rather
2  than using Bates stamps that we identify these
3  documents as exhibit numbers?
4  MR. EPSTEIN: That's fine.
5  MR. RAPPAPORT: So how do you want to call
6  them? Do you want to call this Nasi Number 1 and
7  then Nasi Number 2?
8  MR. EPSTEIN: That would be fine.
9  MR. RAPPAPORT: We're at Nasi 2 then.
10  Is that okay with you, Janice?
11  THE COURT REPORTER: That's fine.
12  (Exhibit Nasi 1, Curriculum Vitae,
13  KEUCH000516 through KEUCH000518, marked for
14  identification)
15  (Exhibit Nasi 2, Position Description,
16  KEUCH00521 and KEUCH000522, marked for
17  identification.)
18  THE WITNESS: So where should I go, just
19  to understand?
20  BY MR. EPSTEIN:
21  Q. Go to Bates stamp 521.
22  A. So that's the job description for the
23  position. Is that correct?
24  Q. It's a job description for the head of
25  Total Rewards, Latin America.

Page 11

1  A. Yes.
2  Q. Have you seen this document previously?
3  A. Honestly, probably yes. I guess, you
4  know, when I was hired, probably yes.
5  Q. Would you take a look at this document
6  and -- in preparation for telling me whether or
7  not it properly records your essential duties and
8  your position requirements in that role.
9  A. For Latin America, yes. Yes, it does
10  represent what I -- what I was supposed to do back
11  in 2014 when I was hired for Latin America.
12  Q. Your résumé demonstrates that when you
13  were employed by General Mills, you were employed
14  in Doral, Florida. Am I correct?
15  A. Yes.
16  Q. Now, when you were the -- when you were
17  hired at Teva to be the head of Total Rewards in
18  accordance with the -- what have been marked as
19  Nasi 2, the position description, how many people
20  did you have reporting to you?
21  A. Directly none because they had accounts
22  that were part of HR in the region.
23  But indirectly I would say we started with
24  six, one in each one of the countries.
25  Q. Now, you said that the people that you had

Page 12

1  indirect -- an indirect line to were part of HR.
2  Was there a separate director of HR for
3  the Latin America locations?
4  A. Yes.
5  Q. And who was that?
6  A. That was Martin Salas, who was also based
7  in Florida.
8  Q. And was -- is Martin a male or a female?
9  A. Male.
10  Q. Mr. Salas --
11  A. I'm sorry. We are talking about Teva,
12  right?
13  Q. Excuse me? At Teva.
14  A. Yeah. Okay.
15  Q. With regard to Mr. Salas, did he have a
16  separate group of people that he dealt with other
17  than the six people that you've talked about?
18  A. Yes.
19  Q. And how many people did he supervise? Do
20  you know?
21  A. I can't recall right now.
22  Q. When you were hired in July of 2014, who
23  did you report to?
24  A. Directly to Randy and a dotted line to
25  Martin.

Page 13

1  Q. Okay. When you say "Randy," you mean
2  Randy Keuch, correct?
3  A. That's correct.
4  Q. Until January of 2018, did you continue to
5  report to Randy Keuch during that entire time?
6  A. Yes.
7  Q. And in terms of your dotted line reporting
8  function, did you continue to have a dotted line
9  to Martin Salas?
10  A. Martin left Teva at some point in 2015.
11  When he was gone, I was somehow the
12  intervening person for HR LatAm. And then we
13  hired Carlos Benitez who became Martin's
14  successor, so then I was a dotted line to Carlos
15  at that point. I can't recall the specific dates,
16  but he was the new one.
17  Q. And did Mr. Benitez remain a dotted line
18  report for you throughout your tenure until
19  January of 2018?
20  A. Yes.
21  Q. When you were first hired, what was your
22  classification, your rating?
23  A. 15, director.
24  Q. Just give me a moment. I just want to
25  turn off both phones.

4 (Pages 10 to 13)



Page 14

```
 1          And did you remain at 15 through January
 2   of 2018?
 3      A.   Yes.
 4      Q.   When you first started, what was your rate
 5   of pay?
 6      A.   160K.
 7      Q.   And during the time of your tenure at
 8   level of 15, did you receive raises?
 9      A.   Yes.
10      Q.   And what was your compensation prior to
11   the time that you took over Mr. Keuch's position
12   in January of 2018?
13          MR. RAPPAPORT:  Objection to the question.
14      You can answer.
15          THE WITNESS:  I don't remember right now.
16   BY MR. EPSTEIN:
17      Q.   Prior to undertaking the new position in
18   January of 2018, did you have any specific
19   knowledge of United States or Canadian laws that
20   involved compensation for employees?
21      A.   Compensation, yes.  I had been living in
22   the U.S. since 2008, and as a compensation expert
23   of course you get a lot of news and talk to
24   people.  So yes.
25      Q.   Did you have any formal courses during
```

Page 15

```
 1   that period of time, either internal or external,
 2   involving compensation issues or compensation laws
 3   that affect employees in either the United States
 4   or Canada?
 5      A.   No.
 6      Q.   Were you involved in any laws that
 7   involved the closing of locations, whether it be
 8   administrative locations or manufacturing
 9   locations, in the U.S. or Canada?
10      A.   Prior to January 2018?
11      Q.   Yes.
12      A.   No.
13      Q.   And in terms of EEOC laws, did you have
14   any knowledge gained from coursework involving
15   what procedures were used for persons who make
16   claims against an institution either for equal pay
17   or for some form of discrimination?
18      A.   No.
19      Q.   Prior to 2018, were you required to have
20   any involvement with any vendors that supplied
21   compensation services to Teva other than your own
22   paycheck?
23      A.   They were basically the same vendors.  We
24   had to use the same vendors for LatAm and for
25   North America.
```

Page 16

```
 1          So yes, we had some relationship -- I had
 2   some relationship before with them.  But again,
 3   not, as I said, if we're talking about Canada or
 4   the U.S.
 5      Q.   What vendors did you share with Canada and
 6   the U.S. locations when you were heading up
 7   Latin America?
 8      A.   Mainly Willis Towers Watson.
 9      Q.   I'm sorry.  Say that again.
10      A.   Willis Towers Watson.
11      Q.   And what support did you receive from
12   Willis Towers Watson?
13      A.   Mainly on compensation surveys, and also
14   when we had some of the acquisitions.  With
15   Actavis and Rimsa, they were involved in some of
16   those processes.
17      Q.   Any other vendors that you had any
18   dealings with while you were taking care of Latin
19   America?
20      A.   No.
21      Q.   In Latin America are health services
22   provided to employees?
23          MR. RAPPAPORT:  Object to the form of the
24   question.
25          You can answer if you understood it.
```

Page 17

```
 1   BY MR. EPSTEIN:
 2      Q.   By Teva.
 3      A.   Yes.
 4      Q.   What type of health benefits did employees
 5   receive if they were working in Latin America?
 6      A.   Similar to the U.S.  Medical plan, medical
 7   coverage, dental, vision, well-being.
 8      Q.   How about retirement benefits?
 9      A.   Yes.
10      Q.   Again, was it the same type of benefits
11   that were provided to North American employees
12   both in the United States and Canada?
13      A.   It's similar.
14          We -- in Brazil, for instance, it's
15   similar.  We don't have, like, a private patient
16   plan for the other countries in LatAm, it's more
17   from government.
18          But in Brazil we did have a very similar
19   pension plan if you compare it to our 401(k) in
20   the U.S.
21      Q.   When you were taking care of
22   Latin America, did you have a problem regarding
23   any of the pension plans that occurred with regard
24   to employee compensation?
25      A.   No.
```



Page 18

1    Q.  In Latin America are there any government
2  services such as provided here in the
3  United States under Social Security or Medicare?
4    A.  Yes.
5    Q.  And did you have experience with those
6  facilities while you were the head of
7  Latin America?
8    A.  Yes.
9    Q.  Were you familiar with -- through any
10  coursework or any direct knowledge -- as to Social
11  Security and Medicare-type benefits regarding the
12  United States or Canada?
13    A.  No.
14    Q.  During the time that you worked under
15  Randy Keuch, can you describe for me what your
16  relationship was with Mr. Keuch?  A good one?  A
17  bad one?
18      Were there any blips in that relationship
19  that you can recall at the present time?
20    A.  No, it was a good relationship.  I don't
21  remember having any issues with Randy.
22    Q.  And during that period of time, were you
23  questioned -- was there any kind of 360 Review
24  where employees who worked for Mr. Keuch were
25  questioned regarding his capabilities that you

Page 19

1  recall?
2    A.  Not that I can recall.
3    Q.  Did you have any conversations with any of
4  the people who were working in the United States,
5  including Mr. Lawlor, regarding Randy Keuch's
6  ability or his daily work?
7    A.  Not at that time.
8    Q.  I'm talking about before January of 2018.
9    A.  Correct.  So no.
10    Q.  Were you ever questioned by anyone else at
11  Teva, including Tal Zorman or anyone else in
12  Israel or in the United States, as to your
13  assessment of Randy Keuch's abilities and
14  performance?
15    A.  No.
16    Q.  When were you first advised that there
17  would be a substantial cut in employment at Teva
18  in 2017?
19    A.  I would say all the employees were made
20  aware of a restructure coming right after
21  Kåre Schultz joined Teva.  So I would say probably
22  October, November.
23      Not necessarily impacted on the individual
24  level, but that some restructure was coming and we
25  had to reduce headcount across the globe.

Page 20

1    Q.  When you say "Kåre," you meant
2  Kåre Schultz, correct?
3    A.  That's correct.
4    Q.  That's K-å-r-e.  Schultz spelled the usual
5  way.
6    A.  Yes.
7    Q.  With regard to Mr. Schultz coming aboard,
8  what did you hear was going to be the guidance for
9  that transition of the cut in employees in terms
10  of numbers?
11    A.  A $3 billion reduction in costs overall
12  for the next two years.
13    Q.  Did you say a trillion dollars, sir?
14    A.  No, 3 billion.
15    Q.  3 billion.
16      How about headcount?  Was that a topic
17  that you heard in October, November of 2017?
18    A.  Yes.  There was a global reduction of
19  25 percent of the overall headcount.
20    Q.  When you heard these general statements,
21  did you hear as to what the guidance was in terms
22  of how that headcount would be reduced?
23    A.  No, not at that first moment.
24    Q.  Did you ever hear it said either by
25  Mr. Sabag or Kåre Schultz that the guidance would

Page 21

1  be preparation for Teva's future?
2    A.  Yes.
3    Q.  You heard that expression used, correct?
4    A.  Not necessarily in that same words, but in
5  general, yes.
6    Q.  What words do you recall being used?
7    A.  That in order for Teva to survive for the
8  future, we need to do those drastic changes and
9  restructuring.
10    Q.  When did you specifically first hear that
11  you were being considered for a new role in --
12  starting in January of 2018?
13    A.  At the end of December.
14    Q.  Do you remember a specific date?
15    A.  I would say December 21st.  I think Randy
16  sent me a note saying that Tal Zorman would like
17  to talk to me around that date, December 21st or
18  22nd.
19    Q.  And did he tell you what that was about?
20    A.  We thought that she would like to
21  understand better my experience because
22  Latin America now would be part of international
23  markets, not Americas.
24      So we thought that that would be the case,
25  to see if I would take an international markets

6 (Pages 18 to 21)



Page 26

1  Teva regarding whether or not there was going to
2  be a plan in place to determine whether the cuts
3  would comply with the laws of the United States or
4  Canada?
5     A.  No, not at that moment, actually.
6     Q.  As of December 21st, did you hear anything
7  from anybody as to whether or not there was going
8  to be a plan in place to resolve who were the best
9  people to cut or to leave in place as employees of
10 Teva?
11    A.  No.
12    Q.  During your tenure at Teva, had you
13 experienced or participated in any prior cuts
14 prior to the time that the cuts were taking place
15 in December and January of 2017 and '18?
16    A.  So we had -- in Mexico we had a large
17 layoff due to one of the acquisitions, but
18 this -- not related to the restructuring after
19 Kåre came onboard.
20    Q.  When you had that restructuring in Mexico
21 and had layoffs, was there a plan in place as to
22 how to select people to be laid off or not to be
23 laid off that was guided by their performance?
24    A.  It was managed by local HR, so this was
25 their responsibility.  There was based upon

Page 27

1  performance, but it was a huge layoff of people.
2  It was pretty much most of the people who we
3  acquired from that organization.  So -- but it was
4  mainly managed by local HR in Mexico.
5     Q.  Did you participate in that assessment of
6  individuals as to who should be laid off or not
7  laid off?
8     A.  No.
9     Q.  Did you observe it?
10    A.  No.
11    Q.  Were you aware at all as to what protocols
12 were being employed to determine who would be laid
13 off or not laid off?
14    A.  No.
15    Q.  Did you ever see any assessment sheets
16 that would determine the comparative benefits of
17 people to be laid off or to be retained?
18    A.  No.
19    Q.  But you are aware that such a plan was in
20 place to make those assessments, correct?
21    A.  Yes.
22    Q.  How long of a period was there that those
23 layoffs took place?  Was it weeks?  Years?
24 Months?
25    A.  No.  I can't remember exactly, but it was

Page 28

1  kind of a fast process similar to what we faced,
2  you know, in the U.S. during the restructuring.
3     Q.  When did you next speak with Tal Zorman
4  after the 21st of December?
5     A.  I believe it was the next day.  It was
6  December 22nd.
7     Q.  And what was your conversation on the
8  22nd?
9     A.  That was about the position, the
10 North American Total Rewards position.
11    Q.  What did she say to you?
12    A.  She basically offered the position to me.
13    Q.  Were you surprised by that?
14    A.  Not necessarily.
15    Q.  When you say "not necessarily," what do
16 you mean?
17    A.  Because I indicated to her that moving to
18 North America in terms of the work -- right? --
19 was part of my career plan.  So that's why not
20 necessarily.
21    Q.  But you also spoke to her on the 21st
22 about taking over the international part of Teva's
23 compensation, Total --
24    A.  No, that was my -- my thought and Randy's
25 thoughts when she asked to speak to me.  Not about

Page 29

1  the content of our conversation.
2     Q.  So she didn't mention that on the 21st.
3     A.  No.
4     Q.  Do you have any basis as to why that was
5  Randy's thought?
6     A.  I would say similar to mine; that we
7  believed that because LatAm would be part of
8  international markets, that she would like to
9  explore that opportunity with me.
10    Q.  During the time that you spoke to her
11 about taking over North America, did she talk to
12 you about what would happen to Randy?
13    A.  Not directly, but I understood what was
14 going to happen.
15    Q.  Well, you said "not directly," but do you
16 know whether or not there were any plans to have
17 Randy retained in another position?
18    A.  No.
19    Q.  Did you have any conversations with her
20 about whether or not Randy would be retained?
21    A.  No.
22    Q.  Did you have any conversations with her
23 about what she felt to be Randy's long-term goals
24 such as the ones that you spoke to her on the 21st
25 about about you?



Page 42

1  was a buyer at some period of time, that would be
2  it. If not, I think at some point -- you know, I
3  don't want to say anything because I don't
4  remember the rule for that one.
5      But at the end of the day, the transaction
6  happened that I sold my house.
7      It gets transferred to Teva, and then Teva
8  sells to the buyer.
9      Q.  How about the purchase price of your new
10  home?  What monetary aid did they give you to
11  purchase the new home?
12     A.  Just help with the commutation, these type
13  of things.  Everything else was -- the price of
14  the house, but it was paid by me.
15     Q.  So they didn't give you any economic help
16  in purchasing a new home that was almost double
17  the price of your old home.
18     A.  No.  I bought my previous home in Florida
19  in 2010, so I was around -- I was 29 at the time.
20  So that makes a difference as well, you know, in
21  my home purchasing power, you know, from 2010 to
22  2018.
23     Q.  Did Teva provide you with any relocation
24  expenses?
25     A.  Yes.

Page 43

1      Q.  What relocation expenses did they give you
2  to relocate to Basking Ridge?
3      A.  So the housing, temporary housing for,
4  say, up to two months.  If needed, storage.
5  Again, the moving company.  These type of regular
6  benefits, relocation benefits.
7      Q.  Do you remember how much your relocation
8  benefits were?
9      A.  No.
10     Q.  If I were to suggest to you that the
11  relocation benefits that were provided to you
12  overall were nearly a hundred thousand dollars,
13  would I be wrong?
14     A.  I would guess probably less than that.
15     Q.  How much less?
16     A.  I'm just guessing maybe 20K less.  I would
17  probably guess around 80, 80K.
18     Which, by the way, if I left before two
19  years, I would have to pay all that money back to
20  Teva.
21     Q.  The approximately $80,000 that you talked
22  about was moneys that Teva paid to you to relocate
23  you to Basking Ridge, correct?
24     A.  Not to me directly, but on -- let's say on
25  my behalf.

Page 44

1      Q.  Okay.  I understand.  I would like you to
2  look at the next pages in that pile, specifically
3  Teva 611 through 613.  612 rather.
4      Okay.  It's a document that's states "Job
5  Changes During Restructuring."
6      A.  Uh-huh.
7      Q.  Do you recall ever seeing this document in
8  2017?
9      A.  Yes.
10     Q.  And specifically if you would turn to --
11  I'll have this marked as Nasi 6 -- the second page
12  of Nasi 6.
13     A.  So that's the thing, I don't see this
14  Nasi 6 anywhere in my documents.
15     MR. RAPPAPORT:  It's not marked.
16     THE WITNESS:  Okay.
17     MR. RAPPAPORT:  We're making it for
18  purposes of a future record.
19     THE WITNESS:  Perfect.  Okay.
20     MR. RAPPAPORT:  So the only marking that
21  you have are those Bates stamps that Alan gave
22  you, which is Teva 611 and 612.
23     There is no Nasi 6 anywhere in any of the
24  documents.
25     THE WITNESS:  Okay.  Thanks for clarifying

Page 45

1  again.
2      (Exhibit Nasi 6, "Job Changes During
3  Restructuring, Total Rewards 2017," TEVA000611 and
4  TEVA000612, marked for identification.)
5  BY MR. EPSTEIN:
6      Q.  Did you ever -- did you see at that time
7  this document that is Bates stamped 612?
8      A.  Yes.
9      Q.  At the time that you had conversations
10  with Tal Zorman during the month of December and
11  prior to your actually assuming the job as the
12  head of Total Rewards for North America in January
13  of 2018, did you have any conversation with her as
14  to a change in your job level?
15     A.  So when we spoke again around the 21st,
16  22nd, she told me that we will discuss any salary
17  change or grade change; that this was not the
18  point.
19     And so, no, she never -- nobody never told
20  me that, yes, I would be promoted or my salary
21  would change.  That was not part of any
22  conversation at that point.
23     Q.  Did she talk to you about whether or not
24  it would be a conversation at some point?
25     A.  Not from her.  From me, yes, I did ask the

12  (Pages 42 to 45)



Page 46

1  question.
2      Q.  Okay.  What was her response?
3      A.  That we will not talk about that at that
4  time.
5      Q.  Okay.  Did you get the impression that
6  this was for future discussion?
7      A.  Not from her, from me.  I think being a
8  compensation Total Rewards person I would expect
9  that from my job-related, you know, experience.
10     Q.  Would you look at page 612 again.
11     A.  Uh-huh, yes.
12     Q.  And that specifically states that if there
13 are major and significant role changes, that it
14 may result in grade changes.
15         Is that why you had that expectation?
16     A.  Yes.
17     Q.  It also states that the effective date for
18 grade or job changes will be made effective
19 immediately.
20         When were you first advised that you would
21 have a change in your job level?
22     A.  I don't remember the exact date, but it
23 was around our yearend process that we call
24 Connect.  The effective date is mid to end of
25 March, and this is when in general most of the

Page 47

1  promotions happen.
2      And at the time for the restructuring we
3  were discussing some promotions to happen at that
4  time and some of them after.
5      So, no, to my knowledge at least, some --
6  some promotions happen after, you know, the
7  announcement was made.
8      For instance, in my case.  Right?  So it
9  was announced in January, but the change happened
10 only in March.
11     Q.  When you were the head of Latin America,
12 what was your title?
13     A.  Director of Total Rewards for
14 Latin America.
15     Q.  And when you took on the new position in
16 January, what was your title?
17     A.  It continued to be Director, Total
18 Rewards.  So we didn't change, you know, the
19 level.
20     Even in my -- honestly, you can see my
21 signature in some of the emails, it was really
22 Total Rewards North America.  There was no title
23 in there.
24     Q.  Just one moment.
25     A.  Sure.

Page 48

1      MR. RAPPAPORT:  Alan didn't say this at
2  the beginning, but you are entitled to a break
3  whenever you need one.  I'm not suggesting that
4  you need one now, but were you to need one, you
5  could certainly ask for one.
6      THE WITNESS:  Okay.  Thank you.  I'm good
7  so far.  Thank you.
8  BY MR. EPSTEIN:
9      Q.  I know you talked about when things were
10 effective, but when were you first told that you
11 would experience a change in salary or a change in
12 grade?
13     A.  I would say somewhere in February.
14     Q.  And what changes were made in February to
15 your salary or your grade?
16     A.  Nothing really at that time.  That would
17 happen only in March.  But ...
18     Q.  I asked what were you told, not when it
19 became effective.
20         So what were you told?
21     A.  Yeah, that's correct.  So around February
22 I think I was told that I was being promoted, but
23 any official change in grade and salary happened
24 only at the end of March.
25     Q.  Okay.  And what was the change in grade?

Page 49

1      A.  From 15 to 16.
2      Q.  And what was the change in salary?
3      A.  I don't remember.
4      Q.  Am I correct in stating that your salary
5  was raised to a level of $198,000?  Does that
6  refresh your recollection?
7      A.  Not really.  I really don't remember how
8  much it was.
9      Q.  What is your current salary, sir?
10     A.  Around 237.
11     Q.  And when was that change made?
12     A.  Every year we have the process, again the
13 year-end process.  So usually we get a salary
14 increase at those times.
15         So my last increase was back in
16 March 2022.
17     Q.  And were there increases each year in
18 March after you took the job?
19     A.  Pretty much, yes.  I would say pretty
20 much, yes.
21     Q.  Was Randy still working with you or
22 working at Teva in February when you were advised
23 as to what your new salary would be?
24     A.  I would say no.  I can't clearly recall
25 when it was the last day for Randy.  I would guess

13  (Pages 46 to 49)



Page 50

1   mid-February or something around that. So, no.
2       Q.  I'd like you to turn to a document that's
3   next in the email that I gave you, specifically a
4   document that is entitled "Global Talent
5   Management - L3 Structure."
6       A.  Okay.
7           MR. RAPPAPORT:  Is it Bates stamped 636,
8   Alan?
9           MR. EPSTEIN:  Yes.
10          MR. RAPPAPORT:  Is it more than one page?
11          MR. EPSTEIN:  Just one page.
12          MR. RAPPAPORT:  Okay.  We're going to call
13  that Nasi 7?
14          MR. EPSTEIN:  Okay.  We're going to call
15  that Nasi 7.  I didn't get there yet.
16          MR. RAPPAPORT:  Thank you, Alan.
17          THE WITNESS:  At least now I understand
18  what you guys are talking about.
19          MR. EPSTEIN:  Exhibit 7 will be attached
20  to your deposition.  So you will be able to review
21  them when you read your deposition to see if
22  there's any corrections.
23          THE WITNESS:  Perfect.  Thank you.
24
25

Page 51

1           (Exhibit Nasi 7, Global Talent Management
2   - L3 Structure, TEVA000636, marked for
3   identification.)
4   BY MR. EPSTEIN:
5       Q.  This is a structure that was in place
6   after the changes were made.  Is that correct?
7       A.  Yes.
8       Q.  So it was sometime after the first of the
9   year that this describes the structure of global
10  talent management.
11      A.  Yes.  I can't recall exactly the dates
12  that this was communicated, but yes.
13      Q.  It was sometime after the first of the
14  year, though.
15      A.  Probably, yes.
16      Q.  It came into effect.
17          With regard to the global talent
18  management, the head of that organization was
19  Tal Zorman.  And under that there were various
20  persons who were in charge of Total Rewards.
21          Do you see that?
22      A.  Yes.
23      Q.  Do you know Mr. Vitman?
24      A.  Yes.
25      Q.  And he was in charge of global

Page 52

1   compensation and equity design.
2           What does that mean?
3       A.  It means that all the compensation topics
4   from a global perspective, it was his
5   responsibility.
6           And equity is our stock management plans,
7   so these would be also under his responsibility.
8       Q.  With regard to Mr. Vitman, do you know his
9   approximate age?
10      A.  I would say similar to mine.
11      Q.  Okay.  How about Mr. Zorah?  How old was
12  he?
13      A.  I have no idea.  I want to guess that he's
14  older than me.
15      Q.  How much?  Five years?  Ten years?
16      A.  Maybe between five and ten.
17      Q.  And your age at the time that this
18  transition took place in January, how old were
19  you?
20      A.  37.
21      Q.  Was there somebody determined to be the
22  head of Total Rewards Europe after the 1st of
23  January or sometime after the first of January?
24      A.  Yes.  It took longer because in Europe
25  there's a lot of different rules for

Page 53

1   communication, replacing people, work counts,
2   et cetera.  So yes.
3           Karolina Bloch was announced, I can't
4   recall when.  But after a couple of months maybe
5   she was announced as the head of the Total Rewards
6   for Europe.
7       Q.  Okay.  And Ms. Bloch -- how old was
8   Ms. Bloch, approximately?
9       A.  I don't know her age.  I would assume
10  around mine as well.
11      Q.  The area of talent acquisition, do you
12  know Gregory Sullivan?
13      A.  He left a little bit after the
14  announcement; so not that I knew him for too long.
15      Q.  Okay.  And Michelle Durkin, do you know
16  her?
17      A.  Yes.
18      Q.  And can you give me an approximate age for
19  Ms. Durkin?
20      A.  I hope she does not get offended with my
21  guess, but I think she's probably closer to 50s.
22  And I believe Greg Sullivan would be the same as
23  well.
24      Q.  Okay.  Now, you said he left.
25          He left voluntarily?

14  (Pages 50 to 53)



1   A. Yes.
2   Q. And how about Carolyn -- is it Mave?
3   A. Carolyn Maye, Maye.
4   Q. Maye. About how old was Carolyn?
5   A. I would say more than 55.
6   Q. Okay. The next column over is L&D.
7   What does "L&D" stand for?
8   A. Learning and development or sometimes
9   leadership and development.
10  Q. Okay. And with regard to the head of
11  talent and leadership development, engagement,
12  Mr. Eshed, how old was he?
13  A. It's a female.
14  Q. A female. I'm sorry.
15  A. Yeah, that's okay.
16  Q. How old is she?
17  A. All the three names that you see there,
18  they're in Israel.
19  Q. Yes.
20  A. I would have to guess again.
21      The three of them -- Ravit, Avital, and
22  Lior -- I would they are at least -- let me go
23  Ravit and Lior -- for sure about 50. I would say
24  Avital, around 45 or something. But that's really
25  my guess.

1   Q. Okay. And the last is a Mr. Szarfman,
2   planning and process management.
3       Do you know or have any idea what his age
4   is?
5   A. It is the same person as learning. So the
6   name is the same on learning, on the L&D, and also
7   the planning and process. So she had double
8   heads.
9   Q. Got you. Again, a she.
10  A. Yes, uh-huh.
11  Q. I would like you to turn to a document
12  that's been marked as Teva 642, and it's the Total
13  Rewards description of the new organization in
14  North America after the change in 2018 -- into
15  2018.
16  A. Uh-huh.
17  Q. Never mind. Skip it.
18      MR. RAPPAPORT: We're not marking this
19  then?
20      MR. EPSTEIN: No.
21      MR. RAPPAPORT: Okay.
22      MR. EPSTEIN: I don't know why I included
23  it in the pile.
24      In the documents presented next are
25  documents that are Bates stamped 645 through 650

1   entitled "Total Rewards Separation Guidelines."
2   I would like to mark those as Nasi 8.
3       (Exhibit Nasi 8, Total Rewards Separation
4   Guidelines, TEVA000645 through TEVA000650, marked
5   for identification.)
6   BY MR. EPSTEIN:
7   Q. Prior to your taking responsibility for
8   being the head of Total Rewards North America
9   after 2018, or after January 1, 2018, had you seen
10  this document marked "Total Rewards Separation
11  Guidelines"?
12  A. Yes. This was -- this was shared with the
13  entire Total Rewards team. So even when I was
14  still with Latin America that was already shared
15  with everyone.
16  Q. Okay. Did you understand the separation
17  packages that would be offered to individuals at
18  that time, prior to January 1, 2018?
19  A. So this document is really about the
20  process from a global perspective, not really
21  indicating what it would look like in any specific
22  country. So this is really a global -- a global
23  presentation.
24  Q. I would like you to turn to what has been
25  marked as 657.

1   A. Okay.
2   Q. It talks about separation guiding
3   principles, and one of them is cost optimization
4   as a key element.
5       Do you understand what that means in the
6   context of the separation package?
7   A. So this would come from 657?
8       MR. RAPPAPORT: I don't see it.
9       THE WITNESS: It says "America's Region -
10  Key Statistics."
11      MR. EPSTEIN: No, 647.
12      THE WITNESS: Okay.
13      MR. EPSTEIN: Nasi 8 is 645-646, and then
14  the third page is 647.
15      MR. RAPPAPORT: Understood.
16      THE WITNESS: Okay.
17  BY MR. EPSTEIN:
18  Q. And there's a bold item called "Cost
19  optimization as a key element."
20      Did you understand what that was in the
21  context of?
22  A. Again, this is a global guideline. Right?
23      So I think the idea was written as the
24  first bullet to reduce costs while complying with
25  the guiding principles. So where we could find

15  (Pages 54 to 57)



Page 58

1  savings in general from a severance perspective,
2  but again still complying with any local laws and
3  regulations.
4      Q.  Did you have any input into this cost
5  optimization or, as we talked about before,
6  looking to Teva's future?  Did you have any inputs
7  into those guiding principles?
8      A.  No.
9      Q.  By the way, at the time that you became
10 the head of North America and Randy was leaving,
11 do you know the difference in your salaries?
12     A.  Yes.
13     Q.  What was Randy making before he left?
14     A.  I would say somewhere around 285K.
15     Q.  And at the time that you took over -- I
16 think I asked you this before -- do you recall
17 whether you were then raised to either 195 or
18 $198,000?  Is that about right?
19     A.  I would say again I don't remember exactly
20 how much it was, but -- I don't know.  I don't
21 think it's off, but I don't remember the exact
22 number.
23     Q.  Okay.  Something just below $200,000?
24     A.  I would guess yes.
25     Q.  Now, how many people left Total Rewards

Page 59

1  North America as a result -- and not including
2  Miriam who left later on voluntarily -- but how
3  many people involuntarily were separated from
4  Total Rewards North America?
5      A.  So our target was to lose by 50 percent.
6          And at the time, including Randy and
7  people reporting direct to him in North America,
8  there were 12.  So we ended up with six people,
9  including myself, after that.
10         And there was one person who was -- who is
11 actually Jen in Canada.  She was part of the local
12 HR headcount, and then she become -- she became
13 part of the North America TR.
14         But at the end it was a reduction pretty
15 much from -- so if we include Jen, from 13 to six.
16     Q.  Okay.  And how many people are in your
17 organization at the current time?
18     A.  Today, six.
19     Q.  I'd like you to look at a document that
20 has a Bates stamping from 654.
21     A.  Okay.
22     Q.  It's entitled "Working Together to Achieve
23 our 2017 Goals."
24     A.  Uh-huh.
25     Q.  It goes from 254 through -- let me get the

Page 60

1  end result.  Unfortunately, my clip ran out.
2      It goes from 254 through 744.
3      MR. RAPPAPORT:  You said 254, but I think
4  it's 654.
5      MR. EPSTEIN:  654.
6      MR. RAPPAPORT:  I believe it goes to 684.
7  It's 30 pages.
8      MR. EPSTEIN:  Well, it doesn't go entirely
9  to 684.  It goes -- they're select pages in there.
10 It goes from 654 sequentially through 677.
11     THE WITNESS:  Okay.
12     MR. EPSTEIN:  And then it picks up again
13 at 683 and 684.  Let's just take it through the
14 first part of that, and that is 677.
15     THE WITNESS:  Yeah, I think that these are
16 two different presentations.  The one starting at
17 683, yep.
18     MR. EPSTEIN:  It is.  So it's 677.
19     THE WITNESS:  Okay.
20     MR. RAPPAPORT:  We're on the same page.
21     MR. EPSTEIN:  We'll mark this as Nasi 9.
22     (Exhibit Nasi 9, Working Together to
23 Achieve Our 2017 Goals, TEVA000654 through
24 TEVA000677, marked for identification.)
25

Page 61

1  BY MR. EPSTEIN:
2      Q.  Did you see this document prior to the
3  change in 2018?
4      A.  Yes.  This was back in June 2017.  So
5  there was nothing to do with the restructuring,
6  Kåre, anything like that.
7      Q.  Would you please look at the page number
8  that's Bates stamped 657.
9      A.  Okay.
10     Q.  In 2017, prior to Kåre Schultz coming in
11 as the head of Teva, can you tell me approximately
12 how many people were involved in the United States
13 and Puerto Rico?
14     A.  In terms of?
15     Q.  In that document.
16     A.  If I'm reading here, we are talking about
17 22,000 employees plus dependents.
18     Q.  And that would be -- combined with
19 Canada -- approximately 25,000 people, correct?
20     A.  Yep.
21     Q.  With a billion dollars of salaried
22 payroll.
23     A.  Uh-huh.
24     Q.  Compare that to Latin America, there was a
25 total of 10,000 employees.

16  (Pages 58 to 61)



Page 62

1    A. Yes, plus dependents.
2    Q. And the total payroll -- the total payroll
3  was about $130 million in U.S. dollars.
4    A. Uh-huh.
5    MR. RAPPAPORT: You're going to have
6  answer "yes" or "no" because "uh-huh" doesn't
7  work.
8    THE WITNESS: I'm sorry. Yes.
9  BY MR. EPSTEIN:
10    Q. Moving to benefits, the United States and
11  Canada combined were about $260 million in
12  benefits that were allocated to employees for
13  those areas in 2017.
14    Correct, that's what this indicates?
15    A. Yes.
16    Q. And the total spent on benefits for
17  Latin America was in the area of $71 million
18  total.
19    A. Okay. Yes.
20    Q. Overall the U.S. and Canadian areas were
21  substantially larger both in headcount and in cost
22  than Latin America that you had headed up,
23  correct?
24    A. Correct.
25    Q. Had you in your experience in any

Page 63

1  organization ever headed up an organization as
2  large as the combined U.S. and Canada
3  organizations in Teva after 2018?
4    A. No.
5    Q. Now I would like you to turn to what is
6  marked as 659.
7    A. Okay.
8    Q. Is there anything in that document -- and
9  take a look at it and tell me if there's anything
10  in that document in terms of what it notes as
11  people who are employed by Teva in 2017, is there
12  anything inaccurate about that document?
13    A. From 2017, no.
14    Q. Nothing there that you think was
15  inaccurate, correct?
16    A. That's correct. It seems correct
17  information, yes.
18    Q. Did you have any input into this document
19  when it was prepared in 2017?
20    A. Yes.
21    Q. And would your inputs include what the
22  status was noted in these documents as being or
23  involving the Latin America countries?
24    A. That's correct, my input was for LatAm,
25  Latin America.

Page 64

1    Q. I would like you to go to page 670 of that
2  same document.
3    A. Okay.
4    Q. And that document is entitled "Total
5  Rewards Americas - The Teva TR Team in Future."
6    As far as you know, was this the plan --
7  prior to the announcement of cuts, was this the
8  plan going forward and did you have input into
9  that plan?
10    A. On the Latin America side, yes.
11    Q. And to your knowledge, was this the plan
12  going forward?
13    A. At that time in June 2017, yes.
14    Q. I would like you to turn to what has been
15  marked as Bates stamp 683 and 684.
16    A. Okay.
17    Q. Would you first take a look at this
18  document which denotes both offered and accepted
19  candidates and deselected candidates.
20    A. Okay.
21    Q. Am I correct in stating that this was in
22  the context of the cuts that were made in 2018 or
23  effective in 2018?
24    A. That's correct. This is the new, let's
25  say, HR structure for North America on 683.

Page 65

1    Q. Okay. And do you know those people that
2  are listed here: Ellen McMahon, Pam Daknis
3  Indiya Hynd and Linda Misialek?
4    A. Misialek. Yes, I know all of them.
5    Q. Okay. With regard to Ellen McMahon, how
6  old, approximately, is she?
7    A. I don't know. I would say 55 plus.
8    Q. And how about Pam Daknis?
9    A. She left the organization back in 2018
10  voluntarily. I would guess around the same age.
11    Q. Okay. McMahon stayed with the
12  organization in 2018?
13    A. That's correct. She left, I would say,
14  2019. I can't recall exactly, but she left as
15  well voluntarily.
16    Q. Okay. And Indiya Hynd, how old?
17    A. Guessing again, but I would say high 40s,
18  around 50 probably.
19    Q. And lastly, Misialek?
20    A. 55 plus.
21    Q. And is she still with the organization or
22  did she leave?
23    A. Both Indiya and Linda, they're still here
24  in the same roles.
25    Q. Okay. Let's look at those persons who

17 (Pages 62 to 65)



Page 70

1  be strong candidates for the roles that they
2  fulfilled?
3      A.  That they fulfilled?  Yes, yes.
4      Diane was very, very knowledgeable in
5  terms of benefits, so that's why she was probably
6  the most important people for me to retain at the
7  time.  And this was also a directive of Randy in
8  terms of the organization, how it would look like.
9  So, yes, Diane was a very, very strong person in
10 terms of benefits.
11     Miriam, she has, in my view at least, very
12 good knowledge in terms of compensation in general
13 for North America.
14     Q.  Would you say that they were strong
15 talents in their areas of concern?
16     A.  I would say Diane more than Miriam, but I
17 think Miriam was good.
18     Q.  With regard to -- and going back to your
19 salary and promotion, I would like you to look at
20 the next two documents.  One is a -- one is
21 labeled 768.
22     A.  Okay.
23     Q.  We had some conversation before about what
24 your salary was and what Randy's salary was.
25     Would you look at this document, read it,

Page 71

1  and then I'll ask you a couple of questions.
2      A.  Okay.
3      Q.  Does this refresh your recollection that
4  your salary at the time that you were asked to
5  take over the role and before January of 2018 was
6  168 -- almost 170 -- almost $169,000?
7      A.  Okay.  That's -- this came from Yonatan as
8  a recommendation.  Yes, that sounds accurate.
9      Q.  Okay.  And it also recites that Randy's
10 salary was what you said, 285.
11     Does that strengthen your recollection as
12 to what Randy was making at the time?
13     A.  Yes.
14     Q.  And it also has a recommendation of your
15 going to $195,000.
16     Does that reinforce your recollection as
17 to how much you were making at that time?
18     A.  Yes.
19     MR. EPSTEIN:  I would like to have this
20 marked as Nasi 11.
21     (Discussion off the record.)
22     (Exhibit Nasi 10, Offered and Accepted
23 Candidates and Deselected Candidates, TEVA000683
24 and TEVA000684, marked for identification.)
25

Page 72

1      (Exhibit Nasi 11, Email, TEVA000768,
2  marked for identification.)
3      MR. EPSTEIN:  There's a document marked
4  776 that I would like to have marked as Nasi 12.
5      (Exhibit Nasi 12, Email, TEVA000776,
6  marked for identification.)
7  BY MR. EPSTEIN:
8      Q.  And it is dated -- from Vitman to
9  Jane Hoopes, and it states that you are being
10 promoted to Grade 16, and it's dated
11 February 27, 2018.
12     Does that refresh your recollection as to
13 when it was that you were told that you would be
14 promoted?
15     A.  Yes, I had it somewhere in February; so
16 even after Randy left.
17     Q.  And at the same time you were being
18 promoted to a position of senior director of Total
19 Rewards, correct?
20     A.  Correct.
21     Q.  Now, it says in this document, in this
22 email that, "This was approved by Tal and Dan and
23 also communicated to him."  The "him" being you.
24     Do you remember when it was that it was
25 first communicated to you?

Page 73

1      A.  So, again, I can't recall exactly, but I
2  remember it to be around February, at the end of
3  February.
4      Q.  During the time in 2017 -- in 2017, in
5  addition to your actual salary did you also
6  receive a bonus during that year?
7      A.  In 2017?  So in March 2017 we paid a
8  bonus.  We didn't give a salary increase for
9  directors and above.  That was a global direction.
10     But, yes, a bonus was paid that year to
11 everybody who was eligible and had a good
12 performance.
13     Q.  I have indicated here in my notes that
14 your bonus for that year was 50,000, almost
15 $51,000.  Does that sound right to you?
16     A.  I guess, yes.
17     Q.  When was it that you sold your house and
18 relocated to Basking Ridge?
19     A.  So it was in the summer of 2018.  So I
20 would guess around June, July.
21     Q.  During that time, from January to June,
22 did you travel to Pennsylvania?  Or to the new
23 organization that was located in Basking Ridge,
24 correct?
25     A.  Yes.  It was to North Wales in

19 (Pages 70 to 73)



Page 74

1  Pennsylvania because people were still there.
2  Nobody would have relocated at that time.
3       MR. RAPPAPORT: Just for the purpose of
4  the record, it wasn't Basking Ridge, it was
5  Parsippany.
6       THE WITNESS: Parsippany, yes.
7       MR. EPSTEIN: Parsippany. Excuse me.
8  BY MR. EPSTEIN:
9    Q.  When did the relocation take place to
10  Parsippany itself?
11   A.  You mean for the other employees?
12   Q.  Yes.
13   A.  So they were in waves, in different waves
14  depending on the business units. It was between
15  February 2019 and end of 2020.
16   Q.  How about you? When did you move?
17   A.  In June, July of 2018.
18   Q.  Between January of 2018 and June and July
19  of 2018, did you make trips to Pennsylvania?
20   A.  That's correct.
21   Q.  How many trips did you make?
22   A.  I don't remember. Maybe twice a month.
23   Q.  So during those months there would be
24  approximately ten to 12 trips?
25       MR. RAPPAPORT: Object to the form of the

Page 75

1  question. It's misleading and confusing.
2  BY MR. EPSTEIN:
3    Q.  You can answer the question. I don't
4  think it was either one of those, Mr. Nasi.
5    A.  Twice a month. Maybe eight times, ten
6  times, whatever that may be.
7    Q.  And your transportation costs and your
8  overnight costs when you came to Pennsylvania to
9  take those trips, that was all paid by -- paid by
10  the company, paid by Teva, correct?
11   A.  Correct.
12   Q.  After you came into that role but sometime
13  before Miriam -- or sometime after, rather,
14  Miriam Weinstein left, did you have to solicit her
15  aid in anything that needed to be done as part of
16  Total Rewards?
17   A.  There was one meeting. There was an OFCCP
18  audit that was happening prior to my time, and
19  there was an interview with the auditor. I would
20  say probably around July of 2018.
21       Legal requested her to join us in terms of
22  help. She did. She was very nice and she did it,
23  but she didn't participate in any answer of the
24  author's, you know, questions. So I did that
25  pretty much by myself. She didn't get involved.

Page 76

1       She was just there if needed, but we
2  didn't really need her participation.
3    Q.  Okay. But she did -- you did call her in
4  to be with you during the audit.
5    A.  I didn't. It was legal's decision.
6    Q.  Legal decided that.
7    A.  Yes.
8    Q.  Did you have to accept that?
9    A.  I was okay with that. I didn't have to,
10  but I was okay.
11   Q.  After the Total Rewards organization
12  changed under you in 2018, did you engage in any
13  outsourcing for anything that Total Rewards had to
14  do, specifically to an organization Burgess?
15   A.  The organization of what? Sorry?
16   Q.  Did you hire an organization called
17  Burgess to outsource any functions that were
18  performed by Total Rewards?
19   A.  No, no Burgess.
20   Q.  Did you outsource any of the matters that
21  had been previously handled by Total Rewards --
22   A.  No.
23   Q.  -- after you came in in 2018 or 2019?
24   A.  Nope.
25   Q.  Did you have any conversations with Randy

Page 77

1  regarding whether or not he would be permitted to
2  look for another position within Teva?
3    A.  No.
4    Q.  Did you have any conversations with
5  anybody else other than Randy about whether or not
6  he would be permitted to seek other employment
7  within Teva?
8    A.  No.
9    Q.  During your tenure with Teva, were you
10  aware of any general practice in terms of people
11  being reduced in grade level?
12   A.  Yes.
13   Q.  And do you know of any rule that applies
14  to that type of reduction in terms of retaining
15  salaries?
16   A.  Yes, and it depends, again, on the
17  salaried position.
18       If the person is too high in the range for
19  the new demoted job, that could impact them and we
20  could extend an offer with a lower salary. It
21  does not mean that we would keep anyone's salary
22  if the person is being demoted.
23   Q.  Okay. And do you know whether or not
24  there was a general practice to allow people to
25  keep their salary if they were being demoted one

20  (Pages 74 to 77)



Page 78

```
1    grade?
2        A.  It's case by case.  It depends on the
3    current situation of the salary.
4        Q.  Did you have experience in the past where
5    you were employed at Teva where people were
6    demoted and retained their salary if they were
7    only demoted one grade?
8        A.  Prior to December 2018?
9        Q.  Yes.
10       A.  No, because in Latin America the laws are
11   different, so we can actually not do that.  So,
12   no.
13       Q.  What couldn't you do?
14       A.  You cannot reduce salaries or reduce the
15   grade of the employee.  It's different from
16   North America.
17           Because remember, before December 2018, I
18   was with Latin America.  Right?  So I didn't have
19   any experience in demotion in the case that you
20   are asking me.
21       Q.  Now I understand.  Thank you.
22       A.  Okay.
23           (Discussion off the record.)
24           MR. EPSTEIN:  Okay.  Why don't we take a
25   15-minute break.
```

Page 79

```
1            (A recess was taken.)
2            MR. EPSTEIN:  I'm sorry to disappoint you,
3    Mr. Nasi, but I have no further questions.
4            MR. RAPPAPORT:  That was an opportune
5    break.  I have some questions, so I won't be
6    disappointing you.
7            MR. EPSTEIN:  I assumed that you would.
8            MR. RAPPAPORT:  Thanks, Al.
9                EXAMINATION
10   BY MR. RAPPAPORT:
11       Q.  When you worked for Teva and were
12   responsible for what you call LatAm, which I guess
13   is Latin America, who was your employer at that
14   time?
15       A.  What do you mean?
16       Q.  Were you employed by Teva USA?
17       A.  Yes, Teva USA.  Everybody based in the
18   U.S. was basically Teva USA.
19       Q.  And is Teva a wholly owned subsidiary of
20   TPI?
21       A.  Yes.
22       Q.  And is it in the same business that TPI is
23   in?
24       A.  Yes.
25       Q.  And how would you describe TPI's business?
```

Page 80

```
1        A.  It's a pharmaceutical.  Right?  So in both
2    generics and speciality and also biologics.  We
3    have a large, let's say, spectrum of different TAs
4    and products across the globe.
5        Q.  Does it both manufacture and market these
6    products?
7        A.  Yes.
8        Q.  And are there different therapies that it
9    has responsibility for?
10       A.  Yes.
11       Q.  Can you identify what those therapies are,
12   as many as you can recall?
13       A.  Oncology, respiratory, CNS, neuro,
14   neuroscience, psychiatric.  So there is a range of
15   different TAs.
16       Q.  Now, Mr. Keuch was the person who was
17   primarily responsible for hiring you?
18       A.  Yes.
19       Q.  And do I understand that you had a prior
20   relationship with him?
21       A.  Yes.  Correct.
22       Q.  And where did that relationship begin?
23       A.  When I was with Mercer already in the U.S.
24   So probably around 2010, '11.  I was with Mercer,
25   and I was responsible for the compensation
```

Page 81

```
1    benefits business for Latin America.
2            And one of -- we had different groups of
3    clients -- right? -- depending on the industry.
4    Consumer goods was one of them.
5            And Randy at the time, he was the head of
6    Global Total Rewards for Heinz.
7            And we had already around, I don't know,
8    22, 25 companies, and we wanted to increase the
9    number of companies.  So Heinz was one of the
10   companies that got invited by that group.
11           And that's how we -- I met Randy.
12       Q.  And when you were working -- when you were
13   working prior to joining Teva, did someone recruit
14   you?  Did someone call you and ask you if you
15   would be interested in a Teva position?
16       A.  So the first person to reach out to me for
17   Teva, it was Martin Salas; the person that I
18   mentioned before that was the head of HR for Latin
19   America.  I also knew him from my time at Mercer.
20   So he was the first one to contact me about this
21   position.
22       Q.  So both Salas and Mr. Keuch were both
23   familiar to you as a result of your Mercer
24   employment?
25       A.  Correct.
```

21  (Pages 78 to 81)



Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA
-   -   -
RANDOLPH W. KEUCH          :
                           : CASE NO.
v                          : 2:19-CV-05488
                           :
TEVA PHARMACEUTICALS :
USA, INC., And TEVA        :
PHARMACEUTICAL
INDUSTRIES, Ltd.           :

-   -   -

WEDNESDAY, APRIL 13, 2022
-   -   -

Virtual deposition of MARK

SABAG, taken pursuant to Notice,

commencing at 8:10 a.m., on the above

date, before Benjamin Moebius, a Court

Reporter and Notary Public in and for the

Commonwealth of Pennsylvania.

-   -   -

MAGNA LEGAL SERVICES
(866) 624 6221



JOINT APPX 1164

Page 2

```
1   APPEARANCES:
2   (VIA ZOOM)
3   SPECTOR, GADON, ROSEN, VINCI, P.C.
    BY:  ALAN B. EPSTEIN, ESQUIRE
4   1635 MARKET STREET, 7TH FLOOR
    PHILADELPHIA, PENNSYLVANIA 19103
5   215-241-8888
    aepstein@lawsgr.com
6   Representing the Plaintiff
7
    STEVENS & LEE
8   BY:  LARRY J. RAPPAPORT, ESQUIRE
    BY:  BRANDON S. SHEMTOB, ESQUIRE
9   1500 MARKET STREET, 18TH FLOOR
    PHILADELPHIA, PENNSYLVANIA 19102
10  ljr@stevenslee.com
    215-575-0100
11  Representing the Defendants
12
    TEVA PHARMACEUTICALS
13  BY:  THOMAS MCDONOUGH, ESQUIRE
    1090 HORSHAM ROAD
14  NORTH WALES, PENNSYLVANIA 19454
    888-838-2872
15  In house Counsel for:
    Teva Pharmaceuticals USA, Inc.
16  and Teva Pharmaceuticals
    Industries, Ltd.
17
18
19
20
21
22
23
24
```

Page 3

```
1              - - -
2            I N D E X
3              - - -
4
5   Testimony of:  MARK SABAG      PAGE
6     BY MR. EPSTEIN............. 04
7
8
9
10
11          - - -
12        E X H I B I T S
13          - - -
14     (NONE MARKED.)
15
16
17
18
19
20
21
22
23
24
```

Page 4

```
1              - - -
2           (It is hereby stipulated and
3      agreed by and between counsel for
4      the respective parties that
5      reading, signing, sealing, filing
6      and certification are waived; and
7      that all objections, except as to
8      the form of questions, be reserved
9      until the time of trial.)
10             - - -
11        MARK SABAG, after having been
12     duly sworn, was examined and
13     testified as follows:
14        THE WITNESS:  Yes.
15             - - -
16          EXAMINATION
17             - - -
18  BY MR. EPSTEIN:
19     Q.   Mr. Sabag, am I pronouncing
20  your name correctly?
21     A.   Yes, thank you.
22     Q.   What is your date of birth?
23     A.   March 8th, 1970.
24     Q.   And where were you born?
```

Page 5

```
1     A.   Israel.
2     Q.   Where in Israel?
3     A.   Kiryat Ata.
4     Q.   And have you lived in Israel
5   as a citizen of Israel your entire life?
6     A.   No.  I was, for a short
7   period of time, in relocation in the U.S.
8     Q.   Was that as an adult as
9   opposed to a child?
10    A.   Correct.
11    Q.   Can you give me a summary of
12  your education after you finished high
13  school?
14    A.   I'm graduated in economics as
15  well as business management from the
16  University of Haifa in Israel, and I also
17  had the advanced management program of
18  Harvard Business School.
19    Q.   When did you graduate from
20  University of Haifa?
21    A.   1994.
22    Q.   When did you complete the
23  program at Harvard?  Was that an MBA?
24    A.   No, it's a program for
```

2  (Pages 2 to 5)



Page 14

1  Q.  What year was that?
2  A.  I think mostly around 2016.
3  Q.  And when you say, "some
4  exposure", what do you mean by that?
5  A.  We had -- I had, as part of
6  my regular visits to the regions and the
7  countries as the head of HR, you know, I
8  meet -- I met, sorry, the, the teams, the
9  HR teams that reports -- that report to
10  my subordinates.  So, as part of those
11  meetings, you know, I also met -- I also
12  met Randy, and I think that in this
13  period of time, you know, I had with --
14  he -- he led some of certain Total Reward
15  project that some of them were presented
16  to me in a certain forum.
17  Q.  Other than that, did you have
18  any direct supervisory role in overseeing
19  what Randy Keuch did on a daily basis?
20  A.  No.
21  Q.  Were you involved in his
22  hiring at all?
23  A.  Not that I recall.  You know,
24  obviously, I approved the -- the needs to

Page 15

1  recruit this position in the U.S. back
2  then, and I was maybe informed by his
3  managers about the progress but not --
4  not that I recall more than that.
5  Q.  And on a daily basis, did you
6  review or approve, in any way, his
7  performance reviews?
8  A.  No.
9  Q.  When are performance reviews
10  usually given at Teva?
11  A.  The process starts -- the
12  dialogue between the manager and the
13  employee starts typically in -- in
14  December.  When the actual feedback --
15  the formal process, is typically in
16  February/March.
17  Q.  Is it usual that a
18  performance review is performed mid year?
19  A.  We also have a mid-year
20  process.
21  Q.  What is that process?
22  A.  Typically, it's in the middle
23  of the year, typically in
24  September/October timeframe, which gives

Page 16

1  the employee a feedback against his or
2  her goals for this period of the year --
3  for this part of the year.
4  Q.  In any of the performance
5  reviews for Mr. Keuch, did you have any
6  direct role in those performance reviews?
7  A.  No.
8  Q.  During the time that he was
9  employed until the time that his
10  employment was terminated, did you
11  specifically review his performance
12  reviews?
13  A.  No.
14  Q.  Did you work with Randy on
15  any of the projects that he undertook as
16  head of Total Rewards for U.S. and Canada
17  in terms of saving Teva money from
18  benefits areas or compensation areas?
19  A.  I was aware to the project
20  that he's leading and maybe even attended
21  status meetings, status review meetings,
22  but I was not involved or guiding him on
23  those projects.  He had the direct
24  managers.

Page 17

1  Q.  Who was that?
2  A.  Lesley Billow and Ron Yaniv.
3  Q.  Ron Yaniv, you said?
4  A.  Correct.
5  MR. EPSTEIN:  To the
6  reporter, that's Y-A-N-I-V.  Billow
7  is B-I-L-L-O-W.
8  BY MR. EPSTEIN:
9  Q.  Now, in terms of the overall
10  decision by Mr. Schultz to cut people
11  from employment with Teva and setting
12  goals of 25 percent, what role did you
13  play in that?
14  A.  I basically, as the head of
15  HR, orchestrated this entire program.
16  Q.  When you say you orchestrated
17  it, what did you mean by that?  Did you
18  make the decision about 25 percent, or
19  did Mr. Schultz do that?
20  A.  Mr. Schultz came with the --
21  with the desire -- with the need of Teva
22  to reduce significantly the cost based
23  and the head count and the conclusion was
24  that it needs to have -- it needs to be



Page 22

```
1        Q.   In Teva before she was
2    promoted by you to have that
3    responsibility, did she ever have any
4    background in that area?
5            MR. SHEMTOB:  Objection.
6            THE WITNESS:  She had some --
7        at Teva, she didn't.  Of course,
8        she was a senior leader in our
9        organization in HR, and as a
10       leadership team, we dealt daily
11       with strategic topics including
12       areas that are not in our direct
13       responsibility, but she was not
14       managing directly this function
15       beforehand.
16   BY MR. EPSTEIN
17       Q.   At any time during the time
18   that she was employed at Teva, did she
19   spend any time in the U.S., overall,
20   looking at the area of Total Rewards,
21   including compensation and benefits?
22       A.   No.
23       Q.   Do you know Ms. Zorman's age?
24       A.   No.
```

Page 23

```
1        Q.   Do you have any idea how old
2    she is?
3        A.   I can have a range in my mind
4    but it's not relevant to me.
5        Q.   Okay.  Well, tell me the
6    range in your mind.
7        A.   Fifty.
8        Q.   Were you aware of Mr. Keuch's
9    age at any time while you were working at
10   Teva?
11       A.   No.
12       Q.   Do you have a range in your
13   mind as to how old he was?
14           MR. MCDONOUGH:  Objection.
15           THE WITNESS:  No.
16           MR. SHEMTOB:  Object.  When?
17           MR. MCDONOUGH:  I'll withdraw
18       the objection.
19   BY MR. EPSTEIN
20       Q.   At the time that he was
21   terminated in 2018, were you aware at all
22   of Mr. Keuch's age?
23       A.   No.
24       Q.   Did you have any idea after
```

Page 24

```
1    you met him as to what his age might be,
2    whether he was younger than or older than
3    60 years old?
4        A.   I don't recall even thinking
5    about it.
6        Q.   Did you ever review Mr.
7    Keuch's resume at any point during your
8    responsibilities as the senior vice
9    president at Teva?
10       A.   After Randy joined, you mean?
11       Q.   Yes.
12       A.   No.
13       Q.   How about before he joined
14   and when he was being hired, did you
15   review his resume?
16       A.   I'm sure that as part of the
17   process of hiring, you know, this, maybe
18   his background was shared with me before
19   he got an offer or something like that.
20       Q.   At some point, you made a
21   decision to place Ms. Zorman in a
22   different position at the end of 2017.
23           Do you remember what position
24   you had placed her in?
```

Page 25

```
1        A.   Yes.
2        Q.   What was that?
3        A.   Basically, I basically asked
4    her to take the responsibility of -- on
5    all the global Center of Expertise in HR,
6    which included basically -- and
7    streamlined this function based on the
8    target of 50 percent reduction, which
9    included basically Learning and
10   Development, Talent Acquisition,
11   Mobility, and Total Reward.
12       Q.   Did everybody in each of the
13   countries or regions such as Asia or
14   South America or U.S., Europe, Israel all
15   report through her for all those things?
16       A.   Correct.
17       Q.   Did you ever look at the
18   resumes of other persons within the
19   global marketplace, including Mr. Keuch,
20   when you made the decision to move Tal
21   into that position?
22       A.   No, I did not.
23       Q.   While you were employed in
24   your position as the global head of HR,
```

7 (Pages 22 to 25)



Page 34

1 moving, right.
2    Q.   How about any specific
3 discussion about Mr. Nasi and his ability
4 to carry out the job?
5    A.   It was very clear that the
6 both of them are confident with his
7 ability to do the job.
8    Q.   Mr. Lollar and Ms. Zorman?
9    A.   Correct.
10    Q.   What discussions did you have
11 with Mr. Lollar, specifically, how many
12 discussions, one, more?
13    A.   After the nomination you
14 mean?
15    Q.   After they decided who they
16 were going to have leave and who was
17 going to come into the job, how many
18 discussions did you have before that?
19    A.   I don't recall.
20    Q.   How many discussions did you
21 have afterwards in terms of your
22 approvals of those moves?
23    A.   It was one meeting.
24    Q.   Did you have any discussions

Page 35

1 with anybody at Teva about this move to
2 reduce head count by 50 percent regarding
3 whether or not it was advisable to engage
4 in a plan that included the manager's
5 assessments of each individual and their
6 abilities?
7    A.   Can you repeat?  I'm not sure
8 I understood.
9    Q.   Yes, it's often called
10 putting things into a totem of having the
11 managers evaluate each of their employees
12 and who would be retained and who would
13 not be retained based upon those
14 evaluations.
15         Was there any plan at Teva
16 when they were engaged in this reduction
17 in force to engage in that type of
18 evaluation plan?
19    A.   So let me maybe elaborate
20 about the process because the process
21 within Teva was not unique to HR or to a
22 specifical.  We needed to cut this -- in
23 2018, more than 14,000 jobs.  Part of the
24 -- around the -- around the world.  Part

Page 36

1 of them are unionized, some of them are
2 not, and it started, by the way, first
3 and foremost, actually, and then,
4 unfortunately, in the executive level.
5         So it's very hard to
6 generalize, but my direction to the
7 entire organization was that we are
8 following very basic principles.  First
9 we set for ourselves what is the future
10 structure that we need to put in place in
11 order for Teva to move forward in our
12 business.
13         So first is the structure,
14 then is to set and to define the
15 positions and then to fill those -- those
16 position with the best people available
17 within the organization in the utmost
18 fair and transparent process.  And the
19 other direction was that unfortunately
20 the other people, the remaining people
21 that needs to leave the organization, to
22 treat them in the utmost respect as
23 possible by Teva and to escort them
24 through this process in the most

Page 37

1 sensitivity possible.
2         So these are the guiding
3 principles that I laid down to the entire
4 organization and we definitely followed
5 them also in HR.
6    Q.   Did you provide to the
7 individual managers a plan of evaluation
8 that would have permitted them to
9 evaluate who would be the best person to
10 put into the new roles?
11    A.   No.  It was up to them to
12 decide.
13    Q.   By the way, had you ever
14 worked with Mr. Nasi directly at any time
15 in your tenure at Teva?
16    A.   No.
17    Q.   Did you have any discussions
18 with Tal Zorman about what the level
19 would be -- the grade level would be for
20 Mr. Nasi in his new role after he was
21 elevated to the position of being head of
22 total rewards?
23    A.   As far as I recall, and
24 that's the process, we first set the

10  (Pages 34 to 37)



Page 38

```
 1    structure and the positions, and
 2    therefore, the grades were defined before
 3    the nomination of the individual.  So I
 4    remember -- I remember approving the
 5    grade for this position, and later on,
 6    they decided that Mr. Nasi is the right
 7    person with the right capabilities to
 8    this role.
 9         Q.    What grade did you approve
10    for Mr. Nasi moving into the head of
11    Total Rewards North America?
12         A.    Grade 15.
13         Q.    Did you have any part in
14    moving him from a 15 to a 16?
15         A.    It was brought to me as part
16    of some concerns that afterwards.  By the
17    way, also regarding the other equivalent
18    roles of Total Reward in -- in the other
19    regions that maybe we scaled the role too
20    far, all those roles.
21         Q.    How long after Mr. Nasi was
22    in that position did you first have a
23    conversation about moving it to a 16?
24         A.    As I -- it's in the course of
```

Page 39

```
 1    '18.  I don't remember, exactly, the
 2    date.
 3         Q.    Early, late?
 4         A.    Sorry?
 5         Q.    Early or late in 2018?
 6         A.    I don't recall, exactly,
 7    sorry.
 8         Q.    Was it first quarter, second
 9    quarter, third quarter, fourth quarter?
10         A.    I don't recall, exactly.
11         Q.    Did you have any hand in
12    presenting to Mr. Nasi the new title of
13    Senior Head of Total Rewards for the
14    Americas?
15         A.    No.
16         Q.    Did you personally ever
17    review Mr. Nasi's CV, his file?
18         A.    Not that I recall.
19         Q.    Do you know what Mr. Nasi's
20    age is?
21         A.    No.
22         Q.    Do you know if he's more than
23    30 or less than 30?
24         A.    Thirty you said?  Sorry.
```

Page 40

```
 1         Q.    Thirty.
 2         A.    Just to make sure.
 3         Q.    Thirty.
 4         A.    I can imagine he's more than
 5    30.
 6         Q.    How about more or less than
 7    40?
 8         A.    I don't know.
 9         Q.    No idea?
10         A.    No.
11         Q.    Do you know Yonit
12    Landskroner?
13         A.    Yes.
14         Q.    Who is that?
15         A.    She was the head of Total
16    Reward, the global head of Total Reward,
17    before Ron Yaniv.
18         Q.    Did you have any discussions
19    with her when Mr. Keuch was hired?
20         A.    Not that I recall, not at
21    all.
22         Q.    And how old was Yonit
23    Kronsberger -- Landskroner, excuse me.
24         A.    Landskroner, yeah.  It's a
```

Page 41

```
 1    pure guess, but I think around 50 as
 2    well.
 3         Q.    Could she be older than that?
 4    More than 60?
 5         A.    I don't think so.
 6         Q.    Who made the decision for Ms.
 7    Landskroner to no longer be employed at
 8    Teva ?  I think we lost him.
 9         A.    You mean Yonit, right?
10         Q.    Yes, Landskroner.
11         A.    Yeah, Yonit -- Yonit, as far
12    as I remember, Yonit decided to move on.
13    She moved to -- with her family to
14    Canada.
15         Q.    In terms of revenues, what
16    portion of Teva's overall revenues were
17    represented by the employment of people
18    in Canada and the U.S.?
19         A.    Today?  Today, it's about a
20    bit more than half.  I can imagine -- can
21    estimate about 55 percent.
22         Q.    How about in 2017 and '18?
23         A.    I can estimate around 60
24    percent.
```



Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

- - -

RANDOLPH W. KEUCH       :    CIVIL ACTION
                        :
          v.            :
                        :
TEVA PHARMACEUTICALS:
USA, INC., and TEVA :
PHARMACEUTICAL      :
INDUSTRIES, Ltd.    :    NO. 2:19-cv-05488

- - -

April 4, 2022

- - -

Oral deposition of TAL
ZORMAN taken pursuant to notice, was held
via videoconference beginning at 10:50
a.m., on the above date, before JoAnn
Cheli, a Professional Court Reporter and
Notary Public in the Commonwealth of
Pennsylvania.

- - -

MAGNA LEGAL SERVICES
www.MagnaLS.com
(215) 207-9460



| | |
|---|---|
| Page 10 | Page 11 |

**Page 10**

1    A.    Statistics and math.
2    Q.    Have you had any specific
3  courses in the area of salary, HR or
4  benefits?
5    A.    Within Teva and Intel, yes.
6    Q.    Other than what you received
7  at Teva, did you get that type of
8  training in the various areas of HR or
9  some form of benefits training outside of
10  Teva?
11    A.    No.
12    Q.    How about in the area of
13  compensation?
14    A.    No.
15    Q.    Within Teva have you taken
16  any particular courses in HR management?
17    A.    Yes.
18    Q.    What type of courses have
19  you taken internally at Teva?
20    A.    HR opportunity program.
21    Q.    Was that an online program?
22    A.    Online and some face-to-face
23  and some self-study.
24    Q.    What is the source of

**Page 11**

1  self-study?
2    A.    On the web there are many
3  courses that I took to self-educate
4  myself.
5    Q.    Can you specify them at all
6  at this time?
7    A.    No.  Throughout my years
8  I've been to -- I took many online
9  programs.  I cannot specify.  I was,
10  also, in a program when I worked at Intel
11  and it was an HR program.  I took many HR
12  programs.  I don't recall exactly the
13  names of all of them.
14    Q.    How about programs in
15  benefits as it relates to United States
16  employment, have you had any training
17  internally or externally in that area?
18    A.    No, not training, not
19  official training.
20    Q.    How about unofficial
21  training?
22    A.    I learned from my
23  colleagues, yes.
24    Q.    Other than what you've

**Page 12**

1  learned internally from your colleagues
2  prior to December 2017, had you had
3  education of any type in the area of
4  benefits and compensation as it relates
5  to the United States?
6    A.    No.
7    Q.    Did you go right from your
8  BS at Baruch College to your master's
9  program?
10    A.    Yes.
11    Q.    When did you graduate from
12  Baruch College with your BS?
13    A.    I believe it was '96 -- '96
14  or '97.
15    Q.    How about your MBA?
16    A.    I graduated I believe it was
17  '98.
18    Q.    After 1998 where did you go
19  work?
20    A.    I came back to Israel and I
21  worked at Intel.
22    Q.    What was your job at Intel?
23    A.    HR.  I started as Operations
24  in HR with my first role.

**Page 13**

1    Q.    How long did you remain in
2  Operations in HR at Intel?
3    A.    About four to five years in
4  various roles.
5    Q.    What roles did you take on
6  at Intel in HR?
7    A.    I started with Recruitment
8  Ops, and then moved to Employee Services
9  of Israel.  And then took an L&D position
10  in Europe, Greater Europe.
11    Q.    What is an L&D?
12    A.    Sorry, Learning &
13  Development.
14    Q.    Where were you stationed
15  when you did that?  Were you in Israel or
16  were you in Europe?
17    A.    In Israel.
18    Q.    At L&D Europe what did you
19  do there?
20    A.    I did the Global L&D out of
21  the US, Portland, Oregon.
22    Q.    Were you stationed in
23  Portland or in Israel?
24    A.    In Portland, Oregon.

Page 26

```
1    Rewards that were based out of Israel.
2        Q.    And what were their
3    responsibilities different from Mr. Amir
4    Zirah?
5        A.    Mr. Amir was Israel. The
6    global responsibilities we had global
7    stock. Back then I think we had global
8    programs and processes, another position
9    that was global.
10       Q.    Am I correct in stating that
11   prior to any cuts Mr. Keuch was the head
12   of compensation and benefits Total
13   Rewards and under him were people who
14   took care of Latin America?
15       A.    Yes, Latin America and North
16   America, yes.
17       Q.    Now when you learned that
18   there was going to be a 50 percent cut on
19   average in all the HR functions, did
20   anybody outline to you as to any plan of
21   assessment of individual abilities that
22   were to be implemented?
23       A.    No.
24           MR. RAPPAPORT: I'm going to
```

Page 27

```
1    object to the form of the
2    question. But you can answer.
3    You've already answered. Thank
4    you.
5    BY MR. EPSTEIN:
6        Q.    Was there any plan for
7    placing the individuals in the various
8    areas on some form of lattice or toto, as
9    it's often called, where you would put in
10   place those persons that you felt were
11   most qualified down to the least
12   qualified?
13       A.    I'm not sure I understand
14   the question. Sorry.
15       Q.    Was there any plan in place
16   that evaluated the individuals by past
17   achievement, by performance, performance
18   ratings that placed them in their
19   particular areas a hierarchy of who was
20   most qualified?
21       A.    It was done differently. We
22   started from the structure and then we
23   looked at which individuals are qualified
24   for that.
```

Page 28

```
1        Q.    I'm talking more about
2    companywide. Was there an actual plan
3    that you were presented as to how to make
4    those decisions?
5        A.    I presented the structure
6    that we can afford and the individuals
7    that were qualified to lead these
8    positions.
9        Q.    Was there any companywide
10   directives coming from Mr. Sabag or
11   anyone else that specifically told you
12   how to evaluate people?
13       A.    No.
14       Q.    Did you receive any
15   memorandum or documents that made
16   suggestions to you as to how to evaluate
17   people?
18       A.    Not that I remember.
19       Q.    Did you have any discussions
20   with anyone, whether it be above or below
21   you, that such a plan of evaluations was
22   either appropriate or should be
23   considered?
24       A.    I'm not sure I understand
```

Page 29

```
1    the question. Sorry.
2        Q.    Did you have any discussions
3    with anyone as to whether or not there
4    should be a plan that provided a
5    structure for evaluation of individual
6    employees when you were doing these cuts?
7        A.    Of course, I did get
8    evaluation and consulted my relevant
9    colleagues.
10       Q.    I'm asking whether or not
11   you received any documentation that set
12   forth a plan of how to evaluate
13   individuals within the various areas?
14       A.    No.
15       Q.    When was it in 2017 that you
16   first became the head of all Global
17   Rewards?
18       A.    It was between December 2017
19   and January. I don't recall the exact
20   date. I think the official date was
21   January 18, but because some of the
22   colleagues left before it may be in
23   December. I don't remember the exact
24   date.
```



Page 30

1    Q.   I think you're
2  misunderstanding my question.  When did
3  you become the head of Talent Management?
4    A.   Oh, sorry.  The head of
5  Talent Management.  I was --
6    Q.   You said it was 2017.  Do
7  you remember what month it was that you
8  were given that position?
9    A.   December, probably December.
10   Q.   So at the time that you were
11 asked to make these cuts you had just
12 come into that position?
13   A.   Yes, it was part of the
14 restructuring.
15   Q.   Did you have any
16 relationship prior to that for heading up
17 any persons who were directly involved in
18 Total Rewards?
19   A.   What's the question?  Sorry.
20   Q.   Prior to you're now being
21 elevated to the position of Total
22 Management did you have any supervisory
23 responsibility for Total Rewards in North
24 America?

Page 31

1    A.   No.
2    Q.   Other than meeting Mr. Keuch
3  in some meetings when you were in
4  Portland, and having some e-mails go back
5  and forth between the two of you, did you
6  have any direct supervision of Mr. Keuch
7  or of Eduardo Nasi prior to --
8      MR. RAPPAPORT:  I'm going to
9    object to the form of the question
10   because the Portland reference was
11   when she was at Intel not at Teva.
12     MR. EPSTEIN:  I didn't mean
13   Portland.
14 BY MR. EPSTEIN:
15   Q.   I meant at Teva did you have
16 any direct supervisory control over
17 either Mr. Keuch or Mr. Nasi?
18   A.   Before the change?  No.
19   Q.   Before the changes were
20 made?
21   A.   No.
22   Q.   Once you were made the
23 Senior VP of Talent Management sometime
24 around December prior to the changes

Page 32

1  being made, was it then that you first
2  learned from Mr. Sabag that there would
3  be a 50 percent cut?
4    A.   I learned that there was a
5  50 percent cut, and then I was offered
6  this expanded role.
7      By the way, the SVP was
8  given to me two years before.  I didn't
9  get the SVP in late 2017.  I received it
10 years before.
11   Q.   But you didn't have any
12 direct position with regard to
13 supervising Total Rewards prior to the
14 change in position, correct?
15   A.   I didn't receive?
16   Q.   You didn't have supervisory
17 responsibility for Total Rewards before
18 there was this change in position,
19 correct?
20   A.   Correct, correct.
21   Q.   Am I correct in stating that
22 that would include North America and
23 Latin America?
24   A.   Correct, yes.

Page 33

1    Q.   Now after you got that
2  position in December -- and do you
3  remember when it was in December?
4    A.   No, I don't have the exact
5  date.
6    Q.   Prior to that time did you
7  ever have reason to evaluate the
8  performance of either Mr. Nasi or Mr.
9  Keuch?
10   A.   Prior to that, no.
11   Q.   Had you ever reviewed prior
12 to the time that you were starting to
13 implement the changes, did you have any
14 chance to review their personnel records?
15   A.   No.
16   Q.   Once you were in that
17 position to make these cuts and to
18 evaluate how to implement those cuts,
19 were you at that time in conversation
20 with Mr. Sabag that he told you how to do
21 that implementation?
22   A.   No.
23   Q.   Was the implementation of
24 those cuts and new structure entirely



9  (Pages 30 to 33)

Page 38

1  remember it said that he needs to
2  further develop his collaboration
3  with the stakeholders.
4  BY MR. EPSTEIN:
5      Q.   Was there anything else in
6  there that struck you or was highlighted?
7      MR. RAPPAPORT:  Object to
8  the form of the question.
9      THE WITNESS:  No.
10     MR. EPSTEIN:  By the way, to
11 further identify this document it
12 is a document marked as Keuch
13 000079.
14     MR. RAPPAPORT:  Are you
15 marking it as a deposition
16 exhibit?
17     MR. EPSTEIN:  It can be, if
18 that would be your preference.
19     MR. RAPPAPORT:  It's up to
20 you.
21     MR. EPSTEIN:  It's not
22 necessary.  For my purposes we've
23 identified the document by its
24 Bates stamp.

Page 39

1      MR. RAPPAPORT:  I think he's
2  asking you to identify the
3  document.
4      MR. EPSTEIN:  She already
5  did.  It was the document that she
6  received on the 20th.
7      THE WITNESS:  Yes, I already
8  said yes.
9  BY MR. EPSTEIN:
10     Q.   Did you also receive from
11 Mr. Keuch, and I'm showing you a document
12 that is marked as Keuch 000050 through
13 53.  Is this the second e-mail that you
14 received from Mr. Keuch, actually,
15 earlier on December 15th?
16     A.   Yes.
17     Q.   And by then; isn't it true
18 that you had informed Mr. Keuch
19 that there would be a reorganization of
20 Total Rewards for North America?
21     A.   Yes.
22     Q.   Is there anything else in
23 his file that you looked at that provided
24 Mr. Keuch with accolades or positive

Page 40

1  reinforcement for his performance?
2      A.   No.
3      Q.   At the time that you
4  received his CV on the 20th of December
5  had you made any decisions as to who
6  would stay and who would leave and what
7  positions would remain available?
8      MR. RAPPAPORT:  You made
9  reference to the 20th of December,
10 but this is the document that's
11 the 15th of December.  The 20th
12 was the prior document.
13     MR. EPSTEIN:  I asked
14 whether or not before she received
15 the subsequent document on the
16 20th did she receive Mr. Keuch's
17 CV?
18     MR. RAPPAPORT:  That's not
19 what you asked.  You can re-ask
20 the question or the court reporter
21 can read it back.  Because the
22 question you asked --
23     MR. EPSTEIN:  Larry, I don't
24 want to get into a debate.  I'm

Page 41

1  going to ask the court reporter to
2  mark the initial exchange or the
3  initial document that I questioned
4  her about.  That's Keuch
5  004079, the Bates stamp 79 to mark
6  that as Zorman-1.
7      MR. RAPPAPORT:  That's fine.
8  Thank you.
9      MR. EPSTEIN:  And I'll ask
10 the court reporter to mark the
11 second document that I've just put
12 up and she identified.  It starts
13 with the e-mail from Ms. Zorman to
14 Randy Keuch of December 15th.  His
15 e-mail is next under that December
16 14th, 2017.  And that is pages
17 Bates stamped 50-53.  We'll mark
18 that as Zorman-2.
19     (Zorman-1 and Zorman-2
20 marked for identification.)
21     MR. RAPPAPORT:  That's fine.
22 We're following you.
23 BY MR. EPSTEIN:
24     Q.   Now did you review the



11 (Pages 38 to 41)

Page 42

1 actual position statement for Mr. Keuch's
2 position as the Head of Compensation for
3 the United States when you were making
4 the decision as to what the job would
5 entail?
6      A.   His regional position?
7      Q.   I'm talking about that which
8 has been marked as Keuch-130 through 131.
9 It is entitled Position Head of
10 Compensation United States.  Did you
11 review that document?
12      A.   No, I don't think so.
13      Q.   And the title of that was
14 Head of Total Rewards for the Americas,
15 correct?  That's what it says on the
16 document?
17      A.   Yes.
18      Q.   Was Mr. Keuch at the time
19 that you were making the decision before
20 you made it, was he the head of Total
21 Reward for the Americas?
22      A.   Yes.
23      Q.   And did he have somebody
24 working for him who was the head of

Page 43

1 compensation for the United States, and
2 also somebody working for him who was the
3 head of Latin America?
4      A.   When he was hired?  I don't
5 know.
6      Q.   Not when he was hired.  I'm
7 talking about --
8      A.   That document is from 2014
9 so I'm not sure I understand the
10 question.  Sorry.
11      Q.   I'm asking you, using this
12 document which need not be marked as an
13 exhibit, but when using this document as
14 a guidance, whether or not Mr. Keuch at
15 the time that you were making the
16 decision in December of 2017 who would
17 leave and who would be retained, at that
18 time was he the head of Total Rewards for
19 the Americas?
20      A.   Yes.
21      Q.   Did he have reporting to him
22 somebody who was head of compensation for
23 the U.S., and somebody else who was the
24 head of compensation for Latin America?

Page 44

1      A.   I don't remember.  I think
2 U.S. was the split.  It wasn't one person
3 that reported to Randy, but I don't
4 remember.
5      Q.   Isn't it true that Mr. Keuch
6 as part of his responsibilities as the
7 head of Total Rewards for the America was
8 in charge of compensation and benefits
9 for North America at that time?
10      A.   Yes, yes.
11      Q.   And do you remember who was
12 the person who was head of Total Rewards
13 for Latin America?
14      A.   Yes, Edu Nasi.
15      Q.   Did you review this
16 document, which I'm asking the court
17 reporter to mark as Zorman-3, did you
18 review this document of Mr. Nasi's CV at
19 the time that you made your decision?
20           (Zorman-3 marked for
21 identification.)
22      A.   I think so.  I do not
23 remember, but I think so.
24      Q.   You don't think so or you do

Page 45

1 think so?
2      A.   I do think so.
3      Q.   Did you review Mr. Nasi's
4 performance reviews from the previous
5 years?
6      A.   Yes.  For this year, yes.
7      Q.   And did you review anything
8 that provided you with information that
9 Mr. Nasi had any knowledge of North
10 American benefits and compensation?
11      A.   What's the question?  I'm
12 not sure I understand.
13      Q.   This document for Mr. Nasi
14 that describes his background, did you
15 review any documentation other than this
16 document that provided you with knowledge
17 that he had any information, experience
18 or knowledge about benefits in the United
19 States?
20      A.   No, I don't think so.
21      Q.   What do you remember about
22 Mr. Nasi's performance evaluations?
23      A.   That he was a solid
24 performer.  And as part of his



12 (Pages 42 to 45)

Page 46

1  development was to gain knowledge of the
2  U.S. compensation and benefits.
3      Q.   Do you know whether or not
4  prior to the time that you provided him
5  with that role that he had any knowledge
6  of U.S. compensation and benefits?
7      A.   Benefits I know he didn't.
8  Compensation I think he had limited
9  knowledge.
10      Q.   Now other than the
11  statements made about collaboration of
12  Mr. Keuch, did you review any
13  documentation of his, whether it be
14  performance evaluation or getting any
15  information from Mr. Yaniv or Mr. Lawlor,
16  as to his knowledge of compensation and
17  benefits in the United States?
18      A.   Just the documents.
19      Q.   Just those documents. Was
20  there anything in those documents that in
21  any way suggested to you that he didn't
22  have deep knowledge in the area of
23  compensation and benefits in the United
24  States?

Page 47

1      A.   No.
2      Q.   Had you reviewed prior to
3  your making a decision as to remove Mr.
4  Keuch from employment had you reviewed
5  any documentation as to whether or not
6  Mr. Keuch previous to --
7      A.   I'm sorry, I'm sorry, there
8  is network issue.  You are breaking up.
9  Can you repeat?
10      Q.   With regard to Mr. Keuch's
11  knowledge of either compensation or
12  benefits in the United States, was there
13  anything that you read that he was
14  deficient with regard to that area?
15      A.   No.
16      Q.   And did you read at any time
17  any of the rewards that he received in
18  2015 to 2017 that he was provided with a
19  reward of a retention benefit?
20      A.   Yes.
21      Q.   You did read that?
22      A.   Yes.
23          MR. EPSTEIN:  I'm going to
24  show you what I'd like the

Page 48

1  reporter to mark.  And with regard
2  to the exhibits, please attach all
3  the exhibits as designated.
4      (Zorman-4 marked for
5  identification.)
6  BY MR. EPSTEIN:
7      Q.   Is this the base salary
8  increase and retention bonus that you
9  reviewed that was dated August 6, 2015?
10      A.   I knew about it.
11      Q.   You just knew about it
12  generally?
13      A.   Yes, we gave many retention
14  bonuses in 2016 so I was aware of it.
15      Q.   Were you aware that he
16  received a substantial increase in salary
17  from $257,000 to $280,000?
18      A.   I knew his salary, yes.
19      Q.   And were you aware that he
20  also received a $60,000 retention bonus
21  to stay aboard as long as he stayed
22  aboard for 2016 and 2016?
23      A.   Again, in general I knew
24  about the retention bonus.  I don't

Page 49

1  recall if I knew about the specifics.
2      Q.   This document which has
3  Bates stamping Keuch 28 and 29 indicates
4  that he received $30,000 in 2016 and
5  $30,000 retention bonus in 2017.  Do you
6  have any reason to believe that this
7  wasn't true?
8      A.   No.
9      Q.   When this retention bonus
10  was given out, do you know whether or not
11  Mr. Nasi received any retention bonuses
12  during that same period of time?
13      A.   No.
14      Q.   Do you know if Nasi received
15  any additional pay, an increase in his
16  pay during that particular time?
17      A.   I don't think so because it
18  was mainly for the senior leaders and
19  above so I assume not.
20      Q.   At that time that you were
21  making your decision is it true that you
22  were clear that Mr. Nasi worked directly
23  for Mr. Keuch?
24      A.   Yes.



Page 50

1    Q.    Did you talk to Mr. Keuch as
2  to Mr. Nasi's ability to control the
3  compensation and benefits package for the
4  United States?
5    A.    Yes, after I made the
6  decision, yes.
7    Q.    After you made the decision?
8    A.    The decision of the
9  structure, yes.
10    Q.    Did you talk to Mr. Keuch
11  about this?
12    A.    Yes.
13    Q.    And what did Mr. Keuch tell
14  you about Mr. Nasi's knowledge of
15  compensation and benefits in the United
16  States?
17    A.    That he has very limited
18  knowledge.
19    Q.    Now when you decided the
20  structure, what was the structure that
21  you decided on?
22    A.    That we are eliminating the
23  head of Total Rewards and we follow the
24  business changes, meaning that North

Page 51

1  America is without Latin America.  Latin
2  America moved under the Growth Market and
3  North America stayed just U.S. and Canada
4  so the cost was reduced.
5    And, also, given the
6  restructuring we had to reduce 50 percent
7  of our head count and, therefore, the
8  role was very operational and tactic, and
9  not strategic and design oriented like
10  what Randy was doing.  And, also, the
11  grade level was Grade 15.
12    Q.    Did you have any
13  conversations with Mr. Nasi about these
14  changes and what you were about to do?
15    A.    Yes.
16    Q.    When did you first talk to
17  Mr. Nasi?
18    A.    I don't have the exact date,
19  but I spoke with him after I wanted to
20  evaluate him as a potential candidate for
21  this position.
22    Q.    At that time what level was
23  Mr. Nasi?
24    A.    15.

Page 52

1    Q.    Did you discuss with Mr.
2  Nasi at that time whether or not there
3  would be availability to move him to a 16
4  level?
5    A.    No.
6    Q.    Did you talk to him at all
7  whether or not if he was to be considered
8  for this new position, what you labeled
9  as a procedural position, did you talk to
10  him at all about whether or not he would
11  have to move from Florida to the North
12  America headquarters?
13    MR. RAPPAPORT:  I'm going to
14    object to the use of the term
15    procedural position.  She never
16    used that term. But with that
17    objection noted, you can answer.
18    THE WITNESS: Yes. The
19    answer is yes.
20  BY MR. EPSTEIN:
21    Q.    Did you talk to him about
22  what compensation he would receive for
23  making that move?
24    A.    Not at that time.

Page 53

1    Q.    Was there a procedure in
2  place to compensate people to move them
3  from one location to another, a
4  relocation plan?
5    A.    There was a site
6  consolidation effort in North America,
7  Parsippany, and there were very clear
8  guidelines in terms of compensating
9  people outside of New Jersey into New
10  Jersey.
11    Q.    When did that plan take
12  place? Was that before or after the
13  consolidation?
14    A.    This is part of the site
15  consolidation initiative.
16    Q.    And when did that take
17  place, 2017, 2018?
18    A.    '18, '18.
19    Q.    Was there a plan in place
20  that would move Mr. Nasi if he took the
21  position as the head of Total Rewards for
22  North America, was there a plan in place
23  to move him from Florida up to wherever
24  it was that the headquarters would be?



Page 54

1    A.   Yes, that was the intent
2  back then.  We didn't know if the
3  headquarters would remain in Pennsylvania
4  or in New Jersey.  The decision was made
5  afterwards.
6    Q.   In either case, Mr. Nasi
7  would be required if selected for the
8  position, to move to either Pennsylvania
9  or New Jersey?
10    A.   Yes.
11    Q.   Was there a plan in place
12  other than site location that came about
13  in 2018?  Was there a plan in place, the
14  old plan, to move him from Florida to
15  Pennsylvania?
16    A.   I'm not sure I understand
17  the question.
18    Q.   Was there a relocation plan
19  in place prior to 2018?
20    A.   I'm sorry, you're breaking
21  up.
22    Q.   Was there a plan in place in
23  2017 regarding relocation?
24    A.   Can you hear me?

Page 55

1    Q.   Yes.  Did you hear me?  Can
2  you hear me now?
3    A.   Okay, yes.
4    Q.   Was there a plan in place
5  prior to 2018 for relocation of
6  employees?
7    A.   I cannot hear you.
8    MR. RAPPAPORT:  Let's go off
9  the record for a few minutes to
10  make sure we're all able to hear
11  each other, and then we can go
12  back when it's corrected.  Can we
13  go off the record, Alan?
14    MR EPSTEIN:  Sure.
15    (A recess occurred.)
16  BY MR. EPSTEIN:
17    Q.   With regard to 2017 prior to
18  the time that relocation was going to be
19  made to Parsippany, was there a
20  relocation plan in place at Teva?
21    A.   Relocation plan in place for
22  what?
23    Q.   For relocating from one part
24  of the United States to the national

Page 56

1  headquarters?
2    A.   If there was relocation
3  guidelines you mean?
4    Q.   A plan, a guideline, how
5  would people get compensated.
6    A.   I think so, yes.
7    Q.   Did you do any evaluation of
8  what it would cost to relocate Mr. Nasi
9  from Fort Lauderdale, Florida to either
10  Pennsylvania or Parsippany?
11    A.   At the time of moving him,
12  yes.
13    Q.   And what was the cost of
14  moving him from Florida to either
15  Pennsylvania or New Jersey?
16    A.   I don't remember the figure.
17    Q.   If I would suggest to you
18  that the cost might have been as much as
19  $100,000; does that refresh your
20  recollection at all?
21    A.   No.
22    Q.   Now at the time that you
23  were making your decision did you
24  consider any other persons to be a

Page 57

1  potential candidate for the position that
2  you gave to Mr. Nasi?
3    A.   Yes.
4    Q.   Who else?
5    A.   Team members from North
6  America.
7    Q.   Who?
8    A.   The head of the benefits.  I
9  forgot her name -- Diane, I think her
10  first name is.
11    Q.   Is that Diana Rohatch (ph.)?
12    A.   I think so, yes.
13    Q.   Anybody else?
14    A.   I don't remember anyone
15  else.
16    Q.   Did you consider Miriam
17  Weinstein?
18    A.   She was the head of -- maybe
19  I considered a few members in the North
20  America.  I think one or two, but I don't
21  recall exactly.
22    Mr. EPSTEIN:  I'm going to
23  show you a document that I'd like
24  to have marked as Zorman-5.



1  on page what has been marked as Bates
2  stamped 40 that he had a BS in industrial
3  organizational psychology and an MS
4  degree in applied psychology?  Did you
5  know?
6      A.   Yes.
7      Q.   And you were aware that his
8  earliest employments on a professional
9  basis was, at least, as documented on
10 this page at least 1988, and there have
11 been compensation positions that he had
12 prior to that at four different companies
13 before 1999, correct?
14     A.   Yes.
15     Q.   Had you reviewed or had you
16 seen any of the Answers to
17 Interrogatories that were submitted by
18 Mr. Keuch in connection with this
19 litigation?
20     A.   If I saw what?  I'm sorry.
21     Q.   Did you see any of the
22 answers Mr. Keuch gave in his Answers to
23 Interrogatories, questions posed to him
24 in this litigation by the attorneys for

1  Teva?
2      A.   I'm not sure I received a
3  document.  I'm not sure that I had
4  Randy's answers.
5      Q.   Did you receive any
6  information from any source directly or
7  indirectly wherein Mr. Keuch answered
8  interrogatory number 51 that any cost
9  analysis of moving of Mr. Nasi from
10 Florida to the headquarters would run
11 about $100,000?
12     A.   I don't recall.  Randy
13 didn't make this offer.  I did.  So I
14 don't know how he calculated it, but we
15 had done that after Randy left.
16     Q.   Do you have any reason that
17 that statement isn't true?
18     A.   I'm sorry?
19     Q.   As you sit here today do you
20 have any knowledge about how that
21 calculation was made?
22     A.   No, I would have to look.  I
23 don't recall exactly the cost of it.
24     Q.   As you're sitting here

1  today, do you have any reason to believe
2  that that wasn't, in fact, an appropriate
3  cost analysis of what it would cost to
4  move Mr. Nasi from Florida to the
5  headquarters?
6          MR. RAPPAPORT:  Object.  You
7  can answer.
8          THE WITNESS:  I'm not sure.
9  BY MR. EPSTEIN:
10     Q.   Are you sure, or is it true
11 that there would be a cost to move Mr.
12 Nasi from Florida to the headquarters if
13 he were to be provided that new position?
14     A.   Yes.
15     Q.   Do you have any
16 documentation, or are you aware of any
17 documentation of your discussions with
18 Mr. Lawlor or Mr. Yaniv as to their
19 suggestions to you of Mr. Nasi's ability
20 to assume the role?
21     A.   If I have documented?
22     Q.   Yes, do you have notes?  Do
23 you have anything at all to demonstrate
24 that?

1      A.   No, not as far as I recall,
2  no.
3      Q.   And, again, did either one
4  of those gentlemen provide you with
5  information beyond what you already
6  testified to about Mr. Keuch and his
7  ability to enter relationships with his
8  people?  Was there anything else that
9  they told you?
10     A.   No, not as far as I
11 remember.
12     Q.   Did you have any written
13 document, or are you aware of any written
14 documentation regarding the proposals
15 made by Mr. Keuch of how the organization
16 should be reorganized?
17     A.   Yes.
18     Q.   Other than the e-mail that
19 went from him to you on the 14th and your
20 response that you would review it on the
21 15th, are you aware of any other
22 documentation as to your response to his
23 suggestions?
24     A.   No.

Page 66

1    Q.  Ms. Zorman, did you at the
2 time that you were making these
3 decisions, did you go to sources outside
4 of Teva, sources like LinkedIn or any
5 other internet sources to determine
6 whether Mr. Nasi or Mr. Keuch was the
7 better qualified candidate?
8    A.  I don't remember.
9    Q.  Have you since that time
10 reviewed any outside sources, such as
11 LinkedIn as to Mr. Nasi's current
12 position?
13    A.  I'm not sure I follow the
14 question.
15    Q.  Have you reviewed since the
16 time that you put Mr. Nasi into the
17 position of the head of Total Rewards for
18 North America, have you reviewed any
19 outside sources such as LinkedIn?
20    A.  In general?
21    Q.  Yes.
22    A.  Yes.
23    Q.  What sources have reviewed
24 regarding Mr. Nasi?

Page 67

1    A.  In general you said, not Mr.
2 Nasi. I'm sorry, I don't understand the
3 question.
4    Q.  Did you review any
5 documentation of Mr. Nasi on LinkedIn
6 since the time that he was given the
7 position?
8    A.  I do not think so.
9    Q.  Shortly after you placed him
10 in that position did you upgrade the
11 position to a Level 16?
12    A.  Yes.
13    Q.  When did you do that?
14    A.  I believe it was March 2018.
15    Q.  And did Mr. Nasi receive
16 additional compensation for the raise in
17 his level?
18    A.  I think, yes, he received a
19 promotion.
20    Q.  Do you remember what his
21 compensation was raised to in 2018 when
22 you gave him that promotion?
23    A.  I think it was 190
24 something.

Page 68

1    Q.  And at that time when he was
2 put in that position did he receive an
3 elevation in title?
4    A.  Yes.
5    Q.  What was his title when he
6 received that promotion in March of 2018?
7    A.  Senior director.
8    Q.  And that's the same title
9 that was held my Mr. Keuch before the
10 reorganization, correct?
11    A.  Yes, but a different grade
12 level. He was 16. Randy was 17. There
13 is a difference in terms of benefits and
14 equity.
15    Q.  With regard to the
16 difference in the benefits and equity
17 between those two positions, did you ever
18 have any conversations with Mr. Keuch
19 about whether or not he'd be willing to
20 accept a lower level position to a lower
21 level position, a Level 16 from his Level
22 17 position?
23    A.  Not explicitly, no.
24    Q.  When you say not explicitly,

Page 69

1 what do you mean by that?
2    A.  When I started the
3 conversation with Randy, it was obvious
4 that he is too senior for that role, too
5 strategic, too experienced. And he was
6 offering to come to Israel to help, but
7 it wasn't needed. The challenge was that
8 he was over qualified, not under
9 qualified.
10    Q.  Did you ever discuss with
11 him, it's a yes or no answer, whether
12 he'd be being willing to take the lower
13 level position?
14    A.  I don't think so.
15    Q.  At that time when you
16 elevated Mr. Nasi, was there an ability
17 for people to move down one level to
18 accept a lower level position?
19    A.  It was possible, but not
20 very common.
21    Q.  But there was a policy that
22 allowed it, correct?
23    A.  Yes.
24    Q.  You said you received



18 (Pages 66 to 69)

Page 78

1  January?
2      A.   When he started to report to
3  me, I think it was mid-January.
4      Q.   And what were those e-mails
5  about?
6      A.   The changes, the execution.
7  Are we staying in Pennsylvania, are we
8  moving to New Jersey.  The site
9  consolidation introduced many changes and
10 challenges in terms of who is staying and
11 who can move to New Jersey.
12     Q.   Did those e-mails in any way
13 address the issue of any promises made to
14 move his position from a 15 to a 16, to
15 your recollection?
16     A.   What's the question?
17     Q.   Did the e-mails that you're
18 referring to, did they address in any way
19 the promise to move him from a 15 to a
20 16?
21     A.   It wasn't a promise.  We
22 decided to move him.  From when I made
23 the offer to him, it was obvious that he
24 was Grade 15.  But it became obvious to

Page 79

1  us in March that the grade level had to
2  be 16 due to the complexity of mainly the
3  site consolidation.  So it wasn't a
4  promise in the beginning.
5          THE WITNESS:  Is there any
6  way we can take a one-minute bio
7  break?
8          MR. EPSTEIN:  Sure, why
9  don't we make a five-minute break.
10 It is now 12:35.  We'll come back
11 at 12:40.
12         (A recess occurred.)
13         MR. EPSTEIN:  I have no
14 other questions of the witness?
15         MR. RAPPAPORT:  I just have
16 a couple.
17         -  -  -
18         EXAMINATION
19         -  -  -
20 BY MR. RAPPAPORT:
21     Q.   Ms. Zorman, when you were
22 making the decisions with regard to the
23 structure that you created, did you
24 consider the cost of relocation as part

Page 80

1  of that decision making process?
2      A.   Yes.
3      Q.   And why did you consider the
4  cost of relocation?
5      A.   Because it was obvious that
6  the head of North America Total Rewards
7  will have to be based in North America.
8      Q.   Now the plan or structure
9  that you developed, did it result in the
10 elimination of the senior director level
11 position?
12     A.   Yes.
13     Q.   Was that just true of North
14 America, or was that true elsewhere?
15     A.   It was true also in Europe.
16     Q.   And had there been an
17 incumbent senior director in Europe who
18 was responsible for Total Rewards?
19     A.   Yes.
20     Q.   And was his position
21 eliminated?
22     A.   Yes.
23     Q.   And who would then be
24 responsibile by job title for Total

Page 81

1  Rewards in Europe?
2      A.   Director for Europe.
3      Q.   Was that the same decision
4  making, or was it different decision
5  making in eliminating the senior
6  directors in both North America and in
7  Europe?
8      A.   Similar.
9      Q.   What made you think in
10 December of 2017 that you could eliminate
11 the senior director positions and still
12 operate with just a director at the Total
13 Rewards level?
14     A.   The challenge that we had,
15 and we knew that we had to cut 50 percent
16 and just execute what is needed.  So
17 the business running without any strategy
18 or special new program designs.  So the
19 scope was very operational.  Just to keep
20 the business running we had no choice
21 back then.
22     Q.   Well, if the scope was to
23 become more operational, how does that
24 factor into eliminating senior director



Page 82

1  level positions and operating with just
2  directors both in North America and in
3  Europe?
4      A.    The scope was smaller in
5  terms of number of direct reports. And,
6  also, more execution and operational,
7  rather than strategy and design.
8      Q.    Did you think that you could
9  operate that way both in North America
10  and in Europe with just directors?
11      A.    Yes.
12      Q.    Who would be responsible for
13  the strategy and design piece, if there
14  was one?
15      A.    I would.
16      Q.    And what occurred in North
17  America and Europe that made you decide
18  that you wanted to advance Mr. Nasi from
19  a director in labor Grade 15 to senior
20  director of labor Grade 16?
21      A.    The complexity of the
22  restructuring at Teva created a huge
23  challenge from comp and ben, especially
24  North America with the site

Page 83

1  consolidation.
2      Q.    Can you explain how site
3  consolidation created more work or more
4  direction or more responsibilities at
5  Total Rewards position?
6      A.    Sure.  We had to come up
7  with a plan, first of all, to evaluate
8  what's the right location if it's
9  Parsippany for the headquarters in North
10  America, if it's Parsippany or
11  Pennsylvania.
12          And then once the decision
13  was made, to understand the implications
14  of all our people that have to move into
15  the headquarters to New Jersey in terms
16  of comp.  And if they're moving, from
17  which location what we need to compensate
18  them with.  So there was a lot of work.
19          And, also, the restructuring
20  in terms of letting go of a quarter of
21  our workforce created a lot of work to
22  the comp and ben team.  But the site
23  consolidation was the main factor that
24  was changed in March in the U.S.

Page 84

1      Q.    Who made the decision to
2  adjust the position from a director to a
3  senior director position?
4      A.    I made the recommendation
5  and Mark approved it.
6      Q.    Are those the only two
7  people that would be involved in that
8  decision making method?
9      A.    And Dan Lawlor, the HR
10  responsible for North America.
11      Q.    Was a similar adjustment
12  made in Europe where you took the
13  incumbent at the director level and made
14  that a senior director position as well?
15      A.    We had done it in Europe a
16  little bit after North America.  I
17  believe it was August that we changed the
18  position into a director.
19      Q.    From a director to what?
20  You said to a director.  Did you mean
21  from a director?
22      A.    From a director, from 15 to
23  16.
24      Q.    And was it for the same

Page 85

1  reasons?
2      A.    It was, yes, due to the
3  complexity of the restructuring.
4      Q.    Mr. Epstein asked you at
5  some point whether or not you gave any
6  consideration moving Mr. Keuch from a
7  senior director labor Grade 17 into the
8  director position.  Do you recall that
9  question?
10      A.    Yes.
11      Q.    Why wasn't in your mind Mr.
12  Keuch suitable for the director of Total
13  Rewards at the labor Grade 15 level?
14      A.    Because of his vast
15  experience and also ambition to become
16  even a VP at Teva, and to expand his
17  role.  And we knew that we needed
18  someone, you know, much more operational.
19          And, also, from my
20  experience demoting someone two grade
21  levels is not a good decision for the
22  individual and for the organization.
23      Q.    Why is that --
24      A.    Since --



Page 90

1   wouldn't be given as parts of releases to
2   individuals?
3        A.   What's the question?
4        Q.   Did you have any
5   conversations with anyone as to why such
6   information would not be given to the
7   individuals when they were presented with
8   releases to sign?
9        A.   No.
10       Q.   Did you review Mr. Keuch's
11  release?
12       A.   I don't recall.  I don't
13  remember.
14       Q.   Do you remember whether or
15  not there was anything attached to that?
16       A.   No.
17       Q.   Whether there was anything
18  attached to his proffered release
19  statement and separation agreement,
20  whether there was anything attached to
21  that that would demonstrate what the
22  various ages were in Total Rewards or
23  across the board as to who was retained
24  or who was not retained?

Page 91

1        A.   No.
2        Q.   You mentioned something
3   about ambition.  That Mr. Keuch had
4   ambition to rise even higher in the
5   organization.  Was that a consideration
6   when you made the decision to eliminate
7   him?
8        A.   No.
9        Q.   Well, you mentioned it as
10  was one of your considerations.  You're
11  saying now that it wasn't a
12  consideration?
13       A.   I mentioned that the fact
14  that he was two grades above the
15  position, that this is why I made the
16  decision.  I, also, mentioned why I
17  didn't think it's a good idea to offer
18  him that because of his over
19  qualification and his further ambition to
20  even get a higher level position at Teva.
21       Q.   Would there be anything that
22  would preclude him from getting a higher
23  position if he had stayed based upon this
24  reorganization?

Page 92

1        A.   I don't understand the
2   question.
3        Q.   You said because of his
4   ambition and he wanted to move onto a
5   higher position, was there anything that
6   would prevent him from moving to a higher
7   position if he were Grade 16, for
8   example?
9        A.   It's a theoretical question.
10  I cannot answer it.  I'm not sure I
11  understand it.  I'm sorry.
12       Q.   Was there any written
13  prohibition in the hierarchy of Teva that
14  would disallow him to move to a higher
15  position, like a VP if he were only a 16?
16       A.   No.  We eliminated VP
17  positions and senior VP positions.  So
18  I'm not sure I understand the relevance.
19  But, yes, the answer is no.
20       Q.   You're a senior VP, right?
21       A.   Right.
22       Q.   Are you the only senior VP?
23       A.   Where?
24       Q.   At Teva.

Page 93

1        A.   No.
2        Q.   Are you the only VP at Teva?
3   Are there other VPs at Teva?
4        A.   Yes.
5        Q.   And were they people who
6   came aboard before or after 2018?  Were
7   there VP positions at Teva that were not
8   eliminated in this changeover, December
9   to January of 2018?
10       A.   Yes.
11       Q.   And were there positions of
12  VP after that?
13       A.   Yes.
14       Q.   Were there senior VPs before
15  the reorganization?
16       A.   Yes.
17       Q.   Were there senior VPs after
18  that?
19       A.   Yes.
20       Q.   You said that lowering
21  somebody's position in terms of grade
22  level doesn't work well.  What experience
23  have you had in that regard?
24       A.   At Intel I had to lead a



Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

```
RANDOLPH W. KEUCH        :
                         : CASE NO.
v                        : 2:19-CV-05488
                         :
TEVA PHARMACEUTICALS      :
USA, INC., And TEVA      :
PHARMACEUTICAL            :
INDUSTRIES, Ltd.         :
```

—  —  —

FRIDAY, APRIL 15, 2022

—  —  —

        Virtual deposition of

DANIEL LAWLER, taken pursuant to Notice,

commencing at 10:02 a.m., on the above

date, before Benjamin Moebius, a Court

Reporter and Notary Public in and for the

Commonwealth of Pennsylvania.

—  —  —

MAGNA LEGAL SERVICES
(866) 624 6221



Page 6

```
1        Q.   And how about from your
2   master's and Drexel?  When did that
3   complete?
4        A.   I did that part time and it
5   was in the spring of '92.
6        Q.   Following your graduation
7   from La Salle, what did you do?
8        A.   I went to work for the Hay
9   Group, a consulting firm that was
10  headquartered in Philadelphia at that
11  time.
12       Q.   And how long did -- what was
13  your position with the Hay Group when you
14  were first employed?
15       A.   I was an analyst working on
16  retirement and pension plan
17  administration and I then moved into an
18  HR generalist position supporting the Hay
19  Group employees themselves.  I was there
20  from '89 -- '86 to '89.
21       Q.   Where did you go work then?
22       A.   I went to ICI Americas in
23  1989 -- December of '89.
24       Q.   What is ICI Americas?
```

Page 7

```
1        A.   It stands for Imperial
2   Chemical Industries.  It's a large -- it
3   was a large conglomerate that was
4   headquartered in London and their U.S.
5   headquarters was in Wilmington, Delaware.
6        Q.   And how long did you remain
7   with ICI?
8        A.   I was with ICI for ten years
9   and over the course of that time, the
10  company changed to Zeneca Pharmaceuticals
11  then AstraZeneca Pharmaceuticals.
12       Q.   What was your position at
13  ICI?
14       A.   I had various positions.  I
15  started again in benefits administration
16  when I first joined.  I then moved into
17  compensation and compensation analyst,
18  compensation planning.  From there, I
19  moved back into generalist roles and
20  eventually into an HR manager role prior
21  to leaving AstraZeneca.
22       Q.   What was your official title
23  at AstraZeneca when you were in the
24  management role?
```

Page 8

```
1        A.   I believe I reached the
2   associate director level at AstraZeneca,
3   associate director.
4        Q.   And when did you leave -- and
5   when did you leave there?
6        A.   I left there in October of
7   '99.
8        Q.   Where did you go?
9        A.   I went to Purdue Pharma.
10       Q.   And what position did you
11  hold at Purdue?
12       A.   I was -- I had several
13  positions there, but I started as a
14  director of HR for their research
15  development biologics division
16  headquartered in Princeton, New Jersey.
17       Q.   Then what?
18       A.   Then I moved to a senior
19  director role maintaining responsibility
20  that I had in my previous job but also
21  responsible for operations,
22  manufacturing, quality, those different
23  groups.
24       Q.   Okay.  And how long did you
```

Page 9

```
1   remain at Purdue?
2        A.   I remained at Purdue until
3   October of 2005.
4        Q.   Where did you go then?
5        A.   From there, I went to
6   Cephalon, a biopharmaceutical company
7   headquartered in Frazer, Pennsylvania.
8        Q.   How do you spell Cephalon?
9        A.   C-E-P-H-A-L-O-N.
10       Q.   And what did you do at
11  Cephalon?
12       A.   I started there as a senior
13  director supporting their manufacturing
14  operations division senior HR director.
15       Q.   Okay.  And how long did you
16  remain at Cephalon?
17       A.   I remained at Cephalon until
18  Teva acquired Cephalon in October of
19  2011.
20       Q.   Okay.  And what was your last
21  position at Cephalon?
22       A.   I was senior director for
23  organizational development, learning, HR
24  operations and services.
```



Page 10

1       Q.    After you left there in 2011,
2   where did you go?
3       A.    So Teva acquired us and I was
4   briefly assigned by Teva to their
5   generics commercial division as the lead
6   HR business partner.
7       Q.    Which division -- which
8   division was that?
9       A.    It was their U.S. generics
10  division, commercial.
11      Q.    Okay.
12      A.    That assignment lasted three
13  months.  However, there was a lot of flux
14  in the organization due to the
15  acquisition and I was then moved back to
16  Frazer to be the vice president of HR for
17  the North America commercial division of
18  specialty pharmaceuticals for Teva.
19      Q.    And when did -- when did that
20  take place?  When did you become the
21  senior VP?
22      A.    VP, just VP at that point --
23      Q.    Okay.
24      A.    -- and it was in, I'd say,

Page 11

1   March of 2012.
2       Q.    And how long did you remain a
3   VP in that division?
4       A.    I remained a VP for about two
5   years in that division.
6       Q.    And then what?
7       A.    That division was expanded
8   from being U.S. to being global and my
9   role was then expanded to be the global
10  head of HR for the global specialty
11  medicines division of Teva.
12      Q.    How long did you remain as
13  the global HR head in specialty?
14      A.    That was again for about two
15  years and it was during that time that I
16  was promoted to an SVP.
17      Q.    Okay.  After your promotion
18  to SVP of that division, where did you go
19  in Teva?
20      A.    Teva created a similar
21  division for its generics organization, a
22  global generics medicines commercial
23  division and I was moved to be the HR
24  lead business partner for their global

Page 12

1   generics medicines division.
2       Q.    How long did you remain as
3   the HR head of global generics?
4       A.    I remained the head until
5   December of 2017.
6       Q.    That was December of 2017?
7       A.    That's right.
8       Q.    Where did you move to then?
9       A.    I moved to the role that I'm
10  currently in today which is the head of
11  the North America region for HR and the
12  HR business partner for generics and
13  specialty commercial North America.
14      Q.    When did you first meet with
15  Randy Keuch?
16      A.    I first met with Randy, I
17  guess, shortly after he was hired.  I was
18  in my VP of U.S. specialty HR role so
19  back in the 2013/2014 timeframe.  I'm not
20  exactly sure when -- when Randy started,
21  but it would have been during that time
22  period.
23      Q.    And what interaction did you
24  have with Mr. Keuch when you first met

Page 13

1   him?  Were you part of the hiring team?
2   Did you interview him?
3       A.    No, I did not have any
4   involvement in his interview or his
5   hiring at the time.
6       Q.    In what context did you meet
7   with him or have any interaction with him
8   after he was hired?
9       A.    Yeah, the first that I can
10  remember was a project that we were
11  working on for the president of the U.S.
12  specialties division which had to do with
13  benchmarking our field sales organization
14  and their compensation.
15      Q.    What do you mean by
16  benchmarking?
17      A.    Looking at our base pay,
18  bonus pay and equity that we were
19  providing to our sales organization and
20  gauging how competitive that was against
21  other companies in our industry.
22      Q.    And what was his position
23  when you first met him?
24      A.    He was the head of Total



Page 14

1    Rewards for -- for Teva North America as
2    from what I remember or Teva Americas
3    maybe. I'm not exactly sure, but he was
4    definitely the head of Total Rewards.
5        Q.   Who else did you meet with at
6    the time that you worked on this project
7    with him?
8        A.   Well, there was a direct
9    report of mine -- his name is Darren
10   Teeter -- who was very involved in this
11   project and on Randy's team, I think it
12   was a woman named Rose Riccioli -- I'm
13   not sure if I'm pronouncing her name the
14   right way -- who was involved in
15   that -- in that project as well.
16       Q.   And how long did that
17   interaction take place that you were
18   working out with him this benchmarking?
19       A.   Yeah, I would say we -- we
20   started it, because it was during our
21   connect cycle, so we probably started it
22   in January of maybe 2014 and it ran
23   through about April of that year.
24       Q.   Okay. And how much

Page 15

1    interaction did you have with him? Was
2    it daily, was it weekly?
3        A.   Actually, Darren and Rose
4    worked more together and I think, for me
5    and Randy, we had some check ins maybe
6    every other week until -- until it got
7    close to sort of the deadline where we
8    were due to present to the -- to the
9    president of the specialty division.
10       Q.   And after that project was
11   completed in April of 2004, what further
12   interaction did you have with Mr. Keuch?
13       A.   Yeah, I think it was 2014.
14       Q.   '14 rather. I'm sorry.
15       A.   Yeah, that's okay. Honestly,
16   not much. My role, when I became the
17   global head of global specialty medicines
18   and then global generic medicines, I was
19   not involved in as much of the day to day
20   Total Rewards compensation. It would've
21   been more when we have very senior leaders
22   at the -- what we call the L2 level that
23   had a compensation matter or issue that I
24   would've had to kind of connect with

Page 16

1    Randy on -- on -- on those type of more
2    executive comp matters than normal day to
3    day.
4        Q.   And how long did that non-day
5    to day or infrequent interaction take
6    place?
7        A.   Yeah, that pretty much was
8    the -- was the norm for -- for me until
9    September of 2017.
10       Q.   What happened then?
11       A.   There -- there was a peer of
12   mine, her name was Lesley Billow, who
13   left the organization. Lesley was in
14   charge of all of sort of the North
15   America HR activity day to day whereas I
16   was in a global role and I didn't have
17   that involvement and I was asked to sort
18   of hold the reins for -- for her after
19   she departed in -- in 2018 and that's
20   when I began to interact more with Randy
21   again.
22       Q.   Was that September of 2018 or
23   '17?
24       A.   '17. I'm sorry.

Page 17

1        MR. RAPPAPORT: You said '18.
2    It was '17.
3        THE WITNESS: Yeah, yeah.
4    September of 2017.
5    BY MR. EPSTEIN:
6        Q.   And how much interaction did
7    you have with Randy after September of
8    2017?
9        A.   Early on, not very much. I
10   would say, you know, he didn't report to
11   me. He reported to global. It was more
12   sort of like a matrix reporting and not
13   too much early on. It wasn't until, I
14   would say, the November timeframe of 2017
15   when he and I had to begin to work
16   together on some very urgent critical
17   projects related to separation severance,
18   those types of things.
19       Q.   Was it that November period
20   that it was announced that there would be
21   a RIF at Teva across the board and across
22   country lines?
23       A.   When -- when An -- when Randy
24   and I first began working together, the



Page 18

1  RIF had not been announced. I think that
2  was announced in December of 2017, but we
3  were asked to begin working on separation
4  benefits in November of that year.
5      Q. Why was that?
6      A. We don -- we didn't know
7  really at the time, but it was sort of
8  understood that the company was facing
9  serious, serious financial troubles and
10 we were asked to evaluate how we could
11 benchmark the now -- the separation plan
12 we had in place and see if there were
13 ways to reduce the cost of our separation
14 benefits.
15     Q. With regard to that time
16 period, that November time period, how
17 much interaction did you have with Randy
18 himself in November and -- throughout the
19 month of November?
20     A. Yeah, I would say it was much
21 more regular, at least twice a week
22 probably we were working on these
23 projects together.
24     Q. Prior to your working on

Page 19

1  those projects together in November of
2  2017, did you ever have the opportunity
3  of reviewing Randy's credentials, his
4  background, his CV?
5      A. No, never did.
6      Q. You said that you were more
7  of a matrix manager.
8          What does that mean in the
9  context of Teva?
10     A. Yeah, that means I was not
11 responsible for Randy's goals,
12 performance review, performance rating,
13 compensation for Randy, none of those
14 decisions. As a matrix manager, it was
15 more I was geographically closer to him
16 than his manager based in Israel so I had
17 some -- more line of sight and also being
18 responsible for the region, I was sort of
19 a customer, to some degree, of Randy's
20 for the work that the -- the global Total
21 Rewards organization was doing.
22     Q. And who was his manager in
23 Israel at that time in November of 2017?
24     A. Ron Yaniv would've been his

Page 20

1  manager at that time.
2      Q. Did you ever have any
3  discussions with Ron Yaniv regarding
4  Randy's performance?
5      A. Yes, yes, I did have
6  discussions with Ron regarding that.
7      Q. When?
8      A. I would say back to even my
9  prior role when I was in global and we
10 were getting support in North America
11 for -- for different projects. Ron would
12 reach out to his peers -- I was a peer of
13 Ron's on the global HR team for any
14 feedback or input on -- on Randy as well
15 as his other direct reports that Ron had
16 in Europe and other places.
17     Q. What did he have to say about
18 Randy at that time?
19     A. Yeah, my feedback on Randy
20 was pretty consistent for the years that
21 he worked at Teva. I thought Randy was
22 good with big ideas, sort of, you know,
23 innovative approaches to compensation or
24 benefits. However, on the fundamentals,

Page 21

1  I thought he wasn't as strong and he
2  lacked knowledge of our industry in
3  pharmaceuticals which sometimes led to
4  not providing the right solutions for
5  what -- for what we needed.
6      Q. Can you be more specific
7  about that?
8      A. Yeah, sure. So, you know,
9  this benchmarking project, I guess, was
10 my first interaction with Randy in that
11 regard and when Randy came to us kind of
12 with the analysis, unfortunately, it was
13 not on the mark at all. It didn't
14 understand the nuances of our sales
15 organization, sort of the history of our
16 compensation within the sales
17 organization and the differences between
18 bonus and equity and base salary. He
19 came with more of a just sort of a
20 vanilla boilerplate approach to that
21 analysis which didn't really meet our
22 needs at the time and it required --
23     Q. Did you ever -- did you ever
24 have a writing about your criticisms of



Page 22

1  his work on that project?
2      A.   I don't think it was ever --
3  I never was asked to write anything
4  regarding Randy's performance, but I did
5  share it with his management, Ron Yaniv.
6  It might not even have been Ron at that
7  time. It might've been Yonit who -- who
8  was Ron's predecessor.
9      Q.   Did the project itself close?
10     A.   Yes, the project did close
11 and you know, we eventually were able to
12 kind of move on, but it did require a lot
13 more intervention on my part, the part of
14 the gentleman who worked for me, Darren
15 Teeter, in order to make the necessary
16 changes and corrections to -- to get it
17 right.
18     Q.   Have you ever seen any
19 documentation as to those corrections to
20 make it right?
21     A.   Well, Randy was involved. We
22 did involve him and he understood at the
23 time what needed to change, so he was
24 involved in -- in definitely making those

Page 23

1  corrections.
2      Q.   So, it was an interactive
3  process, correct?
4      A.   Yes, yes, mhm.
5      Q.   Other than that project, was
6  there any other time that you perceived
7  that Randy lacked an ability as to his
8  knowledge and his ability to guide the
9  areas of compensation or benefits?
10     A.   Well, if I then fast forward
11 to the severance separation project,
12 it -- it was again another example where
13 Randy had some good big ideas in
14 particular about linking our separation
15 and severance to unemployment which is
16 something we had not done before. A few
17 companies had begun to do it. So, he
18 brought that idea forward, but as we got
19 into more of the implementation and the
20 execution of it, I found that his -- his
21 judgment was not -- was not accurate in
22 some of the design elements of that plan.
23     Q.   Am I correct in saying that
24 there was a disagreement as to who would

Page 24

1  be eligible with regard to the deduction
2  of unemployment compensation benefits?
3      A.   There was, I recall, more of
4  a discussion at the date around who would
5  be eligible and how we would be able to
6  ensure that everyone got their full
7  severance. My -- my concern with Randy's
8  judgment, as we got into the process, was
9  Randy was leaning on ideas around some
10 people having to forfeit their severance
11 as part of this new arrangement which was
12 something that I didn't think was aligned
13 to Teva's values and our treating of
14 people being separated by the company
15 respectfully.
16     Q.   Well, explain to me what you
17 mean by Randy's idea was to have people
18 forfeit severance?
19     A.   Sure. So, there was maybe
20 two types of scenarios that came up
21 during -- during this time. One would be
22 if when we separated someone from the
23 company, that individual made a voluntary
24 choice that they were going to leave the

Page 25

1  workforce for a while. That could be
2  maybe a stay-at-home mom or a stay-at-
3  home dad deciding that they weren't going
4  to work for a while. It could also be
5  individuals who decided that they were
6  going to retire or retire early.
7      In sort of the initial
8  discussions with Randy, you know, this
9  connection to unemployment would require
10 these individuals to have to go to
11 unemployment, apply for unemployment in
12 order to get their severance from us and
13 I felt we were putting them in a
14 precarious situation if they really
15 weren't truly intentioned to continue to
16 work to force them to go through an
17 unemployment process.
18     His -- his view was, well
19 then they don't get severance basically
20 unless they're willing to go through the
21 unemployment. And I pushed back to say
22 we need some sort of a workaround because
23 we shouldn't force people to go through
24 what would -- what felt for me like a



Page 26

1  non-complaint process of going to
2  unemployment pretending they were looking
3  for a job, collecting unemployment when
4  they really had no intention of doing
5  that.
6          That would be one scenario.
7  The other one was, of course, once people
8  were on unemployment, we would know if
9  they got a new job, right? We would
10 never know that in the past if people
11 left the company, but once we were
12 connecting it to unemployment, if they
13 stopped unemployment, Randy's initial
14 approach was then, well, then we stop
15 paying them severance too, and I said no,
16 they're entitled to their full amount of
17 severance. It's actually good if they
18 get a job. We don't want to
19 disincentivize them from working hard to
20 get a job because then we'll take away,
21 you know, money from them that, by our
22 policy, they were entitled to.
23         So, we had to -- we had to
24 work through a couple of those

Page 27

1  differences and perspective and judgment
2  on -- on the process of the severance.
3      Q.   Randy and others who were
4  working on these projects have stated
5  that your -- your direction was if you
6  were older than 62 years old that the
7  unemployment that you would receive would
8  be exempt from any deduction.
9          Is that correct?
10     A.   Well, Randy came to me with
11 all of these questions around the process
12 and the plan design and one of them had
13 to do with if we were going to create a
14 workaround -- it ended up being called
15 the excess plan, I guess. If we were
16 going to create a workaround, the vendor
17 needed to know because it was a qualified
18 plan now, right? The vendor needed very
19 strict rules about when would someone be
20 eligible for the excess plan, when would
21 they not?
22         So, I remember being in a
23 meeting with Randy and Shannon Phillips
24 was her name who was like our -- our PMO

Page 28

1  call it, project management office, for
2  all of this restructuring and the three
3  of us had a discussion around well, what
4  would be the -- the appropriate age and
5  the general consensus among the three of
6  us was 62 because rarely did people at
7  Teva work to 65 for retirement. We had
8  many people and the sort of general
9  consensus was 62 would be the -- the
10 retirement age.
11     Q.   Well, that didn't answer my
12 question. I understood from Mr. Keuch's
13 testimony that you specifically pushed
14 and it actually became part of the
15 severance protocols that if you were 62
16 years old that it was not anticipated
17 that you would need unemployment because
18 it was retirement age and that actually
19 became part of the protocols that
20 somebody who is 62 years old did not have
21 to apply for unemployment compensation.
22         Is that correct?
23     A.   It is correct that they did
24 not have to, but my understanding was if

Page 29

1  they wanted to, they could. This was
2  more on the other side of not forcing
3  them to if they didn't want to.
4      Q.   I understand, but is it true
5  that you put into place, at your request
6  that this was put in place, that if you
7  were 62 years old the amount you received
8  from unemployment wasn't deducted from
9  your severance?
10     A.   It was a general consensus.
11 Randy was part of that decision.
12     Q.   Sir, I'm just asking whether
13 or not that was put into place.
14     A.   It was put into place, but
15 you're asking if I put it into --
16         MR. RAPPAPORT: Alan --
17         Alan -- Alan, please let the
18         Witness answer your question before
19         you admonish him let alone ask
20         another question. He was midway
21         through his answer and you cut him
22         off.
23         MR. EPSTEIN: Okay, Larry --
24         Larry, I appreciate your



Page 30

1  admonishment, but -- but this is my
2  deposition and it's a situation --
3        MR. RAPPAPORT: It is but
4  there are certain rules of civility
5  that go with a deposition and I
6  would like for you to allow Mr.
7  Lawler to complete his answer.
8        MR. EPSTEIN: I have each
9  time, but if he pauses, I have a
10  right to intercede.
11 BY MR. EPSTEIN:
12       Q.   Mr. Lawler, again, I'm going
13 to ask you the same question.
14       Did it become part of the
15 protocols in this provision regarding
16 unemployment that if you were 62 years
17 old you didn't have a deduction from
18 your -- from your severance benefit?
19       A.   Yes.
20       Q.   And is it true that if you
21 were younger than 62 years old that you
22 would have a deduction made from your
23 severance benefit?
24       A.   No.

Page 31

1        Q.   Was there anybody who was
2  under 62 who, if they got unemployment,
3  wasn't required to deduct?
4        A.   Yes.
5        Q.   And explain that please.
6        A.   It goes to my earlier example
7  of people who would attest to the fact
8  that they were leaving the workforce and
9  they would complete an attestation to
10 that effect and they would not have to go
11 through the sub plan, they would go
12 through the excess plan.
13       Q.   But people who were 62 years
14 old were presumptively leaving the
15 workforce?
16       A.   Again, my understanding was
17 if someone wanted to, over 62, go through
18 unemployment, they could still do that,
19 but they were not required to.
20       Q.   You were attributed, sir, by
21 Mr. Keuch and others that I've spoken to
22 that I do not want to have employees over
23 the age of 62 to suffer the humiliation
24 and embarrassment of filing for

Page 32

1  unemployment. They should simply retire
2  as they probably would not find another
3  job.
4        Is that statement true or not
5  true?
6        A.   I don't recall saying that.
7  It's not something that sounds like I
8  would say that, no.
9        Q.   You don't recall making this
10 statement?
11       A.   I don't recall making that
12 statement, no.
13       Q.   In November of -- I'm sorry,
14 December of 2017, did you have any direct
15 interactions with Tal Zorman regarding
16 Randy Keuch?
17       A.   Yes.
18       Q.   Had you worked with Tal
19 Zorman prior to that time?
20       A.   Yes.
21       Q.   Did you have any discussions
22 prior to December of 2017 with Tal Zorman
23 about Randy Keuch?
24       A.   No.

Page 33

1        Q.   Did you have discussions with
2  Tal Zorman after 2000 -- December 2017,
3  during that time period, about Randy
4  Keuch and his abilities?
5        A.   Yes.
6        Q.   And what conversations did
7  you have with her?
8        A.   Tal was asked to restructure
9  the COEs which included Total Rewards and
10 she was looking for my input on some of
11 her thinking around how she would
12 restructure the COEs.
13       Q.   I asked you whether or not
14 you had those interactions, how -- did
15 you actually speak with her on the
16 telephone?
17       A.   Yes.
18       Q.   And how often did you speak
19 with her on the telephone specifically
20 regarding Randy Keuch?
21       A.   I would say no more than two
22 times.
23       Q.   And how long did those
24 discussions take place? I mean, were



Page 34

1   they long discussions of hours or
2   minutes, how long?
3       A.   Well, she was discussing more
4   than just Randy.  She was discussing all
5   of her areas.  So, I would say --
6       Q.   I'm talking about --
7       A.   I'm trying to explain to you.
8   So, maybe Randy was five, ten minutes of
9   that time, but it wasn't just Randy when
10  I was speaking with Tal.  It was more.
11      Q.   I understand, but
12  specifically dealing with Randy Keuch and
13  his abilities, you said about five to ten
14  minutes?
15      A.   Yeah, probably ten minutes
16  each call.
17      Q.   Did you also have discussions
18  about Eduardo Nasi?
19      A.   Yes.
20      Q.   And what interactions had you
21  had with Eduardo Nasi prior to December
22  of 2017?
23      A.   Few interactions when I was
24  in my global role and had responsibility

Page 35

1   for areas of Latin America where he was
2   the -- the head of Total Rewards.
3       Q.   When?
4       A.   Sporadically, probably
5   through the 2014/2017 period.
6       Q.   Did you ever have any
7   discussions with Eduardo Nasi as to his
8   knowledge of United States compensation
9   and -- and compensation and benefits
10  laws?
11      A.   Yes.
12      Q.   What conversations would you
13  have with somebody who is involved with
14  South America about North American laws?
15      A.   Well, I had those
16  conversations after he began working for
17  us in North America, but not before.
18      Q.   Did you have any
19  conversations with Tal Zorman regarding,
20  specifically, Nasi -- Eduardo Nasi's
21  abilities?
22      A.   Yes.
23      Q.   When?
24      A.   In that 2017 period initially

Page 36

1   and then through some check ins with Tal
2   over the course of, you know, the latter
3   months.
4       Q.   That was after January of
5   2022?
6       A.   After January of 2018.
7       Q.   '18 rather, I'm sorry.
8       A.   Yeah, mhm.
9       Q.   But before that, in December,
10  how many conversations did you have with
11  her about Eduardo Nasi?
12      A.   Probably two as well,
13  similarly --
14      Q.   How long -- how long did you
15  speak with her about Mr. Nasi's
16  qualifications?
17      A.   Probably, you know, 10 to 15
18  minutes each time.
19      Q.   During those conversations,
20  what did she say to you about Mr. Keuch?
21      A.   From recollection, she was
22  trying to look at what were the needs of
23  the job and whether Randy would be the
24  best fit for the job going forward.

Page 37

1       Q.   I didn't ask you about that.
2           What did she say about her
3   knowledge of Mr. Keuch's abilities?
4       A.   Nothing.
5       Q.   And she spoke to you in the
6   context of the needs of the job going
7   forward, correct?
8       A.   That's right.
9       Q.   At the time that you spoke to
10  Tal, did she ever suggest to you that she
11  knew the respective backgrounds of either
12  Mr. Keuch or Mr. Nasi?
13      A.   Yes.  She was doing her
14  homework so she generally had begun to,
15  you know, ask about each of them and was
16  sort of collecting feedback and input.
17  So, she had some knowledge, yep.
18      Q.   Did she indicate to you that
19  she actually had done her homework with
20  regard to reviewing the comparative
21  backgrounds of these individuals through
22  their resumes?
23      A.   By the second call she had
24  with me when she was finalizing her



Page 38

1  design, yes.
2      Q.   Was there any discussion
3  regarding Mr. Nasi or Mr. Keuch as to
4  long-range envisioning of where they
5  would be placed within the organization?
6      A.   Yes.
7      Q.   What discussions did you have
8  in that regard?
9      A.   Again, it was based on what
10  were the needs of the head of Total
11  Rewards for North America over what was
12  going to be a long restructuring period
13  for the company.
14      Q.   By the way, at any time, had
15  Randy Keuch, who -- was there any
16  conversation with you or in your presence
17  or did you hear that Randy had any
18  intention of retiring?
19      A.   No.
20      Q.   Did you ever hear anybody
21  discuss whether Randy had suggested that
22  he might be retiring in the near future
23  after he reached the age of 65?
24      A.   No.

Page 39

1      Q.   Were you personally aware of
2  the backgrounds of each -- of Mr. Nasi
3  and Mr. Keuch in terms of having reviewed
4  their respective resumes or -- or knowing
5  their background in some way?
6      A.   Only what I knew from working
7  with them, not from resume review, no.
8      Q.   Were there any discussions
9  with Tal about anybody else in the Total
10  Rewards area that was employed there
11  regarding their abilities?
12      A.   Not that I recall, no.  It
13  was mainly Randy and Edu.
14      Q.   Were there any interactions
15  in writing, whether it be email or letter
16  or memo that you're aware of, that
17  reflected on the relative capabilities of
18  Randy or Edu Nasi?
19      A.   No, not that I recall.
20      Q.   Now, other than these
21  discussions with Ms. Zorman, did you have
22  any other interaction with her or anyone
23  else at Teva regarding who should
24  continue in the role that Randy had prior

Page 40

1  to the RIF?
2      A.   No.  I think it was really
3  Tal.  She was the only one.
4      Q.   Did you have any
5  conversations with Mr. Sabag about Randy
6  or Eduardo Nasi or their respective
7  qualifications?
8      A.   No, I don't recall discussing
9  it with Mark.
10      Q.   Did you have any meetings --
11  in -- in terms of -- of -- of
12  restructuring, did you have any meetings
13  with Miriam Weinstein or Pam Dacras (ph)?
14      A.   Not with Miriam, yes with
15  Pam.
16      Q.   What meetings did you have
17  with Pam Dacras regarding the
18  reorganization and RIF?
19      A.   Yes, Pam was part of the
20  project team -- the HR project team
21  managing the RIF and she was also
22  responsible for a certain segment of our
23  business units.  So, specifically, on
24  those business units, I would have

Page 41

1  conversations with her.
2      Q.   Going back to your
3  conversations with Tal, what part of
4  December did you have those
5  conversations?
6      A.   I would have to say it was
7  early December.  By early December, we,
8  you know, we knew we were going to be
9  doing a RIF and we were putting the
10  project team together.  So -- and I was
11  also responsible for restructuring my
12  team and Pam was part of that
13  restructuring of my team.
14      Q.   The early December
15  conversations you had with Tal about her
16  restructure and Mr. Nasi and -- and --
17  and Mr. Keuch, with regard to those, had
18  she expressed to you, at some time, that
19  she had made a decision that Mr. Nasi
20  would remain and Mr. Keuch would be
21  terminated?
22      A.   Yes, except I don't know if
23  she made that decision in December or
24  maybe it came in early January.



Page 42

```
1        Q.   Well, I'm asking you did you
2   have any conversation with her about that
3   decision?
4        A.   Oh, I'm sorry, I thought we
5   already covered that.  The other two
6   conversations is where that took place.
7        Q.   I understand, but I'm asking
8   whether or not, when she had made her
9   decision, when was that?
10            You said it was either
11  December or early January?
12       A.   That would be my guess, yes.
13  I don't know for sure when she made her
14  decision.
15       Q.   Did you have any
16  conversations with her about her
17  conversations with Randy or with Eduardo
18  Nasi?
19       A.   Yes, I would say I did, after
20  she informed them.
21       Q.   You know when that was?
22       A.   That would most likely have
23  been January, but I don't recall exactly.
24       Q.   Did you have any --
```

Page 43

```
1        MR. RAPPAPORT:  January of
2   2018.
3        THE WITNESS:  January of
4   2018, yeah.
5   BY MR. EPSTEIN:
6        Q.   Did you have any
7   conversations with Mr. Sabag about what
8   was expected in the context of the
9   protocols for this RIF?
10       A.   Yes, yes.
11       Q.   And during those
12  conversations, did you have a discussion
13  with him as to the overall view or his
14  overall view of what was important in
15  terms of planning for these RIFs?
16       A.   Yes.
17       Q.   And did he ever express to
18  you, in -- in the context of this, that
19  the -- excuse me for just one moment,
20  going to get this note -- that an
21  important factor in dealing with these
22  things, the first important factor was
23  the -- the structure that was needed to
24  move forward at Teva.
```

Page 44

```
1            Did he express that to you?
2        A.   Yes, mhm.
3        Q.   And he was talking about Teva
4   restructuring for the future, correct?
5        A.   Yes.
6        Q.   Now, during your
7   conversations with Tal Zorman in January
8   of 2018, did you discuss with her at what
9   level Eduardo Nasi would be employed?
10       A.   Yes, I think so.
11       Q.   And when did you have that
12  discussion?
13       A.   The same timeframe,
14  January -- early January.
15       Q.   And what did she tell you as
16  to what her reflection was as to what Mr.
17  Nasi's level would be after early
18  January?
19       A.   Yes, she was planning at the
20  director level is what she informed me.
21       Q.   And how about grade level?
22       A.   That would have been grade
23  level 15.
24       Q.   Did you have any
```

Page 45

```
1   conversations with an upgrade of his
2   grade level to 16 as the matter moved
3   forward?
4        A.   Yes.
5        Q.   What conversations did you
6   have with her at that time in early
7   January about moving him to the next
8   level of a grade level 16?
9        A.   None at that time.
10       Q.   Well, when did you speak with
11  her about that?
12       A.   That came probably more
13  towards the March timeframe.
14       Q.   And what did she tell you as
15  to why she wanted to move him to a grade
16  level 16?
17       A.   The -- the work involved had
18  become much more voluminous, a lot more
19  work due to some other aspects of
20  restructuring that had not been
21  anticipated.
22       Q.   Like what?
23       A.   A major decision to
24  consolidate all of our office sites into
```



Page 46

1   Parsippany.
2       Q.   Okay.  Other than moving him
3   from Florida to Parsippany, what else did
4   you discuss that would have increased Mr.
5   Nasi's importance to Teva to have him
6   raised to level 16?
7       A.   Yeah, the decision to have
8   a -- a site consolidation to Parsippany
9   put a lot of extra work on the Total
10  Rewards department and that was partly
11  the extra challenge, the extra work, the
12  extra stress involved was what led to
13  that decision.
14      Q.   But it was just extra work
15  that moved him to the next level, not
16  anything else?
17      A.   Extra work in combination
18  with the challenging circumstances around
19  that was mainly the basis.
20      Q.   How long was this move to
21  Parsippany to take place?  Was it going
22  to be years?
23      A.   It -- it -- at the time, we
24  were only in the early phases of

Page 47

1   designing and understanding what was
2   involved, but we knew we immediately had
3   a huge retention concern.  Above and
4   beyond the people that we had already
5   separated, this was people that we had
6   intended to stay with the organization
7   that we would see a huge retention
8   concern with those people voluntarily
9   leaving and that created a big need on
10  Total Rewards to work with us on
11  retention programming.
12      Q.   Other than that retention
13  programming, was -- was there any other
14  aspect of the job that required him to be
15  moved up a grade as early as March?
16      A.   I -- I think, as the
17  organization settled and we looked at
18  where everything landed after the very
19  fast restructuring, there was a view
20  within probably the HR peer comparators
21  that that role would -- would have been
22  better leveled at a senior director 16.
23      Q.   Do you know when that took
24  place?

Page 48

1       A.   I think it was in that March
2   timeframe of 2018.
3       Q.   By the way, at the time that
4   this RIF was taking place, prior to that
5   December period in 2017, how many
6   employees -- how many people were
7   employed by Teva in North America, all of
8   its divisions?
9       A.   Okay, so before the RIF, I
10  would say we had roughly between 12,000
11  and 13,000 employees.
12      Q.   And how about after the RIF?
13      A.   Somewhere in the 8,000 to
14  9,000 range.
15      Q.   Is the United States the
16  largest employer -- is the largest
17  segment of Teva in terms of employment?
18      A.   Today, yes, the U.S. has the
19  most employees.
20      Q.   At the time in 2017 -- in
21  December of 2017, before the RIF, how
22  many employ -- people were employed at
23  Teva outside of the United States and
24  Canada?

Page 49

1       A.   I would say 45,000 to 50,000.
2       Q.   Total?
3       A.   Total outside of North
4   America.
5       Q.   Okay.  How about today?
6       A.   Today, outside of North
7   America, probably around 32,000 to 33,000
8   would be my guess.  I don't know exactly.
9       Q.   And that would be Asia, South
10  America and Europe and Israel?
11      A.   Yes, we're in all regions of
12  the world pretty much other than North
13  America, yeah.
14      Q.   Is there any other segment,
15  Europe or Israel or South America or
16  Asia, that had as many employees as those
17  in the United States at that time in
18  Nov -- in December of 2016 -- '17?
19      A.   I don't know for certain, but
20  Israel was always very close to the U.S.
21  It could have been that Israel had more
22  at that time than we did in the U.S., at
23  a country level, yes.
24      Q.   How about Canada?  Did you

**MAGNA**
LEGAL SERVICES

Page 50

1  combine -- did you combine the numbers
2  that you gave me, 12,000 to 13,000 and
3  then 8,000 to 9,000 -- does that include
4  Canada?
5      A.   Yes, mhm.
6      Q.   At the time of this RIF
7  planning in December of 2000 -- November
8  and December of 2017, did you ever have a
9  meeting with Randy or his people where
10  the subject of evaluations being the
11  driving force in deciding who would stay
12  and who would leave, whether it be
13  looking at all evaluations or -- or doing
14  new evaluations in writing, did that
15  subject ever come up in any of the
16  conversations?
17      A.   What do you mean by
18  evaluations?
19      Q.   Well, very often in the HR
20  context, it's called toteming -- who
21  would be the best person to be put into a
22  particular position and very often, that
23  is done in a structured way of having the
24  individual managers do that evaluation

Page 51

1  and then having that reviewed by a second
2  level in the HR department.
3          Was that ever discussed or
4  that concept ever discussed in context of
5  the RIF in Teva?
6      A.   Yes, yeah, we -- we could
7  call that the org design phase of the
8  process, but yes, we did discuss that.
9      Q.   And -- and you called it the
10  ord?
11      A.   Organization design.
12      Q.   Okay, org.
13      A.   Org, yeah.  Org design or
14  organization design.
15      Q.   Did you have any specific
16  discussions about whether or not the org
17  design would -- a specific org design
18  would be instituted to help give
19  individual managers direction?
20      A.   Are you referring to just
21  with HR or to the whole business in -- in
22  this question?
23      Q.   I'm talking about the whole
24  business.

Page 52

1      A.   Yes, yes, HR had a
2  responsibility for assisting with org
3  design.
4      Q.   And what organizational
5  design did you put into place in order to
6  facilitate managers to be able to do
7  that, what I call toteming or levels
8  of -- of -- of those people that would be
9  retained and those people who would be
10  asked to leave?
11      A.   Sure.  Well, the org design
12  phase was done without focusing on the
13  people.  It was more on the jobs and the
14  work that needed to be done and then
15  after that was complete, we would look at
16  the people and who would be best matched
17  to that org design.
18      Q.   We took the deposition of Mr.
19  Sabag and it's -- he said in the org
20  design area that it was his intention to
21  plan an organizational design that would
22  look to Teva's future.
23          Is that what you're talking
24  about in terms of organizational design?

Page 53

1      A.   Yes, yes.
2      Q.   And then, with regard to
3  that, was there, as part of this process,
4  a new written definition of the various
5  jobs in each of the areas of Teva that
6  would be necessary to carry out that org
7  design looking to the future?
8      A.   I would say we were moving at
9  such a fast pace we didn't have written
10  everything designs.  We -- we did have
11  what I would call more structural
12  designs, but not full-fledged job
13  descriptions at that point in time, but
14  we had a good idea of what each job was
15  and what would be required.
16      Q.   That was never put into
17  writing, was it?
18      A.   Well, job descriptions
19  eventually were done, but not at that
20  point -- at that exact point in time in
21  2017 to early 2018.
22      Q.   Am I correct in stating that
23  job descriptions of what would be needed
24  for the future weren't written prior to



Page 58

1  the people over the age of 40 to 40
2  percent being over the age of 40.
3          Do you have any knowledge of
4  that?
5          MR. RAPPAPORT:  Before you
6  answer, I'm going to object.  That
7  has never come up during any of the
8  depositions.  It's a false premise.
9  I -- you know, to the extent that
10 you have any evidence to suggest
11 that there has been such an
12 analysis -- you've not demonstrated
13 that at all -- the Witness can
14 answer the question, but it's --
15 I -- I object to it.
16         THE WITNESS:  No, I don't.
17         MR. EPSTEIN:  I -- I -- I
18 don't agree -- I don't agree that
19 it was a false analysis.  It did
20 come up in the depositions and
21 specifically and certainly in Mr.
22 Keuch's deposition that was
23 suggested, but that's something
24 that Mr. Keuch -- if it did not

Page 59

1  come up, that means you didn't ask
2  it because he knows that and -- and
3  if it is a false premise, I'm sure
4  you'll be able to demonstrate that.
5  BY MR. EPSTEIN:
6      Q.   Mr. Lawler, do you have any
7  knowledge as to whether or not the
8  average age of persons over and under the
9  age of 40 went from 55 percent to 40
10 percent after the RIF?
11     A.   No, I -- I had no knowledge
12 of that.
13     Q.   Why was it that no overall
14 analysis was done prior to the actual
15 formation of the RIF as to the impact on
16 the company overall?  Was there a reason
17 for that?
18     A.   Again, it was my
19 understanding an analysis was done so
20 I -- I really can't answer that question
21 because I don't know if you're saying
22 that an analysis wasn't done, that was
23 not my understanding.
24     Q.   And you have no knowledge of

Page 60

1  what that analysis showed as to age
2  impact?
3      A.   That's correct.  It was my
4  understanding we had done the analyses
5  and we were -- we were in compliance.
6          MR. RAPPAPORT:  I need to use
7  the men's room.  It is possible for
8  you to tell me when an appropriate
9  time for a break would be?
10         MR. EPSTEIN:  Men's room
11 breaks are appropriate when a
12 person says I need to use the
13 restroom.  So, let's take a ten-
14 minute break.
15         MR. RAPPAPORT:  All right.
16             - - -
17         (Whereupon, a brief recess
18 was taken.)
19             - - -
20 BY MR. EPSTEIN:
21     Q.   Mr. Lawler, did you have any
22 conversations regarding whether or not
23 Rose Riccioli should be made a
24 permanent -- permanent from the

Page 61

1  standpoint of not a contractor, but an
2  employee -- a direct employee of Teva?
3      A.   Yes.
4      Q.   It was stated that your
5  response to that was that Rose was not
6  long term and that's why you didn't want
7  to move her from contractor to employee
8  as recommended by -- by the HR people.
9          Is that true or not true?
10         MR. RAPPAPORT:  I'm going to
11 object to the form of the question.
12 I think it misrepresents and states
13 what has been testified to.  With
14 that being said, you can answer.
15         THE WITNESS:  Yeah, the --
16 the -- the context for long term
17 was -- was someone able to grow
18 their capabilities and do more than
19 the job that we were hiring them
20 into in terms of their
21 capabilities.
22 BY MR. EPSTEIN:
23     Q.   But you did make the
24 statement about not being long term?



Page 62

1    A.   Yes, based on feedback I had
2  received from others in HR on Rose's
3  performance as a contractor and lack of
4  confidence that she could really do more
5  or go above and beyond what was
6  considered average performance at the
7  time.
8    Q.   Did you express what you
9  meant by long term during that
10  conversation or did you just make the
11  statement based upon what you had
12  explored before?
13    A.   I don't recall my exact terms
14  at the time, but we were all in -- in the
15  mode of upscaling our talent in the
16  organization at that time.  That was a
17  general theme for everybody in HR and
18  Rose --
19    Q.   Let me ask you -- I'm sorry.
20    A.   -- yeah, Rose -- Rose did not
21  fit the definition of upscaling our
22  talent.
23    Q.   Did you make that statement
24  about not upscaling talent or any other

Page 63

1  reason for your saying that she wasn't
2  long term at the time that you made that
3  statement?
4    A.   I -- I don't recall because
5  it was a long time ago, but it was in
6  that spirit.
7    Q.   Were you present at the time
8  that grants were made in 2015 and 2016
9  where the grant program was -- the
10  benefits program was readjusted -- excuse
11  me -- readjusted?
12    A.   Bless you.
13    Q.   Thank you.
14    A.   Are you referring to equity
15  grants?
16    Q.   Yes.
17    A.   Yes, I was part of Teva then,
18  yes.
19    Q.   And did you have any role in
20  planning for those -- the changes in the
21  equity grants program?
22    A.   I would have been consulted
23  as a -- as a business HRBP.
24    Q.   Were you ever advised by

Page 64

1  anyone that the change in the program of
2  equity grants disadvantaged older
3  employees?
4    A.   No.
5    Q.   Did you ever hear anyone
6  speak about the fact that there was a
7  disadvantage in putting forward this new
8  program of equity grants as it being one
9  that disadvantaged the employees?
10    A.   Yes, and I -- I agreed, to
11  some degree, that the changes were not
12  going to do what we had designed the plan
13  for.
14    Q.   With whom did you have those
15  conversations?
16    A.   With Ron Yaniv and with Mark
17  Sabag.
18    Q.   How about with Randy?
19    A.   This was before really Randy
20  and I had much interaction together so I
21  don't know that -- maybe -- maybe I had
22  discussions with Randy, but I remember
23  more so having discussions with his --
24  his boss, Ron.

Page 65

1    Q.   In that regard, did -- did
2  you ever receive any documentation from
3  Randy either directly or through Ron
4  Yaniv regarding their opinions as to the
5  disadvantage to older employees?
6    A.   No, nothing to do with older
7  employees.  It had -- had more to do with
8  retention.
9    Q.   But I'm asking whether or not
10  you ever heard from either Randy directly
11  or through Ron Yaniv that Randy had
12  protested that the -- the new equity
13  program was doing to disadvantage older
14  employees.
15    A.   No, I had no knowledge of
16  that.
17    Q.   Did you have any discussions
18  about disadvantaging older employees with
19  regard to these equity grants in the new
20  program with either Ron or -- or Mark
21  Sabag?
22    A.   No.
23    Q.   Did you personally have any
24  final say as to whether or not the -- the

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA
-  -  -

RANDOLPH W. KEUCH          :
                          : CASE NO.
V                         : 2:19-CV-05488
                          :
TEVA PHARMACEUTICALS        :
USA, INC., And TEVA        :
PHARMACEUTICAL             :
INDUSTRIES, Ltd.           :

-  -  -

FRIDAY, APRIL 15, 2022
-  -  -

Virtual deposition of

ELAINE MCGEE, taken pursuant to Notice,

commencing at 2:13 p.m., on the above

date, before Benjamin Moebius, a Court

Reporter and Notary Public in and for the

Commonwealth of Pennsylvania.

-  -  -

MAGNA LEGAL SERVICES
(866) 624 6221

MAGNA ❯

JOINT APPX 1199

Page 18

```
 1    the company had considered you as one of
 2    the possible candidates for that position
 3    when she took that position?
 4        A.   I really don't -- I'm not
 5    sure what -- if they considered me or
 6    not.
 7        Q.   And who is Daniela Shea?
 8        A.   Daniela Shea was who I
 9    reported to after Jarret at that time
10    after --
11        Q.   To who?
12        A.   After Jarret Miller, when
13    I --
14        Q.   And how long did you report
15    to Daniela Shea?
16        A.   Approximately two to three
17    years.
18        Q.   During that period of time,
19    did Lauren Benner replace Daniela Shea?
20        A.   I did report to Lauren
21    Benner, yes.
22        Q.   Well, I'm asking you was --
23    did Lauren Benner take Daniela's place as
24    your immediate supervisor?
```

Page 19

```
 1        A.   Yes.
 2        Q.   And how old was Daniela Shea,
 3    if you know?
 4        A.   I'm not sure.
 5        Q.   How about Lauren Benner?
 6        A.   I'm not sure.
 7        Q.   Now, in your job as the
 8    director of HR services, what grade level
 9    are you at?
10        A.   I believe it's a 15/16.
11        Q.   It was a 15/16 or just --
12        A.   Well, I started at a 15 and
13    then with the promotion.
14        Q.   Okay.  When you became
15    senior, you became 16?
16        A.   Correct.
17        Q.   Now, we've heard about a
18    meeting with Mr. -- by the way, before I
19    get into that, did there come a time when
20    you were made aware of the likelihood of
21    there being a RIF at Teva?
22        A.   Yes.
23        Q.   When was that?
24        A.   That was in December 2017
```

Page 20

```
 1    when it was announced that there would be
 2    a reduction in force amongst Teva, all
 3    the employees.
 4        Q.   And when was that again --
 5    what part of --
 6        A.   It was in December of 2017.
 7        Q.   And how did you become aware?
 8        A.   A corporate announcement.
 9        Q.   Did you have any discussions
10    with anybody about that announcement?
11        A.   In -- in what way?  I -- I
12    don't understand the question.
13        Q.   Did you have any discussions
14    once you received the corporate
15    announcement?
16        A.   I was surprised that we
17    were -- you know, this was happening.
18    You know, just in general.  I can't say
19    to whom I had the conversation, but I
20    know everybody was surprised.
21        Q.   Did you have any
22    conversations with the people that you
23    reported to either at a direct report or
24    a dotted line report?
```

Page 21

```
 1        A.   No.
 2        Q.   In connection with that with
 3    your position as a senior director of
 4    shared services, were you responsible for
 5    doing analytics as to the workforce,
 6    whether it was linked to race or age or
 7    any other category of individuals?
 8        A.   At what point in time?  I'm
 9    sorry.
10        Q.   During the time that you were
11    either director or the senior director of
12    HR shared services, did you have the
13    responsibility of doing analytics for
14    the -- for Teva either North America or
15    the Americas or globally?
16        A.   We would -- the only thing my
17    team would've done would be any type of
18    submissions that are required in the
19    U.S., such as EEO-1 filings.
20        Q.   Those EEO-1 filings would
21    supply what information to the federal
22    government?
23        A.   It's the total number of
24    employees in the categories, like male,
```

Page 22

1  female, and ethnicity.
2      Q.   Did you, during that period
3  of time, either directly or through
4  outside vendors, do any analytics as to
5  the differences from one year to the next
6  regarding those categories?
7      A.   In affirmative action plans.
8      Q.   Would those types of
9  analytics be available through an
10 affirmative action plan that people could
11 review at the company?
12     A.   People in general, no.  We
13 would share that only with our VP of HR.
14     Q.   And who was that at that
15 time?
16     A.   That would be Dan Lawlor.
17     Q.   Do you know if there were any
18 analytics done as to how the RIF impacted
19 various classes of people on the basis of
20 age?
21     A.   No, I'm not aware of that.
22     Q.   Were you ever in a meeting
23 with Mr. Lawlor or any other individuals
24 at Teva where a discussion was had about

Page 23

1  doing analytics as to how the RIF would
2  impact people on the basis of age?
3      A.   No.
4      Q.   Have you, in connection with
5  this lawsuit or at the direction of Mr.
6  Lawlor or any other individual at Teva,
7  done any analytics that involved a
8  discussion of the impact of the RIF on
9  age?
10     A.   No.
11     Q.   Have you personally ever
12 reviewed the documentation supplied to
13 individuals in the HR area as to how the
14 RIF impacted people on the basis of their
15 age?
16     A.   No.
17     Q.   Have you seen any analytics
18 in that regard?
19     A.   No.
20     Q.   Now, prior to this particular
21 RIF in the end of 2017/beginning of 2018,
22 have you ever seen analytics done when
23 there was a previous reduction in force?
24     A.   Trying to think if we ever

Page 24

1  had such a large reduction in force.
2  This was the first time that Teva's
3  experienced something so large.
4      Q.   Well, I don't necessarily
5  mean it was an equivalent reduction in
6  force, but there have been reductions
7  during the period from 2014 on hadn't
8  there been?
9      A.   Yes.
10     Q.   And in connection with any of
11 those, were there any analytics done to
12 see whether or not there was an impact on
13 race or age or other protected
14 categories?
15     A.   Yes.
16     Q.   Do you know why analytics
17 weren't done this time?
18     A.   I -- I don't know why.
19     Q.   Have you ever heard anybody
20 discuss why analytics should be or should
21 not be done in connection with the
22 reduction in force at the end of 2017 and
23 the beginning of 2018?
24     A.   No.

Page 25

1      Q.   In connection with previous
2  reductions in force, have you ever seen
3  guidance issued by Teva as to what HR
4  people called totaling or analyzing who,
5  which of the people in a particular area,
6  was best suited to remain or should be
7  part of the reduction in force?
8      A.   Could you repeat that one
9  more time, please?
10     Q.   Sure.  I wasn't very clear,
11 and I apologize.
12         Did you ever see any program
13 suggest that, when there was a reduction
14 in force, it didn't have to be as big as
15 this one, requesting that individual
16 managers follow certain protocols in
17 outlining who they thought were best
18 suited to stay and who would be best
19 suited to leave?
20     A.   In a restructuring or some
21 reductions, I have seen an assessment of
22 the individuals by skill to see who would
23 stay and who would leave.
24     Q.   With regard to that type of

Page 26

1  assessment that I've labeled totaling, in
2  this particular case, did you overhear or
3  were you part of any discussion that
4  talked about doing that type of
5  assessments?
6      A.   Could you clarify that one
7  more time?
8      Q.   During the month of
9  December/early January, especially in the
10  November/December period, were you part
11  of any discussion that talked about doing
12  assessments like the one that we just
13  discussed by skill?
14      A.   No.
15      Q.   I think I asked you this
16  question before, and I'm not trying to
17  have you restate your position, if you
18  have answered it, but were you in the
19  meeting with Ms. Dakris, Pam Dakris, or
20  did you hear about a meeting with Ms.
21  Dakris or Miriam Weinstein where a
22  discussion was made that there would be
23  no analytics done in this particular RIF?
24      A.   I'm not aware of any such

Page 27

1  meeting.
2          MR. RAPPAPORT:  And for the
3  record, it's Daknis with an N, not
4  Dakris with an R.
5          MR. EPSTEIN:  I'm sorry.
6  Daknis.  I spelled it that way on
7  my sheet, but I didn't pronounce it
8  properly.  Thank you.
9  BY MR. EPSTEIN:
10      Q.   Do you have any knowledge of
11  a claim brought by a Brian McManus
12  against Teva alleging age discrimination?
13      A.   I'm not familiar with his
14  case or any complaint he may have.
15      Q.   In connection with -- again,
16  I think I touched upon this, but I'm not
17  sure I asked you this specific question.
18          Am I correct in stating that
19  you have not been asked to do any
20  analysis of the RIF as it related to HR
21  and or Total Rewards?
22      A.   Correct.
23      Q.   There has been some talk in
24  this case about a policy regarding being

Page 28

1  able to take a demotion of a single grade
2  if you are slated for -- if your position
3  is being eliminated.
4          Are you aware of that policy?
5      A.   Yes, I am.
6      Q.   Can you tell me what you know
7  about that policy as best you can?
8      A.   That the -- a demotion of a
9  grade -- possibly -- you could possibly
10  do a demotion of grade and not have -- be
11  separating from the company.  But it's
12  not -- it doesn't apply to every
13  demotion, because it's whether they're
14  eligible for separation benefits.
15      Q.   Is the only thing it applies
16  to the actual eligibility for separation
17  benefits?
18      A.   That's what I remember.
19      Q.   Okay.  In connection with
20  this particular matter, have you worked
21  with or had any dealings in depth with
22  Eduardo Nasi?
23      A.   Yes.
24      Q.   When did you first meet Mr.

Page 29

1  Nasi?
2      A.   In 2018.
3      Q.   And in what regard?
4      A.   He became the Total Rewards
5  lead.
6      Q.   For what sector?
7      A.   For North America.
8      Q.   And that was in 2018?
9      A.   2018.
10      Q.   Had you had any dealings with
11  him before that time?
12      A.   I don't recall.
13      Q.   Did you have any knowledge as
14  to whether or not he was knowledgeable
15  about the laws and the regulations that
16  controlled employment in North America
17  and Canada?
18      A.   I don't have that information
19  or knowledge.
20      Q.   Did you or have you had any
21  working relationship with him where you
22  could assess whether or not he had that
23  knowledge?
24      A.   I've been working with him

8  (Pages 26 to 29)

Page 1

1          IN THE UNITED STATES DISTRICT COURT
        FOR THE EASTERN DISTRICT OF PENNSYLVANIA

2

3    RANDOLPH W. KEUCH,          *

4              Plaintiff        *

5    v.                          *   CASE NO. 2:19-CV-05488

6    TEVA PHARMACEUTICALS         *
     USA, INC., And TEVA
7    PHARMACEUTICAL               *
     INDUSTRIES, Ltd.,

8                                 *

               Defendants

9    *          *          *          *          *          *          *

10

11      VIDEOCONFERENCE DEPOSITION OF RANDOLPH KEUCH

12                PARTY/FACT WITNESS

13              BALTIMORE, MARYLAND

14                APRIL 12, 2022

15

16

17

18

19   Reported by Kathleen E. Manes, Court Reporter

20

21

22

23

24

25

JOINT APPX 1203

Page 2

```
1    VIDEOCONFERENCE DEPOSITION OF RANDOLPH KEUCH
2         The Deposition of Randolph Keuch, taken in
3    the above-captioned case on Tuesday, April 12th,
4    2022, commencing at 9:16 a.m. Eastern Standard Time,
5    via videoconference, and reported by Kathleen E.
6    Manes, Court Reporter and Notary Public.
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
1    APPEARANCES:
2
3    ALAN EPSTEIN, ESQUIRE, ESQUIRE
     JENNIFER MYERS CHALAL, ESQUIRE
4        Spector Gadon Rosen Vinci P.C.
         1635 Market Street, 7th Floor
5        Philadelphia, PA 19103
         215.241.8832
6        aepstein@sgrvlaw.com
         jmyers@sgrvlaw.com
7        On Behalf of the Plaintiff
8
9    LARRY J. RAPPOPORT, ESQUIRE
     BRANDON S. SHEMTOB, ESQUIRE
10       Stevens & Lee, P.C.
         1500 Market Street, Centre Square
11       East Tower, Suite 1800
         Philadelphia, Pennsylvania 19102
12       215.496.3835
         larry.rappoport@stevenslee.com
13       bss@stevenslee.com
         On Behalf of the Defendant
14
15
     ALSO PRESENT:  Tom McDonough, Esquire
16       Teva In-house Counsel
17
18
19
20
21
22
23
24
25
```

Page 3

```
1              INDEX
2    The Videoconference Deposition of Randolph Keuch
3              April 1, 2022
4
5    Examination by Mr. Rappoport              6
6
7    EXHIBITS
8    Ex. 1 Email - Keuch 000388-389            18
9    Ex. 2 Org chart - Keuch 000017            144
10   Ex. 3 Email - Keuch 000028-29             144
11   Ex. 4 Email - Keuch 000050               151
12   Ex. 5 Proposed Headcount reduction for North
13       American TR Team - Keuch 000051-78    154
14   Ex. 6 Email - Keuch 000079                176
15   Ex. 7 Separation Notification and Benefits
16       Summary - Keuch 000183-184           191
17   Ex. 8 Global Talent Management - Leadership
18       Structure Updates - Keuch 000009-10  198
19   Ex. 9 Departing Employee Document Retention
20       Checklist - Keuch 000251-252          224
21
22   (Note:  Exhibits attached hereto.)
23
24
25
```

Page 5

```
1    P R O C E E D I N G S:
2         THE COURT REPORTER:  The attorneys
3    participating in this deposition acknowledge
4    that I am not physically present in the
5    deposition room, and that I will be reporting
6    this deposition remotely.
7         They further acknowledge that, in lieu of an
8    oath administered in person, I will administer the
9    oath remotely.
10        The parties further agree that if the witness
11   is testifying from a state where I am not a Notary,
12   that the witness may be sworn in by an out-of-state
13   Notary.
14        If any party has an objection to this manner of
15   reporting, please state now.
16        MR. EPSTEIN:  No objections.
17        MR. RAPPOPORT:  No objections.
18        Hearing none, we can proceed.
19   Whereupon,
20             RANDOLPH KEUCH,
21   the witness herein, having first declared or
22   affirmed under penalty of perjury to tell the truth,
23   the whole truth, and nothing but the truth, was
24   examined and testified as follows:
25
```

2 (Pages 2 - 5)

Page 6

1        EXAMINATION
2    BY MR. RAPPOPORT:
3    Q   Good morning, Mr. Keuch. My name is
4 Larry Rappoport. I'm with the firm of Stevens
5 & Lee. I'm accompanied by Brandon Shemtob also
6 with the same firm. We represent the defendant
7 Teva in connection with ligation that's been
8 commenced in the Eastern District of
9 Pennsylvania on your behalf by your counsel,
10 Mr. Epstein and his law firm.
11        We are here today to take your
12 deposition. A deposition is a discovery tool
13 which is taken for a number of reasons, not the
14 least of which is were we to proceed to trial,
15 I can use your sworn testimony in connection
16 with my cross examination of you at trial. I'm
17 here to ask you a number of questions. It's
18 discovery. I'm here to ask you questions that
19 are either relevant or will lead to the
20 discovery of relevant information.
21        My questions will sometimes be
22 confusing perhaps. And if that is the case, I
23 don't want you to answer a question that you
24 don't understand. And I'd like for you to
25 respond to my question if you don't understand

Page 7

1 it by telling me that you don't understand it.
2 In which case, I will provide you with a
3 question that you can understand. Is that
4 clear?
5    A   That is -- that is clear.
6    Q   If you answer my question, can I
7 presume that you understood it?
8    A   Yes.
9    Q   For the court reporter's benefit, it
10 is best that we wait until each of us are
11 finished before we talk so that we're not
12 interrupting each other that way she can
13 transcribe a cleaner deposition. So I would
14 ask that you wait until I've finished my
15 question. Sometimes the most important word in
16 a question is at the end. And I will try my
17 best to wait until you finish your answer
18 before I can ask the next question. Is that
19 clear?
20    A   That is clear.
21    Q   In the same regard, it's best for the
22 court reporter and for the parties themselves
23 that all of your responses be verbal responses,
24 not shrugging your shoulder or shaking your
25 head or thumbs up or thumbs down, et cetera.

Page 8

1 So I would ask that all of your responses be
2 verbal responses. Are you capable of that?
3    A   I am.
4    Q   Okay. Have you ever had your
5 deposition taken prior to today?
6    A   Not to my recollection.
7    Q   Okay. Where were you born,
8 Mr. Keuch?
9    A   I was born in Glen Ridge, New Jersey.
10    Q   And when were you born?
11    A   May 27, 1954.
12    Q   How many job offers have you received
13 since your separation from Teva?
14    A   None.
15    Q   How many job interviews have you had
16 since your separation from Teva?
17    A   I don't know. It was well over a
18 dozen.
19    Q   Can you identify who you interviewed
20 with and when?
21    A   I can recall a few names. I believe
22 that I provided a list to counsel of the
23 companies I met with or spoke with. So if you
24 want me to basically give you my recollection,
25 or we can pull up the Bates document and go

Page 9

1 from there.
2    Q   I prefer that you give me your
3 recollection.
4    A   Okay. Safelight would be one
5 company. I believe Airgas would be another.
6 And I don't recall the others. It was about --
7 you know, it was four years ago.
8    Q   So four years ago would have been
9 2018. Were all of the interviews you made
10 reference to in 2018?
11    A   Yes.
12    Q   Okay. So there have been no
13 interviews since 2018?
14    A   That is correct.
15    Q   And why have there been no interviews
16 since 2018?
17    A   The message I received was that --
18 that I was too old.
19    Q   Who provided you with that message?
20    A   It was not a clear message. It was
21 basically we would do one interview. And then
22 it would either be silence. Or I would be told
23 that, you know, there were other candidates
24 more qualified.
25    Q   And as a result, did you stop

3 (Pages 6 - 9)

Page 10

```
1   interviewing?
2       A    As of -- no.  As a result, I started
3   my own business.
4       Q    What business was that?
5       A    I formed the Total Rewards
6   Compensation -- Total Rewards Consulting Group.
7       Q    Is that referred to as the TTRCG?
8       A    That is correct.
9       Q    And when was that formed?
10      A    It became an LLC in January of 2020.
11  It was formed in 2019.
12      Q    And since it has been formed, does
13  that mean you have not sent out any resumes?
14      A    That's correct.
15      Q    Do you recall what month in 2019 you
16  formed TTRCCG and stopped sending out resumes?
17      A    I do not.
18      Q    Do you remember what season?
19      A    I -- I do not.
20      Q    Do you recall what quarter?
21      A    I -- I -- I honestly do not recall
22  when.
23      Q    Okay.  Had there been a predecessor
24  to TTRCG?
25      A    No.
```

Page 11

```
1       Q    Are you the founder?
2       A    Yes.
3       Q    (Inaudible) employee?
4            THE COURT REPORTER:  Sorry?
5            THE WITNESS:  I didn't hear that.
6            BY MR. RAPPOPORT:
7       Q    Are you its only employee?
8       A    Yes.
9       Q    Do you have any clients?
10      A    Yes.
11      Q    How many clients?
12      A    Three.
13      Q    Who are they?
14      A    My first client was GameStop.  My
15  next client is Hayward Holdings.  And my next
16  client is MS -- MSA Safety.
17      Q    Are you still doing work for those
18  three companies?
19      A    No.
20      Q    Okay.  When did you stop doing work
21  for GameStop?
22      A    That would be back in 2019.  I don't
23  know the -- you know, there isn't an official
24  stop date that I'm aware of.
25      Q    How long did you do work for
```

Page 12

```
1   GameStop?
2       A    Three to four months.
3       Q    And what revenues did you receive as
4   a result of the services provided to GameStop?
5       A    As I recall it was -- it was probably
6   around $1,300.
7       Q    Are you still doing work for Hayward
8   Holdings?
9       A    Currently I have no assignments.
10      Q    When was your last assignment?
11      A    I don't understand the question.
12      Q    When did you last provide services to
13  Hayward Holdings as part of TTRCG?
14      A    Let's see.  I had a call with them
15  either one or two months ago.  And I elected
16  not to charge them.
17      Q    When did you begin providing services
18  to Hayward?
19      A    That would probably be around
20  November, December of 2019.
21      Q    What were your revenues as a result
22  of the services provided to Hayward Holdings?
23      A    Aggregate?
24      Q    Yes.
25      A    Somewhere in the range of 100 and --
```

Page 13

```
1   I think it was some -- somewhere around
2   $133,000.
3       Q    And when did you last receive
4   revenues from Hayward Holdings?
5       A    Probably -- probably Q4 in 2021.
6       Q    When did you last work for
7   MSA Safety?
8       A    MSA Safety is a prospective client.
9   I hope to start the work in a couple weeks.
10      Q    Have you been engaged?
11      A    Verbally but -- but not officially.
12      Q    And what type of services do you
13  anticipate providing to MSA Society -- or
14  Safety?
15      A    It would be organizational work
16  regarding the structure of their human
17  resources organization.
18      Q    Other than the three that you've
19  identified, one of which is prospective, have
20  you provided or has TTRCG provided services to
21  any other entity?
22      A    No.
23      Q    Do you have any other source of
24  revenue other than TTRCG?
25      A    I don't understand the question.
```

4 (Pages 10 - 13)

Page 14

1    Q   Other than the revenue that's
2 generated through TTRCG, does Randy Keuch have
3 any other revenue?
4    A   I receive Social Security.
5    Q   And when you did you start receiving
6 Social Security?
7    A   At age 67.
8    Q   Any other sources of revenue?
9        MR. EPSTEIN:  Are you talking about
10 earnings?
11       MR. RAPPOPORT:  Yes.
12       MR. EPSTEIN:  As opposed to other
13 forms of compensation from investments.
14 BY MR. RAPPOPORT:
15   Q   With that qualification, can you
16 answer?
17       MR. EPSTEIN:  Any other earnings is
18 what he's asking Randy.
19       THE WITNESS:  Yes.  No, I'm -- I
20 understand.  I receive deferred compensation.
21 I receive an annuity from the H.J. Heinz
22 Company.  And I receive retirement income from
23 Pfizer.
24 BY MR. RAPPOPORT:
25   Q   How does TTRCG find business?

Page 15

1    A   Word of mouth.
2    Q   And what do you do in that regard?
3    A   I stay in contact with -- with my
4 colleagues and people that I have known over
5 the years.
6    Q   So you have a network of some -- some
7 individuals that you've made -- that you've had
8 relationships with?
9    A   Yes.
10   Q   And other than using the network, is
11 there any other way that TTRCG finds business?
12   A   No.
13   Q   Why did you decide in 2019 to stop
14 looking for other employment and to form TTRCG?
15   A   I was advised by several close
16 friends as well as individuals in the search
17 business that -- that it would be challenging
18 for me to find a job because of my age.
19   Q   And as a result of that advice, you
20 concluded that it was no longer necessary for
21 you to look for work?
22   A   Yes.  That combined with the other
23 inability to -- to get interviews.
24   Q   When you were looking for work, which
25 was in 2018 and parts of 2019, what was your

Page 16

1 search -- what did your research involve?  What
2 kind of positions were you looking for?
3    A   Compensation and benefit positions.
4    Q   At what level?
5    A   Director and above.
6    Q   In what geography?
7    A   I wasn't limited by geography.
8    Q   So does that mean that you inquired
9 about positions that were located throughout
10 the United States?
11   A   I was open to those.  I pursued more
12 on the East Coast.
13   Q   Has TTRCG had any employees other
14 than yourself?
15   A   No.
16   Q   Who is Jim Turner?
17   A   Jim Turner is -- is a senior vice
18 president at a brokerage firm, a top 100
19 brokerage firm, called Tompkins.
20   Q   And has he been a source of business
21 for TC -- TTRCG?
22   A   He has been a -- he has helped me
23 with prospecting for business.
24   Q   Who's Lesley Billows.
25   A   Lesley Billow is -- was my matrix

Page 17

1 manager at Teva.  And she is currently the
2 chief human resources officer for Hayward
3 Holdings.
4    Q   What is a matrix manager?
5    A   That's a good question.  But
6 basically it's someone who -- at Teva who
7 watches over you.
8    Q   And did Lesley Billow watch over you
9 during your employment at Teva?
10   A   She did.
11   Q   What did that involve?
12   A   She hired me.  Or at least did the
13 initial interview and recommended me to be
14 hired.  She -- she was someone that I worked
15 very closely with.  We had a high degree of
16 collaboration between her and the HR community.
17 She was actually I will assume the -- the
18 pseudo head of HR for all of the Americas.  So
19 she would hold periodic meetings with all of
20 the function heads including Teva legal counsel
21 and most of the HR folks from, you know, the
22 various businesses that Teva had in Canada,
23 united States, and the head of HR for -- for
24 Latin America.
25   Q   You referred to her as a "pseudo

Page 18

1 head." What does that mean?
2    A   I'm not sure in the Teva hierarchy
3 that -- that other than -- other than having
4 responsibility for shepherding the HR
5 community, she didn't have a lot of authority
6 because of Teva's siloed HR structure.
7    Q   And what do you mean by a "siloed HR
8 structure"?
9    A   I reported directly to the head of
10 Total Rewards for -- for Teva globally in
11 Israel. And that was where everything I did
12 had to pretty much be approved. That's where
13 the budget sat. That's where I got
14 authorization or approvals. And the other
15 heads were in similar situations.
16    Q   Was Lesley Billow the individual at
17 Hayward who engaged TTRCG to provide services?
18    A   She was.
19    Q   And did you solicit Ms. Billow when
20 she was at Bristol-Meyers Squibb?
21    A   I did not.
22       MR. RAPPOPORT: I'm going to show you
23 what I'm marking as Keuch Exhibit 1, which is
24 Bates stamped 388, Keuch 388.
25       (Keuch Deposition Exhibit No. 1 was

Page 19

1 marked for identification.)
2       BY MR. RAPPOPORT:
3    Q   I'm showing you what's been marked as
4 Keuch Exhibit 1, Bates stamped Keuch 388, and
5 ask you if this would be you soliciting Bristol
6 Meyers Squibb for employment?
7    A   Okay. Was Lesley at -- at BMS at
8 this time or had she moved on? I'm not clear
9 on when she moved. This was to her personal
10 email I believe.
11    Q   At the bottom of the page you write,
12 "The goal of my practice is to combine my
13 experience with the expertise of Tompkins to
14 benefit businesses such as BMS."
15       Would you agree that you wouldn't
16 have said that if she weren't at BMS?
17    A   Yes. Now I can't -- I can't see that
18 on my screen so it's hidden by something.
19 Okay. So then I guess I did solicit her when
20 she was at BMS. My apologies.
21    Q   And did she refer any business to you
22 while at BMS?
23    A   She did not.
24    Q   Does TTRCG have a website?
25    A   It does not.

Page 20

1    Q   Does it have marketing materials?
2    A   It does not -- well, yes, it does. I
3 have a -- I have few Word documents.
4    Q   What kind of documents?
5    A   Word documents that just simply
6 incorporate what my firm does.
7    Q   And when was its last engagement?
8    A   The last engagement was when we ended
9 the Hayward engagement, which would have been
10 again probably -- well, I had a call with her
11 as I said, you know, a couple months ago but I
12 didn't bill her for that call.
13    Q   When was the last engagement that
14 TTRCG had that was billable?
15    A   That would have been the work that
16 ended I believe in Q4 of 2021.
17    Q   Where are you presently living?
18    A   I live in South Carolina.
19    Q   What city?
20    A   Isle of Palms.
21    Q   Is that your primary residence?
22    A   It is.
23    Q   Is it your only residence?
24    A   No.
25    Q   What other residence do you have?

Page 21

1    A   I have a condominium in Wexford,
2 Pennsylvania.
3    Q   Where is Wexford, Pennsylvania?
4    A   It is a suburb of Pittsburgh.
5    Q   And how long have you owned the
6 condominium in Wexford?
7    A   I bought it in December of -- let's
8 see -- of 2020 I believe.
9    Q   When do you use it?
10    A   Good question. When do I use it?
11 There is no schedule, but my wife and I are
12 generally up there maybe six times -- six,
13 seven times a year.
14    Q   And do you have a home in Isle of
15 Palms?
16    A   I do.
17    Q   What's the address?
18    A   It's 7 Summer Dunes Lane, Isle of
19 Palms, South Carolina 29451.
20    Q   Do you own or rent?
21    A   I own.
22    Q   And how long have you owned the
23 residence in Isle of Palms, South Carolina?
24    A   About 11 years.
25    Q   Was it bought as a retirement home?

6 (Pages 18 - 21)

Page 22

1   A   It was bought as both a future
2   retirement home and rental property.
3   Q   Is it currently being rented?
4   A   No.
5   Q   How long have you had a primary
6   residence in Isle of Palms?
7   A   I moved here in January of 2020.
8   Q   Where did you move from?
9   A   From Chalfant, Pennsylvania.
10   Q   And did you own a home in Chalfant?
11   A   I did.
12   Q   And did you sell that home?
13   A   I did.
14   Q   And did you use the proceeds of the
15   sale of the home in Chalfant to purchase the
16   home in Isle of Palms?
17   A   I did not.
18   Q   What did you sell the Chalfant home
19   for?
20   A   Good question.   I can give you only
21   an approximation, but it was 750,000, somewhere
22   in that neighborhood.
23   Q   What came first the sale of the
24   Chalfant home or purchase of the Isle of Palms
25   residence?

Page 23

1   A   The Isle of Palms residence.
2   Q   Did you ever discuss your retirement
3   plans with anyone while you were still employed
4   at Teva?
5   A   Yes.
6   Q   With whom?
7   A   My wife, my financial advisor.
8   Q   Can you think of anyone else?
9   A   Not really.   I talked to my staff
10   that when I retire that I would -- you know,
11   would be developing one of them to -- take
12   my position.   But other than that, your
13   question is a bit vague because everyone talks
14   about when they're going to retire.
15   Q   Let me be a bit more specific then.
16   Did you ever provide a date to anyone at Teva
17   while still employed at Teva as it relates to
18   your retirement plan?
19   A   Not that I can recall.
20   Q   Did you provide a date to your
21   financial advisor?
22   A   Multiple dates.
23   Q   What does that mean?
24   A   Teva changed the stock or their
25   equity program so it went from 65 and five to

Page 24

1   age 65 and ten years of service.   So I would
2   not have achieved that until age 70.   So again,
3   life changes, plans changed, and my retirement
4   date the earliest I could retire and keep my
5   benefits would be age 70.
6   Q   And which benefits are you referring
7   to?
8   A   I'm referring to my -- my equity
9   holdings.
10   Q   When did Teva ever change its equity
11   plan from 65 plus five to 65 plus ten?
12   A   I'm sorry.   Could you -- could you
13   just -- I didn't hear the beginning:
14   Q   I'm sorry.   When did Teva change its
15   equity plan from 65 plus five to 65 plus ten?
16   A   I believe it was 2017.
17   Q   And do you know why it changed its
18   plan?
19   A   I believe they -- they were getting
20   ready to do the reduction in force and felt
21   that by discriminating against older employees
22   this would benefit them financially.
23   Q   Did anyone share that with you as the
24   reason for the change to the stock plan?
25   A   There were numerous communications

Page 25

1   between myself Roni Percik, Ron Yaniv,
2   regarding the -- regarding this change.   I
3   believe some are in the files.
4   Q   Who is Roni Percik?
5   A   Roni Percik was in Israel on
6   corporate Total Rewards staff and was
7   responsible for the equity programs at Teva.
8   Q   And who was Ron Yaniv?
9   A   Ron Yaniv at that time was the global
10   head of Total Rewards.
11   Q   And is that who you reported to?
12   A   That is correct.
13   MR. EPSTEIN:   Larry, I -- I didn't
14   plan to interrupt your -- I just wanted to let
15   you know in approximately 15 minutes I'm going
16   to be leaving the screen.   Jennifer will be
17   staying on.   I have a hearing in the Court of
18   Common Pleas in Philadelphia County.   I will
19   return after I'm done with that hearing.
20   MR. RAPPOPORT:   Thank you.
21   BY MR. RAPPOPORT:
22   Q   What communications did you have with
23   Roni Percik as it related to the change with
24   regard to the equity plan?
25   A   Predominantly emails, some phone

Page 26

1 calls.
2    Q    And did you raise with -- is it
3 mister or Ms. Percik?
4    A    Miss.
5    Q    And did you raise with Ms. Percik the
6 opinion that you've expressed today that the
7 reason for the change was to discriminate
8 against older workers in the impending
9 reduction in force?
10    A    No.
11    Q    And is Ron Yaniv a male or a female?
12    A    Ron is a male.
13    Q    Did you raise with Mr. Yaniv what
14 you've testified to today, your belief that the
15 change to the equity plan was in response to
16 wanting to discriminate against older workers
17 in connection with an impending reduction in
18 force?
19    A    Well, let's -- let's be clear.  The
20 answer to Roni as well as to Ron, you've asked
21 me an "and question."  And because it's an "and
22 question," I have to say no.
23        If you bifurcate that question, my
24 answer would be different.
25    Q    How would your answer be different if

Page 27

1 you bifurcate it?
2    A    Well, why don't you bifurcate it and
3 then I can answer?
4    Q    No.  I'm the one asking the
5 questions, not you, sir.
6    A    Okay.  So by bifurcating, you asked
7 if I raised the fact that it was discriminatory
8 against older workers.  The answer to that
9 question is yes.  You asked if it was in
10 response to the reduction in force.  The answer
11 to that is no, because the reduction in force
12 for the -- the one that took place 2017/2018, I
13 was unaware of at that time.
14    Q    What explanation if any were you
15 provided as to the reason for the change to the
16 equity plan?
17    A    I'm not sure I was given a reason.
18    Q    And do I understand your testimony
19 correctly that with both Ms. Percik and
20 Mr. Yaniv, you expressed an opinion that the
21 plan change was discriminatory against older
22 workers?
23    A    Yes.
24    Q    Prior to the change to the plan --
25 I'll you ask you this way:  Did the change to

Page 28

1 the plan have any impact on your retirement
2 date?
3    A    I did not have a retirement date, but
4 it certainly pushed it out that the earliest I
5 could retire would be aged 70.
6    Q    But prior to the change in the plan,
7 what was the earliest that you could retire?
8    A    I could retire at any time.
9    Q    Is that because you were over the age
10 of 65 and had five years of service?
11    A    I was not over the age of 65 and had
12 five years of service.  I never reached that
13 milestone.
14    Q    Had it been your intention prior to
15 the change to retire at age 65 with five years
16 of service?
17    A    No.
18    Q    Had you ever had any discussions with
19 Eduardo Nasi as to your intention to retire at
20 age 65?
21    A    Not that I can recall.
22    Q    Okay.  Did Mr. Nasi report to you?
23    A    He did.
24    Q    Did you hire him?
25    A    I did.

Page 29

1    Q    Did you ever discuss with him the
2 possibility of him being your successor?
3    A    I did.
4    Q    Okay.  Had you identified him as your
5 likely successor?
6    A    As one of the potentials, yes.
7    Q    But was he the lead?
8    A    No.
9    Q    Who were the others?
10    A    Miriam Weinstein, and Diane Rohach.
11    Q    So there were three potentials as you
12 saw it?
13    A    Correct.
14    Q    And did you ever have any discussions
15 with anyone other than the three potentials as
16 it relates to who may succeed you?
17    A    Can you restate that?
18    Q    Did you have any discussions with
19 anyone other than the three potentials that you
20 identified -- Weinstein, Rohach, and Nasi --
21 about who may succeed you as the senior
22 director of Total Rewards?
23    A    Yes.
24    Q    Who did you discuss it with?
25    A    Ron Yaniv.

8 (Pages 26 - 29)

JOINT APPX 1210

Page 30

1    Q    Okay. In what context?
2    A    Succession planning.
3    Q    And was that an event that took place
4  on a regular basis at Teva where they would
5  engage in succession plan discussions?
6    A    It was part of the annual performance
7  review.
8    Q    And during those performance reviews
9  with Mr. Yaniv, did you identify all three of
10 those individuals as potential successors to
11 you?
12   A    I'm not sure the context in which
13 those discussions came up. I would certainly
14 have discussed that with each of the
15 individuals individually that, you know, they
16 would -- that I was trying to develop them to
17 be my successor. I assume with Mr. Yaniv that
18 I probably -- probably had similar
19 conversations. And I know I had conversations
20 with him about Edu Nasi.
21   Q    What specifically do you recall
22 telling him about Edu Nasi?
23   A    That he was -- had no qualifications
24 currently to take over my position and that the
25 only way I could develop him would be to

Page 31

1  relocate him to North Wales so that he could be
2  developed.
3    Q    You proposed that?
4    A    I did.
5    Q    And what response did you get to the
6  proposal?
7    A    It was not approved.
8    Q    Did you have similar conversations
9  with Mr. Yaniv about Miriam Weinstein?
10   A    Yes. But she did not require
11 relocation since her office was next to mine.
12   Q    And where was that office?
13   A    North Wales.
14   Q    Did you indicate that Ms. Weinstein
15 was already qualified to succeed you?
16   A    She was not already qualified. She
17 had experience in compensation. She had the
18 experience in benefits. She had some
19 international exposure. In her role at Teva,
20 she was learning Canadian compensation and
21 getting some exposure to Latin America
22 compensation as well as benefits.
23   Q    Did you give Mr. Yaniv an indication
24 as to when she might be ready to succeed you?
25   A    I did not.

Page 32

1    Q    Did you have any conversations with
2  Mr. Yaniv as it relates to Ms. Rohach's
3  readiness to succeed?
4    A    I did not.
5    Q    Do I understand correctly that the
6  only one that you spoke to about not presently
7  having the qualifications was Mr. Nasi?
8    A    I -- I believe that's correct. I
9  will rephrase that Ron and I have talked about
10 Miriam and talked about Diane. I can't
11 remember the context. We're always talking
12 about our people.
13   Q    In your mind did you have a likely
14 successor?
15   A    At that time, no. Miriam was clearly
16 the -- the top choice if I was --
17   Q    And what --
18   A    -- to get hit by the beer truck.
19   Q    What made her the top choice?
20   A    Her qualifications.
21   Q    And how were her qualifications
22 superior to that of Mr. Nasi?
23   A    I stated previously, Mr. Nasi had no
24 knowledge of Canadian benefits or compensation,
25 no knowledge of -- of United States

Page 33

1  compensation or benefits. And Miriam had --
2  had both.
3    Q    Are you the person who reviewed
4  Mr. Nasi?
5    A    I am.
6    Q    And were your performance reviews
7  reflective of your testimony today that he was
8  limited with regard to his knowledge?
9    A    I don't recall what was in the
10 performance reviews.
11   Q    Do you recall what his rankings were
12 during the period of time you reviewed him?
13   A    For the work he did in Latin America,
14 I recall rating him either satisfactory or
15 above or better.
16        MR. EPSTEIN: Larry. Larry, I'm
17 going to interrupt just to say that I'm signing
18 off now. And I will be back as soon as my
19 hearing concludes.
20        MR. RAPPOPORT: Thank you, Alan.
21        BY MR. RAPPOPORT:
22   Q    Is the level of ranking above
23 satisfactory exceeds?
24   A    That would be correct, I believe.
25   Q    Did you receive any severance

9 (Pages 30 - 33)

Page 34

1  benefits after leaving Teva?
2      A   I received no severance benefits from
3  Teva.
4      Q   Do you have an understanding as to
5  why not?
6      A   Because I did not sign a release.
7      Q   Okay.  And is there a reason why you
8  didn't sign the release?
9      A   I was advised.
10         MS. CHALAL:  I'm just going to object
11  it's attorney-client privilege.  Don't -- don't
12  reveal anything discussed with your attorney.
13  But if you can, answer that.
14         THE WITNESS:  Can you restate the
15  question?
16         BY MR. RAPPOPORT:
17      Q   Is there a reason why once presented
18  with the release, you chose not to sign it?
19      A   The released said to speak to legal
20  counsel, which I did, and was advised not to
21  sign it.
22      Q   Did you ever call Thomas McDonough to
23  find out about your severance benefits?
24      A   I believe I sent him an email.
25      Q   Okay.  And what do you recall the

Page 35

1  email saying?
2      A   I was asking whether or not I was to
3  receive any separation pay.
4      Q   And do you recall what Mr. McDonough
5  shared with you in that regard?
6      A   He said unless I signed the release,
7  I was not entitled to anything.
8      Q   Other than counsel, did you speak to
9  anyone else about your decision not to sign the
10  release?
11      A   I spoke to my wife.
12      Q   Other than counsel and your wife,
13  were there others that you conferred with about
14  whether or not to sign the release?
15      A   I did not confer with anybody other
16  than those two.
17      Q   Did you speak to anyone on the
18  subject of whether or not to sign a release?
19      A   To that, I'm -- I'm not sure.  I know
20  I spoke to my direct reports and probably
21  numerous others about the situation.
22      Q   And by "direct reports," do I -- does
23  that include Ms. Weinstein, Mr. Nasi, and
24  Ms. Rohach?
25      A   That's correct.

Page 36

1      Q   Did you meet with them all together?
2      A   I believe on January 2nd when I was
3  told that I was being terminated, I believe I
4  spoke to Edu first.  But again, I'm not clear.
5  And he wanted to speak to the team.  And I
6  asked for some time to speak to the team
7  myself, which I did.  And then he I believe
8  spoke to them individually.
9      Q   What happened on January 2nd, 2018?
10      A   I believe Tal Zorman called me and
11  told me that -- that I was being terminated and
12  replaced by Edu.
13      Q   Do you recall anything else that she
14  may have said during the course of that
15  conversation?
16      A   I do not.
17      Q   And was Edu the next person that you
18  spoke to?
19      A   I believe that was the correct order.
20  I'm not totally clear, but I believe it was Edu
21  and then -- and then my staff.
22      Q   Describe to me as best you can recall
23  what you said to Edu after having spoken to
24  Ms. Zorman on January 22nd.
25      A   The gist of the call would have been,

Page 37

1  one, that I understand that, you know, you are
2  taking -- you know, you are replacing me, that
3  I'm being terminated.  And I believe I offered
4  to help him through the transition.  I'm not
5  sure when it was decided to -- to keep me on
6  through February, because most of the people
7  being notified of termination I believe were
8  asked to leave the building in -- you know,
9  within the -- the day or two.  So there was a
10  discussion on how we could make this transition
11  work, because Edu acknowledged that he had
12  again very little expertise in comp and
13  benefits for the U.S. and Canada and needed
14  considerable assistance.
15      Q   What did he say specifically in that
16  regard?
17      A   I can't recall.
18      Q   Was he the one that asked you to stay
19  on till February of 2018?
20      A   I believe it was Tal Zorman.
21      Q   Was that in the same conversation
22  that you just testified about?
23      A   Again, I don't recall when that
24  occurred, if it occurred on the initial call or
25  on a subsequent call.

10 (Pages 34 - 37)

Page 38

1   Q   Do you recall whether there was more
2   than one call with Tal Zorman?
3   A   I believe there were at least two.
4   Q   First of which was January the 2nd.
5   A   That I recall.  That's when it
6   occurred, yes.
7   Q   And how long after the January 2nd
8   call did you have your second call with
9   Ms. Zorman?
10   A   I don't recall.
11   Q   Would it have been the same month in
12   January?
13   A   Definitely.
14   Q   And what do you recall being
15   discussed during the second call with
16   Ms. Zorman?
17   A   That would have been my -- my last
18   day worked and how I could help Edu transition.
19   Q   So when you say your last day worked,
20   that's when she shared with you, a date?
21   A   Yeah.  I'm not sure we had a fixed
22   date as much as it was -- she wanted to think
23   about it and get back to me, but definitely,
24   you know, she would appreciate if I stuck
25   around for -- you know, for a month or so.

Page 39

1   Q   And did you stick around until the
2   February 18th date that you testified to?
3   A   Yeah, it was -- I don't know if it
4   was the 18th or the 24th, but there was --
5   you know, it did end in the later part of
6   February.
7   Q   And during that period of time, what
8   did you do to assist Mr. Nasi with respect to
9   the assumption of some or all of the duties
10   that you had been handling?
11   A   We had a number of vendor meetings
12   and Edu attended them.  So it was a -- a
13   transferring of the baton so he would get to
14   meet the -- you know, the people that we were
15   working as our -- as our vendors and understand
16   sort of the role they played and -- and what we
17   were working on with them.
18   Q   About how many vendor meetings were
19   there?
20   A   I -- I don't recall.
21   Q   And were the vendor meetings in North
22   Wales, Pennsylvania?
23   A   Yes.
24   Q   And did Mr. Nasi attend them in
25   person?

Page 40

1   A   Most of the time he would fly up
2   and -- he was on a schedule of traveling to
3   North Wales every other week so we scheduled
4   those meetings around his travel schedule.
5   Q   Okay.  And were the meetings attended
6   by a representative of the vendor, yourself,
7   and Mr. Nasi?
8   A   Yes.
9   Q   Would others be present as well?
10   A   Yes.
11   Q   Who else?
12   A   Depending on the vendor, it
13   definitely would -- definitely would be Diane
14   Rohach.  Often it would include members of her
15   team.  And if it was a compensation matter, it
16   would be Miriam and appropriate members of her
17   team.
18   Q   And Ms. Rohach have --
19   A   And from time to time, there would be
20   Suhas Petkar from procurement at Teva.
21   Q   And the passing of the baton, was
22   that your way of introducing Mr. Nasi as the
23   next compensation man -- I'm sorry -- as the
24   next Total Rewards manager for North America?
25   A   That's correct.

Page 41

1   Q   Did you ever have occasion to
2   question anyone at Teva as to why they selected
3   Mr. Nasi rather than Ms. Rohach or
4   Ms. Weinstein?
5   A   I had conversations with Miriam
6   and -- and Diane.  But there was no real
7   opportunity to question the selection.
8   Q   So the conversations with Miriam,
9   were they with regard to the subject of
10   Mr. Nasi becoming the new head of Total Rewards
11   for North America?
12   A   That -- that was one of the
13   conversations, yes.
14   Q   Okay.  And during the course of the
15   conversation, were there questions as to how
16   Mr. Nasi was selected rather than Ms. Weinstein
17   herself?
18   A   Yes.
19   Q   And did you have an explanation for
20   her?
21   A   No.
22   Q   Did you speculate or share an opinion
23   as to why they selected Mr. Nasi?
24   A   Can you restate that?  I'm not sure I
25   understand.

11 (Pages 38 - 41)

JOINT APPX 1213

Page 42

1      MR. RAPPOPORT:  Ms. Court Reporter,
2  read back my question, please.
3      (Whereupon, the court reporter read
4  the question.)
5      BY MR. RAPPOPORT:
6      Q   If you're not able to answer the
7  question, I'll ask you another one.
8      A   Okay.  Please do.
9      Q   Did you share your opinion with
10  Ms. Weinstein as to how they came to select
11  Mr. Nasi?
12      A   No.
13      Q   Did you have an opinion as to how
14  they came to select Mr. Nasi?
15      A   Other than his age and he was a male,
16  no.
17      Q   Okay.  So it was your opinion that
18  him being a male and him being whatever age he
19  was, were to contributing factors to his
20  selection?
21      A   Yes.
22      Q   And what's basis of that opinion?
23      A   The fact that he's a male and he was
24  much younger than I was.  And I was being
25  terminated because of my age.

Page 43

1      Q   My question really related to his
2  selection rather than Ms. Weinstein's as
3  opposed to yourself.  Maybe it's the same
4  answer.  Let me ask it this way:  Was it your
5  opinion that the reason Mr. Nasi was selected
6  rather than Ms. Weinstein was because he was a
7  male and younger than Ms. Weinstein?
8      A   No.
9      Q   Okay.  What was your opinion if you
10  had one as to why Mr. Nasi was selected rather
11  than Ms. Weinstein?
12      A   I did not have one.
13      Q   Okay.  Did you have an opinion as to
14  why Ms. Rohach wasn't selected to become the
15  next head of Total Rewards for North America?
16      A   I did not have one.
17      Q   But you did have an opinion as to why
18  Mr. Nasi was selected rather than yourself?
19      A   Yes.
20      Q   And that opinion was what?
21      A   That opinion was that he was -- he
22  was substantially younger than I was.
23      Q   How old were you when you were hired
24  by Teva?
25      A   I believe I was age 60.  I was hired

Page 44

1  in 2014.  Or approached age 60.  I was 59
2  because my birthday's May.
3      Q   59 and a half about to turn 60 in
4  May, would that sound right?
5      A   That sounds correct.
6      Q   Has it ever occurred to you that Teva
7  hired a 59 and half year old who's about to
8  turn 60 who is now alleging age discrimination?
9      A   I don't understand the question.
10      Q   Okay.  Let me ask you this way:  What
11  was your last position before Teva?
12      A   I was the global head of Total
13  Rewards for the H.J. Heinz Company.
14      Q   And are they a Pittsburgh-based
15  company?
16      A   They are.
17      Q   Okay.  And where did you live when
18  you worked for H.J. Heinz?
19      A   I lived in Wexford, Pennsylvania.
20      Q   And is that where you raised your
21  family?
22      A   Well, understand I have a wide range
23  of ages for children.  So I raised probably
24  half of my family, a little more than half.  I
25  do have eight children.

Page 45

1      Q   So the younger half would have been
2  raised in Wexford?
3      A   That's correct.
4      Q   And how about the older?
5      A   Well, some were in college.
6      Q   Okay.  Where were they raised?
7      A   Well, that's a good question too
8  because I have moved -- I have moved around.  I
9  probably have moved seven or eight times in my
10  career.
11      Q   Why so many times?
12      A   Good question.  Because I had upward
13  mobility.  And these were great opportunities
14  to progress my career.
15      Q   Other than Teva, were you ever
16  terminated involuntarily?
17      A   That's a good question.  I was
18  terminated involuntarily at -- at the
19  H.J. Heinz Company.
20      Q   Would that have been in 2013?
21      A   I believe that's correct, yes.
22      Q   What occurred to cause you to be
23  terminated involuntarily at H.J. Heinz?
24      A   The company was acquired by Berkshire
25  Hathaway and 3G and became a privately held

12 (Pages 42 - 45)

Page 46

1 company.
2     Q    Were you replaced?
3     A    Replaced.  Yes, I believe -- yes, I
4 was.
5     Q    Were you replaced by a younger
6 person?
7     A    I don't know the age of the person
8 who replaced me.
9     Q    Did you receive a package when you
10 were separated by the H.J. Heinz Company?
11     A    I did.
12     Q    And what was the package that you
13 received?
14     A    I'm not sure of the question.
15     Q    Do you recall what you received from
16 H.J. Heinz Company at the time of your
17 separation?
18     A    With regard to benefits,
19 compensation?
20     Q    As best you recall.
21     A    Yeah, I received severance payments.
22 You know, I received benefits continuation.
23 And I was, you know, vested in -- in my pension
24 plan.
25     Q    Was that conditioned upon your

Page 47

1 execution of a release?
2     A    It was.
3     Q    Did it occur to you that your
4 selection for the termination at that time at
5 H.J. Heinz was discriminatory on the basis of
6 your age?
7     A    No.
8     Q    So at the time you were interviewing
9 at Teva, were you still receiving severance
10 benefits at H.J. Heinz?
11     A    Yes.
12     Q    Is H.J. Heinz a global organization?
13     A    Yes.
14     Q    What makes an organization global?
15     A    The number of countries that it
16 operates in would be probably the key.
17     Q    Was your role a global role?
18     A    Yes.
19     Q    And were you the highest level Total
20 Rewards individual at H.J. Heinz at the time
21 that you were separated in 2013?
22     A    Yes.
23     Q    And did you report to a -- who did
24 you report to?
25     A    Chief human resource officer.

Page 48

1     Q    But you don't know the age of your
2 replacement after you were let go?
3     A    I do not.
4     Q    How did you come to be introduced
5 or -- to Teva?
6     A    I applied for a -- oh, I know how it
7 went.  I work -- Teva works closely with
8 Salveson Stetson -- or Stetson Salveson, which
9 is a search firm.  And that search firm had
10 placed me at Heinz.  And I had reached out to
11 an individual.  Her name is Donna DeHart.  And
12 she put me in touch with -- with Teva.  So
13 that's how I found out.
14     Q    And do you recall who at Teva she put
15 you in touch with?
16     A    I believe she put me in touch with
17 either Lesley Billow or she put me in touch
18 with their talent acquisition team.  It
19 probably was their talent acquisition team
20 initially, but I don't recall.
21     Q    Let me go back to an earlier
22 question.  I ask you about involuntary
23 terminations or separations.  You identified
24 H.J. Heinz.  Were any of the other former
25 companies that you worked for places where you

Page 49

1 were likewise involuntarily terminated?
2     A    I assume that does not include mutual
3 agreement?
4     Q    Well --
5     A    Does that --
6     Q    -- let's explore that.  Were there --
7 were there companies where you left by mutual
8 agreement?
9     A    Yes.
10     Q    And does that mean that they
11 suggested that you leave and you agreed that it
12 would be a good time to leave?
13     A    No.  It was that I had felt it was
14 time to leave.  And we agreed that was correct.
15     Q    Okay.  But they accepted a
16 resignation.
17     A    Through mutual agreement, yes.
18     Q    Which company are you referring to?
19     A    That would be with Pfizer.
20     Q    All right.  And how long were you
21 with Pfizer?
22     A    Well, that's an interesting question.
23 I joined a company called Warner-Lambert and
24 Warner-Lambert subsequently was acquired by
25 Pfizer.  And then I left.  So for the whole

13 (Pages 46 - 49)

Page 50

1 period, I'd have to look at the dates but I
2 assume I was probably there for close to five
3 years.
4    Q   So was it --
5    A   I had to be five years because I got
6 a --
7    Q   So was it the Pfizer acquisition that
8 you decided that you no longer wished to work
9 for Pfizer?
10    A   No, that's not correct.
11    Q   What was it about the employment at
12 Pfizer that caused you to speak to
13 representatives of Pfizer about your decision
14 to want to leave?
15    A   Well, one, I was being groomed for
16 the top position, Total Rewards position, at
17 Warner-Lambert. Warner-Lambert is the company
18 that invested in Lipitor, which is -- was a
19 $10-billion-a-year drug. But it had not
20 reached its potential at that point.
21 Regardless, they made a play for America Home
22 Products. And as a result of that initiative,
23 Pfizer was then legally allowed to -- to do a
24 hostile bid for -- for Warner-Lambert and took
25 over the company.

Page 51

1        Pfizer had no intention of keeping
2 the -- all of the four businesses that
3 comprised Warner-Lambert. Their main goal was
4 to keep the pharmaceuticals, particularly
5 Lipitor. So they owned a fish-keeping-type
6 business called Tetra. They owned a
7 confectionary-type business. And they owned a
8 consumer healthcare business. And they owned
9 the pharmaceutical business. My role was to
10 hire staff for all of these businesses
11 for the -- for Total Rewards and make them --
12 give them good appearance so that they were
13 easy to sell. And because of regulations, they
14 could not sell those businesses for two years.
15 So for two years that was my role. When the
16 two years was up, the businesses were indeed
17 sold. I helped manage some of the transition
18 and then I began working in -- in New York
19 City. I was working there around the time of
20 the -- September 11 when the towers went down.
21        And after working in New York for a
22 period of time, I had -- I had wanted to leave.
23 And Pfizer decided to acquire Pharmacia. And
24 they asked me to stay to manage that transition
25 because I had done such a good job with the

Page 52

1 prior acquisition, so I stayed. And when that
2 acquisition was finally settled, I wanted to
3 move on. I -- I was not real pleased working
4 in New York City.
5    Q   Why then are you referring to it as a
6 mutual decision?
7    A   Because I don't know if Pfizer wanted
8 me necessarily to go. I think they valued the
9 work I did and the contributions I made. But,
10 you know, I wanted to -- you know, I was not
11 happy. That's all.
12    Q   Now, you called it a mutual decision,
13 but you continue to say that it was your
14 decision. Can you tell me why you referred to
15 it as a mutual decision?
16    A   Well, as I said, they -- I don't
17 necessarily believe they wanted to terminate
18 me, but with the Pharmacia acquisition, there
19 were again a lot of individuals from that
20 company. So there was sort of a question of
21 who would stay and who would go. And, you
22 know, there was a fellow who I think was -- I
23 guess he might have been the head of Total
24 Rewards for Pharmacia at that time. Because
25 Lou Cheek (phonetic) was actually I think

Page 53

1 the -- the head of HR at the time, although he
2 has huge experience in comp and benefits. But
3 at any rate, you know, they were making
4 decisions as to who should stay and who should
5 go. And, you know, because I was unhappy, I
6 think I guess it made sense. So that's why I
7 call it mutual decision. Maybe I'm not using
8 that term correctly, but that was my
9 perspective.
10    Q   Okay. With respect to the
11 opportunity at Teva, was there a vacant
12 position in Total Rewards?
13    A   Was there a vacant position? That
14 I'm not clear about. There was an individual
15 in the role. And then that person was replaced
16 by I believe Darren DeRosa. Then that person
17 was replaced by Jarret Miller. I don't know if
18 they were just interims or if they were
19 permanent employees. I know that neither of
20 them left Teva but were given other
21 responsibilities outside of Total Rewards.
22 That's all I can recall.
23    Q   Who do you recall interviewing with
24 at Teva for the position in Total Rewards?
25    A   I -- I know I met with Lesley Billow.

14 (Pages 50 - 53)

Page 54

1 I was then flown to Israel. I met with Yonit
2 Landskroner. And I met with Mark Sabag. Those
3 I remember.
4    Q   The two individuals in Israel that
5 you made reference to, what levels of the
6 organization were they at?
7    A   Yonit was the global head of Total
8 Rewards. And Mark was the chief HR officer.
9    Q   And as a result of the meetings and
10 interviews, were you offered employment?
11   A   Yes.
12   Q   At senior director level?
13   A   Yes.
14   Q   Were there any discussions at all
15 with respect to bringing you on at a different
16 level?
17   A   No.
18   Q   Was Yonit at the senior director
19 level?
20   A   No. I believe she was a senior vice
21 president. But again, I'm not sure.
22   Q   And Mr. Sabag was not at the senior
23 director level?
24   A   No.
25   Q   Would Yonit have been your person

Page 55

1 that you would be reporting to?
2    A   Yes.
3    Q   And did she have a Total Rewards
4 background?
5    A   I'm not that familiar with her
6 background, but I would assume she did.
7    Q   Were you impressed by her?
8    A   She wasn't an overly impressive
9 person, but she seemed very effective at what
10 she was doing. She was someone that I could
11 easily work with.
12   Q   Was she the one who hired you?
13   A   I honestly don't know. I assume so.
14   Q   And as a result of the new position
15 at Teva, is it true that you went from a vice
16 president at Heinz to a senior director at
17 Teva?
18   A   That is correct. I was -- took a
19 demotion as you would call it.
20   Q   Is that what you called it?
21   A   It was a drop down from my prior
22 responsibilities, yes.
23   Q   Why were you willing to accept a
24 position that would have been at a lower level
25 that what you had been at H.J. Heinz?

Page 56

1    A   Well, that's a -- that's a good
2 question. If you look at my history, again,
3 I've -- I've moved around. I've climbed the
4 ladder. I've had a very successful career, a
5 very filling career. After nine years at
6 Heinz, heavy travel, lots of responsibilities
7 working with the board and senior executives,
8 it was kind of time to -- to take time to
9 reflect on life. My -- my wife's father was --
10 you know, was at that time would have been 86
11 or so. And, you know, we were concerned about
12 his health. So Teva offered me sort of a
13 really nice situation where I could be close to
14 him because he was in the Philadelphia area.
15 We could be close to my wife's family. And I
16 would be, you know, able to spend more time
17 with my family because the Teva position did
18 not require extensive travel, did not deal with
19 the board of directors, and seemed to be a
20 great environment where I could thrive and find
21 that balance between work and -- and life.
22   Q   Were there any discussions as it
23 related to your aspirations to become a vice
24 president during the interview process?
25   A   No.

Page 57

1    Q   Did you take a reduction in pay to
2 come to Teva?
3    A   Yes.
4    Q   Did you take a reduction in bonus?
5    A   Yes.
6    Q   And were there other things that you
7 also left on the table so to speak by leaving
8 Heinz for the Teva position?
9    A   Define "left on the table."
10   Q   Were there other reductions in
11 benefits that you had enjoyed at Heinz that
12 were not going to be available to you because
13 of your level at Teva?
14   A   Yes.
15   Q   I didn't hear your answer.
16   A   Yes.
17   Q   What were they?
18   A   It's a pretty long list. I believe
19 the benefits at Heinz, the health care benefits
20 were better, the equity or long-term incentives
21 were better. You've mentioned bonus. You've
22 mentioned salary. We still traveled business
23 class. And when I joined Teva, it was supposed
24 to be business class. But literary the week I
25 joined, that got canceled, so no more business

15 (Pages 54 - 57)

Page 58

1 class. The retirement plans were pretty good
2 I -- I guess that's about it. I'm trying to
3 think if there was anything else of substance.
4 I'm sure there were -- there were, you know,
5 variations to the benefits that were provided,
6 supplemental benefits as well as voluntary
7 benefits.
8     Q    Did Teva call the program -- the
9 organization that you're in Total Rewards when
10 you joined?
11    A    I believe so, yes.
12    Q    And how big was the organization in
13 terms of the number of employees?
14    A    Well, the U.S. was -- was 8,049
15 people I believe at the time. Canada was maybe
16 a few thousand. And Latin America was probably
17 4,000 or so, four or 5,000.
18    Q    Did you say approximately 15,000
19 employees?
20    A    All-in, that would be close, yeah, 14
21 or 15 -- probably 14,000.
22    Q    And how big was the Total Rewards
23 organization?
24    A    Let's see. We had a manager, Rick
25 Taylor, two analysts so that's three in the

Page 59

1 comp area. And Diane, she -- I really -- it --
2 I -- I -- I really don't recall. It probably
3 was somewheres around -- if I add Canada and
4 I've got to add all the countries in Latin
5 America, it might have approached 20, 18. Some
6 people were sort of shared people when you got
7 into the Latin American countries so they had
8 multiple responsibilities.
9     Q    Who did you report to originally or
10 initially when you joined Teva?
11    A    Yonit Landskroner.
12    Q    Where was she based?
13    A    Israel.
14    Q    And did you have any dotted line
15 reporting?
16    A    Lesley Billow was as I had said
17 earlier was called a matrix manager.
18    Q    Did you attend her staff meetings?
19    A    I did.
20    Q    And were there staff meetings that
21 Yonit had with regard to her direct reports?
22    A    I'm sorry. Can you repeat that?
23    Q    Were there staff meetings that Yonit
24 held with her direct reports?
25    A    Yes.

Page 60

1     Q    And were her direct reports like you,
2 persons in Total Rewards that had
3 responsibilities for other continents -- or
4     A    They were people who had
5 responsibilities for other regions as well as
6 the corporate -- her corporate team.
7     Q    The regional team would be you in
8 North America. Correct?
9     A    Correct.
10    Q    Was there someone who was your
11 counterpart in Europe?
12    A    Yes. At the time of my hiring, it
13 was Wim Zeeuw.
14    Q    And what other reasons were there
15 where there were direct reports who reported up
16 to Yonit?
17    A    I can only give you my recollection.
18 You had Israel. You had Asia pacific.
19    Q    Who was your --
20    A    That's --
21    Q    -- counterpart in Israel?
22    A    That's -- I -- I think that -- I
23 think that that's all that I can -- can recall.
24    Q    Who was your Israeli counterpart?
25    A    That would have been Amir Zeirah.

Page 61

1     Q    Who was the Asia-Pacific counterpart?
2     A    Fellow by the name of Gaurav.
3     Q    Where was he based?
4     A    I think I believe he was based in
5 Singapore.
6     Q    Did you hear my question?
7     A    No, I didn't hear a question.
8     Q    I said, was Gaurav a last name or a
9 first name?
10    A    Oh, that would be a last name.
11    Q    How long did you report to Yonit
12 Landskroner?
13    A    I don't -- I don't quite know. I
14 assume it was less than a year because I
15 believe she left the organization in 2000 --
16 let's see in 2014. But again, I'm not -- I'm
17 not sure.
18    Q    Was she replaced?
19    A    She was.
20    Q    By whom?
21    A    Ron Yaniv.
22    Q    And did he have a Total Rewards
23 background before coming to Teva?
24    A    He had a background in compensation
25 and benefits.

16 (Pages 58 - 61)

Page 62

1    Q    Is that different than Total Rewards?
2    A    Not necessarily.
3    Q    Well, does compensation plus benefits
4  equal Total Rewards?  Or is there something
5  that I'm missing in the equation?
6    A    No.  I think that's the general
7  scope.
8    Q    So when I asked you the question
9  whether he had a Total Rewards background and
10  you responded by saying he had a background in
11  compensation and benefits, is there some reason
12  why you answered it that way?
13    A    No.  It's just that that's -- that
14  was my knowledge of his -- of his skill set.
15    Q    When did you begin reporting to him?
16    A    I did.  When, again I'm not
17  100 percent clear whether it was the latter
18  part of 2018 or the early part of 2019.
19    Q    Were you a candidate for the position
20  that Mr. Yaniv filled?
21    A    I -- I'm unaware of whether I was or
22  was not.
23    Q    Did you self-identify as someone who
24  would be interested in that role?
25    A    I did not.

Page 63

1    Q    And did Mr. Yaniv report to
2  Mr. Sabag?
3    A    Yes, he did.
4    Q    Did he take on additional reports
5  other than the ones that you've already
6  testified to that Yaniv had?
7    A    By additional reports, additional
8  positions? additional headcount?
9    Q    Direct reports.
10    A    I don't know.
11    Q    Did he have staff meetings?
12    A    Yes.
13    Q    And did you attend the staff
14  meetings?
15    A    I did.
16    Q    What was your working relationship
17  like with Mr. Yaniv?
18    A    It was a very good working
19  relationship.
20    Q    Did he evaluate you?
21    A    He did.
22    Q    And were you satisfied with the
23  evaluations that you received?
24    A    I believe if you reviewed the -- the
25  performance reviews, you will see in my notes

Page 64

1  that, you know, there was not always agreement.
2    Q    What were the subjects that you
3  didn't agree on?
4    A    I believe -- I believe it was a
5  challenge that I faced with regard to educating
6  Mr. Yaniv as well as the team in Israel about
7  the complexities of the U.S. benefits system in
8  particular.
9    Q    And what -- how would you describe
10  the challenge?
11    A    Mr. Yaniv's experience was -- even
12  though he had -- he had I believe had worked in
13  the U.S. for Martel, but some of his -- most of
14  his experience was with government-run benefit
15  programs.
16    Q    And as a result, you needed to
17  educate him and others with regard to how
18  benefits are provided in countries where
19  they're not government run?
20    A    Yes.
21    Q    And did that result in clashes?
22    A    Not necessarily classes.  Again, it
23  was an educational prospective more on an
24  intellectual basis.  And it resulted in again,
25  some cultural differences that we worked out.

Page 65

1  Clearly, you know, Mr. Yaniv gave me the -- the
2  approvals to proceed with the programs that I
3  had initiated.  And those programs were very
4  successful.
5    Q    What were the programs that you had
6  initiated that were successful?
7    A    That's going to take a while.  One is
8  that we -- we built a Total Rewards portal.
9  Within Teva, there was no -- within Teva
10  globally, there was no communications down to
11  the -- the factory level.  And unless we just
12  focus on the U.S., again, there was no
13  communications, two way, or immediate
14  communications with all the employee
15  population.  So basically you had to reach them
16  by the U.S. Postal Service or by word of mouth,
17  sort of you tell -- you tell the HR person, and
18  the HR person then holds a meeting at a
19  facility and tells the employees.  The portal
20  was one that brought all of this to life.  And
21  I won't go into the details, but it was
22  probably one of the greatest changes that Teva
23  experienced in the U.S.
24         I also moved the culture from
25  being -- towards a culture of -- of wellness.

17 (Pages 62 - 65)

1 So if you think about healthcare, the -- you
2 know, the biggest issue is to identify diseases
3 in the early stages and even better is to
4 prevent them.  That's why women have mammograms
5 to detect breast cancer in its early stages.
6 And so encouraging our female employees then to
7 have mammograms and having the company pay the
8 full cost of those mammograms was -- you know,
9 was a -- was a big deal.  And so getting --
10 getting Teva in Israel to understand that if we
11 spent money on prevention, that the return on
12 that investment would be substantial because we
13 wouldn't have all the claims for cancer and oh,
14 by the way, we would have healthy workers and
15 be doing a service -- a great service to our
16 female employee population.  So I can go on if
17 you want me to keep going.
18     Q   I think that's fine.  So you had
19 responsibility for introducing benefits in your
20 capacity as head of Total Rewards for North
21 America.  And among the benefits that you
22 introduced were healthy lifestyle benefits and
23 preventative measures like you've testified to.
24 Is that a fair description?
25     A   Yes.  As well as negotiating with

1 various providers to -- to reduce their costs
2 or provide services that would help Teva to
3 reduce their costs.
4     Q   Those were the aforementioned vendors
5 that would provide benefits to Teva.
6     A   Yes.  There were about 24 vendors
7 that we used.
8     Q   And you were the person who was lead
9 negotiator for Teva in terms of negotiating
10 those -- their proposals.
11     A   It was a very collaborative
12 effort with -- with procurement.  So we
13 partnered with procurement who also again
14 helped us in some of the negotiations.
15     Q   Did -- for the -- did Mr. Yaniv for
16 the most part allow you to run and operate the
17 Total Rewards organization in North America?
18     A   Yes.  Within certain limits.
19     Q   When did you assume responsibility
20 for Latin America?
21     A   I believe I had Latin America on the
22 day I was hired.
23     Q   And were you the one who was
24 responsible for finding the head of Total
25 Rewards for Latin America?

1     A   That is correct.
2     Q   Was that Mr. Nasi?
3     A   Yes.
4     Q   What was it about his background that
5 resulted in your offering him employment at
6 Teva?
7     A   I've known Mr. Nasi for perhaps as
8 long as 20 years or so.  And when I was at
9 H.J. Heinz, I believe I had engaged Mr. Nasi
10 in -- you know, in some consulting work for
11 some of the Heinz operations down in Latin
12 America.  Mr. Nasi was with Mercer when I first
13 started working with him.  He ran their survey
14 for the consumer products industry in Latin
15 America.  And so as part of that survey group,
16 it was sort of a private group, we would meet
17 at least once a year and go through the survey
18 data.  There would also be either meetings,
19 phone calls, other activity around inputting
20 the survey data, which again was often done on
21 a country level.
22         But then Mr. Nasi left Mercer and
23 joined General Mills.  He worked for a good
24 friend of mine by the name of Tracy Kofski.
25 She was the head of Total Rewards for General

1 Mills.  And then he and I connected.  I reached
2 out to him more to see if he knew of anyone.
3 And he was unhappy and General Mills so -- so
4 he went through our interview process and was
5 hired.
6     Q   You solicited him for the possibility
7 of Teva employment?
8     A   Yeah.
9     Q   And then hired him as the head of
10 Total Rewards for Latin America?
11     A   Yes.
12     Q   He reported to you during that period
13 of time?
14     A   Yes.
15     Q   Did he have authority to make
16 decisions without your involvement or input as
17 it related to the Latin American countries
18 where Teva employed employees?
19     A   It was limited.
20     Q   Now, you said you had dotted line
21 responsibility for Lesley Billow and you called
22 her the chief human resource officer for North
23 America?
24     A   I don't think I called her the chief
25 human resource officer for North America.  But

JOINT APPX 1220

**Page 70**

1 she for whatever reason appeared to be the --
2 the most senior HR person for North America as
3 she was the one who called all of the other HR
4 leads together.
5    Q    Including yourself?
6    A    Including myself.
7    Q    And did she leave Teva before you
8 did?
9    A    Yes.
10   Q    Can you recall when she left?
11   A    I only know that she left in 2017. I
12 don't recall the exact date.
13   Q    Did she leave voluntarily?
14   A    Yes.
15   Q    Do you know what caused her to leave
16 Teva?
17   A    That I -- I'm not clear about.
18   Q    She never shared with you?
19   A    Not in detail.
20   Q    Did she leave for another employment
21 opportunity.
22   A    Yes.
23   Q    Was that at BMS?
24   A    Correct.
25   Q    And was she replaced?

**Page 71**

1    A    I don't believe she was.
2    Q    Who assumed her duties and
3 responsibilities?
4    A    I -- Daniel Lawlor to my knowledge.
5    Q    Had you known Mr. Lawlor prior to him
6 assuming those duties and responsibilities
7 sometime in 2017?
8    A    I had interacted with him from time
9 to time during the -- you know, since I joined.
10   Q    During the period of time that both
11 he and Ms. Billow worked at Teva in HR roles,
12 what was the difference between their HR roles?
13   A    Well, as best I can tell, Mr. Lawlor
14 was responsible more for the -- for the
15 specialty business, so the branded business. I
16 can't -- I don't -- and -- and he might have
17 had the generics business. I'm not -- again,
18 I'm not sure. But he had responsibilities for
19 some of those types of business. Lesley seemed
20 more on the administrative side if that's fair
21 because we did have a manufacturing
22 organization, I think it's called TGO, that had
23 its own head. So that's really all I can tell
24 you. I believe Lesley had legal. She had the
25 finance. So she had again maybe the support

**Page 72**

1 functions probably, but I'm not sure if she
2 had, you know, monies, purchasing, procurement.
3    Q    And when she left Teva, Mr. Lawlor
4 began to assume her responsibilities. Is that
5 right?
6    A    I'm not sure who took over all her
7 responsibilities. There was a vice president
8 that reported to Lesley. And I assume that she
9 took on some of those responsibilities. I also
10 assume that she may have reported to
11 Mr. Lawlor. But -- but I -- I honestly do
12 not -- do not know.
13   Q    Is that Pam Daknis?
14   A    No this would have been I think
15 Jennifer Flaischer.
16   Q    Did Mr. Lawlor continue to have
17 meetings with direct reports that you attended
18 after Ms. Billow left?
19   A    I believe he did.
20   Q    And did you remain in touch with
21 Ms. Billow after she left?
22   A    I've had correspondence with her,
23 yes.
24   Q    Did you tell Ms. Billow that you were
25 suing Teva for $12.9 million?

**Page 73**

1    A    I did.
2    Q    Okay. And when you told her that you
3 were suing for $12.9 million, how did you
4 determine that number?
5    A    Well, the number initially was
6 probably 12.9. It's currently in its revised
7 format at 15 million.
8    Q    When you told Ms. Billow that you
9 were suing Teva for $12.9 million, how did you
10 come up with that number?
11   A    I believe that a spreadsheet has been
12 shared with you and it was a calculation
13 basically extrapolating my salary as well as
14 bonus and other earnings and other income from
15 Teva.
16   Q    Okay. And when you just answered
17 that, the number that you provided was an early
18 number. And the actual number is now
19 $15 million. How was that calculated?
20   A    In the same format. There were a few
21 again benefits that were not in the original
22 calculation.
23   Q    Do you recall what those were?
24   A    I do not, but they had to do more
25 with -- more with retirement income because of

19 (Pages 70 - 73)

Page 74

1 the -- you know, the way the 401K plan was
2 structured. And in fact that number -- if the
3 Secure 2 legislation is passed in the -- in
4 con- -- by congress, then, you know, what's
5 called a catch-up contribution will go from
6 6. -- 6,500 to $10,000 a year. So it's all a
7 moving target depending on what you want to
8 again update it. And with the 6 percent
9 inflation and now today it was 8 and a half,
10 again inflation numbers, I think we held that
11 around 2 percent. Clearly, if we updated it to
12 today and then fast-forwarded it 2 or
13 3 percent, it would be a much higher number.
14     Q    Did you also tell Ms. Billow that age
15 was a key factor in hiring decisions and that
16 you had gone through the interview process with
17 a number of companies about Total Rewards
18 opportunities, that once they found out your
19 age, they were quiet?
20     A    I believe so.
21     Q    Okay. What companies were you
22 referring to when you told Ms. Billow that?
23     A    Again, I would have to go back to --
24 to my notes. But there was an offer from -- or
25 not an offer but an opportunity at Airgas.

Page 75

1 And, you know, I was given an offer from a
2 competitor of that company that I -- that I did
3 not accept at age 62. So, you know, it --
4 it -- I'm not sure how to answer your question,
5 but, yes, I did tell Lesley that it appears
6 that I'm not being hired because of my age.
7     Q    What was the Airgas competitor that
8 gave you an offer at age 62?
9     A    I honestly don't recall. I'd have to
10 look it up.
11     Q    Is that while you were still --
12     A    That's Allentown --
13     Q    -- employed --
14     A    New Jersey -- Allentown,
15 Pennsylvania. They're headquartered there.
16 And there's an offer letter that's part of what
17 you have in -- that's been Bates stamped.
18     Q    All right. The offer that you
19 received from the Airgas competitor in
20 Allentown, Pennsylvania, was that while you
21 were still employed at Teva?
22     A    I received an offer while I was still
23 employed at Teva, yes.
24     Q    Were you looking for employment
25 opportunity during the period of time that you

Page 76

1 were employed by Teva, which is as I understand
2 it, was from 2014 to 2018.
3     A    Not -- not aggressively, no.
4     Q    Well, how is it that you received an
5 offer while un-aggressively not looking for
6 other opportunities?
7     A    I received a call and decided that it
8 was worthwhile to explore. And I explored it.
9 And I got the job, got the offer.
10     Q    Was it at a senior director level?
11     A    It would have been a vice president
12 position, yes.
13     Q    Was it a global opportunity?
14     A    It was.
15     Q    Okay. But you declined the position
16 because of what?
17     A    I met with Ron Yaniv and discussed
18 the situation with him. And he didn't want me
19 to -- he did not want me to leave. He valued
20 my -- my expertise, my skill set, what I
21 brought to Teva. And so again, it was a
22 question because I'd have to move further away
23 from the Philadelphia hub that I -- you know,
24 that my wife's father was situated in. And
25 Teva had -- had made some interesting comments.

Page 77

1 Mr. Yaniv had told me that he would look into
2 the grading of my position. And so he gave me
3 a salary increase. He gave me a retention
4 bonus. And since my work at Teva was not
5 really done, I had built a strategy for the
6 benefits programs and was in the process of
7 implementing that strategy that -- and enjoying
8 the work I did, so it didn't make sense to
9 leave.
10     Q    Do I understand your testimony
11 correctly that the reason that you were given
12 the salary increase and the retention bonus was
13 in response to you sharing with Mr. Yaniv that
14 you had received a competitive offer from
15 another company?
16     A    Yes.
17     Q    Do I understand you correctly that
18 Mr. Yaniv also shared with you that he would
19 look into the possibility of a different job
20 title and labor grade for you?
21     A    A different grade, yes.
22     Q    What grade were you?
23     A    I was a 17.
24     Q    Wasn't that the highest grade for a
25 senior director?

20 (Pages 74 - 77)

Page 78

1   A   That's correct.
2   Q   So if you were to receive a labor
3   grade 18, would that necessarily have meant a
4   promotion to a vice president position?
5   A   That normally would go hand in hand,
6   yes.
7   Q   Were there senior directors at labor
8   grade 18?
9   A   Not that I'm aware of.
10   Q   But when you qualified your answer by
11   that "normally," were there instances where you
12   could have been promoted to a labor grade 18,
13   but still retain the senior director title?
14   A   That I don't know.  Teva makes
15   exceptions in numerous cases.
16   Q   Going back to your earlier testimony,
17   you were -- well, let me ask it this way: One
18   of the considerations that you said was
19   relocating out of the Philadelphia area.
20   Didn't you say the job was in Allentown,
21   Pennsylvania?
22   A   Yes, I did.
23   Q   Isn't Allentown, Pennsylvania 45 to
24   50 miles from Philadelphia?
25   A   I'm not sure but I know it -- it's a

Page 79

1   good distance.  You can take the turnpike to
2   get there.  But again, it wasn't -- it wasn't
3   what I wanted to do.  It was too far a distance
4   because it would require, you know, at least an
5   hour or so drive.
6   Q   So I heard your testimony -- I
7   thought I heard your testimony to say that
8   there was a contrast to getting a job offer at
9   62 from an Airgas competitor in contrast to
10   Airgas not figuring out your job and going
11   quiet.  Is that accurate?
12   A   I'm sorry.  Can you repeat that?
13   Q   I can.  I'm sorry.  I'll ask it
14   better.
15        Were you suggesting in your testimony
16   that there was in contrast in light of the fact
17   that at age 62 you received an offer from an
18   Airgas competitor, but now that you were
19   looking for work, Airgas had figured out your
20   age and had gone quiet?
21   A   I assume that -- that Airgas did not
22   want to hire me because of my age.
23   Q   And what -- what's that assumption
24   based upon?
25   A   I believe the correspondence or

Page 80

1   conversation that went through was that they
2   had found better qualified candidates.
3   Q   By a better qualified candidate, that
4   to you meant a younger candidate?
5   A   That's typically what it means, yes.
6   Q   Is it possible for there to be a
7   better qualified candidate at a younger age?
8   A   There is.
9   Q   Do you know how Airgas figured out
10   your age?
11   A   They may have figured it out from my
12   resume.
13   Q   Was there something on your resume
14   that allowed them to do the math to figure out
15   how old you were?
16   A   Some of my resumes contain the dates
17   in which I received my -- my college degrees
18   and also contain the dates of my employers.
19   Q   Where were you educated?
20   A   I received my bachelor's of science
21   from Stevens Institute of Technology.
22   Q   Where is that located?
23   A   Hoboken, New Jersey.
24   Q   And what year did you receive that
25   degree?

Page 81

1   A   1976.
2   Q   Okay.  And what was your
3   concentration at Stevens Institute of
4   Technology?
5   A   Industrial and organizational
6   psychology.
7   Q   Do you have any advanced degrees?
8   A   I have a master's of science.
9   Q   Where was that received from?
10   A   Stevenson Institute of Technology.
11   Q   In what year?
12   A   I believe it was 1981.
13   Q   And how long a program was that?
14   A   I -- I had to work my way through
15   college, so I took that degree evenings, so I
16   guess it took me five years.
17   Q   How long would it have been if you
18   had been a full-time student?
19   A   Probably three.
20   Q   And what's the area of concentration
21   with regard to your advanced degree?
22   A   It was also industrial organizational
23   psychology.  It may have said applied
24   psychology but it was a similar field.
25   Q   In the same email that I referenced

21 (Pages 78 - 81)

Page 82

1  to Lesley Billow, you told her that you would
2  be filing a class action suit against Teva, you
3  told her that Steve Middlebrooks won a
4  $6.1 million lawsuit earlier that year. And
5  then you said, and I quote: so it should be
6  fun.
7        What makes it fun?
8     A    What makes what fun?
9     Q    Suing.
10    A    Suing Teva?
11    Q    Yeah.
12    A    What makes it fun, I guess it's
13 the -- the David and Goliath aspect of it. The
14 fact that here I am one person going up against
15 a huge corporation.
16    Q    Are you having fun today?
17    A    Intellectually this is very
18 interesting.
19    Q    You don't deny telling her that suing
20 Teva should be fun, do you?
21    A    Whatever was in the email, that's
22 what I did.
23    Q    Okay. Were there particular projects
24 that you had worked with Mr. Lawlor on before
25 he replaced Ms. Billow?

Page 83

1     A    Yes.
2     Q    What projects were they?
3     A    Well, the last one I worked on him
4  with was the supplemental unemployment benefit
5  plan.
6     Q    Was that -- what year would that have
7  been?
8     A    2017.
9     Q    And what was his role and what was
10 your role?
11    A    Well, Teva was focused on trying to
12 reduce costs to save money. And I had been in
13 touch with our finance department as well as
14 with Ernst & Young. And it came to our
15 attention that there was a program that would
16 offset what Teva's state unemployment benefits
17 against whatever Teva's severance payments
18 were, that it was legal, and, you know, as part
19 of my responsibilities I brought that program
20 to the attention of Mr. Lawlor, that if they
21 really wanted to save money, you know, this
22 could save close to $10 million.
23    Q    This was your discovery?
24    A    It was through Anna Khais at finance
25 and then my involvement thereafter.

Page 84

1     Q    So finance had the idea and shared it
2  with you. And you took it from there?
3     A    Finance had the -- the connection to
4  Ernst & Young. I had worked with Ernst & Young
5  as well with Anna on a number of projects, but,
6  yes, they raised it to her first.
7     Q    And then it came to your attention?
8     A    That's correct. I joined the meeting
9  where it was first discussed.
10    Q    And what was Mr. Lawlor's role as it
11 relates to the SUB plan?
12    A    Well, he was -- he was a client at
13 that -- at that particular time. So it was
14 something that if he was interested in, that we
15 could -- that we could pursue. I don't know if
16 he was the decision-maker. But it was
17 certainly -- if you're going up the chain of
18 command, it was more in his purview than it
19 would have been in Total Rewards.
20    Q    So were there meetings that were held
21 that involved or included both you and he?
22    A    Yes.
23    Q    And were you trying to attract him to
24 this plan in order to save money for Teva?
25    A    I believe my position was neutral.

Page 85

1     Q    Okay. Was he interested in the plan?
2     A    He was.
3     Q    He expressed his interest to you?
4     A    Yes.
5     Q    And did the plan proceed?
6     A    Well, we -- we had to work with
7  procurement. Finance sort of took a back seat,
8  meaning their involvement was -- was very
9  limited. A woman by the name of Samantha
10 Blattler, who was the project manager and
11 worked with a company called Conduant. She was
12 contacted. We got a proposal. We agreed -- we
13 signed it. I don't know -- I think I signed
14 the proposal.
15        And again, for me to sign something,
16 it would have to have been approved by Dan and
17 probably by mister -- well, I don't know if Ron
18 was still around, so I have a sense it was
19 simply Dan. And I don't know who Dan would
20 have engaged in that conversation. But I was
21 given the approval to go ahead and sign it. I
22 signed it. And we built the plan.
23    Q    And as a result of the plan, what
24 changed?
25    A    Well, recognize -- what changed is

22 (Pages 82 - 85)

Page 86

1 that if you terminate Teva, signed a release,
2 you would receive severance payments, which was
3 salary continuation. And Teva had changed the
4 plan. At one point it was a lump sum. Now it
5 was a monthly payment. So you received your
6 severance in -- in weeks of pay so every week
7 or biweekly -- oh, sorry -- bimonthly you got
8 your -- your paycheck. And obviously if you
9 did get employed, then the -- the severance
10 would cease. The new plan basically said that
11 you had to file for state unemployment
12 benefits. Those benefits would then be
13 deducted from the -- I'm sorry -- from the Teva
14 payment, and that was the savings. Basically
15 Teva took money out of the pockets of employees
16 and -- and put it in theirs, money that
17 historically would have been paid to the
18 employee.
19      Q   And this applied to all employees
20 irrespective of age. Correct?
21      A   Well, that's not correct because in
22 the twelfth hour, the last meeting I had with
23 Dan, Dan basically said to me, "You know, I --
24 I don't -- I don't want to have those employees
25 over age 62 to have to suffer the humiliation

Page 87

1 and embarrassment of applying for -- for
2 unemployment. They should simply retire as
3 they probably will not find another job." So
4 Dan basically did an exclusion that if you were
5 age 62 or older, you did not have to -- you
6 were not subject to this program. You were not
7 eligible. So you kept -- if you did apply for
8 state unemployment, you kept all of it.
9      Q   As a result, didn't that benefit
10 employees age 62 or greater?
11      A   As a result -- well, the answer would
12 be yes.
13      Q   Did you challenge or contest Dan's
14 decision to make it easier for employees age 62
15 to receive both severance and unemployment
16 without an offset?
17      A   I questioned his rationale.
18 Understand that because I -- yeah, I -- I
19 questioned his rationale. I wasn't sure why he
20 was excluding that. And again, he just
21 continued to basically say that those -- those
22 people 62 or older are unemployable. They
23 should retire and -- and not collect
24 unemployment, period.
25      Q   Was this at a meeting?

Page 88

1      A   Yes, it -- at -- at at a meeting between
2 him and myself, yes.
3      Q   The two of you?
4      A   I believe so.
5      Q   That's when he introduced you to this
6 idea or concept that the plan would not apply
7 to employees retiring at age 62 or greater?
8      A   That is when he instructed me to make
9 that change.
10      Q   Okay. Which you did at his
11 direction?
12      A   Yes, I did.
13      Q   And while doing it, even though it
14 benefited employees 62 or greater, you took
15 issue with his rationale?
16      A   I did.
17      Q   And what exactly did you question as
18 it related to his rationale?
19      A   I questioned why he felt people age
20 62 were unemployable and should just retire.
21      Q   To which he responded how?
22      A   There really wasn't much of a
23 response. It was just an acknowledgement that
24 that was how he felt. And there was no further
25 discussion.

Page 89

1      Q   Did you take it up the ladder so to
2 speak to others beyond Mr. Lawlor?
3      A   I did not.
4      Q   Did you speak to anyone other than
5 Mr. Lawlor about the change that he had
6 proposed?
7      A   Clearly, I had to speak to the
8 contractor. And I had to speak to my staff, at
9 least my direct reports because it affected
10 them. And I believe it also had to be
11 communicated somewhat with Daniela Shea in HR
12 ops and services I believe because they handled
13 all of the severance arrangements and this was
14 a significant change in the -- in the process.
15 So they were already onboard with the regular
16 change but they had to be informed that this
17 was an additional -- sorry -- an additional
18 change.
19      Q   So this exception or carve out, that
20 was the idea of Mr. Lawlor, whose rationale you
21 questioned. Did others similarly question the
22 rationale of Mr. Lawlor?
23      A   I don't believe so.
24      MR. RAPPOPORT: Okay. I'm going to
25 take a break now. We've been going for two

23 (Pages 86 - 89)

Page 90

1  hours.  Maybe ten minutes, and then we'll come
2  back at 11:22?
3       THE WITNESS:  Sure.
4       (Recess taken -- 11:12 a.m.)
5       (After recess -- 11:27 a.m.)
6       BY MR. RAPPOPORT:
7    Q   Mr. Keuch, calling to your attention
8  Paragraph 41 of the amended complaint which
9  makes reference to an unannounced change in the
10  2015 Teva stock plan revising the 2010 plan,
11  what involvement or role did you have with
12  respect to that modification?
13   A   I had no involvement in the creation
14  of the modification.  When I was advised of it,
15  I then provided some responses as to some of
16  the issues it would create.
17   Q   Who advised you of it?
18   A   I believe the first communications
19  were from Roni Percik.
20   Q   And what did she advise you?
21   A   This is what either had been or was
22  going to the board of directors and what the
23  future would look like.  And I believe you may
24  have some of her emails in the Bates filing,
25  files -- Bates stamped files.

Page 91

1    Q   When she advised you of what was
2  either on its way to the board of directors or
3  already at the board of directors, what if
4  anything, did you share with regard to the
5  same?
6    A   Well, I -- I communicated that it was
7  very unusual to do a look-back, meaning to put
8  a rule in effect that would impact historical
9  grants.  I advised her that when you deal with
10  restricted stock units, when a person vests in
11  those units and by vesting means vests by
12  virtue of meeting the criteria for let's say
13  retirement, that Teva as well as the employee
14  has to pay FICA taxes on those shares based on
15  the value on the date of their vesting, unless,
16  of course, you know, they had done a -- I think
17  it's called a 52B election, but -- when paid
18  the taxes in advance.  But let's just stick
19  with the basics.  So if you do a look-back and
20  someone has already paid the taxes and were to
21  leave and forfeit those RSUs because they
22  didn't meet the new requirements, they would
23  not be able to recover those taxes so that was
24  clearly one issue of concern.  The second is
25  that because the -- the change was not going to

Page 92

1  be communicated to employees, the only -- well,
2  the -- the typical way an employee would find
3  out about it would be that when they retired
4  and thought the old rules were still in place
5  and they met the 65 and five or they met the
6  rule of 70, that they would be able to then
7  retire and have their equity still continue to
8  vest throughout their retirement.  And they
9  would enjoy the -- whatever income came from
10  those -- from that equity.  And that I honesty
11  did not feel was the way we should treat our
12  employees.  And so I basically brought that up.
13  And clearly it was disfavoring older employees
14  because they were the ones who had a lot of the
15  earlier shares and perhaps may have been
16  considering retiring.
17   Q   Did it personally affect you?
18   A   It did.
19   Q   How did it affect you?
20   A   Well, it depends on when I was going
21  to retire.  If I was going to retire at age 65,
22  I -- I would forfeit a lot of -- a good portion
23  of my equity grants.  So I was now going to
24  have to retire at age 70, which really wasn't
25  an issue because that was not my plan to retire

Page 93

1  at 65 anyway so...
2    Q   When you brought it to Ms. Percik's
3  attention, were there any further discussions
4  with others?
5    A   There were many, many discussions.
6  And it went all the way up to Mr. Sabag.  There
7  were more modifications made, changes.  It went
8  through a number of -- again of the
9  discussions.  And I'm not aware or can't recall
10  all of the options and changes that were
11  perhaps discussed.  But that's all I can share
12  with you or I think that answers you question.
13   Q   Did you speak to Mr. Sabag yourself
14  about it?
15   A   I did not.
16   Q   Other than Ms. Percik, did you speak
17  to anyone else?
18   A   I believe I spoke with Lesley.  I
19  believe she was still around at the time.  And
20  I clearly spoke to -- to Ron Yaniv and I may
21  have spoken with Shlomit.  I'm sure I brought
22  it up at Ron's staff meetings.  I'm sure I
23  brought it up at Lesley's staff meetings as
24  more of an FYI, this is, you know, what -- what
25  is being -- what's happening.

24 (Pages 90 - 93)

1    Q    Is it fair to say you raised
2 objections?
3    A    By raising objections, I basically
4 felt that -- that, one, it was not correct
5 to -- to not communicate the change; two, it
6 was discriminatory because, there were
7 statistics that were run that demonstrated
8 that; three, that it certainly affected a
9 number of individuals who had already paid
10 their taxes; and four, that the look-back
11 was -- was troubling.
12    Q    So there were four areas of
13 objections.  One was the lack communication.
14 Was that corrected?
15    A    Yes.
16    Q    Okay.  The second was your belief
17 that it was discriminatory, was that corrected?
18    A    No.
19    Q    The third was the potential tax
20 implications.  Was that corrected?
21    A    I'm not sure.  I know the individuals
22 were identified.  I'm not sure what actions
23 were taken.
24    Q    Weren't you one of the individuals?
25    A    Excuse me?

1    Q    Were you one of the individuals who
2 was identified?
3    A    No.
4    Q    Okay.  And the fourth issue you said
5 was the look-back.  Was that corrected?
6    A    No.
7    Q    So as a result of your objections,
8 some but not all of them were addressed?
9    A    Yes.
10    Q    Okay.  As when was this change put
11 into effect?
12    A    I believe it was last -- somewhere in
13 2017.
14    Q    Did anyone indicate to you that the
15 United States or North America was an outlier
16 and these were the policies that applied
17 globally throughout the rest of the country or
18 the world?
19    A    Well, understand the retirement age
20 for equity in Canada was age 55 and two years
21 of service.  So I'm not familiar with what the
22 requirements were in all of the other
23 countries.  But certainly Canada's from my
24 knowledge was the most dramatic.
25    Q    Do you know who decided to make this

1 change?
2    A    I do not.
3    Q    Was it implemented on a global level?
4    A    It was.
5    Q    And what is it about it specifically
6 that shows what you call a clear age bias?
7    A    I can only speak from a U.S. and
8 Canadian perspective that, you know, it -- it
9 changed the game of substantially for those
10 individuals.  As I said for myself personally,
11 you know, my retirement age would have to be 70
12 or older to -- to capture my equity.
13    Q    Is that because you wouldn't have ten
14 years of service until you reached 69?
15    A    That's correct.
16    Q    Okay.  Whereas under the prior plan,
17 you would have reached your five years of
18 service at 64?
19    A    I believe that's correct, yes.  Well,
20 yeah.  Yes.  It was 65 and five so I would have
21 had to be age 65 with five years of service.
22    Q    Do you know whether anyone at Teva
23 benchmarked other companies to see how their
24 equity plans compared to these other companies?
25    A    There was a rudimentary analysis

1 performed, yes.
2    Q    Who performed the rudimentary
3 analysis?
4    A    I do not know.
5    Q    Were your part of that?
6    A    I was not.
7    Q    Did you -- did you see the
8 rudimentary analysis?
9    A    I saw it in a -- in a presentation.
10    Q    What makes it rudimentary?
11    A    The -- the lack of apples and apples
12 comparisons.
13    Q    Did the change for the stock plan
14 that's referenced in Paragraph 41 of the
15 amended complaint impact all employees or age
16 protected or just a subset of employees?
17    A    It would have affected all employees
18 that were holding equity.
19    Q    But it wouldn't affect employees,
20 would it, who already had ten years of service
21 in?
22    A    I believe that's -- that's correct.
23 Although the rule of 70 would have allowed --
24    Q    We haven't gone to that yet.  I'm
25 about to get to that.

Page 98

1   A   Okay.
2   Q   Well, let's doing that now.  Let's
3   look at Paragraph 42 of your amended complaint,
4   which starts on Page 10 and continues to
5   Page 11.  And there you similarly allege that
6   age bias was evidenced by changing the rule of
7   70 to a plan that required 55 and 15 years of
8   service.  Is that correct?
9   A   That's correct -- that would --
10  that's correct.
11  Q   Okay.  Did these things happen at the
12  same time?
13  A   They were all proposed at the same
14  time, yes.
15  Q   And can you explain what proposal was
16  made that you made reference to in Paragraph 72
17  of the amended complaint that you perceived
18  shows age bias?
19  A   Well, basically you have employees
20  who could retire at any time as long as they
21  met the rule of 70 and were age 55.  You now
22  were forced to -- to reach age 65 in order to
23  be able to -- to retire.
24  Q   There's nothing in your complaint
25  that makes reference to age 65.  And as a

Page 99

1   result, I ask you if you can explain why it
2   required you to reach the age of 65 when the
3   complaint is silent in that regard?
4   A   Again, I'm not clear of what the
5   question is.
6   Q   Okay.  That's fair.
7   Where in your complaint -- your
8   amended complaint is there any reference to
9   reaching the age of 65 in order to be able to
10  retire?
11  A   There's nothing that says you can't
12  retire prior to age 65.  But under the rules of
13  the equity plan, if you didn't meet their
14  rules, you forfeited your equity.
15  Q   And the old rule was a rule of 70
16  which combined age with years of service?
17  A   That's correct.
18  Q   And the new rule required that you be
19  at least 55 years old with 15 years of service?
20  A   No.  The new rule required that you
21  be age 65 with ten years of service.
22  Q   I'm reading the first sentence of
23  Paragraph 42, the amended complaint.  "Age bias
24  was also evidenced in the raising of the age of
25  retirement in the 2010 and 2015 equity plan to

Page 100

1   age 55 for those employees who had 15 or more
2   years of service as compared to the previous
3   policy and the rule of 70."
4   Did I read that accurately?
5   A   You read it.  Let me just interpret
6   it, so...
7   MR. EPSTEIN:  I don't know if there's
8   a question, Randy.
9   MR. RAPPOPORT:  That was the
10  question:  Did I read it accurately?  He said,
11  yes, I read it.
12  BY MR. RAPPOPORT:
13  Q   Doesn't it reference 65 -- 55 and
14  15 years of service.
15  A   That's how you would get to 70, yes.
16  Q   Okay.  Is the complaint wrong?
17  A   That's a good question.  I'm just
18  trying to -- age biased -- Okay.  Right.
19  It says they raised the age so before there was
20  not a age limit.  You just had to meet the rule
21  of 70.  Now, you had to be again 55 and 15 to
22  reach the rule of 70.
23  Q   Was any explanation given to you as
24  to why this change had been proposed to the
25  board of directors.

Page 101

1   A   I believe the rationale that was
2   espoused was one where if you have a reduction
3   in force forthcoming, that this would save the
4   company a tremendous amount of -- of money
5   because they would be able to -- for the people
6   who were leaving the organization, which were
7   predominantly older employees, they would then
8   be able to forfeit all of their equity.  And
9   also for any of the employees who had equity,
10  again it would not be vesting.  They made the
11  vesting much harder.  But it was again as you
12  can see, the vesting is contingent upon age and
13  years of service that were all raised, so there
14  was a huge amount of equity that would be
15  forfeited.
16  Q   Who espoused that the reason for it
17  was to save dollars as a result of an impending
18  reduction in force?
19  A   I'm not sure I can attribute that any
20  one individual.  It was certainly discussed.
21  Roni Percik probably would have been, you know,
22  the most vocal person as to regards to the
23  change.
24  Q   Are you testifying at the time this
25  change was made that someone at Teva had

26 (Pages 98 - 101)

Page 102

1 already shared there would be an impending
2 reduction in force?
3    A  I believe we had already completed
4 one reduction in force prior to the large one.
5 Reductions in force at Teva tended to be
6 ongoing.  There was always one happening from
7 time to time.  So again, putting the pieces
8 together, there was speculation that this was
9 an approach to -- to save money.
10   Q  The earlier reduction in force that
11 preceded the one that impacted you, when was
12 that?
13   A  I can't recall that but I assume it
14 was 2016.
15   Q  Okay.  Did it impact anyone in the
16 Total Rewards organization that you managed?
17   A  Well, that's good a good question.
18 It may have affected the ability to fill open
19 positions.
20   Q  Isn't the ability to fill open
21 positions different than a reduction in force?
22   A  Yes.
23   Q  Isn't one considered a hiring freeze
24 while the other is considered a job
25 elimination?

Page 103

1    A  Yes.
2    Q  Were there jobs eliminated in 2016 in
3 Total Rewards as a result of the earlier RIF?
4    A  I don't believe there were any jobs
5 eliminated.
6    Q  As it relates to the change from the
7 rule of 70, did you ever hear anyone at Teva
8 indicate to you that it was tied to a upcoming
9 RIF?
10   A  Not directly, no.
11   Q  How about indirectly?
12   A  There was speculation amongst the
13 staff.
14   Q  And were you one of the speculating
15 staff?
16   A  I listened.
17   Q  Okay.  Who was the one that you were
18 listening to?
19   A  I honestly don't recall.
20   Q  Okay.  Did anyone indicate to you
21 that this was related to benchmarking other
22 companies of similar size?
23   A  I saw the data that was presented to
24 the board by Roni Percik.
25   Q  Was this the same data that you made

Page 104

1 reference to before and called rudimentary?
2    A  Yes.
3    Q  Were the two issues that are
4 referenced in Paragraphs 41 and 42, were they
5 associated with each other or were they
6 separate events?
7    A  They were all part of one large
8 change.
9    Q  And can you go on record as
10 indicating that you believe that these changes
11 were discriminatory on the basis of age?
12   A  I believe that I mentioned it as a
13 concern, yes.
14   Q  To Percik?
15   A  To Percik and possibly others.
16   Q  But you can't recall who others were?
17   A  It probably was again at one of Ron's
18 staff meetings and may have been at one of
19 Lesley's staff meetings.  It may have been at
20 both.
21   Q  Did anyone address your concern that
22 this could potentially be discriminatory?
23   A  There was a shaking of heads.
24   Q  What does that imply?
25   A  It implies that acknowledgment that,

Page 105

1 yeah, that -- that may be a factor.
2    Q  With respect to the other jobs that
3 you applied for where you decided that you
4 weren't going to get it because of your age.
5 Did you ever file any age discrimination
6 charges alleging a refusal to hire?
7    A  I did not.
8    Q  Any particular reason why?
9    A  I was looking for a job and did not
10 need to create issues because they could have
11 been unfounded.  I did not have evidence of
12 such.
13   Q  Do you have any -- any more evidence
14 in the Teva case that age was a factor in the
15 decision to select you for layoff?
16   A  Well, if I under -- I -- I had an
17 employee who in a meeting with Mr. Lawlor
18 basically would not hire her because of her
19 age.
20   Q  Any other additional evidence?
21   A  Daniela Shea was released because of
22 her age and -- yeah, and there are probably
23 others I don't recall.
24   Q  Let's talk about Daniela Shea.  What
25 position did she have?

27 (Pages 102 - 105)

Page 106

1     A    She was the head of HR ops and
2  services for North America.
3     Q    Who did she report to?
4     A    I believe she reported to Anat.  I
5  can't pronounce her last name, but it starts
6  with an "M."
7     Q    And when was she let go?
8     A    About the same time I was.
9     Q    Is it fair to say she was let go as
10 part of the same global restructuring?
11    A    That's correct.
12    Q    Do you know how old Ms. Shea is.
13    A    I believe she's in her 40s, late 40s.
14    Q    And your -- if I understood your
15 testimony correctly, you had indicated that
16 what differentiates the decision Teva made in
17 December of 2017 with the situations where you
18 were not able to find jobs, but couldn't really
19 prove it was age discrimination, including the
20 way that Daniela Shea was treated.  Is that
21 correct?
22    A    I believe that Daniela Shea was
23 discriminated against, yes.
24    Q    What's the basis of your belief that
25 she was discriminated against on the basis of

Page 107

1  her age?
2     A    She was replaced by Lauren Benner,
3  someone in her 20s who was not very well
4  qualified as much as Daniela was.  And in
5  addition Elaine McGee, who was an associate
6  director, the parallel being my Miriam, was --
7  was overlooked, not considered.  And this
8  20-something year old was put in the spot.  And
9  I believe Elaine may have been around her 40s.
10 So I don't know her age to say if she was, you
11 know, discriminated because of her age, because
12 certainly she was many years older than -- than
13 Lauren.
14    Q    From the evidence that you have that
15 would support your claim that the Teva decision
16 was age-based, whereas, decisions by Airgas and
17 others were not age-based, is the favorable
18 treatment provided to Lauren Benner.  Is that
19 correct?
20    A    I'm not sure what you're asking.
21       MR. RAPPOPORT:  Read it again if you
22 could court reporter?
23       MR. EPSTEIN:  He said he didn't
24 understand it.  He heard it.  He didn't
25 understand it.  To be very honest, my jaw

Page 108

1  dropped when you got to the third part of that
2  sentence.
3       MR. RAPPOPORT:  Let's read it back
4  and see whether or not you understand it.  And
5  maybe you can keep your jaw in place.
6       (Whereupon, the court reporter read
7  the question.)
8       BY MR. RAPPOPORT:
9     Q    Okay.  I asked you previously why you
10 believe that the Teva discussion could
11 terminate your employment was age
12 discrimination in contrast to not filing claims
13 against other employers who interviewed you but
14 didn't hire you where you said you didn't have
15 evidence to support that it was age.  You gave
16 me as an example the fact that the company
17 retained Lauren Benner at the expense of
18 Daniela Shea.  Is that correct?
19    A    I'm not sure if the two are
20 intertwined.  You asked me I thought to give
21 you another age discrimination that I saw at
22 Teva.  And hence I provided Daniela Shea as an
23 example.
24    Q    Other than Daniela Shea's age in
25 comparison to Lauren Benner's age, do you have

Page 109

1  any information at all as to how the decision
2  was made to retain Lauren Benner?
3     A    I do not.
4     Q    And with respect to Elaine McGee, was
5  she separated by Teva as part of the global
6  restructuring?
7     A    No.  Lauren Benner left Teva and then
8  Elaine McGee was offered that position.
9     Q    And Elaine McGee I believe you said
10 was in her late 40s, about the same age as
11 Daniela Shea?
12    A    No.  I said she was probably in her
13 40s.
14    Q    Okay.  Was the decision to offer
15 Elaine McGee the position vacated by Lauren
16 Benner's departure evidence of age
17 discrimination?
18    A    I don't know.
19    Q    Let's talk about Rose Riccioli.
20    A    Riccioli, yes.
21    Q    Okay.  Thank you for the correction.
22       What was Rose Riccioli's association
23 to Teva prior to her being separated?
24    A    She was a contractor.
25    Q    Did she work in Total Rewards comp --

28 (Pages 106 - 109)

Page 110

1  in Total Rewards?
2    A    She did.
3    Q    On the comp side or on the benefit
4  side?
5    A    Compensation side.
6    Q    How long did she work as a contract
7  employee?
8    A    I want to think she was there for at
9  least a year.
10    Q    Okay.  And by "contract employee," do
11  you mean that she was actually hired by a
12  third-party vendor but provided service
13  entirely or exclusively to Teva?
14    A    I believe so.  I really do not.  I
15  don't know.
16    Q    But you believe that she was treated
17  in a way that evidences age discrimination.
18  Isn't that correct?
19    A    That's correct.
20    Q    Now, at some point in time, was there
21  a decision that was being discussed to change
22  her status from contract employee to Teva
23  employee?
24    A    We had an open position.  And she
25  interviewed for the position as did others.

Page 111

1    Q    Okay.  And the others who
2  interviewed, were they likewise working either
3  at or for Teva?
4    A    I'm not sure.  There may have been
5  one or two Teva employees, and I actually don't
6  believe we had any -- we may have had one other
7  external employee.
8    Q    And when she interviewed, were you
9  among the people she interviewed with?
10    A    Yes.
11    Q    Okay.  Were there others who
12  interviewed her?
13    A    Yes.
14    Q    Who were the others?
15    A    Well, Miriam Weinstein was the comp
16  director, compensation director.  And I'm not
17  sure who in HR or whether talent acquisition
18  interviewed her.  I would believe it could --
19  could have been Pam Daknis who interviewed her.
20  But she was interviewed one or two human
21  resource employees.
22    Q    Okay.  Did you make a recommendation
23  on her behalf?
24    A    I don't understand the concept of a
25  recommendation.

Page 112

1    Q    Did you have hiring authority?
2    A    No.
3    Q    Who had hiring authority?
4    A    Well, that's a good question.  The --
5  the authorities changed from time to time.  You
6  had to have the head count approved.  And once
7  that was approved, then you had to go ahead and
8  look for a candidate.  And once you had an
9  offer, a candidate you wanted to hire, the
10  offer had to be approved typically by me, but
11  because it was HR and it was Total Rewards, I
12  believe my manager would have to get involved.
13  And generally it -- it went through.  But given
14  the -- the times, I believe this was Q3 of
15  2017.  And Lesley was gone, I believe for
16  whatever reason Dan Lawlor decided that he
17  wanted to see it before it went through.
18    Q    Did you recommend to Dan Lawlor that
19  Rose Riccioli be considered for the opened
20  vacant Teva position?
21    A    Yes.
22    Q    Was that recommendation in writing or
23  was it orally?
24    A    We would not have prepared an offer
25  if it wasn't in writing.  And I believe we

Page 113

1  prepared a full offer for her.
2    Q    Was that offer ever extended?
3    A    No.
4    Q    Why wasn't it extended?
5    A    Again, my recollection is that I was
6  called into Dan's office.  And Dan basically
7  knew her, had worked with her, had also given
8  me compliments on the quality of her work.
9  And -- but he asked me if she had long-term
10  potential.  And he asked me if she could fill
11  my position in the near future.
12    Q    And how did you respond to his
13  questions?
14    A    I basically told him that she could
15  clearly aspire to be the director of
16  compensation, so she could succeed Miriam.  As
17  far as my role, she would need a lot of
18  training and development to be brought up on,
19  you know, the international aspects of my
20  position and some of the details in the
21  benefits area.
22    Q    Wasn't one of the questions whether
23  she had long-term potential?
24    A    That's correct.  What I said.
25    Q    (Inaudible) question.

29 (Pages 110 - 113)

Page 114

1    A   I -- I -- I with repeat myself.
2    Q   Well, you didn't answer my question
3 the first time, so you won't be repeating
4 yourself, but go ahead.
5    A   What I said the first time was that
6 she was capable of aspiring to taking Miriam
7 Weinstein's position, who was the director of
8 compensation.
9    Q   Was anyone else in the meeting with
10 you and Mr. Lawlor?
11    A   No.
12    Q   Were you taken aback when Mr. Lawlor
13 asked whether she could be a replacement for
14 you?
15    A   Yes.
16    Q   Was that the first time that you and
17 he had ever discussed a possible replacement
18 for you?
19    A   It might have been.  Recognize that
20 Mr. Lawlor was a matrix manager and had just
21 recently taken over that position.
22    Q   Okay.  Can you recall any earlier
23 time when you and he spoke about your potential
24 successor?
25    A   I don't recall any of those

Page 115

1 conversations.
2    Q   So when he asked whether she was a
3 potential successor for you, did you say
4 something to the effect of I'm not going
5 anywhere?
6    A   I did not say that.
7    Q   Is there a reason --
8    A   (Inaudible) always looks for
9 successors.  You always build your successors.
10    Q   Did you indicate to him that she was
11 not a likely successor, but there were other
12 successors within the Total Rewards
13 organization?
14    A   I did not.
15    Q   Okay.  Did he ask you what her age
16 was?
17    A   He did not.
18    Q   Did you know what her age was?
19    A   I believe -- I believe I was told by
20 Diane Rohach that she was in her 50s.
21    Q   So by in her 50s, does that mean
22 anywhere between 50 and 59?
23    A   I -- I assume so, yes.
24    Q   Other than Ms. Rohach sharing that
25 she was in her 50s, did you have any other

Page 116

1 knowledge of her age?
2    A   No.
3    Q   When Ms. Rohach shared with you that
4 she was in her 50s, was Mr. Lawlor present?
5    A   No.
6    Q   And did you understand his question
7 as to her long-term potential to be a proxy for
8 age?
9    A   That's typically the way human
10 resource people position that question, yes.
11    Q   That wasn't my question.  Did you
12 understand his question as to whether she had
13 long-term potential to be a proxy for age?
14    A   Yes.
15    Q   And did you tell him that that's not
16 an appropriate inquiry?
17    A   I did not.
18    Q   Is there a reason why you did not?
19    A   He should know better.
20    Q   So as a result of the discussion, did
21 he decide not to extend an offer to
22 Ms. Riccioli?
23    A   That's correct, yes.
24    Q   And did --
25       MR. EPSTEIN:  I'm sorry.  Can I make

Page 117

1 a comment.  You're not on camera.  And -- and
2 some of what you're saying where you might skip
3 over a word or so can't be discerned because we
4 can't see your face asking those questions.  If
5 you could get on the camera, that would be
6 better.
7       MR. RAPPOPORT:  I can see myself on
8 camera.
9       MR. SHEMTOB:  Is it -- is everyone
10 able to see us?
11       (Discussion off the record.)
12       MR. RAPPOPORT:  I'm -- I'm sorry to
13 do this to you, Kathleen, but can you read back
14 my last question?
15       (Whereupon, the court reporter read
16 the question.)
17       BY MR. RAPPOPORT:
18    Q   Did she remain as a contract
19 employee?
20    A   Yes.
21    Q   Was the position filled by someone
22 else?
23    A   No.
24    Q   At the time that you left Teva --
25 Teva in February of 2018, was she still a

30 (Pages 114 - 117)

Page 118

1 contract employee?
2    A   I don't recall.  I believe so.
3    Q   Other than that comment as it relates
4 to Ms. Riccioli's long-term potential, had you
5 ever heard Dan Lawlor say anything else to you
6 that you felt was either discriminatory on its
7 face or a proxy for age?
8    A   I'm sorry.  Can -- can you just
9 repeat that?  A proxy, I didn't quite
10 understand.  If you could just repeat it,
11 though.
12    Q   Other than the conversation that
13 you've just testified to where he asked you
14 whether or not Ms. Riccioli had long-term
15 potential, had you ever heard Mr. Lawlor make
16 any remark that you perceived to be either
17 discriminatory on its face or a proxy for age?
18    A   Well, we've gone through some of the
19 discriminatory events that -- that I
20 experienced with Mr. Lawlor.  We talked about
21 the -- the unemployment SUB plan.  We talked
22 about -- well, he was -- he did not engage in
23 the stock option plan changes.  Let's see, I
24 assume if -- I don't have to assume.  We know
25 that he was engaged in the discussion to

Page 119

1 terminate me and replace me with Edu Nasi.  We
2 can assume that he --
3    Q   I don't want to interrupt you, but my
4 question was, did you ever hear him make any
5 remark, statement, comment that you perceived
6 to be discriminatory on the basis of age or a
7 proxy for age?
8       MR. EPSTEIN:  An age-related, I'm
9 confused.  Can age-related be Mark relating to
10 Randy regarding anything like retirement or
11 anything else?
12       MR. RAPPOPORT:  I can't for the life
13 of me understand the basis of the confusion.
14 I'll -- I'll move on.
15       BY MR. RAPPOPORT:
16    Q   In the answer to your Interrogatory
17 No. 6 you indicate that her age was 55 even
18 though today you indicated that you had heard
19 that she was in her 50s.  I can show you
20 Interrogatory No. 6 then your answer if you'd
21 like, but I'm making that representation.  And
22 I'd like to know how is it that you knew her
23 specific age?
24    A   I believe that Diane had shared with
25 me her age.  I'm not sure when it was shared.

Page 120

1 As I said, Rose had been with us for -- for a
2 year.  So Diane could have told me her age when
3 she had a conversation with Rose.  So 55 is
4 probably the number -- is the number that was
5 once shared with me.  I don't know at what
6 time, but it was around that time and around
7 that -- that age.  And I don't know how
8 accurate Diane is.  I only know what she shared
9 with me.
10    Q   Would you agree with me that there
11 was no communication that you were a part of
12 where Mr. Lawlor inquired about her age or was
13 advised what her age was?
14    A   To the best of my knowledge, no he
15 did not inquire about her age.
16    Q   Can you explain your earlier answer
17 where you indicated that among HR folk, using
18 the long-term potential really means age?
19    A   That's just -- that's just common
20 knowledge.  I believe if you would ask people
21 in the search business, you will get that
22 response.  I believe if you Google it, you will
23 get that response.
24    Q   When did you learn that Teva had
25 assumed considerable debt and would be taking

Page 121

1 measures to address the debt that had it -- it
2 had incurred?
3    A   I don't believe I was ever informed
4 of that other than through communications from
5 either Mark Sabag -- that's all I can recall is
6 whatever we got out of corporate was the
7 information that we had.
8    Q   Were you privy to any discussions in
9 the latter part of 2016 or 2017 prior to the
10 arrival of Kare Schultz, that related to the
11 imminent bankruptcy of Teva?
12    A   Not that I can recall.
13    Q   Okay.  Were you aware that they had
14 acquired Actavis?
15    A   Yes.  I was very -- I was very -- I
16 played a role in the Allergan acquisition, yes.
17    Q   And were you involved in the
18 integration of Allergan with Teva?
19    A   Yes.
20    Q   From a Total Rewards standpoint?
21    A   Yes.
22    Q   Had there been discussions that you
23 had overheard about imminent bankruptcy?
24    A   Not at that time.
25    Q   Were you aware of people leaving on

31 (Pages 118 - 121)

1 their own in response to the potential for a
2 likely bankruptcy?
3     A   I'm not sure the word "bankruptcy" is
4 not a word that -- that I'm not familiar with
5 in the --
6     Q   Prior --
7     A   -- Teva --
8     Q   -- to Kare's -- prior to Kare's
9 arrival, were there any suggestions that you
10 were aware of, either formerly or informally,
11 that a global reduction in force was imminent?
12     A   Only rumors.
13     Q   And what were the rumors that you had
14 heard?
15     A   That, you know, Teva was -- was
16 struggling financially.  They -- I had worked
17 on an acquisition of Rimsa down in Mexico with
18 them.  And apparently senior management got
19 snookered on that deal because the Mexican
20 government stepped in.  There were a lot of
21 issues around the drugs they were producing.
22 It was just I guess a nightmare for Teva.
23     Q   And certainly you were watching the
24 stock price, were you not?
25     A   I definitely watched the stock price,

1 yes.
2     Q   And you would agree with me that the
3 stock price declined after the purchase of
4 Actavis?
5     A   It did, yes.
6     Q   Now, in your role as the head of
7 Total Rewards, did you have responsibility for
8 Canada?
9     A   I did.
10     Q   For Latin America?
11     A   Yes.
12     Q   And did Latin America also include
13 South America?
14     A   Yes, I believe it would have.  Yes.
15     Q   Peru, Chile, Brazil?
16     A   Yes, those countries were part of
17 Latin America.
18     Q   I'd like to show you an org chart
19 that you provided that was Bates stamped
20 Keuch 017.
21       MR. EPSTEIN:  Would you repeat that,
22 please, Larry?  You broke up.
23       BY MR. RAPPOPORT:
24     Q   I would like to show you an org chart
25 that you produced that was Bates stamped

1 Keuch 017.  This will be marked as an exhibit
2 but for now we won't number the exhibit until
3 after the hearing, but can you identify what
4 this org chart is?
5     A   It was a --
6       (Discussion off the record.)
7       THE WITNESS:  It was a chart that --
8 that I received on the reorganization of the HR
9 op and services group.
10       BY MR. RAPPOPORT:
11     Q   So can you estimate when it was
12 provided to you?
13     A   I can't.  I assume maybe it was in
14 January of 2018.
15     Q   Were you ever part of that
16 organization?
17     A   I'm not part of that organization,
18 no, but we collaborate very closely with them
19 because severances all have compensation and
20 particularly they have benefit issues.  And
21 with COBRA for those being severed, so
22 there's -- there's interactions between those
23 groups and -- and my team, yes.
24     Q   So this was provided to you at your
25 request sometime in 2018?

1     A   I don't think I ever requested it.
2 And I'm not sure how I came by it, but, you
3 know, it may have been in a presentation that
4 someone did and it was shared with me.
5     Q   It doesn't refer or relate at all,
6 does it, to Total Rewards organization?
7     A   Not to my knowledge, no.
8     Q   With respect to the Total Rewards
9 organization -- with respect to the Total
10 Rewards organization in Latin America, did
11 Mr. Nasi have responsibility for the day-to-day
12 operations of that Total Rewards organization?
13     A   Yes.
14     Q   And did he have direct reports?
15     A   That's an interesting question.  The
16 answer is he had some direct reports and some
17 dotted-line-type reports.  As I stated earlier,
18 there were individuals who had multiple
19 responsibilities and some reported to the HR
20 head in country.
21     Q   Okay.  So about how many direct
22 reports did he have?
23     A   All right.  We had Enzo.  We had
24 Argentina.  We had Mexico.  That's three.  We
25 had Chile, four; Peru, five.  He may have

1 had -- had around seven.
2    Q    And how many indirect dotted line
3 direct reports would he have had?
4    A    Well, I sort of counted them all in
5 there.  So maybe there's five or six directs
6 and maybe two -- two indirects, something like
7 that.
8    Q    Did you give him the authority to run
9 the Latin America Total Rewards organization
10 without your personal involvement?
11    A    No.
12    Q    So how often did you speak to Edu
13 Nasi about what was going on in Latin America?
14    A    Once or twice a month.
15    Q    Okay.  When you hired Mr. Nasi, were
16 there other candidates for the position?
17    A    I don't recall.
18    Q    Do you recall what it was that caused
19 you to hire Mr. Nasi?
20    A    As I said earlier, I've known him for
21 20 years.  He -- he was capable.  He had the
22 expertise.  He had a similar job with General
23 Mills.  And, you know, I -- I could trust him.
24 He was -- he was qualified for the job.
25    Q    Was he fluent in both Spanish and

1 Portuguese?
2    A    To my knowledge, yes.
3    Q    Was that important for his role as
4 head of Total Rewards for Latin America?
5    A    It was definitely a positive.  I
6 believe most if not all of my team in Latin
7 America, I know they all spoke English.
8    Q    And did he have related Total Rewards
9 experience from General Mills?
10    A    I can only say that from his resume
11 and from what I know, he had responsibility
12 for -- for what you call Total Rewards for comp
13 and benefits and that he also reported to as I
14 said to Tracy Kofski, who was the global head
15 of Total Rewards for General Mills.
16    Q    When he reported to you in his role
17 as head of Total Rewards for Latin America, did
18 he also have dotted line responsibility for an
19 operational person or an HR person for Latin
20 America?
21    A    Yes.  He had a matrix -- I don't know
22 if it would be called a matrix manager, but he
23 worked closely with the head of HR for Latin
24 America.
25    Q    Who was that?

1    A    The name escapes me.  It was a
2 gentleman headquartered out of Mexico.  I
3 cannot remember his name.
4    Q    Was Eduardo Nasi your first hire at
5 Teva?
6    A    That's a good question.  He might
7 have been.  I -- I don't know.  I hired him and
8 I hired Miriam.  I don't know the timing of the
9 two, but they were certainly close together.
10    Q    Was he your best hire at Teva?
11    A    In hindsight, I would say no.
12    Q    And why in hindsight would you say
13 no?
14    A    I tried to develop him.  And again,
15 it was hard because I was getting little or no
16 support from corporate, from my boss.  And the
17 head of global benefits, a fellow by the name
18 of Gal Fain wanted to get to know Edu
19 because -- again, I wanted Edu to grow and
20 develop.  And working with one of the corporate
21 people I thought was a great development
22 opportunity.  So Edu worked with him on putting
23 a pension plan in.  I can't recall.  It was
24 either Brazil or Peru, and worked with our
25 fellow by the name of Enzo.  And he also worked

1 with a consultant from Mercer.  So I took a --
2 sort of a hands off approach to that.  I
3 allowed him to work directly with Gal Fain
4 recognized that whatever plan came up if I was
5 involved, I still would have to submit it to
6 Gal.  So basically I cut myself out as the
7 middleman and said, no, you work directly with
8 corporate because that will develop your skill
9 set, you'll get to know the corporate person
10 and start to build that -- that relationship.
11        Well, when the final plan was
12 presented, it had a fatal flaw in it: there was
13 not a social security offset to the plan.  Now,
14 typically that could be missed in the early
15 stages.  But without that offset it could cost
16 the company exponentially millions of dollars
17 over the years as -- as that offset again
18 wasn't there.  And so I believe that some of
19 Edu's progress may have been impacted by the
20 fact that -- you know, that he did not do a
21 good job on developing this pension plan.
22    Q    Were you the one who caught the
23 failure to have the social security offset
24 incorporated into the pension plan?
25    A    As I said earlier, I did a hands off

33 (Pages 126 - 129)

Page 130

1 and allowed Edu to work directly with Gal. And
2 so I -- I would only have been brought in at
3 the very, very end when Gal was getting ready
4 to approve it and just review it with me or Edu
5 would have reviewed it with me. So, no, I was
6 not the one who identified that.
7     Q   Do you know who it was?
8     A   It was Gal Fain.
9     Q   Okay. You've indicated in hindsight
10 he was not your best hire. At the time, as
11 opposed to using hindsight, would you have
12 described him as your best hire?
13    A   I would have described him as a very
14 good hire with a -- you know, who could have
15 grown to -- to a bigger role.
16    Q   Okay. Did you tell Mr. Nasi at the
17 time of hire that he was a potential successor
18 to you?
19    A   Definitely, yes.
20    Q   And did you tell him that you
21 intended to work five more years, which would
22 have been till 2019?
23    A   I believe I said at least five more
24 years.
25    Q   Okay. So the number five was used

Page 131

1 but you believe it was at least five rather
2 than a firm five?
3     A   Correct. It was speculative.
4     Q   Okay. And didn't you tell him from
5 time to time that he should more involved in
6 certain things because he would be your likely
7 successor and needed the exposure?
8     A   I told that to him as well as Miriam
9 and Diane, yes.
10    Q   So you expected it to be a
11 three-person competition for your position once
12 you decided to retire?
13    A   Correct.
14    Q   While you were still at Teva which
15 extends through February of 2018, had you begun
16 making any retirement plans?
17    A   No.
18    Q   Okay. Do you recall the first time
19 that you learned officially that there would be
20 a global restructuring?
21    A   No.
22    Q   All right. Do you recall when you
23 learned that there would be a global
24 restructuring?
25    A   Sometime in Q4. I want to say

Page 132

1 November of 2017.
2     Q   And do you recall who it was who
3 shared that with you?
4     A   No. It could have been either at a
5 staff meeting. I don't believe Lesley was
6 there so it would have been something held by
7 Dan. Sometimes there were global meetings that
8 we were called into auditoriums or rooms and
9 looked at a video monitor and had those
10 announcements. So I -- I don't recall the
11 time, the medium, or how it was conveyed.
12    Q   The global -- the meetings that were
13 held in auditoriums with video, et cetera,
14 weren't those for important decisions?
15    A   Important communications, yes.
16    Q   And wasn't this an important
17 communication?
18    A   Yes.
19    Q   So was there such an auditorium
20 meeting where someone shared with you that Teva
21 was about to embark upon a global restructure?
22    A   I believe there was.
23    Q   And was that in the fourth quarter of
24 2017?
25    A   I believe it was.

Page 133

1     Q   Was it likely in December of 2017?
2     A   I'm not sure but that would make
3 sense, yes.
4     Q   Do you believe it was before
5 Thanksgiving of 2017?
6     A   I'm trying -- I have to look up the
7 contract that I signed for the SUB plan because
8 that would have been part of what was going on
9 with the -- you know, with the reduction in
10 force.
11    Q   So if we found the document that you
12 signed for the SUB plan, would that be -- would
13 that tell us when the meeting was where you
14 were informed that there would be a reduction
15 in force?
16    A   No, but that would basically give me
17 some sense of timing because obviously prior to
18 that, there would have been meetings with
19 finance and Dan Lawlor to basically agree that
20 we should move forward. So I -- I -- I
21 honestly cannot tell you when I found out or
22 was informed of the reduction in force.
23    Q   Did you understand that global
24 restructuring meant job eliminations?
25    A   Yes.

34 (Pages 130 - 133)

Page 134

1    Q   Had you anticipated prior to being
2  formally advised that there would be a global
3  restructuring which will involve job
4  eliminations?
5    A   I think I understand the question.
6  You want to -- can you repeat it?
7    Q   Had you anticipated prior to being
8  formally notified that there would be a global
9  restructuring which would include job
10  eliminations?
11    A   Yeah.  As I said, there were -- there
12  were rumors.  And so, you know, one thought all
13  right, we've got another reduction in force
14  coming, yes.
15    Q   Did it ever occur to you that you
16  might be a victim of that reduction in force
17  and the positions that would be eliminated as a
18  result of the same?
19    A   It may have -- it occurred but I
20  perceived it as unlikely.
21    Q   And why was that your perception?
22    A   When -- when an employee is
23  terminated at Teva, they're offered COBRA under
24  the severance plan.  And COBRA can run for
25  18 months.  So if you terminate a thousand

Page 135

1  employees and their families -- well, you
2  terminate a thousand employees, the benefits
3  team still has to manage those benefits for
4  those thousand employees plus their -- you
5  know, their families.  So they don't just
6  immediately disappear.  We still have to manage
7  them.  And when individuals are unemployed,
8  there is a tendency for those individuals to --
9  to use greater medical resources than perhaps
10  they did while they were employed, so the work
11  volume actually was quite significant.
12    Q   So if I understand your answer and
13  please correct me if I'm wrong, your
14  expectation was, is that you and the Total
15  Rewards organization would likely not be
16  impacted because of the work that would be
17  associated with a global restructuring and
18  position eliminations?
19    A   That's correct.  We -- again, we may
20  have been affected further down the line, but,
21  you know, those employees were all a part of --
22  of our workload.  And they weren't going away.
23  And Teva was even still hiring people during
24  the course so you still had new hires coming
25  onboard as well.

Page 136

1    Q   How did you know that Ron Yaniv's
2  position was eliminated?
3    A   I believe there was -- I believe he
4  may have told me or there was an announcement
5  or both.
6    Q   As you sit here today, do you have a
7  clear recollection as to how you learned about
8  it?
9    A   I don't know which came first.  But I
10  believe Ron told -- I know Ron told me and I
11  also may have heard from -- from Lesley because
12  I believe he was terminated in the summer of
13  2017.  So --
14    Q   That's incorrect.  He was terminated
15  in December of 2017 and worked through the end
16  of the month into January 2018, so Lesley would
17  have been gone so --
18    A   I don't -- I don't -- I don't recall
19  that.  I recall --
20    Q   What do you recall?
21    A   -- that -- that Ron Yaniv went on
22  garden leave for most of 2017.  And, you know,
23  he was still there but he was sort of not in
24  the office.  Again, garden leave means that
25  you're home doing your gardening.  But I don't

Page 137

1  think he was an active player for -- for
2  part -- a good part of 2017.  And I think
3  that's how I found out about it because he
4  shared that with me.
5    Q   So you believe that you had a
6  conversation with him in either the third
7  quarter or the fourth quarter of 2017 where he
8  shared with you that he'd been placed on garden
9  leave?
10    A   Correct.
11    Q   And what else did he share with you?
12    A   That was really it that they were
13  going to figure out, you know, whether he would
14  be replaced or -- or who the -- the -- who the
15  function would report to.
16    Q   And were you aware of anyone else
17  going out on garden leave around the same time?
18    A   No.  I think Ron was the main focus
19  of mine.  There may have been others, but --
20  but they really didn't -- I don't recall.
21    Q   Did Ron Yaniv indicate to you how he
22  came to be put on garden leave?
23    A   No.
24    Q   Did you understand it to be voluntary
25  or involuntary?

35 (Pages 134 - 137)

Page 138

1    A   From my conversations with Ron, I
2  believe he may have had some health issues, but
3  he didn't seem unhappy about it.  So I assume
4  that he got a nice severance packet.
5    Q   How many conversations did you have
6  with Mr. Yaniv as it related to his leave?
7    A   I only recall the one.
8    Q   And during that leave -- I mean
9  during that conversation, you believe it
10 predates being informed formally of the global
11 restructuring?
12   A   I think so.  Or it -- it may have
13 been around the time.  It could have been in --
14 in November.  I -- I honestly don't have any
15 clear recollection of those dates.  It was four
16 years ago.
17   Q   Do you have a recollection of
18 speaking to Lesley Billow about Ron Yaniv's
19 garden leave?
20   A   Yeah, I -- I did speak to -- to
21 Lesley while she was at BMS, not while she
22 was -- I don't think she was at Teva at the
23 time.
24   Q   When Mr. Yaniv went on garden leave,
25 did your reporting responsibilities accordingly

Page 139

1  change?
2    A   I think we were still reporting to
3  Ron.  I don't -- again, I don't know.  He -- he
4  wasn't officially gone.  So he still -- he
5  still stuck around if that's the way to put it.
6  It was -- so, no, we did not have any -- any
7  new leader.  We did not report to Mark Sabag.
8  We did report to Tal.  We reported to Ron.  But
9  I have a sense that Ron was sort of a lame duck
10 in the sense that he knew his termination date.
11 He just was still around although as I recall I
12 thought he went -- like on garden leave, so it
13 was just sort of a void.
14   Q   Do you know how long the garden leave
15 was to last?
16   A   Well, yeah.  He -- he was leave -- he
17 was officially leaving I thought the -- the end
18 of the year.
19   Q   Okay.  That would be 2017.
20   A   Correct.
21   Q   So it's your testimony that you
22 believe for a number of months prior to the end
23 of 2017, he was on garden leave, but still
24 managing you while on garden?
25   A   That's my understanding or

Page 140

1  recollection, yes.
2    Q   And when you learned that Ron Yaniv
3  was on garden leave and would be leaving at the
4  end of the year, did you aspire to his
5  position?
6    A   No.
7    Q   Did you have a person in mind to take
8  Mr. Yaniv's position over once his garden leave
9  was converted to a separation?
10   A   Did I have a person in mind?
11   Q   Yeah.
12   A   That would not be my -- again, my
13 purview or responsibility.  Recognize that, you
14 know, Ron replaced Yaniv.  So it was, you know,
15 all decided at corporate.  So I don't know what
16 the process or procedure was, if they were
17 doing a search, if they were posting it as an
18 open position.  All I know is -- knew was that
19 Ron was leaving the company.
20   Q   You never saw any information that
21 related to a search for his replacement, did
22 you?
23   A   I did not.  Correct.
24   Q   You never saw any indication
25 indicating that there would be a job posting

Page 141

1  for the position, did you?
2    A   Correct.
3    Q   And your testimony is that Ron Yaniv
4  was a one-off and his garden leave was
5  unrelated to the global restructuring that
6  followed later in the year?
7    A   No, that's not correct.
8    Q   What's incorrect about it?
9    A   I do not know why Ron was leaving the
10 organization.  It may have been again related
11 to a reduction in force.  But the
12 communications that I had and the conversations
13 I had did not suggest that -- that he would not
14 be replaced at least prior to the announcement
15 of Tal.
16   Q   When did you first start talking to
17 Ron Yaniv about the possibility of you being
18 upgraded from a senior director to a vice
19 president?
20   A   I believe it would have been around
21 2016.  And it was not a conversation to be
22 ungraded to a vice president.  It was to have
23 my job looked at given the fact that the job
24 responsibilities had grown substantially with
25 the acquisitions.

36 (Pages 138 - 141)

Page 142

1    Q    And as a result of the change to your
2  job responsibilities, did you feel that you
3  were not properly rated in your labor grade 17
4  role?
5    A    I felt that with the new grading
6  grading system that if you ran my job through
7  that system, you would come up with a different
8  grade.
9    Q    And the different grade would have
10 been a higher grade?
11   A    Correct.
12   Q    And that would have been a labor
13 grade 18?
14   A    Correct.
15   Q    And that would have necessarily
16 required you to become a vice president?
17   A    That's correct.
18   Q    Okay. Did you have counterparts in
19 the global organization who were heading
20 global -- I'm sorry -- heading -- or Total
21 Rewards who were at the vice president level?
22   A    No.
23   Q    Everyone was at the senior director
24 level?
25   A    Correct. So you had a senior vice

Page 143

1  president as Ron. And I believe he was a 19.
2  No one in 18. And then you had 17s.
3    Q    All right. And the 17 would have
4  been a 17 in Europe, a 17 in North America, a
5  17 in Asia-Pacific, and a 17 in Israel.
6    A    Correct.
7    Q    Okay. Did you have more than one
8  conversation with Mr. Sabag about your desire
9  to be evaluated and perhaps upgraded?
10   A    I never had that conversation.
11   Q    There were no conversations?
12   A    That's correct.
13   Q    Okay. So there was no discussion
14 between you and mister -- Mr. Yaniv about
15 becoming a vice president?
16   A    There was one conversation, maybe
17 two.
18   Q    But with no one other than Mr. Yaniv?
19   A    With mister -- with Ron. That's
20 correct.
21   Q    And did Ron ever indicate to you that
22 it could not happen?
23   A    He never did.
24      MR. RAPPOPORT: Let me show you
25 what's marked as an exhibit. It's going to be

Page 144

1  Bates stamped Keuch 028.
2      BY MR. RAPPOPORT:
3    Q    This is a letter dated August 6,
4  2015, via mail to you from Ron Yaniv, subject
5  base salary increase and retention bonus. And
6  I'd like for you to just read to yourself the
7  second paragraph of the letter.
8      MR. EPSTEIN: Would you repeat
9  what -- what number this is in terms of exhibit
10 and what Bates stamp it is?
11      MR. RAPPOPORT: It's Bates stamped
12 Keuch 028. And it would be Exhibit 3.
13      MR. MCDONOUGH: Org chart to be two?
14      MR. RAPPOPORT: Yeah.
15      (Keuch Deposition Exhibit Nos. 2 and
16 3 were marked for identification.)
17      THE WITNESS: Okay. I have read it.
18      BY MR. RAPPOPORT:
19   Q    Did he ever get back to you after
20 sending you the letter that's been marked as
21 Exhibit 3 as it relates to considering you for
22 a potential promotion to vice president at a
23 global grade 18?
24   A    Yes.
25   Q    And what did -- when he got back to

Page 145

1  you, what did he tell you?
2    A    That it would be challenging in the
3  current environment.
4    Q    Okay. And what did you understand
5  that to mean?
6    A    I understood it to mean that it was
7  going to be a hard sell.
8    Q    And who would he have to sell it to?
9    A    He would have to sell it to Mark
10 Sabag.
11   Q    And did you have a working
12 relationship with Mr. Sabag.
13   A    I had minimal contact with Mr. Sabag.
14   Q    The retention bonus that you received
15 at this time of $60,000, were those retention
16 bonuses being paid to others or was this
17 something special for you?
18   A    There was -- there was a list that
19 circulated and worked through the organization.
20 And, yes, there were others who also received
21 the retention bonuses.
22   Q    And were they retention bonuses in
23 differing amounts?
24   A    To the best of my knowledge, yes.
25   Q    And what do you recall the range of

37 (Pages 142 - 145)

Page 146

1  retention bonuses that were being provided at
2  this time?
3      A   I did not have exposure to that, so I
4  don't know -- do not know the ranges.
5      Q   Were there retention bonuses that
6  were higher than the $60,000 that were being
7  offered to you to your knowledge?
8      A   I don't know.
9      Q   Okay.  What was your understanding as
10 to why you were being provided with a retention
11 bonus?
12     A   That Teva, as it says in the letter,
13 was very happy with the work I've done and
14 wanted me to -- to remain because there was
15 most likely a reduction in force coming and
16 they did not want me to -- to leave Teva
17 voluntarily.
18     Q   Was this the reduction in force that
19 ultimately caused you to leave Teva or was this
20 an earlier reduction in force?
21     A   This was an earlier one.  This
22 letter's dated 2015.
23     Q   Okay.  So there was a reduction in
24 force that was -- that was on the horizon when
25 they offered you and others retention bonuses

Page 147

1  in varying amounts?
2      A   I believe so, yes.
3      Q   Did you ever discuss the amount of
4  retention bonuses with anyone other than
5  yourself while at Teva?
6      A   I don't recall.
7      Q   Did any of your direct reports
8  receive retention bonuses?
9      A   I don't believe so.
10     Q   Were counterparts in Europe, Asia,
11 and Israel given retention bonuses?
12     A   I would not know that information so
13 I don't know.
14     Q   Did you agree to the terms that were
15 set forth within what's been marked Exhibit 3?
16     A   Yes.
17     Q   And did you receive the
18 $60,000 that's referenced therein?
19     A   I received two payments of $30,000,
20 yes.
21     Q   And did you understand this to be as
22 a result of services that you provided above
23 and beyond what are required given your
24 position?
25     A   It wasn't a bonus for performance as

Page 148

1  much as a bonus for retention.
2      Q   What's the difference?
3      A   A performance-based bonus says, hey,
4  you did X; we're going a pay you Y.  And
5  retention bonus says please stay here for a
6  period of time and you will be compensated with
7  such and such.
8      Q   After Mr. Yaniv indicated to you that
9  he was not able to get you the promotion to
10 vice president global grade 18, did that quash
11 those discussions or did they continue?
12     A   No.  That pretty much ended those
13 discussions.
14     Q   What do you recall Mark Sabag
15 announcing on December 14, 2017?
16     A   What was the date?
17     Q   December 14, 2017.
18     A   I don't recall.  I can only guess.
19     Q   I don't want you to guess.  Do you
20 recall being present in a meeting that
21 Mr. Sabag conducted?
22     A   This would have been a video session?
23     Q   You tell me.
24     A   I don't know.  I don't recall.
25     Q   Well, was Sabag the one who announced

Page 149

1  the global restructuring to Teva employees?
2      A   I honestly don't know.
3      Q   Well, you're bringing a lawsuit and
4  you're claiming that you were terminated on the
5  basis of your age.  And I'm trying to ask you
6  how you came to learn that there would be a
7  global restructuring with positional
8  eliminations.  And you have no idea?
9      A   I don't recall the exact dates, nor
10 do I recall the formats.  There was substantial
11 information coming to me from multiple sources
12 all at the same time and a rumor mill.  And so
13 where I got each specific piece of information,
14 I'd have to go back to my notes, to the
15 documents that you were provided and refresh my
16 memory as to what happened on what specific
17 date.
18     Q   When you refer to your notes, what
19 are you referring to?
20     A   The items that were Bates stamped and
21 sent to you.
22     Q   Did you keep a journal?
23     A   I used to keep a journal.
24 Unfortunately that got -- got lost in the -- in
25 my -- in my move to South Carolina.

Page 150

1    Q    And when did you move to South
2 Carolina?
3    A    I moved in January of 2020.
4    Q    Okay.  So there would be a journal
5 that you can't find that describes the events
6 that took place in December of 2017?
7    A    I kept a journal, yes, there was one.
8 I believe it was thrown out.
9    Q    By whom?
10    A    By me.
11    Q    And did it -- was it thrown out after
12 you filed your lawsuit?
13    A    Probably.  It got -- it got caught in
14 a box that ended up not making the trip if
15 that's the way to put it.  It was not
16 intentional.  It just was a box that got
17 tossed.
18    Q    Let me try it this way and let's see
19 how we can do.  Who is the first person that
20 you can recall who told you that there would be
21 a global restructuring and that the goal was to
22 eliminate 50 percent of the jobs at Teva?
23    A    I'm assuming it came up from a -- a
24 staff meeting either of the Total Rewards team
25 or Mr. Lawlor may have had a staff meeting.

Page 151

1    Q    Now, the Total Rewards team would
2 have been Mr. Yaniv's team?
3    A    Right.  And I don't recall whether,
4 you know, Ron was physically present and
5 whether he called the whole team together.
6    Q    So you don't recall a Yaniv team
7 meeting.  You recall a Lawlor team meeting?
8    A    I don't specifically recall a Lawlor
9 team meeting but my assumption is, is that
10 that's typically how these kinds of
11 communications would have happened.
12        MR. RAPPOPORT:  Let me show you an
13 email that's been Bates stamped 0050.  It's
14 going to be Keuch 4.
15        (Keuch Deposition Exhibit No. 4 was
16 marked for identification.)
17        BY MR. RAPPOPORT:
18    Q    I'm showing you an email that was
19 sent to Tal Zorman by you on December 14, 2017,
20 at what appears to be 9:07 p.m. that includes a
21 deck with bare bone recommendations for your
22 teams and options that suggest elimination of
23 either your position or Miriam's position.  Are
24 you familiar with this email?
25    A    I am.

Page 152

1    Q    What caused you to prepare it?
2    A    I was asked by Tal Zorman to do that.
3    Q    And when were you asked by Tal Zorman
4 to do that?
5    A    It would have been only a few days
6 before the date of this memo.  So if this memo
7 is December 14th, then it would have been in
8 early December.  I was not given a -- I don't
9 think I was given much lead time.
10    Q    In early December 2017, what
11 specifically did Tal Zorman request of you?
12    A    She asked me to put together some
13 options to basically reduce my staff by
14 50 percent.
15    Q    But wouldn't that have been the first
16 communication that you had with anyone at Teva
17 that a reduction in force was imminent and that
18 it would be 50 percent of the workforce?
19    A    I'm not sure that was the first
20 communication that -- you know, we were not
21 made aware that there were going to be -- there
22 was going to be a reduction in force.  I have a
23 sense that -- that I knew earlier, but did not
24 know the ramifications for my team.
25    Q    See even earlier then, about a week

Page 153

1 before December 14th, you were aware that a
2 reduction in force had been announced by the
3 new CEO Kare Schultz?
4    A    I -- again, I don't recall all the
5 dates.
6    Q    Okay.  The dates aren't important as
7 much as the sequence.  It sounds to me like
8 what you're saying is that even before you were
9 asked by Tal Zorman to prepare the deck that
10 I'm going to be marking soon as Exhibit 5, even
11 before you were asked, you knew that a
12 reduction in force was coming?
13    A    That is correct.
14    Q    Okay.  And then when you spoke to Tal
15 before December 14th, did she share with you
16 what the size of the reduction would be?
17    A    And I believe the number was
18 25 percent global reduction.
19    Q    Okay.  Did she indicate to you that
20 the head count reduction in HR would be
21 50 percent?
22    A    I'm not sure if she said HR but
23 certainly for my organization it was to be
24 50 percent.
25    Q    But you're not certain as to whether

39 (Pages 150 - 153)

Page 154

1 that would apply to other organizations within
2 HR as well?
3     A    I'm not 100 percent sure if that was
4 part of the conversation.
5     Q    Okay.  So when she shared with you
6 that the Total Rewards organization would be
7 reduced in half, is that when she asked you to
8 come up with some suggestions or
9 recommendations?
10     A    That's correct.
11     Q    And when you worked on the deck,
12 which we may as well mark as Exhibit 5 and
13 which accompanies this email, did you prepare
14 that yourself?
15         (Keuch Deposition Exhibit No. 5 was
16     marked for identification.)
17         BY MR. RAPPOPORT:
18     Q    I could show it to you if that
19 would --
20     A    No, no, I don't believe I did.  I
21 asked -- I approached Miriam and I approached
22 Diane and asked for their input.
23     Q    So between the time that Tal shared
24 with you that there would be a reduction in
25 your organization of 50 percent and the time

Page 155

1 that you prepared the deck, which has been
2 marked as Exhibit 5, you had conversations with
3 both Miriam and with Diane?
4     A    That's correct.
5     Q    But not with Edu?
6     A    Edu was not -- Tal had told me that,
7 you know, I would -- the job would no longer
8 have responsibilities for Latin America.  So
9 Edu was not on my -- on my list.
10     Q    Was that in the same conversation
11 when she asked you to prepare the deck?
12     A    Yes, it was.
13     Q    Did she explain why Edu would no
14 longer be part of North America?
15     A    I believe the conversation was that
16 it was being moved to -- I think to Gaurav, who
17 was Asia-Pac.
18     Q    Did she indicate why?
19     A    No.  Just simply this was how they
20 were changing.  I had a sense it was dealing
21 more with business alignment.
22     Q    Did she indicate to you that there
23 was a realignment and Latin America would no
24 longer go through North America?
25     A    That's what I just said, yes.

Page 156

1     Q    Okay.  Going back to what's been
2 marked as Keuch 4, your email, you would agree
3 with me, would you not, that you suggested that
4 a potential option could be the elimination of
5 your position?
6     A    That is correct.
7     Q    And you also suggested that it could
8 be an elimination of Miriam's position?
9     A    That is correct.  And I would take
10 over Miriam's responsibilities.
11     Q    You would wear two hats then?
12     A    Well, I would wear the -- the same
13 hat.  It's just that I would -- I would be more
14 engaged in the day-to-day activities, you know,
15 which I'm perfectly comfortable doing and
16 eliminate one level of -- of management.
17     Q    Now, when you asked her to delay the
18 change until after quarter one, was that
19 because you understood that there was a lot of
20 work that needed to be done in quarter one and
21 that there were risks to Teva if it was done by
22 a reduced organization?
23     A    That's correct.  Because as I said --
24 explained earlier, a lot of these employees
25 don't just disappear.  They're still -- require

Page 157

1 a lot of -- of work.
2     Q    And you raised as an example the
3 potential that your 401K plan could be
4 disqualified, which could cost Teva a
5 significant amount with regard to losing tax
6 benefits?
7     A    There are a number of -- of benefits
8 that we needed to keep our eyes on.  And, yes,
9 if things were not done properly, there were
10 legal issues.  I believe in the appendix you
11 can see each item that is regulated and again
12 has -- has some risks of failure to comply with
13 the regulations.
14     Q    And is it fair to say you didn't
15 really understand the magnitude of the
16 reductions by virtue of the fact that you were
17 asking that some exception be carved out for
18 Total Rewards?
19     A    That's not true, no.
20     Q    You did understand the magnitude of
21 the reduction?
22     A    I did.
23     Q    Okay.  But not withstanding
24 understanding the magnitude of the reduction,
25 you still felt that Total Rewards should get a

40 (Pages 154 - 157)

Page 158

1  pass at least for a calendar quarter because
2  you felt that these matters were of grave
3  concern to Teva?
4       A   Correct.  And that the workload had
5  really not changed.  You can't -- I had a
6  friend.  His name is Bob Kanner (phonetic) he
7  was the head of -- of compensation for Ford
8  Motor Company back in the day.  And I had an
9  appointment with him at 9:00 in the morning.
10  And when I arrived, there were police there.
11  And the gentleman had taken a firearm and blown
12  his brains out in his office.  And he had at
13  least two children and a wife.  And Ford had
14  taken the people out, but they never took the
15  work out.  He was a perfectionist.  So, yeah,
16  there's a -- there's a lot that's going to go
17  on because my team is heavily dedicated.
18  They -- they want to do a really good job
19  and -- and were doing a really good job.  And
20  taking the people out is -- is fine, but the
21  work was not gone at all for the U.S. team.  If
22  anything, it had increased.
23       Q   All right.  Let me show you what's
24  been marked as can Keuch Exhibit 5, which is
25  the deck that you prepared.  And let's go to

Page 159

1  the first page which is 52.
2       (Discussion off the record.)
3       BY MR. RAPPOPORT:
4       Q   Okay.  Let's go to the cover page,
5  which is 51.  I just want to ask you one
6  question.  The email that you sent to her was
7  dated December 14, but the deck is dated
8  December 15.  Can you reconcile the two?
9       A   I'm not sure.  I don't understand the
10  question.
11       Q   Well, my question was if you look at
12  Keuch Exhibit 4, which was your email where you
13  attach the deck, it's dated December 14th, but
14  your deck is dated December 15th.  I -- I --
15  it doesn't seem significant perhaps.  But I was
16  just wondering why is it that there are two
17  different dates?
18       A   It may have been a typo.  Maybe I had
19  planned on sending it on the 15th and Tal
20  had -- because I was probably still refining
21  it.  And Tal had probably said, no, she needed
22  it today, so I probably send it off as it was.
23       Q   How long did it take you to prepare
24  what's been marked as Keuch Exhibit 5?
25       A   Probably a couple days at best.  I

Page 160

1  mean, you know, I pulled the team together.
2  We -- you know, we had a lot of the information
3  already, you know, in another format for
4  perhaps another exhibit.  You know, we have
5  team meetings and a lot of these things are --
6  are already prepared for discussion at -- you
7  know, at my team meetings.  So from what I can
8  recall, you know, I pulled from other decks
9  also recognized that when -- when I built the
10  portal, the Total Rewards portal, myteva, all
11  of this information had to be pulled together
12  and put into the formulas, calculations, and
13  format for that -- for that portal.  So my
14  recollection would be that a lot of the things
15  that were legally required had already been
16  formatted.  So, no, I did not sit down and type
17  this whole presentation and appendix up in --
18  in two days.  But I was able to cut and paste
19  and then confirm that the information was still
20  valid.
21       Q   Are you the primary author?
22       A   I am.
23       Q   Let me show you the page that's
24  marked 054 in Exhibit 5.  Can you identify what
25  that work org chart is?

Page 161

1       A   Yes.  That was my current
2  organization.  And as you can see, Rose is
3  still there, so she was there.
4       Q   She had been retained in a contract
5  capacity.
6       A   Correct.
7       Q   Okay.  But Edu was not there?
8       A   Correct.  Because I was not asked
9  by -- I was asked specifically to just focus on
10  North America, nothing else.
11       Q   And that was because you were already
12  aware that there were going to be changes to
13  the reporting responsibilities as it related to
14  Latin America?
15       A   Correct.  I assumed Edu would report
16  to whomever.
17       Q   And the asterisk next to the 12 FTEs
18  makes reference to Jan Gustavsen.  Can you
19  explain why she was treated the way as opposed
20  to a 13 FTE?
21       A   Because she did not report into my
22  organization directly.  She reported to the
23  head of HR in Canada and sort of a dotted line
24  to me to my --
25       Q   Now --

41 (Pages 158 - 161)

Page 162

1    A    -- team.
2    Q    -- the very next page, you offer a
3 scenario and you're talking about a 54 percent
4 reduction.  Why 54 percent?
5    A    Because you're dealing with such a
6 small number, I couldn't cut arms and legs off
7 people to make them proportionate to get to 50.
8    Q    So was it your understanding that Tal
9 Zorman wanted you to get to 50 percent or more?
10    A    My understanding was she wanted me to
11 get to 50 percent.
12    Q    Okay.  But if you got from 13 to 7,
13 the 13 including Ms. Gustavsen, that would not
14 have given you the 50 percent reduction that
15 you needed?
16    A    The math doesn't work that way,
17 that's correct.  Seven I would have needed to
18 have 14 people to get to 50 percent.
19    Q    And what caused you to shoot for
20 50 percent?
21    A    Because that's what I was told.
22    Q    Okay.  By Ms. Zorman?
23    A    That's correct.
24    Q    If you look at Page 56, this the
25 first of two proposals, which gets you down to

Page 163

1 6 FTEs.  And that includes you and Ms. Rohach
2 and Ms. Weinstein.  Correct?
3    A    That's correct.
4    Q    And then you made reference to the
5 benefits team retaining the lowest graded
6 employees.  What is -- what's the significance
7 of that?
8    A    It assumes Canadian benefits is -- is
9 severed with full responsibility, transferred
10 to the North American TRT.  Basically, that
11 means that Jan Gustavsen would be terminated.
12 And the north -- the U.S. team would take over
13 responsibility for administering the Canadian
14 benefits.
15    Q    But my question to you related to the
16 other note that's just below the box that has
17 Diane Rohach's name where you make reference to
18 the benefits team retaining the lowest graded
19 employees, what -- what are you referring to
20 there?
21    A    Oh, that we -- we were only keeping
22 the analysts and specialists.  And I believe we
23 had two compensation managers if you go up to
24 the earlier chart, Samantha Rivello -- well,
25 her name changed.  She got married.  But there

Page 164

1 were -- I believe I had two compensation -- I'm
2 sorry -- two either benefit managers or senior
3 benefit analysts on the team.  You'd have to go
4 back up and we can look at who got eliminated
5 but that's what it --
6    Q    When --
7    A    -- means.
8    Q    -- Zorman directed you to provide her
9 with options, which resulted in the deck that's
10 been marked Exhibit 5, was it always in terms
11 of head count, or were labor costs also
12 discussed?
13    A    Labor costs were -- were never
14 discussed.
15    Q    But even though labor costs were
16 never discussed, you made reference, did you
17 not, to the lowest graded employees.  Isn't
18 that a reference to labor costs?
19    A    You would assume that the higher the
20 grade, the higher the compensation, yes.
21    Q    Okay.  But your discussion with
22 Ms. Zorman was always with regard to cutting
23 head count?
24    A    That's correct.
25    Q    And did you understand that

Page 165

1 Ms. Zorman was working at the direction of
2 Mr. Sabag.
3    A    I assumed such, yes.
4    Q    Did you understand that Mr. Sabag was
5 working at the direction of the new CEO,
6 Mr. Schultz?
7    A    I assumed that as well.
8    Q    But you had no discussions with
9 either Mr. Sabag or Mr. Schultz, did you?
10    A    I did not.
11    Q    Okay.  And by this point in time,
12 where was Mr. Yaniv?
13    A    I assume that he was tending to his
14 garden.
15    Q    He was not someone you were
16 conferring with as it relates to attempting to
17 achieve the reductions that you were mandated
18 to achieve?
19    A    No.  I was working directly with Tal.
20    Q    In the very next, page 57, you
21 discuss leadership and somewhat surprising at
22 least to me, you identified Diane Rohach as the
23 most valuable leader.  Why?
24    A    It should be obvious but because
25 you're terminating so many people, again they

42 (Pages 162 - 165)

Page 166

1  create a huge amount of work with regard to
2  COBRA, people getting their medical payments,
3  the whole system needed a leader to manage all
4  our providers and our vendors.  I mean, it was
5  a $220 million year spend on benefits.  And
6  someone had to watch that money and make sure
7  that it was working and that employees were
8  getting the benefits they needed.  We also have
9  1.2 billion at that time I believe in assets in
10  the pension retirement program, the 401K.  And
11  again, if you go to the appendix, you'll see
12  all of the compliance issues.  You fall out of
13  compliance, you -- you do get penalties and
14  sometimes you can get a plan that could be
15  disqualified.  So I think at that -- in a
16  crisis that's the job that you want to retain.
17  Whereas compensation, if you do nothing, you --
18  you have again an easier path of not violating
19  any regulations.
20      Q    Did you recognize that in identifying
21  Rohach as even more valuable than you with
22  regard to the handling of the benefits that you
23  were setting yourself up for a possible job
24  elimination?
25      A    I did not.

Page 167

1      Q    And by identifying Rohach as being
2  the most valuable leader, are you suggesting
3  that there were things that she could do in
4  terms of compliance requirements that you could
5  not do?
6      A    No.
7      Q    What then made her more valuable if
8  you could fill in for her?
9      A    What made her more valuable was
10  simply that she was totally up to date on
11  everything, had her hands in all the pots, so
12  to speak, all of the activities.  And to -- to
13  fill in for her shoes would have required a
14  some -- some in-depth knowledge of the inner
15  workings of how things are working with each
16  vendor, how the claims money gets calculated
17  and wired, you know, basically the nuts and
18  bolts of everything that goes on in the
19  organization.  And when you're cutting out her
20  staff, you're really getting down to the bare
21  bones.  And I don't think the organization
22  could have survived effectively without --
23  issues without her guidance.
24      Q    Is she closer to the nuts and bolts
25  than you?

Page 168

1      A    That's typically how it works in an
2  organizational hierarchy.  I've done all that
3  work in my past, but -- you know, I'd probably
4  be a little bit rusty.
5      Q    So in your more elevated role, were
6  you more strategic and less operational?
7      A    I was both.  I think as I said, when
8  I built the portal, I had to review and create
9  every formula, every calculation, every benefit
10  that went into it.  So I would say that, yeah,
11  I'm as knowledgeable as Diane in that arena.
12  Where my shortcoming would be, if there was
13  one, is simply that I did not handle it on a
14  day-to-day basis currently.
15      Q    Why then do you rank yourself as more
16  valuable than Weinstein?
17      A    Because given all that was going on,
18  she -- she could keep the boat afloat.  I think
19  that without her, the boat might sink.  It
20  would take -- it would take a little bit of
21  transition time, the same as we tried to give
22  Edu to try and at least be brought up to speed
23  on the status of everything that was going on
24  in the organization.
25      Q    I'm not sure you answered my

Page 169

1  question.  Let me ask it again.  Why did you
2  consider yourself to be more valuable to the
3  organization than Miriam Weinstein?
4      A    As I said before, if you have to
5  chose between compensation and benefits,
6  benefits is the most complex and requires the
7  most in-depth knowledge to keep the thing
8  going.  Benefits has the most compliance
9  regulations that have to be met.  It -- it's
10  just -- it's just something that you -- you --
11  you can't stop.  Compensation you can stop and
12  get by for a period of time until the
13  marketplace catches up with you.  And when
14  you're out of alignment, then you have other
15  issues to deal with.
16      Q    Is that an another way of saying you
17  felt more comfortable stepping in in Miriam
18  Weinstein's role than you did in Diane Rohach's
19  role?
20      A    No.  What it says is that I did not
21  value the compensation issues at that time as
22  being as important as the benefits issues.
23      Q    You say in this email that you have
24  managed situations similar -- oh, wait a
25  second.  Okay.  The $220 million spend relates

43 (Pages 166 - 169)

Page 170

1 to the cost of benefits?
2    A    That's what we were spending
3 annually, yes.
4    Q    Go to the next org chart. Now, on
5 this org chart which you shared with Tal
6 Zorman, let me --
7        MR. EPSTEIN: Before you go on to the
8 next -- before you go on to the next chart, is
9 there any discussions that should be had as to
10 when we're going to take a break?
11       MR. RAPPOPORT: Sure. Let's have
12 that discussion right now. When did you want
13 to take a break?
14       MR. EPSTEIN: I -- I don't determine
15 those things. It's your deposition. And the
16 court reporter probably needs a break.
17       MR. RAPPOPORT: All right.
18       MR. EPSTEIN: I would think so --
19       MR. RAPPOPORT: We took a break right
20 before you came back. Would you like to --
21 would you like to take a lunch break. Or would
22 you like to work through lunch?
23       MR. EPSTEIN: Well, it depends on how
24 long you intend to go. If you intend to spend
25 the entire day, the seven hours that you have,

Page 171

1 I think we should take a lunch break. If you
2 don't, then we don't need one.
3       MR. RAPPOPORT: Okay. I -- I do
4 intend to take the seven hours that are
5 allotted to me. So let's come back at 2:00.
6       MR. EPSTEIN: Okay.
7       MR. RAPPOPORT: Okay. Okay. Thank
8 you.
9       (Recess taken -- 1:14 p.m.)
10      (After recess -- 2:03 p.m.)
11 BY MR. RAPPOPORT:
12   Q    Mr. Keuch, I'm showing you still the
13 proposal that you made which has been marked as
14 Keuch Exhibit 5 and -- and when you -- in the
15 middle paragraph we talked about the region TR
16 head, why do you use the word "probably"?
17   A    Where?
18   Q    When you describe yourself.
19   A    And I probably use that because --
20 because of my leadership style. I'm not one
21 who likes to boast or brag about one's
22 credentials, so I leave it to others to -- to
23 asses my strengths and my values. And I leave
24 it to my accomplishments to demonstrate what I
25 bring to the organization so...

Page 172

1    Q    So if you're saying probably the next
2 most valuable, if it's not you, would it then
3 be Weinstein?
4    A    She shows up as No. 3, yes.
5    Q    And when you tell Ms. Zorman that
6 you've been -- that you handled situations
7 similar to Teva's, what are you referring to?
8    A    When I was with the H.J. Heinz
9 companies, we had some reductions in force.
10 When I was with -- as I explained earlier, with
11 Pfizer, when Warner-Lambert was acquired and I
12 had to work through the divesture of -- of four
13 businesses. I consider that to be comparable
14 expertise in these kinds of situations.
15   Q    I just want to be clear with respect
16 to something we testified to before our lunch
17 break. You testified that you received a call
18 from Ms. Zorman about a week before you
19 prepared what's been marked as Exhibit 5, which
20 has a December 15th date. And that in response
21 to the call you prepared Exhibit 5. During the
22 call with Ms. Zorman, does she mention Mr. Nasi
23 at all?
24   A    I'm not sure. But if she said she
25 did, I believe it was mentioned in the context

Page 173

1 of, you know, Latin America would no longer be
2 reporting to me. So we did not dwell on it
3 other than it was simply a matter of fact.
4    Q    Did you tell Mr. Nasi at some point
5 in time that he was going to be interviewed by
6 Ms. Zorman?
7    A    No.
8    Q    Did Ms. Zorman ever ask you your
9 opinion of Mr. Nasi?
10   A    No, not that I can recall.
11   Q    Did Ms. Zorman ever ask to see the
12 reviews that you prepared for Mr. Nasi?
13   A    No.
14   Q    When you had the conversation with
15 her on December the 7th or thereabouts, a week
16 before you prepared it, did you give any
17 consideration at all at that time that Mr. Nasi
18 may be identified as the next director for
19 Total Rewards in North America?
20   A    No.
21   Q    So if his name came up at all, it was
22 only to share with you that Latin America would
23 not be reporting in through North America?
24   A    That's correct.
25   Q    Okay. If you look at the chart you

44 (Pages 170 - 173)

Page 174

1 prepared, which is on 58, which is part of
2 Exhibit 5, in the first chart you have
3 eliminate the region head. That would be you.
4 Correct?
5    A    That's correct.
6    Q    Okay. And you're suggesting that as
7 a proposal retaining both Rohach and Weinstein.
8 Is that correct?
9    A    That is correct.
10    Q    And both Rohach and Weinstein were
11 both younger than you, weren't they?
12    A    That's correct.
13    Q    Okay. Notwithstanding the fact that
14 they were younger than you, you felt that one
15 scenario would see you leave and the two
16 younger people stay on?
17    A    And they would report to corporate,
18 yes.
19    Q    And by "corporate," what did you
20 mean?
21    A    Tal Zorman. Or -- or whoever became
22 the global head of Total Rewards. Again, it
23 was not clear that Tal was permanently going to
24 be the head of Total Rewards. It was simply
25 the fact that Ron was leaving and the duties

Page 175

1 were then shifted to her and the tenure for the
2 shift was never disclosed. It could have been
3 temporary.
4    Q    And on the same org chart you have
5 instead of eliminating the region head,
6 eliminate the compensation head and that would
7 have been Miriam Weinstein.
8    A    That is correct.
9    Q    So there were at least three
10 scenarios that you painted for Ms. Zorman to
11 choose from?
12    A    That is correct.
13    Q    Okay. And in all of the scenarios,
14 Rohach stays on?
15    A    That is correct.
16    Q    And in one of the scenarios, you
17 leave?
18    A    That is correct.
19    Q    So when you send this to her, does
20 she respond and talk to you about the options
21 that you've painted?
22    A    No.
23    Q    No follow-up at all?
24    A    I didn't say that. I believe you
25 have emails in your files that say thank you --

Page 176

1 you know, thank you I think is really all it
2 said. She was --
3    Q    I'm showing you exhibit 4, which was
4 your email that accompanied the -- the -- the
5 proposal. And in it she responds by saying,
6 "Thanks much, Randy. Will review and be in
7 touch with you today/next week."
8         That's O50. We could show it to you
9 if you like.
10    A    No, that's fine. But she never got
11 back to me.
12    Q    Okay.
13    A    Other than January 2nd and other
14 than the email where I -- I offered to help
15 her.
16    Q    All right. I'm going to show you
17 that now.
18         MR. RAPPOPORT: And I'm going to mark
19 it as Keuch Exhibit 6. It's 079.
20         (Keuch Deposition Exhibit No. 6 was
21 marked for identification.)
22         MR. EPSTEIN: What is the Bates
23 number?
24         MR. RAPPOPORT: It's Bates stamped
25 Keuch 0079. It's an email dated December 20th,

Page 177

1 2017. And it's from Randy Keuch to Tal Zorman.
2 The subject is how can I help you?
3         BY MR. RAPPOPORT:
4    Q    And, of course, you can recall
5 sending this to her. Correct?
6    A    I do.
7    Q    Of course. And in it, you decide
8 that you want to send her your CV for her
9 review?
10    A    That's correct.
11    Q    What was your motivation there?
12    A    I assumed she didn't have it. And
13 also since Edu Nasi was so unqualified for the
14 position and Miriam was -- was almost there and
15 Diane was -- you know, was a distant third
16 because she needed more background in
17 compensation, so I didn't know -- I shouldn't
18 say Edu. I should talk about Miriam and Diane,
19 I wanted her to recognize that, one, I had a
20 higher skill set than Miriam or Diane; and two,
21 that I had held the position of global Total
22 Rewards for a major corporation for nine years
23 and to give her some of my background.
24    Q    And that's because she had never
25 really managed you?

45 (Pages 174 - 177)

1   A   That's correct.
2   Q   Correct?
3       And had you known Tal Zorman in
4   connection with any of the work that you had
5   performed?
6   A   I remember delivering cosmetics to
7   her, U.S. cosmetics. But, no, we really never
8   interacted very much at all.
9   Q   You did not attend meetings that
10  attended or presented at?
11  A   No. I attended meetings. I used the
12  word "interaction." Other than hello, hi,
13  there was not much interaction.
14  Q   Had you formed an opinion of her?
15  A   Not really. She seemed competent in
16  the role she had.
17  Q   And what was the role that she had?
18  A   I believe she was leadership talent
19  development.
20  Q   Okay. Did she share with you that
21  she would be assumed the role that Ron Yaniv
22  had performed?
23  A   She did.
24  Q   Okay. Do you know who Simon Kelner
25  is?

1   A   I believe Simon was again a person in
2   maybe the talent acquisition organization.
3   Q   If I share with you that he was in
4   global mobility, would that refresh your
5   recollection?
6   A   Okay. Sure. He's in global
7   mobility, my apologies.
8   Q   That's okay. Did she indicate to you
9   that Simon Kelner had been -- his position had
10  been eliminated and she was assuming those
11  responsibilities as well?
12  A   She did not.
13  Q   Did you come to learn that Simon
14  Kelner's position had been eliminated?
15  A   I believe he may have been included
16  in an organizational announcement that came out
17  from either her or from Mark Sabag.
18  Q   Okay. Did you have an understanding
19  as to who would assume his responsibilities?
20  A   I believe it stated that it -- it
21  would be -- if it's talent would be Tal.
22  Q   Okay. So when you write to Tal, you
23  don't think that she had any real familiarity
24  with your background?
25  A   I was unsure. So better to be safe

1   that sorry.
2   Q   And you include your CV?
3   A   Yes.
4   Q   And you even offer to move to Israel
5   on a temporary basis?
6   A   If that's what it took to -- to help
7   her.
8   Q   Okay. And the way you characterize
9   it, I would be correct in saying that you were
10  going to, quote, fill in for Ron to help Teva
11  get through the next six months or so?
12  A   That's correct. A temporary
13  assignment. I didn't want to be over there
14  more than six months but knowing that she had
15  very little if any compensation and benefits
16  expertise, I thought she might benefit from
17  someone helping her.
18  Q   And what made you believe that she
19  had very little compensation and benefits
20  experience?
21  A   Because she didn't.
22  Q   How did you know that?
23  A   I'd say it was an educated guess.
24  But she does -- I believe she's either up on --
25  on LinkedIn or some other websites where her --

1   well, LinkedIn would probably be where I would
2   have looked to look her up.
3   Q   So you did a little research on your
4   own?
5   A   Yes. You normally like to research
6   your -- your new -- your manager.
7   Q   Okay. And you concluded that she had
8   very little if any experience in connection
9   with compensation or benefits?
10  A   That was my conclusion.
11  Q   All right. And you suggested that
12  you fill in for Ron Yaniv, but didn't you know
13  that Ron Yaniv's position had been eliminated?
14  A   I wasn't sure whether the position
15  was eliminated, if Roni was eliminated, if it
16  was temporary, if it was permanent. There was
17  a lot of secrecy sometimes around some of the
18  changes that took place in -- in Teva
19  Corporate, so making assumptions, again, I did
20  not confront Tal that -- you know, that she
21  wasn't qualified. I simply lended her a
22  thought that if she needed help, I would be
23  willing to -- to help her.
24  Q   And she responds the same day that
25  you send your email if you look above.

Page 182

1　A　Yep.
2　Q　I'm thanking you and indicating that
3　she appreciated your note and would be in touch
4　with you after the holidays?
5　A　Correct.
6　Q　Now, before the holidays, still 2017,
7　did anyone tell you what your status was in
8　terms of going forward?
9　A　No.
10　Q　Okay.  And were you made aware that
11　your team would be reduced by 50 percent?
12　A　No.  I was simply asked to provide
13　proposals.  I was told that they were going to
14　do cuts, but one always hopes that maybe
15　they'll see the light and -- and not do those
16　cuts or at least as extensive as -- as they
17　were thinking.
18　Q　We're now in early January of 2018,
19　does Tal reach out to you?
20　A　January 2nd.
21　Q　By phone?
22　A　By phone.
23　Q　Okay.  And what does she say as best
24　you can recall?
25　A　She told me she'd given it some

Page 183

1　thought, that my position would -- that --
2　that -- that I was going to be terminated, my
3　position would be filled with Edu, you know, we
4　should talk about or think about a -- a last
5　day in the office, the term date was March, I
6　don't know, 18th, something like that.  And
7　that was kind of it.  I think she might have
8　said Edu would be calling me.
9　Q　It was a short conversation?
10　A　Very short, yes.
11　Q　And this is the first time that she
12　mentions Edu to you?
13　A　As a -- as a replacement for my
14　position, yes.
15　Q　Has she ever mentioned Edu to you for
16　any other reason?
17　A　Not that I can recall other than she
18　may have given me a compliment on Edu or raised
19　a question as Edu was on -- I put him on some
20　corporate project teams.  So he did spend some
21　time, you know, in Israel on those teams as
22　well as working through it.  So while I was not
23　in Israel and he was there most of the time, it
24　may have been that he had some interaction with
25　her.

Page 184

1　Q　Are you speculating or do you know
2　that to be true?
3　A　I'm speculating.
4　Q　Okay.  How did you feel when she told
5　you of the news?
6　A　I think you go through the stages of
7　grieving.  So the first -- first aspect is sort
8　of denial.  So a little bit of shock, a little
9　bit of denial.  But, you know, you move through
10　the stages and basically reconcile where you're
11　at and move on.
12　Q　So did you attempt to appeal to her
13　any further?
14　A　No.  She made it quite clear that
15　this was a final decision.
16　Q　Did you speak to Mr. Sabag about it?
17　A　I did not.
18　Q　Did you speak to Mr. Lawlor about it?
19　A　I did not.
20　Q　Did you feel right away that it was a
21　wrong decision?
22　A　Yes.
23　Q　And did you feel right away that it
24　was a discriminatory decision?
25　A　I -- I had an instinct, an intuitive

Page 185

1　instinct that perhaps it was.
2　Q　And what do you recall about that
3　intuitive instinct?
4　A　My dealings with Dan Lawlor and the
5　discriminations that he had -- he had done in
6　my presence.
7　Q　You made a connection?
8　A　I did.
9　Q　Did you have reason to believe that
10　Dan Lawlor was involved in the decision?
11　A　I did.
12　Q　What was that?
13　A　Well, he obviously got involved in
14　the hiring of Rose Riccioli.  And it made sense
15　since Lesley Billow was involved in my hiring
16　that Dan now had that same role.  And so he
17　would be the matrix manager of this position
18　and probably knew me from some of our
19　interactions better than Tal.
20　Q　Did she mention Dan Lawlor as a
21　resource to her in connection with her
22　decision?
23　A　No.  But she copied Dan and Ron Yaniv
24　on her response to my note.
25　Q　Which note was that?

47 (Pages 182 - 185)

Page 186

1    A    The -- the response to the -- to what
2  I sent her.  I'd have to look it up but...
3    Q    (Inaudible) the deck?
4    A    Yes.
5         THE COURT REPORTER:  I'm sorry.  I
6  didn't hear that question.
7         MR. RAPPOPORT:  I said the question
8  was:  Do you mean the deck?
9         THE COURT REPORTER:  Thank you.
10        BY MR. RAPPOPORT:
11   Q    And we're referring to the email that
12  is Bates stamped 00050, which I believe is
13  Teva 4 -- sorry Keuch 4.
14        So did you talk to Ron Lawlor -- or
15  Dan Lawlor about it at all?
16   A    No.
17   Q    And did Edu call you as she suggested
18  he would?
19   A    I believe Edu reached out to me after
20  I hung up with Tal.  I assumed Tal called Edu.
21  Edu then called me.  And we then discussed how
22  we would communicate to the team.  And -- and
23  the transition.
24   Q    Tell me as much as you can recall
25  about your conversation with Edu.

Page 187

1    A    Well, recognize Edu and I have known
2  each other for 20 years, so he -- he felt bad.
3  He -- he told me that he had to keep it a
4  secret and that bothered him tremendously
5  because he could not share with me the fact
6  that I was going to be terminated and -- and
7  that -- you know, that he was the chosen one.
8         But, you know, it didn't -- it didn't
9  affect our friendship.  I understood.  And I
10  wanted him to -- to be successful.
11   Q    Was there then a team meeting?
12   A    I don't believe there was a team
13  meeting.  I believe or recall that I met
14  with -- well, I met with first of all Miriam
15  and Diane.  I believe I met with them together.
16  And then I shared it with the -- the team that
17  was physically in my area.  I did not share it
18  with the Latin America community.  And I'm not
19  sure that we were able to get Jan Gustavsen
20  from Canada on the -- you know, on the phone
21  line.  So that -- that conversation really
22  didn't -- didn't happen.
23        And after I told my team and -- and
24  after that, then -- then Edu called Miriam and
25  called Diane.  And then he came up by plane I

Page 188

1  want to say within a few days, at most the next
2  week, and he met with the team.
3    Q    When you say "your team," is that
4  more than just Miriam and Diane?
5    A    Yeah.  It would be my -- my
6  compensation team members, managers, analysts,
7  and it would be my benefits people.
8    Q    Did you meet with Miriam and Diane
9  separately or together?
10   A    I believe I met with them together.
11   Q    What did you tell them?
12   A    I told them that I was being
13  terminated and that Edu was taking my position.
14   Q    Did you tell them that you believed
15  it was age discrimination?
16   A    I did not.
17   Q    Did you tell them when you would be
18  leaving?
19   A    I didn't know my -- I didn't know the
20  full date structure.  It hadn't been worked
21  out, but my last day I knew was March 18th I
22  believe.
23   Q    And what did you tell your team?
24   A    I told them that I was being severed
25  and that Edu would be taking my position.

Page 189

1    Q    So when Edu comes up a few days later
2  by plane, do you meet with Edu?
3    A    Yes.
4    Q    Does he tell you that he's coming
5  over as a director?
6    A    Yes.
7    Q    Does he tell you that he's
8  maintaining his labor grade 15?
9    A    I'm not sure when he shared with me
10  that it was a 15 going to a 16.  So that I'm
11  not 100 percent clear.  But I believe all he
12  shared with me at that time was it was a 15.
13   Q    Was there a subsequent conversation
14  with him where he told you that the 15 would
15  soon become a 16?
16   A    I believe there were, yeah, prior to
17  my departure.
18   Q    So prior to the end of -- prior to
19  February?
20   A    Prior to -- yeah, February 24th,
21  whatever the date was, I believe we -- we had a
22  conversation at that stage.
23   Q    Okay.  Do you recall a conversation
24  or are you just believing a conversation?
25   A    It was a while ago so I'm not sure.

48 (Pages 186 - 189)

Page 190

```
1  I've talked to Edu, you know, since -- since I
2  have left Teva so that conversation could have
3  occurred.  I know that -- that I checked his
4  LinkedIn page and it said he was a senior
5  director so it sort of was obvious.
6      Q   So before you checked his LinkedIn
7  page to see that he was a senior director, had
8  you had a conversation with him about becoming
9  a senior director?
10     A   I don't recall having that
11 conversation.
12     Q   So is it your testimony that the way
13 you learned that he became a senior director
14 was through a LinkedIn check?
15     A   Well, that was part of it because --
16 because the LinkedIn check said he became a
17 senior director in January.  And I have a sense
18 that others in the organization may have shared
19 that with me.  It may have been Miriam, it may
20 have been Diane, because I kept in touch
21 with -- it may have been Samantha.  I kept in
22 touch with many of my team members after.
23     Q   Were you the one who was responsible
24 for telling team members that their positions
25 would be eliminated?
```

Page 191

```
1      A   I don't believe so.  I believe Edu
2  took charge of that.  They hadn't been decided
3  at the time that -- that my termination
4  happened.
5      MR. RAPPOPORT:  Let he show you what
6  I'm marking as Keuch Exhibit 6, which is Bates
7  stamped Keuch 183.  And it's a letter dated
8  January 9, 2018.
9      MR. SHEMTOB:  Seven.
10     MR. RAPPOPORT:  Seven.  I'm sorry.
11     (Keuch Deposition Exhibit No. 7 was
12 marked for identification.)
13     BY MR. RAPPOPORT:
14     Q   Do you recall receiving this letter?
15     A   I -- I do.
16     Q   Was it received by mail?
17     A   That I -- I -- I don't recall.  It
18 was a large package.  So I'll assume it was
19 received by mail but I don't -- I don't recall.
20     Q   And it would -- is that your
21 separation date, does it not?
22     A   Yes.
23     Q   And that was March 18 of 2018?
24     A   Yes.  Well -- yes.
25     Q   You were paid through that date, were
```

Page 192

```
1  you not?
2      A   Yes, I was.
3      Q   And the targeted last day of work as
4  set forth in the first paragraph was
5  February 23 of 2018.  Isn't that correct?
6      A   That's correct.
7      Q   Now, you testified earlier this
8  morning that other people being separated were
9  not expected to continue to work was active
10 employees.  Is there a reason why you were
11 expected to do so?
12     A   I believe that because of the lack of
13 experience and qualifications that Mr. Nasi
14 had, that they wanted me to stay on board and
15 make a smooth transition.
16     Q   What is the basis of that answer, who
17 told you that was the reason that they wanted
18 you had to stay on board?
19     A   That was a conversation that I had
20 with Tal Zorman.
21     Q   When was that conversation?
22     A   Sometime after January 2nd because
23 that's how the February 23rd date got set.
24     Q   So sometime after January 2nd, but
25 before February 23rd, you had still another
```

Page 193

```
1  conversation with Tal Zorman?
2      A   I believe so.  Yes, she would have
3  been the one that would have made that
4  decision.
5      Q   And what was the subject matter of
6  this next conversation?
7      A   It was the transition.  When --
8  when -- when I should -- my -- my last day in
9  the office should be.
10     As I said, most people as I recall,
11 you know, were not expected to work more than a
12 few days after they were notified of their
13 termination.
14     Q   Whereas you were expected to work
15 until February 23rd per your agreement with
16 Tal Zorman?
17     A   Correct.
18     Q   Okay.  What else does Tal Zorman say
19 during the meeting other than to determine that
20 a February 23rd last day of work would work?
21     A   It was just simply discussion around
22 Edu's travel schedule, how we had to work
23 together with him to, you know, maximize his
24 time that he would be flying up north, staying
25 in hotel, you know, every other week or some
```

49 (Pages 190 - 193)

Page 194

1 sort of schedule. And if I could work with him
2 so that I was available and, you know, help him
3 transition to the -- to the vendors and the
4 providers we had. That was pretty much the --
5 the gist of the conversation.
6    Q   And in the subsequent call, do you
7 question or challenge the decision?
8    A   I did not.
9    Q   Did you ask for any explanation?
10    A   I did not.
11    Q   Did you agree to assist Mr. Nasi with
12 regard to transitioning the duties from you to
13 him?
14    A   I did.
15    Q   And did you do that?
16    A   I did.
17    Q   And did you conduct yourself
18 professionally in that regard?
19    A   I did.
20    Q   Was there any discussion with
21 Ms. Zorman with respect to the severance
22 package?
23    A   No.
24    Q   Did you have an understanding as to
25 how your severance package was calculated?

Page 195

1    A   I did.
2    Q   What was your understanding?
3    A   It's based on your grade and your
4 years of service. There's a table. And --
5 and -- or because the severance package has
6 been changed over the years made much leaner at
7 least for the lower grades and the bonus
8 portion of the severance was removed so, you
9 know, I kind of worked on the severance package
10 over my tenure at Teva.
11    Q   And were you treated the same as any
12 other employee being separated with regard to
13 the calculation of your severance?
14    A   Yes.
15    Q   Did you think the severance that was
16 being offered to you was inadequate?
17    A   Yes.
18    Q   And did you ask for enhancement of
19 the severance?
20    A   No.
21    Q   What made it inadequate?
22    A   Well, my knowledge that at -- at
23 age -- well, what would I have been 60 -- 64 I
24 guess, right, 54, 18, yeah, probably would have
25 been 64, that the odds of my -- as Dan Lawlor

Page 196

1 had said that I was unemployable, it would be
2 extremely difficult for me to -- to find a new
3 position.
4    Q   When did Dan Lawlor say that Randy
5 Keuch was unemployable?
6    A   He basically feels that everyone is
7 unemployable. He said that at age 62 in the
8 severance -- supplemental severance program
9 restructuring.
10    Q   That wasn't specific to you, though,
11 was it?
12    A   Well, it applied to me. Was it
13 specific to me, no.
14    Q   And the plan that I've marked Keuch 7
15 makes no reference to filing for unemployment.
16 Isn't that correct?
17    A   I'm sorry. What was the question?
18    Q   The letter that I've marked as
19 Keuch 7 makes no reference to you filing for
20 unemployment. Isn't that correct?
21    A   I believe that's true.
22    Q   And that's because you are of a
23 certain age?
24    A   That's correct.
25    Q   Employees younger than you needed to

Page 197

1 have their severance offset by -- I'm sorry --
2 have their unemployment offset by their
3 severance benefits?
4    A   No. They had their severance
5 benefits offset by their unemployment benefits.
6    Q   That did not apply to you because you
7 never received severance benefits?
8    A   That's correct as well.
9    Q   Okay. So during the roughly month
10 and a half from January 2nd until
11 February 23rd, you'd come in every day?
12    A   I did.
13    Q   And on some of those weeks you're
14 meeting with the vendors along with Mr. Nasi?
15    A   That's correct. And on some of those
16 days, I was given time off to do job
17 interviews.
18    Q   And did you interview while still
19 employed at Teva?
20    A   I worked on it. And I believe I may
21 have done one or two -- I know I did one
22 interview, yes.
23    Q   Which one was that?
24    A   I met with Salveson Stetson, Donna
25 DeHart.

50 (Pages 194 - 197)

1    Q    They're a recruiting firm or
2 headhunter.  Correct?
3    A    That's correct.
4        MR. RAPPOPORT:  Okay.  I'm going to
5 direct your attention to what I'm marking as
6 Keuch 8, which is Bates stamped 009 to 010.
7        (Keuch Deposition Exhibit No. 8 was
8 marked for identification.)
9 BY MR. RAPPOPORT:
10    Q    You're still employed at Teva when
11 you received the document that I'm referring to
12 as Keuch 8, which is a letter, Dear Colleagues
13 signed by Tal Zorman?
14    A    Yes.
15    Q    And in the -- on the second page
16 reference is made to you.  Correct?
17    A    There was a reference thanking me for
18 a job well done, yes.
19    Q    Okay.  And she makes reference to
20 your significant contributions and dedication?
21    A    Correct.
22    Q    Were you still employed by Teva when
23 you learned that Edu Nasi's job would not be a
24 director but would be senior director?
25    A    Well, that's a good question.  As I

1 said, I looked at -- at LinkedIn and -- and saw
2 it there.  That's not an official employee
3 record, so other than that, and maybe some
4 whispers so that was my reference point really.
5    Q    My question to you was, was this
6 while you were still employed at Teva or had
7 you already left Teva?
8    A    I believe I checked LinkedIn while I
9 was employed at Teva.
10    Q    And upon checking LinkedIn, did you
11 realize that Ms. Nasi would be a senior
12 director?
13    A    I guess it was sometime -- it might
14 have been in February when I checked.  I'm not
15 100 percent sure.
16    Q    Did you have any discussion with him
17 with respect to that subject?
18    A    I did not.
19    Q    Did you come to learn whether his
20 labor grade has been enhanced from a 15 to a
21 16?
22    A    I did.
23    Q    When was that conversation?  How did
24 you learn that?
25    A    I believe I learned it from Diane

1 Rohach.  And it would have been in -- in March.
2    Q    You stopped work in February but you
3 kept in touch with Diane Rohach?
4    A    I did.
5    Q    And did she tell you that?
6    A    She did.
7    Q    Well, I didn't finish my question.
8 What did she tell you as it relates to
9 Mr. Nasi?
10    A    She simply told me that he was -- he
11 had been promoted to a grade 16, senior
12 director.
13    Q    Was that bothersome to you?
14    A    Yes.
15    Q    Why?
16    A    I knew from the start that if Teva
17 had used their global grading system and
18 established the grade for the new job or the
19 revised position or the shortened position of
20 Total Rewards for now North America, that it
21 would not have come up as a grade 15.  It's
22 also very uncommon to have a 15 reporting to a
23 15, which Miriam was a grade 15.
24    Q    You had an expectation that at some
25 point in time, he would be evaluated as a labor

1 grade 16?
2    A    I felt that the labor grading system
3 was basically administer -- manipulated to
4 basically get rid of me.
5    Q    Can you explain your answer?
6    A    It's quite simple.  If you run that
7 job through the grading system, you would not
8 come up -- have come up with a 15.  But by
9 making it a 15, it was a two-grade reduction,
10 which gave Teva much more clarity that I -- I
11 wouldn't accept the two-grade deduction and
12 maybe more of a legitimate claim, but then once
13 I was gone, they moved it to a 16.  It seems a
14 little bit deceptive.
15    Q    Are you speculating or did someone
16 share with you that that was in fact the
17 scheme?
18    A    A little -- I'm speculating.
19    Q    You have no real evidence to support
20 your speculation, do you?
21    A    I think if you ran the system, you
22 would find that it was not being used
23 accurately, that it was being manipulated to
24 get whatever senior leadership wanted to get
25 out of it at least in the HR organization.

51 (Pages 198 - 201)

1   Q   And who specifically do you believe
2   was manipulating the grading system at that
3   time?
4       A   It probably had to start near the top
5   where -- which would be with Mark Sabag and
6   down through Ron and then ultimately with --
7   with Tal.
8       Q   So there were three individuals that
9   you believe were attempting to rig the system?
10      A   Well, I believe that's correct.
11      Q   And what was it about the new job
12  that was -- that it made it clear to you that
13  it would not stand up as a labor grade 15?
14      A   Well, recognize that I played a role
15  as did Edu Nasi and others in designing the
16  global grading system.  So we knew the factors.
17  We knew what went into it.  And I believe if
18  you -- you already talked about the discussion
19  with Ron Yaniv that perhaps my grade was an 18.
20  And if you look at if that job has been graded
21  it -- it might have come out an 18.  Clearly,
22  it was a strong 17 otherwise Ron would not have
23  gone to bat to try and get it to be an 18.  So
24  when we look at now what was a 15, the job had
25  not -- had not changed very much.  I was hired

1   in January of 2014.  And as we talked about,
2   there are -- at time there was probably maybe
3   12,000 employees throughout the region.  And
4   when we acquired Actavis that added about 3,000
5   employees.  When we acquired Anda, that added
6   well over 1,000.  We acquired Rimsa, that added
7   again another five, 800 people.  And there were
8   probably a few smaller acquisitions that took
9   place over that tenure.  So my people
10  responsibilities had grown, at least the
11  employees that we were managing their Total
12  Rewards for had grown by, I don't know, five,
13  6,000 employees.  So now you take a 25 percent
14  cut and guess what, we're back to where we
15  were.  And when you look at the countries,
16  yeah, we're just North America and we are, what
17  would I say, Canada, so New York America, U.S.,
18  and Canada.  And if you look at Gaurav's
19  position as an example, his position after
20  the -- his position before the act -- the
21  reduction in force was just Asia-Pacific.  He
22  had a few thousand employees in a few
23  countries.  If you look at Amir Zeirah, who was
24  the Total Rewards head for Israel, he had only
25  Israel, one country, one language, maybe two if

1   you count English, and only 8,000 employees.
2   No one else.  So how -- and -- and it was
3   government-run, socialized medicine, so health
4   care.  So anyone -- any comp expert looking at
5   Israel, that job, and looking at the position
6   that I held, would clearly come to the
7   conclusion, undoubtedly, unequivocally that the
8   job I held was a higher-graded job than the
9   Israel job.
10      Q   How are jobs graded?
11      A   They're using a global grading system
12  that had a number of factors much like Hay
13  point factor system.  I don't remember all the
14  factors, but you know, there are a number of
15  scopes, countries, people, employees, you know,
16  that you're responsible for, et cetera,
17  countries, language.
18      Q   So the size of the workforce as well
19  as the number of languages spoken and the
20  number of countries would all be factors in
21  connection with the way a labor grade is
22  evaluated?
23      A   Well, they fit into the concept of
24  scope and complexity.  And again, when you do
25  compensation, if you're valuing a job in the

1   world of compensation, there's a high
2   correlation between the size of the
3   organization and the compensation provided to
4   the organization.  If we look at what we used
5   in Europe as well as in Latin America, we used
6   the Mercer International Position Evaluation
7   System.  And I was a critical player in
8   developing that system in Europe.  I developed
9   it for the consumer -- for the European
10  Consumer Forum with a fellow out of Heineken.
11  But long story short is, you know, there's a
12  system that was designed to evaluate jobs.  And
13  I don't believe this -- these changes were run
14  through that system.
15      Q   What causes a job to be evaluated?
16  How -- how often does it happen?
17      A   Typically it happens whenever there's
18  a change.
19      Q   So are you testifying that you knew
20  and recognized that within a relatively short
21  period of time because of the change, that the
22  job that Mr. Nasi would be reevaluated from
23  a labor grade 15 to a labor grade 16?
24      A   I knew that it was a grade higher
25  than a 15.

Page 206

1    Q    Was he a 15 when he managed Latin
2 America?
3    A    He was.
4    Q    Okay. Was he the only 15 who
5 reported to you?
6    A    Miriam Weinstein was a 15.
7    Q    Okay. And did you have reason to
8 believe that her job would also be reevaluated
9 and enhanced?
10    A    I think her job was -- was properly
11 evaluated at a 15. It was the right level and
12 nothing had changed as I said even with the
13 reduction in force, the number of employees,
14 maybe it had dropped in aggregate 500, 800
15 employees but not a significant move.
16    Q    Can an employee of Teva request that
17 their job be reevaluated?
18    A    Not to my knowledge.
19    Q    What happened to Miriam Weinstein's
20 position as director of compensation?
21    A    That I'm not clear. She stayed to my
22 knowledge as a 15. And then she left the
23 organization in -- I believe in February.
24    Q    Voluntarily?
25    A    Yes.

Page 207

1    Q    Was she demoted?
2    A    I don't know if she was or if that
3 took place. But --
4    Q    When's the last time you spoke to
5 Miriam Weinstein?
6    A    A couple days ago.
7    Q    Is she assisting you in connection
8 with this litigation?
9    A    I have -- I -- I have tested her
10 memory.
11    Q    Okay. Now, did anyone ever speak to
12 you about the possibility of being demoted?
13    A    No.
14    Q    Okay. During the period of time that
15 you worked at Teva from 2014 to 2018, were you
16 involved in any demotions?
17    A    One that I can recall and that was
18 Deb Macaleer.
19    Q    Okay. What do you recall about that?
20    A    Deb Macaleer I recall was a senior
21 vice president, so that would have been a
22 grade 19. Her job was being eliminated and
23 there was an open position at a grade 18, a VP
24 level. And she was offered that -- that job as
25 a demotion.

Page 208

1    Q    So the senior vice president
2 position, was that when she was running Teva
3 Women's Health?
4    A    I believe so.
5    Q    Okay. And what caused you to be
6 involved in the decision with regard to Deb
7 Macaleer? Was it because of your role as head
8 of Total Rewards?
9    A    Yes.
10    Q    Okay. So who consulted with you in
11 connection with Deb Macaleer's demotion?
12    A    It would have been gone through --
13 through the compensation manager normally as
14 initially. And then it would have been -- so I
15 believe it went through Kent Schurr, who
16 handled the sales organization and some of
17 that -- that organization and as what happens
18 when that comes in is that's when we do an --
19 an evaluation of the new job and put together a
20 recommendation of -- of what the -- the new pay
21 should look like. And then I fill out a form
22 with -- with my recommendation on it and send
23 it to -- to Mr. Yaniv for approval.
24    Q    And is that what you did with regard
25 to Ms. Macaleer?

Page 209

1    A    Yes.
2    Q    And do you know whether
3 Ms. Macaleer's salary was reduced as a result
4 of those steps?
5    A    My recollection is the salary would
6 remain the same, the target bonus would --
7 would be aligned to the new grade, and the --
8 any equity, future equity awards would be
9 aligned to the new grade.
10    Q    Can you think of any other demotions
11 during the period of time that you were
12 employed at Teva?
13    A    Not that I can recall.
14    Q    Okay. With respect to the global
15 restructuring and the elimination of positions,
16 were there any discussions or conversations
17 that you participated in related to the
18 possibility of demoting employees?
19    A    If you look at policy, the policy
20 states that, one, under the job grading system
21 if your grade is evaluated a grade lower,
22 because again we were trying to get the job
23 grading system in line with the competitive
24 marketplace, the incumbent would be offered a
25 demotion. And if they accepted it, then they

53 (Pages 206 - 209)

Page 210

1 would stay in the position at the lower grade,
2 salary the same, and the bonus would change.
3 And -- and the equity opportunity would change.
4 That was the -- that was the policy and the
5 practice. We also offered that under another
6 program, severance program, which basically
7 said the same thing.
8 Q   Was there a written policy that
9 addressed demotions while you were employed at
10 Teva?
11 A   Yes.
12 Q   Do you recall what that policy was
13 called?
14 A   The Teva separation plan and the
15 global grading system. I don't have those
16 documents but -- well, I might have a severance
17 document.
18 Q   And those policies recognized the
19 possibility of a demotion by one labor grade?
20 A   That's correct.
21 Q   Did they preclude promotions by more
22 than one labor grade?
23 A   It does not.
24 Q   All right. Was there a point in time
25 where you discussed the possibility of your own

Page 211

1 demotion with anyone?
2 A   I wasn't demoted.
3 Q   No, the possibility of a demotion
4 rather than a job elimination?
5 A   I did not have any of those
6 conversations.
7 Q   Are you aware of anyone who's ever
8 been demoted more than one labor grade?
9 A   Well, I think if you look at Tal
10 Zorman's presentation you'll see that she was
11 taking Miriam Weinstein down to a grade 12.
12 And she was taking Diane Rohach down to a
13 grade 12. Miriam, as we've discussed, was a
14 15. Diane was a 14. So I believe that -- that
15 there were plenty of -- of demotions that would
16 have been occurring during that reduction in
17 force.
18 Q   The presentation that you made
19 reference to, who made -- who made the
20 presentation?
21 A   That would be Tal Zorman.
22 Q   Was that while you were still
23 employed there?
24 A   Yes. It was the presentation that
25 you folks sent over yesterday that showed the

Page 212

1 presentation to the leadership team regarding
2 the new organization.
3 Q   Are you talking about an org chart?
4 A   I am.
5       MR. RAPPOPORT:  Let's go off the
6 record for a second.
7       (Discussion off the record.)
8       BY MR. RAPPOPORT:
9 Q   This is the org chart that was
10 referenced in Ms. Zorman's deposition that was
11 sent to me by Brandon after that deposition.
12       Did Tal make a presentation to the
13 Total Rewards organization that you attended
14 while still employed at Teva?
15 A   I would assume she did. I don't
16 recall.
17 Q   Okay. What's the basis of your
18 assumption?
19 A   That as a new leader, she would have
20 held a -- some sort of a town hall-type
21 meeting, a video, a zoom-type meeting. Again,
22 we had, you know, video facilities that one
23 could go into and have those kinds of meetings
24 with, you know, large number of -- of
25 employees.

Page 213

1 Q   Well, when I asked you earlier about
2 whether or not you participated in a
3 presentation that Mr. Sabag held, you couldn't
4 recall. And now I'm asking you about a
5 presentation that Ms. Zorman had and you're
6 assuming it, but you don't recall anything, do
7 you?
8 A   I don't recall it, no.
9 Q   Did you have any conversations with
10 Ms. Weinstein about her being reduced to a
11 labor grade 12?
12 A   No.
13 Q   Did you have any conversations with
14 Mr. Rohach about being her being demoted to a
15 labor grade 12?
16 A   No.
17 Q   Is that --
18       MR. EPSTEIN:  Larry, I'm sorry. What
19 was the timing on that? You mean before he
20 left or ever?
21       MR. RAPPOPORT:  Ever.
22       BY MR. RAPPOPORT:
23 Q   Does that change your answer,
24 mister --
25 A   That would change my answer. With

1 Miriam, no. With Diane, no, I -- it doesn't
2 change my answer. We never talked about the
3 grades.
4    Q   Do you know if --
5    A   I'm not aware of --
6    Q   -- whether those --
7    A   -- (inaudible).
8    Q   -- grades were ever changed after you
9 left?
10    A   Correct. I was -- I was not -- not
11 part of that conversation.
12    Q   So you don't know whether they in
13 fact were demoted, do you?
14    A   Correct. I can only tell from --
15 from what you sent over yesterday, an exhibit
16 that I had not seen before, that they basically
17 showed that there was going to be a change. It
18 also showed that Edu Nasi was a 15/moving to a
19 16 so. And that was dated in January.
20    Q   How has Teva's decision changed your
21 life?
22    A   Well, I've had to sell my house.
23    Q   Which house?
24    A   The house in Chalfant.
25    Q   Was it your intent to keep that

1 house.
2    A   Well, I was going to live there, yes.
3    Q   So you downsized?
4    A   Yes.
5    Q   And you went from three homes to two
6 homes?
7    A   No. I went from two homes to one
8 home to two homes.
9    Q   And is the home in South Carolina
10 smaller than the home in Chalfant?
11    A   Yes.
12    Q   Are all of your children adults?
13    A   Yes.
14    Q   Do any of them reside with you?
15    A   No.
16    Q   Had any of them been residing with
17 you while you were in Chalfant?
18    A   Yes.
19    Q   How many?
20    A   Two, three, four -- probably I'll say
21 three at one time.
22    Q   So when you sold the Chalfant home,
23 where did they move to?
24    A   One moved to Allentown, one moved to
25 Philadelphia, and one moved back to the

1 Pittsburgh area.
2    Q   Are you supporting any of them
3 financially?
4    A   I am.
5    Q   How many?
6    A   Depends on the magnitude of the
7 finances.
8    Q   Other than the need to sell your
9 house, how else has your life changed since the
10 Teva decision to terminate?
11    A   Well, I've -- I've had to apply for
12 social security. I've had to apply for
13 Medicare. My health benefits and that are not
14 quite what I'm accustomed to. Obviously my
15 income is all dependent on -- on prior pensions
16 that I had -- had to get started and started
17 taking RMDs, required disbursements, so I'm not
18 sure how to answer that question. But, you
19 know, when you're working and --
20    Q   It sounds like the Teva change has
21 been mostly economic.
22    A   It's been economic, but it's also
23 been, you know, humiliated and embarrassing. I
24 had to apply for the -- for unemployment to
25 keep myself going. I've had to sell a home.

1 I -- I've had to change my lifestyle somewhat.
2 And, you know, you go through as I said a
3 grieving process when you're terminated. It's
4 not a good feeling. And not being able to get
5 another position when I'm healthy and -- you
6 know, like our presidents could easily work to
7 75 or beyond, I just, you know, feel it's
8 really tough to go on. So I've started to
9 try -- I applied for a teaching position as a
10 professor at the College of Charleston, an
11 adjunct professor, and so I'm on the list. But
12 that's about it. It's -- it's -- you know,
13 it's a depressing feeling.
14    Q   How has your lifestyle changed?
15    A   Well, I guess if you were to go out
16 to eat several times a week, you can't do that
17 on -- on your budget. You have to manage to a
18 budget.
19    Q   Are you suggesting that you're not
20 dining out at all?
21    A   I'm not suggesting that. I'm
22 suggesting that the frequency has been reduced.
23    Q   From what to what?
24    A   I really don't keep track, but maybe
25 three or four times down to one or two a week.

55 (Pages 214 - 217)

Page 218

1   Q   Does your wife work?
2   A   She does not.
3   Q   When did she last work?
4   A   Let's see.  My wife is a -- is a
5 nurse practitioner.  She -- she worked at
6 St. Chris's in Philadelphia.  We -- when we got
7 married in 1982 it took us five years to
8 conceive.  We'd adopted two children so -- at
9 that time, I would say that she stopped
10 working around, let's see, '82 to late '80s,
11 '85 --
12   Q   And hasn't --
13   A   -- '87.
14   Q   Hasn't worked outside the home since
15 then?
16   A   Yeah, I'd say so, late '80s.
17   Q   How many of your eight children are
18 adopted?
19   A   Seven.  Three are special needs.
20   Q   You made references to humiliation
21 and embarrassment.  And one of the things that
22 you referenced was having to file for
23 unemployment benefits.  Why was that
24 humiliating or embarrassing?
25   A   Because you have to, one, fill out

Page 219

1 the form.  Once you filled it out, then every
2 week you have to log in and tell them you're
3 still looking.  Then you have to continue to do
4 that throughout the period of the unemployment.
5 So it's just -- it's just not something you --
6 you want to do.  Every -- every week you're
7 reminded of the fact that you're unemployable.
8   Q   Can you describe any other
9 embarrassment or humiliation that you suffered
10 as a result of losing your position at Teva?
11   A   Well, sure.  I had to tell my family
12 members, my extended family members, my
13 friends.  So, you know, you -- when -- when you
14 go looking for a new position, one of the
15 things you do, as you saw with Lesley, is you
16 reach out to them and -- and then I ultimately
17 turned the corner and decided, well, I'll go
18 back to them and ask them for business.
19   Q   Have you ever sought medical
20 treatment in connection with the loss of the
21 job at Teva?
22   A   No.
23   Q   Ever seen a therapist as a result of
24 it?
25   A   No.

Page 220

1   Q   Ever been medicated as a result of
2 it?
3   A   Probably took some Ambien.
4   Q   To help you sleep?
5   A   Yes.
6   Q   Okay.  Any counseling?
7   A   No.
8   Q   Any marital discord?
9   A   Well, my wife wasn't happy, I can
10 tell you that.
11   Q   Other than her being unhappy, was
12 there any marital discord associated with your
13 loss of a job at Teva?
14   A   Define "marital discord."
15   Q   If you don't know what it means it's
16 hard for me to define it.
17   A   I can't answer your question.
18 There's always --
19   Q   You don't know --
20   A   -- happiness.  There's always anger.
21 You know, your -- your bride has to go through
22 the same stages of grieving.  She now has to
23 adapt to you being home all the time, so, sure,
24 there's some discord there if that's a proper
25 category.

Page 221

1   Q   Did you apply for social security
2 earlier than you intended?
3   A   I applied at age 67.  I would not
4 have applied unless -- you know, if I was
5 employed other than whenever the mandatory age
6 was.
7   Q   Is there anything else that you
8 applied for that you wouldn't have applied had
9 you still been employed?
10   A   I probably would have applied for
11 Medicare, but I -- I wouldn't have taken the
12 benefits at that time.  I would have stuck with
13 my Teva benefits.  I also had to take my
14 deferred compensation from Teva.  I had to get
15 that started because I was no longer employed
16 there.
17   Q   Do you know whether you're the oldest
18 employee who was impacted by the global
19 restructuring?
20   A   I do not.
21   Q   You testified earlier that you
22 thought that the global restructuring had a
23 greater impact on older employees rather than
24 younger employees.  What was the basis of that
25 belief or opinion?

56 (Pages 218 - 221)

**Page 222**

1    A    Conversations, looking at the -- at
2  what was sent to me as my severance package you
3  could see that the -- the -- the six -- I
4  believe 65 percent -- well, maybe it was
5  65 percent, but a large percentage of those
6  being terminated in my -- and I wasn't even on
7  the list, was -- was like 65 percent were age
8  40 or older. And then the HR net result was
9  that the age in HR went I believe from -- it
10  dropped maybe five years off of the average
11  age. Or at least the people who were -- the
12  percentage of people who were age 40 and older
13  dropped either 10 or 15 percent versus those
14  who were younger. I'd have to look at the
15  numbers again. It's been a while. But it was
16  evident from that.
17        And what was the question again?
18    Q    What -- you did an analysis of the
19  numbers of the -- of the ages of the
20  individuals in the HR organization and
21  concluded that the HR organization got younger
22  as a result of the workforce reduction?
23    A    That's what the numbers show. These
24  are the numbers that Teva provided me.
25    Q    When did they provide you those

**Page 223**

1  numbers?
2    A    As I stated a few minutes ago, they
3  were provided in the WARN notice -- in the
4  notice, not the WARN notice, but the severance
5  package I got, the one you just had on the
6  screen.
7    Q    So the release which I haven't shown
8  you has the ages of individuals. Is that what
9  you're referring to?
10    A    Yes, of course.
11    Q    As we sit here today, do you have any
12  knowledge or information as to how you came to
13  be selected for the global restructuring job
14  elimination?
15    A    I do not.
16    Q    Do you know how many employees were
17  impacted by the job, the global restructuring
18  job elimination?
19    A    I do not.
20    Q    Would you agree that many of the
21  employees who were let go had more Teva years
22  of service than you did?
23    A    I have nothing to base that on.
24    Q    Why is your password "fired 1" for
25  your phone and "Fired 123" for your laptop?

**Page 224**

1    A    I'm sorry. I -- I don't know what --
2  I don't understand the question at all.
3        (Keuch Deposition Exhibit No. 9 was
4  marked for identification.)
5        BY MR. RAPPOPORT:
6    Q    Let me show you what's been marked as
7  Keuch 8, which is Bates stamped 251 -- it's
8  nine -- if you look at the second page of the
9  Departing Employee Document Retention
10  Checklist, Bates stamped 252, it shows your --
11  your passwords for your laptop and your iPhone.
12  And as I looked at it, I was curious as to how
13  you came to identify -- to select those
14  passwords.
15    A    Well, it's interesting because on my
16  last day worked, not a single HR person met me,
17  took my laptop, took my phone, took anything.
18  It was basically just left there all alone, so
19  I decided -- well, I had changed my password
20  because I was fired.
21    Q    Did you ever describe yourself as
22  retired?
23    A    Rarely.
24    Q    What instances do you?
25    A    Well, when I was going through the --

**Page 225**

1  the anger phase I guess or the denial phase in
2  the sense that, you know, you didn't want to
3  tell people that you were fired. So it was
4  easier to say retired. But I can -- I can tell
5  you that it was a very rare occurrence that I
6  would use that language because I'm not
7  retired. I do have a thriving business and
8  I -- I'm still working.
9    Q    What make your business thriving?
10    A    Well, the fact that I've got good
11  clients and, you know, I make a few dollars.
12    Q    You identified three clients, none of
13  whom you're doing work for right now. Am I
14  incorrect?
15    A    No, you're not incorrect.
16    Q    So three nonactive clients to you
17  constitutes a thriving business?
18        MR. EPSTEIN: Objection. Don't
19  answer that.
20        Come on, Larry. He made $133,000 or
21  so last year. He -- he -- the year is only a
22  couple months in.
23        MR. RAPPOPORT: Okay.
24        MR. EPSTEIN: The question -- that
25  kind of question is just unnecessary.

57 (Pages 222 - 225)

Veritext Legal Solutions
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830

JOINT APPX 1259

1      BY MR. RAPPOPORT:
2      Q   I -- I didn't mean to offend you.
3          What do you do all day?
4      A   How do I spend my day?
5      Q   Yeah.  Do you watch TV most of the
6  day?
7      A   I do not.
8      Q   Read?
9      A   I do read.
10     Q   What else do you do?  Do you
11 exercise?
12     A   I do exercise in the morning.  I have
13 a -- sort of an elliptical.
14     Q   What else is part of your daily
15 regimen?
16     A   I -- I spend time in the last year --
17 I've spent a lot of time with my client,
18 Hayward Holdings.  And I have an assignment
19 that again could be upwards of a quarter of a
20 million dollars, so I'm working on -- on
21 preparations for that assignment.  Again, I
22 don't have it.  I have a verbal, you've got a
23 part of it, so we'll see how the rest of it
24 works.
25        I also do business with -- with

1  Tompkins, so reaching out as I did with Lesley
2  Billow at BMS.  I go -- we do sales calls for
3  clients to basically deal with primarily
4  voluntary benefits.  And I work with Andy
5  Goldman as I believe you know on life insurance
6  issues, but I've decided that that is not a
7  business I really want to get into.  And I work
8  with Road Runner Media Group, which is pretty
9  new exciting technology basically trying to --
10 to sell -- sell their innovative braking
11 systems to -- to those who handle
12 transportation systems.  And I also work with
13 TFG Partners and just sold some business to
14 MSA Safety.
15     Q   What was that transaction?
16     A   TFG Partners has a proprietary
17 software that looks at claims data and
18 basically determines if the claims
19 administrator, let's say Blue Cross Blue Shield
20 properly adjudicated the claims.  And if they
21 didn't, then the company, MSA in this case, is
22 entitled to the provider to pay them back the
23 funds that they spent that were not in line
24 with their rule or their formulas.
25     Q   When was the last time you did

1  something to actively look for employment?
2      A   I believe when I started my business,
3  which would have been in -- sometime -- where
4  in 2019.
5      Q   Who was Noel Mulvihill?
6      A   Noel Mulvihill was the region head
7  for Total Rewards for Europe.
8      Q   Was he your counterpart?
9      A   He was.
10     Q   Was his position eliminated as part
11 of the global restructuring?
12     A   It was.
13     Q   Who assumed responsibility in Europe
14 if you know for Total Rewards?
15     A   Caroline Blonchose, something like
16 that, Clo -- I'd have to look it up.  Block --
17 block-something or other Caroline
18 Block-something or other.
19     Q   Okay.  And did Caroline have a lower
20 role in Total Rewards organization than
21 Mr. Mulvihill?
22     A   Again, I'm not sure of the question.
23 I don't understand.
24     Q   Was she employed by Teva while you
25 were employed there?

1      A   Yes.
2      Q   And did she report to Mr. Mulvihill?
3      A   Yes.
4      Q   And was she moved into the head of
5  Total Rewards for Europe after Mr. Mulvihill's
6  position was eliminated?
7      A   Yes.
8      Q   Okay.  Was there any difference
9  between her moving into that position and
10 Mr. Nasi moving into the position of head of
11 Total Rewards for North America?
12     A   I think again if you can look at --
13 at Tal Zorman's charts, I believe she had her
14 down also as a 15-16.  And it's interesting
15 that she was not made a 16 until I guess
16 September, whereas Edu was made a 16 in --
17 officially in March.
18     Q   How were -- did you become aware
19 that -- that Carolyn Block-something became a
20 16 in September?
21     A   Through LinkedIn.
22     Q   So you relied upon the dates that she
23 put down in LinkedIn as being the dates of her
24 elevation to the labor grade 16?
25     A   That's correct.

58 (Pages 226 - 229)

Page 230

1    Q    Did you talk to Mr. Mulvihill about
2  your lawsuit?
3    A    I have -- he's aware of it.
4    Q    And did you ask for assistance or for
5  him to share information with you?
6    A    I asked him how his experience went.
7    Q    Are you still in communication with
8  him?
9    A    I speak with him periodically.
10   Q    Okay.  Who else have you talked to
11 about your litigation who's either employed at
12 Teva or no longer employed at Teva?
13   A    I have spoken with Daniela Shea.  I
14 have spoken with Samantha.  Her -- her
15 unmarried name was Rivello.  I can't remember
16 her married name.  She got married --
17   Q    Kalisher?
18   A    Huh?
19   Q    Is it Samantha Kalisher?
20   A    Yeah, that would be it.  Let's see, I
21 have spoken to Lesley Billow.  I have spoken to
22 Randy Miller.
23   Q    Did you attempt to speak to Mr. Yaniv
24 and Mr. Yaniv indicated he -- that he did not
25 want to cooperate with you?

Page 231

1    A    Yes.  I sent him an email to see if
2  he wanted to -- you know, to talk.  And
3  obviously his email response was that he did
4  not.
5    Q    Are you still receiving information
6  from Teva employees or former employees with
7  respect to what occurred to you in 2018?
8    A    Only Miriam Weinstein to my
9  knowledge.
10   Q    What information is Miriam Weinstein
11 providing you?
12   A    Her knowledge of her experience which
13 unfortunately is limited because she was only
14 there -- she left in February 2018.
15   Q    When you first joined Teva in 2014,
16 did you tell anyone that you had manipulated
17 the H.J. Heinz' benefits to benefit you?
18   A    I don't understand the question.
19   Q    Let me ask it this way:  Did there
20 come a point in time -- yes, please.  While you
21 were employed at Teva.  I'm sorry.  While you
22 were employed at H.J. Heinz, were you involved
23 in making changes to benefit offerings?
24   A    That was a part of my job, yes.
25   Q    What changes did you spearhead?

Page 232

1    A    There were at least a dozen, maybe
2  50.  You know, I was there nine years.  So
3  there were tons of changes.
4    Q    And did you benefit personally from
5  any of the changes that you spearheaded?
6    A    I do benefit the same as all other
7  employees.
8    Q    Were any of the changes that you
9  spearheaded put into play because it had a
10 positive effect on you?
11   A    I received the same benefits as all
12 other employees who are eligible for those
13 benefits.
14   Q    Do you recall ever telling any of
15 your Teva HR colleagues that you had
16 manipulated benefit programs while at Heinz to
17 your own advantage?
18   A    I do not.
19   Q    Do you deny telling your HR
20 colleagues that you manipulated benefit
21 programs at Heinz for your own advantage?
22   A    I do.
23   Q    So if Teva HR colleagues stated that
24 you told them that, they would be lying.
25 Correct?

Page 233

1    A    The word "manipulating," that's
2  correct.
3    Q    Okay.  Is there another word that you
4  would feel more comfortable with than
5  manipulating?
6    A    You're asking the questions.
7    Q    Okay.  Did you ever brag to any Teva
8  HR colleagues that you made changes to the
9  benefits programs to -- for your own advantage?
10   A    Made changes to benefits programs,
11 no.
12   Q    Have you ever filed a charge of
13 discrimination against any former employer?
14   A    No.
15   Q    Have you ever filed a lawsuit against
16 any former employer?
17   A    No.
18       MR. RAPPOPORT:  Give me five minutes.
19 I think I'm done.  And I'll get back on and
20 either say I'm finished or I'm not.
21       MR. EPSTEIN:  Okay.  Why don't we
22 make it 3:30 just to have a definitive time.
23       (Recess taken -- 3:23 p.m.)
24       (After recess -- 3:29 p.m.)
25       MR. RAPPOPORT:  I'm going to say no

59 (Pages 230 - 233)

Page 234

1 further questions.
2      MR. EPSTEIN:  Okay.  I heard what
3 said.  I heard what you said.  I don't have any
4 questions for -- for Randy.
5      MR. RAPPOPORT:  All right.  See you
6 tomorrow morning.
7      MR. EPSTEIN:  Okey-doke.  And we'll
8 stay at 8:00.
9      THE COURT REPORTER:  Guys, I know
10 this is Pennsylvania, so I just don't know,
11 read and sign?
12      MR. EPSTEIN:  Yes, I would like
13 Mr. Keuch to read and sign.
14      THE COURT REPORTER:  Very good.  And
15 then, Mr. Epstein, did you want to order a copy
16 of this transcript?
17      MR. EPSTEIN:  Yeah, I want a
18 mini-copy only, but I'd like you to attach and
19 I'm sure that Brandon can get it to you, I'd
20 like you to attach those documents that have
21 been marked as exhibits.
22      THE COURT REPORTER:  Very good.  And
23 then --
24      MR. EPSTEIN:  Mini only, please not
25 the big fat one.  I am big on saving paper.

Page 235

1      (Discussion off the record.)
2      THE COURT REPORTER:  Mr. Rappoport, I
3 know you're getting the original, would you
4 also like a mini or just original size?
5      MR. RAPPOPORT:  Both, please.
6      THE COURT REPORTER:  Very good.
7      (The Deposition concluded at
8 3:30 p.m.)
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 236

1 State of Maryland
2 County of Baltimore
3      I, Kathleen E. Manes, a Notary Public of the
4 State of Maryland, County of Baltimore, do hereby
5 certify that the within-named witness personally
6 appeared before me via videoconference at the time and
7 place herein set out, and after having been first duly
8 sworn by me, according to law, was examined by
9 counsel.
10      I further certify that the examination was
11 recorded stenographically by me, and that this
12 transcript is a true record of the proceedings.
13      I further certify that I am not of counsel
14 to any of the parties, nor an employee of counsel,
15 nor related to any of the parties, nor in any way
16 interested in the outcome of the action.
17      As witness my hand and seal this 26th day of
18 April, 2022.
19
20
             Kathleen E. Manes
21           My Commission Expires 04-28-24
22
23
24
25

Page 237

1      INSTRUCTIONS TO THE WITNESS FOR
2           REVIEWING TRANSCRIPT
3      Read your deposition over carefully.  It
is your right to read your deposition and make
4 changes in form or substance.
5      You should mark any change in the
appropriate columns on the errata sheet.  Changes
6 made in your transcript may be questioned by counsel
at a later date.
7
     Please note any change in form or
8 substance on the following errata sheet.  Enter the
relevant page number and the line number.  Also
9 enter the incorrect word and your correction.
10     Then sign and date your deposition at the
end of the errata sheet in the space provided.  You
11 are signing it subject to the changes you have made
in the errata sheet, which will be attached to the
12 deposition before filing.
13     The errata sheet needs to be returned to
Veritext Legal Solutions, litsup-pa@veritext.com.
14     If you have any questions, please give us
a call at 410.837.3027.
15
16
17
18
19
20
21
22
23
24
25 5170337

Veritext Legal Solutions
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830

Page 238

```
1        ERRATA AND SIGNATURE SHEET
2        I, RANDOLPH KEUCH, have read the foregoing
3  deposition and verify the same to be
4  stenographically accurate with the exception of the
5  following changes (if any):
6  Page  Line   Reads          Should Read
7  _____
8  _____
9  _____
10 _____
11 _____
12 _____
13 _____
14 _____
15 _____
16 _____
17 _____
18 _____
19 _____
20 ( )  I have no corrections.
21
22
   _____    _____
23 RANDOLPH KEUCH             DATE
24
25 5170337
```

Veritext Legal Solutions
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830

JOINT APPX 1263