**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| RANDOLPH W. KEUCH, | : | |
| | : | |
| Plaintiff, | : | |
| | : | CASE NO. 2:19-CV 05488 |
| v. | : | |
| | : | (JUDGE JOHN M. GALLAGHER) |
| TEVA PHARMACEUTICALS USA, | : | |
| INC., and TEVA PHARMACEUTICAL | : | (Electronically Filed) |
| INDUSTRIES, Ltd., | : | |
| | : | |
| Defendants. | : | |
| | : | |

**DEFENDANTS' POST-TRIAL PROPOSED
FINDINGS OF FACT AND CONCLUSIONS OF LAW**

Defendant Teva Pharmaceuticals USA, Inc.  ("TUSA") and Defendant Teva

Pharmaceutical Industries, Ltd.  ("TPI" with TUSA collectively the "Defendants" or "Teva"),

submit Proposed Post-Trial Findings of Fact and Conclusions of Law in accordance with the

Order of the Court dated February 7, 2023 (ECF Entry Number 91).

**PROPOSED FINDINGS OF FACT**

**<u>Mr. Keuch's Employment at Teva Begins</u>**

1.  Teva is the leading generic drug company in the world, with a robust portfolio of

innovative medicine, API and biosimilar drugs.  (Sabag Dep. Dec. 8 at 25:5-7).[1]

2.  Plaintiff, Randolph Keuch ("Plaintiff" or "Mr. Keuch") was born on May 27, 1954.

(Trial Transcript Day 1 ("Tr. Trans. 1")[2] at 37:10-11).

---

[1] "Sabag Dep. Dec. 6 refers to the trial deposition of Mark Sabag which occurred on December 6, 2022.
"Sabag Dep. Dec. 8 refers to the trial deposition of Mark Sabag which occurred on December 8, 2022
[2] "Tr. Trans. 1" refers to the first day of the Bench Trial which occurred on December 19, 2022.
"Tr. Trans. 2" refers to the first day of the Bench Trial which occurred on December 20, 2022.
"Tr. Trans. 3" refers to the first day of the Bench Trial which occurred on December 21, 2022.

3.  In January 2014, Teva hired Mr. Keuch to become the Senior Director of Total Rewards for the Americas which was then comprised of Canada, Latin America and the U.S. (Def. Ex. 11 at TEVA000047-49).

4.  Mr. Keuch's employment at Teva was as an at-will employee.  (Def. Ex. 11 at TEVA000047-49).

5.  At the time of Mr. Keuch's hiring, he was 59 years old turning 60 the following May. (Tr. Trans. 1 at 6:12-14).

**Teva' Labor Grade System**

6.  Teva utilizes a numerical grading scale to determine the salary range for each employee.  (Tr. Trans. 2 at 230:11-14, Tr. Trans. 2 at 151:6-17).

7.  When Mr. Keuch was hired as the Head of Total Rewards, Americas he was graded as a Labor Grade 17.  (Tr. Trans. 2 at 61:18-25).

8.  In addition to the numerical Labor Grade designations, Defendants also associate job titles with positions.  (Tr. Trans. 2 at 230:11-14).

9.  By way of example, Labor Grade 15 is associated with "Director" level positions, Labor Grades 16 and 17 are both associated with "Senior Director" level positions and Labor Grades 18 and 19 are associated with the "Vice President" level.  (Tr. Trans. 2 at 230:11-14).

10.  As Mr. Keuch was a Labor Grade 17, he held the higher of the "Senior Director" titles. (Tr. Trans. 2 at 61:18-25).

**Total Rewards and Mr. Keuch's Role in the Organization**

11.  Total Rewards is part of Teva's Human Resources organization and is largely responsible for making sure employees are properly compensated and provided benefits.  (Sabag Dep. Dec. 8 at 7:11-21).

12.  In this role, Mr. Keuch was responsible for designing and overseeing compensation and benefits policy for Defendants' employees in the United States, Canada, Mexico, and the other countries in Latin America where Teva conducted business.  (Tr. Trans. 1 at 65:18-67:4).

13.  Mr. Keuch's role as Head of Total Rewards, Americas was a regional role not a global role.  (Tr. Trans. 2 at 16:12-24).

14.  There were other Senior Directors serving in similar regional roles.  (Tr. Trans. 2 at 17:9-18:10).

15.  Specifically, there were regional heads in Europe, Asia Pacific and Israel.  (Tr. Trans. 2 at 17:9-18:10).

16.  These regional heads each reported to the same global head of Total Rewards.  (Tr. Trans. 2 at 18:11-24).

17.  The global head of Total Rewards when Mr. Keuch was hired was Yonit Landskroner, who was a Vice President.  (Tr. Trans. 2 at 18:11-24).

18.  Sometime in 2015, Ms. Landskroner left Teva and was replaced by Ron Yaniv.  (Tr. Trans. 2 at 27:8-11).

19.  Mr. Yaniv's position was similarly global as he was a Senior Vice President at the Labor Grade of 19.  (Sabag Dep. Dec. 6 at 41:13-15).

20.  Mr. Yaniv reported to Mark Sabag who was the Global Executive Vice President, Human Resources. (Sabag Dep. Dec. 6 at 56:9-11).

21.  Mr. Keuch had three of his own direct reports:  (1) Eduardo Nasi (Director—Labor Grade 15), the Head of Total Rewards for Latin America; (2) Miriam Weinstein, the Head of Compensation, North America (Labor Grade 15); and (3) Diane Rohach, the Head of Benefits, Americas (Labor Grade 15).  (Tr. Trans. 2 at 29:19-30:1, Def Ex. 16 at TEVA000125).

**Mr. Keuch's Compensation at Teva**

22.   Teva hired Mr. Keuch in 2014 at a starting base salary of $250,000 per year.  (Def. Ex. 11 at TEVA000047-49).

23.   Mr. Keuch was also eligible for a 30 percent bonus—which equates to $75,000.  (Tr. Trans. 2 at 19:15-17).

24.   Teva also provided Mr. Keuch with a sign on bonus of $50,000 to be paid to him one year after his start date when he would be 60 years old turning 61.  (Def. Ex. 11 at TEVA000047-49; Tr. Trans. 1 at 37:10-11).

25.   In addition, Mr. Keuch was eligible to receive healthcare benefits, vacation and participate in other incentive plans.  (Def. Ex. 11 at TEVA000047-49).

26.   Throughout the course of his employment, Mr. Keuch received merit increases each year.  (Tr. Trans. 1 at 55:17-21).

27.   In July 2015, approximately a year and a half after Mr. Keuch began employment at Teva, a company located in the Lehigh Valley, Air Products, approached Mr. Keuch.  (Def. Ex. 12 at KEUCH000132-133, Tr. Trans. 2 at 46:22-47:2).

28.   Mr. Keuch was 61 years old at this time.  (Tr. Trans. 1 at 37:10-11).

29.   Mr. Keuch participated in a series of interviews with Air Products.  (Tr. Trans. 2 at 46:22-47:2).

30.   On July 27, 2015, Air Products offered Mr. Keuch a job as Global Head, Total Rewards.  (Def. Ex. 12 at KEUCH000132-133).

31.   The Air Products role would have required Mr. Keuch to either relocate or commute about an hour each way to and from work.  (Tr. Trans. 2 at 49:13-50:15).

