**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

———————————————————————

| | | |
|---|---|---|
| RANDOLPH W. KEUCH | : | |
| Plaintiff, | : | CIVIL ACTION |
| v. | : | |
| TEVA PHARMACEUTICALS USA, INC., | : | CASE NO. 2:19-CV-05488 (JMG) |
| And TEVA PHARMACEUTICAL | : | |
| INDUSTRIES, Ltd., | : | |
| Defendants. | : | |

———————————————————————

### PROPOSED FINDINGS OF FACT AND CONCLUSION OF LAW

Plaintiff Randolph W. Keuch ("Keuch" or "Plaintiff"), by and through his undersigned

counsel, respectfully submits the following Proposed Findings of Fact and Conclusions of Law

which Plaintiff respectfully requests that this Honorable Court adopt.

### INTRODUCTION

This is an age discrimination action pursuant to the Age Discrimination in Employment

Act ("ADEA"), 29 U.S.C. §621, *et seq*. and the Pennsylvania Human Relations Act ("PHRA"),

43 P.S. §951 *et seq*. asserted by Mr. Keuch against Teva Pharmaceuticals USA, Inc. (hereinafter

"TUSA") and TEVA Pharmaceuticals Industries, Ltd. (hereinafter "TPI") (collectively

"Defendants" or "TEVA") based upon Defendants' failure to properly evaluate Mr. Keuch's

performance for retention in connection with a broad reduction of workforce and terminating his

employment while retaining a substantially younger but less credentialed and qualified

individual who was one of Plaintiff's direct reports to take over his job responsibilities.  The case

was tried to the Court, without jury, on December 19, 2022, December 20, 2022 and December

21, 2022.  A trial deposition of witness Mark Sabag was taken on December 6, 2022 and

December 8, 2022 which was submitted to the Court on the last day trial.  The Parties have

moved the following exhibits into evidence: Plaintiff's Exhibits 15, 16, 17, 22, 23, 24, 26, 27, 29,

33, 39, 43, 48, 50, 52, 53, 55, 56, 58, 63, 73, 85, 90, 100, 108, 114, 115 and Defendants' Exhibits

1, 2, 3, 4, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 21, 22, 23, 24, 25, 26, 27, 28, 29, 30, 31, 32,

33, 34, 36, 37, 40, 41, 42, 43, 44, 45, 47, 48, 52, 54, 58, 59, 66, 67, and 63ab. [1]

Having reviewed the Proposed Findings and Conclusions submitted by the Parties,

Plaintiff's Trial Exhibits, Defendants' Trial Exhibits, the transcribed Notes of Testimony ("N.T.")

and the trial deposition transcripts of Mark Sabag ("Sabag T.D. I" and "Sabag T.D. II"), the

Court now makes the following Findings of Fact and Conclusions of Law.

## FINDINGS OF FACT

### The Parties

1.      Plaintiff Keuch was born on May 27, 1954 and is currently 68 years of age.

12/19/22 N.T., p. 37:10-11.

2.      He is married and has eight children, seven of which are adopted.  *Id*; p. 36:14-23.

3.      Plaintiff earned both a Bachelor of Science degree in Industrial and

Organizational Psychology and a Master of Science degree in Applied Psychology from Stevens

Institute of Technology.  *Id*; pp. 38:1, 39:24, 40:11-41:8.

4.      Plaintiff also attended the Executive Development Program at Harvard University.

*Id*; pp. 44:22-45:5.

5.      Accomplished in his field, Plaintiff has been employed by SmithKline Beecham

as the Corporate Director of Compensation Strategy and Director of Human Resource Planning,

Systems and Compensation (1994-1998); Pfizer, Inc. as the Corporate Director of Strategic

Rewards and Director of Pfizer Consumer Group Compensation (1998-2004); the Hartford as the

---

[1] Defendants object to the scope of use of Plaintiff's Exhibit 108.

AVP of Compensation of the P&C Division (2004-2005) and the H.J. Heinz Company as the Vice-President of Total Rewards (2005-2013).   12/19/22 N.T., pp. 43:18 - 46:25.  *See generally* Defendants' admission contained in their Response to Plaintiff's Counterstatement of Material Facts No. 10 [ECF Dkt No. 61-1], pp. 3-4.

6.     TEVA is a global pharmaceutical company committed to increasing access to high-quality healthcare to patients around the world manufacturing world-leading genetic and specialty medicines.  Plaintiff's Exhibit 108 [TEVA Pharmaceutical Industries Ltd. Form 10-K], p. 2*. See also* Defendants' admission in their Response to Plaintiff's Counterstatement of Material Facts No. 17 [ECF Dkt No. 61-1], p. 6.

7.     TEVA operates worldwide with headquarters in Israel along with a significant presence in the United States, Europe and other markets around the world.  Plaintiff's Exhibit 108 [TEVA Pharmaceutical Industries Ltd. Form 10-K], p. 2.

8.     TEVA is the largest generic drug manufacturer in the world.  Defendants' admission in their Response to Plaintiff's Counterstatement of Material Facts No. 18 [ECF Dkt. No. 61-1], p. 6.

9.     In the United States alone, TEVA employs as many as 22,000 employees.  Sabag T.D. I, p. 73:2-11.

10.     In November 2017, Kare Schultz ("Schultz") became the CEO of TEVA. *Id*; pp. 75:22, 77: 24.

11.     From 2013 through the summer of 2021, Mark Sabag ("Sabag") was employed by TEVA Pharmaceutical Industries as the Global Head of Human Resources.  *Id*;  pp. 12:21-14:2.

**<u>Plaintiff And His Employment With TEVA</u>**

12.     Plaintiff was hired by TEVA for the position of Senior Director of Total Rewards

(Compensation and Benefits) - Americas on December 20, 2013 and began his employment on January 6, 2014.  Plaintiff's Exhibit "16" [December 20, 2013 Offer Letter].

13.     In this position, he was graded as a Labor Grade 17.  Defendants' Statement of Uncontested Material Facts No. 9 [ECF Dkt. No. 51(1)].

14.     The decision to hire Plaintiff was made by Yonit Landskroner who was the head of Global Total Rewards at Teva headquarters in Tel Aviv and Leslie Billow who was the Head of Human Resources for North America.  12/19/22 N.T., p. 52:14-25; 12/21/22 N.T., p. 90:5-14.

15.     At the time, Daniel Lawlor ("Lawlor") was serving as the Head of Human Resources for the North America Specialty Division and was transitioning over to the position of Global Head of Human Resources for the Generic's Commercial Division.  12/21/22 N.T., p. 92:2-15.

16.     During Plaintiff's employment from 2014-2017, Mr. Lawlor had minimal interaction with him.  *Id*; pp. 94:19-95:9.

