## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| RANDOLPH KEUCH, | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Civil No. 2:19-cv-05488-JMG |
| | : | |
| TEVA PHARMACEUTICALS USA, INC., *et al.*, | : | |
| Defendants. | : | |

## MEMORANDUM OPINION

**GALLAGHER, J.**                                                        **August 22, 2023**

### I.  OVERVIEW

After four years of employment at Defendant Teva Pharmaceuticals USA, Inc. ("Teva"), Plaintiff Randolph Keuch's position was eliminated, and his employment terminated. Plaintiff claims Defendant, and their parent company, discriminated against him based on his age in violation of the Age Discrimination in Employment Act ("ADEA") and the Pennsylvania Human Relations Act ("PHRA").  A bench trial was held from December 19, 2022 through December 21, 2022, inclusive.  The parties subsequently filed proposed findings of facts and conclusions of law, *see* ECF Nos. 92 and 93, and on May 4, 2023 presented oral argument.  The following findings of fact and conclusions of law are based upon the evidence presented at trial, the parties' submissions, and the arguments advanced by counsel.

## II.    FINDINGS OF FACT

Upon consideration of the testimony and evidence presented at trial, as well as the submissions of counsel,[1] this Court makes the following findings of fact:

### Parties

1.      Plaintiff was born on May 27, 1954 and at the time of the trial was 68 years old. Trial Transcript Day 1, December 19, 2022 ("Tr. Trans. 1") at 37:10-11.

2.      Plaintiff is married and has eight children.  *Id.* at 36:14-23.

3.      Prior to working at Teva Plaintiff worked as Corporate Director of Strategic Rewards and Director of Pfizer Consumer Group Compensation from 1998-2004; Associate Vice President of Compensation of the P&C Division at the Hartford from 2004-2005; and at the H.J. Heinz Company as the Vice President of Total Rewards from 2005-2013.  Pl. Ex. 15 at TEVA000037-38.  Before this experience Plaintiff spent approximately three years working for SmithKline Beecham.  Tr. Trans. 1 at 43:18-44:1.

4.      Plaintiff was hired by Teva as the Senior Director of Total Rewards  – Americas on December 20, 2013 and began working in the position on January 6, 2014.  Pl. Ex. 16 at TEVA 000047-49.

5.      Plaintiff worked in that role until February 23, 2018.  Trial Transcript Day 2, December 20, 2022 ("Tr. Trans. 2") at 127:19-23.

6.      He was then paid by Teva through March 18, 2023.  *Id.*

7.      At the time he was hired by Teva, Plaintiff was 59 years old.  *Id.* at 6:12-14.

---

[1]      The parties separately filed Proposed Findings of Fact and Conclusions of Law.  *See* ECF Nos. 92 & 93.  The Court's Findings of Fact are substantially derived from the parties' submissions at ECF 92 and 93.

8.    Defendant Teva is the leading generic drug company in the world.  Court Exhibit 4, Transcript of Mark Sabag Deposition, December 8, 2022 ("Sabag Dep. Dec. 8") at 25:5-7.[2]

9.    Teva employs as many as 22,000 people in the United States alone.  Court Exhibit 3, Transcript of Mark Sabag Deposition, December 6, 2022 ("Sabag Dep. Dec. 6") at 73:7-11.

## Plaintiff's Employment at Teva

10.    At that time Plaintiff was hired by Teva, Total Rewards-Americas was comprised of Canada, Latin America and the United States.  Tr. Trans. 1 at 56:8-13; *see* Pl. Ex. 16 at TEVA 000047-49; Def. Ex. 11 at TEVA 000047-49.

11.    Total Rewards is part of Teva's Human Resources Organization and is largely responsible for making sure employees are properly compensated and provided benefits.  Sabag Dep. Dec. 8 at 7:11-21.

12.    In this role, Plaintiff was responsible for designing and overseeing compensation and benefits policy for Teva's employees in the United States, Canada, Mexico and other countries in Latin America where Teva conducted business.  Tr. Trans. 1 at 56:8-13; 65:18-67:4.

13.    There were other regional heads serving in similar roles in Europe, Asia Pacific and Israel.  Tr. Trans. 2 at 17:9-18:10.

---

[2]    The trial depositions of Mr. Sabag took place on December 6, 2022 and December 8, 2022.  Videos and transcripts of the depositions were produced to the Court but were not admitted as exhibits during the bench trial.  "District Courts have broad discretion to reopen the record to take new evidence, which may occur on motion of a party or *sua sponte*." *Bistrian v. Levi*, 448 F. Supp. 3d 454, 483 (E.D. Pa. 2020).  Before re-opening the record to take new evidence, a court must consider "the burden that will be placed on the parties and their witnesses, the undue prejudice that may result from admitting or not admitting the new evidence, and considerations of judicial economy." *Gibson v. Mayor & Council of City of Wilmington*, 355 F.3d 215, 229 (3d Cir. 2004).  Upon consideration of these factors, the will re-open the record *sua sponte* to admit the videos and transcripts from the trial deposition of Mr. Sabag.  Here, both parties have relied on the testimony from these depositions, citing the transcripts in their Proposed Findings of Fact.  See ECF Nos. 92 & 93.  Accordingly, the Court will admit the videos and transcripts as the following exhibits:  the videos from the depositions on December 6th and 8th of 2022 will be admitted as Court Exhibits 1 and 2, respectively.  The transcripts from these depositions will be admitted as Court Exhibits 3 and 4, respectively.

14.     These regional leaders reported directly to the same global head of Total Rewards.  Tr. Trans. 2 at 18:11-24.

15.     At the time Plaintiff was hired, Yonit Landskroner was a vice president of Teva and the head of Global Total Rewards.  Tr. Trans. 2 at 18:11-24; Pl. Ex. 16 at TEVA 000047-49; Def. Ex. 11 at TEVA 000047-49.

16.     During the initial phase of his employment, Plaintiff reported directly to Ms. Landskroner, who was his immediate supervisor, and Leslie Billow who was his Matrix Manager.  Tr. Trans. 1 at 72:6-14, 86:21-87:13; Tr. Trans. 2 at 24:3-15, 32:3-10.

17.     Ms. Billow was the Head of Human Resources for North America and was based out of Pennsylvania. Tr. Trans. 2 at 32:3-10; Trial Transcript Day 3, December 21, 2022 ("Tr. Trans. 3") at 90:10-14.

18.     In 2015, Ms. Landskroner left Teva and was replaced by Ron Yaniv, who became Global Head of Total Rewards and Plaintiff's Direct Supervisor.  Tr. Trans. 1 at 81:25-82:4; Tr. Trans. 2 at 27:8-11.

19.     Mr. Yaniv reported to Mark Sabag, who was Teva's Global Executive Vice President, Human Resources.  Sabag Dep Dec. 6 at 56:9-11, 66:24-67:2.

20.     Plaintiff had the following individuals reporting directly to him: Diane Rohach, who was the Head of Benefits for North America; Miriam Weinstein, who was the Head of Compensation for North America; and Eduardo Nasi, who was the Head of Total Rewards for Latin America.  Tr. Trans. 1 at 106:4-8; Tr. Trans. 2 at 29:19-30:5; Def. Ex. 16 at TEVA000125.

21.     At the time he was hired, Plaintiff's compensation package included a starting base salary of $250,000 per annum, a sign-on bonus of $50,000, eligibility to participate in the TEVA 2014 Bonus Program and consideration for equity compensation awards in the form of

Options and/or Restricted Share Units.  Pl. Ex. 16 at TEVA 000047-49; Def. Ex. 11 at TEVA 000047-49.

22.    The level for the bonus program was thirty percent, which equated to $75,000 of Plaintiff's $250,000 base salary.  Tr. Trans. 2 at 19:7-17.

23.    Plaintiff was also eligible to receive healthcare benefits and vacation time, and to participate in other incentive plans.  Pl. Ex. 16 at TEVA 000047-49; Def. Ex. 11 at TEVA 000047-49.

24.    Plaintiff received merit increases each year he was employed at Teva.  Tr. Trans. 1 at 55:17-21.

25.    In his position, Plaintiff was graded as a Labor Grade 17. Tr. Trans. 1 at 109:11-13; Tr. Trans. 2:22-25.

26.    Teva utilizes a numerical grading system scale to determine the salary range for its employees.  Tr. Trans. 2 at 230:11-14; *see id.* at 151:6-17.

27.    In July 2015, Plaintiff was approached by Air Products and Chemicals, a company located in the Lehigh Valley, regarding a similar position at their company.  *Id.* at 46:22-47:2.

28.    After he participated in several interviews with the company, Plaintiff was offered a position as Global Head, Total Rewards.  *Id.*; Def. Ex. 12 at KEUCH000132-33.  Plaintiff was offered a salary of $290,000 with a signing bonus of $55,000 and a potential retention bonus of $90,000.  Tr. Trans. 2 at 48:3-49:4.

29.    This new role with Air Products would have required Plaintiff to relocate or commute roughly one hour to and from work each day.  Tr. Trans. 2 at 49:13-50:15.