32.   Mr. Keuch did not wish to add a commute to his daily lifestyle.  (Tr. Trans. 2 at 49:13-50:15).

33.   Mr. Keuch also did not want to relocate due to the health of his father-in-law.  (Tr. Trans. 2 at 49:13-50:15).

34.   The Air Products role would have global responsibility as opposed to regional responsibility.  (Tr. Trans. 2 at 47:20-25).

35.   Mr. Keuch was not interested in having global responsibilities as he had already experienced the demands of a global role when he worked previously at H.J. Heinz. (Tr. Trans. 2 at 23:4-20).

36.   Mr. Keuch felt that returning to a global role would have too many life interruptions. (Tr. Trans. 2 at 51:9-19).

37.   The Air Products role would be further from Mr. Keuch's adult children.  (Tr. Trans. 2 at 49:13-50:15, 51:9-19).

38.   Despite these many factors each weighing against accepting the global role at Air Products, Mr. Keuch informed his boss, Ron Yaniv, of the job offer as leverage to increase his salary at Teva.  (Tr. Trans. 2 at 51:22-53:9).

39.   In response, Teva provided Mr. Keuch with an increase to his base salary from $257,000 to $280,000 effective August 1, 2015.  (Def. Ex. 13 at KEUCH000028-29).

40.   Additionally, Teva provided Mr. Keuch with a $60,000 retention bonus.  (Def. Ex. 13 at KEUCH000028-29).

41.   The retention bonus was to be paid in two installments.  (Def. Ex. 13 at KEUCH000028-29).

42.   Each installment was $30,000 and was contingent on Mr. Keuch remaining employed at Teva on two benchmark dates.  (Def. Ex. 13 at KEUCH000028-29).

43.   The first benchmark date was August 6, 2016 when Mr. Keuch would be 62 years old and the second date was a year later on August 6, 2017 when he would be 63.  (Def. Ex. 13 at KEUCH000028-29, Tr. Trans. 1 at 37:10-11).

44.   Mr. Keuch received both of the retention payments.  (Tr. Trans. 2 at 58:22-59:4).

45.   When Mr. Keuch received the second retention payment, he was already 63 years old. (Def. Ex. 13 at KEUCH000028-29, Tr. Trans. 1 at 37:10-11).

46.   Mr. Keuch also used the offer from Air Products as leverage to request a change to his Labor Grade and title from a Senior Director, Labor Grade 17 to a Vice President, Labor Grade 18.  (Tr. Trans. 2 at 59:5-8).

47.   Teva informed Mr. Keuch that it could not accommodate his request to be promoted to a Vice President at that time.  (Tr. Trans. 2 at 59:16-19).

48.   This was the first of two times that Mr. Keuch requested that his position be elevated to the Vice President level.  (Tr. Trans. 2 at 61:1-25).

49.   In 2016, Mr. Keuch asked Mr. Yaniv to have his position re-graded as a Vice President, Labor Grade 18 in response to additional work as a result of Teva acquisitions and integration and specifically the Actavis acquisition.  (Tr. Trans. 2 at 61:1-25).

50.   Again, Mr. Yaniv explained that his position would not be elevated to Vice President. (Tr. Trans. 2 at 61:1-25).

51.   None of the other regional heads for Total Rewards were Vice Presidents. (Tr. Trans. 2 at 17:9-18:10).

52.   Mr. Keuch's job performance was not without criticism. (Def. Ex. 17 at TEVA000748).

53.  For example, Mr. Lawlor testified that in 2017 he spoke with Mr. Keuch's then manager, Mr. Yaniv, about Mr. Keuch's performance. (Tr. Trans. 3 at 112:18-120:7, Def. Ex. 17 at TEVA000748).

54.  Mr. Lawlor explained that Mr. Keuch often engaged in time consuming and voluminous analyses that were not needed and missed the crux of the issues. (Tr. Trans. 3 at 112:18-120:7, Def. Ex. 17 at TEVA000748).

55.  Further, Mr. Lawlor explained that Mr. Keuch was defensive when given feedback, turned to point fingers at others and would brag when in front of business leaders. (Tr. Trans. 3 at 112:18-120:7, Def. Ex. 17 at TEVA000748).

**Mr. Nasi Joins the Organization and Mr. Keuch Grooms Him to Be His Eventual Successor**

56.  Mr. Keuch and Mr. Nasi knew one another from professional experiences prior to either joining Teva.  (Tr. Trans. 2 at 38:1-8).

57.  In fact, Mr. Keuch and Mr. Nasi had known one another for over twenty years.  (Tr. Trans. 2 at 38:1-8).

58.  Mr. Keuch thought enough of Mr. Nasi that when Teva needed to hire a Head of Total Rewards for Latin America, Mr. Keuch solicited Mr. Nasi to join the organization.  (Tr. Trans. 2 at 38:23-39:12).

59.  As early as the first interview with Mr. Nasi, Mr. Keuch suggested to Mr. Nasi that it could be a growth opportunity for Mr. Nasi and that when Mr. Keuch retired Mr. Nasi would be a potential successor.  (Tr. Trans. 2 at 40:8-12).

60.  Mr. Keuch expressed to Mr. Nasi in 2014 that Mr. Keuch expected to retire within five years.  (Tr. Trans. 2 at 237:5-18).

61.  Mr. Keuch went as far as to begin to groom Mr. Nasi to take over his position.  (Tr. Trans. 2 at 41:25-42:2).

7

62.  Mr. Keuch suggested to his manager, Mr. Yaniv, that Mr. Nasi relocate from Florida to Pennsylvania so that he could work closer to Mr. Keuch and develop faster.  (Tr. Trans. 2 at 41:12-19).

63.  Mr. Keuch recommended Mr. Nasi to be Teva's representative for a leadership program called "Leadership in Motion."  Mr. Nasi was the sole representative for Total Rewards to attend this program in Israel.  (Tr. Trans. 2 at 240:3-23).

64.  Mr. Nasi was requested to fly to Israel over ten times to represent Total Rewards for the Americas.  (Tr. Trans. 2 at 242:3-17).

65.  This was far more travel to Israel than any of Mr. Keuch's other direct reports.  (Tr. Trans. 2 at 242:3-17).

**Teva Acquires Actavis**

66.  In the summer of 2015, Teva announced the signing of a $40 Billion acquisition of Actavis.  (Sabag Dep. Dec. 8 at 24:11-25)

67.  Actavis was the generic pharmaceutical division of the Allergan company.  (Sabag Dep. Dec. 8 at 24:11-25).

68.  Teva completed the Actavis acquisition in the fall of 2016.  (Sabag Dep. Dec. 8 at 24:11-25).

69.  As a result of the Actavis acquisition, Teva's global headcount increased from approximately 50,000 employees to over 60,000 employees.  (Sabag Dep. Dec. 8 at 25:22-26:3).

70.  At the time of the Actavis acquisition, Teva's stock price on the New York Stock exchange was approximately $74 per share.  (Sabag Dep. Dec. 8 at 26:4-7).

71.  The stock price of a publicly held company is the primary component in determining the value of the company.  (Sabag Dep. Dec. 8 at 26:11-23).

72.  By the beginning part of 2017, Mr. Sabag and senior Teva executives realized that the Actavis acquisition was a poor business decision.  (Sabag Dep. Dec. 8 at 28:6-13).