17.     Plaintiff's initial base pay when hired was $250,000 per annum and he was awarded a sign-on bonus of $50,000 along with eligibility to participate in the TEVA 2014 Bonus Program and he was entitled to consideration for equity compensation awards in the form of Options and/or Restricted Share Units.  Plaintiff's Exhibit "16" [December 20, 2013 Offer Letter].

18.     While Plaintiff's salary was lower than his previous employment, Plaintiff believed that this position was a wonderful opportunity affording him more quality of life and viewed this as his final place of employment before eventual retirement.  12/19/22 N.T., pp. 51:17-23, 53:1-8, 55:1-16.

19.     As the Senior Director of Total Rewards for North America, Plaintiff was

responsible for overseeing benefits and compensation for Canada, the United States and Latin America.  12/19/22 N.T., p. 56:8-13.  *See generally* Defendant's Exhibit "16" [America's Total Rewards Team Operational Review -June, 2017], pp. 8-14.

20.     During the initial phase of his employment at TEVA, Plaintiff directly reported to Ms. Landskroner who was his immediate supervisor and Ms. Billow served as his Matrix Manager.  12/19/22 N.T., pp. 72:6-14, 86:13-87:19; 12/20/22 N.T., p. 24:3-15, 32:3-10.

21.     In late 2014 - early 2015, Ms. Landskroner was replaced by Ron Yaniv ("Yaniv") who became the Global Head of Total Rewards and Plaintiff's direct supervisor.  12/19/22 N.T., pp. 81:25-82:4.

22.     Mr. Keuch also supervised the following individuals that directly reported to him: Diane Rohach ("Rohach") – Head of Benefits for North America, Miriam Weinstein ("Weinstein") – Head of Compensation for U.S. and Eduardo "Edu" Nasi ("Nasi") – Head of Total Rewards for Latin America.  12/19/22 N.T., p. 106:4-8; 12/20/21 N.T., pp. 29:19-30:5.  *See generally* Defendant's Exhibit "16" [America's Total Rewards Team Operational Review – June 2017], p. 6.

23.     During his employment, Plaintiff was an excellent leader of the Total Rewards Group for North America utilizing his subject matter expertise to provide noteworthy solutions and achieve remarkable results for TEVA.  12/19/22 N.T., pp. 72:22-77:12, 85:16-18, 100:8-101:2.  *See also* Plaintiff's Exhibit "33" [2014 and 2015 Performance Evaluation]; Defendant's Exhibit"16" [America's Total Rewards Team Operational Review – June 2017], p. 5.

24.     In fact, in August 2015 after Plaintiff was recruited and presented with an offer to go to Air Products and Chemicals at a higher salary and better benefits, he was awarded a salary increase to $280,000 and a $60,000 retention bonus as an incentive to remain at TEVA.  12/19/22

N.T., pp. 78:12-83:16.  *See also* Defendants' Exhibit "13" [August 6, 2015 Letter regarding Base Salary Increase and Retention Bonus].

25.     Mr. Yaniv assured Plaintiff that he was a highly valued colleague at TEVA and that TEVA was "looking forward to [his] continued contributions to TEVA in the years to come." Defendants' Exhibit "13" [August 6, 2015 Letter].

26.     Mr. Yaniv also told Plaintiff that he would be considered for potential promotion to Vice-President and a Global Labor Grade 18.  *Id*.

27.     Further recognizing the performance accolades he continued to receive, Plaintiff was given an additional salary increase to $285,600 in May 2016 along with a performance bonus.  12/19/22 N.T., pp. 84:7-85:21; Defendants' Exhibit "14" [May 26, 2016 Letter to Plaintiff regarding Salary Increase].

28.     While Mr. Lawlor contends that he prepared a written statement in October 2017 regarding critical reflections of Plaintiff, the written statement was never shared with Mr. Yaniv or with Tal Zorman ("Zorman") and Mr. Lawlor's concerns were never addressed with Plaintiff. 12/21/22 N.T., pp. 112:11-118:21, 120:15-121:18.

### The 2017 Workforce Reductions

29.     Following TEVA's acquisition of the generic pharmaceutical division known as Actavis, TEVA experienced some financial difficulties in early 2017 and TEVA started to take certain measures including terminating their then CEO, Erez Vigodman, as well as implementing hiring freezes and holds on salary increases to reduce expenses.  Sabag T.D II, pp. 28:6-30:8.

30.     On October 3, 2017, Mr. Sabag issued a pronouncement to Plaintiff and other Human Resource business heads addressing year-end compensation processes and advising that TEVA's "'pay-for-performance' approach" would remain the same thus for allowing for salary

increases; however, bonuses for top management and equity compensation could be affected. Plaintiff's Exhibit "48" [October 3, 2017 Update On Year-End Compensation Processes issued to TEVA Top Managers].

31.     Mr. Sabag remained positive, did not indicate that TEVA was suffering any type of drastic financial situation and even spoke about moving "… the organization forward and build[ing] an amazing future for [the company]. *Id*. *See also* 12/19/22 N.T., pp. 111:22-115:19.

32.     Mr. Sabag constantly used the term "future" which was a term used repeatedly while Plaintiff was employed at TEVA and was indicative of TEVA's culture that tended to be youth-oriented looking to hire and promote younger individuals.  12/19/22 N.T., pp. 89:11-17, 114:1-16.

33.     Plaintiff clarified that phrases such as "entering a new generation, a new future, … building for the future" were a common theme promulgated by Mr. Sabag which reflected Teva's "propensity towards youth" and the "youth culture" seen at Teva in Israel.  *Id*; p. 89:11-17.

34.     Around the time Mr. Sabag sent out his update on year-end compensation, Mr. Schultz (age 56 years) was selected as the new CEO of TEVA.  Sabag T.D. I, pp. 75:22-76:13; Sabag T.D. II, p. 31:13-20; Plaintiff's Exhibit 108 [TEVA Pharmaceutical Industries Ltd. Form 10-K], p. 195.

35.     Shortly thereafter, on December 14, 2017, Mr. Sabag announced changes in the leadership structure of Human Resources.  12/19/22 N.T., p. 117:9-22.  *See generally* Plaintiff's Exhibit "53" [Global HR Leadership Team Updates].

36.     As part of these changes, Tal Zorman was promoted to Senior Vice President of Integrated Talent Management which combined the area of Leadership and Talent with Total

Rewards.  Plaintiff's Exhibit "53" [Global HR Leadership Team Updates]; 12/21/22 N.T., pp.

42:19-44:9; Sabag T.D. II, pp. 61:24-62:23.

37.     Ron Yaniv was terminated and Ms. Zorman took over his responsibility

overseeing Total Rewards and replaced Mr. Yaniv as Plaintiff's immediate supervisor.  12/19/22

N.T., p. 118:3-11; Sabag T.D. II, p. 62:4-19.