30.    Plaintiff acknowledged several factors weighed against taking the position at Air Products.  These factors included the relocation or increased commute, the potential of living

away from his father-in-law who was elderly, a lack of interest in returning to a global role, and that he would be living further away from his children and grandchildren who lived in Pittsburgh. *Id.* at 49:19-50:17.

31.     After Plaintiff informed Mr. Yaniv about the offer, Teva increased Plaintiff's salary from $257,000 to $280,000 effective August 1, 2015, and provided a retention bonus of $60,000 to be paid in two installments. Tr. Trans. 1 at 82:11-83:16; Tr. Trans. 2 at 56:21-57:18; Def. Ex. 13 at KEUCH000028-29.

32.     Each installment was $30,000 and would be paid so long as Plaintiff remained employed by Teva at two benchmark dates. Def. Ex. 13 at KEUCH000028-29.

33.     The first benchmark date was August 6, 2016 when Plaintiff would be 62 years old, and the second date was August 6, 2017, when he would be 63. *Id.*; Tr. Trans. 2 at 58:22-59:4.

34.     Plaintiff received both of those payments. Tr. Trans. 1 at 83:10-16; Tr. Trans. 2 at 58:22-59:4.

35.     At the time he discussed the Air Products offer with Mr. Yaniv, Plaintiff also discussed the potential of moving from senior director to a vice president at level 18 with Mr. Yaniv. *Id.* at 59:5-8.

36.     Mr. Yaniv was unable to convince Mr. Sabag to make Plaintiff a vice president at labor grade 18 level at that time. *Id.* at 59:16-19.

37.     Plaintiff later received an additional salary increase from $280,000 to $285,6000 on May 23, 2016. Def. Ex. 14.

38.     Plaintiff received positive performance reviews in both 2014 and 2015, wherein he either met or exceeded expectations in several different areas. Pl. Ex. 33.

39.     Plaintiff's performance was also criticized.  Tr. Trans. 3 at 112:18-120:7; Def. Ex. 17.

40.     Daniel Lawlor testified that in 2017 he spoke with Mr. Yaniv regarding Plaintiff's job performance, explaining that Plaintiff often engaged in time consuming analyses that were unnecessary and often missed the crux of issues, Plaintiff would often point fingers at others when given feedback, Plaintiff failed to make adjustments when necessary, and that he sometimes provided too many details and/or updates with a degree of bragging in front of the business of HR community.  *Id.*

41.     Mr. Lawlor based these observations on time spent working with Plaintiff in 2014 and then again in 2017.  Tr. Trans. 3 at 115:12-18.

42.     Mr. Lawlor testified he never had a meeting with Mr. Yaniv and Plaintiff to address these concerns, as Mr. Yaniv's position was terminated through the restructuring.  *Id.* at 120:15-21.

43.     In 2014, Plaintiff hired Mr. Nasi as Director of Total Rewards – Latin America after soliciting him to apply for a position at Teva.  Tr. Trans. 2 at 38:23-39:12, 200:21-201:18, 210:22-211:4, 243:16-19.

44.     Plaintiff had known Mr. Nasi for approximately twenty years at the time at the time Mr. Nasi submitted an application.  *Id.* at 38:4-8.

45.     During his interview, Plaintiff suggested to Mr. Nasi that this could be a growth position, and that if and when he retired Mr. Nasi could be a potential successor.  *Id.* at 40:8-12.

46.     Mr. Nasi testified that after he was hired, he had a conversation with Plaintiff wherein Plaintiff stated he expected to retire in five years.  *Id.* at 237:5-18.  Plaintiff disputed this evidence in his testimony, claiming he never said that he would retire within the next five years.  *Id.* at 40:16-18.

47.     While Mr. Nasi worked under Plaintiff, Plaintiff was grooming him to be his eventual successor, and at one point suggested to Mr. Yaniv that Mr. Nasi be relocated from Miami to Pennsylvania to have more exposure to Plaintiff and his direct reports.  *Id.* at 41:12-42:15.

### Teva's Acquisition of Actavis

48.     In the summer of 2015, Teva announced the $40 billion acquisition of Actavis, which was the generic pharmaceutical division of the Allergan company.  Sabag Dep. Dec. 8 at 24:11-25.

49.     The acquisition was completed in the fall of 2016.  *Id.*

50.     As a result of the acquisition, Teva's workforce increased from approximately 50,000 employees to over 60,000 employees in the fall of 2016.  *Id.* at 25:22-26:3.

51.     In 2016, Plaintiff asked Mr. Yaniv again to have his position regraded for the additional work he performed as a result of Teva's acquisitions and integrations, in particular the acquisition of Actavis.  Tr. Trans. 2 at 61:1-25.

52.     Mr. Yaniv advised Plaintiff that he could not regrade Plaintiff's position to a labor grade 18.  *Id.* at 61:23-25.

53.     At the time of the Actavis acquisition, Teva's stock price was approximately $74 per share.  Sabag Dep. Dec. 8 at 26:4-7.

54.     By the beginning of 2017, Teva executives began to realize the acquisition of Actavis was a poor business decision and that Teva had overpaid for Actavis.  *Id.* at 27:19-21, 28:5-13.

55.     Teva took immediate steps to mitigate the effects of the acquisition.  *Id.* at 28:14-29:4.

56.     Teva fired its then Chief Executive Officer ("CEO") Erez Vigodman and replaced him with an acting CEO.  *Id.*

57.     Next, Teva instituted cost cutting initiatives, which included a hiring freeze, a hold on salary increases, and other measures to reduce the expenses of the organization.  *Id.* at 29:23-30:6.

58.     While these initiatives were implemented to mitigate Teva's financial issues, Mr. Sabag and others believed more drastic measures would need to be taken.  *Id.* at 30:9-30:18.

59.     On October 3, 2017, Mr. Sabag sent an email to Plaintiff and other Human Resource leaders addressing year-end compensation processes and advising that Teva's "pay for performance" approach would remain the same and that annual salary increases with eligibility would be provided.  Pl. Ex. 48.

60.     Mr. Sabag also stated in that email that bonuses for top management and equity compensation might be affected.  *Id.*

61.     Mr. Sabag finished this email with "Together, we can take the organization forward and build an amazing future for our company."[3]  *Id.*

### Kare Schultz Is Hired as CEO

62.     In early 2017, Teva began its search for a new and permanent CEO.  Sabag Dep. Dec. 8 at 31:1-18.

63.     Kare Schultz was announced as the new CEO on November 1, 2017.  *Id.* at 31:13-20.

---

[3] Plaintiff testified that Sabag often used phrases like "entering a new generation," "a new future," and/or "building for the future," which Plaintiff believed reflected Teva's "propensity towards youth" and "the youth culture" seen at Teva in Israel.  Pl. Ex. 48; Tr. Trans. 1 at 89:11-17.

64.     Mr. Schultz had prior experience leading companies in times of distress and in turning around such organizations.  *Id.* at 35:17-36:15.

65.     Prior to the announcement, Mr. Sabag met with Mr. Schultz to discuss an expedited onboarding process given the company's financial situation.  *Id.* at 31:24-32:8.

66.     Mr. Sabag described Teva's financial position and told Mr. Schultz there was an urgency to develop an immediate plan to regain the trust of shareholders, bondholders and employees.  Sabag Dep. Dec. 6 at 78:14-79:9; Sabag Dep. Dec. 8 at 32:15-24, 33:16-34:21.

67.     At the time Mr. Schultz was hired, Teva's stock price had dropped from $74 per share to approximately $11 per share.  Sabag Dep. Dec. 8 at 33:11-25; Sabag Dep. Dec. 6 at 79:10-21.

68.     Analysts and shareholders determined that Teva was holding approximately 40 billion dollars of debt while the company value was approximately 11 billion dollars.  Sabag Dep. Dec. 8 at 33:16-25.

69.     Soon after the announcement of Schultz as CEO, Mr. Schultz fired most of the Teva's then leadership team.  Sabag Dep. Dec. 8 at 37:11-19.

70.     Mr. Sabag and two other senior executives were the only members of the Teva leadership team retained.  *Id.* at 39:8-20.

71.     Mr. Schultz, with the assistance of Mr. Sabag and others, developed a restructuring plan to reduce Teva's expenses by up to $3 billion per year. *Id.* at 41:9-42:14; Sabag Dep. Dec. 6 at 38:6-18.

72.     This plan included reducing capital investments, Teva's manufacturing footprint, and Teva's research and development budget.  Sabag Dep. Dec. 8 at 44:6-17; Sabag Dep. Dec. 6 at 37:20-38:3.

73.     This plan also included closing plants around the world, including Teva's legacy plant in Jerusalem.  Sabag Dep. Dec. 8 at 47:9-48:6, 48:24-49:15.

74.     Teva also sold the land that was to contain their new headquarters in Tel Aviv, which they had purchased the year before.  *Id.* at 46:8-47:5.