73.  Specifically, Mr. Sabag and senior Teva executives realized that there was a large financial gap between what Teva assumed the value that Actavis would bring into the organization versus what it was actually generating.  (Sabag Dep. Dec. 8 at 28:6-13).

74.  In substance, Mr. Sabag and senior Teva executives realized that Teva had drastically overpaid for the Actavis acquisition.  (Sabag Dep. Dec. 8 at 28:6-13).

75.  Teva began to take immediate steps to help mitigate the financial issues that it was experiencing.  (Sabag Dep. Dec. 8 at 28:14-29:4).

76.  First, Teva fired its then Chief Executive Officer and replaced him with an acting Chief Executive Officer.  (Sabag Dep. Dec. 8 at 28:14-29:4).

77.  Next, Teva began instituting a number of cost cutting initiatives such as; a hiring freeze, a hold on salary increases, and other measures to reduce the expense level of the organization.  (Sabag Dep. Dec. 8 at 29:23-30:6).

78.  However, these initiatives were a mere "drop in the bucket" and did not materially improve Teva's financial problems.  (Sabag Dep. Dec. 8 at 30:9-11).

79.  Instead, far more drastic measures would be needed awaiting the appointment of a new CEO by the Teva Board.  (Sabag Dep. Dec. 8 at 30:12-22).

**Teva Hires a New Chief Executive Officer**

80.  Teva began searching for a new and permanent Chief Executive Officer in early 2017.  (Sabag Dep. Dec. 8 at 31:1-18).

81.  Teva identified Kare Schultz as its new CEO and he was announced as the CEO on November 1, 2017.  (Sabag Dep. Dec. 8 at 31:1-18).

02/16/2023 SL1 1825557v7 030421.00713

82.  Mr. Schultz had prior experience leading organizations in financial distress and specifically in turning around such organizations. (Sabag Dep. Dec. 8 at 35:17-36:15).

83.  Given the severity of Teva's financial footing, Mark Sabag (Global Head of Human Resources) flew to Copenhagen to meet with Mr. Schultz prior to Mr. Schultz being formally announced as the new CEO as part of an expedited onboarding process.  (Sabag Dep. Dec. 8 at 31:21-32:8).

84.  Mr. Sabag described to Mr. Schultz Teva's serious financial position.  (Sabag Dep. Dec. 6 at 78:14-79:9, Sabag Dep. Dec. 8 at 32:15-24).

85.  Mr. Sabag told Mr. Schultz that there was an urgency to develop an immediate plan to regain the trust of shareholders, bondholders and employees.  (Sabag Dep. Dec. 8 at 33:16-34:21).

86.  Mr. Sabag and Mr. Schultz realized that without immediate and massive change, the company could default, need to file for Chapter 11 bankruptcy, or be vulnerable to being acquired by a competitor (Sabag Dep. Dec. 8 at 35:20-12).

87.  In fact, Mr. Sabag testified that "in late November of 2017 Teva was on the edge of Chapter 11…" (Sabag Dep. Dec. 6 at 34:19-20).

88.  By the time Mr. Schultz had joined Teva in November of 2017 as its new CEO, Teva's stock price had dropped from $74 per share down to approximately $11 per share.  (Sabag Dep. Dec. 8 at 33:17-25).

**<u>Mr. Schultz Takes Immediate Action</u>**

89.  After being announced as CEO, Mr. Schultz restructured and fired most of Teva's then senior leadership team.  (Sabag Dep. Dec. 8 at 37:14-19).

90.  Mr. Schultz chose to retain just Mr. Sabag and two other senior executives at the leadership level. (Sabag Dep. Dec. 8 at 39:8-20).

91.  Mr. Schultz changed the business structure of the organization to simplify the company's structure and make it more efficient.  (Sabag Dep. Dec. 8 at 37:11-19; Def. Ex. 18 at TEVA000237).

92.  Mr. Schultz, with the assistance of Mr. Sabag, and others, developed a restructuring plan to reduce Teva's expenses by $3 Billion a year to get Teva back into a positive cash position.  (Sabag Dep. Dec. 6 at 38:6-18, Sabag Dep. Dec. 8 at 41:9-42:14).

93.  Without reducing Teva's expenses by at least $3 Billion a year, Teva would have a negative cash flow and had discussed and considered bankruptcy protection.  (Sabag Dep. Dec. 8 at 41:9-42:14).

94.  Mr. Schultz's plan included reducing capital investments, reducing Teva's manufacturing footprint, and reducing Teva's research and development budget.  (Sabag Dep. Dec. 8 at 44:6-17).

95.  This included closing many plants across the globe including Teva's legacy plant in Jerusalem, Israel.  (Sabag Dep. Dec. 8 at 47:10-6).

96.  Israel's government tried to convince Teva not to close the Jerusalem legacy plant, going as far as having Prime Minister Bibi Netanyahu meet with Mr. Schultz.  (Sabag Dep. Dec. 8 at 48:6-23).

97.  However, Mr. Schultz and Teva politely explained to Prime Minister Netanyahu that the closure of the Jerusalem legacy plant was necessary and that without severe action, Teva would cease to exist.  (Sabag Dep. Dec. 8 at 48:6-23).

98.  These cost saving measures, along with other divestitures, would save Teva approximately $2 Billion towards the $3 Billion dollars needed each year.  (Sabag Dep. Dec. 8 at 44:6-17).

**The Reduction in Force**

99.  Mr. Schultz, with Mr. Sabag's input and influence, determined that the remaining $1 Billion dollars in savings would need to come from a reduction in the employee workforce ("RIF").  (Sabag Dep. Dec. 6 at 75:1-8, Sabag Dep. Dec. 8 at 44:1-5; Def. Ex. 22 at TEVA000242-243).

100.  Teva announced on December 14, 2017 that the RIF would unfortunately effect at least 25% of the workforce.  (Sabag Dep. Dec. 8 at 54:69, Def.  Ex. 22 at TEVA000242-243).

101.  While Teva had previously engaged in reductions in force, this RIF was different because of the scale, scope and speed involved.  (Sabag Dep. Dec. 8 at 51:19-52:6).

102.  Specifically the RIF design contemplated the elimination of 15,000 positions from Teva by the end of 2018.  (Sabag Dep. Dec. 6 at 103:11-17).

103.  At Teva, the CEO is considered an L-0.  (Sabag Dep. Dec. 8 at 53:7-17).

104.  The next tier of management is referred to as the "L-1" tier and L-1 managers report directly to the CEO.  The next tier of management is referred to as the "L-2" tier.  (Sabag Dep. Dec. 8 at 53:7-17).

105.  L-2 managers report to the L-1 leaders.  This pattern continues in the same fashion through the L-5 level. (Sabag Dep. Dec. 8 at 53:7-17).

106.  The RIF started with reductions made by Mr. Schultz to the L-1 tier; the remaining L-1's were then responsible for making reductions to the L-2 tier, followed by reductions to the L-3 tier and so on and so forth. (Sabag Dep. Dec. 6 at 118:2-16, Def. Ex. 21 at TEVA000211).

107.  The reductions to the L-2 tier were made by the remaining L-1s.  (Def. Ex. 21 at TEVA000211).

108.  The reductions to the L-3 tier were made by the remaining L-2s and so on until the RIF was completed.  (Def. Ex. 21 at TEVA000211).