38.     Ms. Zorman was forty-eight (48) years old at the time [DOB: 12/1/69], 12/21/22

N.T., p. 5:1-7.

39.     Mr. Lawlor was also promoted to Head of Human Resources for North America

and became Plaintiff's Matrix Manager.  12/19/22 N.T., p. 118:12-16; Plaintiff's Exhibit "53"

[Global HR Leadership Team Updates].

40.     Mr. Lawlor was younger than Plaintiff as well and was fifty-four (54) [DOB:

11/8/63] at the time.

41.     TEVA thereafter determined it would cut 25% of its entire workforce which Mr.

Sabag and Ms. Zorman now suggested was dire and needed to be completed very quickly

without specifying the need for the hasty action.  Sabag T.D. I, p. 88:2-15; 12/21/22 N.T., p.

48:11-16.

42.      While Mr. Sabag testified at trial for the first time during the pendency of this

case that TEVA was on the brink of bankruptcy thereby requiring an extreme and very fast

restructuring, the exhibits presented and witness testimony are devoid of any evidence of an

impending bankruptcy.  Sabag T.D., pp. 34:16-35:7,  36:13-25; 12/19/22 N.T., pp. 112:18-25;

12/21/22 N.T., pp. 84: 20-24.

**The Reduction In Force Of The Total Rewards Group**

43.     Mr. Sabag set a goal of cutting 25% of the entire workforce and 50% of

employees in support functions such as HR.  Sabag T.D. I, pp. 89:12-90:25.

44.     Accordingly, when Ms. Zorman was placed into her newly created function and charged with oversight of Total Rewards, Ms. Zorman was given the responsibility of restructuring the Total Rewards Group and eliminating 50% of its employees.  Sabag T.D. I., pp. 90:5-25, 102:7-17, 107:4-12; Sabag T.D. II, pp. 62:24-64:16.  *See also* 12/21/22 N.T., p. 16:1-4, 48:9-16; Defendants' Exhibit "23" [Americas Town Hall dated December 14, 2017].

45.     Ms. Zorman, whose primary experience was in the area of learning and developing employees, never had any specific training dealing with benefits and compensation issues for North America.  *Id*; p. 10:1-20.

46.     She also never had any controls over the Total Rewards Group during her career at Teva until she was placed in her new role.  *Id*; p. 20:13-15.

47.     Ms. Zorman admits that she was never previously involved with a reduction in force at TEVA.  *Id*; pp. 47:21-48:2.

48.     In dealing with the restructuring and reduction process for the first time, Ms. Zorman set out to design the new structure of the Total Rewards Group and to select individuals to retain and eliminate.  *Id*; p. 48:9-16.

49.     At the time, Ms. Zorman never directly worked with Plaintiff and, other than meeting at two conferences, she did not have any previous interrelationships with him.  *Id*; p. 11:4 -16.

50.     Ms. Zorman first reached out to Plaintiff on December 13, 2017 to advise him that he had to reduce the Total Rewards staff by 50%.  12/19/22 N.T., pp. 120:2-121:4.

51.     While first suggesting that TEVA should not reduce the Total Rewards Group at that time because of all the work that would need to be done when reducing a large amount of

employees, Plaintiff nevertheless provided Ms. Zorman with three options on how to restructure the Group and reduce staff.  *Id*; pp. 121:14-124:22.  *See generally* Plaintiff's Exhibit "56" [December 15, 2017 email from Plaintiff to Tal Zorman], at Joint Appx 0646; Defendants' Exhibit "28" [Proposed Headcount Reduction for the North American PR Team].

52.     Although in one of the proposals Plaintiff suggested the elimination of his position, Plaintiff was not suggesting that he be eliminated as an employee but envisioned that he would be retained in another position within the group.  12/19/22 N.T., pp. 124:23-125:23.

53.     Other then perhaps asking him a few questions about the proposals, Ms. Zorman and Plaintiff did not have any other meaningful discussions regarding his suggestions.  *Id*; pp. 123:23-124:17.

54.     While Ms. Zorman spoke to Mr. Lawlor more than twenty (20) times after December 15, 2017 regarding the employee reductions, she had no recollection of how many times she spoke about Plaintiff or even if it were once or twice or how long any conversation about Plaintiff with Mr. Lawlor was held.  She also kept no notes of her conversations. 12/21/22 N.T., pp. 28:21-31:25.  *See also* Defendants' Exhibit "30" [December 15, 2017 email from Tal Zorman to Daniel Lawlor regarding Minimal PR Organization for North America].

55.     Ms. Zorman also had no specific recollection of talking to anyone else about the decision regarding Plaintiff.  12/21/22 N.T., pp. 28:21-31:25.

56.     Mr. Lawlor and the Company demonstrated a clear age-related bias during Plaintiff's employment including but not limited to the following:

a.     Mr. Lawlor would not let Plaintiff hire Rose Riciolli ("Riciolli"), an older Compensation Contractor working at TEVA on a contract basis who performed well. 12/19/21 N.T., pp. 150:22-152:24.  In directing Plaintiff to find another candidate, Mr.

10

Lawlor asked if Ms. Riciolli had any long-term potential and whether she could fill Plaintiff's job in the near future.  *Id*; p. 152:4-16.  The term "long-term potential" is a code word used in human resources regarding the age of the candidate and whether the candidate is too old.  *Id*; p. 152:15-19.  Plaintiff confirmed that Mr. Lawlor was concerned about Ms. Riciolli's age and rejected her as a candidate for a permanent position because she did not fit within "the youth-centered culture at TEVA and she was just too old for the job."  12/20/22 N.T., p. 75:1-19.

b.      Mr. Lawlor implemented unannounced changes to TEVA's equity plan which included raising the age for retirement in order for retiring employees to still retain equity shares.  12/19/22 N.T., pp. 154:13-157:12, 175:16-176:19.  *See also* Plaintiff's Exhibit "24" [Email chain regarding Equity Treatment at Qualifying Retirement-Update], pp. Joint Appx. 0625-0628.  Plaintiff complained that the changes to the equity plan were discriminatory because the changes hurt older employees and Mr. Lawlor ignored these concerns.  *Id*; page 157:1-12.

c.      In November 2017 when TEVA was implementing a Supplemental Employment Benefit Plan ("Sub Plan") and determining who would be exempt from applying for unemployment benefits and instead get weekly severance payments as opposed to a lump sum, Mr. Lawlor made the discriminatory comment: "I do not want people age sixty-two (62) or older who were severed to endure the embarrassment and humiliation of having to apply for unemployment insurance.  Those individuals are unemployable.  They should retire because they are not going to find employment…" 12/19/22 N.T., pp. 181:24-184:15.  The Sub Plan implemented favored younger employees and permitted them to enjoy tax savings which advantage was taken away

from older employees.  *Id*; pp. 184:8-185:17.