75.     The Israeli government opposed the closing of the Jerusalem legacy plant, with the Prime Minister calling a meeting with Mr. Schultz and the Israeli Minister of Economics to try to convince Mr. Schultz to stop the restructuring in Israel.  Sabag Dep Dec. 8 at 48:7-23.

76.     Mr. Schultz informed Mr. Netanyahu, the Prime Minister, that closure of the Jerusalem plant was necessary and that without drastic steps taken Teva would cease to exist.  *Id.*

### Reduction in Force

77.     Mr. Schultz, with Mr. Sabag's input and influence, determined that the remaining one billion dollars per year in savings would need to come from a reduction in the workforce of Teva.  Sabag Dec. 6 at 75:1-8; Sabag Dep. Dec. 8 at 44:1-5; Def. Ex. 22 at TEVA000242-243.

78.     On December 14, 2017, Teva announced the reduction in force ("RIF") would affect at least 25% of Teva's workforce.  Sabag Dep. Dec. 8 at 54:6-16; Def. Ex. 22 at TEVA000242-243.

79.     The RIF contemplated the elimination of 14,000 positions from Teva between 2018 and 2019.  Sabag Dep. Dec. 6 at 91:24-92:11; Def. Ex. 22 at TEVA000242-243; Pl. Ex. 100 at TEVA 000749-000750.

80.     At Teva, the structural layers of management are ordered L-0 through L-5. *Id.* at 53:7-17.

81.     The CEO is considered holds the top management position, which is designated L-0. *Id.*

82.     The next tier of management is referred to as the "L-1" tier and L-1 managers report directly to the CEO.  The next tier of management is referred to as the "L-2" tier.  *Id.*

83.     L-2 managers report to the L-1 leaders.  This pattern continues through the L-5 level.  *Id.*

84.     The RIF began with reductions made by Mr. Schultz to the L-1 tier; the remaining L-1's were then responsible for making reductions to the L-2 tier, followed by reductions to the L-3 tier and so on and so forth.  *See* Sabag Dep. Dec. 6 at 118:2-16; Def. Ex. 21.

85.     The reductions to the L-2 tier were made by the remaining L-1's, and the reductions to the L-3 tier were made by the remaining L-2's and so on until the RIF was completed.  *See id.*

86.     Teva created a timeline for the RIF wherein the majority of the reductions at the L-5 level and above would occur in the six weeks between December 14, 2017 and February 2018.  *See* Def. Ex. 21.

87.     Mr. Sabag, as Global Head of Human Resources, was responsible for making cuts within his own Human Resources organization.  Sabag Dep. Dec. 8 at 58:6-20.

88.     As part of the RIF, support functions, which included HR, had reduction targets of 50%.  *Id.*

89.     At the time, Mr. Sabag had 12 direct reports, and was required to reduce that number to six.  *Id.* at 58:21-25.

90.     Overall, the HR Department at Teva would need to be reduced from approximately 700 employees to approximately 300 employees.  Sabag Dep. Dec. 6 at 72:6-11.

91.     Prior to deciding which employees would remain and who would be dismissed as part of the RIF, Sabag designed a new structure for his organization.  Sabag Dep. Dec. 8 at 59:5-18.

92.     This involved combining several Centers of Expertise ("COE") and consolidating what had previously been the responsibility of managers responsible for their own COE into one unit with a single manager.  *Id.* at 62:12-19.

93.     Sabag previously had direct reports for each of the following COE's: (1) Total Rewards; (2) Talent Acquisition; and (3) Leadership and Development.  *Id.*

94.     As a result of the restructuring, Mr. Sabag combined these three COE's into a single COE referred to as Integrated Talent.  *Id.;* Sabag Dep. Dec. 6  at 100:17-101:6.

95.     On December 14, 2017, Mr. Sabag announced the changes made to the leadership structure of HR.  Tr. Trans. 1 at 117:21-118:2; Pl. Ex. 53.

96.     As part of these changes, Tal Zorman was promoted to Senior Vice President of Integrated Talent Management.  Pl. Ex. 53; Sabag Dep. 6 at 95:12-96:5; Sabag Dep. Dec. 8 at 62:12-19.

97.     Mr. Yaniv, the previous Global Head of Total Rewards and Simon Kelner, the previous Global Head of Talent Acquisition, both had their positions terminated.  Pl. Ex. 53; Sabag Dep. Dec. 8 at 62:1-19.

98.     Ms. Zorman replaced Mr. Yaniv as Plaintiff's supervisor.  Tr. Trans. 1 at 118:3-11; Sabag Dep. Dec. 8 at 62:1-19.

99.     Ms. Zorman was 48 years old at the time.  Tr. Trans. 3 at 5:1-16.

100.     Ms. Zorman did not have any specific training dealing with benefits and compensation issues for North America, nor did she ever have any controls over the Total Rewards Group prior to her promotion.  *Id.* at 10:1-20, 20:13-15.

101.     Mr. Lawlor was promoted to Head of Human Resources for North America and became Plaintiff's Matrix manager.  Tr. Trans. 1 at 118:12-16; Pl. Ex. 53.

102.    Following her selection, Ms. Zorman was given the responsibility of reducing the headcount of the newly consolidated Integrated Talent COE by 50%.  Sabag Dep. Dec. 8 at 62:24-63:10.

103.    This included eliminating 50% of the positions within the Total Rewards group. Tr. Trans. 3 at 16:1-4.

104.    Ms. Zorman was tasked with designing her new organization over the next two to three weeks before submitting the structure to Mr. Sabag for approval, and then making the decisions on nominations.  Tr. Trans. 3 at 48:9-16; Sabag Dep. Dec. 8 at 64:11-65:20.

105.    While Ms. Zorman had been involved in a RIF with a previous employer, she did not have any prior experience with a RIF at Teva.  Tr. Trans. 3 at 47:21-48:8.

106.    Ms. Zorman contacted her regional heads, including Plaintiff, seeking their input on how the design of her new organization could be accomplished.  *Id.* at 49:9-22.

107.    On December 13, 2017, Ms. Zorman contacted Plaintiff by phone and informed him he would need to reduce the Total Rewards staff by 50%.  Tr. Trans. 1 at 120:2-121:4.

108.    Ms. Zorman asked Plaintiff to prepare a presentation outlining how he could meet that reduction.  *Id.*

109.    On December 14, 2017, Plaintiff submitted a PowerPoint presentation with his recommendations via email to Ms. Zorman, Mr. Lawlor and Mr. Yaniv.  Def. Ex. 24 at TEVA000144; Def. Ex. 28 at TEVA000145-170; Tr. Trans. 1 at 121:8-13.

110.    In this presentation, Plaintiff provided three options for how Teva could achieve the 50% reduction in his group.  Def. Ex. 28 at TEVA000150-152; Tr. Trans. 1 at 121:14-124:22.

111.    Two of the proposed options would involve Plaintiff remaining as the Head of Total Rewards – Americas and overseeing a reduced staff.  See Def. Ex. 28 at TEVA000150-152.

112.    One of the options submitted involved cutting leadership roles, including Plaintiff's position.  *Id.* at TEVA000151; Tr. Trans. 1 at 124:23-125:23.

113.    Plaintiff testified that he was not suggesting he be eliminated from the Teva workforce, only that his position could be eliminated.  Tr. Trans. 1 at 124:23-125:23.

114.    In his presentation, Plaintiff also stated that if leadership roles needed to be cut, Diane Rohach was the most valuable leader in Total Rewards, that the remaining staff did not have the expertise to handle benefits for Teva, and that he was "probably the next most valuable leader."  Def. Ex. 28 at TEVA000151.

115.    In his email to Ms. Zorman containing the presentation, Plaintiff encouraged Ms. Zorman to refrain from making any leadership changes during the first quarter of the year as the risks would be very high, and to consult with the legal department as to risk and exposure.  Pl. Ex. 56 at TEVA000050; Tr. Trans. 1 at 125:23-126:23.

116.    Plaintiff indicated this request was not a personal request and was not made out of concern of his position being eliminated.  *Id.*

117.    On December 15, 2017, Ms. Zorman thanked Plaintiff for his proposals.  *Id.*

118.    That same day, Ms. Zorman contacted Mr. Lawlor for his opinion on the proposed structures.  Def. Ex. 30; Tr. Trans. 3 at 28:17-23.

119.    Mr. Lawlor replied that he preferred the structure suggested by Plaintiff wherein the regional head, Plaintiff's position, would be eliminated.  Pl. Ex. 58.

120.    Ms. Zorman elected not to accept Mr. Lawlor's suggestion, as she preferred retaining regional heads.  Tr. Trans. 3 at 60:1-5.

121.    Ms. Zorman would speak to Mr. Lawlor more than 20 times after December 15, 2017 regarding the employee reductions.  Tr. Trans. 3 at 28:24-29:5.

122.    Ms. Zorman could not recall how many times she discussed Plaintiff with Mr. Lawlor, or the length of any conversations with Mr. Lawlor regarding Plaintiff. *Id.* at 28:24-29:18.