12

**Mr. Sabag Must Make Cuts to His Own Organization**

109.  Teva created an ambitious timeline for the RIF that included the majority of the reductions at the L5 and above level occurring in the six weeks between December 14, 2017 and February 2018.  (Def. Ex. 21 at TEVA000211).

110.  Mr. Sabag, as Global Head of Human Resources, was responsible for making cuts within his own HR organization.  (Sabag Dep. Dec. 8 at 58:9-20).

111.  As part of the RIF, support functions—those that are not revenue generating including Human Resources—had reduction targets of 50% or more.  (Sabag Dep. Dec. 6 at 90:19-25, Sabag Dep. Dec. 8 at 58:9-20).

112.  At that time, Mr. Sabag had 12 direct reports, of which he was required to cut back to six.  (Sabag Dep. Dec. 8 at 58:24-25).

113.  Overall, the Human Resources department at Teva would go from approximately 700 employees to approximately 300 employees. (Sabag Dep. Dec. 6 at 72:8-12).

114.  Before deciding who would stay and who would go, Mr. Sabag first designed the structure of his new leaner organization.  (Sabag Dep. Dec. 8 at 59:5-18).

115.  This involved combining several Centers of Expertise ("COE") and consolidating what had previously been the responsibility of managers responsible for their own COE into one unit with a single manager.  (Sabag Dep. Dec. 8 at 61:6-19).

116.  Mr. Sabag previously had direct reports for each of the following COEs:  (1) Total Rewards, (2) Talent Acquisition and (3) Leadership and Development.  (Sabag Dep. Dec. 8 at 61:6-19).

117.  As a result of the restructuring, Mr. Sabag combined those three functions into a single COE referred to as Integrated Talent that included all of the previous COE functions.  (Sabag Dep. Dec. 6 at 100:17-24, Sabag Dep. Dec. 8 at 61:6-19).

118. Mr. Sabag chose Tal Zorman who had been responsible for the Leadership and Training COE to lead this integrated COE.  (Sabag Dep. Dec. 6 at 95:12-96:5, Sabag Dep. Dec. 8 at 61:6-19).

119. This meant that Mr. Sabag needed to terminate the employment of the prior Global Head of Total Rewards, Ron Yaniv and the prior Global Head of Talent Acquisition, Simon Kelner.  (Sabag Dep. Dec. 8 at 62:1-19; Pl. Ex. 53 at TEVA000113-115).

120. In selecting Ms. Zorman over the others, Mr. Sabag did not ask, request information or consider Ms. Zorman or any of the other candidates' age.  (Sabag Dep. Dec. 8 at 59:21-23).

**Ms. Zorman Must Make Cuts to Her New Organization**

121. After selecting Ms. Zorman, Mr. Sabag explained to Ms. Zorman she would need to make 50% reductions in headcount for her newly consolidated Integrated Talent COE.  (Sabag Dep. Dec. 8 at 62:24-63:10).

122. Mr. Sabag, informed Ms. Zorman that the timeline for these cuts must be aggressive and that she must design her new organization during December 2017 and begin notifying employees by January 2018.  (Tr. Trans. 3 at 48:9-16).

123. Mr. Sabag explained that he was concerned with both reducing headcount as well as reducing the cost of labor of the surviving organization.  (Sabag Dep. Dec. 8 at 64:24-65:3).

124. Mr. Sabag directed Ms. Zorman to first create an organizational design, without including the names of who will fill each position, and then bring the organizational design to him for review and approval.  (Sabag Dep. Dec. 8 at 64:11-65:8).

**Ms. Zorman Designs Her New Organization**

125. Ms. Zorman started this process by deciding the most effective way to satisfy the business's needs with a very minimal workforce.  (Tr. Trans. 3 at 49:1-8).

02/16/2023 SL1 1825557v7 030421.00713

126.  Ms. Zorman reached out to her regional heads to get their perspective on how this could be accomplished.  (Tr. Trans. 3 at 49:9-22).

127.  On or about December 13, 2017, Ms. Zorman contacted Mr. Keuch by phone and asked him to prepare a presentation outlining how he could reduce the headcount in his organization by 50%.  (Tr. Trans. 1 at 120:7-10).

128.  On December 14, 2017, Mr. Keuch submitted to Ms. Zorman, via email with copies to Daniel Lawlor and Ron Yaniv, a PowerPoint presentation which outlined his recommendations. (Def. Ex. 24 at TEVA000144, Def. Ex. 28 at TEVA000145-170).

129.  Mr. Keuch outlined three options for how Teva could achieve the 50% reduction in the Total Rewards North America organization.  (Def. Ex. 28 at TEVA00150-152).

130.  In the first of the three options, Mr. Keuch proposed eliminating his own role.  In the other two options, Mr. Keuch proposed that he be retained as Head of Total Rewards North America with a smaller staff.  (Def.  Ex. 28 at TEVA00150-152).

131.  Mr. Keuch clearly recognized that his own role could be eliminated as part of the RIF. (Def.  Ex. 28 at TEVA00150-152, Tr. Trans. 1 at 125:3-10).

132.  Mr. Keuch candidly expressed in the PowerPoint presentation that if leadership level roles needed to be cut, Diane Rohach (responsible for benefits) and not himself should be considered to be the most valuable leader in Total Rewards.  (Def.  Ex. 28 at TEVA00150-152).

133.  Mr. Keuch concluded that that the remaining staff lacked the expertise to handle benefits without Ms. Rohach thus making her retention essential.  (Def. Ex. 28 at TEVA00150-152).

134.  Mr. Keuch also stated with some equivocation that he was "probably the next most valuable leader."  (Def.  Ex. 28 at TEVA00150-152).

15

135. On December 15, 2017, Ms. Zorman thanked Mr. Keuch for his proposals. (Pl. Ex. 56 at KEUCH000050).

136. Also on December 15, 2017, Ms. Zorman contacted Daniel Lawlor (Regional Head of Human Resources for North America) for his perspective on the structure. (Def. Ex. 30 at TEVA000784).

137. Mr. Lawlor shared that he preferred the structure suggested by Mr. Keuch in which the regional head was eliminated. (Pl. Ex. 58 at TEVA000783).

138. Ms. Zorman, however, elected not to accept Mr. Lawlor's suggestion as she preferred retaining regional heads. (Tr. Trans. 3 at 60:1-5).

139. Ms. Zorman submitted to Mr. Sabag her organizational design for approval and Mr. Sabag approved the proposed design. (Tr. Trans. 3 at 59:13-60:5).

140. Ms. Zorman performed this same task for Total Rewards, Talent Acquisition and Leadership and Development for each of the geographic regions where these functions existed. (Tr. Trans. 3 at 74:5-13).

141. As a result of the RIF, Ms. Zorman needed to terminate as many as 90% of the individuals who had previously reported to her when she led the COE for Leadership and Development. (Tr. Trans. 3 at 74:5-13).

142. Ms. Zorman had to make the decisions regarding the employment future of many individuals within a two week time frame and did not have time to dwell on each and every decision. (Tr. Trans. 3 at 52:15-21, 74:5-13).

**<u>Ms. Zorman Selected Who Would Fill The Positions in her New Organization</u>**

143. Ms. Zorman next moved to determining which employees should fill the roles in the reduced in size Total Rewards department, i.e., filling the boxes with names. (Tr. Trans. 3 at 48:9-16).

16

144.   As part of Teva's overall restructuring, its business was to be changed with Latin America no longer included in the "Americas" Region; instead, Latin America would become a part of the "Emerging Markets" Region.  (Tr. Trans. 3 at 56:16-21).