57.     Recognizing this age bias, Ms. Zorman relied upon Mr. Lawlor and decided to terminate him as the Head of Total Rewards for North America based upon her determination that he was not a "good fit" for the reduced role.  12/21/22 N.T., pp. 31:22-32:10, 64:13-25.

58.     Ms. Zorman confirmed that Mr. Lawlor's views about Mr. Keuch were important in her decision.  *Id*; p. 85:9-11.

59.     Attempting to somehow justify her decision, Ms. Zorman testified that Plaintiff would not be a "good fit" for leading the restructured group because he was experienced and focused on growth as opposed to reducing the scope of work.  She also stated that she wanted to ensure that there was a leader that was more flexible and able to do the work himself.  12/21/22 N.T., p. 64:16-25.

60.     However, given that Ms. Zorman and Plaintiff never even had daily interactions, she had no opportunity to measure Plaintiff's abilities and evaluate his talents in order to make such a determination.  12/19/22 N.T., p. 138:7-13; 12/21/22 N.T., p. 11:13-16.

61.     Ms. Zorman admits that she never reviewed Plaintiff's letter of employment, was not aware that he received a substantial retention bonus due to his value as an employee and did not talk to his direct reports other than Mr. Nasi.  12/21/22 N.T., pp. 12:6-13:11, 21:17-22:20.

62.     Ms. Zorman does not even recall reviewing Mr. Keuch's personnel file.  *Id*; p. 11:17-23.

63.     Ms. Zorman also never reviewed any documentation regarding the roles and responsibilities required of individuals that headed up Total Rewards – Compensation and Benefits.  *Id*; p. 24:6-15.

64.     Ms. Zorman further admits that neither Mr. Lawlor nor Mr. Yaniv ever expressed

any questions regarding Plaintiff's abilities with respect to policy, strategy or performance in the Total Rewards spectrum. *Id*; p. 32:21-25.

65.     While Ms. Zorman suggested during her testimony that the restructured Total Reward Center of Expertise would be more operational, she admitted that the role was designed to encompass both strategic and operational responsibilities. *Id.*; pp. 33:15-34:24. *See generally* Defendants' Exhibit "40" [Global Talent Management – Leadership Structure Update].

66.     Ms. Zorman also conceded that the candidate for the position needed to understand the laws surrounding benefits in the United States in order to carry out the required operational objectives and that Plaintiff did have the knowledge for the position unlike Mr. Nasi. *Id*; pp. 24: 20-24, 34:25-35:3.

67.     More significantly, Plaintiff's experience was not limited to strategic thinking and he handled the daily administration of compensation and benefits as part of his operational responsibilities. 12/19/22 N.T., pp. 66:20-70:4.

68.     At the time he was selected for termination, Plaintiff was the only employee in the Total Rewards area well over the age of 60. *Id*; p. 114:12-14.

69.     TEVA also terminated Daniella LaChey, a Senior Director in her late 40s who was the Head of Human Resource Operations and Services, as part of this reduction and replaced her with Lauren Brenner, a Manager in her mid-20s. 12/19/21 N.T., pp. 153:6-154:12.

70.     In selecting Ms. Brenner, TEVA overlooked Elaine McGee ("McGee"), an Associate Director in her early 50s, as a replacement for Ms. LaChey even though she was more experienced. *Id*; pp. 153:6-154:18.

71.     Like Plaintiff, Mr. Lawlor would have been consulted regarding the termination of the Ms. LaChey. *Id*; p. 154:1-12.

72.     The information disclosed by TEVA pursuant to the Older Workers Benefits

Protection Act regarding the age breakdown of persons terminated in connection with the

reduction in force indicates that thirty-four (34) of the employees not retained were over the age

of 40 and twenty-three (23) of these individuals were between the ages of 50 and 59.

Defendants' Exhibit "3" [Separation Agreement and General Release], at Exhibit "C"

[Information regarding Ages and Job Titles of Employees Selected for Layoff].

73.     Only twenty-three (23) of the individuals selected for layoff were under 40 years.

*Id.*

74.     While twenty-three (23) employees over the age of 40 were retained, none of the

retained individuals were over the age of 60.  *Id.*

75.     Additionally, Plaintiff was not even listed as an employee selected for termination

in the information that was disclosed which prevented employees from knowing that there were

actually thirty-five (35) employees over the age of 40 not retained and that 3 of the employees

were over the age of 60.  *Id.*.  *See also* 12/21/22 N.T., pp. 128:8-129:8.

76.     Unlike other reductions in force at TEVA, there was no process put in place

during the 2017 reduction to assess the effect the reduction would have on older employees,

indicating an desire by TEVA to hide any age bias.  12/21/22 N.T., pp. 123:9-124:23, 199:2-

201:1.

77.      Ms. McGee, an associate director in HR operations at the time who pull the data

to perform such an assessment confirmed :

> **Q:**    Now, in connection with either this lawsuit or generally, the RIF
> that occurred, did you engage in any analytics involving the impact
> of this reduction enforce on age?
>
> **A:**    No.

> **Q:** And have you ever personally reviewed the documentation supplied to individuals in the HR area as to how the RIF impacted people on the basis of their age?
>
> **A:** No.
>
> **Q:** Have you seen analytics previously in that regarding in previous RIFs?
>
> **A:** Previous RIFs?  Yes.
>
> **Q:** … In connection with any of those RIFs where that [was done], were there analytics done to see whether or not there was an impact on the category that we talked about, race or age or ethnicity?
>
> **A:** Yes.

*Id*; pp.199:2-21.

## Mr. Nasi Is Selected To Replace Plaintiff

78.    On or about December 22, 2017, after only speaking with Mr. Nasi on a telephone call the previous day, Ms. Zorman offered him the job of Senior Director of Total Rewards for North America.  12/20/22 N.T., pp. 256:22-257:4, 260:18-261:5.  *See generally* Defendants' Exhibit "9" [Global Talent Management – L3  Structure], pp. TEVA 000636-TEVA 000638.

79.    At the time, Mr. Nasi was the Director of Total Rewards for Latin America and directly reported to Mr. Keuch.  12/20/22 N.T., p. 200:21-201:18.

80.    While the Director of Total Rewards for Latin America, Mr. Nasi was a Grade Level 15.  *Id*; p. 230:8-10.

81.    Mr. Nasi is 27 years younger (DOB July 22, 1980) than Plaintiff and was 37 years old at the time selected to replace Plaintiff.  12/20/22 N.T., pp. 194:1-2, 220:23-25.

82.    Mr. Nasi was less experienced than Plaintiff, did not have any direct reports and had no experience or knowledge regarding compensation and benefits in the United States and

Canada. In fact, Mr. Nasi spent his career managing issues in South America. 12/19/22 N.T., pp. 106:9-12; 138:19-139:14; 12/20/22 N.T., p. 209:12-18; Plaintiff's Exhibit "43" [Eduardo Nasi Compensation and Benefits/Total Rewards Management Positions].