123.    Ms. Zorman could not recall whether she took any notes of these conversations. *Id.* at 29:15-18.

124.    Mr. Lawlor testified he recalled having about two conversations with Ms. Zorman regarding Plaintiff and his position in a new restructure, and that each conversation lasted roughly ten minutes each.  *Id.* at 108:15-109:2.

125.    Ms. Zorman submitted her organizational design to Mr. Sabag who then approved the proposal.  Sabag Dep. Dec. 8 at 65:4-8.

126.    Ms. Zorman performed this same task for Total Rewards, Talent Acquisition, and Leadership and Development for each of the geographic regions where these functions existed. Tr. Trans. 3 at 74:5-13.

127.    As a result of the RIF, Ms. Zorman needed to terminate as many as 90% of the individuals who had previously reported to her when she led the COE for Leadership and Development.  *Id.*

128.    Following approval, Ms. Zorman next determined which employees should fill the roles in the *reduced in size* Total Rewards department.  *Id.* at 48:9-16; Sabag Dep. Dec. 8 at 65:12-20.

129.    As part of Teva's overall restructuring, Latin America would no longer be included in the "Americas" Region; instead, Latin America would become part of the "Emerging Markets" Region.  Tr. Trans. 3 at 56:16-21, 57:24-58:3.

130.    This meant that the "Americas" region would be changed to the "North America" region and would include only the United States and Canada.  *Id.*

131.    As a result of this change, the new regional head of North America would be managing fewer employees and would have half the number of direct reports compared against the prior head of Total Rewards, Americas.  *Id.* at 64:16-25.

132.    Ms. Zorman envisioned the new regional head of North America would need to be less strategic and more operational.  *Id.* at 64:16-65:4.

133.    Any Total Rewards strategy would now be handled at the corporate level and not regionally.  *Id.* at 65:11-16.

### Mr. Nasi is Selected As Head of Total Rewards North America

134.    Ms. Zorman identified Eduardo Nasi as a potential candidate to fill the Total Rewards regional head role for North America. (Tr. Trans. 3 at 60:22-61:7).

135.    Mr. Nasi had been discussed as a talent during a Human Resources leadership forum, and Ms. Zorman had met him previously when he had represented Total Rewards for the Americas at a program Ms. Zorman had hosted in Israel. (Tr. Trans. 3 at 60:22-61:7).

136.    At this time, Mr. Nasi was the Director of Total Rewards for Latin America at the Labor Grade 15 level and reported directly to Plaintiff.  Def. Ex. 44 at KEUCH000519; Tr. Trans. 2 at 200:21-201:18, 230:8-10.

137.    As a Labor Grade 15, Mr. Nasi was earning a base salary of $168,896 and his overall compensation package was valued at approximately $325,000.  Def. Ex. 44 at KEUCH000519.

138.    By way of comparison, Plaintiff was a Labor Grade 17 earning a base salary of $285,600 and Mr. Keuch's overall compensation package was valued at approximately $574,000.  Def. Exhibit 43, at KEUCH00014.

139.    Mr. Nasi did not have any specific course work in laws regarding benefits in compensation in the United States and Canada, and he did not have any direct reports at the time. Tr. Trans. 1 at 106:9-12, 138:19-139:14; Tr. Trans. 2 at 209:12-18.

140.    Ms. Zorman knew that Mr. Nasi did not have knowledge regarding benefits in North America.  Tr. Trans. 3 at 24:20-24.

141.    At the time, Ms. Zorman had not worked directly with Mr. Nasi and cannot recall whether she reviewed his personnel file.  *Id.* at 20:13-21:9.

142.    Ms. Zorman called Mr. Nasi on December 21, 2017. (Tr. Trans. 2 at 256:22-25).

143.    During this call, Ms. Zorman discussed Mr. Nasi's career aspirations and the Total Rewards structure for Latin America.  *Id.* at 256:22-257:4.

144.    Plaintiff had emailed Mr. Nasi informing him that Ms. Zorman would be contacting him, and surmising that Ms. Zorman was likely calling because she wanted Mr. Nasi to lead Total Rewards for the Emerging Markets Region.  Def. Ex. 31 at TEVA000608-609.

145.    Ms. Zorman sought input regarding Mr. Nasi from Plaintiff, Mr. Lawlor and Carlos Benitez, who was the Human Resources head for Latin America.  Tr. Trans. 3 at 21:2-8, 65:19-21, 66:4-9, 75:7-9.

146.    Both Mr. Lawlor and Mr. Benitez provided a positive endorsement of Mr. Nasi. *Id.* at 65:19-21, 66:4-9, 75:7-9, 104:19-105:5, 139:14-21.

147.    Plaintiff told Ms. Zorman that Mr. Nasi was not qualified for the position of the Head of Total Rewards for North America and that Mr. Nasi needed to develop and gain experience in the area of compensation and benefits for North America.  Tr. Trans. 1 at 139:1-14.

148.    Ms. Zorman stated that Mr. Lawlor's views about Plaintiff were important in her decision.  Tr. Trans. 3 at 85:9-11.

149.    Ms. Zorman contacted Mr. Nasi on December 22, 2017 and offered him the job as head of Total Rewards, North America.  Tr. Trans. 2 at 211:16-19, 260:19-23.

150.    Ms. Zorman informed Mr. Nasi that neither an increase in salary nor an increase in Labor Grade/ title were components to the job offer.  *Id.* at 234:10-14, 265:5-8.

151.    On December 24, 2017, Mr. Nasi accepted the offer to become Head of Total Rewards for North America.  *Id.* at 264:22-265:4.

152.    On January 2, 2018, Mr. Nasi sent an email to Mr. Lawlor thanking him for his support of his nomination for Total Rewards North America.  *Id.* at 263:7-15; Def. Ex. 42.

153.    Ms. Zorman did not consider Plaintiff to be an appropriate fit for the new role. Tr. Trans. 3 at 64:16-65:10.

154.    The new role would start at the Director level and would be smaller in scope and size compared to the role that Plaintiff had occupied.  *Id.*

155.    Additionally, the new role would have half the number of direct reports and would no longer include Latin America.  *Id.*

156.    Prior to making her decision, Ms. Zorman did not have any interactions with Plaintiff on a regular basis.  *Id.* at 11:13-16.

157.    Ms. Zorman did not review Plaintiff's letter of employment, was not aware that he received a retention bonus after receiving the offer from Air Products, and did not talk to Plaintiff's direct reports other than Mr. Nasi.  *Id.* at 12:6-13:11; 21:17-22:20.

158.    Ms. Zorman does not recall reviewing Plaintiff's personnel file.  *Id.* at 11:17-23.

159.    Ms. Zorman was not willing to retain Plaintiff in a lower position level.  *Id.* at 31:10-15.

160.    While demotions were possible as part of the RIF, they were heavily disfavored. *Id.* at 53:20-54:7; Sabag Dep. Dec. 8 at 96:10-25.

161.     Both Ms. Zorman and Mr. Sabag had negative experiences at prior employers when demotions were utilized during a RIF.  *Id.*

162.     Plaintiff would have accepted a reduction in pay to stay employed, but was never given the opportunity to accept a demotion and move down a grade level in order to stay with Teva.  Tr. Trans. 2 at 186:24-187:6.

163.     There was no rule at Teva against employees accepting a demotion.  Tr. Trans. 3 at 121:19-122:4, 204:3-15.

164.     Teva does allow grade level demotions under certain circumstances.  *Id.* at 53:3-16.

165.     Ms. Zorman believed Plaintiff' strengths in his role as senior director were strategic thinking and developing new initiatives and benefits, neither of which Ms. Zorman thought would be as necessary in the new role.  *Id.* at 64:16-65:10.

166.     Ms. Zorman was also aware that Plaintiff frequently utilized consultants and contractors to facilitate these new initiatives, and that Teva would not have money for consultants moving forward due to budget cuts.  *Id.* at 64:16-65:10; 160:1-12.

167.     In making her decision, Ms. Zorman knew the candidate for the position needed to understand the laws regarding benefits in the United States in order to carry out the required operational objectives and that Plaintiff had this knowledge while Mr. Nasi did not.  *Id.* at 24:20-24; 34:21-35:3.

168.     Plaintiff was advised on January 2, 2018 that Mr. Nasi would be stepping into the new role of Head of Total Rewards for North America, and that Plaintiff's job was eliminated.  Tr. Trans. 1 at 130:21-131:4; Tr. Trans. 2 at 120:12-121:10.

169.    Ms. Zorman requested that Plaintiff remain at Teva to help transition responsibilities to Mr. Nasi.  Tr. Trans. 1 at 132:24-133:6, 135:1-136:23; Tr. Trans. 2 at 138:3-13.

170.    This transition consisted largely of Mr. Keuch introducing Mr. Nasi to various vendors used in Total Rewards.  Tr. Trans. 1 at 135:1-136:23; Tr. Trans. 2 at 272:20-273:11.

171.    Plaintiff's last day in the office was February 23, 2018. Tr. Trans. 2 at 127:19-23.

172.    Teva's year-end process to evaluate an employee's labor grade ranking and compensation is referred to as the "connect process."  *Id.* at 232:12-233:17.