145.   This meant that the "Americas" region would be changed to the "North America" region and include only the United States and Canada.  (Tr. Trans. 3 at 56:16-21).

146.   Ms. Zorman realized that because of this change, the new regional head of North America would be managing fewer employees in a smaller geographic area.  (Tr. Trans. 3 at 80:22-25).

147.   As a result of the RIF, the new regional head of North America would have half the number of direct reports compared against the prior head of Total Rewards, Americas.  (Tr. Trans. 3 at 64:16-25).

148.   Lastly, it was Ms. Zorman's belief that the new regional head of North America would need to be less strategic and far more operational.  (Tr. Trans. 3 at 65:1-16).

149.   This was because Teva would not be expecting the new head to strategize, design or offer new benefits or initiatives but rather would be expected to simply manage existing benefits. (Tr. Trans. 3 at 62:15-22).

150.   Any Total Rewards strategy would now be handled at the global level—i.e., by Ms. Zorman—as opposed to at the regional level.   (Tr. Trans. 3 at 65:11-16).

151.   Ms. Zorman determined that the reduced in scope regional role could be performed by a Labor Grade 15 Director as opposed to a Labor Grade 17 Senior Director.  (Tr. Trans. 3 at 67:14-19).

152.   For similar reasons, Ms. Zorman reached this same conclusion for the regional head of Total Rewards for Europe.  (Tr. Trans. 3 at 67:14-19).

**Ms. Zorman Focuses on Mr. Nasi for the Head of Total Rewards North America Director Role**

153.   Ms. Zorman identified Eduardo Nasi as a potential candidate to fill the Total Rewards regional head role for North America.  (Tr. Trans. 3 at 60:22-61:7).

154.   Ms. Zorman had met Mr. Nasi previously when Mr. Nasi had represented Total Rewards for the Americas at a program that Ms. Zorman had hosted in Israel.  (Tr. Trans. 3 at 60:22-61:7).

155.   In addition, Mr. Nasi had been discussed as a talent during a Human Resources leadership forum. (Tr. Trans. 3 at 60:22-61:7).

156.   At this time, Mr. Nasi was the Head of Total Rewards for Latin America and was a Director at the Labor Grade 15 level.  (Def. Ex. 44 at KEUCH000519).

157.   As a Labor Grade 15, Mr. Nasi was earning a base salary of $168,896 and his overall compensation package was valued at approximately $325,000.  (Def. Ex. 44 at KEUCH000519).

158.   By way of comparison, Mr. Keuch was a Labor Grade 17 earning a base salary of $285,600 and Mr. Keuch's overall compensation package was valued at approximately $574,000.  (Def. Exhibit 43, at KEUCH00014).

159.   Thus, there was an approximate quarter million dollar ($250,000) difference in total compensation package costs between Mr. Keuch and Mr. Nasi. (Compare Def. Exhibit 43, at KEUCH00014 vs. Def. Ex. 44 at KEUCH000519; Sabag Dep. Dec. 6 at 128:25-129:5).

160.   Ms. Zorman called Mr. Nasi on December 21, 2017.  (Tr. Trans. 2 at 256:22-25).

161.   During this call, Ms. Zorman discussed Mr. Nasi's career aspirations, the fact that Latin America would be moving from the Americas into the International Markets segment of the business and how this change may effect his future at Teva.  (Tr. Trans. 2 at 256:22-257:4).

162.   Mr. Keuch had surmised in an email to Mr. Nasi informing him that Ms. Zorman would be in contact and that Ms. Zorman was likely calling Mr. Nasi because she wanted Mr. Nasi to lead Total Rewards for the Emerging Markets Region. (Def. Ex. 31 at TEVA000608-609).

163.   This email implicitly demonstrates that Mr. Keuch believed that Mr. Nasi was ready to become his peer and lead a Total Rewards regional organization. (Def. Ex. 31 at TEVA000608-609).

164.   Ms. Zorman also sought input regarding Mr. Nasi from Mr. Lawlor and Carlos Benitez—the Human Resources head for Latin America—both of whom provided a positive endorsement of Mr. Nasi.  (Tr. Trans. 3 at 65:19-21, 66:4-9, 75:7-9).

165.   Ms. Zorman contacted Mr. Nasi on the following day, December 22, 2017 and offered him the job as head of Total Rewards, North America.  (Tr. Trans. 2 at 260:19-23).

166.   Ms. Zorman informed Mr. Nasi that neither an increase in salary nor an increase in Labor Grade/ title were components to the job offer.  (Tr. Trans. 2 at 234:10-14, 265:5-8).

167.   Mr. Nasi explained that he needed to discuss the offer with his wife because it would require relocating either to Horsham, Pennsylvania or Parsippany, New Jersey.  (Tr. Trans. 2 at 264:22-24).

168.   On December 24, 2017, Mr. Nasi accepted the offer to become Head of Total Reward for North America.  (Tr. Trans. 2 at 264:22-265:4).

**Mr. Keuch Not an Appropriate Fit For The New Role**

169.   Ms. Zorman did not consider Mr. Keuch to be an appropriate fit for the new role. (Tr. Trans. 3 at 64:16-65:10).

170.   First, Mr. Keuch's total compensation package was roughly $250,000 more than Mr. Nasi's. (Compare Def. Exhibit 43, at KEUCH00014 vs. Def. Ex. 44 at KEUCH000519).

19

171.  The new role would start at the Director level and would be smaller in scope and size as compared to the role that Mr. Keuch had occupied. (Tr. Trans. 3 at 64:16-65:10).

172.  Not only would the role have half the number of direct reports, but the role also would no longer include Latin America. (Tr. Trans. 3 at 64:16-65:10).

173.  While demotions were possible as part of the RIF, they were heavily disfavored. (Tr. Trans. 3 at 53:20-54:6, 159:5-10, Sabag Dep. Dec. 8 at 96:10-25).

174.  Both Ms. Zorman and Mr. Sabag had negative experiences at prior employers when demotions were utilized during a reduction in force. (Tr. Trans. 3 at 53:20-54:6, 159:5-10, Sabag Dep. Dec. 8 at 96:10-25).

175.  Moreover, given Mr. Keuch's prior actions it was clear that he was not a candidate for a demotion. (Tr. Trans. 2 at 61:1-25).

176.  Specifically, on two separate occasions Mr. Keuch had asked Mr. Yaniv to have his position re-graded to become a Vice President, Labor Grade 18 role. (Tr. Trans. 2 at 61:1-25).

177.  Thus, it was believed that Mr. Keuch's aspirations were always directed to becoming a Vice President and he was not someone who should be considered as a demotion candidate. (Tr. Trans. 2 at 61:1-25).

178.  Next, Mr. Keuch's strengths in his role were strategic thinking and developing new initiatives and benefits, neither of which Ms. Zorman thought would be as necessary in the new role.  (Tr. Trans. 3 at 64:16-65:10).

179.  Mr. Keuch had frequently utilized consultants and contractors to facilitate these new initiatives.  (Tr. Trans. 3 at 64:16-65:10; 160:1-12).

20

180.  Mr. Lawlor shared with Ms. Zorman his view that Mr. Keuch heavily relied on consultants and always had "a large team working under him." (Tr. Trans. 3 at 64:16-65:10; 160:1-12).