83.    Ms. Zorman knew that Mr. Nasi had no knowledge regarding the benefits in North America.  12/21/22 N.T., p. 24:20-24.

84.    Mr. Sabag, who approved the appointment, also was not aware of whether Mr. Nasi had any knowledge about North America benefits at the time Mr. Nasi was given the role of Head of Total Rewards for U.S. and Canada.  Sabag T.D. II, p. 104.

85.     Ms. Zorman did not have any prior experience working with Mr. Nasi when she selected him for the position and does not even recall reviewing his personnel file.  12/21/22 N.T., pp. 20:13-21:9.

86.    Ms. Zorman spoke to Plaintiff, Mr. Lawlor and a human resource manager in Latin America about Mr. Nasi, but only Plaintiff had a direct reporting relationship with Mr. Nasi.  *Id*; pp. 20:25-21:14.

87.    Plaintiff made Ms. Zorman aware that Mr. Nasi was not qualified for the position of the Head of Total Rewards for North America and that Mr. Nasi needed to develop and gain experience in the area of compensation and benefits for North America.  12/19/22 N.T, p. 139:1-14.

88.    On the other hand, Mr. Lawlor viewed Mr. Nasi as someone with a "future" at TEVA even though he only had a dotted-line relationship with him and supported his selection. 12/21/22 N.T., pp. 104:19-105:5, 139:14-17.

89.    Recognizing Mr. Lawlor's involvement in Ms. Zorman's selection of him for the position, Mr. Nasi specifically thanked Mr. Lawlor for the promotional opportunity.  12/20/22, p.

263:7-15.

90.     Plaintiff was advised on January 2, 2018 that Mr. Nasi would be stepping into his role as the Head of Total Rewards for North America and that his job was eliminated.  12/19/22 N.T., pp. 130:21-131:4; 12/20/22 N.T., pp. 120:12-121:10.

91.     Confirming Mr. Nasi's lack of experience, Ms. Zorman requested that Plaintiff remain at TEVA after he was advised of his termination to help orient him into the role.  12/19/22 N.T., pp. 133:4-9, 135:1-136:23; 12/20/22 N.T. p. 138:3-13.

92.     While he readily would have accepted a reduction in pay to stay employed, Plaintiff was never given the opportunity to accept a demotion and go down a grade level so that he could remain in the position. 12/20/22 N.T., pp. 186:24-187:6.

93.     Again, relying on Mr. Lawlor, Ms. Zorman confirmed that she was not willing to retain Mr. Keuch in a lower position level.  12/21/22 N.T, p.31:10-15, 22-25.

94.     There was no rule at TEVA which would have prohibited an employee from accepting a demotional position.  12/21/22 N.T., pp. 121:19-122:4, 204:3-15.

95.     While infrequently done, Mr. Lawlor also confirmed that there is no broad prohibition on demoting an employee.  12/21/22 N.T., pp. 121:19-122:4.

96.     Ms. Zorman likewise confirmed that TEVA allows grade level demotions in some cases and a reference to demotions was even made in an email regarding Changes in Global Grades due to Restructuring.  12/21/22, N.T., p. 53:3-16.  *See also* Defendants' Exhibit "67" [Email chain regarding Changes in Global Grades due to Restructuring], at TEVA 000881.

97.     At the time Mr. Nasi was promoted, he maintained a salary of $168,000.00 and was a Grade Level 15.  12/20/22 N.T., pp. 205:16-19, 220:25-221:12; 12/21/22 N.T., p. 70:9-16.

98.     However, as quite apparently always intended, in February 2018 just weeks after

Plaintiff's termination was decided, Mr. Nasi was elevated to a Grade Level 16 and given an increase of salary to $199,296.90.  12/20/22 N.T., p. 222:10-25, 12/21/22 N.T., p. 79:8-19.  *See generally* Defendants' Exhibit "58" [Pay letter issued to Mr. Nasi].

99.     Mr. Lawlor was the individual who suggested that Mr. Nasi be promoted to a Grade Level 16.  12/21/22 N.T., p. 79:17-19.

100.     In addition, because he was residing in Miami at the time, TEVA was required to compensate Mr. Nasi for travel from Miami to the Company Headquarters in North Wales, PA between 10 and 12 times including payment for airfare, car rental and reimbursement for meals in the amount of $700.00 to $1,000.00 per trip.  Defendants also paid him to relocate from Miami in an amount of $80,000.00.  12/20/22 N.T., pp. 217:15-220: 19.

101.     Mr. Nasi also continued to receive bonuses, equity, medical benefits and 401K matching as had Plaintiff.  12/20/21 N.T., pp. 202:15-207:15.

102.     With just his increased salary and relocation expenses alone, TEVA spent approximately $289,296.90 on Mr. Nasi without even considering his equity awards and the value of the other benefits he received.  Those expenses together with his raises in salary brought the expense for Mr. Nasi up to over the salary level paid to Plaintiff at the end of his tenure.  12/20/21 N.T., pp. 204:16-206:4, 219:17-25; Defendants' Exhibit "58" [Pay letter issued to Mr. Nasi].

103.     Based upon his experience with compensation and benefits, Mr. Keuch testified that TEVA actually lost money in replacing him with Mr. Nasi and that the future cost savings were minimal.  12/20/21 N.T., pp. 164:10-165:24.

104.     Confirming Plaintiff's testimony, Mr. Nasi is presently earning $237,000.00 per annum in just salary alone and continues to receive medical benefits, bonuses, equity and 401K

matching in 2019, 2020 and 2021.  12/20/22 N.T., pp. 206:5-207:15, 209:1-4.

### Plaintiff's Job Search

105.    Following his termination, Plaintiff reached out to certain of his vendors to advise that he was looking for employment and networked with compensation and benefit professionals. 12/19/21 N.T., p. 187:2-24.

106.    Plaintiff also contacted executive search firms including Tower Consultants, Davis Consulting, ENY Career Network, Koren and Ferry and Willis Towers Watson.  *Id*; pp. 193:22-195:24.

107.    Additionally, Plaintiff applied to Air Gas, Safe Light and approximately 5 or 6 other companies for relevant positions.  *Id*; p. 196:1-17.

108.    While Plaintiff did not hear from any of the companies or he otherwise received a letter stating that the company had a more qualified candidate, Plaintiff still continued to look for work.  *Id*; pp. 196:23-197:3; 12/20/22 N.T., p. 143:1-5.

109.    Ultimately, given his age and skills, Plaintiff decided to stop looking for corporate employment and started a consulting firm in late 2019 to assist turnaround companies and private equity companies in compensation systems.  12/19/22 N.T., p. 197:4-24.