173.    Generally this is the process where promotions and changes to base salary are addressed.  *Id.*

174.    In February 2018, as part of the "connect process," Mr. Nasi was promoted from Labor Grade 15 to Labor Grade 16, and as a result his base salary was increased to approximately $199,000, effective March 26, 2018.  Tr. Trans. 3 at 79:8-19; Tr. Trans. 2 at 205:16-19; Def. Ex. 58.

175.    At the time he started the new role Mr. Nasi was still residing in Miami.  Tr. Trans. 2 at 218:3-9.

176.    Mr. Nasi moved to Basking Ridge, New Jersey approximately six months later. *Id.* at 217:15-18.

177.    During that approximate six-month period, Mr. Nasi traveled to Teva's offices in North Wales, PA approximately twelve times.  *Id.* at 217:19-24.

178.    For each trip, Teva paid the expenses for airfare, car rental and meals in the amount of $700 to $1000.  *Id.* at 220:12-24.

179.    Teva also paid for Mr. Nasi's relocation expenses.  *Id.* at 219:17-25.

180.     Mr. Nasi is currently earning $237,000 per annum in base salary and continues to receive medical benefits, bonuses, equity and 401K matching in 2019, 2020 and 2021.  *Id.* at 206:5-207:15, 209:1-4.

181.     Mr. Nasi remains a labor grade 16.  *Id.* at 230:15-22.

### RIF Terminations

182.     Teva also terminated Daniella LaChey, a senior director in her late 40's who was the Head of Human Resource Operations and Services and replaced her with Lauren Brenner, a manager in her mid-20's.  *Id.* at 153:6-154:12.

183.     The information disclosed by Teva pursuant to the Older Workers Benefits Protection Act regarding the age breakdown of persons terminated in connection with the RIF indicates that thirty-four (34) of the employees not retained were over the age of 40, twenty three (23) of these individuals were between the ages of 50 and 59, and two of these individuals were 60 years old.  Def. Ex. 3 (Ex.C).

184.     23 of the individuals selected for termination were under 40 years old.  *Id.*

185.     There were 46 individuals retained: 15 of these individuals were over the age of 50, five were between the ages of 40 and 49, and the rest were under the age of 40.  *Id.*

186.     None of the individuals retained were 60 years or older.  *Id.*

### Changes to the Rule of 70

187.     Teva's 2010 equity plan included what was sometimes referred to as the "Rule of 70."  Tr. Trans. 2. at 62:1-25.

188.     Under this rule, employees could continue vesting in equity they had received ever after they had left Teva's employment.  *Id.*

189.    The Rule of 70 stated that if an employee's age and years of service added up to 70, the company would allow an employee's stock to continue vesting even after the employee no longer worked for the company.  *Id.*; Sabag Dep. Dec. 8 at 18:12-24.

190.    Teva performed a benchmarking exercise to determine if this benefit was common in the industry.  Sabag Dep. Dec. 8 at 19:15-20:18.

191.    Through this process they learned the benefit it was offering was not in alignment with the industry.  *Id.*

192.    Teva learned that other companies generally did not permit employees to continue vesting after their separation from employment when the separation was voluntary rather than involuntary.  *Id.*

193.    As a result, Teva first modified the Rule of 70 to apply only to those situations where a departing employee was involuntarily separated from Teva and not for employees who voluntarily left.  *Id.* at 20:19-21:10.

194.    Contemporaneous with this change, Teva added a secondary criteria consistent with other companies that required an employee to have a combination of at least 15 years of service and 55 years of age to be eligible to continue vesting after separation of employment.  *Id.*

195.    Teva later modified the rule again and reduced the 15 years of service to 10 years of service if the employee was terminated after he or she had attained the age of 65.  *Id.* at 22:1-12.

196.    Changes to corporate benefit plans such as Teva's equity plan required approval from Teva's Board of Directors.  *Id.* at 19:2-9.

197.    Neither Ms. Zorman or Mr. Lawlor had any role or involvement with the changes made to the Rule of 70.  Tr. Trans. 2 at 70:11-16; Tr. Trans. 3 at 153:18-25.

198.    The Qualified Retirement Policy was also adjusted.  Pl. Ex. 24 at KEUCH000089.

199.     Under these changes, which were approved in September 2015, the definition of "Qualifying Retirement" was changed from at least 65 years old and at least five years of service to at least 65 years old and at least ten years of service.  *Id.*; Tr. Trans. 1 at 155:15-19; Tr. Trans. 2 at 68:19-24.

200.     In meetings with Ms. Billows in which Mr. Lawlor was present, Plaintiff complained that the changes to the equity plan were discriminatory because the changes hurt older employees.  Tr. Trans. 1 at 157:1-12.

201.     Plaintiff also raised these issues with his manager at the time, Mr. Yaniv.  *Id.*

202.     Plaintiff observed that Mr. Lawlor was silent on the issue.  *Id.*

203.     Plaintiff thought it was strange that Mr. Lawlor did not at least raise concerns regarding the impact of the changes.  *Id.*

204.     Because of these changes, Plaintiff would not be able to retire until he reached age 70, had his employment continued at Teva.  Tr. Trans. 2 at 67:11-14.

205.     These changes were decided in 2015 and later.  Tr. Trans. 1 at 155:6-19; Tr. Trans. 2: 70:21-71:11; Tr. Trans. 3 at 153:9-17; Pl. Ex. 24 at KEUCH000089.

### Teva's Severance Plan

206.     Historically, Teva's severance plan was not a qualified plan under IRS guidelines. Tr. Trans. 3 at 144:3-4, 146:13-15.

207.     In 2017, Teva discovered there could be tax and other financial incentives if it converted its severance plan into a qualified plan.  *Id.* at 144:15-145:4.

208.     By converting to a qualified plan, Teva could use state unemployment benefits to help fund Teva's severance payments, thereby reducing the severance payments Teva was obligated to pay by the amount the separated employee would collect through state unemployment benefits.  *Id.* at 144:16-145:24, 146:19-147:21.

24

209.     To receive benefits under the qualified plan, the departed employee would need to apply for state unemployment benefits. *Id.* at 146:19-147:21.

210.     As a result, an issue was raised regarding how the plan should treat individuals who were being separated if the employee was not otherwise eligible for unemployment benefits. *Id.* at 146:19-148:10.

211.     Plaintiff expressed the view that if people were not going to go back to work, then they did not need severance because severance was designed to hold an individual over from one job to the next. *Id.* at 148:16-149:2.

212.     Mr. Lawlor wanted an exception made to the qualified plan for those individuals who did not intend to return to the workforce so they could receive severance benefits. *Id.* at 149:2-150:20.

213.     Because it was an IRS qualified plan, any exceptions to the plan needed to be clearly defined by rule. *Id.* at 149:5-12.

214.     Mr. Lawlor expressed that a clear rule would be that if an employee was let go and over the age of 62, he or she would not have to apply for unemployment in order to receive severance benefits. *Id.* at 149:13-150:20.

215.     Mr. Lawlor selected the age of 62 because that is when an individual is eligible for social security benefits, and, based on Teva historical data, 62 was the age when individuals at Teva began to retire. *Id.* at 149:13-150:20.

216.     Additionally, if the employee was under the age of 62 and did not want to return to the workforce, he or she could sign an attestation and still receive severance benefits. *Id.* at 151:4-17.

217.     Plaintiff testified that in November 2017, as Teva was implementing the plan, Mr. Lawlor made the statement: "I do not want people age sixty-two or older who were severed to

endure the embarrassment and humiliation of having to apply for unemployment insurance. Those individuals are unemployable.  They should retire because they are not going to find employment."  Tr. Trans. 1 at 181:24-185:17.

218.    In his testimony Mr. Lawlor denied stating that employees over the age of 62 were unemployable and should retire.  Tr. Trans. 3 at 152:13-16.

### Rose Riccioli

219.    Rose Riccioli was a Compensation Contractor working at Teva on a contract basis.  *Id.* at 150:22-151:3; Tr. Trans. 3 at 96:14-22.

220.    In 2017, Plaintiff expressed an interest to Mr. Lawlor that the organization should hire Ms. Riccioli as an employee.  Tr. Trans. 1 at 151:7-18; Tr. Trans. 3 at 96:23-97:13.

221.    Mr. Lawlor explained to Plaintiff that Mr. Lawlor had received some negative feedback regarding Ms. Riccioli from other team members.  Tr. Trans. 3 at 98:11-17.

222.    Mr. Lawlor encouraged Plaintiff to speak with these individuals who had the negative feedback.  *Id.*

223.    During this process, Mr. Lawlor asked Plaintiff if Ms. Riccioli had any long-term potential and whether she could fill Plaintiff's job in the near future.  Tr. Trans. 1 at 152:4-16.

224.    Mr. Lawlor instructed Plaintiff to find a different candidate for the position.  *Id.* at 152:22-24.

225.    Mr. Lawlor did not hire Ms. Riccioli, and no one filled that role.  Tr. Trans. 2 at 76:8-9, Tr. Trans. 3 at 99:18-24.