181.  As a result of the RIF, Teva was becoming more cost conscious and would be relying on the new Total Rewards head to roll up his sleeves and do the work himself. (Tr. Trans. 3 at 62:15-22, 160:1-12).

182.  Teva did not expect to be creating new initiatives and would be reducing or eliminating its use of consultants. (Tr. Trans. 3 at 62:15-22, 160:1-12).

183.  Ms. Zorman did not ask for or request access to any age information and she did not consider the ages of any individual in making her selection. (Tr. Trans. 3 at 71:15-72:5).

184.  Ms. Zorman received input in reaching her decision from various stakeholders but the ultimate decision to retain Mr. Nasi over Mr. Keuch was her responsibility. (Tr. Trans. 3 at 75:25-76:9).

185.  If Ms. Zorman had to do it all over again, she would make the same decision. (Tr. Trans. 3 at 75:25-76:9).

**Ms. Zorman Informs Mr. Keuch of Her Decision**

186.  Ms. Zorman notified Mr. Keuch of her decision on January 2, 2018. (Tr. Trans. 1 at 130:21-25).

187.  Ms. Zorman asked Mr. Keuch to remain onboard for a brief period of time to transition responsibilities to Mr. Nasi. (Tr. Trans. 3 at 60:14-21).

188.  This transition consisted largely of Mr. Keuch introducing Mr. Nasi to various vendors used in Total Rewards. (Tr. Trans. 2 at 272:20-273:10).

189.  Mr. Keuch's last day in the office was February 23, 2018. (Tr. Trans. 2 at 127:19-23).

190.   Teva continued to pay Mr. Keuch until March 18, 2018. (Tr. Trans. 2 at 127:19-23).

191.   At no point after Mr. Keuch's departure did Mr. Nasi have the need to reach out to Mr. Keuch for any guidance or support. (Tr. Trans. 2 at 272:20-273:10).

**Teva Elevates Mr. Nasi During Its Normal Review Period**

192.   Teva's year-end process to evaluate an employee's Labor Grade ranking and compensation is referred to as the "connect process." (Tr. Trans. 2 at 232:12-233:17).

193.   Awards under the connect process—such as raises and promotions—are typically communicated in February of each year. (Tr. Trans. 2 at 232:12-233:17).

194.   As part of the connect process in 2018, Mr. Nasi was promoted from Labor Grade 15 to Labor Grade 16. (Tr. Trans. 3 at 79:8-19, Def. Ex. 58 at TEVA000853).

195.   Mr. Nasi's base salary was increased to approximately $195,000 effective March 26, 2018. (Tr. Trans. 2 at 205:16-19, Def. Ex. 58 at TEVA000853).

196.   As of the date of trial (now more than 4 years after Keuch left Teva), Mr. Nasi's base salary had been increased to $237,000 still $48,000 less than Mr. Keuch had been earning at the time of his termination in 2018. (Tr. Trans. 2 at 209:1-4. Def. Exhibit 43, at KEUCH00014).

197.   Because bonuses for Senior Directors are calculated as a percentage of base salary, Mr. Nasi's bonuses over the past four years have been tens of thousands of dollars less than Mr. Keuch would have received. (Tr. Trans. 2 at 152:15-25).

198.   Mr. Nasi remains a Labor Grade 16. (Tr. Trans. 2 at 230:15-22).

199.   Retaining Mr. Nasi instead of Mr. Keuch has saved the company hundreds of thousands of dollars. (Tr. Trans. 2 at 230:15-22, Def. Exhibit 43, at KEUCH00014. Def. Ex. 44 at KEUCH000519).

02/16/2023 SL1 1825557v7 030421.00713

**Changes Made to Teva's Equity Plan**

200.  Teva's 2010 equity plan included what was sometimes referred to as the "Rule of 70." (Tr. Trans. 2 at 62:1-25).

201.  The Rule of 70 permitted employees to continue vesting in equity that they had received even after they had left Teva's employment. (Tr. Trans. 2 at 62:1-25).

202.  The Rule of 70 stated if an employee's age and years of service added up to 70, the Company would allow an employee's stock to continue vesting even after the employee no longer worked for the Company. (Tr. Trans. 2 at 62:1-25, Sabag Dep. Dec. 8 at 18:12-24).

203.  Teva performed a benchmarking exercise to determine if this benefit was common in the industry. (Sabag Dep. Dec. 8 at 19:15-20:18).

204.  Teva learned through this benchmarking process, that the benefit it was offering was not in alignment with the industry. (Sabag Dep. Dec. 8 at 19:15-20:18).

205.  Specifically, Teva learned that other companies generally didn't permit employees to continue vesting after their separation from employment when the separation was voluntary rather than involuntary. (Sabag Dep. Dec. 8 at 19:15-20:18).

206.  As a result, Teva first modified the Rule of 70 to apply only to those situations where a departing employee was involuntarily separated from Teva and not for employees who voluntarily left. (Sabag Dep. Dec. 8 at 20:19-21:10).

207.  Contemporaneous with this change, Teva added a secondary criteria consistent with other companies that required an employee to have at least 15 years of service to be eligible to continue vesting after separation of employment.  (Sabag Dep. Dec. 8 at 20:19-21:10).

208.  Subsequently, Teva modified the Rule of 70 again to make it more attractive to older workers and reduced the 15 years of service to 10 years of service if the employee was terminated after he or she had attained the age of 65. (Sabag Dep. Dec. 8 at 22:1-12).

209.  These changes were made to align Teva's equity policy on global level and affected all of Teva's employees regardless of age, sex, gender, race or other protected characteristic. (Sabag Dep. Dec. 8 at 23:16-19).

210.  Changes to corporate benefit plans such as Teva' equity plan required approval from Teva's Board of Directors. (Sabag Dep. Dec. 8 at 19:2-9).

211.  Neither Ms. Zorman or Mr. Lawlor had any role or involvement in the changes made to the Rule of 70. (Tr. Trans. 2 at 70:11-20).

**Changes to Teva's Severance Plan**

212.  Historically, Teva's severance plan was not a qualified plan under IRS guidelines. (Tr. Trans. 3 at 144:3-4).

213.  In November 2017, Teva discovered that there could be tax and other financial incentives if it converted its severance plan into a qualified plan.  (Tr. Trans. 3 at 144:16-145:4).

214.  By converting to a qualified plan, Teva could use state unemployment benefits to help fund Teva's severance payments. (Tr. Trans. 3 at 144:16-145:4).

215.  This would reduce the severance payments Teva was obligated to pay by the amount the separated employee would collect through state unemployment benefits. (Tr. Trans. 3 at 144:16-145:24).

216.  However, to receive benefits under the qualified plan, the departed employee would need to apply for state unemployment benefits. (Tr. Trans. 3 at 146:19-147:21).

217.  As a result, an issue was raised regarding how the plan should treat individuals who were being separated if the employee was not otherwise eligible for unemployment benefits. (Tr. Trans. 3 at 146:19-148:10).

218.  By way of example, if the individual intended to retire or to become a stay at home parent then the individual would not be eligible for unemployment benefits as they would no longer be seeking employment. (Tr. Trans. 3 at 146:19-148:10).

219.  Mr. Keuch expressed the view that if people were not going to go back to work, then they did not need severance because severance was designed to hold an individual over from one job to the next. (Tr. Trans. 3 at 148:16-149:2).