110.    Plaintiff has earned approximately $135,000.00 through his new business.  *Id*; pp. 198:1-199:10.

### Plaintiff's Damages

111.    At the time of his termination, Plaintiff was earning a salary of approximately $285,600.00.  12/20/22 N.T., p. 123:20-22.

112.    With benefits, target bonuses and equity, Plaintiff's total compensation package was valued at $574,832.00.  12/20/22 N.T., pp. 123:20-124:7.  *See also* Defendants' Exhibit "43"

[Total Rewards for Randolph Keuch].

113.    Plaintiff testified that it has been incredibly challenging to find consulting work for compensation system because the benefit laws keep changing and he does not have a staff. *Id*; p. 198:4-12.

114.    When terminated from his employment at TEVA, Plaintiff had no set plan for retirement plan, but realized that he would have to retire at age seventy (70) or older to retire with full benefits due to the changes in the equity plan.  12/20/22 N.T., pp. 67:7-68:24.

115.    Plaintiff had no issues with respect to his health and/or availability that would have prevented him from working until the age of 70 or even 75.  12/19/22 N.T., pp. 282:10-203:14.

116.    The age of seventy (70) would have been the minimum age that Plaintiff could have retired.  *Id*; p. 202:10-15.

117.    Based on Plaintiff's knowledge of compensation issues and total rewards including benefits, Plaintiff did a complete analysis of his economic losses through the age of 70 and through the age of 75.  *Id*; pp. 199:17-201:20.  *See generally*  Plaintiff's Exhibit 115 [Economic Damage Chart Calculation].

118.    Plaintiff's calculations included allocations for salary loss, potential 30-percent bonuses, potential of equity awards, and estimates for medical benefits.  12/19/22 N.T., pp. 200:2-201:17; Plaintiff's Exhibit 115 [ Economic Damage Chart Calculation].

119.    If Plaintiff worked until the age of 70 without a freeze in salary, he would have earned a total of $5.4 million and his earning through age 75 would have equaled $15,285,425. 12/19/22 N.T., p. 201:21-23; Plaintiff's Exhibit 115 [Economic Damage Chart Calculation].

120.    Even if his salary had been frozen pretermination levels, he would have earned

$5.1 million by age 70.  12/19/22 N.T., p. 201:24-25; Plaintiff's Exhibit 115 [Economic Damage Chart Calculation].

121.    If Plaintiff had been required to incur a 10% reduction in salary by a demotion, his total earnings through age 70 would have totaled approximately $4.9 million.  12/19/22 N.T., p. 202:1-2; Plaintiff's Exhibit 115 [Economic Damage Chart Calculation].

122.    Plaintiff has proven that he has reasonably suffered damages for the loss of salary and benefits from the time of his termination of his employment through the time of trial  (less his earnings of $135,000.00 set forth above) in the amount of $3,660,357.  Plaintiff's Exhibit 115 [Economic Damage Chart Calculation].

123.    Plaintiff will continue to suffer a loss of pay and benefits from the time of trial through his intended retirement time at the age of seventy (70) years on May 27, 2024, and will suffer an additional future loss of earnings of $1,710,688.  Plaintiff's Exhibit 115 [Economic Damage Chart Calculation].

124.    Alternatively, if he works until age 75, Plaintiff will reasonably continue to suffer a loss of pay and benefits from the time of trial through his intended retirement time at (75) years on May 27, 2029, and will suffer an additional future loss of earnings of $9,914,245.  Plaintiff's Exhibit 115 [Economic Damage Chart Calculation].

125.    Plaintiff also struggled emotionally having to divulge to professional contacts in the industry and to his friends that was terminated and replaced by one of his direct reports who was 27 years younger.  12/20/22 N.T., p. 172:4-25.

126.    It was a hurtful experience for Plaintiff, and he underwent a series of emotions including anger, denial and eventually acceptance.  12/20/22 N.T., pp. 4:18-5:5.

127.    As a result of Defendants' unlawful discrimination, Plaintiff has suffered

emotional distress, humiliation, mental anguish and the loss of life's pleasures as a result of the loss of his job.  12/20/22 N.T., pp. 4:18-5:5, 172:4-25.

### Willfulness

128.    In its Form 10-K filed with the Securities and Exchange Commission, TEVA recognized that it may have wrongful termination and discrimination claims from employees affected in the workforce which could "significantly increase" its severance costs and the "loss of numerous long-term employees, the loss of institutional knowledge and expertise, the reallocation of certain job responsibilities and the disruption of business continuity, all of which could negatively affect operational efficiencies…."  In fact, the unlawful actions of TEVA informing the expedited and ill-conceived reduction in force affected the proffered results in each category.  Plaintiff's Exhibit "18" [TEVA Pharmaceutical Industries Ltd. Form 10-K], at p. 37.

129.    A December 14, 2017 email chain with Mr. Lawlor foretold of difficulties of the rushed reduction in force plans that "should stand legal scrutiny" which is more an issue in the U.S. where age/race/sex discrimination laws are fairly stringent."  Defendant's Exhibit 25 [Email Chain between Daniel Lawlor and Earl Major], at pp. TEVA 000643 – TEVA 000644.

### CONCLUSIONS OF LAW

1.    The ADEA provides, in relevant part, that "[i]t shall be unlawful for an employer (1) to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1).  *See also* 43 Pa. C.S. § 955(a).[2]

---

[2] Because Plaintiff's age discrimination claims are analyzed under similar legal frameworks and are based upon the same evidence, they must consider together. *See Kelly v. Drexel Univ.*, 94 F.3d 102, 105 (3d Cir. 1996) (discrimination claims under Title VII, the ADA, the ADEA, and the PHRA are interpreted co-extensively).

2.      Because Plaintiff largely relies on circumstantial evidence in this matter, the burden-shifting framework established by *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) applies. *Willis v. UPMC Children's Hosp. of Pittsburgh*, 808 F.3d 638, 644 (3d Cir. 2015).

3.      Under the first step of the *McDonnell Douglas* framework, Plaintiff bears the burden of establishing a *prima facie* case of discrimination. *Burton v. Teleflex Inc.*, 707 F.3d 417, 426 (3d Cir. 2013).

4.      "The elements of a *prima facie* case of age discrimination are that: (1) the plaintiff is at least forty years old; (2) the plaintiff suffered an adverse employment decision; (3) the plaintiff was qualified for the position in question; and (4) the plaintiff was ultimately replaced by another employee who was sufficiently younger so as to support an inference of a discriminatory motive." *Willis*, 808 F.3d at 644.

5.      Plaintiff has presented a *prima facie* case of discrimination.

6.      First, he is nearly 69 years old and was nearly 63 at the time he was discharged.

7.      He was clearly qualified and a productive employee .

8.      He suffered adverse action because he was discharged from his job duties and replaced with a less qualified thirty-seven (37) year old man to perform those duties.