## III.   DISCUSSION

### a.   Legal Analysis

Plaintiff has brought age discrimination claims under the ADEA[4] and the PHRA.[5]

Under the ADEA, the plaintiff has the burden of establishing a *prima facie* case of

discrimination.  *See Burton v. Teleflex Inc.,* 707 F.3d 417, 426-27 (3d Cir. 2013).  To satisfy a

*prima facie* case under the ADEA, a plaintiff must show: (1) they are a member of a protected

class (forty years of age or older); (2) who was discharged; (3) they were qualified for the job at

issue; and (4) the employer filled the position with a person who was sufficiently younger to

create an inference of age discrimination. *Narin v. Lower Merion Township Sch. Dist.*, 206 F.3d

323, 331 (3d Cir. 2000).  Satisfying the *prima facie* case creates an inference of unlawful

discrimination. *See Lackey v. Heart of Lancaster Reg'l Med. Ctr.,* 704 Fed. Appx. 41, 45-46 (3d

Cir. 2017).

---

[4]      The ADEA provides, in pertinent part, that "[it] shall be unlawful for an employer (1) to
fail or refuse to hire or to discharge any individual or otherwise discriminate against any
individual with respect to his compensation, terms, conditions, or privileges of employment
because of such individual's age." 29 U.S.C. § 623(a)(1).

[5]      Plaintiff brings identical claims under ADEA and its state counterpart the PHRA. These
claims are closely related and will be analyzed concurrently. Resolution of Plaintiff's ADEA claim
also resolves his PHRA claim. *See e.g. Isley v. Aker Philadelphia Shipyard, Inc.*, 275 F. Supp. 3d
620, 626 n.6 (E.D. Pa. 2017); *Taylor v. Phoenixville Sch. Dist.,* 184 F.3d 296, 306 (3d Cir. 1999)
(citing *Kelly v. Drexel Univ.*, 94 F.3d 102, 105 (3d Cir. 1996)) (discrimination claims under Title
VII, the ADA, the ADEA, and the PHRA are interpreted co-extensively); *Ngai v. Urban Outfitters,
Inc.,* No. 19-1480, 2021 WL 1175155, at *7 (E.D. Pa. March 29, 2021) ("Because such claims
[ADEA, PHRA, and PFPO] are analyzed under similar legal frameworks, they will be considered
together as appropriate."); *Fogleman v. Mercy Hosp., Inc*., 283 F.3d 561, 567 (3d Cir.
2002) (precedent interpreting Title VII, ADEA, and/or PHRA is equally relevant to interpretation
of each statute); *Jones v. Sch. Dist. of Philadelphia*, 198 F.3d 403, 409 (3d Cir. 1999) ("We do not
distinguish between the claims under federal and Pennsylvania law in our disposition of the case
as...the standards are the same for purposes of determining the summary judgment motion.").

If the plaintiff succeeds, the burden shifts to the defendant to provide evidence of a legitimate nondiscriminatory reason for the adverse employment decision. *Smith v. City of Allentown,* 589 F.3d 684, 690 (3d Cir. 2009). This "relatively light" burden is met by introducing evidence "which, if true, would permit a conclusion that it took the adverse employment action for a non-discriminatory reason." *Burton*, 707 F.3d at 426 (citations omitted). Once the defendant meets that burden, the plaintiff must demonstrate that the defendant's proffered reason was a pretext for discrimination. *McDonnell Douglas Corp.,* 411 U.S. at 804; *see Willis v. UPMC Children's Hosp. of Pittsburgh*, 808 F.3d 638, 644 (3d Cir. 2015) (citing *Burton,* 707 F.3d at 426-427); *see also Smith,* 589 F. 3d at 691 (affirming that *McDonnell Douglas* applies in ADEA cases involving indirect evidence).

Plaintiff has met his burden for the first prong of the *McDonnell-Douglas* framework. First, Plaintiff was 59 at the time he was hired, and was 63 at the time of his dismissal. Pl. Ex. 16; Tr. Trans. 1 at 37:10-11, 130:21-131:4; Tr. Trans. 2 at 120:12-121:10, 127:19-23. Second, he was terminated from his position at Teva. *See* Tr. Trans. 1 at 130:21-131:4; Tr. Trans. 2 at 120:12-121:10, 127:19-23. Third, he was qualified for the position. Plaintiff had worked in several similar roles prior to working as the Senior Director of Total Rewards (Compensation and Benefits) – Americas at Teva. These roles included Corporate Director of Strategic Rewards and Director of Pfizer Consumer Group Compensation from 1998-2004; Associate Vice President of Compensation of the P&C Division at the Hartford from 2004-2005; and at the H.J. Heinz Company as the Vice President of Total Rewards from 2005-2013. Pl. Ex. 15 at TEVA000037-38. Plaintiff also spent approximately three years working for SmithKline Beecham. Tr. Trans. 1 at 43:18-44:1. Finally, Plaintiff, who was 63 years old at the time of his dismissal, was replaced by Mr. Nasi, who was 37 years old at the time.

As Plaintiff established a prima facie case of age discrimination, the burden shifts to Defendants to produce "sufficient evidence to support a nondiscriminatory explanation for its decision." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000). This "relatively light" burden is met by introducing evidence "which, if true, would permit a conclusion that it took the adverse employment action for a non-discriminatory reason." *Burton*, 707 F.3d at 426 (citations omitted).

The evidence presented established several nondiscriminatory reasons for retaining Mr. Nasi and selecting him for the Senior Director position over Plaintiff. Ultimately, Ms. Zorman selected Mr. Nasi for the position and Mr. Sabag quickly approved her decision. Tr. Trans. 3 at 69:3-70:18; Def. Ex. 32. Ms. Zorman traveled from Israel to testify in person at the trial. Tr. Trans. 3 at 4:24-25, 6:6-7, 41:20-21. The Court found her testimony to be credible and persuasive. She testified that she and others at Teva believed Mr. Nasi could handle the new role. Mr. Nasi had been discussed as a talent during a Human Resources leadership forum, and Ms. Zorman had met him previously when he had represented Total Rewards for the Americas at a program that Ms. Zorman had hosted in Israel. Tr. Trans. 3 at 60:22-61:7. And at the time, Mr. Nasi was the Director of Total Rewards for Latin America at the Labor Grade 15 level. Def. Ex. 44 at KEUCH000519; Tr. Trans. 2 at 200:21-201:18, 230:8-10. She also sought input from Mr. Lawlor and Carlos Benitez, the head of Human Resources from Latin America, both of whom endorsed Mr. Nasi. Tr. Trans. 3 at 65:19-21, 66:4-9, 75:7-9.

The evidence also showed Plaintiff also believed Mr. Nasi could perform in a similar role. Prior to hiring Mr. Nasi, Plaintiff had known him for approximately 20 years. Tr. Trans. 2 at 38:4-8. During his interview with Mr. Nasi, Plaintiff suggested that this could be a growth position, and that if and when he retired Mr. Nasi could be a potential successor. *Id.* at 40:8-12. While Mr. Nasi worked under Plaintiff, Plaintiff was grooming him to be his eventual successor,

at one point suggested to Mr. Yaniv that Mr. Nasi be relocated from Miami to Pennsylvania to have more exposure to Plaintiff and his direct reports.  *Id.* at 41:12-42:15.  Later, as Ms. Zorman was nominating individuals to serve the various roles in the newly restructured organization, Plaintiff stated in an email to Mr. Nasi dated December 21, 2017 that Mr. Nasi was likely being considered to lead Total Rewards for the Emerging Markets Region.  Def. Ex. 31.

There was also evidence presented that the salary differential between Plaintiff and Mr. Nasi played a role in the retention decision.  At the time of Mr. Nasi's retention, he was earning a base salary of $168,896, and his overall compensation package was approximately $325,000. Def. Ex. 44.  Plaintiff's base salary at the time was $285,600, and his total compensation was valued at approximately $574,000.  Def. Ex. 43.  But as discussed below, there was also evidence presented that showed this the gap between their compensation packages was not so wide once the relocation expenses, frequent trips from Miami to Pennsylvania, and Mr. Nasi's raise he received one month after being on the job were considered.

Additionally, the scope of the new role would be different from Plaintiff's role as Senior Director of Total Rewards  – Americas.  Ms. Zorman testified that the new position would be more operational and less strategic.  *Id.* at 64:16-65:4.  Because the new role would not include Latin America, the new regional head of North America would be managing fewer employees and would have half the number of direct reports compared against the prior head of Total Rewards, Americas.  *Id.* at 64:16-25.  Ms. Zorman testified she was also looking for someone who was flexible and could "roll the sleeves and do a lot of the work himself."  *Id.*  When asked to clarify, she stated the person she envisioned in that role would not rely on consultants on a frequent basis and would work closely with the team and not just manage the team.  *Id.* at 65:1-4. Ms. Zorman and Mr. Lawlor were aware that Plaintiff frequently utilized consultants for his

team, and that Teva would not have money for consultants moving forward due to cost cutting measures.  *Id.* at 65:5-10; 160:1-12.