220.  Mr. Keuch's point of view was that if employees who left Teva did not intend to remain in the workforce they should not be eligible for severance benefits. (Tr. Trans. 3 at 148:16-149:2).

221.  This view was not shared by others as being consistent with Teva's principles. Mr. Lawlor wanted an exception made to the qualified plan for those individuals who did not intend to return to the workforce so that they could receive severance benefits. (Tr. Trans. 3 at 149:2-150:20).

222.  Because it was an IRS qualified plan, any exceptions to the plan needed to be clearly defined by rule. (Tr. Trans. 3 at 149:5-12).

223.  Mr. Lawlor expressed that a clear rule would be that if an employee was let go and over the age of 62, he or she would not have to apply for unemployment in order to receive severance benefits. (Tr. Trans. 3 at 149:13-150:20).

224.  Mr. Lawlor selected the age of 62 because that is when an individual is eligible for social security benefits and also based on  Teva historical data, 62 was the age when individuals at Teva began to retire.  (Tr. Trans. 3 at 149:13-150:20).

225. Additionally, if the employee was under the age of 62 and did not want to return to the workforce, he or she could sign an attestation and still receive severance benefits. (Tr. Trans. 3 at 151:4-17).

226. The automatic exception for employees over the age of 62 would benefit employees over age 62 and cost Teva millions of dollars in what would otherwise be savings. (Tr. Trans. 1 at 185:14-17, Tr. Trans. 3 at 151:18-21).

227. Mr. Lawlor championed this exception because he thought it was the right thing to do. (Tr. Trans. 3 at 149:13-150:20).

228. Mr. Lawlor never expressed an opinion that employees over the age of 62 were unemployable and should simply retire. (Tr. Trans. 3 at 152:13-16).

**<u>Rose Riccioli's Age Was Not A Factor In Teva's Decision Not to Hire Her</u>**

229. Rose Riccioli was a contractor in Total Rewards who provided compensation services. (Tr. Trans. 3 at 96:14-22).

230. In 2017, Mr. Keuch expressed an interest to Mr. Lawlor that the organization should hire Ms. Riccioli as an employee. (Tr. Trans. 3 at 96:23-97:13).

231. Mr. Lawlor explained to Mr. Keuch that he had received some negative feedback regarding Ms. Riccioli from other team members.  (Tr. Trans. 3 at 98:11-17).

232. Mr. Lawlor encouraged Mr. Keuch to speak with the individuals who Mr. Lawlor had received negative feedback regarding Ms. Riccioli. (Tr. Trans. 3 at 98:11-17).

233. Mr. Keuch never followed up with any of these stakeholders. (Tr. Trans. 3 at 99:9-17).

234. Mr. Lawlor decided that Ms. Riccoli should not be hired and no one filled that role**.** (Tr. Trans. 2 at 76:8-10, Tr. Trans. 3 at 99:18-24).

235. Mr. Lawlor never asked Mr. Keuch how old Ms. Riccioli was. (Tr. Trans. 3 at 172:4-9).

236.   Mr. Lawlor never reviewed any of Teva's records to determine Ms. Riccioli's age. (Tr. Trans. 3 at 172:4-9).

237.   Ms. Riccioli's age played no role in Mr. Lawlor's opinion. (Tr. Trans. 3 at 172:4-19).

**References to Planning for the Future Do Not Demonstrate an Age Bias**

238.   Teva employees will often use terminology to discuss Teva's future. (Tr. Trans. 2 at 76:17-25).

239.   Mr. Sabag often used phrases such as "building for the future." (Tr. Trans. 2 at 76:17-25).

240.   In a letter to Mr. Keuch written by Mr. Sabag on September 16, 2016, Mr. Sabag stated "Your work has helped both our organizations reach this stage, ready to move into the future to deliver on our shared purpose…" (Def. Ex. 15 at KEUCH000025).

241.   In this same letter, Mr. Sabag provided Mr. Keuch with a $23,800 bonus in recognition for Mr. Keuch's contribution to the organization. (Def. Ex. 15 at KEUCH000025).

242.   Mr. Sabag concluded the letter by thanking Mr. Keuch for "helping to lead the way to [Teva's] new future." (Def. Ex. 15 at KEUCH000025).

243.   Thus, it is clear that whatever "future" Mr. Sabag was referring to included Mr. Keuch. (Def. Ex. 15 at KEUCH000025).

244.   Moreover, Mr. Keuch himself frequently used the word "future" in his own presentations. (Tr. Trans. 2 at 77:1-11, Def. Ex. 16 at TEVA000121, 134, 136, 137, 143).

245.   In a presentation made by him dated June 2017, the word future appears 10 times. (Def. Ex. 16 at TEVA000121, 134, 136, 137, 143).

246.   Mr. Keuch had final decision making authority as to what went into this presentation. (Tr. Trans 1 at 95:16-19, Tr. Trans. 2 at 77:1-11).

**Mr. Keuch Failed to Mitigate His Alleged Damages**

247.  Following Mr. Keuch's separation of employment from Teva, Mr. Keuch did not seriously attempt to secure new employment. (Tr. Trans. 141:3-150:6).

248.  Since Mr. Keuch's employment ended in March of 2018, Mr. Keuch has only been on one job interview. (Tr. Trans. 2 at 141:17-19).

249.  Recruiters informed him that he may be able to find employment with either organizations that were in a turnaround status or with private equity firms. (Tr. Trans. 2 at 146:8-19).

250.  Mr. Keuch did not pursue any opportunities with turnaround companies or private equity firms. (Tr. Trans. 2 at 146:20-23).

251.  Instead, Mr. Keuch stopped looking for employment in 2019 when he started a consulting firm. (Tr. Trans. 2 at 146:24-147:3).

252.  Since 2019, Mr. Keuch's consulting firm has only had two clients. (Tr. Trans. 2 at 146:20-148:14).

253.  Mr. Keuch did not seriously pursue subsequent employment because he had already decided that he wanted to retire. (Tr. Trans. 2 at 141:3-150:6).

254.  Immediately after learning that he would be included in the RIF, he emailed colleagues to state that he was considering accepting retirement and "heading to the beach."  (Tr. Trans. 2 at 132:17-21, Def. Ex. 41 at TEVA000876-877, Def. Ex. 48 at TEVA000871-872).

255.  In fact, in 2019 Mr. Keuch moved full time to his beach home in South Carolina. (Tr. Trans. 2 at 148:17-19).

256.  This comports with what he told Mr. Nasi in 2014, of his intent to retire in five years. (Tr. Trans. 2 at 237:5-18).

257.  Instead of actively looking for subsequent employment, Mr. Keuch decided to sue Teva. (Tr. Trans. 2 at 131:7-132:7).

258.  Mr. Keuch initially sued Teva in a class action lawsuit. (Tr. Trans. 2 at 131:7-132:7).

259.  However, not a single other employee who was included in the RIF joined Mr. Keuch's lawsuit. (Tr. Trans. 2 at 131:7-132:7).

260.  Rather, Mr. Keuch is the only employee who was included in the RIF that has sued Teva as a result of his or her inclusion in the RIF.  (Sabag Dep. Dec. 6 at 103:11-17, Tr. Trans. 2 at 131:7-132:7).