9.      These circumstances are more than sufficient to create an inference of age discrimination.

10.     "[T]he burden of production [then] shifts to the defendant to offer a legitimate non-discriminatory [justification] for the adverse employment action." *Id.* (first alteration added) (quoting *Smith v. City of Allentown*, 589 F.3d 684, 690 (3d Cir. 2009)).

11.     While the employer's burden of proffering a legitimate non-discriminatory reason for its conduct is "relatively light" and "is satisfied if the employer provides evidence, which, if true, would permit a conclusion that it took the adverse employment action for a non-discriminatory reason". *Burton*, 707 F.3d at 426.

12.     "[T]he defendant need not prove that the articulated reason actually motivated its conduct" *Id.* (quoting *Shellenberger v. Summit Bancorp, Inc.*, 318 F.3d 183, 189 (3d Cir. 2003)).

13.     Here, Defendants' utilization of a magician's use of misdirection and a sales person's omission of material facts does not suffice to even sustain that light burden.

14.     Defendants only suggest that the reason Ms. Nasi was chosen for retention and that Plaintiff was not offered the position was because Plaintiff was overqualified for the very job responsibilities that he fulfilled since the inception of his employment and only further stated Ms. Zorman's undefined view that Plaintiff would not be happy in assuming a role that was below his qualifications and one with lesser responsibility.

15.     Defendants' position has no evidentiary basis especially because Plaintiff would have readily accepted a demotion.

16.     Additionally, the Defendants other proffered reason for their actions was that they "were in a dire financial position which necessitated desperate measures".

17.     That justification is not supported by trial record.

18.     However, even if this Court determines that Defendants have satisfied the burden of production, that finding only shifts the burden of proof back to Plaintiff who is then provided "an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by Defendants were not its true reasons, but were a pretext for discrimination." *Burdine*, 450 U.S. at 253; *Josey v. John R. Hollingsworth Corp*, 996 F.2d 632 (3rd Cir. 1993).

19.     To show that Defendant's explanation is pretextual, Plaintiff need not proffer affirmative evidence of discrimination.  *Kautz v. Met-Pro Corp.*, 412 F.3d 463, 467 (3d Cir. 2005).

20.     Instead, Plaintiff must only point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not the determinative cause of the employer's action. *Gross v. FBL Fin. Servs., Inc*., 557 U.S. 167, 177-78 (2009).

21.     Ultimately, Plaintiff must prove his age discrimination claim pursuant to a "but-for" causation which requires him to prove that his age was a determinative factor in Defendants' decision to terminate his employment and replace him with Mr. Nasi.   *Id*. at 177-178.

22.     Although this is a heightened standard, the analysis of Plaintiff's age discrimination shall still proceed under the *McDonnell Douglas* framework which was not altered by *Gross*.  *Palmer v. Britton Industries, Inc.* 662 Fed. Appx. 147, 152 (3d Cir. 2016).

23.     In the present matter, the evidence produced by Plaintiff satisfies both categories of the pretext analysis.

24.     To prove pretext through the first method outlined in *Fuentes*, Plaintiff must show "not merely that the employer's proffered reason was wrong, but that it was so plainly wrong that it cannot have been the employer's real reason." *Keller v. Orix Credit Alliance,* 130 F.3d 1101, 1109 (3d Cir.1997).

25.     In order to satisfy this standard, Plaintiff must "demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy

of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons." *Willis*, 808 F.3d at 644-45 (*citing Fuentes*, 32 F.3d at 765).

26.     Plaintiff is only required to "present evidence contradicting the core facts put forward by Defendants as the legitimate reason for its decision." *Kautz*, 412 F.3d at 467.

27.     Alternatively, if seeking to prove pretext through the second method outlined in *Fuentes* and demonstrate that age was a determinative factor in the employment decision, Plaintiff may show that Defendants had previously discriminated against him, that Defendants discriminated against other persons within his protected class, or that Defendants have treated similarly situated persons not within the protected class more favorably.  *Id.  See also Simpson v. Kay Jewelers, Div. of Sterling, Inc.*, 142 F.3d 639, 644-45 (3d Cir.1998).

28.     Applying these standards to the matter at hand, the primary reason given by Tal Zorman for selecting Mr. Nasi for retention over Plaintiff was that the restructured job involved reduced responsibilities and that Plaintiff was overqualified.

29.     However, this decision was largely motivated by her very brief discussions with Mr. Lawlor who did not supervise either individual and who, through the evidence produced by Plaintiff, was shown to have previously engaged in age bias on several occasions.

30.     Mr. Lawler's influence over Ms. Zorman's decision, coupled with his demonstrated age-discriminatory actions and his discriminatory animus regarding older workers, support a finding that age was the determinative factor for the decision under the "cat's paw" theory of liability.

31.     Under the "cat's paw" theory of liability, an employer will be held liable if those persons exhibiting discriminatory animus influenced or participated in the ultimate decision to terminate, even if those persons were not the formal decision-makers. *McKenna v. City of*

*Philadelphia,* 649 F.3d 171, 177–78 (3d Cir.2011) *cert. denied,* —U.S. —, 132 S.Ct. 1918, 182 L.Ed.2d 773 (2012). ("A 'cat's paw' or 'subordinate bias' theory of liability is 'one in which [the plaintiff seeks] to hold his employer liable for the animus of a non-decisionmaker.' ").

32.      In advancing a cat's paw theory based on alleged discriminatory animus of a non-decisionmaker such as Mr. Lawlor, Plaintiff must only establish (1) the animus of the influencing individual  and (2) whether the influencing individual's animus translated into discrimination actions that caused the decisionmaker - Ms. Zorman - to take the adverse action. *Chase v. Frontier Communications Corporation*,  361 F.Supp.3d 423, 448 (M.D. Pa. 2019) (citing *Thomas v. Berry Plastics Corp.*, 803 F.3d 510, 515 (10th Cir. 2015)).

33.      In *Abramson v. William Paterson College of New Jersey*, 260 F.3d 265 (3d Cir.2001), the Third Circuit applied the "cat's paw" theory in the context of an ADEA and concluded that "a rational jury could find that [the ultimate decision-maker] did not make his decision in a vacuum. *Abramson*,  260 F. 3d at 285-86.  The Abramson Court recognized, "[u]nder our case law, it is sufficient if those exhibiting discriminatory animus influenced or participated in the decision to terminate." *Id*. at 286 (citing *Abrams v. Lightolier Inc.*, 50 F.3d 1204, 1214 (3d Cir.1995) (stating in ADEA case that if plaintiff's supervisor participated in decision to terminate him, even though president of company formally terminated him, evidence of supervisor's age-related animus would be relevant in determining if there was discriminatory motive at play)). *See also Russell v. McKinney Hosp. Venture*, 235 F.3d 219, 226 (5th Cir. 2000)("If the employee can demonstrate that others had influence or leverage over the official decisionmaker ... it is proper to impute their discriminatory attitudes to the formal decisionmaker."); *Santiago-Ramos v. Centennial P.R. Wireless Corp*., 217 F.3d 46, 55 (1st Cir.