Because behind all of this was Teva's financial condition.  At the time Mr. Schultz was hired as the CEO, Teva found itself in a precarious financial position.  After its acquisition of Actavis, Teva's senior leadership realized they overpaid for Actavis.  Sabag Dep. Dec. 8 at 28:6-13.  Teva's stock price had gone from 74 dollars per share at the time of the Actavis acquisition to 11 dollars per share at the time Mr. Schultz was hired.  *Id.* at 33:8-25, 82:17-20, 83:5-17.  Following the announcement of Mr. Schultz as CEO, Teva began to institute several measures to reduce expenses to get the company back into a positive cash position.  Sabag Dep. Dec. 6 at 38:6-18; Sabag Dep. Dec. 8 at 41:9-42:14.  These measures included a restructuring as well as reductions in capital investments, Teva's manufacturing footprint, and the company's research and development budget.  Sabag Dep. Dec. 8 at 44:6-17.  Teva also closed several plants around the world, including the company's legacy plant in Jerusalem.  *Id.* at 47:10-16.  This was the largest Teva plant at the time.  *Id.* at 48:4-6.  Israeli Prime Minister Netanyahu met with Mr. Schultz and the Israeli Economic Minister in an attempt to convince Teva not to close the legacy plant.  *Id.* at 48:6-23.  Despite this intervention, Teva continued with their plans.  *Id.*  These measures were expected to save Teva approximately two billion dollars each year.  *Id.* at 44:6-17.

In addition to the two billion in savings, the RIF was expected to save the company one billion dollars each year.  Sabag Dep. Dec. 6 at 75:1-8; Sabag Dep. Dec. 8 at 44:1-5; Def. Ex. 22.  On December 14, 2017 the company announced the RIF would effect approximately 25 percent of Teva's workforce.  Sabag Dep. Dec. 8 at 54:10-16.  The RIF contemplated the elimination of 14,000 positions from Teva between 2018 and 2019.  Def. Ex. 22 at TEVA000242-243; Pl. Ex. 100 at TEVA 000749-000750.  Some of these reductions would be made at the highest levels.

31

Sabag Dep. Dec. 6 at 118:2-16; Def. Ex. 21.  In fact, when Mr. Schultz took over as CEO, he

fired most of Teva's then leadership team, retaining Mr. Sabag and just two others. Sabag Dep.

Dec. 8 at 37:11-19, 39:8-20.

These cuts deeply impacted the Total Rewards team.  Ms. Zorman was tasked with

redesigning her newly consolidated COE by 50%, which required eliminating 50% of the

positions in the Total Rewards group.  *Id.* at 62:24-63:10; Tr. Trans. 3 at 16:1-5.  When asked to

prepare a presentation on how to reduce the Total Rewards staff by 50%, Plaintiff provided three

different scenarios, one of which included the elimination of his position.  Def. Ex. 28 at

TEVA000150-152; Tr. Trans. 1 at 124:23-125:23. And as described above, Ms. Zorman ended

up selecting Mr. Nasi for the new director position.  In total, the RIF ended up affecting

approximately 15,000 employees.  Sabag Dep. Dec. 8 at 103:4-17.

This evidence discussed above is sufficient to "support a nondiscriminatory explanation

for [Teva's] decision" to retain Mr. Nasi and terminate Plaintiff's position.  *Reeves*, 530 U.S. at

143.

As the evidence has established a "nondiscriminatory explanation" for Teva's decision,

Plaintiff "must point to some evidence, direct or circumstantial, from which a factfinder could

reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that

an invidious discriminatory reason was more likely than not a motivating or determinative cause

of the employer's actions." *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994); *see also*

*McErlain v. SPS Techs.*, No. 17-3034, 2019 WL 356541, at *11 (E.D. Pa. Jan. 29, 2019) ("The

plaintiff can prove pretext by submitting evidence that either casts doubt on the employer's

justification or shows that discrimination was more likely than not a 'but for' cause of the

employment action." (citation omitted)).

"In order to raise sufficient disbelief, the evidence must indicate 'such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons' to satisfy the factfinder that the employer's actions could not have been for nondiscriminatory reasons." *Willis*, 808 F.3d at 644–45 (quoting *Fuentes*, 32 F.3d at 765). In other words, a plaintiff "may satisfy this standard by demonstrating, through admissible evidence, that the employer's articulated reason was not merely wrong, but that it was so plainly wrong that it cannot have been the employer's real reason." *DeCicco v. Mid-Atl. Healthcare, LLC*, 275 F. Supp. 3d 546, 557 (E.D. Pa. 2017) (quoting *Jones*, 198 F.3d at 413).

Plaintiff points to Ms. Zorman's testimony that Plaintiff was overqualified for the new position.  Plaintiff testified that he would have accepted demotion to stay with the company. Defendants contend Plaintiff was not considered to be a good candidate for demotion.  *See* Tr. Trans. 2 at 61:1-25.  While there was no specific rule against demotions, they were heavily disfavored by Mr. Sabag and Ms. Zorman.  Tr. Trans. 3 at 53:20-54:7; Sabag Dep. Dec. 8 at 96:10-25.  Ms. Zorman had a negative experience with demotions in her prior role at Intel and also at Teva.  Tr. Trans. 3 at 53:24-54:1.  Moreover, given Plaintiff's prior requests to have his position regraded to vice president at the Labor Grade 18 role, it was believed Plaintiff had higher aspirations.  *See* Tr. Trans. 2 at 61:1-25.

Plaintiff also points to Lawlor's influence over Zorman's decision as part of the cat's paw theory of liability.  Under this theory of liability, "an employer may be liable for employment discrimination if the source of illegal animus was not the final employment decision-maker but rather another employee whose animus proximately caused the adverse employment action at issue in the case." *Mason v. Se. Pa. Transp. Auth.*, 134 F. Supp. 3d 868, 874 (E.D. Pa. 2015) (citing *McKenna v. City of Phila.*, 649 F.3d 171, 178 (3d Cir. 2011)).

Plaintiff brings this theory on account of Mr. Lawlor and his involvement in the decision to retain Mr. Nasi over Plaintiff. To succeed on this theory, Plaintiff must show the animus of Mr. Lawlor, and, whether his animus proximately caused the dismissal of Plaintiff. *See id.* With respect to the animus of Mr. Lawlor, Plaintiff cites several instances where Mr. Lawlor acted with animus towards older workers. Mr. Lawlor would not let Plaintiff hire Ms. Riccioli, an older worker who was a compensation contractor working at Teva on a contract basis. Tr. Trans. 1, at 150:22-152:24. Mr. Lawlor instructed Plaintiff to find another candidate, and asked Plaintiff if Ms. Riccioli had any "long-term potential" and whether she could be considered to fill Plaintiff's position in the near future. *Id.* at 152:4-21.

Plaintiff also points to Mr. Lawlor's implementation of unannounced changes to Teva's equity plan that affected older workers. This was in regard to changes to what was once called the Rule of 70 and the "Qualified Retirement Policy." Upon learning the benefits they were offering were not in alignment with the industry, Teva first modified the Rule of 70 to apply only to those situations where a departing employee was involuntarily separated from Teva and not for employees who voluntarily left. Sabag Dep. Dec. 8 at 19:15-20:18, 20:19-21:10. Contemporaneous with this change, Teva added a secondary criteria consistent with other companies that required an employee to have at least 15 years of service and 55 years of age to be eligible to continue vesting after separation of employment. *Id.* at 20:19-21:10. Teva later modified the rule again and reduced the 15 years of service to 10 years of service if the employee was terminated after he or she had attained the age of 65. *Id.* at 22:1-12. Additionally, the definition of "Qualifying Retirement" was changed from at least 65 years old and at least five years of service to at least 65 years old and at least ten years of service. Pl. Ex. 24 at KEUCH000089; Tr. Trans. 1 at 155:15-19; Tr. Trans. 2 at 68:19-24. But Mr. Lawlor played no role in these changes. Tr. Trans. 2 at 70:11-20; Tr. Trans. 3 at 153:18-22. These changes, as any

change to Teva's corporate benefit plan, required approval from the Teva board of directors.

Sabag Dep. Dec. 8 at 19:2-9.  And Plaintiff's evidence as to Mr. Lawlor's involvement in these

changes was that he was silent on the changes being made and did not take a position on it.  Tr.

Trans. 1 at 154:13-157:12.  Additionally, these changes were decided in 2015 and later.  Tr.

Trans. 1 at 155:6-19; Tr. Trans. 2: 70:21-71:11; Tr. Trans. 3 at 153:9-17; Pl. Ex. 24 at

KEUCH000089.  It should be noted that in August 2015, when Plaintiff was 61 years of age,

Teva increased Plaintiff's salary and provided him a retention bonus to be paid in two

installments in 2016 and 2017 following Plaintiff's offer from Air Products.  Tr. Trans. 1 at

82:11-83:16.  Plaintiff received both installment payments.  Tr. Trans. 1 at 83:10-16; Tr. Trans. 2

at 58:1-3, 22-25; 59:1-4.