261.  The RIF effected approximately 15,000 employees.  (Sabag Dep. Dec. 6 at 103:11-17).

## PROPOSED CONCLUSIONS OF LAW

1.  Teva is a covered employer under the ADEA. 29 U.S.C. § 621, *et seq.*

2.  Teva is a covered employer under the PHRA. 43 P.S. §§ 951 *et seq.*

3.  At the time Mr. Keuch was terminated, he was 63 years old and thus protected from unlawful age discrimination under the ADEA and the PHRA.

4.  The PHRA and ADEA are interpreted coextensively with respect to Mr. Keuch's claims of age discrimination.  *See Colwell v. Rite Aid Corp.*, 602 F.3d 495, 499 n.3 (3d Cir. 2010); *Gottschall v. Reading Eagle Co.*, Civ. A. No. 11-5361, 2013 WL 961266, at *3 (E.D. Pa. Mar. 12, 2013).

5.  "To establish a disparate-treatment claim under the plain language of the ADEA, ... a plaintiff must prove that age was the 'but-for' cause of the employer's adverse decision." *See Gross v. FBL Financial Services, Inc.*, 557 U.S. 167, 176 (2009).

6.  Therefore, Mr. Keuch must establish that age was the 'but-for' cause of Teva's decision to include him in the RIF.  *See Gross*, 557 U.S. at 176.

7.  In age discrimination cases, it is not enough to simply show that age was "a motivating factor" in the adverse employment action. *See Smith v. City of Allentown*, 589 F.3d 684, 690-91 (3d Cir. 2009).

8.  Further, to prove a violation of the ADEA, it does not suffice to show that age played some minor role in the decision. *See Kelly v. Moser, Patterson And Sheridan, LLP*, 348 F. App'x 746, 749 (3d Cir. 2009).

9.  Rather, a plaintiff must demonstrate that age was a determinative factor or "the 'but-for' cause of the employer's adverse decision." *See Smith*, 589 F.3d at 690-91.

10.  The plaintiff retains the burden of proof to establish that age was the 'but-for' cause of the employer's adverse action." *See Gross*, 557 U.S. at 177.

11.  Mr. Keuch cannot establish that but for his age of 63, Teva would have retained him. *See Gross*, 557 U.S. at 176; *Smith*, 589 F.3d at 690-91; *Kelly,* 348 F. App'x at 749; *Palmer v. Britton Indus., Inc*., 662 F. App'x 147, 154 (3d Cir. 2016).

12.  Teva, though Ms. Zorman, believed in good faith that Mr. Nasi could manage the new, smaller Total Rewards organization for North America. *See Gross*, 557 U.S. at 176; *Smith*, 589 F.3d at 690-91; *Kelly,* 348 F. App'x at 749; *Palmer v. Britton Indus., Inc*., 662 F. App'x 147, 154 (3d Cir. 2016).

13.  Additionally, the ADEA does not prohibit an employer from making an employment decision while considering higher salaries, increased benefits, pension status, or claims for medical expenses even though these characteristics are often correlated with an employee's age. *See Hazen Paper Co., 507 U.S. at 611, 113 S.Ct. 1701; Broaddus v. Fla. Power Corp.*, 145 F.3d 1283, 1287 (11th Cir.1998); *Kelly*, 348 F. App'x 746 at 750.

14.  It is undisputed that at the time Mr. Keuch's separation, his compensation package was approximately $250,000 more expensive to Teva than that of Mr. Nasi. (Compare Def. Exhibit 43, at KEUCH00014 vs. Def. Ex. 44 at KEUCH000519).

15.  The fact finder's responsibility is not to sit as a super-personnel department that examines an entity's business decisions."  *See Brewer v. Quaker State Oil Ref. Corp*., 72 F.3d 326, 332 (3d Cir. 1995).

16.  Teva had legitimate business reasons to retain Mr. Nasi and eliminate Mr. Keuch's position including its good faith belief and honest opinion that Nasi was qualified to handle the new position. *See Brewer*, 72 F.3d at 332.

02/16/2023 SL1 1825557v7 030421.00713

17.  Teva is not required to be correct in making these business reasons so long as its actual reason for eliminating Mr. Keuch's role was not because of Mr. Keuch's age. *See Brewer*, 72 F.3d at 332.

18.  Teva was not legally required to demote nor to consider the demotion of Mr. Keuch. *O'Connell v. Associated Wholesalers, Inc.*, 558 F.App'x 286, 292 (3d Cir. 2014).

19.  Accordingly, Teva did not violate the ADEA or the PHRA by terminating Mr. Keuch's employment. *See Gross*, 557 U.S. at 176; *Smith*, 589 F.3d at 690-91; *Kelly,* 348 F. App'x at 749; *Palmer*, 662 F. App'x at 154 (3d Cir. 2016).

20.  Even assuming *arguendo* that Mr. Keuch's age was the "but for" reason for his termination, Mr. Keuch is not entitled to compensatory damages for lost wages and benefits from the time Mr. Keuch was terminated until the date of the Court's verdict because Mr. Keuch failed to properly mitigate his damages. *See Ford Motor Co. v. EEOC*, 458 U.S. 219 (1982); *Maxfield v. Sinclair Int'l*, 766 F.2d 788, 794 (3d Cir. 1985).

21.  Even assuming *arguendo* that Mr. Keuch's age was the "but for" in Teva's decision to terminate his employment, Mr. Keuch is not entitled to damages for lost wages and benefits from the date of the Court's verdict until a reasonable time in the future because Mr. Keuch failed to properly mitigate his damages.  *See Ford Motor Co.*, 458 at 219; *Maxfield*, 766 F.2d at 794.

22.  Even assuming *arguendo* that Mr. Keuch's age was the "but for" in Teva's decision to terminate his employment, Mr. Keuch is not entitled to compensatory damages for emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, or any future non-wage monetary loss because Mr. Keuch presented no evidence to substantiate any such damages.  *See Pennsylvania Human Relations Commissions v. Zamantakis*, 478 Pa. 454, 387 A.2d 70, 73 (1978); *Lubin v. American Packaging Corp.*, 760 F. Supp. 450, 452 (E.D.Pa.1991).

23.  Even assuming *arguendo* that Mr. Keuch's age was the "but for" in Teva's decision to terminate his employment, Mr. Keuch is not entitled, to liquidated damages as Teva did not, through its agents, show reckless disregard for whether terminating Mr. Keuch's employment was prohibited by law. Rather, Teva's conduct in terminating Mr. Keuch was a result of the size, scope and speed required to effectuate the RIF. *Trans World Airlines v. Thurston*, 469 U.S. 111, 128 (1985).

Respectfully submitted,

STEVENS & LEE, P.C.

Dated:  February 17, 2023

By:  */s/ Larry J. Rappoport*
Larry J. Rappoport, Esquire
Brandon S. Shemtob, Esquire
STEVENS & LEE
A PA Professional Corporation
1500 Market Street, East Tower, St.1800
Philadelphia, PA 19102
Phone:  (215) 496-3839
Fax:  (610) 371-7977
larry.rappoport@stevenslee.com
brandon.shemtob@stevenslee.com

*Attorneys for Defendants*

33

## **CERTIFICATE OF SERVICE**

I, Larry Rappoport, certify that on this date, I served a certified true and correct copy of Defendant's Post-Trial Proposed Findings of Fact and Conclusions of Law upon the following counsel of record, via ECF and thus effectuated service on all parties.

*/s/ Larry J. Rappoport*
Larry J. Rappoport

Dated:  February 17, 2023