2000) (stating that "discriminatory comments . . . made by . . . those in a position to influence the decisionmaker" can be evidence of pretext).

34.    As the Third Circuit in *Roebuck v. Drexel University*, 852 F.2d 715, 727 (3d Cir. 1988) noted, "it is plainly permissible for a jury to conclude that an evaluation at any level, if based on discrimination, influenced the decision-making process and thus allowed discrimination to infect the ultimate decision."

35.    The conclusion that an age discriminatory animus was the determinative factor in Plaintiff's termination and replacing him with Mr. Nasi is further supported by Mr. Sabag's frequent use of the term "future" and the culture at TEVA that Plaintiff testified was  youth-oriented looking to hire and promote younger individuals.

36.    The age breakdown of the employees terminated and retained in connection with the RIF also supports the conclusion that age had a determinative effect.  Twenty-three (23) of the thirty-four (34) individuals laid off were between the ages of 50 and 59 and three individuals (not two as disclosed by Defendants) were over the age of sixty (60).  None of the individuals retained were over the age of sixty (60).

37.    Equally suspicious and casting doubt on Defendants' position that age did not play a role, Defendants never engaged in any analysis to assess the impact the reduction would have on older workers, action which was unprecedented at TEVA.

38.    Additionally, there are weaknesses in the reasons proffered by Defendants for selecting Plaintiff for termination that I reject and find are unworthy of belief.

39.    Specifically, Ms. Zorman had no personal knowledge regarding the professional standing of either Mr. Nasi or Plaintiff, had not reviewed their respective backgrounds and did

not express any ability to judge how they would perform in the challenge-producing arena of a substantial reduction of employees in the United States and Canada.

40.     Her decisions that Mr. Nasi could handle the job without any background or knowledge of American and Canadian law was based on two short discussions with Mr. Lawlor, a Human Resources Manager who had no supervisory relationship with either Mr. Nasi or Plaintiff and who had a noted age bias and is therefore unsupported.

41.     Likewise, given all of the money spent transitioning Mr. Nasi into to this position, there really was no cost-savings in the decision.

42.     The purported concern regarding demoting Plaintiff is also implausible given Ms. Zorman promoted Mr. Nasi and increased his grade level immediately following the Plaintiff's termination.

43.     The evidence also supports that there is no prohibition on such demotions and Plaintiff would have accepted the opportunity to remain at a lower grade level.

44.     Further, the reasons given when produced in the spotlight of Mr. Sabag's overriding goal of planning for the future denotes that he was sending a message that the company's "future success" should be placed in the hands of persons like himself, Ms. Zorman and other employees who are substantially younger than Plaintiff that were in their thirties, forties and fifties.

45.     Ultimately, the issue of pretext is necessarily an issue of fact as well as credibility and intent.  As the court in *Jalil* found, where the Defendant's intent has been seriously called into question, it is within my discretion as the fact finder to resolve the issue of pretext in favor of the Plaintiff.  *Jalil v. Avdel Corp.*, 873 F.2d at 701, 707 (3d Cir. 1989).

46.     Accordingly, I find that:

(A) Plaintiff has sustained his burden of proving a *prima facie* case of

discrimination;

(B) I do not accept Defendants' proffer of a non-discriminatory reason for the

termination of Plaintiff; and

(C) Even if the proffer of a non-discriminatory reason for the termination had

been established, there is sufficient evidence to conclude that the Defendants' proffered reasons

were not their true reasons for the termination of Plaintiff, but were a pretext for age

discrimination and that Plaintiff would not have been terminated but for his age.

47.     I find that Plaintiff has suffered damages as a result of the Defendants

actions.

48.     I find that following his termination Plaintiff has demonstrated that he made

reasonable efforts to seek other employment and did not withdraw from the workforce.

49.     Defendants have the burden of proving a failure to mitigate.  *Booker v. Taylor*

*Milk Company*, 64 F.3d 860, 864 (3d Cir. 1995) (finding that while a plaintiff has a duty to

mitigate damages, the employer has the burden of proving a failure to mitigate).

50.     Defendant can satisfy this burden by demonstrating that "(1) substantially

equivalent work was available, and (2) [the Plaintiff] did not exercise reasonable diligence to

obtain the employment." *Booker*, 64 F. 3d at 864 (citing *Anastasio v. Schering Corp.*, 838 F.2d

701, 708 (3d Cir. 1988)).  Alternatively, they can satisfy this burden by establishing that Plaintiff

withdrew entirely from the employment market.

51.     I find that Defendant has not met its burden to prove a lack of Plaintiffs' efforts to

properly mitigate his damages.

52.     Defendants also have not demonstrated that Plaintiff withdrew from the job market.

53.     In light of the evidence that he has earned $135,000 since the time of his termination from employment, the award I make in Plaintiff's favor for back pay through the time of trial as set forth below will be reduced by the amount.

54.     Since I find that the TEVA Defendants have intentionally discriminated against Plaintiff on the basis of age in terminating his employment, and that Plaintiff has proven that he has reasonably suffered damages for the loss of salary and benefits from the time of his termination of his employment through the time of trial  (less his earnings set forth above) in the amount of $3,660,357,  I award him $3,660,357 in backpay damages.

55.     I find that the actions of the Defendants were in willful violation of the ADEA and award Plaintiff an additional amount equal to the above backpay award set forth above in the amount of $3,660,357.

56.     I also find that Plaintiff will reasonably continue to suffer a loss of pay and benefits from the time of trial through his intended retirement time at the age of seventy (70) years on May 27, 2024, and accordingly award $5,371,045 as future pay.

## OR ALTERNATIVELY

I also find that Plaintiff will reasonably continue to suffer a loss of pay and benefits from the time of trial through his intended retirement time at the age of seventy (75) years on May 27, 2029, and accordingly award $15,285,425 as future pay.

57.     I additionally find that Plaintiff has suffered emotional distress, humiliation, mental anguish and the loss of life's pleasures as a result of the loss of his job and, in accordance with the PHRA, I award him the sum of $ **[TO BE DETERMINED BY THE COURT]**

resulting from Defendants' unlawful discrimination.

Respectfully submitted,

/s/ *Alan B. Epstein*

Alan B. Epstein, Esquire (2346)
Jennifer Myers Chalal, Esquire
SPECTOR, GADON ROSEN VINCI P.C.
1635 Market Street, Seventh Floor
Seven Penn Center
Philadelphia, PA  19103
(215) 241-8832/8817
Attorney for Plaintiff, Aaron Lett

Dated: 2/17/22