Plaintiff also points to Mr. Lawlor's statements regarding Teva's severance plan.

Plaintiff testified that Mr. Lawlor stated: "I do not want people age sixty-two or older who were

severed to endure the embarrassment and humiliation of having to apply for unemployment

insurance.  Those individuals are unemployable. They should retire because they are not going to

find employment." Tr. Trans. 1 at 181:24-185:17.  In his testimony Mr. Lawlor denied stating

that employees over the age of 62 were unemployable and should retire.  Tr. Trans. 3 at 152:13-

16.  Additionally, Mr. Lawlor's position was that an employee over the age of 62 who was

dismissed should not have to apply for unemployment in order to receive severance benefits.  *Id.*

at 149:13-150:20.  He selected the age of 62 because based on data that was the age when Teva

employees began to retire.  *Id.* at 149:13-150:20.

Based on the evidence described, Plaintiff fails to show that Mr. Lawlor had an animus

towards older workers.  Mr. Lawlor testified credibly that there were legitimate, non-age related

reasons for not hiring Ms. Riccioli, he played no role in the changes to the equity plan, he denies

making comments about the employability of older workers, and his purpose for changing the severance plan was to benefit older workers.

But even if Plaintiff had demonstrated animus on the part of Mr. Lawlor, he did not establish such animus proximately caused the dismissal of Plaintiff.  Ms. Zorman testified that she spoke with Mr. Lawlor approximately 20 times while working on the restructuring of her team.  Tr. Trans. 3 at 28:24-29:7.  Ms. Zorman could not recall how many times she discussed Plaintiff with Mr. Lawlor, or the length of any conversations with Mr. Lawlor regarding Plaintiff. *Id.* at 28:24-29:18.  Mr. Lawlor testified he recalled having about two conversations with Ms. Zorman regarding Plaintiff and his position in a new restructure, and that each conversation lasted roughly ten minutes each.  *Id.* at 108:15-109:2.  Ms. Zorman did testify, however, that Mr. Lawlor's opinions regarding Plaintiff were important in her decision making.  *Id.* at 85:9-11. She also testified that neither Mr. Yaniv nor Mr. Lawlor ever asked questions about Plaintiff's ability regarding policy, strategy or performance.  *Id.* at 32:21-25.  But while Ms. Zorman considered Mr. Lawlor's opinion and found it important in her decision-making, the evidence still does not support a finding that Mr. Lawlor's purported involvement proximately caused the dismissal of Plaintiff.

As further evidence of pretext, Plaintiff points to Mr. Sabag's repeated use of the term "future" and Plaintiff's observation that the culture at Teva was youth-oriented, wherein the company looked to hire and promote younger individuals.  Defendants do not dispute that Mr. Sabag often used these types of phrases.  One such instance highlighted by Plaintiff was in the October 3, 2017 Update on Year-End Compensation that was sent to Teva's top managers.  *See* Pl. Ex. 48.  In this correspondence Mr. Sabag stated: "Together, we can take the organization forward and build an amazing future for our company." *Id.*  But as Defendants have noted, Mr. Sabag also used this language in correspondence with Plaintiff recognizing Plaintiff's $25,000

36

bonus.  Def. Ex. 15.  In that letter, Mr. Sabag used the phrases "Your work has helped both our organizations reach this stage, ready to move into the future…," and "Thank you again for helping to lead the way to our new future."  *Id.*

Plaintiff also cites to the age breakdown of the individuals who were dismissed in connection with the RIF as additional evidence of pretext.  The information disclosed by Teva pursuant to the Older Workers Benefits Protection Act regarding the age breakdown of persons terminated in connection with the reduction in force indicates that thirty-four (34) of the employees not retained were over the age of 40, twenty three (23) of these individuals were between the ages of 50 and 59, and two of these individuals were 60 years old.  Def. Ex. 3 (Ex.C).  Twenty-three of the individuals selected for termination were under 40 years old.  *Id.* There were 46 individuals retained: 15 of these individuals were over the age of 50, five were between the ages of 40 and 49, and the rest were under the age of 40.  *Id.*  None of the individuals retained were 60 years or older.  *Id.*

Plaintiff also points to the retention of Mr. Nasi despite having less experience than Plaintiff, and that the compensation gap between the two individuals was not so wide.  Plaintiff avers that Ms. Zorman did not have any personal knowledge regarding the professional standing of Mr. Nasi or Plaintiff, and yet retained Mr. Nasi even though his knowledge of American and/or Canadian law was limited.  With respect to compensation, the evidence presented showed a distinguishable difference in compensation between Plaintiff and Ms. Nasi.  At the time Ms. Zorman made her decision, Mr. Nasi was earning a base salary of $168,896 with an overall compensation package valued at approximately $325,000.  *See* Def. Ex. 43.  Plaintiff, meanwhile, was earning a base salary of $285,600 and his overall compensation package was valued at approximately $574,000.  *See* Def. Ex. 44.  But as Plaintiff notes, weeks after Plaintiff's dismissal, Mr. Nasi was elevated to a Grade 16 and his salary was raised to

$199,296.90.  Teva also had to had to pay relocation expenses for Mr. Nasi to move from his home in Miami.  Additionally, Mr. Nasi traveled between Miami and company headquarters in North Wales, PA approximately 10 to 12 times during the first six months in the new role.  These trips cost Teva approximately $700-$1000 each time.  While the differential may have shrunk once the relocation and travel expenses are considered, there was still a cognizable difference between the salary and compensation packages of Plaintiff and Mr. Nasi.  And an employer is not prohibited from considering salaries and compensation packages when making employment decisions, even though they often correspond with an employees' age.  *See Kelly v. Moser, Patterson And Sheridan, LLP*, 348 F. App'x 746, 750 (3d Cir. 2009) (citing *Broaddus v. Fla. Power Corp.*, 145 F.3d 1283, 1287 (11th Cir.1998) ("The ADEA does not prohibit an employer from making an employment decision on the basis of higher salaries, increased benefits, pension status, or claims for medical expenses even though these characteristics are often correlated with an employee's age." (citation omitted)).

With respect to Mr. Nasi's experience level, Ms. Zorman believed that Mr. Nasi could assume the new role as Head of Total Rewards for North America.  Despite his limited knowledge regarding Canadian and/or American law, prior to assuming the new role Mr. Nasi had served as Head of Total Rewards for Latin America and was a Director.  He had been discussed as a talent at a Human Resources leadership forum and had represented Total Rewards for the Americas at a program that Ms. Zorman had hosted in Israel.  So while Plaintiff certainly had more experience than Mr. Nasi, Mr. Nasi was respected and was viewed as a talent within the organization.  Plaintiff himself viewed Mr. Nasi as a talent based on his email to Mr. Nasi informing him that Ms. Zorman would be contacting him and that Ms. Zorman was likely calling Mr. Nasi because she wanted Mr. Nasi to lead Total Rewards for the Emerging Markets Region.

Upon consideration of the evidence, Plaintiff has not persuaded the Court by a preponderance of the evidence to disbelieve Defendants' "articulated legitimate reasons" for terminating Plaintiff, nor has Plaintiff demonstrated "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in [Defendants'] proffered reason[s] for its action that a reasonable factfinder could rationally find them unworthy of credence, and hence infer that the [Defendants] did not act for [the asserted] non-discriminatory reasons." *Fuentes*, 32 F.3d at 765 (citations and internal quotations omitted.)  Plaintiff has also failed to prove that his age was the but-for cause of his termination.  And because Plaintiff has failed to establish his claims under the ADEA and PHRA, it is unnecessary for the Court to make findings of fact and conclusions of law regarding damages.  *See Tarnoski v. United States*, No. 3:04-CV-0060, 2007 WL 1387302, at *5 (M.D. Pa. May 8, 2007).

## IV.   CONCLUSIONS OF LAW

1.      Teva is a covered employer under the ADEA and PHRA.  See 29 U.S.C. § 621, *et seq.*; 43 P.S. §§ 951 *et seq.*

2.      At the time of his termination, Plaintiff was 63 years old and is thus protected from unlawful age discrimination under the ADEA and PHRA.

3.      Plaintiff met his burden under the *McDonnell Douglas* framework and presented a prima facie case of age discrimination.

4.      Defendants met their burden of establishing legitimate nondiscriminatory reasons for Plaintiff's adverse employment decision.

5.      Plaintiff has not shown the legitimate nondiscriminatory reasons offered by Defendants were a pretext for discrimination.

6.      Plaintiff has also failed to prove that his age was the but-for cause of his termination.

7.      Plaintiff has thus failed to establish a claim for age discrimination under the

ADEA and PHRA.

8.      Accordingly, Judgment is entered in favor of Defendants and against Plaintiff.

BY THE COURT:


*/s/ John M. Gallagher*
JOHN M. GALLAGHER
United States District Court Judge